**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CDW CORPORATION, NEWEGG | ) | Civil Action No. 6:07-CV-00511-LED |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | JURY TRIAL DEMANDED |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS CDW CORPORATION'S, NEWEGG INC.'S,
AND ZAPPOS.COM, INC.'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES
AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT**

Pursuant to the Order Granting Agreed Motion For Extension Of Time For

Defendants To File Amended Answer, Affirmative Defenses And Counterclaims (Docket No.

135) in this action, Defendants CDW Corporation ("CDW"), Newegg Inc. ("Newegg"),

Zappos.com, Inc., a California corporation ("Zappos-CA"), and Zappos.com, Inc., a Delaware

corporation ("Zappos-DE"), by and through their undersigned counsel, hereby file their First

Amended Answer, Affirmative Defenses and Counterclaims to the Amended Complaint of

Plaintiff Soverain Software LLC ("Plaintiff" or "Soverain").  CDW, Newegg, Zappos-CA and

Zappos-DE are collectively referred to herein as the "Answering Defendants."  Where appropriate, Zappos-CA and Zappos-DE are collectively referred to herein as "Zappos."[1]

## ANSWER

1.      Answering Defendants admit that Soverain filed an Amended Complaint against the named defendants.  Except as so expressly admitted, Answering Defendants deny the remaining allegations set forth in Paragraph 1 of the Amended Complaint.

## INTRODUCTION

2.      The Answering Defendants admit that the Amended Complaint alleges claims of infringement of one or more of Soverain's United States Patents and that, as such, the action arises under 35 U.S.C. § 271.  The Answering Defendants deny the remaining allegations set forth in Paragraph 2 of the Amended Complaint.

## THE PARTIES

3.      Upon information and belief, the Answering Defendants admit the allegations set forth in Paragraph 3 of the Amended Complaint.

4.      CDW admits that it is an Illinois corporation with a principal place of business at 200 N. Milwaukee Ave., Vernon Hills, IL  60061 and admits that it does business through a website located at www.cdw.com.  Except as so expressly admitted, CDW denies the remaining allegations set forth in Paragraph 4 of the Amended Complaint.  Newegg and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Amended Complaint and, therefore, deny the same.

---

[1] Soverain has indicated that it intended to sue Zappos-CA. Zappos-CA and Zappos-DE are addressing this disparity with Soverain, and anticipate shortly filing a joint motion with Soverain requesting dismissal of Soverain's Amended Complaint with respect to Zappos-DE.

5.      Newegg admits that it is a Delaware corporation with a principal place of business at 16839 E. Gale Ave., City of Industry, CA  91745 and admits that it does business through a website located at www.newegg.com.  Except as so expressly admitted, Newegg denies the remaining allegations set forth in Paragraph 5 of the Amended Complaint.  CDW and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Amended Complaint and, therefore, deny the same.

6.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 and, therefore, deny the same.

7.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 7 of the Amended Complaint and, therefore, deny the same.

8.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Amended Complaint and, therefore, deny the same.

9.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 9 of the Amended Complaint and, therefore, deny the same.

10.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Amended Complaint and, therefore, deny the same.

11.      The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 11 of the Amended Complaint and, therefore, deny the same.

12.     Zappos-DE admits that it is a Delaware Corporation.  Zappos-CA denies that it is a Delaware corporation.  Zappos-DE admits that it has a principal place of business at 2280 Corporate Circle Dr., Suite 100, Henderson, NV  89074.  Zappos-CA admits that it has a principal place of business at 2280 Corporate Circle Dr., Suite 100, Henderson, NV  89074 and that it does business through a website located at www.zappos.com.  Except as so expressly admitted, Zappos denies the remaining allegations set forth in Paragraph 12 of the Amended Complaint.  CDW and Newegg lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 of the Amended Complaint and, therefore, deny the same.

## JURISDICTION AND VENUE

13.     The Answering Defendants admit that Plaintiff purports to bring an action arising under the patent laws of the United States and that this Court has subject matter jurisdiction over such actions.  Answering Defendants deny the remaining allegations set forth in Paragraph 13 of the Amended Complaint.

14.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 to the extent that they relate to other defendants.  CDW, Newegg and Zappos-CA admit the remaining allegations set forth in Paragraph 14 of the Amended Complaint.  Zappos-DE denies the remaining allegations set forth in Paragraph 14 of the Amended Complaint.

15.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15 to the extent that they relate to other defendants.  CDW, Newegg and Zappos-CA admit that this Court has personal jurisdiction over them.  Zappos-DE denies that this Court has personal jurisdiction over it.  The Answering

Defendants deny that they have committed infringing acts in Texas or any where else, as well as all remaining allegations set forth in Paragraph 15.

16.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16 to the extent they relate to other defendants.  The Answering Defendants admit that they are nonresidents of, do not maintain regular places of business in, and do not have designated agents for service of process in the State of Texas.  CDW further admits that it does business in the State of Texas, but denies that this action arises out of such activity.  Newegg further admits that it does business through certain websites that are accessible by residents of Texas, but denies that this action arises out of such activity.  Zappos-CA admits that it does business through certain websites that are accessible by residents of Texas, but denies that this action arises out of such activity.  Zappos-DE denies that it does business in the state of Texas.  Except as so expressly admitted, Answering Defendants deny the remaining allegations set forth in Paragraph 16 of the Amended Complaint.

17.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Amended Complaint and, therefore, deny the same.

18.     The Answering Defendants admit that United States Patent No. 5,715,314 ("the '314 patent") entitled "Network Sales System" issued on February 3, 1998, and that an alleged copy of the '314 patent was attached as Exhibit "A" to the Amended Complaint.  The Answering Defendants deny that the '314 patent was duly and properly issued.  The Answering Defendants admit that an Ex Parte Reexamination Certificate issued on October 9, 2007 and that an alleged copy of that certificate was attached as Exhibit "B" to the Amended Complaint.  As to the

remaining allegations set forth in Paragraph 18, Answering Defendants lack knowledge and information sufficient to form a belief as to the truth of those allegations and, therefore, deny the same.

19.     The Answering Defendants admit that United States Patent No. 5,909,492 ("the '492 patent") entitled "Network Sales Systems" issued on June 1, 1999, and that an alleged copy of the '492 patent was attached as Exhibit "C" to the Amended Complaint.  Answering Defendants deny that the '492 patent was duly and properly issued.  The Answering Defendants admit that an Ex Parte Reexamination Certificate issued on August 7, 2007 and that an alleged copy of that certificate was attached as Exhibit "D" to the Amended Complaint.  As to the remaining allegations set forth in Paragraph 19, Answering Defendants lack knowledge and information sufficient to form a belief as to the truth of those allegations and, therefore, deny the same.

20.     The Answering Defendants admit that United States Patent No. 7,272,639 ("the '639 patent") entitled "Internet Server Access Control and Monitoring Systems" issued on September 18, 2007, and that an alleged copy of the '639 patent was attached as Exhibit "E" to the Amended Complaint.  The Answering Defendants deny that the '639 patent was duly and properly issued.  The Answering Defendants admit that Plaintiff Soverain is stated to be the assignee on the face of Exhibit E.  As to the remaining allegations set forth in Paragraph 20, Answering Defendants lack knowledge and information sufficient to form a belief as to the truth of those allegations and, therefore, deny the same.

21.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Amended Complaint and, therefore, deny the same.

6

## ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY CDW

22.     CDW denies the allegations set forth in Paragraph 22 of the Amended Complaint. Newegg and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Amended Complaint and, therefore, deny the same.

23.     CDW denies the allegations set forth in Paragraph 23 of the Amended Complaint. Newegg and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Amended Complaint and, therefore, deny the same.

24.     CDW denies the allegations set forth in Paragraph 24 of the Amended Complaint. Newegg and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Amended Complaint and, therefore, deny the same.

25.     CDW denies the allegations set forth in Paragraph 25 of the Amended Complaint. Newegg and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Amended Complaint and, therefore, deny the same.

## ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY NEWEGG

26.     Newegg denies the allegations set forth in Paragraph 26 of the Amended Complaint.  CDW and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the Amended Complaint and, therefore, deny the same.

27.     Newegg denies the allegations set forth in Paragraph 27 of the Amended Complaint.  CDW and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27 of the Amended Complaint and, therefore, deny the same.

28.     Newegg denies the allegations set forth in Paragraph 28 of the Amended Complaint.  CDW and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28 of the Amended Complaint and, therefore, deny the same.

29.     Newegg denies the allegations set forth in Paragraph 29 of the Amended Complaint.  CDW and Zappos lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29 of the Amended Complaint and, therefore, deny the same.

### ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY REDCATS, INC., REDCATS L.P. AND THE SPORTSMAN'S GUIDE

30.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 30 of the Amended Complaint and, therefore, deny the same.

31.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 31 of the Amended Complaint and, therefore, deny the same.

32.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 32 of the Amended Complaint and, therefore, deny the same.

33.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33 of the Amended Complaint and, therefore, deny the same.

34.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 34 of the Amended Complaint and, therefore, deny the same.

<u>ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY SYSTEMAX</u>

35.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Amended Complaint and, therefore, deny the same.

36.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 36 of the Amended Complaint and, therefore, deny the same.

37.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 37 of the Amended Complaint and, therefore, deny the same.

38.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 38 of the Amended Complaint and, therefore, deny the same.

<u>ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY TIGERDIRECT</u>

39.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 39 of the Amended Complaint and, therefore, deny the same.

40.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 40 of the Amended Complaint and, therefore, deny the same.

41.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 41 of the Amended Complaint and, therefore, deny the same.

42.     The Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42 of the Amended Complaint and, therefore, deny the same.

## ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT BY ZAPPOS

43.     Zappos denies the allegations set forth in Paragraph 43 of the Amended Complaint.  CDW and Newegg lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 43 of the Amended Complaint and, therefore, deny the same.

44.     Zappos denies the allegations set forth in Paragraph 44 of the Amended Complaint.  CDW and Newegg lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 44 of the Amended Complaint and, therefore, deny the same.

45.     Zappos denies the allegations set forth in Paragraph 45 of the Amended Complaint.  CDW and Newegg lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 45 of the Amended Complaint and, therefore, deny the same.

46.     Zappos denies the allegations set forth in Paragraph 46 of the Amended Complaint.  CDW and Newegg lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 46 of the Amended Complaint and, therefore, deny the same.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

The Amended Complaint, and each and every purported claim for relief therein, fails to allege facts sufficient to state a claim against the Answering Defendants.

### SECOND AFFIRMATIVE DEFENSE
### (Noninfringement)

The Answering Defendants have not infringed and are not infringing any of U.S. Patent Nos. 5,715,314; 5,715,314 C1; 5,909,492; 5,909,492 C1; 7,272,639 (the "patents-in-suit") under any theory, including direct infringement, infringement by inducement, or contributory infringement.

### THIRD AFFIRMATIVE DEFENSE
### (Invalidity)

The patents-in-suit and all of the claims thereof are invalid for failure to comply with one or more of the requirements for patentability, including those set forth in the Patent Act, 35 U.S.C. §§ 1 *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, and/or 305.

### FOURTH AFFIRMATIVE DEFENSE
### (Estoppel)

Plaintiff is estopped from claiming that the patents-in-suit cover any method, system, apparatus, or product of the Answering Defendants by virtue of the prior art and/or the prosecution history of the patents-in-suit.

## FIFTH AFFIRMATIVE DEFENSE
### (Limitation on Damages)

To the extent that Plaintiff seeks damages for any alleged infringement more than six years before the filing of this action, the claims are barred by the statutory limitation on damages pursuant to 35 U.S.C. § 286.

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver, Laches, and Acquiescence)

Plaintiff's claims for damages and other relief are barred in whole or in part by the equitable doctrines of waiver, laches, and/or acquiescence, including but not limited due to Plaintiff's unreasonable delay in asserting the patents-in-suit.

## SEVENTH AFFIRMATIVE DEFENSE
### (Failure to Provide Notice)

To the extent that Plaintiff seeks damages for any alleged infringement prior to its giving actual notice of the patents-in-suit to the Answering Defendants, its claims are barred pursuant to 35 U.S.C. § 287(a).

## EIGHTH AFFIRMATIVE DEFENSE
### (Intervening Rights)

Plaintiff's claims for damages and other relief are barred in whole or in part pursuant to 35 U.S.C. §§ 252 and 307(b).

