**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **SOVERAIN SOFTWARE LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:07-CV-00511-LED** |
| | ) | |
| **CDW CORPORATION,** | ) | **JURY TRIAL DEMANDED** |
| **NEWEGG INC.,** | ) | |
| **REDCATS USA, INC.** | ) | |
| **SYSTEMAX INC.,** | ) | |
| **ZAPPOS.COM, INC.,** | ) | |
| **REDCATS USA, L.P.,** | ) | |
| **THE SPORTSMAN'S GUIDE, INC.,** | ) | |
| **AND** | ) | |
| **TIGERDIRECT, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**SOVERAIN'S CLAIM CONSTRUCTION BRIEF**
**PURSUANT TO PATENT RULE 4-5(a)**

---

# TABLE OF CONTENTS

I.   Introduction ................................................................................................. 1

II.  Legal Standard ............................................................................................ 1

III. Claim Construction ..................................................................................... 4

A.   United States Patent No. 7,272,639 ................................................. 4

1.   Technology Background ........................................................ 4

2.   Interpretation of Disputed Claim Terms ............................... 5

(a)   "controlled document" ................................................ 5

(b)   "validating, at the server system, the appended session identifier" and "validating the session identifier appended to the service request" ..... 7

(c)   "stored session identifier" ........................................... 9

(d)   "a purchase request / a request to purchase" ............... 12

(e)   "Initial service request" .............................................. 13

(f)   "Creating, responsive to the initial service request, the session identifier" ......................................................................... 14

(g)   "subsequent distinct requests" .................................... 16

(h)   "Hyperlink" ................................................................. 17

B.   United States Patents No. 5,715,314 and 5,909,492 ........................ 19

1.   Technology Background ........................................................ 19

2.   Interpretation of Disputed Claim Terms ............................... 20

(a)   "Shopping cart computer" ........................................... 20

(b)   "URL"-related terms ................................................... 22

(i)   "shopping cart URL" ....................................... 22

(ii)   "statement URL" .............................................. 23

(c)   "Hypertext link" .......................................................... 24

(d)   "Payment message" ..................................................... 25

NYI-4172187

(e)     "To cause said payment message to be activated to initiate a payment transaction" .............................................................. 27

IV.     Conclusion ...................................................................................................... 28

NYI-4172187

# TABLE OF AUTHORITIES

## Cases

*Bd. of Regents of the Univ. of Texas Sys. v. Benq Am. Corp.*,
   No. A-05-CA-181, 2006 WL 6112210 (W.D. Tex. Jul. 14, 2006) .................................... passim

*Bicon, Inc. v. The Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ........................................................................................ 12, 15

*Flex-Rest, LLC.  v. Steelcase, Inc.*,
   455 F.3d 1351 (Fed. Cir. 2006) ............................................................................................. 4

*Free Motion Fitness, Inc. v. Cybex Intern., Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005) ............................................................................................. 4

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ................................................................................................................... 3

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
   401 F.3d 1367 (Fed. Cir. 2005) ................................................................................. 3, 13, 16

*Laitram Corp. v. Rexnord, Inc.*,
   939 F.2d 1533 (Fed. Cir. 1991) ............................................................................................. 2

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ......................................................................................... 2, 23

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) .............................. 1, 3, 17

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) ................................................................................... 3, 7, 14

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) ................................................................................... 2, 9, 16

*Northern Telecom Ltd. v. Samsung Elec. Co., Ltd.*,
   215 F.3d 1281 (Fed. Cir. 2000) ........................................................................................... 21

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008) ............................................................................................. 6

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................................... passim

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ............................................................................................. 2

*SanDisk Corp. v. Memorex Products, Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ............................................................................................. 3

*SRAM Corp. v. AD-II Eng'g, Inc.*,
   465 F.3d 1351 (Fed. Cir. 2006) ......................................................................... 10, 11, 21, 26

*Stumbo v. Eastman Outdoors, Inc.*,
   508 F.3d 1358 (Fed. Cir. 2007) ........................................................................... 12

*Texas Instruments Inc. v. U. S. Int'l. Trade Comm'n.*,
   988 F.2d 1165 (Fed. Cir. 1993) ........................................................................... 15

*TIP Sys., LLC. v. Phillips & Brooks/Gladwin, Inc.*,
   529 F.3d 1364 (Fed. Cir. 2008) ........................................................................... 12

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...................................................................... passim

*Voda v. Cordis, Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008) ..................................................................... passim

## I.     INTRODUCTION

Plaintiff Soverain Software LLC ("Soverain") submits this brief supporting its proposed constructions of disputed terms and phrases in the three patents-in-suit: U.S. Patent No. 5,715,314 ("'314 patent"), U.S. Patent No. 5,909,492 ("'492 patent"), and U.S. Patent No. 7,272,639 ("'639 patent"), attached as Exhibits 1-3, respectively.

The Court is already familiar with the '314 and '492 patents, and the parent of the '639 patent, U.S. Patent No. 5,708,780 ("'780 patent"), attached as Exhibit 4, from *Soverain Software LLC v. Amazon.com, Inc.*, 6:04-cv-14 ("*Amazon*").  To reduce the number of terms requiring construction, the parties have stipulated that, except where disputed, the Court's claim constructions in *Amazon* will apply in the present case.[1]  Notwithstanding the stipulation, fourteen terms, three of which have already been construed by the Court in *Amazon*, remain in dispute.

## II.     LEGAL STANDARD

The Court construes patent claims as a matter of law.[2]  "It is a bedrock principle of patent law that "the claims of a patent define the invention to which the patentee is entitled."[3]  The terms in a claim "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention."[4]  When the ordinary meaning of a claim term is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly

---

[1] Defendants agreed to adopt *Amazon* constructions for certain terms subject to the right to appeal those constructions based on the *Amazon* record. (*See* Dkt. No. 192, attached as Exhibit 6.)

[2] *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

[3] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted).

[4] *Id.* at 1312-13.

understood words."[5]  In certain cases, a Court is not even required to supply a construction for the term differing from the language of the term itself.  The Court can simply state that the plain meaning of the term applies.[6]

For terms having a particular meaning in a field of art, the Court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."[7]

When construing claims, courts should examine other claims in the patent, whether or not asserted.[8]  Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can illuminate the meaning of the term in another.[9]  Moreover, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular terms."[10]  A specific application of this principle is the doctrine of claim differentiation, under which "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."[11]

_____

[5] *Id.* at 1314.

