**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  6:07-CV-511 |
| | § | |
| CDW CORPORATION, NEWEGG INC., | § | Hon. Leonard E. Davis |
| REDCATS USA, INC., SYSTEMAX, INC., | § | |
| ZAPPOS.COM, INC., TIGER DIRECT, | § | |
| INC., THE SPORTSMAN'S GUIDE, INC., | § | |
| and REDCATS USA LP, | § | |
| | | |
| Defendants. | | |

**NEWEGG INC'S. CLAIM CONSTRUCTION BRIEF**
**PURSUANT TO PATENT RULE 4-5(b)**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION   4

II.  LEGAL STANDARD ................................................................................................ 4

III.  ARGUMENT ....................................................................................................... 6

   A.  U.S. PATENT NO. 5,909,492 ("THE '492 PATENT") ........................................... 6

     1.  *"hypertext link"*.................................................................................. 7

   B.  U.S. PATENT NO. 7,272,639 ("THE '639 PATENT") ........................................ 10

     1.  *"controlled document"*...................................................................... 11

     2.  *"subsequent distinct requests"*.......................................................... 16

     3.  *"creating, responsive to the initial service request, the session identifier"* ............... 18

     4.  *"initial service request"* ..................................................................... 20

**TABLE OF AUTHORITIES**

## Cases

*Astrazeneca AB v. Mutual Pharmaceutical Co.,* 384 F.3d 1333, 1336 (Fed. Cir. 2004)      4

*Comark Communications v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1998)....................... 5

*Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 385 (1996) ............................... 4

*Nystrom v. Trex Co.,* 424 F.3d 1136 (Fed. Cir. 2005*)* .................................................. 4

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005*)* ........................................ 4

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al.*, 2008-1267, -1376 at 10 (Fed. Cir. April
    29, 2009) ............................................................................................. 9, 11, 13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir.
    2001) ..................................................................................................... 13

*Standard Oil Co. v, Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)........................... 5, 8

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)............................... 4

*Warner v. Ford Motor Co.,* 331 F.3d 851, 854 (Fed. Cir. 2004).................................... 4

## I.      INTRODUCTION

Soverain Software LLC ("Soverain") has offered proposed definitions which plainly contradict the fundamental rules of claim construction.   In most cases, the proposed constructions completely ignore the extrinsic evidence, namely the arguments made during prosecution as well as the descriptions provided in the specification.   In addition, Soverain completely ignores the arguments made to the United States Patent and Trademark Office ("USPTO") in the reexamination proceedings subsequent to the *Amazon* case.

## II.     LEGAL STANDARD

The objective of claim construction is to determine the meaning that persons of ordinary skill in the art would apply to the terms in patent claims.  *Warner v. Ford Motor Co.,* 331 F.3d 851, 854 (Fed. Cir. 2004).  Claim construction "is a question of law, to be determined by the court."  *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 385 (1996).  To begin a claim construction analysis, the Court must first consult the intrinsic record, which includes "the words of the claims themselves, the remainder of the specification, [and] the prosecution history." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005*); Nystrom v. Trex Co.,* 424 F.3d 1136 (Fed. Cir. 2005*).*  The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.  *Phillips,* 415 F.3d at 1315-16.

The law is clear that "evidence intrinsic to the patent -- particularly the patent's specification, including the inventors' statutorily-required written description of the invention -- is the primary source for determining claim meaning."   *Astrazeneca AB v. Mutual Pharmaceutical Co.,* 384 F.3d 1333, 1336 (Fed. Cir. 2004); *see, e.g., Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (holding that "intrinsic evidence is the

most significant source of the legally operative meaning of disputed claim language.").   In *Phillips v. AWH Corp.,* the *en banc* court explained that the role of the specification is to describe and enable the invention.   415 F.3d 1303, 1321 (Fed. Cir. 2005).   In turn, the claims cannot be of broader scope than the invention that is set forth in the specification.   *Id.*   Thus, a court looks to the specification "to ascertain the meaning of a claim term as it is used by the inventor in the context of the entirety of his invention."   *Comark Communications v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1998).

