# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC,<br><br>                    PLAINTIFF,<br><br>V.<br><br>CDW CORPORATION, NEWEGG INC.,<br>REDCATS USA, INC., SYSTEMAX INC.,<br>ZAPPOS.COM, INC., REDCATS USA,<br>L.P.,<br>THE SPORTSMAN'S GUIDE, INC,. AND<br>TIGERDIRECT, INC.,<br><br><br>        DEFENDANTS. | Civil Action No. 6:07-cv-00511 (LED) |

---

## DEFENDANTS SYSTEMAX INC.'S AND TIGERDIRECT, INC.'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION PURSUANT TO PATENT RULE 4-5(b)

---

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ............................................................................................................ ii

I.     INTRODUCTION ............................................................................................................ 1

II.    THE PATENTED TECHNOLOGY ................................................................................ 2

       A.     The '314 and '492 Patents ................................................................................. 2

       B.     The '639 Patent................................................................................................... 9

III.   THE ASSERTED CLAIMS AND DISPUTED CLAIM TERMS.......................................14

IV.    ARGUMENT ...................................................................................................................15

       A.     The principles of claim construction...................................................................15

       B.     Systemax's construction of the term "*shopping cart computer*" in the asserted
              '314/'492 patent claims should be adopted. ..........................................................16

              1.     The intrinsic record supports Systemax's construction. ...........................16

              2.     Soverain's arguments supporting its construction are meritless. .................19

       C.     Defendants' construction of the term "*stored session identifier*" in asserted claim
              1 of the '639 patent should be adopted. ...............................................................22

              1.     The intrinsic record supports Systemax's construction. ...........................22

              2.     Soverain's non-construction should be rejected..........................................24

V.     CONCLUSION................................................................................................................26

CERTIFICATE OF SERVICE...................................................................................................28

## INDEX OF AUTHORITIES

### CASES

*Computer Docking Station Corp. v. Dell, Inc.,*
 519 F.3d 1366, (Fed. Cir. 2008) ................................................................. 20, 23

*Honeywell, Int'l, Inc. v. ITT Industries, Inc.,*
 2006 WL 1703376 Fed. Cir. 2006) ......................................................................... 18

*Markman v. Westview Instruments, Inc.,*
 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, (1996) ........................................ 15, 16

*Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
 521 F.3d 1351,  (Fed. Cir. 2008) .......................................................... 16, 20, 24

*Phillips v. AWH Corp.,*
 415 F.3d 1303,  (Fed. Cir. 2005)(*en banc*) ........................................... 15, 16, 17, 18

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al.,*
 2008-1267, -1376 (Fed. Cir., April 29, 2009) ....................................................... 17

*Standard Oil Co. v. Am. Cyanamid Co.,*
 774 F.2d 448 (Fed. Cir. 1985) ............................................................................. 15

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
 242 F.3d 1337 (Fed. Cir. 2001) ............................................................................ 17

*Southeastern Bell Telephone, L.P. v. Arthur Collins, Inc.,*
 2005 WL 6225305 (N.D. Tex. 2005) ..................................................................... 19

*Texas Instruments, Inc. v. Linear Technologies Corp.,*
 182 F. Supp.2d 580, (E.D.Tex. 2002) ................................................................... 19

*Vitronics Corp. v. Conceptronic, Inc.,*
 90 F.3d 1576,  (Fed. Cir. 1996) ............................................................................ 15

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*
 375 F.3d 1341,  (Fed. Cir. 2004) .......................................................................... 20

I.    __INTRODUCTION__

Defendants Systemax, Inc. and TigerDirect, Inc. (collectively "Systemax")  agree with Defendant NewEgg, Inc. ("NewEgg") on the construction of all the disputed claim terms of the '314, '492, and '639 patents-in-suit, except for the following terms: (1) "*shopping cart computer*" in the asserted '314/'492 patent claims; and (2) "*stored session identifier*" in the asserted '639 patent claims.  Systemax therefore joins with NewEgg in the arguments presented in NewEgg's responsive claim construction brief as to the meaning and scope of the other disputed claim terms, and Systemax will not present further argument or evidence on those terms here.

In this claim construction brief, Systemax presents its arguments and evidence in support of its construction of the terms "*shopping cart computer*" and "*stored session identifier.*" As demonstrated below, Systemax's proposed constructions are fully consistent with the plain language of the asserted claims, the representations as to claim scope made by the inventors in the patent specifications and prosecution file histories, and the law of claim construction.   In contrast, Soverain's brief abandons the basic principles of claim construction and ignores and contorts key pieces of the intrinsic record of the patents-in-suit in an attempt to broaden the scope of the disputed terms.  For these reasons, and as more fully discussed below, Systemax respectfully requests that the Court adopt Systemax's proposed constructions of the terms "*shopping cart computer*" and "*stored session identifier.*"

## II.     THE PATENTED TECHNOLOGY

### A.     The '314 and '492 Patents

The patents at issue are U.S. Patent Nos. 5,715,314 ("the '314 patent") and 5,909,492 ("the '492 patent"), both entitled "Network Sales System.".  *See* Exh. 1, at 1; Exh. 2 at 1.[1] The '314 patent issued on February 3, 1998, based on patent application Serial No. 08/328,133 filed on October 24, 1994 ("the '133 application").  The '492 patent issued on June 1, 1999, based on patent application Serial No. 08/878,396 filed on June 18, 1997 ("the '396 application").

