## THE '780 PATENT

82. As shown in Exhibit 3, many of the dates of invention for claims of the '780 patent predate the art asserted by Dr. Taylor, and thus his discussion of these references is misapplied. For example, the subject matter of claims 1, 4, 5, 8, 9, 22, 23 and 40-42 of the '780 patent was invented prior to any alleged effective date of the following references: Benson, FFBS, wwworder, Stuff.com, CC, Bibliobytes, Web2Mush, H3, Internet Shopkeeper, Virtual Vineyards, the Berners-Lee article, the Shen System, the Cameron patent, the Session Control Thread, the Smithson paper, Derler and the Hall reference. All of these references, except for NCSA HTTPd, are also predated by '780 claims 24 and 28. Many of these references are additionally predated by claim 12. See Exhibit 3. Therefore, Dr. Taylor's analysis of the alleged "prior art" references, beyond being improperly reasoned, is, on an even more basic level, wholly inapplicable with regard to many of the references in comparison to '780 claims, under 35 U.S.C. §§ 102-103, as not constituting "prior" art.

83. Dr. Taylor believes that because various mechanisms for maintaining state in HTTP sessions were known before the '780 invention, its claims must be invalid. That is not a proper invalidity analysis, which must examine each element of each claim and find it in a particular reference or combination.

84. The '780 patent does not claim session identifiers per se, nor did the inventors invent them. The patent teaches a very specific method of using session identifiers in conjunction with HTTP, which was not designed to support sessions, to enable web commerce.

85. (p. 66) With regard to the discussion of "returning a session identifier," there is no analogy at all between the Johnson patent and claim 1. The Johnson patent contains no mention whatsoever of a "session" or "session identifier," or any related concept. It deals instead with a "credentials identifier," which is a form of password issued by the server to a user who has authenticated himself. This credentials identifier, when presented by the user at a later time, permits the user to access otherwise restricted or confidential information without again having to authenticate himself. The specification states, "The credentials identifier only has to

21

be created once, and then can be used over again without going back through the authentication process" (6:15-17). This activity takes place outside the context of any "session." The identifier may be used once, or it may be used indefinitely. There is no basis at all for equating "credentials identifier" with "session ID," particularly because the credentials identifier identifies a user, not a session. The alleged reference made by Dr. Taylor to 5:47-6:8 of Johnson contains none of the language he cites, and particularly does not refer to a "session of requests." Just because the examiner in the '780 case incorrectly asserted that the identifiers were equivalent does not entitle Dr. Taylor to repeat the error.

86. (p. 66) With respect to Biznet, there is no hint or clue of a session ID. In fact, Biznet teaches against session IDs: "Upon being 'logged in' to the system (by typing in a valid id and password pair), a user is assigned a code (hereto referred to as a 'cookie'), that is used to identify the user as being valid. This code is valid for exactly one protocol request (hereto referred to as a 'get')." This exactly the opposite of a session ID, which by definition is to be used for an entire session, not just one service request. Also the purpose of the code in Biznet, as in Johnson, is to authenticate a user, not to provide session continuity.

87. (p. 67) Trewitt discusses various method of maintaining state in HTTP exchanges. However, of the technique perfected by Levergood et al., Trewitt says, "6.3. Maintaining State – In the URL. *The mechanism described in this section is somewhat speculative -- we haven't used it, and there is not currently enough information to know if it is truly effective. It is presented here as a possible option.*" [Italics in original.] Thus, the Trewitt reference cannot be deemed to anticipate the '780 claims or render them obvious.

88. (p. 67) Smithson is not prior art, as discussed. It also deals with information for authentication purposes, not to maintain state or session continuity. It is a user ID, not a session ID.

89. (p. 67) Deposition references to Internet Shopping Network are uncorroborated and therefore inapplicable per the preceding paragraph.

90. (p. 67) Derler is not prior art and is therefore inapplicable.

22

91. (p. 67) The Montanaro reference is not prior art as to claim 1. While it discusses maintenance of state, it never teaches or suggests adding a token to communications from the client to the server, which is required by the last step of claim 1.

92. (p. 67) Web2Mush is not prior art as to claim 1. While the reference discusses maintenance of state, the proposed random numbers are for user identification and authentication, not for session identification.

93. (p. 67) The Neuss reference discusses maintenance of state in passing forms used in database queries. It does not teach or suggest the concept of a session. The "transaction id" is generated by the client, not the server, as required by the claim element. While Dr. Taylor asserts that it would be obvious that the server would generate the id, this is the opposite of what occurs in Neuss.

94. (pp. 67-68) H3 and CC are not prior art as to claim 1.

95. (p. 68) Stuff.com is not prior art as to claim 1.

