namely using a POST method or placing the identifier in HTTP headers, does not possess all the advantages of the claimed invention. The beauty of placing the SID in a URL is that no POST is needed and so no special client-side mechanism for inserting the SID in headers is required. A client page can be populated with hyperlinks containing the SID. When the user clicks on a link, the SID is automatically transmitted to the server with no additional steps being required.

134. Paragraph 44 offers the idea that claims directed to hypertext statements would not be infringed if transaction detail hyperlinks were omitted, e.g., if the details were all included in a single document. That obviously does not confer all the advantages of the claimed invention. A user statement containing all of the details of every transaction would be extremely cumbersome and difficult to read or navigate through. By allowing the user to obtain information about one transaction by clicking a single link is a distinct advantage. Thus the alternative suggested is not a non-infringing alternative.

135. Paragraph 45 proposes that no infringement of the "payment computer" claims would occur if a private (as opposed to a public) network were used to connect the payment computer to other computers or if a protocol other than packet-switching were used for communication. Any proposed non-infringing alternative must be "available" in order to be realistic. Dr. Taylor has not suggested the availability of any non-packet-switched network that might have been used. Dr. Taylor asserts several times in his report that the "payment computer" can be the merchant's server (see, e.g., pp. 33-36, 39-40). To be effective for electronic commerce, the merchant's computer must be connected to the Internet, so using a private network is not an acceptable non-infringing alternative.

136. Paragraph 46 states correctly that no infringement would occur if all steps and apparatus were located outside the United States. However, Amazon is a large U.S.-based company whose business is targeted to millions of U.S. customers. Even if Amazon were to remove all of its own computers from the United States, each U.S. customer would still operate a "buyer computer" located in the United States, thus causing infringement in the U.S. The only feasible way for Amazon to avoid infringement in this manner would be to stop doing business

in the U.S. Going out of business is not a suitable non-infringing alternative, and it certainly does not possess all of the advantages of the claimed invention.

## TAYLOR CONCLUSIONS

137. Paragraphs 48-50 of the Taylor Report contain a summary of his conclusions. He claims to have found "abundant prior art which either fully discloses or teaches each of the asserted claims of each of the three patents." However, he has not exhibited any such art. At most he has shown that individual claim elements of some of the claims of the patents can be found separately in a hodge-podge of over 30 references, some of which are uncorroborated snippets of deposition testimony and numerous others of which do not predate the claimed inventions. He has not met the burden of demonstrating, for any allegedly invalid claim, how every element of the claim can be found in a single prior art reference or motivated combination. Therefore, his conclusion in paragraph 49 that "the claims of the patents in suit discussed above are invalid" is unsupported.

138. Paragraph 50 of the Taylor Report contains a listing of eight secondary indicators of non-obviousness, with a paragraph for each explaining why the particular indicator is not applicable. In each case the analysis is in error.

1. Dr. Taylor asserts, without support, that Plaintiff has not enjoyed commercial success from the inventions. Whether this is true or not, commercial success of the invention need not be demonstrated through the Plaintiff's own success. Amazon.com ought to be very familiar with this principle. In Amazon.com, Inc. v. Barnesandnoble.com, Inc., Amazon pointed to Barnes & Noble's use of "one-click" ordering as evidence of commercial success: "Further evidence of commercial success of single-action ordering is suggested by the fact that Barnesandnoble.com promoted its Express Lane feature in a press release after it was announced." (See para. 40 of the Court's Order on Plaintiff's Motion for Preliminary Injunction," 1999 U.S. Dist. LEXIS 18660).

32

2. Dr. Taylor makes light of the indicator "surprise by persons skilled in the art" by taking the opportunity to comment that many people expressed surprise that the patents were granted. That, of course, is irrelevant to non-obviousness. Persons in the industry are not generally familiar with what has been patented or what the standards for patentability are. The Patent Office, which issued the patents, has that familiarity. I note that Dr. Taylor does not actually state that persons failed to be surprised at the advances claimed in the patents.

