**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CDW CORPORATION, NEWEGG | ) | Civil Action No. 6:07-CV-00511-LED |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT NEWEGG'S MOTION FOR SUMMARY JUDGMENT THAT THE '639
PATENT IS NOT ENTITLED TO CLAIM THE BENEFIT OF THE FILING DATE OF
ITS PARENT APPLICATION, AND THAT THE ASSERTED CLAIMS OF THE '639
PATENT ARE THEREFORE INVALID, AND BRIEF IN SUPPORT THEREOF**

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES.................................................................................................. 1

SUMMARY OF THE ARGUMENT ......................................................................................... 1

I.      AN OVERVIEW OF THE RELEVANT TECHNOLOGY ........................................... 3

II.     THE '639 PATENT IS NOT ENTITLED TO THE FILING DATE OF THE PARENT
APPLICATION ........................................................................................................... 5

     A.   The Claimed Invention and Allegedly Supporting Disclosure ....................................... 6

     B.   The '780 Patent Fails To Provide A Written Description Of The Invention Claimed In
The '639 Patent ......................................................................................................... 10

     C.   The '780 Patent Fails To Provide An Enabling Disclosure Of The '639 Patent Claims 13

     D.   The '780 Patent Fails To Set Forth The Best Mode Of Practicing The Invention ........ 19

III.    THE '639 PATENT IS INVALID UNDER § 102(b) AND § 102(e) .......................... 21

     A.   The Claimed Invention Of The '639 Patent Was On Sale More Than One Year Prior To
The Filing Date Of The '639 Patent ............................................................................. 22

     B.   The Claimed Invention Of The '639 Patent Was Disclosed In Prior Art Patents.......... 24

CONCLUSION.................................................................................................................... 30

## STATEMENT OF THE ISSUES

Pursuant to Fed. R. Civ. P. 56 and Local Rule CV-56, Defendant Newegg, Inc. ("Newegg") hereby moves this Court to enter summary judgment that U.S. Patent No. 7,272,639 ("the '639 patent") is not entitled to claim the benefit of the filing date of its parent application, now U.S. Patent No. 5,708,780 ("the '780 patent").  The '639 patent cannot claim the benefit of the earlier filing date of its parent application because the parent application fails to comply with the requirements of 35 U.S.C. § 112, first paragraph.  Because the '639 patent is not entitled to the earlier filing date, Newegg further moves this Court to enter summary judgment that asserted claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, and 79 of the '639 patent are invalid over the intervening prior art.  The invention claimed by the '639 patent was unambiguously admitted to have been on sale more than one year prior to the effective filing date of the '639 patent. Intervening prior art patents also clearly invalidate the asserted claims of the '639 patent, which are anticipated by U.S. Patent No. 5,774,670 to Montulli ("Montulli") under 35 U.S.C. § 102(e), and/or also under 35 U.S.C. § 103(a) as being obvious over Montulli in view of U.S. Patent No. 5,724,424 to Gifford ("Gifford").

## SUMMARY OF THE ARGUMENT

When Open Market, Inc. (Soverain's predecessor in interest) first filed a patent application covering a method of exchanging session identifiers (SIDs) in URLs between a Web server and client browser, it was aware that Netscape had very recently invented an alternative method of exchanging session identifiers with the use of "cookies."  In its patent application, Open Market provided a careful description of the URL method and particularly claimed the URL method.  It also included a disguised reference to the Netscape cookie method, but stated that "[t]his embodiment, however, requires a special browser which can handle such

communications and is generally not suitable for the standard browser format common to the Web."   The application included no claims directed to the cookie method, and provided no explanation as to the details of the "special browser" required.   Indeed, the disguised reference to the Netscape Navigator browser and the Netscape method was intended to "hedge [their] bets on what and when Netscape may have done with respect to IP [Intellectual Property]."   This first application issued as the '780 patent.

Over two years later, when the Netscape cookie method was becoming widely used, Open Market filed a purported "continuation" application with claims covering the cookie method.   This second application was the first time Open Market's patents ever discussed cookies, wherein it added new language to the specification that provided that "[the presently claimed method] may now be implemented in cookie compatible browsers."   This added language was included solely in an attempt to support claims directed to the cookie method, as such supporting language was wholly absent in the '780 patent.   This second patent application eventually issued as the '639 patent, and was afforded on its face the benefit of the filing date of the parent case.   Meanwhile, Netscape had released its cookie compatible browser and publicized the cookie functionality well before Open Market filed for the '780 patent.   Netscape also sought a patent of its own shortly thereafter, which disclosed the cookie method in great detail.

Pursuant to 35 U.S.C. § 120, the '639 patent is entitled to the priority date of the '780 patent only if the '780 patent satisfies each of the 35 U.S.C. § 112 requirements of written description, enablement, and best mode for the claims of the '639 patent.   Due to Open Market's knowledge of Netscape, but effectively nonexistent disclosure related to cookies in the '780 patent, none of the Section 112 requirements are satisfied and the '639 patent is thus not entitled to claim the benefit of the filing date of the '780 patent.   Because Open Market admittedly sold a

software product called Transact (a commercial embodiment of its '639 patented software) more than one year prior to the '639 patent's filing date, the '639 patent claims are invalid.  The patent claims issued in the '639 patent are also invalid because of Netscape's intervening prior art patent directed to its cookie method.

## I.      AN OVERVIEW OF THE RELEVANT TECHNOLOGY

The technology involved in the '780 and '639 patents may be briefly summarized as follows.  When a user, or client, displays a page of a website on a browser, the information for the page is provided by a particular computer, called a server.  '639 Patent, Ex. A hereto, at col. 1, ll. 48-65.  Each page or file of the website is stored on the server and is associated with a particular URL, or website address, which the browser uses to direct the server to the associated page or file.  *Id.* at col. 2, ll. 20-39.  Users can navigate through various pages of the website or to other websites via "links," or text or pictures on a website, which when clicked on by a user, direct the user to another URL.  *Id* col. 2, lines 14-26.  Every interaction between the client and the server constitutes a distinct request or communication between the client and the server. Treese & Stewart, *Designing Systems for Internet Commerce*, Addison-Welsey (2nd ed. 2003), attached hereto as Exhibit E, at page 155.[1]  When these individual transactions are a series of related transactions (i.e., all by the same user), they are considered a single "session."  *Id.* at 155-56.  To collect and store together the transactions that are part of the same session, the URLs of the links on a web page can be modified by the server to include a "session ID" unique to the user, such as a string of numbers and letters.  '639 patent (Ex. A), at col. 3, ll. 20-41.  When the user communicates with the server by clicking on the links, the server can recognize the session ID in the URL and store the information about the communication or transaction.  *Id.* at col. 3, ll.

---

[1] The authors of this book, Win Treese and Lawrence Stewart, are named inventors of the '780 and '639 patents.

42-47.  This method of storing session information is known as a "dynamic URL" method, and it is the method described and claimed in the '780 patent.  Treese & Stewart, *supra*, at p. 157; '780 patent, Ex. B hereto, at cols. 3-4 and claim 1.

