IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CDW CORPORATION, NEWEGG INC., REDCATS USA, INC., SYSTEMAX INC., ZAPPOS.COM, INC., REDCATS USA, L.P., THE SPORTSMAN'S GUIDE, INC., and TIGERDIRECT, INC., | ) Civil Action No. 6:07-CV-00511-LED |
| | ) |
| Defendants. | ) |

**DEFENDANT NEWEGG'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
INVALIDITY AND/OR DENIAL OF PRIORITY CLAIM OF THE '639 PATENT**

Pursuant to Local Rule CV-56, the Defendant hereby states the undisputed material facts surrounding the invalidity of the '639 patent.

1. The '639 patent was filed on June 7, 1995.  Ex. A.

2. The '780 patent was filed on January 12, 1998.  Ex. B.

3. The '639 patent was filed as a purported continuation which claims the benefit of the earlier filing date of the application which resulted in the '780 patent.  Ex. A at col. 1, lines 6-9.

4. The '639 patent includes two independent claims: claim 1 and claim 78.  Ex. A at col. 10, lines 26-37 and col. 14, lines 43-52.

5. Claim 1 of the '639 patent includes the following limitation:

> returning a session identifier from the server system to the client, the client storing the session identifier for use in subsequent distinct requests from the client to the server system; and
>
> appending the stored session identifier to each of the subsequent distinct requests from the client to the server system.

Ex. A at col. 10, lines 32-37.

6.   Claim 78 of the '639 patent includes the following limitation:

> receiving, from the client, a service request to which a session identifier stored at the client has been appended by the client, wherein communications between the client and server system are according to hypertext transfer protocol.

*Id.* at col. 14, lines 46-50.

7.   Because claims 1 and 78 are the only independent claims in the '639 patent, all claims of the '639 patent require that the client store the session identifier, and that the client append the stored session identifier to each subsequent request made to the server. *Id.* at cols. 10-14.

8.   In the specification accompanying the '780 parent application, "storing" is described in a single paragraph:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser format common to the Web.

Ex. B at col. 4, lines 25-31.  The '780 patent contains no further details of the required "special browser."  For example, the '780 patent does not explain how a "special browser" would identify and accept the SID or tag, how and where the

SID or tag would be stored by the browser, or how the browser would retrieve the SID or tag and use the SID or tag in each URL call.

9. In the '639 continuation application, however, this paragraph was modified to read as follows:

> In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and *was generally not suitable for early browser formats common to the Web. However, it may now be implemented in cookie compatible browsers.*

Ex. A at col. 4, lines 22-29.

10. During prosecution of the '639 application, the inventors first added the term "cookie" to the claims, then cancelled the claims containing the term "cookie" after a telephone interview with the Examiner, admitting that "the 'cookie' limitations . . . were not explicitly stated in the earliest application to which priority is claimed." Exhibit C, at page 5.

11. During prosecution of the '639 application, to distinguish the claims from a prior art reference, the applicants argued: "Freeman-Benson [the prior art reference], at the time of its publication, worked with '*all* existing WWW browsers' . . . . Such browsers as existed at that time would not support Applicants' claimed invention, which, as of the priority date, required a modified browser." Exhibit D, at page 7. The applicants again referenced the "special browser" language of their application as supportive of this distinction, and argued that "modified" and "special" actually meant "cookie compatible." *Id.*

3

12. In October of 1994, the first version of Netscape was publicly available. Exhibit K, Netscape Press Release of October 13, 1994 entitled "Netscape Communications Offers New Network Navigator Free on the Internet."

13. The Netscape Navigator 1.0 browser released in December 1994 or January 1995 was cookie enabled. Exhibit L, Montulli Declaration filed with USPTO on May 11, 2000.

14. Cookies were explained in detail on the Netscape WWW site in December 1994 or January 1995 in a document entitled "Persistent Client State HTTP Cookies," Exhibit M. *See also* Exhibit L, page 2, at lines 15-19.

15. Prior to filing the application for the '780 patent on May 19, 1995, inventor Lawrence C. Steward informed the individual preparing the patent application as follows:

> 1) The netscape navigator browser has a cookie storage mechanism, in which the server can tell the browser "Store this cookie, and present it whenever you send a request to any server on this list".
>
> This cookie mechanism would work for passing SIDs around. The auth server would set the cookie, and tell the browser to present it when any request is made to the content servers. This is just another way to store the SID. (We store it in the URL, which is universal, but also requires that the content be written with relative URLs.)

Exhibit F.

16. On the same day, Bill Dally, the individual preparing the patent application replied:

> Yes. I'm aware of this. We mention this facility in the specification of the patent and have claims that straddle both sides of it to hedge our bets on what and when Netscape may have done with respect to IP.

Exhibit G.

17. Mr. Lou Montulli, who worked at Netscape is the widely acknowledged inventor of cookies. Exhibit E, p. 157; Ex. N, at 10.

