# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC<br><br>          Plaintiff,<br><br>     vs.<br><br>CDW CORPORATION, NEWEGG INC.,<br>REDCATS USA, INC., SYSTEMAX INC.,<br>ZAPPOS.COM, INC., TIGER DIRECT,<br>INC., THE SPORTSMAN'S GUIDE, INC.,<br>and REDCATS USA LP<br><br>          Defendants. | CIVIL ACTION NO. 6:07-CV-511<br><br>Hon. Leonard E. Davis |

**PLAINTIFF SOVERAIN'S OPPOSITION TO NEWEGG'S MOTION FOR**
**<u>SUMMARY JUDGMENT OF INVALIDITY OF THE '639 PATENT</u>**

# TABLE OF CONTENTS

I.    Counterstatement of Issues ................................................................................................. 1

II.   Statement of Facts ............................................................................................................. 2

III.  Argument ........................................................................................................................... 5

   A.   The Burden of Proof Rests Squarely on Newegg ............................................................ 5

   B.   The '639 Patent Is Entitled to the Priority Date of Its Parent Application ....................... 6

      1.   The Written Description Requirement of § 112 Is Met ................................................... 6

         (a)   The written description of the '780 patent encompasses the invention claimed in the '639 patent .......................................................................................................... 6

         (b)   The written description cases relied upon by Newegg do not support its position. 8

         (c)   Intent is irrelevant to whether the written description requirement is or is not met ................................................................................................................................. 9

      2.   The Enablement Requirement of § 112 Is Met ............................................................ 10

         (a)   The '780 patent provides an enabling disclosure of the '639 patent claims ......... 10

         (b)   Newegg's attempt to heighten the standard by describing browsers as nascent technology fails ................................................................................................................ 12

         (c)   The other enablement cases relied upon by Newegg do not support its position . 14

      3.   The Best Mode Requirement of § 112 Is Met ............................................................. 15

         (a)   At the time of the filing of the '780 patent application, the inventors understood the URL method as the best mode ................................................................................... 16

         (b)   The best mode was not intentionally hidden from the Patent Office ................... 17

         (c)   The '780 patent enables the best mode ............................................................... 18

   C.   The '639 Patent Is Not Invalid Under § 102(b) and § 102(e) ......................................... 19

IV.  Conclusion ....................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991) ........................................................... 15

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   560 F.3d 1366 (Fed. Cir. 2009) ......................................................... 8, 9

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   No. 2008-1248, slip op. (Fed. Cir. Aug. 21, 2009) ................................. 8

*Automotive Tech. Int'l, Inc. v. BMW of N. Am., Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) ........................................................... 13

*Bayer AG v. Schein Pharms., Inc.*,
   301 F.3d 1306 (Fed. Cir. 2002) ........................................................... 15

*Calabrese v. Square D Co.*,
   No. 98-1550, 1999 WL 718238 (Fed. Cir. Sept. 13, 1999) .................... 17

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) ........................................... 8, 10, 11, 13

*Fonar Corp. v. Gen. Elec. Co.*,
   107 F.3d 1543 (Fed. Cir. 1997) ...................................................... 11, 12

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009) ............................................................. 9

*In re Hayes Microcomputer Prods. Patent Litig.*,
   982 F.2d 1527 (Fed. Cir. 1992) .......................................................... 6, 7

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007) ........................................................... 14

*Northern Telecom, Inc. v. Datapoint Corp.*,
   908 F.2d 931 (Fed. Cir. 1990) ...................................................10, 11, 12

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
   315 F.3d 1335 (Fed. Cir. 2003) ........................................................... 15

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ............................................................. 5

*Randomex Inc. v. Scopus Corp.*,
   849 F.2d 585 (Fed. Cir. 1988) ............................................................. 17

*Robotic Vision Sys., Inc. v. View Eng'g*,
   112 F.3d 1163 (Fed. Cir. 1997) .................................................. 6, 15, 16

*Sitrick v. Dreamworks,* LLC,
516 F.3d 993 (Fed. Cir. 2008) ............................................................................... 12

*Space Sys./Loral, Inc. v. Lockheed Martin Corp.*,
405 F.3d 985 (Fed. Cir. 2005) ................................................................................. 6

*Spectra-Physics, Inc. v. Coherent, Inc.*,
827 F.2d 1524 (Fed. Cir. 1987) .............................................................................. 15

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) ............................................................................... 5

*Transco Prods. Inc. v. Performance Contracting, Inc.*,
38 F.3d 551 (Fed. Cir. 1994) ................................................................... 16, 17, 18

*U.S. Gypsum Co. v. Nat'l Gypsum Co.*,
74 F.3d 1209 (Fed. Cir. 1996) ............................................................................... 17

*Univ. Rochester v. G.D. Searle & Co.*,
249 F. Supp. 2d 216 (W.D.N.Y. 2003) ................................................................... 8

*Univ. Rochester v. G.D. Searle & Co.*,
358 F.3d 916 (Fed. Cir. 2004) ................................................................................. 8

## Statutes

35 U.S.C. § 112 ............................................................................................... passim

35 U.S.C. § 120 .................................................................................................. 1, 6

35 U.S.C. § 282 ..................................................................................................... 5

## I.      COUNTERSTATEMENT OF ISSUES

Newegg's motion seeks to deprive Soverain's U.S. Patent No. 7,272,639 (the "'639 patent") of its entitlement under 35 U.S.C. § 120 to the priority filing date of its parent, U.S. Patent No. 5,708,780 (the "'780 patent"), because of the alleged failure of the '780 patent specification to meet the written description, enablement, and best mode requirements of 35 U.S.C. § 112.  If the '639 patent is not entitled to the '780 patent's priority date, Newegg then argues that the '639 patent is invalid over the prior art.

