# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC<br><br>         Plaintiff,<br><br>    vs.<br><br>CDW CORPORATION, NEWEGG INC., REDCATS USA, INC., SYSTEMAX INC., ZAPPOS.COM, INC., TIGER DIRECT, INC., THE SPORTSMAN'S GUIDE, INC., and REDCATS USA LP<br><br>         Defendants. | CIVIL ACTION NO. 6:07 CV 511<br><br>Hon. Leonard E. Davis |

### **DECLARATION OF LAWRENCE C. STEWART**

I, Lawrence C. Stewart, declare as follows:

1. I am a named inventor on U.S. Patents 5,708,780 ("the '780 patent") and 7,272,639 ("the '639 patent"). I submit this declaration in response to Newegg Inc.'s Motion for Summary Judgment of Invalidity and/or Denial of Priority Claim of the '639 Patent. I have personal knowledge of the matters set forth in this declaration.

2. I joined Open Market, Inc. ("Open Market") in April 1994, and I worked at Open Market through December 2000.

3. Open Market was a pioneering e-commerce company.

4. One of the initial problems we identified in developing a commerce system for the World Wide Web ("Web") is that the interactions on the Web are stateless and the underlying protocol, HTTP, does not provide for maintaining state or sessions.

5. "State" refers to information about the present condition of a series of

communications. State can be any block of information that is relevant to a particular application. For example, a list of items in a shopping cart would be an example of "state" information.

6. A session identifier ("session ID" or "SID") is an identifier of a session that stays constant throughout a session. A session ID is used to identify to a server which block of state information belongs to a particular series of interactions. Our idea was to store a session ID at the client and have the client return it to the server in future requests within a session. Our initial implementation involved carrying the session ID in the URL.

7. In any session ID method for the Web, the session ID must be stored by the browser. Storing the session ID in the server is not possible because there is no way to determine which stored SID is the correct one for a given browser.

8. When SIDs are passed in URLs, they are stored by the browser between requests; and when relative URLs are used, the SIDs are stored by the browser across a whole series of requests.

9. We began the development of passing the session ID in the URL in the spring of 1994.

10. In early January 1995, Dr. David Gifford, founder of Open Market and a professor at MIT, proposed that we file an application on the technology that was ultimately disclosed in the '780 patent. Recognizing that neither he nor we had time to prepare the application, Dr. Gifford enlisted the assistance of Dr. William Dally, who was also a professor at MIT.

11. In the spring of 1995, I learned of a rumor that the Netscape browser could save a "packet of information and represent it to the server later." (Exh. 8) In May of 1994, I read a WWW-TALK post written by Lou Montulli. (Exh. 6.) In his post, Mr. Montulli discussed cookies and provided a description of how cookies worked. (Exh. 6.)

12. I emailed Dr. Dally about Netscape's cookie mechanism: "This cookie mechanism would work for passing SIDs around. . . . This is just another way to store a SID. (We store it in the URL, which is universal . . . .)" (Exh. 7.)

13. Contrary to Newegg's assertion that cookies are a method of exchanging session IDs, as I described in my email to Bill Dally, cookies are merely one way for the server to direct the browser to store information and for the browser to send that information back to the server. It is possible to use cookies to store session IDs just as it is possible to use URLs to store session IDs. It is also possible to use cookies, or URLs, to store information having nothing to do with session IDs.

14. Dr. Dally replied in an email that he was aware of cookies: "Yes, I'm aware of this. We mention this facility in the specification . . . ." (Exh. 9.)

15. In that same email, Dr. Dally also refers to "claims . . . to hedge our bets." I believe that this refers to the fact that the originally filed claims of the '780 patent did not specify that the SID is carried in the URL and therefore covered carrying the session ID in the URL, in a cookie, or in some other way. (Exh. 9.)

16. I understand that Newegg in its motion asserts that Dr. Dally and I intended to "disguise" a reference to cookie-enabled browsers in the specification of the '780 patent application. I had no intention of disguising anything to the Patent Office, including any reference to Netscape's browser. I do not believe that any of the other inventors or Dr. Dally had any intention of disguising the Netscape browser to the Patent Office.

17. I do not recall focusing at the time whether the Netscape browser should have specifically been mentioned. However, I understood that a "special browser" would include a cookie-compatible browser, and therefore the Netscape browser. I believe that a developer in June 1995 also would have understood the "special browser" to include a cookie-compatible browser, and therefore the Netscape browser.

3

18. Our invention was using a SID as part of methods of access control and methods of processing service requests, especially in the HTTP environment.

19. I also understood the specification's description of a "special browser" to describe the functionality of a modified browser. I believe that a developer at the time, June 1995, could have read the paragraph in question and made or obtained the described browser. The paragraph in question reads: "In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser format common to the Web." (Exh. 2, '780 patent, col. 4:24-31.)

20. The first sentence teaches what the client browser must be programmed to do: "to store an SID or similar tag for use in each URL call to that particular server." The sentence describes that the SID is then used in each "URL call" to the server. A URL call means a request from the browser to the server using the HTTP protocol. (Exh. 2, '780 patent, col. 4:24-27.)

