# Exhibit B

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
                 TYLER DIVISION

                      - - - - -

SOVERAIN SOFTWARE,    )
LLC,                  )
                      )
        Plaintiff,    )
                      ) Civil Action No.
        vs.           ) 6:07-CV-00511-LED
                      )
CDW CORPORATION,      )
NEWEGG INC.,          )
REDCATS USA, INC.,    )
SYSTEMAX INC.,        )
ZAPPOS.COM, INC.,     )
REDCATS USA, L.P.,    )
THE SPORTSMAN'S       )
GUIDE, INC., and      )
TIGERDIRECT, INC.,    )
                      )
        Defendants.   )


                      - - - - -


      VIDEOTAPED DEPOSITION OF EDWARD TITTEL

                      - - - - -


         WEDNESDAY, SEPTEMBER 2, 2009


REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING
AGENCY
                      - - - - -
```

Page 2

```
 1       DEPOSITION OF EDWARD TITTEL
 2  a witness herein, called by the Plaintiff for
 3  examination, taken pursuant to the Federal
 4  Rules of Civil Procedure, by and before
 5  Constance Lee, a Professional Court Reporter
 6  and Notary Public in and for the Commonwealth
 7  of Pennsylvania, at the law offices of The
 8  Webb Law Firm, 9th Floor, Koppers Building,
 9  436 Seventh Avenue, Pittsburgh, Pennsylvania,
10  on Wednesday, September 2, 2009, at 9:33 a.m.
11             -----
12  COUNSEL PRESENT:
13  For the Plaintiff:
14      Thomas L. Giannetti, Esquire
        Ognian V. Shentov, Ph.D.
15      Jones Day Reavis & Pogue
        222 East 41st Street
16      New York, NY 10017
        212-326-3939
17      Fax:  212-755-7306
        Tlgiannetti@jonesday.com
18      Ovshentov@jonesday.com
19  For the Defendant:
20      Kent E. Baldauf, Jr., Esquire
        James Bosco, Esquire
21      The Webb Firm
        700 Koppers Building
22      Pittsburgh, PA 15219
        412-471-8815
23      Fax: 412-471-4094
        Jbosco@webblaw.com
24      Kbaldaufjr@webblaw.com
```

Page 4

```
 1              P R O C E E D I N G S
 2              -----
 3           VIDEOGRAPHER:  This is tape number
 4  one in the video deposition of Ed Tittel taken
 5  in the matter of Soverain Software versus CDW
 6  Corporation.  Today is September 2nd, 2009,
 7  and we're going on the record at approximately
 8  9:33 a.m.  Would counsel please identify
 9  themselves for the video record.
10           MR. GIANNETTI:  For the Plaintiff,
11  Soverain Software, Tom Giannetti and Ognian
12  Shentov of Jones Day New York.
13           MR. BALDAUF:  For the Defendant,
14  Newegg, Inc., Kent Baldauf, Jr. And James
15  Bosco from the Webb Law Firm.
16           VIDEOGRAPHER:  Thank you, Counsel.
17  The court reporter will now swear in the
18  witness, please.
19             EDWARD TITTEL
20  a witness herein, having been first duly
21  sworn, was examined and testified as follows:
22              -----
23             EXAMINATION
24  BY MR. GIANNETTI:
```

Page 3

```
 1              I N D E X
 2              -----
 3         WITNESS:  EDWARD TITTEL
 4
 5   E X A M I N A T I O N:          PAGE
 6   BY MR. GIANNETTI                  4
 7
 8   E X H I B I T S:
 9   TITTEL DEPOSITION NO. 1          32
10   TITTEL DEPOSITION NO. 2          91
11   TITTEL DEPOSITION NO. 3         119
12   TITTEL DEPOSITION NO. 4         125
13   TITTEL DEPOSITION NO. 5         126
14   TITTEL DEPOSITION NOs. 6 through 8   145
15   TITTEL DEPOSITION NO. 9         167
16   TITTEL DEPOSITION NO. 10        178
17   TITTEL DEPOSITION NO. 11        196
18   TITTEL DEPOSITION NO. 12        200
```

Page 5

