# Exhibit B

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
                   TYLER DIVISION

                      - - - - -

SOVERAIN SOFTWARE,    )
LLC,                  )
                      )
        Plaintiff,    )
                      ) Civil Action No.
        vs.           ) 6:07-CV-00511-LED
                      )
CDW CORPORATION,      )
NEWEGG INC.,          )
REDCATS USA, INC.,    )
SYSTEMAX INC.,        )
ZAPPOS.COM, INC.,     )
REDCATS USA, L.P.,    )
THE SPORTSMAN'S       )
GUIDE, INC., and      )
TIGERDIRECT, INC.,    )
                      )
        Defendants.   )


                      - - - - -


       VIDEOTAPED DEPOSITION OF EDWARD TITTEL

                      - - - - -


          WEDNESDAY, SEPTEMBER 2, 2009


REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING
AGENCY

                      - - - - -
```

Page 2

1  DEPOSITION OF EDWARD TITTEL
2  a witness herein, called by the Plaintiff for
3  examination, taken pursuant to the Federal
4  Rules of Civil Procedure, by and before
5  Constance Lee, a Professional Court Reporter
6  and Notary Public in and for the Commonwealth
7  of Pennsylvania, at the law offices of The
8  Webb Law Firm, 9th Floor, Koppers Building,
9  436 Seventh Avenue, Pittsburgh, Pennsylvania,
10 on Wednesday, September 2, 2009, at 9:33 a.m.
11          -----
12 COUNSEL PRESENT:
13 For the Plaintiff:
14     Thomas L. Giannetti, Esquire
       Ognian V. Shentov, Ph.D.
15     Jones Day Reavis & Pogue
       222 East 41st Street
16     New York, NY 10017
       212-326-3939
17     Fax: 212-755-7306
       Tlgiannetti@jonesday.com
18     Ovshentov@jonesday.com
19 For the Defendant:
20     Kent E. Baldauf, Jr., Esquire
       James Bosco, Esquire
21     The Webb Firm
       700 Koppers Building
22     Pittsburgh, PA 15219
       412-471-8815
23     Fax: 412-471-4094
       Jbosco@webblaw.com
24     Kbaldaufjr@webblaw.com

Page 4

1           P R O C E E D I N G S
2              -----
3      VIDEOGRAPHER: This is tape number
4  one in the video deposition of Ed Tittel taken
5  in the matter of Soverain Software versus CDW
6  Corporation. Today is September 2nd, 2009,
7  and we're going on the record at approximately
8  9:33 a.m. Would counsel please identify
9  themselves for the video record.
10     MR. GIANNETTI: For the Plaintiff,
11 Soverain Software, Tom Giannetti and Ognian
12 Shentov of Jones Day New York.
13     MR. BALDAUF: For the Defendant,
14 Newegg, Inc., Kent Baldauf, Jr. And James
15 Bosco from the Webb Law Firm.
16     VIDEOGRAPHER: Thank you, Counsel.
17 The court reporter will now swear in the
18 witness, please.
19         EDWARD TITTEL
20 a witness herein, having been first duly
21 sworn, was examined and testified as follows:
22            -----
23         EXAMINATION
24 BY MR. GIANNETTI:

Page 3

1           I N D E X
2              -----
3      WITNESS: EDWARD TITTEL
4
5  E X A M I N A T I O N:           PAGE
6  BY MR. GIANNETTI                   4
7
8  E X H I B I T S:
9  TITTEL DEPOSITION NO. 1            32
10 TITTEL DEPOSITION NO. 2            91
11 TITTEL DEPOSITION NO. 3            119
12 TITTEL DEPOSITION NO. 4            125
13 TITTEL DEPOSITION NO. 5            126
14 TITTEL DEPOSITION NOs. 6 through 8  145
15 TITTEL DEPOSITION NO. 9            167
16 TITTEL DEPOSITION NO. 10           178
17 TITTEL DEPOSITION NO. 11           196
18 TITTEL DEPOSITION NO. 12           200

Page 5

1      Q.  May we have your full name and
2  address, please.
3      A.  Certainly. My full legal name is
4  Edward Richard Tittel. I reside at 2443 Arbor
5  Drive, in Round Rock, Texas, and I'll even
6  give you the zip code if you'd like.
7      Q.  Go ahead.
8      A.  78681-2160.
9      Q.  Mr. Tittel, is this your first
10 deposition?
11     A.  Yes, it is.
12     Q.  Is this your first time testifying?
13     A.  Yes, it is.
14     Q.  All right. I'll be asking you some
15 questions, and if you have problems
16 understanding one of my question, will you
17 please let me know?
18     A.  Yes, I will.
19     Q.  Mr. Tittel, are you a lawyer?
20     A.  No, sir, I am not.
21     Q.  Have you ever studied the law?
22     A.  No, sir, I have not.
23     Q.  Are you a patent agent?
24     A.  I don't even know what a patent

Page 134

1    A.   Yes, sir.
2    Q.   -- "that included some way for
3 individual users - perforce working on a buyer
4 computer" --
5    A.   Yes, sir.
6    Q.   -- "to commence payment processing
7 by sending a message to the remote server (the
8 shopping cart computer)."
9    A.   Yes, sir.
10   Q.   And what is your basis for saying
