# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| GOLDEN HOUR DATA SYSTEMS, INC. a California corporation, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO.  2:06-cv-381-TJW |
| EMSCHARTS, INC., a Pennsylvania corporation, and SOFTTECH, LLC, an Oregon limited liability company, | Judge T. John Ward |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

<u>**GOLDEN HOUR DATA SYSTEMS, INC.'S OPPOSITION TO EMSCHARTS, INC.'S**</u>

<u>**MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A**</u>

<u>**NEW TRIAL ON THE ISSUES OF INFRINGEMENT AND WILLFULNESS**</u>

# <u>TABLE OF CONTENTS</u>

Page #s

I.     INTRODUCTION ....................................................................................................1

II.    APPLICABLE LEGAL STANDARDS FOR JMOL AND NEW
TRIAL...................................................................................................................2

     A.    Standard For Granting JMOL .....................................................................2

     B.    Standard For Granting Motion For A New Trial ........................................3

III.   THE JURY VERDICT SHOULD BE UPHELD IN ALL
RESPECTS ...........................................................................................................3

     A.    Joint Infringement Has Been Sufficiently Proven .....................................3

          1.    emsCharts Misapplies Federal Circuit Precedent
Regarding Joint Infringement .......................................................4

          2.    Evidence at Trial Demonstrated That emsCharts
Directed Activities of Softtech......................................................4

          3.    Evidence at Trial Showed That emsCharts Could Be
Held Vicariously Liable for the Actions of Softtech ....................7

          4.    Evidence at Trial Demonstrated That emsCharts
Merely Contracted Softtech To Perform The Step of
Collecting Flight Information ........................................................8

          5.    There is Substantial Evidence That emsCharts and
Softtech Import Data from Flight Vector Into
emsCharts.com...............................................................................9

     B.    The Evidence At Trial Demonstrated That emsCharts.Com
Was Capable Of Billing A Patient Appropriately Resulting
In Infringement Of Asserted Claims 10, 12-14 ......................................10

          1.    Under *Intel,* Golden Hour Need Only Show a
Billing Capability to Prove Infringement of Claim
10..................................................................................................10

          2.    Substantial Evidence in the Record Supports the
Jury Finding of a Billing Capability ...........................................11

     C.    Substantial Evidence Supports The Jury's Finding Of
Inducement............................................................................................18

          1.    The Law of Inducement ...............................................................18

# TABLE OF CONTENTS
### (Cont'd.)

**Page #s**

2. Substantial Evidence in the Record Shows that
Defendants' Customers Used the Infringing System
and Carried Out the Infringing Method ....................................................19

3. The Jury Heard Substantial Evidence from Which It
Could Easily Have Concluded That emsCharts
Possessed a Specific Intent to Induce Infringement
by Its Customers ........................................................................................20

D. The Jury Verdict of Willful Infringement is Supported by
Substantial Evidence .................................................................................21

1. emsCharts May Not Seek JMOL on Willfulness
Because It Failed to Move for JMOL Prior to
Submission of the Case to the Jury ...........................................................21

2. The Jury Verdict Is Not Against the Great Weight
of the Evidence ..........................................................................................22

IV. CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

Page #s

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
    344 F.3d 1186 (Fed. Cir. 2003) ........................................................... 24

*Bay Colony, Ltd. v. Trendmaker, Inc.*,
    121 F.3d 998 (5th Cir. 1997) ............................................................. 21

*Bellows v. Amoco Oil Co.*,
    118 F.3d 268 (5th Cir. 1997) ............................................................. 2

*BMC Res. Inc. v. Paymentech, L.P.*,
    498 F.3d 1373 (Fed. Cir. 2007) ....................................................... 4, 7, 8

*Broadcom Corp. v. Qualcomm Inc.*,
    543 F.3d 683 (Fed. Cir. 2008) ........................................................ 18, 21

*Conway v. Chem. Leaman Tank Lines, Inc.*,
    610 F.2d 360 (5th Cir. 1980) ............................................................. 3

*Dawson v. Wal-Mart Stores, Inc.*,
    978 F.2d 205 (5th Cir. 1992) ............................................................. 3

*Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*,
    984 F.2d 410 (Fed. Cir. 1993) ......................................................... 21

*DSU Med. Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir 2006) ....................................................... 18, 20

*Duro-Last, Inc. v. Custom Seal, Inc.*,
    321 F.3d 1098 (Fed. Cir. 2003) ....................................................... 9, 21

*Ellis v. Weasler Eng'g Inc.*,
    258 F.3d 326 (5th Cir. 2001) ............................................................. 3

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
    287 F.3d 1108 (Fed. Cir. 2002) ....................................................... 10

*Harrington v. Harris*,
    118 F.3d 359 (5th Cir. 1997) ............................................................. 2-3

*Hiltgen v. Sumrall*,
    47 F.3d 695 (5th Cir. 1995) ............................................................. 3

*Ins. Co. of N. Am. v. Morris*,
    981 S.W.2d 667 (Tex. 1998) ........................................................... 7

## TABLE OF AUTHORITIES
### (Cont'd.)

Page #s

*Intel v. U.S. Int'l Trade Com'n,*
    946 F.2d 821 (Fed. Cir. 1991)..................................................................... 10, 11

*Love v. Sessions,*
    568 F.2d 357 (5th Cir. 1978) ............................................................................ 3

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
    806 F.2d 1565 (Fed. Cir. 1986)....................................................................... 22

*Palasota v. Haggar Clothing, Co.,*
    499 F.3d 474 (5th Cir. 2007) .......................................................... 3, 5, 12, 24

*QPSX Devs. 5 PTY LTD. v. Nortel Networks, Inc.,*
    No. 2:05-CV-268, 2008 WL 728201 (E.D. Tex. Mar. 18, 2008) ...................... 3

*Scott v. Monsanto Co.,*
    868 F.2d 786 (5th Cir. 1989) ....................................................................... 3, 11

*In re Seagate,*
    497 F.3d 1360 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1445 (2008) ................ 22, 23, 25

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,*
    225 F.3d 1349 (Fed. Cir. 2000)....................................................................... 24

*Southwest Software, Inc. v. Harlequin Inc.,*
    226 F.3d 1280 (Fed. Cir. 2000)..................................................................... 2, 11

*Water Techs. Corp. v. Calco, Ltd.,*
    850 F.2d 660 (Fed. Cir. 1988)......................................................................... 18

## OTHER AUTHORITIES

35 U.S.C. § 271(a) ................................................................................................. 9, 19

35 U.S.C. § 271(b) ................................................................................................... 18

Fed. R. Civ. P. 59(a) ............................................................................................... 2, 3

Plaintiff Golden Hour Data Systems, Inc. ("Golden Hour") hereby submits its Opposition to the Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial on the Issues of Infringement and Willfulness ("the Motion") filed by Defendant emsCharts, Inc. ("emsCharts").

