# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CENTILLION DATA SYSTEMS, LLC,<br>　　　　　Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | 1:04-cv-0073-LJM-DML |
| QWEST COMMUNICATIONS<br>INTERNATIONAL, INC. and QWEST<br>CORPORATION,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>) | |
| ————————————————— | )<br>) | |
| QWEST CORPORATION and QWEST<br>COMMUNICATIONS CORPORATION,<br>　　　　Consolidated Plaintiffs, | )<br>)<br>)<br>) | |
| vs. | )<br>) | 1:04-cv-2076<br>(consolidated with above) |
| CENTILLION DATA SYSTEMS, LLC and<br>CTI GROUP (HOLDINGS), INC.,<br>　　　　Consolidated Defendants. | )<br>)<br>) | |

## <u>AMENDED ORDER</u>

This matter comes before the Court on the parties' cross motions for summary

judgment pursuant to Federal Rule of Civil Procedure 56(c).   In this action,

plaintiff/consolidated defendant, Centillion Data Systems, LLC, and consolidated defendant,

CTI Group (Holdings), INC. (collectively, "Centillion"), assert that defendants/consolidated

plaintiffs, Qwest Communications International, Inc. and Qwest Corporation (collectively,

"Qwest"), infringed upon their patent, U.S. Patent No. 5,287,270, Feb. 15, 1994 (the "'270

patent").   Qwest asserts that the '270 patent is invalid.   Specifically, it asserts that

technology developed and allegedly sold by Verizon, formerly NYNEX, anticipates the '270

patent and renders that patent obvious.   Finally, Qwest asserts that the accused applications do not infringe the '270 patent.

Both Centillion and Qwest have moved for summary judgment on Qwest's claim of patent invalidity.  In addition, Qwest has moved for summary judgment of non-infringement regarding all of the accused applications.  Finally, Centillion has moved for summary judgment of infringement on the accused e-Bill Companion application.  The parties have fully briefed their motions[1] and the Court is duly advised.  The Court rules as follows.

## I.  FACTUAL & PROCEDURAL BACKGROUND

### A.  THE '270 PATENT

The Patent & Trademark Office ("PTO") issued the '270 patent on February 15, 1994, to Compucom Communications Corporation ("Compucom").  Pl.'s Ex. 1 (the '270 patent), Dkt. No. 623(2)-(3).  In 1994, Compucom changed its name to Centillion Data Systems, and on February 12, 2001, it merged with CTI Group (Holdings), Inc. ("CTI Group").   As part of the merger, ownership of the '270 patent was transferred from Centillion Data System, Inc. to Centillion Data Systems, LLC.  Pl's Br. at ¶ 2, Dkt. No. 623; Def.'s Resp. at 3, Dkt. No. 644 (admitting the allegations in paragraph 2 of Centillion's statement of material facts).

The '270 patent is directed to billing systems that may be utilized by a service customer to manipulate usage and cost information from a service provider, such as a telecommunications company or credit card company.  '270 Patent, col. 1, l. 15-20.

---

[1] Qwest's Motion to Strike Portions of Centillion's Surreply (Dkt. No. 721) is **DENIED**.

According to the '270 patent, increased communication between companies and their clients have increased the need for companies to analyze the costs associated with this communication in an effort to minimize those costs and to allocate them properly. *Id.* Col. 1, l. 35, to col. 2, l. 7.   Prior to the system described by the '270 patented invention, methods used to manipulate telecommunications data, in particular, were hampered by paper billing itemized by a call-originating station. *Id.* Col. 2, ll. 8-17.   Former processing methods included non-automated methods of hand sorting data; semi-automated methods of manual key-punching or scanning of the paper bill into a computer system;  automated methods based on machine-readable tapes from the service provider that contained limited information, or customer-based recording equipment for providing estimated costs. *Id.* Col. 2, ll. 18-57.   However, all of these data collection methods had problems. *Id.*

According to the '270 patent, these problems created the need "for a system which provides to large-volume telecommunications customers the ability to conveniently and affordably analyze and manipulate call-detail and other telecommunications transaction information by computer, and which provides results which exactly correspond with the information printed on the customer's paper bill." *Id.* col. 2, ll. 58-64.

The '270 patented invention purports to solve this problem through a system that combines "standard processing hardware and specially designed software for distributing to . . . service customers . . . bills . . . on diskettes compatible with commonly available small and inexpensive personal computers for customer-directed display and in-depth analysis." *Id.* col. 2, l. 67, to col. 3, l. 6.   The invention includes two major aspects:

> One aspect of the invention includes an application software package, capable of running on a small computer (such as an IBM Personal Computer or compatible computer), which under the direction of the user can:

3

      1.     display the telephone bill (or selected subsets thereof) in its ordinary (paper-like) format;

      2.     display the bill (or selected subset thereof) sorted in non-conventional order (e.g. call detail records sorted by length of call);

      3.     display a variety of preprocessed summary reports and graphs useful in analyzing telecommunications costs; and

      4.     display non-preprocessed reports according to user-formulated ad-hoc queries.

*   *   *

Another aspect of the invention involves the use of appropriate method steps and apparatus and control software for obtaining appropriate billing information from carriers and physically rearranging this information in such a manner that it is optimally pre-processed and reformatted into a form appropriate for efficient and rapid use in subscribers' personal computers, and writing the information in this format on compatible diskettes containing [sic] for distribution to subscribers.

These functions may be performed by a third party processor engaged in the business of providing such services to service providers and their subscribers, or by the provider itself or perhaps even by a large corporate subscriber.

*Id.* col. 3, l. 34, to col. 4, l. 2.  According to the '270 patent, the second aspect of the invention mentioned above produces the following summary reports:

number of calls, length, and total call cost for each accounting or project code;

number of calls, length, and total cost for day, evening and night calls for each carrier;

number of calls, length, and total cost of calls of each call type;

number of calls, length, and total cost for day, evening, and night calls to each terminating area code;

number of calls, length, and total cost for calls of each product type (i.e. carrier's marketing plan);

4

number of calls, length, and total cost for day, evening, and night calls from each site or location identifier; [and]

number of calls, length, and total cost for calls made from each originating station and authorization code.

*Id.* col. 7, ll. 49-68, to col. 8, ll. 1-3.

Centillion asserts that the accused applications infringe claims 1, 8, 10, 46, and 47 of the '270 patent.  Those claims read:

1.   A system for presenting information concerning the actual cost of a service provided to a user by a service provider, said system comprising:

storage means for storing individual transaction records prepared by said service provider, said transaction records relating to individual service transactions for one or more service customers including said user, and the exact charges actually billed to said user by said service provider for each said service transaction;

data processing means comprising respective computation hardware means and respective software programming means for directing the activities of said computation hardware means;

means for transferring at least a part of said individual transaction records from said storage means to said data processing means;

said data processing means generating preprocessed summary reports as specified by the user from said individual transaction records transferred from said storage means and organizing said summary reports into a format for storage, and manipulation and display on a personal computer data processing means;

means for transferring said individual transaction records including said summary reports from said data processing means to said personal computer data processing means; and

said personal computer data processing means being adapted to perform additional processing on said individual transaction records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said selected records including said exact charges actually billed to said user.

