```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   SOVERAIN SOFTWARE, LLC        )
                                   )   DOCKET NO. 6:07cv511
 4      -vs-                       )
                                   )   Tyler, Texas
 5                                 )   10:10 a.m.
     CDW CORPORATION, ET AL        )   January 21, 2010
 6
                   TRANSCRIPT OF PRETRIAL CONFERENCE
 7              BEFORE THE HONORABLE LEONARD DAVIS,
                    UNITED STATES DISTRICT JUDGE
 8
                        A P P E A R A N C E S
 9
     FOR THE PLAINTIFFS:      MR. MICHAEL C. SMITH
10                            SIEBMAN LAW FIRM
                              713 South Washington
11                            Marshall, Texas  75670

12                            MR. KENNETH R. ADAMO
                              JONES DAY
13                            2727 N. Harwood St.
                              Dallas, Texas  75201-1515
14
                              MR. THOMAS L. GIANNETTI
15                            MR. BARRY R. SATINE
                              MR. OGNJAN V. SHENTOV
16                            JONES DAY
                              222 E. 41st St.
17                            New York, New York  10017

18   ALSO PRESENT:           MS. KATHARINE A. WOLANYK
                             PRESIDENT & CHIEF LEGAL OFFICER
19                           SOVERAIN

20

21   COURT REPORTER:         MS. SHEA SLOAN
                             211 West Ferguson
22                           Tyler, Texas  75702

23

     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
```

2

```
 1   FOR THE DEFENDANTS:      MR. RICHARD A. SAYLES
                              MR. MARK STRACHAN
 2                            SAYLES WERBNER
                              1201 Elm St.
 3                            4400 Renaissance Tower
                              Dallas, Texas  75270
 4
                              MR. HERBERT A. YARBROUGH, III
 5                            YARBROUGH LAW FIRM
                              100 E. Ferguson, Ste. 1015
 6                            Tyler, Texas  75702

 7                            MR. DAVID C. HANSON
                              MR. KENT E. BALDAUF, JR.
 8                            MR. DANIEL H. BREAN
                              THE WEBB LAW FIRM
 9                            700 Koppers Bldg
                              436 Seventh Ave.
10                            Pittsburgh, PA  15219

11                            MS. CLAUDIA W. FROST
                              PILLSBURY LAW FIRM
12                            909 Fannin St., Ste. 2000
                              Houston, Texas  77010
13
     ALSO PRESENT:            MS. MIRA S. WOLFF
14                            MR. LEE CHENG
                              NEWEGG, INC.
15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. Ferguson, if you will call the case,
 4     please.
 5              THE CLERK:  Court calls Case No. 6:07cv511, Soverain
 6     Software, LLC v. Newegg, Inc.
 7              THE COURT:  Okay.  Announcements.
 8              MR. SMITH:  Your Honor, for the plaintiff Soverain,
 9     Michael Smith and Ken Adamo; and Mr. Adamo will introduce the
10     team from Jones Day.  We have our CO Katherine Wolanyk with us
11     as well.
12              THE COURT:  Okay.  Good morning.
13              MR. ADAMO:  Your Honor, I think you have met
14     everybody from the Amazon.com case days; Barry Satine.
15              MR. SATINE:  Good morning.
16              MR. ADAMO:  Mike Shentov.
17              MR. SHENTOV:  Good morning, Your Honor.
18              MR. ADAMO:  Tom Giannetti from our office.  And, of
19     course, you know Katherine Wolanyk.
20              THE COURT:  Good to see you all.  Thank you.
21              Defendants?
22              MR. SAYLES:  May it please the Court.  I'm
23     Dick Sayles with the Sayles Werbner Firm in Dallas.  I
24     represent Newegg.  We are ready to proceed this morning.  I
25     would like to introduce Mark Strachan with my firm in Dallas;
```

4

```
 1    and, of course, Trey Yarbrough in Tyler.

 2              THE COURT:  Mr. Yarbrough.

 3              MR. SAYLES:  From the Webb Law Firm, this is Dan

 4    Brean, Dave Hanson, and this is Ken Baldauf.  And with the

 5    Court's permission we have in the courtroom Claudia Frost of

 6    the Pillsbury Firm who will assist us on legal matters during

 7    the trial.  And our client representatives and in-house

 8    counsel Mr. Lee Cheng and Mira Wolff.

 9              THE COURT:  Very good.

10              I must tell you I found out not too long ago who

11    Newegg was through a -- full disclosure -- a purchase I made

12    through Newegg, and it a very neat concept that you have

13    there.  All right.  Well, let's get down to this case -- and

14    if anyone wishes for me to recuse on that basis, I will be

15    glad to, and let this pass to someone else.

16              MR. ADAMO:  It depends on what you bought.  No, Your

17    Honor, obviously not.

18              THE COURT:  Thank you.  All right.  Well, we have

19    got a lot to do here today.  Let's get down to business.  I

20    think what I will do is start with the Daubert motions and

21    other expert-related motions.  So first let's hear Newegg's

22    motion with regard to -- Nawrocki?

23              MR. SATINE:  Nawrocki (different pronunciation.)

24              THE COURT:  Nawrocki.

25              Okay.  Mr. Brean.
```

1          MR. BREAN:  Good morning, Your Honor.  Newegg's

2    position with respect to its Daubert challenge to Mr. Nawrocki

3    is centered around his invocation of the entire market value

4    rule.  Essentially the rule exists as it is explained in the

5    Rite-Hite case and in Lucent v. Gateway.  The purpose of this

6    rule is to avoid overreaching by a patentee where they are

7    trying to encompass damages that extend beyond what is

8    traceable to the patented invention.

9          In this instance Mr. Nawrocki has taken the total

10   profit of newegg.com's online sales, the total value of each

11   sale and essentially applied the 25 percent rule, or as he

12   uses it, the 25 to 33 percent rule, to that entire profit.

13   Now, Newegg's profit is traceable to a multitude of sources

14   including the pricing variable to offer the quality of the

15   products, Newegg's award winning customer service, among many

16   other features of its website, its search functionality, and

17   the allegedly infringing shopping cart and session ID

18   functionality.

19          With respect to Mr. Nawrocki's methodology,

20   essentially, it is set forth in his report in Paragraph 100

21   where he takes Newegg's profit margins and applies those

22   margins to the average value of each sale to arrive at the

23   average profit, and then he explains that applying a 25 to 33

24   percent apportionment to these figures results in a royalty

25   range that equates to .75 dollars to $2.20 per order and his

1    $1.20 falls precisely in the middle of that range.

2           Now, the cases that we cited in our report, such as

3    the Cornell case, the Grain Processing case, it is clear that

4    some sound economic proof is required in order to invoke this

5    rule and take a percentage of profits that are attributable to

6    things other than the patented invention; and as set forth in

7    the Rite-Hite case, two of the things that have to be shown

8    would be (1) that the patented invention shares a functional

9    relationship with the -- what is included in the royalty base;

10   and (2) that the patented invention drives the demand for

11   everything that is included in the royalty base.  And, again,

12   as set forth in his report on Paragraph 100, the entire value

13   of each sale, the entire profit has been included in his

14   calculation.

15          Now, with respect to Mr. Nawrocki's methodology --

16          THE COURT:  Are you talking about the total value of

17   each sale or the profit from each sale?

18          MR. BREAN:  The total profit from each sale is what

19   he uses --

20          THE COURT:  The total profit.  So not gross revenue

21   but net profit basically -- or gross profit, I guess?

22          MR. BREAN:  Yes, Your Honor.

23          THE COURT:  What does the plaintiff have to say in

24   response to that?

25          MR. SATINE:  Good morning, Your Honor.  This

1    argument is really a strawman.

2              THE COURT:  Really a what?

3              MR. SATINE:  A strawman.  There is no use of the

4    entire market value rule by Mr. Nawrocki.  He has made that

5    clear at his deposition and in his report.  What has happened

6    here is in determining a royalty, there is the royalty base

7    and the royalty rate.  The entire market value rule applies to

8    the royalty base.  Mr. Nawrocki's royalty base is the number

9    of transactions which infringe the patents.

10             Mr. Nawrocki uses that as his royalty base.  He then

11   determines a royalty rate and in calculating a royalty rate,

12   multiplied against the royalty base.  One of the things that

13   he looks at is the average revenue per infringing transaction

14   and he calculates what is a rate with respect to that average

15   sales revenue from the infringing transaction.

16             It is not -- yes, when you multiply all of the

17   numbers it is going to be there somewhere in the equation what

18   their revenue is because their revenues are using -- engaging

19   in a transaction.  The transaction is the infringement.  So in

20   calculating a rate, one of the things an expert has to look at

21   is how much is the transaction worth to the infringer?  But

22   then when Mr. Nawrocki looks at the base, the only thing he is

23   looking at --

24             THE COURT:  Is the number of transactions?

25             MR. SATINE:  Is the number of transactions which --

1    of the infringement.  That is not a violation of the entire

2    market value.

3              THE COURT:  What is your response to that?

4              MR. BREAN:  Newegg's response is that this is a red

5    herring; that Mr. Nawrocki doesn't say he invokes the entire

6    market value rule.  He says that he is basing his royalty on

7    the number of transactions; but, in fact, a reading of his

8    report reveals the only substantive calculation that Mr.

9    Nawrocki makes in his report that touches on where that $1.20

10   per transaction comes from is by taking Newegg's total profit

11   and applying the 25 percent rule.

12             This sort of, as we explain in our reply brief -- or

13   our surreply brief, Mr. Nawrocki's methodology, the

14   mathematics, has been manipulated in a way to appear as if he

15   is using the number of transactions; but, in fact, the

16   mathematics works out the same whether he had explicitly used

17   the entire market value rule or not.  Essentially, what he has

18   done is taken the average sale and taken 25 percent of the

19   profit from that sale and then multiplied by the number of

20   transactions.  Whereas, under a more direct approach under the

21   entire market value rule, he would simply take the royalty per

22   transaction and then multiply for each transaction -- I'm

23   sorry.  I think I got that backwards.

24             Under the entire market value rule, he would find

25   out the royalty base of the total revenues; and then instead

1   of taking it as an average, he would then already include the

2   number of transactions.

3              THE COURT:  All right.  The Court is going to deny

4   the Daubert motion, Docket No. 252.

5              All right.  Soverain's Daubert motion regarding

6   Tittel, Docket No. 253.  Who is going to be heard from

7   Soverain on that?

8              MR. ADAMO:  Dr. Shentov.  We have it split up,

9   hopefully, for efficiency.

10             THE COURT:  Okay.

11             MR. SHENTOV:  Your Honor, for your permission can I

12  stand here, because I have a PowerPoint presentation?

13             THE COURT:  As long as the Court Reporter can hear

14  you.

15             Can he plug in up there with his computer?  Well,

16  however you want.  However would be the fastest, you can go

17  ahead.

18             MR. SHENTOV:  Let me see if it works out.

19             Your Honor, the defendant to this case is one

20  technical expert for issues of infringement and validity, and

21  it is a very charming gentleman who has written books and is

22  quite knowledgeable.  However, it turns out that when the time

23  came for him to present expert reports and to help the jury,

24  allegedly at some point with scientific or technical or other

25  specialized knowledge, he really didn't do it.

1           The fact of the matter is -- I will show in the next

2   slide his methodology in addressing issues of infringement and

3   invalidity is completely wrong and completely unreliable.   Why

4   do I say that?   In this slide I have just a sample of the

5   methodological flaws in his approach.

6           Number one, he never used the Court's claim

7   constructions.   There are 70 terms which are construed among

8   the Amazon case five years ago; and earlier this year in May

9   you essentially -- Your Honor, granted the constructions that

10  Soverain proposed in the claim.   There are roughly 70 terms.

11  I'm not saying all of them are implicated in what he did

12  wrong.   What I am saying is that he ignored them.   He has a

13  listing of the items, the documents which he used in his

14  report, and the Amazon order was never there.   He never listed

15  it.   He never looked at it.   The order from this case was

16  listed in his infringement report on the top, but he ignored

17  it also; and he kind of admitted that.

18          In addition, for the purposes of invalidity that is

19  his first report on July 23rd, it is a very interesting

20  piece -- document.   When you read this and you try to make

21  sense of what exactly is Mr. Tittel trying to say, you figure

22  out there is very little substance behind what he is saying.

23  First of all, as I mentioned, he doesn't use the claim

24  construction.

25          Number two, he doesn't use an element-by-element

1    analysis.  This is touchstone of any invalidity or

2    infringement analysis.  What he had instead is a listing of

3    the claims in which he basically throws in phrases this is

4    obvious technology, this would have been the most obvious way

5    to do it; generalities that essentially would make -- could

6    confuse potentially the jury in terms of presenting a clear

7    and convincing evidence as to the invalidity, alleged

8    invalidity of our patent state, nowhere near that point.

9           On this slide I have the third point, which is

10   probably the most concerning also is that for the purposes of

11   infringement he used one type of claim construction, which is

12   very, very narrow; and for the purposes of validity, anything

13   under the sun kind of goes.  He admitted that in his

14   deposition, Your Honor.  He admitted that in particular for

15   one term, he admitted for the term "database design."  He

16   admitted using a "database" definition that requires all kinds

17   of things for the purposes of infringement.

18          They show, for example, that the database has to be

19   stored, it has to be searchable, indexable, and things like

20   this.  When asked if he did that for the purposes of validity,

21   he said essentially that he used a more relaxed definition of

22   a "database."  And I will show you a little bit in the slide.

