```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                              TYLER DIVISION

 3    SOVERAIN SOFTWARE              )
                                     )   DOCKET NO. 6:07cv511
 4        -vs-                       )
                                     )   Tyler, Texas
 5                                   )   9:45 a.m.
      NEWEGG, INC.                   )   April 19, 2010
 6
                      TRANSCRIPT OF VOIR DIRE OF THE JURY PANEL
 7                  BEFORE THE HONORABLE LEONARD DAVIS,
                        UNITED STATES DISTRICT JUDGE
 8
                          A P P E A R A N C E S
 9
      FOR THE PLAINTIFFS:     MR. THOMAS GIANNETTI
10                            JONES DAY
                              222 E 41st
11                            New York, NY  10017

12                            MR. CARL ROTH
                              MS. AMANDA ABRAHAM
13                            MR. BRENDAN ROTH
                              ROTH LAW FIRM
14                            115 N. Wellington, Ste. 200
                              P.O. Box 876
15                            Marshall, Texas  75670

16                            MR. MICHAEL SMITH
                              SIEBMAN LAW FIRM
17                            713 S. Washington
                              Marshall, TX  75670
18
      ALSO PRESENT:  MS. KATHARINE A. WOLANYK, SOVERAIN
19                   MR. LEE CHENG AND MS. MIRA WOLFF, NEWEGG

20    COURT REPORTER:         MS. SHEA SLOAN
                              211 West Ferguson
21                            Tyler, Texas  75702
                              shea_sloan@txed.uscourts.gov
22

23    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
24

25
```

2

```
 1   FOR THE DEFENDANTS:    MR. RICHARD SAYLES
                            MR. MARK STRACHAN
 2                          SAYLES WERBNER
                            4400 Renaissance
 3                          1201 Elm St.
                            Dallas, Texas  75270
 4

 5                          MR. KENT BALDAUF
                            THE WEBB LAW FIRM
 6                          200 Koppers Bldg.
                            436 Seventh Ave.
 7                          Pittsburg, PA  15219

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2          (Call to Order of the Court.)
 3              THE COURT:  Please be seated.
 4              All right.  Good morning, Ladies and Gentlemen of
 5     the Jury.  I am United States District Judge Leonard Davis,
 6     and we are about to start the trial of a civil case, and you
 7     are here for jury selection this morning.
 8              Let me tell you that this is what we would call a
 9     patent case.  It is a case where the plaintiff accuses the
10     defendant of infringing three of its patents that it holds.
11              Now, y'all have seen the video downstairs; is that
12     correct?  Okay.  So you know a little bit about the patent
13     system, if you didn't before, from that patent video.
14              I and the parties are going to have much more to say
15     about patent law, patent cases, and this case specifically and
16     what the patents are as the trial progresses.  So I just
17     wanted you to have a general idea of what the case is about.
18              Now, we are going to select a jury this morning; and
19     once that is done, eight of you who are selected to be on the
20     jury will be seated, and then will come back next Monday for
21     the actual trial to begin.
22              Today is just going to be jury selection.  I
23     anticipate that all of you should be released and go about
24     your business by noon today.
25              I do want to say that the trial, when it begins on
```

4

```
 1    Monday, should conclude next week; but it will probably go

 2    through Friday, so you should realize that if you are selected

 3    to be on the jury today, basically today and all of next week

 4    will be taken up with the trial of this case.

 5           I do hope that you will consider it an honor to be

 6    serving in jury duty today and not a burden.  I know a lot of

 7    people look at it that way.  I know it is inconvenient for you

 8    to be here when you have other things you need to be doing,

 9    but it is really part of your commitment to service to your

10    country just as our military serves, just as our elected

11    officials serve.

12           We enjoy a right in this country to trial by jury

13    where a jury of peers can decide disputes between people that

14    have disputes.  And that is not a privilege that is enjoyed or

15    a right that exists in most places in the world today.  So it

16    is a very important right, and you are playing an important

17    part of it today.  So I do hope that you will view it in that

18    manner, even though I know it is an inconvenience.

19           Now, what we are going to do today is to begin with

20    Voir Dire Examination, and I am going to be asking you some

21    questions, the attorneys are going to be asking you some

22    questions.  This will probably talk about an hour, maybe a

23    little longer.  Each side is then allowed to strike a certain

24    number of jurors, and the first remaining 8 jurors will be

25    sworn as the jury which will decide this case.
```

5

1          Those 8 of you that are selected will come back next

2    Monday morning, and you will begin by hearing opening

3    statements.  That is what the attorneys expect the evidence

4    will show in this case.

5          That will be followed by a presentation of the

6    evidence with the plaintiff presenting evidence first and then

7    the defendant and then the plaintiff again.

8          After all of the evidence is in, you will then

9    receive what is called a Court's charge from me, which will

10   instruct you on the law and what factual questions you need to

11   answer.

12         And at the end of the case you will have half a

13   dozen short questions that you will answer that will be your

14   verdict in this case.

15         After you have received the Court's charge, you will

16   then hear closing arguments by the attorneys in the case.

17   That is what they believe that the evidence has shown and why

18   you should find a specific way.  Then and only then would you

19   begin your deliberations in the case.

20         So that is sort of -- for those of you that are

21   selected -- what will be going on next week.

22         But today is Voir Dire Examination, and the purpose

23   of Voir Dire is to enable the Court to determine whether or

24   not any prospective juror should be excluded from jury service

25   either by the Court for cause or by Counsel for the parties by

6

1    way of a peremptory challenge.  And that is one of those

2    strikes for which no reason need be given.

3           Now, "Voir Dire" is Latin phrase, which means "to

4    speak the truth," which I know each of you will do as you

5    answer the questions that will be asked of you this morning.

6    Please listen carefully to the questions that I will be asking

7    you, as well as the attorneys, and don't be timid about

8    speaking up if they apply to you.

9           If you are sitting there today and someone asks a

10   question and you are going, well, I don't know whether I

11   should answer because I am not sure it is correct -- you know,

12   100 percent on point, go ahead and answer anyway.  There are

13   no right or wrong answers, and more information rather than

14   less is very important to this process.

15          Now, just to get to know each other a little bit, I

16   know you filled out a jury questionnaire and that is very much

17   appreciated and will be very helpful to the attorneys in

18   selecting this jury.

19          This jury questionnaire, by the way, the Court will

20   take all of that back up when the case is concluded, and our

21   courtroom administrator Ms. Ferguson will see that those are

22   all shredded, so all of your personal information on there

23   will not be passed on or made available to anyone.

24          But right now just to get you used to answering

25   questions and to give us a chance to get to know you, I would

1    like for each juror to introduce yourselves and just tell what

2    your favorite thing to do in your spare time is.  So we will

3    start with Juror No. 1, Ms. Williams.

4            MS. N. WILLIAMS:  My name is Nancy Williams.  I am

5    from Jacksonville.  My favorite thing to do in spare time is

6    just work in the yard and spend time with my kids and

7    grandkids.

8            THE COURT:  Very good.  Thank you.

9            MS. WHITWORTH:  My name is Patsy Whitworth.  I'm

10   from Rains County.  And mostly I just work in the yard and

11   garden.

12           THE COURT:  Okay.  Thank you.

13           MS. DEVELIN:  My name is Kristi Develin.  I'm from

14   Carthage.  My favorite thing to do is spend time with my two

15   children and my husband, and I love to read.

16           THE COURT:  Thank you.

17           MS. RUSHING:  My name is Patricia Rushing.  I'm from

18   Carthage also.  My favorite thing, I guess, is just spending

19   time -- when I have time after working -- just spending time

20   with family and just relaxing.

21           THE COURT:  All right.

22           MS. VEERKAMP:  My name is Betty Veerkamp.  I live in

23   Ben Wheeler, Texas.  I do a lot of crafting and also helping

24   out with neighbors, taking him to food banks and doctors'

25   appointments in my spare time.

     1              THE COURT:  Okay.  Thank you.

     2              MR. HURST:  My name is Bob Hurst, and I was raised

     3     here in Tyler.  I went to the old John Tyler High School.

     4     Attended Tyler Junior College.  I worked for a company here

     5     for several years, one of the foundries.  I was a maintenance

     6     supervisor.  I had served an apprenticeship as a youngster, as

     7     a pattern maker or tool and die work, so to speak.

     8              I left Tyler when the crunch kind of hit on some of

     9     the industries around here and they kind of went down the

    10     tube, so to speak.  And I moved to -- went to work for Lone

    11     Star Steel as a maintenance supervisor there.  The same thing

    12     happened there.  About ten years later I was laid off because

    13     of a downturn in business with the steel companies.  So I

    14     moved back to Tyler.

    15              I went to work for Tyler Pipe Industries as a

    16     pattern maker, and stayed there until I retired.  And now I

    17     live at Lindale out in the country.

    18              And my wife and I -- I have a daughter that teaches

    19     school there in Lindale, and I've got a daughter-in-law that

    20     teaches school in Whitehouse.  And I have got a son that lives

    21     out there in the country with me.  He spent 18 years with J.

    22     B. Smith here, and now he is a supervisor for Brookshire's at

    23     Brookshire's Dairy.

    24              THE COURT:  All right.

    25              MR. HURST:  And that about brings it up to date for

1    me.  Thank you.

2              THE COURT:  Mr. Hurst, thank you.

3              Mr. Shafer.

4              MR. SHAFER:  Chris Shafer.  I'm from Kilgore.  I

5    just like to putt around the house and spend time with the

6    kids.

7              THE COURT:  Okay.  Thank you.

8              All right.  Ms. Stegall?

9              MS. STEGALL:  My name is Becky Stegall.  I'm from

10   Tyler, Texas.  I'm a life-long resident.  My favorite thing to

11   do is spending time with my husband and my daughter.

12             THE COURT:  Okay.  Thank you.

13             MS. HUFF:  I'm Harriet Huff.  I have recently

14   retired, and I like spending time with my 8 grandchildren.

15   I'm from Carthage.

16             THE COURT:  Thank you.

17             MR. BOWLES:  My name is Kelley Bowles.  My favorite

18   thing to do is be with my grandkids.  I like motorcycle riding

19   and fishing.  I'm from Longview, Texas.

20             THE COURT:  Thank you.

21             MR. HUTCHINSON:  My name is Keith Hutchinson.  I'm

22   from Longview, Texas.  My favorite thing to do is swim.

23             THE COURT:  Thank you.

24             MR. DAVIS:  My name is Johnny Davis.  I'm from

25   Malakoff, Texas.  My favorite hobby is fishing and gardening.

1           THE COURT:  Thank you, sir.

2           MS. CARTER:  My name is Judy Carter, and I enjoy my

3    husband for 28 years; and then we have two kids and I have got

4    4 grandkids and enjoy every minute of that.

5           THE COURT:  Okay.  Thank you.

6           MS. C. WILLIAMS:  I'm Connie Williams from Athens.

7    And I enjoy spending time with my family and working in the

8    yard.

