```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
 2                             TYLER DIVISION

 3    SOVERAIN SOFTWARE            )
                                   )   DOCKET NO. 6:07cv511
 4        -vs-                     )
                                   )   Tyler, Texas
 5                                 )   1:30 p.m.
      NEWEGG, INC.                 )   April 19, 2010
 6
                      TRANSCRIPT OF MOTION HEARING
 7              BEFORE THE HONORABLE LEONARD DAVIS,
                     UNITED STATES DISTRICT JUDGE
 8
                         A P P E A R A N C E S
 9
      FOR THE PLAINTIFFS:     MR. THOMAS GIANNETTI
10                            JONES DAY
                              222 E 41 Street
11                            New York, NY  10017

12                            MR. CARL ROTH
                              MS. AMANDA ABRAHAM
13                            MR. BRENDAN ROTH
                              ROTH LAW FIRM
14                            115 N. Wellington, Ste. 200
                              P.O. Box 876
15                            Marshall, Texas  75670

16                            MR. MICHAEL SMITH
                              SIEBMAN LAW FIRM
17                            713 S. Washington
                              Marshall, TX  75670
18
      ALSO PRESENT:  MS. KATHARINE A. WOLANYK, SOVERAIN
19                   MR. LEE CHENG AND MS. MIRA WOLFF, NEWEGG

20    COURT REPORTER:         MS. SHEA SLOAN
                              211 West Ferguson
21                            Tyler, Texas  75702
                              shea_sloan@txed.uscourts.gov
22

23    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
24

25
```

