```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                           TYLER DIVISION

 3    SOVERAIN SOFTWARE              )
                                     )    DOCKET NO. 6:07cv511
 4        -vs-                       )
                                     )    Tyler, Texas
 5                                   )    1:30 p.m.
      NEWEGG, INC.                   )    March 17, 2010
 6
                      TRANSCRIPT OF EVIDENTIARY HEARING
 7                 BEFORE THE HONORABLE LEONARD DAVIS,
                      UNITED STATES DISTRICT JUDGE
 8
                        A P P E A R A N C E S
 9
      FOR THE PLAINTIFFS:      MR. GEORGE MANNING
10                             MR. KENNETH R. ADAMO
                               JONES DAY
11                             2727 N. Harwood St.
                               Dallas, Texas  75201-1515
12
                               MR. THOMAS DEMITRACK
13                             JONES DAY
                               North Point, 901 Lakeside Ave.
14                             Cleveland, Ohio  60606

15                             MR. CARL ROTH
                               MS. AMANDA ABRAHAM
16                             ROTH LAW FIRM
                               115 N. Wellington, Ste. 200
17                             P.O. Box 876
                               Marshall, Texas  75670
18

19    ALSO PRESENT:            MS. KATHARINE A. WOLANYK, SOVERAIN
                               MS. HILDA GALVAN
20                             MR. BRAD CONRAD

21
      COURT REPORTER:          MS. SHEA SLOAN
22                             211 West Ferguson
                               Tyler, Texas  75702
23

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:    MS. CLAUDIA W. FROST
                            MR. JEREMY J. GASTON
 2                          PILLSBURY WINTHROP
                            909 Fannin St., Ste 2000
 3                          Houston, Texas   77010

 4                          MR. MARK STRACHAN
                            SAYLES WERBNER
 5                          4400 Renaissance
                            1201 Elm St.
 6                          Dallas, Texas   75270

 7                          MR. DAVID C. HANSON
                            THE WEBB LAW FIRM
 8                          200 Koppers Bldg.
                            436 Seventh Ave.
 9                          Pittsburg, PA  15219

10                          MR. HERBERT A. YARBROUGH, III
                            YARBROUGH WILCOX
11                          100 E. Ferguson, Ste. 1015
                            Tyler, Texas   75702
12
                            MR. ERIC FINDLAY
13                          FINDLAY CRAFT
                            6760 Old Jacksonville Hwy., Ste. 101
14                          Tyler, Texas   75703

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Ferguson, if you will call the case,

4    please.

5              THE CLERK:  Case No. 6:07cv511, Soverain Software v.

6    Newegg.

7              THE COURT:  Announcements?

8              MR. ADAMO:  Good afternoon, Your Honor.

9              THE COURT:  Erin go bragh, Happy St. Patrick's Day.

10             MR. ADAMO:  Do you think that is appropriate attire

11   for Court, Mr. Adamo?

12             MR. ADAMO:  You just cost me $10.  This was the best

13   I could do in an emergency circumstance.

14             THE COURT:  They're fine.  Ms. Ferguson has been

15   sticking all of us with the shamrocks.

16             MR. ADAMO:  I went for the back-up, Your Honor,

17   under the assumption that mardi gras beads would not be

18   acceptable here.

19             THE COURT:  All right.

20             MR. ADAMO:  Ken Adamo, Jones Day for Soverain

21   Software.  With me today, Your Honor, Ms. Wolanyk -- whom I am

22   sure you are well and truly familiar with -- and two people

23   that you have not met so far, Mr. George Manning.

24             MR. MANNING:  Good morning, Your Honor.

25             MR. ADAMO:  From the Jones Day Dallas office and my

1   partner Mr. Tom Demitrack from the Jones Day Cleveland office.

2          THE COURT:  Okay.  Very good.  Thank you.

3          MR. YARBROUGH:  Your Honor, Trey Yarbrough on behalf

4   of the movant Newegg.  Also with me is Ms. Claudia Frost, who

5   will be presenting the motion on behalf of Newegg; Jeremy

6   Gaston; and, of course, Mark Strachan.

7          THE COURT:  Very good.

8          All right.  Very well.  We are here on Newegg's

9   motion to disqualify.  I think what I would like to do is hear

10  a brief opening statement from both sides, and I then I will

11  let each side just in normal fashion call whatever witnesses

12  they wish to, cross-examine, and then closing arguments.

13         So if you would like to proceed.

14         MS. FROST:  Good afternoon, Your Honor.  Claudia

15  Frost for Newegg.  Before we proceed, we are probably going to

16  go into today some of the contents of the declarations and

17  some matters that we believe are confidential.  There are some

18  people in the courtroom today, whom I am not familiar with,

19  who may not be appropriate to hear this type of information,

20  so I don't know whether all of these people are Jones Day

21  people or who they might be.

22         THE COURT:  Mr. Adamo, can you provide Ms. Frost

23  with any introductions or help in that regard?

24         MR. ADAMO:  Of course, Your Honor.

25         Ms. Frost, I believe the gentleman sitting at the

1   end is Mr. Finkelstein.  Immediately to his left is my partner

2   Ms. Galvan.  And immediately to her left is my partner Mr.

3   Conrad.  And the last two people on the end don't need

4   introduction.  That's Mr. Roth and the smartest person in his

5   office.

6            MR. ROTH:  Amanda Abraham.

7            MR. FINDLAY:  Your Honor, Eric Findlay.  I represent

8   Vista Print and QVC in some subsequent Soverain litigation and

9   was here out of interest that this proceeding might involve

10  our case.  I have an interest in being here --

11           THE COURT:  Who else do we have back here?

12           MS. FROST:  Our clients are here, Mr. Lee Cheng from

13  Newegg and Mira Wolff from Newegg.

14           THE COURT:  All right.  Is there anyone that you

15  object to for the whole proceedings, or do you just wish to

16  have them excluded when you get to a part that you would

17  consider confidential?

18           MS. FROST:  I think it would appropriate to just

19  exclude them at a certain part rather than the entire

20  proceeding.

21           THE COURT:  I will leave that up to you to let us

22  know when.

23           MS. FROST:  Thank you, Your Honor.

24           MR. ADAMO:  Your Honor, just so it is clear on the

25  record that neither Ms. Galvan nor Mr. Conrad are part of the

6

1    Soverain software trial team if it becomes important at a

2    later point.  Actually the only member of the trial team that

3    you usually see on this case that is here today is me.

4              THE COURT:  Very well.

5              MS. FROST:  Before we begin I would like to let the

6    Court know how I intend to make my opening remarks today and

7    how I would like to proceed, if it would be appropriate with

