1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF TEXAS
                           TYLER DIVISION
 3
    SOVERAIN SOFTWARE                )
 4                                   )   DOCKET NO. 6:07cv511
         -v-                         )
 5                                   )   Tyler, Texas
                                     )   9:00 a.m.
 6  NEWEGG, INC.                     )   April 26, 2010

 7
                         TRANSCRIPT OF TRIAL
 8                        MORNING SESSION
               BEFORE THE HONORABLE LEONARD DAVIS,
 9        UNITED STATES DISTRICT JUDGE, AND A JURY

10                    A P P E A R A N C E S

11
    FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
12                           JONES DAY
                             2727 N. Harwood St.
13                           Dallas, Texas  75201-1515

14                           MR. THOMAS L. GIANNETTI
                             MR. BARRY R. SATINE
15                           MR. CLARK R. CRADDOCK
                             JONES DAY
16                           222 East 41st St.
                             New York, New York  10017-6702
17
                             MR. CARL ROTH
18                           ROTH LAW FIRM
                             115 N. Wellington, Ste. 200
19                           P.O. Box 876
                             Marshall, Texas  75670
20
                             MR. MICHAEL C. SMITH
21                           SIEBMAN, REYNOLDS, BURG,
                             PHILLIPS & SMITH
22                           713 S. Washington Ave.
                             Marshall, Texas  75670
23

24  COURT REPORTER:      MS. JUDITH WERLINGER

25  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
```

2

```
 1  FOR THE THE DEFENDANTS:   MR. RICHARD SAYLES
                              MR. MARK STRACHAN
 2                            SAYLES WERBNER
                              4400 Renaissance
 3                            1201 Elm St.
                              Dallas, Texas  75270
 4
                              MR. HERBERT A. YARBROUGH, III
 5                            YARBROUGH LAW FIRM
                              100 E. Ferguson, Ste. 1015
 6                            Tyler, Texas  75702

 7
                              MR. DAVID C. HANSON
 8                            MR. KENT BALDAUF, JR.
                              MR. DANIEL H. BREAN
 9                            THE WEBB LAW FIRM
                              200 Koppers Bldg.
10                            436 Seventh Ave.
                              Pittsburgh, PA  15219
11

12                            MS. CLAUDIA W. FROST
                              MR. JEREMY J. GASTON
13                            PILLSBURY WINTHROP
                              909 Fannin St., Ste 2000
14                            Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

3

<pre>
 1                    P R O C E E D I N G S

 2                    THE COURT:  Please be seated.

 3                    All right.  I understand there's a matter

 4      before the jury comes in; is that correct?

 5                    MR. GIANNETTI:  That is correct, Your

 6      Honor.

 7                    THE COURT:  All right.  And what would

 8      that be?

 9                    MR. GIANNETTI:  Your Honor, at the

10      hearing on the Motions in Limine asserted by the

11      Plaintiff, we would like to submit a bench memo with

12      respect to Motion in Limine 13 concerning an alleged

13      non-infringing alternative, which is licensed after the

14      hypothetical negotiation.

15                    We're raising that now because in the

16      Defendant's slides that they intend to use in opening,

17      they rely upon that alleged non-infringing alternative.

18                    And we have a bench memo --

19                    THE COURT:  All right.  Hand it up.

20                    (The Court reviews the document.)

21                    THE COURT:  All right.  Response -- or

22      excuse me.  Go ahead.

23                    MR. GIANNETTI:  Your Honor, the case

24      which I think is most relevant is the Pall case from the

25      Federal Circuit, where -- and if I could just read a
</pre>

4

1    little bit of that, Your Honor, and substitute the third

2    party's, Defendant's, and Plaintiff's names.

3              During the period before the third-party

4    products were licensed, their presence in the

5    marketplace did not defeat Plaintiff's entitlement to

6    lost profit damages for all of Defendants infringing

7    sales where the third-party products were not

8    non-infringing substitutes.

9              It was not necessary for Plaintiffs to

10   continue the third-party litigation to judicial decision

11   of the issue of infringement as Defendant argues that

12   the voluntary settlement of litigation does not

13   retrospectively transform an accused infringing product

14   into a non-infringing substitute.

15             And that's our situation, Your Honor.  At

16   the time of the hypothetical, Open Market was in a

17   patent infringement lawsuit and sued Endo-Shop for

18   patent infringement.  That lawsuit was settled eight

19   months later, at which time Endo-Shop received a patent

20   license.

21             Defendant argues that Endo-Shop was a

22   non-infringing alternative at the time of the

23   hypothetical negotiation when Endo-Shop is accused of

24   infringing eight months before they received a license.

25             THE COURT:  Okay.  Response?

1          MR. BALDAUF:  All right.  Your Honor, we

2  prepared a response.

3          THE COURT:  All right.  Let me tell

4  y'all, though, that jury is -- it's 9:00 o'clock.  The

5  jury has been sitting in there five minutes, and I'm

6  just going to tell you upfront, during the course of

7  this trial, this is not going to cut it.

8          I'm not going to be handed bench memos I

9  have to read while the jury's sitting in there.  I'm not

10  going to be arguing these things beforehand.

11  So go ahead and hand it up, but I'm just telling you --

12          MR. BALDAUF:  I can read this -- I can

13  make my argument --

14          THE COURT:  Well, hand it up and make

15  your argument very briefly.

16          MR. BALDAUF:  Very briefly, Your Honor.

17          THE COURT:  And whenever you file

18  something, give me extra copies for my Law Clerks, too.

19          All right.  What do you have?

20          MR. BALDAUF:  The difference here is that

21  in this situation, the time periods for damages is well

22  after the time period.

23          In the Pall case, it stands for the

24  proposition that a settlement license does not transform

25  an infringing product into a non-infringing alternative

1  in the time period before the license.

2           And here that's not an issue, because the

3  entire damage period here is after, well after --

4           THE COURT:  All right.  How -- how

5  important is it for you to mention this in your opening

6  statements?

7           MR. BALDAUF:  It's extremely important to

8  us, Your Honor, because this is another software product

9  that was out there that was licensed with this

10 technology, and we believe it's a non-infringing

11 alternative that was available to Newegg.

12          THE COURT:  All right.  I'm going to

13 grant the motion in limine at this time.  Don't mention

14 it in opening statement, and I'll give you a ruling on

15 the admissibility when it comes up during the course of

16 the trial.

17          MR. BALDAUF:  Real briefly, Your Honor,

18 with respect to one of the slides that has been proposed

19 by the Plaintiff, it appears that they're going to

20 reference the Amazon license, as well as the other

21 settlement licenses with the Defendants in this case, as

22 evidence of commercial success.

23          I'd like to bring your attention to the

24 decision in DataTreasury versus Wells Fargo from Judge

25 Folsom from a few months ago, directly on point of how

1    that these types of settlement agreements are not

2    evidence of commercial success.

3              Number one, there has to be expert

4    testimony from the Plaintiffs.  There has to be some

5    established nexus between those settlement agreements

6    and the recognized commercial success or value of the

7    patents as opposed to just the design to avoid for

8    litigation, and that has not been done.  In fact, it's

9    nowhere in the any of their expert reports.

10              MR. ADAMO:  Very brief response, Your

11   Honor.

12              Mr. Sayles is going to use this slide in

13   his opening, which he's removed the names of the various

14   licensees, which was on the version that I was given

15   last night; but he has informed me in good candor that

16   the names are going to be mentioned during trial.

17              About five minutes.  These are agreed

18   exhibits.  This stuff is all going to be in evidence.

19   There's no requirement under law that evidence of

20   secondary considerations, including commercial success,

21   has got to be in an expert report.  It is, by the way,

22   in Professor Shamos' expert report.  So it is there and

23   certainly in his slides, which come directly from his

24   report.

25              Two things that Mr. Giannetti mentioned

1   when you ruled in our favor last Monday to allow us to

2   name the licensees -- and I didn't put the -- the

3   numbers are not down here.  I even changed the heading

4   to take off any reference to commercial success -- and

5   we told them this last night -- to make this more

6   neutral.

7                This is exactly what Mr. Giannetti argued

8   to Your Honor a week ago today that you allowed us to

9   do.  The Plaintiffs -- well, his position is, no small

10  licensees, and that's not going to be the situation for

11  more than about probably 10 minutes.

12               And I think the position is, you've got

13  to have experts discuss commercial success, which is not

14  the law, but in any event, Dr. Shamos has it, and we

15  should be allowed to use this, Your Honor.

16               THE COURT:  Response?

17               MR. BALDAUF:  Your Honor, we -- with

18  respect to the point of mentioning that there are larger

19  licenses, that's not what we're talking about here.

20               We're talking about the issue of

21  commercial success in that reference.  And there's been

22  no established link between these settlement licenses

23  and commercial success.

24               THE COURT:  Now, are y'all going to

25  mention the licenses?

1          MR. BALDAUF:  We have no interest in

2    mentioning the Amazon license whatsoever, as we put in

3    our motion in limine to begin with.

4          MR. ADAMO:  Your Honor, they've moved

5    into evidence and we've agreed, we're about to read the

6    list into the record, all the small licenses, exactly

7    the issue Mr. Giannetti argued to Your Honor last week

8    when you allowed us to do what's in my -- in my slide.

9          MR. BALDAUF:  Which were not in

10   settlement litigation.

11          MR. ADAMO:  Your Honor, that -- this has

12   all been argued last week.  Nothing has changed.  This

13   is exactly what you allowed us to do.

14          THE COURT:  All right.  I'm going to --

15   I'm going to grant their objection.  Don't go into that

16   in opening statement, and I'll take it up when we get

17   into the evidence.

18          Bring the jury in.

19          COURT SECURITY OFFICER:  All rise for the

20   jury.

21          (Jury in.)

22          THE COURT:  All right.  Each member of

23   the jury, come back down to these four seats on the

24   front row down on this end, please.

25          Thank you.  I think it will be easier for

1  you to see down here.

2              All right.  Please be seated.

3              All right, Ladies and Gentlemen of the

4  Jury.  Good morning, and welcome back.  I hope you had a

5  restful weekend and week and are ready to get started in

6  this case.

7              I think we're going to work some pretty

8  long days this week, but it's going to be our objective

9  to try to finish the case by Friday.  So if you'll bear

10 with us -- and it's going to be some hard days -- but

11 some -- I think you would probably prefer that than

12 stretching it over into next week, if I would guess

13 right.

14             But if anybody needs a break at

15 anytime -- sometimes we get to going a little long with

16 the testimony.  If anybody needs to use the restroom or

17 can't stay awake or whatever, raise your hand, and we'll

18 take a short break.

19             Normally, I take about a 15-minute break

20 in the morning, and usually an hour to an hour and 15

21 minutes for lunch, and a 15-minute break in the

22 afternoon.  But we can take more short breaks, if we

23 need to.  So please feel free to let me know.

24             Now, what we're going to start out with

25 this morning, I'm going to give you some preliminary

1   instructions, again, just as an overview of what this

2   case is all about, a little bit of the framework of what

3   the law is that you'll be applying.

4                    I'm going to give you much more detailed

5   instructions on the law at the end of the case.  Plus,

6   you'll hear the attorneys talking about it.  You'll hear

7   the experts talking about it.

8                    So don't feel like you have to have

9   everything down, you know, perfect this morning, but

10   it's just to help you start getting familiar with it.

11                    After I finish my opening instructions on

12   the law and the contentions in the case, giving you an

13   overview, you're going to hear the attorneys from both

14   sides make an opening statement.

15                    And as you'll recall, that's where

16   they're going to outline for you what they believe the

17   evidence is going to show in this case; and then after

18   they've both had a chance to do that, then we'll start

19   hearing the evidence.

20                    So let me give you these preliminary

21   instructions at this time.

22                    You have all now been sworn in as the

23   jury to try this case.  Your job as the jury will be to

24   decide the disputed questions of fact in the case.

25   I, as the Judge, will decide all questions of law and

1   procedure.  What comes into evidence, what the law is,

2   that's all my province.  But your province is the

3   fact-finder.  You're to seek the truth as to the facts

4   of this case.

5            From time to time during the trial and at

6   the end of the trial, I'm going to instruct you on the

7   rules of law that you must follow in making your

8   decision.

9            Very soon the lawyers for each side will

10  be making what's called their opening statement, and

11  that is to assist you in understanding the evidence.

12           However, realize what the lawyers say

13  during their opening statements, that is not the

14  evidence.  The evidence you'll hear from the witness

15  stand and from the exhibits that are admitted into

16  evidence.  And you should only rely on the evidence in

17  making your decision.

18           Now, the party who brings the lawsuit is

19  called the Plaintiff.  In this case, the Plaintiff is

20  Soverain Software, LLC, who will be referred to as

21  Soverain.

22           The party against whom this suit is

23  brought is called the Defendant.  In this action, the

24  Defendant is Newegg, Inc., who will be referred to as

25  Newegg.  This is a case of alleged patent infringement.

1              After the opening statements, Soverain

2    will call witnesses and present evidence.  Then Newegg

3    will have an opportunity to call their witnesses and

4    present evidence.

5              After the parties' main case is

6    completed, Soverain may be permitted to present rebuttal

7    evidence.  Then I will restruct -- instruct you on the

8    applicable law.  Then you will hear closing arguments,

9    and then and only then will you retire to deliberate on

10   a verdict.

11             During the trial of this case, keep an

12   open mind.  Do not decide any fact until you've heard

13   all of the evidence, the closing arguments, and my

14   instructions.  Pay close attention to the testimony and

15   evidence.

16             If you would like to take notes during

17   the trial, you may do so.  The Court Security Officer is

18   now going to pass out to you your juror notebooks.

19             Inside your juror notebook, you should

20   find a blank pad for note-taking.  Should be in one of

21   the pockets on the -- on the juror notebook.  You should

22   find a pad in there like this (indicates).

23             If you would, the first thing I'd like

24   for you to do is, on the cover of the pad, to write your

25   name.

1          After you've done that, then if you wish

2   to flip to the second page to start taking notes or to

3   the first page inside the notebook, you can.