## NINTH AFFIRMATIVE DEFENSE
### (Unenforceability)

The patents-in-suit are unenforceable due to inequitable conduct because, during the prosecution of the applications leading to the '314, '492, and '639 patents and the parent application to the '639 patent, one or more of the named inventors failed to disclose to the United States Patent and Trademark Office ("USPTO"), with an intent to deceive, information known to

12

them that was material to the patentability of the claimed invention. Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 309 of the Counterclaim set out below.

## ANSWERING DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, the Answering Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff Soverain Software LLC as follows:

A.      Soverain take nothing by the Amended Complaint and the same be dismissed with prejudice;

B.      Judgment be entered that Answering Defendants do not infringe and have not infringed any claim of the patents-in-suit under any theory;

C.      Judgment be entered that each asserted claim of the patents-in-suit is invalid and/or unenforceable;

D.      No injunctive relief issues to Soverain;

E.      No damages be awarded to Soverain;

F.      No costs, expenses, or attorneys' fees be awarded to Soverain;

G.      No other relief be awarded to Soverain;

H.      This case be declared exceptional pursuant to 35 U.S.C. § 285 and attorneys' fees be awarded to Answering Defendants;

I.      Costs and expenses be awarded to Answering Defendants as may be deemed just and appropriate; and

J.      Such other and further relief as the Court deems just and proper.

**COUNTERCLAIMS OF**
**CDW CORPORATION, NEWEGG INC., ZAPPOS.COM, INC.**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, CDW Corporation ("CDW"), Newegg Inc. ("Newegg"), Zappos.com, Inc., a California corporation, ("Zappos-CA") and Zappos.com, Inc. ("Zappos-DE"), a Delaware corporation, (Zappos-CA and Zappos-DE are collectively referred to herein as "Zappos" and CDW, Newegg, and Zappos are collectively referred to herein as "Counterclaim Plaintiffs") assert the following counterclaim against Soverain Software LLC ("Soverain") and allege as follows:

1.      This is a complaint for a declaratory judgment of patent invalidity, unenforceability, and non-infringement.  This action arises under the provisions of the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

2.      CDW is a corporation organized under the laws of the State of Illinois with a principal place of business located at 200 N. Milwaukee Ave., Vernon Hills, IL  60061.

3.      Newegg is a corporation organized under the laws of the State of Delaware with a principal place of business located at 16839 E. Gale Ave., City of Industry, CA  91745.

4.      Zappos-DE is a corporation organized under the laws of the State of Delaware with a principal place of business located at 2280 Corporate Circle Dr., Suite 100, Henderson, NV  89074.  Zappos-CA is a corporation organized under the laws of the State of California with a principal place of business located at 2280 Corporate Circle Dr., Suite 100, Henderson, NV 89074.

5.      Upon information and belief, Soverain is a limited liability company organized under the laws of the State of Delaware, having a principal place of business at 233 South Wacker Drive, Suite 3970, Chicago, IL 60606.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 28 U.S.C. §§ 2201 and 2202, in that it arises under an Act of Congress relating to patents and in that there is an actual and justiciable case or controversy between the Counterclaim Plaintiffs and Soverain as to the non-infringement and/or invalidity of the patents-in-suit.

7.      This Court has personal jurisdiction over Soverain by virtue of the fact that Soverain has submitted to the jurisdiction of this Court by bringing the instant action.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 28 U.S.C. § 1400(b).

9.      As a result of the actions and statements of Soverain, an actual controversy now exists between the parties regarding the non-infringement, invalidity, and unenforceablility of the patents-in-suit.

10.      The Counterclaim Plaintiffs have not and do not infringe directly, by inducement or by contribution, any valid and/or enforceable claim of the patents-in-suit.

**COUNT ONE**
**(Declaratory Judgment of Non-infringement)**

11.      Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 10 of the Counterclaim set out above.

12. There is an actual and justiciable controversy between the parties arising under the Patent Act, 35 U.S.C. § 1, *et seq.* concerning Counterclaim Plaintiffs' non-infringement of the claims of the patents-in-suit.

13. Counterclaim Plaintiffs have not and do not infringe directly, by inducement or by contribution, any valid and/or enforceable claim of the patents-in-suit.

14. Counterclaim Plaintiffs are entitled to a declaration by the Court that they have not and do not infringe any valid and/or enforceable claims of the patents-in-suit.

## COUNT TWO
### (Declaratory Judgment of Invalidity)

15. Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 14 of the Counterclaim set out above.

16. There is an actual and justiciable controversy between the parties concerning the validity of the patents-in-suit.

17. The patents-in-suit and all of the claims thereof are invalid for failure to comply with one or more of the requirements for patentability, including those set forth in the Patent Act, 35 U.S.C. §§ 1 *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, 132, and/or 305.

18. Counterclaim Plaintiffs are entitled to a declaration by the Court that the patents-in-suit are invalid.

## COUNT THREE
### (Declaratory Judgment of Unenforceability)

19. Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 18 of the Counterclaim set out above.

20.     There is an actual and justiciable controversy between the parties concerning the enforceability of the patents-in-suit.

21.     During the prosecution of the applications for the '314, '492 and '639 patents and the parent application to the '639 patent, one or more of the inventors failed to disclose to the USPTO, with an intent to deceive, information known to them that was material to the patentability of the claimed invention.

**a. Failure to Disclose New Matter Introduced in the Specification of the '639 patent**

22.     On January 12, 1998, attorney James M. Smith, on behalf of  Payne, Thomas Mark Levergood, Lawrence C. Stewart, Stephen Jeffrey Morris, and George Winfield Treese (collectively "the applicants") filed U.S. Patent Application No. 09/005,479 ("the '479 application"), claiming priority to U.S. Patent Application No. 08/474,096 ("the '096 application"), which had been earlier filed on June 7, 1995.

23.     The '479 application ultimately issued as the '639 patent on September 18, 2007.

24.     In the text of the '479 application, the applicants represented to the USPTO that the '479 application was a "continuation" of the '096 application.

25.     Despite that representation, the applicants modified the specification of the as-filed '479 application vis-à-vis the '096 application by introducing new matter into the disclosure of the specification. For instance, the "Abstract" was modified as follows (additions underlined; deletions in strikethrough):

> This invention relates to methods for controlling and monitoring access to network servers. In particular, the process described in the invention includes client-server sessions over the Internet ~~involving hypertext files~~. In ~~the hypertext~~ <u>this</u> environment, <u>when the user attempts to access</u> ~~a client views a document transmitted by a content server with a standard program known as the browser. Each hypertext document or page contains links~~ to other hypertext pages which ~~the user may select to traverse. When the user selects a link that is directed to~~ an

17

access-controlled file, the server subjects the request to a secondary server which determines whether the client has an authorization or valid account. Upon such verification, the user is provided with a session identification which allows the user to access to the requested file as well as any other files within the present protection domain.

26.     The "Summary of the Invention" was modified as follows (additions underlined;

deletions in strikethrough):

In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and is was generally not suitable for the standard early browser format formats common to the Web. However, it may now be implemented in cookie compatible browsers.

27.     The "Detailed Description of the Invention" was modifed as follows (additions

underlined; deletions in strikethrough):

This invention has particular application to network sales systems such as presented in U.S. patent application Ser. No. 08/328,133, filed Oct. 24, 1994, by Payne et al. which is incorporated herein by reference.

28.     In the prosecution of the '479 application, the applicants sought and ultimately

obtained issuance of claims for which the foregoing modifications and introduction of new

matter were material to patentability.

29.     Upon information and belief, upon filing the '479 application, Mr. Smith and one

or more of the applicants were aware of yet, with an intent to deceive, chose not to disclose to

the USPTO the addition of this new matter and its potential effect on the effective filing date of

claims pursued in connection with the '479 application, and to affirmatively misrepresent that the

'479 application was a "continuation" of the '096 application and that undisclosed amendments

to the specification entitled the issued claims an effective filing date of June 7, 1995.

30.     The new matter and its potential effect on the effective filing date of claims

pursued in connection with the '479 application was material to the patentability of those claims

because the effective filing date of those claims may have impacted the USPTO's determination of whether those claims were unpatentable under 35 U.S.C. §§ 102, 103, 112, *et seq*., and, upon information and belief, Mr. Smith and/or one or more of the applicants knew the same.

31.     Upon information and belief, Mr. Smith and/or one or more of the applicants committed inequitable conduct by violating the duty of candor, good faith, and disclosure through the foregoing failure to disclose and affirmative misrepresentation, and the claims of the '639 patent are consequently unenforceable.

**b. Failure to Disclose Information Material to Best Mode and Enablement – '639 patent**

32.     Counterclaim Plaintiffs repeat and reallege Paragraphs 25 through 34 of the Counterclaim set out above.

33.     On information and belief, in the '096 application that led to the issuance of the '780 patent, each of the inventors named on the '780 patent (namely, Levergood, Stewart, Morris, Payne, and Treese), with an intent to deceive, intentionally withheld information material to the best mode and enablement requirements of 35 U.S.C. § 112, ¶1, including withholding the actual contemplated best mode, with respect to the "embodiment" of their purported invention wherein a "session identifier" is "stored" by a client.

34.     This intentional withholding of information is evidenced by the following language in the '780 patent (column 4, lines 25-31):

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser format common to the Web.

35.     This intentional withholding is further evidence by the following modification to that language in the '639 patent (column 4, lines 23-30), which was filed as a "continuation" of the '096 application that led to the issuance of the '780 patent:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and was generally not suitable for early browser formats common to the Web. However, it may now be implemented in cookie compatible browsers.

36.     Upon information and belief, Levergood, Stewart, Morris, Payne, and Treese were aware of yet, with an intent to deceive the USPTO in the '780 patent and in the '639 patent, chose not to disclose information regarding storage of a "session identifier," or the required "special browser" that was material to the best mode and enablement requirements of 35 U.S.C. § 112, ¶1, including withholding the actual contemplated best mode.

37.     Because 35 U.S.C. § 112, ¶ 1 requires specifications to include disclosure of a contemplated best mode, and the manner and process of making and using claimed subject matter in full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains to make and use the same, this information was material to the patentability under of subject matter claimed in the '780 and '639 patents, and, upon information and belief, Levergood, Stewart, Morris, Payne, and Treese knew the same.

38.     Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of

the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

39.     Upon information and belief, Levergood, Stewart, Morris, Payne, and Treese committed inequitable conduct by violating the duty of candor, good faith, and disclosure through the foregoing failure to disclose, and the claims of the '780 and '639 patents are consequently unenforceable.

### c. Failure to Disclose Material Information from *Soverain v. Amazon.com, Inc. et al.* – '314, '492 & '639 patents

40.     On November 3, 2004, a third party requested the USPTO to conduct an *ex parte* reexamination of the '314 and '492 patents, and the USPTO granted those requests on January 26, 2005. The USPTO issued reexamination certificates for the '492 patent on August 7, 2007, and for the '314 patent on October 9, 2007, respectively.

41.     The application that was filed with the USPTO that led to the issuance of the '639 patent was filed on January 12, 1998, and was pending before the PTO until it issued on September 18, 2007.

42.     In connection with *Soverain Software LLC v. Amazon.com, Inc.*, Case No. 6:04-CV-14 (E.D. Tex.) (Davis, J.), attorney David  B. Cochran came into the possession of and obtained knowledge of certain information that was material to the patentability of claims in the '314 and '492 patents that were being reexamined and claims being prosecuted in the application that led to the issuance of the '639 patent.

43.     Mr. Cochran did not disclose that information to the USPTO in the reexamination of the '314 and '492 patents or in the prosecution of the application that led to the issuance of the '639 patent.

44.     For example, on June 1, 2005, Amazon.com, Inc. ("Amazon") served Soverain with its Final Invalidity Contentions concerning claims of the '314 and '492 patents and the parent of the '639 patent.

45.     Amazon's Final Invalidity Contentions disclosed its positions concerning the alleged invalidity of claims of the '314 and '492 patents and the parent of the '639 patent under 35 U.S.C. § 112, disclosed evidence that Amazon contended rendered claims of those patents invalid as anticipated or obvious under 35 U.S.C. §§ 102 & 103, and disclosed its positions including a chart summarizing how that evidence allegedly disclosed or rendered obvious specific elements of claims in those patents.

46.     By deliberately choosing not to provide Amazon's Final Invalidity Contentions to the USPTO, Mr. Cochran effectively denied the Examiner information material to patentability in disclosures to the USPTO.