[6] *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001); *Bd. of Regents of the Univ. of Texas Sys. v. Benq Am. Corp.*, No. A-05-CA-181, 2006 WL 6112210, at *12 (W.D. Tex. Jul. 14, 2006) ("[T]he Court properly refuses to attach a special construction to a term when the ordinary meaning of the term applies.").

[7] *Mentor H/S*, 244 F.3d at 1380.

[8] *Phillips*, 415 F.3d at 1314 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

[9] *Id*. (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)).

[10] *Id*. (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)); *see also Voda v. Cordis, Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (citing *Phillips*, 415 F.3d at 1314).

[11] *Phillips*, 415 F.3d at 1315 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).

– 2 –

In *Phillips*, the court further emphasized that "[i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[12] Usually, the specification is dispositive; "it is the single best guide to the meaning of a disputed term."[13]  It is not permissible, however, to focus on only a portion of the specification and ignore other parts, rather, "[t]he court must always read the claims in view of the full specification."[14]  It is generally improper to limit the scope of the claims to a single embodiment, even if it is the only disclosed embodiment.[15]  Likewise, it is generally improper to construe a claim in a way that would exclude the preferred embodiment from the claim scope.[16]  Additionally, the construction of a claim should not defeat the purpose of the invention.[17]

While the claims and specification are the best indicators of claim scope, a court "should also consider the patent's prosecution history."[18]  However, because "the prosecution history represents an ongoing negotiation between the [Patent Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."[19]  Accordingly, the prosecution history should be used

---

[12] *Id.* at 1313.

[13] *Id.* at 1315.

[14] *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).

[15] *Phillips*, 415 F.3d at 1323 (expressly rejecting "the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

[16] *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." (citation omitted)); *Vitronics*, 90 F.3d at 1583-84.

[17] *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371-72 (Fed. Cir. 2005) (rejecting a construction that "would defeat the purpose of the invention").

[18] *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980 and *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966)).

[19] *Id.*

to limit the scope of the claims only when "the applicant clearly and unambiguously 'disclaimed or disavowed any interpretation during prosecution in order to obtain claim allowance.'"[20]

Because of its availability to the public, intrinsic evidence – the claims, the specification, and the prosecution history – should be used to determine how a person of ordinary skill in the art would have understood disputed claim language.[21]  In addition to the intrinsic evidence, however, "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words."[22]  But the Court "must ensure that any reliance on dictionaries accords with the intrinsic evidence."[23]

 "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."[24]

## III.     CLAIM CONSTRUCTION

### A.     United States Patent No. 7,272,639

#### 1.     Technology Background

The technology of Soverain's '639 patent was developed by employees of Open Market, Inc., one of the earliest e-commerce software companies.  The patented technology relates to the control and monitoring of access to information on the Internet, and is applicable to processing

---

[20] *Voda*, 536 F.3d at 1321 ("This court has emphasized . . . that in order to disavow claim scope during prosecution 'a patent applicant must clearly and unambiguously express surrender of subject matter.'" (citation omitted)).

[21] *See Phillips*, 415 F.3d at 1312-17; *Flex-Rest, LLC. v. Steelcase, Inc.*, 455 F.3d 1351, 1361 (Fed. Cir. 2006).

[22] *Phillips*, 415 F.3d at 1322.

[23] *Free Motion Fitness, Inc. v. Cybex Intern., Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1314).

[24] *Phillips*, 415 F.3d at 1324.

– 4 –

service requests in a hypertext transfer protocol ("HTTP") environment, such as the World Wide Web ("Web").  HTTP is said to be "stateless," that is, it does not keep track of communications exchanged between a user's computer and a website's server ("web server") during a given session (e.g., e-commerce shopping).   Under HTTP, a web server cannot tell whether a series of communications from a client are part of the same session.

Soverain's patented technology permits a web server to recognize a series of inquiries (service requests) from the same client during an online session, and to control access to information without repeated authentication.  In this manner, users may conveniently browse information they are authorized to access.

The technology is based on the use of a session identifier created by a web server.  The client appends the session identifier to requests sent to that web server.  The session identifier allows the web server to recognize requests that belong to the same session and to distinguish among the requests of different sessions.  This ability allows the web server to provide access to information resources that the user is authorized to access and to monitor the user's access.  In practice, this technology allows electronic merchants to maintain an e-commerce session with a user, and to track and monitor visitors to their websites.

### 2.    Interpretation of Disputed Claim Terms

#### (a)    "controlled document"

| Soverain's Construction | Defendants' Construction |
|---|---|
| a document that can be accessed when one or more conditions are met | a document for which authentication is required |

An aspect of the '639 patent is controlling access to certain documents on the server system.[25]  In the specification, these documents are referred to as "controlled documents,"

---

[25] *E.g.*, Ex. 3, '639 patent, col. 2, l. 40 – col. 4, l. 29.

"controlled pages," or "controlled files."[26]  The specification discloses various embodiments in which access to controlled documents may or may not require authentication.  In one embodiment, access to controlled documents is based on the presence of a valid session identifier in requests to the server system.[27]  Depending on the circumstances, the session identifier may be obtained upon verification of the users' credentials (authentication) or without such verification.  For example, the specification discloses that "[i]f the request is for a low level document, the authentication [server] may issue an appropriate SID immediately . . . and *forego* [sic] *the credential check procedures*."[28]  In an alternative embodiment, users access content by using telephone numbers including unpublished ambassador numbers that permit access to controlled documents "*without* user authentication."[29]

Soverain's proposed construction is correct because it encompasses the various methods of controlled-document access expressly disclosed in the specification, i.e., accessing controlled documents in different embodiments, with or without user authentication.  Defendants' construction, on the other hand, should be rejected for two reasons.  First, Defendants attempt to limit the construction of "controlled document" to a subset of embodiments, ignoring those where no authentication is required.  This is not permissible.[30]  Second, Defendants' construction is vague because it does not specify (1) for which specific actions related to the controlled documents (e.g., reading, writing) authentication is required, and (2) who or what is authenticated.

---

[26] *E.g.*, *id.* at Abstract, col. 3, l. 6 – col. 4, l. 29, col. 6, ll. 1-4.

[27] *Id.* at col. 6, ll. 5-16.

[28] *Id.* at col. 6, ll. 39-43 (emphasis added).

[29] *Id.* at col. 10, ll. 5-11 (emphasis added).

[30] *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-1277 (Fed. Cir. 2008) (Courts "normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification."); *Phillips*, 415 F.3d at 1323 (warning "against confining the claims to [specific] embodiments").