Not only must the specification be used as a guide to the meaning of a term, but the specification can provide a stringent limitation on the meaning of a claim term.   A patentee is "not entitled to a claim construction divorced from the context of the written description and prosecution history."   *Nystrom v. Trex*, 424 F.3d at 1144-45.   In fact a "[b]roadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended violates the principles articulated in *Phillips."  Id.*

To understand the meaning of the claims, "a court 'should also consider the patent's prosecution history, if it is in evidence."   *Phillips,* 415.F.3d at 1317 (citation omitted).   The prosecution history, which is also a part of the intrinsic evidence, "consists of the complete record of the proceedings before the [Patent Office] and includes the prior art cited during the examination of the patent."   *Id.*   As the prosecution history "was created by the, patentee in attempting to explain and obtain the patent," the prosecution history provides helpful insights into "how the PTO and the inventor understood the patent."   *Id*.; *Standard Oil Co. v, Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.").

### III.     ARGUMENT

**A.     U.S. Patent No. 5,909,492 ("the '492 patent")**

Generally speaking, the claims of the '492 patent additionally relate to features of the user-interactive network sales system in combination with a "smart statement" feature, that provides the user with a listing of the purchase transactions for a given month. (Ex. A at col. 3, ll. 20-23, col. 8, ll. 33-35; Fig. 11)   The payment/shopping cart computer manages the "smart statement" feature and responds to a buyer's request for the list of the purchase transactions previously made by the user in a particular month.  *Id*. at col. 8, ll. 33-37.  The buyer requests a smart statement by sending a request to show transactions for a particular month (i.e. "a smart statement URL") to the payment computer. *Id*. at col. 8, ll. 35-41. The payment/shopping cart computer performs security checks on the request to make sure (1) that the request is created using a cryptographic key and (2) that the buyer's actual network address matches the network address recorded in the request.  *Id*. at col. 8, ll. 37-47.  If the request passes the security checks, the payment/shopping cart computer then asks the buyer for buyer's account name and password. Upon verifying the buyer's account name and password, the payment/shopping cart computer:

> **[1]** retrieves the requested settlement data from the settlement database, **[2]** creates a smart statement document for the buyer, and **[3]** sends the smart statement document to the buyer computer (step 142). An example of a smart statement document is shown in FIG. 11.

(*Id*. at col. 8, ll. 54-59) (e*mphasis added*).  The smart statement document lists the buyer's purchase transactions with information that includes at least:

> Each purchase transaction record in the smart statement document includes **[1]** the data of the transaction, **[2]** the name of the merchant, **[3]** an identification of the product, and **[4]** the payment amount for the product. The smart statement document also includes **[5]** a transaction detail URL for each purchase transaction (these URLs, or hypertext links, are discussed below and are not shown in FIG. 11). The smart statement

> document also **[6]** identifies previous statements that the user may wish to
> have displayed.

(*Id*. at col. 8, l. 59-col. 9, l. 1) (*emphasis added*).  If the buyer wants more information about a

particular transaction, the buyer computer sends another request (i.e. "a transaction detail URL")

to the payment computer.  *Id*. at 9:3-13.  The transaction detail URL request includes at least:

"**[1]** a transaction identifier, **[2]** a buyer network address, and **[3]** a transaction detail URL

authenticator."  (*Id*. at col. 9, ll. 8-10) (*emphasis added*).  The payment/shopping cart computer

again performs security checks, similar to those it performs before returning the statement

document.  *Id*. at col. 9, ll. 11-14.  Upon completing the security verification, the

payment/shopping cart computer:

> **[1]**retrieves from the settlement database data corresponding to the
> payment transaction specified in the transaction detail URL,
> **[2]**creates a transaction detail document, and **[3]**sends it to the
> buyer computer (step 152). An example of a transaction detail
> document is shown in FIGS. 12 and 13.

*Id*. at col. 9, ll. 14-21) (*emphasis added*.)  The returned "transaction detail document" includes at

least: "**[1]** the transaction date, **[2]**end of the duration time ("expiration"),**[3]** a description of the

product, **[4]**the payment amount, **[5]**the domain corresponding to the product, **[6]**an identification

of the merchant, and **[7]**the merchant's address."  (*Id*. at col. 9, ll. 21-25) (*emphasis added*).