The inventors listed the '396 application as a "continuation" of the '133 application, so they could benefit from the earlier filing date of the '133 application.  *See* 35 U.S.C. § 120. For the '396 application to properly have been accorded "continuation" status, it must have had the identical specification (*i.e.*, the abstract, drawings, and written description of the invention) as the '133 application.  *See* 35 U.S.C. § 132; Exh. 3: M.P.E.P. § 201.07.  The '314 and '492 patents were both subject to reexamination proceedings in the United States Patent and Trademark Office ("PTO").  Reexamination certificates were issued for the '314 and '492 patents on October 9, 2007 and August 7, 2007, respectively.  *See* Exh. 1, at 37; Exh. 2 at 38.

The claimed inventions of the '314/'492 patents relate "to user-interactive network sales systems for implementing an open marketplace for goods or services over computer

---

[1]      Copies of Systemax Exhibits referenced herein are attached to the Declaration of Mary-Olga Lovett, filed concurrently with this brief.

networks such as the Internet," that include a combination of a buyer computer, a merchant computer, and a payment computer. *See* Exhs. 1-2 at 1:14-17.[2]  Generally speaking, the difference in the claimed inventions of both patents is that the '314 patent claims relate to the buyer computer/merchant computer/payment computer features of the network sales system; the claims of the '492 patent relate to these features in combination with a "smart statement" feature, which provides the user with a listing of the purchase transactions for a given month.

In the "Background Of The Invention" portion of the patent specifications, the '314/'492 patents state that the inventions were intended to address the security issues inherent in prior art interactive-network sales systems that permitted full and direct communication between a merchant computer and a payment computer. *Id.* at 1:18-35.  In column 1 of the patents, the specifications describe the workings of one particular prior art network sales system for purchasing "Digital Active Advertising" as follows:

> A user at a buyer computer asks to have advertisements displayed, and the buyer computer requests advertisements from a merchant computer, which sends the advertisements to the buyer computer.  The user then requests purchase of an advertised product, and the buyer computer sends a purchase message to the merchant computer.  **The merchant computer constructs a payment order that it sends to the payment computer, which authorizes the purchase and sends an authorization message to the merchant computer.**  When the merchant computer receives the authorization message it sends the product to the buyer computer

Exhs. 1-2 at 1:24-35 (emphasis added).

 Thus, in the prior art, the merchant computer did not merely communicate directly with the payment computer to facilitate payment and delivery of the purchased advertising

---

[2]        Citations in the form "__:___" refer to patent "column number: line number(s)."

materials to the customer.  The merchant computer also "construct[ed] a payment order," and sent it to the payment computer to initiate the payment process.  Consequently, the merchant computer was made privy to the customer's credit card information and/or other payment credentials.

In 1994, when the priority application leading to the '314/'492 patents was filed, the Internet was in its infancy and innumerable individuals and entities -- reputable and unreputable -- were creating merchant websites where goods could be purchased online. The security of customer payment credentials quickly became an issue, and the inventors believed the best way to address the issue was to prevent merchant computer owners/operators from gaining access to these credentials.  One of the inventors, Andrew Payne, summarized the solution in notes he prepared on July 19, 1994, three months before the patent application was filed:

> Story: "We are building a payment system for the Web.  Our novel approach works with today's clients and ***doesn't let the merchants see the client's payment credentials***."

*Notes for the Web payment system*, Payne, July 18, 1994, SVN2-0040037-42, Exh. 4 (emphasis added).

By prohibiting online merchants from having access to customer payment credentials, the claimed inventions of the '314/'492 patents: (1) lifted payment processing responsibility from online merchants, thereby enabling them to concentrate on selling their products; and (2) decreased the apprehension experienced by customers who were forced to divulge their personal billing information directly to the merchants.  The Summary Of The Invention

4

portion of the '314/'492 patent specifications succinctly states the inventors' solution as follows:

> The invention provides a simple design architecture for a network sales system that allows the merchant computer to respond to payment orders from the buyer computer **without the merchant computer having to communicate directly with the payment computer to ensure that the user is authorized to purchase the product and without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products.** Rather, when the merchant computer receives an access message from the buyer computer identifying a product to be purchased, **the merchant computer need only check the access message to ensure that it was created by the payment computer (thereby establishing for the merchant computer that the buyer is authorized to purchase the product)**, and then the merchant computer can cause the product to be sent to the buyer computer who has been authorized to purchase the product.

Exhs. 1-2 at 2:3-18 (emphasis added).

Of particular interest here, Soverain's own expert in the *Amazon* case, Michael Shamos, conceded that the term "*shopping cart computer*" in the asserted '314/'492 patent claims means the same thing as the term "payment computer" in the patent specifications. *See* Exh. 5: Shamos 5/9/05 Preliminary Rebuttal Expert Report at ¶ 47.  Shamos averred that "[T]he only logical meaning that can be attached to 'payment computer' is that it should read 'shopping cart computer.' This is clear because it is only the shopping cart computer that holds the shopping cart, hence a request for the shopping cart directed to any other computer would be fruitless." *Id.*   As shown in Figure 1 of the '314/'492 patent specifications (and all other patent Figures illustrating the interaction of the merchant computer with other components of the claimed network sales system), the merchant computer never communicates directly with the payment (*i.e.,* shopping cart) computer:

5

buyer computer 12          merchant computer 14          payment computer 16



**FIG. 1**

The patent specifications describe Figure 1 as "a block diagram of the network sales system in accordance with the present invention." Exhs. 1-2 at 3:59-60.  As shown in Figure 1, the buyer computer (12) is used by a buyer wishing to purchase a product (*e.g.,* digital advertisements).  A creation computer (20) creates a database of digital advertisements and sends them to the merchant computer (14).  The merchant computer (14) stores the digital advertisements and sends them to the buyer computer (12) upon request.  *See* Exhs. 1-2 at 4:35-63.  The payment computer (16) manages the purchase by receiving a purchase request and the customer's payment credentials from the buyer computer (12) and verifying whether the buyer is an authorized purchaser. *Id.* at 1:55-65; 7:14-24.  As stated in the Summary Of The Invention, the merchant computer (14) "need only check the access message to ensure it was created by the payment computer … and then [ ] cause the product to be sent to the buyer computer." *Id.* 1-2 at 2:13-18.  In this manner, the merchant computer is effectively removed from the payment process carried out by the payment computer and never gains access to the customer's payment credentials.   Indeed, as envisioned by the inventors, the

only rationale for the use of discrete computers is to prevent merchant access to customer data.

In columns 5-8 of the written description and Figure 2 of the drawings (Exhs. 1-2), the '314/'492 patent specifications describe, in great detail, the security steps required to protect the customer's payment credentials and to ensure that the user is authorized to purchase the product. These steps are all accomplished between the payment computer (16) and the buyer computer (12). None of these security steps involve the merchant computer (14) in any manner.

The '314/'492 patent specifications reveal that the key to maintaining the separation of the merchant and payment computers (and thereby preserving the security of the customer's payment credentials) was to configure the claimed network sales system so that the payment computer was not operated by the operator of the merchant computer. Indeed, the written description of the inventions corresponding to Figures 1-3 repeatedly distinguishes the "merchant" and the "operator of the payment computer" as separate and distinct entities. *See* Exhs. 1-2 at 5:43-47, 7:24-27, 7:65-8:2 (describing a cryptographic security "key" that is shared by "the **merchant** and the **operator of the payment computer**"); 5:26-37 (disclosing that the customer's payment URL sent by the buyer computer to the payment computer includes "***a merchant account identifier*** that represents the particular merchant account to be credited with the payment amount") (emphasis added). The necessity for having a cryptographic security key shared by the merchant and payment computers and merchant account identifiers arises only when these computers are being operated by separate and distinct entities and the payment computer

7

wants to ensure that the merchant computer cannot access the customer's payment credentials. It is axiomatic that if both the merchant and payment computers were being operated by the same or associated entities, the cryptographic key and merchant identifiers would be unnecessary.

Appendices E-F to the patent specifications confirm that the merchant and payment computers of the '314/'492 patents must be operated by separate and distinct entities. First, Appendix F, the source code for the network sales system (Exhs. 1-2 at 4:46-49), identifies "Open Market" (the original assignee of the '314/'492 patents) as the manager of the payment (*i.e.,* shopping cart) computer. *See* Exh. 6 at SOV0000241 (portion of source code identifying "Open Market Shopping Cart"). Second, the source code requires that each merchant that wishes to participate in the network sales system sign and transmit to Open Market an "Open Market Merchant Agreement." *Id.* at SOV0000254. The terms "Open Market" and "Merchant" clearly denote separate and distinct entities, and merchant participation agreements would be unnecessary if the payment and merchant computers were being operated by the same or associated entities.

Second, Appendix E to the patent specification describes the requirements for setting up and maintaining merchant accounts in the network sales system. *See* Exh. 7. It states that "[i]n order for the payment system to work, the following steps must be accomplished":

- Create principal account for merchant
- Create keys for merchant
- Load merchant server with merchant keys
- Use merchant's keys to generate payment URL's (sic)

Exh. 7 at SOV0000147.

Again, the use of cryptographic security keys to ensure that the merchant computer cannot access the customer's payment credentials would be unnecessary if both the merchant and payment computers were being operated by the same or associated entities.

The specifications of the '314 and '492 patents do not disclose (or even suggest) an embodiment of the claimed network sales system in which the merchant computer and the payment computer can be owned and/or operated by the same or associated entities.

**B.    The '639 Patent**

The patent at issue is U.S. Patent No. 7,272,639, entitled "Internet Server Access Control And Monitoring System."  *See* Exh. 8 ("the '639 patent").  The '639 patent issued on September 18, 2007 from patent application Serial No. 09/005,479 filed on January 12, 1998 ("the '479 application").   The inventors denominated the '479 application as a "continuation" of patent application Serial No. 08/474,096 filed on June 7, 1995 ("the '096 application").   The '096 application resulted in the issuance of U.S. Patent No. 5,708,780 ("the '780 patent"), which is the parent of the '639 patent.  *See* Exh. 9.  The '479 application leading to the '639 patent must have had the identical specification (abstract, drawings, and written description) as the '096 application for the '780 patent in order to be accorded "continuation" status.  35 U.S.C. § 132; Exh. 3: M.P.E.P. § 201.07.  As discussed *infra* p.12, the specifications were not identical. The inventors denominated the '479 application as a "continuation" of the '096 application so they could claim a priority invention date for the '639 patent all the way back to the June 7, 1995 filing date of the '096 application.  *See* 35 U.S.C. § 120.