96. (p. 68) The deposition testimony concerning NetMarket and Virtual Vineyards is uncorroborated and therefore inapplicable.

97. (p. 68) The NCSA reference is not prior art as to claim 1.

98. (pp. 68-71) With respect to the "appending" limitation, Dr. Taylor's argument based on Neuss appears to be that because he considers "transaction" and "session" to be equivalent, a "transaction id" must be a "session id" within the meaning of claim 1. However, the references cited do not support the equivalence.

99. (p. 68) Trewitt has been analyzed above. At most it speculates that sessions could be identified by strings embedded in URLs. It does not by any stretch of logic comprise all of the elements of claim 1, as it would have to do to be anticipatory, as averred by Dr. Taylor.

100. (p. 69) Benson is not prior art as to claim 1. Even if it were, it does not teach session ids. It teaches using strings in URLs for authentication purposes, totally divorced from any notion of a session. The "long key" is repeated in multiple requests, not because they form part of a session, but because an authenticator is needed to identify the user.

23

101. (p. 69) English is not prior art as to claim 1. Even if it were, it does not teach a session id as used in the '780 patent. It uses something called a "session id" only for authentication purposes to restrict access to protected information, and not to maintain continuity of a session.

102. (p. 69) The SC thread is not prior art as to claim 1. Even if it were, it uses IDs in URLs to implement "access restrictions for some documents served," not to maintain continuity of a session.

103. (p. 69) Derler is not prior art as to claim 1 and is therefore inapplicable.

104. (p. 69) Hall is not prior art as to claim 1 and is therefore inapplicable. Hall teaches a user id, not a session id.

105. (p. 70) Stuff.com is not prior art as to claim 1 and is therefore inapplicable. Even if it were, it is not possible to find all of the elements of claim 1 in the cited email.

106. (p. 70) H3 is not prior art as to claim 1 and is therefore inapplicable. Even if it were prior, the id used therein is not a session id for the simple reason that it can be used in more than one session, can change during a session, and can be used by multiple parties in different sessions simultaneously and thus does not identify a session. This is well-demonstrated by the server log at Bates #TS3 0018139-0018202. Examining a searchable .pdf file of this document, I asked for all references to "iris203," of which there were 37. At the fourth request from iris203, at time 6:53:02, a supposed "session id" of "_075480e8" is assigned. This id is never reused within the log, so it cannot constitute a real session id. However, at time 6:53:25, 22 seconds after the first "session id" was assigned to iris203, a different id of "_036c312a" is assigned. This is also never reused. The entire sequence of accesses by iris302 continues in the same manner. Every few seconds a different id is assigned and never reused. This is not a session id. The same session id is used for more than one user. At 6:42:06. user chevrier_pc.ssc.gov is assigned id "_3b4c05cb". At 6:44:54, less than three minutes later, exactly the same id is assigned to user esparc43.webo.dg.com. Thus, whatever function the id accomplishes, it is not a session id within the meaning of the claims.

24

107. (p. 70) CC is not prior art as to claim 1 and is therefore inapplicable. Even if it were prior, CC adds a number to the URL but only until the user logs in. Once he identifies himself, his name is inserted in subsequent URLs and the previous number is removed. Therefore, the number cannot be a session id within the meaning of the claims. The user name is not a session id, since it is used every time a user accesses the system and in fact the user may have multiple sessions open, all of which would be identified by the same user id.

108. (p. 70) The testimony concerning NetMarket and Virtual Vineyards is uncorroborated and is therefore inapplicable.

109. (p. 70) McCartney is not prior art as to claim 1 and is therefore inapplicable.

110. (p. 70) Web2Mush is not prior art as to claim 1 and has already been discussed.

111. (p. 71) The first full paragraph on p. 71 illustrates Dr. Taylor's erroneous invalidity analysis. He asserts that "Johnson could certainly be combined with wwworder or Trewitt, for example, to render the claim obvious." This is impermissible hindsight. It is not proper to use the claim as a guide for selecting those references which might render it obvious. He continues, "The motivation to do so, as discussed earlier, would be to support e-commerce in the broad market of the WWW." Such a diffuse "motivation," if valid, could support virtually any possible combination of references, whether suggested in the art or not. One might as well say that the television set was obvious because it was deemed desirable to transmit moving images over a great distance. It is Defendant's obligation to demonstrate not only a particular suggestion to combine references but also a suggestion that the combination would solve the problem.

112. (p. 71) With respect to Biznet, it is explained above why its "cookie" is not a session id.

113. (p. 71) In claim 2, the "session identifier *includes* a user identifier." The session identifier and user identifier are distinct, so a prior art reference which employs only a user identifier does not anticipate the claim.