3. Dr. Taylor dismisses the fact that some parties have licensed the claimed inventions by commenting that their number is small compared with the number of companies engaged in the vast field of electronic commerce. That is not a proper licensing analysis, which cannot be based on a single conclusory sentence in an expert report. Such an analysis must consider, among other factors, the license fee, the degree to which the licensee investigated the patents and the market position of the licensees.

4. Dr. Taylor confuses "praise for the invention" with giving awards such as knighthoods to the inventors. An invention can be praised even if one is completely unaware of the inventor's identity, and praise can be expressed through the adoption of the invention by another, as Amazon.com pointed out in Amazon.com, Inc. v. Barnesandnoble.com, Inc., when it emphasized the adoption of one-click ordering by Barnes & Noble: "it gives the tribute of its praise to the prior art; it gives the [invention] the tribute of its imitation, as others have done." (See para. 25 of the Court's Order on Plaintiff's Motion for Preliminary Injunction," 1999 U.S. Dist. LEXIS 18660). Dr. Taylor also says he is "unaware of anyone praising the applicants or the subject of the patents," but he never claims that he was asked to look for such praise, and it certainly does not mean than none exists.

5. Dr. Taylor says he found no evidence of "copying by others" during the course of his investigation. There is no showing that he was asked to do so, or even attempted to find copying. However, he would not have had to look far, since Amazon.com and The Gap copied the inventions, as did numerous other shopping sites. As to his statement that OpenMarket personnel "learned from others" is irrelevant. Every inventor learns from others, and one skilled

33

in the art is presumed to know everything previously developed in his field. There is no shame in that. The question is whether the inventors made a patentable improvement over what was known by others, and Dr. Taylor refrains, at least in the paragraph discussing copying, from asserting that they did not.

6. In discussing "failure by others," Dr. Taylor points out that some parties, such as H3 and CC, who attempted to develop the invention, succeeded, which he claims shows that making the invention was not difficult. Ignoring the fact for the moment that H3 and CC do not predate the inventions, the "failure of others" that is relevant is that websites desperately tried for at least five years prior to the filing of the applications to develop the convenient method of ordering products over the web that was patented by applicants.

7. Dr. Taylor says that there was no "long-felt need" for the invention because the development of web applications proceeded very quickly in the early 1990s. Whether a need is "long-felt" is measured with respect to the pace of a specific industry. Dr. Taylor cites references going back at least to 1989 (Prodigy), at least five years prior to the earliest filing date of any of the patents in suit. Moreover, his report contains over 20 references to the rapid growth of electronic commerce and how well-established it was well before the filing dates. (See, e.g., p. 46 of the Taylor Report, last paragraph.) Somehow between page 46 and page 87 Dr. Taylor forgot how much the industry sought to develop an efficient method of online shopping.

8. Dr. Taylor states that he finds no evidence that the applicant proceeded contrary to accepted wisdom. He never states that he actually looked for any such evidence, nor has any been presented to him at this stage of the case. He points out, correctly, that the HTTP protocol "was done in a thoughtful manner and involved a community of researchers." How this might be relevant is elusive, however, since the patents do not claim HTTP and in fact a thrust of the patents is how to overcome deficiencies in HTTP that hindered its initial use in electronic commerce.

139. Dr. Taylor's opinion as to the invalidity of the patents in suit does not meet the requirements of Federal Rule of Evidence 702 in that it is not "based upon sufficient facts or

34

data," is not "the product of reliable principles and methods," and because he has not "applied the principles and methods reliably to the facts of the case." The principles and methods he used do not conform to the legal requirements for anticipation and obviousness, and do not embrace the proper definition of a "non-infringing alternative."

## TAYLOR EXHIBIT E

140. Attached to the Taylor Report is a chart labeled Exhibit E, "Inequitable Conduct References and The Claims Anticipated and/or Rendered Obvious by Those References." This exhibit is not referred to anywhere else in the Taylor Report, and it is not clear whether it was prepared by Dr. Taylor or prepared by someone else, or whether it represents any opinion of Dr. Taylor. I assume it is meant to represent his opinion. If so, many of the entries find no support in the body of the report and are, in fact, incorrect.