Session information may also be stored on the user's browser instead of on the server by using a browser which supports "cookie" functionality.  As two inventors of the '780 and '639 patents explain in their book, "[a] cookie is a block of information transmitted from server to browser and stored there.  On subsequent requests to the server, the browser sends back the cookie along with the Web request.  Cookies can be used to store session identifiers."  Treese & Stewart, *supra*, at page 157.  These two inventors also admit that the idea for using cookies in internet browsers was "originally introduced by Netscape."  *Id.*

Netscape is the company that created Netscape Navigator, a popular internet browser, which was first released to the public in October of 1994.   Netscape Press Release of October 13, 1994 entitled "Netscape Communications Offers New Network Navigator Free on the Internet," Ex. K hereto; David M. Kristol, "HTTP Cookies: Standards, Privacy, and Politics," ACM Transactions on Internet Technology, 2001, Ex. N hereto, p. 9.   Internet browser cookies were invented by Lou Montulli, who worked at Netscape.  Treese & Stewart (Ex. E, at 157); Ex. N, at 10 ("Lou Montulli wrote the original specification, and he chose the term 'cookie.'").  Netscape applied for a patent on Montulli's invention, which was filed on October 6, 1995, and subsequently issued as U.S. Patent No. 5,744,670.  Ex. I.  The first version of the Netscape browser, released prior to December 15, 1994, fully implemented Montulli's cookie method.  Declaration of Lou Montulli filed at the United States Patent and Trademark Office on May 11, 2000, attached hereto as Exhibit L, at page 2, lines 25-28; Ex. N, at page 9 (The first version of Netscape "supported state management [i.e., cookies].").   In December of 1994 or January of

4

1995, shortly after the first version of Netscape Navigator was released, Netscape published a preliminary specification on its website explaining how its new cookie method worked.  Ex. M; Ex. L, p. 2, ll. 15-19.

In view of the above history of Internet technology, at the time that the '780 patent was filed (June 7, 1995), a cookie compatible browser was already available (i.e., Netscape Navigator) and its cookie functionality had been publicized.  At least one of the inventors of the '780 patent, Lawrence Stewart, and the author of the patent, Bill Dally, were well aware of Netscape and its cookie functionality prior to the filing date of the '780 patent.  *See* email from Lawrence Stewart to Bill Dally dated May 19, 1995, Ex. F hereto.

## II.    THE '639 PATENT IS NOT ENTITLED TO THE FILING DATE OF THE PARENT APPLICATION

The patent statute contains three requirements that must be satisfied in the invention disclosure, or specification, of a patent application:

(1)    The "written description" requirement requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms."

(2)    The "enablement" requirement requires that the disclosure is sufficient to "enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."

(3)    The "best mode" requirement requires that the specification "set forth the best mode contemplated by the inventor of practicing their invention."

35 U.S.C. § 112, ¶1 (2006).  These three requirements are independent and distinct requirements that must each be satisfied for the resulting patent claims to be valid.  *University Of Rochester v. G.D. Searle & Co., Inc.*  358 F.3d 916, 921 (Fed. Cir. 2004).

The '780 patent was filed on June 7, 1995, with the '639 patent being filed as a purported "continuation" on January 12, 1998, claiming the benefit of the '780 patent's earlier filing date

under 35 U.S.C. § 120.  It is the patentee's burden to bring forward evidence proving they are entitled to claim priority to an earlier filing date under § 120.  *PowerOasis, Inc. v. T-Mobile, USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008).  Section 120 priority is applicable only if the earlier-filed application complies with each of the requirements of section 112.  *Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1313 (Fed. Cir. 2002); *In re Hafner*, 410 F.2d 1403, 1406 (C.C.P.A. 1969) (holding that in order to claim the benefit of an earlier filing date, "the invention disclosed in the 'previously filed' application must be described therein in such a manner as to satisfy all the requirements of the first paragraph of § 112 as the courts have construed it").  Here, the disclosure of the '780 patent fails to satisfy all three requirements of § 112, first paragraph, and therefore does not provide sufficient support for the claims in the '639 patent.  Accordingly, the '639 patent is not entitled to the filing date of the '780 parent application.

A.      The Claimed Invention and Allegedly Supporting Disclosure

The '639 patent has two independent claims, claim 1 and claim 78.  Claim 1 includes the following limitations:

> returning a session identifier from the server system to the client, <u>the client storing the session identifier</u> for use in subsequent distinct requests from the client to the server system; and
>
> <u>appending the stored session identifier to each of the subsequent distinct requests</u> from the client to the server system.

Exhibit A, at col. 10, ll. 32-37 (emphasis added).  Claim 78 includes the following limitation:

> receiving, from the client, a service request to which a <u>session identifier stored at the client has been appended by the client</u>, wherein communications between the client and server system are according to hypertext transfer protocol.

*Id.* at col. 14, ll. 46-50 (emphasis added).   Because these limitations are contained in the independent claims, all claims of the '639 patent require that the client store the session identifier and append the stored session identifier to all subsequent requests made to the server.

Soverain has alleged that "[e]ach asserted claim of the '639 patent is entitled to a priority date of June 7, 1995, the filing date of its parent application."  (Docket Item No. 84, Soverain's Disclosure of Asserted Claims and Infringement Contentions, 5).   In the specification accompanying the '780 parent application, "storing" is discussed in a single paragraph:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser format common to the Web.

Ex. B, at col. 4, ll. 25-31.  The '780 specification contains no other references to "storing," and provides no additional description as to the details of the "special browser," which is supposedly "require[d]" to practice such a method.  In the '639 specification, however, this paragraph was modified to read:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server.  This embodiment, however, requires a special browser which can handle such communications and *was generally not suitable for early browser formats common to the Web. However, it may now be implemented in cookie compatible browsers.*

Ex. A at col. 4, ll. 22-29 (emphasis added).  Here, for the first time, the required "special browser" was defined and explained to be a "cookie compatible browser."  Further, by asserting that such a browser "was" previously unsuitable but that it "now" can be implemented, the applicants represented that suitable browsers were unknown and/or unavailable at the time the '780 patent was filed.

During prosecution of the '639 application, the term "cookie" was added to the claims, then the "cookie" claims were cancelled after a telephone interview with the Examiner. Amendment of May 15, 2001, Ex. C hereto, p. 5.  It was admitted that the "cookie" claims were cancelled because "the 'cookie' limitations . . . were not explicitly stated in the earliest application to which priority is claimed."  *Id.*  Other pending claims were amended to recite that "the client stor[ed] the session identifier for use in subsequent communications.  *Id.* at page 6. The applicants asserted that this wording of other pending claims "still cover[ed] the cookie embodiment" and "assure[d] a priority claim to June 7, 1995 for all claims," referencing the above-cited paragraph of the specification as supportive of these assertions.  *Id.* at page 6.

In a subsequent amendment to distinguish the '639 patent claims from a prior art reference, the applicants argued:

> Freeman-Benson [the prior art reference], at the time of its publication, worked with '*all* existing WWW browsers' . . . .   Such browsers as existed at that time would not support Applicants' claimed invention, which, as of the priority date, required a modified browser.