18. At the time the application for the '780 patent was filed, the only method Open Market Inc. had for using session IDs was to have the server write relative URLs into the content supplied to the browsers. This method was considered "universal" since it would work with all browsers not just those supplied by Netscape. *See* paragraph 15 herein.

19. Soverain has produced no internal documents of Open Markets Inc. that disclose how a "special browser" would identify and accept an SID or tag, how and where the SID or tag would be stored by the browser, or how the browser would retrieve the SID or tag and use the SID or tag in each URL call.

20. Soverain and/or its predecessors in interest have sold a software product called Transact that "incorporates or reflects each asserted claim of the '639 patent." Ex. H, at page 29.

21. The Transact product was first offered for sale in October 1994. Ex. H, at page 35.

22. Soverain and/or its predecessors in interest have sold a software product called "OM-Axcess" that "incorporates or reflects asserted claims 1, 3, 10, 47, 63, 78 and 79 of the '639 Patent," which includes the two independent claims of the patent. Ex. H, at page 33.

23. The OM-Axcess product was first offered for sale in March 1996. Ex. H, at 35.

24. In both the Transact and the OM-Axcess products, the step of "returning a session identifier from the server system to the client, the client storing the session identifier for use in subsequent distinct requests from the client to the server system" is accomplished when "[t]he server system issues a session identifier . . . either (i) by returning it within a URL or (ii) by returning it within a cookie." Ex. H, at 29, 33.

25. In both the Transact and the OM-Axcess products, "[t]he client runs a browser that is programmed to store the URL or the cookie and therefore the session identifier for use in subsequent distinct requests to the server system." Ex. H, at 29-30, 33.

26. The step of "appending the stored session identifier to each of the subsequent distinct requests from the client to the server system" is accomplished in both the Transact and OM-Axcess products when "[t]he stored session identifier is appended to each of the subsequent distinct requests from the client to the server system either (i) by including the session identifier in the URL that is sent from the client to the server system or (ii) by sending the cookie that contains the session identifier from the client to the server system." Ex. H, at 30, 33.

27. United States Patent No. 5,774,670 entitled "Persistent Client State in a Hypertext Transfer Protocol Based Client-Server System" to Montulli ("Montulli patent") was filed on October 6, 1995. Exhibit I.

28. The Montulli patent was filed more than two years and three months before the '639 patent was filed (January 12, 1998). Exhibit I; Exhibit A.

29. Netscape introduced a cookie enabled browser and published a preliminary specification explaining cookies and their use six months prior to the filing of the application for '780 patent and three years prior to filing for the application for the '639 patent. See paragraphs 13, 14, 15 and 16 herein.

30. U.S. Patent No. 5,724,424 entitled "Digital Active Advertising" to Gifford ("Gifford") was filed on November 29, 1995, Exhibit J.

31. The asserted claims 1, 10, 47, 60, 62, 63, 65, 66, 68, 78, and 79 of U.S. Patent No. 7,272,639 are accurately reproduced in the table of section III.B in Defendants' Motion for Summary Judgment, served herewith. Ex. A.

32. Montulli discloses "a method and apparatus for transferring state information between a server computer system and a client computer system." Ex. I, at Abstract.

33. Montulli discloses a method in which "an http client requests a file, such as an HTML document, on an http server, and the http server transmits the file to the http client." Ex. I, at Abstract and Fig. 4.

34. Montulli discloses a method in which "the http server transmits a state object, which describes certain state information, to the http client." Ex. I, at Abstract and Fig. 4.

35. "State information" in Montulli encompasses session information, and the state information "can later be send back to the server at appropriate times." Ex. I at col. 2, lines 6-20.

36. Montulli discloses a method in which "[t]he http client stores the state object, and will typically send the state object back to the http server when making later requests for files on the http server." Ex. I, at Abstract and Fig. 4.

37. Montulli discloses a method in which the state information may be set by the server, and can be included for later use in subsequent requests from the client. Ex. I, at col. 7, line 56 – col. 8, line 14.

38. Montulli discloses a method wherein "when a server responds to an http request by returning an HTTP object to a client, the server may also send a piece of state information that the client system will store . . . . [W]hen the client system sends future HTTP requests to servers that fall within the range of defined URLs, the requests will include a transmittal of the current value of the state object." Ex. I, at col. 7, lines 13-23.

39. Montulli discloses a method wherein "[t]he "path" attribute is used to specify a subset of file system directories in a domain for which the cookie is valid. If a cookie has already passed "domain" matching, then the path name of the URL for a requested document is compared with the "path" attribute. If there is a match, the cookie is considered valid and is sent along with the http request." Ex. I, at col. 8, lines 52-57.

40. Montulli discloses that "[t]o illustrate one possible use of the state information system of the present invention, an implementation of an on-line shopping system will be described. The on-line shopping system allows customers to shop in one or more stores that are implemented as Web servers on the Internet. A customer can browse information on the Web servers that describe products available from

8

the stores.  When a desired product is found, the user can place the product into a 'virtual shopping basket.'  The virtual shopping basket is implemented as a set of cookies that are sent to the client computer system and stored on the client computer system.  At check-out time, the customer pays for the selected products using some type of payment system such as a credit card.  After payment is received, the on-line shopping system notifies the stores to ship the selected products to the customer." Ex. I, at col. 11, lines 47-63.