Newegg spends so much of its motion mischaracterizing the '639 patent as a cookie patent and accusing the inventors of the '639 patent of "disguising" their true invention from the Patent Office that it is easy to mistake these as relevant arguments.  They are not.  The entire "cookie story" is a red herring having no relevance to whether the disclosure in the '780 patent sufficiently supports the claims of the '639 patent.  The cookie story is just that—a story, and a fictional one at that.  The '639 patent is not a cookie patent, but includes claims directed to methods of processing HTTP service requests.  This distinction—blurred by Newegg—is crucial.

Contrary to Newegg's misreading of the law, Soverain does *not* bear the burden of proof on this motion.  The facts show that in June 1995, the inventors filed the '780 patent application, which described an invention for maintaining state on the World Wide Web ("Web") by storing a session identifier ("session ID" or "SID") at the client browser and having the browser return it to the server in future requests within a session.  The patent specification describes two embodiments of the invention:  passing the session ID in the uniform (or universal) resource locator ("URL") (the "URL method"), *and* programming the client browser to store an SID or a similar tag for use in each URL call to that particular server (the "modified browser method").  This second, modified browser approach would include the use of cookies.  Both embodiments are sufficiently described and enabled by the specification shared by the '780 and '639 patents.

Specifically, in addition to describing in detail the URL method, the specification of the

'780 patent discloses the ability to practice the invention with a "special," or modified, browser. When the '639 patent application was filed as a continuation of the '780 patent, the applicants updated this portion of the specification to be clear that such a modified browser was, by that time, commonplace.  Not only did the inventors not hide the cookie from the Patent Office, they highlighted it, appropriately noting the advances in the field by amending the patent specification.  Furthermore, at the time of the filing of the '780 patent, the inventors believed that the URL embodiment was the best way to carry out the invention, and appropriately disclosed this understood best mode in the '780 patent specification.  In any event, Newegg's unsubstantiated charges of deceit have no place in the analysis of whether the '780 patent meets the requirements of § 112.

Finally, even if Newegg were to show that the '639 patent is not entitled to the priority date of the '780 patent, which it has not, Newegg has not met its burden of showing that the '639 patent is invalid based on intervening prior art.  It appears as though Newegg hopes that simply labeling the '639 patent as "the cookie patent" would lead the court to conclude, *ipso facto,* that the patent is anticipated by cookies.  But the '639 patent is not just a cookie patent.  Rather, genuine issues of material fact abound regarding what, and when, aspects of the claimed technologies were disclosed, thus precluding summary judgment on the issue of whether the '639 patent is invalid even if it is not entitled to the '780 patent's June 7, 1995 filing date.

## II.    STATEMENT OF FACTS

The '639 patent is directed to the field of e-commerce on the Web.  One of the early problems in developing such systems for the Web was that interactions on the Web are stateless. The underlying protocol, HTTP, does not provide for maintaining state or sessions.  (Exh. 1, Stewart Decl. ¶ 4.)[1]  Maintaining session refers to the server's ability to recognize and link

---

[1] The declaration of '780 and '639 patents' co-inventor Dr. Larry Stewart ("Stewart Decl.") is submitted herewith.

together various requests from the same client, or browser, of a website.  (*Id.* ¶ 6.)  The inventors

of the '780 and '639 patents sought to solve this problem.  Their solution was to store a session

identifier at the client browser and have the browser return this to the server in future requests

within a session.  (*Id.*)  The inventors' initial implementation involved passing the session ID in

the URL.  (*Id.*)  The benefit to using the URL method was that it was universal, i.e., it would

work with all browsers and servers.  (*Id.* ¶¶ 12, 29-32.)  For that reason, at the time of the filing

of the '780 patent, the inventors believed that the URL embodiment was the best way to carry

out the invention.  (*Id.* ¶ 29.)

While the inventors preferred the URL method, they also disclosed in the '780 patent a

second method for passing session identifiers, by programming the client browser to store an

SID or a similar tag for use in each URL call to that particular server. (Exh. 2, '780 patent, col.

4:24-27.)  In May 1995, Dr. Stewart learned about cookies from a WWW-TALK post by Lou

Montulli, an employee of Netscape Communications Corporation ("Netscape").  (Exh. 1, ¶ 11.)

Dr. Stewart recognized cookies as another way (aside from URLs) for the server to direct the

browser to store information and for the browser to send that information back to the server.  (*Id.*

¶¶ 12-13, 34.)  Dr. Stewart was aware by May 1995 that cookie capability was a feature of the

new Netscape browser, version 1.0 of which was introduced in December 1994 or January 1995.

(*Id.* ¶¶ 11-13.)

In the '780 application, Dr. Stewart and the other the inventors described the URL

method.  They also described the modified browser method:

> In another embodiment, a server access control may be maintained
> by programming the client browser to store an SID or a similar tag
> for use in each URL call to that particular server.  This
> embodiment, however, requires a special browser which can
> handle such communications and is generally not suitable for the
> standard browser format common to the Web.