21. The second sentence then says that "[t]his embodiment, however, requires a special browser which can handle such communications and is generally not suitable for the standard browser format common to the Web." I understood this to mean that the then-commonly available browsers and the HTTP protocol must be modified "to handle such communications." (Exh. 2, '780 patent, col. 4:24-31.)

22. The HTTP protocol at the time of filing of the '780 patent consisted of a request from browser to server, and a response from server to browser. The request transmitted the method, the URL, and optional headers. The reply returned a status code, a document type, optional headers, and the document.

23. Any developer familiar with HTTP would have realized that if the SID was not passed in the URL, then it would have to be passed in one of the optional headers. "Special"

4

means one would have had to define a new header for server-to-client, perhaps "store-sid: <SIDVALUE>" and a new header for client to server, perhaps "sid: <SIDVALUE>."

24. I have downloaded the source code for Xmosaic version 2.5 from ftp://ftp.NCSA.uiuc.edu/Mosaic/Unix/source/ dated 03/12/1995 12:00:00 AM and considered how much time it would have taken to program the browser according to the description in the specification. Xmosaic was a widely used open-source Web browser at the time, and I used it in 1994 and 1995. The following source code modules have all the code needed to modify the browser:

- Mosaic2.5/libwww2/HTAABrow.c
- Mosaic2.5/libwww2/HTAAUtil.c
- Mosaic2.5/libwww2/HTTP.c

25. These source code modules have code to parse headers in the server-to-browser message, code to store information from those headers in a data structure associated with that particular server, and code to use the information stored to generate headers in subsequent browser-to-server messages.

26. I estimate that a developer could have programmed the browser to perform the specification's described function in approximately one week or less. Or the developer could have chosen to use a preexisting browser (such as the Netscape browser) with the described function.

27. The source code for the Xmosaic browser from NCSA was publicly available and well known to web developers in 1995 because it was common to download the sources and build the browser rather than to install a binary package. Xmosaic did not come preinstalled on any operating system in early 1995. Likewise, building a modified browser as described in the '780 specification also would have been a clear-cut programming task.

28. The Montulli WWW-TALK post is included in the reference list for the '780

5

patent, and that post also outlines everything a developer would have needed to know to modify the HTTP protocol to make the modified browser.  (Exh. 2, '780 patent, p. 2; Exh. 6; Exh. 10.)

29.     As an inventor, I believed at the time of the filing of the '780 patent application that passing the SID in the URL was the best embodiment for carrying out the invention.  This embodiment worked with all browsers, did not require Open Market to program a new browser, did not require customers to have a new browser, and did not require customer support for installing and configuring a new browser.  The other disclosed embodiment, encompassing storing a session ID in a cookie, had none of these advantages at the time of the filing of the '780 patent application.

30.     My email to Bill Dally makes this very point:  "We store [the session ID] in the URL, which is universal . . . ."  (Exh. 7.)  Use of the URLs to store the session ID made the system universal so it could be used without a modified browser, e.g., a cookie compatible browser.  Additionally, my email makes it clear that at the time of my email, I understood that the browser "stores" the session ID when it is carried in the URL.

31.     It was a goal, often touted during sales calls, that the Open Market technology would work with any browser.  Requiring a special browser was viewed as a negative as the whole point of web standards is that browsers written by one company work together with servers written by another, and with content written by anyone.

32.     The meaning of "special" in "special browser," as I understood it in June 1995, was a browser with added capabilities, including capabilities that make use of a modified HTTP protocol, and this was not as desirable as it would mean users of the Open Market technology would have had to obtain and install a modified browser rather than being able to use whatever browser they already had.  Requiring users to use a custom browser would merely limit market share.

33.     I was not trying to hide from the PTO the embodiment I considered to be the best

6

embodiment of the invention.

34. Operationally, in later years, cookie-compatible browsers became widespread and standardized, so Open Market products such as its web server, Transact, and OM-Axcess supported the use of cookies to store SIDs. However, as far as I know, customers never were able to depend on that method alone.

35. By the time cookie support was generally available, there was a firestorm of concern over privacy, and many users turned off cookies, which was an option in available browsers. Rather than having a poor user experience for users with cookies disabled (or no cookie support at all), the Open Market systems generally used both URLs and cookies.

36. As to the meaning of the amendments to the '780 specification when the '639 application was filed, I understand "was generally not suitable for early browser formats common to the Web" to mean not conforming to the then-existent HTTP specification of June 1995. This sentence does not state or mean that the Netscape cookie browser didn't exist in June 1995, merely that use of cookies would be incompatible with the browsers common at that time. By 1998, I understood cookie support to be nearly universal among the available browsers. Thus, what was a "special" browser in June 1995 was common by 1998. I understand the sentence added to the '639 patent specification to be a statement of that development: "However, it may now be implemented in cookie compatible browsers." (Exh. 4, '639 patent, col. 4:25-29.)

       I declare under penalty of perjury that the foregoing is true and correct.

       Signed on September 10, 2009 in Wayland, Massachusetts

                                     Lawrence C. Stewart