```
 1      Q.   May we have your full name and
 2  address, please.
 3      A.   Certainly.  My full legal name is
 4  Edward Richard Tittel.  I reside at 2443 Arbor
 5  Drive, in Round Rock, Texas, and I'll even
 6  give you the zip code if you'd like.
 7      Q.   Go ahead.
 8      A.   78681-2160.
 9      Q.   Mr. Tittel, is this your first
10  deposition?
11      A.   Yes, it is.
12      Q.   Is this your first time testifying?
13      A.   Yes, it is.
14      Q.   All right.  I'll be asking you some
15  questions, and if you have problems
16  understanding one of my question, will you
17  please let me know?
18      A.   Yes, I will.
19      Q.   Mr. Tittel, are you a lawyer?
20      A.   No, sir, I am not.
21      Q.   Have you ever studied the law?
22      A.   No, sir, I have not.
23      Q.   Are you a patent agent?
24      A.   I don't even know what a patent
```

Page 58

```
 1  yes. But my own direct knowledge of CGI comes
 2  mostly from Perl.
 3       Q.   You also listed the Trevor report
 4  and Trevor deposition.
 5       A.   Yes, sir.
 6       Q.   Did you review those in connection
 7  with this?
 8       A.   Yes, I did.
 9       Q.   Did you -- have you ever met
10  Mr. Trevor?
11       A.   No, sir, I have not.
12       Q.   What's your understanding of
13  Mr. Trevor's role in the prior case?  With
14  Amazon?
15       A.   My understanding is that he was an
16  expert that was asked to appear and to opine
17  at the request of Amazon.
18       Q.   The -- Trevor was associated with
19  CompuServe?
20       A.   That's correct.
21       Q.   CompuServe was a service, an online
22  service that you used; is that correct?
23       A.   I was a SysOp on CompuServe while
24  working at Novell from 1987 until '91, '92.
```

Page 59

```
 1       Q.   '87 to '92?
 2       A.   Yes, sir.
 3       Q.   And as SysOp you presided over one
 4  of the forums?
 5       A.   Yes.
 6       Q.   Which ones?
 7       A.   I was -- there were six of us that
 8  presided over the Novell forums, and I was --
 9  I mean -- there was so much traffic that they
10  actually had to allocate it across multiple
11  people.
12       Q.   And what was your role as a SysOp?
13       A.   There are two traditional
14  components to a SysOp's role.  One of them is
15  best described as expert/guide, which is to
16  say to provide information about workings of
17  the system and also about the topics and
18  technologies on the discussion.  Then there's
19  also the part of the role which you might
20  describe as either babysitter or traffic cop,
21  where you have to remind people that they
22  should be polite and behave themselves or not
23  indulge in certain kinds of language an so on
24  and so forth and, when necessary, to boot
```

Page 60

```
 1  people off for breaking the rules.
 2       Q.   To prevent the flame wars from
 3  breaking out?
 4       A.   To the degree possible, yes,
 5  absolutely.
 6       Q.   Now, when you said to advise people
 7  of the workings of the system, I think that's
 8  what you said, you don't mean from a technical
 9  standpoint; do you?
10       A.   Well, it's sort of a
11  quasi-technical in the sense that at the time
12  CIS and Taps sys were operated by a lot of
13  fairly arcane keyboard strokes and things like
14  that, and occasionally people would ask how to
15  do things, and those of us who knew the answer
16  would provide them.
17       Q.   CompuServe doesn't exist anymore;
18  does it?
19       A.   I'm not aware if it exists or not.
20  I believe there may still be a CompuServe.com.
21       Q.   Yeah, there is a CompuServe.com,
22  but you can verify this, you don't have to
23  take my work for this, I believe they went out
24  of business under -- their service closed down
```

Page 61

```
 1  this summer.
 2       A.   Oh, interesting.  I was not aware.
 3  I pretty much stopped using CompuServe about
 4  the same time that I left Novell in May of
 5  1994.
 6       Q.   Did you get involved in the
 7  technology used to support the CompuServe
 8  system on a system programmer level?
 9       A.   No, sir, but because CompuServe was
10  a Novell customer and because I called on
11  Wright-Patterson Air Force Base in Dayton, I
12  got to know some people from CompuServe and
13  was somewhat aware of the inner workings of
14  their systems.
15       Q.   Who would they be, the people that
16  you knew from CompuServe?
17       A.   Boy, I cannot recall the names off
18  the top of my head, but I save all my e-mails,
19  so I can go back and find out, if you like.
20       Q.   At the time you were associated
21  with CompuServe as a SysOp, was it a dialup
22  system?
23       A.   Yes, sir.
24       Q.   And that meant you had to use an
```

Page 62