11 the remote server in Prodigy and CompuServe is
12 the shopping cart computer?
13   A.   My understanding of a shopping cart
14 computer is a computer that acts as a network
15 server that is also capable of storing and
16 working with item -- purchase item
17 information. And by that criterion, I made
18 that assessment.
19   Q.   So that was your understanding of
20 what a shopping cart computer was when you
21 prepared this report?
22   A.   Yes, sir.
23   Q.   And what was your basis for saying
24 that there was a buyer computer in Prodigy and

Page 135

1 CompuServe?
2    A.   That a person was using a PC of
3 some kind on the other side of a network
4 connection to manipulate a user interface
5 where they could select items for purchase and
6 then commence purchase operations and even
7 conduct a purchase if they so chose.
8    Q.   Do you recall our discussion a few
9 minutes ago of CompuServe, and I think you
10 recall the character mode of operation?
11   A.   Yes, sir.
12   Q.   Would you say that someone
13 interacting with CompuServe in the character
14 mode using terminal emulation, would that be a
15 buyer computer?
16   A.   I would have to say yes because
17 that computer is still running terminal
18 emulation software, and the person who is
19 operating that computer is working under the
20 impression that they're doing something on
21 their PC and their keyboard to get something
22 done on the remote computer.
23   Q.   If that person had read your book,
24 they would know that they were really

Page 136

1 operating as a dumb terminal; wouldn't they?
2    A.   They might.  They might not care.
3 The fact of the matter is they were using
4 that -- their machine to get something done.
5    Q.   Right.  So you -- I guess what
6 you're saying is that the user -- it wouldn't
7 matter to the user what mode of operations --
8    A.   I have --
9    Q.   -- as long as they were getting
10 something done?
11   A.   I firmly believe that.
12   Q.   From the point of view of the
13 server, however --
14   A.   Yes.
15   Q.   -- would it matter whether the
16 terminal was in terminal emulation mode or
17 full graphics mode?
18   A.   Absolutely.  The sequence of
19 messages or characters that passed back and
20 forth over the remote connection would be
21 different.
22   Q.   And in -- and in -- in character
23 mode --
24   A.   Yes, sir.

Page 137

1    Q.   -- the server would treat the
2 incoming signals as though they were coming
3 from a dumb terminal; correct?
4    A.   Correct.
5    Q.   Is a dumb terminal a computer?
6    A.   We discussed this before lunch, and
7 the real answer to that question is, it
8 depends on what kind of hardware the terminal
9 emulator is running on or the software that's
10 providing the terminal function is running on.
11       I think we already agreed before
12 lunchtime that if it were running on a
13 teletype machine or a remote terminal, then it
14 was not a computer, and then if it were
15 running on a machine with some built-in
16 processing power and intelligence, then it
17 would still be a computer, just perhaps not
18 being used a computer at the moment.
19   Q.   And you say that even though --
20 from the perspective of the server, the server
21 might not be able to distinguish between the
22 teletype terminal or the computer running a
23 terminal -- terminal emulator.
24   A.   Yeah, and the reason I say that is

Page 138

1  <u>because when a PC is operating in terminal</u>
2  <u>emulation mode, it doesn't lose all of its</u>
3  <u>capabilities to operate as a PC. The process</u>
4  <u>context that is running the terminal emulation</u>
5  <u>software indeed does what the name says and</u>
6  <u>emulates a terminal, but that is still running</u>
7  <u>as one process of many on a more general</u>
8  <u>purpose operating system with all kinds of</u>
9  <u>other general computing capability.</u>
10      Q.   <u>From the perspective of the server,</u>
11  <u>though, it doesn't matter; does it?</u>
12      A.   <u>No, it does not</u>.
13      Q.   All right. Let's continue on Page
14  7 here.
15      A.   Okay.
16      Q.   Now, in -- in your analysis of
17  '314, Claim 50, you make reference to a packet
18  switched network that CompuServe developed.
19      A.   Yes, sir.
20      Q.   We discussed that briefly earlier.
21      A.   Yes, sir.
22      Q.   What's your -- what's the basis for
23  your information on that?
24      A.   Having been involved with the

Page 139

1  technical guys at CompuServe in conjunction
2  with my work at Novell in the late '80s, I was