## I.  INTRODUCTION

In delivering its verdict on November 25, 2008, the jury found that emsCharts had infringed all asserted claims of U.S. Patent No. 6,117,073 ("the '073 patent").  Prior to submitting the case to the jury, emsCharts sought judgment as a matter of law ("JMOL") arguing that Golden Hour had not set forth sufficient evidence to meet the "control or direction" standard required to prove joint infringement, and had not set forth sufficient evidence that the accused products are capable of billing a patient appropriately.  emsCharts also moved for JMOL arguing that it had not induced infringement of any of the asserted claims because Golden Hour did not show direct infringement by another party and did not demonstrate that emsCharts had a specific intent to induce the infringement.  emsCharts *did not* move for JMOL on the issue of willfulness. The Court denied all of emsCharts' pre-verdict JMOL motions.

In the instant Motion, emsCharts invites legal error by ignoring binding precedent on various key issues.  For example, emsCharts belatedly moves for JMOL on willfulness, even though its failure to do so prior to submitting the case to the jury precludes a post-verdict JMOL on that issue.  emsCharts also asks this Court to award JMOL of non-infringement because Golden Hour had failed to prove that the emsCharts.com system had actually ever produced a bill.  In doing so, however, emsCharts asks this Court to ignore Federal Circuit precedent that a claim element requiring only a capability to perform a function does not require that the function actually be performed in the accused device to support a finding of infringement.  More generally, emsCharts improperly relies on conflicting evidence, wrongly assumes that its preferred witness testimony must have been credible in the eyes of the jury, and ignores evidence in the record contrary to its position.  Further, emsCharts never presented the testimony of an independent expert witness rebutting that testimony of Golden Hour's expert Dr. John Ogle

regarding infringement of the asserted claims.  In sum, a reasonable jury on this record could have easily decided that Golden Hour proved by a preponderance of the evidence that emsCharts infringes all the asserted claims.  There is thus no legally cognizable basis to overturn its verdict, and its Motion requesting JMOL should be denied.

emsCharts' request for a new trial on various grounds also fails for the same reasons.  emsCharts' Motion ignores the correct legal standard, which for the grant of a new trial requires the jury's verdict to be against the "great weight," not merely the weight, of the evidence.  emsCharts' Motion fails to satisfy this high standard, nor could it on this record.  The jury's verdict was both reasonable and consistent with the evidence.  Golden Hour proved infringement and willfulness at trial, and the jury properly decided in its favor and against emsCharts.  A new trial on infringement or willfulness is therefore not warranted.

## II.  APPLICABLE LEGAL STANDARDS FOR JMOL AND NEW TRIAL

emsCharts seeks judgment as a matter of law on the issues of infringement and willfulness.  In the alternative, a new trial is sought pursuant to Federal Rule of Civil Procedure 59(a).  emsCharts' Motion fails to meet the high legal standards for the grant of either form of relief.

### A.    Standard For Granting JMOL

"A motion for judgment as a matter of law should be granted by the trial court if, after considering all the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997); s*ee also Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1289 (Fed. Cir. 2000) ("We determine whether, 'viewing the evidence in the light most favorable to the non-moving party,' and giving the non-movant 'the benefit of all reasonable inferences,' there is sufficient evidence of record to support a jury verdict in favor of the non-movant.") (citations omitted).  In making its determination, the Court is "not free to reweigh the evidence or to re-evaluate credibility of witnesses." *Harrington*

*v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (quoting *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir.1995)).  Rather, the Court is required to "disregard all evidence favorable to the moving party that the jury is not required to believe." *Palasota v. Haggar Clothing, Co.*, 499 F.3d 474, 480 (5th Cir. 2007) (citing *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001)); *QPSX Devs. 5 PTY LTD. v. Nortel Networks, Inc*., No. 2:05-CV-268, 2008 WL 728201, at *1 (E.D. Tex. Mar. 18, 2008).

**B.      Standard For Granting Motion For A New Trial**

Federal Rule of Civil Procedure 59(a) provides that a Judge may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." However, the mere existence of a conflict in evidence is insufficient grounds for a new trial. *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).  Rather, to justify a new trial, the jury's verdict must be against great, not merely greater, weight of evidence.  *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989).  Accordingly, where "a new trial is decreed on the ground that the verdict is against the weight of the evidence," Fifth Circuit precedent "mandate[s] the greatest degree of scrutiny" on appeal "to assure that the judge does not simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury." *Conway v. Chem. Leaman Tank Lines, Inc*. 610 F.2d 360,362-363 (5th Cir. 1980); *Love v. Sessions*, 568 F.2d 357 (5th Cir. 1978).

### III.   THE JURY VERDICT SHOULD BE UPHELD IN ALL RESPECTS

**A.      Joint Infringement Has Been Sufficiently Proven**

emsCharts challenges the jury verdict that it jointly infringed system Claims 1, 6-8 and method Claims 15-22 of the '073 patent.  It first argues that Golden Hour failed to provide sufficient evidence to meet the "control or direction" standard required for a finding of joint infringement.  emsCharts also argues for the first time (including trial and pre-verdict JMOL) that there was insufficient evidence that either emsCharts or Softtech performs the "integrating" emsCharts alleges is required to infringe Claims 1 and 15.

As noted above, in ruling on a JMOL motion, the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Palasota*, 499 F.3d at 480. Because emsCharts relies solely on evidence that was either contradicted by other witnesses or impeached on cross-examination, and because there is additional substantial evidence ignored by emsCharts which supports the verdict, its request for JMOL of no joint infringement should be denied.