5

\*   \*   \*

8.  A system for presenting, under control of a user, usage and actual cost information relating to telecommunications service provided to said user by a telecommunications service provider, said system comprising:

telecommunications service provider storage means for storing records prepared by a telecommunications service provider related to telecommunications usage for one or more telecommunications subscribers including said user, and the exact charges actually billed to said user by said service provider for said usage;

data processing means comprising respective computation hardware means and respective software programming means for directing the activities of said computation hardware means;

means for transferring at least a part of the records from said service provider storage means to said data processing means;

said data processing means generating preprocessed summary reports as specified by the user from said telecommunications usage records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means;

means for transferring said telecommunications usage records including said summary reports from said data processing means to said personal computer data processing means; and

said personal computer data processing means being adapted to perform additional processing on said telecommunications records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said telecommunications usage records including said exact charges billed to said user.

\*   \*   \*

10.  A system as in claim 8 wherein said selected records relating to telecommunications usage and cost comprise at least one telecommunications call detail record corresponding to a unique telecommunications call to be billed to said subscriber, said call having a length determined by said telecommunications carrier.

\*   \*   \*

6

46.  A system as in claim 8 wherein an information interchange media means in the form of a data communications line is employed for transferring said selected records from said data processing means to said personal computer data processing means.

47.   A method for presenting information on a personal computer data processing means concerning the actual cost of a service provided to a user by a service provider, said method comprising:

storing individual transaction records prepared by said service provider on a storage means, said transaction records relating to individual service transactions for at least one service customer including said user, and the exact charges actually billed to said user by said service provider for each said service transaction;

transferring at least a part of said transaction records from said storage means to a data processing means;

generating preprocessed summary reports as specified by the user from said individual transaction records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means;

transferring said preprocessed individual transaction records including said summary reports from said data processing means utilizing said summary reports for expedited retrieval of data;

performing additional processing of said individual transaction records on said at least one personal computer data processing means utilizing said summary reports for expedited retrieval of data;

presenting a subset of said individual transaction records chosen via said at least one personal computer processing means including said exact charges actually billed to said user; and

said data processing means and said at least one personal computer processing means comprising respective computation hardware means and respective software programming means arranged for directing the activities of said computation hardware means.

*Id.* col. 31, l. 39 to col. 36, ll. 3-45.  The Court provides additional facts about the '270 patent below as necessary.

7

## B.  THE ACCUSED SYSTEMS

Qwest provides billing analysis products to some of its customers under the names Logic and eBill Companion.  Belusko Decl., Ex. 10 at QCC-0005104.  Qwest also provides a billing analysis product named Insite to BellSouth customers under an agreement with BellSouth.  Centillion alleges that Insite is identical to Logic and eBill Companion and, therefore, it has not provided a separate infringement analysis for it.  Qwest has a portal referred to as Qwest Control available to business customers.  Formerly, Qwest provided a portal referred to as Qwest Remote Control to its wholesale customers; however, it was discontinued.  Belusko Decl., Exs. 12 at QCC-1908528; 13 at 191-92.  The Qwest Control portal permits access to various Qwest applications, including eBill Companion.  Belusko Decl., Exs. 4 at 116-117, 120-21; 11 at QCC-0908003; 15 at QCC-579227.  Centillion claims that Qwest infringed claims 1, 8, 10, 46 and 47 through its use of Logic, eBill Companion, and Insite, and the Qwest Control and Qwest Remote Control portals.

Qwest introduced eBill Companion in 2002.  Pl's Ex. 2, Dkt. No. 623(4), at 42.  The eBill Companion system provides Qwest's commercial customers billing-analysis capability.  The eBill Companion system is comprised of two parts: (1) Qwest's Billing Systems, including LATIS, eBill Companion Back Office, and, according to Centillion, "various related 'back office' systems;" and (2) the eBill Companion client applications, which Qwest makes available to all long distance business customers.

The eBill Companion system permits display and billing analysis of long-distance usage for a particular customer.  The customers receive the actual billing information either directly from Qwest or, if received on CDROM, through a third party entity contracted for that service by Qwest.  Pl's Ex. 4, Dkts. No. 623(6), at QCC-005285-508; Defs.' Ex. 3, Dkt.

8

No. 643(5), at 293.  Call detail records ("CDRs") relating to discrete customer telephone calls are captured at Qwest's telecom switches.  Pl.'s Exs. 5, Dkt. No. 623(8), at QCC-2941499-529, 2941506; 6, Dkt. No. 623(9), at 341761-82, 3411764.  In addition, Qwest's Billing Systems rate each CDR to include the exact charge actually billed to the customer for the call.  Pl.'s Exs. 6, Dkt. No. 623(9), at QCC-341772-73; 7, Dkt. No. 623(10), at 69-71.  Qwest stores rated CDRs at several instances, or locations, in the Qwest architecture.  For example, the Billing Data Service is a data store for call detail records that have been rated by Qwest's LATIS Pricing Engine during the LATIS Cycle Processing.  Pl.'s Exs. 3, Dkt. No. 623(5); 8, Dkt. No. 623(11), at QCC-617931-37.

The Qwest Billing Systems are software systems running on hardware.  In particular, the eBill Companion Back Office ("eBCBO") is a software application written in JAVA and XML running on the "LXLKPO37" machine in Qwest's Columbus, Ohio, Cyber Center.  Pl.'s Ex. 9, Dkt. No. 624(2).  The LATIS system is a software application that runs on the "NTLKPROD," "SULKPROD," "LWPROD," and "LAT A-Z" servers.  Pl.'s Exs. 10, Dkt. NO. 624(3); 11, Dkt. No. 624(4).  eBCBO fetches call detail records from the Billing Data Server via Billing Data Server Interactive.  Call detail records stored on the Billing Data Server are transferred to the eBCBO in response to requests from the Back Office.  Although the parties disagree about the specifics, for purposes of this motion the Court assumes that the customer's billing data pooled by eBill's "back end" is made available to Qwest's customers through the Qwest Control portal or on CDROM.  Qwest customers can receive the eBill applications software and supporting billing data via either web download through the eBill Companion client application or on CD-ROM.  The eBill Companion client application is designed to adapt the customer's personal computer to display information concerning the

9

actual cost for services provided by Qwest using the actual billing information received from Qwest.