23   So here he didn't use the proper claim construction.

24          From a standpoint of methodology, this is sort of

25   the beginning of a serious methodological flaw.  The claim

1    constructions are the law of the case.  How is a technical

2    expert supposed to explain to the jury facts or compare facts

3    to the claims if he does not know or does not apply the

4    constructions as Your Honor claimed in the case?

5          And I have given here in the second bullet point

6    some inconsistent constructions that he used for purposes of

7    infringement and invalidity.  "Database" being, perhaps, one

8    of the most egregious examples because for purposes of

9    validity he didn't even look -- there is no evidence of a

10   database in the prior art asserted against us; whereas, for

11   the purposes of infringement, he said that the "database" has

12   to meet all kinds of limitations, which, of course, are

13   difficult to meet.

14         And "digital advertisement" I will actually play a

15   short clip to show.

16      (Video clip played.)

17         "Q.  So would it be fair to say then that you are

18          withdrawing your objection to Claim 73?

19          A.  I am not sure if it is possible to raise a

20          discussion or observation that the information from the

21          construction may diverge from ordinary understanding;

22          and, if so, then I would say that my objection stands.

23          If that is not a possible avenue of discussion, then I

24          must withdraw.

25          Q.  Okay.  So if you have to follow the Court's

1          construction, you will withdraw the objection?

2                  A.  Yes, sir.

3                  Q.  And if you don't have to follow the claim

4          construction, you don't have to withdraw the objection?

5                  A.  This way lies madness, yes."

6          (Video Clip concluded.)

7                  MR. SHENTOV:  This is an example of the position we

8      took.  This is their position of September 3rd.  This is after

9      all of the expert reports have been submitted.  And at his

10     deposition Mr. Tittel didn't know whether he has to follow

11     your claim constructions or not.

12                 THE COURT:  Let me hear a response about the --

13                 MR. HANSON:  Thank you, Your Honor.

14                 THE COURT:  -- claim construction.

15                 MR. HANSON:  Mr. Tittel -- there is no question here

16     they are not questioning his technical competence.  Their main

17     argument is he is not a patent attorney.  Well, you don't have

18     to be a patent attorney to testify as a technical expert in a

19     patent infringement lawsuit.

20                 THE COURT:  Well, what is he going to testify about

21     though in a -- what is he going to testify about --

22                 MR. HANSON:  Oh, he is going to testify about the

23     prior art, explain the prior art to the jury.  He is also

24     going to testify about the operation of the Newegg system,

25     which is accused to be infringed --

1            THE COURT:  Is he going to express opinions --

2            MR. HANSON:  Your Honor, he is not going to --

3            THE COURT:  Excuse me.  Let me finish my question.

4    Is he going to express opinions regarding infringement and

5    invalidity?

6            MR. HANSON:  No, Your Honor.  He is not going to be

7    expressing legal opinions.  He is going to explain some

8    technical facts.  That is his job, and that is what we are

9    using him for.  Now, he is going to correlate --

10           THE COURT:  So he is just going to be background,

11   this is how Newegg works, this is how prior art works --

12           MR. HANSON:  Yes, Your Honor.  But he will also

13   relate it somewhat to the claims without interpreting the

14   claims.

15           THE COURT:  How can he relate it to the claims

16   without interpreting the claims?

17           MR. HANSON:  Just explain the plain meaning of the

18   words in the references and the plain meaning of the words in

19   the --

20           THE COURT:  But my problem with that is I am going

21   to instruct the jury from the outset that they are going to

22   be -- have to follow the Court's claim construction as to what

23   all of these words mean --

24           MR. HANSON:  He will not --

25           THE COURT:  Excuse me.  Let's don't talk over each

1    other, okay?

2              MR. HANSON:  Yes, sir.

3              THE COURT:  We will get along much better if we do

4    that.  Okay?  Okay?

5              MR. HANSON:  Yes, sir.

6              THE COURT:  All right.  I don't want the jury to be

7    confused if he is using one interpretation that is not what

8    the Court has.

9              MR. HANSON:  He will not use an interpretation that

10   is not what the Court has held, and there has been no -- if

11   you look at the details of his testimony so far in what he has

12   said, he has never said anything inconsistent with the Court's

13   interpretations.  The Court's interpretations are very broad.

14   In our reply brief and in our surreply brief we point out

15   that --

16             THE COURT:  Wait a minute.  You said the Court's

17   claim interpretations are very broad?

18             MR. HANSON:  Yes, they are, sir.

19             THE COURT:  Well, if you have -- are you saying you

20   have some claim construction issues then as to what a

21   particular term means such that it is subject to more than one

22   definition?

23             MR. HANSON:  No, Your Honor, we don't have any

24   argument with your claim construction.

25             THE COURT:  All right.  Go ahead.

1           MR. HANSON:  Well, he is not a professional

2    witness.  This is the first time he has ever testified as an

3    expert.  He may not know his way around how a lot of

4    professional witnesses testify, but he has got the technical

5    knowledge to explain the facts, the facts of the prior art,

6    the facts of what Newegg does with their system to the jury.

7    And his background and experience will help to make that clear

8    to the jury.

9           THE COURT:  Response?

10          MR. SHENTOV:  May I respond, Your Honor?  Here is a

11   statement from their rebuttal brief stating exactly what they

12   expect Mr. Tittel to do at trial.  He is expected to point out

13   relations of the prior art in the accused Newegg system to

14   elements of the patent claims.  This is what they have

15   admitted that Mr. Tittel is expected to do at trial, so he

16   will be talking inferentially or different or otherwise, he

17   will be talking about the claims and the prior art.  We don't

18   have a problem with him generally discussing the prior art.

19   We have a problem, however, with him relating the prior art to

20   the claims of the patents-in-suit as it applies to both

21   infringement and invalidity.

22          THE COURT:  Do you intend to have him just testify

23   about the prior art or have him relate it to the claims?

24          MR. HANSON:  We wanted to have him relate it to the

25   claims in a general way, not inconsistent with the Court's

1  interpretation.  I mean, the language of the claims is common

2  language, English language that everybody can understand.  You

3  don't have to be a patent attorney to explain common English

4  language.

5          MR. SHENTOV:  May I respond, Your Honor?

6          THE COURT:  Yes.

7          MR. SHENTOV:  The consistency that he is talking

8  about is in terms of the alleged breadth of the Court's claim

9  construction.  Mr. Tittel for purposes of infringement is

10  using very narrow constructions which are within the scope of

11  the Court's construction.  That is the sense in which Mr.

12  Hanson applies the consistency.  So it is consistent in the

13  sense that it is somewhere within your definition, but it is

14  not your definition.  What is really troubling about this

15  whole thing is that for the purposes of infringement it is

16  very, very narrow.  For purposes of invalidity, it takes the

17  full scope.

18          THE COURT:  That sounds like good fodder for

19  cross-examination.

20          MR. SHENTOV:  We thought of that, Your Honor.  And

21  the fact of the matter is that it is -- Rule 702 in the

22  Daubert case by the Supreme Court essentially says that if the

23  methodology is so wrong, it is inadmissible.  Actually there

24  is a recent case in the District of Massachusetts by Judge

25  Young, which was somewhat humorously written actually, but it

1    considered the exact same situation.  Judge Young said, I

2    always thought that this is the proper subject matter for

3    cross-examination.  We will show the witness and you will

4    expose basically what it is.  Judge Young concluded that that

5    is not the case because it is a mandate, essentially, by the

6    Federal Circuit to have claim analysis and claim construction

7    be conducted in a particular way.  The Daubert case also has

8    assigned the gatekeeping function to the Court so that the

9    jury does not get confused.

10          Again, Mr. Tittel is a rather charming person and

11   can talk at length about HTML and about a lot of things that

12   he has written books about.  The thing is that they will be

13   confusing to the jury and inadmissible per se, according to

14   Rule 702 and in the Daubert case.

15          I would like to address one other point.  You

16   mentioned about the patent law expert.  He is not a patent law

17   expert.  And we don't -- "we" Soverain has never asserted that

18   a technical expert has to be a patent law expert.  What we do

19   assert is that the expert has to follow the rules of the

20   game.  The rules are that you do the proper claim

21   construction, you follow the claim construction, and then you

22   do a proper element-by-element analysis, none of which was

23   done by Mr. Tittel with the knowledge of defendants' law

24   firm.  These are people who were guiding him through the

25   processes.

1          He is not an expert, we understand that.  Everybody

2     has to do things for the first time.  But he had the guidance

3     of the lawyers who would tell him what is it he had to do.

4     This is what they told him, to put the paragraph in which he

5     says, well, this is obvious technology.  Obvious to whom?

6     Why?  This would be confusing, Your Honor --

7               THE COURT:  Is this your only expert regarding

8     infringement --

9               MR. HANSON:  Yes, Your Honor.

10              THE COURT:  -- and invalidity?

11              MR. HANSON:  And I would challenge the comment that

12    he said that he has inconsistently applied the claims.  He

13    hasn't done it, and I would direct your attention to our

14    briefs on that point.

15              THE COURT:  Inconsistently done what?

16              MR. HANSON:  Applied the claims to either the prior

17    art and to the Newegg system.

18              THE COURT:  You are saying he has used the same

19    standard as far as invalidity and infringement as far as his

20    construction as far as --

21              MR. HANSON:  I'm saying his constructions --

22              THE COURT:  -- his interpretations?

23              MR. HANSON:  I'm saying his construction is

24    consistent in each case.  I think I brought that out in --

25              THE COURT:  I will have to hear that when I hear the

1    evidence --

2            MR. SHENTOV:  Your Honor --

3            THE COURT:  Excuse me.  Go ahead.

4            MR. SHENTOV:  If I can mention one thing about the

5    selection of a single expert.  They raised the point in the

6    past because in our briefing we pointed to a case Hearing

7    Components in which an expert in a similar situation was

8    precluded from testifying for exactly the same reasons except

9    there was a back-up guy, and Newegg in its response says,

10   well, our facts are very different because we have a single

11   expert.  That is their choice.  They pick one guy who has

12   never testified previously, didn't direct him properly as to

13   how to do his job, and now they are complaining like, well,

14   sorry.  I think the Rules --

15           THE COURT:  Well, I am going to deny your Daubert

16   motion, 253.  I will hear what he has to say.

17           But I will caution Newegg.  Has he read my

18   construction order yet?

19           MR. HANSON:  Yes, he has.

20           THE COURT:  Well, he darn sure better, and he better

21   stick to it.  He better not be expressing opinions outside of

22   that.  You know, Soverain is going to be free to object at any

23   time.  And, you know, this is not a training ground.  If he is

24   not up to it and is going to start saying things like --

25   throwing words like "obviousness" around loosely, he is going

1   to get his hand spanked and you are probably going to get

2   embarrassed in front of a jury, so I would really sit down

3   with him and explain to him that all these words have great

4   import in a patent case, and he is going to have to use them

5   properly.

6            MR. HANSON:  Agreed, Your Honor.

7            THE COURT:  Understood?

8            MR. HANSON:  Understood.

9            THE COURT:  Anything further?

10           MR. SHENTOV:  Nothing.  He will have to stick to his

11   report, which is very, very skinny, in terms of invalidity?

12           THE COURT:  Okay.  Very well.

13           All right.  Next would be Soverain's motion to

14   strike Newegg's damage expert, No. 243.

15           Y'all just don't want either side to put on the

16   case, do you?

17           MR. SATINE:  No, Your Honor, we didn't seek to

18   strike their expert, just some of his theories.

19           THE COURT:  Okay.

20           MR. SATINE:  Newegg's damage expert is W.

21   Christopher Bakewell.  And what we have sought is an order

22   with respect to certain of his opinions; not all of them.  And

23   I understand, Your Honor, and I want to point out we also have

24   motions in limine that also address some of these, so there is

25   some overlap.

1          But under Daubert, an expert's testimony must rest

2     on a reliable foundation.  And what Mr. Bakewell has done is

3     has identified a number of what he calls "data points" which

4     he uses in his opinions and to attack Mr. Nawrocki's opinions.

5     And some of these data points do not have a reliable

6     foundation.

7          One of the things that he talks about is

8     noninfringing alternatives.  Those break down into three

9     categories.  There are software products which he says are

10    similar to the technology of the patents-in-suit.  How does he

11    know that?  He had a conversation with Mr. Tittel who simply

12    told him there are these other software products out there on

13    the market.  But Mr. Tittel was not going to opine as to any

14    of these other software products.  Nobody is going to testify

15    as to what these software products do, whether or not they are

16    noninfringing, or indeed whether or not they were available.

17         They questioned Mr. Bakewell how can you say these

18    are noninfringing alternatives?  And his answer is, well, it

19    doesn't matter if they are noninfringing or not noninfringing,

20    they give us a data point.  We can look at what they sell for

21    in the marketplace.  What is the relevance if it is not a

22    noninfringing alternative what they sell for in the

23    marketplace?

24         He also points to a software product which was sold

25    by a company by the name of Intershop.  And his argument there

1   is Intershop was licensed by Soverain's predecessor Open

2   Market with respect to the patents-in-suit and, therefore,

3   that must be a noninfringing alternative.

4           Well, among other things, at the time of the

5   hypothetical negotiation, Open Market, the patentee, had sued

6   Intershop for patent infringement.  It wasn't until nine

7   months later that that case was settled and they entered into

8   a license agreement.  So at the time of the hypothetical

9   negotiation, that product was accused of infringement.  We

10  still don't know what that product does because there is

11  nobody testifying about it.  Nonetheless, Mr. Bakewell uses

12  that as another one of his data points.  He has a series of

13  these data points.  It is like the straw that breaks the

14  camel's back.  Each one is just a straw, but how many do you

15  keep lining up to justify an opinion if none of them have no

16  foundation?