9           THE COURT:  Thank you.

10          MR. CROSS:  My name is Brian Cross.  I'm from

11   Mineola.  And I enjoy fishing with my son and coaching his

12   baseball team.

13          THE COURT:  Thank you, sir.

14          MS. COOKE:  I'm Patty Cooke.  I'm from Emory, Texas

15   in Rains County.  And my favorite thing to do is spend time

16   with my new grandson.

17          THE COURT:  Okay.  Thank you.

18          MR. BOYD:  My name is Jerry Boyd from Quitman, and

19   my favorite thing to do is square dance and work outside.

20          THE COURT:  Thank you.

21          MS. BOYD:  I am Alice Boyd.  I live in Tyler -- here

22   in Tyler.  And if I have any spare time, I love to play music

23   and listen to music.

24          THE COURT:  Thank you.

25          MS. ALLEN:  I'm Patricia Allen.  I live in

11

```
 1   Gladewater, Texas.  I like to garden and read and learn new
 2   things.
 3           THE COURT:  Thank you.
 4           MR. NITSON:  I'm Ronald Nitson.  I go by Gene.  My
 5   favorite thing to do -- I live at Wills Point -- and my
 6   favorite thing to do is run with my sheep out there; shear and
 7   farm and all that.
 8           THE COURT:  Okay.
 9           MR. McGEHEE:  My name is Randall McGehee.  I live in
10   Noonday.  And I like to make art.
11           THE COURT:  Okay.
12           MS. BARNETT:  I'm Glenda Barnett from Yantis, Texas.
13   I enjoy traveling with my husband, working outside, and
14   family.
15           THE COURT:  Okay.
16           MS. WALKER:  I'm Claudia Walker from Jacksonville.
17   My favorite hobbies are spending time with grandkids,
18   gardening, and sewing.
19           MS. THOMPSON:  My name is Connie Thompson.  I'm from
20   Longview.  My favorite thing to do is spending time with my
21   girlfriends and my family.
22           THE COURT:  Okay.  Thank you.  All right.  Thank
23   y'all for those introductions.
24           In just a moment I'm going to ask the attorneys for
25   each side to introduce themselves, their co-Counsel, their
```

12

1    clients, and also to identify for you the witnesses that they

2    expect to call to testify in this case.

3            And the reason I am going to ask them to do that is

4    to see if you know any of these people.  So listen carefully

5    when they are going through listing their clients, their

6    co-Counsel and their witnesses and see if you know any of

7    those people.

8            There may be some from East Texas.  There may be a

9    lot that aren't from East Texas.  But after they have

10   indicated that, I am then going to ask any of you who know any

11   of them or any of the people they have listed, to please

12   stand; and we will have some more questions for you.

13           So at this time the Court will recognize Counsel for

14   the plaintiff to introduce themselves, their co-Counsel, their

15   parties, and their witnesses.

16           MR. ROTH:  My name is Carl Roth.  I'm from Marshall,

17   Texas.  I practice over there --

18           THE COURT:  Mr. Roth, you can go over to this podium

19   if you would like to where you won't have to have your back to

20   -- this one right here -- won't have to have your back to any

21   of the jury panel.  I know that is hard to talk to people when

22   you are not able to face them there.

23           MR. ROTH:  Do you want us to do the witnesses now,

24   Your Honor?

25           THE COURT:  Yes, uh-huh.

1        MR. ROTH:  I represent the plaintiff Soverain

2   Software in this case, along with the trial team from a firm

3   of Jones Day.  Jones Day has got several offices around.  With

4   us here today is Mr. Tom Giannetti from New York.

5        In addition to Mr. Giannetti is going to be Kenneth

6   Adamo.

7        And Mr. Adamo, Your Honor, there is some good news

8   about the results of a volcano because Mr. Adamo is lost

9   somewhere in Europe.  I'm sure the Court will be glad to know

10   that.  Because of the weather.  Mr. Adamo will be here.  He is

11   Lead Counsel.

12        Andrew Belenky -- there is a number of lawyers that

13   are listed here that may have some role in the case or appear

14   in the courtroom during the case.  Don't expect that you have

15   to listen to all of these lawyers.

16        Andrew Belenky; Ken Canfield; Clark Craddock; Barry

17   Satine; Ognjan Shentov; Debra Smith; and Michael Smith, my

18   ex-partner, from Marshall.

19        Also with us today is two other of my lawyers;

20   Amanda Abraham sitting at counsel table and Brendan Roth, my

21   son, who practices with me in Marshall.

22        Our client is Soverain Software.  Our client's

23   representative throughout the trial is Katharine Wolanyk.

24   Here is Ms. Wolanyk.  She is the president of the company and

25   chief legal officer and pretty much runs the show there.  She

14

```
 1    is from Chicago.

 2              The potential witnesses at the trial in this case

 3    will include the following people:  Jack Grimes, Tom

 4    Levergood, James Nawrocki, Andrew Payne, Michael Shamos,

 5    Lawrence Stewart, Winfield Treese, Ms. Wolanyk, Lee Cheng,

 6    Lucy Huo, Rick Quiroga, and James Wu.

 7              THE COURT:  All right.  Thank you, Mr. Roth.

 8              Does anybody on the jury panel know Mr. Roth or any

 9    of his partners or his co-Counsel from New York or Soverain's

10    president from Chicago or any of the other witnesses that were

11    listed?  Any of those names ring a bell with anyone?

12              Yes, ma'am?

13              MS. VEERKAMP:  I do know of Jones Day.

14              THE COURT:  Okay.

15              MS. VEERKAMP:  That's all.

16              THE COURT:  All right.  If you would stand, please

17    ma'am, and state your name.

18              MS. VEERKAMP:  I'm sorry.

19              THE COURT:  Here is the microphone for you.  This is

20    the procedure we will follow with each of you.  Whenever you

21    speak, please state your name again so the Court Reporter can

22    know who is speaking.

23              MS. VEERKAMP:  Yes.  My name is Betty Veerkamp, and

24    I do know of Jones Day from when I worked in Dallas.

25              THE COURT:  Okay.  Where did you work in Dallas?
```

1           MS. VEERKAMP:  Haynes & Boone Law Firm.

2           THE COURT:  And how long did you work for them?

3           MS. VEERKAMP:  20 years as a night word processor.

4           THE COURT:  As a what?

5           MS. VEERKAMP:  Night word processor.  Mostly in the

6    corporate and legal -- real estate section.

7           THE COURT:  Okay.  So you just heard of the law firm

8    of Jones Day?

9           MS. VEERKAMP:  Right, just heard of the law firm.

10          THE COURT:  Thank you very much.

11          Anyone else?

12          All right.  Counsel for defendant?

13          MR. SAYLES:  May it please the Court.

14          THE COURT:  Mr. Sayles.

15          MR. SAYLES:  Good morning.  I'm Dick Sayles.  I'm a

16   lawyer from Dallas.  I hope you won't hold that against me.  I

17   have been in these courtrooms quite a bit.

18          Mark Strachan here is my partner.  He grew up in

19   Longview, so some of you might recognize him.

20          Kent Baldauf is my co-Counsel.

21          And our client representative is Mr. Lee Cheng.

22   Lee, would you please stand up.

23          And seated at the counsel table is Mira Wolff.  Mira

24   is an in-house lawyer with our client Newegg.

25          And the name of our client is Newegg.  It is an

1    online retailer of electronic products.

2          The witnesses that we are likely to call in this

3    case are Lee Cheng, whom you just met; James Wu, who is the

4    chief technical officer of Newegg; Alexander Trevor, who is a

5    witness about facts, about some of the prior art.  An expert

6    witness named Ed Tittel, who is a writer and author of a

7    number of books; and a witness named Chris Bakewell, who will

8    address the subject of damages.

9          THE COURT:  Okay.  Thank you.

10         All right.  Does -- do any of the members of the

11   jury panel know Mr. Sayles or Mr. Strachan or any of their

12   co-Counsel, their corporate representative, or any of the

13   witnesses that he has listed?

14         Yes, sir.  If you would please stand and state your

15   name?

16         MR. HUTCHINSON:  Keith Hutchinson.  And I know Mark

17   Strachan.

18         THE COURT:  Okay.  And how do you know Mr. Strachan?

19         MR. HUTCHINSON:  Kind of grew up together, went to

20   church in Longview.

21         THE COURT:  Okay.  All right.  Are you friends with

22   him --

23         MR. HUTCHINSON:  I haven't seen him in about ten

24   years.

25         THE COURT:  Okay.  All right.

 1          MR. HUTCHINSON:  It's been a while.  I didn't even

 2    recognize him until his name --

 3          THE COURT:  So you don't visit in each other's home

 4    or that type of thing?

 5          MR. HUTCHINSON:  No, sir.

 6          THE COURT:  Thank you.  You may have a seat.

 7          All right.  Anyone else?  All right.  Very well.

 8          All right.  Now, in just a moment I'm going to allow

 9    Counsel for each side to ask you some questions.  But, first,

10    just let me ask you is there any reason right off the top of

11    your head that you can think of why you would not be a

12    qualified juror to hear this case just knowing what you know

13    about it, not very much?  Anyone?

14          Yes, ma'am?

15          MS. N. WILLIAMS:  I don't know if this counts; but I

16    am a teacher and next week is the State-mandated TAKS test,

17    and I teach dyslexic children, and they have certain

18    combinations and we have practiced with them all year long.

19    And it would be, I think, unfair to them for me to be away

20    from them next week, since they would have to have a stranger

21    they haven't worked with all year.

22          THE COURT:  Thank you.  Thank you for that

23    information.

24          All right.  Anyone else?

25          Yes, sir?  If you would, please stand.

18

 1              MR. BOREN:  My name is Jerry Boren.  I don't know

 2    if you need to know this, but the 28th and 29th I do have

 3    dentist appointments lined up.

 4              THE COURT:  Okay.  Thank you.

 5              All right.  Anyone else?  Okay.

 6              MS. BARNETT:  Glenda Barnett from Yantis.  I have a

 7    close friend of 40 years that is expected to die at any time,

 8    and I don't want to use that as an excuse, but it is something

 9    I can't miss being with the family.

10              THE COURT:  Thank you.

11              Anyone else?

12              MS. THOMPSON:  I'm Connie Thompson.  I, too, am in

13    the education field, and I too will be involved next week with

14    special ed students in testing.

15              THE COURT:  Okay.  Thank you.

16              Anyone else?

17              Yes, ma'am?

18              MS. WHITWORTH:  My name is Patsy Whitworth, and I

19    have been passing out.  Right now I'm on medication for it.

20    It is working, but they don't know if it will keep on working

21    or not.

22              THE COURT:  Okay.  Thank you.

23              All right.  Anyone else?

24              All right.  At this time the Court will recognize

25    Counsel for plaintiff for the purposes of Voir Dire.

1            MR. ROTH:  May I ask the Court to give me a

2   15-minute warning and 5-minute warning?