2

```
 1   FOR THE DEFENDANTS:    MR. RICHARD SAYLES
                            MR. MARK STRACHAN
 2                          SAYLES WERBNER
                            4400 Renaissance
 3                          1201 Elm St.
                            Dallas, Texas  75270
 4

 5                          MR. KENT BALDAUF
                            THE WEBB LAW FIRM
 6                          200 Koppers Bldg.
                            436 Seventh Ave.
 7                          Pittsburg, PA  15219

 8

                            MS. CLAUDIA W. FROST
 9                          PILLSBURY WINTHROP
                            909 Fannin St., Ste 2000
10                          Houston, Texas  77010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.

3            All right.  We are back with the pretrial.  I guess

4    Soverain's Docket No. 326, motion to exclude

5    belatedly-produced CompuServe documents and the CompuServe

6    manuals as corroborating evidence and Trevor's uncorroborated

7    testimony.

8            Who would like to be heard on that?

9            MR. GIANNETTI:  Your Honor, I would like to be heard

10   on that.

11           THE COURT:  All right  Mr. Giannetti.

12           MR. GIANNETTI:  Your Honor, may it please the Court.

13   This is the latest chapter in the Trevor controversy.  Just to

14   remind the Court as to who is Mr. Trevor, Mr. Trevor is a

15   former CTO, chief technical officer, of CompuServe, one of the

16   main prior art items being relied upon in this case.

17           But he has now turned -- he is now a software

18   archeologist, which is another way of saying a professional

19   witness.  Mr. Trevor has testified in a number of cases.  He

20   was in the former Amazon case as an expert witness.  Here he

21   is being put forth by Newegg as a fact witness.

22           We were in court on this at the pretrial conference

23   at the end of January, and the controversy, as you recall, was

24   the disclosure of Trevor and also his testimony being

25   uncorroborated.  Your Honor ruled at the time in response to

4

1    one of our motions that Mr. Trevor could not give

2    uncorroborated testimony.  That has been decided already.

3         And the other thing Your Honor did at that time was

4    to give us leave to take Mr. Trevor's deposition, even though

5    the discovery period had ended due to the fact that he was not

6    properly disclosed during the discovery period.

7         So we took his deposition.  We noticed his

8    deposition, or scheduled it with the defendants, and we showed

9    up for his deposition.  It was in Florida.  It was scheduled

10   for February 23rd.

11        And the evening before the deposition was to

12   commence, I got a telephone call at about 8:00 or 9:00 o'clock

13   while out at dinner, saying lo and behold they had found some

14   additional documents they wanted to present to me.  You

15   remember the big controversy about Mr. Trevor was that his

16   testimony was supposedly corroborated by three CompuServe user

17   manuals, and there was a dispute over whether they really

18   adequately corroborated his testimony and whether they

19   provided the appropriate element-by-element support for his

20   description of the CompuServe Mall.

21        The real prior art here is a product called -- or a

22   service called the CompuServe Mall.  There are three user

23   manuals that the defendants are relying upon to corroborate

24   the expected testimony about the Mall.  That was it, just

25   those three pieces of paper.

1        Now on February 22nd, the evening before Mr.

2   Trevor's deposition, I am handed a stack of documents

3   including a couple of documents with no technical content, and

4   two stacks of computer software that I am supposed to examine

5   Mr. Trevor about the next day.

6        So we took Mr. Trevor's deposition.  We went forward

7   with it and asked him some questions both about the manuals

8   and about these software modules.  And what came out of the

9   deposition was interesting.  We established, we believe, the

10   absolute deficiency of those manuals to corroborate anything.

11        These manuals, admittedly, were not written for

12   software engineers, and they are missing pieces of important

13   items that are important to the claims of the

14   patents-in-suit.  They are just not there in these manuals.

15   They are very, very superficial manuals.  Mr. Trevor was

16   forced to admit that at his deposition.

17        And the other thing that came out is that we now

18   have these additional documents that we think should be

19   precluded because, first of all, they are -- they were

20   produced late.  Secondly, they really don't corroborate

21   anything anyhow.  The documents with no technical content are

22   no better than the manuals, and the computer software we don't

23   think it is really competent evidence of anything, much less

24   the fact that we really haven't had a chance to have a

25   thorough examination of these and weren't able to question Mr.

1   Trevor about them because we got them the night before, and

2   they weren't even written by him.

3          These documents -- he hasn't written any of these

4   documents.  We haven't seen any laboratory notebooks for this

5   man, we haven't seen any of the traditional corroborative

6   materials, so we would say that the manuals -- the

7   late-produced documents should certainly be excluded.  It is

8   not fair to dump documents on us the night before the guy's

9   deposition.

10          When we went through the chronology with him we

11  learned that not only had the documents been produced at the

12  last minute, but they hadn't asked him for the documents until

13  after the Pretrial Conference.  Apparently they had a meeting

14  with him in early February after the January conference.

15  Perhaps recognizing the situation they were in with respect to

16  corroboration, they asked Mr. Trevor would he please look and

17  see if he had anything further.

18          And what he came up with were these non-technical

19  documents and these two pieces of software which he had not

20  himself written, which he admitted had hundreds of versions.

21  This was software that was changing all the time.  He could

22  not relate the software to the extent that we could go into it

23  on such short notice.  He couldn't really relate it to any of

24  the other documents we have.  So this is really not fair.

25          And, furthermore, I think it is time to really look

7

1    at the situation and say what are they trying to do here with

2    Mr. Trevor?  I think what they are trying to do is they are

3    going to have him come into court; and if Your Honor permits

4    this evidence to come in, they are going to have Mr. Trevor

5    sit there and interpret this software.

6              None of this software is covered by any of the

7    expert reports.  None of it has been subject to discovery in

8    this case, and I think they are going to put him forth -- they

9    really want him to be an expert.  They want him to interpret

10   this software.  They want to interpret these documents he

11   hasn't written, and they want to have him try to corroborate

12   the testimony that Your Honor has already ruled has to be

13   corroborated.

14             So we say that this really stop here.  It is time to

15   exclude the newly-produced documents, recognize that these

16   manuals just don't do it, and without any corroboration

17   exclude Mr. Trevor's testimony.

18             THE COURT:  All right.  Thank you.

19             Response?

20             MR. BALDAUF:  May it please the Court.  As an

21   initial matter, Your Honor, I would like to address the

22   corroboration issue.

23             With all due respect, I certainly understand that

24   Your Honor has ruled on this previously, but you did invite us

25   to go back and take a look at the case law.  I would like to

1    submit that because Mr. Trevor is not a party witness, that

2    under the applicable law of the Federal Circuit, no

3    corroboration is required.

4              In the decision of Thomson SA v. Quixote Corp, 166

5    F.3d 1172 that is cited in our brief, the Federal Circuit set

6    forth that the corroboration requirement is only required by a

7    party witness, someone who actually has a dog in the fight, so

8    to speak.

9              Now, I'm sure the plaintiff is going to turn our

10   attention to the subsequent Finnigan decision where that was

11   extended to third parties; however, the earlier Thomson case

12   was never overruled, it was never reversed by an en banc

13   decision, it is the law of the Federal Circuit until we are

14   told otherwise.  So it is our position that no corroboration

15   whatsoever is necessary for this testimony.  That being said,

16   we still believe his testimony is fully corroborated.

17             Now, with respect to corroboration, the law is very

18   clear on this fact.  In Woodland Trust v. Flowertree, 138 F.3d

19   1368, the Federal Circuit said the issue of corroboration is

20   to be decided by a rule of reason.  Unlike what the plaintiff

21   is putting forth, there is absolutely no requirement that

22   there be a line-by-line correspondence between the testimony

23   that needs to be elicited and the

24   corroborating references.  Indeed, there just has to be a

25   reasonable understanding that they relate to each other.

1            With respect to the corroboration issue in these

2    recently-produced documents, as they call them, these

3    documents are not new prior art references.  They don't set

4    forth any new ground for invalidity, but since November we

5    have been hearing that we need more corroboration, we need

6    more corroboration.

7            Based upon that, we went back and asked Mr. Trevor

8    if he could find any additional documents that further

9    corroborate his testimony.  We did so.  We gave them to them

10   before his deposition.  Mr. Giannetti did question him about

11   these documents at his deposition.

12           We agreed to leave the deposition open so they could

13   come back and ask him any additional questions.  And,

14   specifically, when Mr. Giannetti called me to have the

15   meet-and-confer about the filing of this motion, I again

16   offered him the opportunity to take Mr. Trevor's deposition

17   one more time.

18           These documents themselves do corroborate his

19   testimony.  Again, there is no requirement that there is this

20   line-by-line sort of match-up procedure, if you will, that the

21   plaintiffs are advancing.

22           Our position has never changed.  All along we have

23   alleged that the CompuServe Mall invalidates the claims of

24   these patents.  We have presented the manuals.  The Court has

25   already ruled on the manuals and said that they could come

1   into evidence.  The manuals corroborate the testimony.  And

2   these additional documents further corroborate the testimony.

3   But, again, they are not new prior art references.  There is

4   no obligation to supplement invalidity contentions or anything

5   like that.

6          The one final point that I would like to make on

7   this issue is that we have two points that are intertwined in

8   the plaintiffs' position.  One, being the exclusion of the

9   documents themselves.  We submit that there is no basis for

10  it.  They have had the documents since February.  They have

11  had the opportunity to take further depositions.

12         With respect to the documents themselves, mind you,

13  we are talking about the only two they have identified in

14  their motion.  There is an article in the Online Today

15  magazine, which was a publication of CompuServe, that matches

16  up completely with the other references and describes the use

17  of the shopping cart.

18         Secondly, there is the computer code, which I

19  believe Mr. Giannetti himself is probably capable of

20  understanding.  Certainly, Mr. Shamos -- Dr. Shamos and Dr.

21  Grimes are as well.  They take this one step further, and now

22  they want to exclude again Mr. Trevor.  There was a motion --

23  a Daubert motion that was filed asking to exclude Mr. Trevor.

24  That was denied, and they were given leave to take his

25  deposition.

1          There is absolutely no basis to exclude this

2    gentleman's testimony.  We have alleged that the CompuServe

3    prior art invalidates the patent under both Section 102 and

4    Section 103.  So there is no requirement that even if it is

5    decided that corroboration is necessary, there is absolutely

6    no requirement that this man can only testify if his testimony

7    is going to match up with every claim limitation.  That simply

8    doesn't exist.  So there is no basis to exclude this

9    gentleman's testimony whatsoever.

10          Thank you, Your Honor.

11          THE COURT:  Response?

12          MR. GIANNETTI:  Your Honor, I am so glad that

13   Counsel raised the Thomson case because I was in that case for

14   the defendant and I argued the case at the Court of Appeals.

15   I can tell you we did the job right in this case.  We brought

16   in two witnesses.  We had laboratory notebooks.  We had pieces

17   of equipment.  We did it from A to Z, and we won

18   that case.  The case went up on appeal, and we won on appeal

19   also.

20          And then in the subsequent Finnigan case, Thomson

21   was explained.  We know that it was the correct explanation

22   because Judge Rich, who was in -- who wrote the decision,

23   wrote the decision in the Thomson case was on the panel in

24   Finnigan.  And this is what they wrote:  The Thomson court did

25   not opine on the necessity of corroboration, et cetera.

1    However, Thomson did not involve uncorroborated testimony of a

2    single witness.  Indeed, the district court in the case noted

3    that the evidence supporting the anticipation finding came

4    from one or more sources; the live testimony of two people who

5    had worked on the project, an expert report, portions of his

6    deposition, the experts' exhibits, and certain documents the

7    experts had reviewed.  These are the laboratory notebooks and

8    other things.

9         All of this is missing.  This is all missing from

10   this case.  It is absolutely gone.  So I am happy that he

11   cited the Thomson case because the Thomson case is a lesson in

12   how to do it correctly.  And the Thomson case is explained in

13   Finnigan, and definitely Finnigan applies here.  So I don't

14   see their basis for saying that Thomson hasn't been overruled.

15   Thomson has been explained in the Finnigan case, and it

16   doesn't stand for what they say.  In fact, it stands for what