8    the Court.  We have brought the witnesses Mr. Cheng and Ms.

9    Wolff pursuant to the Court's order.  We have crafted the

10   declarations that we have submitted in the case mindful of

11   this Court's precedent as well as that of the Fifth Circuit to

12   try to provide sufficient information to establish the

13   substantial relationship test and also to establish that

14   confidences were, in fact, shared.

15             We admit that that exercise is sort of a

16   "Goldilocks" exercise in some respects.  But we don't think

17   ours are too hot or too cold; in fact, we think they are just

18   right and they do, in fact, establish the substantial

19   relationship and the sharing of confidences on their own.

20             I thus plan to make my argument based on --

21   principally on those declarations.  And at the end of my

22   argument -- which I will try to make as short as possible -- I

23   hope that I will have eliminated any questions that this Court

24   might have beyond the scope of those declarations.

25             THE COURT:  Okay.  Now, is this for your opening

1   statement?

2         MS. FROST:  No, this -- yes, for my opening

3   statement.  You mean is what I am saying now my opening?

4         THE COURT:  Yes, is this your opening statement?

5         MS. FROST:  No, I am just asking if I could proceed

6   in this fashion and let you know what my plan is.  I am

7   planning to use the declarations principally.

8         THE COURT:  Well, what I had intended -- I have read

9   the declarations.  But what I would like for you to do is to

10  give a brief opening statement of whatever you would like to,

11  about five minutes or so, and then call whatever witnesses you

12  would like to call.  And you can move in summary form through

13  some of the information but then give an opportunity for

14  cross-examination based upon your examination of witnesses.

15  And we will conduct it just like a trial.

16        MS. FROST:  Well, I will proceed in that fashion,

17  Your Honor, of course.  The reason, of course, I suggested

18  that we rely muchly on the declarations is because Jones Day

19  is representing itself here.  We are somewhat concerned about

20  going into the provision of further disqualifying confidential

21  information in order to protect our confidences.  But mindful

22  of that, I will proceed as Your Honor suggests.

23        THE COURT:  All right.

24        MS. FROST:  Whether analyzed under the substantial

25  relationship test where sharing confidences between Newegg and

8

1   Mr. Finkelstein is irrebuttably presumed or by application of

2   other ethical rules because relevant confidences were, in

3   fact, shared by Newegg with Mr. Finkelstein, Newegg has met

4   its burden of proof that Finkelstein is personally and Jones

5   Day is vicariously disqualified from representing Soverain in

6   this case.

7          In response to Newegg's arguments Jones Day asks

8   this Court, as it must, to ignore the law of this Circuit and

9   this state and adopt a new rule seeking the result that it

10  desires to achieve.  That rule is that if an ethical screen is

11  belatedly erected, a law firm can be adverse to a former

12  client of one of its current partners in a substantially

13  related matter.  That rule has not been recognized by the

14  courts in Texas or in the Fifth Circuit nor is it one that is

15  consistent with any established set of national, legal ethics,

16  standards or norms.

17         Indeed, the ABA Model Rule on which Jones Day

18  depends, does not qualify as a national norm that this Circuit

19  would accept because it has not -- it departs from --

20  substantially from the rule in 39 jurisdictions, including

21  this one.

22         Finally, the result Jones Day is seeking requires

23  the Court to bend and go even beyond the scope of that very

24  rule, the ABA Model Rule, its specific notice and timing

25  requirements that Jones Day did not comply with.  Moreover,

1    Mr. Finkelstein had obligations to Newegg that he did not

2    comply with.  Accordingly, the Court should decline to accept

3    Jones Day's invitation to chart this unprecedented legal

4    course.

5         We believe that we have demonstrated aptly the

6    existence of the substantial relationship test and met the

7    substantial relationship test in our declarations.  We have

8    established, it is undisputed, an actual attorney/client

9    relationship between the moving party and the attorney. We are

10   seeking to disqualify as well as a substantial relationship

11   between the subject matter of the former and present

12   representations.

13        Indeed, that a substantial relationship exists, we

14   submit, is axiomatic because here the former representation

15   actually involved disclosures and risk assessments of the

16   present case.

17        THE COURT:  But isn't that really the gist of the

18   matter?  Don't we have a dispute, a factual dispute as to

19   that, because as I read the declarations, there is a fairly

20   different interpretation between Mr. Cheng -- I believe it

21   is -- and Mr. Finkelstein?

22        MS. FROST:  Yes, Your Honor, there is a factual

23   dispute about what was exchanged.  But there is not a factual

24   dispute that the Soverain litigation was part of Mr.

25   Finkelstein's -- and risk assessment of appropriate risk

1   factors to be disclosed with respect to the Soverain

2   litigation was not part of Mr. Finkelstein's obligations and

3   responsibilities to Newegg in that representation.

4           Clearly, Mr. Finkelstein says -- his declaration

5   makes plain that among the matters that were discussed,

6   included this case, and he indicated on the December 10th call

7   in particular -- and I am looking at his declaration at

8   Paragraphs 14 and 15, he indicates unequivocally there that

9   the Soverain litigation was discussed on both due diligence

10  calls.  And specifically he recalls talking the case and

11  asking questions about the case on the December 10th call.

12          His declaration states clearly, Your Honor, that the

13  purpose of the discussion and the requested information on

14  that call was to determine what disclosures should be made in

15  the IPO documents regarding the intellectual property issues

16  and litigation issues and in particular risk factors that

17  needed to be publicly disclosed.  Newegg's disclosure of such

18  risk factors for consideration by Mr. Finkelstein in order to

19  determine which ones needed to be disclosed, are precisely the

20  types of confidential disclosures that the attorney/client

21  relationship is designed to protect.

22          Because of the substantial relationship, Your Honor,

23  though, you don't need to go into the actual substance of the

24  confidences.  The Court -- indeed the Court's precedent

25  provides that once it is established that prior matters are

1   substantially related to the present case, the Court will

2   irrebuttably presume that the relevant confidential

3   information was disclosed during the former period of

4   representation.  Any effort by Mr. Finkelstein to disavow the

5   receipt of confidences, therefore, should be ignored for that