4          These notebooks will be taken up at the

5   end of the day each day by the Court Security Officer

6   and passed back out to you the next morning.  They will

7   be kept locked up and confidential.

8          At the end of the case, they'll be taken

9   up, and your notes will be shredded.  So you can rely on

10   the privacy of your notes.

11          If you decide to take notes during this

12   case, be careful not to get so involved in your

13   note-taking that you're not listening to the testimony

14   or you miss part of it.

15          Even though the Court Reporter is making

16   a -- stenographic notes of everything that is said, a

17   typewritten copy of the testimony will not be available

18   for your use during deliberations.  On the other hand,

19   any exhibits that are introduced into evidence will be

20   available.

21          Now, until this trial is over, do not

22   discuss this case with anyone and do not permit anyone

23   to discuss this case in your presence.  This includes

24   your family and friends.

25          Do not discuss the case even with the

 1   other jurors until all of the jurors are in the jury

 2   room actually deliberating at the end of the case.

 3   If anyone should attempt to discuss this case or

 4   approach you concerning this case, you should inform me

 5   immediately through my court staff.

 6               So, again, even though we're now starting

 7   the case, you're not free to begin to deliberate among

 8   yourselves.  That only comes at the end of the case.

 9   So when you take a break, don't start talking about the

10   case.  If somebody should mention something about it,

11   other jurors, you should just say:  Remember the Judge's

12   instruction.  We're not supposed to talk about that

13   until the end of the case.

14               The same thing about discussing it with

15   any of your family members or friends.  You should not

16   do that.

17               Also during the trial, you should hold

18   yourself completely apart from the people here in the

19   courtroom that are involved in the case, the witnesses,

20   the parties, and the attorneys.

21               It is important not only that you remain

22   fair and impartial but that you also appear to be fair

23   and impartial.  And that is why you should not have

24   contact with any of them.

25               This also means that if you have a social

1  networking site or tool, like FaceBook, MySpace, or

2  Twitter, you should not discuss or even mention the case

3  at all on those sites.  Do not post updates about what

4  is going on in the case, and do not send or receive text

5  messages about the case.

6            Also remember, don't make any independent

7  investigation of any fact or matter in the case.  Do not

8  learn anything about the case from any outside source,

9  such as television or newspaper.  Do not use the

10  internet or Google to find out more information about

11  the case, the parties, or the attorneys in the case.

12            For example, if you have a home computer,

13  during this case, don't go home and get on your computer

14  and start trying to figure things out.  You are to be

15  guided only by the evidence in the case, only by what

16  you see and hear in this courtroom and not anything

17  else.

18            Again, if you did that, you could put

19  these entire proceedings in jeopardy, and as you can

20  tell, there's been a lot of expense and time -- time

21  invested on your part and a lot of time and expense

22  invested on the part of the parties and the Court, and

23  we don't want that to go for naught.

24            During the trial, it may be necessary for

25  me to confer with the lawyers here at the bench or

1  outside of your presence.  I will handle these matters

2  as briefly and as conveniently for you as I can, but you

3  should remember that they are a necessary part of the

4  case.

5           I try very hard to not leave you sitting

6  in the jury room.  We say we're going to start at 9:00.

7  I really try to start.  Now, sometimes we're running a

8  few minutes late, but I'm going to try my very best to,

9  when you're here, have you here in the courtroom hearing

10  evidence.

11           Now let me go over with you the parties

12  and the nature of this case.

13           This case involves three U.S. patents,

14  Patent Nos. 5,715,314, which is also known as the '314

15  patent.

16           And patents are generally known by the

17  last three digits of the patent, so you can see the

18  three patent numbers here on the screen and beside it is

19  the shorthand reference, which are the last three digits

20  to the patent.  These patents are referred to as the

21  patents-in-suit.

22           The '314 patent and the '492 patent

23  generally rely -- relate to a network-based sales

24  system.

25           The '639 patent generally relates to

1  methods for controlling and monitoring access to network

2  servers.  You will hear more about the technology during

3  the attorneys' opening statement.

4              This case involves network-based sales

5  systems used in E-commerce websites.  Soverain contends

6  that Newegg has infringed and is infringing one or more

7  claims of the patents-in-suit by making, using, offering

8  for sale, or selling within the United States products

9  or processes that practice the invention claimed in the

10 patents-in-suit.

11             Soverain also contends that Newegg is

12 inducing infringement of one or more claims of the '314

13 patent and the '492 patent by others, namely, Newegg's

14 customers.

15             Soverain contends that it is entitled to

16 money damages for Newegg's infringement.  Newegg

17 contends that -- or Newegg denies that it infringes the

18 patents-in-suit and denies that Soverain is entitled to

19 money damages.

20             Newegg also contends that the asserted

21 claims of the patents are invalid.  Invalidity is a

22 defense to infringement.

23             Now let me visit with you about the U.S.

24 patent system and how it works and how a patent is

25 obtained.  You saw some of that on the video you saw

1  last Monday.

2          The U.S. Government is empowered by the

3  United States Constitution to enact patent laws and

4  issue patents to protect inventions.  The purpose of the

5  patent system is to help advance science and technology.

6          The patent system achieves this purpose

7  by granting to the owner of a patent the right, for the

8  life of the patent, to exclude any other person from

9  making, using, offering for sale, or selling anywhere in

10  the United States the invention covered by the patent.

11          A patent has a life for a limited amount

12  of time which for the patent involved in this case has

13  not yet ended.

14          Once a patent expires, the invention

15  becomes part of the public domain, which means that

16  anyone is free to use it; and the patent owner, after it

17  becomes a part of the public domain, may no longer

18  exclude anyone from making use of the invention claimed

19  in the patent.

20          During the term of the patent, however,

21  if another person, without the patent owner's

22  permission, makes, uses, sells, or offers to sell

23  something that is covered by the claims of the patent,

24  then that person is said to infringe the patent.

25          The patent owner may enforce a patent

1   against persons or customers believed to be infringers

2   in a lawsuit in federal court as in this case.

3               Everyone, however, has the right to use

4   existing knowledge and principles.  A patent cannot

5   remove from the public the ability to use what was known

6   or obvious before the invention was made or patent

7   protection was sought.

8               Thus, to be entitled to patent

9   protection, an invention must be new, useful, and

10  non-obvious.

11              To obtain a patent, the applicant must

12  file a patent application with the United States

13  Patent & Trademark Office.

14              After the applicant files a patent

15  application, a Patent Examiner examines the application

16  to determine whether the invention described in the

17  patent application meets the requirements of the patent

18  laws for patentable inventions.

19              If the Examiner concludes that the legal

20  requirements for a patent have all been satisfied, he or

21  she is said to allow the claims, and the application

22  then issues as a patent.

23              The process, from the filing of the

24  patent application to the issuance of the patent, is

25  called patent prosecution.

1              The record of the papers relating to the

2    patent prosecution is referred to as the prosecution

3    history or the file history of the patent.

4              So you have the application coming in.

5    You have a lot of stuff going back and forth with the

6    Patent Office.  Then the patent issues.  Everything,

7    from beginning to end, is what's referred to as the

8    prosecution or the file history of the patent.

9              The granting of a patent by the Patent &

10   Trademark Office carries with it the presumption that

11   the patent is valid.  From the issuance of a patent, it

12   is presumed that it is -- that its subject matter is

13   new, useful, and constitutes an advance that was not, at

14   the time the invention was made, obvious to one of

15   ordinary skill in the art.

16             However, that presumption of validity may

17   be rebutted at trial, and you, the finder of fact, may

18   find that the patent is invalid.

19             Now let me go over with you the parts of

20   a patent.

21             You have been provided with copies of the

22   patents-in-suit in your notebooks.  Please take time to

23   refer to the '639 patent in your binder, which is at Tab

24   3.

25             So if you'll flip over to Tab 3, I'm

1  going to go over this one as an example for you.  You'll

2  see there on the first page is the certificate of the

3  Patent Office containing the language granting the

4  patent.

5           Then if you turn the page to the next

6  page, on the left-hand side, you'll see the cover page

7  of the patent.  The cover page of the '639 patent --

8  and, again, you'll notice that's the '639.

9           If you'll look in the upper right-hand

10  corner where it says patent number, then it's got

11  7,272,639, that '639, the last three digits, that's

12  what's referred to as the '639 patent.

13           This cover page of the patent provides

14  the identifying information, including the date the

15  patent was issued.  You will see that up in the upper

16  right-hand corner.  It says date of patent:  September

17  18, 2007.

18           It also includes, over in the left-hand

19  column, the names of the inventors.  You'll see a few

20  lines down, it says, Inventors:  Thomas Mark Levergood,

21  and then it lists a number of people.

22           A little bit further down on Line 22, it

23  has the date that the patent was filed.  That's called

24  the filing date.  That's January 12th, 1998.

25           And then up a couple of lines above that

1  at Line -- where it says 73, it refers to the assignee,

2  which is Soverain Software, LLC.  In other words, the

3  assignee is the one that now owns the patent.

4           Then a little further down, it says,

5  References cited:  U.S. patent documents, and then it

6  lists a number of patent numbers, names, and dates.

7  This is what's called a list of the prior art

8  publications that the patent officer considered, in

9  other words, looked at, when he issued the '639 patent.

10          You'll hear more about that later.

11          A patent specification must contain a

12  written description of the claimed invention telling

13  what the invention is, how it works, and how to make use

14  of it.

15          The specification of the '639 patent

16  begins with an abstract, which is found on that first

17  page in the right-hand column near the bottom.  See

18  where it says abstract?

19          And it says:  This invention relates to

20  methods for controlling and monitoring access to network

21  servers.  Then it goes on to give a brief description.

22  It gives a brief statement about the subject matter of

23  the invention.

24          Next are the drawings which appear --

25  flip on over to Page -- three or four pages, and you'll

1  see a series of drawings starting where it says Figures

2  1 through 6.  These drawings depict various aspects or

3  features of the invention.  They are described in words

4  later in the patent specification.

5              The written description of the invention

6  appears next.  If you'll flip on over past the drawings

7  and figures, you'll see a page that it has a 1 and a 2

8  up at the top.  Everybody have that?

9              And it begins, related application, and

10  then it has background of the invention.  This is what's

11  called the written description, beginning on this and

12  the following pages.

13              In this portion of the patent, each page

14  is divided into two columns.  You'll see the 1 and the

15  2.  If you'll flip the page, the next page has a 3 and a

16  4 at the top.  The next page, a 5 and a 6.

17              So go back to the Column 1 -- the page

18  that has Column 1 and 2 on it.  These columns are

19  numbered for your reference.

20              So if somebody says, look at Column 1,

21  then down the middle, you'll see some small numbers, 5,

22  10, 15, 20, 25.  That refers to the line number.  So if

23  somebody said, look at Column 1, Line 11, you'd look

24  down, find Column 1, look down to the line below 10, and

25  that would be background to the invention.

1          So if someone said, I want you to look at

2   the background of the invention, it begins at Column 1,

3   Line 10, you would know to flip to that column, jump

4   down to that line number, and there would be whatever

5   they're referencing.

6          The written description of the '639

7   patent begins at Column 1, Line 1, and continues all the

8   way to Column 10, Line 24.  It includes the background

9   section there in Column 1, then a summary of the

10  invention beginning on Column 3 on the next page.

11         Column 3, Line 4, that's the summary of

12  the invention.  Then in Column 4, it has a brief

13  description of the drawings.

14         Column 5 begins -- you'll see the

15  title -- detailed description of the invention.

16         You'll see over in Column 10 another

17  paragraph that says:  Equivalents.

18         Now, the specification ends with the

19  beginning of the next paragraphs which are called

20  claims.

21         You see in Column 10, Line 25 --

22  everybody find that -- it says what is claimed is, and

23  then it has a number of claims, 1, 2, 3, 4, 5, and that

24  goes on for several pages.

25         Look at Column 1 -- I mean Column 10,

1  Line 26 -- 25, and it says:  What is claimed is (1) a

2  method of processing, and then it goes through, and it's

3  got several paragraphs.

4           Each claim may be divided into a number

5  of parts, which are referred to as claim limitations.

6  The '639 patent, the claims begin at Column 10, Line 25,

7  and continue to the end of the patent.

8           Now let's talk about the claims of the

9  patent.  They're very significant, because the claims of

10  the patent are the main focus of the case, because the

11  claims at the end of the patent are what define the

12  patent owner's rights under the law; that is, the claims

13  define what the patent owner may exclude others in doing

14  during the term of the patent.

15           The claims of a patent serve two

16  purposes.  First, they set the boundaries of the

17  invention covered by the patent.

18           Second, they provide notice to the public

19  of those boundaries.

20           The claims of the patent are what are

21  infringed when patent infringement occurs because the

22  claims define what the patent is.

23           Thus, when a product or a method is

24  accused of infringing a patent, the patent claims are

25  compared to the accused product or method to determine

1   whether there is infringement.

2              The claims are also at issue when the

3   validity of a patent is challenged.  In reaching your

4   determination with respect to infringement and validity,

5   you must consider each claim separately.

6              Now let me visit with you about what's

7   called claim construction or construction of the claims

8   or claim term definitions, if you will.

9              I'm going to instruct you now and at the

10   end of the case about the meaning of some of the words

11   that are used in the claims.

12              In deciding whether or not an accused

13   product infringes a patent, the first step is to

14   understand the meanings of the words used in the patent.

15   It may be useful to refer back to the '639 patent as I

16   discuss the claims at issue.

17              The claims, again, begin at Column 10,

18   Line 25.  These claims may exist in two forms referred

19   to as independent claims and dependent claims.

20   An independent claim does not refer to any other claim

21   of the patent.  In other words, it's not necessary to

22   look at any other claim to determine what an independent

23   claim covers.

24              Claim 1, for example, is an independent

25   claim.  In other words, it stands by itself.  It doesn't

1  depend on any other claim.

2              A dependent claim refers to at least one

3  other claim in the patent.  A dependent claim includes

4  each of the limitations of the other claim that it

5  refers to, as well as the additional limitations recited

6  in the dependent claim itself.

7              Therefore, to determine what a dependent

8  claim covers, it is necessary to look at both the

9  dependent claim and the other claim or claims to which

10  it refers.