47.     Additionally, expert witnesses were retained by the parties in *Soverain Software LLC v. Amazon.com, Inc.*, and, on information and belief, those experts authored reports concerning issues such as the invalidity under 35 U.S.C. §§ 102 & 103 of the claims of the '314, '492 and '780 patents. For example, and on information and belief, Alexander Trevor authored a report on Compuserve Travelshopper in 1991-93, Michael Shamos and Richard Taylor authored reports on whether the claims of the '314, '492 and '780 patents are invalid, Justin Erenkrantz and Peter Martin authored reports on the operation of certain prior art websites, and Larry Nixon and James Gambrel authored reports on whether inequitable conduct was committed in the prosecution of the '314, '492 and '780 patents.

48.     By deliberately choosing not to provide these expert reports to the USPTO, Mr. Cochran effectively denied the Examiner information material to patentability in disclosures to the USPTO.

49.     Upon information and belief, Mr. Cochran was aware of yet, with an intent to deceive, chose not to disclose the foregoing information to the USPTO (with the exception of the citation of the Trevor report in the reexamination of the '314 and '492 patents).

50.     This information was material to the patentability of the subject matter claimed in the '314, '492 and '639 patents, and, upon information and belief, Mr. Cochran knew the same.

51.     Upon information and belief, Mr. Cochran, committed inequitable conduct by violating the duty of candor, good faith, and disclosure through the foregoing failure to disclose, and the claims of the '314, '492 and '639 patents are consequently unenforceable.

### d. Failure to Disclose Kerberos - '639 patent

52.     The Kerberos authentication system employed a method of servicing requests by a client using a session identifier as early as 1988. A server processed a service request by validating a server-supplied identifier presented by the client as part of the service request, the Kerberos ticket, that the client obtained in response to an initial service request.

53.     Once the ticket issued, the client could use it in subsequent distinct service requests.

54.     For the foregoing reasons, Kerberos was material to the patentability of claims in the '780 patent, including those obtained during the reexamination of the '780 patent, and was further material to the patentability of the claims of the '639 patent, all of which recite "methods" of "processing" "service requests" involving a "session identifier."

55.     At least Win Treese had knowledge of Kerberos and the foregoing aspects of Kerberos and its materiality to the claims of the '780 and '639 patents, due at least in part to his service as Chief Systems Engineer at the Massachusetts Institute of Technology's Project Athena, the organization that developed the Kerberos system, and he had that knowledge no later than the dates on which the applications that led to the issuance of the '314 patent and the '639 patent were filed.

56.     Evidence of Treese's knowledge is found in, among other things, a Kerberos "MAN" (*i.e.*, manual) page bearing a "1985, 1986" copyright notice of the Massachusetts Institute of Technology in which details of the Kerberos system were discussed, Treese's email address treese.root@athena.mit.edu was referred to as one of a few "examples of valid Kerberos names," and Treese was named as one of the "people [who] helped on various aspects of the [Kerberos] system" and who specifically "contributed code and/or useful ideas."

57.     Further evidence of Treese's knowledge of Kerberos and its materiality to the claims of the '780 and '639 patents is Steiner *et al.*, "*Kerberos: An Authentication Service for Open Network Systems*," Proceedings of the Winter 1988 Usenix Conference (February 1988), which further discussed details of the Kerberos System, noted in the "Acknowledgements" of the paper that Treese was one of "numerous other people have been involved with the project" and that "[w]e are grateful to . . . Win Treese whose suggestions much improved earlier drafts of this paper."

58.     Upon information and belief, at least Treese, with an intent to deceive, chose not to disclose details of the Kerberos system to the USPTO in the prosecution of the '780 and '639 patents.

24

59.     Inequitable conduct committed in the prosecution of the '780 patent was not cured during the reexamination of the '780 patent.

60.     Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and Kerberos would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

61.     Upon information and belief, at least Treese committed inequitable conduct by violating the duty of candor, good faith, and disclosure through the foregoing failure to disclose, and the claims of the '780 and '639 patents are consequently unenforceable.

**e. Failure to Disclose Material Information from Another Application - '314 & '492 patents**

62.     On October 24, 1995, Open Market filed International Patent Application No. PCT/US95/13723 ("PCT application"), claiming priority to U.S. Patent Application No. 08/328,133 ("the '133 application"), which led to the issuance of the '314 patent.

63.     As part of its PCT application, Open Market filed the same sixty (60) claims that Payne, Stewart and Mackie filed in the '133 application that led to the issuance of the '314 patent.

64.     On December 5, 1996, Examiner Gail O. Hayes of the USPTO, which served as the Internal Preliminary Examining Authority in connection with Open Market's PCT application, issued an International Preliminary Examination Report for claims 1-60.

65.     In the December 5, 1996 International Preliminary Examination Report, Examiner Hayes indicated that each of claims 1-60 was unpatentable for lack of inventive step.

66.     For example, Examiner Hayes indicated that claims 54-58 were unpatentable for lack of inventive step over Shavit *et al*. U.S. Patent No. 4,799,156 ("Shavit *et al*.") in view of Rescorla *et al*., "The Secure Hypertext Transfer Protocol" (Enterprise Integration Technologies, June 1994), and specifically explained:

> Claims 1-5, 7, 9-33 , 40-48 and 54-58 lack an inventive step under PCT Article 33(3) as being unpatentable over Shavit in view of Rescorla (June 1994).

<p style="text-align:center">* * *</p>

> As to claims 54-58, use of hypertext links were-known in the art and in frequent use on the internet (see discussion of claim 2, above) at the time of the invention, as evidenced by the Rescorla article. Thus it would have been obvious to use them in an on-line transaction system such as disclosed in Shavit. Recording of transactions in a database and transmission of statements to clients is disclosed in Shavit at col. 9, lines 31-42 and col. 11, lines 22-24. Customer service forms are old and well-known and it would have been obvious to one skilled in the art that such forms could be requested and transmitted by hypertext links. One further would have been motivated to use hypertext links because of their known efficiency in requesting and transmitting documents and accessing information.

67.     Examiner Hayes further indicated that claims 34-39 were unpatentable for lack of inventive step over Shavit *et al*. in view of Yourick U.S. Patent No. 4,775,935 ("Yourick), and specifically explained:

> Claims 34-39 and 49-53 lack an inventive step under PCT Article 33(3) as being unpatentable over Shavit in view of Yourick (4,775,935).

> As to claim 34, Shavit discloses 2 network-based sales system, having a buyer computer which receives purchase requests from a user, and a seller computer interconnected by a computer network as discussed above in the discussion of claim 1. Transmission of payment messages initiating payment transactions is disclosed at col. 8 line 23 to col. 9, line 42. A seller database is disclosed at col. 7, lines 35-43.

> Shavit differs from Applicant's invention in that it does not disclose that the seller computer is a "shopping cart computer" with the seller database including a shopping cart and that a plurality of products may be selected and placed into the shopping cart database before the payment message is created. Shavit does disclose that a "variety of services" may be available from the seller

(col. 12, lines 50-53) and that transactions may be accumulated and periodically transmitted in "batch mode" at col. 8, lines 15-22. Shavit also discloses presentation of "promotional materials" (e.g. advertisements) to the buyer at col. 12, lines 45-47.

Yourick discloses a system for presentation of promotional materials to potential buyers which allows the buyer to accumulate a plurality of products into a "shopping cart" database. Cols. 13-16 and figure 5b, item 85. It would have been obvious to one skilled in the art to modify the invention of Shavit by allowing buyers to accumulate a number of products in a shopping cart and require only one payment message and transaction for the group of products in order to avoid the expense associated with unnecessary multiple payment transactions. Note that this is akin to the old and well-known practice of listing several items on a single order form in a mail order catalog, rather than mailing in a separate order form and check for each purchased item.

As to claim 35, it would have been obvious to one skilled in the art to have the payment message created by the seller computer because this is where the information necessary (e.g. price, availability, applicable fees) to create the payment message resides. Also, it would be necessary to create the payment message before it could be activated.

As to claims 36-38, Yourick discloses requests for and display of the contents of the shopping cart at col. 14, lines 33-38. It would have been obvious to one skilled in the art to receive a request by the buyer computer and for the buyer computer to transmit the request to the seller computer in order to execute such request.

Claim 39 is a method claim to the apparatus of claims 34-38 and lacks an inventive step for the same reasons.

68.     At the time of Examiner Hayes's issuance of the December 5, 1996 International Preliminary Examination Report, precisely the same claims 1-60, including claims 34-39 and 54-58, were co-pending before the USPTO in connection with the '133 application that led to the issuance of the '314 patent.

69.     For the foregoing reasons, this information was material to the patentability of claims sought by Payne, Stewart and Mackie in connection with the co-pending '133 application that led to the issuance of the '314 patent.

70.     Claims substantially similar to those originally-filed, including claims 34-39, ultimately issued in the '314 patent on February 3, 1998, but at no point during the prosecution of the co-pending '133 application, or during the reexamination of the '314 patent, did Payne, Stewart, Mackie, David Gifford, William Dally, attorney James M. Mrose or anyone else disclose to the examiners responsible for examining the '133 application the December 5, 1996 International Preliminary Examination Report or Examiner Hayes's corresponding indication or reasoning that substantially similar claims in the PCT application were unpatentable for lack of inventive step, including over Shavit *et al*. in view of Yourick.

71.     On June 18, 1997, attorney Mrose, acting on behalf of Payne, Stewart and Mackie, filed U.S. Patent Application No. 08/878,396 ("the '396 application"), which led to the issuance of the '492 patent.

72.      During the prosecution of the '396 application that led to the issuance of the '492 patent, attorney Mrose, acting on behalf of Payne, Stewart and Mackie, presented to the USPTO application claims 15-16. These claims were substantially similar to PCT application claims 54-58 that, in the December 5, 1996 International Preliminary Examination Report, Examiner Hayes indicated were unpatentable for lack of inventive step over Shavit *et al*. in view of Rescorla *et al*.

73.     Those claims ultimately issued as claims 15-16 of the '492 patent.

74.     Also during the prosecution of the '396 application, attorney Mrose, acting on behalf of Payne, Stewart and Mackie, presented to the USPTO application claims 17-18 and 35-36, which were substantially similar to PCT application claims 34-39 that, in the December 5, 1996 International Preliminary Examination Report, Examiner Hayes indicated were unpatentable for lack of inventive step over Shavit *et al*. in view of Yourick.

75.     Those claims, the so-called "shopping cart" claims, ultimately issued as claims 17-18 and 35-36 of the '492 patent.

76.     At no point during the prosecution of the '396 application, or during the reexamination of the '492 patent, did Payne, Stewart, Mackie, Gifford, Dally, attorney Mrose or anyone else disclose to the examiners responsible for examining the '396 application of the December 5, 1996 International Preliminary Examination Report or Examiner Hayes's corresponding indication or reasoning that substantially similar claims were unpatentable for lack of inventive step, including over Shavit *et al.* in view of Yourick, or over Shavit *et al.* in view of Rescorla *et al.*

77.     For the foregoing reasons, this information was material to the patentability of claims sought by Payne, Stewart and Mackie in connection with the co-pending application that led to the issuance of the '492 patent.

78.     On information and belief, during the prosecution of the applications that led to the issuance of the '314 and '492 patents, at least Payne, Stewart, Mackie, Gifford, Dally, and attorney Mrose knew of the PCT application December 5, 1996 International Preliminary Examination Report and Examiner Hayes's corresponding indication or reasoning that substantially similar claims were unpatentable for lack of inventive step over Shavit *et al.* in view of Yourick, and over Shavit *et al.* in view of Rescorla *et al.*, and knew this information was material to the patentability of claims sought by Payne, Stewart and Mackie in connection with those applications.

79.     On information and belief, at least Payne, Stewart, Mackie, Gifford, Dally and attorney Mrose, with an intent to deceive, chose not to disclose this information to the USPTO during the prosecution of the applications that led to the issuance of the '314 and '492 patents.

80.     Upon information and belief, at least Payne, Stewart, Mackie, Gifford, Dally and attorney Mrose committed inequitable conduct by violating the duty of candor, good faith, and disclosure through the foregoing failure to disclose, and the claims of the '314 and '492 patents are consequently unenforceable.