– 6 –

**(b)**   **"validating, at the server system, the appended session identifier" and "validating the session identifier appended to the service request"**

| Soverain's Construction | Defendants' Construction |
|---|---|
| at the server system, determining the validity of the appended session identifier<br><br>determining the validity of the session identifier appended to the service request | checking that the session identifier is valid without resort to information stored elsewhere, such as in the server system |

The parties seem to agree that the term "validating" has plain meaning and does not require construction.  Indeed, the parties use the word "valid" and "validity" to define "validating."  The dispute is whether validating must occur "without resort to information stored elsewhere," as Defendants propose.

Defendants' construction is wrong because it impermissibly excludes the preferred embodiment from the claim coverage.[31]  Specifically, in the preferred embodiment:

> validation includes the following list of checks: (1) the SID's digital signature is compared against the digital signature computed from the remaining items in the SID and the user IP address using the secret key shared by the authentication and content servers; (2) the domain field of the SID is checked to verify that it is within the domain authorized; and (3) the EXP field of the SID is checked to verify that it is later than the current time.[32]

All three validation checks disclosed in the preferred embodiment require information "stored elsewhere."  The first check requires a secret key shared by the authentication and content servers.  The secret key is not passed in the session identifier, so it must be stored elsewhere.  The second check verifies that the domain field of the session identifier is within the authorized domain.  The information regarding which domains are authorized is not passed in the session identifier, so it must be stored elsewhere.  The third check verifies whether the session

---

[31] *MBO Labs.*, 474 F.3d at 1333; *Vitronics*, 90 F.3d at 1583-84.

[32] Ex. 3, '639 patent, col. 6, ll. 9-16.

identifier has expired by comparing the EXP field of the session identifier to the current time. The current time is not passed in the session identifier, so it must be stored elsewhere.  Thus, Defendants' proposed construction contradicts the specification.

In support of their proposed construction, in their P.R. 4-3 submission, Defendants appear to rely on the following quote from the prosecution history, where the applicants stated:

> Johnson does not teach or suggest a session identifier but rather teaches a credential identifier.  A credential identifier is a "small value" used to access a "credential structure which is maintained on the server.  Each time a request is made, the server reconstructs "an image of the user."  Johnson uses the credentials identifier to locate the credentials structure from which the image of the user is reconstructed.
>
> Applicants' invention, on the other hand, does not need to perform this reconstruction, because the session identifier itself contains sufficient information to validate that the request is authorized.[33]

Any prosecution-disclaimer argument based on the above statement is flawed.  The statement does not amount to a clear and unambiguous disavowal required to limit the scope of the invention for the following reasons.[34]

First, this statement does not preclude the use of information stored elsewhere to perform validation.  It only describes the information contained in the session identifier as being *sufficient* for validation; it does not say that the session identifier must contain the entire universe of information that the server system can use for validation.

Second, the statement was offered to distinguish claims of the '639 patent application from a prior art patent referred to as "Johnson" and must not be taken in isolation.  As described in the file history, Johnson discloses a method for authorizing requests from the client to the

---

[33] *See* Amended P.R. 4-3 Submission, Ex. C at 78, attached as Exhibit 7 (citing '639 patent File History, December 28, 2001 Amendment, p. 8 (citation omitted), attached as Exhibit 9).

[34] *Voda*, 536 F.3d at 1321.

– 8 –

server.[35]  Johnson's requests that require authorization contain a credential identifier.[36]  The authorization is performed in two steps: (1) retrieving the user profile based on the credential identifier; and (2) authorizing the user to perform a particular action.[37]  In distinguishing the '639 claims from Johnson, the applicants explained that their invention does not need to retrieve the user profile (step 1).  They did not distinguish Johnson on the basis of validation (step 2).

Any reading of applicants' statement as excluding the use of information "stored elsewhere" for validation contradicts both the specification and what applicants actually stated during prosecution.

**(c)    "stored session identifier"**

| Soverain's Construction | Defendants' Construction |
|---|---|
| Plain meaning applies; this term does not require construction | a session identifier that is recorded in computer storage without other information, excluding standard browser formats common to the Web on or before June 7, 1995. |

The term "stored session identifier" has a plain meaning and does not require construction.  The parties agree that a portion of the disputed term, "session identifier," means "a text string that identifies a session."  What remains in dispute is the meaning of the remaining word "stored."  This word is clear on its face and does not require construction.[38]

In an apparent attempt to avoid infringement through claim construction, Defendants are reading the following limitations into the single word "stored": (1) the location where the session identifier is stored; (2) whether other information is stored together with the session identifier;

---

[35] *See* Ex. 9, '639 patent File History, December 28, 2001 Amendment, pp. 6-8.

[36] *See id.*

[37] *See id.*

[38] *Mentor H/S*, 244 F.3d at 1380 (concluding that the district court properly refused to construe claim terms "irrigating" and "frictional heat" and did not err by instructing the jury that these terms should receive their ordinary meanings); *Bd. of Regents of the Univ. of Texas Sys.* 2006 WL 6112210, at *12.

– 9 –

and (3) the means by which the storing is accomplished.  Defendants' overly restrictive
construction should be rejected because it conflicts with the no-reading-in principle,[39] and also
because it has no support in either the specification or the prosecution history.[40]

Defendants' first limitation requires the session identifier to be "recorded in computer
storage."  Persons of ordinary skill in the art would know exactly what "stored" meant.  The
phrase "recorded in computer storage" clarifies nothing and raises an additional question of what
is "computer storage."  For example, is a flash drive "computer storage"?

Second, Defendants attempt to limit the construction of the word "stored" by requiring
that the session identifier be stored "without other information."  This negative limitation, like
the "without resort to information stored elsewhere" limitation discussed in Section III.A.2(b)
immediately above, does not supply meaning to the disputed term at issue.  Instead, it adds an
unsupported restriction specifying that nothing can be stored together with the session
identifier.[41]  This negative limitation contradicts the specification, which discloses a specific
embodiment in which the client is running a browser.[42]  In this embodiment, the client must store
the session identifier together with at least the browser program, and thus not "without other
information."

Defendants' third limitation, likewise, does not define the word "stored," but instead
attempts to confine the claims to browsers available only after June 7, 1995, the '639 patent

---

[39] *Phillips*, 415 F.3d at 1323.

[40] *See id.* at 1324.

[41] *See SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006) (noting that courts are "powerless to rewrite the claims and must construe the language of the claim at issue based on the words used" (citation omitted)).