Additionally, the statement document and the transaction detail document both include customer

service information.  *Id*. at col. 9, ll. 26-29.

### 1.  *"hypertext link"*

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| "*hypertext link*" | "text in a document that forms a navigational element pointing, for example, to another document, or form, or resource " | "a non-sequential web association which the user can use to navigate through related topics" |

The term "*hypertext link*" appears in asserted claims 15-16 of the '492 patent (Ex. A). Soverain's position is that this term was construed by the Court in *Amazon* and, therefore, requires no further construction as used in claims 15 and 16 of the '492 patent.  Soverain further portrays the dispute in parties' construction to be primarily between Soverain's "mid-1990s understanding of [hypertext link] in the context of the World-Wide Web" and Defendants' "pre-Web, 1960s understanding."  Soverain supports its construction which limits this term "*hypertext link*" to only the "Web associations," i.e. the Internet, by pointing to Figures 5-14 and Appendixes.  Pl.'s Brief at 17-19, 24-25.  Soverain's argument is without merit.

First, during the *Ex Parte* reexamination, Soverain introduced new claims which sabotage the Court's earlier construction.  *Standard Oil Co. v, Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.")  Soverain introduced new dependent claim 39 which requires the network limitation of the hypertext statement system of claim 15 to be "*an Internet.*" Col. 1, ll. 21-22.  By introducing this specific limitation of "an Internet," i.e. the Web, into dependent claims, Soverain broadened the Court's earlier construction of "*hypertext link.*"  Since independent claims must have a broader scope than their dependent claims, claims 15 and 16 of the '492 patent now recite both Web and non-Web networks and, subsequently, the term "hypertext link" as used in claims 15 and 16 must be applied to both the Web and non-Web implementations.   This alone provides a sufficient reason to reject Soverain's limiting construction.  *See Phillips v. AWH Corp., 415* F.3d 1303, 1314 (Fed. Cir. 2005*); Nystrom v. Trex Co.,* 424 F.3d 1136 (Fed. Cir. 2005*).*

Second, Soverain's portrayal of the dispute as being between its understanding of the "*hypertext link*" as related to the Web, and Defendants' "pre-Web, 1960s" understanding is false. As explained in Defendants' R. P. 4-3 submissions, the term "*hypertext link*" has had a consistent meaning before and after the birth of the Web. (Docket No. 195, Exhibit C at 44-49.)  The Web represents just another method to transport linked information to users from a remote location (i.e. using hypertext transfer protocol.)  *Id*.

Further, Soverain's assertion that Defendants' construction excludes links formed by other objects but text, e.g. hypermedia, is false.  Defendants' construction follows the hypertext conventions known to a person of ordinary skills as of the alleged priority date of the '492 patent.  As Defendants' R. P. 4-3 submission and the specification reveals, at the time of the filing, hypertext links were constructed from a specific text in a document.  This specific text could, for example, be a URL as disclosed in Appendixes A and B to the '492 patent.  However, the specification of the '492 patent does not support Soverain's assertion that the term "*hypertext link*" as used in claims 15 and 16 is formed by objects other than text.  Soverain cites unrelated disclosure from the later '639 patent, since the disclosure of the '492 patent clearly supports Defendants' position and should be applied.  *Phillips,* 415 F.3d at. 1317.  For example, Figures 11 thru 13 show only the text-based "transaction detail hypertext links."  Additionally, the specification discloses "the links" could point "to another document or form (including multimedia documents, hypertext documents including other links, or audio/video documents" but no where does specification discloses that the hypertext links objects could be other than text. *See* Ex. B at col. 9, ll. 59-63;  *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al*., 2008-1267, -1376 at 10 (Fed. Cir. April 29, 2009); *see also Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.") (citations omitted).

Therefore, Defendants' construction consistent with the intrinsic record and should be adopted.