9

The claimed invention of the '639 patent is generally directed to "methods for processing service requests from a client to a server through a network." *See* Exh. 8 at 3: 6-7. The following disclosure from column 2, line 40-column 3, line 2 of the patent specification describes the problems addressed by the claimed invention as follows:

> The Internet maintains an open structure in which exchanges of information are made cost-free without restriction.  The free access format inherent to the Internet, however, presents difficulties for those information providers requiring control over their Internet servers. Consider for example, a research organization that may want to make certain technical information available on its Internet server to a large group of colleagues around the globe, but the information must be kept confidential. Without means for identifying each client, the organization would not be able to provide information on the network on a confidential or preferential basis. In another situation, a company may want to provide highly specific service tips over its Internet server only to customers having service contracts or accounts.

> Access control by an Internet server is difficult for at least two reasons. First, when a client sends a request for a file on a remote Internet server, that message is routed or relayed by a web of computers connected through the Internet until it reaches its destination host. The client does not necessarily know how its message reaches the server. At the same time, the server makes responses without ever knowing exactly who the client is or what its IP address is. While the server may be programmed to trace its clients, the task of tracing is often difficult, if not impossible. Secondly, to prevent unwanted intrusion into private local area networks (LAN), system administrators implement various data-flow control mechanisms, such as the Internet "firewalls", within their networks. An Internet firewall allows a user to reach the Internet anonymously while preventing intruders of the outside world from accessing the user's LAN.

The technology of the '639 patent that attempted to address these problems may be summarized from the patent specification as follows:

> The information on the Internet is made available to the public through "servers".  A server is a system running on an Internet host for making available files or documents contained within that host.  Such files are typically stored on magnetic storage devices, such as tape drives or fixed disks, local to the host.  An Internet server may distribute information to any computer that

requests the files on a host.  The computer making such a request is known as
the "client," which may be an Internet-connected workstation, bulletin board
system or home personal computer (PC).

Exh. 8 at 1:24-33.  The patent specification further states that:

The World-Wide Web (Web) is a method of accessing information on the
Internet which allows a user to navigate the Internet resources intuitively,
without IP addresses or other technical knowledge….The Web is made up of
hundreds of thousands of interconnected "pages", or documents, which can
be displayed on a computer monitor.  The Web pages are provided by hosts
running special servers.  Software which runs these Web servers is relatively
simple and is available on a wide range of computer platforms including PC's
(sic). Equally available is a form of client software, known as a Web
"browser", which is used to display Web pages as well as traditional non-Web
files on the client system.

Exh. 8 at 1:48-65.

The specification further discloses that "the Web is based on the concept of
'hypertext' and a transfer method known as 'HTTP' (Hypertext Transfer Protocol)." Exh. 8
at 1:66-2:1.  In addition, it states that:

[e]ach Web page may contain pictures and sounds in addition to text. Hidden
behind certain text, pictures or sounds are connections, known as "hypertext
links" ("links"), to other pages within the same server or even on other
computers within the Internet. . . .Each link is directed to a web page by using
a special name called a URL (Uniform Resource Locator).  URLs enable a
Web browser to go directly to any file held on any Web server.

*Id.* at 2:15-23.

Every interaction between the client and the server constitutes a distinct request or

communication between the client and the server.  When these individual transactions are a

series of related transactions by the same client, they are considered a single "session."  To

aggregate multiple transactions that are part of the same client session, the '639 patent

specification discloses that the URLs of the links on a web page can be modified by the

11

server to include a "session ID" ("SID") unique to that client, such as a string of numbers and letters.  *See* Exh. 8 at 3:20-41.  The patent specification gives the following example of how a URL modified to include a SID would appear: "**http://content.com/[SID]/report.**" *Id.* at 5:53-54.

 Again, Soverain's own expert in the *Amazon* case, Shamos, provides a key concession:  he admits in his expert report that the inventors did not "invent session identifiers *per se.*"  Rather, according to Shamos, they instead invented "a very specific method of using session identifiers in conjunction with HTTP"--*i.e.*, incorporating session identifiers into URLs.  Exh. 5 at ¶ 84.

Moreover, during prosecution of the '639 patent, the inventors specifically made it clear to the PTO that their SIDs were different from the prior art because only the SID itself, and not other information in the request (*i.e.*, in the communication between the client and the server), was stored by the client.  Specifically, in an amendment filed with the PTO on December 28, 2001, the inventors informed PTO Examiner that:

> [u]pon receiving the SID from the server system, the client browser stores the SID. The client browser then appends the stored SID to each subsequent request to that server system. Because just the SID (and not the entire request) is stored, and because the SID is appended to subsequent requests to the particular server, use of the SID is not limited merely to a particular request but rather can extend to all subsequent requests to the server system, thus providing the sense of a session between the client and the server system (emphasis added)

Exh. 10 at 5.

The claims of the '639 patent asserted against Systemax all contain the following limitations directed to the use of URLs modified to include SIDs: "[*t*]*he client storing the session identifier for use in subsequent distinct requests to the server system; and appending the stored session*

12

*identifier to each of the subsequent distinct requests from the client to the server system.*"  The only support

for these limitations in the parent '780 patent, however, is the following disclosure from

column 4, lines 25-31 of the specification:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server.  **This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser formats common to the Web.**

Exh. 9 at 4:25-31 (emphasis added).

Critical to the claim construction issues surrounding the term "*stored session identifier*" is

the fact that even though the '479 application for the child '639 patent was a "continuation"

of the '096 application for the '780 parent patent, and therefore, was supposed to have the

identical disclosure as the '096 application, the above-quoted paragraph from the '780 patent

was changed in the '479 application (and resulting '639 patent) to read:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. **This embodiment, however, requires a special browser which can handle such communications and was generally not suitable for early browser formats common to the Web. However, it may now be implemented in cookie compatible browsers** Exh. 8 at 4:23-29 (emphasis added).