114. (p. 71) With respect to Johnson, Dr. Taylor exhibits the habit of quoting from the examiner's office actions instead of offering his own opinion. If he were actually in agreement with the examiner, then he would have to concede that all the claims are valid since the patents issued. The applicant was able to overcome the examiner's rejection, so the examiner eventually changed his mind. Is Dr. Taylor agreeing with the examiner's first impression or his final conclusion? In any event, the examiner was wrong in his assessment of Johnson and eventually corrected himself. Johnson does not disclose the claimed element since it lacks a session id entirely and has only a user id. Likewise for Hall and Benson.

115. (p. 71) Dr. Taylor refers to an office action in the reexamination of the '780 patent. An examiner's statements during prosecution are not conclusive and are often revised based on arguments made by the applicant. In any case, the Trewitt reference contains no teaching conforming to the quoted portion of the examiner's office action. Trewitt refers to authentication only in the context of maintaining state in the server, not in the URL, and nowhere are session ids and user ids equated. In any event, the examiner is in error is stating that an authenticator is a user identifier. One may readily possess an anonymous token entitling one to access a file, document or even a physical facility. For example, a movie ticket entitles the holder to enter the theatre, but is not in any sense a "user identifier."

116. (p. 72) English, Smithson, Web2Mush and CC do not predate claim 2 and are inapplicable. English and Smithson deal with access controls, but not for session maintenance. Web2Mush deals with user identification, not session identification. CC identifies users and user id contains no information other than the user's name.

117. (p. 72) With respect to claim 3, the quoted statement by the examiner is incorrect. It would not have been obvious to include the expiration time in the session id since the expiration time could easily be stored in a table on the server and associated with the session id. The server could then look up the expiration time corresponding to any given session id. The references to Biznet, wwworder, Derler and CC are not relevant. While the user authorizations in these systems expired after a fixed period of time, the expiration time was not part of the id.

118. (pp. 72-73) With respect to claim 4, whether server logs were known in the prior art is irrelevant. Claim 4 includes all elements of the parent claim, which were not taught in any of the cited references. Hence claim 4 is neither anticipated by, nor obvious in light of, the references given, of which the only corroborated one that predates claim 4 is HTTPd 1.2.

119. (pp. 73-74) With respect to claim 5, it is irrelevant whether server log analysis was known in the prior art. That is not what is claimed. What is claimed is, in addition to all of the elements of parent claims 1 and 4, the use of server log analysis to examine sessions. While in hindsight it might be quite clear how to do this once one learns from the patent how to maintain a session, that does not mean that the claim as a whole was obvious when the invention was made. None of the references given by Dr. Taylor teaches or suggests session analysis. The Hughes testimony, even if it were correct, is merely hindsight analysis. The issue is not whether, once having been told what to do (track access histories within a session), one might be able to figure out a way to do it with existing tools. The issue is whether the references taught it.

120. (p. 74) The analysis of claim 6 is pure hindsight. Once the invention has been made and disclosed, it might well be apparent to those skilled in the art how to implement it with existing tools, such as Unix utilities. The fact that one can show later how to use simple tools to build a novel device does not diminish the novelty of the device. Dr. Taylor has given no reference that teaches tracking of access history specifically through a session and certainly has cited no reference teaching all the elements of claims 1, 4, 5 and 6 together.

121. (p. 74) The analysis of claim 7 suffers from the same deficiencies as the analysis of claim 6. It is hindsight without citation of a single reference, and surely no reference teaching all the elements of claims 1, 4 and 7 together.

122. (pp. 74-75) With respect to claim 8, Hall does not predate it and is thus inapplicable. Even if it were relevant, Hall teaches tracking users but does not relate them to access patterns. The "database of orders" of Hall is not the "database relating customer information to access patterns" of claim 8. Likewise, CC is not prior art as to claim 8 and the particular quotation from Mr. Ramstad is uncorroborated. Even if credence may be attached to

27

it, Mr. Ramstad never claims that CC actually related the customer name to any access pattern, merely that it could have been done using the tools that were available. There is also no testimony relating "customer information" to "access patterns," as required by the claim. H3 is also not prior art as to claim 8, the Lazzaro testimony is uncorroborated, and he never claimed that access patterns were analyzed. Therefore, no reference or combination has been cited that teaches the elements of claims 1, 4 and 8.

123. (p. 75) With respect to claim 9, the issue is not whether the new limitation added by claim 9 can be found in the prior art. Dr. Taylor needs to point to a reference or combination that teaches all the elements of claims 1, 4, 8 and 9, and he has not done so. In any case, CC and H3 are not prior art as to claim 9. There is no indication that any of the references teach maintaining "customer demographics," as required by the claim. User identities are not "customer demographics."