141. With respect to the CC website, it has been established above that it does not anticipate '314 claims 34-39, '492 claims 1-2, 4-5, 17-18, 35-36 or '780 claims 1-4, 8-11, 22-24, 32-35 and 37-40. Likewise the obviousness arguments with respect to CC for the claims shown in Exhibit E have been shown to be erroneous. In addition, CC is not prior art with respect to any of the claims for which it is listed as a reference in Exhibit E.

142. Web2Mush is not prior art with respect to any claim listed for it in Exhibit E except '780 claim 12. Even if it were, all of the arguments given in the Taylor Report with respect to obviousness and anticipation based on Web2Mush have been shown to be erroneous except for '780 claim 12. Although Exhibit E asserts that '780 claim 12 is rendered obvious by Web2Mush, the Taylor Report contains no discussion of, or support for, that conclusion. If and when a report is submitted that attempts to make such an argument, I will respond to it.

143. The Fielding reference is asserted in Exhibit E to render obvious certain '780 claims. How it might do so is explained nowhere in the Taylor Report, so I am unable to determine what the basis might be for such a conclusion. It is not even clear which document is meant by the "Fielding Reference," although I assume it refers to the wwwstat document

35

beginning at Bates No. AMS-S 168252. If so, any reliance Dr. Taylor places on it with respect to '780 is unjustified, for all it represents is a specification of log file formats. None of the terms "access pattern," "common client," "data," "database," "demographic," "exclude," "exclusive," "history," "identifier," "purchase," "repeated requests," "session" or "track," for example, all of which are used to define the subject matter of the allegedly obvious '780 claims, or any synonyms thereof, appear anywhere in Fielding, and it does not apply to any of the claims for which it is listed.

144.  The Allen reference is asserted to render obvious '314 claims 1 and 33 and '492 claims 19, 21 and 30, none of these which is asserted in this lawsuit. The only arguments given in the Taylor Report with respect to Allen are based on double patenting and the '599 file history. These arguments have been dealt with earlier in this rebuttal.

145.  All arguments with respect to FFBS and H3 have been treated in this rebuttal.

146.  The Hughes reference (getstats) consists of about 45 pages of C program code that performs processing of server logs. It contains no teaching other than the procedures it contains and no explanations of what it might be used for. It suffers from the same deficiencies as the Fielding Reference in that it does not teach or suggest how to practice the steps of the claims for which it is cited and contains none of the terms "access pattern," "client," "data," "database," "demographic," "exclude," "exclusive," "history," (except in the irrelevant context of "version history") "identifier," "purchase," "repeated requests," "session" or "track."

147.  Dr. Taylor says no more of Internet Shopkeeper than that it "provided the ability for merchants to create a shop on the Internet, including managing the shop's inventory, changing prices of merchandise, and changing descriptions of the products offered for sale. It also offered online ordering support." None of these functions is claimed in any of the claims of the patents in suit, so it is not a suitable obviousness reference.

148.  ISN and NetMarket have been treated extensively above.

149.  The Session Control (SC) Thread does not predate any of the claims of the '780 patent except possibly 10, 32, 33, 35, 38 and 39. Of these, Exhibit E states that it anticipates

claims 32 and 33 but the report contains no explanation of how it might do so. The SC thread is a two-page document consisting of comments by Dan Aronson of how he proposed to maintain HTTP state by adding a key to URLs. His method was unimplemented, discloses no more than Montulli, over which the cited claims were allowed, and is cumulative to Montulli.

150. Shen appears in Exhibit E only with respect to '780 claim 12. It is not prior art as to claim 12, however, and therefore is inapplicable. The Shen reference does not teach the elements asserted by Dr. Taylor on p. 77 of the report. The elements not taught have been supplied only by uncorroborated deposition testimony.

151. The Stuff.com and Trewitt references are discussed in detail in this rebuttal. Stuff.com does not predate any claim of '314, or '492. Of the claims listed for it in Exhibit E, Stuff.com may predate '780 claims 10, 12, 26, 33, 35, 38 and 39. However, aside from uncorroborated deposition testimony, the only evidence proffered concerning Stuff.com is a one-page non-enabling email discussing the use of ids in URLs, in a fashion similar to Montulli. It does not anticipate or render obvious any claim of the patents in suit.