Amendment of December 28, 2001, Ex. D hereto, p. 7.  The applicants again referenced the "special browser" language of their application as supportive of this distinction, and argued that "modified" and "special" actually meant "cookie compatible."  *Id.*   Here, the applicants once more represented that a suitable browser for practicing their invention was unknown or unavailable as of the '780 filing date.  *Id.*

The inconsistency of Open Market claiming a cookie embodiment in the '639 patent (which claims priority to the '780 patent), while at the same time representing to the Patent Office that cookie compatible browsers would not have supported the invention as of the '780 filing date, may be better understood in light of discussions taking place outside the Patent Office.  About two weeks before the '780 patent was filed, Lawrence Stewart, one of the named

inventors of the '780 and '639 patents, emailed Bill Dally, who was preparing the application

which would later become the '780 patent.  Ex. F.  In his email Mr. Stewart wrote:

> I also wanted to raise a couple more issues, just in case we need to do anything to the application.
>
> 1) <u>The Netscape Navigator browser has a cookie storage mechanism</u>, in which one server can tell the browser "Store this cookie, and present it whenever you send a request to any server on this list".
>
> <u>This cookie mechanism would work for passing SIDs around</u>.  The auth server would set the cookie, and tell the browser to present it when any request is made to the content servers.  This is just another way to store the SID.  (We store it in the URL, which is universal, but also requires that the content be written with relative URLs.)

Ex. F (emphasis added).  In Mr. Dally's response to this email (Ex. G), he notes that regarding

the Netscape cookie functionality:

> Yes, I'm aware of this.  We mention this facility in the specification of the patent and have claims that straddle both sides of it to hedge our bets on what and when Netscape may have done with respect to IP.

In view of this prosecution history and background, the sole purpose of the filing of the

'639 patent appears to have been to attempt to claim a new embodiment of the '780 patent's

invention, but utilizing a browser having cookie capabilities to store the session ID information.

Soverain would have this Court believe that the cookie method was fully disclosed in the '780

patent, even though the '780 specification was devoid of any such disclosure and was clearly and

unambiguously amended in the '639 patent to provide that such a method may "now" (i.e., in

1998) be implemented in cookie compatible browsers.  While it may seem based only on the

prosecution history that the inventors were simply unaware of any appropriate "modified" or

"special" browsers to support the cookie embodiment when the '780 patent was filed, it is clear

from correspondence prior to the filing date that at least one inventor and the patent drafter

omitted known and essential information about such browsers from the application.  Open

Market made the clear choice in 1995, when the '780 patent was filed, to pursue the dynamic

URL method, not the cookie method.  Later, once the cookie method was becoming more prominent, it attempted to file a "continuation" to claim the cookie method.

In cases such as this where patent claims are clearly unsupported by the disclosure in the specification, this Court has entered summary judgment invalidating the claims for failure to satisfy the disclosure requirements of section 112. *See, e.g., Grantley Patent Holdings, Ltd. v. Clear Channel Commun., Inc.*, 2008 WL 5781056 (E.D. Tex. 2008) (invalidating patent claims under section 112, ¶ 6, because the specification "describe[d] no algorithm, formula, or series of steps performed by the computer to accomplish the function" that was set forth in the claims).

B.    The '780 Patent Fails To Provide A Written Description Of The Invention Claimed In The '639 Patent

The written description requirement is to ensure that the scope of the right to exclude as defined by the claims does not over-reach the scope of the inventor's contribution to the art as defined by the specification.  *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004).  The written description requirement is intended to help ensure that the public gets its end of the bargain struck by the patent system whereby the public receives meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time.  *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009).   In exchange for a patent, the inventors must provide a "full, clear, concise, and exact" disclosure of the invention, to allow those of ordinary skill in the art to recognize that the inventors invented what was claimed.  35 U.S.C. § 112, ¶1; *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Company*, 560 F.3d 1366, 1371-72 (Fed. Cir. 2009).  The '639 patent claims are alleged to encompass a method for processing service requests where the client stores session information via a cookie compatible browser.  Even though the first Netscape browser supported cookies when the '780 patent was filed, which was known to Lawrence Stewart and Bill Dally, the '780 patent still fails

10

to provide a "full, clear, concise, and exact" written description of the mentioned "special" browser to sufficiently support the '639 claims.   Indistinct and generalized language, which describes what something does, as opposed to what it is, does not satisfy the written description requirement.  *Ariad*, 560 F.3d at 1372.

In *Ariad Pharmaceuticals*, the patentee claimed a method for reducing NF-KB activity in a cell, including the step of "reducing binding of NF-KB to NF-KB recognition sites on genes." *Id.* at 1370.   The specification, however, only "hypothesize[d] three classes of molecules potentially capable of reducing NF-KB activity" by reducing such binding, and did not provide any specific working examples of particular molecules in the specification.  *Id.* at 1373.   The Court invalidated the patent as failing to contain a written description of the invention, saying that the specification only amounted to a wish or plan for future research, and   "[was] not so much an 'example' as it [was] a mere mention of a desired outcome."  *Id.* at 1375.   The patentee presented evidence that others managed to actually practice the claimed method shortly after the application was filed, but the Court rejected this argument because written description analysis occurs at the filing date.  *Id.* at 1374.   Noting that the patented technology was primitive and uncertain, the Court held that more detailed disclosure to fill in the gaps was required, noting that "the scope of the right to exclude must not overreach the contribution to the field of art *as described in the patent specification*."  *Id.* at 1376 (citing *Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1345-46 (Fed. Cir. 2000)) (emphasis added).

In *University of Rochester*, the patentee claimed a method for inhibiting PGHS-2 activity, including the step of "administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene." 358 F.3d at 918.   However, the specification disclosed no particular non-steroidal compounds that would produce the desired effect of inhibiting PGHS-2 gene activity,

and there was no evidence that a person having ordinary skill in the art would have been able to identify an appropriate compound based on the specification's vague functional description. *Id.* at 927-28.  The Court found the patent invalid for failure to contain a written description of the invention, noting "there is no language here, generalized or otherwise, that describes compounds that achieve the claimed effect." *Id.* at 923.  Likewise, in *ICU Medical*, the Federal Circuit affirmed the grant of summary judgment of invalidity under Section 112 ¶ 1 for lack of written enablement wherein the specification only described valves with "spikes" as opposed to the claimed spikeless valves.  558 F.3d at 2378-79.  Due to this lack of disclosure, one skilled in the art would not have understood the inventor to have invented a spikeless valve. *Id*. at 1378.