41. Montulli explicitly discusses servers accessing stored customer information, such as billing information. *Id*. at col. 3, lines 5-14.

42. Montulli discloses a method wherein "[t]he customer uses Web browser software to access an on-line 'merchant' server that is operated by a merchant having products to sell. . . .  The home Web page contains information about the merchant and its products (e.g., shoes, hats, shirts, etc.). The home Web page can implement a set of linked Web pages that describe the products that are available from the merchant.  Each product may be associated with its own HTML document that fully describes the product.  Products can be described using text, images, sounds, video clips, and any other communication form supported by Web browsers.  The user can continue browsing through Web pages of the merchant server by repeating steps 212, 214, and 215.  Ex. I, at col. 12, lines 10-27.

43. Montulli discloses a method wherein "[w]hen the customer desires to buy the products, the customer accesses a link that identifies a 'check-out' Web page. The check-out Web page causes the browser to send all the product description

9

cookies (230). Thus, the check-out Web page empties out the virtual shopping basket. The merchant server generates a total bill for all the products in the virtual shopping basket. The server may then request billing information (e.g., credit card number) and shipping (e.g., address) information from the customer using a form. In a preferred embodiment the transaction of credit card information is transmitted using a secure medium. The transaction server then performs a real-time credit card authorization. Once the transaction is authorized, transaction server sends messages to individual merchants to fulfill the order (step 240)." Ex. I, at col. 13, lines 9-23.

44. Montulli discloses the use of cookies as a way of authenticating a user to access publications based on a paid subscription. Ex. I, at col. 2, line 67 – col. 3, line 27.

45. Montulli discloses a method wherein "[w]hen a client system that implements the present invention wishes to send an http request to a particular Web server, the client system first examines its cookie list to see if the cookie list contains any matching cookies that need to be sent to the particular Web server. Specifically, before the client sends an http request to a Web server, the client compares the URL of the requested Web document against all of the stored cookies. If any of the cookies in the cookie list matches the requested URL then information containing the name/value pairs of the matching cookies will be sent along with the HTTP request." Ex. I, at col. 9, lines 47-58.

46. Montulli discloses a method wherein "[a]fter browsing through the Web pages provided by the server, the customer may select a product (step 216) by, for example, "clicking" (in the conventional manner) on an image of a product that

causes the browser to request a Web page that fully describes the product. If the customer wishes to buy shoes from the merchant, the customer could click on a "buy it" button.  The merchant server then sends an HTML form document that requests the customer to send necessary details for the purchase (step 218). For example, the customer may select a quantity, a desired style, and size of the product as requested by the form document." Ex. I, at col. 12, lines 28-38.

47. Gifford discloses "[a] complete system for the purchasing of goods or information over a computer network." Ex. J, at Abstract.

48. Gifford discloses a method wherein "the payment computer checks the authorization of the payment order at 28.  If the payment system authorizes the request, an authorization message at 29 is returned to the buyer computer, and the merchant computer checks at 30 that the authorization message came from the payment computer using the authenticator mechanism described below. Assuming that the authorization message is valid, the merchant computer performs fulfillment at 30, returning the purchased product in response at 31." Ex. J, col. 6, lines 50-63.  Fig. 5 and col. 4, lines 8-9 of Gifford disclose a publication having been purchased and transmitted by the server to the client browser.

49. Montulli discloses a method wherein "information containing the name/value pairs of the matching cookies will be sent along with the HTTP request." Ex. I, at col. 9, lines 47-58.

11

                                                                                          Respectfully submitted,

Dated: August 17, 2009                        /s/ Kent E. Baldauf, Jr. with permission Trey Yarbrough
                                                                                           David C. Hanson
                                                                                           Kent E. Baldauf, Jr.
                                                                                           John W. McIlvaine

                                                                                           THE WEBB LAW FIRM
                                                                                           700 Koppers Building
                                                                                           436 Seventh Avenue
                                                                                           Pittsburgh, PA 15219
                                                                                           T:  (412) 471-8815
                                                                                           F:  (412) 471-4094

                                                                                           Trey Yarbrough
                                                                                           Bar No. 22133500
                                                                                           YARBROUGH ♦ WILCOX, PLLC
                                                                                           100 E. Ferguson St., Ste. 1015
                                                                                           Tyler, Texas 75702
                                                                                           Tel: (903) 595-3111
                                                                                           Fax: (903) 595-0191
                                                                                           E-mail: trey@yw-lawfirm.com

                                                                                           Attorneys for Defendant
                                                                                           Newegg Inc.

## Certificate of Service

     I certify that all counsel who have consented to electronic service have been served with a copy of this instrument via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 17, 2009. All counsel who have not so consented will be served via electronic means, facsimile transmission, or certified mail, return receipt requested.

                                                                                           /s/ *Trey Yarbrough*
                                                                                           Trey Yarbrough