(Exh. 2, '780 patent, col. 4:24-30.)  The first sentence sets forth the function of a required

modified browser.  (Exh. 1, Stewart Decl. ¶ 20.)  The second sentence explains that commonly available browsers and the HTTP protocol must be modified to handle communications not part of the then-current HTTP standard.  (*Id.* ¶21.)  Dr. Stewart understood the modified browser to include but not be limited to a cookie-enabled browser, such as the then-recently released Netscape browser.  (*Id.* ¶ 17.)  He believed that other software developers at the time would have had the same understanding.  (*Id.*)  The '639 patent shares the same specification (with minor amendments, discussed below) with the '780 patent, including descriptions of both the URL and modified browser approaches.

The inventors were upfront about their knowledge of cookies during prosecution of both the '780 and '639 patents.  (*Id.* ¶¶ 16, 28.)  In the '780 patent specification, they provided a functional description of the modified browser, with the intent that a software developer could easily build or obtain such a browser.  (*Id.* ¶¶ 17-28.)  They also disclosed to the Patent Office the WWW-TALK post from which Dr. Stewart learned about cookies (*Id.* ¶¶ 11, 28) and other relevant materials from Netscape.  (Exh. 2, '780 patent, pp. 1-2.)

The originally submitted claims of the '780 patent were broad enough to cover both the URL embodiment and the modified browser embodiment (including the use of cookies). (Exh. 3, '780 application, p. 20.)  The claims of the '780 patent were narrowed during prosecution to focus on the URL embodiment, but a continuation was filed to pursue claims that would also include the modified browser embodiment.  That continuation matured into the '639 patent.  By the time the '639 patent was filed, cookies had become widespread and standardized. (Exh. 1, Stewart Decl. ¶¶ 34-36.)  The '780 patent specification was therefore appropriately amended before being filed as the '639 application to reflect that, due to widespread adoption of cookies, browsers that were once "special" had become commonplace:

> In another embodiment, a server access control may be maintained
> by programming the client browser to store an SID or a similar tag
> for use in each URL call to that particular server.  This

> embodiment, however, requires a special browser which can
> handle such communications and *was* generally not suitable for
> *early* browser formats common to the Web.  *However, it may now
> be implemented in cookie compatible browsers.*

(Exh. 4, '639 patent, col. 4:22-29 (emphasis added); Exh. 1, Stewart Decl. ¶ 36.)  Not only did

the applicants not hide the cookie concept from the Patent Office, they highlighted the

technological advances in the field to the Patent Examiner.  There was no deception.

## III.   ARGUMENT

### A.   The Burden of Proof Rests Squarely on Newegg

Newegg attempts to shift the burden to Soverain to prove the validity of its patents, but

the law does not support such a shift.  (Newegg's Motion for Summary Judgment [hereinafter

"Newegg"] at 5-6.)  The law is clear:  Soverain's patents are presumed to be valid.  35 U.S.C.

§ 282.  A defendant must prove by clear and convincing evidence that a patent is invalid.  *Tech.*

*Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327-28 (Fed. Cir. 2008).

Newegg's citation to *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir.

2008) is misplaced.  (Newegg at 6.)  The Federal Circuit has observed that this case "says

nothing more than . . . that *once a challenger . . . has introduced sufficient evidence* . . . the

patentee has the burden of going forward with evidence and argument to the contrary."  *See*

*Tech. Licensing*, 545 F.3d at 1328-29 (discussing *PowerOasis*, 522 F.3d 1299.) (emphasis

added).  *PowerOasis* does not place any burden on the patent holder until *after* the party

challenging the patent has adduced prior art sufficient to make a prima facie case of invalidity,

which Newegg has not done.  And even then, *PowerOasis* does not shift the burden of proof,

which remains with Newegg.[2]

---

[2] Newegg also blurs the important distinction between continuation-in-part applications ("CIPs") at issue in
*PowerOasis* and continuation applications like the '639 patent.  "[T]he quintessential difference between a
continuation and a continuation-in-part is the addition of new matter."  *PowerOasis*, 522 F.3d at 1304 n.3.  "Since
CIPs generally add new matter, the claims may be fully supported by the parent application or they may rely on the
new matter for support."  *Id.* at 1305 n.4.  Because the '639 patent is a continuation, not a CIP, there is no issue as to
whether the '639 claims rely on its parent application for support.

**B.      The '639 Patent Is Entitled to the Priority Date of Its Parent Application**

Filed as a continuation application, the '639 patent is entitled to the benefit of the priority filing date of its parent, the '780 patent.  35 U.S.C. § 120.  Only if Newegg can show by clear and convincing evidence that the '780 patent does not meet the requirements of § 112 as they relate to the challenged claims of the '639 patent does this entitlement not apply.  Newegg argues that the '780 patent fails to meet three of § 112's requirements:  (1) written description; (2) enablement; and (3) best mode.  However, each of these three requirements of § 112 is met, and the '639 patent is therefore entitled to the priority date of the '780 patent.

**1.      The Written Description Requirement of § 112 Is Met**

**(a)      The written description of the '780 patent encompasses the invention claimed in the '639 patent**

The written description requirement of § 112 "serves the fundamental patent purpose of making known what has been invented, including any variations and alternatives contemplated by the inventor."  *See Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005).  For software-related inventions, "[d]isclosing . . . function[ality] is sufficient to satisfy the requirement of section 112, first paragraph, when one skilled in the relevant art would understand what is intended and know how to carry it out."  *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1534 (Fed. Cir. 1992) (rejecting the defendant's argument that a program listing was necessary because "[o]ne skilled in the art would know how to program a microprocessor to perform the necessary steps described in the specification" (emphasis omitted)).  The Federal Circuit has emphasized the sufficiency of functional disclosures in other cases involving software.  *See, e.g., Robotic Vision Sys., Inc. v. View Eng'g*, 112 F.3d 1163, 1166 (Fed. Cir. 1997) ("[I]t is generally sufficient if the functions of the software are disclosed, it usually being the case that creation of the specific source code is within the skill of the art.").