```
 1  analog phone like and a modem to get access?
 2      A.  Well, by the time the '90s rolled
 3  around, most of the modems were like V.30
 4  class or V.40 class, and at that time they
 5  were no longer analog, per se.  Of course,
 6  they were still using analog to digital and
 7  digital to analog, but it wasn't -- there were
 8  no more acoustic covers in use at that point.
 9      Q.  But at that time period you were
10  not accessing CompuServe through the internet,
11  you were dialing it up.
12      A.  Yes, sir, absolutely.
13      Q.  Did you have any experience with
14  WinZip?
15      A.  Yes, sir.
16      Q.  As a user?
17      A.  Yes, sir.
18      Q.  Any programming experience for
19  WinZip?
20      A.  No, sir.
21      Q.  Did you have any firsthand
22  experience with the technology behind any
23  CompuServe Mall?
24      A.  No, sir.
```

Page 63

```
 1      Q.  Did you have any firsthand
 2  experience with the technology behind the
 3  CompuServe service Eaasy Sabre?
 4      A.  No firsthand experience but some
 5  knowledge.
 6      Q.  As a user?
 7      A.  Yes.
 8      Q.  Any experience firsthand, technical
 9  experience with the CompuServe Travelshopper
10  service?
11      A.  No, sir.
12      Q.  Did any of the individuals -- were
13  the individuals -- were the individuals that
14  you mentioned earlier that you had contact
15  with in connection with Novell, were any of
16  those people responsible or involved with
17  those services that I mentioned, the
18  Travelshopper, the Eaasy Sabre, and the Mall?
19      A.  No, sir.
20      Q.  Does your knowledge of the
21  technology of those services -- let me
22  rephrase it.
23          Do you have -- do you have any
24  knowledge of the technology behind those three
```

Page 64

```
 1  services that I mentioned, the Travelshopper,
 2  the Eaasy Sabre, and the Mall, all on
 3  CompuServe?
 4      A.  I have researched their behavior to
 5  the extent that the current record permits, so
 6  I would say I have some knowledge of those
 7  systems.
 8      Q.  Does your research -- is your
 9  research confined to the Trevor report and
10  deposition that you mentioned earlier?
11      A.  No, sir.  It's also based on
12  internet searches of documents and
13  descriptions about how those systems worked
14  and how they behaved and online chatter about
15  them at the time.
16      Q.  And is that information listed in
17  your report?
18      A.  Only where it was cited.  So if it
19  wasn't cited, it doesn't appear.
20      Q.  So all of the -- all of the sources
21  of your technical information on the
22  CompuServe services that I mentioned, Eaasy
23  Sabre, Travelshopper, Mall, those are listed
24  in the report?
```

Page 65