3  aware that they operated numerous timesharing
4  networks for third parties and worked
5  extensively with vendors like Comnet and
6  Timenet and others that offered X 25 or other
7  packet switched network services to businesses
8  or to institutions in addition to the work
9  that they did on end user dialup services.
10  And my reason for inclusion of this
11  information was to indicate that packet
12  switched networks were used for various
13  purposes prior to the introduction of the
14  internet.
15          In fact, there were other examples
16  that could have been chosen as well.
17      Q.   Okay. Why -- was CompuServe's
18  commercial service a packet switched network?
19      A.   It depended on what kind of service
20  package you signed up for with CompuServe.
21  Sometimes you would use only DSU/CSU with X 25
22  interface to get true end-to-end packet
23  switching, and sometimes you would have
24  connections that terminated with a telephone

Page 140

1  line, which would then switch to an analog
2  modem.
3      Q.   In -- in the 1993-'94 time period
4  when CompuServe was still a dialup service --
5      A.   Yes, sir.
6      Q.   -- when somebody subscribed as an
7  individual --
8      A.   Yes.
9      Q.   -- to CompuServe and paid -- I've
10  forgotten what it was -- $9 or $10 --
11      A.   Yeah. $9.95 a month, if memory
12  serves.
13      Q.   Would the service that that person
14  receives be over a packet switched network?
15      A.   Well, recall our earlier discussion
16  of hybrid networks. It -- it's 100 percent
17  likely that the connection between the end
18  user's telephone and some local point of
19  presence, that CompuServe either itself
20  operated or contracted to a third party, would
21  have been done over an analog modem. At the
22  point where CompuServe would start aggregating
23  bandwidth and moving larger amounts of data
24  across a network, it's about an 80-85 percent

Page 141

1  probability that everything from there on in
2  to the core of the CompuServe network would be
3  packet switched.
4      Q.   And -- and yet you refer to that as
5  a packet switched network in the analysis of
6  this claim; right?
7      A.   I did not say that CompuServe was
8  entirely a packet switched network. What I
9  said was CompuServe developed its own packet
10  switched network which it used extensively. I
11  said extensively, not exclusively.
12      Q.   At the bottom of this page you
13  say -- this is in reference to '314, Claim 60.
14      A.   Yes, sir.
15      Q.   Toward the end of this paragraph
16  you say, "In fact, the use of text appended to
17  URLs was well-known and understood as early as
18  1993 as a mechanism for passing all kind of
19  information from clients to servers."
20      A.   Yes, sir.
21      Q.   What were you referring to there?
22      A.   Well, we talked about WAIS earlier,
23  the Wide Area Information Service. There were
24  also numerous other instances of remote

36 (Pages 138 to 141)

d9210c6f-c421-45b5-85d5-0d8be8080632

Page 194

1    Q.   While we're on the subject of this
2  report, I note that one of the questions that
3  you addressed was the prevail -- prevailing
4  state of knowledge in art for competent web
5  developers prior to April 1994.
6    A.   Yes, sir.
7    Q.   Okay.  And I'm going to read you
8  something from a motion that's been filed in
9  the case.  I'll even show it to you if you
10 like, but I'll read something to you.  And it
11 relates to the time period of 1995 --
12   A.   Okay.
13   Q.   -- when the '780 patent was filed.
14 This was a motion that's been filed by Newegg
15 in the case.  And I'll ask you whether you can
16 express a view as to whether you agree with
17 this or not.  Here's the statement, it says,
18 "The technology of internet browsing and
19 session data was primitive in 1995 when the
20 '780 patent was filed."  You understand that
21 the '780 patent was the parent of the '639
22 patent?
23   A.   Yes, sir.
24   Q.   Okay.  I'll read the statement

Page 195

1  again.  "The technology of internet browsing
2  and session data was primitive in 1995 when
3  the '780 patent was filed."  I'll just ask you
4  whether you agree or disagree with that.
5    A.   I agree with it.
6    Q.   And you think that that is
7  reflected in your report here?
8    A.   Yes, sir, I do.  May I add a
9  remark?
10   Q.   Sure.  Go ahead.
11   A.   Having worked in the area at the
12 time and having been very interested in
13 eCommerce at the time, it was very much the
14 case that people understood what had to be