1.      **emsCharts Misapplies Federal Circuit Precedent Regarding Joint Infringement**

emsCharts correctly cites *BMC Res. Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007) and *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir 2008) as the leading Federal Circuit cases on the joint infringement of method claims.  However, in applying the standard for joint infringement set forth in these cases, emsCharts ignores the "direction" aspect of the "control *or* direction" standard.  emsCharts also ignores the Federal Circuit's express statement in *BMC Resources* that "[a] party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity."  498 F.3d at 1381.  Moreover, emsCharts also ignores the fact that these cases addressed only method claims, while asserted Claims 1 and 6-8 (found to have been jointly infringed by emsCharts and Softtech) are system claims.  emsCharts never explains to the Court why the rationale of these Federal Circuit cases dealing with method claims should be applied in the context of system or apparatus claims.

2.      **Evidence at Trial Demonstrated That emsCharts Directed Activities of Softtech**

emsCharts argues that there was insufficient evidence for a reasonable juror to have found that the control or direction standard was met.  emsCharts asserts that the evidence was uncontroverted that emsCharts and Softtech were independent companies.  Even if this were the case, there is nothing in *BMC* or *Muniauction* stating that separate companies cannot be held liable for joint infringement.  Indeed, if this were the case, there would be no such thing as joint

infringement at all.  Thus, mere evidence that emsCharts and Softtech are separate companies cannot be sufficient to set aside the jury's verdict.

The remaining evidence cited by emsCharts in support of setting aside the verdict consists entirely of evidence that the jury was entitled not to believe.  For example, emsCharts misstates Rick Mosteller's testimony by characterizing it as testimony that neither emsCharts nor Softtech had control or direction over the other.  None of the questions asked of Mr. Mosteller ever touched on whether emsCharts directed the actions of Softtech.  Instead, Mr. Mosteller was asked only about control.  Moreover, Mr. Mosteller is an employee of Golden Hour, so his testimony about the relationship between emsCharts and Softtech was based on his limited understanding of the situation.  In view of the Protective Order, he had little information about the details of the relationship between emsCharts and Softtech because much of the evidence was produced under an "attorneys' eyes only" confidentiality designation.  The jury properly found this cross-examination unpersuasive.

emsCharts also contends that the testimony of Mr. Cromer (of Softtech) and Mr. Goutmann (of emsCharts) demonstrates that emsCharts did not control or direct the actions of Softtech.  The jury, however, was not required to believe any of this testimony because it was obviously biased and contradicted by other evidence in the record.  For example, emsCharts relies on Mr. Cromer's testimony that emsCharts never directly made a sale of Flight Vector on behalf of Softtech.  Trial Tr. [11/24/08 a.m.] at 79:23-25.  Yet, the evidence in the record shows that emsCharts was paid directly by a customer for the Flight Vector software.  PX 32.  The evidence of record further included a spreadsheet of "Flight Vector closed sales" generated by Greg Howard of emsCharts.  PX 47.  Given that the documents in evidence conflicted with Mr. Cromer's testimony, it is entirely reasonable for the jury simply to have found his testimony not credible on this issue.  Because the testimony of Mr. Cromer and Mr. Goutmann cited by emsCharts was contrary to other evidence in the trial record, this testimony is properly disregarded in this JMOL analysis.  *Palasota*, 499 F.3d at 480.

In fact, there was substantial evidence presented at trial that emsCharts both controlled and directed the actions of Softtech.  As but one example, the jury heard testimony and saw evidence related to the University of Michigan Request for Proposal ("RFP") in response to which emsCharts and Softtech jointly submitted a bid.  This testimony and evidence revealed that when emsCharts learned of the RFP it assumed that Flight Vector would be part of the bid.  PX 83.  Additional evidence demonstrated that emsCharts did not first ask Mr. Cromer if he was interested in participating, but instead merely assumed it and sent him the RFP and directed him to fill it out.  PX 84.  Other evidence showed that emsCharts directed Mr. Cromer to complete specific portions of the RFP, and also directed him to provide pricing.  PX 85.  Still more evidence revealed that when Softtech asked how the Defendants should present the joint software solution, emsCharts directed it to present its software in conjunction with emsCharts.  PX 86.  Finally, a single bid was submitted jointly by emsCharts and Softtech in response to the Michigan RFP.  PX 90.  Trial testimony also revealed that emsCharts paid for some of the sales trip expenses of Allen Zon, Softtech's sales agent.  Trial Tr. [11/24/08 a.m.] at 139:16-23.  Based on this evidence alone, the jury could have reasonably concluded that emsCharts directed the actions of Softtech.

The record is replete with additional evidence which the jury could have relied upon to support its finding of joint infringement.  For example, evidence in the record showed that emsCharts received payment from a customer for the sale of Flight Vector. PX 31.  Other evidence showed that John Massie, emsCharts' president, directed Scot Cromer and Allen Zon of Softtech to "aggressive [sic] follow up and stay focused on closing the CAD lead sales opportunities from the AMTC show" including "prepare a list documenting the prospect name, contact information, phone number, address, and e-mail information."  PX 37.  Evidence in the record also included an e-mail message drafted by Greg Howard of emsCharts which touted Flight Vector and notified its recipients that "we are holding one-on-one sessions to provide you with an in-depth demonstration of Flight Vector."  PX 77.  Still more evidence showed that emsCharts generated price quotes for Flight Vector.  PX 41.

### 3.    Evidence at Trial Showed That emsCharts Could Be Held Vicariously Liable for the Actions of Softtech

emsCharts complains that there is insufficient evidence of the "type of 'control or direction' necessary for there to be joint infringement." Motion at 5. To the contrary, the evidence at trial revealed precisely the type of control or direction predicate for a finding of joint infringement. *BMC Resources* held that the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method. 498 F.3d at 1379. In this case, the jury heard substantial evidence that emsCharts could be held liable (and in fact was held liable in view of its agreement to indemnify Softtech) for the infringing acts committed by Softtech in this case.