For all of Qwest's billing systems, Centillion admits that Qwest customers are not obligated or contractually bound to perform additional processing on individual transaction records provided by Qwest.  Pl.'s Br., Dkt. No. 655, at 9.  Rather, Qwest's customers independently determine whether or not to perform additional processing on individual transaction records provided by Qwest.  Moreover, Qwest does not control whether its customers load the Logic or eBill Companion client applications on their personal computers.  *Id.* at 9-10.  Qwest stores its billing information as it chooses, and transfers it as it chooses to what Centillion and its expert allege is a data processing means.  *Id.* at 10. Finally, the "Qwest Alterative Media Support Group Training Manual ("Support Manual")" contains instructions for Qwest personnel to log into a customer's account to assist the customer with technical difficulties.  Pl.'s Ex. F, Dkt. NO. 655(8)-(10).  However, the record does not contain any evidence of a Qwest employee performing this function for a Qwest customer.

The Court adds additional facts about the accused systems below as needed.


## C. COBRA/TRACE

Qwest contends that NYNEX's Customer Oriented Billing Records Analysis system ("COBRA") and Telecommunications Record Analysis for Customer Evaluation system ("TRACE") invalidate the '270 patent and render the '270 patent obvious.  Qwest, in large part, relies upon the deposition testimony of four former NYNEX employees.  Qwest

10

asserts that these individuals were intimately involved in the creation and execution of the COBRA and TRACE systems.

Bruce Whitman ("Whitman") was director of billing systems at NYNEX during the 1980s. He claims to have conceived the idea for COBRA in 1986. Jim Coyle ("Coyle"), a former NYNEX manager who reported to Whitman, worked on the COBRA and TRACE projects from 1986 until 1992 or 1993. Pl.'s Ex. C, Dkt. No. 659(4), at 13-14, 34-35. Ed Varley ("Varley") worked for NYNEX from 1968 until 1994. He spent part of his time working in the COBRA and TRACE tape-processing center. Pl.'s Ex. D, Dkt. No. 659(2), at 28, 31-34, 36. Finally, Michael Graves ("Graves") created a substantial portion of the computer programming for COBRA/TRACE, and worked for NYNEX from 1986 to 1989. Pl.'s Ex. A, Dkt. No. 659(2), at 23-24, 40, 101.

According to Whitman, in the 1980s NYNEX faced pressure from business customers to provide an easier, more cost-effective method of reconciling telecommunications bills. Defs.' Ex. 8, Dkt. No. 607(3), at 34, 62. At the time, customers could either cull through stacks of paper bills or use mainframe computers to read magnetic tapes on which telecommunications companies offered billing information electronically. *Id.* at 62-64.

At some point between 1986 and 1988, Whitman claims that he conceived COBRA, a system that he believed would solve the billing problem. *Id.* at 27, 62, 66, 81, 94. According to a video Whitman claims he created in 1987 (the "COBRA video"), COBRA was "a personal computer diskette delivery system with tailored reports to the individual customer's request." Defs.' Ex. 7, Dkt. No. 607(2), at 0:34-0:40, 0:42-1:00. Whitman

11

testified that "[t]he initial concept was to deliver by floppy disk, readable by personal computer," actual rated transactions.  Defs.' Ex. 8, Dkt. No. 607(3), at 82.

Whitman and Coyle testified that NYNEX already rated and stored transaction records electronically using mainframe computers and magnetic tape or disk.  *Id.* at 44-47, 50, 55; Defs.' Ex. 9, Dkt. No. 607(4), at 40-41.   There were four different types of transaction records for NYNEX telecommunications services: TOLL; station message detail recording ("SMDR"); customer services records ("CSRs"), and other charges and credits ("OCC").

TOLL records were for rated, point-to-point calls, "usually outside of the area code."  Defs.' Exs. 8, Dkt. NO. 607(3), at 44-45; 9, Dkt. No. 607(4), at 50.  Whitman asserts that a TOLL record included fields such as time of day, duration of call, the number from which the call was placed, the number to which the call was placed, and charge.  Defs.' Ex. 8, Dkt. NO. 607(3), at 44-46.

According to Graves, and as demonstrated by Defendant's Exhibit 12, a TRACE Demonstration Package, the fields of an SMDR were identical to TOLL except for the width, or number of digits, of the charge field.  Defs.' Exs. 11, Dkt. No. 607(6), at 51, 161; 12, Dkt. No. 608(8), at CENT QWST 00030-31.  However, SMDR did not provide a record-by-record charge format.  Pl.'s Ex. A, Graves Depo. Tr., Dec. 9, 2008, Vol. 1 at 113, 123.  In other words, although both TOLL and SMDR contained point-to-point detail records, Graves testified that SMDR did not have cost information.  *Id.* at 123.   However, Coyle testified that NYNEX charged local calls not on a per call basis, but rather per volume.  Defs.' Ex. 9, Dkt. No. 607(4), at 39.   For example, NYNEX utilized a counter system where a

customer could make one hundred message unit calls per month, but would be charged for any calls over that amount.  *Id.* at 39, 49.

Whitman testified that CSRs were "[a]n itemization of the service and equipment that the customer has leased, bought, purchased, [or] rented from the telephone company." Defs.' Ex. 8, Dkt. No. 607(3), at 114.  Whitman claims that NYNEX held each CSR in a "master file . . . with an associated rental charge for each item of equipment and services." *Id.* at 55, 114.  According to Whitman, there was a CSR for every extension, telephone, switchboard, and data circuit.  *Id.* at 55-56.

Finally, Whitman submitted that OCC files included "prorated charges that resulted from addition, deletion, or a change of service mid-month,"  including services "like access to the network [and] rental of extension phones."  *Id.* at 52-53.  In addition, OCC included onetime charges that only applied when NYNEX had a change to service, for example when an installer went to a location.  *Id.* at 53-54.

Whitman and Coyle asserted that, by late 1986, NYNEX used these four stored transaction records to produce bills for its customers.  Defs.' Exs. 8, Dkt. No. 607(3), at 56, 58-59; 9, Dkt. No. 607(4), at 41.  In addition, NYNEX produced, for purchasing customers, magnetic tapes that contained each customer's TOLL, SMDR, CSR, or OCC transaction records.  Defs.' Exs. 8, Dkt. No. 607(3), at 89-90; 9, Dkt. No. 607(4), at 52, 104.  However, according to Qwest's expert, Jack D. Grimes, Ph.D ("Dr. Grimes"), and  Whitman, the records on those magnetic tapes were not in a format compatible to personal computer software.  Defs.' Exs. 8, Dkt. No. 607(3), at 72; 13, Dkt. No. 608(9), at 76-79.  Therefore, customers would need to process the records further before they could use the records on a personal computer.  *Id.*  Whitman envisioned using these magnetic tapes as inputs to the

13

COBRA system, which would process the records at NYNEX so customers with personal computers and popular database management software could use the records.  Defs.' Ex. 8, Dkt. No. 607(3), at 85-86.