17          Then he also in this category refers to the Transact

18  software product.  Now, the Transact software product is a

19  software product of Soverain's, and it was a software product

20  of Soverain's predecessor, Open Market; and we admit that the

21  Transact product incorporates the asserted claims of the

22  patents-in-suit.  Mr. Bakewell says, well, at the hypothetical

23  negotiation, what would have happened is the parties would

24  have negotiated a software license to Transact, and that is

25  what you have to look at, what would a Transact software

1    license have cost?

2         We have discussed the fact that we have to assume

3    that we have a willing licensor and a willing licensee to the

4    patents, not the software.  He agrees.  Nonetheless, he says

5    it is another data point.  The party would have been talking

6    about the software license.  And, Your Honor, he has no --

7    there is no foundation in law to look at these things if they

8    are not alternatives.

9         The only source for a Transact software license

10   would have been the patentee, so basically what Mr. Bakewell

11   is asking us to assume is that the patentee in this

12   hypothetical negotiation for a patent license would have said,

13   no, instead of licensing you to our patents, we will give you

14   a software license for substantially less money.  There is no

15   foundation for these arguments.

16        He also looks at other things.  So, for example,

17   there is a design-around memo with respect to Mr. Tittel.  But

18   that is the subject of another motion.  There is the purchase

19   price that the patents were purchased for out of bankruptcy.

20   He says that is another data point, and the purchase price of

21   the bankruptcy is also a subject of our motion in limine.  How

22   does that set a data point?  It is a fire sale.  He has a

23   series of these, Your Honor.  But the most troubling ones are

24   the noninfringing alternatives that nobody says are

25   noninfringing or the alternatives which just are software that

1    have no relevance to the issues in this case.

2            THE COURT:  Okay.  Response?

3            MR. BREAN:  Your Honor, the first point I would like

4    to address is that Mr. Bakewell admitted in his deposition and

5    we also admitted in our brief that he will not characterize

6    any software as a noninfringing alternative unless the

7    evidence introduced at trial supports that.  To the extent

8    that Mr. Tittel is precluded from testifying that any of these

9    other software products are noninfringing, Newegg will not

10   introduce any statements to suggest they are noninfringing

11   alternatives.

12            With respect to the Intershop product, Intershop

13   offers a -- and offered a software product that provides

14   similar functionality to the patented technology and it was a

15   licensed product and that license from the former patent owner

16   did extend to Intershop's customers, so it is Newegg's

17   position that that does qualify Intershop as a noninfringing

18   alternative further based on Mr. Bakewell's interview of two

19   representatives of Intershop with whom he spoke about the

20   product itself, its functionality, and what it would be able

21   to support for a company such as Newegg to use it.

22            With respect to Transact, Transact has been admitted

23   by Soverain to embody the patented technology.  It is highly

24   relevant to the value of this technology.  And value is really

25   the main purpose for offering evidence of Transact and

1    evidence of other software products.  And value is certainly a

2    highly relevant consideration under the Georgia-Pacific

3    factors.  Among others, the Georgia-Pacific case discusses the

4    established profitability and commercial success of the

5    patented invention, the popularity of the patented invention,

6    and also the price for the use of the invention or analogous

7    inventions.

8         So even if these alternative software products are

9    not shown conclusively to be within the scope or without of

10   the scope of the claims, they are still relevant to a

11   reasonable royalty analysis.

12        And with respect to Transact, it is Newegg's

13   position that Transact also can be offered as a noninfringing

14   alternative.  One thing that Mr. Satine raised is the idea

15   that Transact was available only from the patent owner and,

16   therefore, it can't be considered available to Newegg or

17   another accused infringer.  Well, Newegg is prepared to offer

18   testimony from one of the founders and the CEO of Open Market

19   at the time the patent owner who said that had Newegg

20   approached and asked for a license, they would have gladly

21   licensed Newegg at its standard terms.

22        And as we raised in our brief, there is a lot of

23   talk in this briefing about the supposed unreliable

24   methodology of Mr. Bakewell, but really at bottom the facts

25   show that the price of the Transact software, the price of the

1    patented invention therein, was set by Open Market and its

2    successive owners of these patents to be roughly on the order

3    of $340,000 or less.  And it is that fact and that indication

4    of value that Soverain is really trying to exclude here.

5              THE COURT:  Response?

6              MR. SATINE:  Your Honor, to begin with, there is no

7    expert report in this case from the defense which addresses

8    any noninfringing alternatives other than Mr. Bakewell, the

9    damage expert.  No one else opines as to noninfringing

10   alternatives.  And Mr. Bakewell does concede without some

11   expert for him to rely on, he can't say they are

12   noninfringing -- they are noninfringing alternatives.  He said

13   it doesn't matter, just as we have heard.  It doesn't matter

14   if they are not -- if they are infringing -- infringements.

15   But if it is an alternative that infringes, then what is the

16   relevance?  Why are we talking about that?

17             But, yes, there are -- there is other software out

18   in the marketplace.  But if it does not fall within what is an

19   available, noninfringing alternative, then it has no relevance

20   and there is no basis for an expert to rely upon it for his

21   opinions.

22             THE COURT:  Do you disagree with that statement?

23             MR. BREAN:  I do, Your Honor.  To the extent that

24   Newegg is offering this evidence of value, it is highly

25   relevant.  I think Mr. Satine's argument would be valid,

1   perhaps, if we were offering evidence of these software

2   products as noninfringing alternatives when they were not

3   shown to be noninfringing, then that would be confusing and

4   that would also --

5           THE COURT:  But you are saying you are going to show

6   them to be noninfringing?

7           MR. BREAN:  We intend to introduce evidence to show

8   that at least with respect to Transact and Intershop that they

9   are noninfringing.

10          THE COURT:  Who are you going to introduce that

11  evidence through?

12          MR. BREAN:  Well, the evidence would be in part

13  through Soverain's admission in prior pleadings and

14  representations that Transact embodies the patented

15  technology.  Evidence from former Open Market employees,

16  including the CEO, that the view was that a license with

17  Transact carried an implied license to practice the patented

18  technology.

19          With respect to Intershop, Mr. Bakewell, his

20  interviews with those employees show that Intershop was an

21  acceptable software product that was available at the time.

22  And from a technical standpoint, it is immaterial that Mr.

23  Tittel, our technical expert, has not opined or reported on

24  the infringing or noninfringing nature of these alternatives

25  because from a legal standpoint they can be deemed to be

1   noninfringing because of the license in the case of Intershop

2   and also because of the implied license with respect to

3   Transact.

4           THE COURT:  Okay.

5           MR. SATINE:  Your Honor, yes, a former officer of

6   Open Market said that in the scheme of things if someone had

7   come to Open Market and said we would like to purchase a

8   software license, we would have sold a software license.  That

9   has nothing to do with a hypothetical negotiation where the

10  parties are sitting down on the eve of infringement to discuss

11  a patent license.  And a software license is not the

12  equivalent of a patent license.  It does not give you the

13  opportunity to practice those patents any way you wish.

14          THE COURT:  Okay.  I am going to deny the motion.

15  But as in the other one, it is certainly -- and on all these

16  motions, they are all without prejudice to objections raised

17  at time of trial, and I will hear the objections and rule on

18  admissibility and everybody can do their homework on the law.

19          All right.  Soverain's Daubert motion to exclude

20  Bakewell, 254.

21          MR. SATINE:  That was the one we just heard, Your

22  Honor.

23          THE COURT:  I'm sorry.

24          MR. SATINE:  We could do it again.

25          THE COURT:  No, no.  All right.  242 Soverain's

1    motion with regard to Trevor.  I believe that is moot now; is

2    that correct?

3           MR. GIANNETTI:  It is, Your Honor, I believe.  They

4    represented to us that they are not going to be relying on the

5    Trevor report or Trevor's testimony at deposition in the

6    Amazon case.  And if that is true, it moots this particular

7    motion.  There is still a controversy over whether Mr. Trevor

8    should be permitted to appeal and also it centers on the

9    controversy around the CompuServe documents, so there is a

10   live controversy here; but just not as to this particular

11   motion.

12          THE COURT:  With regard to this motion, does Newegg

13   agree with what Mr. Giannetti just said?

14          MR. BALDAUF:  I guess we do, Your Honor.

15          THE COURT:  You do?

16          MR. BALDAUF:  Yes, we do.

17          THE COURT:  All right.  I will deny that as moot

18   then.

19          Soverain's -- let's see.  What about 287, is that

20   moot, as well, Soverain's motion in limine to preclude Trevor

21   at trial?  Did we just deal with that?

22          MR. GIANNETTI:  That is not moot, Your Honor.

23          THE COURT:  Would you like to be heard with regard

24   to that?

25          MR. GIANNETTI:  There is also a motion in limine,

1    Your Honor.

2              THE COURT:  This is Soverain's motion in limine to

3    preclude Trevor at trial, 287.

4              MR. GIANNETTI:  That is not included.

5              MR. ADAMO:  As best as I can track it, Your Honor,

6    that should be our Motion in Limine 24.

7              MR. GIANNETTI:  That is a separate motion in

8    limine, that's 287.

9              MR. ADAMO:  Sorry, Your Honor, I apologize for the

10   confusion.

11             MR. GIANNETTI:  May I proceed, Your Honor?  Your

12   Honor has heard the name Alexander Trevor, and maybe not

13   recognized it from the Amazon case, so I will first address

14   the question of, who is Alexander Trevor?  He is the former

15   chief technical officer of CompuServe.  His current occupation

16   is a software archeologist.  That is what he calls himself.

17   He works for a company that basically digs up old software for

18   use mainly in patent cases such as this case and the Amazon

19   case.

20             In the Amazon case Mr. Trevor was designated as an

21   expert with respect to two former CompuServe systems involving

22   online travel reservations.  One was called Travelshopper,

23   and the other was called EasySabre.  He submitted an expert

24   report in that case.  We took his deposition as to both

25   systems Travelshopper and EasySabre, and he never got to

1    testify because the case settled before trial.

2            In this case he has been identified by Newegg not as

3    an expert witness.  He has not submitted an expert report, but

4    he has been identified as a trial witness, as a fact witness

5    with respect to a separate CompuServe system called the

6    CompuServe Mall, which was not at issue in the Amazon case.

7    In fact, when we asked at his deposition whether he had been

8    asked to consider the CompuServe Mall in connection with the

9    Amazon case he said that he had not; that that was not

10   something he had been asked to do in connection with that

11   case, so the Mall is new to this case.

12           There is an issue of his identification.  He was not

13   identified in the initial disclosures, and he was never

14   identified -- while he was identified in the invalidity

15   contentions with respect to Travelshopper, he was never

16   identified by name with respect to the CompuServe Mall.

17           But I would like to address the issue more on the

18   merits, and we certainly believe that we did not get proper

19   notice of what his role is going to be in this case, but there

20   is a more serious problem with his testimony, Your Honor --

21           THE COURT:  When did you get notice?

22           MR. GIANNETTI:  Basically, when we got their witness

23   list.  His name appears in their invalidity contentions; but

24   with respect to Travelshopper, the conclusion that we drew was

25   that they were going to rely upon his deposition testimony in

1    the prior case; and, in fact, we moved in one of the motions

2    that is pending to preclude him from doing that.  It turns out

3    that he is going to appear as a live witness.  He was

4    identified on their witness list.  So the first time that we

5    knew that he was appearing live I believe was on their witness

6    list.

7              So here is the situation with Mr. Trevor.

8    Notwithstanding the fact that he is a software archeologist

9    for the system CompuServe Mall which was produced by the

10   company that he worked for as a CTO, he has no documents, not

11   one laboratory notebook, not one internal CompuServe memo,

12   nothing on the CompuServe Mall.  So this raises a problem, as

13   Your Honor knows, if you are trying to prove up a prior art

14   system, you have to have corroboration.  Mr. Trevor has none.

15   He has not one piece of paper.

16             So to deal with this, Newegg has come forth with

17   three third-party books.  These are not CompuServe books.

18   They are user manuals of the most general sort.  They are

19   really designed for neophyte users of CompuServe.  They

20   designated a few pages for each of these manuals.  These

21   manuals are not directed to software developers.  They are not

22   directed to the people that would be working for Mr. Trevor.

23   They are directed to people who are neophyte users of

24   CompuServe.

25             Your Honor will recall that CompuServe was around in

1   the early '90s when computers were not as prevalent and a lot

2   of people were frightened of computers, and needed these kinds

3   of books to get them into the swing of things, and they are

4   very, very basic books designed for users; not for software

5   developers.  They don't tell you how to make the Mall or how

6   to build a Mall.  They tell you how to use the Mall.

7        So Trevor's testimony with respect to the details of

8   the Mall, the kinds of details that would be necessary to

9   present in a patent case when you are trying to invalidate a

10   patent, is completely lacking.

11        Now, in their witness summary for Mr. Trevor they do

12   describe what he is going to talk about.  They talk about

13   his -- they talk about the databases and the messages and that

14   sort of thing.  And he is really going to go below the

15   surface.  He is going to talk about things that the user does

16   not see.  But the books on the Mall don't have anything at

17   that level of detail.  So there are really two problems with

18   this alleged corroboration.