3            THE COURT:  15 and 5?

4            MR. ROTH:  Yes, sir.

5            THE COURT:  Okay.

6            MR. ROTH:  Good morning again, Ladies and Gentlemen.

7   As I said, I am Carl Roth from Marshall.  I represent Soverain

8   Software in this case.  I am very proud to be here

9   representing them in this courtroom this morning.

10            I was sitting over there thinking to myself a little

11   while ago that I really don't know anywhere else I'd rather be

12   or anything I would rather be doing than trying this lawsuit

13   for Soverain.  And right away I know that that sets me apart

14   from everybody on the panel because without asking the first

15   question, I know that every one of you would rather be

16   somebody else if you had your druthers.

17            But the Court has explained to you how important it

18   is to be here for jury service, and there is a reason for

19   that.  It is because it is the way that in our country we

20   resolve disputes between parties.  And you heard the Court

21   already indicate to you there is a dispute between my client

22   Soverain Software and the defendant, Newegg.

23            Sovereign believes that Newegg is infringing its

24   patent rights.  Newegg disagrees.  They say they are not; and

25   they also say even if we were, your patents aren't any good,

1   they are invalid, shouldn't have been issued.  So Soverain

2   filed this lawsuit to resolve that dispute and bring us all

3   together here today.

4            Now, these types of disputes are customarily

5   resolved in our system with the assistance of a jury.  And a

6   jury is 12 people out of the community.  We don't trust in our

7   system, for example, important disputes like this -- and this

8   is an important dispute -- it means a lot to both parties.

9   There is potentially a lot of money involved, as well as

10  important technology.  And it is a very important decision.

11  And we don't leave these kind of decisions in our judicial

12  system to elected officials or governmental agencies.  We use

13  a jury.

14           And we trust the jury, which is made up of 12 -- or

15  8 people in this case, out of the community to come in and

16  listen to the evidence and listen to the Court's instructions

17  as to what the law is and decide who is right and who is

18  wrong.  And that is what is going to take place here today.

19           And as the Court indicated to you, our purpose here

20  today is to find out which 8 people are going to sit in

21  judgment and decide who is right and wrong in this case.  And

22  it is important, of course, that we pick the best jurors for

23  that.

24           You are starting off with 24 of you that won the

25  Court's lottery, so to speak, and got summoned here today.

1   And it is kind of like American Idol, there are 8 of you that

2   get selected to come back next week.

3          But what we are entitled to, both sides, and what we

4   are looking for through this process, is to find the best

5   jurors for this particular kind of case.  And we want fair and

6   impartial jurors.

7          Now, if I start down with Ms. Williams there and go

8   all the way through the list and say are you going to be fair

9   and impartial, everybody is going to say, of course, I am, I

10  am a fair and impartial and open-minded person.  But, you

11  know, each of us comes into this courtroom with a lifetime of

12  experiences.  And those experiences have an effect on our

13  beliefs and our beliefs of how we view and decide important

14  events.

15         And there are things that happen in our lives that

16  cause us to lean one way or another on particular issues.  And

17  you might well be a fair and open-minded juror in one

18  situation and not in another type of situation.

19         Just take me, for example.  You know, I have been

20  doing this now for some 46 years trying lawsuits.  That is

21  probably why I enjoy being here.  As a matter of fact, I was

22  thinking a minute ago I started 46 years ago at the courtroom

23  right down the end of the hall here.

24         But I have had a lot of dealings with insurance

25  companies over the years.  And based on my experiences you

1    don't want me on a jury where an insurance company is a

2    party.  I would try to be open-minded, but it is just not

3    going to be in me.  I have had too many experiences that shape

4    my views.

5            So what we are going to do here today, as the Court

6    indicated, is to allow the parties to tell you a little bit

7    about the case and it is not much, not much facts will come

8    out because you are not being asked to decide anything today.

9    We are just looking for the best jurors to be the ones

10   selected to decide after hearing all of the evidence and the

11   Court's detailed instructions.

12           So I want to start off by finding out a little bit

13   more about you.  I want to emphasize what the Court already

14   has alluded to, there are no right or wrong answers.  We are

15   asking you about your opinions and your beliefs, and there are

16   no right or wrong answers.  Everybody is entitled to their

17   opinion.  And believe me the lawyers that are asking this

18   question, you are not going to hurt our feelings.  This is a

19   process that we are asking for information to help find the 8

20   people who are best suited to decide this dispute between

21   these parties.

22           I want to start off by asking you a little more

23   detail, and the information that we have got from the

24   questionnaires that you took the time to fill out is going to

25   be very helpful to speed this process along.  But let me start

1    off by asking each of you a few questions to elaborate a

2    little bit.

3            Let me start with Ms. Williams.  What do you teach

4    at Jacksonville, Ms. Williams?

5            MS. N. WILLIAMS:  I teach dyslexic children, grades

6    2 to 4; a few first graders that are repeating 1st grade, but

7    basically 2 to 4.

8            MR. ROTH:  Your husband is a landman for who?

9            MS. N. WILLIAMS:  He is self-employed.

10           MR. ROTH:  Independent?

11           MS. N. WILLIAMS:  Yes.

12           MR. ROTH:  He probably knows about royalties --

13           MS. N. WILLIAMS:  Yes.

14           MR. ROTH:  -- in this day and time?

15           All right.  Ms. Whitworth, you indicated that your

16   husband worked for Bell Helicopter.  Can you tell us what he

17   did?

18           MS. WHITWORTH:  He retired there about 20 -- let's

19   see, 14, 15 years ago; and we live in Rains County now.

20           MR. ROTH:  And what did he do, what type of work?

21           MS. WHITWORTH:  It was the instrumental part of

22   making the helicopters, tests.  They made helicopters for

23   testing, and they tested them to see if they worked.

24           MR. ROTH:  Was he at Fort Worth?

25           MS. WHITWORTH:  Yeah -- yes, sir.

1           MR. ROTH:  Thank you, ma'am.

2           Ms. Develin, and what do you teach?

3           MS. DEVELIN:  I teach 2nd grade, 2nd grade.

4           MR. ROTH:  2nd grade.  And you indicated your

5    husband is an operator.  Where does he work?

6           MS. DEVELIN:  At Spectra Energy.

7           MR. ROTH:  Okay.  Thank you.

8           Ms. Rushing?

9           MS. RUSHING:  Yes, sir.

10           MR. ROTH:  What is a DL coordinator?

11           MS. RUSHING:  Distance education or distance

12    learning.  Anything to do with online courses there at the

13    college.

14           MR. ROTH:  And your husband is a dispatcher --

15           MS. RUSHING:  Yes, sir.  He is a dispatcher at

16    Just-In-Time Sanitation.

17           MR. ROTH:  Okay.  Thank you.

18           Ms. Veerkamp, I think you already answered the

19    question I had for you.  You worked at Haynes & Boone?

20           MS. VEERKAMP:  Yes, sir.

21           MR. ROTH:  And did not work for any particular

22    lawyer --

23           MS. VEERKAMP:  No, sir.

24           MR. ROTH:  You were in the night type.  Thank you

25    very much.

1           Mr. Hurst, I believe that you have given us a

2    complete history already of your employment, so we can pass it

3    on to Mr. Shafer.

4           And you indicated your wife is involved in data

5    entry?

6           MR. SHAFER:  Yes, sir.

7           MR. ROTH:  Could you describe her work for us?

8           MR. SHAFER:  Well, I work at Alford-Pace Air

9    Conditioning.  It is just an air conditioning firm, and she

10   does warranty claims and customer entry, registration, and new

11   equipment, that type of thing.

12          MR. ROTH:  Okay.  Thank you.

13          Let's see, Mr. Davis is a welder's helper.  Believe

14   me, I know what that job is.

15          Ms. Carter, No. 13.  You indicated you worked for

16   RDA.  What is that?

17          MS. CARTER:  It is a professional beauty supply.

18          MR. ROTH:  Okay.

19          MS. CARTER:  It is a wholesale place.

20          MR. ROTH:  Okay.  And your spouse is a nurse?

21          MS. CARTER:  Yes.

22          MR. ROTH:  Where is he employed?

23          MS. CARTER:  He works for the Trinity Orthopedic

24   Clinic.

25          MR. ROTH:  Okay.  Thank you, ma'am.

26

1            Ms. Williams, what do you teach?

2            MS. C. WILLIAMS:  I teach kindergarten.

3            MR. ROTH:  Okay.  Thank you.

4            Over to Mr. Cross.  What do you do for AT&T?

5            MR. CROSS:  Install and repair phone lines, land

6    lines.

7            MR. ROTH:  Customer service rep?

8            MR. CROSS:  Technician, yeah.

9            MR. ROTH:  Thank you, sir.

10           Ms. Allen, what type of work do you do at Gregg

11   County Elections?  It says electronics.

12           MS. ALLEN:  Oh, I register voters.  I help program

13   the voting machines during the elections; just whatever needs

14   doing.  I work on the computer a lot.

15           MR. ROTH:  Do you also go by Diane?

16           MS. ALLEN:  Yes, sir.

17           MR. ROTH:  Thank you, ma'am.

18           Mr. Nitson, it indicates that -- first of all, what

19   do you teach?

20           MR. NITSON:  7th grade Texas history.

21           MR. ROTH:  Okay.

22           MR. NITSON:  Pray for me.

23           MR. ROTH:  And you indicated that your wife is an IT

24   manager.  Could you describe what that means?

25           MR. NITSON:  Not really because it is computers and,

1   you know, I am an ag major.  So I know she does the hardware

2   that keeps everything up running and the hardware stuff so --

3           MR. ROTH:  Who does she work for?

4           MR. NITSON:  It is Old Castle Glass & Manufacturing.

5   They make the store fronts like you see at Brookshire's and

6   Wal-Mart.  They do all that stuff.

7           MR. ROTH:  All right.  Thank you very much.

8           Mr. McGehee, what do you teach?

9           MR. McGEHEE:  I teach high school math, geometry at

10  the high school.

11          MR. ROTH:  And your spouse is a teacher, too?

12          MR. McGEHEE:  Yes, she is an art teacher.

13          MR. ROTH:  All right.  Thank you very much.

14          Ms. Barnett, you are a retired teacher, physical

15  education?

16          MS. BARNETT:  Yes, sir.

17          MR. ROTH:  Okay.  Your husband, you indicated what

18  was an electrical manager.  Who does he work for?

19          MS. BARNETT:  He was working for RES, Renewable

20  Energy Sources out of Colorado.  Actually construct -- did the

21  high voltage on the windmills for electricity.

22          MR. ROTH:  All right.  Thank you, ma'am.

23          And, Ms. Walker, you indicated that your husband was

24  an insurance agent.  Is he independent or with a company?