17   I say.

18        They should have done all of this earlier if they

19   could have.  I don't know where all of the documents are that

20   you would expect someone like Mr. Trevor, the software

21   archeologist, to have, but he hasn't produced them yet.

22        As far as line-by-line corroboration, we are not

23   talking about that.  All we are saying is that the elements of

24   the claims that they say are present in this CompuServe Mall,

25   hypertext statements, the messages containing product

1    identifications, they are absolutely missing from this stuff.

2            I don't know what they are going to do with this

3    software.  It is not covered in their report, so the expert

4    can't testify about it.  Are they planning on having Mr.

5    Trevor testify about it?  Do they want to make Mr. Trevor

6    their expert witness.  Maybe he is the expert they wish they

7    had hired in the first place.  But whatever it is, it is not

8    permitted by the rules.  They are not permitted to have lay

9    testimony about software code.

10           THE COURT:  All right.  Here is what the Court is

11   going to do:  The new documents and computer code that were

12   produced right before the deposition are too late; they will

13   be excluded.

14           I have previously ruled that the manuals could be

15   considered.

16           I am going to withhold making a decision on -- well,

17   let me state very clearly that I do hold that Mr. Trevor's

18   testimony as a fact witness needs to be corroborated.  I don't

19   know whether the manuals corroborate it or not.  We will have

20   to see as it goes to trial.

21           I will allow either party that wishes to present him

22   outside the presence of the jury for me to decide whether

23   there is sufficient corroboration to put it to the jury, can

24   do so during the trial.  Whoever loses on that exercise, the

25   time taken up will be charged to that side.

1            So that is my ruling as to 326.  Any questions?

2            MR. GIANNETTI:  Yes.  I just want to reserve our

3    right -- if Mr. Trevor is going to testify about this -- well,

4    the software code is out of the case --

5            THE COURT:  That's correct.

6            MR. GIANNETTI:  I will withdraw that statement.

7            THE COURT:  All right.  Any questions?

8            MR. BALDAUF:  No questions, Your Honor.

9            THE COURT:  Very well.  What is next?

10           MR. GIANNETTI:  We have a series of motions in

11   limine, Your Honor; some of ours and one of theirs, I

12   believe.  And I would be happy to address the first motion in

13   limine, if you will.

14           THE COURT:  Okay.

15           MR. GIANNETTI:  This is what was designated -- just

16   bear with me for a second, Your Honor.

17           THE COURT:  I do want to say this about Mr. Trevor:

18   If he is going to be a fact witness, he is going to be a fact

19   witness.  He will not be expressing any opinions.

20           MR. BALDAUF:  That has never been our intention,

21   Your Honor.

22           THE COURT:  All right.  254, patents-in-suit.

23           MR. GIANNETTI:  This is Soverain's Motion in Limine

24   No. 1, which relates to the acquisition of the

25   patents-in-suit.  As Your Honor may know, the patents-in-suit

1    were acquired in a bankruptcy proceeding, and we believe that

2    that information is not relevant and should not be presented

3    to the jury.

4            I believe they intend to tell the jury that the

5    patents were acquired at a bankruptcy auction.  I think they

6    would probably like to tell the jury how much Soverain paid

7    for them, which was just under $600,000; but really this was a

8    fire sale, Your Honor.  It was a bankruptcy proceeding, it was

9    an auction, and it really has no bearing on what the damages

10   calculation should be in this case, any of the Georgia-Pacific

11   factors.

12           The case that we rely on principally is the Alpex

13   case out of the Southern District of New York.  It is cited in

14   our papers.  In which Judge Kimba Wood held that statements in

15   a bankruptcy proceeding are really not relevant to the

16   reasonable royalty issue.  And so I think under Rule 403 and

17   also under the relevancy rules, we believe that this

18   information should not be placed before the jury.  It is not

19   relevant evidence, it is highly -- even if it were relevant

20   evidence, it would be at most marginally relevant, highly

21   prejudicial.  We believe it should not be presented to the

22   jury.  We believe the cases cited in our brief support us.

23           THE COURT:  Okay.  Response?

24           MR. BALDAUF:  Your Honor, I have heard this a number

25   of items that this was a, quote, fire sale.  There has been

1    absolutely no evidence of this whatsoever.  This was an arm's

2    length transaction.  There were multiple bidders in this

3    process.  It was fairly negotiated, and that was the price

4    that was agreed upon.

5            Under Georgia-Pacific there are a number of factors

6    that are relevant to establish profitability, commercial

7    success of the patented technology, the portion of the profit

8    that should be credited to the invention, and the amount that

9    a willing licensee would pay for use of the patented

10   technology.

11           What they paid for the technology is certainly

12   relevant to all of this.  We have heard the argument about

13   Alpex.  But this has absolutely nothing to do with it.  In

14   that case we were dealing with statements made in the context

15   of forced liquidation where the technology was described as

16   being obsolete and having no actual market value.  That is not

17   the case here.

18           There was no fire sale.  There is no evidence of

19   that.  There were multiple bidders.  The price was fairly

20   agreed to.  And it is certainly relevant under

21   Georgia-Pacific.

22           THE COURT:  What about their point that the auction

23   was two years after the hypothetical negotiation?

24           MR. BALDAUF:  Your Honor, the Supreme Court and

25   Federal Circuit have been very clear that, although the

1   hypothetical negotiation certainly is a relevant time point,

2   it by no way excludes the evidence to be considered.  This was

3   just recently heard again in the Lucent-Gateway case going

4   back to 1933 in the Supreme Court in Sinclair.  Information

5   that is relevant is not limited by the date of the

6   hypothetical negotiation by any means.  We are still able to

7   consider these other relevant points.

8           MR. GIANNETTI:  Your Honor, that's -- the

9   hypothetical negotiation takes place at a certain point in

10  time.  In this case it was in 19 -- in 2001.  And this

11  bankruptcy sale took place long before that.  This was prior

12  to that time.  The word fire -- so it is not relevant.  It is

13  not even Book of Wisdom.  I'm not quite sure why they think it

14  is relevant, but it certainly isn't relevant to the

15  hypothetical negotiation in terms of timing.

16          And the fire sale issue is -- that is not my words.

17  Those are the words of Judge Wood in her case.  I think it is

18  clear that any kind of bankruptcy sale like this does not

19  really reflect --

20          THE COURT:  When did you say the bankruptcy sale

21  took place in relation to the hypothetical negotiation?

22          MR. GIANNETTI:  The sale took place -- when was it?

23  In 2003.  It was after the hypothetical negotiation, Your

24  Honor.  The hypothetical negotiation in this case took place

25  in 2001, so it did not take place at the time of the

1   hypothetical negotiation, really shouldn't be held to be

2   relevant --

3          THE COURT:  I'm going to grant the motion in limine

4   as to the bankruptcy sale.

5          All right.  Next?  Undisclosed expert testimony.

6          MR. GIANNETTI:  This is an issue involving Mr.

7   Tittel, Your Honor.  You recall that Mr. Tittel is their main

8   technical expert.  And Tittel's report, you will recall, had

9   some problems.  When we discussed it last, we noted that when

10  he had wrote the report on infringement, he did not have in

11  mind the Court's Markman rulings.

12         He didn't really include a Section 112 analysis.

13  And he did not include an analysis of three patent claims that

14  are in suit today.  That is Claim 61 of the '492 patent and

15  Claim 639 of the -- excuse me Claims 78 and 79 of the '639

16  patent.

17         So three claims that are in suit here, 3 of the 7

18  claims that are going to be tried next Monday are not really

19  analyzed in his expert reports.  So our request is that those

20  analyses, any analysis of those claims at trial by Mr. Tittel

21  not be permitted.

22         Okay.  Response?

23         MR. BALDAUF:  Yes.  Your Honor, what had happened

24  here was a little bit of a mix-up in that these claims,

25  specifically 78 and 79, were added at a later date, and they

1    did not make it into the expert's report.  However, we are in

2    no way going to be prejudicing the plaintiff in this instance.

3            With respect to invalidity, Claim 78 of the '639

4    patent is virtually identical to Claim 1 of that same patent.

5    And we would only have --

6            THE COURT:  Is 78 a dependent claim?

7            MR. BALDAUF:  78 is independent.  Claim 1 is

8    independent.  Claim 1 was addressed in the expert's report.

9    We would do nothing more than apply the same art to Claim 78

10   that was applied to Claim 71 in exactly the same way.  They

11   have had our supplemental invalidity contentions where that is

12   addressed.  There is no prejudice whatsoever.  It is the exact

13   same argument.  It is the exact same art.

14           THE COURT:  What is the prejudice?

15           MR. GIANNETTI:  The prejudice is that we haven't had

16   a chance to examine him on these claims.  They were not in his

17   report.  They were not covered in his expert deposition.  We

18   don't know what he is going to say.  It is not fair that an

19   expert should be permitted to testify about claims that are

20   not covered in his report.

21           THE COURT:  Do you have any problem if he is limited

22   to what he said about Claim 1?

23           MR. GIANNETTI:  I would have to check that, Your

24   Honor.  I don't know the relationship.  I am accepting

25   Counsel's representation, but I would like an opportunity to

1    read those claims against each other.  I do not have them

2    committed to memory.

3            THE COURT:  All right.  I will take Counsel at their

4    representation that his testimony will not vary from that as

5    to Claim 1, and I will deny the motion based upon that

6    representation.  But anything other than what he testifies as

7    to the Claim 1, would be excluded.

8            MR. BALDAUF:  Thank you, Your Honor.

9            MR. GIANNETTI:  Your Honor, the next motion in

10   limine is No. 9.

11           THE COURT:  All right.

12           MR. GIANNETTI:  Which Counsel advised me earlier

13   today they no longer oppose it.

14           THE COURT:  No. 9 is agreed; is that correct?

15           MR. BALDAUF:  That's correct, Your Honor.

16           THE COURT:  All right.  Agreed.  Granted as agreed.

17           No. 12.

18           MR. GIANNETTI:  This is a claim, damage-related

19   motion.  It has to do with the idea of an acceptable

20   non-infringing alternative.  It has to do with the

21   hypothetical negotiations.

22           As Your Honor may know, one of the factors in

23   Georgia-Pacific that should be considered at the hypothetical

24   negotiation in 2001 is the existence of acceptable

25   non-infringing alternatives.  That has some bearing on -- on

1    the value of a license.

2            The defendant in this case points to a product, the

3    Transact product that Soverain offers, as a non-infringing

4    alternative, which would have been on the table at this

5    hypothetical negotiation.  Their position is that it is an

6    acceptable non-infringing alternative that can be part of

7    their expert's damage analysis in connection with the

8    determination of reasonable royalty.

9            In fact, they go so far as to say the price of a

10   Transact license should be pointed to -- would have been

11   pointed to by the hypothetical negotiator as a cap on what

12   they would have paid for a license under the patents-in-suit.

13           Well, there are a couple of problems with that, Your

14   Honor.  The first is that Transact is really not -- the

15   Transact license is not a patent license.  It is a software

16   license.  And that is not just a semantic difference.  As I am

17   sure you appreciate, a patent license allows you to design a

18   custom product, whatever you want, that is within the scope of

19   the patent.  Whereas, a software license allows you to use the

20   software.  It doesn't allow you to change the software.  It

21   doesn't allow you to make modifications to the software.

22           So this is an apples-to-oranges comparison.  It is

23   plainly not something that is contemplated by the hypothetical

24   negotiation.  They are negotiating for a patent license and

25   not for a software license, so we think it is irrelevant.

1   They shouldn't be able to point to this Transact license as

2   some sort of cap on what they would have paid as a reasonable

3   royalty.

4          The second thing is that under the Federal Circuit

5   case, the Rite-Hite case, you can't point to the patentee's

6   own product as an alternative technology.  That is really not

7   what the damages analysis contemplates.  So we would ask Your

8   Honor to grant our motion in limine and prevent them from

9   pointing to the Transact product as an acceptable,

10  non-infringing alternative at the hypothetical negotiation.

11         THE COURT:  Now, whose product was Transact?

12         MR. GIANNETTI:  It is Soverain's product, Soverain's

13  own product.  Their argument is that if the price for a

14  license got too high, they would have purchased -- for a

15  patent license got too high -- they would have instead

16  purchased a software license to use Transact.

17         Of course, that is not what they were contemplating

18  at all.  I think we heard this morning about James Wu having

19  this brilliant vision of making his own software.  I think

20  that is the story they are going to tell to the jury.

21         But in the hypothetical negotiation they are going

22  to say, well, we would have settled for a patent license, for

23  a software license under Transact.  So it is an

24  apples-and-oranges comparison, Your Honor.  It really has no

25  relevance.  It should be excluded.