6   reason alone.  The American Airlines case, and among many

7   others, makes that plain.

8          Indeed the Court there indicates that once a lawyer

9   has given advice in a substantially related matter, he must be

10  disqualified whether or not he has gained confidences.

11         Under controlling law applying the substantial

12  relationship test, Mr. Finkelstein is personally disqualified

13  from representing and would not be permitted to represent

14  Soverain in this litigation.  That is the first test.  And

15  clearly he would not be able to represent Soverain in this

16  litigation because of the information that he obtained and the

17  substantial relationship that exists between his work for

18  Newegg while he was at Latham & Watkins on the IPO and the

19  litigation here.

20         The next issue is whether Jones Day itself must be

21  disqualified because Mr. Finkelstein is now a partner there.

22  Fifth Circuit law, Texas law, federal common law and national

23  standards will all impute Mr. Finkelstein's confidences and

24  conflicts of interest to Jones Day.  ABA Model Rule 1.10 will

25  impute it.  The Texas Disciplinary Rules of Professional

1    Conduct 109(b) will impute it.  It is well established under

2    Texas law that when a lawyer is privy to client confidences

3    related to an ongoing matter and then joins another law firm

4    which represents an adverse party to that same ongoing

5    litigation, the law firm must be disqualified.  Federal law is

6    also in accord.  There is indeed an irrebuttable presumption

7    that confidences retained by an individual lawyer will be

8    shared with other members of his firm.

9          There are two exceptions to that rule, neither of

10   which apply here.  Both of them involve double or some form of

11   imputation.  When the lawyer who has left the firm, the first

12   firm, the lawyer who has represented the client -- the lawyer

13   who leaves the first firm has not represented the client.

14   When he has not represented the client himself or gained any

15   confidences, then when he leaves the firm and goes to another

16   firm, the confidential information and the conflict doesn't

17   travel with him.  It is not a burden on him.

18         But if, as in this case, Mr. Finkelstein had the

19   attorney/client relationship with Newegg, he did obtain

20   confidences either actually or presumptively, when he leaves

21   his firm, they go with him; and they follow him wherever he

22   goes.

23         The Fifth Circuit has recently affirmed in the Pro

24   Education case that the determinative principle that should be

25   applied in this case.  And that is if an attorney is currently

1    affiliated with a personally disqualified lawyer, that

2    attorney is conclusively disqualified by imputation while he

3    remains at his firm.  Well, this case, of course, makes our

4    point.  Because Mr. Finkelstein is personally disqualified, he

5    is not disqualified by imputation, he is not disqualified

6    because somebody else at Latham represented Newegg.  He

7    represented Newegg.  Because of that reason, all members of

8    any firm he would be affiliated with, including Jones Day, are

9    conclusively disqualified by imputation.

10           Now let me address two things very briefly.  One is

11   that Jones Day's contention that even though the

12   presumption -- even if the presumption were rebuttable that

13   there were -- or irrebuttable, that there would be an ethical

14   screen available that they could use under ABA Model Rule 1.10

15   and the amendment of it as of February 2009.

16           First of all, it is our position that as long as it

17   is recognized that the presumption is irrebuttable -- which

18   the Fifth Circuit recently affirmed that it is -- there is no

19   need to consider the ethical screen because it is

20   inconsistent -- the model rule is inconsistent with the Fifth

21   Circuit's precedent.

22           Nonetheless, I will briefly address it because an

23   ethical screen is simply ineffective under any circumstances.

24   Texas law and the Texas Disciplinary Rules do not recognize

25   one.  The Fifth Circuit has never recognized one.  And since

1    the ABA's Model Rule was passed in February of 2009, that

2    Model Rule has not been adopted by any state.  Indeed, it is a

3    very controversial rule, and a minority report was submitted

4    to and published with the rule when it was passed.  It

5    provides that the rule itself departs substantially from the

6    applicable ethical rule in 39 jurisdictions.

7              Jones Day acknowledges that in deciding

8    disqualification issues, this Court should look to national

9    norms.  And we agree.  But a rule that has not been passed by

10   any state, has not been recognized in this Circuit, and that

11   departs from the rules of 39 states, surely cannot represent

12   the national standard or norm.  Accordingly, the Court should

13   decline to follow that rule.

14             Even if the Court were to choose to depart from it

15   and depart from established law and follow this rule, it

16   wouldn't make any difference in the outcome of the case.

17   Comment 7 of the rule makes clear that the rule doesn't apply

18   unless certain specific procedures are followed.  They were

19   not followed in this case.

20             Before Mr. Finkelstein began work at Jones Day,

21   Jones Day knew that he had represented Newegg at Latham and

22   that it involved the Soverain litigation.  Jones Day didn't

23   erect an ethical screen before Mr. Finkelstein arrived.

24   Indeed it didn't do so until Newegg's Counsel called to meet

25   and confer about this very motion.  And that was simply too

15

1    little too late.

2            Jones Day's own procedures through Exhibit 1 to the

3    Callahan Declaration indicate that when available as a means

4    of avoiding imputation, screening procedures must be in place

5    prior -- typically must be in place prior to a new lawyer's

6    start date.

7            In any event, this Court should not go out on a limb

8    for Mr. Finkelstein or for Jones Day in this case.  Mr.

9    Finkelstein and Jones Day knew early on in their courtship

10   that they had serious ethical issues which they discussed

11   among themselves but never revealed to Newegg or its Counsel.

12           Indeed, the ABA report that issued when the

13   amendment to the model rule was passed, condemns the very

14   conduct of the parties in this case.  It observed that a

15   lawyer's move from one private firm to another almost

16   invariably requires confidential discussion between the lawyer

17   and the new firm before the lawyer terminates her prior

18   relationship to determine whether or not the move will be in

19   the lawyer's and the new firm's best interest.

20           If the lawyer is representing a client adverse to a

21   client in the new firm, the lawyer must inform the client of

22   her intention to begin discussions with the new firm because

23   the personal interest of the lawyer in changing firms creates

24   a conflict under 1.7.  Thus, the report concludes, screening