11              For example, flip over to Claim 60 of the

12  '639 patent, which is contained in Column 13, Line No.

13  27.  Everybody in Column 13, Line 27?  And you can see

14  it there on the board.

15              Claim 60 is what's called a dependent

16  claim.  And you'll notice how Claim 60 begins.  It says:

17  The method of Claim 1, and then it goes on and says some

18  other things.

19              For example, to determine what the

20  dependent claim covers, it's therefore necessary that

21  you look at the words of the independent claim as well.

22  So for Claim 60 to be infringed, not only does each

23  element of it have to be satisfied, but so does each

24  element of the claim to which it refers, Claim 1.

25              Sometimes the claims of the patent use

1  the term comprising, as you'll see there in No. 60.  And

2  then it lists several methods.  And you'll also see it

3  up in Claim 1, the end of the second line says:

4              Comprising the steps of, and then it

5  lists those steps.

6              Comprising means including or containing.

7  A claim that uses the word comprising or comprises is

8  not limited to products or methods having only the

9  elements that are recited in the claim but also cover

10  products or methods that add additional elements.

11             Take, for example, a claim that covers a

12  table.  If the claim recites a table comprising a

13  tabletop, legs, and glue, the claim will cover any table

14  that contains these three structures:  A tabletop, legs,

15  and glue.

16             Now, if you have a table that has those

17  three things but also has other structures, such as a

18  leaf or a wheel or wheels on the leg, that would

19  nevertheless be included.

20             Now that I have instructed you as to the

21  types of claims at issue in this case, please take a

22  time to look at the claim construction chart provided in

23  your notebook at Tab 6.

24             Now, what this is about, at some time

25  prior to trial, the lawyers on both sides came to the

1  Court -- they met, conferred, had a meeting to see if

2  they could agree on a meaning of some of the words.

3  The words that they could not agree on the meaning of

4  were then presented to me at an earlier -- what's called

5  a claim construction hearing.  And I heard legal

6  arguments from both sides as to what a particular word

7  meant.

8            For example, in -- let's look down to the

9  third claim term there, connected to.  There was a

10  dispute, and I resolved that dispute by saying that

11  connected to means having a link to, to send or receive

12  data.

13            So that's the definition that I came up

14  to -- with for those words.  And this chart describes

15  the meaning of all those words.  It lists the Court's

16  constructions for each of the patents and what that was.

17            It was my job as Judge to determine what

18  the claims mean and to instruct you about those

19  meanings.  You must use these meanings I give you when

20  you decide the issues of infringement and invalidity.

21  And you will hear some of the experts testifying about

22  the way the Court defined a specific term in one of the

23  claims.

24            So that's an overview of the patent.

25            You've heard about the written

1  description, which contains the abstract, a summary of

2  the invention, and other matters, and you've heard about

3  the claims at the end, which the claims define what that

4  patent covers, and you've heard about the claim

5  construction chart that helps define some of those

6  words.

7                  Don't feel like you have to have all of

8  that in your head now.  It will become clearer to you as

9  we progress through the trial.

10                 Now let's talk about the issues that you

11 are going to be deciding in this case.  I'm going to

12 give you some information about those, as well as a

13 short overview of the applicable law.

14                 Again, at the close of the case, you will

15 see -- receive much more specific instructions that you

16 must follow in reaching your verdict.  You will also be

17 given a verdict form and questions that you must answer

18 in providing your verdict.

19                 And in very summary form, you'll be asked

20 whether the Defendant, Newegg, has infringed the patent;

21 you'll be asked whether the patent is invalid or not;

22 and you'll be asked about damages in the case.

23                 And there are different burdens of proof

24 dealing with each of these questions that you're going

25 to be asked, and I'm going to discuss those burdens of

1   proof with you now.

2              In any legal action, facts must be proved

3   by a legal standard known as the burden of proof.  In a

4   patent case, such as this, there are two different

5   burdens of proof that are used.

6              The first is called the preponderance of

7   the evidence standard.  The second is called the clear

8   and convincing evidence standard.

9              And you may have heard of a third that's

10  called the beyond a reasonable doubt standard.  That's

11  used in criminal cases, but that does not apply in a

12  patent case.  We'll only be concerned with the first

13  two.

14             In this case, Soverain must prove its

15  case by a preponderance of the evidence.  When a party

16  has the burden of proof by the preponderance of the

17  evidence standard, it means that you must be persuaded

18  that what the party seeks to prove is more probably true

19  than not true.

20             Put in another way, if you were put -- to

21  put the evidence for and against the party who must

22  prove the fact on opposite sides of a scale, the

23  preponderance of the evidence standard requires that the

24  scale tip at least somewhat towards the party who had

25  that burden of proof.  That's the preponderance of the

1  evidence standard.

2          Now, Newegg, with regard to the defense

3  of invalidity, has a heavier burden called the clear and

4  convincing evidence standard.  When a party has to prove

5  something by clear and convincing evidence, it means

6  that the evidence must produce in your minds a firm

7  belief or conviction as to the matters sought to be

8  established.

9          In other words, if you were to put the

10 evidence for and against the party who must prove the

11 fact on opposite sides of a scale, the clear and

12 convincing evidence standard requires the scale tip more

13 heavily toward the party who has the burden of proof.

14          Again, you may have heard of beyond a

15 reasonable doubt.  That does not apply in this case, and

16 you should just put that out of your mind.  The beyond a

17 reasonable doubt is the highest standard, and then the

18 preponderance of the evidence is the lesser standard in

19 a civil case, and then clear and convincing evidence is

20 somewhere in between.

21          All right.  Understanding those burdens

22 of proof, let me talk with you about the various legal

23 theories.

24          The first is infringement.  And, again,

25 Soverain contends that Newegg infringes Claims 35 and 51

1   of the '314 patent.

2               And I would just suggest that you flip

3   over to Page -- Tab No. 2.  Tab No. 2 is the '314

4   patent.  Go all the way to the end, right before Tab 3,

5   and start flipping backwards three or four pages to

6   Column 10.  So you should be looking at Column 10 of the

7   '314 patent.

8               Now, Soverain contends that Newegg

9   infringes Claims 35 -- so flip the page, and over in

10  Column 14, you'll see Claim No. 35, okay?  Circle Claim

11  No. 35, just the number, so that you'll know which

12  claims are involved, and Claim 51.

13              So flip over to the next page -- is that

14  correct, Claim 51 of the '314?

15              MR. ADAMO:  Yes, Your Honor, 35 and 51 of

16  the '314.

17              THE COURT:  My copy of the notebook just

18  goes through Claim 48.  Perhaps you meant 41?

19              MR. ADAMO:  I'm checking, Your Honor.  I

20  don't believe -- it's re-examine -- Your Honor, I'm

21  sorry.  The '314 patent is one of the patents that was

22  reexamined --

23              THE COURT:  Ah.

24              MR. ADAMO:  -- and you've got to go to

25  the '314 patent reexam cert.

1            THE COURT:  Which is No. 4, right?

2            MR. ADAMO:  Yes, sir.

3            THE COURT:  All right.  I misled you,

4  Ladies and Gentlemen.  Flip over to Tab No. 4.

5            All right.  At Tab No. 4, that's the most

6  current -- see the date in the upper right-hand corner,

7  October 9, 2007?

8            And it should say:  Ex parte

9  reexamination certificate, and that's where there was a

10  reexamination of this patent by the Patent Office, and

11  they issued this certificate, which is the one that

12  applies to the claims contained in there.

13            And if you'll flip over to Column 1,

14  which is three or four pages over, and you will see in

15  Column 1 on the '314, Claim No. 51 in that column.

16            Does everybody find that?  Should be on

17  Tab 4 over three or four pages to where it begins the

18  column number, and Column 1 says:  Ex parte

19  reexamination certificate issued under 18 U.S.C. 307.

20            And down about halfway, you'll see Claim

21  51.  Put a circle around that.

22            The attorneys are -- they're going to

23  have this cut and pasted and on the screen for you, but

24  I was just going to walk through these and circle them,

25  if we can, easily.

```
 1                Let's see.  The next one, Claim 17, would
 2    that be at -- I guess that would be over at Tab No. 5.
 3    Flip over to Tab No. 5 in Column 1, Claim No. 41 --
 4                MR. ADAMO:  I think you were looking for
 5    Claim 17, Your Honor.
 6                THE COURT:  Oh, you're right.  Claim 17.
 7                MR. ADAMO:  Yes, sir.
 8                THE COURT:  Well, I tell you what, we
 9    won't find it in there now.  This is too tedious.  The
10    lawyers will point them out to you.  Just take my word,
11    out of these patents and some of the reexaminations of
12    the patents, there are certain claims that are at play
13    in this case, and you might just want to make a note in
14    your notebook.
15                Soverain contends that Newegg infringes
16    Claims 35 and 51 of the '314 patent.  So the '314
17    patent, Claims 35 and 51.
18                As to the '492 patent, they contend that
19    Claims 17, 41, and 61 are infringed.
20                And as to the '639 patent, they contend
21    that Claims 60 and 79 are infringed.
22                Soverain also contends that Newegg
23    indirectly infringes Claims 35 and 51 of the '314 patent
24    and indirectly infringes Claims 17, 41, and 61 of the
25    '492 patent by inducing the direct infringement of
```

1   others.

2                   And what I basically mention there,

3   you've got two types of infringement.  There's direct

4   infringement and indirect infringement.  Let me explain

5   to you now what direct infringement is.

6                   There are two ways in which a patent

7   claim may be directly infringed.

8                   First, a claim can be literally

9   infringed.

10                  Second, a claim may be infringed under

11  what is called the Doctrine of Equivalents.

12                  Soverain seeks to prove direct

13  infringement both ways -- in both ways.

14                  To prove literal infringement of a

15  particular claim, Soverain must prove, by a

16  preponderance of the evidence, that Newegg's internet

17  sales process contains each and every limitation of that

18  particular claim.

19                  The Doctrine of Equivalents provides that

20  patent protection is not limited to a claim's literal

21  terms but also embraces its equivalents.

22                  To prove infringement under the Doctrine

23  of Equivalents, Soverain must prove, by a preponderance

24  of the evidence, that for each claim limitation not

25  literally met by the accused internet sales process, the

1  limitation is met equivalently in the accused manner of

2  use.

3             I will explain more about what is meant

4  by equivalents at the end of the case.

5             Newegg denies that it directly infringes

6  any of the claims.

7             So you've got the claims.  You've got

8  Soverain alleging direct infringement.  They're alleging

9  it in two ways, both literally and by the Doctrine of

10 Equivalents.  Newegg denies that it infringes any of

11 those claims.  Now that's direct infringement.

12            Then there's indirect infringement.

13 Soverain also alleges that Newegg has indirectly

14 infringed the asserted claims by inducing another to

15 directly infringe.

16            To prove that Newegg induced someone else

17 to infringe, Soverain must prove, by a preponderance of

18 the evidence, that Newegg encouraged or instructed

19 another person or company to use or sell a product in a

20 manner that infringes; that Newegg knew or should have

21 known that the encouragement or instructions would

22 likely result in the other person doing that which you

23 find to be an infringement.

24            And that Newegg intended to cause the

25 encouraged acts and that the encouraged acts were

1  actually performed by the other person.

2           Newegg denies that it indirectly

3  infringes any of these claims.

4           So, again, back to an overview.  Soverain

5  accuses Newegg of infringing these various claims both

6  by direct infringement, which can be proven literally,

7  or by the Doctrine of Equivalents, and indirectly by

8  inducing others to infringe.

9           So that's the infringement part of the

10 case.  That is just an overview.  You'll get much more

11 detailed instructions later.

12          Now, Newegg claims the patents are

13 invalid.  Invalidity is a defense to patent

14 infringement.  A person accused of infringement has the

15 right to assert that the claimed invention in a patent

16 did not meet the requirements for patentability even

17 though the patent was issued by the Patent Office.

18          In other words, you the jury, in hearing

19 this case will hear evidence, and you have a right, in

20 essence, to overrule the Patent Office Examiner based on

21 the evidence you hear.

22          However, the fact that the Patent Office,

23 Patent & Trademark Office of the United States, issued a

24 patent in this case carries with it a presumption that

25 they were correct and that the patent was valid.  And

1    that presumption has to be overcome.

2              The presumption of patent validity

3    imposes the burden on Newegg to prove invalidity, not by

4    a preponderance of the evidence, but by the clear and

5    convincing evidence standard.

6              Now, Newegg has a number of grounds for

7    invalidity, and I'm going to go over those with you in

8    just a moment, but let me just backtrack again.  We've

9    got infringement.  I've discussed the various ways that

10   a patent can be infringed.  Then you've got the defense

11   of invalidity.  Infringement requires the presumption --

12   requires the preponderance of the evidence standard.

13             Invalidity requires a higher, clear and

14   convincing evidence standard because of the presumption

15   of validity that comes from the issuance of the patent.

16             Now, how are the ways that Newegg can

17   prove the patent is invalid?  First, you need to

18   understand the effective filing date of the '639 patent.

19   The '639 patent was filed as what's called a

20   continuation of another patent, and that other patent

21   was the '780 patent.  Soverain contends that the '639

22   patent is entitled to the '780 patent's filing date

23   because it was a continuation of that patent.

24             Newegg, on the other hand, contends that

25   the '639 patent is not entitled to the filing date of

1    the earlier patent.  It's also referred to as the parent

2    patent.  So, in this case you have the parent patent,

3    the '780 patent, that was then continued as the '639

4    patent.  And Newegg is contending that Soverain should

5    be limited to the effective filing date of the '639

6    patent.  Soverain contends that they should be entitled

7    to the earlier date of the '780 patent because it was a

8    continuation.

9                Newegg contends that the '639 patent is

10   not entitled to the filing date of the parent '780

11   patent and that it is invalid for intervening prior art,

12   because the '780 patent fails to satisfy the written

13   description, best mode, and enablement requirements to

14   support the claims of the '639 patent.

15               I am now going to address each of those

16   requirements.  So we're still talking about invalidity.

17   Now we're talking, first of all, about written

18   description.