### f. Failure to Disclose the NetMarket System – '314, '492, '639 patents

81.     The following allegations of inequitable conduct (paragraphs 81 through 287) are made on information and belief (Soverain has not yet produced many of the written communications referred to below) and are based on the allegations of inequitable conduct made by Amazon in the Corrected Fourth Amended Answer, Affirmative Defenses and Counterclaims to Soverain Software, LLC's Complaint (D.I. 272), which, following extensive briefing by the parties, Judge Davis granted Amazon leave to file (D.I. 270) in *Soverain Software LLC v. Amazon.com, Inc.*, Case No. 6:04-CV-14 (E.D. Tex.) (Davis, J.).

82.     The inventors named on one or more patent-in-suit are Payne, Stewart, Morris, Levergood, and Treese.  David J. Mackie ("Mackie") was also named as an inventor during the prosecution of the  '314 and '492 patents.

83.     On information and belief, the '639 patent and its parent, U.S. Patent No. 5,708,780, and the '314 and '492 patents are unenforceable due to patent misuse and inequitable conduct by each of these individuals, alone or in cooperation with one another, as set forth below.

84.     On information and belief, Open Market and/or the named inventors obtained the patents-in-suit by deliberately and fraudulently withholding relevant, material prior art from the USPTO during its prosecution of those patents.  Open Market and/or the named inventors engaged in a pattern of fraudulent conduct in this regard, by systematically withholding

information regarding companies and technology that Open Market and/or the named inventors considered to be their closest competition.

85.    On information and belief, Open Market's own documents show that Open Market and/or one or more of its named inventors were aware of competitors' public activities and publications before the named inventors filed even the first of the applications for the patents-in-suit, but failed to disclose those competitors, activities, or software to the USPTO.

86.    Patent applicants are required to prosecute patent applications with candor, good faith, and honesty.  This was also true at all times during the prosecution of the patents in this case.

87.    On information and belief, the breach of this duty by Open Market and/or one or more of the named inventors was coupled with an intent to deceive or mislead the USPTO, which constitutes inequitable conduct for each of the patents-in-suit.  In particular, Open Market and/or one or more of the named inventors failed to disclose the following references, rendering the '780, '639, '314, and '492 patents unenforceable:

- The NetMarket System
- The Trewitt Paper and the Future Fantasy Bookstore Website
- The HotHotHot Website
- Internet ShopKeeper
- The Condom Country Website
- The Shen System
- The Internet Shopping Network Website
- The First Virtual System
- Glenn Crocker's Web2Mush Software
- The WWW-Talk Threads
- Stuff.com

88.    The above-listed references are sometimes collectively referred to herein as "the Undisclosed References."

89.     On information and belief, at least one of the named inventors on each of the three patents-in-suit was aware of each of these references during prosecution of each patent-in-suit, but failed to disclose that reference to the USPTO.

90.     On information and belief, at least one of the named inventors on each of the three patents-in-suit was aware that the reference embodied or described technology that was comparable to what Open Market was trying to patent.

91.     On information and belief, while the applications for the patents-in-suit were pending, the named inventors exchanged e-mail between themselves and others at Open Market discussing the subject matter of each of these references and of the pending patent applications.

92.     On information and belief, Open Market stored source code from at least one of these competitors (NetMarket) in Open Market's own database, and stored at least one other reference (the Shen system) in a special file directory labeled with one of the patent in suit's last three numbers.

93.     On information and belief, the NetMarket Website was one of the first websites that allowed customers to make purchases using the Internet.

94.     On information and belief, by July 1994, a user visiting the NetMarket Website at www.netmarket.com could purchase music CDs from Noteworthy Music using his or her credit card.

95.     On information and belief, the NetMarket Website also used a session identifier embedded in a uniform resource locator ("URL") as part of its way of handling these transactions.

96.     On information and belief, the NetMarket Website was no secret; in fact, it was the featured subject of a *New York Times* article by noted columnist Peter H. Lewis, published on

August 12, 1994 (still more than two months before the earliest patent application in this case was filed), titled:  "Attention Shoppers:  Internet is Open, and Secure."  Describing a customer who used the NetMarket website to purchase a music CD, the article stated, in part, that "At noon Thursday, Phil Brandenberger of Philadelphia went shopping for a compact audio disk, paid for it with his credit card and made history."

97.     On information and belief, this *New York Times* article described the NetMarket Website technology in sufficient detail to make clear that the website used public key cryptography in combination with a version of Mosaic, which was then the most popular browser for the World Wide Web.

98.     On information and belief, on the same day that this *New York Times* article was published, its full text was circulated at Open Market in an e-mail that acknowledged that NetMarket "sounds like a very real competitor to Open Market," and noted that Open Market would "need to keep this little company in mind as we develop positioning, a competitive matrix, etc."

99.     On information and belief, Treese received a post made by Daniel Kohn to the comp.infosystems.announce newsgroup on or about July 21, 1994, describing the NetMarket Website, including the ability to purchase CDs from Noteworthy Music.

100.    The NetMarket Website is prior art that should have been disclosed to the USPTO because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO.

101.    The materiality of the NetMarket website to the patentability of the claims of at least the '780 patent is evidenced by the USPTO's grant of a request to reexamine '780 claims 1-45 in view of, *inter alia*, a NetMarket PGP Help file that was published on the NetMarket

website as early as December 10, 1994, and its finding that that file raised a substantial question of patentability as to those claims.

102.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the NetMarket reference would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

103.    Inequitable conduct committed in the prosecution of the '780 patent was not cured during the reexamination of the '780 patent.

104.    During the prosecution of the patents-in-suit and the '780 patent, Open Market and/or one or more of the named inventors associated with the filing and prosecution of the application for these patents were aware of a method and system for conducting commercial transactions over the Internet that had been publicly implemented in July 1994 by The NetMarket Company.

105.    On information and belief, for example, on July 16, 1994, over four months before Open Market had a commercial product of any kind, and three months before it filed the first patent application at issue in this case, Andrew Payne sent an e-mail to his alleged co-inventors at Open Market admitting that competitor NetMarket's "on-line" system looked "almost exactly like" the demonstration system that Open Market was still just developing:

> Take a look again at:
>
> http://www.netmarket.com/
>
> They've done a lot of work in the past few weeks. ***Their on-line system looks almost exactly like our demo system.***

34

106.     On information and belief, in December 1994, in drafting a funding proposal to Digital Equipment Corporation, Open Market listed NetMarket at the top of its list of competitors.

107.     On information and belief, Open Market's documents also show that one or more of the named inventors suggested Open Market literally "steal" code to try to catch up with NetMarket.

108.     On information and belief, for example, on Monday, July 18, 1994, Andrew Payne included an item on his "ToDo" that Open Market should "write/steal PostScript for making inlined image buttons (like Netmarket or GNN) with arbitrary text."

109.     On information and belief, Soverain has relied on the document bearing Soverain production numbers SOV 4291-92 for the alleged *conception* date for the '314 and '492 patents in suit, when in fact the document shows that NetMarket *predated* Open Market in developing the subject matter that Open Market was seeking to patent.

110.     On information and belief, as noted above, Open Market was well aware of the NetMarket Website before Open Market filed even the first of the applications leading to any of the patents in suit.  On information and belief, Open Market and/or one or more of the named inventors committed inequitable conduct in not disclosing the NetMarket website and its public use to the USPTO during the prosecution of the patents in suit.  On information and belief, each of these individuals knew that the NetMarket Website was a material reference, but withheld it with an intent to deceive the USPTO.

111.     On information and belief, named inventor Andrew Payne became aware of the NetMarket Website at least as early as June 15, 1994, when he examined the website located at

35

http://www.netmarket.com, and sent an electronic mail message to Lawrence Stewart (another

named inventor) at stewart@openmarket.com, stating in relevant part:

> "Check out: http://www.netmarket.com/about.html
> There's an item about security and how they take credit card numbers, host based
> access control, etc."

112.     On information and belief, on or about July 1, 1994, Payne added the HTML

source code for the home page of http://www.netmarket.com into Open Market's "Revision

Control System."

113.     On information and belief, on or about July 16, 1994, Payne sent an electronic

mail message to tech@openmarket.com with the subject line "Competitor" that included the

following text:

> "Take a look again at: http: //www.netmarket.com/
> They've done a lot of work in the past few weeks.  Their on-line system looks
> almost exactly like our demo system!!"

114.     On information and belief, on or about July 18, 1994, Payne created a "To do" list

containing the following text:

> TODO rev1.1          Mon Jul 18 14:40:11 1994       1
> This is Andy's 'punch list" from the July 15th demo
> -------------------------------------------------- -----
> . . . .
> -   write/steal PostScript for making inlined image buttons (like
>      Netmarket or GNN) with arbitrary text.
> . . . .

115.     On information and belief, the term "inlined image button" as used by Payne in

this TODO Rev. 1.1" document refers to an image presented to a computer user (namely, in this

context, a consumer seeking to purchase products over the Internet) that looks and acts like a

button in the physical world; for example, a user can click on a button that is labeled with some

useful text, like "Purchase This Item."  "PostScript" refers to a programming language for specifying the layout of documents.

116.    On information and belief, one or more of the named inventors examined the Netmarket website at http://www.netmarket.com.

117.    On information and belief, on or about July 20, 1994, Payne sent an electronic mail message to Gail Grant at the address grant@pa.dec.com that stated:

> Have you looked at Netmarket (www netmarket com)?  I've been watching them, and of anyone I've seen, they're the closest to what we're doing They capture credit card info, have a way of composing orders, have plans to use PGP for encrypting stuff have a restricted version of Lynx that you can telnet to browse their stuff, etc., etc.  It looks like they are on the ball ....

118.    On information and belief, on or about July 20, 1994, Payne sent an electronic mail message to treese@openmarket.com and stewart@openmarket.com at the address grant@pa.dec.com that stated:

> The folks at 'netmarket.com' seem to be on the ball. They have HTML comments in their sources:
> ```
> <!------------------------------------------------------------------>
> <!-- Hello unknown@aegean.openmarket.com!              -->
> <!-- Thank you for reading our sources!                -->
> <!--                                                   -->
> <!-- Today is: Wed Jul 20 16:54:21 EDT 1994            -->
> <!-- Today's randomly selected fortune is:             -->
> <!-- 'Yeah, you want to trade your hair for some phlegm.' -->
> <!--            - Jerry, trying to get a               -->
> <!--              better babka, in 'The                -->
> <!--     Dinner Party', _Seinfeld_                     -->
> ```
>
> Cute.
>
> Also, from their "about Netmarket" page:

```
>NetMarket is porting ViaCrypt's commercial PGP to our flavor of Unix
>and will support PGP communications as soon as ViaCrypt delivers the
>newest version to us. In addition, clients will have the option to
>limit the hosts (either by domain names, IP numbers or both) from which
>NetMarket orders can be transmitted, adding another layer of protection.
. . . .
```

119.    On information and belief, on or about July 20, 1994, Lawrence Stewart ("Stewart") forwarded the electronic mail message identified in the preceding paragraph to omi.intelligence@openmarket.com with the subject "NetMarket progress."

120.    On information and belief, in August 1994, one or more of the named inventors evaluated the secure electronic commerce capabilities of the NetMarket website.

121.    On information and belief, on or about August 15, 1994, Winfield Treese ("Treese") authored a document entitled Cryptography Notes, dated August 15, 1994, stating that "NetMarket is using PGP for web-based transactions  . . . ."

122.    On information and belief, "PGP" stands for "Pretty Good Privacy," a software program which at that time allowed computer users to encrypt information using a technology known as public key cryptography.

123.    On information and belief, on or about September 2, 1994, Payne sent an electronic mail message to staff@netmarket.com that included the text:  "Have you gotten much business from folks with PGP capable Mosaic browsers?"

124.    On information and belief, on or about, September 2, 1994, Payne sent an electronic mail message to Henry Houh at MIT that included an address for the NetMarket website (namely, the URL http://www.netmarket.com/netmarket/bin/press/:st=hjirwulincgl2).

125.   On information and belief, on or about September 2, 1994, Payne sent an electronic mail message to omi.intelligence@openmarket.com with the subject "Internet Credit Card" that included the following text:

> At NetMarket:
>     http://www.netmarket.com/netmarket/bin/press/:st=hjvwulincg|2
> >NetMarket is also working with other partners to take public-key
> >encryption to the next logical level, The Internet Credit Card.