[42] *E.g.*, Ex. 3, '639 patent, col. 7, ll. 22-26; *see also* Ex. 4, '780 patent, claims 58, 111.

application's priority date.  Defendants' attempt to rewrite the claims should be rejected.[43]  In

support of their third limitation, Defendants have identified in their P.R. 4-3 submission a portion

of the specification describing a "modified" special browser that stores session identifiers,[44] in

combination with the following statement in the prosecution history:

> In addition, Freemen-Benson, at the time of its publication, worked
> with "*all* existing WWW browsers.  Such browsers as existed at
> the time would not support Applicants' claimed invention, which
> as of the priority date, required a modified browser.  Of course,
> 'modern' browsers which support cookies are such 'modified'
> browsers.[45]

Defendants' reliance on the "modified browser" description in the specification is

misplaced.  So too is their reliance on the prosecution history.  The above statement refers to *all*

browsers that "existed at the time" of the Freeman-Benson publication, i.e., May 1994,[46] and not

the June 7, 1995 priority date of the '639 patent application.  The statement goes on to say that

these pre-May 1994 browsers would not support the applicants' invention.  It says nothing about

browsers introduced between May 1994 and June 1995.[47]  Nowhere did applicants

unambiguously disclaim the use of pre-June 7, 1995 browsers, and thus reading into the claims

such a limitation excluding such browsers is be completely unwarranted.[48]

---

[43] *SRAM*, 465 F.3d at 1359.

[44] *See* Ex. 7, Amended P.R. 4-3 Submission, Ex. C at 96 (citing '639 patent, col. 4, ll. 23-29).

[45] *See id.* at 98-99 (citing '639 patent File History, December 28, 2001 Amendment, p. 7 (emphasis in the original)) (citation omitted).

[46] '639 patent File History, January 19, 2001 Office Action, Notice of References Cited, attached as Exhibit 10.

[47] For example, the Netscape browser was introduced after May 1994.

[48] *Voda*, 536 F.3d at 1321.

– 11 –

### (d)   "a purchase request / a request to purchase"

| Soverain's Construction | Defendants' Construction |
|---|---|
| One or more messages requesting a purchase | a service request including a user identifier in which a buyer initiates a payment transaction for product(s) the buyer wishes to purchase |

The terms "[a] purchase request" and "a request to purchase" have a plain meaning. When construing "service request" in *Amazon*, the Court held that a request "may entail the exchange of any number of messages."[49]  Soverain's construction, which simply applies this holding in the context of the term "purchase request," should be adopted.

Defendants' proposed construction would impermissibly render other portions of the claims superfluous, and should be rejected.[50]  Specifically, Defendants' construction equates a "purchase request" to a "service request including a user identifier."  But "user identifier" is already part of claims that recite "purchase request."  For example, claim 60 recites that "the purchase request includ[es] an associated user identifier."  Similarly, "an identifier of a purchaser" is already part of a claim that recites "a request to purchase."  In particular, claim 62 recites "sending a request to purchase the item along with an identifier of a purchaser."

Furthermore, Defendants' construction is wrong because substituting it in the claims produces a senseless result.[51]  Specifically, claim 60 recites that "at least one service request comprises a purchase request."  Carrying out the substitution results in the phrase "at least one

---

[49] *Amazon* Memorandum Opinion, April 7, 2005 (6:04-cv-14, Dkt. No. 246) ("*Amazon* Markman Order") at 9, attached as Exhibit 11.

[50] *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (rejecting a construction that would render express claim language "superfluous"); *Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Bd. of Regents of the Univ. of Texas Sys.* 2006 WL 6112210, at *12 (rejecting defendants' attempt to add to the construction of a disputed term language similar to what already was in the claim, explaining that "the Court cannot imagine how a jury would find it useful for the Court to build this point into a separate, specially attached construction").

[51] *TIP Sys., LLC. v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1372-73 (Fed. Cir. 2008) (rejecting proposed construction as unhelpful and "nonsensical").

– 12 –

service request comprises a service request . . . ."  Nor is it clear whether the buyer initiates the

payment transaction in the user identifier or in the service request, making the claim vague under

Defendants' construction.

**(e)      "Initial service request"**

| Soverain's Construction | Defendants' Construction |
|---|---|
| the first service request in a session | the first request for service |

The dispute between the parties is whether the initial service request is (a) the first

service request in a session, or (b) the first service request ever.  By defining the "initial service

request" to be the first request *ever*, Defendants make it impossible for a particular client and

server to have more than one session.[52]

Soverain's proposed construction is correct because it is consistent with the function or

purpose of the invention.[53]  The claim expressly recites a "*session* identifier."  Also, as disclosed

in the specification, the '639 patent deals with session management:

> One aspect of the invention involves forwarding a service request
> from the client to the server and appending a session identification
> (SID) to the request and to subsequent service requests from the
> client to the server *within a session of requests*.  In a preferred
> embodiment, the present method involves returning the SID from
> the server to the client upon an initial service request made by the
> client.[54]

Soverain's construction is consistent with the claim language and the preferred embodiment, in

which the server system returns the session identifier upon the receipt of the first request in the

session.  Defendants' proposed interpretation of "initial service request" that is unrelated to a

---

[52] A possible reading of Defendants' construction mandates only one session for a given server irrespective of the number of clients.

[53] *Howmedica Osteonics*, 401 F.3d at 1371-72.

[54] Ex. 3, '639 patent, col. 3, ll. 10-17 (emphasis added).

– 13 –

session would be contrary to the understanding of a person of ordinary skill in the art at the time of the invention.

Conversely, Defendants' construction violates the principle that claims should be construed to cover the preferred embodiment.[55]  Under their construction, claims 10 and 79 would cover only a single session and not the preferred embodiment, which allows for multiple sessions between the same client and server.  More fundamentally, however, under the Defendants' proposed construction, a session identifier would not even be necessary because there would be only one session between a given client and a given server.  A permanent, unique identifier of the client, such as a user identifier or IP address, would identify that never-ending session.  Defendants' construction does not allow for another initial request because any request following the first one would, by definition, be a subsequent request.  This construction should be rejected.

> **(f)   "Creating, responsive to the initial service request, the session identifier"**

| Soverain's Construction | Defendants' Construction |
|---|---|
| producing, in response to the initial service request, the session identifier | creating, based on a type of the first request for service, the session identifier |

This disputed phrase comprises (1) the term "initial service request," discussed in section III.A.2(e) immediately above, and (2) the term "session identifier," whose construction the parties adopted from *Amazon*.  In dispute is the meaning of the phrase "creating, responsive to."

Soverain's construction of "creating, responsive to" as "producing, in response" should be adopted as being closely aligned with the disclosure in the specification.[56]  Defendants' proposed construction "creating, based on a type" reads out the "responsive" requirement from

---

[55] *MBO Labs.*, 474 F.3d at 1333; *Vitronics*, 90 F.3d at 1583-84.