## B.     U.S. Patent No. 7,272,639 ("the '639 patent")

U.S. Patent No. 7,272,639 ("the '639 patent") is a CIP of U.S. Patent No. 5,708,780 ("the '780 patent").  (U.S. Patent No. 7,272,693 is attached hereto as Exhibit B.)  The technology involved in the '639 patent may be briefly summarized as follows.  When a user, or client, displays a page of a website on a browser, the information for the page is provided by a particular computer, called a server.  Ex. B, at col. 1, lines 48-65.  Each page of the website is stored on the server and is associated with a particular URL, or website address, which the browser uses to direct the server to the associated page.  *Id.* at col. 2, lines 20-39.  Users can navigate through various pages of the website or to other websites via "links," or text or pictures on a website, which when clicked on by a user, direct the user to another URL.  *Id.* col. 2, lines 14-26.  Every interaction between the client and the server constitutes a distinct request or communication between the client and the server.  When these individual transactions are a series of related transactions (i.e., all by the same user), they are considered a single "session."  To collect and store together the transactions that are part of the same session, the URLs of the links on a web page can be modified by the server to include a "session ID" unique to the user, such as a string of numbers and letters.  Ex. B, at col. 3, lines 20-41.  When the user communicates with the server by clicking on the links, the server can recognize the session ID in the URL and store the information about the communication or transaction.  *Id.* at col. 3, lines 42-47.

### 1.      "controlled document"

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| *"controlled document"* | "a document for which authentication is required" | "a document that can be accessed when one or more conditions are met" |

The "invention" of the '639 patent, entitled "Internet Server **Access Control** And Monitoring Systems" describes the need for authentication.  Ex. B at 1.   The Abstract summarizes the need for authentication as follows: "when the user attempts to access an accessed-controlled file, the server subjects the request to a secondary server which determines whether the client has an authorization or valid account."  *Id.*  The plain language of Claim 47 shows that the action of "returning a controlled document" is something that occurs post-validation of the appended session identifier.  Consistent with the language of the claim, the specification of the '639 patent discloses that authentication is a necessary component of the invention, particularly with respect to allowing access to the "controlled document" of Claim 47. Claim terms must be "commensurate with the scope of the specification; a court looks to the specification for guidance to ascertain the scope of the claim in claim construction."  *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al.*, 2008-1267, -1376 at 10 (Fed. Cir., April 29, 2009); *see also Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (citations omitted).

There can be no dispute that the access-controlled file described in the Abstract corresponds to the "controlled document" of Claim 47 - or that in order to gain access to any such file an authentication process is required.  The need for authentication is further described in the body of the specification throughout col. 5.  "The details of the authentication process are

11

described in Fig. 2B…."  Further description of the authentication process is found in col. 7, ll.

22-67 ("If a valid account exists for the user an SID is issued which authorizes access to the

"controlled page").  Additional disclosure of an authentication process with respect to granting

access to a controlled document is found in Cols. 8 and 9:

> In Step 8, **the authentication server redirects the client to the tagged
> URL, "http://content.com/[SID]/report"**, to the client.  In Step 9, the
> tagged URL is automatically forwarded by the browser as a GET request
> to the content server.  The content server logs the GET request in the
> Transaction database 56 by recording the tagged URL, the client IP
> address, and the current time.  **In Step 10, the content server, upon
> validating the SID, transmits the requested controlled page "report"
> for display on the client browser**.
>
> *       *       *       *
>
> The Target URL can also describe a URL that includes **an SID that
> provides a preauthorized means of accessing a controlled page.**

*Id*. at col. 8, ll. 5-13, col. 9, ll. 56-58) (*emphasis added*).  Even Soverain concedes that the

invention of the '639 patent includes an authentication process: "[A]n aspect of the '639 Patent is

controlling access to certain documents on the server system" - and that the specification refers

to such documents as "controlled documents," "controlled pages," or "controlled files."  (Pl.'s

Brief at 5-6.)  As shown above, both the plain language of the claims and the specification

consistently disclose that the act of gaining access to such documents is dependent on an

authorization of the user in advance.

In support of its amorphous construction of this term - and seeking to evade the

specification's clear teaching of an authentication process - Soverain argues that the specification

"discloses various embodiments in which access to controlled documents may or may not require

authentication" and points to a number of places in the specification to support its position.