In essence, the wording in the '096 application for the '780 patent--in which the

inventors represented that the claimed invention was **incompatible** with standard web

browsers existing as of the '780 patent's June 5, 1995 filing date--was improperly changed in

the '479 application to read that the claimed invention was **compatible** with standard pre-

June 7, 1995 web browsers.

13

However, in order for the inventors to properly represent to the PTO that the '479 application was a "continuation" of the '096 application--and thereby claim a priority invention date for the '639 patent claims all the way back to the June 7, 1995 filing date of the '096 application--the specifications of the '096 and '479 applications had to have been **_identical_** in every way.  They were not.  In fact, the above-quoted disclosures **_contradict_** one another, and the inventors deliberately changed the language in the '479 application in an improper attempt to expand the scope of the term "*stored session identifier*" in the resulting '639 patent claims.

## III.   THE ASSERTED CLAIMS AND DISPUTED CLAIM TERMS

Soverain asserts the following claims of the patents-in-suit against Systemax:

| Patent | Asserted Claims[3] |
|---|---|
| '314 | 34, 35, 36, 39, 49, 50, 51, 60, 65, 74, 84, 109, 110, 111, 120, 125, 134, 144 |
| '492 | 15, 16, 17, 18, 35, 36, 39, 40, 41, 66, 67, 68, 73, 74, 75, 76, 101, 102, 103, 108 |
| '639 | 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, 79 |

The disputed terms discussed in this brief appear in the following asserted claims:

| Disputed Claim Term | Patent(s)/Asserted Claim(s) |
|---|---|
| "shopping cart computer" | '314 patent:  claims 34-36, 39, 49-51, 60, 65, 74, 84, 109-111, 120, 125, 134, 144<br><br>'492 patent:  claims 17, 18, 35, 36 |
| "the stored session identifier" | '639 patent:  claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, 79 |

---

[3] In total, Soverain asserts 49 claims between all three patents-in-suit.

IV.    **ARGUMENT**

A.    **The principles of claim construction.**

Claim construction is an issue of law for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 391 (1996).  The words of a claim "are generally given their ordinary and customary meaning."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Moreover, "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(*en banc*).

In claim construction proceedings, "[t]he claims, of course, do not stand alone. . .[C]laims 'must be read in light of the specification, of which they are a part.'"  *Phillips*, 415 F.3d at 1315.  The specification is relevant to claim construction analysis, and it is "the single best guide to the meaning of a disputed term."  *Id.* (citation omitted).  Indeed, the specification is "the primary basis for construing the claims."  *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)).

As the *Phillips* court held, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  415 F.3d at 1316.  Moreover, "[i]n other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  *Id.*

15

The Court "should also consider the patent's prosecution history" before the U.S.P.T.O. in construing disputed claim terms. *Markman*, 52 F.3d at 980. As with the specification, "the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. This is because "the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id*.

Finally, in claim construction proceedings, the court has a 'duty' to resolve all 'fundamental dispute[s] regarding the scope of a claim term' that are presented to the court. *02 (Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*), 521 F.3d 1351, 1362 (Fed. Cir. 2008) (finding that the district court erred in failing to construe scope of term "only if").

**B.**    **Systemax's construction of the term "*shopping cart computer*" in the asserted '314/'492 patent claims should be adopted.**

| Claim Term | Systemax's' Proposed Construction | Soverain's Proposed construction |
|---|---|---|
| "*shopping cart computer*" | "a computer processing data associated with one or more shopping carts but is not operated by an operator of a merchant computer" | "a computer processing data associated with one or more shopping carts" |

**1.**    **The intrinsic record supports Systemax's construction.**

As discussed above, the specifications of the '314 and '492 patents are identical--they contain the identical 25 sheets of drawings, and the identical written description of the claimed invention. Systemax's construction of the term "*shopping cart computer*" should be adopted because it is fully consistent with the written description and drawings of both patents.

Claim terms must be "commensurate with the scope of the specification; a court looks to the specification for guidance to ascertain the scope of the claim in claim construction." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., et al.*, 2008-1267, -1376 at 10 (Fed. Cir., April 29, 2009); *see also Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' ) (citations omitted).  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001).

Here, the background of the invention, summary of the invention, drawings, and detailed description of the invention portions of the '314/'492 patent specifications, as well as Appendices E-F to the specifications, make clear that: (1) the claimed inventions were intended to address payment security issues inherent in prior art interactive-network sales systems that permitted direct communication between a merchant computer and a shopping cart computer (Exhs. 1-2 at 1:25-35; Exh. 4: SNV2-0040037-42); (2) the inventors believed the best way to address this issue was to prevent owners/operators of merchant computers from gaining access to customer payment credentials (credit card information and the like) (*Id.* at 1:56-65; Figs. 1-3; 2:4-11; 2:12-18; 3:59-4:63; 7:14-24); and (3) the key to maintaining the separation of merchant computers and shopping cart computers (thereby preserving the security of the customer's payment credentials) was to configure the claimed network sales

17

system so that the shopping cart computer is not operated by the operator of the merchant computer. *Id.* at 3:45-49; 5:26-37; 5:43-46; 7:24-28; 7:65-8:2; Exh. 6: SOV0000241, and SOV0000254; Exh. 7: SOV0000147.