124. (pp. 75-76) With respect to claim 10, Dr. Taylor claims it is unclear because he cannot determine what is meant by an "initial service request." The parent claim 1 speaks of "processing service requests from a client to a server system." Surely in any sequence of requests there must be an initial one, and that is the one referred to in the claim. Dr. Taylor has no trouble with the concept when it is used in an allegedly invalidating reference. On p. 76, for example, in his analysis of claim 11, he states, "Derler discusses the construction of a session key, done at the time of the processing of the first command from a user." If the term "first command" is meaningful, then there can be nothing wrong with "initial service request." The Stuff.com material relied upon is uncorroborated.

125. (pp. 75-76) Once more, it is irrelevant whether prior art references teach the element added in dependent claim 10, but whether any reference teaches all the elements of claim 10 together with its parent. Smithson and Hall do not have session ids. Derler does not predate claim 10. In CC, the string that Dr. Taylor alleges to be the session id is not assigned at the first service request but is assigned after the user logs in.

126. (p. 76) With respect to claim 11, Smithson, Hall and Johnson do not use a session ids. In CC, the user name in plaintext surely is not protected from forgery. The Trewitt citation is inapplicable since there are no "hidden fields" in a URL. Derler and Hall do not predate claim 11.

127. (pp. 76-78) With respect to claim 12, in all the discussion offered by Dr. Taylor he points to no corroborated prior art reference that teaches an authentication server that provides session identifiers.

128. (pp. 78-82) Claims 22-24, 26 and 28 are method claims corresponding to various combinations of the apparatus claims discussed above, so the same analysis applies. Regarding the reexamination office action to justify the invalidity of claim 28, Dr. Taylor is wrong to rely on it. See the discussion of reexamination standards given above. The examiner was obliged to use the application date as the date of invention. Claim 28, for example, cannot possibly be anticipated by Pitkow 2, as stated by the examiner, since it long predates that reference. Dr. Taylor repeatedly refers in hindsight to what "could be done." That shows neither invalidity nor obviousness. One must show what was done or suggested. To the extent that Dr. Taylor's arguments with respect to claims 1, 4, 5, 7 and 15 are incorrect, so likewise are his arguments against claims 22-24, 26 and 28. Claim 24 requires customization based on a user profile. Derler is the only corroborated reference that teaches such a step, but does not predate the claim. Dr. Taylor provides no analysis at all of claim 26 to invalidate the "exclusive of repeated requests from a common client" step. Dr. Taylor's principal reference for claim 28 is Hall, but Hall does not predate any claim of the '780 patent. Although he says that Hall is pertinent to the sale of documents to be delivered only to authorized users, a close inspection of Hall reveals that it teaches no such thing.

129. (p. 81) Dr. Taylor asserts, with respect to claim 28, that, "strictly speaking, this claim is meaningless." He objects to the language that referring to a "document received from a client through the network" with the argument that it is impossible to send documents electronically but only copies of documents. The objection is without merit, for those skilled in

29

the art understand the meaning of the colloquialism. One says, for example, "send me an email." One does not say, "send me a copy of an email." Or, "let me have that file" instead of "let me have a copy of that file." Possibly Dr. Taylor brings up the point because it appears in one of his own papers, cited as reference dddd) in the Taylor Report, although it is a mystery what a publication dated May 2002 might have to do with this litigation.

130. (pp. 82-85) Claims 32-40 are means-plus-function claims corresponding to various apparatus claims discussed above, so the same analysis applies. Because the discussion of claims 32-40 in the Taylor Report were replaced by pp. 7-14 of the Supplementary Report, I have dealt with them in my rebuttal to the Supplementary Report, beginning at paragraph 159, below.

## NON-INFRINGING ALTERATIVES

131. Paragraphs 41-46 of the Taylor Report attempt to deal with the availability of non-infringing alternatives, presumably in support of an ultimate defense to a claim of damages for infringement. Unfortunately, Dr. Taylor misapprehends the concept of an "alternative." To be an acceptable non-infringing alternative, the alternative must have the advantages of the patented invention. Standard Havens Products v. Gencor Indus., 953 F.2d 1360, 1373 (Fed. Cir. 1991). Paragraph 41 suggests that a method of avoiding infringement would have been to use a system without a shopping cart database. Such a system would not have the advantages of the claimed invention since the shopping cart paradigm could not be implemented and useful server-side processing could not occur. Thus a system without a shopping cart database is not an acceptable non-infringing alternative.

132. Paragraph 42 suggests avoiding infringement by omitting the shopping cart mechanism. That clearly does not possess all the advantages of the claimed invention and is not a non-infringing alternative.

133. Paragraph 43 states correctly that there would no infringement of the '780 claims if there were no session identifier included in URLs. However, the supposed alternatives listed,

30