## THE SUPPLEMENTARY REPORT

152. The claim charts on pp. 3-6 of the Supplementary Report rely on NCSA HTTPd documentation as a reference. Dr. Taylor asserts that the reference teaches a session id, but a thorough examination reveals that it neither teaches nor hints at such a thing. In fact, it doesn't refer to sessions at all. It does discuss the passing of attribute-value pairs through a URL. It is a very great leap from that teaching to discover that: (1) a useful attribute might be a session identifier; (2) one ought to assign a session identifier at the server; (3) one ought to include the same attribute-value pair in every URL that passes between server and client; and (4) one ought to have an intelligent way of deciding when to stop using a specific value for the session identifier and pick a new one. Not a single one of these teachings is contained in the HTTPd reference. Furthermore, the '780 patent does not even pass a session identifier as an attribute-

37

value pair. Instead, it embeds it alone, between delimiters, in the URL, contrary to the teaching of HTTPd.

153. That HTTPd does not relate to session identifiers is clear from the example quoted by Dr. Taylor. He asserts that the string "language=english" is a session identifier, but clearly it is not used that way and cannot do so. There is nothing about "language=english" that distinguishes among users, or among sessions, and in fact it might change during a session or be shared by multiple simultaneous users. It is simply a parameter that is passed to the server to indicate that the response to the request should be in English.

154. This erroneous analogy is carried throughout Dr. Taylor's analysis of the '780 claims. On p. 4 he states that "language=english" satisfies "the limitation of being 'a text string that identifies a session'."

155. (p. 4) With respect to claim 4, Dr. Taylor relies on the common logfile format (CLF) of HTTPd. The applicants in this case do not claim to have invented server logs, nor are server logs claimed as such in the '780 patent. Claim 4 depends from claim 1, so if claim 1 is valid, claims 4 is also, regardless whether server logs at the time recorded entire URLs.

156. (p. 5) With respect to claim 22, Dr. Taylor again states, as he did in the Taylor Report, his opinion that it would have been possible, using logs and tools available at the time the invention was made, to perform the sort of analysis recited in claim 22. Whether this is true or not is irrelevant. The point is that Dr. Taylor has not shown any reference that teaches or suggests doing that analysis in the manner claimed. One might, using tools available on Earth today, build an anti-gravity machine, but the availability of the tools would not render such an invention obvious.

157. (p. 6) The analysis of claim 23 is similarly flawed. Since HTTPd does not teach sessions, there is nothing in it that could teach or suggest tracking sessions of requests.

158. (p. 6) With respect to claim 24, Dr. Taylor says that "HTTPD/CGI teaches the first step of this claim." It doesn't, as shown above, but it also teaches none of the other steps of the claim.

38

159. (p. 7) In his discussion of the means-plus-function claims 32-39, Dr. Taylor relies on two different understandings of the Markman interpretation of various claim elements. For example, he proposes two readings of the first element, "means for receiving service requests from clients and for determining whether a service request includes a session identifier, wherein communications between the client and server systems are according to the hypertext transfer protocol." Neither reading is correct. Dr. Taylor states that it is his understanding that "the content server . . . must execute the algorithm shown in block 120 of Fig. 2A, that comprises blocks 102, 104, 122, 106, 114, 108, 110, 112, and 116 executed in the order prescribed by the flowchart shown." Dr. Taylor's own readings of the remaining means-plus-function elements in his Supplementary Report likewise requires these elements to comprise all blocks listed in the respective flowcharts. There is no basis for such readings in the Markman order. Only those blocks in the flowcharts that relate to the claimed functions must be present to constitute the required "means." For example, the only block shown expressly in Fig. 2A that implements the determining function of this specific means element is block 104, which tests whether a session id is present. There is no basis for reading the details of a preferred embodiment as constituting claim limitations. The Court already observed that to do so would penalize applicant for submitting source code. There is likewise no basis for asserting that the means must implement the steps in the order shown in the flowchart.