Here, the '780 patent merely expresses a desire for a "special browser" which can "store an SID or similar tag for use in each URL call to that particular server."  Ex. B at col. 4, ll. 24-31.  Since the specification provides no elaboration on what makes the "require[d]" browser "special," the disclosure is not an example, but a "mere mention of a desired outcome." *Ariad*, 560 F.3d at 1375.  As the genetic technology was in *Ariad*, the technology of Internet browsing and session data was primitive in 1995, when the '780 patent was filed.  As such, it is insufficient to generally allude to a "special browser" and state what it does, without saying what it is. *Id.* at 1372.  The public is entitled to a description which is "full, clear, concise, and exact," 35 U.S.C. § 112, ¶1, but the '780 patent contains no definition or qualification of the word "special."   The '780 patent therefore cannot satisfy the written description requirement with respect to the '639 patent claims because it fails to describe how the special browser "achieve[s] the claimed effect" of the client storing the session ID. *Univ. of Rochester*, 358 F.3d at 923.  Even if others were able to practice the invention claimed by the '639 patent shortly after the '780 patent was filed, that would not suffice to show that the '780 patent satisfies the written

12

description requirement, because such analysis must be done as of the filing date of the '780 patent. *Ariad*, 560 F.3d at 1374.

To allow Soverain to claim the cookie embodiment in the '639 patent based on the description in the '780 patent would allow it to "overreach the contribution to the field of art as described in the ['780] patent specification." *Id.* The written description requirement is intended to prevent applicants from updating their disclosures during pendency of the application(s), because "[o]therwise applicants could add new matter to their disclosures and date them back to their original filing date, thus defeating an accurate accounting of the priority of invention." *Chiron Corp. v. Genentech, Inc.* 363 F.3d 1247, 1255 (Fed. Cir. 2004). This is precisely what Soverain would have the Court allow it to do in this instance. Soverain would have this Court believe that the '639 patent's explanation in 1998 that the cookie method "may now be implemented in cookie compatible browsers," was included in the '780 patent specification in 1995. However, the Court must not overlook the fact that the '780 patent provides no meaningful contribution regarding cookies in its specification, which is where the written description analysis takes place. 35 U.S.C. § 112, ¶1. Therefore, the '639 patent claims are unsupported by the disclosure in the '780 patent, and cannot be afforded the benefit of the '780 patent's filing date. *Hafner*, 410 F.2d at 1406.

C. The '780 Patent Fails To Provide An Enabling Disclosure Of The '639 Patent Claims

The disclosure in a patent specification must be sufficient to enable a person having ordinary skill in the art to make and use the claimed invention, without "undue experimentation." 35 U.S.C. § 112, ¶1; *Chiron*, 363 F.3d at 1253. Where an application claims the benefit of an earlier application's filing date, "the prior application must enable one of ordinary skill in the art to practice 'the full scope of the claimed invention.'" *Chiron*, 363 F.3d at 1253. This ensures

that the disclosure in the earlier specification is commensurate in scope with the later claims. *Id.* "[W]here the specification teaches against a purported aspect of an invention, such a teaching 'is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed Cir. 2007). Here, there is no specific or useful disclosure in the '780 patent relating to how to make or use the cookie method claimed in the '639 patent, and the '780 patent even teaches away from using such a cookie method. As a matter of law, the '639 patent claims are therefore not enabled by the '780 patent disclosure.

In *Chiron.*, the patentee filed an application claiming a particular monoclonal antibody. 363 F.3d at 1251. After the application was filed, a new type of chimeric antibody had been invented. *Id.* The patentee then filed a continuation-in-part which disclosed additional monoclonal antibodies and broadened the disclosure so that the claims would encompass the new chimeric antibodies. *Id.* at 1251-52. Because the claims encompassed antibodies beyond those which were taught with a specific and useful teaching in the specification, the claims were found invalid for failure to enable their full scope. *Id.* at 1256.

*Chiron* distinguished between three classes of technology: (1) that which is well known at the time the application is filed, (2) that which does not exist until after the filing date, and (3) nascent technology, which is new and emerging. *Id.* at 1254. Well known and routine technology is preferably omitted from the specification. *Id.* As demonstrated *supra* and in the '780 patent, a cookie compatible browser was in no way routine or well known when the '780 patent was filed. Indeed, neither "cookie" nor "Netscape Navigator" appear anywhere in the '780 patent. If such technology were well known, it would have at least been mentioned in the patent, instead of the '780 patent's mere cryptic allusion to a "special browser." Ex. A, at col. 4,

14

line 28.  By contrast, applicants are not expected to enable technology which does not exist at the time of filing because such disclosure would be impossible.  *Chiron*, 363 F.3d at 1254.  With regard to enabling nascent technology, the *Chiron* Court ruled that:

> Nascent technology, however, must be enabled with a "specific and useful teaching."  The law requires an enabling disclosure for nascent technology because a person of ordinary skill in the art has little or no knowledge independent from the patentee's instruction. Thus, the public's end of the bargain struck by the patent system is a full enabling disclosure of the claimed technology.

*Chiron*, 363 F.3d at 1254 (citations omitted).  Here, the cookie-enabled browser was nascent technology when the '780 patent was filed, as it was first introduced by Netscape only a few months prior to the '780 patent's filing date.  The '780 patent, however, fails to provide a specific and useful teaching to enable this technology.  The alleged "disclosure" of the cookie method, namely the words "special browser," is at best extremely vague and is effectively useless to one who seeks to make and use a cookie compatible browser.

In *Automotive Technologies International, Inc. v. BMW of North America, Inc.*, the patent in suit claimed a side impact automobile crash sensor.  501 F.3d 1274, 1276-77 (Fed. Cir. 2007).  The specification described mechanical velocity-type sensors in great detail, and also briefly noted that an electronic sensor assembly can also be used.  *Id.* at 1277-78.  A single "conceptional view" of an electronic sensor was included in the application, and the specification taught only that the motion in the electronic sensor "can be sensed by a variety of technologies using, for example, optics, resistance change, capacitance change or magnetic reluctance change." *Id.* at 1278.  The Court found the claims to be invalid because the application failed to enable the full scope of the claims, which included electronic sensors.  *Id.* at 1282.  The Court emphasized that "only one short paragraph and one figure relate to an electronic sensor.

Importantly, that paragraph and figure do little more than provide an overview of an electronic sensor without providing any details of how the electronic sensor operates." *Id.*

The patentee in *BMW* argued that that the knowledge of those skilled in the art could fill in the gaps in the disclosure, but the Court rejected that reasoning. *Id.* at 1283.

> It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement. Although the knowledge of one skilled in the art is indeed relevant, the novel aspect of an invention must be enabled in the patent . . . . Given that the novel aspect of the invention is side impact sensors, it is insufficient to merely state that known technologies can be used to create an electronic sensor.

*Id.* (emphasis added). Accordingly, the specification provided "only a starting point, a direction for further research" with regard to electronic sensors; it did not provide guidance to a person of ordinary skill in the art in "reasonable detail" sufficient to enable the making and use of electronic side impact sensors. *Id.* at 1284. The patentee therefore failed to enable the claims because "[w]hen there is no disclosure of any specific starting material or any of the conditions under which a process can be carried out, undue experimentation is required." *Id.* at 1283-1284 (quoting *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)).