Newegg concedes that the '780 patent specification describes a "special browser" and

"what it does," i.e., its function. (Newegg at 12; Exh. 2, '780 patent, col. 4:24-30 ("In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server.").)  While Newegg implies that one paragraph—regardless of its substance—could never adequately describe the modified browser, the court in *Hayes* rejected a similar argument, explaining that "the adequacy of the description of an invention depends on its content in relation to the particular invention, not its length."  *Hayes*, 982 F.2d at 1534.  Here, as in *Hayes,* this paragraph is sufficient to meet the written description requirement of § 112.

In addition, both Dr. Stewart and Soverain's technical expert Dr. Michael I. Shamos[3] aver that the '780 patent's functional description of a modified browser would have been understood by a person of ordinary skill in the art to mean a browser programmed to receive an HTTP header from a server containing certain information, store that information, and send that information back to the server in another HTTP header, where the information can be a session identifier.  (Exh. 1, Stewart Decl. ¶¶ 19-28, Exh. 5, Shamos Decl. ¶¶ 9-14.)  As in *Hayes*, the evidence supports the conclusion that the '780 patent satisfies the written description requirement.  *See Hayes*, 982 F.2d at 1534 ("The evidence of record supports the conclusion that all that was required for one of ordinary skill in the art to understand what the invention was and how to carry it out was the disclosure of a microprocessor having certain capabilities and the desired functions it was to perform.").  Newegg's assertion that the '780 patent fails to disclose "what it [the modifier browser] is" is nonsensical, for the written description in the '780 patent is clear that "it" *is* a browser.  (Newegg at 12.)  At most, Newegg has raised an issue of material fact:  whether a person of ordinary skill in the art would understand the disclosure adequately to describe the modified browser.

---

[3] The declaration of Dr. Shamos ("Shamos Decl.") is submitted herewith.

(b)     **The written description cases relied upon by Newegg do not support its position**

Newegg relies mainly on cases involving biotech and chemical composition patents, including *Univ. Rochester v. G.D. Searle & Co.*, 358 F.3d 916 (Fed. Cir. 2004) (Newegg at 5, 10-12), *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 560 F.3d 1366 (Fed. Cir. 2009) (Newegg at 10-13),[4] and *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247 (Fed. Cir. 2004) (Newegg at 13-15). These cases are inapposite.  As *Rochester* itself explained, it is more difficult for a functional description of a *chemical* compound to satisfy § 112's written description requirement than for other inventions.  *See Rochester*, 358 F.3d at 925-26.  Soverain's cited software cases are the apposite precedent here.

The *Rochester* court, in a chemical case, actually confirmed the Federal Circuit's long-held position that functional descriptions may meet the written description requirement.  *See id.* at 925.  The *Rochester* court observed that "there is no language here, generalized or otherwise, that describes *compounds* that achieve the claimed effect," *id.* at 923 (emphasis added) and "it is clear that the inventors had neither possession nor knowledge of such a *compound*," *id.* at 926 (quoting the district court, 249 F. Supp. 2d 216, 229 (W.D.N.Y. 2003)) (emphasis added). Newegg admits both that the '780 specification describes the modified browser's function, and that the public at large (inventor Stewart included) knew of at least one modified browser—the Netscape browser—that could perform the required function.  (Newegg at 4-5, 11-12; Exh. 1, Stewart Decl. ¶¶ 11, 17, 19.)

---

[4] The Federal Circuit has vacated this decision, one of Newegg's principal authorities, and granted Ariad's petition for a rehearing *en banc*.  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, No. 2008-1248, slip op. (Fed. Cir. Aug. 21, 2009) (order granting rehearing *en banc* and vacating 560 F.3d 1366) (attached as Exh. 11).  The Federal Circuit specifically requested briefing from the parties regarding (a) "Whether 35 U.S.C. § 112, paragraph 1, contains a written description requirement separate from the enablement requirement?" and (b) "If a separate written description requirement is set forth in the statute, what is the scope and purpose of the requirement?"  Although Soverain will proceed with its arguments based upon the current law, the Federal Circuit's order is clear that the law governing written description compliance appears to be in flux and that uncertainty weighs against any grant of summary judgment prior to the Federal Circuit's forthcoming *en banc* consideration of the issue.

In *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) (Newegg at 12), a case involving valves for intravenous tubing, the patent claims were broad enough to cover valves with spikes and valves without spikes, but the patent specification disclosed only valves with spikes.  The Federal Circuit held that the claims were invalid, as the written description provided no disclosure of the claimed valves without spikes.  *See ICU Med.*, 558 F.3d at 1378-79.  The Federal Circuit noted that "ICU has failed to point to *any* disclosure in the patent specification that describes a spikeless valve."  *Id.* at 1379 (emphasis added).  In the present case, the '780 patent specification discloses the modified browser method.

And even if *Ariad* (Newegg at 11) had not been vacated by the Federal Circuit (*see supra* n.4), it is distinguishable, as the '780 patent's description of a modified browser is not (to paraphrase *Ariad*) a "mere mention of a desired outcome" or a "mere desire" for such a browser. Newegg itself points to evidence that the inventors and the public knew that Netscape had modified its browser to have the function described in the specification of the '780 patent. (Newegg at 1, 2, 4, 5, 9; Newegg Exhs. F, G, K, L, M, N.)  Newegg claims, in fact, that the inventors knew and understood that their invention, session identifiers, could be transported by another means:  "it is clear from the correspondence prior to the filing date that at least one inventor [Stewart] and the patent drafter [Dally] omitted known and essential information about such [cookie-enabled] browsers from the application."  (Newegg at 9.)  The facts show that modified browsers were both known and sufficiently described, undermining completely Newegg's motion for summary judgment.