```
 1      A.  There are numerous books that are
 2  listed, and then there are also those expert
 3  reports to which you refer, yes, sir.
 4      Q.  Would you say that the books that
 5  are listed here that relate to CompuServe are
 6  really designed for CompuServe users?
 7      A.  Absolutely.
 8      Q.  Let's take -- let's go back to your
 9  report.  We were going down the list of items
10  here, and I see Montulli is mentioned.  Did
11  you ever meet Mr. Montulli?
12      A.  No, sir, I have not.
13      Q.  What's your understanding of
14  Mr. Montulli's contribution, if any, to the
15  art of eCommerce?
16      A.  As much as he hates the single-word
17  characterization, the first thing that pops to
18  mind is cookies.
19      Q.  Mr. -- the development of the
20  cookie is attributed to Mr. Montulli; is that
21  right?
22      A.  He was certainly involved in it.
23  I'm not sure that he was personally
24  responsible for it.
```

Page 70

1   what I would call proper error handling
2   techniques, I quickly realized that Appendix G
3   was to Appendix F as a production system is to
4   a prototype or demonstration system.
5       Q.   And is that when you changed your
6   view on the best mode issue that we discussed
7   earlier?
8       A.   Yes, sir, it is.
9       Q.   Now, you also mention here that you
10  reviewed the Trevor, Erenkrantz and Taylor
11  reports.
12      A.   Yes, sir.
13      Q.   And what was your purpose in doing
14  that?
15      A.   My purpose was as stated in the
16  document, first and foremost to get a good
17  working model of what a report looks like,
18  how -- what elements it includes, how it
19  flows, and, you know, to get a sense of how to
20  implement the pro forma pieces thereof.  To a
21  secondary degree, I was interested to see what
22  kinds of discussions the other experts had
23  proposed and defended in their work.
24      Q.   Mr. Trevor talks about the

Page 71

1   CompuServe system in his report; is that
2   correct?
3       A.   Yes, sir, that's correct.
4       Q.   And did you -- did you use any of
5   the information in Mr. Trevor's report in
6   forming the conclusions that you included in
7   this document?
8       A.   Yes, sir, I did.  And specifically,
9   I was highly informed by the exhibits that he
10  put together where he actually marches through
11  the process of conducting an online travel
12  reservation and paying for an airline ticket
13  online.  Since I was no longer able to run
14  those sort of transactions myself as a user, I
15  found them both illuminating and informative
16  as to the capabilities of systems involved and
17  as to their operation.
18      Q.   Did you attempt to verify for
19  yourself the correctness of Mr. Trevor's
20  explanation of those systems?
21      A.   To the degree that online
22  information was available to either confirm or
23  deny what he said, yes, I did.  There is, for
24  example, an online manual for both Eaasy Sabre

Page 72

1   and the CompuServe travel system still
2   available on line, and the instructions that
3   are provided therein are in accordance with
4   what Trevor describes in his report.
5       Q.   Are those items listed in your
6   report here?
7       A.   No, sir, they are not.  I did not
8   cite them.
9       Q.   What was your understanding of what
10  you were required to list in your report?
11      A.   Anything that I cited I was
12  required to list.
13      Q.   And not everything that you
14  reviewed in connection --
15      A.   Yes, sir, that's correct.
16      Q.   Anything that you reviewed?
17      A.   No.  I said everything that I
18  cited, and then you said, everything that you
19  reviewed, and the question came across to me
20  as one where a positive answer would indicate
21  not everything that I had reviewed.
22      Q.   I'm sorry about the confusion.  I'm
23  glad that you straightened it out.
24           So your understanding was you have

Page 73

1   to list everything that you cite in the report
2   but not everything you reviewed.
3       A.   That's correct.
4       Q.   What do you mean in this last
5   sentence here where you say, "There is little
6   overlap between their coverage and contentions
7   and what appears herein"?
8       A.   I meant that the topics and the
9   subject matters that they covered in their
10  reports, with the exception of the Trevor
11  CompuServe stuff, had little or no bearing on
12  what I discuss further on in the report.
13      Q.   So you meant to accept the Trevor
14  discussion of CompuServe in that sentence?
15      A.   No, sir, I did not.  I meant to
16  indicate that there was relatively little
17  material in all of those reports that was
18  relevant to what I was discussing.  I don't
19  recall having made a formal statement of
20  acceptance of Trevor one way or the other,
21  except, of course, that I did cite Trevor,
22  which would indicate that by citing him I
23  accepted him.  But that was not implied in the
24  statement you just read back to me.

Page 74

1    Q.  All right.  You say here there's
2    little overlap.  Was there any overlap between
3    the coverage of these reports?
4    A.  I think we've just discussed where
5    the overlap occurred.
6    Q.  Trevor?
7    A.  Yes, sir.
8    Q.  Now, in the next paragraph you talk
9    about -- the word "state" appears.  Do you see
10   "state"?  And I'll read the whole document.
11   "Other documents from the document database
12   for the civil action number," and then the
13   action number of this case appears.
14       I'll read you the first sentence,
15   "These were provided to furnish me with
16   evidence to review about common knowledge and
17   prior discussion regarding how state could be
18   maintained in a web browser session?"
19       Do you see that?
20   A.  Yes, I can.
21   Q.  Now, you use two different terms
22   there.  You use "state" and you use the term
23   "session."  Okay.  Now, I'm going to ask you
24   first, what do you mean by "state" in that

Page 75

1    sentence?
2    A.  If I may, I'll start by saying that
3    state is a very important concept in the World
4    Wide Web because HTTP, the protocol that is
5    designed to transfer web pages between clients
6    and servers, was specifically designed to be
7    stateless.  Even though HTTP itself is a
8    stateless protocol, maintaining information
9    about state ends up being important for any
10   kinds of actions that involve multiple
11   transfers of information between a client and
12   a server.
13       So from that statement, a good
14   definition of "state" is, information about
15   prior activity that persists over time despite
16   HTTP's inability to explicitly convey state
17   information.  And if you want to look at one
18   of the interesting and challenging efforts
19   that were underway pretty much from 1992 on,
20   even an extent to the present day, creative
21   and crafty ways of conveying state remains a
22   very interesting problem on the web, even as
23   we speak.
24   Q.  Okay.  Would an example, just

Page 76

1    talking about an eCommerce system such as the
2    ones involved in this lawsuit, would an
3    example of state be the contents of somebody's
4    shopping cart?
5    A.  Yes.
6    Q.  And then you go on in that sentence
7    to talk about a web browser session.  Do you
8    see that?
9    A.  Yes, sir.
10   Q.  What do you mean by that?
11   A.  A session is a sequence of client
12   server response requests where those requests
13   and responses share some kind of common
14   thread. It's a very broad concept.
15   Q.  It's a different thing than state;
16   is that right?
17   A.  State information is necessary to
18   set up, maintain and ultimately terminate a
19   session, but they are different, yes.
20   Q.  What do you mean in this sentence
21   where you say, "An essential collection of
22   information to maintain persistent information
23   about web users or customers wishing to shop
24   or conduct other financial transactions," what

Page 77

1    are you referring to there?
2    A.  I'm referring to information that
3    allows the client and the server to be
4    reasonably sure, when they're talking to each
5    other, that they're both talking about the
6    same things and that the same user on the
7    client side is interacting with the server on
8    the server side.
9    Q.  Were you trying to describe what a
10   session was or what state was in that
11   parenthetical?
12   A.  I think it's probably safer to say
13   I was describing how state and session work
14   together to enable eCommerce to occur.
15   Q.  Did you also look at source code
16   from the OpenMarket source code control system
17   as indicated here?
18   A.  There are numerous elements in both
19   Appendix F and Appendix G that came from the
20   source code control system.  They had numerous
21   make files that were included in there.
22   Q.  And did this effort relate to the
23   best mode investigation that you talked about
24   earlier?

20 (Pages 74 to 77)

Page 206