15 done and a great deal of how to do it but that
16 no standard or compelling implementations had
17 yet made themselves available.
18   Q.   All right.  Now, I want to shift
19 topics briefly.  I think we're pretty close to
20 wrapping up.
21   A.   Okay, sure.
22   Q.   I want to ask you about your
23 knowledge of OpenMarket.  Are you aware that
24 the patents that are involved in this lawsuit

Page 196

1  were based on technology that was developed by
2  OpenMarket?
3    A.   Yes, sir, I am.
4    Q.   And OpenMarket is mentioned in at
5  least one of your books; is that right?
6    A.   That's correct.  In the eCommerce
7  book I mention OpenMarket as a -- one of a
8  handful of companies that offers eCommerce
9  systems.
10   Q.   And that's your book, Building
11 web --
12   A.   -- Commerce Sites.  Yes, sir.
13   Q.   I'm going to show you some excerpts
14 from that just to refresh your memory on what
15 you've said about OpenMarket.
16   A.   Okay.
17       MR. GIANNETTI:  Okay.  This will be
18 Exhibit 11.  Please mark it.
19           (Tittel Exhibit No. 11 was
20 marked for identification.)
21   Q.   Okay.  Now, I note that you are a
22 coauthor of this book?
23   A.   Yes, sir.
24   Q.   Okay.  And what was your purpose in

Page 197

1  writing this book?
2    A.   As has been the case for many books
3  that I work on, my purpose was to try to get a
4  book out on an idea of interest to the
5  marketplace in a timely manner.  Normally,
6  when my name appears first as the author of a
7  book, and sometimes even when my name appears
8  second as the author of book, the book was my
9  idea.  I wrote the outline.  I defined the
10 architecture. I edited every page before it
11 was submitted to the publisher, and I was
12 involved in all of the corrections and
13 amendments made to the manuscript as it made
14 its way to typesetting and printing.
15   Q.   And this book falls in that
16 category?
17   A.   It certainly does.
18   Q.   So on Page 79 of the excerpt, and
19 I've got the whole book here.
20   A.   Oh, that's okay.  I've got a copy
21 of it, too.
22   Q.   I'm sure you do.  There's a section
23 on OpenMarket.
24   A.   Yes, sir.

Page 198

1  Q. It -- it -- and you characterize
2  OpenMarket as a "leader in electronic commerce
3  products since early 1994"; don't you?
4  A. Yes, sir.
5  Q. And then you go on to talk about
6  their server, and you state that it was "one
7  of the most comprehensive servers on the
8  market."
9  A. Yes, sir.
10 Q. Were you recommending OpenMarket's
11 technology to the readers of your book?
12 A. I was holding it up as an example
13 of an expensive Cadillac solution for
14 eCommerce.
15 I have to believe that anybody who at the time
16 needed to buy a book on eCommerce probably
17 wouldn't be able to afford OpenMarket.
18 Q. Doesn't your book go on to say that
19 OpenMarket's software solution is regarded as
20 one of the most viable for businesses wanting
21 to establish an online commerce presence?
22 It's on Page 157.
23 A. Yes, sir.
24 Q. And by -- I think you refer to it

Page 199

1  as a Cadillac?
2  A. Yes, sir.
3  Q. Okay. And to me that means two
4  things, quality and expensive.
5  A. That is very true.
6  Q. And you would agree with that
7  characterization?
8  A. Yes, sir, I would.
9  Q. Was part of the reason for the
10 expense the fact that it was a server that was
11 designed to work with all -- all products that
12 were out there?
13 A. Yes, that's correct. Another
14 reason why it was expensive was because it
15 included an extremely broad range of
16 functionality and capability, only some of
17 which would be of interest of somebody wanting
18 to do a small to medium scale eCommerce site.
19 Q. Didn't you refer to their web
20 server as a powerful web server?
21 A. Yes, sir, that is the word that was
22 used.
23       MR. GIANNETTI: Let's take a break
24 and see if we're done. We're probably pretty

Page 200

1  close.
2        VIDEOGRAPHER: Off the record, 3:25
3  p.m.
4        (A brief recess was taken.)
5        (Tittel Exhibit No. 12 was
6  marked for identification.)
7        VIDEOGRAPHER: Back on the record,
8  3:32 p.m.
9  Q. All right. We are back, and I just
10 have one more topic that I would like to cover
11 with you, Mr. Tittel. I've asked the reporter
12 to mark, while we were off the record, the
13 Trevor report as Tittel Exhibit 12. Do you
14 have that before you?
15 A. Yes, sir, I do.
16 Q. Okay. This is the report that's
17 listed in your expert reports as something
18 that you've looked at.
19 A. Yes, sir, it is.
20 Q. I'm going to just direct you to one