For example, the jury heard testimony that a cross-claim was filed in this case by Softtech against emsCharts, a crucial fact entirely avoided and unmentioned in emsCharts' Motion. Trial Tr. [11/24/08 a.m.] at 83:2-6. This cross-claim included allegations that emsCharts breached the Distributor Agreement by intentionally infringing Golden Hour's patent. *Id.* at 83:15-84:7. The jury also heard testimony that the cross-claim filed by Softtech accused emsCharts of breach of fiduciary duty because Softtech believed that emsCharts owed it a duty of loyalty and candor. *Id.* at 85:2-88:16. Mr. Cromer testified that at least some of Softtech's claims against emsCharts were brought under Texas state law. *Id.* at 84:13-23. Yet, under Texas law, the fiduciary duty that Softtech claimed was breached by emsCharts does not arise out of a mere arms-length transaction. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Additional evidence revealed that emsCharts settled Softtech's cross-claim by indemnifying Softtech. Trial Tr. [11/24/08 a.m.] at 90:18-21. During his cross-examination, Mr. Cromer testified that he believed that the allegations in his cross-claim were true. He further testified that he himself believed that emsCharts should be held vicariously liable for Softtech's infringement in this lawsuit:

- 7 -

> **Q.** So you believed that emsCharts should be liable if Softtech
> was found to have infringed Golden Hour's patent, correct?
>
> **A.** Yes.

*Id*. at 90:7-10.  Given that Softtech itself admitted that its relationship with emsCharts was more than simply an arms-length transaction, and that emsCharts settled the cross-claim by fully indemnifying Softtech, it was entirely reasonable for the jury to conclude that emsCharts should be held vicariously liable for the actions of Softtech.  Because *BMC Resources* contemplates precisely these types of vicarious liability scenarios as giving rise to claims of joint infringement, the jury reasonably concluded that the control or direction standard had been met and that joint infringement should be found.

### 4. Evidence at Trial Demonstrated That emsCharts Merely Contracted Softtech To Perform The Step of Collecting Flight Information

*BMC Resources* also stated that "[a] party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity."  498 F.3d at 1381.  Evidence presented at trial also supported a finding that the Distributor Agreement (PX 25) between emsCharts and Softtech was simply an attempt by emsCharts to contract out the step of collecting flight information to Softtech.

For example, the Distributor Agreement imposed obligations on Softtech to allow emsCharts to sell its software to emsCharts prospective customers.  PX 25; Trial Tr. [11/24/08 a.m.] at 92-100.  The agreement also permitted emsCharts to "package [Flight Vector] with other software [emsCharts] sells to customers."  PX 25 at 3.  Moreover, Mr. Cromer testified that under the agreement, emsCharts was able to, and in fact did, sell Flight Vector together with emsCharts to customers as a package in which Flight Vector performed the dispatch function and emsCharts.com performed the charting and billing functions.  Trial Tr. [11/24/08 a.m.] at 100-101.  Moreover, testimony and evidence also revealed that under the Distributor Agreement, the two Defendants considered themselves to have entered into a "strategic partnership" with each other to deliver a "complete pre-hospital data solution."  *Id*. at 106-110.  The jury also heard

- 8 -

testimony that after the Defendants claimed to have terminated the agreement, they continued to work together in a manner entirely consistent with the way they worked together before termination of the agreement.  *Id*. at 126-129; PX 83-PX 90.  In view of this evidence, the jury could have quite easily concluded that the Distributor Agreement was nothing more than an attempt by emsCharts to contract out steps of the patented process to Softtech.

>    **5.**    **There is Substantial Evidence That emsCharts and Softtech Import Data from Flight Vector Into emsCharts.com**

emsCharts also argues that in order for Claims 1 and 15 to be infringed, either Softtech or emsCharts must import dispatch information from Flight Vector to emsCharts.com.  emsCharts contends that there is no evidence that either emsCharts or Softtech performs the import step themselves.

As an initial matter, this ground for arguing no joint infringement was never raised at trial, nor was it raised during any pre-verdict JMOL motion.  Accordingly, any post-verdict request for JMOL based on this argument has been waived.  *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1108 (Fed. Cir. 2003).  To the extent that this argument is considered, it is specious.  The jury heard testimony from Golden Hour's expert Dr. John Ogle.  With respect to system Claim 1, Dr. Ogle testified that emsCharts.com and Softtech form an integrated system in which data is imported from one module to another.  Trial Tr. [11/20/08 p.m.] at 56:25-59:7.  Infringement of a system claim such as Claim 1 occurs when a party makes, uses, sells, or offers for sale a system having each limitation in the claim.  35 U.S.C. § 271(a).  Even if emsCharts were correct that there is no evidence that emsCharts or Softtech perform any importing themselves, there is substantial evidence in the record that emsCharts and Softtech directly infringed Claim 1 by making and selling an "integrated data management system comprising … a second module [emsCharts.com] capable of receiving information from the first module [Flight Vector]."  See, e.g., Trial Tr. [11/20/08 p.m.] at 56:25-59:7; PX 30.

Moreover, the evidence in the record directly contradicts emsCharts' assertion regarding the absence of evidence that emsCharts or Softtech performs the import step themselves.  See PX

49 ("Flight Vector will automatically send the data to emsCharts"); see also PX 9 (E-mail RE: emsCharts Integration). With respect to method Claim 15, in addition to PX 49, the jury also heard additional testimony from Dr. Ogle describing how Softtech and emsCharts perform the method recited in Claim 15. Trial Tr. [11/20/08 p.m.] at 76:15-80:22; PX 43; PX 99. In sum, there was substantial evidence in the record for the jury to find joint infringement by emsCharts and Softtech, so its verdict on that issue should not be disturbed.

**B.**     **The Evidence At Trial Demonstrated That emsCharts.Com Was Capable Of Billing A Patient Appropriately Resulting In Infringement Of Asserted Claims 10, 12-14**

emsCharts also argues that there is insufficient evidence in the record that emsCharts.com met the limitation of "billing the patient appropriately for the patient incident" as recited in Claim 10. emsCharts' arguments primarily rest on the legally flawed premise that Golden Hour was required to prove that the accused software had actually been used to generate patient bills, a requirement plainly contrary to Federal Circuit precedent and the claim language itself.