Whitman testified that COBRA consisted of three components. The first component processed the data, or magnetic tapes, into a format compatible with personal computers and database management software.  Defs.' Ex. 8, Dkt. No. 607(3), at 68.  The second component consisted of off-the-shelf, modified software that would create "specific templates" that the customer could use to view and further process records.  *Id.*  Finally, the third component consisted of an installation package for the customer to put on its own hardware to enable the customer to store the records and templates.  *Id.* at 68-69.

Under Whitman's direction, Graves claims that he programmed the COBRA system to:

1.   Process the transaction records from magnetic tape;
2.   Analyze, reorganize, edit, and segregate the records by client and record type, depending on the customer's subscription;
3.   Populate database tables with the processed transactions records;
4.   Store those database tables in dBase files on diskettes for customers; and
5.   Create command files that a customer could use with dBase on its personal computer to view and manipulate the transaction records in the dBase files.

Defs.' Exs. 11, Dkt. No. 607(6), at 43-45, 47-50, 53-60, 98; 14, Dkt. No. 607(7), at 262, 263-64, 268-70, 273, 279; 18, Dkt. No. 607(11), at 134, 151-53; 19, Dkt. No. 607(12), at GR 000007.  Coyle asserts that he assisted Whitman with COBRA demonstrations, including demonstrations that utilized the COBRA video .  Defs.' Exs. 8, Dkt. No. 607(3), at 97; 9, Dkt. No. 607(4), at 68-69.

Citing Whitman's testimony and a COBRA Operator's Manual, Qwest claims that NYNEX first rolled out COBRA to trial customers in 1987.  Defs.' Ex. 15, Dkt. No. 607(8), at CENTVZ 01971-01981.   Whitman recalled providing the manual to NYNEX's customers—Morgan Stanley, for example—and that all of NYNEX's trial customers utilized COBRA to view their actual transaction records.  Defs.' Ex. 8, Dkt. No. 607(3), at 108-112, 159, 200-01, 203-04.  According to the COBRA Trial Customer Documentation Release 2.0, depending on a NYNEX customer's initial subscription request, the customer would "receive one or all of the DBASE database files and their related indices."  Defs.' Ex. 21, Dkt. No. 607(14), at CENTVZ-01933.  Whitman asserts that during this time he gave over forty demonstrations.  Defs.' Ex. 8, Dkt. No. 607(3), at 98.

Whitman testified that, in the fall of 1987, NYNEX decided to launch COBRA on a subscription basis and, for marketing reasons, rebranded it as TRACE.  *Id.* at 11, 145, 158. As part of that effort, Whitman claims that NYNEX created and distributed an introductory package to prospective subscribing customers. *Id.* at 152-53.  The package included a user guide, a sample diskette, and instructions for the installation of the software on the customers' personal computers.  *Id.* at 153.  Whitman testified that NYNEX placed TRACE on sale by the end of 1987.  *Id.* at 159.

## II. <u>STANDARDS</u>

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also CAE Screenplates v. Heinrich Fiedler GMBH*, 224 F.3d 1308, 1316 (Fed. Cir. 2000).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law.  *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact.  *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir. 1992).  This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists.  *See Wollin*, 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992).  The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists.  *See Wollin*, 192 F.3d at 621; *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).  This burden cannot be met with conclusory statements or speculation, *see Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993)); *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir. 1999); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence.  *See* Local Rule 56.1; *Brasic v.*

16

*Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir. 1997); *Foreman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).  Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party.  *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Wollin*, 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).  If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate.  *Stop-N-Go*, 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).  When the standard embraced in Rule 56(c) is met, summary judgment is mandatory.  *Celotex Corp.*, 477 U.S. at 322-23; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*, 975 F.2d at 1294.

## B.  PATENT INFRINGEMENT

Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . within the United States . . . infringes the patent."  Reviewing whether a particular device or system infringes a patent is a two-step process.  *See CAE Screenplates*, 224 F.3d at 1316*; K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999).  First, a court must interpret the disputed claims, "from a study of all relevant patent documents," to determine their scope and meaning.  *K-2 Corp.*, 191 F.3d

17

at 1362.  *See also Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 297 (Fed. Cir. 1994).  Second, a court must determine if the accused device, system or process comes within the scope of the properly construed claims, either literally or by a substantial equivalent.   *See K-2 Corp.*, 191 F.3d at 1362;   *Dolly*, 16 F.3d at 397; *SmithKline Diagnostics v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).  In this case, the first phase of the infringement analysis, claim construction, occurred prior to the instant summary judgment motions.[2]   Therefore, the Court must focus on whether Qwest's systems come within the scope of the claims as they were previously construed by the Court.

Ordinarily, to prove infringement of a patent, the plaintiff must show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in an accused device or process, either literally or by an equivalent.  *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990); *Pennwalt v. Durand-Wayland, Inc.*, 833 F.2d 931, 935 (Fed. Cir. 1987), *cert. denied*, 485 U.S. 961 (1988) & 485 U.S. 1009 (1988).  Here, however, the parties disagree over the correct standard that the Court should apply to determine if Qwest infringed upon the '270 patent's systems claims.  Simply put, the parties dispute whether Qwest can be held liable for the "use" of the '270 patent if it did not, by itself, practice each and every element of the '270 patent's system claims.  Centillion, citing *NTP, Inc. v. Research In Motion, LTD.*, 418 F.3d 1282 (Fed. Cir. 2005), urges the Court to adopt and apply a standard that would hold

---

[2] In its Order on Claim Construction, the Court ordered the parties to brief the construction of the term "usage."  The Court declines to construe "usage" because its construction of that term is not necessary to resolve these motions for summary judgment.

Qwest liable if Qwest put the '270 patent as a whole into service, i.e. exercised control and benefitted from its use as a whole.  Qwest claims that *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.* ("*CMP*"), 424 F.3d 1293 (Fed. Cir. 2005), and *BMC Resources, Inc. v. Paymenttech, L.P.* ("*BMC*"), 498 F.3d 1373 (2008), establish that Qwest cannot be held liable for direct infringement of a system claim if a third party is responsible for practicing some elements of a claim.

In *NTP*, the court considered the patent for the technology embodied in the Blackberry device, which included both system and method claims.  NTP alleged that Research in Motion ("RIM") was liable for direct infringement under § 271(a). In the district court, RIM argued that summary judgment should be entered against NTP because the Blackberry relay component of the accused system was located in Canada; therefore, the component failed to satisfy the requirement that the infringing activity occur within the United States.  *NTP*, 418 F.3d at 1314.  The district court disagreed, and the jury found RIM liable for direct, induced and contributory infringement.

RIM appealed the jury verdict.  However, the Federal Circuit specifically noted that RIM had not appealed the jury's conclusion that RIM's customer's "put[ ] into action" the patented system.  *Id.* at 1317 n.13.  Rather, RIM appealed the district court's decision that RIM's customers used the patent "within the United States" as required by § 271(a).