19        One is the hearsay problem; that these are documents

20   that were written by third parties, none of who are appearing

21   at the trial, none of whose depositions were taken.  So they

22   are hearsay.  And as corroboration for Mr. Trevor's testimony,

23   they have to be offered for the truth because if they are not

24   true, then they don't corroborate.  So that is one problem.

25   The evidentiary problem is that this is nonadmissible

1    evidence.

2           And the second problem, even if it were admissible,

3    it is so general that it does not corroborate the features

4    that are necessary to correlate to the patent claims.  And the

5    cases are quite clear that you have to corroborate the

6    elements of the patent claim; otherwise, you don't have a

7    prior art defense.  Just to make this clear, they are trying

8    to prove up CompuServe as prior art, prior use of a system

9    that they claim is prior art.  And they have a witness who is

10   going to testify with no documents about this, and they have

11   the hearsay manuals, which are inadmissible.  And even if they

12   were admissible, don't really corroborate the features that

13   need to be corroborated.

14          So they have a failure of proof here, and we think

15   under the prevailing authorities, Mr. Trevor should not be

16   permitted to take the witness and just talk from his memory of

17   CompuServe without any documents at all.  There is no

18   corroboration.  These documents are not admissible, and his

19   testimony ought to be excluded.  Mr. Trevor has testified in a

20   number of cases about CompuServe.  This seems to be -- it is

21   somewhat astonishing that there are no CompuServe documents

22   available.  He shouldn't be allowed to do this, Your Honor,

23   and we believe his testimony should be precluded.

24          THE COURT:  Okay.  Response?

25          MR. BREAN:  The first point I would like to address,

1   Your Honor, is with regard to the adequacy of disclosure of

2   Alexander Trevor.  As Mr. Giannetti pointed out, Mr. Trevor

3   was an expert witness in the prior case against Amazon and the

4   Gap.  Soverain and its attorneys certainly knew about Mr.

5   Trevor and his association with CompuServe.  And indeed in his

6   deposition in the Amazon case he did indicate he was familiar

7   with the Mall.  He gave a brief description of the Mall.  And

8   Soverain declined to press him for further information about

9   that.

10          Mr. Trevor's name, as well as Newegg's intention to

11  rely on the Mall were both in Newegg's invalidity contentions

12  served in August of 2008.  Mr. Trevor was listed by name with

13  respect to the Travelshopper service offered by CompuServe.

14  And it says that, "Persons with knowledge of the Travelshopper

15  service included at a minimum Alexander Trevor and employees,

16  representatives, et cetera of CompuServe."  A few pages later

17  when Newegg disclosed the Mall, it indicated that also persons

18  with knowledge included entities, owners, and employees and

19  representatives of CompuServe.  Mr. Trevor's name wasn't

20  listed specifically there.  But, again, his knowledge about

21  the CompuServe Mall was already known to Soverain.

22          With respect to the corroboration of Mr. Trevor's

23  testimony, I would first like to note that at some point Mr.

24  Hanson will be speaking as to some of the more technical

25  details of this argument; but, in general, the corroboration

1    rule, Newegg certainly concedes Mr. Trevor's testimony must be
2    corroborated.  However, we have very different views than what
3    Soverain is offering as the rule of corroboration.  The
4    purpose of this rule is simply to avoid fraud, to avoid a
5    situation where a witness can invalidate a patent based solely
6    on oral testimony.  And that is how the courts express this
7    rule, the Supreme Court when the rule began to take form.
8         The proper analysis of this corroboration
9    requirement is the totality of the circumstances standard.
10   The rule of reason as expressed in the cases that we cited in
11   our brief make clear that there is no impossible standard of
12   independent corroboration for every word that might come out
13   of Mr. Trevor's mouth.  There is certainly nothing that we
14   have seen in the case law that would suggest that the details
15   of the CompuServe Mall must be corroborated in essentially the
16   same language that is expressed in the claims.  It is our view
17   that Soverain is creating a much higher standard than as is
18   expressed in the cases, which is a reasonableness standard;
19   essentially, is there a reasonable likelihood that what the
20   testifier is saying is true?  And we believe that the books
21   have more than adequate technical detail about various aspects
22   of the Mall to support such a reasonableness standard.
23        MR. GIANNETTI:  Well, Your Honor, let me just
24   address the notice issue briefly because there is a more
25   fundamental issue here, but the notice issue is he was not

1   disclosed ever with respect to the Mall.  He was disclosed

2   with respect to Travelshopper.  And I think my colleague

3   agrees --

4           THE COURT:  And he is proposing to testify about

5   both?

6           MR. GIANNETTI:  No, he is going to testify about the

7   Mall in this case.  In the Soverain -- in the Amazon case, we

8   are sure we asked him have you ever heard of the Mall and he

9   said, yes.  Were you asked to opine on the Mall or to consider

10  the Mall in connection with this case?  And he said, no.  So

11  we went on.  We didn't touch the Mall.  The Mall was not at

12  issue at all in the Amazon case, so in that case we left it

13  alone.  In this case he was disclosed by name with respect to

14  Travelshopper, exactly the same prior art he testified about

15  in the earlier case, so our conclusion was that was what he

16  was going to be presented for would be Travelshopper.  It was

17  a surprise to us that Trevor was going to be testifying about

18  the Mall.

19          THE COURT:  Do you have objection to him testifying

20  with regard to Travel --

21          MR. GIANNETTI:  He is not going to testify --

22          THE COURT:  Okay.  He is just testifying with regard

23  to the Mall, and you are just making the point that -- when

24  did you first find out that he was going to testify with

25  regard to the Mall?

 1          MR. GIANNETTI:  I believe when we moved against him.

 2    I think it was when we got the witness statements, and it was

 3    around the time that we were filing our first motion against

 4    him.  Our first thought was they were going to read his report

 5    or they were going to try to use his deposition about

 6    Travelshopper.  And when we made that motion, it started to

 7    become clear little by little that he wasn't going to be

 8    talking about Travelshopper, he was going to be talking about

 9    Mall.  But it really wasn't until we got the witness statement

10    that Mr. Hanson provided us after we filed our motion that we

11    confirmed.

12          THE COURT:  When was that?

13          MR. GIANNETTI:  Well, we filed this motion in

14    December, so I would say sometime the end of last year late --

15          THE COURT:  Do you contest the fact that he wasn't

16    identified with regard to the Mall until December of this

17    year, late December of this year?

18          MR. BREAN:  Your Honor, I believe that might be the

19    first time that he was specifically told to Soverain that he

20    would testify as to the Mall.  But, again, Your Honor, Mr.

21    Trevor was listed, among others, in our initial disclosures

22    his knowledge of the Mall, his knowledge of CompuServe and

23    Newegg's intent to rely on the Mall have been known to

24    Soverain for well in excess of a year.  Soverain declined in

25    the Amazon case and in this case to pursue discovery related

1    to the Mall.

2         THE COURT:  Well, you know, that doesn't really

3    carry a lot of weight with me that they didn't pursue

4    discovery with regard to the Mall; but what I am trying to get

5    at is when did you first link this witness with your theory

6    regarding the Mall?

7         MR. BREAN:  At the latest, Your Honor, in our

8    invalidity contentions served in August of 2008 when employees

9    and representatives of CompuServe were named in connection

10   with the Mall, Mr. Trevor's name was listed elsewhere in the

11   document as another employee of CompuServe, who was also

12   already known to Soverain.  It is our position at the latest

13   that was more than sufficient to show that Mr. Trevor was one

14   of the people who we could rely on for testimony related to

15   the Mall.  It is Exhibit D of our opposition, Your Honor.

16        MR. GIANNETTI:  They did not identify Mr. Trevor

17   with the Mall, specifically with the Mall until we got their

18   witness statement in November of 2009, November 12th.  The

19   invalidity reports had the Mall, but they didn't link it with

20   Trevor.  They linked Travelshopper with Trevor but not the

21   Mall.  So we really didn't have notice that he was going to be

22   their witness on the Mall until November 12th that the

23   letter -- it is attached as Exhibit 2 to our motion.  Document

24   287.

25        MR. BREAN:  Your Honor, just to be clear, again,

1   attached to Exhibit D is the relevant portion of our

2   invalidity contentions.  The CompuServe Mall is not mentioned

3   in a vacuum as something we rely on.  It is mentioned and

4   listed under the persons with knowledge is not Mr. Trevor by

5   name but owners, agents, employees, and representatives of

6   CompuServe.  And, again, elsewhere in this same document, in

7   fact, five pages, six pages earlier with respect to the

8   Travelshopper we indicate that persons, including Alexander

9   Trevor and other employees of CompuServe have knowledge with

10  regard

11  to the Travelshopper.  It is our position that this is more

12  than sufficient to show that Mr. Trevor, being the chief

13  technical officer of CompuServe was adequately disclosed and

14  known to Soverain.

15          THE COURT:  All right.  I'm going to deny the

16  motion, and I'll take up the matter whether the manuals are

17  sufficient corroboration when we get to trial on that.  It is

18  a close call though, and this is still without prejudice to

19  Soverain's right to object.  If Soverain wishes to take any

20  deposition with regard to him, I'll grant you leave to do

21  that.  Do you wish to?

22          MR. GIANNETTI:  We would like to consider that and

23  discuss it, Your Honor.  We appreciate it.  We may very well

24  do that.

25          THE COURT:  All right.  If you need to, I will ask

1   defendant to cooperate with them in getting that scheduled.

2            MR. BREAN:  Certainly, Your Honor.

3            THE COURT:  Is that all of our Daubert expert

4   motions?

5            MR. ADAMO:  I think so.

6            THE COURT:  All right.  Let's go to the summary

7   judgments.  Newegg's motion for summary judgment, Docket No.

8   221.

9            MR. ADAMO:  Your Honor, just not to lose continuity,

10  and I'll let Mr. Hanson speak about the corroboration when we

11  get to the motion in limine, there is some further discussion

12  of these CompuServe manuals at that point.

13           THE COURT:  Let's go ahead and do that now.

14           MR. ADAMO:  I'm sorry.  I didn't mean to interrupt

15  you.

16           THE COURT:  I think that is a good suggestion.  I'm

17  not sure we'll get through all of the motions in limine.  I'm

18  probably going to order y'all to meet and confer.  Some of my

19  rulings should have resolved a lot of those, but I'll go ahead

20  and hear that.

21           MR. ADAMO:  Should we do that now, Your Honor?

22           THE COURT:  Yes.

23           MR. ADAMO:  If it please the Court.  Basically, if

24  this is all right with Your Honor, motion in limine -- our

25  Motion In Limine No. 20 deals with the corroboration point.

1    Our Motion in Limine 23 deals with another point that Mr.

2    Giannetti touched on that the manuals are hearsay, and then

3    actually there is one more relevant subject with respect to

4    these manuals that appears in our Motion in Limine 28 which

5    challenges whether the manuals are receivable as prior art.

6    So the manuals are being used by Newegg here to be essentially

7    tri-functional.  They are being offered to corroborate the

8    testimony of Mr. Trevor, required by law as counsel for Newegg

9    has admitted.  And so to do that, as Mr. Giannetti said, they

10   can't be hearsay.  And then they are also being advanced

11   potentially, as I understand it, 102(b) prior art.

12            THE COURT:  Okay.

13            MR. ADAMO:  Here is the issue on the corroboration

14   in as focused a fashion as I can possibly make it.  Trevor has

15   got nothing but verbal testimony.  The law is very clear.  It

16   has got to be corroborated.  The controlling Federal Circuit

17   case law, which we have briefed to Your Honor, is very

18   explicit that there has to be corroboration for all elements

19   of any claim that he is going to testify verbally about.  So,

20   in other words, he is going to get up and say the Mall has

21   got -- anticipates, let's just use that, Claim 1 of the '317

22   patent -- I'm just picking one as an example -- he has to have

23   corroboration of all of the elements in that claim.

24            The rule of reason doesn't excuse that.  The Federal

25   Circuit precedent on this point is crystal clear.  What the

1   rule of reason means in a corroboration situation is that

2   there isn't any formula for exactly the nature of the

3   corroboration.  You don't have to have it in haec verba -- to

4   use an old Latin phrase that Chief Judge Rudd used to use in

5   Delaware years ago -- but it doesn't give you a pass that

6   looking at the totality of the evidence you get to trump the

7   case law that says you have got to corroborate every element

8   in the claim.  That is the problem here.

9          So to the extent that someone is overreading the

10  law, it is not us.  It is the fact that the rule of reason

11  talks about the acceptable quality of the corroborate

12  evidence, not what the corroborative evidence has to make up.

13  The Federal Circuit is very clear on this point.  It has got

14  to corroborate all of the elements.  That is the issue with

15  the corroboration.  These three manuals, which are, as Mr.

16  Giannetti said, they are not programmer-level manuals, they

17  are not system-level manuals, they are the kind of manuals

18  that the Spanish-for-Stupid -- or whatever that series is that

19  I can never remember it -- that is the level they are written

20  on.  They don't have the detail that is necessary.

21         Absent the detail, the Circuit says in Finnegan and

22  other cases, you are not supposed to let somebody testify

23  because the uncorroborated testimony is simply inadmissible.

24  I am not accusing the man of committing fraud.  I don't even

25  know him.  And I would assume he is going to come into this

1    courtroom and put his hand up and swear he is going to tell

2    the truth.  This isn't a fraud issue.  This is people forget,

3    clear and convincing evidence, you have to trust the system,

4    that it is related to documents, et cetera.

5              So the rule of reason, as I said, goes to the

6    quality, the specific quality of the corroborative evidence so

7    it can be all sorts of variations, but it has to be element by

8    element.