25          MS. WALKER:  He is an independent agent.

```
 1              MR. ROTH:  Thank you, ma'am.  And I apologize for my
 2    remarks about insurance companies.
 3              The last is Ms. Thompson.  And you indicated that
 4    your husband was an engineer at Texas Eastman; is that right?
 5              MS. THOMPSON:  Yes.
 6              MR. ROTH:  And does he have a technical degree?
 7              MS. THOMPSON:  Yes, he is a mechanical engineer.
 8              MR. ROTH:  Mechanical engineer?
 9              MS. THOMPSON:  Yes.
10              MR. ROTH:  Thank you very much.
11              Let me talk a little bit about the parties in this
12    case.  My client Soverain you probably haven't heard of
13    because they don't sell to the general public.  Soverain is a
14    software company, and its customers are companies that are
15    engaged in selling products online or on the Internet, the
16    Worldwide Web.
17              The defendant, Newegg, as Mr. Sayles indicated, is
18    an online retailer; and they sell computer components,
19    cameras, televisions, and all sorts of electronic devices
20    online.  They are one of the biggest online retailers I
21    believe in the world.  They have about 2 billion dollars in
22    sales every year.  I noticed a number of people on the panel
23    indicate that they do online shopping.
24              My question is, does anybody recall being a customer
25    online of Newegg?  Nobody has been buying computers --
```

1          THE COURT:  You've got one over here.

2          MR. ROTH:  I'm sorry.  Yes, sir, Mr. McGehee.

3          THE COURT:  Mr. Roth, you have used 15 minutes also.

4          MR. ROTH:  Thank you, Your Honor.

5          MR. McGEHEE:  Yes, I think I recall buying

6   something.  I have no idea what it was.  It has been a long

7   time.  I just remember the name.

8          MR. ROTH:  Well, is there anything about your

9   experience then that would cause you --

10         MR. McGEHEE:  I don't remember anything about the

11  transaction.

12         MR. ROTH:  Nothing about it that causes you to

13  either love them or hate them?

14         MR. McGEHEE:  No.

15         MR. ROTH:  Not going to affect your decision at all

16  in this case?

17         MR. McGEHEE:  No.

18         MR. ROTH:  Thank you very much.

19         Let me tell you a little bit more about my client

20  Soverain.  You are going to hear unfold during the course of

21  this case a story about some really bright guys up in Boston

22  back in the early '90s who with the very advent of the

23  Internet becoming something that was going to be publicly

24  available, used by the public and never been used for

25  commercial use at all; and they decided that if you are going

1   to have a successful retail market online that you needed to

2   have a program that would give a customer the same type of

3   experience they have if they go into a grocery store or a

4   mall.

5           It turns out there were an awful lot of technical

6   difficulties involved in getting this accomplished.  It is not

7   nearly as easy as it might sound.  But they overcame the

8   obstacles.  They found the solution.  And they came up with a

9   computer system and method with software that enabled

10  merchants to present their product descriptions to buyers

11  online, provide them with photographs and descriptions for

12  buyers to have a way to gather up their purchases and put them

13  in a shopping cart or shopping basket and then go back at a

14  later time and pay for them and complete the purchase.  They

15  did all of this, of course, over what is known as the

16  Worldwide Web and Internet.

17          They were granted several patents as a result of

18  these revolutionary concepts and inventions.  The inventors

19  created a software product that they call Transact, based on

20  these inventions, which was a pioneer product in allowing

21  companies to successfully market online.

22          They released their first version of Transact back

23  in October of 1994 very early on, and sold the product for use

24  by companies like AT&T and Disney and Time Warner and U.S.A

25  Today, and a number of others.

1          Soverain is the successor company to Open Market.

2     And it now owns the rights to these revolutionary patents.

3     Its headquarters are based in Chicago -- Ms. Wolanyk -- and

4     they have several employees around the country because they

5     still service their customers and still sell Transact and

6     service it for their customers.

7          In addition, they have licensed -- or given

8     permission -- to other major online retailers to use their

9     patented technology for their sales sites, websites; companies

10    such as Amazon and other major retailers.

11         Soverain believes that Newegg is using their

12    patented technology in their website to make their 2 billion

13    dollars a year in sales.  And that is what this lawsuit is all

14    about.  That is why we are here today.

15         A number of people have used the Internet to shop

16    online, and I will just suggest to you that -- well, let me

17    just ask --

18         Ms. Williams, I believe you were one.  Do you not

19    shop online?

20         MS. N. WILLIAMS:  Yes.

21         MR. ROTH:  Do you do it very often?

22         MS. N. WILLIAMS:  No.  Holidays more especially.

23         THE COURT:  If you would please stand, Ms. Williams,

24    and take the microphone.

25         MR. ROTH:  Is this an experience where you can go

1   online and find a company you want to buy from and look up

2   their products, and they have pictures and descriptions?

3            MS. N. WILLIAMS:  Not all of them.

4            MR. ROTH:  Some of them do?

5            MS. N. WILLIAMS:  Some of them do, yes.

6            MR. ROTH:  And then you select the ones you want and

7   put it in a shopping basket?

8            MS. N. WILLIAMS:  Yes.

9            MR. ROTH:  And you have means to come back later and

10  deselect it or add to it --

11           MS. N. WILLIAMS:  Yes.

12           MR. ROTH:  Kind of like pushing your shopping basket

13  down the aisle at the grocery store, right?

14           MS. N. WILLIAMS:  Yes.

15           MR. ROTH:  You take it to the counter and you pay

16  for it all at one time?

17           MS. N. WILLIAMS:  That's right, all at one time.

18           MR. ROTH:  Thank you, ma'am.

19           Does anybody else have a different concept of

20  shopping online with these particular features the way people

21  do?  Is that the common experience of everybody?  Is there

22  anybody that has a different experience?

23           Is there anybody on the panel that tried to shop

24  online back in the '94/'95 time frame, if you even had a

25  computer with access?

33

1           One of the issues in this case is infringement.

2   And -- well, let's see.

3           Let me ask Mr. Hurst.  Mr. Hurst, you indicated that

4   you owned property out there at Lindale?

5           MR. HURST:  Yes, sir.

6           MR. ROTH:  When you bought your property --

7           MR. HURST:  Excuse me.

8           MR. ROTH:  When you bought your property, you got a

9   deed, didn't you?

10          MR. HURST:  Yes, sir.

11          MR. ROTH:  And that deed gives a detailed

12  description of what Robert Hurst owns?

13          MR. HURST:  Right; abstract.

14          MR. ROTH:  It tells the whole world what part of the

15  property is yours?

16          MR. HURST:  Right.

17          MR. ROTH:  And it has boundaries.  And if somebody

18  comes along and gets across your boundary line, what are they

19  called?

20          MR. HURST:  If somebody comes along, well, then he

21  is infringing on my boundary.

22          MR. ROTH:  He is a trespasser?

23          MR. HURST:  Right.

24          MR. ROTH:  Right.  And you have a right to keep

25  trespassers off of your property, don't you?

1           MR. HURST:  Yes, sir.

2           MR. ROTH:  And you have those boundary descriptions

3    that you can go to and tell somebody, you are on my property?

4           MR. HURST:  Right.

5           MR. ROTH:  And you don't have permission to be?

6           MR. HURST:  Right.

7           MR. ROTH:  Of course, it is different if you give

8    them permission?

9           MR. HURST:  Yes.

10           MR. ROTH:  Okay.  Well, thank you, Mr. Hurst.

11           I would like to talk about patent infringement.  The

12    Court tells you it is a patent infringement case as being

13    similar to a trespass case.  It is the same thing.  A patent

14    is like a deed.  It has detailed descriptions of the

15    boundaries of that intellectual property, the technology that

16    these people have been given a right to by the U.S. Patent

17    Office to use and to keep other people from using for a period

18    of years.

19           Now, is there anybody that has any problem with the

20    concept of keeping trespassers off of your property, or would

21    you have any problem with the idea that people should not be

22    allowed to use your property without permission?  Does anybody

23    have any problem with that as a concept?

24           The Court is going to tell you that Soverain has to

25    prove its infringement case by a standard of preponderance of

1    the evidence.  Preponderance of the evidence, the Court is

2    going to tell you, simply means the greater weight and degree

3    of credible evidence; or another way to put it is more likely

4    true than not true.  That is going to be the standard, and

5    that is going to be our burden in this case to prove that

6    Newegg is infringing by that standard of more likely true than

7    not true.

8            Another issue that you will be faced with if

9    selected on a jury in this case is the question of damages.

10   Damages in a patent case are usually talked about in terms,

11   the Court will tell you, if you use somebody else's property

12   without permission you have to pay at least a reasonable

13   royalty.  The Court will give you a lot of definitions about

14   that, and you will hear a lot of evidence about how to

15   calculate a reasonable royalty.

16           My question to you is -- very quickly -- is --

17   without going in any of the details -- but does anybody have a

18   problem with the concept that if somebody uses your property

19   without permission, they have to pay a reasonable royalty or

20   some fee for using your property?  Does anybody have any

21   problem with that concept?

22           If it turns out that the evidence that you do hear

23   and the instructions the Court does give you on reasonable

24   royalty, if it turns out that based on that, the reasonable

25   royalty figure is a very large number, millions and millions

1   of dollars, would anybody have difficulty awarding what the

2   evidence supports by a preponderance of the evidence just

3   because it is a big number?

4           Anybody have some arbitrary limit, you know, I'd

5   award damages, but I'm never giving over a million dollars or

6   10 million dollars or 50 cents?  Nobody has that kind of a

7   problem?

8           The next issue that you are going to have to decide,

9   on this jury, is the question of invalidity.  And that is

10  going to be the burden on Newegg to prove that the Patent

11  Office made a mistake and never should have given these

12  inventors their patents, back in the '90s.

13          Now, that is going to be something they have the

14  burden of proof on.  And one point I want to make about that

15  very quickly is that you will see that the Court's

16  instructions are going to tell you that Newegg's burden is not

17  preponderance of the evidence, or more likely true than not

18  true, that is, slightly tipping the scales of justice in our

19  favor as our burden of proof is.  Their burden of proof is

20  clear and convincing evidence.

21          And the Court will define clear and convincing

22  evidence for you.  And I want to read it because I don't want

23  to misstate it.

24          Clear and convincing evidence is evidence that

25  produces an abiding conviction that the truth of a factual

1   contention is highly probable, highly probable.  If you are

2   looking at the scales of justice and preponderance of the

3   evidence is slightly tipping, clear and convincing evidence

4   requires the scales to tip very heavily.

5           It is not beyond a reasonable doubt like in a

6   criminal case where the scales have to be all one-sided

7   completely.  But it is a stronger burden of proof.  And the

8   reason is, is that Congress set up the patent system and the

9   Patent Office -- and you saw from the video what kind of work

10  you have to go through to get that patent through and get an

11  invention patented -- and there is a presumption that the

12  patent examiner experts knew what they were doing and did it

13  right.