```
 1              THE COURT:  Response?

 2              MR. BALDAUF:  Apples to oranges?  I am having a

 3     tough time with that.  We heard this morning about how

 4     Transact was the product that was sold by Open Market, how

 5     revolutionary it was, how it is still being sold today.  So

 6     what we have is a hypothetical negotiation -- let me step back

 7     and make one additional point.

 8              Soverain has stipulated that the accused

 9     functionality is incorporated in this product.  This is a

10     product that was available that they were trying to market.

11     We took the deposition of the former chief executive officer

12     of Open Market who said unequivocally that absolutely had

13     Newegg spoken to me about a potential license, we would have

14     granted it to them at our then going rates.

15              How this could be ignored and how it wouldn't be

16     relevant, is simply puzzling.  This is a

17     commercially-available product that provides the same

18     functionality.  Whether you call it a patent license, whether

19     you call it a software license, we are not saying they are the

20     same thing.  We are saying it is certainly something that

21     would have been considered by the parties.

22              The idea that this product was available -- by their

23     own proclamations it was the best thing since sliced bread and

24     it had "X" price to it.  It is absolutely something that would

25     have been considered.  I don't think there is any question
```

1   about it.

2          Again, we look to the Georgia-Pacific factors;

3   established profitability, commercial success, portion of

4   realizable profit.  This all relates to that commercial

5   product that they were selling, and it is absolutely something

6   that would have been considered by the parties.  I don't see

7   how anyone could think otherwise.

8          THE COURT:  Do you plan on going into actually

9   calling it a non-infringing device?

10          MR. BALDAUF:  We do absolutely, Your Honor, because

11   we think that is what it was.  Had we obtained a license to

12   the Transact Software, that, of course, comes with the

13   inherent license to use that software.  They have set forth

14   and stipulated that it includes the functionality of the

15   patents-in-suit.

16          We wouldn't be infringing their patents if we had a

17   license to that software product.  It is absolutely a

18   real-world consideration and one that would have been

19   considered by the parties.

20          MR. GIANNETTI:  Your Honor, it has to be an

21   acceptable substitute.  They wanted to build their own

22   software.  We don't sell this product; we license it.  They

23   wanted to build their own software.  There is no proof

24   whatsoever that it would have been an acceptable

25   non-infringing alternative.

1          THE COURT:  Okay.  I think it is going to go to the

2    weight given to it.  You can argue it to the jury.  But that

3    one is denied.

4          THE COURT:  No. 13.  I guess that would be the

5    same --

6          MR. GIANNETTI:  Well, this is another acceptable

7    non-infringing alternative.  There were -- I think when you

8    boil it all down, it comes down to a product called the

9    Enfinity product manufactured by a company called Intershop.

10         The problem here is that the Intershop product was

11   licensed by -- this is a company that was licensed by Soverain

12   or Soverain's predecessors but not until after the

13   hypothetical negotiation.  So the hypothetical negotiation was

14   in January of 2001.  The license doesn't take place until 9

15   months later.  So it would not have been a non-infringing

16   alternative at the time of the hypothetical negotiation.  It

17   would have been an infringing alternative.  So I don't see how

18   it is relevant to a hypothetical negotiation in January of

19   2001.

20         And, furthermore, there is no proof at all that this

21   would have been an acceptable non-infringing alternative.

22   There is no proof at all that they would have wanted to use

23   it.  And, furthermore, as I understand it, it was a five-year

24   license.  So at the hypothetical negotiation, even if it were

25   relevant, they would have only been buying a 5-year license

1    exposing them to a suit in 2006.

2             So, first of all, it was not a non-infringing

3    alternative; and, secondly, it certainly wasn't demonstrably

4    an acceptable non-infringing alternative.

5             THE COURT:  Response?

6             MR. BALDAUF:  I will address the last two points

7    first.  With respect to the temporal scope, I disagree.  I

8    don't believe it expired after the five years.  But be that as

9    it may, that and whether or not it would have been acceptable

10   to Newegg, those seem like they would certainly be issues for

11   cross-examination, not any reason to bar the admissibility of

12   that evidence.

13            And I believe the Sinclair case -- again, this is

14   United States Supreme Court in 1933 holding that events

15   occurring after the date of first infringement constitute a

16   Book of Wisdom that courts may not neglect; and that no law

17   sets a clasp upon on its pages and forbids us to look within.

18            And then the Federal Circuit last year in Lucent, a

19   hypothetical negotiation analysis permits and often requires

20   the Court to look at events and facts that occurred thereafter

21   and could not have been known or predicted by the hypothesized

22   negotiators.  We are talking about a matter of months here

23   where Open Market granted a full unrestricted license to one

24   of its competitors under its patents to develop and license a

25   competing product.

1          What that product was being sold for is absolutely

2    relevant by its terms by means of that license.  That is a

3    non-infringing alternative.  Again, I don't see any logical

4    way that could be excluded.

5          MR. GIANNETTI:  Your Honor, the Book of Wisdom cases

6    are not applicable here.  The non-infringing alternative has

7    to be available at the time of the hypothetical negotiation.

8    Counsel has admitted that this is one that was not available

9    until 9 months later.

10         MR. BAULDAUF:  I'm aware of no statutory authority

11   or case law authority that says that it had to be available on

12   that day.

13         MR. GIANNETTI:  I think it is their burden to come

14   up with a case that says it has to be.  I don't think they

15   have.  It has got to be available --

16         THE COURT:  All right.  I'm going to deny Motion in

17   Limine No. 13.  But all these motions in limine are not

18   without the right to object at the time of trial; and if you

19   can come up with case law that says 8 months after the

20   hypothetical negotiation should not be considered, I will take

21   it up at that time.

22         All right.  No. 14, reliance on design-arounds as

23   non-infringing alternatives.

24         MR. GIANNETTI:  I believe we have reached agreement

25   on that, Your Honor.  They have withdrawn --

1            THE COURT:  Excuse me?

2            MR. GIANNETTI:  They have withdrawn their

3    opposition.

4            THE COURT:  That is agreed?

5            MR. BALDAUF:  That's agreed upon, Your Honor.

6            THE COURT:  All right.  Reliance -- let's see.  I

7    think we have already done that.  Reliance on E-commerce

8    Software as data points, No. 15.  That is covered by No. 12,

9    isn't it?

10            MR. GIANNETTI:  Excuse me, Your Honor?  Is what

11    covered?

12            THE COURT:  I have down here No. 15.

13            MR. GIANNETTI:  Yes.

14            THE COURT:  That is the same as No. 12, isn't it?

15            MR. GIANNETTI:  Not quite, no, Your Honor.

16            THE COURT:  E-commerce Software.

17            MR. GIANNETTI:  There are some nuances here.  Let me

18    go back -- 12 -- no, 12 was the Transact issue.  I think this

19    is a little bit different, Your Honor.

20            THE COURT:  All right.

21            MR. GIANNETTI:  Okay.  Here we are -- this deals

22    with Mr. Bakewell's report.  There is a footnote.  I think it

23    is No. 233 in Mr. Bakewell's report in which he talks about

24    the other so-called non-infringing alternatives that were out

25    there at the time -- or relevant to the hypothetical

1    negotiation.  And we challenged them on that.  We said you

2    have got to show that they are non-infringing, you have to

3    show they are acceptable, and you have to show they are

4    available, all of the things that I have been talking about in

5    my arguments in the previous motions.

6            So Mr. Bakewell came back and said, well -- or I

7    should say defendants came back and said, well, they don't

8    have to do all that to prove.  These are just data points, and

9    as data points we don't have to establish all of the factors

10   that you have to establish for a non-infringing alternative.

11           And so we would ask Your Honor to exclude this

12   evidence; that this data point theory is basically undermining

13   the whole concept of an acceptable non-infringing alternative.

14           THE COURT:  Response?

15           MR. BALDAUF:  Your Honor, we are not suggesting, by

16   any means, that these products are non-infringing

17   alternatives.  That representation is incorrect.  These are

18   other products that are available.  They are analogous

19   products.  Maybe they infringe and maybe they don't infringe.

20   We are not going to even remotely suggest they are

21   non-infringing alternatives.

22           The purpose of this is consistent with the

23   Georgia-Pacific factors to show the customary pricing for this

24   type of product, current popularity, customary selling price

25   for use of the invention or analogous inventions.  These are

1    other products that are out there, and they are all offered

2    for various price points, and that is the reason for this.  We