25   is therefore of principal utility in cases where the lawyer's

1    role in the prior representation is concluded.

2            That did not happen here.  Mr. Finkelstein did not

3    ever mention his intention or his -- seek consent for leaving

4    Latham and going to Jones Day, the known opponent of his

5    client Newegg in this very significant IP matter to Newegg in

6    connection with its IPO.

7            In light of the breaches of confidence that have

8    already occurred in this case, any fear by Newegg that an

9    ethical screen would not be efficacious even if it were

10   applicable is reasonable.  The report notes that the Court is

11   free to object if the efficacy of a screen called for under

12   the rule, if it is reasonable under the particular

13   circumstances for the former client to fear that a screen may

14   not be effective.

15           For these reasons and others we will explain, we

16   request the Court to disqualify Jones Day.

17           THE COURT:  Okay.  Thank you.

18           Jones Day.

19           MR. ADAMO:  Your Honor, Mr. Demitrack will address

20   the Court, and probably in a few minutes I will explain why.

21           THE COURT:  Okay.

22           MR. DEMITRACK:  Good afternoon, Your Honor.  I will

23   be brief because I know the Court wants to hear from the

24   declarants.  We do agree with Newegg that they bear the burden

25   of proof.  This Court in the Microsoft case has indicated that

1    attorney disqualification rules are not to be mechanically

2    implied.  We also agree with Newegg that federal law applies.

3    That federal law that is most appropriate here is the Fifth

4    Circuit decision in Pro Education which made clear that the

5    statement in the American Airlines case about irrebuttable

6    presumption, was dicta.

7              And in thinking about this issue, it is important to

8    keep in mind that there are multiple presumptions that are

9    involved in a disqualification motion, and it is easiest to

10   see that Your Honor if you think about the applicable rule,

11   1.9.  The applicable rule says that there is a two-step

12   process.

13             And the process is:  First, has the individual

14   attorney either acquired or should he be presumed to have

15   acquired confidential information of the adverse party?  That

16   is the first presumption.  The second presumption is whether

17   that information should be imputed to the other attorneys at

18   the firm.

19             Now, if we go back to the first test or the first

20   step of the disqualification analysis, the movant has to

21   show -- and I am paraphrasing from the Court's Microsoft

22   opinion -- that the attorney either actually acquired specific

23   confidential information, or secondly, should he be presumed

24   to have acquired it?

25             That second presumption, should the attorney be

1    presumed to have acquired it, comes from the so-called

2    substantial relationship test.  And as the Court is aware, the

3    substantial relationship test come from a case back in the

4    '40s, the Theater case.  And it is designed to act as a

5    surrogate for not requiring the aggrieved party to actually

6    present the confidential information.

7            And what the test says is, look, if the case of the

8    prior representation is substantially related, we will presume

9    the passage of confidential information.  In this case and in

10   their briefs, Newegg did not argue that portion of Step 1 of

11   the analysis.  They simply didn't argue it.  And the reason is

12   pretty clear.  No way could they have shown it.  Mr.

13   Finkelstein never represented Newegg in any litigation, let

14   alone this litigation, nor did Latham.

15           What Mr. Finkelstein did is to spend about ten hours

16   reviewing due diligence inquiries in connection with an IPO.

17   Factually, not similar -- that's Step 1 of the three-part test

18   that this Court applied in Microsoft for the purposes of

19   determining substantial relationship -- no similarities

20   between the legal issues.  And the third part of the test

21   involves an analysis of the nature and extent of the

22   attorney's involvement.  Was the attorney substantially,

23   critically involved in that prior matter?  Ten hours is not

24   enough.

25           So we get then to what Newegg focused on to show

1    that the attorney either acquired or should be presumed to

2    have acquired confidential information, and that is to

3    actually prove the passage of specific confidential

4    information.  They did not meet that burden either, Your

5    Honor, and we, respectfully, submit that they have recently

6    affirmatively disclaimed any intent to rely on the passage of

7    actual confidences.

8            Your Honor received yesterday a stipulation between

9    the parties.  And that stipulation arose out of a request by

10   Soverain for the notes, documents, and other materials either

11   at Latham or elsewhere relating to this motion.  And in

12   response to that, Newegg wrote an email and indicated to us

13   that those documents were irrelevant; that is, the content of

14   the communications that we could have cross-examined their

15   witnesses on and used to support Mr. Finkelstein's testimony

16   were not relevant because the content of the communications

17   was irrelevant.

18           Having now taken that position, Newegg, we

19   respectfully submit, can no longer base its argument on the

20   content of those communications, especially given this Court's

21   articulation of the standard in the Microsoft case that there

22   must be the identification of specific, confidential

23   communications.  They cannot have it both ways.

24           In Microsoft this Court indicated that the movant

25   has the burden to delineate with specificity what confidential

1   information was shared.  They can't go halfway and say there

2   was something and respond to our request for the documents and

3   say we are not going to give them to you because they are not

4   relevant.  So for that reason alone -- they did not brief

5   substantial relationship, they took the position that the

6   passage of actual confidences was not relevant, we submit the

7   motion ought to be denied.

8          However, even if the Court allows the testimony --

9   and we are perfectly prepared to proceed with that testimony,

10  Your Honor -- Newegg cannot meet its burden.  The testimony of

11  Mr. Finkelstein, which Your Honor will hear from this

12  afternoon, will indicate that he worked on one matter, this

13  due diligence.  He spent about ten hours on it.  He had two

14  telephone calls.  The first of those calls, the one to which

15  Counsel pointed on September -- in September, the earlier --

16  the first of the calls, was a call in which Mr. Finkelstein

17  was asking questions about 40 cases involving Newegg.

18         And the purpose for doing that, as is the purpose of

19  any time an attorney is conducting a litigation due diligence,

20  is to understand whether the case ought to be disclosed.  It

21  is a risk factor analysis; and for the purposes of that as Mr.