19               In order for a patent to be valid, a

20   patent must contain a written description of the product

21   claimed in the -- in the patent.  To satisfy the written

22   description requirement, the patent must describe each

23   and every limitation of a patent claim in sufficient

24   detail, although the exact words found in the claim need

25   not be used.

1             The written description requirement is

2    satisfied if a person of ordinary skill in the art,

3    reading the patent application as originally filed,

4    would recognize that the patent application

5    describing -- describes the invention as finally claimed

6    in the patent.

7             Newegg bears the burden of proving by the

8    clear and convincing evidence standard that the '780

9    patent does not meet the written description requirement

10   as it relates to the challenged claims of the '639

11   patent.

12            So we've talked about infringement.  Now

13   we're talking about invalidity, talking about the first

14   way a patent can be invalid.  That's for lacking a

15   correct written description.  You will hear the experts

16   for both sides talk about that.  That's a question

17   you're going to be deciding in the case.

18            The second way that a patent can be

19   invalid is what's called the best mode defense.  The

20   patent specification must disclose the inventor's

21   preferred way or best mode of performing the claimed

22   invention at the time the patent application was filed.

23   This is referred to as the best mode requirement.

24            In order to prove that the '780 patent

25   does not disclose the best mode of the invention as it

1  relates to the challenged claims of the '639 patent,

2  Newegg must prove, by clear and convincing evidence,

3  that, first, at the time the patent application was

4  filed, the inventor knew of a best mode of performing

5  the claimed invention, and, second, that the '780 patent

6  does not disclose that best mode.

7             So, again, that's the second way, best

8  mode that a patent can be found invalid.  Both of them

9  require the clear and convincing evidence standard.

10             The next way is the enablement.  A patent

11  must contain a sufficiently full and clear description

12  of the claimed invention.  To be sufficiently full and

13  clear, the description must contain enough information

14  to have allowed persons of ordinary skill in the art to

15  make and use the invention at the time the patent

16  application was filed.  This is known as the enablement

17  requirement.

18             In order to prove that the '780 patent

19  does not satisfy the enablement requirement as it

20  relates to the challenged claims of the '639 patent,

21  Newegg has the burden to show by, again, clear and

22  convincing evidence, that the '780 patent does not

23  permit persons of ordinary skill in the art to make or

24  use the invention without having to conduct undue

25  experimentation.

44

1                    Next is anticipation.  Newegg contends

2    that the inventions covered by the asserted claims of

3    the patents-in-suit are not new.  An invention that is

4    not new is said to be anticipated by the prior art.  To

5    prove that a claim is anticipated by the prior art,

6    Newegg must prove by the clear and convincing evidence

7    standard that each and every limitation of the claim was

8    present in a single item of prior art.  That's the

9    anticipation defense of invalidity.

10                    Next is obviousness.  Newegg also

11   contends that a number of the asserted claims of the

12   patents-in-suit are invalid for obviousness.  To prove

13   invalidity of a patent based on obviousness, Newegg must

14   prove by clear and convincing evidence that the

15   invention defined by the claim would have been obvious

16   to a person of ordinary skill in the art at the time the

17   invention was made.

18                    The hypothetical person of ordinary skill

19   in the art that you've heard me refer to is a person of

20   average education and training in the field of the

21   invention and is presumed to be aware of all of the

22   relevant prior art.  You will hear evidence about the

23   skill and experience of such a person during the course

24   of the trial.

25                    Unlike anticipation, which allows

1   consideration of only one item of prior art, obviousness

2   may be shown by considering more than one item of prior

3   art.

4           So to back up again.  Talked about

5   infringement, Soverain's burden, the ways in which

6   infringement can be proven.  Their burden is

7   preponderance of the evidence.  Talked about Soverain --

8   about Newegg's defense of invalidity, the various ways a

9   patent can be proven to be invalid and their burden of

10  proof, which is the clear and convincing evidence

11  standard.  So we have infringement, we have invalidity,

12  and now we're going to talk about damages.  That's the

13  third area that you'll be asked about in the case.

14          Soverain claims that, as a result of

15  Newegg's infringement, it is entitled to damages in the

16  form of a reasonable royalty for Newegg's use of the

17  inventions.  Damages may not be speculative.  Soverain

18  must prove the damages it has suffered as a result of

19  Newegg's alleged infringement by a preponderance of the

20  evidence.  There's that standard again.

21          The fact that I am instructing you about

22  damages, however, does not necessarily mean that

23  Soverain is or is not entitled to recover damages.

24  Again, that's going to be up to you to decide.

25          I will explain to you further at the end

1  of the trial how a reasonable royalty is determined.

2  And you'll hear testimony on that during the trial.

3           At the end of the trial you will get a

4  written charge that will have all of these instructions

5  in it for you in much more detail than I'm giving it to

6  you now, and you will also have a verdict form that will

7  ask you some very simple questions dealing with the

8  three questions:  Infringement, invalidity, and damages.

9           I know this all may seem very complex and

10  may not make a lot of sense to you the first time that

11  you hear it.  Don't feel like you have to be an expert

12  on patent law.  There are going to be plenty of experts,

13  and the lawyers, and the Court, and the witnesses that

14  you will hear from.

15           This is -- my instructions to you are

16  meant to give you an overview so that, as you hear some

17  of these items referred to in the opening statements and

18  you hear them referred to by the witnesses, you will

19  have some context to filter it through that's my

20  overview of what the case is about, what the law is, and

21  the questions you're going to be deciding as jurors.

22           Let me just visit with you finally about

23  your duties as jurors.

24           You have two duties as jurors.  Your

25  first duty is to decide the facts from the evidence in

1   this case.  That is your job and yours alone.

2                   Your second duty is to apply the law that

3   I give you to the facts.  You must follow these

4   instructions even if you disagree with them.  Each of

5   the instructions is important and you must follow all of

6   them.

7                   Perform these duties fairly and

8   impartially.  Do not allow sympathy, prejudice, fear or

9   public opinion to influence you.  Nothing I say now and

10  nothing I say or do during the trial is meant to

11  indicate any opinion on my part about what the facts are

12  or about what your verdict should be.  Again, you, the

13  jury, will be the sole judges of the facts in this case.

14                  That concludes my preliminary

15  instructions to you.  We are now going to hear opening

16  statements by the attorneys.

17  Let me look here and see.

18                  Let me ask the jury.  We've got -- each

19  side has been allowed 30 minutes for your opening

20  statement.  Would you like to take a short break first

21  before you hear the opening statements because they are

22  going to go for about an hour?  Why don't we do that.

23                  Let's take a break now until 10:25 and

24  give you a chance to get a cup of coffee, use the

25  facilities.  Then we'll come back and we will hear the

1  opening statements, which will take about an hour.

2                    So be in recess until 10:25.

3                    COURT SECURITY OFFICER:  All rise.

4                    THE COURT:  You may follow the Court

5  Security Officer to the jury room.

6                    (Jury out.)

7                    COURT SECURITY OFFICER:  All rise.

8                    THE COURT:  Please be seated.

9                    All right.  Let me revisit this license

10  issue.  I need to know -- what I want to know from

11  Newegg is, are you going, in opening statement, to go

12  into your argument that Soverain has only listed --

13  licensed these patents to these small no-name companies?

14                    MR. SAYLES:  Yes, we are.

15                    THE COURT:  Okay.  If you're going to go

16  down that road --

17                    MR. SAYLES:  I'm sorry, sir.

18                    THE COURT:  Excuse me.  Go ahead.

19                    MR. SAYLES:  Not by name, but I would say

20  we're definitely going to make reference to that.

21                    THE COURT:  Okay.  Well --

22                    MR. SAYLES:  The names are not --

23                    THE COURT:  You know, my mind -- I've had

24  two or three cases going here.  I'm getting this one

25  squared back in.

1                    And I believe Mr. Adamo was correct, that

2    in the prior pretrial, I said that if you went into

3    that, they would be able to go into the fact that they

4    had licensed to significant companies, but they would

5    not go into the amounts, and we would not get into all

6    that settlement stuff.

7                    I think both sides agreed they did not

8    want to get into that mess; is that right?

9                    MR. SAYLES:  That's right.

10                   THE COURT:  Okay.

11                   MR. ADAMO:  That's correct, Your Honor.

12                   THE COURT:  Okay.  So that's all you're

13   going to say?

14                   MR. ADAMO:  You saw the slide.  All I'm

15   going to do --

16                   THE COURT:  No, I didn't see it.

17                   MR. ADAMO:  Oh, I'm sorry.

18                   THE COURT:  You held it up, but I

19   couldn't read it.

20                   MR. ADAMO:  My apologies, Your Honor.

21                   THE COURT:  Okay.  All right.

22                   MR. ADAMO:  That's -- that's all the

23   slides.  That's all I will --

24                   THE COURT:  Do you have any objection

25   with that?

1                    MR. SAYLES:  That slide would be

2  consistent with your ruling in the pretrial.

3                    THE COURT:  Okay.  So what was your

4  objection this morning about then?

5                    MR. BALDAUF:  Your Honor, it was the

6  reference to these licenses with the entities that have

7  been previously sued as evidence of commercial success

8  as a secondary consideration.

9                    Amazon, CDW, all of these entities that

10  settled --

11                    THE COURT:  Isn't that what I just talked

12  about that we decided at the pretrial?

13                    MR. BALDAUF:  Well, it's how they're

14  referenced, Your Honor, the idea of whether they can be

15  referenced, the fact that they exist or whether he's

16  going to go into the fact --

17                    THE COURT:  Okay.

18                    MR. BALDAUF:  -- that these are evidence

19  of secondary consideration on obviousness.

20                    THE COURT:  All right.  How are you going

21  to reference them, Mr. Adamo?

22                    MR. ADAMO:  Your Honor, all I was going

23  to do was -- and I apologize.

24                    Casey, can you put 22 up?  There's the

25  slide, Your Honor, if you can see it on the monitor.

51

```
 1                THE COURT:  Right.  Okay.

 2                MR. ADAMO:  And I was simply going to put

 3   that up, and this has in a series -- short series of

 4   slides where I talk about contemporaneous recognition of

 5   the inventions.

 6                I was going to simply put the slide up

 7   and say Soverain Software has also licensed the patented

 8   technology, and this is a list of the licensees.  That

 9   was it.

10                THE COURT:  Okay.  All right.  Is there

11   any objection to that, if that's as far as he goes?

12                MR. BALDAUF:  We don't maintain the

13   objection in that -- in view of the fact that these are

14   in settlement of litigation, we don't believe they're

15   proper to put up.

16                THE COURT:  Well, I'm not sure I want to

17   get into settlement litigations, but if y'all are going

18   to take the position that it's only been licensed to a

19   bunch of no-name companies, I think they're entitled at

20   least to show that it has been licensed to big-named

21   companies.

22                But I don't think y'all want to get into

23   the amount.  I don't want to get into the amount.  I

24   don't think the others do.  But if -- if -- you know,

25   this is a tricky slope, once we start getting into them.
```

52

1            But you're teeing it up by arguing that

2   they have not licensed it.

3            MR. BALDAUF:  Well, Your Honor, I think

4   there's a significant difference in that in the first

5   instance, the agreements that we're relying on have not

6   been entered into in settlement of litigation, and these

7   have been.

8            THE COURT:  Okay.  But I'm -- I'm not

9   going to let the jury just see half the picture.  So

10  even though these were entered into in settlement of

11  litigation, they were significant licenses, so...

12           All right.  You may go into that,

13  Mr. Adamo.

14           Bring the jury in, please.

15           MR. ADAMO:  Can I restore the slide?

16           THE COURT:  Yes, you may.

17           MR. ADAMO:  Thank you, Your Honor.

18           (Jury in.)

19           THE COURT:  All right.  Please be seated.

20           All right, Ladies and Gentlemen of the

21  Jury.  We're now going to hear the opening statements.

22  The Court will recognize Mr. Adamo, who I don't believe

23  you met last week.  I think he was stranded in Europe

24  somewhere due to the volcano going off, but he's --

25           MR. ADAMO:  I was being held captive by a

1  volcano god, Your Honor.

2  [Laughter]

3         THE COURT:  We will now hear opening

4  statements from Mr. Adamo.

5  Mr. Adamo?

6         MR. ADAMO:  Thank you.

7         Your Honor, so that I don't have to turn

8  around and glance at the official clock, could I have a

9  five-minute warning from the Court, please?

10         THE COURT:  Certainly.

11         MR. ADAMO:  Well, good morning.  I'm

12  always pleased to be in Tyler, but I'm particularly

13  pleased in contrast to where I was a week ago today.  So

14  thank you.

15         Will -- Ms. Ferguson, could we get the

16  lights?  Thank you.

17         And, Ladies and Gentlemen, we put a

18  monitor here at the end of the box that has exactly the

19  same thing that will show up on the big slide.  Some of

20  us, who don't have great eyes, might find using this a

21  little bit easier, so...

22         Thank you, Your Honor.

23         Ladies and Gentlemen, this case is about

24  fundamental online shopping systems or methods that were

25  invented in 1994 and 1995.  The inventors solved major

1  technical problems that had severely restricted online

2  shopping development when the internet first became

3  available for public use, which was in 1991, and the

4  worldwide web was developed in 1991 and 1992.

5              They created solutions that the industry

6  and even Newegg's technical expert recognized were

7  technically innovative.  These solutions strongly

8  influence right to this day online shopping, what

9  sometimes is referred to as E-commerce.

10             Soverain Software is the successor in

11 ownership, the later owner of the patents-in-suit that

12 resulted from those inventions.  We're here because we

13 seek payment, as provided by the law, for Newegg's use

14 of these inventions in a very successful business that

15 has turnover of over $2 billion a year in online

16 shopping.

17             I want to spend just a little bit of time

18 talking about technology.  Dr. Grimes, our first

19 witness, is going to get into this with y'all in a

20 little more detail.

21             The technology involved in this case, as

22 Mr. Roth told you last Monday, is the internet and a

23 part of the internet that's called the worldwide web.

24             Sixteen years ago, when this work was

25 first done, online shopping -- to the extent anything

1   existed that was called online shopping -- was

2   absolutely in its infancy.  It was nothing like we enjoy

3   today.