126.   On information and belief, on or about September 3, 1994, Payne had a telephonic discussion with Daniel Kohn, CEO and founder of NetMarket regarding the function of the NetMarket Website, and Payne sent notes from this call to all@openmarket.com.

127.   On information and belief, on or about March 17, 1995, an electronic mail message was sent to all@openmarket.com that included the following text:

> >> After reading yesterday's news about NetMarket I decided to
> re-visit. While there I noticed they seem to have a primitive
> session ID system which tracks which pages people visit. No error
> checking seems to be done on this field (which is even called sid
> in the url) since I was able to change it and the page happily
> reloaded. See: http://netmarket.con/nm/pages/demoinfo?sid=Qw8aJtLc4b .
> [perry]

128.   On information and belief, "all" in the address allopenmarket.com indicates that the message was sent to all of the company's employees, including all of the named inventors, and "[perry]" refers to Open Market employee Jeff Perry.

129.   On information and belief, in late 1994, NetMarket's headquarters were relocated to Cambridge, Massachusetts, within several blocks of Open Market's headquarters.

130.   On information and belief, Open Market employees, including the named inventors, continued to monitor the NetMarket Website and communicate with NetMarket employees through at least 1996.

131.     On information and belief, the NetMarket Website was identified on the Commercial Sites Index that Open Market operated while the applications for the patents in suit were pending.

132.     On information and belief, on May 30, 1998 and in June of 1998, while the application that led to the issuance of the '492 patent was pending before the USPTO, David K. Gifford and attorney James Mrose communicated regarding a press release concerning the Internet Shopping Network, an August 1994 New York Times article discussing Netmarket technology, and a post regarding the potential invalidity of Open Market patents in view of Netmarket technology that was publicly-available in 1994. On information and belief, Gifford acknowledged the shopping cart systems referenced in the press release and the New York Times article as prior art.

133.     On information and belief, neither Gifford nor Mrose disclosed this information to the USPTO during the prosecution of either the '314 patent or the '492 patent.

134.     On information and belief, in March of 1998, Treese read a post regarding the potential invalidity of Open Market patents in view of Netmarket technology that was publicly-available.

135.     On information and belief, Treese did not disclose this information to the USPTO during the prosecution of the '492 patent.

136.     On information and belief, Treese, Payne, Mackie, Stewart, and Gifford were each substantively involved in the prosecution of the '314 and '492 patents-in-suit.

137.     On information and belief, Treese, Payne, Mackie,  Stewart and Gifford each knew, during the prosecution of the '314 and '492 patents, that NetMarket operated a website through which customers could make purchases using the Internet, including purchasing music

CDs from Noteworthy Music, and each knew that NetMarket used a session identifier embedded in a uniform resource locator.

138.    On information and belief, Treese, Payne, Mackie, Stewart and Gifford each knew, during the prosecution of the '314 and '492 patents, of the NetMarket Website, and failed to disclose the NetMarket Website to the USPTO.

139.    On information and belief, each did so with knowledge that the reference was material, since each knew that the NetMarket Website technology predated and closely competed with what Open Market was seeking to patent.

140.    The failures of Open Market, David Gifford, and the named inventors to disclose the NetMarket Website reference to the USPTO renders each of the patents-in-suit unenforceable.

**g.   The Trewitt Paper and the Future Fantasy Bookstore Website - '314, '492 & '639 patents**

141.    On information and belief, "*Using Tcl to Process HTML Forms*" (the "Trewitt Paper"), authored by Dr. Glenn Trewitt, was published on or about March 2-3, 1994 by Digital Equipment Corporation, and describes a method and system for conducting commercial transactions over the Internet.

142.    On information and belief, the Trewitt Paper is also sometimes referred to by its number, "TN-14," wherein "TN" stands for "Technical Note."

143.    On information and belief, at the time that Dr. Trewitt authored, presented and distributed his paper, he was a computer scientist who worked at Digital Equipment Corporation, which was also known as "DEC."

41

144.    On information and belief, during March 1994, Payne, Stewart and Treese were employees of DEC's Cambridge Research Laboratory, and Payne and Treese each received a review copy of the Trewitt Paper, and were present at the conference(s) at which the Trewitt Paper was published.

145.    On information and belief, Stewart also became aware of the Trewitt Paper by the end of 1994.

146.    On information and belief, Treese retained a copy of the Trewitt Paper when he left DEC to join Open Market in 1994.

147.    On information and belief, before the application leading to the '780 patent was filed, Treese e-mailed Dr. Trewitt at DEC the following message explaining that he had kept a copy when he left DEC, and seeking permission to copy it for others at Open Market:

> I have a copy of TN-14, dated March 1994.  It's not marked internal use only, so I kept it.  Was it officially issued by NSL?  Can we make copies of it (or get copies from you)?  It's quite good, and some of our new people could learn a lot from it.

148.    Among other things, the Trewitt Paper discusses how to maintain state in an online store using session identifiers in a URL, making it material to all of the asserted claims of the '780 patent.

149.    More generally, the Trewitt Paper describes the technology used to create the "Future Fantasy Bookstore Website," an online bookstore on the World Wide Web.

150.    On information and belief, DEC implemented the Future Fantasy Bookstore Website at least as early as February l, 1994, in cooperation with the Future Fantasy Bookstore that already had a physical location in Palo Alto, California.

151.     On information and belief, at least Stewart, Payne and Treese at Open Market knew that the Future Fantasy Website was in public use in the United States before they filed any of the applications that led to the issuance of the patents in suit.

152.     On information and belief, Treese and Payne had known about the Future Fantasy Bookstore Website at least as early as February of 1994, when Glenn Trewitt sent electronic mail to the DEC internal mailing list WWWExperts with the subject "New Future Fantasy home page."

153.     On information and belief, Trewitt's e-mail further included the URL for the Future Fantasy Bookstore Website:  http://www.commerce.digital.com/palo-alto/FutureFantasy/home.html.

154.     On information and belief, the Future Fantasy Bookstore Website that was in public use prior to October 24, 1994, could accumulate a plurality of books into a single order from a customer, and allowed a purchaser to enter credit card and shipping information into a text box on the website.

155.     On information and belief, on or about May 8, 1994, Stewart sent an email to Payne and Gifford with the subject "Notes of 5/6/94 Meeting at EDS" that named the Future Fantasy Bookstore Website as an example of electronic commerce over the Internet.

156.     On information and belief, prior to October 24, 1994, Treese, Payne and Stewart were each aware that the Future Fantasy Bookstore Website could accumulate a plurality of books into a single order from a customer.

157.     On information and belief, prior to October 24, 1994, the Future Fantasy Bookstore Website order page contained a text box in which a purchaser could enter credit card and shipping information.

43

158.    The Trewitt Paper and the Future Fantasy Bookstore Website should each have been disclosed to the Patent Office during the prosecution of the '314, '492 and '780 patents, because each of these references was material to the patentability of the claimed subject matter that the named inventors Open Market was pursuing in the Patent Office.

159.    The materiality of the Trewitt Paper to the patentability of the claims of the '314, '492 and '780 patents is evidenced by the USPTO's grants of requests to reexamine the claims of those patents in view of, *inter alia*, the Trewitt Paper, and its finding that that the Trewitt Paper raised a substantial question of patentability as to those claims.

160.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the Trewitt Paper would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

161.    Inequitable conduct committed in the prosecution of the '314, '492 and '780 patents was not cured during the reexamination of those patents.

162.    The Future Fantasy Bookstore Website could accumulate a plurality of books selected by a customer into a single order, and therefore is material to the patentability of one or more claims of the '314 and '492 patents-in-suit.

163.    On information and belief, Treese, Payne, and/or Stewart committed inequitable conduct in not disclosing the Trewitt Paper and the Future Fantasy Bookstore Website and its public use to the USPTO during the prosecution of the '314, '492 and '780 patents.

164.    On information and belief, Treese, Payne, and/or Stewart committed further inequitable conduct in not disclosing to the USPTO during the prosecution of the '314, '492 and

44

'780 patents, during the reexaminations of those patents, or during the prosecution of the '639 patent that the Trewitt Paper and the Future Fantasy Bookstore Website were prior art under 35 U.S.C. § 102(f) in that subject matter recited in the claims of those patents was derived from Dr. Trewitt while each was employed by DEC, and further derived from the Trewitt Paper and the Future Fantasy Bookstore Website.

165.    On information and belief, each of these individuals knew that each of the Trewitt Paper and the Future Fantasy Bookstore Website was a material reference, and that derivation from those references and Dr. Trewitt himself was material, but withheld disclosure of the same with intent to deceive.

166.    Further, during the reexamination of the '780 patent, attorney Cochran and Payne, Stewart, Treese, Levergood, and Morris urged in a May 17, 2005 paper and accompanying declaration that the Examiner not consider the Trewitt Paper prior art because it was not a "printed publication," but failed to notify the Examiner that Dr. Trewitt's work was prior art under 35 U.S.C. § 102(f) due to its receipt by one or more of the named inventors and could be considered under 35 U.S.C. §§ 102 & 103.

167.    Attorney Cochran and the named inventors committed additional acts of inequitable conduct in failing to notify Examiner Winder in connection with the prosecution of the co-pending application that led to the issuance of the '639 patent that, in reliance on the Trewitt Paper, Examiner Najjar had rejected as anticipated and obvious claims in the reexamination of the '780 patent that Soverain has now asserted encompass substantially similar subject matter.

### h.  The HotHotHot Website - '314, '492 & '639 patents

168.    On information and belief, as early as September 1994, The HotHotHot Website sold hot sauces via the Internet.  Although the website targeted a niche product line, it demonstrated certain basic principles equally and obviously applicable to selling other goods besides hot sauce.

169.    On information and belief, the HotHotHot Website (also known as "Hot Hot Hot" and "H3") was in public use prior to the time Open Market filed its application for any patent in suit, and allowed customers to purchase more than one product at a time, using a credit card at the customer's option.

170.    On information and belief, on or about September 29, 1994, Payne sent an electronic mail message to tech@openmarket.com stating that the HotHotHot website contained "one implementation of shopping carts" and that it appeared to use session identifiers embedded in a URL.

171.    On information and belief, Mackie, Stewart and Payne received this September 29, 1994 message.

172.    On information and belief, because the HotHotHot website implemented session identifiers in a URL, the HotHotHot website was material to the patentability of one or more claims of the '780 patent.

173.    On information and belief, because the HotHotHot website implemented "shopping carts," it was material to the patentability of one or more claims of the '314 and '492 patents.

46

174.    On information and belief, the HotHotHot Website is prior art that should have been disclosed to the USPTO because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO.

175.    On information and belief, one portion of the HotHotHot Website that was in public use prior to October 4, 1994, appeared substantially as shown below:

US-SW Hot Sauces                                                    Page 1 of 3

# Hot Sauces in the SouthWest US



**Brother Bru Bru's**

This African potion comes to you from the wiles of Venice Beach, CA. Salt free, it contains a variety of unusual African peppers and spices.

Hot

#B2 200 5fl oz. *$4.50*  Order

## Texas Tears

- from Austin, Texas Habaneros, sweet onion, garlic and tangy fresh citrus juice combine to make a slightly sweet, zesty, fresh tasting sauce. Hot enough to make you cry! Salt-free.

Fiery

#S2 242 5fl.oz. *$4.75*  Order

176.    On information and belief, Payne, Stewart, and Treese committed inequitable conduct in not disclosing the HotHotHot Website and its public use to the USPTO during the prosecution of the '314, '492, and '780 patents. On information and belief, each of these individuals knew that the HotHotHot Website was a material reference, but withheld it with intent to deceive.

177.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning the HotHotHot website would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

### i.  Internet ShopKeeper - '314, '492 & '639 patents

178.    On information and belief, Internet ShopKeeper software ("ISK") was developed by Internet Presence and Publishing ("IPP") in 1994, and allowed clients to create online stores that would be hosted on a computer provided by IPP, and those stores were accessible at the URL http://www.ip.net/shops.html.

179.    On information and belief, ISK version 2.0 was released in late 1994.

180.    On information and belief, ISK is particularly material to claims involving a "creation computer" such as claims 1-5 of the '492 patent in suit.

181.    On information and belief, Open Market, including at least Payne and Treese, knew this; in fact, after Keith Basil of IPP posted a message to the WWWORDER mailing list requesting beta testers for ISK in July of 1994, Payne forwarded Basil's post to others at Open

Market with the comment "Can you say StoreBuilder?"  StoreBuilder was the name of an Open

Market product.