[56] *Phillips*, 415 F.3d at 1316.

the claim.[57]  Specifically, by reading the "responsive" requirement out of the claim, Defendants'

construction ignores the causal relationship between the receipt of the initial service request and

the creation of the session identifier.[58]

Defendants' construction should be rejected for another reason: it reads into the claim the

requirement that the creation of a session identifier depends on the "type of the request," which

requirement finds no support in the claims or specification.  Notably, the word "type" does not

even appear in the patent, nor does the specification convey the idea of there being different

"type[s]" of service requests.  Notwithstanding, Defendants' P.R. 4-3 submission points to the

portion of the specification that discloses the server system (1) generating a session identifier

when it receives the request for a controlled document, and (2) not generating the session

identifier when it receives the request for an uncontrolled document.[59]  Defendants apparently

suggest, incorrectly, that the "type of the first request" is determined by whether the request is

for a controlled document, and that the session identifier is created only when the request is for a

controlled document.  The specification, however, teaches that in certain circumstances, the

session identifier is not generated even if the request is for a controlled document.  For example,

the session identifier could have been generated in response to an earlier request in the session.[60]

Defendants' construction is contrary to the specification and should be rejected.

---

[57] *See Bicon, Inc.*, 441 F.3d at 951; *Texas Instruments Inc. v. U. S. Int'l. Trade Comm'n.*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting a construction that would read an express limitation out of the claim).

[58] Ex. 3, '639 patent, claim 79.

[59] *See* Ex. 7, Amended P.R. 4-3 Submission, Ex. C at 108-10 (citing '639 patent, col. 5, l. 18 – col. 6, l. 8).

[60] Ex. 3, '639 patent, col. 5, l. 42 – col. 6, l. 16 ("If the request is directed to a controlled page, the content server determines whether the URL contains an SID . . . .  If the initial GET URL contains a SID . . .").

– 15 –

(g)      "subsequent distinct requests"

| Soverain's Construction | Defendants' Construction |
|---|---|
| Plain meaning applies; this term does not require construction | every request for a separate and different service |

The phrase "subsequent distinct requests" has a plain meaning and requires no construction.[61]  The word "requests" refers to "service requests," which has an agreed-upon construction.  Indeed, "requests" derives its antecedent basis from the recitation of "service requests" in the preambles of claim 1 and 78.[62]  The *Amazon* construction of "service request" is adopted by the parties and is not in dispute.  Essentially, Defendants dispute the constructions of two words, "subsequent" and "distinct," both of which have plain meaning.

Defendants confuse "distinct requests" with "separate and different service[s]."  The claims do not specify what is being requested (i.e., which service), but only require "subsequent distinct requests."  Such subsequent distinct requests may be for the *same* service, for example, the repeated retrieval of a given controlled document.  By requiring that the requests be for "*separate and different* service[s]," Defendants' proposed construction would exclude repeated requests for the same document from the term, even though the specification contemplates making such requests.[63]

Moreover, the use of the words "every request" in Defendants' proposed construction expands the scope of "subsequent distinct requests" to cover requests from different sessions.  Such a construction is inconsistent with a key function of the '639 patent invention: distinguishing between requests of different sessions.[64]  This function is accomplished by

---

[61] *See Mentor H/S*, 244 F.3d at 1380; *Bd. of Regents of the Univ. of Texas Sys.* 2006 WL 6112210, at *12.

[62] *See* Ex. 3, '639 patent, claims 1, 78, and 79.

[63] *See, e.g.*, *id.* at col. 8, l. 14 – col. 9, l. 6.

[64] *Howmedica Osteonics*, 401 F.3d at 1371-72.

– 16 –

forwarding a service request from the client to the server and appending a session identifier to the request and to subsequent service requests from the client to the server within a session of requests.[65]  If the session identifier is used outside of the session, it is no longer the identifier of that session and it cannot be used to distinguish among requests from different sessions.

### (h)    "Hyperlink"

| Soverain's Construction | Defendants' Construction |
|---|---|
| a non-sequential web association which the user can use to navigate through related topics | a navigational element pointing, for example, to another document, or form, or resource |

The term "hyperlink" is a contraction of the term "hypertext link" that was construed in *Amazon* as "a non-sequential web association which the user can use to navigate through related topics."  No further construction is required.

The parties' principal disagreement is whether the term "hyperlink," as used in the patent, refers to the mid-1990s understanding of "hyperlink" in the context of the World-Wide Web, or the pre-Web, 1960s[66] understanding of the term "hypertext," as urged by Defendants.[67]

Soverain's construction of "hyperlink" in terms of the World-Wide Web is consistent with the understanding of a person of ordinary skill in the art at the time of the invention.  This should be the focus in construing disputed terms.[68]  The sources for ascertaining this understanding include the claims, the specification, the prosecution history, and extrinsic evidence.[69]  The priority date of the '639 patent is the filing date of its parent (the '780 patent),

---

[65] Ex. 3, '639 patent col. 3, ll. 10-15.

[66] Although the term "hypertext" was coined in the 1960s, hyperlinks did not come into widespread use until the 1990s with the explosion of the World-Wide Web.

[67] *See* Ex. 7, Amended P.R. 4-3 Submission, Ex. C at 91.

[68] *Markman*, 52 F.3d at 986.

[69] *See generally Phillips*, 415 F.3d 1303.

June 7, 1995, which falls within a period of active Web development.  The background section

of the '639 patent provides the invention's context, which is *exclusively* Web-oriented:

> Created in 1991, the Web is based on the concept of "hypertext"
> and a transfer method known as "HTTP" . . .
>
> The Web client, a browser, reads [HTML] codes in order to
> display the page. *The hypertext conventions and related functions
> of the world wide web* are described in the appendices of U.S.
> patent application Ser. No. 08/328,133, filed on Oct. 24, 1994, by
> Payne et al. which is incorporated herein by reference.[70]

As highlighted in the above quotation, the appendices to the application that matured into

the '314 and '492 patents, incorporated by reference in the '639 patent specification, provide

further evidence that hyperlinks should be understood to be in the context of the conventions of

the Web.  These appendices relate to contemporaneous developments of the World-Wide Web.[71]

The summary of the invention in the '639 patent begins with the following statement

regarding particular applicability of the invention to the World-Wide Web:

> The present invention relates to methods of processing service
> requests from a client to a server through a network.  In particular
> the present invention *is applicable to processing client requests in
> an HTTP (Hypertext Transfer Protocol) environment, such as the
> World-Wide Web (Web)*.[72]

Also, several figures in the '314 and '492 patents as well as figures in the '639 patent depict a

typical contemporary World-Wide Web browser.[73]

---

[70] *E.g.*, Ex. 3, '639 patent col. 1, l. 48 – col. 2, l. 13 (emphasis added).