(Pl.'s Brief at 6.)  There is actually no disclosure of an embodiment in the specification to

support Soverain's contention that there are embodiments described that allow access to

controlled documents without a required authentication procedure.  *See Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al.*, 2008-1267, -1376 at 10 (Fed. Cir. April 29, 2009); *Phillips*, 415 F.3d at 1315; *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001).

Soverain first points to col. 6, ll. 5-16 of the specification to support its proposition that only one embodiment of the invention requires a valid session identifier, "a SID" to access controlled documents.  This paragraph of the specification actually supports Defendant's position as it discloses that "the requested URL" for a controlled document is "tagged with SID."  As disclosed earlier in the specification the contents of the server system include two categories of documents: (1) "an uncontrolled page, as in 'advertisement' page," -- to access which the client (user) does not need to provide "a valid SID [session identifier]," -- and "a controlled page" to access which the client (user) must have "a valid SID." *Id.* at col. 5, ll. 36-49.  If the client requests an uncontrolled page, the server system simply records any information which the server system could gather about this request, such as "the URL and the IP address," and then provides the uncontrolled page to the client without performing any more than a simple bookkeeping action regarding this request, *e.g.* "server records the URL and the IP address." *Id.* at col. 5, ll. 36-41; Fig. 2A.  If the client requests a controlled page, the authentication process is invoked:

> [i]f the request is directed to a controlled page, the content server determines whether the URL contains an SID 102. For example, a URL may be directed to a controlled page name "report", such as "http://content.com/report", that requires an SID. If no SID is present, as in this example, the content server sends a "REDIRECT" response 122 to the browser 100 to redirect the user's initial request to an authentication server 200 to obtain a valid SID. The details of the authentication process are described in FIG. 2B….

*Id*. at col. 5, ll. 42-50.   This citation by Soverain simply confirms the existence of an authentication process with respect to "controlled documents."  *Phillips*, 415 F.3d at 1317.

Soverain next points to col. 6, ll. 39-43 as another disclosure that supports its position that access to controlled documents "may or may not require authentication." (Pl.'s Brief at 6.) Again, this disclosure also does not support Soverain's position.   In contrast, this disclosure teaches that when the client requests a controlled document, the server system performs substantially more complex activity than the simple bookkeeping of requests which the server system does with respect to uncontrolled documents- i.e. an authentication process is carried out. Ex. B at col. 5, l. 42-col. 6, l. 16; Fig. 2A.   To obtain the controlled document, client's request must include a valid SID.  *Id*.  Therefore, upon receiving the request for controlled document, the server system first checks if the request contains a SID and, if it does, if the SID is valid. *Id*. Further, if the request lacks a SID or contains an invalid SID, the '639 patent discloses a single way by which the requested control page could be accessed -- the request is mandatorily subjected to an authorization procedure by the "authentication server," -- a server within the server system which differs from the server that actually sends controlled pages to the client.  *Id*. at col. 5, l. 46-Col. 6; l. 4, Col. 6, l. 27-Col. 7; l. 21; Figs. 2A and 2B.

As the '639 patent discloses that based on authentication rules of the authentication server -- i.e. "determining the level of authentication required for the access requested," -- the authentication first involves the determination a degree of restrictiveness imposed on accessing a particular controlled document, *e.g.* "a low level document" would have a lesser degree of restrictiveness imposed for its access.  *Id*. at col. 6, ll. 35-46; Fig. 2B.  If the particular controlled document has a higher degree of restrictiveness, then the authentication procedure of the authentication server would require additional information from the requester, i.e. the client,

14

before the authentication server issues the valid SID for accessing the requested controlled page. *Id*.

Soverain's attempt to conflate the "credential check procedures" described for low-level controlled documents with the express requirement imposed by the disclosure of the '639 patent- that any request for a control page must pass through the authentication procedure of the authentication server- must fail. *Id.* at col. 5, l. 46-col. 6, l. 4; col. 6, l. 27-col. 7, l.21; Figs. 2A and 2B; *Phillips*, 415 F.3d at 1317. Put simply, Soverain misrepresents the disclosure of the '639 patent by selectively narrowing the authentication procedure performed by the authentication server to just one aspect of the authentication process -- verification of the users' credentials when the authentication procedure establishes that a particular controlled document has a degree of restrictiveness which warrants such verification. *Id.* at col. 5, l. 46-col. 6, l. 4; col. 6, l. 27-col. 7, l.21; Figs. 2A and 2B. Such sleight-of-hand can not override a clear teaching throughout the specification that access to "controlled documents" is preceded by an authentication procedure. Defendant's construction should be adopted as most in line with the disclosure of the intrinsic record.