The Summary Of The Invention, patent drawings, and appendices emphasize that a system configuration in which the merchant computer has no direct access to the shopping cart computer, and is operated by a person/entity separate and distinct from the operator of the shopping cart computer for security reasons, is the "invention", the "present invention," and necessary for the "payment system to work." Exhs. 1-2 at 2:4-12; 3:59-60; Exh. 7 at SOV0000147. Such statements are strong evidence that Systemax's construction of "*shopping cart computer*" is the correct one. *See Honeywell, Int'l, Inc. v. ITT Industries, Inc.*, 2006 WL 1703376, *5 (Fed. Cir. 2006) (finding that the term "fuel injection system component" limited to a "fuel filter" where the specification referred to the fuel filter as the "invention" or the "present invention").

The '314/'429 patents do not disclose an embodiment of the claimed network sales system in which the merchant computer and the shopping cart computer can be owned and/or operated by the same or associated entities. Thus, Systemax's construction of "*shopping cart computer*" to mean "a computer processing data associated with one or more shopping carts but is not operated by an operator of a merchant computer" should be adopted, because it most naturally aligns with the description of the invention in the patent specifications. *Phillips*, 15 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

## 2.      Soverain's arguments supporting its construction are meritless.

Soverain makes the following arguments in an attempt to support its construction of "*shopping cart computer*" and refute Systemax's construction: (1) Soverain's construction was adopted by the *Amazon* Court; (2) the asserted claims do not use the term "merchant computer;" (3) the patents do not disclose an embodiment of the invention in which the shopping cart and merchant computers have different operators; (4) the words "an operator of a merchant computer" do not appear in the patents, and Soverain "doesn't know" what the word "operator" means; and (5) the inventor Payne's pre-filing statements to the effect that the purpose of the invention is to prevent the merchant computer from seeing client payment credentials is unreliable, and in any event, do not support the portion of Systemax's construction to the effect that the shopping cart computer "is not operated by an operator of a merchant computer." Soverain Br. at 20-21.  Each argument is addressed in turn below.

First, the Court in *Amazon* **did not construe the term "shopping cart computer."** Rather, the construction was stipulated to by the parties, so the Court adopted it.  In fact, the "*shopping cart computer*" in the asserted claims has never been construed by any court. Moreover, as a non-party to *Amazon*, Systemax is not bound by any claim constructions agreed upon by the parties to, or rendered by the Court in, that case.  *See Texas Instruments, Inc. v. Linear Technologies Corp.*, 182 F. Supp.2d 580, 590 (E.D.Tex. 2002); *Southeastern Bell Telephone, L.P. v. Arthur Collins, Inc.*, 2005 WL 6225305, *5 (N.D. Tex. 2005).

Second, the fact that the asserted claims do not contain the term "merchant computer" is immaterial.  The prior art distinguished by the inventors in the patent specifications, and the specifications' descriptions of the claimed inventions, specifically

19

involve a merchant computer.  The specifications go to great lengths to describe and limit the interactions between the shopping cart and merchant computers, and an Internet-based network "sales" system without a merchant computer makes no sense.  The Court's role in claim construction is to interpret the meaning and **scope** of disputed claim terms, and Systemax's construction of "*shopping cart computer*" places a proper scope on the term. Specifically, it delineates who an operator of the "*shopping cart computer*" may be *vis-a-vis* a merchant computer in light of the specification disclosure.  Given the disclosure of the specifications, and the Court's claim construction role, the absence of the term "merchant computer" in the asserted claims is simply irrelevant.  *See, e.g., 02 Micro Int'l Ltd.*, 521 F.3d at 1362 (Fed. Cir. 2008) (holding that scope of term "only if" must be construed to determine whether the term provided for "exceptions," as argued by the defendant); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1378-79 (Fed. Cir. 2008) ("The claims do not recite the term 'microcomputer.' This point, however, does not alone expand the claims beyond the microcomputer embodiment described in the specification. . . [T]he written description emphasizes differences between the claimed invention and laptops. . . .").

Third, Soverain is simply wrong in asserting that the patents do not disclose an embodiment of the invention in which the shopping cart and merchant computers have different operators.  That is the only embodiment that can be reasonably derived from the disclosure of the specifications, and the patents do not have to expressly state such an embodiment for Systemax's construction of "*shopping cart computer*" to be the correct one.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004) (noting that

the proper construction is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence of record").

Fourth, the fact that the words "an operator of a merchant computer" do not appear in the patents is likewise immaterial.  A merchant computer certainly must have an operator--it does not operate by itself.  Soverain cites no authority for the proposition that a claim construction cannot use words or phrases that do not expressly appear in the patent.  Indeed, were that the standard, Soverain's construction of "*shopping cart computer*" should be rejected out of hand, because the words of Soverain's construction do not appear in the patents either.  Soverain's related assertion that it does not know what the word "operator" means is feigned ignorance.  The patents repeatedly use the word operator, although no express definition is given.  *See* Exhs. 1-2 at 5:45-46; 7:26-27; 8:1-2.  Common sense should prevail over Soverain's supposed lack of comprehension here.  There can be no dispute that in the context of the '314/'492 patents, the term "operator" refers to the responsible person or entity who owns, controls, and/or operates the computer at issue.  *See* Exh. 11 (*Webopedia* online dictionary entry, defining the word "operator" as the person generally responsible for ensuring that the computer runs properly).