160. It is express in the patent that the "means" element must support "receiving service requests from clients" via HTTP and "determining whether a service request includes a session identifier," and no more. The "determining" element in Fig. 2A is block 104. The "receiving" element is not shown at all in Fig. 2A but is implied as part of the arrow connecting blocks 100 and 102. Block 102 is not a required means element and so the arrow impliedly connects blocks 100 and 104.

161. Recognizing that his own interpretation might be incorrect, Dr. Taylor offers another possible interpretation that is also incorrect. He says on p. 7 that "if this reading is incorrect, and the content server need only perform block 104, and ignore the rest of the

39

algorithm in block 120," then certain prior art is anticipating. However, since the means element requires two functions and block 104 only performs one of them, then clearly that is not the only step the means must implement.

162. Because Dr. Taylor's readings of the Markman order are incorrect, his conclusions on pp. 7-11 do not follow.

163. Regardless of his interpretations, a full discussion of the relevance and applicability of the prior art cited on pp. 7-11 can be found in my earlier discussion of the '780 patent.

164. (pp. 11-14)   Claims 40-41 are means-plus-function claims corresponding to method claims 22-23. Therefore, the rebuttal contained in my discussion above of the '780 patent applies.

165. (p. 14) Claim 42 requires a "database relating customer demographics to access patterns." Dr. Taylor has shown no reference in either of his reports that teaches or suggests this element.

166. Based on the analysis above, the conclusions contained in paragraphs 14 and 15 of the Supplementary Report are incorrect.

## THE TREVOR REPORT

167. The fundamental error of the Trevor Report is considering EAASY SABRE and Travelshopper to be shopping cart systems. They aren't. They were online ordering systems that did not employ the shopping cart model as claimed in the '314 and '492 patents (despite the fact that the term "shopping basket" occurs in the EAASY SABRE documentation).

168. (p. 7) Things go off the rails right at the start when Mr. Trevor describes Travelshopper as a "network-based sales system." It wasn't. It was a travel reservation system. It sold nothing. As is expressly shown in the QuickTime video SR01-TUSORD.mov, the purchase of tickets corresponding to reservations made with the system had to be made separately, entirely outside the system using a service called "Ticket by Mail." EAASY SABRE

40

also offered a "Receive Tickets By Mail" option. Page 33 of the EAASY SABRE User's Guide (Bates AMZ-S 207958) states, "CONGRATULATIONS! You have just completed making all of your travel plans, including air, hotel and car reservations via EAASY SABRE."

169. (p. 7) There is no "buyer computer" in either Travelshopper or EAASY SABRE. According to the Court's Markman opinion, a "computer" is "a functional unit that can perform substantial computation, including numerous arithmetic operations, or logic operations without human intervention." While a CompuServe user may have accessed the service via a personal computer, the required CompuServe CIM software needed to access the service turned the PC into a "dumb terminal," capable only of emulating a screen display (see Trevor Report, p. 5).

170. (p. 7) While the user of Travelshopper may have desired to buy products, as required by '314 claim 1, Travelshopper was unable to oblige, since it did not sell products, but merely reserved them.

171. (p. 7) Mr. Trevor makes the conclusory statement that "CompuServe host computers running TRVWIN included shopping cart capability," but he provides no support for the contention. According to the Markman opinion in this case, a "shopping cart" is a "stored representation of a collection of products." At most, the CompuServe host computers maintained itinerary lists, which are "identifications of reservations." The Trevor analysis ignores the substantive difference between the "order form" and "shopping cart" paradigms.

172. (pp. 7-8) It is not possible to have a "shopping cart computer" or a "shopping cart database" without a shopping cart.

173. (p. 8) Without a buyer computer or a shopping cart computer, it is not possible to have "buyer computer and said shopping cart computer being interconnected by a computer network."

174. (p. 8) The last element on the page is not present because in CompuServe there is no buyer computer, shopping cart, shopping cart computer or shopping cart database. There are also no "shopping cart messages" because the terminal emulator employed by the user merely indicated to the server which menu or list options the user had selected. (See the Trevor example

41

"(ItemID: 5[ListBox])," which is not a product identifier but specifies a list selection.) These are not "shopping cart messages."