In *Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, the patent at issue claimed genetically engineered plant cells. 315 F.3d 1335, 1338 (Fed. Cir. 2003). The only working examples of the cells disclosed in the specification were dicots (seeds sprouting two leaves), but the claims also encompassed monocots (seeds sprouting a single leaf). *Id.* At the time the application was filed, "stably-transformed monocot cells were highly desirable . . . [b]ut stably transformed monocot cells were difficult to produce." *Id.* at 1340. The Court held that the claims were invalid for lack of enablement because inventors may not "claim what was specifically desired but difficult to obtain at the time the application was filed, unless the patent discloses how to make and use it." *Id.*

The '780 patent's alleged "disclosure" of a cookie compatible browser is even more scant than the disclosure of an electronic sensor is in *BMW*.  In *BMW*, the specification included a drawing of the electronic sensor and at least mentioned a few of the particular components which would be included in the electronic sensor.  *BMW*, 501 F.3d at 1278.  Here, the '780 patent contains no substantive disclosure of the browser other than the word "special."  Further, as the monocots were in *Plant Genetic Systems*, a cookie compatible browser may have been highly desirable, but was difficult to obtain, at the time the '780 patent was filed.  The '780 patent expresses a desire for a "special browser which can handle such communications," but states that such a browser is "generally not suitable for the standard browser format common to the Web." Ex. B, at col. 4 ll. 24-31.  This disclosure demonstrates that the '780 patentees desired some sort of special browser, but represents that a suitable one was either unavailable or would be difficult to develop. Accordingly, the '639 patentees cannot claim a method using a cookie compatible browser as their invention dating back to the '780 patent's filing date because the '780 patent merely sets forth what is desired without disclosing how one could make and use such a method. *Plant Genetic Systems*, 315 F.3d at 1340.

The *BMW* patent was invalid because it did not contain more disclosure, in the specification, of the novel aspect of the invention (i.e., a velocity-type side impact sensor), even if those of ordinary skill in the art could have filled in the gaps.  501 F.3d at 1283.  The novel aspect claimed by the '639 patent is the use of a cookie compatible browser, but the '780 patent specification provides, at most, "only a starting point, a direction for further research."  *Id.* at 1284.  Without some "reasonable detail" in the specification that would enable a person to discern how to identify, make, and/or use the "special browser" without undue experimentation, the '780 patent cannot enable the full scope of the '639 patent claims.  *Id.*

17

Further, to the extent that the '780 patent alludes to the cookie method, the '780 patent clearly teaches away from using such a method, which "is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention." *Liebel-Flarsheim*, 481 F.3d at 1379.  The '780 patent unambiguously explains that the cookie embodiment later claimed by the '639 patent would require the use of a special browser which "is generally not suitable for the standard browser format common to the Web." Ex. B, at col. 4, ll. 28-31 (emphasis added).

In *Liebel-Flarsheim,* the patent disclosure similarly taught away from an undisclosed embodiment.  There, the asserted patent claims were alleged to encompass high pressure syringes that did not have a pressure jacket for reinforcing the structural integrity of the syringe. 481 F.3d at 1379.  The specification and drawings, however, only disclosed syringes having a pressure jacket. *Id.*  Further, the specification taught away from making syringes without pressure jackets when it said that making syringes to withstand high pressures without a pressure jacket would be "expensive and therefore impractical." *Id.*  Such absence of disclosure and teaching away from a non-jacketed syringe caused the Court to affirm the district court's summary judgment ruling of invalidity, finding that it would require, as a matter of law, undue experimentation to make and use a non-jacketed syringe.  *Id.* at 1379-80.

In both *Liebel-Flarsheim* and the present case, the patent specifications failed to disclose a particular embodiment that was within the scope of the claims, and further taught against such embodiments, saying that they were "impractical" and "not suitable," respectively.   Under *Liebel-Flarshiem,* it would require undue experimentation, as a matter of law, to practice the cookie method claimed in the '639 patent based on the '780 patent's disclosure.  *See Liebel-Flarsheim Co.,* 481 F.3d at 1379.  Because the '780 patent fails to enable a person of ordinary

skill in the art to practice the method claimed in the '639 patent without undue experimentation, the '639 patent is not entitled to the filing date of the '780 patent.  Soverain may attempt to counter this lack of enablement by offering unsupported expert opinion.  In *Sitrick v. Dreamworks,LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008), the court held that conclusory expert assertions concerning enablement cannot raise a triable issue of material fact.

  D. <u>The '780 Patent Fails To Set Forth The Best Mode Of Practicing The Invention</u>

  The patent statute requires that a patent's specification disclose the "best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1.  The best mode requirement prevents patentees from obtaining patent protection while concealing preferred embodiments from the public.  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1330 (Fed. Cir. 2002).  A patent violates the best mode requirement if the inventors knew of and concealed a better mode of carrying out the claimed invention than was set forth in the specification. *Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 560 (Fed. Cir. 1994).  Intentional concealment is not required, as long as the disclosure inadequately sets forth the best mode contemplated.  *See United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1215-16 (Fed. Cir. 1996).

  The critical paragraph of the '780 application states unequivocally that "programming the client browser to store an SID . . . *requires* a special browser." Ex. B, at col 4, lines 26-29.  The applicants also stated in prosecution of the '639 patent that any browser able to "support Applicants' claimed invention . . . as of the priority date, required a modified browser." Ex. D, at page 7.  These statements that a "special browser" is required in order for the client to store session identifiers (a necessary step in both independent claims of the '639 patent) demonstrate that the inventors contemplated a best mode for these claims when the '780 patent was filed. *See*

*United States Gypsum*, 74 F.3d at 1213 (holding that a particular mode is a best mode when it is "essential to improving the invention").

During prosecution of the '639 patent, the applicants repeatedly argued with the Examiner that the "special browser" disclosed in the '780 patent was a cookie compatible browser.   Ex. C, at page 6 (arguing that language of the '780 patent may be set forth in the claims to "cover[] the cookie embodiment"); Ex. D, at page 7 (arguing that the "special browser" referred to in the specification is a cookie compatible browser).   The applicants therefore represented to the patent office that the best mode contemplated for practicing the '639 patent's method was utilizing a cookie compatible browser.

Despite such representations by the applicants, the '780 patent application does not adequately disclose the cookie embodiment.   Because both independent claims of the '639 patent require "storing" of session identifiers by the client, the best mode of accomplishing the "storing" step must be set forth.   *See Engel Industries, Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed. Cir. 1991) ("The best mode inquiry is directed to what the applicant regards as the invention, which in turn is measured by the claims.").

The above-cited paragraph of the '780 patent application is the sole support for the "storing" claims in the '639 patent.   Indeed, no other portion of the '780 application discusses "storing."   The '780 patent casually mentions only that a "special browser" is required, and does not provide any information about what type of browser this is, nor does it disclose any examples of browsers with the necessary capabilities.   This disclosure is wholly without substance.   *See Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1536 (Fed. Cir. 1987) ("Even though there may be a general reference to the best mode, the quality of the disclosure may be so poor as to effectively result in concealment.").   The '780 application does not disclose the critical

function of the browser, cookie compatibility, that is needed for "storing" and therefore fails to set forth the best mode.