### (c)     Intent is irrelevant to whether the written description requirement is or is not met

While the applicant's intent is wholly irrelevant to the issue of written description, Newegg is wrong to claim that the inventors and Dr. Dally, who assisted in drafting the '780 patent application, "omitted" or "disguised" the modified browser embodiment from the patent.

(Newegg at 2, 9.)  The specification plainly discloses and describes the modified browser:  *See supra* § III.B.1(a); *infra* § III.B.2.  A preliminary specification of Netscape's cookie function was even cited in the '780 patent—Lou Montulli, Electronic Mail to multiple recipients of the www-talk list (www-talk@www10.w3.org) on "Session Tracking" (omi.mail.www-talk, Apr. 18, 1995).  (Exh. 2, '780 patent, at p. 2; Exh. 6; Exh. 10.)  In his declaration, Dr. Stewart states unequivocally that he and Dr. Dally did not omit information about such modified browsers.  (Exh. 1, Stewart Decl. ¶¶ 16-17.)  All talk of wrongdoing in Newegg's motion is nothing more than a red herring designed to obscure the real issues, on which issues the facts establish that summary judgment is not appropriate.

### 2.    The Enablement Requirement of § 112 Is Met

Newegg does not deny that the URL method is enabled;[5] rather, the sole issue is whether the '780 patent enables the modified browser method.  On this issue, Newegg not only fails to establish the absence of a factual dispute, but even presents facts in Soverain's favor.

### (a)    The '780 patent provides an enabling disclosure of the '639 patent claims

"A decision on the issue of enablement requires determination of whether a person skilled in the pertinent art, using the knowledge available to such a person and the disclosure in the patent document, could make and use the invention without undue experimentation."  *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990).  Enablement "is a question of law based on underlying facts."  *Chiron*, 363 F.3d at 1253.

Newegg admits that the Netscape browser was released and publicized and a cookie specification was published, all prior to filing.  (Newegg at 4-5.)  Upon those facts, a jury could find that one of ordinary skill in the art would know that Netscape is an example of a modified browser, and therefore *no* experimentation at all would be necessary to make and use the

---

[5] Newegg concedes that "Open Market provided a careful description of the URL method."  (Newegg at 1.)

invention.  In his declaration, Dr. Stewart states that the inventors intended the modified browser language to encompass Netscape, and he believes that a software developer at the time would have understood that to be the case.  (Exh. 1, Stewart Decl. ¶ 17.)  There is, at minimum, a genuine issue of material fact as to whether a person of ordinary skill in the art would have understood the modified browser to encompass the Netscape browser.[6]

Even if a person of ordinary skill in the art would not have understood the modified browser to encompass the Netscape browser, the claims would still be enabled, because such a person could have programmed such a browser without undue experimentation.  For computer-related inventions, enablement is viewed from the perspective of a "skilled programmer using the knowledge and skill with which such a person is charged," and for whom "the conversion of a complete thought . . . as expressed in English and mathematics . . . into a language a machine understands is necessarily a mere clerical function."  *Northern Telecom*, 908 F.2d at 941-42 (citation omitted).  In light of the capabilities of skilled programmers, a functional description of software is generally sufficient for enablement.  *See Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1549-50 (Fed. Cir. 1997) (discussing enablement of best mode relating to software and noting that "[b]ecause adequate disclosure of the functions of the 'chip' was in the specification, failure to specifically identify a particular manufacturer's 'chip' was not fatal to satisfaction of the best mode requirement").  Given a complete functional specification, the result is predictable.[7]

The '780 specification provides a complete functional description of the modified browser, thereby providing a skilled programmer sufficient direction and precluding the need for

---

[6] Dr. Shamos' declaration confirms the suitability of the Netscape browser.  (Exh. 5, Shamos Decl. ¶ 15.)

[7] This is in contrast to a developing biotechnology field, where one often must conduct unpredictable experiments in a lab.  *See Chiron*, 363 F.3d at 1256 (citing evidence that creating a class of the claimed antibodies at the relevant time "required significant experimentation," because those antibodies were "unpredictable," and that "only a few laboratories contained the necessary equipment").  Newegg's heavy reliance on emerging biotechnology case law is inapposite.

11

any experimentation other than routine quality control testing.  (Exh. 1, Stewart Decl. ¶¶ 19-28;

Exh. 5, Shamos Decl. ¶¶ 9-14.)  From the functional description of the modified browser as a

browser capable of storing a session identifier, and the publicly available source code for the

NCSA Mosaic browser (available at least as of March 12, 1995) as a starting point, a skilled

programmer would have been able to program the described modified browser within

approximately one week or less.  (Exh. 1, Stewart Decl. ¶ 26; Exh. 5, Shamos Decl. ¶ 14.)  This

time would not have been spent "experimenting," but performing the "clerical function" of

converting the functional description of the '780 patent into a computer program.  (Exh. 1,

Stewart Decl. ¶¶ 19-28; Exh. 5, Shamos Decl. ¶ 14); *see also Northern Telecom*, 908 F.2d at 942;

*Fonar*, 107 F.3d at 1549 ("normally, writing code for such software is within the skill of the art,

not requiring undue experimentation, once its functions have been disclosed").  As Dr. Shamos

explains, the challenge was commercial (getting users to install modified browsers), not

technical.  (Exh. 5, Shamos Decl. ¶ 13.)