```
 1              -----
 2            CERTIFICATE
 3       I, EDWARD TITTEL, do hereby certify
    that I have read the foregoing transcript of
 4  my deposition consisting of Pages 1 through
    205, and it is a true and correct copy of my
 5  testimony except for the changes, if any, made
    by me on the attached Deposition Correction
 6  Sheet.
 7
 8
 9             EDWARD TITTEL
10
11             (Date)
12
13
14
    Notary Public
15
16
    (Date)
17
18
19
20
21
22
23
24
```

Page 207

```
 1  UNITED STATES DISTRICT COURT)
    EASTER DISTRICT OF TEXAS    )
 2
 3       I, Constance Lee, Professional Court
    Reporter and Notary Public in and for the
 4  Commonwealth of Pennsylvania, do hereby
    certify that the witness was by me first duly
 5  sworn to testify the truth, the whole truth,
    and nothing but the truth; that the foregoing
 6  deposition was taken at the time and place
    stated herein; and that the said deposition
 7  was recorded stenographically by me and then
    reduced to typewriting under my direction, and
 8  constitutes a true record of the testimony
    given by said witness, all to the best of my
 9  skill and ability.
         I further certify that the
10  inspection, reading and signing of said
    deposition were not waived by counsel for the
11  respective parties and by the witness and if
    after 30 days the transcript has not been
12  signed by said witness that the witness
    received notification and has failed to
13  respond and the deposition may then be used as
    though signed.
14
         I further certify that I am not a
15  relative, or employee of either counsel, and
    that I am in no way interested, directly or
16  indirectly, in this action.
17       IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my seal of office this
18  16th day of September, 2009.
19
20
21  -------------------------------
22  Constance Lee
23
24
```