21 page, but you're free to look at as much of
22 the report as you like. And the page I would
23 like you to look at is Page 8.
24 A. Okay.

Page 201

1  Q. If you will. And I will apologize
2  because this report is actually more -- it's
3  easier to work with when it's in color, but
4  I've done the best I can to make a good,
5  legible copy so the shading --
6  A. Yeah, it was all shades of blue, if
7  memory serves.
8  Q. Blue and green.
9  A. Yeah, yeah.
10 Q. And the portion I would like you to
11 look at is on this page in the third column
12 from the left. There are, in the lower
13 portion, the lower box, there are two
14 screens --
15 A. Yes, sir.
16 Q. -- and then some information below
17 that that begins with H113; do you see that?
18 A. Yes, sir.
19 Q. And at the very last sentence there
20 it says, "The product identifier is
21 highlighted in green." Do you see that?
22 A. Second column, third column?
23 Q. Second column -- third column.
24 A. Third column. And we're on Page

Page 202

1  10.
2     Q.  Right.
3     A.  Okay.  I'm sure I can find it.
4         MR. BALDAUF:  No, I think
5  we're on Page 8; aren't we?
6     Q.  Page 8.
7     A.  Oh, thank God.  I'm looking on 10,
8  and I don't see anything in green.  I -- I
9  grabbed two pages when I flipped,
10 accidentally, and went to ten.  I apologize.
11    Q.  And this is part of a claim chart
12 that --
13    A.  Yes, sir.
14    Q.  -- Mr. Trevor prepared.  He has two
15 screens there.
16    A.  Yes, sir, I see the highlighted in
17 green --
18    Q.  Flight details and --
19    A.  Yes, yes.
20    Q.  And you see what is intended to be
21 highlighted in green?
22    A.  Yes, I do.
23    Q.  And I will represent to you that
24 there is green highlighting in the lower part

Page 203

1  of this page.
2     A.  Okay.
3     Q.  With the paragraph that has the
4  numbers one and two in brackets.
5     A.  Yes, sir.
6     Q.  Okay.  And my question is a simple
7  one.  Mr. Trevor says, "The product identifier
8  is highlighted in green."  Do you see that?
9     A.  Yes, sir.
10    Q.  And -- and my question is, is there
11 anything in the highlighted data that suggests
12 identification of product to you?
13    A.  Yes, sir, there is.  In the
14 parentheses below each of items one and two in
15 the square brackets there is this phrase that
16 says, item ID: 6, followed by other in square
17 brackets below number one and then an item ID
18 number 5, followed by "list box" in square
19 brackets under item number two.  Those both
20 appear to be product identifiers to me.
21    Q.  Okay.  And by "product
22 identifiers," are you referring to something
23 that specifically identifies a product, like
24 an SKU?

Page 204

1     A.  In context, it looks like this
2  refers two different flight records, but in
3  the context of a travel reservation system, I
4  submit that a reservation record could be
5  considered a product.
6     Q.  So by reservation records, you mean
7  that these are pointers to records in some
8  database?
9     A.  More than likely, yes, sir.
10    Q.  Does it strike you as strange that
11 there's only one number -- one digit for the
12 product I.D., five or six?
13    A.  Well, again, understanding the way
14 that this particular menuing system works,
15 it's a function of the number of items on
16 display on the screen rather than a function
17 of the number of the items in the database.
18 So no, it doesn't surprise me, but it
19 certainly doesn't look like a typical product
20 identifier if you were to look for a -- a link
21 it to a database web site, let's say.
22    Q.  So -- so what you're saying is that
23 the five or six refer to, what, a position of
24 a record on a screen?

Page 205

1     A.  It's a relative reference.  Well,
2  there would be data associated with the -- the
3  items as they appear on the screen, but not
4  all of the data being pointed to is being
5  presented in that record.
6         MR. GIANNETTI:  Okay.  Thank you
7  very much, Mr. Tittel.
8         THE WITNESS:  It's a lot like
9  a hyperlink, actually.
10        MR. GIANNETTI:  That's -- that
11 completes our direct examination.
12        MR. BALDAUF:  Okay.  We have
13 no questions.
14        MR. GIANNETTI:  Thank you very
15 much, Mr. Tittel.
16        THE WITNESS:  A real pleasure, Mr.
17 Giannetti.  Thank you very much.
18        VIDEOGRAPHER:  Off the record, the
19 time is 3:37 p.m.
20        (Signature not waived.)
21        (Whereupon, the above-entitled
22 matter was concluded at 3:37 p.m.)
23              -----
24

52 (Pages 202 to 205)

Page 206