**1.**     **Under *Intel*, Golden Hour Need Only Show a Billing Capability to Prove Infringement of Claim 10**

Where a claim requires only the ability to perform a function, selling a device with that capability infringes the claim even if the capability is never used by customers. *Intel v. U.S. Int'l Trade Com'n*, 946 F.2d 821, 832-33 (Fed. Cir. 1991); *see also Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117-1119 (Fed. Cir. 2002). *Intel* involved a claim coving a memory chip in an integrated circuit having "programmable selection means for selecting [an] alternate addressing mode." *Intel*, 946 F.2d at 831. The accused infringer argued that although the accused device was capable of selecting a page mode which would read on "alternate addressing mode", the devices were never sold to operate in the page mode. The accused infringer also argued that no customer was ever told how to convert the chip to operate in the page mode nor were they told that such conversion was possible. *Id.* at 832. The Federal Circuit rejected these arguments holding that "[b]ecause the language of claim 1 refers to

'programmable selection means' ... the accused device, to be infringing, need only be capable of operating in the page mode." *Id.*

Like the claim at issue in *Intel*, the limitation at issue in this case requires only a capability in the accused system:  "a second module <u>capable of</u> receiving data from the first module and billing the patient appropriately for the patient incident" (emphasis added).  Just as the infringers in *Intel* argued that the customers did not use the device in the infringing mode, emsCharts here argues its customers did not use its software to bill patients appropriately. emsCharts' arguments in this case are no different than those rejected in *Intel* and should be rejected for the same reasons.

> **2.**      **<u>Substantial Evidence in the Record Supports the Jury Finding of a Billing Capability</u>**

emsCharts also argues that infringement of Claim 10 has not been proven because "the jury was provided with substantial evidence to show that emsCharts' software is not capable of generating an appropriate … bill."  Motion at 9.  Even if this statement were true (which it is not), it turns emsCharts' burden on this Motion on its head.  In order to prevail on this issue, emsCharts must demonstrate that the jury's finding of infringement was against the great weight of evidence, *Scott,* 868 F.2d 7at 789, or that there is not sufficient evidence of record to support a jury verdict in favor Golden Hour.  *Southwest Software, Inc,* 226 F.3d at 1290.  Merely showing that the jury was provided with substantial evidence that emsCharts.com is not capable of billing does not overcome emsCharts' heavy burden on this motion.  In any event, there was more than substantial evidence in the record that emsCharts.com includes the limitation of "a second module capable of receiving information from the first module and billing the patient appropriately for the patient incident" as recited in Claim 10.

### a.   emsCharts Reliance on Mr. Goutmann's Testimony is Misplaced Because His Testimony Is Contradicted by Other Evidence in the Record

emsCharts argues that Mr. Goutmann "consistently testified that the emsCharts software program does not accurately bill a patient,"[1] citing trial testimony objected to by Golden Hour where the Court sustained the objection.  See emsCharts Mot. at 9-10 (citing Trial Tr. [11/24/08 p.m.] at 17:7-9, objection sustained at 17:10-19:13).  Mr. Goutmann's testimony cannot however be relied upon by emsCharts because it is contradicted by other evidence in the record, and the jury was not required to believe Mr. Goutmann.  *Palasota*, 499 F.3d at 480.

For example, although emsCharts points to Mr. Goutmann's assertions that the billing capability of emsCharts.com was limited and not accurate, evidence in the record revealed that emsCharts.com included sophisticated billing logic.  *See, e.g.*, PX 6 (showing detailed flow diagrams of billing logic).  emsCharts also points to Mr. Goutmann's testimony that emsCharts could not take into account insurance rates, and account contract requirements of an insurance carrier.  Yet, even though the claims do not require those details, the emsCharts.com User Manual (PX 43) flatly contradicts this testimony:

**14.3. Fee Schedules**

The Fee Schedules page (Figure 147) is where you enter billing information that can be used for multiple insurance companies[254,255].

---

[1] emsCharts also attempts to revisit claim construction issues resolved long ago, arguing that it cannot infringe because the '073 patent specification indicates that an "appropriate" bill should be submitted to an appropriate party in an appropriate format.  emsCharts Mot. at 9 n. 10. The Court construed the term "appropriate" to mean "accurate" within the context of the asserted claims.  emsCharts did not oppose this claim construction during the Markman hearing, and it is far too late to make any such challenge now by attempting to import embodiments from the specification into the claims.

PX 43 at 118.  emsCharts also points to Mr. Goutmann's testimony that emsCharts.com cannot apply any discounted rates, yet the emsCharts.com User Manual shows the ability to modify charges on the bill from base rates:

Charges which have been manually added/edited will appear with an asterisk (*) to the left of the charge name to indicate the change. An audit of all changes for a bill can be viewed by clicking on the **View Charges Audit** button (Figure 144).

PX 43 at 114.  Moreover, emsCharts' Administration Manual shows the ability to provide both surcharges and discounted rates against default rates on the bill:

3. **Default Charge:** The default charge for each procedure.
4. **Disable Billing:** If this option is set to Yes, a charge will not be created for that procedure, even if it was performed on the chart.
5. **Surcharge:** The amount that will be added to the Default Charge to determine the final charge. This column can also be used to give a discount by entering a negative number. This column is only displayed if Use surcharges is set to Yes on the Billing Setup code table.

PX 45 at 141.  emsCharts also points to Mr. Goutmann's testimony that emsCharts.com cannot include charges for supplies.  emsCharts' User Manual also contradicts this testimony:

### 13.1.3.     Supplies

The Supplies page (Figure 131) allows the user to define supplies used by the service.



**Figure 131**

PX 43 at 104.  emsCharts also points to Mr. Goutmann's testimony that emsCharts.com does not include any information that a patient would need to know concerning where to send  payment for the charges incurred during a medical transport – testimony also contradicted by its User Manual:



PX 43 at 112, Figure 141.  STAT MedEvac is one of emsCharts' larger customers, and its address is included in the billing information shown in Figure 141.  Given that STAT MedEvac is one of emsCharts customers, it would be entirely reasonable for the jury to conclude that this address is a remittance address.

Yet another example of Mr. Goutmann's testimony being contradicted by the evidence is his statement emsCharts.com does not include information concerning medical insurance codes.  Yet, even though the claims do not require this level of specificity, the Administration Manual shows that emsCharts may be configured to include Medicare codes on the bills:

PX 44 at 142.

In sum, the testimony from Mr. Goutmann cited by emsCharts consists entirely of testimony that is contradicted or called into question by other evidence in the record.  The jury was not required to believe Mr. Goutmann, and its verdict in Golden Hour's favor indicates that it indeed chose to believe the unbiased documents over his self-serving testimony.