The court noted that the situs of the infringement "is wherever an offending act [of infringement] is committed."  *Id.* at 1316.  Moreover, the situs of the infringing act is a "purely physical occurrence[ ]."  *Id.*  The Court observed that, in terms of the infringing act of "use," other courts had interpreted the term "use" broadly.  *Id.*  For example, "[i]n *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913), the Supreme Court stated that 'use,' as used in a

19

predecessor title 35, is a 'comprehensive term and embraces within its meaning the right to put into service any given invention.'" *Id.* at 1316-17.  Moreover, the court observed that the ordinary meaning of "use" is to "put into action or service."   *Id.* at 1317 (citing WEBSTER'S THIRD NEW INT'L DICT. 2523 (1993)).  Finally, the court noted that following the *Bauer* decision, courts that have addressed the meaning of "use" under § 271(a) "have consistently followed the Supreme Court's lead in giving the term a broad interpretation. *Id.* (citations omitted).

Ultimately, the Court held that "[t]he use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained."  *Id.*  Because RIM's United States customers controlled the transmission of the originated information and benefitted from the exchange of that information with the Blackberry relay component in Canada, it was proper for the jury to find that use of NTP's asserted system claims occurred within the United States.  *Id.*

In *CMP*, the court considered an apparatus claim directed at a fixation device for segments of the spine.  424 F.3d at 1299.  As properly construed, one of the structural claim limitations required that the anchor seat be in contact with bone.  Id. at 1310. Medtronic provided the devices to surgeons for placement; however, Medtronic itself did not make a device that included an anchor seat in contact with bone.  Rather, the surgeons, with Medtronic personnel in the surgery room, connected the device to the bone. Cross-Medical argued that it was the combination of Medtronic and the surgeon that resulted in direct infringement.  In other words, Cross-Medical urged the Court to hold Medtronic liable for direct infringement even though a third party, the surgeons, performed

20

one of the elements of the apparatus claim, namely connecting the device to the bone. The

Court stated:

> In support of its argument that Medtronic directly infringes, Cross Medical cites evidence that Medtronic's representatives appear in the operating room, identify instruments used by surgeons, and thus in effect "join" the anchor seat to the bone. Cross Medical argues that the situation is analogous to those in which courts have found a party to directly infringe a method claim when a step of the claim is performed at the direction of, but not by, that party. *See, e.g., Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1389 (W.D.La.1980). However, if anyone makes the claimed apparatus, it is the surgeons, who are, as far as we can tell, not agents of Medtronic. Because Medtronic does not itself make an apparatus with the "interface" portion in contact with bone, Medtronic does not directly infringe.

*CMP*, 424 F.3d at 1311.

Finally, in *BMC*, the Federal Circuit considered the extent to which an alleged

infringer is liable for direct infringement of a method claim if it does not itself practice each

step of the method.  498 F.3d at 1378-81.  The Court began its analysis by acknowledging

that direct infringement requires a party to perform or use each and every step or element

of a claimed method or product.  *Id.* at 1378.  The Court continued:

> When a defendant participates in or encourages infringement but does not directly infringe a patent, the normal recourse under the law is for the court to apply the standards for liability under indirect infringement. Indirect infringement requires, as a predicate, a finding that some party amongst the accused actors has committed the entire act of direct infringement. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed.Cir.2004).
>
> These rules for vicarious liability might seem to provide a loophole for a party to escape infringement by having a third party carry out one or more of the claimed steps on its behalf. [*CMP*], 424 F.3d [at ]1311[.]  To the contrary, the law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party. *Engle v. Dinehart*, 213 F.3d 639 (5th Cir.2000) (unpublished decision) (citing Restatement (Second) of Agency § 220 cmt. d). In the context of patent infringement, a defendant cannot thus avoid liability for direct infringement by having someone else carry out one or more of the

claimed steps on its behalf. In [*CMP*], this court refused to attribute the acts of surgeons in making the claimed apparatus to the medical device manufacturer because the medical device manufacturer representative, who appeared in the operating room and identified instruments for the surgeons, did not direct the surgeons' actions.

*Id.* Thus, according to the *BMC* court, the basis for the *CMP* court conclusion that Medtronic had not directly infringed was its lack of direction over the surgeons.

Centillion submits that the *NTP* court defined what constitutes "use" under § 271(a) and that, therefore, under § 271 an infringer "uses" a system for purposes of direct infringement when it controls and benefits from use of the system as a whole.  Centillion argues that infringement of a system claim does not depend on whether a party practices each element of the claim, so long as the infringing party has used a system embodying all of the elements and limitations of the claim.  As a result, Centillion contends that Qwest "used" the '270 because it controlled and benefitted from its use.  Qwest argues that *NTP* should be strictly limited to the narrow issue of where "use" occurs under § 271(a), and not what constitutes "use."  Moreover, Qwest argues that *CMP* and *BMC* clearly establish that, in order to be liable for direct infringement of the '270 patent, Qwest, by itself, must have practiced each and every element of the system claims.  To the extent the law attributes the actions of a third party to an alleged infringer under *BMC*, Qwest submits that analysis only pertains to method claims.

The Court concludes that the Federal Circuit defined what constitutes "use" under § 271(a) in *NTP*.  Although, as Qwest notes, the *NTP* court addressed the question of when the infringing act of "use" occurs "within the United States" under § 271(a), in order to understand where the use of a patented system occurs, the court necessarily had to establish what constitutes the infringing act of use.  Therefore, by answering the question

22

of when use occurs within the United States, the *NPT* court implicitly defined what constitutes "use" under § 271(a).  As mentioned before, the court concluded that "[t]he use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained.  *NTP*, 418 F.3d at 1317.  Accordingly, the Court concludes that an infringer "uses" a system under § 271(a) when it puts the system into service or action, i.e. when it exercise control over, and benefits from, the system's application.

However, to the extent Centillion suggests that under *NTP* the use of some, but not all, of the elements of a system claim is sufficient to find direct infringement if the use is "beneficial," the Court disagrees.  "Infringement requires, as it always has, a showing that a defendant has practices each and every element of the claimed invention."  *BMC*, 498 F.3d at 1380 (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40 (1997)); *see CMP*, 424 F.3d at 1310.  This requirement derives from § 271(a) itself.  *Id.* "Thus, liability for infringement requires a party to make, use, sell, or offer to sell the patented invention, meaning the entire patented invention."  *NTP*, decided before *BMC* and *CMP*, did not change this requirement.