9              Okay.  The hearsay problem, these manuals don't come

10   from CompuServe.  They are third-party manuals written, again,

11   at this lay level.  To be corroborative --

12             THE COURT:  What do you mean by third-party

13   manuals?

14             MR. ADAMO:  They are not written by people who

15   worked for CompuServe at the time they were written.  They are

16   not written --

17             THE COURT:  Do they have CompuServe's name on them

18   and that type of thing?  Or are they user manuals; is that

19   what you are saying?

20             MR. ADAMO:  Well, they are not -- user manuals

21   connote they are coming from CompuServe.  Yeah, we have

22   them --

23             THE COURT:  Pass them up, if you would.

24             MR. ADAMO:  I have got the, How to Get the Most out

25   of CompuServe, 4th Edition; CompuServe CIM Running Start;

1    Using CompuServe.  But, for example, you can see none of these

2    are coming from CompuServe.  They are coming from third-party

3    vendors.  There is a big difference between a user manual for

4    Windows coming from Microsoft and a user manual for Windows

5    coming from a third party.  That is one of the critical points

6    here.  Those documents, those three documents that Your Honor

7    has in your hands are hearsay.  In fact, they are not just

8    hearsay, they are double hearsay.

9           And in one of the briefings somebody very creatively

10   said, hey, one of those manuals is over 20 years old.

11   803(16), we can use the ancient document rule.  Well, whether

12   one can or can't, it doesn't solve the second-level hearsay

13   problem under 805.  So those documents are not admissible, and

14   only one of the manuals supposedly is an ancient document.

15   But they have to be offered for the truth that, in fact, the

16   CompuServe Mall had all of the elements of one of the claims,

17   so that is classic hearsay.

18          The third point under 102(b) let's say now they want

19   to argue that they are prior art, and that really comes into

20   our Motion in Limine 28.  Well, they have got to prove that it

21   is prior art.  In one of their briefs they said, well, we

22   haven't seen any evidence from Soverain that it isn't prior

23   art.  Well, unfortunately this goes to invalidity.  I don't

24   have to prove it is not art.  They have to prove it is.

25   Burden of proof, clear and convincing evidence.  They haven't

1      got it.

2              They make an argument, well, it would be beyond

3      comprehension to say that someone printed a book like that,

4      that it isn't prior art; that it didn't get disseminated.

5      Well, that is not proof that something was, in fact,

6      disseminated.  They argue it was submitted to the Copyright

7      Office, there is copyright registrations.  Well, that has got

8      to mean it has been published, it was publicly accessible, it

9      was disseminated under the law.  Interesting argument.

10             In re Lister, Federal Circuit, 2009, 583 F.3d, 1307

11     at 1311 through 17, simply depositing a manuscript at the

12     Copyright Office as a part of copyright registration isn't

13     evidence of public accessibility and dissemination.

14             THE COURT:  Okay.  Response?

15             MR. HANSON:  To begin with, copyright registrations

16     were filed for all these books.  Certified copies of those

17     registrations have been -- will be introduced into evidence.

18     The copyright law provides that all of the facts on a

19     copyright registration after it is issued if it has been filed

20     within five years of publication are considered prima facie

21     correct.  In other words, there is a presumption of

22     correctness of the information put forth on a copyright

23     application for registration.

24             On those applications for registration, there is a

25     publication date.  Publication is dissemination.  It is just

1   incredible to believe that commercial publishing houses would

2   print books, publish them, put the date of their publication

3   down and not distribute them.  And, in fact, we will be able

4   to introduce evidence that these books, even though they are

5   the kind of books that one might keep in their home, are in

6   libraries all over the country.  These books were published.

7   They were disseminated.

8           Now, as far as the hearsay question, these books are

9   publications.  They are not offered for the truth of what they

10  say as publications.  They are offered for what they teach.

11  And for that purpose, as for 102(b) as a printed publication,

12  they are available as publications, and there is no hearsay

13  rule that would apply to them.

14          As far as corroboration, for decades inventors'

15  notebooks have been considered corroborating evidence.  They

16  are contemporaneous documentary evidence.  Inventors'

17  notebooks are hearsay, but they are accepted as

18  corroboration.  They prevent somebody just coming into court

19  and saying anything, and the point they keep making that these

20  books are printed by third parties and they don't involve

21  somehow the authority of CompuServe, actually makes them more

22  credible as evidence of what CompuServe was actually doing at

23  the time prior to when Open Market went to work.

24          THE COURT:  Yes?

25          MR. ADAMO:  Inventors' notebooks, according to

1    recent and current and controlling precedent, Your Honor, are

2    not hearsay.  803(6), the face of the rule makes that point

3    and certainly the committee comments make that point if you

4    are a researcher and you are keeping a notebook in the

5    ordinary course of business, that is a business record.  If

6    there is second-level hearsay in them, then you might have a

7    problem with the second-level hearsay, but what I am more

8    interested in is the admission I just heard.

9        If they are not going to offer these three documents

10   for the truth of what they say, as a matter of law those three

11   documents can't corroborate.  It is that simple.  This is

12   their theory to avoid fraud, Mr. Trevor is going to say the

13   Mall had characteristic A, B, C, and D.  How do you

14   corroborate that?  Here is three books or something in

15   writing.  It could be another -- in some circumstances the

16   Circuit has allowed another witness to testify, although that

17   precedent is questionable right now; but they are going to

18   bring the book up now, and they are going to say, well, here

19   is corroboration if he is right, this book says the CompuServe

20   Mall has A, B, C, and D.  That is offered for the fact.  If

21   they don't offer it for the fact, it doesn't corroborate as a

22   matter of law.

23       So if he is holding to what he just told you that

24   they are not going to be offered for the truth of what they

25   say, Trevor's testimony can't be corroborated.  It has got to

1    go.

2            THE COURT:  Is that what you are holding to?

3            MR. HANSON:  No, no.  They are inherently not

4    hearsay because people wouldn't write a book about how to use

5    CompuServe and not make it an accurate representation about

6    what CompuServe does.  They inherently get past the hearsay

7    rule.

8            MR. ADAMO:  Your Honor, I'm sorry, that is just not

9    the Rules of Evidence.

10            THE COURT:  Okay.  I'm going to take that under

11    advisement and get you a ruling on it.

12            MR. ADAMO:  Thank you, Your Honor.

13            THE COURT:  What's next?

14            MR. ADAMO:  Now, do you want to go back to the

15    summary judgment motions?

16            THE COURT:  Yes, I do, uh-huh.

17            MR. ADAMO:  Thank you very much.

18            THE COURT:  Newegg's motion for summary judgment,

19    221.

20            MR. ADAMO:  Is that the '639 and '780 motion, Your

21    Honor?

22            THE COURT:  Right.

23            MR. ADAMO:  Thank you very much.

24        (Pause in proceedings.)

25            MR. BREAN:  Your Honor, this motion is directed to

1    the issue of whether the '639 patent -- or the session ID

2    patent is -- there are two issues.  One is whether it is

3    entitled to the filing date of its priority application, which

4    resulted as the '780 patent.  And, two, the validity of the

5    '639 patent if it is not entitled to that priority date.

6              The issue that I would like to focus on this morning

7    is with regard to Newegg's argument directed to the best mode

8    requirement.  The best mode requirement under Section 112

9    requires that the best mode known to the inventors of

10   practicing the invention be set forth in the specification.

11   And the -- under Section 120 of the Patent Act in order for a

12   later filed application to claim the benefit of a prior

13   application, all three disclosure requirements of Section 112

14   must be satisfied in the priority application.

15             So here we are talking about in the '780 application

16   the best mode must be set forth in a manner that would support

17   the claims of the '639 application, and here it simply does

18   not.  On page -- let's see.  I believe it is on Page 9 of

19   Newegg's opening brief is reproduced two emails, one written

20   by one of the inventors Lawrence Stewart and one written by

21   Mr. Dally, the attorney who drafted the application.  And

22   essentially what the -- these emails speak for themselves, but

23   Mr. Stewart explains that the Netscape Navigator browser has a

24   cookie storage mechanism and that this cookie mechanism would

25   work for passing session ID's around.

1         And so what he is saying there is that he is aware

2    of a method for storing session ID information on the browser;

3    namely, the Netscape Navigator browser.  Now, this information

4    appears absolutely nowhere in the '780 patent.  The only place

5    that Soverain argues this concept is disclosed and supported

6    is where the application refers to a special browser.

7         This language is reproduced in our brief.  The

8    language is on Page 7.  And it says that this embodiment where

9    the session ID is stored on the browser "requires a special

10   browser which can handle such communications."  So the special

11   browser was known to the inventors to be Netscape.  And the

12   specification goes on to say that "such a browser was

13   generally not suitable for early browser formats common to the

14   web."

15        So here we have essentially information in the

16   specification indicating that earlier on, this browser was not

17   suitable.  And, indeed, if you go back and look at the '780

18   specification it says that the special browser is generally

19   not suitable.  Now, this teaching away tends to be evidence

20   that there is insufficient disclosure, and we cite the Medrad

21   case for that proposition.

22        The central contention by Soverain with regard to

23   the best mode is not so much directed to the -- to whether

24   this was the best mode known but from a legal standpoint I

25   mean, their position is mainly they don't need to set forth

1  the best mode in the '780 patent to support the claims of the

2  '639 patent.  That is simply not the case.

3          The Transco case holds only that they need not

4  update the best mode in subsequent filings.  And that is

5  essentially our position with regard to the best mode, Your

6  Honor.  And there is clear evidence of an inventor knowing of

7  how to implement a method of storing, this method of storing

8  being claimed in the '639 patent, and that method of storing

9  and how it is done not being disclosed in the '780 patent; and

10  that there is no requirement that it has to be the result of

11  mal intent.  Omission of this best mode information is

12  sufficient.

13          THE COURT:  Response?

14          MR. GIANNETTI:  Your Honor, as you know they have a

15  very heavy burden on this motion.  They are attacking a

16  patent, and the standard is clear and convincing evidence.

17  And on summary judgment they have to show there are no

18  disputed fact issues.  This motion just bristles with fact

19  issues.  It is a very fact intensive issue.  They have

20  challenged best mode, adequacy of disclosure, written

21  description, which may or may not be a separate element, a

22  separate requirement.

23          But just to address best mode, the premise is --

24  this patent actually discloses two different ways of

25  practicing the invention:  One in which information is sent in

1    the URL, which we refer to in our papers as the URL method.

2    And the second in which the information is sent in a cookie,

3    and that is the so-called cookie method.  They both accomplish

4    the same thing.  They are two different ways of doing it.

5          Their assumption is that -- and the inventors knew

6    about both ways of doing it before the application was filed

7    in June of '95, and that -- the email goes to that.  The email

8    that my colleague just pointed Your Honor to certainly

9    indicates that our inventors knew about the cookie method

10    prior to filing the application.

11          His assumption, however, is that that is the best

12    mode of practicing the invention.  And I don't know what his

13    proof of that is.  I mean, the declaration of the inventor

14    that we submitted, Mr. Stewart's declaration -- this is

15    Exhibit 1 in Paragraph 29.  I believed -- he said, "As the

16    inventor I believed at the time of filing the '780 patent

17    application that passing the session ID in the URL" -- that is

18    the URL method -- "was the best embodiment for carrying out

19    the invention."  The reason was that this embodiment worked

20    with all browsers; those that were cookie enabled and those

21    that are not.

22          There is nothing in the record to dispute this.

23    They have no declarations.  They took Mr. Stewart's

24    deposition.  They didn't ask him about this.  So the record is

25    that the so-called cookie enabled embodiment was not the best

1    mode at least known to the inventor or not considered to be

2    the best mode at the time the application was filed.  That is

3    a fact issue, Your Honor.  That is an issue that has got to be

4    resolved at trial.  So their motion fails right out of the

5    starting gate.

6         I could address some of the other issues about

7    adequacy of disclosure of the best mode, but the point is that

8    they haven't established that the mode that they are talking

9    about, the cookies, was considered by the inventors to be the

10   best mode when the application was filed.  I also think --

11        THE COURT:  Let me hear a response to that.

12        MR. BREAN:  Newegg's main contention with regard to

13   the idea that the best mode known at the time was the URL

14   method, that fails because the best mode requirement insists

15   that -- is directed to the claimed invention, and the claimed

16   invention in the '780 patent is directed to the URL method

17   where the storing of this session ID is done in a very

18   different way than it is done in the '639 patent.  And it is

19   clear from this email from one of the inventors that they did

20   know of a way to perform the mode where the information is

21   stored in a cookie, and yet they did not disclose it.

22        To simply say a special browser, discloses

23   essentially no mode; and yet we have evidence they knew of at

24   least one mode to do it.  So to completely fail to disclose

25   any mode whatsoever is insufficient to satisfy the best mode

1    requirement.

2         MR. GIANNETTI:  Well, he keeps flopping over into

3    the adequacy of disclosure issue, Your Honor, which I don't

4    agree with.  The reference to the special browser and the

5    modified browser was plainly a reference to the Netscape

6    browser, but let's go back to the basic proposition, and that

7    is that -- and what he said is entirely consistent.  It is

8    true that during prosecution the claims of the '780 patent

9    were narrowed.  As originally filed they would cover both, but

10   they were narrowed to the URL method.