14          THE COURT:  Mr. Roth, you have about 3 minutes

15  left.

16          MR. ROTH:  Thank you, Your Honor.

17          Now, so there is a double standard, and I just want

18  to point that out.  Does anyone have a problem with applying

19  one standard of proof for one party and a different standard

20  for the other?

21          Anybody have any problem and think they would have

22  difficulty following the Court's instruction as to what the

23  burden is on the parties to prove their case?

24          I have a number of other areas to talk about, but it

25  appears to me that there was -- at least I saw in the five

1    minutes we had or so or 10 minutes on those questionnaires --

2    there was only one juror that had ever applied for or received

3    a patent, and I believe that was Mr. Bowles.  Is that right?

4              MR. BOWLES:  No, sir.  That was my brother.

5              MR. ROTH:  I'm sorry?

6              MR. BOWLES:  That was my brother.  He has his own

7    business.

8              MR. ROTH:  Oh, okay.

9              MR. BOWLES:  That's what that was.

10             MR. ROTH:  That was not you, it was your brother.

11             MR. BOWLES:  Right.

12             MR. ROTH:  I didn't see it clearly.  Is your brother

13   Danny?

14             MR. BOWLES:  No, his name is Terry.

15             What kind of patents does he have?

16             MR. BOWLES:  It is a motorcycle cover that fits a

17   wide variety of motorcycles, a light-weight cover.

18             MR. ROTH:  Has he ever put it into commercial

19   production?

20             MR. BOWLES:  Yes, sir, he has.  It is actually in

21   force --

22             MR. ROTH:  Are those patents something that he feels

23   are not just a piece of paper but something important to him?

24             MR. BOWLES:  That's his deeds.  That's his deed for

25   his product.

1           MR. ROTH:  Thank you very much, Mr. Bowles.

2           Now, just one other question in closing.  You

3      understand, I believe -- thank you, Mr. Bowles.

4           Does anybody else, by the way, have a patent?  I

5      don't believe so.  Or any member of their family?

6           I think you understand what we are looking for here

7      today.  We are looking for people, 8 people who can be fair

8      and impartial jurors.  Sometimes lawyers ask these questions

9      and cover all of these topics and try to suggest things that

10     might be of interest, but we frequently don't ask the right

11     questions.

12          And so now -- the Court had a question on that

13     questionnaire, do you have any reason why you shouldn't sit in

14     this lawsuit?  But now that you have heard a little bit more

15     about the kind of case it is, a little bit more about the kind

16     of issues that you are going to be faced with, is there

17     anybody on the jury panel that has any doubt that if you are

18     selected as one of those 8 to come back next week, that you

19     can't be a fair and impartial juror; that you won't be able to

20     listen to the evidence that comes from the witness stand,

21     listen to the Judge's instructions as to what the law is, and

22     go back in this jury room and let the chips fall where they

23     may?

24          Is there any reason that anybody can think of,

25     whether it is because you don't like lawsuits?  Don't like

1    people who file lawsuits?  Anything that comes to find that

2    would cause you to feel that you would be less than a fair and

3    impartial juror as we have cited?

4            I thank you very much, and we look forward to

5    presenting our case to you -- before the 8 of you that win the

6    lottery for next week.

7            THE COURT:  Thank you, Mr. Roth.

8            Mr. Sayles.

9            MR. SAYLES:  May it please the Court.

10           Ladies and Gentlemen of the Jury Panel, here comes

11   the caboose.  It is a little ways down the track, so bear with

12   me.

13           I want to start out by pointing out something to you

14   that you observed here that is going to continue throughout

15   the trial.  That is the order of proof and the order in which

16   the lawyers go forward in this case.

17           And the law says that in a case where the plaintiff

18   has the burden of proof on their primary case -- and here it

19   is infringement -- they get to go first.

20           My concern about that is that psychologists tell us

21   that people make up their mind sometimes in the first 10 or 15

22   minutes that they hear about a subject.  Well, if you sit

23   where I sit and you have to sit there and be quiet for 30

24   minutes, it gives you some concern.  And no matter how flat

25   you make a pancake, there is two sides to it; and there is two

41

1    sides to every case.

2           So what I am going to ask you to do is remember that

3    Mr. Roth and his team get to go first just like Mr. Roth did

4    today.  But I think that you would think it is fair to keep an

5    open mind -- to keep an open mind until you have heard all of

6    the evidence in the case from both sides and the charge of the

7    Court and the arguments of the lawyers.

8           And, Ms. Williams, I want to ask you, you have got

9    the coveted No. 1 seat, and this sometimes happens, can you

10   understand my asking that the jury keep an open mind?

11          MS. N. WILLIAMS:  Yes, sir.

12          MR. ROTH:  And since I go second, can you see the

13   point that I was trying to make there?

14          MS. N. WILLIAMS:  Yes.

15          MR. ROTH:  And if you are selected to sit on this

16   jury, do you think that you could resist human nature, which

17   is sometimes to make up a decision very quickly, and keep an

18   open mind until you have heard it all?

19          MS. N. WILLIAMS:  Yes.

20          MR. SAYLES:  Thank you.

21          There is even a book written called Blink.  Has

22   anybody on the jury panel read the book called Blink.  The

23   book is about how people in the blink of an eye make up their

24   mind about a person or situation.  And, you see, in a court of

25   law that can be a dangerous things.

1          So having said that -- and I trust that all of y'all

2   understand that and will keep an open mind, but I want to give

3   you a brief two-minute outline of what the case is about from

4   Newegg's perspective.

5          First of all, Newegg has grown to be a premier and

6   excellent online retailer of mostly electronic products.  It

7   started in 2000, and you are going to hear how it started in a

8   warehouse.  When it first started, it had what was called a

9   static website, which meant you had to pick up the phone and

10  call, in order to do something.

11         But in the last ten years due to low pricing, good

12  customer service, fast shipping, and very high-quality goods,

13  it has grown into a large, and I will say, large company that

14  has warehouses in California; Memphis, Tennessee; and New

15  Jersey.  So it is able to ship to all parts of the country and

16  deliver goods within just a couple of days.

17         You are also going to hear about an employee of

18  Newegg, whose name I mentioned, named James Wu.  James Wu is

19  from China, but he has been in the United States since the

20  year 2000.  And in the year 2000 he was given the task of

21  developing Newegg's website, which is involved in this case.

22         And Mr. Wu had never heard of Soverain or its

23  predecessor, which is Open Market, and another one called

24  Divine -- a name you haven't heard yet.  He had never heard of

25  them and never heard of these patents.  And over a period of

1   months, literally using spare parts and common sense and the

2   training he had as a computer programmer, he built and put

3   together the Newegg website that it still uses to this very

4   day.

5          Soverain in this case has asserted three patents

6   claiming that certain specific features of the Newegg website

7   infringe their patent, and they are asking for enormous

8   damages.

9          The evidence is going to show in great detail --

10  well, I will just briefly say now, that Newegg doesn't

11  infringe Soverain's patents.  It doesn't do what their patents

12  claim.  And what they invented was not new and novel.  As you

13  heard in the patent video this morning downstairs, when that

14  occurs, a patent is invalid.

15         And then finally on damages.  I just want to touch

16  on this briefly.  The evidence will show that the damages in

17  this case are grossly overinflated and exaggerated.  You will

18  hear the term whether a patented feature drives the demand for

19  these products.  Here what drives the demand for these

20  products is the low price, the good service, the quality, the

21  shipping.  And these features have very little, if anything,

22  to do with Newegg's success.

23         And the evidence is going to show that if real-world

24  evidence is considered, the most that these damages could be,

25  the most they could be is less than $500,000, not the tens of

44

1    millions of dollars that Soverain is claiming.

2            Now, having said that, let me talk to you about the

3    burden of proof.  It is correct that Soverain has the burden

4    of proof by a preponderance of the evidence, which Mr. Roth

5    described to you.  And I would say to you now that you should,

6    when the Court gives you instructions and definitions, follow

7    those exactly as given by the Court.  I wouldn't suggest

8    otherwise.

9            But the point here is that Soverain as the plaintiff

10   does have the burden of proof to prove infringement.  And I

11   want to ask Mr. Cross, if I may, I'm going to talk to you

12   about the burden of proof here for just a moment.  Everybody

13   listen because it is coming your way.

14           Mr. Cross, my having explained that Soverain has the

15   burden of proof proving their case of infringement, if you are

16   selected to sit on this jury, will you require them to meet

17   that burden of proof?

18           MR. CROSS:  Yes.

19           MR. SAYLES:  Would you require Newegg to prove

20   anything or disprove anything?

21           MR. CROSS:  Yes.

22           MR. SAYLES:  If the law says that Newegg doesn't

23   have to prove anything with regard to infringement but it is

24   Soverain's burden, could you do that?

25           MR. CROSS:  If the law says?

1           MR. SAYLES:  Yes, sir.

2           MR. CROSS:  Yes.

3           MR. SAYLES:  All right.  I will tell you, and I

4    would be corrected by Mr. Roth right now if I were wrong, on

5    the issue of infringement Soverain has the burden of proof and

6    Newegg does not have to prove anything.  If that is the law

7    that you hear from the Court's charge, will you abide by it?

8           MR. CROSS:  Yes.

9           MR. SAYLES:  Mr. Boren, how about you?

10          MR. BOREN:  Yes.  If the Court says so, yes, sir.

11          MR. SAYLES:  Now, the Court's instructions place the

12   burden of proof, and if the burden of proof is placed on

13   Soverain, if you are over here in this jury box is that where

14   you would put the burden of proof?

15          MR. BOREN:  Yes.

16          MR. SAYLES:  And if I tell you now that Newegg

17   actually doesn't have to come forward with any proof on the

18   issue of infringement -- we will, but we don't have to --

19   would you be able to accept the law and look at the evidence

20   and consider the burden of proof and whether Soverain has met

21   the burden of proof?

22          MR. BOREN:  If the Court says so.

23          MR. SAYLES:  Okay.  Now, I want to ask Ms. Boyd a

24   question while we are over here.  Ms. Boyd, I'm going to

25   change a little bit.  The Ladies and Gentlemen of the panel

1  heard that there is another issue in the case, and that is the

2  validity of these patents.

3           And on that I would be the first to tell you, but

4  Mr. Roth has already mentioned it, Newegg has the burden of

5  proof.  It has to prove by clear and convincing evidence that

6  the patents are invalid.  That was defined by Mr. Roth

7  correctly.  The reason we know that is we have been in and out

8  of court before, and we know how the Judge instructs on that

9  issue.

10          Will you apply that burden of proof and only that

11  burden of proof on the issue of whether these patents are

12  valid or not?

13          MS. BOYD:  Newegg has to prove that the patent was

14  valid?