3    are by no means going to suggest that they are non-infringing

4    alternatives.

5              MR. GIANNETTI:  I don't see the relevance of these

6    data points.  I don't see why the jury -- these should be

7    presented to the jury.  There is a risk of confusion here.  I

8    believe that this should be excluded.

9              THE COURT:  I'm not real sure what they are, but I'm

10   going to grant the motion in limine at this time, but that is

11   not without prejudice to approaching the Bench first when we

12   get further into the testimony and explaining it to me a

13   little bit better, and maybe I will feel otherwise at that

14   time.

15             All right.  Is that all of Soverain's motions in

16   limine?

17             MR. GIANNETTI:  Yes, Your Honor.

18             THE COURT:  All right.  Newegg's motion in limine

19   No. 306, No. 2; preclusion of evidence relating to licenses of

20   the patents-in-suit where such licenses were entered into in

21   settlement of litigation.

22             MR. BALDAUF:  Yes, Your Honor.  This motion deals

23   specifically with the issue of the settlement agreements with

24   Amazon and the Gap and with the other defendants in this

25   case.

1        The plaintiff has agreed that they have no intention

2   of offering the amount at which these licenses were entered

3   into, but they still want to be able to get up there and say

4   that all these people are licensees of theirs.

5        For the life of me I cannot understand nor even

6   suggest how this is relevant.  It is not relevant to damages.

7   I have the recent decision by Magistrate Judge Everingham in

8   Data Treasury where he has specifically held that these types

9   of lump sum agreements are completely irrelevant when the

10  plaintiff is seeking a royalty under a running royalty theory.

11       These were all lump sum payments, have no bearing on

12  their damage case whatsoever, and they haven't been relied

13  upon by their expert.

14       Now, to the extent that the other reason they want

15  to be able to say this is that perhaps it lends some credence

16  to the validity of their patents by saying, well, Amazon is a

17  licensee, that is incredibly prejudicial.  Those settlement

18  agreements were all entered into under actual litigation.

19       Now, I submit probably the likely reason that Amazon

20  settled was that the MercExchange/eBay case had not been

21  decided yet and the threat of an injunction was still out

22  there.  Beyond that, their experts have not submitted any

23  opinion that they are going to be relying upon that as

24  secondary indicia of non-obviousness.  There is just

25  absolutely no basis that they should be able to back-door

1    these settlement agreements in such a way that would

2    incredibly prejudice the jury.

3          Besides the fact that we have these very high

4    settlement amounts out there, specifically Amazon's, if they

5    want to get out there and wave around the fact that Amazon is

6    a licensee, it prejudices the jury because they will sit back

7    and think, well, here is a sophisticated big company we have

8    all heard of, they have taken a license, that must mean there

9    is something to these patents.  While we all know that was

10   entered into to avoid litigation, there is no reasonable basis

11   for allowing that into evidence.

12          MR. GIANNETTI:  Your Honor, if this is a relevancy

13   issue, I would point to the Inline case in the District of

14   Delaware where it was clearly said that evidence of agreements

15   in general or policy of making a particular type of agreement

16   may be relevant as long as it does not extend to the terms of

17   the licenses granted the settlement of litigation.  This is

18   relevant to the issue of the strength of the patents and

19   commercial success, and our expert I believe did refer to this

20   in his report.

21          THE COURT:  You are not going into the amount --

22          MR. GIANNETTI:  No.  Neither side has listed the

23   license agreements, per se.  We are not going to tell the jury

24   the amounts.  We are not going to tell the jury the terms,

25   simply that these licenses have been entered into.  We want to

1    be able to identify the parties, and we want to be able to say

2    that the licenses have been entered into following litigation.

3              THE COURT:  You want to say they have been entered

4    into following litigation?

5              MR. GIANNETTI:  That would be the plan, Your Honor,

6    yes.

7              THE COURT:  And they are offering a number of

8    license agreements which they are going to say these are

9    companies people you have never heard of.  There are a slew of

10   licensing agreements that the prior owner of the patent

11   licensed.  They are going to be offering those, and we have

12   got to be able to respond to that, so they have really opened

13   the door to that kind of testimony.

14             I think what we are asking for here, I don't think

15   it really falls under the Data Treasury rule that Counsel was

16   talking about or the ResQNet case and its progeny.  That is

17   really not what we are talking about here.  We just want to

18   tell the jury that these patents have been licensed, to whom

19   they have been licensed, and what the circumstances were.  And

20   that's it.  We are not trying to confuse the jury.

21             THE COURT:  What is the relevance of that?

22             MR. GIANNETTI:  Well, the relevance of the licenses

23   and the fact that there have been licenses and the

24   individuals, first of all, it is relevant because we need to

25   answer their charge that we have licensed these patents but to

1    a bunch of no-name companies.

2            Secondly, it is relevant to the issue of commercial

3    success of the patents.  I mean the fact that some major

4    companies have taken licenses I think it is something that the

5    jury should hear about the strength of our patents.

6            MR. BALDAUF:  Your Honor, if I may?

7            THE COURT:  Yes, go ahead.

8            MR. BALDAUF:  I didn't mean to interrupt.  I would

9    like to address two points.  First of all, this issue with the

10   Divine licenses.  We went -- in our expert's deposition we had

11   listed a number of these licenses that their predecessor had

12   entered into, Divine.  During the deposition they made a point

13   that some of these were entered into in settlement of

14   litigation.  I personally went through all of the hundreds of

15   thousands of documents that they produced and determined which

16   ones were entered into under settlement of litigation, and we

17   took those off the list.  We are not going to mention them.

18   We are not going to talk about them.

19           There is absolutely no reason these should come in.

20   I could be wrong.  I've been wrong many times before.  But I

21   don't believe there is any reference to any of these

22   agreements in any of their expert reports as a secondary

23   indicia of non-obviousness.

24           But beyond that, you just heard him say it, they

25   want to be able to get up here and say that Amazon took a

1    license, Amazon is a licensee of this.

2            Well, what is anybody going to think?  Anyone is

3    going to think that, wow, that is an arm's length deal.

4    Amazon wanted that technology.  Amazon saw something there.

5    They took a license.  But that case was in this very

6    courtroom.  Amazon certainly didn't do that willingly.  Amazon

7    certainly didn't seek out this technology.

8            It is so incredibly prejudicial and will

9    unquestionably leave the jury with the thought in their mind

10   that there was some sort of willing component to this.  It is

11   probative of nothing.  Amazon tried to avoid spending money in

12   the threat of an injunction.  I think we all know that.

13           MR. GIANNETTI:  How am I going to answer when he

14   puts in all these Divine licenses and says, look at all these

15   licenses?  These are to companies that you have never heard of

16   before.  We have to be able to tell this story to the jury,

17   Your Honor.  It is not fair to have him do that and not allow

18   us to put in -- we are not putting in the terms --

19           THE COURT:  What is he going to be putting in?

20           MR. GIANNETTI:  We are just putting in the names of

21   the licensees, the fact that they took licenses.  And we also

22   would like to be able to mention that these resulted from

23   litigation, but certainly --

24           THE COURT:  No.  I am saying what are you seeking to

25   rebut that he is putting in?

1           MR. GIANNETTI:  He is putting in all of these Divine

2    licenses.  I don't know how many they are putting in --

3           THE COURT:  What kind of licenses?

4           MR. GIANNETTI:  Divine was a company.

5           THE COURT:  Okay.

6           MR. GIANNETTI:  After Open Market there was Divine,

7    and Divine licensed the patents widely, and there were a

8    number of companies that they gave licenses to.  Divine is the

9    name of the company, the licensor.

10          And these licenses are going to come into evidence

11   and many of them are to small companies, very small companies

12   that probably nobody has ever heard of.  They weren't for a

13   lot of money.  These licenses were for -- you know, the

14   company was in dire straits.  So they put out these licenses.

15   That is all going to come in.  But we think we should be able

16   to tell the other side of the story, which is that there were

17   some substantial companies that took in licenses.  We are not

18   going to put in the amounts, we are not going to put in the

19   terms of the license, but we need to tell that to the jury.

20          THE COURT:  I'm going to deny the motion in limine.

21          All right.  What else?  Is there anything further

22   from Newegg?

23          MR. BALDAUF:  That's it, Your Honor -- excuse me,

24   I'm sorry.  There is one other issue that Ms. Frost would like

25   to --