22  Finkelstein will explain, you rely on the worst case outcome.

23  You don't care -- you are not weighing the evidence to see who

24  was right or who was wrong.  You are relying on the worst case

25  analysis.  What is it that Soverain is saying in this case

1   should be disclosed?

2           Indeed, Mr. Finkelstein was not in the protective

3   order in this case.  He couldn't have reviewed as a licensed

4   attorney any of the documents in this case.  And he didn't.

5   And he didn't.

6           The second call was another due diligence call, and

7   he was asked specific questions about should the disclosure be

8   changed now that the case is closer to trial.  Public

9   information -- and, by the way, at both of those calls

10  underwriters' counsel was present.  Indeed, the first call was

11  scheduled by underwriters' Counsel.  It was their call-in

12  number.  They were the host for the call.  That was not a

13  privileged communication in the first place.  The notion is

14  just implausible that not having any access to any documents,

15  not being allowed at the Protective Order to look at

16  documents, sitting in a communication where people outside of

17  his client are present, that there would have been a

18  disgorgement of all of the strategies of this litigation, all

19  of which, by the way, are known now because they are part of

20  the Final Pretrial Order, is just not credible.

21          I know we want to get to the testimony.  Let me just

22  get very quickly, the second part is -- there is a second

23  presumption.  That is, let's assume that Mr. Finkelstein, in

24  fact, had specific confidential information.  Should his

25  knowledge be presumed to have extended to everyone else at

1   Jones Day once he arrived?  His testimony will be clear.

2   Other than what he did for the purposes of clearing his -- or

3   evaluating conflicts before he joined the firm and other than

4   working with me and others assigned by the firm to defend

5   against this motion, he has talked to no one at Jones Day

6   about this litigation.

7          Jones Day, from its perspective, did what it should

8   have done.  It had a procedure, a pre-existing procedure for

9   screening and clearing lateral lawyers coming to the firm.  It

10  followed that procedure here.  The offer letter from our

11  managing partner made it clear you have to clear conflicts

12  before you can come.

13         Mr. Finkelstein received a conflicts form.  He

14  completed it.  He listed over 150 matters.  He listed the

15  Newegg matter.  He was asked about the Newegg matter because

16  the person conducting the analysis at Jones Day was aware that

17  we represented Soverain.  He was told by Mr. Finkelstein,

18  consistent with the testimony you will hear today, that Mr.

19  Finkelstein had no confidences.  He was simply looking at

20  public information and conducting a due diligence analysis.

21  Jones Day did what you would expect it to do, it made the

22  decision that there was no ethical reason that Mr. Finkelstein

23  couldn't come.

24         As soon as Newegg raised the issue -- and actually

25  they raised the issue just a few hours before they filed their

1   motion -- we immediately put up a screen, not because we were

2   required to under the rules but just out of an abundance of

3   caution in case anyone would question our motives.  Mr.

4   Finkelstein received the screen, he signed it, and he has kept

5   it with his assistant.  He has abided by it since then.

6           And the Fifth Circuit in Pro Education, and in the

7   Carbo-Chem case in the district court has indicated that the

8   presumption -- the second presumption of the passage of

9   information to others in the law firm can be rebutted.  Here,

10  Your Honor, we believe that it has been.  We have demonstrated

11  it has been.  We respectfully submit that the motion should be

12  denied and now we look forward to hearing from the testimony.

13          Thank you.

14          THE COURT:  All right.  Ms. Frost.

15          MS. FROST:  Your Honor, to proceed in the fashion

16  the Court please, I call Mr. Cheng.

17          THE COURT:  Let me just ask any witnesses that are

18  going to testify if you would please raise your right hand,

19  identify yourself by name beginning, Mr. Adamo, with you --

20          MR. ADAMO:  No, I rose for another reason.

21          THE COURT:  All right.  Mr. Finkelstein.

22          MR. FINKELSTEIN:  Mark Finkelstein.

23          MR. CHENG:  Lee Cheng.

24          MS. WOLF:  Mira Wolff.

25          THE COURT:  Okay.  Ms. Ferguson, if you would please

24

1    administer the oath.

2        (Witnesses sworn.)

3            THE COURT:  Any request to invoke the Rule?

4            MR. ADAMO:  Yes, Your Honor, Soverain Software

5    requests the Rule to be invoked.

6            THE COURT:  The Rule has been invoked.  All of the

7    witnesses are excluded from the courtroom.  You all understand

8    what the Rule is, don't you?  The Rule?  That you shall not

9    discuss the case among yourselves or anyone else other than

10   Counsel involve in the case during the course of these

11   proceedings.

12           MR. FINKELSTEIN:  Thank you, Your Honor.

13           THE COURT:  Everyone except Mr. Cheng.  You will be

14   the first witness, Mr. Cheng.

15           MR. ADAMO:  Your Honor, I rise at this point just to

16   explain again further caution that Mr. Demitrack has outlined

17   to the Court that the reason that Mr. Demitrack, besides the

18   fact that he is the firm's conflict expert and Mr. Manning

19   right here besides the fact that I report to Mr. Manning, is

20   because I am Lead Counsel in this case and I am behind an

21   ethical wall.  I don't want there being any issue as a result

22   of the testimony that is going to be given here today, which I

23   understand in view of this being an evidentiary procedure this

24   now has to be the evidence that persuades and carries their

25   burden because the declarations effectively have to be trumped

1   because this is an evidentiary procedure, as I understand the

2   law.  I don't want to be in the courtroom and inadvertently

3   get caught in a corner.

4           THE COURT:  You are excused.

5           MR. ADAMO:  Thank you.  I appreciate it.  I just

6   wanted to make a statement of record that I wasn't being

7   disrespectful --

8           THE COURT:  All right.

9           MR. ADAMO:  -- in leaving the courtroom.

10           MR. MANNING:  Thank you, Your Honor.  It makes my

11   life easier.

12           MR. ADAMO:  Can the record note that I heard that?

13           THE COURT:  All right.

14           MR. CHENG:  Thank you.

15      (Mr. Ken Adamo, Mr. Brad Conrad Mr. Carl Roth, and

16      Ms. Amanda Abraham leave the courtroom.)

17      (THIS PORTION OF THE TRANSCRIPT IS UNDER SEAL AND FILED

18      UNDER SEPARATE COVER.)

19      (End of SEALED portion of the transcript - Excused

20       parties return to the courtroom.)

21           THE COURT:  All right.  Y'all come on.

22           MR. ADAMO:  Sorry, Your Honor.

23           MS. FROST:  Old friends.

24           MR. ADAMO:  I was just asking Counsel if she was

25   going to say anything I shouldn't hear.