4               The inventors worked for a company at

5   that time called Open Market.  They were out of Austin.

6   The company had been formed by a group of people who had

7   an idea.

8               The idea was let's develop a system that

9   would allow companies to set up internet stores that

10  will let people shop from their computers without having

11  to leave their homes, just like shopping in a real store

12  in a local shopping center would be.  Try to duplicate

13  the experience on a computer system.

14              Sixteen years ago there were no complete

15  online systems that could duplicate or even come close

16  to the real-world shopping experience.  Nothing came

17  close.

18              Now, the United States Patent & Trademark

19  Office, after examining the patents, as His Honor just

20  described to you, allowed three patents on the

21  technology, and those are the three patents that are in

22  suit, okay?

23              So there's the '314 patent.  And by the

24  way, on the easel over there, Ladies and Gentlemen, are

25  all of the original patent documents.  Those are the

1  actual grants, the original documents that you get from

2  the patent.

3          They're essentially in order:  '314 is

4  the top left; the '492 patent is top center; '639 patent

5  is actually bottom right.  And it's down there because,

6  you remember, His Honor said '639 patent had a parent, a

7  continuation.  That's '780.  I put him/her in the upper

8  right-hand corner so you can remember that the senior

9  patent was party to the junior.

10         Now, those are all the grant documents.

11  Two of these patents, '314 and '492, have been through

12  the Patent Office twice, okay?  The '314 and '492 were

13  reexamined at the request, actually, of amazon.com, but

14  they were reexamined.  We'll discuss that in a little

15  bit more detail later.

16         The evidence we're going to present to

17  you is going to demonstrate, by a preponderance, that

18  Newegg infringes these patents.

19         We're going to focus on our asking you,

20  Ladies and Gentlemen of the Jury -- this is what the

21  evidence is going to focus on -- to require Newegg to

22  pay us, according to the law and in the manner that the

23  law provides, a reasonable royalty, as you heard His

24  Honor say, for using the patented technology in those

25  patents.

1                  Now, why do we ask that?  It's real

2    simple.  Just like in everyday life, if you use somebody

3    else's property without permission, you should pay for

4    it.  It's that simple.

5                  And we need your help to accomplish this.

6    The evidence we will bring to you over the next several

7    days will show you, we hope, that Soverain Software

8    deserves that help.

9                  Let's go back 16-something years and talk

10   to you first about the internet.  The internet is a

11   system of computers that are wired into each other, and

12   they work essentially to send messages back and forth

13   between a computer in your home and a computer located

14   somewhere else -- somewhere else.

15                 Our first witness, Dr. Grimes, is going

16   to give you a whole presentation on this that will

17   explain to you that the internet is a network of

18   computers.  No single computer controls.  They

19   communicate with each other.

20                 And the two general types of computers

21   are those that provide information or give you

22   something, like if you want to look up a catalog, you

23   want to see a canoe that might be on sale, those are

24   called servers.  They render a service.  They give you

25   something you ask for.

 1                    And the computers that make the service
 2    request, essentially will be the one in your home, that
 3    one is called a client computer, sometimes a buyer
 4    computer.  These are just internet basics.
 5                    The internet works -- and Dr. Grimes is
 6    going to get into this in a little more detail -- in a
 7    way that is basic to computer communication.  It's
 8    called packets.  Dr. Grimes will get into this.
 9                    Basically, what that means is, I put
10    something together; I put it in a computer.  I want to
11    send an e-mail to somebody else.  The system breaks it
12    down into pieces, like sentence by sentence, and then it
13    sends it out into the system.
14                    It can go any which way that the system
15    allows to get to the recipient, and then the pieces get
16    put back together.
17                    Originally, where this all came from,
18    this comes out of the Department of Defense trying to
19    build a communications system that during the Cold War
20    couldn't get interrupted, so you had all these different
21    pathways.  But that's basically the internet.
22                    Until the early 1990s, all the internet
23    really worked for was e-mails, text, no pictures.
24                    Before 1991, the government wouldn't
25    allow commercial businesses to use the internet.  That

1  ban was lifted in 1991.  The first possibility then of

2  coming up with an online shopping system.

3           The real difference, though, the real

4  difference was when the worldwide web was developed.

5  This was developed between 1991 and 1992, and Dr. --

6  excuse me -- Grimes will explain that as well.

7           It takes advantage of something called a

8  web browser.  And this is about as far as the technology

9  is going to go.  Web browser, it's a computer program.

10 It stays on your computer in your home, the client

11 computer, and its particular power is, it allows access

12 to text, pictures, video, music, the whole nine yards.

13          Internet Explorer, those of you who have

14 computers, that's a browser, okay?  Mosaic is a browser,

15 and the old Netscape was a browser.

16          Now, before the worldwide web, the

17 internet was really text-based.  The worldwide web then

18 presented the possibility of pictures.  We can get

19 pictures now into someone's home.

20          Again, that now adds more ammunition to

21 someone who is trying to design a system that will allow

22 you, in your home, to duplicate the kind of shopping

23 that you did in the store.

24          Now, there's one other powerful thing

25 that the worldwide web brought.  Again, a good potential

1   tool for online shopping.  They're called hypertext

2   links.

3                  Now, scientists can't seem to get

4   anything down into one word and make it simple.  Why not

5   just call them links?  They're called hypertext links.

6                  And if you look up on the screen -- or at

7   the monitor, there's a worldwide web page that just

8   happens to be the Tyler Convention and Visitors Bureau

9   page.  The little tabs that you can see in the upper

10  right-hand corner, all the various white tabs there,

11  they are hypertext links.

12                 If you took your little computer mouse

13  and clicked on the annual events link up there, you

14  would end up getting a presentation on another page that

15  would give you all sorts of information about various

16  events here in Tyler throughout -- throughout the year.

17                 In some other situations, you click on a

18  link, you get sound; you get pictures; you get graphics

19  of all different types.

20                 Now, this is another big tool that

21  potentially could have been used back in that

22  timeframe -- so now we're in 1992 -- to try to come up

23  with a real online shopping system.

24                 Let's talk about the people that the

25  evidence is going to show, about the people involved.

1          Open Market, as I said, Boston-based, was

2     founded in December of 1993 by two men, a business guy,

3     Shikhar Ghosh, and an MIT professor, a man named Dr.

4     David Gifford.

5          They added a bunch of additional people,

6     including Mr. Treese, who is here and is going to

7     testify, one of the inventors, and they set about this

8     project.

9          Now that's Mr. Treese.  He's sitting

10    behind me somewhere.  That's him right now, and you'll

11    see him in a day or two.  But, remember, this was 16

12    years ago when this work was done.  And that's the

13    timeframe you've got to keep in mind, 16 years ago,

14    1994.

15         Here's what the Open Market people looked

16    like in 1994.  And the guy all the way over on the right

17    with the big fuzzy hair, and they're holding

18    dandelions -- and I'll let him explain to you later what

19    that's all about -- that's what these people looked like

20    back in the day when this work was really done.

21         Now, to help you focus on 1994 a little

22    more, here are some historic things from 1994.  Emmitt

23    throwing his hands up after he scored a touchdown, and

24    the Cowboys won the Super Bowl in 1994.  That's Emmitt

25    Smith in the middle.

1           You know the gentleman in the lower left,

2    who at that time was the Governor of the State of Texas.

3           We won't mention the gentleman in the

4    upper right-hand corner, but that crazy television

5    search from out in California, that took place in 1994.

6    Helicopters were watching.

7           And almost the most interesting thing of

8    all, down in the lower right-hand corner, that's a gas

9    pump, and yes, it really does say 98.9 cents for

10   regular.  That's how long ago this all was, 16 years.

11          So what was -- what was the challenge

12   facing these folks, this group of people?  They wanted

13   to use the internet and the worldwide web to provide

14   customers with a convenient shopping experience that

15   resembled, as much as they could, real-world shopping,

16   where customers were used to browsing through store

17   aisles; you looked at something; you picked it up; you

18   read the information on the product; one by one you'd

19   put it in the shopping cart.

20          You'd go a little further along.  Maybe

21   you would get to the next aisle and you'd go:  Oh, I

22   like this better than what I put in the shopping cart.

23          So you'd take it out, and some of us go

24   to checkout and give it back at checkout, and some of us

25   go put it back, and some of us just leave it where it

1    is, right?

2                    And that's the kind of experience that

3    they were trying to duplicate.  So that was the idea

4    that was driving them.  How do we use the internet and

5    the worldwide web to do that?

6                    But there's problems with the technology.

7    The worldwide web and the internet had basic fundamental

8    technical characteristics.  You know, like I'm bald and

9    I've got white hair and glasses, the internet and the

10   worldwide web had basic technology characteristics that

11   you couldn't get rid of.  You had to work with them.

12   One of the biggest ones was the web, and the way it

13   talked to each other was stateless.

14                   Now, you'll get the detail -- the

15   technical detail through the witnesses, but just

16   remember, that was a huge problem, state and maintaining

17   state to doing what these men were trying to do in this

18   invention.

19                   Second problem:  Sessions, which would be

20   your going back and forth when you were on the computer

21   as you -- as you replicated the shopping experience.

22   That had to be tracked as well if the system was going

23   to work.  That was a problem that was unsolved in the

24   early 1990s.

25                   Managing the session.  You talked back

64

1   and forth to the computer that's not located in your

2   house, the computer of the person selling the materials.

3   Keeping track of that was necessary.  Everybody knew it

4   was a problem.  Nobody knew how to fix it.

5                   How do you keep track of what's in the

6   shopping cart, and in the shopping cart -- what are the

7   contents in your shopping cart?  We wanted a shopping

8   cart because, again, they wanted to try to make this as

9   real world as they could.  That was a huge problem as

10  well.  Nobody knew how to fix it.

11                  Every time you get a request, the

12  computer -- in your upper left-hand corner on this

13  slide -- and you-all would be sitting at home going out

14  to the merchant, because of the state problem, this

15  inherent characteristic in the system, the system didn't

16  know who it was talking to.

17                  Hard to believe as it was, this was a

18  deliberate design.  They did it this way deliberately.

19  But the system didn't know who it was talking to.

20  That's great in certain uses.  It's terrible and totally

21  non-functional if you're going to come up with an online

22  shopping system.

23                  So these people were faced with a lot of

24  problems.

25                  Another problem:  Finishing the

1 transaction.  You want to pay for the purchase while

2 you're still online.  You don't want to have to come

3 back.  You don't want to have to call up your credit

4 card company.  You don't want to have to send them a

5 check.

6                 To the extent there were any systems

7 around at that day for buying online, they didn't go all

8 the way through to the end of the transaction.  They

9 stopped usually at around the purchase point.

10                 Another problem.  Who wants to deal with

11 that?  That's worse than going to the store, because

12 there's always a checkout counter at the store, and

13 you're going to be able to pay at that point.  Another

14 problem that was facing these people.

15                 So in the spring of 1994, Treese and some

16 of the other inventors leave DEC, a big powerful

17 computer company -- was about at IBM's level -- and they

18 joined Open Market.

19                 DEC wasn't ready to challenge and take on

20 these technical issues about the worldwide web and the

21 internet.  DEC was doing very well doing what it was

22 doing, and it just wanted to remain there.

23                 So these men joined Open Market, and you

24 can see they're all there by May of 1994.  And college

25 kids that they almost still were, they worked like dogs,

1    and you'll hear Win Treese talk about this.

2                    They pulled all-nighters.  They worked

3    weekends.  They never went home.  They just worked and

4    worked and worked and worked incredibly long, hard

5    hours.  And by May and June of 1994, they had started to

6    solve these very difficult problems.

7                    They came up with a way to maintain

8    session to handle the state problem.  And how did they

9    do that?  They came up with something called a session

10   identifier.  It's just information or a piece of code.

11                   And that session identifier would go back

12   and forth between the two computers, and that way the

13   computers always knew who they were talking to and

14   whether they were still in the same session or not.

15                   This is one of these elegant little

16   solutions that we look back at, and you go, oh, yeah,

17   gee, who wouldn't have done it that way?  It was not

18   that easy in the day, and they were the first ones that

19   did it.

20                   The second thing they did to solve this

21   problem was they came up with an entire online system.

22   I refer to it as soup and nuts, from the beginning, when

23   you get on the computer and you start looking for

24   products and things that you want to buy, all the way

25   through the shopping cart, the browsing capability,

1   further to the point of purchasing and completing the

2   transaction.

3              Now today, almost everybody's got a

4   shopping cart.  In 1994, that was not the case.

5              So as you heard His Honor summarize

6   earlier and briefly, the '314 patent and the '492

7   patents are the ones that provide the overall solution

8   to shopping and purchase transaction completion

9   problems.

10             The '492 patent provides a convenient way

11  for customers to view their past orders online rather

12  than having to pick up the phone and call customer

13  service.

14             So between these two, you had your

15  complete soup-to-nuts shopping experience.

16             And then as His Honor also mentioned, the

17  key disclosure and claims in the '639 patent came up

18  with how do we control and manage the sessions?  How do

19  we keep the two computers knowing who's talking to whom

20  and the fact that you're in a session, the shopping

21  experience, and whether you've completed it or not?

22             This then solved all of the problems that

23  everybody else, who had been taking a crack at this at

24  this point, hadn't been able to solve.  They came up

25  with it.  They're the ones who figured out how to take

1  the problems with the internet and the worldwide web and

2  make them work for them.

3           Now, as the program was commercialized

4  and as the business expanded, people paid attention.

5  They started getting a lot of attention out in their --

6  in their world in particular, but just generally, people

7  were recognizing that, hey, these people have just done

8  something that's important.

9           The Wall Street Journal and the New York

10  Times had stories about the technology.  They won a

11  couple of industry awards, the Intranet Excellence Award

12  that was presented by a certain company.

13           Very interesting.  Mr. Tittel, Newegg's

14  expert, in 1997, in a book that he wrote -- and you'll

15  hear more about this later -- he praised what Open

16  Market had developed.

17           He said:  They're a leader in electronic

18  commerce products since early '94.  The software is one

19  of the best, most viable ways for a business wanting to

20  set up an online presence to go; and that the software

21  functioned readily with a number of browsers.