182.     On information and belief, on or about July 28, 1994, Treese forwarded Basil's

post to others at Open Market under the subject "A competitor for Store Builder?"

183.     On information and belief, on or about August 2, 1994, Stewart sent an e-mail to

all@Openmarket.com with the subject "Internet Shopkeeper" and stating:  "Is essentially Store

Builder. See http://www.ip.net/."

184.     On information and belief, on or about August 11, 1994, Gail Grant sent an e-mail

to all@OpenMarket.com with the subject "http://www.ip.net/shops.html" stating "Hmm. Looks

ALOT like storebuilder.  And their rates are VERY low."

185.     On information and belief, on or about August 11, 1994, Payne responded to

Grant's message with an e-mail that included the text "Yep, they've been on our radar screen for

a while.  I've told Shikar and Kim about the ShopKeeper several times, but they seem too busy to

care.  Or maybe they do care, but it doesn't worry them."

186.     On information and belief, on or about August 11, 1994 Stewart also responded to

Grant's message with an e-mail that included the text "Yep, we knew about that one too.  We're

positioning Store Builder at the 'up to 200 items' market.  We'll see."

187.     On information and belief, a website for Internet ShopKeeper was also registered

with the Commercial Sites Index that Open Market operated during the prosecution of the '314,

'492, and '780 patents.

188.     On information and belief, the Internet Shopkeeper software and website is prior

art that should have been disclosed to the USPTO because it was material to the patentability of

claims 1-5 of the '492 patent.

189.     On information and belief, at least Payne, Stewart, Mackie and Treese committed inequitable conduct in not disclosing the Internet Shopkeeper Website and its public use to the USPTO during the prosecution of the '314, '492, and '780 patents.  On information and belief, each of these individuals knew that the Internet Shopkeeper Website was a material reference, but withheld it from the USPTO with intent to deceive.

190.     Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning the Internet Shopkeeper Website would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

### j.  The Condom Country Website - '314 & '492 patents

191.     On information and belief, in 1994, using the domain name nfic.com, the New Frontiers Information Corporation designed a website for selling products over the Internet, which was operated under the trade name "Condom Country" at the URL http://www.ag.com/condom/country.

192.     On information and belief, Condom Country began offering products for sale over the Internet in September of 1994, which Open Market and/or one or more of the named inventors knew, but failed to disclose to the USPTO.

193.     On information and belief, on or about September 26, 1994, Christian Hamer announced the opening of Condom Country in a post to the Usenet newsgroup comp.infosystems.www.misc.

194.     On information and belief, on September 29, 1994, Payne wrote an e-mail to Kim Alley at Open Market noting that he had updated the listing for the "Condom Country" website in the Commercial Sites Index that Open Market maintained.  Referring to the Index, Payne wrote: "By the way, we've got a new entry under 'sex'(Condom Country).  Didn't you know someone who wanted to sell condoms on the Internet?  Anyway, I had to make a little editorial decision to remove some explicit wording from their what's new announcement."

195.     On information and belief, on or about October 2, 1994, Payne received an electronic mail from Henry Houh that stated:  "On another issue, do you suppose you will have HTML markup stuff to spin off?  I am thinking of this new company "nfic.com" that now has their own Tl.  They're a bunch of MIT folk, (they did the condoms company)."

196.     On information and belief, the Condom Country website used a session identifier embedded in a URL.

197.     On information and belief, the Condom Country website is prior art that should have been disclosed to the USPTO because it was material to the patentability of at least claim 34 of the '314 patent, claim 17 of the '492 patent, and claim 1 of the '780 patent.

198.     On information and belief, at least Payne committed inequitable conduct in not disclosing the existence of the Condom Country website (which Open Market listed in its own Commercial Sites Index) to the USPTO during the prosecution of the '314 and '492 patents in suit .

199.     On information and belief, each of these individuals knew that the Condom Country website was a material reference, but withheld it with intent to deceive.

### k.   The Shen System - '314, '492 & '639 patents

200.    On information and belief, "The Shen System" refers to the prior art method and system for securing transactions over the Internet involving cryptographic authentication of communications that used the HyperText Transfer Protocol.  On information and belief, it was developed and publicly disclosed by Phillip Hallam-Baker (now Chief Scientist at Verisign) while he was employed at CERN with Tim Berners-Lee.

201.    On information and belief, the Shen code was made available at least as early at July 28, 1994 at the URL:  http://info.cern.ch/hypertext/WWW/Shen/ref/shen.html.  On information and belief, the Shen code was also made available at least as early at August 2, 1994 at the URL: ftp:/info.cern.ch/pub/www/shen.

202.    On information and belief, Open Market and/or one or more of the named inventors knew about the Shen System no later than August of 1994.  On information and belief, on or about August 10, 1994, Payne sent an email to Rob Raisch that contained the text:  "We can use different authentication technology (Secure HTTP, SHEN if it takes off, smart cards, etc.)."

203.    On information and belief, on August 17, 1994, Phillip Hallam-Baker posted a message to the www-security mailing list describing the incorporation of anonymous session identifiers into the Shen System.  This post included the following text:

At WWW'94 #1 Dave Ragget made a suggestion that an anonymous session ID be added to the HTTP protocol.  This could be used for making traffic analysis and to tune servers amongst other things.  The characteristics of the Id should be :

1) That it be guaranteed unique.

2) That it be untraceable to the originator.

i would like to add in an extra parameter that is guaranteed to increase monotonicaly.  This can then be used to prevent replay attacks. NB  the time is

useless for this since different hosts may be in different timezones and not all hosts have GMT, and those that do cannot be guaranteed to be accurate.

I have implemented this in Shen for the time being . . . ."

204.    On information and belief, this August 17, 1994 message (referred to in the preceding paragraph) was also archived separately in an Open Market subdirectory titled "patents\780\Others."

205.    On information and belief, this August 17, 1994 message was also was forwarded to an internal newsgroup at Open Market, omi.mail.www-security.

206.    On information and belief, on August 19, 1994, Stewart forwarded a message that had been posted to the www-security mailing list to his own email address that contains the text: "It is vital that WWW security efforts take into account the ongoing work on related security and document transport issues.  Pertinent efforts include: []

○   Shen from CERN

○   SHTTP from EIT/CommerceNet"

207.    On information and belief, also in August 1994, Treese authored a document at NetMarket the same month identifying "Another secure HTTP" as one of three "competing models for secure world-wide web services."  On information and belief, Open Market and/or one or more of the named inventors, knew that the Shen system was relevant in this regard.

208.    On information and belief, Payne made the handwritten annotation "Shen" on the copy of the Treese memo bearing production number SOV0001831.

209.    On information and belief, on or about November l, 1994, Treese attended a meeting that he later described as "Secure HTTP Review Meeting at MIT" in an email to Payne and Treese.  On information and belief, Treese informed others at Open Market that the attendees included "Tim Berners-Lee (MIT LCS)"  (Massachusetts Institute of Technology

Laboratory for Computer Science), "Adam Cain (NCSA)" (National Center for Supercomputing Applications), "Phill Hallam-Baker (CERN)" (CERN being the nuclear particle research institute where the World Wide Web was first developed by Tim Berners-Lee), "Jeff Hostetler (Spyglass)," (Spyglass being the company that commercialized the Mosaic browser), and Allan Schiffman (EIT) (Enterprise Integration Technologies, identified above in connection with Internet Shopping Network).

210.    On information and belief, Treese further stated that "Hallam-Baker described his work on Shen (see http://cayenne.lcs.mit.edu/people/hallam/WWW/Shen for more information)."

211.    On information and belief, Shen enabled session management in HTTP communication by incorporating an anonymous session identifier.

212.    On information and belief, the cryptographic authentication of HTTP communications taught by Shen was suitable for use in electronic commerce applications.

213.    On information and belief, Shen was known to Treese, Payne, and Stewart prior to the filing of the '314, '492, and '780 patents.

214.    The Shen system is prior art that should have been disclosed to the Patent Office because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO.

215.    On information and belief, each of the named inventors committed inequitable conduct in not disclosing the Shen system to the USPTO during the prosecution of the '314, '492 and '780 patents.  On information and belief, each of these individuals knew that the Shen system was a material reference, but withheld it from the USPTO with intent to deceive.

216.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning the Shen system would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

### l.   The Internet Shopping Network Website - '314, '492 & '639 patents

217.    On information and belief, the Internet Shopping Network ("ISN") began selling computer equipment over the Internet on or about April 12, 1994.  On information and belief, Open Market and/or one or more of the named inventors, knew about ISN well before Open Market filed its applications for any of the patents in suit.

218.    Open Market, through Larry Stewart, was aware of the Internet Shopping Network, Netmarket, Commercenet and approximately 100 other malls or general stores on the internet at least as early as September 22, 1994.

219.    On information and belief, for example, in October 1994, Jonathan A. Bachman from Stanford University wrote to Payne asking for "a list of the 100 or even 25 most progressive and successful retail sites" on the World Wide Web.  On information and belief, Payne responded in relevant part that "The best I can do is point you to the sites I know about that have been doing it for a while."  On information and belief, Payne listed three sites; the first two were Internet Shopping Network and Netmarket.

220.    Payne was a member of ISN prior to October 24, 1994.

221.    On information and belief, ISN was founded by Randy Adams, who obtained development services for ISN from Enterprise Integration Technologies ("EIT").  On

information and belief, in April 1994, the employees at EIT included Allan Schiffman, Jay C. Weber, Eric K. Rescorla, and William T. Wong.  On information and belief, one of the modules developed by EIT for Internet Shopping Network was written by Eric Rescorla ("Nonce Support").

222.    On information and belief, a "nonce" is a piece of random information that can be encrypted and passed between a client and server during an HTTP communication to allow the preservation of state information and to provide authentication of messages between the client and server.

223.    On information and belief, Eric Rescorla provided a version of the Nonce Support code to ISN on or about April 18, 1994.

224.    On information and belief, the encrypted nonce was embedded in URLs passed between the client and server in April 1994.

225.    On information and belief, on May 30, 1998 and in June of 1998, while the application that led to the issuance of the '492 patent was pending before the USPTO, David K. Gifford and attorney James Mrose communicated regarding a press release concerning the Internet Shopping Network,  On information and belief, Gifford acknowledged that the Internet Shopping Network referenced in the press release was prior art to the '492 patent.

226.    On information and belief, neither Gifford nor Mrose disclosed this information to the USPTO during the prosecution of the '492 patent.

227.    On information and belief, on or about June 2, 1994, David Gifford forwarded a copy of THE COMPUTISTS' COMMUNIQUE, Vol. 4, No. 22, June 2, 1994, to Payne and Stewart with the annotation:  "See ISN, WWWORder, list of commerical [sic] services URL."

228.    On information and belief, on or about June 2, 1994, Payne applied for a

membership to the Internet Shopping Network.

229.    On information and belief, on or about June 5, 1994, Treese received a message

from the net-happenings mailing list that contained the text:

> + Billing itself as the first Internet SuperStore, the Internet Shopping
> + Network is now on-line, offering over 10,000 software and hardware
> + products for Mac, Windows, DOS and Unix machines. Check out the wares
> + through the 'Web by connecting to ht tp.~/shop.internet.net: or send email to
> info@internet.net.

230.    On information and belief, on or about July 15, 1994, Payne sent an email to

Shikhar Ghosh and Kim Alley with the subject "Internet Shopping Network data" stating in part

"I read in a developers journal an article about the Internet that claimed that the Internet

Shopping Network is getting about 100 orders per day."

231.    On information and belief, on or about August 31, 1994, Payne sent Treese an

e-mail containing the following text that he had copied from Internet Shopping Network

Website, describing certain products that were offered for sale there:

> >From the Internet Shopping Network:
>
> DECBRIDGE 90 ENET BRIDGE 2BNC, 1AUI W/SNMP HUB-
> BASED.....Modem...........$ 1727.79 DECBRIDGE 90 ENET BRIDGE 2BNC,
> 1AUI W/SNMP STANDALONE....Modem...........$ 1816.91 DECBRIDGE 90FL
> 10BT BRIDGE 1FOIRL,1AUI,1BNC W/SNMP STAND.Modem...........$
> 1816.91 MUXSERVER90 E-NET BRIDGE STANDALONE UNIT W/PWR
> SUPLY,MAN.Modem...........$ 1717.57 DECBRIDGE 90FL 10BT BRIDGE
> 1FOIRL,1AUI,1BNC W/SNMP (HUB .Modem...........$ 1727.79 DECBRIDGE
> 900MX ENET BRIDGE 6 PORT FDDI BRIDGE...........Modem...........$ 5254.29
>
> I don't know how competitive these prices are.