[71] *E.g.*, Appendix A – Beginner's Guide to HTML (stating "[t]his is a primer for producing documents in HTML, the markup language used by the World Wide Web."); Appendix B – Mosaic for X version 2.0 Fill-Out Form Support; Appendix C – Hypertext Transfer Protocol (Internet Draft); Appendix D – Uniform Resource Locators (Internet Draft), title pages of these appendices are attached as Exhibit 12.

[72] Ex. 3, '639 patent col. 3, ll. 6-10 (emphasis added).

[73] Ex. 1, '314 patent, FIGs. 5-14 (the '314 patent and  the '492 patent share the same specification; the citations to the specification of these patents refer to the column, lines, and figures of the '314 patent, even if the construed term appears only in the '492 patent); '639 patent, FIGs. 4-5.

Given the rapid development of the World-Wide Web at the time of the invention and the statements in the background and summary sections, a person of ordinary skill in the art would understand the term "hyperlink" in the claim to refer to a World-Wide-Web hypertext link, and not to the 1960s pre-Web technology, which did not apply "conventions and functions" of the World-Wide Web.  Therefore, under the relevant precedents, this understanding should be reflected in the construction of the term "hyperlink," and Defendants' construction should be rejected.

### B.     United States Patents No. 5,715,314 and 5,909,492

#### 1.     Technology Background

The '314 patent is generally directed to an Internet sales system that allows a user to shop over the Internet and pay electronically.  The system also includes the now-ubiquitous virtual "shopping cart" feature.  The patented network sales system includes a buyer computer for operation by the user desiring to buy products online.  The user selects products for purchase and places them in a shopping cart, which is stored in a shopping cart database.  When ready to check out, the user initiates an electronic payment transaction to pay for the selected products.

The sales system described and claimed in the '314 patent allows a user both to select items and to pay for them over the network, eliminating the need for alternate shopping arrangements such as telephone calls or fax authorizations.  This results in efficient transaction processing, immediate benefits to the merchant through real-time sales, and a more convenient online shopping experience for the user.

The '492 patent claims different aspects of the disclosed technology.  Certain '492 patent claims are specifically directed to the provision of "smart" hypertext statement documents, which allow the user to track past purchase transactions.

– 19 –

2.      **Interpretation of Disputed Claim Terms**

(a)      **"Shopping cart computer"**

| Soverain's Construction | Systemax and TigerDirect's Construction |
|---|---|
| a computer processing data associated with one or more shopping carts | a computer processing data associated with one or more shopping carts but is not operated by an operator of a merchant computer |

The parties agree that a "shopping cart computer" is "a computer processing data associated with one or more shopping carts." This construction is supported by the claims[74] and was adopted by the Court in *Amazon*. No further construction of this term is required.

Defendants Systemax and TigerDirect (collectively "Systemax"), but not Newegg, argue that the Court-adopted construction should be modified by adding the negative limitation "but is not operated by an operator of a merchant computer." This is a position similar to one the *Amazon* defendants took, but ultimately abandoned. In its P.R. 4-3 submission, Systemax quotes portions of the specification that do not even mention an operator of the merchant computer, much less support its proposed construction. Systemax also appears to rely the following statement from an internal document made by one of the inventors: "[w]e are building a payment system for the Web. Our novel approach works with today's clients and doesn't let the merchants see the client's payment credentials."[75] Systemax's construction should be rejected for several reasons.

First, none of the presently asserted claims recite a merchant computer. But even for these claims, Systemax's proposed construction would require adding to the term "shopping cart computer," by definition: (1) a merchant computer; (2) an operator of this merchant computer;

---

[74] *See*, *e.g.*, Ex. 1, '314 patent, claim 34.

[75] *See* Amended P.R. 4-3 Submission, Ex. D at 1, attached as Exhibit 8 (quoting SVN2-0040037, attached as Exhibit 13).

and (3) a different operator of the shopping cart computer.  The combination of such requirements is neither disclosed nor suggested in the patent specification, and Defendants' proposed construction is nothing more than an invitation to the Court to impermissibly rewrite the claims.[76]

Second, the term "an operator of a merchant computer," which does not appear in the patent, is unclear because of the uncertainty of who (or what) is the operator of a merchant computer.  The use of this unclear term in the definition of "shopping cart computer" would make the claim indefinite.

Third, extrinsic evidence of the inventor's statement that merchants should not see clients' payment credentials should not be used to limit claim scope as a matter of law, because it was made outside the patent's prosecution record, makes no reference to the disputed term, and appears at variance with the intrinsic record.[77]  In fact, it appears in an internal document that was not available to the public.  Such statements are particularly unreliable evidence in construing patent claims.[78]  But even if it were relevant to construing the '314 and '492 patent claims, the statement does not require that the shopping cart computer and the merchant computer be operated by different entities as Systemax contends.  It only requires that merchants be prevented from seeing clients' payment information.  At the time of the invention, this could have been accomplished in other ways (for example, encryption).

---

[76] *SRAM*, 465 F.3d at 1359.

[77] *Phillips*, 415 F.3d at 1324; *Northern Telecom Ltd. v. Samsung Elec. Co., Ltd.*, 215 F.3d 1281, 1295-96 (Fed. Cir. 2000) (noting that "extrinsic evidence is rarely, if ever, probative of a special and particular definition of a limitation found in a claim[,] . . . because extrinsic evidence 'may not be used to vary or contradict the claim language' as discerned from the intrinsic record" and finding unpersuasive an argument aimed to limit the construction of a term based on contemporaneous scientific article published by a named inventor.); *Vitronics*, 90 F.3d at 1583-84.

[78] *Bd. of Regents of the Univ. of Texas Sys.*, 2006 WL 6112210, at *7 n.8 ("As an unpublished work, it is difficult to see how the [cited report written by a named inventor] could have any bearing on what ordinary persons of skill in the art would have understood the concededly novel [claim] term . . . to mean . . . .").

– 21 –

### (b)    "URL"-related terms

The parties dispute the constructions of two URL (Uniform Resource Locator)-related terms: "shopping cart URL" and "statement URL."  These terms have ordinary and plain meanings apparent to a person of ordinary skill in the art at the time of the invention.  Both Soverain and Defendants use "URL" in their proposed constructions, and, in *Amazon*, the Court used "URL" when construing the phrase "path name in a uniform resource locator."