In another attempt to locate embodiments within the specification that do not require authentication for access to "controlled documents," Soverain points to the disclosure in col. 10, ll. 5-11. (Pl.'s Brief at 6.) There is nothing in this disclosure to support Soverain's attempt to broaden the scope of this claim element. Soverain disingenuously extracts the clause "without user authentication" in this disclosure from its context - namely a system where pre-assigned telephone numbers (*e.g.* "unpublished 'ambassador' number…directed to a **tagged URL**" (e*mphasis added*)) can be used to access a specialized web site for elite customers. Soverain however conveniently omits that the preceding disclosure that "[t]he **Target URL** [a tagged

URL] can also describe a URL that includes **an SID that provides a preauthorized means of accessing a controlled page.**" (*Id.* at col. 9, ll. 56-58) (e*mphasis added*).   This disclosure directly contravenes Soverain's position which is based on the 3-word phrase taken out of the context, and actually confirms Defendants' position since it is illogical to require additional "user authentication" when the user is already "preauthorized" (i.e. the authentication server generated a valid SID which is incorporated in a tagged URL.)

Finally Soverain's attempt to besmirch the Defendants' construction as vague should be dismissed as without merit.  Unlike Defendant's construction - which is grounded in the intrinsic record - Soverain's construction is hopelessly divorced from the specification and inherently vague with respect to what "one or more conditions" must be met for access to "controlled documents".  Soverain's further complaint that Defendant's proposed construction does not specify for "which specific actions related to the controlled documents (e.g., reading, writing) authentication is required" and that Defendant's construction does not specify "who or what is authenticated" is a non-sequitur.   There is no dispute as dictated above that the "controlled document" is one that is accessed by a user of the system.

For all the above reasons, Defendants' construction of "Controlled Document" should be adopted.

### 2.      "subsequent distinct requests"

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| "subsequent distinct requests" | "every request for a separate and different service" | Plain meaning applies; this term does not require construction |

Soverain submits that this term requires no construction.  Soverain further submits that Defendants' proposed construction is inconsistent with the specification.  Any broader disclosure

in the specification is irrelevant to this analysis.  The construction of this term is dictated solely

by the arguments made by Soverain during prosecution.  In the course of distinguishing the

Freeman-Benson prior art, Soverain argued as follows:

> Upon receiving the SID from the server system, the client browser stores
> the SID.   The client browser then appends the stored SID to each
> subsequent request to that server system. Because just the SID (and not the
> entire request) is stored, and because the SID is appended to subsequent
> requests to the particular server, use of the SID is not limited merely to a
> particular request but rather can extend to all subsequent requests to the
> server system, thus providing the sense of a session between the client and
> the server system.
>
> *   *   *
>
> By storing the special URL, for example, in a hotlist, Freeman-Benson
> stores a particular request, complete with URL, user name and password.
> Such a mechanism can provide automatic validation for the particular
> request, but cannot easily be extended to other requests to the same server
> using different URLs.  **Should the user make a different request to the
> same server, the user must again be prompted for user name and
> password. In other words, Freeman-Benson does not teach a client
> that stores some entity, e.g., a SID or other tag, that is appended to
> subsequent distinct requests to a particular server.**

Amendments and Remarks with Request for Continued Examination, December 28, 2001, Ex. C

(emphasis added).  The language quoted above could not be more clear.  Soverain argued that

Freeman-Benson did not teach maintaining a session for "subsequent distinct requests" because

it could not accommodate "different" requests to the same server.  The claimed Soverain system

was distinguished from this prior art because it was directed to a system that provided validation

to requests for different services.  Again, it is irrelevant if this is narrower than the invention

disclosed in the specification.  This claim scope was sacrificed when the patentee distinguished

Freeman-Benson on this basis to secure allowance.