Finally, Soverain's attempt to distance itself from the inventor Payne's pre-filing statements about the scope of the invention borders on disingenuousness.   Payne's statements cannot be dismissed as "unreliable," as asserted by Soverain, because they constitute binding admissions on Soverain as assignee of the patents.  Moreover, Payne's statements are not limited to the suggestion that the merchant computer does not see the client's payment credentials, as asserted by Soverain.  Rather, Payne's statements inform the

21

very security issue of the prior art that the claimed invention was intended to overcome, and based on the disclosure of the patent specifications, lead to the inescapable conclusion that the inventors decided to address the issue by configuring their network sales system so that the merchant and shopping cart computers must be operated by separate and distinct entities.  If the computers could be operated by the same or associated entities, there would be no purpose in shielding the merchant computer from the payment process and no reason for the columns of disclosure in the patent specifications concerning the "cryptographic security key" used to prevent the merchant computer from gaining access to the customer's credentials.

**C.    Defendants' construction of the term "*stored session identifier*" in asserted claim 1 of the '639 patent should be adopted.**

| Claim Term | Defendants' Proposed Construction | Soverain's Proposed Construction |
|---|---|---|
| "*stored session identifier*" | "a session identifier that is recorded in computer storage without other information, excluding standard browser formats common to the Web on or before June 7, 1995" | "Plain meaning applies; this term does not require construction" |

**1.    The intrinsic record supports Systemax's construction.**

The only disclosure in the '780 parent patent supporting the term "*stored session identifier*" is the disclosure of col. 4, lines 25-30 of the specification, in which the inventors expressly disclaimed the use of SIDs in connection with standard browser formats common to the Web on or before June 7, 1995.  Soverain must be bound by the disclosure of the parent '780 patent specification in determining the scope of the term "*stored session identifier*" in the asserted claims of the child '639 patent.  Otherwise, the inventors' representation to

the PTO that the '479 application for the '639 patent is a "continuation" of the '096 application for the '780 patent would have been false, and thus, the inventors' claim to a priority invention date for the '639 patent claims based on the June 7, 1995 filing date of the '096 application would have been invalid.  It was improper for the inventors to expand the disclosure for the term "*stored session identifier*" in the '479 application, and Soverain cannot benefit from this revisionist history to expand the scope of the term beyond what was disclosed in the '096 application.

In addition, Systemax's construction that the SID "is recorded in computer storage without other information" is fully supported by the prosecution history.  As discussed above, during prosecution of the '639 patent, the inventors also made clear to the PTO that their SIDs were different from the prior art because only the SID itself, and not other information in the request (*i.e.*, in the communication between the client and the server), was stored by the client.  Exh. 10: 12/28/01 Amendment at 5 ("Upon receiving the SID from the server system, the client browser stores the SID.  The client browser then appends the stored SID to each subsequent request to that server system. Because just the SID [and not the entire request] is stored, and because the SID is appended to subsequent requests to the particular server, use of the SID is not limited merely to a particular request.").  The inventors' statements distinguishing the prior art operate as a clear and unmistakable disclaimer of claim scope supportive of Systemax's construction of "*stored session identifier.*" *See Computer Docking Station Corp.,* 519 F.3d at 1378-79 ("As noted above, the 'totality of the prosecution history' informs the disavowal inquiry. . . Here the sum of the patentees'

23

statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage of laptops.").

### 2.    <u>Soverain's non-construction should be rejected.</u>

Soverain argues that the "plain meaning" of "*stored session identifier*" applies and no construction is necessary.  Soverain does not, however, describe this purported "plain meaning."  In any event, since Systemax has offered a proposed construction, and disputes Soverain's non-construction, the Court must construe the term.  *See 02 Micro Int'l Ltd.*, 521 F.3d at 1362 (district court erred by concluding that plain meaning applied and refusing to construe the term "only if" where defendant asserted that the scope of the term provided for "exceptions").

Soverain makes the following arguments in an attempt to refute Systemax's construction: (1) the term "computer storage" is ambiguous; (2) the words "without other information" do not "supply meaning to the disputed term" and contradict the specification embodiment where a SID is stored with a browser program; (3) the words "excluding standard browser formats common to the Web on or before June 7, 1995" are not supported by the prosecution history cited on page 11 of Soverain's brief; and (4) "[n]owhere did applicants unambiguously disclaim the use of pre-June 7, 1995 browsers." Soverain Br. at 10-11.  These arguments are meritless.

First, Soverain's assertion that it does not know what "computer storage" means is disingenuous in light of its admission in the very same paragraph on page 10 of its brief that the meaning of "stored" is well known in the art.  Soverain's position must be that the term "computer" is ambiguous; yet the patents-in-suit liberally use the word "computer" in the

specifications and asserted claims, without expressly defining the term.  The ordinary meaning of "computer storage" can be easily determined by simple reference to a dictionary. Exhs. 12 and 13 (*Webopedia* on-line computer dictionary definitions of "computer" and "storage");   *see also Phillips*, 415 F.3d at 1323 ("Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation." ).

Second, contrary to Soverain's assertion, the words "without other information" in Systemax's construction do supply meaning to "*stored session identifier,*" because they are consistent with the prosecution history disclaimer discussed above, in which the inventors made clear to the PTO that their SIDs were different from the prior art because only the SID itself, and not other information in the request (*i.e.*, in the communication between the client and the server), was stored by the client.  Soverain is also wrong in asserting that Systemax's construction is inconsistent with the embodiment of the specification in which the client stores the SID with a browser program, because the words "without other information" refer to the contents of the communication between the client and server, and not the client and the browser.