175. (pp. 9-10) There is no shopping cart computer, shopping cart message, shopping cart or payment message, so this element cannot be present in CompuServe. More specifically, the Travelshopper example shown by Mr. Trevor is expressly labeled "User requesting a change to the reservation." There can be no payment message since the user was obliged to pay outside the CompuServe system (see the last paragraph on p. 21 of the Trevor Report.). The EAASY SABRE example states, "tickets must be purchased by Aug 02, 1989." It does not allow for the actual purchase of the tickets, so there is no "payment message." Merely informing the user how much the tickets will cost if he ever decides to purchase them is not a "payment message" as that term has been interpreted by the Court.

176. (p. 10) There is no buyer computer, shopping cart, or payment message. The statement by Mr. Trevor in row 2, column 3 is expressly at odds with the screen shot. The system displays a "Reservation Confirmation" and informs the user that tickets must be purchased within 24 hours. Mr. Trevor claims that a "credit card payment for the entire reservation is initiated," but if this were true there would be no need to remind the user to purchase tickets. Likewise, in EAASY SABRE the user is reminded that he must purchase tickets, which he does outside the system.

177. (pp. 10-11) There is no shopping cart or shopping cart database. Also, the systems maintain reservations, not "stored representations of products." A reservation is not a ticket.

178. (p. 11) Mr. Trevor states his conclusion that the additional limitations of claims 35-39 are also found in the CompuServe system, but he provides no demonstration or any exhibit to support the assertion. Because claims 34 in not anticipated, none of claims 35-39 can be either. Claim 35 cannot be anticipated for the additional reason that no payment message is created. Claim 37 cannot be anticipated for the additional reason that no "fetch shopping cart message" is present. Claim 39 is an independent claim not treated by Mr. Trevor.

179. (p. 12) With respect to the '492 patent, Mr. Trevor compares the claims only to the Travelshopper system, which he asserts is a "hypertext statement system." It is apparent, however, from the exhibits in the Trevor Report that it was not because no hyperlinks are shown on any of the screens.

180. (p. 12) There was no "client computer" in Travelshopper within the meaning of "computer" in the Markman opinion, for the same reason there was no "buyer computer." The user's machine was a terminal emulator.

181. (p. 12, last row) There is no "statement document comprising the purchase transaction records" since there is no purchase transaction in Travelshopper. The screen exhibited in column three shows nothing to contradict this statement. It is a list of travel reservations and is does not show any purchase.

182. (p. 13, rows 1 and 2) There is no "statement document" and no "transaction detail hyperlink." The fact that a mechanism was available on Travelshopper to view the details of an individual reservation does not mean that a hyperlink was used.

183. (p. 13) With respect to claim 16, there is no "hypertext statement system" or "client computer" in Travelshopper. There is no "purchase transaction," but only the creation of a reservation; hence there can be no statement document.

184. (p. 14, rows 1-2) There is no "transaction detail hyperlink" in Travelshopper.

The only opinions expressed by Mr. Trevor and expressly designated as such appear on pages 5 and 15, essentially that the Travelshopper demonstration described in his report accurately recreates the system during the 1991-1993 timeframe. I have no evidence to dispute this opinion. However, neither it nor EAASY SABRE anticipates any claims of the patent in suit.

## CONCLUSIONS

185. There is nothing in the Taylor Report, the Supplementary Report or the Trevor Report that demonstrates that any claim of the patents in suit is anticipated, obvious or invalid.

43

186. The Taylor Report presents no viable non-infringing alternatives that could have been adopted by Amazon to avoid infringement.

187. The Taylor Report and the Supplementary Report fail to demonstrate that any of the references listed in Exhibit E anticipate or render obvious any of the claims for which they are cited.

188. The Trevor Report does not show that EAASY SABRE or Travelshopper invalidates any claim for which they are cited.

I hold these opinions to a reasonable degree of professional certainty.

*Michael Ian Shamos*

Michael Ian Shamos, Ph.D., J.D.
May 9, 2005

44