At least inventor Lawrence Stewart and application drafter Bill Dally knew before the '780 filing date that Netscape Navigator was cookie enabled, but the specification makes no mention of it.  Netscape Navigator had been publicly released, and Netscape had published a preliminary specification explaining the cookie method, both several months prior to the filing date of the '780 patent.  Ex. M; Ex. L at p. 2, ll. 14-19.  Rather than acknowledge Netscape's invention and contribution to the art, it appears that the inventors opted to "hedge [their] bets" and hope that Netscape had not sought to patent the cookie embodiment themselves.  *See* Exhibit G.  This goes directly against the central purpose of the best mode requirement, which is

> to ensure that a patent applicant plays "fair and square" with the patent system.  It is a requirement that the *quid pro quo* of the patent grant be satisfied.  One must not receive the right to exclude other unless at the time of filing he has provided an adequate disclosure of the best mode known to him of carrying out his invention.

*Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1209-10 (Fed Cir. 1991).  Here, the '639 patentees must not be permitted to intentionally omit disclosure of the best mode because of their concern that Netscape might be seeking a patent on it.  The later modification of the specification in the '639 application, declaring that storing "may now be implemented with cookie compatible browsers," cannot satisfy the combined requirements of sections 112 and 120, which concern the disclosure in the parent application.  *See In re Hay*, 534 F.2d 917, 920 (C.C.P.A. 1976) (holding that if an inventor contemplated a best mode but left it out of the application, amendments after filing will not cure the original omission).  Therefore, the '639 patent is not entitled to the filing date of the '780 patent.

## III.     THE '639 PATENT IS INVALID UNDER § 102(b) AND § 102(e)

Having established that the '639 patent is not entitled to the benefit of the filing date of the '780 patent, the effective filing date for the '639 patent is January 12, 1998.  Ex. A, at cover page under "Filed."  Because the invention claimed by the '639 patent was on sale more than one year before the '639 patent was filed, the patent is invalid under 35 U.S.C. § 102(b).  Additionally, because the invention claimed by the '639 patent was described in a patent which was filed before the invention of the claimed subject matter by the '639 patent applicants, all of the asserted claims of the '639 patent are also invalid under 35 U.S.C. § 102(e).  Claim 66 is additionally invalid as being obvious under 35 U.S.C. § 103.

A.    The Claimed Invention Of The '639 Patent Was On Sale More Than One
      Year Prior To The Filing Date Of The '639 Patent

Under 35 U.S.C. § 102(b), a patent is invalid if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States."  To satisfy the statutory on-sale bar to patentability, it must be established that, more than one year before the filing date, "(1) the invention [was] the subject of a commercial sale or offer for sale and (2) the invention [was] 'ready for patenting' at the time of the offer or sale."  *Honeywell Int'l Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007).

> An invention is "ready for patenting" when evidence shows that the invention was reduced to practice or described in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation. An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose. An invention works for its intended purpose when there is a demonstration of the workability or utility of the claimed invention.

*Id.* at 997 (citations omitted).

Soverain and its predecessors in interest sold a software product called "Transact" that "incorporates or reflects each asserted claim of the '639 patent."  Soverain's Responses and Objections to Defendant's First Set of Interrogatories ("Soverain's Responses"), Ex. H hereto, p.

29.   Soverain and its predecessors in interest have also sold a software product called "OM-Axcess" that "incorporates or reflects asserted claims 1, 3, 10, 47, 63, 78 and 79 of the '639 Patent," which includes the two independent claims of the patent.  *Id.* at page 33.  The Transact product was admitted to have first been offered for sale in October 1994, and the OM-Axcess product was admitted to have first been offered for sale in March 1996, both of which were mote than one year before the '639 application patent was filed.  *Id.* at 35.

Soverain represents that in both the Transact product and the OM-Axcess product, the step of "returning a session identifier from the server system to the client, the client storing the session identifier for use in subsequent distinct requests from the client to the server system" is accomplished when "[t]he server system issues a session identifier . . . either (i) by returning it within a URL or (ii) by returning it within a cookie."  *Id.* at 29, 33.  In each product, according to Soverain, "[t]he client runs a browser that is programmed to store the URL or the cookie and therefore the session identifier for use in subsequent distinct requests to the server system."  *Id.* at 29-30, 33.  The step of "appending the stored session identifier to each of the subsequent distinct requests from the client to the server system" is accomplished in both the Transact and OM-Axcess products when "[t]he stored session identifier is appended to each of the subsequent distinct requests from the client to the server system either (i) by including the session identifier in the URL that is sent from the client to the server system or (ii) by sending the cookie that contains the session identifier from the client to the server system."  *Id.* at 30, 33.

The fact that Soverain's predecessors in interest had produced working commercial products of its claimed invention demonstrates that the invention was "ready for patenting" because it has been reduced to practice.  Indeed, Soverain admits that the Transact product and the OM-Axcess product each independently "meets every limitation [of the '639 patent] and

operates for its intended purpose." *Honeywell*, 488 F.3d at 997.  Further, the fact that Soverain had been selling the products operates as "a demonstration of the workability or utility of the claimed invention." *Id*.  Because Soverain has admitted that the invention claimed in the '639 patent has been on sale more than one year before the priority date of the '639 patent, the '639 patent is invalid under § 102(b).

B.      The Claimed Invention Of The '639 Patent Was Disclosed In Prior Art Patents

Under 35 U.S.C. § 102(e)(2), a patent is invalid if the claimed invention "was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent."  Importantly, § 102(e) considers what was disclosed prior to the invention date, not the filing date. *Id*.  However, the invention date is generally presumed to be the filing date of a patent application in the absence of evidence demonstrating an earlier date of invention. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). United States Patent No. 5,774,670 to Montulli ("Montulli"), Ex. I hereto, was filed on October 6, 1995, which is more than two years and three months before the '639 patent was filed (January 12, 1998).  Montulli is therefore prior art under § 102(e).  Here, Soverain is asserting claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, and 79 of the '639 patent.  Montulli explicitly discloses each and every element of all asserted claims, thereby anticipating them under 35 U.S.C. § 102(e).

> Claimed subject matter is "anticipated" when it is not new; that is, when it was previously known. Invalidation on this ground requires that every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention.

*Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008).  Additionally and alternatively, the subject matter of claim 66 is also obvious under 35 U.S.C. § 103 over Montulli

in view of U.S. Patent No. 5,724,424 to Gifford ("Gifford"), attached hereto as Exhibit J. Because Gifford was filed on November 29, 1995, it constitutes prior art under § 102(e) with respect to the '639 patent.  Section 103 provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). When combining teachings of multiple prior art references, "the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *KSR Int'l v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007).