The evidence at minimum creates a genuine issue of material fact: whether undue

experimentation would have been necessary at the time of filing to program a modified browser.

*See Fonar*, 107 F.3d at 1548-49 (relying on testimony including inventor testimony that

providing the functions of software was more important than providing code, and affirming jury

finding that best mode was adequately disclosed).[8]

### (b)   Newegg's attempt to heighten the standard by describing browsers as nascent technology fails

Newegg's lack of enablement argument falls apart by treating the '639 claims as if the

invention were the modified browser itself, which it then mischaracterizes as the "novel aspect"

---

[8] Newegg relies on *Sitrick v. Dreamworks,* LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008) (Newegg at 19) for the proposition that conclusory expert assertions concerning enablement cannot raise a triable issue of material fact.  In *Sitrick*, the plaintiff's expert's statements were not only conclusory, but the so-called "expert" admitted to not having expertise in the relevant area.  *See Sitrick*, 516 F.3d at 1001.  In contrast, Soverain has presented nonconclusory evidence from an inventor and from a qualified expert in the field.

of the invention and a "nascent technology."  (Newegg at 14-17.)  The invention of the '639 patent is not the modified browser; rather, the '639 claims are directed to maintaining state through the use of session IDs transported between the server and client.  In any case, the modified browser is not "nascent technology."

"The law requires an enabling disclosure for nascent technology because a person of ordinary skill in the art has little or no knowledge independent from the patentee's instruction." *Chiron*, 363 F.3d at 1254.  (Newegg at 13-15.)  Whether a technology is "nascent" is a "matter of fact," *Chiron*, 363 F.3d at 1255, and Newegg itself has provided facts that favor Soverain, namely, that Netscape's browser was released and publicized, and a cookie specification was published, prior to filing of the '780 patent.  (Newegg at 4-5, 11-12.)  These same admitted-to facts are sufficient to allow a jury to find that the modified browser is not a "novel aspect" of the invention, but "just another known species of a genus consisting" of methods of storing session identifiers.  *Automotive Tech. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); (Newegg at 15-16).

Newegg's cases, *Automotive* (Newegg at 15-16) and *Chiron* (Newegg at 13-15), do not support Newegg's nascent technology argument.  In *Automotive*, the means-plus-function claims were directed to a "side impact crash sensor," and the court held that the specification failed to enable an electronic-sensor embodiment.  *Automotive*, 501 F.3d at 1277, 1284-85.  The specification stated that "[s]ide impact sensing was a new field," and the patentee admitted that at the time it filed the application, it did not know of any electronic sensors used to sense side impact crashes.  *Id.* at 1284.  In *Chiron*, the claims were to monoclonal antibodies, and the defendant presented expert testimony that making a class of those antibodies (chimeric) was not routine and that only a few laboratories had the capacity and expertise to do so at the relevant time.  *See Chiron*, 363 F.3d at 1250, 1256.  Here, the Netscape browser was released and publicized and a cookie specification was published, all prior to filing.

Even if the modified browser were "nascent" technology, the '780 patent specification would be enabling as it provides a "specific and useful teaching" such that a skilled person could have programmed the described modified browser without undue experimentation.  *See supra* § III.B.2(a).

(c)      The other enablement cases relied upon by Newegg do not support its position

Newegg relies on *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007) (Newegg at 14, 18), where the court held that the specification taught away from using disposable syringes without pressure jackets by stating that such syringes would be "expensive and therefore impractical."  481 F.3d at 1379 (quoting the patent-in-suit).  But unlike *Liebel*, where the court remarked that "nowhere does the specification describe an injector with a disposable syringe without a pressure jacket," *id.*, the '780 patent explicitly discloses the modified ("special") browser as being used in an "embodiment" of the invention, (Exh. 2, '780 patent, col. 4:24-30).  The '780 patent, in saying that the modified browser method "is generally not suitable for the standard browser format common to the Web," merely points out that the embodiment was not, at the time of filing, universally applicable.  (Exh. 1, Stewart Decl. ¶¶ 12, 21, 29-33, 36.)  In contrast to the injector in *Liebel*, the embodiment was neither "expensive" nor "impractical," as demonstrated by the existence of the Netscape browser and cookie specification, and the ease with which a modified browser could have been programmed. (*Id.* ¶ 26; Exh. 5, Shamos Decl. ¶ 14.)  The record facts are sufficient for a jury to find that the specification does not teach away from use of a modified browser.[9]

Newegg also relies on *Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 315 F.3d

---

[9] *Liebel* is further distinguishable because not only did the court find teaching away, but the inventors admitted that tests with a jacketless system were unsuccessful, producing such a system would have required more experimentation and testing, pursuing such a system would be "too risky," and they not aware of any similar testing being conducted at that time.  *See Liebel*, 481 F.3d at 1379.

14

1335 (Fed. Cir. 2003) (Newegg at 16-17), analogizing a monocot being "highly desirable" but "difficult to produce" to a cookie browser allegedly being "difficult to obtain."  That analogy fails.  Even assuming Newegg had provided any facts that a modified browser was "difficult to obtain" (it did the opposite, by noting the availability of the Netscape browser), that would not necessarily lead to the conclusion that there was any need for experimentation, let alone undue experimentation.