```
 1                -----
 2              CERTIFICATE
 3       I, EDWARD TITTEL, do hereby certify
    that I have read the foregoing transcript of
 4  my deposition consisting of Pages 1 through
    205, and it is a true and correct copy of my
 5  testimony except for the changes, if any, made
    by me on the attached Deposition Correction
 6  Sheet.
 7
 8
 9           EDWARD TITTEL
10
11            (Date)
12
13
14
    Notary Public
15
16
    (Date)
17
18
19
20
21
22
23
24
```

Page 207

```
 1  UNITED STATES DISTRICT COURT)
    EASTER DISTRICT OF TEXAS   )
 2
 3       I, Constance Lee, Professional Court
    Reporter and Notary Public in and for the
 4  Commonwealth of Pennsylvania, do hereby
    certify that the witness was by me first duly
 5  sworn to testify the truth, the whole truth,
    and nothing but the truth; that the foregoing
 6  deposition was taken at the time and place
    stated herein; and that the said deposition
 7  was recorded stenographically by me and then
    reduced to typewriting under my direction, and
 8  constitutes a true record of the testimony
    given by said witness, all to the best of my
 9  skill and ability.
         I further certify that the
10  inspection, reading and signing of said
    deposition were not waived by counsel for the
11  respective parties and by the witness and if
    after 30 days the transcript has not been
12  signed by said witness that the witness
    received notification and has failed to
13  respond and the deposition may then be used as
    though signed.
14
         I further certify that I am not a
15  relative, or employee of either counsel, and
    that I am in no way interested, directly or
16  indirectly, in this action.
17       IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my seal of office this
18  16th day of September, 2009.
19
20
21  -------------------------------
22  Constance Lee
23
24
```