### b. Other Evidence in the Record Supports the Jury Verdict

In addition to improperly relying on contested testimony from Mr. Goutmann, emsCharts fails to address the substantial evidence that supports the jury's finding of infringement.  For example, the jury heard testimony from emsCharts' President, John Massie that emsCharts has a "billing module."  Trial Tr. [11/20/08 p.m.] at 174:23-175:1.  The jury also heard extensive testimony from Golden Hour's expert witness, Dr. John Ogle, who reviewed all the relevant documents and the emsCharts.com software and explained how emsCharts.com met the billing limitations of asserted Claims 1 and 10:

> **Q.** The second paragraph discusses billing.  Could you tell us what you concluded regarding the billing capability?
>
> **A.** Yes.  After a thorough examination of the user manual and the software from emsCharts, I found that they do what they claim. They have a one-stop solution from dispatch through billing. There is a -- there are multiple files, over 30 -- 32 on my last count -- that deal with the billing export module.  And there's over 10 pages in the user's manual explaining how it generates a bill.  And I'll show some excerpts from that.

Trial Tr. [11/20/08 p.m.] at 56:12-24; *see also Id.* at 59:7-61:25; 70:24-71:14; PX 144. emsCharts failed to present any expert testimony which rebutted or contradicted Dr. Ogle's findings.

Other documents in the record support the jury's verdict of infringement of Claim 10. For example, as indicated by Dr. Ogle during his testimony, the emsCharts User Manual, PX 43, includes an entire chapter describing the use of its Billing Module.  PX 43 at 110-118.  These pages describe a billing system which accurately receives user input charges, associates Medicare codes with those charges, and accurately totals the charges for printing a bill.  Figure 141 from page 112 of the emsCharts.com User Manual is reproduced below:

emsCharts.com
**User Manual**



**Figure 141**

PX 43 at 112.

Moreover, the trial record also included PX 45, the Administration Manual for emsCharts.com, which also provided considerable detail about the billing function of emsCharts.com.  For example, the Administration Manual showed that emsCharts.com allows its users to define security roles which permit, *inter alia*, creation, modification, and queue management of billing form letters, exporting bills, modifying bill payors, modifying billing charges, modifying billing details, modifying fee schedules, preparing invoices, and reviewing invoices, all of which are functions common to accurate billing.



PX 45 at 86.  The Administration Manual also provides a detailed section on configuring the Billing Module in emsCharts.com, additional evidence that the jury could have reasonably relied upon in arriving at its verdict of infringement.

**7.4.45     Billing Charges**

The Billing Charges page (Figure 148) is where you enter charges for each of the billable procedures.  It is part of the Billing – Basic module, and will only appear if a billing generation method of automatic or manual has been selected.

Figure 148

PX 45 at 141.

Finally, emsCharts' repeated statements that any bills generated by emsCharts.com would not be accurate are belied by its own representations to potential customers.  For example, in responding to an RFP issued by the University of Michigan, emsCharts stated that its billing

module "[s]ummarizes billing information for fast and <u>accurate</u> processing…." PX 90 at 4 (emphasis added).

The evidence in the record fully supports the jury's verdict that Claim 10 and its dependent Claims 12-14 are infringed by emsCharts.com.  All of the evidence relied upon by emsCharts in seeking JMOL of no infringement based on this issue is evidence that the jury was not required to believe and in fact did not believe.  Accordingly, the Court should deny emsCharts' request for JMOL of no infringement of Claims 10 and 12-14.

**C.**   **Substantial Evidence Supports The Jury's Finding Of Inducement**

emsCharts attacks the jury verdict of inducement by arguing that the record lacked evidence of a third party direct infringer, and that emsCharts lacked the specific intent necessary to induce the infringement.  emsCharts again overlooks the various types of infringement that may be found, and once more ignores the evidence in the record that contradicts its position.

**1.**   **The Law of Inducement**

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b) (2008).  In order to prove a claim of induced infringement, Federal Circuit precedent requires that the patentee prove that there has been a direct infringement, and that the accused inducer possessed a specific intent to encourage the direct infringement.  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir 2006) (en banc).

Although a specific intent must be proven, direct evidence is not required; rather, circumstantial evidence may suffice.  *Id*.  "The requisite intent to induce infringement may be inferred from all of the circumstances."  *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988).  Moreover, the Federal Circuit has very recently clarified that opinion of counsel evidence may be considered in connection with the intent aspect of inducement.  *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008).  In holding that opinion-of-counsel evidence is relevant to an inducement inquiry, the Federal Circuit explained:

> Because opinion-of-counsel evidence, along with other factors, may reflect whether the accused infringer "knew or should have known" that its actions would cause another to directly infringe, we hold that such evidence remains relevant to the second prong of the intent analysis. Moreover, we … further hold that the failure to procure such an opinion may be probative of intent in this context. It would be manifestly unfair to allow opinion-of-counsel evidence to serve an exculpatory function, … and yet not permit patentees to identify failures to procure such advice as circumstantial evidence of intent to infringe.

*Id.*

## 2.  <mark>**Substantial Evidence in the Record Shows that Defendants' Customers Used the Infringing System and Carried Out the Infringing Method**</mark>

<mark>The trial record includes substantial evidence which shows that the customers of emsCharts and Softtech used the infringing systems and carried out the infringing methods.</mark>  For example, there were spreadsheets in the record providing detailed evidence of customer use of the emsCharts.com and Flight Vector systems.  *See, e.g.,* PX 93, PX94, PX 95, PX 96A-96G, PX 135.  Moreover, Mr. Goutmann himself testified that emsCharts' customers now generate more than 8000 charts each day using the infringing emsCharts.com system.  Trial Tr. [11/24/08 p.m.] at 77:16-21.  As noted above, use of the infringing system by customers constitutes acts of infringement under the "use" prong of section 271(a).  35 U.S.C. § 271(a) ("whoever without authority makes, <u>uses</u>, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent").  Based on this evidence and testimony, the jury properly concluded that direct infringement of all asserted claims by emsCharts' customers had been proven under the "use" prong of section 271(a).