However, the question remains whether § 271(a) applies to an alleged infringer that practices some, but not all, of the elements of a system claim if it directs a third party to practice the remaining elements.  Qwest argues that *CMP* and *BMC* explicitly bar a finding of direct infringement of a system claim where the defendant did not, by itself, practice each an every element of the claim.  Contrary to Qwest's belief, neither *CMP* nor *BMC* held that an alleged infringer may never be held liable if the infringer did not use each element of a claimed system.  Rather, as noted in *BMC*, the court in *CMP* concluded that the plaintiff

23

could not satisfy its burden to show the defendant sufficiently directed the actions of a third party such that the law would attribute the third-party's action to the defendant.  In other words, had the Medtronics personnel sufficiently "direct[ed] the surgeons' actions," Medtronics would have directly infringed that apparatus claim.

Therefore, the Court concludes that under BMC, *CMP* and *NPT*, a party is liable for direct infringement for the "use" of a system claim under § 271(a) if it, by itself or in combination with a third party directed by it, put each and every element of the system claim into service, i.e. exercised control over, and benefitted from, the application of each and every element of the system claim.  *BMC*, 498 F.3d at 1378-81*; CMP*, 424 F.3d at 1311; *NTP*, 418 F.3d at 1316-17.

As to the '270 patent's method claim, "a method claim is directly infringed only if each step of the claimed method is performed."  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).  However, "[a] party cannot avoid infringement . . . simply by contracting out steps of a patented process to another entity."  *BMC*, 498 F.3d at 1381. "Accordingly, where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises "control or direction" over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction*, 532 F.3d at 1329 (quoting *BMC*, 498 F.3d at 1380-81).

## C.  VALIDITY

By statute, a patent is presumed to be valid.  35 U.S.C. § 282.  The party challenging a patent's validity must prove invalidity by clear and convincing evidence.  *See Apple Computer Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 26 (Fed. Cir. 2000); *Oney v.*

24

*Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999) (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999)); *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984).  In the present procedural posture, "[s]ummary judgment is inappropriate if a trier of fact applying the clear and convincing standard could find for either party."  *Oney*, 182 F.3d at 895.

An accusation of anticipation is based on the requirement that an invention be novel or new.  "The novelty requirement lies at the heart of the patent System."  I DONALD S. CHISUM, CHISUM ON PATENTS § 3.01 (Rel. No. 71, Sept. 1999) (hereinafter "CHISUM ON PATENTS").  The defense of anticipation "requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee."  *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995).  *See also MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 2000); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed. Cir. 1998); *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997).  A challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention."  "CHISUM ON PATENTS § 3.02.  Thus, a prior patent or device must contain all of the elements and limitations in the disputed patent as arranged in the patented device.  *See C.R. Bard*, 157 F.3d at 1349; *Hoover Group*, 66 F.3d at 303.  But, "a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it."  *MEHL/Biophile Int'l*, 192 F.3d at 1365.  Anticipation is a question of fact, but may be decided on summary judgment if there is no genuine issue of material fact.  *Oney*, 182 F.3d at 895.

25

## III. <u>DISCUSSION</u>

As previously stated, the parties filed cross motions for summary judgment on validity and infringement.  The Court considers each in turn.

## A.  VALIDITY

Qwest asserts that NYNEX's COBRA and TRACE systems constitute invalidating prior art under 35 U.S.C. § 102(a) and (b).  In response, Centillion argues, *inter alia*, that neither COBRA nor TRACE satisfies the "as specified by the user" limitation in Claims 1, 8, and 47 of the '270 patent.  As discussed above, claim 1 states "said data processing means generating preprocessed summary reports as specified by the user from said individual transaction records . . ."  '270 Patent, col. 31, ll. 56-58.  Similarly, claim 8 states "said date processing means generating preprocessed summary reports as specified by the user from said telecommunications usage records . . ." *Id.* col. 32, ll. 48-50.  Finally, method claim 47 states "generating preprocessed summary reports as specified by the user from said individual transaction records . . ." *Id.* col. 36, ll. 22-24.

The Court construed "as specified by the user" to mean "customer selects, or makes specific, the character of."  Dkt. No. 394 at 34.  In addition, the Court construed "summary report" as a collection of analyzed and/or reorganized data."  *Id.* at 41.  Accordingly, to satisfy the '270 patent's limitations, COBRA and TRACE must have allowed NYNEX's customers to select, or make specific, the character of the collection of analyzed and/or reorganized data the customers received from NYNEX as subscribers of COBRA/TRACE.[3]

---

[3] This analysis assumes that the '270 patent meets the written description and enablement requirement of 35 U.S.C. § 112, ¶ 1.  *See* Dkt. No. 410 at 10 (concluding

Qwest asserts that certain versions of COBRA and then NYNEX's final product, TRACE, satisfy the "as specified by the user" limitation because NYNEX customers could select which of the four types of billing data—TOLL, SMDR, CSR, and OCC—on which they wanted to receive a summary report.  In other words, Qwest asserts that NYNEX customers selected, or made specific, the character of the summary reports they received from NYNEX by choosing the type of billing data they wanted to receive during the their initial subscription request.  In addition, Qwest argues that the "as specified by the user" limitation is satisfied by COBRA and TRACE because the customers could provide a purchase order number to NYNEX.

The Court concludes that neither COBRA nor TRACE satisfies the "as specified by the user" limitations in Claims 1, 8, or 47 of the '270 patent.  Therefore, COBRA and TRACE do not invalidate the '270 patent under §102.  Although Qwest contends that NYNEX customers selected, or made specific, the character of their preprocessed summary reports through their initial subscription request, the record suggests that those subscription requests were merely an extension of the prior system utilized by NYNEX.  As Whitman testified, prior to COBRA, NYNEX customers received billing data on paper or magnetic disk.  Customers could subscribe to receive this billing data.  Because Whitman thought there was a more effective and cost efficient way to supply billing data to the customer, he created COBRA, the purpose of which was to give customers billing data on disks readable by personal computer.  However, as Graves' deposition testimony indicates, a customer's initial subscription, namely the decision regarding the type of billing data the

there was a genuine issue of material facts regarding whether or not the '270 patent met the written description and enablement requirements of 35 U.S.C. § 112, ¶ 1)

27

customer would like to receive as a COBRA customer, was merely an extension of the

pre-COBRA system.

> Q.    Was there anything that you felt was a deficiency of TRACE at the
>       time that you were demoing it that you wanted to continue to work on?
>
>                              *    *    *
>
> A.    No . . .  [T]he eventual capability was for people to be able to request
>       what they wanted.  So my goal was to get the basic browser as solid
>       as possible and then to move on to the next part, which would be,
>       okay, how do we make this so that it's subscribable, you can
>       subscribe to what you want and you can actually tell what you would
>       like to see, if that's possible.
>
> Q.    What do you mean by "you can subscribe to what you want," you
>       mean the customer?
>
> A.    Yeah, the customer could subscribe to a TOLL file or an SMDR or
>       CSR or OC&C.
>
> Q.    I see.  They couldn't do that at the time of the demo?
>
> A.    They already were doing it with tapes.  But at the time of the demo –
>       you know, they had – when they subscribed – there was already a
>       subscription system for TOLL data on the nine-track. . . So you – that
>       was already in place.  This is kind of like a – you know, this whole
>       process is really . . . extending that process.