11        But why is that inconsistent with the notion that

12   the URL method was the best mode?  It certainly is consistent

13   with that.  They haven't pointed to anything in this record,

14   much less clear and convincing evidence, to establish that the

15   best mode is the cookie enabled mode, at least at the time of

16   filing.  So their motion fails right out of the starting gate,

17   Your Honor.

18        THE COURT:  All right.  I'm going to deny Docket No.

19   221.

20        What is next?  247, Newegg's motion for partial

21   summary judgment regarding shopping cart claims.

22        MR. HANSON:  Retail e-commerce or retail electronic

23   commerce was around a long time before the Worldwide Web

24   became available, and it was available, for example, from

25   organizations like CompuServe who allowed their members to

1  dial up the CompuServe computers, access the CompuServe Mall,

2  access a particular merchant who had placed his store upon the

3  Mall, browse through the Mall, select products, select more

4  than one product, check out, get a confirmation.  All this was

5  in place.  It is described in those manuals that are before

6  you, Your Honor.

7        THE COURT:  Okay.  I'm not going to grant a summary

8  judgment on this though.  We will take it up at trial.  You

9  can make a motion for directed verdict on it.  It is just --

10  I'm not going to deal with it.

11        All right.  Soverain's motion for partial summary

12  judgment of infringement.  I think my opinion on this one is

13  about the same, but I do have a question of whether you are

14  raising any claim construction issues that the Court needs to

15  resolve, or whether you have any claim construction issues

16  raised that the Court needs to resolve?

17        MR. SHENTOV:  My sense, Your Honor, is that Newegg

18  is attempting to raise claim construction issues with

19  vis-a-vis the "packet switched network."

20        THE COURT:  What?

21        MR. SHENTOV:  Whether the Internet is a "packet

22  switched network."  That appears to be a claim construction

23  issue because Soverain maintains that the Internet is a

24  "packet switched network."  It is essentially one by

25  definition a "packet switched network."  It is claimed as --

1   we have a claim directed to the Internet for "packet switched

2   network."  In fact, it is the only embodiment of a "packet

3   switched network" disclosed in our application.  So it is our

4   position, Your Honor, that the Internet is a "packet switched

5   network."

6          Their position appears to be a claim construction

7   related position that is not an "entirely packet switched

8   network."  Why?  Because it has components we don't know

9   whether they are packet switched or circuit switched.  And our

10  position on that issue, Your Honor, is it doesn't have to be

11  an entirely packet switched network.  It is a network that

12  operates using packets.  The Internet protocol which defines

13  how the Internet works, the network computer works, operates

14  by shipping packets from one place to another.  There is no

15  dispute about that.

16         The dispute is that some of these packets are routed

17  through a SONET or optical part of the network which is also

18  one of the most convenient ways to ship packets from one place

19  to another.  I think I have one of the slides that this is

20  clearer -- it defines the -- Your Honor defined what a "packet

21  switched network" is.  Let me find it quickly.

22         The Court's construction for "packet switching" is,

23  "a message-delivery technique in which small units of

24  information (packets) are relayed through stations in a

25  computer network preferably along the best route available

1   between the source and the destination."  Does the Internet

2   meet that definition?  Yes, Your Honor, it does.

3   Why?  Because if -- there is no dispute between the experts

4   between what happens when the user uses a browser the

5   information is packetized, these packets are sent from the

6   customer's computer to the server and they go along the best

7   route.

8          Could this route be through a SONET network, an

9   optical network?  Yes, it could.  That also goes through a

10  station preferably along the best route available between a

11  source and destination.  My definition falls within the

12  Court's definition of a "packet switched network."  There is

13  also no dispute that the Internet is a public packet switched

14  network, which is one of the requirements in our --

15         THE COURT:  So what are you asking the Court to do?

16         MR. SATINE:  I think that it is a matter of claim

17  construction, the Internet is a "packet switched network."  We

18  would ask the Court to deny their attempt to create a claim

19  construction issue of whether the Internet is an entirely

20  packet switched network or not an entirely packet switched

21  network.  It is simply not the claim limitation.

22         THE COURT:  What is the defendants' position?

23         MR. BALDAUF:  Your Honor, we don't view this as a

24  claim construction issue whatsoever.  We agree with the

25  Court's claim construction.  We, however, disagree as to

1  whether or not the functionality described by my colleague

2  satisfies that definition specifically with respect to the

3  optional paths and also whether or not the information is sent

4  through the circuit switching part of the network in packets.

5  These are issues that are disputed.  They are factual issues,

6  and they are all within the scope of your claim construction.

7       MR. SHENTOV:  There is no dispute between the

8  experts that information which is sent from one computer to

9  another is packetized.  It is sent in the form of a packet.

10  How it is then -- how these packets are then transferred from

11  one place to the other, that is the issue which their expert

12  has raised and it has essentially no bearing on whether the

13  Internet as a whole is a packet switched network.  It is.  It

14  transfers packets.

15       THE COURT:  Well, if either side wishes to file

16  something for me to rule on, I will be glad to rule on it; but

17  until you do, we will just rock along.

18       Okay.  Did you wish to be heard on your summary

19  judgment of -- let's see which one are we on here -- summary

20  judgment of infringement, Docket No. 230?

21       MR. SHENTOV:  Yes, Your Honor, I have a few slides

22  prepared.  Our motion for summary judgment involves nine

23  claims of which only one, Claim 15, is an independent claim.

24  Basically, all of them stand or fall with respect to Claim 15

25  of the '492 patent because defendant has raised no independent

1    arguments as to the other claims.  I have a listing of Claim

2    15.

3            Here, Your Honor, the next slide illustrates

4    Newegg's e-commerce system, and I will be using some

5    components of that system to show you how it operates and how

6    the operation of the Newegg system relates to the claim

7    elements.

8            Here is the first part of Claim 15.  It requires a

9    hypertext statement system.  That is basically a system that

10   enables users to find their past orders.  I don't believe

11   there is any ambiguity or dispute as to part (a).  15(b) a

12   client computer for operation by a client user.  Here it is,

13   Your Honor, that is the customer computer which is illustrated

14   in the upper right-hand corner.

15           The next one it requires one or more server

16   computers for operation by a server user.  These are the SSL

17   servers, Your Honor, which accept requests from customers and

18   act upon them.  And then the requirement, which we kind of

19   briefly touched upon, Claim 15(d), the client computer and the

20   server computer need to be interconnected by a public packet

21   switched computer.  The cloud that we see there is called

22   public Internet.  So that takes care of the public part.  And

23   the rest of it where the Internet is the public packet

24   switched network that we just discussed.

25           But as I mentioned, Your Honor, the internet was

1    claimed as an example of a public packet switched network in a

2    separate claim from Claim 15 and also is one of the -- it was

3    disclosed as an example of -- the only embodiment of a packet

4    switched network disclosed in the '492 patent.  So this takes

5    care of four of the initial elements of Claim 15.

6            Element 15(e) has several requirements that relate

7    to the operation of the server computers.  These were the

8    three boxes that we looked at.  This is an expanded view of

9    the server computer.  Now we have 15(e) which requires at

10   least one server computer being programmed to record

11   information pertaining to purchase transaction records in a

12   database.  What I have, Your Honor, is a cut-out from Exhibit

13   18 from our motion.  But, in essence, it is a block diagram of

14   how their system operates.

15           On the left-hand side the column which is labeled

16   web server, that is the server component we discussed

17   previously.  When a customer decides to purchase an item, it

18   is sent to the web server through this "submit order" label

19   and then that is sent by message to another MSMQ server which

20   in turn puts it into a database.  We have -- they have raised

21   the defense saying that the web server does not record

22   information pertaining to the purchase transaction record.

23           Your Honor, this cannot be correct for two reasons.

24   Number one, the information which is recorded it is clear from

25   the path highlighted in yellow on your screen, it is clear the

1    information about the purchase, that would be the

2    identification of the purchase item and purchase price, will

3    go -- after the submit order button will go through what is

4    labeled this MSMQ server which formats it in a proper way and

5    then puts it in a database, but it is important to note that

6    the requirement of the claim is to record information

7    pertaining to the purchase transaction records.

8         So, in other words, the information which comes from

9    the web server does not have to necessarily be identical to

10   the information that is stored.  It has to pertain to it.  And

11   there is no question that it does in our case.

12        Part two is this same service goes to transmit a

13   statement document comprising the purchase transaction records

14   over to the client computer over the network.  Our Undisputed

15   Fact No. 32 part of the motion was admitted.  I don't believe

16   there is a dispute about that issue.  So checkmark on this.

17        The next Element 15(f) is several requirements on the

18   client computer has to be programmed to do certain things.

19   Number one, it has to display the statement document.  What is

20   on your screen, Your Honor, is a display of a statement

21   document.  It is the summary of the purchase.  This is how it

22   looks on a personal computer of a client.  Number two, the

23   client computer has to be able to receive a request from the

24   user to display the transaction records.

25        If you look at the order history it is divided by

1    orders and we have highlighted one of these orders which is

2    essentially hypertexting.  When you click on that link, when

3    the user clicks on that link, it essentially responds to a

4    request for a portion of the statement document.  In essence,

5    the user says to the system give me more detail about my

6    Invoice No. 49062560.

7            And the third thing is that it is supposed to cause

8    the transaction detail hypertext link corresponding to the

9    portion of the statement document to be activated.  What does

10   that mean?  The activation of the hypertext statement is

11   sending a message to the server computers.  And in our next

12   slide we will illustrate.  This is a message of traffic which

13   we captured on the client computer site.  A message is sent

14   from the client computer to the Newegg server which says give

15   me the details of this information.  It meets the requirement

16   of 15(f) also.

17           And finally we have Claim Element 15(g), which is

18   that the server computer has to be programmed to respond to

19   the activation of the transaction detail hypertext link by

20   transmitting the transaction details to the client computer.

21   I have listed a number of undisputed facts which they have

22   admitted.  But the bottomline, Your Honor, is when you click

23   on that hypertext link, you get the detail you want the

24   computer to do it.  Obviously, the server computers at Newegg

25   perform that step, so -- to meet this claim limitation.  I

1    misspoke.

2         One of the defenses that they raised is -- in the

3    original motion -- actually when we filed the motion we were

4    trying to be very selective and pick claims which presented a

5    minimum amount of issues for dispute.  At the time we were

6    aware of only bullet point 2, the Internet is an example of a

7    packet switched network.  They have already told us that in

8    their view it is not.  And the last one, Newegg program's

9    client computers, they had indicated to us in their view

10   Newegg does not program the client computers.  It sort of

11   stretches the imagination to think why a client computer would

12   display something that Newegg likes it to display if it is not

13   programmed to do it.

14        But, nonetheless, of the five defenses that Newegg

15   raised ultimately only two were known to us.  Multiple-actor

16   noninfringement defense came up as part of their response

17   motion for the first time.  They have previously indicated

18   that multiple-actor defense vis-a-vis the method claims.  This

19   is the first time that we saw it vis-a-vis a system claim.

20   And I have -- we will probably get to discuss the

21   noninfringement motion as well.

22        But the Newegg multiple-actor defense essentially

23   fails because Newegg uses the system as a whole to provide

24   order, history, and transaction details; and furthermore not

25   only does it use the system as a whole but, in fact, it uses

1    all of the components of the system.  Certainly all of its

2    servers, database servers, message servers, and whatever it is

3    that this first bullet -- and then it uses the customer

4    computers by displaying HTML web pages.  Until the customer

5    wants to view some detail, Newegg shows that detail to the

6    computer on that computer's screen.

7          The next one is Newegg also uses the customer

8    computer by storing shopping cart and other information in

9    cookies.  It sends information -- instead of storing it on

10   Newegg it sends it to the client's computer, and it is a

11   stretch for Newegg to say that the client's computer is not

12   being used when they are, in fact, using it for a receptacle

13   for cookies which stores this information.

14         The Internet is a packet switched network, we have

15   touched upon this, Your Honor.  I wanted to briefly go through

16   this slide.  Claim 39 of our patent says, "Wherein, the

17   network is an Internet."  That means that in the minds of the

18   inventors what was a public packet switched computer network

19   responds to the Internet.

20         The next slide, is the Internet a package switched

21   network?  Yes, it is.  This is an excerpt from the '492

22   patent.  The last line, which is underlined shows, "The buyer,

23   merchant, payment, and creation computers are all

24   interconnected by a computer network such as the Internet."

25         I mentioned the "packet switching" instruction that

1    Your Honor had.

2           All right.  Going to another defense, they say we

3    don't record information.  In the Amazon case we actually

4    discussed the issue as to whether certain acts have to be

5    "direct."  In fact, I have a quote from that discussion about

6    what it means to record in a database.  Your Honor stated that

7    "These constructions reflect the ordinary meaning of the

8    terms."  There is no basis for a limitation to require

9    something -- in other words, for a web server to directly

10   record the information into the database.

11          I also touched upon their contention that the

12   information pertaining to the transaction record is not the

13   same.  It doesn't have to be the same.  The claim does not

14   require the information, which is ultimately stored in the

15   database, to be the same as that which the server computer

16   stored.

17          Finally, this is another of the defenses that more

18   recently came up is that they say, well, it takes the

19   information not from the database.  It takes it from another

20   place.  It simply doesn't matter where it takes it.  The claim

21   does not have any limitation to that effect.

22          Newegg client's computer being programmed.  We were

23   on notice -- originally I think the notion was HTML language,

24   the type of programming language which programs how a page

25   looks on a customer computer is not really programming.  They

1    say it is -- whatever it is, it is not programming.  Why?

2    Because the customer -- allegedly for a real program, the

3    customer has to be able to click on something, has to be able

4    to compile it, and Your Honor has background in this field.