15          MR. SAYLES:  Invalid?

16          MS. BOYD:  Invalid?

17          MR. SAYLES:  Correct.  The patent is presumed to be

18  valid.  And to prove it invalid, Newegg has the burden of

19  proof.  And it is clear and convincing evidence.  Would you

20  listen to the Court's instruction; and if you hear that, would

21  you be able to apply that?

22          MS. BOYD:  Yes.

23          MR. SAYLES:  Now, here is the question.  We have all

24  heard about proof beyond a reasonable doubt on television,

25  right?

1          MS. BOYD:  Uh-huh.

2          MR. SAYLES:  That's in criminal cases.  That is the

3    highest burden of proof.  That is not the burden of proof to

4    prove the patent invalid.  It is kind of the middle level.

5          Do you think that you could apply that level of

6    proof and not require Newegg to prove the validity, invalidity

7    of this patent beyond a reasonable doubt because it is not

8    required to?

9          MS. BOYD:  Yes.

10         MR. SAYLES:  All right.  I appreciate that.

11         It sounds awfully easy when I say it, but I want to

12   tell you that it is a little more difficult when you start to

13   think about it and apply it.

14         Ms. Stegall, let me ask you a question, if I may.

15         MS. STEGALL:  Yes, sir.

16         MR. SAYLES:  On the issue of infringement, on which

17   Soverain has the burden of proof, if you are selected to sit

18   on the jury, would you require Newegg to prove anything on

19   that issue?

20         MS. STEGALL:  No, sir.

21         MR. SAYLES:  All right.  And if you are selected to

22   sit on this jury and you hear instructions on the issue of

23   validity that Newegg does have the burden of proof, would you

24   apply the clear and convincing standard if that is what the

25   Judge gives you?

1            MS. STEGALL:  Yes, sir.

2            MR. SAYLES:  And would you be able to promise us now

3     that you would not apply proof beyond a reasonable doubt?

4            MS. STEGALL:  Yes, sir.

5            MR. SAYLES:  Okay.  All right.  And, again, I tell

6     you that that sounds awfully easy.  Is there anybody -- I'm

7     going to ask this in a general way, which is always a little

8     bit dangerous, but is there anybody who would not be able to

9     apply the law in the manner that I just said that Ms. Williams

10    and Ms. Stegall and others have mentioned, applying the

11    correct burden of proof, preponderance of the evidence, to

12    Soverain, not requiring Newegg to prove anything; but on the

13    issue of validity applying the middle level burden of proof,

14    which is clear and convincing evidence, not beyond a

15    reasonable doubt?

16           Is there anybody that thinks they cannot do that?

17    Because you understand this is my chance to find out.  First

18    row, cannot do that?  Second row?  All right.  Back here in

19    the pews in the third row, is there anyone who could not do

20    that?

21           You see, that is what I am most interested in.

22    Because it wouldn't be right for a juror who feels like, well,

23    you know, you ought to have to prove the invalidity of these

24    patents beyond a reasonable doubt.  You may have that personal

25    feeling.  It would be wrong for us to accept the juror who

1   felt that way.  Back row?

2          Okay.  All right.  Now, one thing that should be

3   obvious is the courthouse doors in the United States are open

4   to everyone.  And I am proud of that fact, and I bet you are

5   too.  But what that means is that there is no Grand Jury that

6   pre-screens a civil case like this one.  A party can file

7   their case and bring it forward in the courtroom, and the

8   courthouse doors are open.

9          My question is, is there anyone that would feel that

10  just because we are here before the Honorable Leonard Davis in

11  a nice large courtroom, that because we are here, there must

12  be something to this case before we even begin?  Ms. Shafer,

13  how do you feel about that?

14         MR. SHAFER:  That there's something to this case?

15         MR. SAYLES:  Yes just because we are here.

16         MR. SHAFER:  Yeah, it appears something is to this

17  case if we are all here.

18         MR. SAYLES:  All right.  I appreciate that.  I'm not

19  going to quibble with you because that is what I wanted to

20  know.  But we are supposed to start out both at the starting

21  line.  Nobody ahead.  I am concerned that because we are just

22  here, that someone might think, well, there must be something

23  to it.  You have expressed you might feel that way?

24         MR. SHAFER:  Sure.

25         MR. SAYLES:  So do you think in this case that

1   Soverain would start out just a little bit ahead in your mind?

2          MR. SHAFER:  Not necessarily.

3          MR. SAYLES:  Tell me how you feel about that?

4          MR. SHAFER:  That they wouldn't be ahead?

5          MR. SAYLES:  Yeah, you say there must be something

6   to it; but on the other hand, you say they don't necessarily

7   start out ahead.

8          MR. SHAFER:  Just what you said, the courthouse

9   doors are open for anybody, so it could go either way.

10          MR. SAYLES:  All right.  So, Ms. Williams --

11          Thank you, sir.

12          Ms. Williams.  (Pause in proceedings.)  That's

13   right.  We have got two Ms. Williams.  That's right.

14          All right.  The courthouse doors are open to

15   anybody.  Would you start out with Soverain ahead just because

16   we are here in this nice courtroom before the Honorable Judge

17   Davis?

18          MS. C. WILLIAMS:  No, sir.  You would have to hear

19   what both sides have to say.

20          MR. SAYLES:  All right.  Start even?

21          MS. C. WILLIAMS:  Uh-huh.

22          MR. SAYLES:  All right.  Thank you very much.

23          All right.  I could go through all of you and ask

24   that question.  So I am going to ask you to search your soul

25   right now.  And I want you to tell me right now if Soverain

1    would start out ahead in your mind even just a little bit

2    because here we are in court, so there must be something to

3    it?  Anybody that would start out with them just slightly

4    ahead?  Anybody on the first row?  Anybody on the second row?

5    Going once, twice, three times.  All right.  Over here to the

6    third row, anybody?  On the back row?

7              Now, nobody is saying anything.  And you understand

8    that in representing Newegg, I have to take your silence now

9    the same as a solemn oath if you stood up and told me verbally

10   and out loud, nope, everybody is starting equally in my mind;

11   I understand just because we are here doesn't mean there is

12   anything to the case.  That is what you are saying by your

13   silence.  Does anybody want to change your answer?

14             All right.  Judge, will you tell me when I have ten

15   minutes left.  I don't think I asked for any time --

16             THE COURT:  You have about 12 left.

17             MR. SAYLES:  All right.  Then I'm going to have to

18   speed it up.  Large companies -- Newegg has enjoyed success

19   over the last ten years, and I think it is fair to say that it

20   is a large company.  It has warehouses in three parts of the

21   country.  It ships a lot of product.

22             Is there anybody on the first row that has ever had

23   a bad experience with a large company?  Second row, anybody

24   ever had a bad experience with a large company?  Over here on

25   the important third row -- and it is.  Anybody ever had a bad

1    experience with a large company?  Boy, if I make it to the

2    fourth row I'm going to be surprised.  Anybody ever had a bad

3    experience with a large company?  Hmm, well, that is good.

4           Let me put it this way:  The law says that everyone

5    in court stands equal at the bar of justice, whether it is one

6    of us as an individual or whether it is a big company.  And we

7    would all be very proud of the fact that an individual stands

8    equal to a big company.  But don't you see the reverse of that

9    must be true also?  A large company must be given a fair shake

10   just like an individual.  And what I want to do is make sure

11   that that is going to take place.

12          And, Ms. Carter, I haven't heard from you in a

13   while.  Would you speak to that, please?  Could you treat a

14   larger company fairly at your hands, as a juror, just like you

15   would if it were against an individual?

16          MS. CARTER:  Absolutely.

17          MR. SAYLES:  Okay.  Can you see why I would ask

18   that?

19          MS. CARTER:  Uh-huh, yes.

20          MR. SAYLES:  All right.  Thank you.

21          Now, I want to go to the --

22          Will you tell me when I have five minutes, Judge?

23          THE COURT:  Yes, I will.

24          MR. SAYLES:  All right.  I want to go to the issue

25   of damages, and this is very important in this case.

53

1          A reasonable royalty is going to be at issue in this

2     case, as it is in every patent case.  Some folks feel as soon

3     as the lawyer representing the defense says anything about

4     damages, they are admitting there is a case.  Let me say right

5     now, our position is that these patents were not infringed and

6     not a penny was owed.

7          But lawyers have a duty to cover all of the bases.

8     And you will hear Judge Davis give you instructions about

9     damages, if any.  He will even say that, "if any."  At some

10    point in the trial he is likely to tell you that just because

11    he is instructing you on damages, it doesn't mean there are

12    any.

13         Now, I am concerned.  Ms. Huff, if I fight the issue

14    of damages and talk about damages, do you understand as a

15    lawyer I have that duty and obligation to my client?

16         MS. HUFF:  Yes.

17         MR. SAYLES:  What I would ask of you if you are

18    seated on the jury is you won't take that somehow as an

19    admission that we must have done something wrong or we must

20    have infringed these patents, otherwise we wouldn't talk about

21    damages?

22         MS. HUFF:  Yes.

23         MR. SAYLES:  All right.  Can you understand why I

24    would ask you that question?

25         MS. HUFF:  Uh-huh.

1            MR. SAYLES:  All right.  Now, because time is short

2    and because I grew up in the south and talk slow, I'm going to

3    have to do this by rows.

4            Is there anybody on the first row that would feel

5    that because Newegg is talking about damages, that they must

6    have done something wrong?  Anybody feel that way?  Because it

7    is not so.  I need to know now.  Anybody on the second row?

8    Over here on the third row, anyone?

9            Yes, ma'am?  Let's get the microphone for you.  This

10   is exactly what I wanted to find out because some people do

11   feel that way.

12           MS. ALLEN:  I don't know anything about patent

13   trials and stuff, but it just comes across to me that if you

14   are already arguing damages, then there is an issue.  I'm

15   sorry, but it just seems that way to me.

16           MR. SAYLES:  All right.  I understand that.  That's

17   exactly why I asked this question.

18           Okay.  And, Ms. Allen -- is that right?

19           MS. ALLEN:  Yes, sir.

20           MR. SAYLES:  Patricia, but you go by Diane?

21           MS. ALLEN:  It is possible.

22           MR. SAYLES:  Now, Ms. Allen was straight up with me

23   about that.  Is there anyone else that feels the way that Ms.

24   Allen just expressed that she does?  If I start talking about

25   damages it might imply or suggest that I did something wrong?

1    Because I have a duty to do that.  Anybody else?

2              Thank you, Ms. Allen.  I appreciate that.

3              MS. ALLEN:  Sorry.

4              MR. SAYLES:  Now, one final topic, and that is,

5    there are a couple of people that have worked for governmental

6    agencies.  Patents are issued by the PTO or Patent and

7    Trademark Office, that y'all heard about this morning.  And

8    they do carry a legal presumption of validity, but it is only

9    a presumption because the process of getting a patent occurs

10   in private.  The parties who may be later accused don't

11   participate.  The patent examiner may have made a mistake.