```
 1              MR. SAYLES:  First of all, may I address something
 2     else?
 3              THE COURT:  Yes.
 4              MR. SAYLES:  In the event that they offer these
 5     settlement licenses and we object and it is overruled,
 6     consistent with your denial of the motion in limine, would we
 7     then have the ability, if we want to, to put in the fact that
 8     these are lump sum agreements because we have the competition
 9     in this case of them seeking a running royalty and us putting
10     forth a lump sum?
11              It seems to me that they shouldn't have the cake and
12     eat it too to put in settlement licenses and say they are not
13     going into amounts but leave us with the inability to point
14     out that these were lump sum settlements?  So I inquire
15     because I want to --
16              THE COURT:  If you put in they were lump sum
17     settlements, would you let them put in the amounts that were
18     paid?  Would you object to that?
19              MR. SAYLES:  Well, we don't think the amounts should
20     come in.  If that was the option we were faced with, we would
21     have to decide whether it was worth it or not.  But the Amazon
22     settlement was $40 million, and that sounds like a lot of
23     money over there in the jury box.  So my inclination is, right
24     now, that we wouldn't want that amount in but these settlement
25     licenses were indeed lump sums.
```

1          MR. GIANNETTI:  We are not putting the amounts in,

2     Your Honor.  I don't think there is any need to tell them what

3     the terms were.

4          THE COURT:  What is your response to his request to

5     put in that they were lump sum settlements instead of running

6     royalties?

7          MR. GIANNETTI:  Well, not if we are not going to

8     tell them what the amounts are.  If the terms aren't coming

9     in, they shouldn't come in for either party.  We are not going

10    to tell the jury that Amazon paid $40 million.

11         THE COURT:  I think that they are entitled to put in

12    the fact that this technology was licensed to Amazon and

13    others, to rebut what you are putting in regarding the Divine

14    licenses.  But how much further you go -- this becomes a very

15    slippery slope -- if you then want to put in that they were

16    lump sum instead of paid-up royalty, then I'm going to let

17    them put in the amounts of the settlement.

18         You know, y'all need to think that through, and I

19    wish y'all could discuss it and decide before we get in the

20    middle of trial to do that --

21         MR. GIANNETTI:  I can say that we don't intend to

22    put in the amounts right now, Your Honor.

23         THE COURT:  I know you don't, but if they want to

24    put in that they were lump sum, then I would allow you to put

25    in the amounts is what I am saying.

1          MR. GIANNETTI:  In other words, if they want to put

2  in the lump sum, then we get to put in the amounts?

3          THE COURT:  That's right.

4          MR. GIANNETTI:  We would prefer no terms at all.

5          THE COURT:  I think that would be simpler because

6  you get on this slippery slope of retrying -- it just starts

7  going into a whole other case, so I am inclined at this time

8  with stopping it, with letting them just put in it was

9  licensed.  You think about it, if you want to really urge, I

10  will consider that later -- I'm not going to rule on it right

11  now, but I will look at it.  But I will give you a heads-up

12  that if you pursue that course and I did go that far, then I

13  would let them put the amounts in.

14          MR. SAYLES:  I understand.

15          MR. GIANNETTI:  Thank you, Your Honor.

16          MR. SAYLES:  Can I mention something to Mr. Baldauf

17  that I want him clarify?

18          THE COURT:  Okay.

19      (Pause in proceedings.)

20          MR. BALDAUF:  Your Honor --

21          THE COURT:  Let me say this further about that last

22  issue we were talking about:  I think really what is at issue

23  or what has been put in issue is the fact of licensing.  Once

24  we get beyond that and start getting into the terms of the

25  license, neither one of you have relied upon those for your

 1   damage experts, so I would really rather probably not get into

 2   all that area.  Okay.

 3           MR. SAYLES:  I think I would probably not, but if I

 4   can take the Court up on thinking about it.

 5           THE COURT:  Think about it.  But -- how long do you

 6   need to think about it?

 7           MR. SAYLES:  Well, I can let you know before we

 8   start on Monday morning.

 9           THE COURT:  Why don't you let Mr. Giannetti know of

10   your position by, say, Thursday at noon.

11           MR. SAYLES:  I can do that.

12           MR. GIANNETTI:  It is a problem, Your Honor, because

13   this was not something factored into the expert reports.

14           THE COURT:  I think it would be a problem for both

15   sides the further we go down that road.  So I would rather

16   just stay in the shallow water.

17           Go ahead.

18           MR. BALDAUF:  Mr. Sayles reminded me of two other

19   things.  When we were discussing the issue of the expert

20   report, we spoke just about the '639 patent, and you had also

21   mentioned Claim 61 of the '492 patent, which is a dependent

22   claim.  We have no intention of having our expert address that

23   claim in the context of infringement.  We will just focus upon

24   the underlying independent claim that was addressed.

25           With respect to invalidity, this claim offers

1    some -- in our view, some fairly frivolous, additional

2    limitations which we will not be offering any additional prior

3    art references to.  We would intend to have our expert just

4    comment they would be matters of common sense.

5            And then the second issue that I would like to bring

6    up -- we have a fairly unusual situation here where the

7    plaintiffs' expert on validity is a former law partner of mine

8    in our law firm, so we would ask that you would agree not to

9    bring that fact up.

10           MR. GIANNETTI:  Can I consult with Mr. Adamo about

11   that?  I think we will probably not raise that.  I think that

12   is fair.

13           THE COURT:  Don't raise that without approaching the

14   Bench first.

15           MR. GIANNETTI:  Yeah, I will do that.

16           On 61, Your Honor -- I just want to make sure I

17   understand.  I thought we had a ruling on agreement on 78 and

18   79.

19           MR. BALDAUF:  Right.

20           MR. GIANNETTI:  61 is a different claim in a

21   different patent.  It wasn't addressed at all, so I don't see

22   how they can now turn and have their expert address 61 even in

23   the context of it being similar to another claim, so I think

24   61 is gone from their expert report and their expert

25   testimony.

42

1              MR. BALDAUF:  If I may, Your Honor, this is a

2    dependent claim dealing with a hypertext statement.  And what

3    it does, it adds the limitation that the statement includes

4    information such as the buyer's name, purchase price.  It is

5    that simple.  So we would just simply want to have our expert

6    comment that would be a matter of common sense.  We have no

7    expectation or intention --

8              THE COURT:  Did he refer to that in his expert

9    report?

10             MR. BALDAUF:  He did not, Your Honor.

11             THE COURT:  No.  If it is not in the report, then it

12   is not coming in.

13             MR. BALDAUF:  Thank you.

14             THE COURT:  What else?

15             MR. BALDAUF:  Ms. Frost has a point to make.

16             THE COURT:  All right.

17             MS. FROST:  Good afternoon, Your Honor.

18             THE COURT:  Good afternoon.

19             MS. FROST:  Thank you.  I would like to make a point

20   briefly for the appellate record --

21             THE COURT:  I'm sorry?

22             MS. FROST:  I would like to make a point briefly

23   just before the case gets underway.

24             THE COURT:  What appellate record?  You are not

25   expecting to have to appeal, are you?

1            MS. FROST:  You never know.

2            THE COURT:  You are wanting to do this for

3    Soverain's behalf, right?

4            MS. FROST:  Absolutely.

5            I would like to specifically state, Your Honor,

6    Newegg's continuing objection to the representation of

7    Soverain by Jones Day.

8            Your Honor has ruled on this, and we are certainly

9    not trying to ask the Court to revisit this issue at all, but

10   we just want to make clear our position that Jones Day's

11   representation of Soverain, in our opinion, violates the

12   ethical rules of this Court, this Circuit, this state, and

13   will prejudice Newegg's right to a fair trial under the

14   federal due process cause.

15           MR. GIANNETTI:  I hope we are not going to have this

16   for every hearing we have --

17           THE COURT:  I don't think it would be necessary for

18   every hearing.

19           MR. GIANNETTI:  I hope this issue is dead for a

20   while.

21           THE COURT:  Did you decide not to seek mandamus?

22           MS. FROST:  Yes, we did and pursue our appellate

23   remedies as we have them.

24           THE COURT:  Very well.

25           All right.  Let's see, start on Monday.  So y'all

1   have 12 hours per side?

2            MR. GIANNETTI:  Yes, Your Honor.

3            THE COURT:  If we can get in about 6 hours a day, so

4   we should finish the evidence on Thursday.  That will be my

5   goal.  So we will work pretty much 9:00 to 5:00.

6            I have never done this before -- I don't know if

7   y'all have -- but would each side be interested in providing

8   refreshments for the jury?

9            MR. SAYLES:  We will do that.

10           MR. GIANNETTI:  We agree to that.

11           MR. SMITH:  We were already planning on bringing

12   water.  I heard mention of doughnuts this morning, so do we

13   need to pick up some Southern Maid on the way in, too.

14           THE COURT:  I think that would be good.  Why don't

15   you visit with Ms. Ferguson and y'all split up, plaintiff do

16   it one day and defendant do it the next, refreshments for

17   their morning and afternoon break.  If we get into taking

18   short lunch hours, if it happens to fall on your day, then you

19   can provide lunch as well.

20           MR. SAYLES:  Very well.

21           THE COURT:  Is that agreeable?

22           MR. GIANNETTI:  That's fine, Your Honor.

23           THE COURT:  I'm not trying to force anyone, but I

24   know the amount of money that is being spent in prosecuting

25   this case, and I think as hard as these jurors are going to be

1    working next week, a little creature comfort for them would be

2    good.

3              MR. GIANNETTI:  That will be fine.

4              MR. BALDAUF:  We will give them flowers too if they

5    request that.

6              THE COURT:  Yeah.  I guess -- do y'all know about

7    that case we were trying?

8              MR. GIANNETTI:  No.

9              THE COURT:  It was VirnetX v. Microsoft.  Mr. Sayles

10   was in it.  And we had an all-female jury.  And I guess it was

11   the next to the last day that they sent out a note that if it

12   would be possible for them to have an arrangement of flowers

13   for the jury room on the last day, they would like to have it.

14             So I asked if either side would be interested in

15   doing that.  Of course, all of the hands go up.  I said, all

16   right, just don't get too over the top.  I could just see both

17   sides having a funeral arrangement there covered up with

18   flowers.

19             So I don't think this one will be asking for

20   flowers, hopefully, Mr. Sayles.