```
 1              THE COURT:  No.

 2              MR. MANNING:  We cleared that.

 3              MS. FROST:  Your Honor, I will be brief.

 4              THE COURT:  All right.

 5              MS. FROST:  I think there are a couple of points

 6    that I wanted to refute very briefly from their opening

 7    statement just so that the record is very clear about it.

 8    Their notion that the substantial relationship test was not

 9    raised by us in our papers is completely wrong.  Look at our

10    motion at Page 5 where we raise it.

11              Any suggestion that we waived the basis for

12    disqualification based on an exchange of confidential

13    information by our refusing to provide the underlying

14    documents that support these declarations, here again, is also

15    wrong.  This Court and the Fifth Circuit have repeatedly held

16    that the underlying documents need not be introduced in order

17    to prove either prong of the disqualification test and the

18    substantial relationship test or the sharing of confidences,

19    so we don't have to produce any further confidential

20    information to protect the confidential information that we

21    are seeking to protect.

22              Our evidence, the declarations alone and the

23    declarations with the testimony from today, prove beyond

24    peradventure that the substantial -- there is a substantial

25    relationship that exists between the prior representation of
```

1   Mr. Finkelstein of Newegg and the current litigation.  It is

2   plain that the current litigation was a focus of and feature

3   of the relationship between the parties and the discussions

4   that they had about the matter.

5            Jones Day raises a few arguments about why that

6   substantial relationship should be ignored.  One is that -- or

7   that the confidential exchange of information should be

8   rebutted or refuted, and that is because the information is

9   public.  Well, the fact that information that is disclosed

10  between a lawyer and his client is public, for

11  disqualification purposes, is irrelevant.  The American

12  Airlines case has flatly rejected that very argument made by

13  Vinson & Elkins back then in connection with the

14  disqualification motion filed against it by Northwest -- or

15  for Northwest.

16           The fact that the information is shared with others

17  is also irrelevant.  The Corrugated case makes that plain.

18  Moreover, here there is no issue that everyone on the calls

19  was on a non-disclosure agreement or otherwise had

20  confidential agreements with Newegg and confidential

21  relationships with Newegg, so that is not an issue.

22           Similarly, they suggest that because Mr. Finkelstein

23  spent a relatively short period of time on the matters, that

24  he can't possibly have enough confidential information to

25  justify Jones Day's disqualification.  That has also been

1    flatly rejected by the Carbo case they rely on their brief and

2    in the case at Page 162.

3            Moreover, any doubts between when there is a

4    conflict in the testimony should be resolved in favor of

5    disqualification.

6            Finally, the confidential information is -- the

7    confidential information that is used in the ethical rules and

8    the law in what we are talking here does not have to rise to

9    the same level as trade secrets or proprietary information or

10   attorney/client privileged information.  The confidential

11   information that the rules and the law refer to is information

12   that is disclosed by the client to his lawyer.  And that is

13   because the substantial relationship test and the rules have

14   as their bedrock principles the duty of loyalty, as well as

15   the protection of confidence.

16           Because of Mr. Finkelstein's work for Newegg and

17   confidences that he either presumptively or actually obtained,

18   he is personally disqualified from representing Soverain in

19   this case.  Because Mr. Finkelstein is now a partner at Jones

20   Day, Jones Day is disqualified, too.

21           This is the second presumption that we discussed

22   in -- Jones Day's Counsel discussed in their opening.  Jones

23   Day says this presumption is rebuttable.  Newegg says it is

24   not.  It is irrebuttable.

25           Jones Day identifies the Pro Education case from the

1    Fifth Circuit as the most important case on this point.  We

2    also agree that it is a very important case on this point.

3    And why?  Because it reaffirms the very rule that compels the

4    conclusion that Jones Day must be disqualified in this case.

5           In the interest of time and because the Court is so

6    familiar with this, I am not going to dwell on it much.  The

7    Court knows there are two types of disqualification; one that

8    is based on imputation and one that is based on actual

9    representation and confidences.  What we are dealing with here

10   is the second kind, the kind that is based on actual

11   representation and confidences.

12          The American Airlines case and the Corrugated case

13   are the leading Fifth Circuit cases that have held that there

14   is an irrebuttable presumption that a lawyer will share

15   confidences with other members of his firm.  The exceptions

16   that are recognized to those cases deal with the type of

17   confidence, the type of relationship where the confidential

18   information is gained by the lawyer by imputation only.  He

19   does not have any client relationship with -- or

20   attorney/client relationship with the client and does not have

21   any actual exposure to confidential information.

22          That is an entirely different situation than the one

23   we have here.  Clearly, Mr. Finkelstein admits everyone knows

24   he was Newegg's lawyer, he received information, presumptively

25   or actually.  He has the second kind of disqualification.

1    That kind of disqualification cannot be irrebuttably refuted.

2    It cannot be walled off.  It cannot be waived unless the

3    client consents.  It cannot be obliterated.

4           Simply put, the Pro Education case established and

5    reaffirmed the principle that if an attorney is currently

6    affiliated with a personally disqualified lawyer, that

7    attorney is conclusively disqualified by imputation while he

8    remains at that firm.  That case could not be any clearer.