22           Transact, which was the software, the

23  commercial product, that they put out, successful,

24  licensed to a number of people, big companies, AT&T,

25  Time Warner, USA Today, also many of the phone companies

1    at that time.

2              And licenses continue, now that Soverain

3    owns the patents, to companies such as amazon.com,

4    TigerDirect, Zappos.

5              All right.  Who's Newegg, right?  Why are

6    we chasing Newegg around?  Are we picking on some poor

7    person here that's inappropriate?  Hardly.  Newegg is

8    the second largest online shopping company in the United

9    States.  Only amazon.com is bigger.

10             THE COURT:  Mr. Adamo, you have ten

11   minutes left.

12             MR. ADAMO:  Ten, Your Honor?

13             THE COURT:  Ten.

14             MR. ADAMO:  Thank you, sir.

15             Newegg was founded in 2001, okay?  They

16   own and run the website www.newegg.com.  And since the

17   lawsuit started -- this lawsuit started in 2007 --

18   they've actually launched two new websites,

19   neweggmall.com and newegg.ca, which is a website based

20   in Canada.

21             Newegg has been in the process of making

22   a number of filings with the Securities and Exchange

23   Commission relating to something they're doing with

24   their business.

25             And in those filings, they're describing

1  themselves as a leading E-commerce company, online

2  sales, online shopping, and they're telling people that

3  their 2008 net sales were $2.1 billion.

4                Their website, www.newegg.com, is the

5  only way they sell.  They have no real-world stores.

6  They live and die on the website.

7                In fact, they told the Securities and

8  Exchange Commission that the performance and reliability

9  of the websites are key contributors to their ability to

10  deliver high-quality customer experience.

11                Unlike a lot of other competitors,

12  though, they are not licensed.  They're competing

13  against people who are, but they are not licensed.

14                All right.  I've already told you that

15  Lynn Treese -- I'm sorry -- Win Treese is going to

16  testify about the invention's story.

17                Jack Grimes, the good-looking young man

18  that you see up here right now, is going to explain and

19  demonstrate to you why the claims that His Honor

20  mentioned earlier are infringed.

21                And Dr. Grimes is going to go through and

22  use information coming from this person in particular,

23  James Wu.  That's Newegg's technical head.  He's

24  testified under oath as Newegg's representative to

25  explain their system.

1          You'll see -- and Dr. Grimes will be our

2     first witness.  He's also got charts and documents and

3     all sorts of detailed drawings such as this, which he

4     studied extensively; and based on that, he will give you

5     his views and show you that these claims are, in fact,

6     being infringed.

7               Now, as a -- just as a note, you may

8     remember last week during voir dire, Mr. Sayles -- and

9     I'm expecting you're going to hear this as part of the

10    evidence.  Mr. Sayles made a point about Mr. Wu

11    supposedly designed Newegg's system and had never heard

12    of any patents-in-suit.

13              At the end of this case, His Honor is not

14    going to tell you that intent or knowledge of the

15    patents is necessary for us to prove infringement and

16    for you to consider awarding us damages.

17              If you infringe, whether you knew about

18    it or not, that doesn't excuse your having to pay

19    damages.

20              Newegg is likely going to raise a whole

21    bunch of other reasons why its infringement doesn't

22    count.

23              For example, Mr. Tittel may say that he's

24    not using a shopping cart database.  And you'll see that

25    right about here on this diagram.  When Dr. Grimes gets

1  up, you're going to see there's something labeled a

2  shopping cart database right there in their system.

3  We're also expecting that, amongst the various things

4  they've raised.

5            They may try to show that the way this

6  system uses the shopping cart doesn't literally infringe

7  Soverain's patents.

8            Remember, His Honor talked about literal

9  infringement and Doctrine of Equivalents.  Dr. Grimes

10  doesn't agree.  He's going to demonstrate to you that it

11  infringes literally.  But he's also going to show, under

12  the Doctrine of Equivalents, that they are also

13  infringing on that basis.

14            Newegg may also try to defend by saying,

15  well, we don't use the entire system that you have in

16  your patents.  Our customers do in part, even though we

17  designed the system so the customers would use it

18  exactly the way they do.  And for some reason, that's

19  supposed to be an excuse for infringement.

20            Dr. Grimes will show you that Newegg uses

21  the entire system, uses its own servers, its own

22  computers; and in the claims of one of the patents, the

23  customers do take some steps in that patent, but they do

24  it in a way directed exactly by Newegg.

25            THE COURT:  You have exactly five minutes

 1  left.

 2                   MR. ADAMO:  Thank you, Your Honor.

 3                   Two more people you're going to -- three

 4  more people you're going to hear from.  Katharine

 5  Wolanyk, the lady who's sitting right there at our

 6  table.  She is the president and chief legal officer of

 7  Soverain Software.

 8                   Ms. Wolanyk will explain to you the

 9  follow-on story at Open Market, how Soverain became

10  involved with Open Market and became the current owner

11  of the technology and how the Transact software product

12  that we mentioned earlier was developed and how it has

13  come out into the marketplace.

14                   Damages.  We will give you a presentation

15  on what we think the damages are here that the law

16  supports.  This is the part of the law that says the

17  damages have to be adequate to compensate but no less

18  than a reasonable royalty, as you heard His Honor say.

19                   What's royalty?  The equivalent in a

20  real-property term would be rent.  Patents are property.

21  You use somebody's property; you pay rent.

22                   Jim Nawrocki, he's behind me here --

23  somewhere behind here.  He is going to testify and

24  explain our views on reasonable royalty and what a fair

25  reasonable royalty is here under the law.

1          He is going to give you his opinion on

2    what the reasonable royalty per order or transaction

3    should be, and he will explain this in detail.  It's 80

4    cents for the '314 patent or the '492 patent together;

5    40 cents for the '639 patent; all in a dollar twenty.

6          Now, you're going to hear from Newegg

7    that we're ripping them off; that this is just an

8    unconscionable amount of money, because when you take

9    the dollar twenty, and you multiply it by the

10   two-and-a-half approximate years that we say they owe us

11   royalty for, last year, 12 million transactions, when

12   you add that all up, you come up with a big number.

13          I'm not denying $34 million is a big

14   number.  But why is it a big number?  Not because we're

15   doing anything improper or overreaching; it's a big

16   number simply because the extent, the breadth of

17   Newegg's use of the technology, 2-plus billion dollars a

18   year, that's the reason the number is so big.

19          Last point.  As His Honor told you, we

20   don't have to prove the patent valid; they've got to

21   prove it's invalid.  They have all sorts of different

22   arguments that you heard His Honor mention that they may

23   bring up.  Whatever they bring up that they previously

24   told us about, we will respond.

25          The gentleman on the screen right now,

1   Mike Shamos, will be our witness, who will answer any of

2   these allegations of invalidity.  The main one they're

3   going to -- the piece of art they're going to rely on is

4   something called CompuServe Mall.

5              But remember this:  When those patents

6   were reexamined -- remember I told you the '314 patent

7   and '492 patent were reexamined -- the Patent Office was

8   aware of CompuServe Mall in detail in both of those

9   reexaminations, and they were aware of CompuServe Mall

10  in the '639 patent.

11             So all of these patents were either

12  allowed directly or reexamined to take into

13  consideration what looks like their piece of prior art.

14             I thank you very much for your attention.

15  I apologize that I wasn't here last Monday, but I'm glad

16  that I'm here now.  We really look forward to spending

17  the next few days with you this week, and we appreciate

18  your commitment in deciding this controversy between

19  Soverain Software and Newegg.

20             That completes my opening, Your Honor.

21  Thank you.

22             THE COURT:  Thank you, Mr. Adamo.

23             Mr. Sayles?

24             MR. SAYLES:  May it please the Court.

25             THE COURT:  Would you like any time

1   warning?

2              MR. SAYLES:  Yes, Your Honor.  Would you

3   tell me when I have ten minutes, five minutes, and one

4   minute remaining?

5              THE COURT:  Yes.

6              MR. SAYLES:  Thank you.

7              Good morning, Ladies and Gentlemen.  I'm

8   Dick Sayles.  I'm honored and pleased to represent

9   Newegg in this case.

10              And you may have noticed we have an

11   additional face at our counsel table.  Mr. Dave Hanson

12   is a lawyer who will also be participating in this case,

13   and you weren't introduced to him earlier.

14              Let me start off by telling you why we

15   are here and what the issues are that you have heard

16   about a little bit.

17              First of all, the Soverain patents are

18   not valid, and I'm going to get into detail about that

19   in a few minutes.

20              An independent and separate reason that

21   we're here is that Newegg doesn't infringe these

22   patents, and I am going to explain that in a few

23   minutes.  Either one is a defense.  They're not

24   connected.

25              If the patents are invalid, that's a

1  defense.  If there's no infringement, that's a defense.

2  Either one.

3            And, third, the reason we're here, the

4  damages claimed in this case are grossly inflated, and I

5  have to address that.

6            Now, you will recall in jury selection I

7  told you the order that cases go in, it's determined by

8  the rules.  The Plaintiff always gets to go first.  You

9  have seen that in action this morning.  There is so much

10  that I want to say and so little time that I'm going to

11  try to move quickly.

12            But I just wanted to remind you that what

13  you saw in action is the way it's going to go throughout

14  this case.  So I'm going to ask you again to keep an

15  open mind until you've heard everything.

16            I'll start by introducing our client.

17  Newegg is an innovative, creative company, and it has

18  achieved success.  There's no doubt about that.  But in

19  the year 2000, it was struggling to survive.  It was in

20  the custom PC market at that time, personal computers,

21  and the competition was heavy.  It developed a strategic

22  plan at that time to become an online internet retailer

23  of electronics.

24            And I'm going to show you the home page

25  of the Newegg website from around Christmastime.  And I

1  know this is hard to see up here, but the number of

2  products now offered are in categories, and they go

3  across the ribbon here.  And there are now over 40,000

4  products that are sold by Newegg.  40,000.

5           So it has become a successful online

6  retailer, and it has benefited millions of ordinary

7  citizens by providing very high-quality goods for a low

8  price and good customer service.  The development of

9  Newegg, like any successful business, requires time,

10  effort, talent of the people, and investment of money.

11           I have to start this description of

12  Newegg by introducing you to James Wu.  He is in the

13  courtroom.  James, would you stand up briefly?  This is

14  James Wu I mentioned earlier.

15           He is now the current chief technical

16  officer of Newegg, and he was the architect of the

17  computer systems that are involved here.  I have to tell

18  you a little bit about James so that you'll understand

19  what he did and how significant what he did for Newegg

20  is.

21           James was born in China.  He was the

22  first in his family to attend college.  He grew up with

23  working-class parents.  He did graduate from college in

24  1991 and went to -- worked for an oil company where his

25  job was in the computer field.  His degree was in

1   computer science.  And he developed systems to run a

2   major refinery and other aspects of the petrochemical

3   business.

4              In the mid '90s, James, for training,

5   visited the United States.  He got to experience and see

6   firsthand the freedoms that we have here and the way of

7   life that we have.  And he had a dream for his own young

8   wife and his young child that he hoped to be able to

9   move to the United States.  He got his chance in 19 --

10  in 1999, he came here, and he actually answered an ad in

11  the newspaper for a job in Los Angeles.

12             It turns out that that job was a job

13  offered by Newegg, at that time, as I said, one basic

14  product, and it was struggling.  James took the job.  In

15  his first eights months on the job, his job was to

16  convert the existing computer systems into a system that

17  would handle a large volume of transactions and a lot of

18  data.  It was a challenging job.  He had few resources

19  and very little help.  And James worked day and night to

20  do this.

21             The foundation for the computer system at

22  Newegg at that time was a Microsoft system for which

23  license fees are paid.  He built on that to build the

24  Newegg system.

25             One of the biggest challenges was

1  computer space.  Where do you put the data about

2  products and all the information that's required to run

3  a website?

4            Through James' skill, his knowledge, the

5  experience that he had gained at Petro China and just

6  using good old common sense and techniques that were

7  known in the computer field, he developed the Newegg

8  website, which launched in January of 2001.  And that's

9  a very important date, January of 2001.

10            I mentioned to you that the products of

11  Newegg have grown steadily.  This is a list that's hard

12  to read.  You will see this later, but it's everything

13  from computers to cords.  Here is a picture of a GPS,

14  computer, big screen TV.  The list goes on and on.

15            The company has grown by virtue of this

16  website, and it uses the same website to this day that

17  James Wu developed in 2001.  It has grown to have

18  warehouses in Los Angeles; Memphis, Tennessee; and in

19  New Jersey, and it's known for its customer service and

20  its fast shipping.

21            Even with strong competition and the

22  dot-com bust that occurred, with very dedicated people,

23  Newegg has become successful.  But it's because of its

24  people and its high-quality goods, its low prices are

25  certainly a factor, and its customer service.

1              Newegg has received numerous customer

2    service awards, which we're going to detail in the

3    evidence.  This is just a representative sample of

4    customer service awards that Newegg has received.  It

5    has received many.

6              The patents -- Mr. Adamo mentioned

7    this -- the patents in issue were not known to James Wu.

8    He didn't copy them.  He was even unaware of Soverain

9    until this lawsuit was filed in 2007.

10             Now, let me talk about how Soverain, the

11   Plaintiff in this case, acquired the patents that are

12   involved here.

13             Soverain acquired these patents in 2003

14   by a purchase from a company called Divine, Divine.  I

15   don't think you've heard that name yet.  And Divine

16   itself had only owned these patents for 15 months before

17   they were sold to Soverain.

18             Divine itself had purchased these patents

19   from Open Market, that you did hear about, where the

20   inventors were.  And that was purchased in 2001.  Open

21   Market had employed these inventors, and they developed

22   a product called Transact that had the patents embodied

23   in them.

24             It's a software program that you can buy

25   and use it to run a website and do various things that

1    the patents describe.  And it had other features.  So

2    Transact contained all that's claimed by these patents.

3              But Open Market was not successful in the

4    business place.  They ended up selling their patents to

5    Divine.  Divine was not successful.  Although they

6    acquired the patents and the rights to Transact, they

7    lasted for about 15 months before they sold to Soverain.