232.    On information and belief, on or about September 6, 1994, Open Market obtained

a membership to the Internet Shopping Network.  On information and belief, Open Market used

ISN to buy computer equipment, and on or about September 8, 1994, Open Market received an

order confirmation e-mail sent to all@openmarket.com stating:

> "Dear Win, Your order was shipped on 9/7/94 and your credit card was charged
> for the amount shown below.
> Thank you for shopping with Internet Shopping Network.
> 433232    DECBRIDGE 90 ENET BR      1840.71      1  $ 1840.71

233.    On information and belief, Open Market purchased equipment from Internet

Shopping Network in open commerce on September 7, 1994, but did not disclose the existence

of the Internet Shopping Network website to the USPTO at any time during the prosecution of

the '314, '492, or '780 patents.

234.    On information and belief, in September 1994, the Home Shopping Network

purchased the Internet Shopping Network.

235.    On information and belief, in December 1994, Open Market listed Internet

Shopping Network as one of its top competitors.

236.    On information and belief, on or about August 29, 1996, Victoria Glickman of

Open Market (who used the e-mail address glickman@openmarket.com) sent an email to Payne

with the subject "Interview with Internet Shopping Network Yesterday" that contained the text:

> "I spoke with Bill Rollinson, VP of Marketing at Internet Shopping Network, yesterday
> morning but in the rush to finish our presentation, I did not have a chance to write up my
> notes..
> * ISN has a partnership with a major distributor for the physical fulfillment of the
> hardware and software that ISN sells on the Internet.
> This involves two-way EDI to their warehouse.  Bill was not sure what % of sales were
> hardware vs. software.

* For electronic fulfillment (downloads), ISN has recently decided to outsource the "back end technology" to Online Interactive Inc, who will also supply their 1000 ready-to-download software titles to ISN.
* ISN now has about 50 downloadable titles up.  The best choices for download are "unique, smaller" products.  Two Bill mentioned that had done well on ISN were:  Intuit's individual state tax package and background programs (city scapes, etc.) for Microsoft's flight simulator program.
* 80+% of ISN's sales are via credit cards.  Thier target customer segments are individual consumers and SOHO's.  According to Bill, SOHO customers are their best customers -- they buy the most per purchase and they are more likely to be repeat customers.
* A rough estimates of ISN's sales growth is 30% per month, although summer is slower.  Bill believes that his average sales price and repeat business is higher than other Internet merchants like Amazon.  He does not want to grow the business too fast until they get "their back end in order."
* ISN now has about 200,000 members (only members can buy but membership is free).  I'd assume that means they have had about 200,000 first time buyers since they started in late 1994.
* ISN might be interested in talking to Open Market as they are beginning to out-grow their home grown transaction system!"

237.    On information and belief, on or about March 7, 1998, Phillip Hallam-Baker sent an electronic mail message to the E-CARM mailing list with the subject "Open Market's Internet Commerce Patents" stating in part:  "There were Internet shops before Open Market was started, ISN opened in April 1993 which is when Open Market was incorporated."

238.    On information and belief, on or about March 7, 1998, Payne responded to Phillip Hallam-Baker with an email message stating in part "I think the year was 1994 (for both us starting and ISN)."

239.    On information and belief, on or about March 8, 1998, Phillip Hallam-Baker responded to Payne in an electronic mail message quoting from the ISN site that "Internet Shopping Network has the distinction of being the first online retailer in the world.  Launched in April 1994, Internet Shopping Network's Computer Superstore . . . ."

240.    On information and belief, not only were Payne and others at Open Market on notice that ISN claimed to be the first online retailer, but Treese and others at Open Market had

actually purchased equipment themselves from ISN before Open Market filed the patent application leading to the '314 and '492 patents.

241.    On information and belief, the Internet Shopping Network is prior art that should have been disclosed to the Patent Office because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO .

242.    On information and belief, each of the named inventors committed inequitable conduct in not disclosing the Internet Shopping Network to the USPTO during the '314, '492, and '780 patents.  On information and belief, each of these individuals knew that the Internet Shopping Network was a material reference, but withheld it with intent to deceive.

243.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning the Internet Shopping Network would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

**m.  The First Virtual System - '314 & '492 patents**

244.    On information and belief, the First Virtual System was an electronic transaction system that was publicly implemented at least as early as August 1994 by a company called First Virtual Holdings, Inc.  On information and belief, the First Virtual System is prior art that should have been disclosed to the Patent Office in connection with the '314, '492 and '780 patents because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO .

245.     On information and belief, in a related proceeding (involving Open Market's application that issued as U.S. patent 6,449,599 to Payne, Stewart and Mackie, titled "Network Sales System"), the USPTO determined that the First Virtual reference invalidated similar Open Market patent claims when combined with the subject matter of Patent Application Serial Number 08/168,519 (the "1993 Gifford Application").  On information and belief, each of the presently named inventors listed on the '314 and '492 patents-in-suit (namely, Andrew Payne, Lawrence Stewart, and David Mackie) knew of both the First Virtual reference and the '193 Gifford Application while the applications for the '314 and '492 patents were pending, but failed to disclose either to the USPTO in the course of those applications.  On information and belief, both the First Virtual prior art and the '193 Gifford Application should have been disclosed to the USPTO because it was material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO, including at least claim 34 of the '314 patent.

246.     On information and belief, the First Virtual System was well known to at least Andrew Payne and Lawrence Stewart long before the '314 or '492 patents issued, as shown both by Open Market's internal correspondence and by the '314 and '492 patents' named inventors own publications.

247.     On information and belief, Treese read a October 15, 1994 posting by Nathaniel Borenstein of First Virtual describing the First Virtual System, and communicated his analysis of the First Virtual System to at least Payne and Stewart in an e-mail sent the same day to notices@openmarket.com.

248.     On information and belief, at least Payne and Stewart committed inequitable conduct in not disclosing the First Virtual reference to the USPTO during the prosecution of the

'314 and '492 patents.  On information and belief, each of these individuals knew that the First

Virtual reference was material to patentability, but withheld it with intent to deceive.

### n.   Glenn Crocker's Web2Mush Software - '639 patent

249.    On information and belief, in October of 1994, many members of the World Wide

Web community came together at the Second International Conference on the World Wide Web

in Chicago, Illinois.

250.    On information and belief, one of the papers published at the Second International

Conference on the World Wide Web was Glenn Crocker's paper "web2mush:  Serving

Interactive Resources to the Web," which discusses mechanics for embedding an authorization

identifier in a URL.

251.    On information and belief, Glenn Crocker's work was already known to Open

Market, including in particular Payne, Stewart and Treese.

252.    On information and belief, in July of 1994 (on or about July 8), Payne reviewed a

posting that Glenn Crocker had made to the Usenet newsgroup

comp.infosystems.www.providers ("Crocker's post").  On information and belief, this posting

announced a web interface for the TinyMUSH server.  On information and belief, TinyMUSH

was a multi-user communication system used for games, and the web2mush software provided

authentication controls in a world wide web environment.  (As stated in the Abstract to the

web2mush paper Crocker presented at the World Wide Web Conference in Chicago, "*Web2mush*

is a system of programs working together which make access to TinyMUSH systems available to

users of the Web through the richer Web interface.").

253.    On information and belief, the software for web2mush was available for

download through the URL http://stratus.cwru.edu/ beginning in July 1994.

254.    On information and belief, on or about July 9, 1994, Payne forwarded excerpts of Crocker's post to others at Open Market using all@OpenMarket.com and David Gifford, with this commentary:

>From comp.infosystems.www.providers, somone else has figured out how
to put stuff in URLs for access control:

>I've written a Web<-->TinyMUSH interface that handles 'interactive"
>sessions by overloading the use of Reload . It also handles security
>by first authenticating to the TinyMUSH server, then providing a chain
>of unique random numbers imbedded in URL's to keep peoples sessions
>separate. It is located at:
>http://stratus.cwru.edu/
[]
"Gawd"

255.    On information and belief, the someone in "someone else has figured out how to put stuff in URLs for access control" was Crocker.

256.    On information and belief, as Payne's emphatic response to Crocker's work suggests, Glenn Crocker's Web2Mush Software was material to the patentability of the subject matter claimed in at least the '780 patent and/or one or more of the patents-in-suit.

257.    On information and belief, each of at least Payne, Stewart, and Treese knew of its materiality when they had a duty to disclose it, as did any others who received Payne's July 9, 1994 e-mail or otherwise learned of the reference.  On information and belief, each of these individuals knew that Glenn Crocker's Web2Mush Software was a material reference, but withheld it from the USPTO with intent to deceive.

258.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning Glenn Crocker's Web2Mush Software would therefore be sufficiently related and material to the claims of the '639 patent such that the

inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

### o.  The WWW-Talk Threads - '639 patent

259.    On information and belief, WWW-Talk was an electronic mail discussion that was published to a mailing list that included one or more of the named inventors.

260.    On information and belief, posts to WWW-Talk regarding authentication and/or session tracking that one or more of the named inventors received included, but were not limited to, (1) Wayne Allen, "Insecure WWW Access Authorization Protocol," WWW-Talk Archives, March 8, 1994, *see, e.g.*, pg. 1-2; (2) Behlendorf, Brian, "Session Tracking," WWW-Talk, April 17, 1995, *see, e.g.*, page 1, par. 2; (3) Kristol, Dave, "Session Tracking," WWW-Talk, April 18, 1995, *see, e.g.*, par. 4; (4) Montulli, Lou, "Session Tracking," WWW-Talk, April 18, 1995, *see, e.g.*, page 1; page 2; (5) McCool, Rob, "using PGP/PEM? using Kerberos?", WWW-Talk, February 25, 1994, *see, e.g.*, par 2; (6) Pathfinder system - see "Session Tracking" published to WWW-Talk on April 17, 1995 by B. Behlendorf; (7) "access and session control" thread published Sept. 15, 1994 to WWW-Talk by D. Aronson, *see, e.g.*, p. 1; (8) WWW-Talk Apr-June 1995: Re:  Session Tracking, *see e.g.* 1-3; and (9) Hinckley, Kee, "Session Tracking," WWW-Talk, April 29, 1995, *see, e.g.*, page 1 (hereafter referred to collectively as the "WWW-Talk Threads").

261.    The materiality of the WWW-Talk Threads to the patentability of the claims of at least the '780 and the '639 patents is evidenced by the USPTO's grant of a request to reexamine '780 claims 1-45 in view of, *inter alia*, the Aronson WWW-Talk Thread, and its finding that that this reference raised a substantial question of patentability as to those claims, and/or Defendants

CDW Corporation, Newegg Inc. and Zappos.com, Inc.'s Invalidity Contentions (incorporated herein by reference).

262.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the WWW-Talk Threads would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

263.    Inequitable conduct committed in the prosecution of the '780 patent was not cured during the reexamination of the '780 patent.

264.    On information and belief, one or more of the named inventors subscribed to posts on WWW-Talk beginning at least as early as 1994 and during the pendency of the subject applications.  At least alleged inventor Andrew Payne subscribed to this list using one or more of the following email addresses: payne@openmarket.com and payne@n8kei.tiac.net.

265.    On information and belief, Open Market archived the Aronson WWW-Talk Thread in a subdirectory titled "patents\780\brighton-msgs."

266.    On information and belief, the WWW-Talk Threads are prior art that should have been disclosed to the USPTO because they were material to the patentability of the claimed subject matter that Open Market was pursuing before the USPTO, including subject matter claimed in the '780 patent.

267.    On information and belief, at least Payne committed inequitable conduct in not disclosing the WWW-Talk Threads to the USPTO during the prosecution of the '780 patent in suit.  On information and belief, at least Payne knew that the WWW-Talk Threads were material references, but withheld them from the USPTO with intent to deceive.

268.    The inequitable conduct committed by, for, or on behalf of Open Market inures to Soverain's detriment.

269.    On information and belief, Soverain claims to be the successor to Open Market's "Transact" business, and has represented to this Court that "Soverain today stands exactly where Open Market did from 1993 to 2000."