The disputed URL-related terms "shopping cart URL" and "statement URL" should be accorded their ordinary meanings, "URL concerning a shopping cart" and "URL concerning a statement," respectively.  Defendants' constructions should be rejected for the reasons set forth below.

### (i)    "shopping cart URL"

| Soverain's Construction | Defendants' Construction |
| --- | --- |
| a URL concerning a shopping cart | a standard HTTP request message send by the buyer computer to the shopping cart computer which causes the shopping cart computer to modify content of a shopping cart and includes URL with a product identifier, a domain identifier, a payment amount, a merchant computer identifier, a merchant account identifier, a duration time, an expiration time, and a shopping cart URL authenticator |

Defendants' 61-word proposed construction of this 3-word term is a textbook example of impermissibly reading limitations from the preferred embodiment into the claims.[79]  Absent a clear disclaimer by the patentee, which Defendants cannot point to here, such reading in of limitations is improper even if only one embodiment is disclosed.[80]  Furthermore, '314 patent claims 60, 61, and 63-67 (and likewise claims 120, 121, and 123-127) require the "shopping cart

---

[79] *See Phillips*, 415 F.3d at 1323 (acknowledging "the danger of reading limitations from the specification into the claim").

[80] *Id*.

URL" to comprise one or more specific pieces of information, such as a domain identifier, a payment amount, or a merchant computer identifier.  Adopting Defendants' overly narrow construction of this term, so as to include that specific information in the definition of "shopping cart URL," would make these claims identical in scope, contrary to the claim-differentiation doctrine.[81]

Additionally, Defendants urge the Court to construe a "URL" as an HTTP message that includes a URL, and to limit that HTTP message to a specific sender (buyer computer) and a specific recipient (shopping cart computer).  Defendants' construction is illogical, technically inaccurate, and not supported by the specification.  First, Defendants define an object (URL) to be something else that includes that object.  This tautology defies logic and should be rejected for this reason alone.  Second, it is technically inaccurate because a URL is not a message and thus cannot be an HTTP message.  And while the specification states that in certain cases a URL may be sent in a standard HTTP message, that does not mean that the URL *is* an HTTP message.[82]

### (ii)    "statement URL"

| Soverain's Construction | Defendants' Construction |
|---|---|
| a URL concerning a statement | a standard HTTP request message with URL to the Statement Document including its path on the server on which it resides |

Defendants' "statement URL" construction suffers from most of the same infirmities as their "shopping cart URL" construction.  In addition, Defendants' proposed construction of "statement URL" is wrong because the phrase "URL to the Statement Document including its

---

[81] *Phillips*, 415 F.3d at 1315; *see also Liebel-Flarsheim*, 358 F.3d at 910.

[82] Ex. 1, '314 patent, col. 9, ll. 51-55 ("Whenever the present application states that one computer sends a URL to another computer, it should be understood that in preferred embodiments the URL is sent in a standard HTTP request message, unless a URL message is specified as a redirection in the present application.").

path on the server on which it resides" suggests the preexistence of the statement document at a specific location. In fact, the specification discloses that the statement document can be generated dynamically in response to the statement URL:

> After verification of account information is complete, the payment computer retrieves the requested settlement data from the settlement database, *creates a smart statement document* for the buyer, and sends the smart statement document to the buyer computer (step 142).[83]

In such a case, the statement document would not exist in advance of the server receiving the statement URL, and expressly requiring the path on a specific server on which the statement document resides makes no sense. Defendants' proposed construction should be rejected.

### (c)    "Hypertext link"

| Soverain's Construction | Defendants' Construction |
|---|---|
| a non-sequential web association which the user can use to navigate through related topics | text in a document that forms a navigational element pointing, for example, to another document, or form, or resource |

The term "hypertext link" was construed in *Amazon* as "a non-sequential web association which the user can use to navigate through related topics," and requires no further construction here.

Because the terms "hyperlink" and "hypertext link" are essentially the same, the discussion related to "hyperlink" in Section III.A.2(h) above at page 16 is applicable to this term as well. The '314 and '492 patents were filed at approximately the same time as the '780 patent (the '639 patent's parent). The evidence of what a person of ordinary skill in the art would understand the term "hyperlink" to mean in the '639 patent is, therefore, equally probative of the construction of "hypertext link" in the '314 and '492 patents.

---

[83] Ex. 1, '314 patent, col. 8, ll. 55-59 (emphasis added).

Defendants suggest that the terms "hypertext link" and "hyperlink" are different.  The distinction suggested by the Defendants is that "hyperlink" is a "navigational element," while "hypertext link" is "text . . . that forms a navigational element."  This is an overly literal and incorrect reading.  It ignores that, at the time of the invention, persons of ordinary skill in the art used the term "hypertext link" to refer to objects other than text.  For example, the '639 patent specification makes clear that "hypertext links" are not limited to text and may also be pictures or sounds.[84]

**(d)     "Payment message"**

| Soverain's Construction | Defendants' Construction |
| --- | --- |
| a message relating to a payment for one or more products | a message relating to a payment for one or more products, containing an authenticated user's payment information and sent to the buyer computer |

The parties agree that a "payment message" is "a message relating to a payment for one or more products," as construed by the Court in *Amazon*.  Soverain submits that this construction is sufficient and no further construction of the phrase is required here.  Defendants would go beyond the *Amazon* construction, urging the Court here to rewrite the claims by narrowing them in violation of several claim construction principles.

First, Defendants would rewrite the claims by specifying the recipient of the "payment message" as the buyer computer.  Defining "payment message" by specifying its recipient in no way clarifies the meaning of "payment message."  A message does not stop being a "payment message" based on its recipient.

---

[84] Ex. 3, '639 patent, col. 2, ll. 16-20. ("Hidden behind certain text, pictures or sounds are connections, known as 'hypertext links' ('links'), to other pages within the same server or even on other computers within the Internet.").

– 25 –

Defendants' construction of "payment message" as a message "sent to the buyer computer" is wrong for the additional reasons that it contradicts the language of the claims and is not supported by the specification.[85]  The presently asserted claims do not specify the recipient of the payment message.  Claim 1 of the '314 patent, however, requires the payment message to be sent to the payment computer, not the buyer computer.[86]  Additionally, the specification contains disclosure of the payment message being sent either to the buyer computer or to the payment computer.[87]  Given that the specification discloses different recipients for the "payment message," one (the payment computer) being expressly claimed in the patent, Defendants' proposed construction adding the "buyer computer" recipient requirement is completely unwarranted.