### 3.      <u>"creating, responsive to the initial service request, the session identifier"</u>

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| "creating, responsive to the initial service request, the session identifier" | "creating, based on a type of the first request for service, the session identifier" | "producing, in response to the initial service request, the session identifier" |

Contrary to Soverain's overbroad construction, the session identifier is not simply produced in response to any initial service request.  Soverain elects to simply ignore the specification in its entirety.  The mechanism for creating the session identifier is described in detail in the '639 patent at column 3, lines 6-41, and column 5, line 18 – column 6, line 8.  The specification is very clear that the session identifier is only created when the user requests a controlled document.

Soverain accuses Defendants of attempting to read out the limitation of "responsive."  The inclusion of this word is immaterial.  What is material is the fact that the entire disclosed process of creating a session identifier occurs only following a request for a controlled document.  Soverain suggests that this is somehow incorrect because a session identifier will not be created upon the request for a controlled document if a session identifier was previously created in response to an earlier request for a controlled document.  This makes no sense and misses the point.  The specification clearly provides that a session identifier is <u>not</u> created when a user requests an uncontrolled document.  The specification contains no exception to this rule.

Soverain proposes the definition "producing, in response to the initial service request, the session identifier."  This construction incorrectly provides that the session identifier is created in response to any initial service request.  This is completely contrary to the only embodiments

described in the specification.  The patent describes how a session identifier is created when a user requests a controlled document:

> the present method involves returning the SID from the server to the client upon an initial service request made by the client.  A valid SID may include an authorization identifier to allow a user to access controlled files.  In a preferred embodiment, a client request is made with a Uniform Resource Locator (URL) from a Web browser.  Where a client request is directed to a controlled file without an SID, the Internet server subjects the client to an authorization routine prior to issuing the SID, the SID being protected from forgery.  A content server initiates the authorization routine by redirecting the client's request to an authentication server which may be at a different host.  Upon receiving a redirected request, the authentication server returns a response to interrogate the client and then issues an SID to a qualified client.  For a new client, the authentication server may open a new account and issue an SID thereafter.

Col. 3, ll. 15-31.  This is quite different than the situation where a user requests an uncontrolled document:

> FIG. 2A is a flowchart detailing the preferred process of the present invention and FIG. 4 illustrates a sample Web page displayed at a client by a browser. The page includes text 404 which includes underlined link text 412. The title bar 408 and URL bar 402 display the title and URL of the current web page, respectively. As shown in FIG. 4, the title of the page is "Content Home Page" and the corresponding URL is "http://content.com/homepage".  When a cursor 414 is positioned over link text 412b, the page which would be retrieved by clicking a mouse is typically identified in a status bar 406 which shows the URL for that link. In this example the status bar 406 shows that the URL for the pointed link 412b is directed to a page called "advertisement" in a commercial content server called "content".  By clicking on the link text, the user causes the browser to generate a URL GET request at 100 in FIG. 2A.  **The browser forwards the request to a content server 120, which processes the request by first determining whether the requested page is a controlled document 102.  If the request is directed to an uncontrolled page, as in "advertisement" page in this example, the content server records the URL and the IP address, to the extent it is available, in the transaction log 114.  The content server then sends the requested page to the browser 116 for display on the user computer 117**.
>
> **If the request is directed to a controlled page, the content server determines whether the URL contains an SID 102. For example, a**

> **URL may be directed to a controlled page name "report", such as
> "http**://content.com/report", that requires an SID.  If no SID is present, as
> in this example, the content server sends a "REDIRECT" response 122 to
> the browser 100 to redirect **the user's initial request to an
> authentication server 200 to obtain a valid SID**.  **The details of the
> authentication process are described in FIG. 2B and will be discussed
> later, but the result of the process is an SID provided from the
> authentication server to the client….**If the initial GET URL contains a
> SID, the content server determines whether the request is directed to a
> page within the current domain 106. If the request having a SID is directed
> to a controlled page of a different domain, the SID is no longer valid and,
> again, the user is redirected to the authentication server 122.  If the request
> is for a controlled page within the current domain, the content server
> proceeds to log the request URL, tagged with SID, and the user IP address
> in the transaction log 108. The content server then validates the SID 110.