Third, Soverain argues that Systemax's construction of "excluding standard browser formats common to the Web on or before June 7, 1995" is not supported by the portion of the prosecution history (cited on page 11 of Soverain's brief concerning the Freeman-Benson reference) because the inventors' statement there only refers to browsers that existed as of May 1994, when Freeman-Benson was published, and "not the June 7, 1995 priority date of the '639 patent application." Soverain Br. at 11.  However, Soverain fails to disclose

25

to the Court that the '096 application, which was relied upon by the inventors to support a priority June 7, 1995 invention date for the asserted '639 patent claims, expressly disclaimed all standard browser formats common to the Web on or before June 7, 1995.  That disclaimer is worth repeating here:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. **This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser formats common to the Web.**

Exh. 9 at 4:25-31 (emphasis added).

Thus, Soverain's final assertion--*i.e.,* "[n]owhere did applicants unambiguously disclaim the use of pre-June 7, 1995 browsers"-- is completely false.  The express disclaimer appears in the very '096 patent application upon which the inventors' priority claim was based.

Soverain has failed to provide the Court with any basis for adopting Soverain's non-construction of  the term "*stored session identifier*."  Accordingly, Systemax's construction, which is fully supported by the intrinsic record of the '639 patent, should be adopted.

## V.    CONCLUSION

For the above reasons, Systemax respectfully requests that the Court adopt the constructions of the terms "shopping cart computer" and "stored session identifier" that are set forth in this Brief.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**


\s\ Mary-Olga Lovett
Mary-Olga Lovett
Attorney in Charge
Texas Bar No. 00789289
lovettm@gtlaw.com
1000 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 374-3500
Telecopier: (713) 374-3505

Michael A. Nicodema (pro hac vice)
Barry J. Schindler (pro hac vice)
Gaston Kroub (pro hac vice)
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

**ATTORNEYS FOR DEFENDANTS
SYSTEMAX INC., AND
TIGERDIRECT, INC.**


**POTTER MINTON, PC**
Douglas R. McSwane
110 N. College
500 Plaza Tower
Tyler, Texas 75702
Ph: (903) 597.8311
Facsimile:  (903) 593.0846

27

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who have deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 1, 2009.  Any other counsel of record will be served by facsimile transmission and first class mail.

_\s\ Mary-Olga Lovett_____
Mary -Olga Lovett

28

Counsel List for:

Soverain v. Systemax

| Counsel | Company | Contact Information |
|---------|---------|---------------------|
| Kenneth Robert Adamo (lead) *kradamo@jonesday.com* Mark Christopher Howland *mchowland@jonesday.com* Ognian V. Shentov ovshentov@jonesday.com (not noticed) | **Soverain Software LLC** | **Jones Day - Dallas** 2727 North Harwood St. Dallas, Tx 75201 Tel: 214-969-4856 Fax: 214-969-5100 |
| Jennifer Seraphine *jseraphine@jonesday.com* | **Soverain Software LLC** | **Jones Day - San Francisco** 555 California Street 26th Floor San Francisco, CA 94l04 Tel: (415) 875-5892 Fax: (415) 875-5700 |
| Thomas L. Gianetti *tlgiannetti@jonesday.com* Mark Christopher Howland *mchowland@jonesday.com* Barry R Satine *barryrsatine@jonesday.com* | **Soverain Software LLC** | **Jones Day - New York** 222 E 41 Street New York, NY 10017 Tel: (212) 326-3939 Fax: (212) 755-7306 |
| Herbert A. Yarbrough, III (Trey) *trey@yarbroughlawfirm.com* | **Newegg Inc.** | **Yarbrough Law Firm** 100 E Ferguson Suite 1015 Tyler, TX 75702 Tel: (903) 595-3111 Fax: (903) 595-0191 |
| David C. Hanson Kent E. Balauf, Jr. John W. McIIvaine dhanson@webblaw.com kbalauf@webblawcom jmcilvaine@webblaw.com | **Newegg Inc** | **Webb Law Firm** 700 Koppers Building 436 Seventh Avenue Pittsburgh, Penn 15219 Tel: 412-471-8815 Fax: 412-471-4094 |

**EXHIBIT LIST**

| EXHIBIT | CONTENT |
|---|---|
| 1. | U.S. Patent Ser. No. 5, 7, 715,314 ("the '314 patent") |
| 2. | U.S. Patent Ser. No. 5,909,492 ("the '492 patent") |
| 3. | M.P.E.P. § 201.07 |
| 4. | "Notes for the Web payment system, " Payne, July 18, 1994 SVN2-0040037-42 |
| 5. | Preliminary Rebuttal Report of Soverain's Expert Michael Shamos, May 9, 2005 |
| 6. | Pages with Source Code, Excerpts from Appendix F to the '314 and 492 patents SOV0000241 & SOV0000254 |
| 7. | Appendix E to the '314 and '492 patents, SOV000015-156 |
| 8. | U.S. Patent Ser. No. 7,272,639 ("the '639 patent") |
| 9. | U.S. Patent Ser. No. 5,708,780 ("the '780 patent") |
| 10. | Amendment D from the file history of the '639 patent, 12/28/01 |
| 11. | *Webopedia* online dictionary entry, defining the word "operator" as the person generally responsible for ensuring that the computer runs properly TD0060639 |
| 12. | *Webopedia* online computer dictionary definitions of "computer" TD0060640-42 |
| 13. | *Webopedia* online computer dictionary definitions of "storage"  TD6060643 |