The following table shows the pertinent prior art disclosures as they relate to the various claim elements in the '639 patent:

| **'639 PATENT CLAIMS / ELEMENTS** | **MONTULLI DISCLOSURE** |
|---|---|
| **CLAIM 1.** A method of processing service requests from a client to a server system through a network, | "A method and apparatus for transferring state information between a server computer system and a client computer system." Ex. I, at Abstract. |
| said method comprising the steps of forwarding a service request from the client to the server system, | "In one embodiment of the method, an http client requests a file, such as an HTML document, on an http server, and the http server transmits the file to the http client." Ex. I, at Abstract and Fig. 4. |
| wherein communications between the client and the server system are according to hypertext transfer protocol, | "In one embodiment of the method, an http client requests a file, such as an HTML document, on an http server, and the http server transmits the file to the http client." Ex. I, at Abstract and Fig. 4. HTTP stands for "hypertext transfer protocol." *Id.* at col. 1, lines 53-55. |
| returning a session identifier for use in subsequent distinct requests to the server system; and | "In addition, the http server transmits a state object, which describes certain state information, to the http client." Ex. I, at Abstract and Fig. 4. "State information" includes session information, and state information "can later be send back to the server at appropriate times." *Id.* at col. 2, lines 6-20. |
| appending the stored session identifier to each of the subsequent distinct requests from | "The http client stores the state object, and will typically send the state object back to the http server when making later requests for files on the http server." Ex. I, at Abstract and Fig. 4. |

| | |
|---|---|
| the client to the server system. | State information may be set by the server, and can be included for later use in subsequent requests from the client. *Id.* at col. 7, line 56 – col. 8, line 14. |
| **CLAIM 10.**  A method as claimed in claim 1 wherein the server system assigns the session identifier to an initial service request to the server system. | "In one embodiment of the method, an http client requests a file, such as an HTML document, on an http server, and the http server transmits the file to the http client. In addition, the http server transmits a state object, which describes certain state information, to the http client." Ex. I, at Abstract and Fig. 4.<br><br>"[W]hen a server responds to an http request by returning an HTTP object to a client, the server may also send a piece of state information that the client system will store . . . . [W]hen the client system sends future HTTP requests to servers that fall within the range of defined URLs, the requests will include a transmittal of the current value of the state object." *Id.* at col. 7, lines 13-23. |
| **CLAIM 47.**  The method of claim 1, wherein the session identifier is designated by the server system, further comprising the steps of: validating, at the server system, the appended session identifier; and returning a controlled document if the appended session identifier is valid. | State information may be set by the server, and can be included for later use in subsequent requests from the client. Ex. I, at col. 7, line 56 – col. 8, line 14.<br><br>"The "path" attribute is used to specify a subset of file system directories in a domain for which the cookie is valid. If a cookie has already passed "domain" matching, then the path name of the URL for a requested document is compared with the "path" attribute. If there is a match, the cookie is considered valid and is sent along with the http request." Ex. I, at col. 8, lines 52-57. |
| **CLAIM 60.**  The method of claim 1, wherein at least one service request comprises a purchase request, the purchase request including an associated user identifier, the method further comprising:<br><br>accessing, upon receipt of the purchase request at the server system, user information associated with the user identifier sufficient to charge to an account associated with the user, the purchase price of the product identified by the purchase request;<br><br>charging the user for the product identified by the purchase request according to the user information; and<br><br>fulfilling the purchase request based on the user information. | "To illustrate one possible use of the state information system of the present invention, an implementation of an on-line shopping system will be described. The on-line shopping system allows customers to shop in one or more stores that are implemented as Web servers on the Internet. A customer can browse information on the Web servers that describe products available from the stores. When a desired product is found, the user can place the product into a 'virtual shopping basket.' The virtual shopping basket is implemented as a set of cookies that are sent to the client computer system and stored on the client computer system. At check-out time, the customer pays for the selected products using some type of payment system such as a credit card. After payment is received, the on-line shopping system notifies the stores to ship the selected products to the customer." Ex. I, at col. 11, lines 47-63.<br><br>Montulli explicitly discusses servers accessing stored customer information, such as billing information. *Id.* at col. 3, lines 5-14. |
| **CLAIM 62.**  The method of claim 1, further comprising: under control of a client system, displaying information identifying a product; and in response to a user selection of a hyperlink associated with a product desired to be purchased, sending a request to purchase the item along with an identifier of a purchaser of the | "The customer uses Web browser software to access an on-line 'merchant' server that is operated by a merchant having products to sell. . . . The home Web page contains information about the merchant and its products (e.g., shoes, hats, shirts, etc.). The home Web page can implement a set of linked Web pages that describe the products that are available from the merchant. Each product may be associated with its own HTML document that fully describes the product. Products can be described using text, images, sounds, video clips, and any other communication form supported by Web browsers. The user can continue browsing through Web pages of the merchant server by repeating steps 212, 214, and 215. Ex. I, at col. 12. lines 10-27. |

| | |
|---|---|
| item to a server system; and<br><br>under control of the server system, upon receiving the request, retrieving additional information previously stored for the purchaser identified by the identifier in the received request;<br><br>charging the user the purchase price of the product; and<br><br>fulfilling the request for the product. | "When the customer desires to buy the products, the customer accesses a link that identifies a 'check-out' Web page. The check-out Web page causes the browser to send all the product description cookies (230). Thus, the check-out Web page empties out the virtual shopping basket. The merchant server generates a total bill for all the products in the virtual shopping basket. The server may then request billing information (e.g., credit card number) and shipping (e.g., address) information from the customer using a form. In a preferred embodiment the transaction of credit card information is transmitted using a secure medium. The transaction server then performs a real-time credit card authorization. Once the transaction is authorized, transaction server sends messages to individual merchants to fulfill the order (step 240)." Ex. I, at col. 13, lines 9-23.<br><br>Montulli explicitly discusses servers accessing stored customer information, such as billing information. *Id*. at col. 3, lines 5-14. |
| **CLAIM 63.** The method of claim 1, wherein the session identifier is appended by the client. | "When a client system that implements the present invention wishes to send an http request to a particular Web server, the client system first examines its cookie list to see if the cookie list contains any matching cookies that need to be sent to the particular Web server. Specifically, before the client sends an http request to a Web server, the client compares the URL of the requested Web document against all of the stored cookies. If any of the cookies in the cookie list matches the requested URL then information containing the name/value pairs of the matching cookies will be sent along with the HTTP request." Ex. I, at col. 9, lines 47-58. |
| **CLAIM 65.** The method of claim 1, wherein a service request comprises a request to purchase a product. | "After browsing through the Web pages provided by the server, the customer may select a product (step 216) by, for example, "clicking" (in the conventional manner) on an image of a product that causes the browser to request a Web page that fully describes the product. If the customer wishes to buy shoes from the merchant, the customer could click on a "buy it" button. The merchant server then sends an HTML form document that requests the customer to send necessary details for the purchase (step 218). For example, the customer may select a quantity, a desired style, and size of the product as requested by the form document." Ex. I, at col. 12, lines 28-38. |
| **CLAIM 66.** The method of claim 65, wherein the product is transmitted over the network. | *See* above Montulli disclosure re claim 65.<br><br>Montulli discloses the use of cookies as a way of authenticating a user to access publications based on a paid subscription. Ex. I, at col. 2, line 67 – col. 3, line 27.<br><br>"A complete system for the purchasing of goods or information over a computer network is presented." Ex. I, at Abstract.<br><br>Gifford Patent Disclosure:<br><br>"In either case, the flowchart continues in FIG. 6 where the payment computer checks the authorization of the payment order at 28. If the payment system authorizes the request, an authorization message at 29 is returned to the buyer computer, and the merchant computer checks at 30 that the authorization message came from the payment computer using the authenticator mechanism described below. Assuming that the authorization message is valid, <u>the merchant computer performs fulfillment at 30, returning the purchased product in response at 31</u>." Ex. J, col. 6, lines 50-63. (emphasis added). *See* also Ex. J, |