And while in *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533-37 (Fed. Cir. 1987) (Newegg at 20), another Newegg-cited authority, the patent application did not include an enabling disclosure of the inventors' preferred method of chemical brazing, the Federal Circuit observed that the chemical arts are less predictable than some other disciplines, and therefore require more disclosure for enabling a best mode.  *See Spectra-Physics*, 827 F.2d at 1533-37.  As previously discussed, *supra* § III.B.2(a), the '780 specification enables an ordinarily skilled artisan to make or obtain a modified browser to practice the modified browser method.  *See Robotic Vision*, 112 F.3d at 1166.

Finally, despite being a biotechnology patent case, *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1209-12 (Fed. Cir. 1991) (Newegg at 21), cited by Newegg, actually supports Soverain's position, holding that the best mode was enabled where all the starting materials either were publicly available or were enabled by the description without undue experimentation. The *Amgen* court held the patent claims valid.  *See Amgen*, 927 F.2d at 1209-12 (upholding claims where the best mode was disclosed, but finding some claims invalid on other grounds). Here, both a modified browser (the Netscape browser) and the starting materials to make a modified browser (the NSCA XMosaic browser) were publicly available.  *See supra* § III.B.2(a).

### 3.    The Best Mode Requirement of § 112 Is Met

The Federal Circuit has noted that it has held patent claims invalid on best mode grounds infrequently.  *Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1316 (Fed. Cir. 2002).  Here,

Newegg alleges the cookie-compatible browser was the best mode.  (Newegg at 20.)  The facts are otherwise.  And, by calling into question the motives of Dr. Dally and Dr. Stewart, Newegg only raises issues of fact rather than establishing clear and convincing proof that the inventors did not disclose the best mode of the invention.

The best mode analysis is a two-pronged test.  The first, subjective, prong requires Newegg to establish that the inventor, at the time of filing of the patent application, had contemplated a best mode for practicing the claimed invention.  *Robotic Vision*, 112 F.3d at 1165.  To meet the second, objective, prong, Newegg must convince the fact finder that the inventor's subjective best mode was not disclosed in sufficient detail to enable a person of ordinary skill in the art to practice it.  *Id.*  Here, Newegg meets neither prong.

### (a)   At the time of the filing of the '780 patent application, the inventors understood the URL method as the best mode

The subjective prong of the best mode analysis for the '639 patent relates to the inventors' understanding of the best mode of the invention at the time the '780 parent application was filed.  *Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 558-59 (Fed. Cir. 1994).  This is the only issue presented in Newegg's motion to which the mindset of the inventors is relevant.  At the time of the filing of the '780 patent application, the inventors did not, as Newegg alleges, view the best mode as one using a modified or cookie-compatible browser.  Their preferred mode of transporting the session ID was in the URL—an embodiment Newegg ignores.[10]  (Exh. 1, Stewart Decl. ¶ 29.)

Open Market's goal was to have a product that would work with all available browsers.  (*Id.* ¶ 31.)  Contrasting the URL method with the modified browser method, Dr. Stewart, in his

---

[10] Even at the time of the filing of the '639 patent in January 1998, the inventors still preferred the embodiment where session IDs were carried in URLs.  (Exh. 1, Stewart Decl. ¶¶ 34-35).

May 19, 1995, email, wrote:  "We store [the SID] in the URL, which is universal . . . ."[11]

(Exh. 7.)  Open Market accomplished its goal of universality by transporting the session ID in

the URL.  (Exh. 1, Stewart Decl. ¶¶ 29-30.)  Using a modified browser (including a cookie-

compatible browser) would not accomplish this goal.  (*Id.* ¶¶ 29-32; Exh. 5, Shamos Decl. ¶ 13)

From this evidence alone, the factual issue of the inventors' subjective belief of best mode

precludes summary judgment for Newegg.  *See, e.g., Calabrese v. Square D Co.*, No. 98-1550,

1999 WL 718238, at *2 (Fed. Cir. Sept. 13, 1999) (holding that there was a genuine issue of

material fact because the inventor's "state of mind is, therefore, relevant in resolving the

subjective question of whether he considered inclusion of the amplifying circuit to be the best

mode of practicing the '849 patent").

> **(b)**      **The best mode was not intentionally hidden from the Patent Office**

In an attempt to impute a mindset to the inventors that was not there (i.e., inventor

preference for the modified browser embodiment), Newegg stoops to alleging misconduct.

Newegg alleges that Dr. Stewart and Dr. Dally intentionally hid the Netscape browser from the

Patent Office, using the term "special browser" as a "cryptic allusion" to "Netscape" and cookies

(Newegg at 1-2, 14, 21.)  The purpose of the modified browser language was not to disguise a

reference to the Netscape browser or cookies, but to encompass a broader class of modified

browsers than just those implementing cookies.[12]  (Exh. 1, Stewart Decl. ¶¶ 15-17.)  Newegg

---

[11] Contrary to Newegg's assertion, a modified browser was not "required" for a client to store a session ID; it was required for a particular embodiment.  For this reason, Newegg's reliance on *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209 (Fed. Cir. 1996) (Newegg at 19-20) fails.  The URL method also has the client store the session ID.  In his May 19, 1995, email, Dr. Stewart stated:  "We *store* [the SID] in the URL, which is universal . . . ."  (Exh. 7 (emphasis added).)