3.     **The Jury Heard Substantial Evidence from Which It Could Easily Have
       Concluded That emsCharts Possessed a Specific Intent to Induce
       Infringement by Its Customers**

emsCharts argues that because Mr. Goutmann testified that he believed that claims of the '073 patent were invalid or not infringed, there is no evidence in the record that emsCharts possessed a specific intent to induce infringement.  emsCharts argues that it did not possess a specific intent to induce infringement because emsCharts believed that the claims of the '073 patent were not infringed or were invalid, pointing to the testimony of Mr. Goutmann at trial.

According to Mr. Goutmann's testimony, he analyzed the patent and concluded that all claims were invalid over the AeroMed software system.  He did not testify that he formed a belief at that time that emsCharts did not infringe the '073 patent claims.  Trial Tr. [11/24/08 a.m.] at 176:1-179:8.  Moreover, the analysis Mr. Goutmann claimed to have performed is not supported by a shred of documentary evidence.  No notes from this supposed analysis were produced, and no letters of correspondence with the lawyers that Mr. Goutmann claims to have met with were placed in evidence or on a privilege log.  No claim charts were produced, not even an internal company memo referencing this analysis.

emsCharts again fails to appreciate that juries make credibility determinations. "Fundamental principles of law hold that it is up to the jury to make determinations of witness credibility, to decide the existence of any factual inferences, and to determine the weight to be attributed to any direct or indirect evidence."  *DSU Med.*, 471 F.3d at 1306.  The testimony relied upon by emsCharts to contest its lack of specific intent is not substantiated by a single document in the record.  Given this lack of substantiation, it is no surprise that the jury concluded that Mr. Goutmann was not a credible witness.

Moreover, the jury heard substantial additional evidence that emsCharts did in fact possess the requisite intent to induce infringement by its customers.  For example, trial testimony revealed that Softtech sued emsCharts for fraud and other torts based on its reckless conduct with respect to the patent, and that emsCharts settled the cross-claim by indemnifying Softtech.  Trial

Tr. [11/24/08 a.m.] at 83:2-91:25.  Additional evidence at trial revealed that when confronted, Mr. Goutmann admitted to Scot Cromer that he had "blown off the patent."  Trial Tr. [11/21/08 p.m.] at 35:4-36:2.  The jury also heard testimony that emsCharts did not obtain an opinion of counsel.  As noted above, opinion of counsel evidence is relevant to the inducement theory. *Broadcom Inc.*, 543 F.3d at 699.  The jury, upon learning that no opinion of counsel was ever received or produced by emsCharts, was entitled to reasonably infer that the lack of any such opinion in the face of a notification letter sent by Golden Hour was indicative of culpable intent on the part of emsCharts.

Because there is substantial evidence in the record that emsCharts' customers directly infringe the claims of the '073 patent by using the infringing system, and because there is substantial evidence in the record that emsCharts possessed a specific intent to induce its customer's infringement, both of the necessary prongs of the inducement analysis are supported by substantial evidence.  Accordingly, there is legally sufficient evidence in the record to sustain the jury's verdict of inducement by emsCharts.

**D.     The Jury Verdict of Willful Infringement is Supported by Substantial Evidence**

emsCharts also seeks judgment as a matter of law or a new trial on the issue of willfulness.  Both of emsCharts requests lack merit and should be denied.

**1.     emsCharts May Not Seek JMOL on Willfulness Because It Failed to Move for JMOL Prior to Submission of the Case to the Jury**

emsCharts' failed to challenge the sufficiency of the evidence of willfulness in a pre-verdict JMOL motion.  See Trial Tr. [11/24/08 a.m.] at 2-7; Trial Tr. [11/25/08 a.m.] at 23.  Under both Fifth and Federal Circuit law, a party may not base a "renewed" or post-trial JMOL motion on any grounds not raised in a pre-verdict JMOL (i.e., directed verdict) motion made during trial.  *See Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1003 (5th Cir. 1997); *Duro-Last,* 321 F.3d at 1106.  In fact, in a case presenting an identical situation, *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 412-13 (Fed. Cir. 1993), the Federal Circuit applying Fifth Circuit law held that the failure of a defendant to move for a pre-verdict JMOL

relating to willful infringement precluded a post-verdict JMOL on that issue.  The Federal Circuit has further held that pre-verdict JMOL motions on issues of infringement are not sufficient to preserve a JMOL on willfulness.  *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579-80 (Fed. Cir. 1986).  Because emsCharts failed to move for JMOL on the issue of willfulness at trial, the Court should not consider its motion at this juncture, as this issue has been waived.

### 2.    The Jury Verdict Is Not Against the Great Weight of the Evidence

To the extent that emsCharts seeks a new trial on willfulness, this request should also be denied because the jury verdict is not against the great weight of the evidence.  emsCharts again fails to appreciate the heavy burden it must meet on this Motion and the analytical framework which requires that the Court disregard all evidence in emsCharts' favor that the jury was not required to believe.  emsCharts improperly draws inferences in its favor, and ignores the considerable evidence in the record that it acted with the objective recklessness predicate to a finding of willfulness.

### a.    The Evidence at Trial Shows That emsCharts Acted with Objective Recklessness with Respect to the '073 Patent

To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.  *In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1445 (2008).  "The state of mind of the accused infringer is not relevant this objective inquiry."[2]  *Id.*

At trial, evidence was presented that emsCharts received a notice letter in October 2003 from Golden Hour which informed emsCharts of its infringement.  PX 5.  Mr. Goutmann testified that he did not obtain a written opinion of counsel regarding the patent.  Trial Tr. [11/24/08 a.m.] at 176:16-179:11.  He further testified that he spent "about an hour" with a

---

[2] emsCharts repeatedly cites its "good faith belief" that the patent was invalid or infringed as evidence that its infringement was not willful.  The actual or subjective state of mind of the infringer is not relevant under *Seagate* so any evidence of a "good faith belief" is irrelevant to the willfulness inquiry.

patent attorney going through "patent law for dummies" and from that hour "concluded" that the patent was invalid.  *Id.*  However, as noted above, Mr. Goutmann's state of mind is not relevant to this inquiry, *In re Seagate*, 497 F.3d at 1371, and in any event, emsCharts adduced no tangible evidence to support this testimony.  Without any tangible evidence to support Mr. Goutmann's testimony, the jury quite understandably discounted it as self-serving and lacking in credibility.