Pl.'s Ex. 11, Dkt. No. 614(12), at 198-99.  In other words, the COBRA subscription request

was merely an extension of the pre-COBRA system; the customer gave the same input to

NYNEX in both the pre-COBRA system and the COBRA/TRACE systems.

In contrast, the '270 patent contemplates more than merely collecting the same call

data that customers received on paper or magnetic disk and compiling it to a diskette

readable by personal computer.  Rather, a major component of the '270 patent, namely the

data processing means, created preprocessed summary reports after input from the

customer regarding the character of those reports.  The '270 patent provided the following list of example reports that the data processing means would generate:

> number of calls, length, and total call cost for each accounting or project code;

> number of calls, length, and total cost for day, evening and night calls for each carrier;

> number of calls, length, and total cost of calls of each call type;

> number of calls, length, and total cost for day, evening, and night calls to each terminating area code;

> number of calls, length, and total cost for calls of each product type (i.e. carrier's marketing plan);

> number of calls, length, and total cost for day, evening, and night calls from each site or location identifier; [and]

> number of calls, length, and total cost for calls made from each originating station and authorization code.

'270 Patent, col. 7, ll. 49-68; col. 8, 1-3.  As such, a service customer could, for example, "select, or make specific, the character of" the preprocessed summary reports it received as a subscriber to the '270 patent by choosing which of these reports, or similar reports, if any, it would like to receive on diskette.  Put differently, a customer of the '270 patent could not only choose the type of billing data it would like to receive, but it could also select, or make specific, the reports that the billing data populated.  Therefore, the ability of NYNEX's customers to subscribe to receive a certain type of billing data does not satisfy the "as specified by the user" limitation of the '270 patent.

Qwest argues that COBRA/TRACE permitted costumers to provide input other than the type of billing data the customer would like to receive.  In support, Qwest cites the COBRA video and Whitman's deposition testimony.  During the demonstration taped on

29

the COBRA video, the speaker noted how part of the preprocessed reports presented to the end customer directly incorporated the customer's purchase order number.  When asked about this feature during his deposition, Whitman explained:

> When a customer makes a transaction with the telephone company, . . . we allow them to assign an arbitrary or their own number to identify all of the activity associated with that transaction.  That's helpful to customers to allocate charges back to their departments within their companies.  And so the data is carried through the system until billing time when it's put out on the bill along with charges that pertain to that transaction.

Defs.' Ex. 8, Dkt. No. 607(3), at 105-06.  According to Whitman, the purchase order appeared in the diskette that was given to the customer in the COBRA system.  *Id.* at 106. Qwest argues that, by providing a purchase order number to NYNEX, NYNEX customers selected, or made specific, the summary report they received from NYNEX as COBRA/TRACE subscribers.

However, Qwest fails to designate any evidence that establishes actual TRACE customers submitted a purchase order number to NYNEX.  Although Qwest points to the COBRA video, and Whitman's explanation of that video, as such evidence, the COBRA video was used "internally . . . in the company."  Pl.'s Ex. B, Dkt. No. 659(3), at 100. Moreover, it is not clear whether NYNEX showed the video to customers, or afforded the customers the opportunity to provide a purchase order number.  Accordingly, although at the time the tape was created NYNEX may have anticipated allowing customers to provide a purchase order number, Qwest has failed to designate evidence that NYNEX customers actually provided a purchase order number to NYNEX.  The designated evidence only supports a finding that NYNEX customers could select the type of billing data they wished to receive from NYNEX.  Therefore, there are no genuine issues of material fact regarding

30

whether COBRA and TRACE satisfy the "as specified by the user" limitation. Consequently, COBRA and TRACE do not invalidate independent claims 1 and 8, and 47, because COBRA and TRACE do not contain each and every limitation of those claims. *See Trintec Industries, Inc. V. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) ("A single prior art reference anticipates a patent claim if it expressly or inherently describes each and every limitations set forth in the patent claim.").  Likewise, dependent claims 10 and 46 are also not invalid.  *See, e.g.*, *Hartness Int'l. Inc. v. Siplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987).

Finally, Qwest argues that COBRA and TRACE render claim 46, which depends from claim 8, obvious is under 35 U.S.C. § 103.  However, "a claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, ¶ 4.  Qwest has not addressed whether COBRA and TRACE rendered claim 8's limitations obvious.  In other words, Qwest has not met its initial burden to show the absence of genuine issues of material fact.  *See Wollin*, 192 F.3d at 620.

In conclusion, Qwest's Motion for Summary Judgment of Invalidity (Dkt. No. 605) is **DENIED**.  Centillion's Motion for Partial Summary Judgment (Dkt. No. 613) is **GRANTED**.


## B.  INFRINGEMENT

As stated above, Qwest seeks summary judgment for non-infringement on all of the accused systems.  Centillion seeks summary judgment on just the eBill Companion.  The Court first considers system claims 1, 8, 10, and 46.  Then, the Court considers method claim 47.

### 1.  <u>System Claims</u>

The Court must determine whether there are genuine issues of material facts as to whether Qwest or its customers directly infringed claims 1, 8, 10, and 46.  As stated above, a party is liable for direct infringement for the "use" of a system claim under § 271(a) if it, by itself, or in combination with a third party directed by it, put each and every element of the system claim into service, i.e. exercised control over, and benefitted from, the application of each and every element of the system claim.

First, Centillion contends that Qwest directly infringes the '270 patent under § 271(a). The portion of the system claims relevant to the Court's analysis state: "said personal computer data processing means being adapted to perform additional processing . . ." '270 Patent, col. 31, ll. 67-68, col. 32, ll. 59-60.  The parties agree that "said personal computer data processing means" refers to a customer's personal computer.  In addition, the Court construed "additional processing" to mean "more action upon" or "further manipulating." Dkt. No. 394 at 40.

Centillion submits that the accused systems satisfy the '270 patent's limitation "said personal computer data processing means being adapted to perform additional processing" because the e-Bill client application, for example, is designed to adapt the customers' personal computers, the customers download the application following Qwest's instructions and user guide, and the customers "further manipulate" the billing data they receive from Qwest.  However, as the Court noted earlier, as a general rule, to hold Qwest liable for direct infringement Centillion must demonstrate that Qwest, by itself, practiced each and every limitation of the system claim.  Here, however, Qwest relies on its customers to satisfy this limitation.  Although the eBill client application may have been designed to adapt

32

the customer's personal computer, the designated evidence demonstrates that it does not actually adapt the customers computer until the customer executes the application. Moreover, Qwest does not control whether its customers load the Logic or eBill Companion client applications on their personal computers. Finally, although the Support Manual indicates that Qwest personnel may have the capability to log in a customer's account, the record does not contain any evidence that Qwest personnel actually performed this service. In other words, Centillion has failed to raise an issue of fact that Qwest personnel adapted a customer's personal computer for additional processing as claims 1, 8, 10 and 46 contemplate.