5    Programming simply means providing a set of instructions.

6             Does the HTML language provide a set of instructions

7    as to how a web page is displayed?  Certainly.  And they have

8    admitted that the HTML code provides instructions as to how to

9    display the page.  And the obvious thing is that computers

10   only do what they are programmed to do.  You cannot have a

11   display unless Newegg programmed the customer's computer to

12   display it in a particular way they requested.

13            I will skip through this.

14            So basically we have all 15 -- all elements of Claim

15   15 are met.  There are eight additional dependent claims for

16   which Newegg has presented no additional noninfringing

17   arguments, so, therefore, the dependent claims are also

18   infringed.

19            THE COURT:  Okay.  Response?

20            MR. BALDAUF:  Your Honor, in our briefing, we

21   addressed a number of the issues addressed by Mr. Shentov

22   concerning the functionality of the Newegg system.  We believe

23   there are a number of factual disputes there.  Certainly, the

24   programming issue as well as the public packet switched

25   network.

1          But I would like to talk about something more

2     fundamental.  Not only should this motion for summary judgment

3     be denied, summary judgment of noninfringement should be

4     granted as a matter of law.  They come up here with a cavalier

5     attitude that the all elements rule somehow does not apply to

6     systems claims.  We have briefed this extensively.  It is just

7     not the case.

8          The Supreme Court is very, very clear in the

9     Warner-Jenkinson case, as well as all precedent, that the

10    accused infringer must satisfy every single limitation of a

11    claim itself.  The Federal Circuit, of course, addressed that

12    issue in the Muniauction case following the BMC case and very

13    clearly held that in these instances of divided infringement,

14    to be held liable for direct infringement the accused

15    defendant must satisfy every limitation of the claim.

16         Soverain has taken the position, well, hey, those

17    cases only applied to method claims because that is what was

18    at issue there.  Certainly not the case.  They then pull back

19    and take a look at the NTP/Research in Motion case, a case

20    that deals specifically and only with the issue of the

21    geographic place of infringement.  In fact, in Footnote 13 in

22    that case the Federal Circuit noted that the issue of direct

23    infringement by the users was not even before the Court.

24         In that case the Court only looked at the issue of

25    where the infringement occurred and in that context held that

1  because there were users in the United States, infringement

2  occurred within the United States.  However, there is nothing

3  in that case and nothing in any case that suggests that

4  systems claims are somehow immune from the all elements rule.

5  In fact, we supplemented our briefing with respect to our

6  motion for summary judgment with the district court case from

7  the Southern District of Indiana, Centillion Data Systems v.

8  Qwest Communications.

9          Subsequent to that in the Central District of

10  California, Phoenix Solutions, Inc. v. the DirecTV Group, this

11  exact issue was addressed by both courts, and it is the same

12  issue we have here.  Our system claims are somehow immune from

13  the all elements rule.  And in both instances the district

14  court said, no, they are not and noted that the NTP decision

15  itself was limited to this issue of geographic place of

16  infringement and did not itself address the fundamental issue

17  we are dealing with here, which is the issue of divided

18  infringement.

19          And in those cases I believe it is the proper

20  conclusion that in order to infringe a system claim, the

21  accused infringer must itself satisfy each and every element

22  of the claim.  There is absolutely nothing in the legal

23  precedent of this country to excuse those types of claims from

24  the all elements rule.

25          THE COURT:  Response?

1          MR. SHENTOV:  May I respond, Your Honor -- yes.

2     First, on the question of as to whether NTP, the Federal

3     Circuit decision in NTP is limited to a locale, the place

4     where the infringement occurred, it is incorrect.

5     Essentially, the Centillion case on which Newegg relies in its

6     supplemental briefing, the Centillion case specifically says

7     that NTP explained the way -- how a system is used and it

8     applies to system use.  So, therefore, the NTP decision

9     certainly applies not only to the geographic location of

10    infringement, but the Centillion case on which Newegg relies

11    suggests that it governs the infringement of system claims.

12          I would like to take a very strong issue with the

13    exception to the Warner-Jenkinson/Hilton Davis decision and

14    whether divided actor system claims are excused from complying

15    with the all elements rule.  We know the Warner-Jenkinson

16    decision.  It was a decision which essentially had to deal

17    with the doctrine of equivalents and how individual elements

18    have to be found in the ultimate system in order to find

19    infringement.

20          I am actually -- I have in front of me a discussion

21    of the Warner-Jenkinson decision by Your Honor in its Renhcol

22    decision.  This is what the all elements rule is about.

23    Stating that the inquiry to determine direct patent

24    infringement is "does the accused product or process contain

25    elements identical to or equivalent to each claim element of

1    the patented invention?"  Let me just briefly turn to the

2    Newegg system.

3            Your Honor, there is absolutely no dispute that all

4    of the elements as we discussed in the opening parts of my

5    statement, all of the elements are there.  There is a customer

6    computer, there is a server computer, there are the required

7    interconnections.  The all elements rule essentially said, as

8    Your Honor said, does the accused product or process contain

9    elements identical to or equivalent to each claimed element?

10   It doesn't say whether one party has to own the elements.

11   That proposition has been rejected multiple times as you

12   pointed out in the Renhcol decision.  It was rejected in the

13   Inline case.  It was rejected in multiple other cases.

14           Do you have to have a direct -- to have direction or

15   control of each of the elements?  Your Honor, in our reply to

16   the supplemental motion in their motion for summary judgment

17   of infringement -- I guess we are jumping a little bit ahead

18   of ourselves.  But we indicated that, first of all, there is

19   only one binding precedent on this Court which is the NTP

20   decision which directly addressed issues of system claim

21   infringement.  That decision, the NTP decision which is

22   acknowledged in Centillion to specifically apply to the

23   infringement analysis of system claims, says nothing about

24   direction or control.  It says nothing about ownership of

25   individual components.  It says you have to find individual

1   components.

2          Furthermore, NTP says that infringement of system

3   claims is fundamentally different from the infringement of the

4   validity case -- of the -- I'm sorry, of method claims.

5          I will probably be jumping a little bit ahead of

6   myself because we may be addressing this thing as part of the

7   other motion, but let's think for a second what does the

8   Federal Circuit tell us in NTP saying that the infringement

9   analysis for system claims is fundamentally different from

10  that of method claims?  Method claims are essentially a

11  sequence of steps.  We can identify each actor, each person

12  who performed the steps.  If you break a window you can find

13  the person who is responsible for breaking the window.

14         If you perform all of the claim elements of a method

15  claim, you can identify for each of the steps recited in the

16  method, you can identify who is responsible for doing this.

17  Let's turn this thing around into the discussion of the system

18  claims.  System claims are a combination of different

19  components.  These are inanimate objects.  They don't have a

20  will of their own.  For Newegg to say that divided actor issue

21  would have to apply to system claims, in essence, would put an

22  unresolvable dilemma really for any kind of knowledge of

23  system claims because as we pointed out -- suppose we have a

24  car, and the car claims a body, driver seat, passenger seat,

25  the body is painted.  According to Newegg you have to have --

1    you have to show that one party and one party only or someone

2    under its direction or control owns all of these components or

3    directs and controls them.

4          What does that really mean?  How can you direct the

5    passenger seat?  Do you have a passenger and if it is not

6    related to you is that possible to even consider

7    infringement?  It is a nonworking solution which was proposed

8    in the Centillion case.  I have an example of the test which

9    was proposed.  A party is liable for direct infringement for

10   use of a claim under 271(a) if it by itself or in combination

11   with a third party directed by it, put each and every element

12   of the system claim into service; i.e., exercised control

13   over, benefited from the application of each element to the

14   system claim.

15         It is not going to work.  Your decision in Renhcol

16   agreed with this.  The Uniloc decision in the Rhode Island

17   case against Microsoft furthermore confirmed that the

18   application of the divided act or rationale in Muniauction

19   simply does not extend to system claims.

20         THE COURT:  Final word.

21         MR. BALDAUF:  Mr. Shentov suggests that this Court

22   is only bound by the NTP case.  I submit it is also bound by

23   the more recent decisions in BMC and in Muniauction.  It is

24   not the issue of ownership.  The Court in Muniauction was

25   very, very clear.  You have to either itself be the accused

1   infringer, perform each and every element of the claim, or it

2   has to direct or control another to do so, it could be liable

3   for their actions in a manner of vicarious liability.

4          There is absolutely no possible way in this set of

5   circumstances that Newegg could be vicariously liable for the

6   actions of the consumers that use its website.  I think the

7   most instructive case was the Global Patent Holdings case from

8   the Southern District of Florida that we cited which dealt

9   with this very specific issue.  I am sure I am going to hear,

10  well, it is a method claim, it doesn't count.  It does count.

11  It addresses this issue that these claims can't be infringed

12  until a user comes and hits that website; and that the

13  operator of that website does not control those actions of the

14  customer.  It is nonsense to suggest otherwise.

15         The fact of the matter is, there is absolutely

16  nothing in the NTP decision that excuses that from the all

17  elements rule.  In fact, the cases that I discussed

18  previously, the Centillion case in particular, specifically

19  addresses the interplay between these cases of law; namely,

20  the divided infringement case law and this issue of the

21  geographic place of infringement specifically analyzed NTP, I

22  believe also cited your decision in the Renhcol case and held

23  that's a different body of case law that deals with the

24  geographic place of infringement and has no impact on the

25  conclusion in the law under Warner-Jenkinson that the accused

1   infringer must itself practice every element of the claim or

2   control someone else to do so, and that just cannot exist here

3   when every one of these claims require a customer and a

4   customer computer.

5           THE COURT:  Okay.  Thank y'all very much.  I'm going

6   to take the last two motions for summary judgment under

7   advisement and carry them along for now.

8           I am going to instruct y'all to get together on your

9   motions in limine and confer and see if you can get those

10  narrowed down in light of the Court's rulings today.

11          With regard to trial time estimates, each side will

12  have 30 minutes for voir dire, 30 minutes for opening

13  statement, 12 hours for direct and cross-examination, and 60

14  minutes per side for closing argument.  I would like to

15  instruct y'all to meet and confer on your jury instructions

16  and really see if you can narrow those down and really -- I'm

17  talking about really working at agreeing on what you can agree

18  to, and then give me a combined version narrowed down with

19  what you can agree to spelled out as to each side so that we

20  can get to work on that.  The jointed proposed jury

21  questionnaire is approved.

22          The trial date, this is going to be very difficult

23  and I apologize for the type of schedule y'all are going to

24  end up on, but the Court's docket is pretty crowded this

25  month.  We will select a jury on the 1st.  However, I have got

1   a criminal case unless it should plead.  If it for some reason

2   should plead, then we could start evidence immediately

3   following jury selection.  I don't think it is going to plead,

4   and I would try to give you as much advance notice if in any

5   event it should.

6          I will give you enough time to -- I'm not going to

7   do it the day before or anything, but in all likelihood the

8   criminal case is going to go.  That will take me through

9   finishing it on either the 8th or 9th.  I have got the one-day

10  civil case that you heard the pretrial on that I am

11  tentatively setting for trial on the 9th.  It will just be a

12  one-day Bench trial.

13         So the soonest I can start your case will be on

14  February 19th, the evidence, if that all holds true, which is

15  a Friday.  I know that is not good to start on a Friday.  I

16  would rather say start on Monday and we will go straight

17  through, but I am really going to be cramming it to even get

18  this trial next month, and I have got others starting next

19  month.  So we will try to get in a full day on the 19th, come

20  back on Monday, Tuesday, and Wednesday the 22nd, 23rd, and

21  24th; but I will advise you I have sentencings scheduled from

22  1:30 to 2:30 on the 22nd.  I have a motion for summary

23  judgment on the 23rd at 1:30, and I have sentencings on the

24  24th from 10:00 to about 11:00.

25         What I will do with those though is try to schedule

1    those around my lunch hour and give you and the jury a break

2    while I do those sentencings, but we are going to have trouble

3    getting in full days those days.  That right there is only

4    four days of testimony, and that takes us through the 24th.

5    I'm going to be out of town on the 25th and 26th, which would

6    mean we will have to come back on March 1st to finish up if we

7    can't finish by the 24th.  I have one, two more patent jury

8    cases to select on the 1st and a nonjury patent case to select

9    on the 1st, so we probably wouldn't start until that afternoon

10   or possibly the next morning on the 2nd.  We will just have to

11   deal with that as it comes up.  We can definitely finish on

12   the 2nd.  I have several criminal pre-trials that day, but I

13   think they will probably go away.  And if we have to go into

14   the 3rd, we will.  So you are looking at starting up on the

15   19th, going through the 22nd throughout 24th and coming back

16   on the 1st or 2nd for a day or two to finish up.

17          THE COURT:  Mr. Adamo.

18          MR. ADAMO:  I am just going to tell the Court, Judge

19   Davis, this is obviously my problem more than it is the

20   Court's.  I have got an expert witness problem.  I don't know

21   whether these dates are going to solve it or not, but we will

22   work on that as soon as we possibly can and I will have to

23   light candles this weekend that Judge Robinson takes me out of

24   my defense case in Delaware on summary judgment motion or I

25   have got to be in two places at the same time in front of two

1    different juries, but that is my problem.