12             And so parties that are charged with infringing

13   patents can challenge the validity of a patent in court.  Is

14   there anyone who would just fall back on the presumption of

15   validity and could not decide this issue in accordance with

16   the instructions given by the Court on what the burden of

17   proof is and in consideration of the evidence?

18             Anybody on this first row?  See, because if you are

19   going to do that, we might as well not even start.  Anybody on

20   the second row?  Third row over here?  The presumption of

21   validity can be overcome in court; otherwise, we wouldn't be

22   allowed to attack it.  Anybody on the back row?

23             All right.  I know that -- oh.  Is there anybody on

24   the jury panel that knows one another?  Anybody?  Tell us --

25   let's get the microphone.  I always like to know who is

1   acquainted with whom on a jury.

2           MS. RUSHING:  I'm from Carthage, Texas.  It's a

3   small town; 6, 7,000 people, so I am very familiar with Kristi

4   Develin and I also am familiar with Ms. Huff.

5           MR. SAYLES:  All right.  Very good.  Thank you very

6   much.

7           I guess and would you tell us the same thing?

8           MS. DEVELIN:  Yes, I'm familiar with Ms. Rushing

9   also.

10          MR. SAYLES:  All right.  If you are selected to be

11  on the jury, could you vote your own conscience even if you

12  happen to disagree with Ms. Rushing?

13          MS. DEVELIN:  Oh, absolutely.

14          MR. SAYLES:  Sometimes it is hard for acquaintances

15  or friends to do that.

16          Anybody else know anybody else?

17          MS. N. WILLIAMS:  Jacksonville is a small town also,

18  and I know Ms. Walker.

19          MR. SAYLES:  Could you vote your own conscience if

20  you are both on that jury and you both happen to disagree?

21          MS. N. WILLIAMS:  Certainly.

22          MR. SAYLES:  All right.  I know that my time is

23  about to expire if it hasn't.  So I want to wrap this up.  We

24  look forward to bringing you the evidence in this case, and I

25  am sure that we will get 8 fair and impartial jurors.  I want

1   you to keep an open mind through the whole case, even though

2   the plaintiff goes first.

3           I want you to hear it all.  I want you to follow the

4   instructions of the Court on the burden of proof, which is not

5   beyond a reasonable doubt on this issue of validity.  If you

6   will do that, that is all anyone could ask.  And I look

7   forward to bringing you the evidence.

8           Thank you, Judge.

9           THE COURT:  Thank you, Mr. Sayles.

10          All right.  Ladies and Gentlemen of the Jury Panel,

11  that about concludes our Voir Dire Examination.  I do want to

12  ask you one other question, and that is, having heard the

13  presentation by Counsel for the plaintiff and Counsel for the

14  defendant and knowing what you do about this case and

15  everything that you have learned so far, is there any reason

16  that maybe you have been sitting here and thinking this might

17  affect me as a juror or affect my ability to serve during the

18  trial of the case but you haven't had an opportunity to

19  express yourself?

20          If you would, please raise your hand at this time so

21  I can explore those matters with you?  Anybody?

22          All right.  Very well.  Let me see Counsel at the

23  Bench, please.

24      (Bench conference held with Counsel.)

25          MR. SAYLES:  Judge, Mr. Roth is a dear friend of

1   mine, and I have the highest regard for him.  I had an

2   agreement with Ken Adamo that no licensees would be mentioned

3   in Voir Dire.

4           THE COURT:  What?

5           MR. SAYLES:  No licensees would be named in Voir

6   Dire.  He named Amazon.  We haven't crossed that bridge yet.

7   So I just wanted to let the Court know I am not waiving

8   anything.  I had that agreement with Mr. Adamo.  It took me by

9   surprise when he mentioned Amazon by name.

10          THE COURT:  Do you have anything you want the Court

11  to do?

12          MR. SAYLES:  Yes.  I would ask that you instruct the

13  jury that the mention of Amazon earlier may or may not be in

14  evidence.  I don't know if it makes it worse.  Do you know

15  what I am saying?

16          MR. ROTH:  It was my understanding that the names of

17  people who have gotten licenses are going to be admitted.

18          MR. SAYLES:  Well --

19          MR. ROTH:  We were not going to talk about the

20  amount of the license but the fact that people have a

21  license --

22          MR. SAYLES:  Maybe --

23          MR. ROTH:  -- is admissible.

24          MR. SAYLES:  Maybe, maybe not.  I had an express

25  agreement with Ken Adamo --

```
 1              THE COURT:  We'll sort that out later.  Let's get
 2   back to the jury list.
 3              MR. SAYLES:  I'm sorry, Judge.
 4              THE COURT:  Does plaintiff have any challenges for
 5   cause?
 6              MR. ROTH:  No.
 7              THE COURT:  Does defendant?
 8              MR. SAYLES:  No, but I am willing to let a couple
 9   go.
10              THE COURT:  Are y'all going to let Ms. Williams go,
11   who is the teacher with the TAAS test?
12              MR. ROTH:  I don't have a problem.
13              MR. SAYLES:  I don't either.
14              THE COURT:  She will be excused.
15              MR. ROTH:  That was Ms. Williams.
16              THE COURT:  What about the lady passing out and on
17   medicine --
18              MR. SAYLES:  I would agree to let her go.
19              THE COURT:  Would you agree to No. 2?
20              MR. ROTH:  No. 2, yes, Your Honor.
21              THE COURT:  Okay.  She is excused for cause by
22   agreement then.
23              And then the lady [sic.] with the dentist
24   appointments, I don't really think that's that good of an
25   excuse.
```

```
 1                MR. SAYLES:  I --

 2                THE COURT:  No. 17 -- we have got plenty of jurors.

 3    I will let him go.

 4                MR. SAYLES:  That will be all right with me?

 5                THE COURT:  Carl?

 6                MR. ROTH:  That's okay.

 7                THE COURT:  I'll excuse Mr. Boren.

 8                Let's see, the lady whose very close friend is about

 9    to die?

10                MR. SAYLES:  I would agree.

11                MR. ROTH:  Yeah, let her go.

12                THE COURT:  And Ms. Thompson, who has the TAAS test

13    for special ed?

14                MR. SAYLES:  I would let her go, yes, sir.

15                MR. ROTH:  That's fine, Your Honor, you've got 22

16    and 23 --

17                THE COURT:  22, 24, 17, 1, and 2 -- let me see

18    here --

19                MR. ROTH:  That leaves 19.

20                THE COURT:  That's 19.  You each have 5 peremptory

21    challenges.

22                MR. SAYLES:  Very good.  Would you mention those

23    numbers again, Judge?

24                THE COURT:  Yeah 1, 2 --

25                MR. ROTH:  I ought to get 6 and he get 5.
```

1            THE COURT:  1, 2, 19 [sic.], 22, and 24.

2            MR. SAYLES:  Okay.

3            THE COURT:  And you each get five strikes.

4            MR. SAYLES:  Very good.

5            MR. ROTH:  We'll have one left.

6            THE COURT:  Yes.

7            MR. ROTH:  We can fix that, Judge.  You can give me

8    6 and give him 5.

9        (Bench conference concluded.)

10            THE COURT:  All right.  Ladies and Gentlemen of the

11   Jury, at this time the Court is going to take a brief recess

12   while the attorneys go over their lists.  What I am going to

13   ask you to do is we will be on break for about 15 minutes

14   until 35 minutes after the hour.

15            So you can go to the hall, use the restroom, get you

16   a Coke down the hall.  There is a Coke machine at the other

17   end if you want one.  So be back in 15 minutes.

18            When you come back in you can sit anywhere in the

19   audience.  You don't have to be in any particular order.

20            I do want to give you this instruction:  Do not

21   discuss the case among yourselves or with anyone else as far

22   as what you heard or any observations or anything.  Talk about

23   the weather or what you did this weekend, anything else; but

24   do not discuss this case.

25            All right.  At this time we will be in recess for 15

1    minutes until 35 after.

2         (Recess was taken at this time.)

3              THE COURT:  Please be seated.  All right.  Please

4    be seated.

5              All right.  Ms. Ferguson, if you will call the names

6    of the jurors.

7              And as your name is called, if you will come

8    forward, and the Court Security Officer will show you where to

9    sit.

10             THE CLERK:  Juror No. 1, Kristi Develin.  Juror No.

11   2, Robert Hurst.  Juror No. 3, Becky Stegall -- or Stegall

12   (different pronunciation.) Juror No. 4, Harriet Huff.  Juror

13   No. 5, Kelley Bowles.  Juror No. 6, Johnny Davis.  Juror No.

14   7, Connie Williams.  And Juror No. 8, Brian Cross.

15             MR. SAYLES:  May we approach?

16             THE COURT:  Yes.

17        (Bench conference held with Counsel.)

18             MR. STRACHAN:  We had struck No. 10, Kelley Bowles.

19             THE COURT:  Excuse me?

20             MR. STRACHAN:  We struck No. 10, Kelley Bowles.

21             THE COURT:  Ms. Ferguson?

22             THE CLERK:  Yes, Your Honor.

23             THE COURT:  They indicated that they struck No. 10,

24   Kelley Bowles.

25             (Pause in proceedings.)

63

1            THE CLERK:  They did.

2            THE COURT:  We will have a recess and re-seat the

3      jury.

4         (Bench conference concluded.)

5            THE COURT:  All right.  Ladies and Gentlemen of the

6      Jury, we have had a little glitch here in our process, so we

7      are going to -- I'm going to give you another about a 5-minute

8      recess, and I'm going to ask you all to be seated out there

9      and start again.  So we will be in recess for 5 minutes.

10     Please go ahead and go to the hallway and take a short break.

11     Then we'll have you come back in and sit down, say, at 10

12     minutes until 12:00 o'clock.

13        (Recess taken.)

14        (Jury panel out of the courtroom.)

15           THE COURT:  Please be seated.

16           All right.  I understand we have another issue with

17     the panel.  This is about as confused as we have ever gotten,

18     so I will see if we can get it straightened out here.

19           I believe that when we were discussing strikes for

20     cause, that it was agreed between the parties that we would

21     strike Juror No. 1; No. 2; and No. 17, Mr. Boren, who had the

22     dentist appointment; and No. 22; and No. 24.

23           Then after we had agreed to that on the record, Mr.

24     Sayles asked if I could repeat those numbers, and I repeated

25     them; but I read the wrong number.  Instead of Juror No. 17, I

64

1    read Juror No. 19.  So everything is somewhat confused now.

2              And the plaintiff was apparently thinking correctly

3    that Juror No. 17 was struck.  The defendant was thinking

4    incorrectly, but for good cause because I had misstated it,

5    that Juror No. 19 was excused for cause.

6              So what I would -- and then we have the other issue

7    of Ms. Ferguson missed the strike to Juror No. 10, so what the

8    Court would propose to do is just give you your strike lists

9    back and let you proceed with making your strikes afresh.