21             All right.  Have y'all exhausted all your settlement

22   talks?  Are you still talking through a mediator or anything?

23             MR. GIANNETTI:  I think Ms. Wolanyk has a report.

24             MS. WOLANYK:  Your Honor, we have had another few

25   rounds of discussions since we were last here in January.  At

1    this point Soverain has offered terms that are comparable to

2    those that we offered Amazon, our broadest terms ever.   And

3    Newegg is seeking further terms and so we have yet to have an

4    offer from them.  We are in an impasse.

5                THE COURT:  Okay.

6                MR. SAYLES:  Mr. Cheng on our behalf.

7                MR. CHENG:  Your Honor, we have made it very, very

8    clear --

9                THE COURT:  I'm sorry, you have made it very clear

10   what?

11               MR. CHENG:  We have made it very clear consistently

12   in our talks, settlement talks with Soverain that we seek,

13   primarily, freedom from future litigation; that being the

14   point and purpose of settlement.   Irrespective of what terms

15   Amazon accepted with Soverain, we have not yet been able to

16   see terms from Soverain that we believe will free us from

17   future litigation, so we have not --

18               THE COURT:  Future litigation from Soverain?

19               MR. CHENG:  Yes, from Soverain.

20               THE COURT:  With regard to these patents?

21               MR. CHENG:  That's right.  Or with respect to the

22   settlement agreement.  The last thing we would want is to sign

23   a settlement agreement that gives them one additional way to

24   litigate -- to sue Newegg.

25               So as a result we have made it clear that if they

1    agree to a settlement agreement term that will give us that

2    comfort, we would very gladly continue our settlement

3    discussions.

4             THE COURT:  Okay.

5             MS. WOLANYK:  And, Your Honor, we feel at this point

6    in time we have offered terms consistent with the agreement

7    that Amazon essentially wrote, and we believe do offer the

8    patent case that Newegg is seeking.  We are also two years

9    into this, and we have yet to know what settlement range

10   Newegg is even offering.

11            THE COURT:  Okay.  Are you -- the term that they --

12   seem to be a sticking point for them, is they want protection

13   as to any future suits by Soverain involving, I guess, other

14   intellectual property.  Is that a sticking point for Soverain?

15            MS. WOLANYK:  No.  We have offered coverage as to

16   our entire portfolio and future patents as well.

17            MR. CHENG:  Your Honor, just to clarify.  We are not

18   talking about future suits involving other Soverain

19   intellectual property.  We are talking about the ability of

20   Soverain to potentially, for example, sue Newegg or a spin-off

21   entity, a subsidiary of Newegg that is about to be acquired,

22   or come after Newegg or would be acquired for additional

23   payments based upon the terms of the settlement agreement.

24            Just to give one example, there are other provisions

25   in the agreement that continue to give us pause as to whether

1    or not patent peace is generally provided for under the terms

2    of that settlement --

3            THE COURT:  If you could go to the podium.  I am

4    having a little trouble hearing you.

5            MR. CHENG:  I'm sorry.  Your Honor, just to clarify,

6    we are not necessarily concerned with respect to other patents

7    in the Soverain intellectual property portfolio.  We are

8    actually concerned about the current terms that Soverain has

9    proposed that we have tried very, very hard to accommodate, do

10   not provide Newegg with protection from Soverain in terms of,

11   for example, events like Newegg potentially being sold to a

12   third party or Newegg selling divisions to a third party.  We

13   are concerned that at the point of an acquisition, Soverain

14   could come and seek additional amounts from Newegg under the

15   very patents --

16           THE COURT:  From Newegg or from Newegg's

17   predecessor?

18           MR. CHENG:  From Newegg.

19           THE COURT:  From Newegg or from its predecessor?

20           MR. CHENG:  No, no, from Newegg, from Newegg

21   indicating essentially -- what would happen is if we don't get

22   coverage after an acquisition, right, an acquirer could force

23   us to accept a lower acquisition price, for instance.  It is

24   very, very critical for us to ensure that there is --

25           THE COURT:  So you are concerned about someone who

1    might acquire Newegg as to whether they would be covered by

2    the license that you have taken?

3              MR. CHENG:  That's correct, that's correct.

4              THE COURT:  Wouldn't they be covered by a license?

5              MS. WOLANYK:  Your Honor, we have provided that

6    coverage.  What Newegg is seeking is an unlimited ability to

7    spin out pieces of licenses to an unlimited number of

8    potential spin-outs.  We are not sure -- this is the challenge

9    on a lump sum type of arrangement as we have, we are saying to

10   them, yes, you can cover your business; yes, you can sell that

11   business and take the license with -- but they want the

12   ability to expand it in an unlimited way --

13             THE COURT:  Sort of divide the license out?

14             MS. WOLANYK:  Yes.

15             THE COURT:  Are you seeking to divide --

16             MR. CHENG:  That is not what we are seeking --

17             THE COURT:  -- the license?

18             MR. CHENG:  -- at all, Your Honor.  That is

19   absolutely not what we are seeking.

20             I think just to sum it up, we have worked very, very

21   hard and we have spent many long hours trying to work with

22   Soverain to come to terms that we believe would give us

23   genuine patent peace.  With due respect to the fact that they

24   believe that they have given us the best possible license

25   terms they can offer, we cannot see patent peace in the

1    agreement they provided to us.

2              THE COURT:  Cannot see what?

3              MR. CHENG:  We don't see patent peace and definitive

4    freedom from litigation with Soverain in the terms they have

5    offered to us, so at this point in time we have not been able

6    to, you know, come to agreement, definitive agreement with

7    Soverain.

8              THE COURT:  I'm a little perplexed because it sounds

9    like y'all are seeing two different worlds totally as far

10   as -- before you even get to talking money as to what the

11   effect if you would come to an agreement on money whether it

12   would buy you the peace you seek or whatever --

13             MR. CHENG:  I'm sure -- I'm sorry, Your Honor.

14             THE COURT:  What were you going to say?

15             MR. CHENG:  I'm sure if we offered enough money,

16   Soverain would give us the terms we want.

17             THE COURT:  What term are you asking for

18   specifically that they are not willing to give?

19             MR. CHENG:  Off the top of my head there are a

20   couple of terms that we have not been able to come to

21   agreement on.  One involves whether or not the benefit of the

22   agreement that we seek -- the patent peace that we seek would

23   extend to acquirers of Newegg's business or parts of Newegg's

24   business that eventually gets sold.

25             It is not our intention at all to try to set up any

1    sort of competitor to Soverain.  It is not our business.  We

2    have no desire to do that.  But they seem to be very fixated

3    on the concept that is what indeed we will do, we will end up

4    spinning off licenses to all sorts of third parties.  That is

5    not our intention at all, but --

6                 THE COURT:  What assurance could you give them that

7    that is not your intention?  In other words, would you agree

8    that you would not spin-off more than one time or more than

9    two times or something of that nature?

10                MR. CHENG:  I can't predict the future, Your Honor.

11   The owner of my company is a very ambitious person.  He is a

12   serial entrepeneur, and he has ideas all the time and

13   constantly.  I guess the only assurance I can provide at this

14   point is that we haven't officially spun a company off, we

15   haven't sold a division off yet.  But I don't think I can

16   responsibly advise my board, especially since we have filed an

17   S1 to go public, that we can limit our options in that

18   respect.  I can't really say we will limit it to one spin-off

19   or two spin-offs or three spin-offs.

20                THE COURT:  Well, who is y'all's mediator?

21                MR. CHENG:  I'm sorry?

22                THE COURT:  Who is the mediator?

23                MS. WOLANYK:  Mike Patterson.

24                MR. CHENG:  Mr. Patterson.

25                MS. WOLANYK:  And Judge Faulkner has also mediated a

52

1    few times for us in the case.

2              THE COURT:  Are y'all in communication with either

3    one of them?

4              MR. CHENG:  We are.  Mr. Patterson has been very

5    helpful.

6              THE COURT:  Okay.  Well, I would just encourage you

7    to -- do y'all think money is going to -- usually these

8    things -- this is kind of like a divorce.  You know, if you

9    are just talking about money, it is not a problem.  But if you

10   are talking about kids, it can be a real problem.  Are

11   y'all -- have y'all discussed money at all?

12             MR. CHENG:  Not for many months, Your Honor.

13   Candidly the last offer that we received financially from

14   Soverain is not something we could contemplate accepting.

15             MS. WOLANYK:  Your Honor, Newegg never made an offer

16   to Soverain on its own.  At one point in time like two years

17   ago when it was still jointly defending, there was a group

18   offer.  They never made us an offer, so we are not really

19   sure.

20             MR. CHENG:  It was very easy, Your Honor, to back

21   out the amount that Newegg offered at the time --

22             THE COURT:  I'm sorry, what?

23             MR. CHENG:  It was very easy -- it would have been

24   very, very simple to do simple math.  It was a group offer

25   involving two of the other defendants that subsequently

1   settled, and it would have been very, very simple to have

2   backed out the amount that would have represented Newegg's

3   portion of that settlement.  So we have indeed made a

4   financial offer in the past.

5          THE COURT:  Okay.  Well, is there anything the Court

6   can do to help y'all try to find some common ground?  I'm

7   really perplexed by this business component.  To me it sounds

8   like, perhaps that is the biggest hang-up than perhaps the

9   money.  I don't know what the dollars are.  But unless you can

10  resolve what is going to be granted and what is going to be

11  released, you know, I'm just -- I haven't run into that very

12  often where that is really the big hang-up.

13         MR. CHENG:  Your Honor, if I may, one of our biggest

14  concerns is to make a financial offer and subsequently realize

15  that we are not seeing eye to eye on the other license terms

16  and have additional amounts extracted from us after we make

17  the financial offer.  Our recognition and our experience in

18  negotiating various contracts suggests that it is more

19  efficient to make sure that the license agreement is very

20  completely agreeable, you know, especially the essential terms

21  like freedom -- for us, freedom from future litigation -- are

22  completely agreed upon before we make financial offers because

23  of that concern.

24         MS. WOLANYK:  With all due respect, Your Honor, we

25  have negotiated licenses with 7 sophisticated companies now,