9    That is the Fifth Circuit last year.

10          As a result of that, Mr. Finkelstein is personally

11   disqualified, not by imputation, because of his work for

12   Newegg and his relationship.  As a result, all members of the

13   firm that he is affiliated with, are conclusively disqualified

14   by imputation.  It could not be any clearer under that case.

15          Now, Jones Day has suggested in its papers and just

16   a bit today that they can use the ABA Model Rules as the basis

17   for erecting an ethical wall and use that to rebut or

18   otherwise ameliorate the harm that comes from the imputed

19   sharing of information that the law requires.  Well, that is

20   completely wrong.  As I mentioned before, the minority report

21   to the Model Rules indicated that they are not national

22   norms.  Indeed, they depart substantially from the rules in 39

23   jurisdictions.  And if I may provide the Court with a copy of

24   the minority report, you may find it of interest.

25          (Document given to Court and Counsel.)

1          MS. FROST:  It is not possible for a rule that

2   departs from such common standards to be deemed a national

3   norm.

4          In addition, the rule that an ethical wall can

5   affect the presumption and be appropriate to cure a

6   disqualification like this has been flatly rejected in Texas

7   in the Petroleum Wholesale case and has never been recognized

8   by the Fifth Circuit, nor would it be recognized by the Fifth

9   Circuit because the Fifth Circuit continues to adhere to the

10  notion that there is an irrebuttable and conclusive

11  presumption that if a lawyer has confidences, he shares it

12  with other members of his firm by operation of law.  An

13  ethical wall is inconsistent with such a legal principle and

14  such a notion.

15         Even if for some reason the Court were to entertain

16  the notion that an ethical wall might be efficacious under the

17  circumstances, they didn't even comply with the very rule they

18  cite that they say should allow them to do that.  The rule

19  specifically requires the parties to give notice and set up a

20  wall when the lawyer starts work.  This wall wasn't put up

21  until March 1st; afterwards.

22         As we have heard today, Mr. Finkelstein has been

23  talking to Jones Day all fall.  The notion that somehow an

24  ethical wall erected on March 1 is going to give any effort

25  and prevent any harm, is beyond the pale.

1          Moreover, Mr. Finkelstein himself, according to the

2     ABA Model Rules and the commentary when they passed them, the

3     rules are controversial -- this new rule is controversial.  It

4     has never been adopted in Texas or any state or the Fifth

5     Circuit.  But when it was passed there was a lot of commentary

6     about it because of its controversy.  One of the things that

7     the commentators wanted to be sure that did not get lost in

8     this was what happens when a lawyer moves from one private

9     firm to another and the things we have heard about today that

10    surround that type of a relationship and that type of a move.

11    As the commentators noticed, a lawyer's move from one firm to

12    another invariably requires some disclosure and discussions

13    between the lawyer and the new firm about whether the clients

14    have confidences, whether there are conflicts of interest, and

15    the like.

16          If the lawyer -- and this the commentary

17    acknowledges -- if the lawyer is currently representing a

18    client adverse to a client of the new firm -- clearly that is

19    the case here -- the lawyer must inform the client of her

20    intention to begin discussions with the new firm.  That never

21    happened here.  The reason he has to do that -- or she -- is

22    because the personal interest of the lawyer in changing firms

23    creates a conflict of interest itself.  The rules, therefore,

24    suggest that screening is a principal utility in cases where

25    the lawyer's role in the prior representation is concluded.

1          This is not a prior representation that has been

2     concluded.  This was an ongoing representation at the time

3     these discussions were being had.  It is a clear violation.

4          The rules note that the Court can disqualify a firm

5     when it is reasonable in the particular circumstances for the

6     former client to fear that a screen may not be effective.  It

7     is here in this case that Newegg has a reason to fear that

8     such an ethical wall would not prevent disclosure of its

9     confidences.  It is here where their lawyer was talking to

10    their adversary's law firm about accepting a job there as a

11    partner in the IP group at the same time he was getting

12    confidential information and seeking new business from that

13    same client.  Jones Day must be disqualified and as would Mr.

14    Finkelstein be if it were just him.

15          THE COURT:  Thank you.

16          Response?

17          MR. DEMITRACK:  Your Honor, I will try to be very

18    brief.  I know the time is late.

19          I want to respond in particular first to this last

20    comment that it was a violation of the Bar rules for us -- for

21    Jones Day to discuss with Mr. Finkelstein what he was working

22    on as part of the conflicts clearance process.  And you heard

23    Counsel just say that in and of itself was a violation.  In

24    fact, they elicited testimony on that point from both

25    witnesses.

1           There is an ABA formal opinion directly addressing

2     this topic.  I don't have the number of it -- we can supply it

3     to the Court as early as tomorrow -- that specifically

4     discusses what do law firms do when they are hiring a lateral

5     lawyer.  And that opinion expressly says that you can disclose

6     information for a limited purpose of allowing the law firm to

7     decide whether there is a conflict of interest.  Jones Day

8     complied with that ABA formal opinion.

9           The notion that it is a violation of the rules of

10    responsibility for a lateral lawyer to go to a law firm and

11    for that law firm to sit blind and dumb and not ask any

12    questions is wrong.  You have to do that.  You have to decide

13    if there is a conflict.  You have to make these inquiries.

14    You have to provide the conflict forms that we did.  That has