8              Soverain has accused Newegg of

9    infringement based on the website.  And I'm going to

10   show you in the evidence in this case, with the help of

11   my colleagues and through witnesses, two independent

12   reasons why Soverain cannot succeed.

13             The first is the failure to comply with

14   the requirements for a valid patent.  And the second is

15   Newegg hasn't infringed these patents.  Two separate

16   reasons.

17             Let me talk about the patents being

18   invalid.

19             As you heard in the patent video and from

20   Judge Davis, the patent laws makes you a part of this

21   process.  The process to get a patent is a secret one.

22   There's nothing wrong with that; that's just the way

23   it's done.  And Soverain, and actually Open Market and

24   the inventors, participated back in 1994.  It wasn't

25   Soverain.  It was actually Open Market and the inventors

1  back in 1994.

2              Newegg did not have an opportunity to

3  contest or have input, nor did anyone else at that time

4  who might be accused of infringement.

5              It's your decision, with a full deck of

6  cards, to decide whether these patents are valid.  Judge

7  Davis showed you on the face of the patents, we know

8  what prior art was considered because the law says it

9  has to all be listed on the patent.  And there's quite a

10  list there; you'll see it later.

11             And to be a valid patent, the invention

12  has to be new, useful, and non-obvious.  And it can be

13  invalid if the prior art already describes the invention

14  or makes the invention obvious to a person of ordinary

15  skill.  Judge Davis has briefed you a little bit on

16  that.

17             The prior art here does describe these

18  inventions, and it makes the inventions obvious to a

19  person of ordinary skill.

20             And you have to look at the invention as

21  a whole.  You fit the pieces together like the pieces of

22  a puzzle.  And if the evidence shows that these

23  inventions were obvious, then these patents are invalid.

24             You ask yourself:  How could the PTO make

25  a mistake?  Well, as you heard in the patent video, the

1    process does occur in private.  There are many

2    applications filed every year.  There may be facts that

3    the Examiner didn't consider.

4                    And, simply said, mistakes are made.

5    People are not perfect, and important information can be

6    overlooked in this case.

7                    You're going to hear from the experts.

8    And you're going to hear with respect to this '314

9    patent and the '492 patent, they merely converted the

10   business process for dial-up online shopping to the

11   internet.  And the internet was already available to the

12   public by the time these patent applications were filed

13   in 1994.  That was even on Mr. Adamo's timeline.

14                    The shopping cart claims of the '314

15   claim a monopoly on the purchase of two or more products

16   using a computer.  This is merely the same method that

17   was used in the dial-up systems of CompuServe and

18   applying them to the internet.

19                    We're fortunate in this case that we have

20   a witness named Sandy Trevor, who happened to be the

21   chief technical officer of CompuServe prior to 1994.

22   And you're going to hear his testimony about the facts.

23                    And he will testify on the facts that

24   CompuServe had pre-internet services where you dial in

25   over a phone line using a personal computer.  And it had

1 the features that are now claimed in this case.

2           I want to tell you also that there are

3 three references that corroborate Mr. Trevor's testimony

4 that were not before the PTO.  And we know that because

5 the list before the PTO is on the patents themselves.

6 CompuServe CIM Running Start, 1993.  Using CompuServe,

7 1994.  How to get the most out of CompuServe, 4th

8 edition, 1989.

9           These books describe the characteristics

10 of the CompuServe Mall system that you'll hear the

11 experts explain, and you'll hear Mr. Sandy Trevor give

12 you the facts about.

13           We'll call Mr. Ed Tittel as a witness in

14 this case.  And one thing I want to say about

15 Mr. Tittel -- he's in the courtroom.  Would you stand

16 up, Mr. Tittel?  This is Mr. Tittel.

17           Mr. Tittel, unlike the other experts who

18 will testify in this case, is not a professional

19 witness.  This will be the first case in which he has

20 ever given testimony to a jury.  And you're going to

21 hear that in contrast to the other witnesses in this

22 case who are experts who have been in and out of

23 courtrooms all over the country many times, Mr. Tittel

24 is an author.  He's written over a hundred books on the

25 internet.  And, in fact, some of you are familiar with

1   the Dummies series.  And I'm holding in my hand HTML For

2   Dummies, which he is the author of.

3            He will testify that the internet emerged

4   as a preferable way to connect home shopping prior to

5   the time the inventors filed for their patents and did

6   their work in this case.  The CompuServe Mall was just

7   known internet tools that would enable a person skilled

8   in the art to apply that to the internet, the CompuServe

9   Mall features.  The CompuServe Mall features had a

10  shopping cart, shopping cart database, and a shopping

11  cart computer.

12           The '492 patent is called the hypertext

13  statement patent.  And I didn't want to overlook that.

14  You're going to hear testimony about that.  It provides

15  a link to display your order history, if you want to see

16  your order history.  And we don't know how many

17  customers use it, but it appears to be only a few.

18           The use of these hypertech -- hypertext

19  links, you're going to hear, is just simply common

20  industry knowledge.  And it's the use of hypertext links

21  for the very purpose for which they were originally

22  designed.

23           The '639 patent, its the session ID

24  patent.  That, too, sets forth methods that involve

25  conventional web technology, and they're invalid.

1          In short, and you're going to hear

2   details on this, Open Market did not invent commerce by

3   computer over the internet; they didn't.  What Open

4   Market patented was not new, it was not novel, and it

5   was obvious.

6          Now, the other reason we're not here is

7   Newegg does not infringe.  Remember I told you it's a

8   separate defense.  They don't infringe.

9          A patent is a bargain between the

10  government on the one hand and the party that applies

11  for the patent on the other hand, and it provides the

12  limits of what is covered.  Just because you have a

13  patent doesn't mean that you get to cover everything.

14  Patents are strictly limited.

15          Those claims that Judge Davis told you

16  about define what the patent covers.  His instruction

17  was:  A patent claim is directly infringed only if the

18  accused system or method includes each and every element

19  in that patent claim.

20          Now, there are other ways to infringe

21  besides direct infringement, that's true.  But whatever

22  method of infringement is alleged, each and every

23  element must be included in some way.  Nine out of ten

24  is not enough.  It takes ten out of ten if there are ten

25  elements in a claim in order to have infringement.

1                Now, the '314 patent, I'm going to tell

2    you briefly why it's not infringed.

3                The '314 is not infringed because the

4    patent requires a database on the server side.  The

5    server in this case would be Newegg, and the customer

6    side is the customer using their own computer at home.

7                The product selections under the Newegg

8    system are not stored on the server side -- on the

9    Newegg side.  They are stored, by design, in a cookie --

10   and you're going to hear that described to you, what

11   that is.  It's a flat file on your personal computer.

12   So the selection of products is actually stored on the

13   customer side.

14               Also, the claims of the '314 require a

15   modification of a shopping cart database as products are

16   added.  That doesn't occur in the Newegg case.

17               And all three patents in this case

18   require participation by the customer for part of the

19   elements and by Newegg for other parts of the

20   elements -- of the elements that are included.  And,

21   actually, for infringement, one party has to meet all of

22   the elements.  Here the customer doesn't and Newegg

23   doesn't.

24               Now, I'm going to turn to damages.  And

25   you might -- let me say first before I talk about

1  damages, you heard Judge Davis instruct you that because

2  he was instructing you on damages didn't mean that there

3  were or were not any damages.  The law says that you get

4  instructions about how to consider damages.

5              As a lawyer, I told you in jury

6  selection, I have a duty and an obligation to address

7  the issue of damages.

8              Let me be clear.  These patents are not

9  infringed; and if they're not infringed, no damages are

10  due.  These patents are invalid; and if you find them

11  invalid, no damages are due.  But I'm duty-bound as a

12  lawyer to address the issue of damages, so I do so now.

13  Soverain's claim for damages in this case are grossly

14  overinflated.

15              THE COURT:  You have 10 minutes left.

16              MR. SAYLES:  It was mentioned by

17  Mr. Adamo that in the last year that Soverain -- excuse

18  me, that Newegg had $2 billion in sales.  Dropped a big

19  number on you.

20              When you hear the evidence, you're going

21  to find out that's gross numbers.  That's

22  number-dropping is what that is.  Ninety percent of the

23  cost -- of the revenues is the cost of goods, before you

24  even get into an analysis of your overhead and your

25  depreciation, which we are going to address in the

1  evidence.

2            So the damages are determined under the

3  law by a hypothetical negotiation.  And I know that's an

4  odd and strange thing for you to hear, but you'll have

5  instructions about that.

6            And the hypothetical negotiation, it's

7  where you have to reconstruct from the evidence what you

8  think the parties would have done if they sat down at

9  the table in 2001, the time of the first alleged

10  infringement.

11            Now, let me remind you about what was

12  going on in 2001.  In 2001 Newegg was an upstart.  They

13  were struggling.  They had a plan and they had hopes.

14  By hindsight we know they were successful; but in 2001,

15  it was a dream and a hope.  That's what Newegg would

16  have sit down at the table with.

17            And on the Open Market side, Open Market

18  had lost about $220 million in their business, and they

19  were going downhill.  And within eight or nine months of

20  the hypothetical negotiation that you are to consider,

21  they sold their patents and their rights to Transact

22  over to Divine.

23            One thing I want you to think about is

24  the real-world evidence.  And I'm talking about what

25  existed in the real world.

1          In this case, the real-world evidence

2   will show that Newegg and Open Market are not

3   competitors.  The royalties here should not be based on

4   some percentage of Newegg's total sale of products -- of

5   products that are not patented.  These patents address

6   very narrow aspects of the sales process.  And the total

7   online revenues from the sale of TVs and computers and

8   the contribution of good customer service and just plain

9   running a good company shouldn't yield damages to

10  Soverain.

11          Let me discuss now the hypothetical

12  negotiation.  As I mentioned, it would be in January of

13  2001.  The Transact software product, now mentioned to

14  you two or three times, which incorporates these

15  patents, was sold by Open Market, and it began selling

16  Transact in 1996.

17          As I said, Open Market, in the business

18  world, actually lost $220 million in business between

19  1996 and 2001, even though they had Transact, which they

20  say incorporated the best features of online retailing

21  since sliced bread.  That's what happened in the real

22  world.  Even with Transact, it was not the patented

23  features that drove demand for that product.

24          Remember the name Mr. Ghosh that was

25  mentioned?  He was the chairman of the board of Open

1    Market.  You're going to hear his deposition where he

2    said that it was not even the patented features that

3    drove the sales they did make of Transact.

4                    In this case a running royalty wouldn't

5    be fair.  A lump sum is how royalties were actually paid

6    in the real world.  What I'm showing you here is a brief

7    slide that shows the real-world patent licenses that

8    were entered into by Divine around and shortly after the

9    time of the hypothetical negotiation.

10                    And the highest one is on the left, and

11   it's for a hundred thousand dollars.  That's the highest

12   one.  There are some in here for a thousand.  There's

13   even one for $400.  And these are real-world patent

14   licenses here, patent licenses.

15                    And the one that's a hundred thousand

16   dollars was to a -- you will see the license

17   agreement -- was to a Johnson & Johnson Vision Care,

18   well-known company.  Many of these other companies you

19   probably will not have heard of, but Johnson & Johnson

20   Vision Care you would have.

21                    And the Transact product.  You're going

22   to consider the licenses with regard to Transact.

23   Transact has not been licensed to a single new customer

24   since the Open Market days.  Ms. Wolanyk will admit

25   that.  And the licenses for Transact are paid in lump

1  sums.  Then what's paid after that is maintenance fees.

2  And the lump sums range up to $344 thousand at the most.

3  That's going to be the evidence.

4           And then here Mr. Nawrocki, the

5  Plaintiff's damage expert, projects damages for just two

6  years at almost $34 million, 340 times the highest

7  patent license that was entered into by Divine.

8           THE COURT:  You have five minutes left.

9           MR. SAYLES:  All right.

10           With regard to these damages, real-world,

11  prior royalties on these patents back close to the time

12  of the hypothetical negotiation and after, when Divine

13  was trying to license the patents, were small.

14           These licenses were non-exclusive.

15  That's a factor.  The parties here are not competitors.

16  Transact itself was not a profitable or commercial

17  success.  Two companies that actually had the rights and

18  owned it, sold it and didn't succeed.

19           The patents in this case don't drive the

20  demand for the Newegg products.  And so the Plaintiff,

21  who's claiming about 40 percent of Newegg's total

22  profits, when you do the math on it, about 40 percent,

23  their patented features, even if you assume they're

24  there, don't drive the demand for the sales of the

25  Newegg products.

1              So we ask that you keep an open mind,

2    because I know you are now.  We ask that you consider

3    the evidence as it comes to you throughout the case.

4    And in the end, in the end, you are going to find that

5    these patents were not infringed, that they are invalid;

6    and you will find that these damages, if you even

7    consider them at all, are grossly overstated.

8              Thank you.

9              THE COURT:  All right.  Thank you,

10   Mr. Sayles.

11             All right, Ladies and Gentlemen of the

12   Jury, that concludes the opening statements.  In a few

13   moments we're going to go ahead -- I am going to let you

14   have an early lunch break today.  And then we will come

15   back and start the evidence after lunch.

16             Before we do, though, I have a couple of

17   housekeeping matters I'd like to take care of.  Is

18   either side going to invoke the rule in this case?

19             MR. ADAMO:  I believe that was the

20   assumption, Your Honor.  Although I think it's probably

21   not going to result in too many people being excluded.

22             MR. SAYLES:  We invoke the Rule.

23             THE COURT:  Ladies and Gentlemen of the

24   Jury, the Rule has been invoked, and I will explain that

25   in a moment.

1                Do you have all of your witnesses that

2    are here today, are they all in the courtroom?

3                MR. ADAMO:  Ours are, yes, Your Honor.  I

4    was just looking for witness Treese.  Yes, they are.

5                THE COURT:  And are all of your witnesses

6    that are --

7                MR. SAYLES:  Mr. Trevor is not here.  I

8    don't know if Mr. Bakewell has arrived.  But two of them

9    are.