270.    On information and belief, the acts and failures to act recited in this counterclaim represent a pattern of non-disclosure that warrants an inference that Open Market's concealment was intentional. On information and belief, Open Market engaged in a pattern of studying others' work -- including that of competitors who had beat Open Market in the race to market -- but concealing that information from the USPTO. On information and belief, that concealment was deliberate and designed to obtain patent claims that would not have been issued absent Open Market's deception.

### p.  Stuff.com - '314, '492 & '639 patents

271.    On information and belief, the Stuff.com website was a "shopping cart" site using "session identifiers" in its URLs, selling T-shirts to the public by June 15, 1994.

272.    On information and belief, Andrew Payne learned of a website at www.stuff.com on or about June 15, 1994.

273.    On information and belief, Payne learned of the Stuff.com website from an e-mail that he received from einet.com on or about June 15, 1994, which published the location of the Stuff.com website and indicated that the Stuff.com website was selling T-shirts.

274.    On information and belief, Payne investigated the www.stuff.com website on June 15, 1994.

275.     On information and belief, on June 15, 1994, Payne reported the results of his investigation to Winfield Treese, David Mackie, and Lawrence Stewart, by an e-mail message. On information and belief, a true copy of that message ("Payne's June 15, 1994 e-mail"), bearing production numbers SOV0007642-43, was marked as Exhibit 4 and Exhibit 22 in the depositions of Michael Kuniavsky and Richard Scott Boake, respectively.

276.     On information and belief, Payne's June 15, 1994 e-mail identifies a website that was selling clothing to the public in 1994 using the domain name Stuff.com.

277.     On information and belief, Payne was aware in June 1994 that the website at www.Stuff.com was using session identifier parameters in URLs.

278.     On information and belief, Winfield Treese, David Mackie and Lawrence Stewart were each aware in June 1994 that the www.Stuff.com website was using session identifier parameters in URLs.

279.     On information and belief, Payne believed that the www.stuff.com website used session identifiers effectively to maintain state for customers buying goods on the stuff.com website.

280.     On information and belief, Payne was aware in June 1994 that the website at www.Stuff.com was using "shopping carts," as that term is construed in the Court's Order of April 7, 2005.

281.     On information and belief, Winfield Treese, David Mackie and Lawrence Stewart were each aware in June 1994 that the www.Stuff.com website was using "shopping carts."

282.     On information and belief, Andrew Payne was aware on June 15, 1994 that the website at www.stuff.com would accept a consumer's credit card information over the Internet.

283.    On information and belief, Andrew Payne wrote to Winfield Treese, David Mackie and Lawrence Stewart on June 15, 1994, stating that the website at www.stuff.com had "an option to take the credit card numbers over the net."

284.    On information and belief, the www.stuff.com prior art is material to the patentability of the subject matter claimed in the patents-in-suit and the '780 patent.

285.    On information and belief, Andrew Payne, Winfield Treese, and Lawrence Stewart were each aware in June 1994 that the www.Stuff.com website was material to the patentability of the subject matter claimed in each of the applications that led to the '780, '314 and '492 patents, but with intent to deceive, withheld that reference from the USPTO, thereby committing inequitable conduct, rendering the patents in suit unenforceable.

286.    Claims of the '639 patent that Soverain asserts in this case against CDW, Newegg and Zappos recite at least one element recited by the claims of the '780 patent, and the information withheld in the '780 patent concerning the www.Stuff.com website would therefore be sufficiently related and material to the claims of the '639 patent such that the inequitable conduct committed in the prosecution of the '780 patent has an immediate and necessary impact on and renders unenforceable the claims of the '639 patent.

287.    Counterclaim Plaintiffs are entitled to a declaration by the Court that the patents-in-suit are unenforceable because of inequitable conduct.

**q. Failure to Disclose Digital Equipment Corporation Electronic Store-The Internet Electronic Connection ("IE-Connection Store") and Additional References - '314, '492 & '639 patents**

288.    Counterclaim Plaintiffs incorporate by reference the inequitable conduct allegations of any other party in this action, including those only recently-filed by co-defendants TigerDirect Inc. ("TigerDirect") and Systemax Inc. ("Systemax") in the Answer, Affirmative

Defenses and Counterclaims to Plaintiff's Amended Complaint for Patent Infringement that each

filed on July 21, 2008 (Court Docket Nos. 129 & 130; Counts III (Paragraphs 12-20), VI

(Paragraphs 27-33), and IX (Paragraphs 40-48)). The following allegations of inequitable

conduct are made upon information and belief, and are based on the allegations of inequitable

conduct in those pleadings.

      **1.**      **'314 patent**

      289.    Upon information and belief, each of the named inventors of patents-at-issue

worked at DEC prior to joining Open Market.

      290.    Upon information and belief, as of December of 1993, at least one of the named

inventors was involved in adapting DEC's Electronic Store-The Internet Electronic Connection

("IE-Connection Store"), which had on-line sales at the time of about 500 million dollars, to

allow for sales over the World Wide Web.

      291.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary

Invalidity Contentions, at least one of the named inventors of the patents-at-issue was aware and

had sufficient knowledge of the existence and functionality of DEC's IE-Connection Store prior

art.

      292.    Upon information and belief, the applicants and or the patent owner did not

disclose DEC's IE-Connection Store prior art to the PTO during prosecution of the '314 patent.

      293.    Under 37 C.F.R. § 1.56 (a), the applicants and or the patent owner had an

uncompromising duty of candor and good faith in dealing with the PTO, which included the duty

to disclose all information known to them to be material to patentability.

      294.    Upon information and belief, the applicants and or the patent owner's omission of

the DEC's IE-Connection Store prior art was material because there was a substantial likelihood

that a reasonable Examiner would have considered such information important in deciding whether to allow the '314 patent to issue. Upon information and belief, the applicants and or the patent owner's omission was made with an intent to deceive the Examiner into allowing the '314 patent to issue. Upon information and belief, the applicants and or the patent owner knew or should have known, that their omission of the IE-Connection Store prior art would have been material to the PTO's consideration of the patent application.

295.    Counterclaim Plaintiffs therefore seek a declaratory judgment that each claim of the '314 patent is unenforceable due to inequitable conduct during its prosecution.

**2.     '492 patent**

296.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary Invalidity Contentions, DEC's IE-Connection Store is relevant, material and non-duplicative prior art to the '492 patent.

297.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary Invalidity Contentions, at least one of the named inventors of the patents-at-issue was aware and had sufficient knowledge of the existence and functionality of DEC's IE-Connection Store prior art.

298.    Upon information and belief, the applicants and or the patent owner did not disclose DEC's IE-Connection Store prior art to the PTO during prosecution of the '492 patent.

299.    Under 37 C.F.R. § 1.56 (a), the applicants and or the patent owner had an uncompromising duty of candor and good faith in dealing with the PTO, which included the duty to disclose all information known to them to be material to patentability.

300.    Upon information and belief, the applicants and or the patent owner's omission of the DEC's IE-Connection Store prior art was material because there was a substantial likelihood

that a reasonable Examiner would have considered such information important in deciding whether to allow the '492 patent to issue. Upon information and belief, the applicants and or the patent owner's omission was made with an intent to deceive the Examiner into allowing the '492 patent to issue. Upon information and belief, the Applicants and or the patent owner knew or should have known, that their omission of the IE-Connection Store prior art would have been material to the PTO's consideration of the patent application.

301.    Counterclaim Plaintiffs therefore seek a declaratory judgment that each claim of the '492 patent is unenforceable due to inequitable conduct during its prosecution.

### 3.    '639 patent

302.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary Invalidity Contentions, DEC's IE-Connection Store is relevant, material and non-duplicative prior art to the '639 patent.

303.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary Invalidity Contentions, at least one of the named inventors of the patents-at-issue was aware and had sufficient knowledge of the existence and functionality of DEC's IE-Connection Store prior art.

304.    Upon information and belief, the applicants and or the patent owner did not disclose DEC's IE-Connection Store prior art to the PTO during prosecution of the '639 patent.

305.    Upon information and belief, as detailed in Systemax/TigerDirect's Preliminary Invalidity Contentions, which are incorporated herein by reference, at least one of the named inventors of the patents-at-issue was aware and had sufficient knowledge of the following additional pieces of prior art to appreciate that each of these additional pieces of prior art was relevant, material and or non-duplicative prior art to the '639 patent:

a. The X Window System;

b. AudioFile, A Network-Transparent System for Distributed Audio Applications;

c. "Visa Protocols for Controlling Inter-Organizational Datagram Flow: Extended Description," Estrin et al., WRL Research Report 88/5, Digital Equipment Corp., December 1988; and

d. "X Through the Firewall, and Other Application Relays," Winfield Treese et al., Technical Report Series, Cambridge Research Laboratory, Digital Equipment Corp., May 3, 1993.

306.     Upon information and belief, applicants and or patent owner did not disclose these additional above-listed prior art to the PTO during prosecution of the '639 patent.

307.     Under 37 C.F.R. § 1.56 (a), the applicants and or the patent owner had an uncompromising duty of candor and good faith in dealing with the PTO, which included the duty to disclose all information known to them to be material to patentability.

308.     Upon information and belief, the applicants and or the patent owner's omission of the DEC's IE-Connection Store prior art and the additional above-listed prior art was material because there was a substantial likelihood that a reasonable Examiner would have considered such information important in deciding whether to allow the '639 patent to issue. Upon information and belief, the applicants and or the patent owner's omission was made with an intent to deceive the Examiner into allowing the '639 patent to issue. Upon information and belief, the applicants and or the patent owner knew or should have known, that their omission of the DEC's IE-Connection Store prior art and the additional above-listed prior art would have been material to the PTO's consideration of the patent application.

309.     Counterclaim Plaintiffs therefore seek a declaratory judgment that each claim of the '639 patent is unenforceable due to inequitable conduct during its prosecution.

## <u>COUNTERCLAIM PLAINTIFFS' PRAYER FOR RELIEF</u>

WHEREFORE, Counterclaim Plaintiffs, CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation and Zappos.com, Inc. a California Corporation, respectfully pray that judgment be entered in their favor and against Soverain Software LLC as follows:

A.        That the Court declare and adjudicate, pursuant to 28 U.S.C. §§ 2201 and 2202, the respective rights and relations of the parties with respect to the matters in issue, including a declaration that the patents-in-suit and the claims thereof are invalid and unenforceable and that CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation and Zappos.com, Inc. a California Corporation,  have not committed any act of infringement of the patents-in-suit;

B.        That Soverain be enjoined from asserting the patents-in-suit against CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation and Zappos.com, Inc. a California Corporation, and their representatives, agents, customers and/or contractors, present or prospective;

C.        That the Court adjudge this case to be an exceptional case under 35 U.S.C. § 285 and order Soverain to pay the attorneys' fees for CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation, and Zappos.com, Inc. a California Corporation;

D.        That CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation and Zappos.com, Inc. a California Corporation, recover of Soverain all costs incurred in this action;

E.        That CDW Corporation, Newegg Inc., Zappos.com, Inc., a Delaware corporation and Zappos.com, Inc. a California Corporation, have and receive a trial by jury on all issues so triable; and

F.      That the Court grant to CDW Corporation, Newegg Inc., Zappos.com, Inc., a

Delaware corporation and Zappos.com, Inc. a California Corporation, such other and further

relief as it deems just and proper.

Respectfully submitted, this 20th day of August, 2008.

By:  /s/ Thomas L. Duston
Eric H. Findlay
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, TX  75702
T:  903.597.3301
F:  903.597.2413
E:  efindlay@rameyflock.com

Thomas L. Duston
Matthew C. Nielsen
Julianne M. Hartzell
Scott A. Sanderson
MARSHALL, GERSTEIN & BORUN LLP
233 S. Wacker Dr., Suite 6300
Chicago, IL  60606
T:  312.474.6300
F:  312.474.0448
E: tduston@marshallip.com

*Attorneys for Defendants CDW
Corporation, Newegg Inc. and
Zappos.com, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the above date, I electronically filed the foregoing

**DEFENDANTS CDW CORPORATION'S, NEWEGG INC.'S, AND ZAPPOS.COM,**

**INC.'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND**

**COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT** with the Clerk of Court

using the CM/ECF system which will send notification of such filing via electronic mail to all

counsel of record.

/s/ Thomas L. Duston
Thomas L. Duston