Defendants would further require "an authenticated user's payment information" to be a part of the definition of "payment message."  The specification does not require that the payment message contain a user's payment information, nor does the specification require user authentication before sending a payment message.  In effect, Defendants' proposed construction would read into the simple term "payment message" a separate processing step of user authentication, another step of sending the message, and the requirement that the message contain certain payment information of the authenticated user.  There is no claim construction principle under which rewriting claims in such a manner is warranted.

---

[85] *See SRAM Corp.*, 465 F.3d at 1359.

[86] Ex. 1, '314 patent, claim 1 (reciting "said buyer computer being programmed to receive a user request for purchasing a product, and to *cause a payment message to be sent to said payment computer* that comprises a product identifier identifying said product") (emphasis added).

[87] *See, e.g.*, Ex. 1, '314 patent, Abstract, col. 1, ll. 51-59, col. 3, ll. 38-42.

**(e)      "To cause said payment message to be activated to initiate a payment transaction"**

| Soverain's Construction | Defendants' Construction |
|---|---|
| to cause an action associated with said payment message to initiate a payment transaction | upon request of the authenticated user, the buyer computer causes the submission of said payment message[88] |

The construction of this term presents two disputes: (1) whether the payment message must be activated by the authenticated user, and (2) whether "activation" of the payment message is limited to submission (sending, transmitting, etc.) of the message.

Defendants' attempt to tie the construction of the payment message to an authenticated user is discussed in Section III.B.2(d) immediately above, and should be rejected for the reasons set forth in that section.

Soverain's construction of "activation" as broader than an act of "submission" is supported by the presumption that different terms in the claims have different meanings.[89]  Claim 1 of the '314 patent recites "to cause a payment message to be *sent* to said payment computer." (emphasis added).  In contrast, claim 34 recites "to cause said payment message to be *activated*." This distinction supports Soverain's position that "activation" is different from "sending" (submission).  Additionally, claim 49, which depends on claim 34, further requires "activat[ing] the payment message by *transmitting* a message."[90]  Dependent claim 49 thus recites a specific manner in which a payment message is activated, further confirming that independent claim 34 is not so limited.  Based on the claim language alone, therefore, "activation" in the '314 and '492

---

[88] Defendants' construction is wrong because when it is substituted into the claims, the claims become grammatically incorrect.  Defendants' construction should be rejected for this reason alone.

[89] *Voda*, 536 F.3d at 1320; *Phillips*, 415 F.3d at 1314.

[90] Ex. 1, '314 patent, claim 49 (emphasis added).

patents refers to performance of an action, which may be "submission" or "transmission," but is not limited to those actions.

Soverain's construction is also supported by the specification, disclosing instances of button and link "activation," which to a person of ordinary skill in the art means "clicking" or "pressing," not "sending."  For example, the specification states that "[w]hen the user activates link 5, an HTTP request 25 is sent to the merchant computer requesting the document."[91]  The use of "activating" and "sending" in the same sentence leaves no doubt that the meaning of the two words is different.[92]

## IV.    CONCLUSION

For the foregoing reasons, the Court should adopt Soverain's claim constructions for each of the disputed terms and phrases at issue.

---

[91] U.S. Pat. No. 5,724,424 ("'424 patent"), col. 5, ll. 57-59.  The '314 patent incorporates U.S. App. No. 09/168,519, later abandoned, by reference.  A continuation of that application, U.S. App. No. 08/563,745, issued as the '424 patent, attached as Exhibit 5.  For convenience, reference is made to columns and lines of the '424 patent instead of U.S. App. No. 09/168,519.

[92] *Phillips*, 415 F.3d at 1315 (holding that "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term" (citation omitted)).

Dated:  April 15, 2009                              Respectfully submitted,


                                                    /s/ Ognian V. Shentov (with permission)
                                                    Kenneth R. Adamo
                                                    State Bar No. 00846960
                                                    Lead Attorney
                                                    Email:  kradamo@jonesday.com

                                                    Mark C. Howland
                                                    State Bar No. 24027240
                                                    Email:  mchowland@jonesday.com

                                                    JONES DAY
                                                    2727 North Harwood Street
                                                    Dallas, Texas 75201-1515
                                                    Telephone:  214-220-3939
                                                    Facsimile:  214-969-5100

                                                    Thomas L. Giannetti
                                                    NY Attorney Reg. No. 1632819
                                                    Email:  tlgiannetti@jonesday.com

                                                    Ognian V. Shentov
                                                    NY Attorney Reg.  No. 2867737
                                                    Email:  ovshentov@jonesday.com

                                                    JONES DAY
                                                    222 East 41st Street
                                                    New York, New York 10017-6702
                                                    Telephone:  212-326-3939
                                                    Facsimile:  212-755-7306

                                                    ATTORNEYS FOR PLAINTIFF

NYI-4172187

**EXHIBIT INDEX**

| Exhibit | Content |
|---|---|
| 1. | U.S. Patent No. 5,715,314 |
| 2. | U.S. Patent No. 5,909,492 |
| 3. | U.S. Patent No. 7,272,639 |
| 4. | U.S. Patent No. 5,708,780 |
| 5. | U.S. Patent No. 5,724,424 |
| 6. | Order Granting Leave To File Amended Claim Construction (Dkt. No. 192) |
| 7. | Amended P.R. 4-3 Submission (Dkt. No. 195), Ex. C, pp. 78, 91, 96, 98-99, 108-110 |
| 8. | Amended P.R. 4-3 Submission (Dkt. No. 195), Ex. D, p. 1 |
| 9. | U.S. Patent No. 7,272,639 file history, Amendment dated December 28, 2001 |
| 10. | U.S. Patent No. 7,272,639 file history, Office Action dated January 19, 2001, Notice of References Cited |
| 11. | *Soverain Software LLC v. Amazon.com, Inc.*, Memorandum Opinion, April 7, 2005 (6:04-cv-14, Dkt. No. 246) ("*Amazon* Markman Order") |
| 12. | U.S. Patent Application No. 08/328,133, Appendices A-D Title Pages |
| 13. | Soverain Document SVN2-0040037-42, p. SVN2-0040037 |

## CERTIFICATE OF SERVICE

This is to certify that on April 15, 2009 a true and correct copy of the foregoing document has been served on all counsel of record via the Court's ECF system.  This is further to certify that on April 15, 2009 a true and correct copy of the foregoing document has been served on the Court-appointed technical advisor by overnight delivery.

/s/ Ognian V. Shentov
Ognian V. Shentov