Col. 5, l. 18-col. 6, l. 8 (emphasis added.)  The quoted language above sets forth that the session identifier is not created in response to an initial service request for an uncontrolled document. Instead, its creation is dependent upon the type of first request for service, namely is the request for a controlled or an uncontrolled document.  This is further described in steps 1 and 2 of Figure 3 and column 7, lines 21-34 of the patent, wherein it is plainly set forth that no session identifier is created when the request is for an uncontrolled document.

Nowhere in the '639 patent is there a description of a session identifier that is created in response to a request for an uncontrolled document.  Consistent with the only description of the invention (that specifically excludes requests for uncontrolled documents), this phrase must be construed as "creating, based upon a type of the first request for service, the session identifier."

### 4. "initial service request"

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| "initial service request" | "the first request for service" | "the first service request in a session" |

The dispute over this term offers the unusual situation where the patent owner is attempting to read a limitation into the claims.  The meaning of the term "service request" has

been agreed to by the parties.  The dispute is only directed to the meaning of the word "initial."

Quite simply, "initial" is "first."  It is difficult to imagine a less ambiguous term.  Nevertheless,

Soverain seeks to limit this to only the first request in a particular session.  However, there is no

intrinsic evidence that supports the addition of this qualifying limitation.

The patent provides that: "[o]ne aspect of the invention involves forwarding a service

request from the client to the server and appending a session identification (SID) to the request

and to subsequent service requests from the client to the server within a session of requests.  In a

preferred embodiment, the present method involves returning the SID from the server to the

client upon an initial service request made by the client."  Col. 3, ll. 10-17.  The patent also

includes the following:

> If the request is directed to a controlled page, the content server determines
> whether the URL contains an SID 102. For example, a URL may be directed to a
> controlled page name "report", such as "http://content.com/report", that requires
> an SID. If no SID is present, as in this example, the content server sends a
> "REDIRECT" response 122 to the browser 100 to redirect the user's initial request
> to an authentication server 200 to obtain a valid SID. The details of the
> authentication process are described in FIG. 2B and will be discussed later, but
> the result of the process is an SID provided from the authentication server to the
> client.

Col. 5, ll. 42-52.   Soverain repeatedly argues that Defendants' proposed construction is

inconsistent with and does not cover the preferred embodiment.  This preferred embodiment is

asserted to be directed to multiple sessions between the same client and server.   However,

Soverain cites to no portion of the patent that allegedly supports this interpretation of the

preferred embodiment.   That is because the preferred embodiment is not described in this

manner.  It describes only a single session.  Soverain may prefer limiting this term to a specific

session, but there is no basis in the patent for doing so.   If Soverain intended to limit "initial

service request" to specific sessions, the patent could have easily disclosed and claimed this

feature.  It did not do so.  "Initial" should be given its ordinary meaning of "first."


Dated: May 1, 2009                                 By: s/ Kent E. Baldauf, Jr.
                                                       David C. Hanson
                                                       Kent E. Baldauf, Jr.
                                                       John W. McIlvaine

                                                       THE WEBB LAW FIRM
                                                       700 Koppers Building
                                                       436 Seventh Avenue
                                                       Pittsburgh, PA 15219
                                                       T:  (412) 471-8815
                                                       F:  (412) 471-4094

                                                       Trey Yarbrough
                                                       Texas Bar No. 22133500
                                                       YARBROUGH ♦ WILCOX, PLLC
                                                       100 E. Ferguson St., Ste. 1015
                                                       Tyler, Texas 75702
                                                       Tel: (903) 595-3111
                                                       Fax: (903) 595-0191
                                                       trey@yw-lawfirm.com

                                                       Counsel for Newegg Inc.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 1, 2009 a true and correct copy of the foregoing document has been served on all counsel of record via the Court's ECF system.  This is further to certify that on May 1, 2009 a true and correct copy of the foregoing document has been served on the Court-appointed technical advisor by overnight delivery.


<u>s/ Kent E. Baldauf, Jr.</u>
Attorney for Defendant Newegg Inc.