| | at Fig. 5 and col. 4, lines 8-9 (showing a publication having been purchased and transmitted by the server to the client browser). |
|---|---|
| **CLAIM 68.** The method of claim 65, wherein the product is a durable product. | "The home Web page contains information about the merchant and its products (e.g., shoes, hats, shirts, etc.)." Ex. I, at col. 12, lines 16-20. |
| **CLAIM 78.** A method of processing, in a server system, service requests from a client to the server system through a network, | "A method and apparatus for transferring state information between a server computer system and a client computer system." Ex. I, at Abstract. |
| said method comprising the steps of: receiving, from the client, a service request to which a session identifier stored at the client has been appended by the client, | "When a client system that implements the present invention wishes to send an http request to a particular Web server, the client system first examines its cookie list to see if the cookie list contains any matching cookies that need to be sent to the particular Web server. Specifically, before the client sends an http request to a Web server, the client compares the URL of the requested Web document against all of the stored cookies. If any of the cookies in the cookie list matches the requested URL then information containing the name/value pairs of the matching cookies will be sent along with the HTTP request." Ex. I, at col. 9, lines 47-58. |
| wherein communications between the client and server system are according to hypertext transfer protocol; | "[I]nformation containing the name/value pairs of the matching cookies will be sent along with the HTTP request." Ex. I, at col. 9, lines 47-58.<br><br>HTTP stands for "hypertext transfer protocol." *Id.* at col. 1, lines 53-55. |
| validating the session identifier appended to the service request; and servicing the service request if the appended session identifier is valid. | "The "path" attribute is used to specify a subset of file system directories in a domain for which the cookie is valid. If a cookie has already passed "domain" matching, then the path name of the URL for a requested document is compared with the "path" attribute. If there is a match, the cookie is considered valid and is sent along with the http request." Ex. I, at col. 8, lines 52-57. |
| **CLAIM 79.** The method of claim 78, further comprising, in the server system: receiving an initial service request from the client;<br><br>creating, responsive to the initial service request, the session identifier; and<br><br>returning the session identifier to the client for storage by the client for use in subsequent distinct requests to the server system. | "[W]hen a server responds to an http request by returning an HTTP object to a client, the server may also send a piece of state information that the client system will store . . . . [W]hen the client system sends future HTTP requests to servers that fall within the range of defined URLs, the requests will include a transmittal of the current value of the state object." Ex. I, at col. 7, lines 13-23.<br><br>State information may be set by the server, and can be included for later use in subsequent requests from the client. *Id.* at col. 7, line 56 – col. 8, line 14. |

In view of the above disclosures contained in Montulli and Gifford, all asserted claims of the '639 patent are invalid as being anticipated by and/or obvious over the prior art.  Each and every element of claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, and 79 is explicitly disclosed and

taught in Montulli, thereby anticipating these claims.  *Sanofi-Synthelabo*, 550 F.3d at 1082.  This should come as no surprise, considering that Lou Montulli is generally regarded as the inventor and father of internet browser cookies.  Ex. N, p. 10.  Two named inventors of the '639 patent even credit Netscape (the assignee of the Montulli patent) as being the first to introduce cookies into an internet browser.  Treese & Stewart (Ex. E), p. 157.

With regard to claim 66, Montulli discloses the use of cookies as a way of authenticating a user to access publications based on a paid subscription. Ex. I, at col. 2, l. 67 – col. 3, l. 27. This anticipates claim 66 because the publications constitute a "product" which is sold and "transmitted" to the purchaser over the Internet.  Montulli does not explicitly discuss the publication subscription embodiment at the point of sale of the subscription, and the initial download of the purchased content from the server.  However, Montulli specifically teaches several embodiments of methods for conducting online sales transactions, and provides examples of products which may be purchased, "e.g., shoes, hats, shirts, etc."  Ex. I, at col. 12, l. 19; *see generally* Ex. I, at col. 11, l. 45 – col. 13, l. 30.  These exemplary suggestions of products in Montulli in no way limit the applicability of the methods to be used for products which can be transmitted over the internet.  Montulli's methods take place entirely in the context of a client and server transmitting information to each other over a network.  This context by definition involves a user browsing through various web pages and downloading information (e.g., publications or programs) from the servers.  Montulli's discussion of using cookies to authenticate a user's paid subscription more than adequately teaches or suggests a method where a product is purchased and transmitted over the internet.  Ex. I, at col. 2, l. 67 – col. 3, l. 27.

Nevertheless, to the extent that the Court might find any insufficiency of the Montulli disclosure with regard to claim 66, Gifford provides a more explicit teaching of this aspect of the

claimed method. The only substantive difference between Montulli's specifically described method and claim 66 is that after the purchase price has been paid, instead of the server initiating a shipment of a physical product, the server permits the user to access a new URL corresponding to their purchased product. *See* claim chart for claim 66, *supra*. Combining the teachings of Montulli and Gifford to perform such a method amounts only to "the combination of familiar elements according to known methods," which in this case is obvious under Section 103 because "it does no more than yield predictable results." *KSR*, 550 U.S. at 416. The subject matter of claim 66, if not anticipated by Montulli, is obvious in view of the prior art as being "the product not of innovation but of ordinary skill and common sense." *Id.* at 421.

## CONCLUSION

For the foregoing reasons, Newegg hereby moves the Court to enter summary judgment that asserted claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, and 79 of U.S. Patent No. 7,272,639 are invalid. Even if this Court declines to enter summary judgment of invalidity, Newegg alternatively moves the Court to at least enter summary judgment that the '639 patent is not entitled to the filing date of the parent '780 patent.

Respectfully submitted,

Dated: August 17, 2009

*/s/ Kent E. Baldauf, Jr. with permission Trey Yarbrough*
David C. Hanson
Kent E. Baldauf, Jr.
John W. McIlvaine

THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
T:  (412) 471-8815
F:  (412) 471-4094

Trey Yarbrough
Bar No. 22133500
YARBROUGH ♦ WILCOX, PLLC
100 E. Ferguson St., Ste. 1015
Tyler, Texas 75702
Tel: (903) 595-3111
Fax: (903) 595-0191
trey@yw-lawfirm.com

Attorneys for Defendant
Newegg Inc.

### Certificate of Service

I certify that all counsel who have consented to electronic service have been served with a copy of defendant's motion for summary judgment and all attachments via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 17, 2009. All counsel who have not so consented will be served via electronic means, facsimile transmission, or certified mail, return receipt requested.

/s/ *Trey Yarbrough*
Trey Yarbrough