[12] One need not disclose a specific commercial product—even if preferred—to satisfy the best mode requirement.  "[T]he best mode requirement does not require an inventor to disclose production details so long as the means to carry out the invention are disclosed.  This includes providing supplier/trade name information where it is not needed, i.e., where such information would be 'mere surplusage—an addition to the generic description.'"  *Transco Prods. Inc.*, 38 F.3d at 560 (quoting *Randomex Inc. v. Scopus Corp.*, 849 F.2d 585, 590 (Fed. Cir. 1988)) (citations omitted).

characterizes a sentence added to the '639 patent specification ("However, it may now be implemented in cookie compatible browsers.") as an attempt to cure the alleged deceit.  (Newegg at 2, 9-10, 13, 21.)  But this sentence merely emphasizes that which one of ordinary skill in the art would have already understood from the '780 specification:  the cookie-enabled browser was a modification of the standard HTTP browser available in 1995.  (Exh. 1, Stewart Decl. ¶¶ 17, 19-23, 32, 36.)  The sentence further indicates that what was "special" in June 1995 was commonplace in January 1998.  (*Id.* ¶ 36.)  Newegg's allegations of deceit are unwarranted.  At the very least, they raise additional facts in dispute that preclude summary judgment.

The post-filing date documents relied upon by Newegg do not show any deceptive intent by the inventors or Dr. Dally.  (Newegg at 19-20 (citing Exh. D), 20 (citing Exh. C), 21 (noting addition to specification in '639 patent).)  The law does not require the best mode to be updated when a continuation is filed.  "[P]ublic policy does not demand that the public receive a new best mode disclosure in all continuing applications.  Such a rule would subvert the patent system's goal of promoting the useful arts through encouraging early disclosure." *Transco*, 38 F.3d at 558.  And Newegg's speculation (Newegg at 19-20) as to what the patent attorney implied in his statements to the Patent Office during the prosecution of the '639 patent in 2001 has no relevance in determining what the inventors believed to be the best mode for practicing their invention in June 1995.  *See Transco*, 38 F.3d at 558 ("Under current practice, the filing of many, if not most, continuing applications is merely a matter of form not requiring any input from the inventor.").  The factual question as to what the inventors considered to be the best mode remains, and precludes summary judgment.

### (c)     The '780 patent enables the best mode

Regardless of whether the URL embodiment or modified browser embodiment was the subjective best mode at the time of filing the '780 patent, the objective prong of the best mode test is satisfied because the '780 patent enables both embodiments.  *See supra* Section III.B.2.

Newegg concedes that the URL method is more than sufficiently enabled by the patents' specification:  "Open Market provided a careful description of the URL method."  (Newegg at 1.)  As it is this embodiment that the inventors believed to be the best mode at the time that the '780 patent application was filed, the best mode requirement of § 112 was met.  Because the alternative modified browser method is also fully enabled in the patents' specification, *see supra* § III.B.2, Newegg's argument fails entirely.

### C.      The '639 Patent Is Not Invalid Under § 102(b) and § 102(e)

Newegg does not contend that Open Market's products or the Montulli patent are prior art if the '639 patent is entitled to the '780 patent's filing date.  The applicability of Montulli and other art to the '639 patent claims is in any case particularly unsuitable for resolving in a summary proceeding, without benefit of the full trial record.

Soverain has already set forth in detail its position on the prior art asserted by Newegg, and respectfully refers the court to Dr. Shamos's Rebuttal Expert Report submitted on August 18, 2009.[13]  The Shamos declaration submitted herewith contains the analysis of Montulli used in his Rebuttal Expert Report.  For example, Dr. Shamos points out that the Montulli patent teaches the use of a state object, not a session identifier, and does not teach any claims of the '639 patent. (Exh. 5, Shamos Decl. ¶¶ 18 et seq.)  Soverain reserves the right to present further rebuttal evidence at trial on all of Newegg's prior art defenses, including those presented in this motion.

---

[13] Because the filing of expert reports is not contemplated under the Local Rules, Soverain will provide a copy of this report to the court if requested.

## IV.  CONCLUSION

Newegg's Motion for Summary Judgment of Invalidity and/or Denial of Priority Claim of the '639 Patent should be denied.

Dated: September 11, 2009                          Respectfully submitted,

                                                   /s/ Thomas L. Giannetti (with permission)
                                                   Kenneth R. Adamo
                                                   State Bar No. 00846960
                                                   Lead Attorney
                                                   Email:  kradamo@jonesday.com
                                                   Mark C. Howland
                                                   State Bar No. 24027240
                                                   Email:  mchowland@jonesday.com
                                                   JONES DAY
                                                   2727 North Harwood Street
                                                   Dallas, Texas 75201-1515
                                                   Telephone:  214-220-3939
                                                   Facsimile:  214-969-5100

                                                   Thomas L. Giannetti
                                                   NY Attorney Reg. No. 1632819
                                                   Email:  tlgiannetti@jonesday.com
                                                   Ognian V. Shentov
                                                   NY Attorney Reg.  No. 2867737
                                                   Email:  ovshentov@jonesday.com
                                                   JONES DAY
                                                   222 East 41st Street
                                                   New York, New York 10017-6702
                                                   Telephone:  212-326-3939
                                                   Facsimile:  212-755-7306

                                                   Jennifer Seraphine
                                                   CA Attorney Reg. No. 245463
                                                   Email:  jseraphine@jonesday.com
                                                   JONES DAY
                                                   555 California Street, 26th Floor
                                                   San Francisco, CA 94104

                                                   ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

This is to certify that on September 11, 2009 a true and correct copy of the foregoing document and accompanying documents, including exhibits, declarations, and the Statement of Genuine Issues, have been served on all counsel of record via the court's ECF system.


/s/ Thomas L. Giannetti
Thomas L. Giannetti