Furthermore, this is not what Mr. Goutmann told Mr. Cromer he had done with respect to the patent.  After Mr. Cromer was served with the Complaint in this lawsuit and learned about the patent for the first time, he confronted his new business partner Mr. Goutmann about it. Instead of telling Mr. Cromer that he had analyzed the patent with the aid of an attorney, Mr. Goutmann told Mr. Cromer simply that he "blew it off."  Trial Tr. [11/21/08 p.m.] at 41:9.

Tellingly, even if all his testimony on this matter is credited (which it should not be at this juncture), Mr. Goutmann never testified that he believed emsCharts.com did not infringe the '073 patent.  He apparently conceded even back in 2003 that there was an infringement problem, but still never obtained a formal written opinion regarding the patent's validity.  Although Mr. Goutmann claimed to have believed that the patent was invalid, there is no evidence in the record that any legally sufficient attempt was made to ascertain the scope of the '073 patent.  For example, the process by which Mr. Goutmann testified that he analyzed the claims, even if taken as true, was wholly inadequate:

> So I acquired a copy of the patent.  I read through it, and I waded
> through all the terminology, eventually got to the claims of the
> patent at the end.  And I think there was 26 or 27 claims of the
> patent.  I sat down and I went through claim by claim and asked
> myself, you know, was this new at the time they filed that patent
> and got that patent.

Trial Tr. [11/24/08 a.m.] at 177-178.

It is axiomatic that in order to properly evaluate the validity of a patent claim, a two step process must take place: first, the claims must be construed, and only then can the prior art be compared to the properly construed claims. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.,* 344 F.3d 1186, 1195 n.4 (Fed. Cir. 2003); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000) ("first step in any invalidity analysis is claim construction"). Mr. Goutmann did not testify that in analyzing the '073 patent he ever performed the first required step of construing the claims. Nor could he properly construe the claims, as he is not a patent lawyer. Moreover, his only attempt to compare any prior art to the claims was based on his recollections about having previously used the AeroMed Software. Trial Tr. [11/24/08 a.m.] at 177-178. There is no evidence that he even had any prior art patents or other documents to compare to the claims, much less properly analyze their validity.

In sum, Mr. Goutmann's "investigation" amounted to no investigation at all, and any conclusions drawn from this so-called analysis were wholly lacking in proper legal foundation. The failure on the part of emsCharts to perform a competent examination of the '073 patent demonstrates that emsCharts acted despite an objectively high risk that its actions constituted infringement of a valid patent, and given the clear inadequacy of its alleged examination, emsCharts should have known of this risk.

**b.      The Evidence Relied Upon by emsCharts Requires That Inferences be Improperly Drawn in Its Favor**

emsCharts cites testimony  that it contends shows that the jury verdict was against the great weight of evidence. As noted previously, in evaluating willfulness in the context of this motion, all reasonable inferences should be drawn in favor of Golden Hour, and all evidence favorable to emsCharts that the jury is not required to believe should be disregarded. *Palasota,* 499 F.3d at 480. emsCharts, however, repeatedly draws inferences in its favor and cites evidence the jury was entitled to disbelieve.

For example, emsCharts repeatedly cites to Mr. Goutmann's testimony that he and his superiors at the Center for Emergency Medicine ("CEM") spent a significant period of time

evaluating the '073 patent.  Given that this alleged analysis was not supported by a shred of documentary evidence at trial, the jury could very reasonably infer that it never took place.

emsCharts also alleges that Dr. Hutton's testimony somehow substantiates its investigation of the '073 patent because he acknowledged that Dr. Paris of CEM told him that an investigation of the patent had been conducted.  However, Dr. Hutton only testified as to what he was *told by Dr. Paris*.  He had no way of independently verifying that any such investigation truly took place, and no documentary evidence of an investigation was entered into evidence.  Thus, the jury could have reasonably believed that in spite of what Dr. Hutton was told, no investigation took place.  emsCharts also cites Dr. Hutton's testimony that it (acting alone) does not infringe dispatching claims, arguing that this testimony is evidence that emsCharts held a "good-faith belief" that the '073 patent was not infringed.  Motion at 16.  As set forth above, emsCharts' subjective state of mind is not relevant to willfulness.  *In re Seagate*, 497 F.3d at 1371.  This argument ignores the joint infringement and the fact that there are other infringed claims that do not involve dispatch.  Infringement of any single claim of a patent gives rise to infringement liability.  Likewise, willful infringement may be predicated on infringement of even a single claim.

## IV.  <u>CONCLUSION</u>

emsCharts has not overcome its heavy burden with respect to any of the issues raised in this Motion, and its request for JMOL of no willful infringement has been waived.  Based on the record, the decision of the jury was fair, reasonable and consistent with the evidence presented at trial.  Accordingly, the Court is respectfully requested to deny emsCharts' Motion for JMOL or, in the alternative, for a new trial, in its entirety.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: February 18, 2009               By:  s/Frederick S. Berretta
                                       Craig   S.   Summers   (State   Bar   No.   108,688)
                                       craig.summers@kmob.com
                                       Frederick S. Berretta (State Bar No. 144,757)
                                       fred.berretta@kmob.com
                                       Phillip A. Bennett (State Bar No. 241,809)
                                       phillip.bennett@kmob.com
                                       KNOBBE, MARTENS, OLSON & BEAR, LLP
                                       550 West C Street, Suite 1200
                                       San Diego, CA  92101
                                       Telephone:  (619) 235-8550
                                       Facsimile:  (619) 235-0176

                                       S. Calvin Capshaw (State Bar No. 03783900)
                                       ccapshaw@capshawlaw.com
                                       N. Claire Abernathy (State Bar No. 24053063)
                                       chenry@capshawlaw.com
                                       1127 Judson Road, Suite 220
                                       Longview, Texas 75601
                                       Telephone: (903) 236-9800
                                       Facsimile:  (903) 236-8787

                                       Attorneys for Plaintiff and Counterdefendant
                                       GOLDEN HOUR DATA SYSTEMS, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this February 18, 2009, the foregoing document **GOLDEN HOUR DATA SYSTEMS, INC.'S OPPOSITION TO EMSCHARTS, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL ON THE ISSUES OF INFRINGEMENT AND WILLFULNESS** was filed electronically in compliance with Local Rule CV-5(a).  As such, the document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).

Luz Wright

6647344
021609

- 27 -