Of course, an exception to the general rule that a party must, by itself, practice each and every element of a patent claim exists where the party directed a third party to reduce to practice the remaining elements of a claim. Accordingly, Centillion must demonstrate a genuine issue of material fact as to whether Qwest sufficiently "directed" its customers to "adapt [their personal computers] to perform additional processing on said individual transaction records." '270 Patent, col. 31, ll. 67-68, col. 32, ll. 59-60. However, Centillion cannot meet this burden. Centillion admits Qwest's customers are not obligated or contractually bound to perform additional processing on individual transaction records provided by Qwest. Rather, Qwest's customers independently determine whether or not to perform additional processing on individual transaction records by Qwest. Moreover, Qwest does not control whether its customers load the Logic or eBill Companion client applications on their personal computers. Therefore, the Court concludes that Centillion has failed to raise genuine issues of material fact regarding whether Qwest directly infringed independent claims 1 and 8, and dependent claims 10 and 46.

33

Likewise, Centillion has failed to demonstrate the Qwest's customers directly infringed claims 1, 8, 10, and 46.  Centillion has not demonstrated, for example, that Qwest's customers directed or controlled the "date processing means" of the accused systems' "back end."  Moreover, Centillion has not demonstrated that Qwest's customers sufficiently directed Qwest personnel to practice the limitations of the system claims that the customers did not themselves practice.  Rather, Centillion argues that Qwest's customers directly infringed the '270 patent because they benefitted from its use.  However, as the Court concluded above, such a finding is insufficient to establish direction infringement under § 271(a).

Accordingly, the Court concludes that Centillion has failed to raise a genuine issue of material fact regarding whether Qwest or its customers directly infringed claims 1, 8, 10, and 46 under § 271(a).  Consequently, without a finding of direct infringement, Qwest is not liable under theories of indirect infringement.  *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement . . .").

Therefore, Qwest's Motion for Summary Judgment of Non-Infringement (Dkt. No. 617) on system claims 1, 8, 10 and 46 of the '270 patent is **GRANTED**.  Centillion's Motion for Summary Judgment of Infringement (Dkt. No. 616) on those claims is **DENIED**.

34

## 2.  Method Claim

As stated above, "a method claim is directly infringed only if each step of the claimed method is performed."  *Muniauction*, 532 F.3d at 1328.  Moreover, "where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises "control or direction" over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction*, 532 F.3d at 1329 (quoting *BMC*, 498 F.3d at 1380-81).

The relevant portion of claim 47 states: "performing additional processing of said individual transaction records on said at least one personal computer data processing means utilizing said summary reports for expedited retrieval of data[.]" Centillion claims that Qwest performs each step of claim 47 when Qwest Alternate Media Support Group personnel log in as an eBill Companion user to provide support or training to a customer. However, although the Support Manual indicates that Qwest personnel may have the capability to log in a customer's account, the record does not contain any evidence that Qwest personnel actually performed this service.  Therefore, Centillion has failed to designate evidence that demonstrates Qwest performed the "additional processing" step of claim 47.

Centillion argues that Qwest exerts sufficient "direction or control" over the performance of the additional processing step of claim 47 to hold it liable as a "mastermind."  However, although Qwest provides the client application used to perform additional processing, Qwest's customers are required to execute the application before it adapts their personal computer.  In addition, Centillion admits that Qwest customers are not obligated or contractually bound to perform additional processing on individual

35

transaction records provided by Qwest.   Rather, Qwest's customers independently determine whether or not to perform additional processing on individual transaction records. Ultimately, there is no evidence upon which a finder of fact could reasonably rely to conclude Qwest constitutes a "mastermind" under *Muniauction.* 532 F.3d at 1329.   Finally, Centillion admits that Qwest's customers do not exercise control or direction over the performance of every step of method claim 47 of the '270 patent.   Pl.'s Br., Dkt. No. 655 at 17.

The Court concludes that there are no genuine issues of material fact, and that Qwest is entitled to judgment as a matter of law on Centillion's claims for infringement of claim 47.   Therefore, Qwest's Motion for Summary Judgment of Non-infringement (Dkt. No. 617) on claim 47 is **GRANTED**.   Centillion's Motion for Summary Judgment of Infringement (Dkt. No. 616) on claim 47 is **DENIED**.

## IV.  **CONCLUSION**

For the foregoing reasons, plaintiff/consolidated defendant's, Centillion Data System, LLC, and consolidated defendant's, CTI Group (Holdings), Inc., Motion for Partial Summary Judgment (Dkt. No. 613) is **GRANTED** and Motion for Partial Summary Judgment of Infringement (Dkt. No. 616) is **DENIED**.  Defendants/consolidated plaintiffs', Qwest Communications International, Inc. and Qwest Corporation, Motion for Summary Judgment of Invalidity of the '270 Patent is **DENIED**; Motion for Summary Judgment of Noninfringement is **GRANTED**, and Motion to Strike (Dkt. No. 721) is **DENIED**.  All other pending motions are **DENIED AS MOOT**.  The Court will enter judgment accordingly.

IT IS SO ORDERED this 29th day of October, 2009.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

37

Distribution to:

Vincent J. Belusko
MORRISON & FOERSTER LLP
vbelusko@mofo.com

J. Manena Bishop
MORRISON & FOERSTER (L.A.)
mbishop@mofo.com

Kenneth L. Bressler
BLANK ROME, LLP
kbressler@blankrome.com

Dale  Buxton II
MORRISON & FOERSTER, LLP
dbuxton@mofo.com

David C. Campbell
BINGHAM MCHALE LLP
dcampbell@binghammchale.com

Nirav Narendra Desai
BLANK ROME LLP
desai@blankrome.com

Phillip J. Fowler
BINGHAM MCHALE LLP
pfowler@binghammchale.com

Alan M. Freeman
BLANK ROME LLP
freeman@blankrome.com

Hector G. Gallegos
MORRISON & FOERSTER LLP
hgallegos@mofo.com

Paul M. Honigberg
BLANK ROME LLP
honigberg@blankrome.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Hemant Keeto Sabharwal
BLANK ROME LLP
sabharwal@blankrome.com

Michael Douglas White
BLANK ROME, LLP
white@blankrome.com

Victor M. Wigman
BLANK ROME LLP
wigman@blankrome.com

Leasa M. Woods
BLANK ROME, LLP
woods@blankrome.com