2              THE COURT:  We will work with you on that.

3              MR. ADAMO:  As Your Honor knows, I have never come

4    before Your Honor asking for a continuance and I don't want to

5    break my habit and do it now.  Let me see what I can do about

6    the case that has been set before Judge Robinson.  It is a

7    defense case, and final pretrial was held on summary judgment

8    motion.  I am hoping by the Markman ruling we are supposed to

9    get next Thursday or motions which hopefully we will get by

10   next Thursday this is not going to be an issue, so, as I said,

11   that is my problem, but I just wanted to tell you.

12             THE COURT:  Let me ask both parties, again, I

13   apologize for that schedule.  That is the best I can do in

14   February.  Now, many thanks to Chief Judge Rader who is taking

15   over my docket in April in Marshall, so April is much, much

16   more open if both sides would have any interest in pushing it

17   off until then.

18             MR. ADAMO:  My client is looking daggers at me if I

19   push this.  I will make those dates.

20             THE COURT:  I don't like to continue cases either

21   and I seldom do, but --

22             What about defendants?

23             MR. SAYLES:  Just like Mr. Adamo, we were hoping and

24   anticipating that we would start the evidence on the 8th.  We

25   had planned our witnesses accordingly.  Not having checked

1    with them, I hope we don't have any insurmountable problems.

2    We will do everything we can to make it work.

3          THE COURT:  Would any of you like to serve the time

4    for this gentleman that is needing to go to trial in this

5    criminal case?  You volunteer Mr. Adamo?

6          MR. ADAMO:  He is senior, Your Honor.  He is the

7    senior manager.

8          MR. SMITH:  Your Honor, I was going to point out I

9    am actually your 23rd at 1:30 hearing.  That is on

10   cross-motions for summary judgment.  Would you like the

11   parties in that Mewbourne/Zenith case to see if possibly we

12   could do that on a different day?

13         THE COURT:  How long is that going to take?

14         MR. SMITH:  As long as you let us talk, I'm afraid.

15         THE COURT:  Not very long.  No, just leave it set.

16   I will try to handle that during lunch or something.

17         MR. SAYLES:  Judge, taking into account what you

18   told us, on a normal working day, what would be --

19         THE COURT:  Six hours, about six hours.  Now, I will

20   usually give the jury the option.  I will explain the problem

21   to them, and sometimes the juries will elect to come in at

22   8:30 and work until 5:30 in which case I can usually get in

23   six-and-a-half to seven a day.  Now, I could cut y'all down to

24   nine hours.  Do you think you could do it in nine hours per

25   side?

1          MR. ADAMO:  There is three patents.

2          MR. SAYLES:  Then I would say, yes, we could.

3          MR. ADAMO:  Well, sure, geeze.  He'd say he could do

4    it in two hours if you would give it to him.

5          MR. SAYLES:  Judge, on the jury questionnaire we

6    have made copies so the Court staff will not have to copy

7    those.  And we will leave those with the Court.

8          MR. ADAMO:  That's agreed.

9          THE COURT:  Okay.  Now, y'all know the obvious

10   example to this is that you go hence and settle this case.

11   Where are you?  Have you been to mediation?  Have you made any

12   progress?  Is there any hope?

13         MR. ADAMO:  Ms. Wolanyk, Your Honor, as you know,

14   does all that work for us.  That is not something I'm very

15   good at.

16         THE COURT:  Ms. Wolanyk.

17         MS. WOLANYK:  Your Honor, we have been trying to

18   move towards settlement since very early in this case and work

19   directly with Newegg and with the mediator and through their

20   counsel.  About a year ago after their co-defendant CDW and

21   Zappos settled the case, we made good progress negotiating the

22   terms of a license agreement.

23         THE COURT:  With Newegg?

24         MS. WOLANYK:  With Newegg, I'm sorry, yes.  At the

25   post-Markman mediation, Newegg declined to make any offer and

 1   we are still at that situation despite some conversations in

 2   the last couple of days.  Soverain is willing to settle this

 3   case, and we think that a mediator could assist us in getting

 4   there, as they did with Amazon.

 5            MR. SAYLES:  Mr. Lee Cheng, who is a lawyer --

 6            THE COURT:  Mr. Cheng.

 7            MR. SAYLES:  -- and a principal of Newegg and would

 8   be handling the settlement negotiations.  I think he could

 9   address that.

10            THE COURT:  Mr. Cheng.

11            MR. CHENG:  Your Honor, Newegg has always been

12   willing to discuss an amicable settlement and resolution to

13   this case.  In the post-Markman mediation Newegg was caught by

14   surprise.  I have had conversations with Ms. Wolanyk, and we

15   are caught by surprise.  We were presented by an offer far in

16   excess, you know, what we expected.  We were interested in a

17   serious discussion about settlement and we continue to be

18   rather than playing a numbers game, and we -- I have a date

19   with Ms. Wolanyk right after this hearing to continue our

20   discussions --

21            THE COURT:  Well, buy her dinner?

22            MR. CHENG:  Sir?

23            THE COURT:  Buy her dinner and maybe that will help.

24   Well, I would encourage y'all to keep talking.  Is there

25   anything I can do to help you in this process going back --

1   who is your mediator in this case?

2          MS. WOLANYK:  The mediator of record is Judge -- I'm

3   sorry is Mike Patterson.

4          THE COURT:  I can send you back to him.  I can send

5   you to another mediator if you think that would be helpful, a

6   fresh pair of eyes or whatever.

7          MS. WOLANYK:  We have mediated voluntarily with

8   Judge Faulkner.  Actually, Judge Faulkner handled the

9   post-Markman mediation.  So that is another option we are open

10   to.

11          THE COURT:  Mr. Cheng.

12          MR. CHENG:  I am open to mediation -- additional

13   mediation, although at this point in time we have had a lot of

14   progress just having discussions between the parties.  Again,

15   Newegg is very interested in settlement discussions based on

16   discussions of the merits of --

17       (Reporter unable to hear and asks Mr. Cheng to repeat his

18       last statement.)

19          MR. CHENG:  I'm sorry.

20          We have had very -- I think we have made good

21   progress just having discussion between the parties, but we

22   are open to the services potentially of another mediator if we

23   reach an impasse and we can't resolve our case.

24          THE COURT:  I'll leave it to y'all to do that

25   discussion.  If you would like for me to -- if you would like

1    to go back to Mr. Patterson or if you would like to have a
2    fresh pair of eyes, just let me know and I will be glad to do
3    whatever you wish in that regard.  I would encourage y'all to
4    really negotiate in good faith and really try to get it
5    resolved.  I have seen these cases.  I will just tell you from
6    the pretrial in this one, it sounds like both sides have
7    pretty completely different views of the world from what I can
8    see, and that can be dangerous to both sides.
9           So I would just encourage you to really see if you
10   can't find a business solution to this case.  You have got
11   great lawyers on both sides.  They are going to do a good job
12   of advocating.  I'm going to do the best job I can of judging.
13   I'm going to call the balls and strikes just like I see them.
14   You are going to have a jury in there that is going to do the
15   best job they can of deciding the case, but it doesn't
16   necessarily mean you are going to win, either side.  And right
17   now you have both got some control over the outcome of this;
18   but come February 1st and February 19th, you will very quickly
19   lose control.  And, you know, your destiny is going to be in
20   somebody's hands.  I know you would rather have it in your
21   own.  So I would really encourage you to try to get the case
22   settled.  That brings finality and closure for everybody.
23          Even if you win or lose on this case, it sounds like
24   there is enough involved you are going to be looking at a long
25   and lengthy appeal and post-trial motions and attorneys' fees

1    I can only, gosh, guess what those are.  I'm sure the lawyers

2    are loving it, but I'm not sure the clients are.

3         MR. ADAMO:  Can the record note, Your Honor, you are

4    looking at Mr. Sayles when you said that?

5         MR. CHENG:  We have to sell a lot of hard drives,

6    Your Honor.

7         THE COURT:  Excuse me?

8         MR. CHENG:  We have to sell a lot of hard drives.

9         THE COURT:  Okay.  All right.

10        While you can, I would encourage both sides to see

11   if you can't see if you can't find a business solution to it.

12   Maybe some of our rulings or lack thereof today will be of

13   help to you in breaking some log jams and give you some

14   indication.  I am a pretty big believer in trial by jury and I

15   am not inclined to preempt on summary judgments and that type

16   of thing.  It doesn't mean that a JMOL on something may be

17   down the road and it is certainly without prejudice when I

18   deny something; but these cases are so complex.  They are hard

19   enough for me to understand, very difficult to understand from

20   the papers.  But I find that once we get in the courtroom and

21   the jury gets in that witness box, I get a pretty good sense

22   and jury does, too, of what is going on; and can make some

23   pretty good decisions.  But somebody always wins and somebody

24   always loses, so we don't know what that will be.

25        Mr. Adamo.

1          MR. ADAMO:  I ask for the Court's indulgence just

2    for a couple of seconds on some housekeeping items.

3          THE COURT:  All right.

4          MR. ADAMO:  Is it Your Honor's plan to put eight in

5    the box for the jury?

6          THE COURT:  Right.

7          MR. ADAMO:  Any feel for how large the jury is going

8    to be, 25?

9          THE COURT:  It will probably be a 20 to 25 member

10    panel.  I will cut all the way through the panel, so voir dire

11    deeply.

12          MR. ADAMO:  What is the Court's sense -- I have

13    heard in various cases where you have impaneled a jury lately

14    and the number of strikes seems to vary depending on a lot of

15    parameters.  Do you have a sense of preemptory --

16          THE COURT:  That is what I am saying, however many

17    jurors, that is how many you will have.

18          MR. ADAMO:  Oh, I see.  If it is eight jurors, you

19    will let us have eight strikes?

20          THE COURT:  No.  If you have got 24 jurors and we

21    don't have any challenges for cause, after your eight jurors,

22    that leaves 16, so you would eight strikes each.

23          MR. ADAMO:  Understood.  Thank you.  That's

24    interesting.  Jury notebook?

25          THE COURT:  As long as both sides can agree.

1          MR. ADAMO:  I will propose that to Mr. Sayles.

2          THE COURT:  Right.  No problem.

3          MR. ADAMO:  Then one last item, I couldn't remember

4     if I missed this, we don't seem to have a 282 notice served on

5     us.  I know Your Honor knows what that is.  That's sine qua

6     non in their invalidity case.  I may have missed it, so if

7     somebody served one, get it to me.  If not and they didn't

8     serve one timely, obviously I object on the basis of not

9     having been served with a 282 notice just so it is of record.

10    I'm not waiving it.  I am just assuming it.  I didn't see it.

11    I just asked Mr. Sayles if he would find a copy of it.  If

12    they didn't serve one, then we are going to have an issue.

13         THE COURT:  Okay.  We will cross those when we get

14    to them.

15         MR. SAYLES:  One housekeeping item, if we agree --

16    and if we don't agree later we will later ask for a ruling,

17    but as a demonstrative we were planning to show and we will

18    exchange and make an agreement on this, the Newegg website.

19    You can do that statically with screenshots or you can pull up

20    the Newegg website with the understanding and pre-agreement

21    live in the courtroom.  Does the Court have any objection to

22    it if we can get the details worked out?

23         THE COURT:  As long as y'all can agree, it doesn't

24    matter to me.

25         MR. SAYLES:  All right, sir.

1          THE COURT:  And as long as you can make it work.

2          MR. ADAMO:  Yes, I will certainly discuss with Mr.

3     Sayles.  We tried that out in Marshall a couple of years ago

4     and it worked great in the Mathworks case until Day 3, and all

5     of a sudden we couldn't get in and the jurors are looking at

6     us and we had to put the paper up on the Elmo and we weren't

7     popular with that jury.

8          THE COURT:  Let me also mention to you if you don't

9     know this, what I will ask you to do when we start the

10    evidence is each day as we begin I will ask plaintiff if they

11    have any exhibits they wish to offer and you will have met and

12    conferred and you will offer in mass by standing up and

13    reading every exhibit number that is not objected to and the

14    other side will say no objection and we don't have any

15    confusion about what is in and not in.  Those that you object

16    to then you can offer in the traditional way during the course

17    of the day.  As soon as I do plaintiff, I will then invite

18    defendant.  And so we will do that as a housekeeping matter at

19    the beginning of each day.

20         MR. ADAMO:  All right, sir.  What Mr. Sayles and I

21    discussed -- this is the first time I have had the pleasure of

22    meeting him -- in the earlier -- before the pretrial we

23    discussed this morning we have got a lot of exhibits -- we

24    have a lot of objections to stuff normally -- I have got a

25    proposal to him that we might be able to stipulate through a

1   lot of that.  There might then be a very small universe of

2   exhibits that we might ask you to have Magistrate Judge Love

3   rule on.  I don't know.  But the whole intention here is to

4   try to get all of the evidentiary stuff gone so your procedure

5   will be easy.

6            THE COURT:  Well, in most of my cases the attorneys

7   do get that worked out, and I don't have to deal with it and I

8   will have high expectations for this case.

9            MR. ADAMO:  I remember the Court's guidance when we

10  got close to trial on amazon.com and I'd just as soon not have

11  to deal with that again.

12           THE COURT:  Anything else the Court can help you

13  with today?

14           MR. SAYLES:  May I retrieve the books from Your

15  Honor?

16           THE COURT:  You certainly may.  You may have those.

17           Anything else?

18           MR. ADAMO:  Thank you very much for your time.

19           THE COURT:  Y'all have a good day.  We will be

20  adjourned.

21      (End of proceedings.)

22

23

24

25

90

1                    C E R T I F I C A T I O N

2

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7    /s/  Shea Sloan                        February 5, 2010

8    SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
9    STATE OF TEXAS NO. 3081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25