10             Is that agreeable to both sides?

11             MR. ROTH:  Your Honor, may I propose another

12   solution is just to take Juror No. 19 off?  The parties have

13   seen each other's strikes at this point.  We did have one in

14   common, but I don't think --

15             THE COURT:  You did No. 19 in common, you say?

16             MR. ROTH:  No, Your Honor.  There is a common

17   strike, but we have both -- you know, we have told each other

18   who we struck.  And my suggestion to the Court is rather than

19   have us restrike the whole panel, they struck -- it is my

20   understanding their complaint is they struck their list with

21   the assumption that No. 19 had been excused.  And the

22   plaintiff would be willing to let the Court go ahead and

23   excuse No. 19 and then correct their strike No. 10, which they

24   had struck which didn't come in.

25             THE COURT:  All right.

1            MR. ROTH:  And just go ahead and seat the jury that

2  way.

3            THE COURT:  Is that agreeable --

4            MR. SAYLES:  That is acceptable.

5            THE COURT:  We will do it that way then.

6            Ms. Ferguson, if you will -- then what we are doing

7  we are excusing Juror No. 19 for cause; and Juror No. 10 was

8  struck for cause, so I believe that would push us over one

9  more where -- who would be our next one after Juror No. 15

10  that has not been struck?

11            MR. ROTH:  Be No. 20, Your Honor.

12            THE COURT:  No. 20.  Mr. Nitson would become Juror

13  No. 8.

14            Is that your understanding, Mr. Sayles?

15            MR. ROTH:  That is correct, Your Honor.

16            MR. SAYLES:  That is correct, yes.

17            THE COURT:  All right.  So our jury is now that will

18  be called will be No. 3 -- Juror No. 3, Ms. Develin.  No. 6,

19  Mr. Hurst.  No. 8, Ms. Segall.  No. 9, Ms. Huff.  No. 12, Mr.

20  Davis.  No. 14, Ms. Williams.  No. 15, Mr. Cross.  And No. 20,

21  Mr. Nitson.

22            Is that correct?

23            MR. SAYLES:  Yes, Your Honor, it is.

24            THE COURT:  Correct?

25            MR. ROTH:  That's correct, Your Honor.

```
 1              THE COURT:  Any objections from either side?

 2              MR. SAYLES:  No objection from the defense.

 3              MR. ROTH:  No objection from the plaintiff.

 4              THE COURT:  All right.  We have a jury.

 5              Please bring the panel in.

 6         (Jury panel returns to the courtroom.)

 7              THE COURT:  Please be seated.

 8              All right.  Ladies and Gentlemen, we are going to

 9     start over here and see if we can't get it correct this time.

10     That was a clerical error on our point.  Sometimes it gets a

11     little complicated.

12              Ms. Ferguson, if you will call the jurors' names.

13              If your name is called, will you come forward and

14     please be seated.

15              THE CLERK:  Juror No. 1, Kristi Develin.  Juror No.

16     2, Robert Hurst.  Juror No. 3, Becky Stegall.  Juror No. 4,

17     Harriet Huff.  Juror No. 5, Johnny Davis.  Juror No. 6, Connie

18     Williams.  Juror No. 7, Brian Cross.  Juror No. 8, Ronald

19     Nitson.

20              THE COURT:  All right.  If the 8 members selected

21     for the jury, would you please rise and raise your right hand,

22     Ms. Ferguson will administer the oath to you.

23         (Jury sworn.)

24              THE COURT:  Please be seated.

25              All right.  I'm going to release everyone in just a
```

1    moment, if those in the audience will just bear with me.

2              You have now been sworn in as the jurors who will

3    decide this case.  I have some preliminary instructions that I

4    would like to give you.  I would like for you to listen to

5    them carefully and be sure you follow them.

6              You have now been sworn as the jury to try this

7    case.  Until this trial is over, you should not discuss this

8    case with anyone; and do not permit anyone to discuss this

9    case in your presence.  This includes your family and

10   friends.  Do not discuss the case even with the other jurors

11   until all of the evidence has been completed and all of the

12   jurors are in the jury room actually deliberating at the end

13   of the case.

14             So that means when you go home tonight and your

15   spouse asks you, well, what happened, you can say I got picked

16   on a jury.  And they can say, what kind of case?  And you can

17   even say patent case.  But it needs to stop right there.  You

18   need to not go into who it is between or what it is about or

19   anything of that nature.

20             The same thing with your co-workers and same thing

21   with each other.  When you come back on Monday morning and we

22   start the trial, you will be assembling in the jury room,

23   which is this room right through this door (indicating) before

24   the case actually starts.

25             Again, you should not discuss this case.  And the

1    reason for this is very simple.  You, the jury, are to decide

2    this case from the evidence that you hear here in this

3    courtroom from the witness stand and from the exhibits that

4    are admitted.  So it would be improper for you to have any

5    conversation with anybody until all of the evidence is in, and

6    you are all beginning to deliberate in the case.

7              If anyone should attempt to discuss this case or to

8    approach you concerning this case, you should inform the Court

9    immediately.  I do not anticipate that that will happen, but

10   if anyone should, you should notify me immediately.

11             Hold yourselves completely apart from the people

12   involved in this case; the parties, the witnesses, the

13   attorneys and the persons associated with them.  As you can

14   see, there are a number of lawyers.  There will be a number of

15   witnesses.

16             During the trial of this case you will bump into

17   them in the hallway or ride an elevator with them.  Again,

18   don't discuss the case with them, and don't even strike up any

19   conversation with them.  And I am instructing them likewise.

20   Even though you might be talking about a baseball game this

21   weekend, it is important that you not only be impartial, but

22   that you give the appearance of impartiality.

23             If the other side saw you talking to somebody on the

24   other side of the case, they might wonder what you are talking

25   about.  So your instructions are to hold yourself completely

69

1   apart.  They won't think you are being rude, and don't you

2   think they are being rude.

3           Now, I also want to instruct you that if any of you

4   have a social networking Internet site or tool such as

5   Facebook, MySpace or Twitter, you should not discuss the case

6   or even mention it at all on those sites.

7           So if any of you are members of those sites, don't

8   make any reference to this case on any of those sites.

9   Definitely do not post any updates about what is going on in

10  the case.  Do not send or receive text messages about this

11  case.

12          Again, it is important not only that you be fair and

13  impartial but that you appear to be fair and impartial.  Any

14  outside contact of any kind is strictly forbidden.

15          And I am also going to instruct you that you should

16  not make any independent investigation of any fact or matter

17  in this case.  Do not learn anything about the case from any

18  other source.  Do not watch television or read the newspaper

19  about this case.

20          I don't think there will be anything in the paper or

21  on the news; but if there should, flip the channel or turn the

22  page.  Don't read it.

23          Also -- and this is very important -- do not use the

24  Internet or Google to find out information about the case, the

25  parties, or the attorneys in the case.

1            Again, if you were to go onto Google, you would be

2    violating this Court's instructions.  You would be frustrating

3    the process of trying this case based on the evidence because

4    you would be going to a source other than legally-admissible

5    evidence.  So do not make any investigation whatsoever.  Don't

6    go home and Google up the names of the parties.  Don't visit

7    any parties' website or anything of that nature.

8            If you did that -- we are going to spend a week in

9    this trial.  There is a lot of your time going to be invested

10   in it, a lot of this Court's time, a lot of expense for both

11   parties.  But if you were to do something like that, it could

12   mean that we would have to start this case all over again with

13   a different jury.

14           Do you understand the importance of these

15   instructions?

16           All right.  Now, the trial of this case will start

17   next Monday, April 26th.  I will give you more specific

18   instructions about the case at that time.  When you come in, I

19   will give you some very detailed instructions about the case,

20   about the law.  You will then hear opening statements by the

21   attorneys.  And then we will get started hearing the

22   evidence.

23           Now, I would encourage you to check the status of

24   this case, and you can do that by calling the 1-800 number.

25   Does everyone have that 1-800 number that they gave you

1    downstairs?  Anyone that doesn't have it?  I can give it to

2    you again if you need it.  Anybody need it?

3              I would encourage you to check that periodically,

4    ideally Sunday night, just to be sure there has not been a

5    delay or something has developed with the case.  If there is

6    any change as to when you should report or anything else, we

7    will note -- that will be our method of notifying you.

8              All right.  Are there any questions from any members

9    of the jury?

10             Okay.  Again, I want to thank you for your service

11   on this jury.  As I told you before, you are performing a very

12   important function in our judicial process.  I think you are

13   going to find this interesting.  I think you are going to find

14   it a good experience.  I try a lot of these patent cases in my

15   court, and I have seen a lot of jurors sit there just like you

16   are on the first day that you are chosen, and they are going,

17   what am I doing here?

18             And I want to reassure you that you should not be

19   intimidated at all.  You are going to hear a lot of testimony.

20   Both sides are going to do a very good job of simplifying this

21   case for you.  They will have experts that will help explain

22   it to you.  And I am confident that by the time you reach the

23   end of the evidence in this case and begin your deliberations,

24   that you are going to feel very good about this experience and

25   very confident about the decisions that you have to make in

1    the case.

2              So with that encouragement, the Court thanks you for

3    your attendance here today.  I am going to ask the Court

4    Security Officer to take you out through the jury room.  This

5    will be sort of your home next week, so this is where you will

6    come to.  In just a moment I will ask you to follow him in the

7    jury room.  He will show you how to get in from the outside

8    door, and that is where you will assemble in the morning.

9              We will plan to have some coffee and doughnuts and

10   some snacks for you.  We try to take good care of our juries

11   while they are in jury service.  So when you come in Monday

12   morning, that is where you will assemble.  Try to be here

13   about 5 or 10 minutes early so nobody is running late and

14   delaying the proceedings.

15             So we will see you back here ready to go at 9:00 on

16   Monday morning.  The jury is excused to the jury room.

17        (Jury out.)

18             THE COURT:  Please be seated.

19             All right.  We have some pretrial matters to take up

20   in this case, but it is past 12:00, so I think we will be

21   adjourned until 1:30.  We will come back at 1:30 and take up

22   those pretrial matters, so anything before we recess?

23             MR. ROTH:  None from the plaintiff, Your Honor.

24             MR. SAYLES:  None from the defense.

25             THE COURT:  Ladies and Gentlemen of the Jury Panel,

1  thank you for your jury service.  All of you are all excused

2  at this time.  You can turn in your badges downstairs.  Thank

3  you for being here.

4           We will be in recess until 1:30.

5      (Unselected jury panel members excused.)

6      (Voir Dire concluded.)

7

8                     C E R T I F I C A T I O N

9

10  I certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-entitled matter.

12

13

14  /s/ Shea Sloan

15  SHEA SLOAN, CSR, RPR
   OFFICIAL COURT REPORTER
16  STATE OF TEXAS NO. 3081

17

18

19

20

21

22

23

24

25