```
 1    all of whom have signed the very license terms that Newegg
 2    doesn't find acceptable; and we are finding it hard for us --
 3    we have been negotiating terms of various variety for two
 4    years now, and we are finding it hard to get to a point to
 5    know what we are negotiating over.  And, again, we have urged
 6    Newegg to make an offer so we know we are in the ballpark here
 7    or ballpark here.  We don't know where we are at.  And they
 8    just keep saying we need more -- we could be in this business
 9    in the future, we might need to have that business in the
10    future.
11               THE COURT:  Do you think that if the money was
12    right, that you could meet their licensing requirements?
13               MS. WOLANYK:  Possibly.
14               MR. CHENG:  If it was high enough, I would assume
15    they would accept almost any terms.  What we can afford is
16    another issue, Your Honor.
17               THE COURT:  You can what?
18               MR. CHENG:  What our company can afford to pay them
19    is a whole other issue.  We have made it very, very clear that
20    there are just amounts that we can't afford to pay just
21    because our business is such a low margin business.
22               THE COURT:  I was just wondering if it might be
23    worth your while, though, to make them an offer contingent
24    upon the license being satisfactory to you, you know, to see
25    if you are in their ballpark or not.  Because she just made a
```

1   representation that if she felt like your offer was in the

2   ballpark, that they would try very hard to meet your license

3   requirements.

4           MR. CHENG:  Your Honor, my concern is -- and I am

5   sure you are well-aware, I mean standard negotiations, theory

6   suggests that basically puts a floor, and the way that our

7   experience has been negotiating arrangements like this with

8   parties similar to Soverain -- it is not like we haven't come

9   to settlement agreement -- in agreement with parties similar

10  to Soverain, is that it doesn't work out very well for us when

11  we basically create some sort of floor for ourselves to start

12  negotiating up from.

13          THE COURT:  Let me say this:  I think whatever offer

14  you make at this stage could just be a one-time deal because

15  we are going to be by -- in about another 10, 12, days the

16  jury is going to decide what that number is and what the terms

17  of the license agreement are, so you have got an opportunity

18  to make a shot at it and it may not be successful.  You can

19  have it all kept confidential and you don't ever have to make

20  another offer, but I would just really encourage you to at

21  least take a look at seeing whether you can give them

22  something to worry about and maybe you can get something

23  worked out, maybe you can't.

24          MR. CHENG:  Thank you, Your Honor, that is an

25  excellent suggestion, Your Honor.  I would also suggest that

56

1    they could give us something to worry about as well by making

2    us an offer we could consider as well -- a financial offer we

3    could consider as well.

4              THE COURT:  Well, I would encourage both of you to

5    try to continue to talk, work through your mediator.  I will

6    just say the clock is ticking down.  And both of you are

7    business people.  You can still work out a business solution

8    to this dispute where you have some control over your future

9    and the future of your company and the future of this

10   litigation and the future of this license.

11             But starting very quickly on next Monday morning,

12   you are going to lose total control of the outcome of this.

13   You have got excellent lawyers on both sides.  They can try to

14   minimize your risk, maximize your potential.  But you have got

15   a lot of variables at play.

16             You have got a jury of 8 people.  You have seen them

17   now.  You know what they look like, but you don't know what

18   they are going to decide.  And you won't know until a week

19   from Friday.  Once they have decided, you are pretty well

20   stuck with that.  You have got a Judge that you don't know how

21   he is going to rule.  He is not perfect.  He does make

22   mistakes.

23             So, you know, you can't totally predict what I am

24   going to do in a case.  But between now and next Monday both

25   of you have an opportunity to have some control over the

1    destiny of this litigation, so I am going to ask both of you

2    to -- I want both of y'all to sit down at the back of the

3    courtroom when we are through, the two of you, and discuss

4    which mediator you would both prefer to use, and see if you

5    can't come to agreement on that, number one.

6              And then get in contact with that mediator, let him

7    know where you are, and let him know you are available to and

8    want to at least try to work with him over the next week to

9    see if you can make any progress towards settlement.  Okay?

10   Because these cases, they are long, they are hard, they are

11   difficult.  The results are unpredictable.  And it will go on

12   and on and on.

13             How much have y'all spent defending this case so

14   far?

15             MR. CHENG:  It's a lot of computers.

16             THE COURT:  Excuse me?

17             MR. CHENG:  We have had to sell a lot of computers.

18             THE COURT:  And a lot of cameras.

19             MR. CHENG:  And a lot of the cameras.

20             THE COURT:  I still like the camera I bought from

21   y'all.  It is working well.  I know it takes a lot of cameras.

22             How much have you spent prosecuting it?

23             MS. WOLANYK:  A large amount.

24             THE COURT:  All right.  You both know what those

25   numbers are, and they are going to do nothing but get bigger.

58

1   I know your lawyers will do you a great job, and they don't

2   mind litigating this case, they don't mind taking it to a

3   jury; but they are not the ones that have to live with the

4   results.  The two of y'all are and your companies are.

5           So I hope you will try to get together and visit

6   this afternoon and see if you can't get past the posturing and

7   get down to getting this deal closed if you can and find some

8   common ground.

9           All right.  See you on Monday.

10          MR. CHENG:  Thank you.

11      (Hearing concluded.)

12

13

14              C E R T I F I C A T I O N

15

16  I certify that the foregoing is a correct transcript from the

17  record of proceedings in the above-entitled matter.

18

19
    /s/ Shea Sloan
20
    SHEA SLOAN, CSR, RPR
21  OFFICIAL COURT REPORTER
    STATE OF TEXAS NO. 3081
22

23

24

25