15    to happen, and the ABA formal opinion specifically recognizes

16    that very fact.  It is simply not the truth.

17          There are two ways that Mr. Finkelstein can have a

18    conflict of interest.  One, there is a substantial

19    relationship; and, second, if there was the imputation -- or

20    the provision of specific confidential information as Your

21    Honor's Microsoft decision indicates.  The notion that a due

22    diligence on an IPO is substantially related to this

23    litigation, is ludicrous.  There is no legal similarity.

24    There is no factual similarity.  And there certainly wasn't a

25    deep and ongoing involvement in this litigation.  Even

1   assuming they brief that issue, they have completely defaulted

2   on their proof.

3          I indicated at the beginning that with respect to

4   the specific confidential information aspect of it, that Mr.

5   Finkelstein would testify that the due diligence he did here

6   was no different than the due diligence activities that he has

7   done 20 or 30 or 40 other times; that what he is looking for

8   is to conduct a risk analysis.  What is the worst case --

9   those were his words -- what is the worst case that is out

10   there?  To do that, as he consistently said, you look to see

11   what the other side is saying.  What is the worst that can

12   happen to you?

13          And he did that not just with the Newegg case, he

14   did that with about 40 other cases.  He went through all of

15   them, and the only one that came to the top that was disclosed

16   was the Newegg case.  But to do that, like all of the other

17   ones -- investigations in due diligence he had ever done -- it

18   was specifically focused on what did the plaintiff say.  There

19   was no disclosure of trial strategy, order of witnesses, what

20   it was that Newegg would want from this case, or anything of

21   that nature.

22          With all respect, Newegg did not prove that element

23   of their case in particular, given the fact that they conceded

24   that the confident -- the discussions were irrelevant and

25   would not even log for us the existence of notes that would

1    have corroborated our position, we believe they failed their

2    burden of proof.

3            With respect to the issue, even assuming you accept

4    the passage of actual, specific confidential information, the

5    American Airlines case and the statement in that case about

6    this second presumption, does the imputation go to the rest of

7    the firm, this is what the Pro Education case said about

8    that.  "In declining to consider Kennedy's evidence, the

9    bankruptcy court relied on In re American Airlines for the

10   proposition that the Fifth Circuit applies an irrebuttable

11   presumption that confidences obtained by an individual lawyer

12   will be shared by other members of the firm; however, the

13   American Airlines case did not actually involve or apply this

14   presumption, so any statements regarding the presumption are

15   dicta."

16           The Fifth Circuit has not applied an irrebuttable

17   presumption standard.  It has said that the national standard,

18   the ABA standards are applicable, and the ABA standards now

19   allow for screening, even assuming, even assuming there was a

20   reason to screen here.  In this case Jones Day had no reason

21   to screen because after conducting a very careful -- it took

22   several weeks -- review of Mr. Finkelstein's matters in asking

23   him questions, Jones Day reached the conclusion that he had no

24   confidential information and, therefore, there was no reason

25   to screen.  The only reason we put a screen up was in

1    connection with the motion to disqualify and just to avoid any

2    possible issue.

3           Newegg says they have reason to fear that Mr.

4    Finkelstein now a partner at Jones Day will disclose

5    confidential information.  First, he doesn't have any.

6    Second, and with all due respect, it is borderline offensive,

7    Your Honor.  We have a screen in place.  Mr. Finkelstein has

8    not talked to anybody in the past about this case.  The

9    suggestion that he would violate the screen having testified

10   under oath that he would not do so, quite frankly does not

11   rise to the level of evidence that should be accepted in this

12   case.

13          Finally, Newegg argues that any doubt should be in

14   favor of disqualification.  That, we respectfully submit as I

15   indicated in my opening, is not the standard.  This Court said

16   that the rules should not be mechanically applied, and the Pro

17   Education case talks about depriving counsel of their choice

18   is not a remedy that should be easily applied here.

19          Even if you accept -- and we do not -- that they

20   have shown the passage of actual confidences and even if you

21   accept -- which we do not -- that there is an irrebuttable

22   presumption that ought to be applied here, that the

23   confidences are imputed to everyone else in the firm, the

24   question still remains under the Pro Education standard

25   whether disqualification of Soverain's Counsel on the eve of

1   trial whether there is zero evidence that any improper

2   communications were transmitted as a matter of fact, ought to

3   take place.  We, respectfully submit, it should not.

4           And, therefore, Your Honor, for all of these reasons

5   we respectfully request a denial of Newegg's motion.  Thank

6   you.

7           THE COURT:  All right.  Thank you.  Your motion is

8   submitted.  The Court will get you an order as soon as

9   possible.

10           MR. ADAMO:  Thank you, Your Honor.

11           MS. FROST:  Your Honor, may I substitute a document

12   for you, the minority report?  I'm not sure I gave you the

13   full set.

14           THE COURT:  Okay.

15           MS. FROST:  It also has ABA rules that I referred

16   to.

17           THE COURT:  Ms. Ferguson, will you substitute that,

18   please.

19           Be in recess.

20       (Hearing concluded.)

21

22

23

24

25

1                       C E R T I F I C A T I O N

2

3      I certify that the foregoing is a correct transcript from the

4      record of proceedings in the above-entitled matter.

5

6

7      /s/ Shea Sloan

8      SHEA SLOAN, CSR, RPR
       OFFICIAL COURT REPORTER
9      STATE OF TEXAS NO. 3081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25