10               THE COURT:  The first thing I'm going to

11   do is I'm going to swear in all of the witnesses that

12   are here today so we can just do it once rather than

13   each time a witness comes to testify.

14               So at this time, if you're going to be a

15   witness in this case, I'd like for you to please stand.

16               All right.  Starting up here, if you will

17   state your name for the record, please.

18               MS. WOLANYK:  Katharine Wolanyk.

19               MR. CHENG:  Lee Cheng.

20               MR. GRIMES:  Jack Grimes.

21               MR. SHAMOS:  Michael Shamos.

22               MR. TREESE:  George Winfield Treese.

23               MR. NAWROCKI:  James Nawrocki.

24               MR. TITTEL:  Edward Tittel.

25               MR. WU:  James Wu.

 1                    THE COURT:  All right.  Please raise your

 2  right hands to be sworn.

 3                    (Witnesses sworn.)

 4                    THE COURT:  All right.  Please be seated.

 5                    All right.  Now, Ladies and Gentlemen of

 6  the Jury, the Rule has been invoked.  And what that

 7  means is that if you're a witness in this case and

 8  you're not a party representative and you're not an

 9  expert witness, then you cannot be present in the

10  courtroom while other witnesses are testifying.

11                    So, are there any witnesses that are not

12  expert witnesses or party representatives that are in

13  the courtroom?

14                    All right.  Please stand, sir.

15                    Anyone else?  All right.  And your name?

16                    MR. TREESE:  George Treese.

17                    THE COURT:  George Treese?  And --

18                    MR. WU:  James Wu.

19                    THE COURT:  All right.  Very well.

20  Both of you, since you're not expert witnesses, you are

21  covered by the Rule.  The Rule means simply that you may

22  not discuss this case, or anything about it, with anyone

23  else other than the attorneys who are involved in the

24  case.

25                    So during the course of the trial, you're

1   going to have to remain out of the courtroom until you

2   testify.  And while you're out of the courtroom, you're

3   not to discuss the case among yourselves or with any of

4   the other witnesses in the case.  The only persons you

5   can talk with are the attorneys involved in the case.

6   Do you understand those instructions?

7                  MR. TREESE:  Yes, Your Honor.

8                  MR. WU:  Yes, Your Honor.

9                  THE COURT:  Okay.  So when we come back

10  from lunch and we're about to start the testimony, you

11  two will remain outside the courtroom.  The other

12  witnesses that are experts can be in the courtroom.

13                 You may be seated at this time.

14                 All right.  Now, with regard to exhibits,

15  Ladies and Gentlemen of the Jury, what I normally do is,

16  at the beginning of each day I have the attorneys offer

17  a list of the exhibits that they're going to use that

18  day that the other side has no objection to.

19                 And, Counsel, we'll mark those as

20  Plaintiff's Exhibit List A, or 1, or however you choose

21  to do it.

22                 And I will ask each side if there is any

23  objections.  I will admit those, and we will have a

24  clear record.

25                 The next morning you will give an updated

98

1  list to Ms. Ferguson and reoffer Plaintiff or

2  Defendant's Exhibit List No. 2 that will include any

3  exhibits that were handled individually during the

4  course of the preceding day plus any that have been

5  agreed to for that day.

6           So at the end of the trial we have a list

7  of everything that's been admitted into evidence.

8  Understood?

9           MR. SAYLES:  I think so, Your Honor.  We

10 have worked together, and we were prepared to offer en

11 masse almost all of the exhibits for Plaintiff and

12 Defendant.

13          THE COURT:  Good.  All right.  Very well.

14          First, Plaintiff, do you have an exhibit

15 list that you would like to -- Plaintiff's Exhibit List

16 No. 1 that you would like to offer?

17          MR. ADAMO:  Yes, Your Honor.  I have a

18 short version that just lists -- is entitled Plaintiff's

19 Soverain's List of Exhibits, to which Defendant Newegg

20 has not objected.  And then I have a more detailed

21 explication that shows what each of the exhibits are.

22          But in this form, it's simply the actual

23 exhibit numbers, as I think Your Honor can see.

24          THE COURT:  Very well.  We will mark that

25 as Plaintiff's Exhibit List Number -- do you have a

1   number on it already?

2                    MR. ADAMO:  I do not, Your Honor.

3                    COURTROOM DEPUTY:  I got one, Judge.

4                    THE COURT:  What are you using?

5                    COURTROOM DEPUTY:  1.

6                    THE COURT:  That will be Plaintiff's

7   Exhibit List No. 1.  A will be just the list of numbers;

8   B will be the list of the descriptions.  So you will

9   have Plaintiff's Exhibit List No. 1A and 1B.

10                   Any objection to Plaintiff's Exhibit List

11  No. 1?

12                   MR. SAYLES:  No Your Honor.

13                   THE COURT:  All right.  Be admitted.

14                   All right.  Does Defendant have any

15  exhibits it wishes to offer?

16                   MR. SAYLES:  Yes, Your Honor.  May I

17  approach and get it marked?

18                   THE COURT:  Yes, you may.

19                   MR. ADAMO:  Your Honor, we also have a

20  joint stipulation that I will present to the Court when

21  Mr. Sayles is finished that also relates to the

22  situation with the exhibits that we've agreed.

23                   THE COURT:  All right.

24                   MR. SAYLES:  At this time the Defendant

25  offers Exhibit List No. 1, which does describe the

1  exhibit numbers and the description of the documents in

2  the document itself.

3            THE COURT:  All right.  Any objection to

4  the exhibits listed in Defendant's Exhibit List No. 1?

5            MR. ADAMO:  No, Your Honor.

6            THE COURT:  All right.  All of those

7  exhibits contained in Exhibit List -- Defendant's

8  Exhibit List No. 1 are admitted.

9            So, Ladies and Gentlemen, we now have all

10 the exhibits admitted into evidence, which are quite a

11 few.

12           With those housekeeping -- do you have

13 another housekeeping matter?

14           MR. ADAMO:  Just one more, Your Honor.

15           There's a stipulation that Mr. Sayles and

16 I entered into that really is belt and suspenders, make

17 sure there's no waiver of any appeal issues, that all

18 issues are preserved.  And simply because we agreed to

19 the admission here, it doesn't waive appeal rights.

20 So, it's --

21           THE COURT:  I'll take that up with you

22 later.

23           MR. ADAMO:  That's all then, Your Honor.

24           THE COURT:  All right.  That concludes

25 our housekeeping matters.

1               I'm going to give you, really -- well, we

2     will be in recess -- it's 11:35.  I will give you an

3     hour and 10 minutes today to give you a little chance to

4     find your way around town.

5               There's a Subway right down the street.

6     You go out the courthouse, make a left and a right,

7     there's a Subway there.  A number of restaurants on that

8     side of the Square, if you're not familiar with it.

9     There's a Mexican food restaurant.  There's several

10    other restaurants.  There's a hamburger place on this

11    side of the Square.

12              So please plan to be back in the jury

13    room and ready to go at 12:45 today when you come back

14    from lunch.

15              Please remember my instructions.  Don't

16    discuss the case among yourselves or with anyone else.

17    Enjoy your lunch.  Have a nice break.  We will see you

18    back here at 12:45.

19              The jury is excused to the jury room at

20    this time.

21              COURT SECURITY OFFICER:  All rise for the

22    jury.

23              MR. ADAMO:  It's two of the same thing,

24    Your Honor.  They're identical.

25                   (Jury out)

```
 1              THE COURT:  All right.  Please be seated.
 2              All right.  Now, what is this stipulation
 3  referred to, Soverain withdraws its objections to
 4  admissibility of Newegg's Exhibits 2 through 8 and 488
 5  through 506, but without waiving or prejudice to your
 6  right to challenge on appeal the admissibility or usage
 7  of these exhibits?
 8              MR. ADAMO:  Mr. Sayles and I were trying
 9  to be as efficient with the Court's time and the jury's
10  time.
11              THE COURT:  What are your objections?
12              Have I had a chance to rule on these
13  objections?
14              MR. ADAMO:  Yes.  Yes.  Either it's
15  something that's open or -- and we just didn't want to
16  worry about the ruling or --
17              THE COURT:  I see.
18              MR. ADAMO:  They were milled -- what most
19  of them were actually --
20              THE COURT:  Okay.  I just want to be sure
21  I have a chance to rule --
22              MR. ADAMO:  You did.
23              THE COURT:  Just a minute.  Let me
24  finish, Mr. Adamo.  I want to be sure I have a chance to
25  rule on the objections.
```

1          So as I understand this stipulation, it's

2   not that I've already ruled on any of this, it's that

3   you're going to make exhibits -- objections to these

4   during the time of trial, and you're not waiving it by

5   having them on this list?

6          MR. ADAMO:  No.  In many instances, there

7   are situations where you have ruled in the motions in

8   limine --

9          THE COURT:  Well, motions in limine are

10  not rulings on admissibility, and every side has the

11  right to tender or to object on a ruling on a motion in

12  limine.

13          MR. ADAMO:  And to avoid wasting a lot of

14  time, we have entered into that stipulation.  So the

15  point being, I won't argue, if we go to appeal here,

16  that there wasn't a sufficient -- that error wasn't

17  preserved on the basis of not getting up and asking you

18  again to rule on the MILs.  In other words, I will stand

19  on what 103(a)2 says.

20          That was the intention of it, Your Honor.

21  We weren't -- we weren't trying to slide anything by the

22  Court.  We were just trying to make this go a little

23  easier.

24          THE COURT:  All right.  Well, I'm not

25  going to accept the stipulation at this time.  If you

1  want to object to something during the course -- if you

2  have not waived an objection -- I will accept the

3  stipulation in this sense:  You have not waived an

4  objection that you may have to these exhibits.  In other

5  words, they're sort of provisionally admitted based on

6  the earlier ruling.

7              But to preserve your objection, I want to

8  hear your objection during the course of trial so I can

9  understand it within the context.  Because I will quite

10  often change my mind on something I may have ruled on in

11  a motion in limine.  That's not a ruling on

12  admissibility.

13              MR. ADAMO:  Let Mr. Sayles and I visit, I

14  think, Your Honor.

15              THE COURT:  Okay.  You withdraw your

16  stipulation at this time?

17              MR. ADAMO:  No.  I prefer to have you

18  hang onto it in view of what you just said.  Now that we

19  have a little guidance from the Court, let us visit

20  again.  As I said, we were trying to do something to

21  save everybody time.

22              THE COURT:  I appreciate that.  That's

23  fine.  But I just don't want to sign something or accept

24  some kind of blanket, you know, that you've already --

25  Judge, you've already ruled on this, when I don't even

 1  know what these exhibits are.

 2              MR. ADAMO:  With that further guidance,

 3  let us further visit.

 4              THE COURT:  We will be in recess then --

 5  excuse me.  Go ahead.

 6              MR. ADAMO:  Thirty seconds more?

 7              THE COURT:  Okay.  All right.

 8              MR. ADAMO:  We didn't mean to get on your

 9  bad side this morning by starting the day off and

10  hitting you with papers.  We really weren't trying to.

11              How would you like us -- because these

12  things are going to come up, and there are still some

13  evidentiary issues.  We worked most of them out between

14  us, but there are a couple still out there.

15              How would you like us to say it to you:

16  We have an issue; we will get the responding brief so

17  you won't get hit with it cold.  What would be the

18  preferred time for you to rule on things like that, or

19  to consider them?

20              THE COURT:  First of all, bring them up

21  to me as soon as you know that it's going to be coming

22  up in the testimony, as early as possible.  Like if you

23  have an issue that's going to come up with your first

24  witness today, advise my clerks that this issue is going

25  to come up, you would like a few minutes of time before

1  the jury comes in.

2              If you have any of those today, I will

3  start back at 12:30 -- 12:35, and we will have 10

4  minutes to deal with them.

5              If you have any written briefs, I

6  don't -- one thing I do not want to be happening is, I

7  don't want every night, y'all having 18 young lawyers

8  cranking out 30-page briefs, filing them at 2:00 in the

9  morning electronically, that I don't ever have a chance

10  to look at.

11              So ask -- if you want to file a brief

12  electronically, ask for permission to do so, so that

13  I'll know it's coming, the other side will know it's

14  coming.  Because if one side files it a 2:00 in the

15  morning, the other side doesn't have a chance to

16  respond, and we get into that.

17              MR. ADAMO:  Understood, Your Honor.  I

18  don't think Mr. Sayles and I work that way, so I'm not

19  terribly concerned about it.

20              THE COURT:  And any briefing you want to

21  provide a copy of a case highlighted or a short brief,

22  just get it to us in advance of the hearing where I have

23  a chance to read it, where I don't have to sit up here

24  and read it while the jury's waiting and you're waiting

25  to argue it.  Okay?

1          MR. ADAMO:  Understood.  We do.  We

2  mentioned Dr. Grimes.  We've got an issue percolating

3  with Dr. Grimes, but we've worked out a way so it

4  doesn't require you to rule on it.  We can get his

5  testimony in, and it's simply going to be whether

6  certain exhibits are going to be demonstrative or going

7  to come all the way into evidence under 1006.

8          I shared with Mr. Sayles a brief

9  yesterday when we met, and he has our views on that.

10  He's going to put something together in response.  We'll

11  then get that to you.  But we can go forward and do all

12  of Dr. Grimes without having to wait for Your Honor to

13  rule.

14          THE COURT:  Very good.

15          Anything further, Mr. Sayles?

16          MR. SAYLES:  No, sir.

17          THE COURT:  Very well.  We'll see you

18  back at 12:45.  We'll be in recess.

19          MR. ADAMO:  Thank you, Your Honor.

20          (Lunch recess.)

21

22

23

24

25

108

1                    C E R T I F I C A T I O N

2

3              I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    /s/

8    SHEA SLOAN, CSR

9    OFFICIAL COURT REPORTER

10   STATE OF TEXAS NO. 3081

11

12

13   /s/

14   JUDITH WERLINGER, CSR

15   DEPUTY OFFICIAL COURT REPORTER

16   STATE OF TEXAS NO. 267

17

18

19

20

21

22

23

24

25