IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

SOVERAIN SOFTWARE ) DOCKET NO. 6:07cv511

-vs- ) Tyler, Texas

) 12:50 p.m.

NEWEGG, INC. ) April 26, 2010

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. KENNETH R. ADAMO
JONES DAY
2727 N. Harwood St.
Dallas, Texas 75201-1515

MR. THOMAS L. GIANNETTI
MR. BARRY R. SATINE
MS. CLARK R. CRADDOCK
JONES DAY
222 East 41st St.
New York, New York 10017-6702

MR. CARL ROTH
ROTH LAW FIRM
115 N. Wellington, Ste. 200
P.O. Box 876
Marshall, Texas 75670

MR. MICHAEL C. SMITH
SIEBMAN, REYNOLDS, BURG, PHILLIPS & SMITH
713 S. Washington Ave.
Marshall, Texas 75670

COURT REPORTER: MS. JUDITH WERLINGER

Proceedings taken by Machine Stenotype; transcript was produced by a Computer.

FOR THE THE DEFENDANTS: MR. RICHARD SAYLES
MR. MARK STRACHAN
SAYLES WERBNER
4400 Renaissance
1201 Elm St.
Dallas, Texas 75270

MR. HERBERT A. YARBROUGH, III
YARBROUGH LAW FIRM
100 E. Ferguson, Ste. 1015
Tyler, Texas 75702

MR. DAVID C. HANSON
MR. KENT BALDAUF, JR.
MR. DANIEL H. BREAN
THE WEBB LAW FIRM
200 Koppers Bldg.
436 Seventh Ave.
Pittsburgh, PA 15219

MS. CLAUDIA W. FROST
MR. JEREMY J. GASTON
PILLSBURY WINTHROP
909 Fannin St., Ste 2000
Houston, Texas 77010

P R O C E E D I N G S

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated.

All right. Mr. Adamo, you may begin.

MR. ADAMO: Thank you.

Your Honor, Soverain Software calls as its first witness Dr. Jack Grimes.

THE COURT: All right.

MR. ADAMO: Your Honor had swore Mr. Grimes earlier, and I hope I wasn't being presumptuous; but in the interest of saving some time, I had asked him to come up and be seated in the witness box.

THE COURT: That's an excellent idea. I appreciate you doing that.

MR. ADAMO: All right. May we proceed, Your Honor?

THE COURT: Yes, you may.

MR. ADAMO: Ladies and Gentlemen, Dr. Grimes; Dr. Grimes, Members of the Jury.

MR. GRIMES: Good afternoon.

JACK GRIMES, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ADAMO:

Q Where do you live?

A I live in Sparks, Nevada.

Q And what have you been asked to testify about today as you understand it, Dr. Grimes?

A I'm giving some material -- I've prepared a tutorial and some background information, but the main purpose is to -- is to present a comparison of the claims of the three patents-in-suit and the way the Newegg system works.

Q Do you feel you're qualified to give an opinion to the jury in this case, Dr. Grimes?

A Yes, I do.

Q Why?

A Well, I have had quite a bit of industry experience, working in the industry, regarding payments.

MR. ADAMO: Ms. Ferguson, is the microphone on, or Dr. Grimes just needs to get a little closer?

All right. Doctor, if you can lean in a bit.

THE WITNESS: Okay.

MR. ADAMO: And, Ms. Ferguson, can we ask for the lights, please, ma'am?

Thank you very much.

Q (By Mr. Adamo) Dr. Grimes, I'm going to put up

on the display system, but you should have a copy of it in your binder there as well, a copy of a document that is in evidence, Exhibit 7.

Do you recognize that?

A Yes, I do. This is my resume, or sometimes we call it a CV for curriculum vitae.

Q Is it pretty much up to date?

A Yes, it is. The date on this is last year, and it's substantially the same as it was then.

Q If you would, could you summarize your educational background for us, please.

A Yes. I received three degrees in electrical engineering; a BS, an MS, and a Ph.D., from Iowa State University. And when I got my Ph.D., my minor was in computer science.

Q Any other education, formal education, Doctor?

A Yes. About 10 years later, I received a second master's degree in experimental psychology that dealt with design of computer and user interfaces.

Q What is your recent work focused on?

A The -- well, in terms of work experience?

Q Well, what -- let's just say since the mid-1990s, what have you -- what have you been working on?

A Oh. I was -- I've been involved in working in

the industry for, you know, 30-some years. And in the mid-1990s, I worked for two payments companies, a small company called IC Verify and a -- one of the most well-known companies in the world, Visa International, Visa, the credit card company.

Q All right. Let's jump by IC Verify then and talk about Visa International. What position did you hold with Visa?

A When I was with Visa, I was a senior vice president, and I was responsible for several areas, including architecture of the back-office systems, as well as the Smart Card Program.

And I had a development group developing software for Smart Cards and had a small group dealing with internet transactions for internet commerce. It was called Secure Electronic Transactions. It was a very high-security payments system designed for use on open networks, such as the internet.

Q Did you leave Visa and then go the work for a company called ServiceHub, Doctor?

A Yes, I did. ServiceHub was a startup, and their -- they had a combination of a web system, and they used web browsers, which at the time were very new and were on the cell phones.

So it was a communication between the

service -- the web service on the internet and the browser on the cell phone. The company dealt with dispatching, like courier services.

Q And what position did you hold there?

A I was the chief technical officer at ServiceHub.

Q All right. Currently, what do you do for a living?

A Well, currently, I'm semi-retired, so I'm -- I do some litigation consulting support, which is why I'm here today, and I also am on the board of a startup company, and I do some other minor consulting.

And then I do the things -- semi, I do the things retired people do. I play racquet ball in the mornings and go hunting in the hills of northern Nevada and so on.

Q Would you care to adopt me, Doctor?

MR. ADAMO: All right. Sorry, Your Honor.

Q (By Mr. Adamo) What types of -- you said you did legal consulting services. Tell the Ladies and Gentlemen of the Jury, if you would, what type of services that involves.

A That involves -- I have an office at home, and that involves primarily doing analysis work. I do lots

of reading of documents that are produced in patent litigation, such as this one; and then I form opinions about, much like this case, do the claims of the patent -- given the Court's construction for what the terms mean in the claims, does that match up or does it not match up with the -- with the way that the accused systems operate.

Q Before you started your work on this lawsuit, did you ever consult on projects involving internet commerce or what I was calling earlier online shopping?

A The primary work I did prior to this case was when I was at Visa, and we dealt with the transaction, the payment portion, of internet -- internet commerce systems.

Q Have you made presentations at scientific meetings during your career relating to internet commerce?

A Yes, I have. When I was with Visa, I made presentations internationally, but the one I remember most was a particular meeting in Southern California where I talked about the electronic transaction effort that Visa was doing.

The project at Visa was a joint effort between Visa, MasterCard, Microsoft, and Netscape.

Q Professional societies or organizations,

Dr. Grimes, what involvement with those types of groups have you had, briefly?

A For decades now, I've been a member of the IEEE, which is Institute of Electrical and Electronics Engineers, which is primarily a professional association of primarily hardware people, really electrical engineers.

And I also belong to ACM, which is sort of the software counterpart, if you will. And both organizations deal with all aspects of computers, but the ACM is primarily concerned with programming computers and computer software issues.

Q Does your previous experience, in your view, relate to the issues that we've asked you to testify about in this case?

A Yes, it does.

Q In what fashion?

A Well, I've dealt with the -- with the issues about internet commerce, in particular, how the payments are done.

And Visa, for example, is the -- is just paranoid about security. They -- they're very concerned with the security of transactions, because they're owned by banks. Banks are very conservative organizations.

And so I became -- very, very heightened

awareness of the issues associated with doing proper transactions and making sure that the transactions were handled in a secure manner so that someone eavesdropping on the communication would not be able to intercept any of the information.

Q Have you ever testified as an expert in a lawsuit before as you're doing right now?

A Yes, I have. I've been involved in testifying in two previous jury trials and at four ITC hearings, which are what you guys refer to as trials, but they're -- they have all the characteristics of a trial. There's just no jury involved.

So those six locations, there was testimony much like I'm giving here today in terms of the format.

Q I think earlier counsel for Newegg characterized you as a professional expert. Do you typically get paid to testify, Doctor?

A No, I do not get paid to testify. I'm paid for my time, basically. It's a -- I work by the hour essentially. And I provide my opinions about the results of my analysis, and I get paid for the time I spend doing that analysis, basically, and here today describing the results of them.

Q Are you getting paid to appear today in this case?

A Only in terms of the -- my hourly -- hourly pay.

Q Does your -- as you understand things, does your compensation depend on what conclusions you reach or whether Soverain wins this case?

A No, it does not. Does not depend on that at all.

Q All right. Let me the turn your -- thank you, Doctor. Let me turn your attention now to the specifics of the subjects that we're involved with here today. I understand you've prepared a slide as part of your PowerPoint presentation where you're going to describe what you're here to testify about.

Am I recalling that correctly?

A Yes.

MR. ADAMO: Would you bring that slide up on the system.

Q (By Mr. Adamo) And then explain to the Ladies and Gentlemen of the Jury what topics you're going to cover in your testimony.

A I have these four topic areas. First of all, I'll try and supplement some of the tutorial information that you've already heard from Judge Davis. And I have one slide, which is a brief background of the Newegg system.

Then I thought it would be helpful to go through a purchase example. I made several purchases on the Newegg website, and this is one of them that I took great detailed records of, and I want to give you some -- I won't go through all the slides of that, but I want to give you a sample of what it's like, in case you haven't yet purchased things from Newegg.

But the bulk of my material for today is in Section 4. In other words, the main reason for me being here really is to give you the results of my analysis where I took the claims, the Court's definition of what the terms mean, the description we got from Newegg about how their system works, and I made a comparison to see if they matched.

And I'm here to present the results of that. That's probably -- oh, probably three-quarters of the time that I'll be presenting today will be just on Topic No. 4.

Q In your -- in your book --

MR. ADAMO: And I'm going to ask to have this put up on the presentation system.

Q (By Mr. Adamo) Do you have a copy of Exhibit 2, which should be a copy of the '314 patent?

A Yes, I do.

Q All right. Is Exhibit 2, in fact, a copy of

the '314 patent?

A Yes, it is. This is the -- Exhibit 2 is the '492 patent.

Q Oh, I'm sorry. All right. '492. Look at Exhibit 1 then. Hopefully, that's -- there. That's the '314 patent.

A Yes. Exhibit 2 is the '314 patent.

Q All right. I think we're talking sideways here. Let me -- I've confused things.

Exhibit 1 is the '314 patent, Doctor?

A Yes, that is correct.

Q And Exhibit 2 is the '492 patent?

A Yes, that is correct.

Q All right. Now, were you in the courtroom earlier where there was some discussion about reexaminations for both of these patents?

A Yes, I was.

Q All right. Would you look at -- well, let's try Exhibit 4 first and see if that's one of the two reexamination certificates.

A Yes. Exhibit 4 is the reexamination certificate for the '314 patent.

Q Do you have an understanding of what a reexamination is?

A Yes. Well, as was described earlier,

basically, the Patent Office took a second look at the validity of the '314 patent. And this is the results of their effort, which is that the claims of the '314 patent were -- were, again, confirmed as being valid.

And in addition, there were other claims that were also allowed.

Q All right. Would you look in your binder at Exhibit 5, which, hopefully, is the reexamination certificate for the '492 patent; is that correct?

A Yes. The story is the same here. This is -- again, there were questions about the validity of the '492 patent, and the Patent Office issued this certificate which confirmed the earlier claims of the '492 patent and then also granted some additional claims.

Q All right. And would you look in your binder and tell me which exhibit the '639 patent is, if you don't mind, Dr. Grimes? I know it seems to be a little less than clear.

A Yes. That is Exhibit 3.

Q 3. All right.

And you've also studied the '639 patent, correct?

A Yes, the patent.

Q Is there a reexamination certificate for the

'639 patent?

A No, there's not. The '639 was issued very recently, in 2007, and so there have been no requests that I know of before the Patent Office to re-examine the '639.

Q In the '639 patent, are there pages where the art that was looked at by the Patent Examiner appear?

A Yes. There's a few on the cover page or the first page, but the second page is -- and the third page and the fourth page are completely devoted to -- five, six, seven pages are completely devoted to other patents and publications that were considered before the granting of the '639 patent.

Q Can you generally describe for us, in your view, what the subject matter of the inventions of the three Soverain patents is?

A Yes. The '314 and the '492 patent deal with the -- a network-based sales system. The sales system includes both the ability to purchase products and pay for them -- select them and pay for them, as well as the ability to find out about history of the products that you've purchased in the past.

Q And what does the '639 patent deal with, to your understanding, Dr. Grimes?

A The '639 patent is called the session ID

patent, and it deals essentially with underlying mechanisms that allow the communication to occur in an effective manner between the client computer, which is the -- let's say in your home -- home family room, and the server computer, which is located in -- someplace in cyberspace.

Q I used the term session during my opening statement for the jury. Does the '639 patent have anything to do with session management?

A Yes. The -- as was described earlier, there was a basic problem in the way that the internet operated if you wanted to try and do something like a sales system.

If all you wanted to do was to retrieve documents, then the internet worked just great. And that was the primary use of it for a long time.

And then when they wanted to build an internet sales system, then they ran into this characteristic of the internet that -- that it didn't really keep track of where the previous request came from.

So when it got a second request, it didn't realize it was from the same -- the same computer system.

Q Thank you, Doctor.

I'd like now for you to focus on what you said

you were going to help us all out with, the tutorial on the subject matter that the patents deal with.

Why don't you start, if you would, by explaining in non-Ph.D. terms, if you can, what the internet is.

A Certainly.

The internet is a network that just interconnects computers and other networks. So it's -- it's -- that's why it's the internet rather than just network. The internet accomplishes both things.

Here's a structural diagram that describes the kinds of connections that can occur. There are clients, which represent computers that you or I may use that are either in our office or at home.

And the internet is the -- you know, the wiring in our house that connects us to this cloud diagram here called the internet. The internet basically connects all computers together, okay, and allows communication to occur among any -- any of them, between any client and any server.

The servers here represent resources on the network. For example, the first -- the one on the left here could represent -- I don't know -- the Weather Channel and weather.com.

And you might go there to find out if we're

really going to have a thunderstorm this afternoon or not. It might show the radar, for example, for the Weather Channel.

The other application server next to it has another server attached to it, database server. This might represent, for example, the Patent & Trademark Office. It turns out, if you go to uspto.gov, the Patent Office website, and put in a patent number, you can actually obtain a patent.

So there have been millions and millions of patents granted, and so those are all stored in this database, which is attached to a database server.

So that's an example of a pretty powerful application server.

Q Just so I'm clear on this and I've confirmed this for the Ladies and Gentlemen of the Jury, a client, as you're showing on your slide right at the moment, is a computer?

A Yes. These are actually all computers. The client is a computer which is -- has software on it that allows it to send requests to --

Q Is the internet open to the public?

A Yes. The internet is, in fact, a public resource. You can obtain free access to the internet by going to certain places. Like, you know, the downtown

of some cities have free internet access. Some restaurants have it.

Or if you want your service at home, you can even pay for a higher speed service and have it -- have it at your home.

But the internet per se, the internet itself, is, in fact, free.

Q The worldwide web, would you tell us what you understand that to be?

A Well, the worldwide web is often used synonymously with the internet, just because the web is such a popular use of the internet.

But the worldwide web is technically an application that uses the internet. Sometimes people refer to the use -- refer to the web as the internet and the internet as the web. And that's a perfectly reasonable thing to do, because the web is such a popular way of using the internet.

Webs have -- they're worldwide literally, and they contain a browser on your computer, as was mentioned earlier today, and when you send the browser to a particular location or the particular website, the website returns a page, such as we have shown here.

These pages are pretty nice-looking. In other words, they're not just text, like they used to be.

They contain pictures, images or photographs and icons, as well as text, as well as sounds sometimes.

You can -- you know, you can go to -- the other night I went to a web location that was broadcasting a hockey game. So sometimes it's the sound that's the most important.

But these web pages also, importantly, contain this complicated term called a hypertext link, as you just wanted to just call it a link this morning. Links are really connections to other web pages.

So, for example, I went to the hockey website, and on that website was a link that said, you know, some radio station, so -- and it was underlined. And so I clicked on it, and sure enough, I started hearing the announcers broadcasting the hockey game.

You can tell -- sometimes it's a little hard, by looking the page, to tell what are links and what are just text, but when you move your mouse over the particular regions of the page, it will change from a pointer into a hand, and that tells you -- that tells the user that it's a link.

And so then if you click the mouse at that point, you will be taken to a web page. What happens underneath the -- underneath the cover, so to speak, is -- is that the click generates a request; the request

goes out over the internet to the location that it's sent to; and then the request returns a response, which is probably another web page, which would then be displayed on your screen.

So there's lots of ability to find out information on the internet by using these web pages with these links on them.

Q Now, let's just briefly go back to web browsers. I don't want to beat this to death, but just -- could you generally tell us what a browser does?

A Yes. A browser is an application that you would load on your computer and run, and then the browser allows you to receive and display web pages.

And the web pages take these actions when you click on various links on the web page.

There's a second important thing for us today that web browsers do that a lot of people are just not aware of, and that is, is that automatically, if the browser has been set up to operate this way, and typically they are, the browser automatically receives information from the website that you connect to, and it stores this information.

It's called a cookie. I have no idea why this is called a cookie, by the way. It seems to me like a pretty odd term. But it's called a cookie. And the

cookie is stored by the browser on the client computer.

And the next time that you make a request to the same website, the cookies that the browser stored locally are, in fact, sent back with your request to the server.

And each time that you are seeing displayed new web pages under the covers, so to speak, these cookies are traveling back and forth and are -- when they're received by the client computer, they're being stored on the -- on your local hard drive.

Q All right. Mr. Sayles made a big point in his opening statement about cookies and how they're going to demonstrate why Newegg doesn't infringe, so I'd like to spend a little more time with you about cookies.

Mr. Sayles characterized a cookie as a flat file. Is that accurate?

A Yes. A cookie is just a string of characters.

Q So XYZGQ1 could be a cookie?

A Yes. And the cookie has a name. And so the name, plus the information related with that name, are stored in a file called the cookie file on the client's computer.

Q And the -- okay. So the client computer -- I'm sitting at home. I'm talking to a -- to a website. Let's just -- for the sake of argument, amazon.com.

Where does the cookie come from in the first place?

A The cookie comes from amazon.com servers.

Q And then it gets sent into my computer?

A Right. It comes along with the web page, basically. So if you click on a product -- this is true for Newegg. It's true for really any web server. When you click on a link that causes a web page to come up, the web page comes to your computer, obviously, so it can be displayed, but it comes along with cookies almost always, and those cookies are stored locally.

Q So the -- the computer that I'm trying to talk to, to buy something from, puts this thing together and shoves it into my computer?

A Yes. I have a diagram here that's probably a little more --

Q Okay. Hopefully, better than talking about shoving things into computers.

A A little more clear.

Q All right. Could you explain to us what this diagram shows with regard to the operation of the cookies, please?

A Yes. This -- this deals with the -- essentially, the network communications.

So you're at the client and you click on link. Okay. The link then causes a service request to be

generated by the client, which goes over the internet to the server. The server then -- that's what servers do, is they respond and provide service for requests.

So the server sends back a web page, let's say, and along with the web page, it returns cookies associated with your request to the server. And those cookies then are stored in this file, cookie file, what was called a flat file earlier. It's a cookie file on the client's side.

Then with additional requests -- you might click on more links, for example. Every time you send another request and another request and another request, every request, the browser automatically attaches the cookies that it has stored that it received from that server to that request and sends those cookies back to the server.

Q All right. Later on today, hopefully not too much later on, when we get into the details of the Newegg system, have you got some animations and some other things that you've prepared so the jury can actually see this whole thing work more or less in real time?

A Yes, I do. The details of how the cookies work are going to turn out to be very important in this case, so I'll spend more time on that later.

Q All right. This point about how cookies work in the Newegg system, that's what I mentioned, if you recall, during my opening, was going to be one of their arguments about why we're not responsible for infringing -- or I'm sorry -- we don't infringe at all, is that how you understood it?

A Yes.

Q And you've looked at this issue?

A Yes, I have.

Q All right. Well, give us a little bit of a preview. In your view, do the cookies, as they function in the Newegg system, mean that Newegg doesn't literally infringe the claims in these patents?

A No. The cookies that -- the way Newegg operates with them, in fact, meet the requirements of the claims -- certain of the claim elements of the '639 patent.

Q You heard mentioned earlier today about literal infringement and Doctrine of Equivalents infringement. In your view, Dr. Grimes, does the presence of the cookies block literal infringement here?

A No. The use of the cookies in the particular way that they're used at the Newegg website matches literally the requirements of the claim, based on the Court's construction for how those -- what those terms

mean.

Q All right. As a -- as a belt and suspenders, if I can put it that way, did you also do a Doctrine of Equivalents analysis about the cookies?

A Yes, I did. With respect to a particular claim that -- that was in dispute, I did.

Q And where did that come out?

A Well, it turns out that they also match under the Doctrine of Equivalents.

Q All right. Let's get now down to the -- to what really counts here, where the rubber meets the road. Let's talk about the Newegg's system. I think that was one of the items on your -- on your list.

A Well, I had a few --

Q What do you mean by Newegg system?

A Well, I had few more tutorial elements here --

Q Oh, I'm sorry. Then let's go back to the tutorial.

A -- which I may have already covered.

I talked about web browsers and servers communicating. One of the important things that will come up later is the -- is how do they communicate; in other words, what language do they use, so to speak?

Q Okay.

A And the answer to that is, is that they use a

protocol called the hypertext transfer protocol. This is more alphabet soup here. This is -- it's called http, and that's what it stands for. And this is the format for the messages.

In other words, you can send a string of characters to a server, but the server has to be able to understand what the string of characters mean that are in your request.

And so the http protocol defines what these -- what these commands and requests are.

Q Is protocol, in this instance, just a fancy word for rules or sort of a dictionary of meanings of terms?

A Yes. Rules of communication is a good way to think of what http is.

And then I mentioned earlier -- or maybe it was mentioned earlier as well in the -- in your opening that the problem solved by the '639 patent is really that the characteristic of the internet, that the request and response is fine; but then a new request comes, and the server can't actually realize -- doesn't actually realize that it came from the same place that the request right before it came.

And if you have -- if the role of the internet is just to provide documents, then a request and a

response is just fine. But if you're going to try and do something involving a sustained interaction, then there's a technical problem that if you address it, is going to make life much simpler for doing things like internet commerce.

Q I think I mentioned during my opening statement the concept of state and whether the web/internet combination was stateless.

Does that have anything to do with what you're talking about?

A Yes. That's -- that's the way -- that's the way the technical people talk about what the problem is. The shorthand for it is, the internet is stateless. And that doesn't have much meaning for a lot of folks, and so that's why I described it as being executed independently.

And when you get multiple requests, it's important in an internet commerce setting to know that you're getting multiple requests from the same client computer.

Q The last subject that I inadvertently jumped over that you wanted to talk to us about was issuing a request, and then what a URL was.

And I see you put that slide up. Would you explain that to the Ladies and Gentlemen of the Jury for

me, please?

A Yes. The -- the browser has to have a destination in mind. In this case, the example is the person here is in the midst of typing www.usa.gov, which is -- which is the location of a website.

So as soon as the O and the V show up, then the person hits -- they may hit the return key. They may click on a button. But this is known as the beginning of the http request.

And so what happens is, is the request is sent to this website address for a -- basically, a default page. If no other information is sent, it returns whatever is the default page for this particular website.

And you can do this by typing in the address, or sometimes you have a web page that already has a link on it. That accomplishes the same thing, when you click on the link or click on a picture.

For example, you might have a weather map of the United States, and you click on Louisiana, and so it then brings up the weather for Louisiana. When you click on Louisiana, that actually is a link that brings back the next web page.

Q All right. Now are we ready to talk about Newegg's system, Dr. Grimes?

A I think I've just -- just gave -- here's some more examples of URLs, but we've already --

Q Okay. I guess not.

A I think this the last --

Q This is your last one; then we've got to keep going here. Come on.

A I think the horse is dead.

Q All right. Well, now can we talk about Newegg's system? Thank you.

Would you describe what you mean by the term Newegg system, please?

A Yes. I have a picture here. In fact, we're going to be using this so much, that if I could have -- I had a -- sort of a larger version of this made up. And I'll be talking about it and pointing at it, and we'll see it show up over and over again. So I had a big board made of it.

This is -- this is a description of the Newegg system. One of the reasons it's so complicated is because Newegg has a great, powerful system. I mean, I've bought things on the Newegg system, and in fact, it's a very powerful system.

So in the -- in the -- there's several things I wanted to point out in particular.

For example, in the upper left-hand corner

here, is an icon that we've seen before. This is the customer computer. So this is also called the client, the client computer. It's also called the buyer computer.

And those basically all refer to the same thing. It's a computer, like a personal computer you would have in your office or in your home, and it's the particular machine that runs the browser.

This is connected over the public internet, and then it connects to the green area here, which represents the -- basically, the data centers that Newegg operates.

In particular, one of the data centers is this blue area right here (indicates), and you can see in the lower right-hand corner, it says data center. And this is the E3 Colo data center.

So this describes symbolically or structurally what are the computers that are contained in the Newegg data center.

Q Does the diagram depict a server, Dr. Grimes, the one we're looking at right now?

A It's really a server system that contains many servers.

These -- for example, this area right here (indicates), we'll be spending quite a bit of time with.

This highlighted area is the collection of servers that perform the shopping cart function, shopping cart computer.

And then on the right-hand side is the shopping cart database, which is where the shopping carts are stored eventually or where the payment occurs. So we'll be dealing with these, and these are -- all contain many, many, many, many computers.

Q Are the customer computers and the Newegg server system connected? Is that done by the internet?

A Yes, that is done by the internet, and that's represented by this black line on the left and across the top and this same cloud here called public internet.

This -- this, by the way, is -- this is a Newegg diagram. In other words, Newegg provided this to us as part of the lawsuit. So this is their description of what the Newegg system -- system is.

Q All right. There's a box in there that looks like it says netscaler or -- it's vertically above the firewall.

Do you see that?

A Yes.

Q Could you tell us briefly what that is?

A Yes. The netscaler is in this connection, the network connection that comes from the computer into the

servers. And the netscaler essentially routes the incoming messages.

Newegg has a number of servers, and you can address them. For example, the one at the top labeled www here stands for worldwide web, and this is where you access all of the product information.

When you decide to do a purchase and put things in a shopping cart, then the requests that come in are routed by the netscaler into this block, which is labeled SSL, and that provides the shopping cart functionality.

Q And you said a few minutes ago, there's a shopping cart database also shown on this diagram?

A Yes, that's correct. DB is just a shorthand notation for database.

So the shopping cart computer -- this arrow right here between the two is the network connection (indicates), so the shopping cart computer is connected directly to the shopping cart database.

Q There's some round symbols on the -- almost look like a sowing thimble to the right of the boxes that represent, I guess, computers and the bigger box that says shopping cart database.

What do those little round cylindrical-looking things represent? I don't know if

you can actually see these or not. These are really tiny. Maybe we can blow them --

There we go. There we go.

MR. ADAMO: Thank you, Mr. Gooden.

A These little cylinders are intended to represent computer center hard disk drives. It's kind of a traditional notation that's used to represent -- in a diagram like this, to represent a very large storage capability.

And so they draw them as cylinders, because at one point in time, they literally were cylinders. They were, you know, perhaps a couple of feet in diameter and maybe 3 or 4 feet high, and that's literally what they looked like back a long time ago.

So this same kind of an icon has been used ever since then to represent mass -- large amounts of storage.

Q (By Mr. Adamo) I think on your list of subjects that you wanted to talk about today, you had a purchase example.

Do you recall that?

A Yes, I do.

Q All right. Now, let's talk about the purchase example now.

The material you've got up on the stand with

you, there should be an Exhibit 12, which should be materials relating to a purchase that was done sometime in June of 2009.

Is that stuff handy?

A Yes, it is.

You'll be happy to know we're not going to go through every page of this. The -- the top two volumes -- binders here represent the -- all the details of the purchase example.

It includes all the web pages that I looked at, and it includes all of the traffic that occurs when you click on links to navigate the website or to add items to your shopping cart, and it includes other information, such as the cookie file that's been mentioned a couple of times. It includes e-mails that I received and confirmations.

In short, this is a complete record, with all the detail that I knew of that exists of a purchase example.

Q All right. Now, in view of the fact that you've just promised the jury that we're not going through all of that paper, is it a safe bet that you've got some slides that summarize this, and you can talk about this shopping example that you did?

A Yes. The shopping example that I did had a

total of, like, 35 web pages, and I've selected maybe half a dozen of them to kind of give you a flavor for what the key things were that I did when I bought a couple of items on the Newegg website.

Q All right. Just so we're all clear on this, in June of 2009, you yourself got on a computer and logged on to Newegg's website and bought some stuff, and that's what is recorded in all of these two huge binders that you're about to explain to us, hopefully, with some simpler slides, right?

A Yes, indeed.

Q Okay. Why don't you walk us through the slides then, Dr. Grimes, I guess starting from the beginning and going through until you're completed with the purchase example.

A So this is the -- sort of the beginning point. I don't know if you can see it at the top or not, but at the top, it says http://www.newegg.com.

And so that was typed in; and when I hit enter, this is the page that showed up. So this is the result of going to the Newegg website. So this is the first page that you see.

Q All right. What happened next?

A Well, then I navigated around using some of the -- clicking on some of these buttons, and I decided

I wanted to buy a cable, a cable and some software.

So this is the cable page that contained the cable that I was looking for. It was a USB cable. And right at the bottom of the page -- of -- right below the cables I was interested in is this button called add-to-cart.

And so I clicked on the add-to-cart button.

Q Okay. Then what happened?

A Okay. Then it gave me this page that said this is the item that's been added to your cart, and then it waited for me to, you know, take some further action.

So I navigated to another portion of the website that contained software, and I looked for -- I was interested in a painting program, so I navigated to this website that has -- a portion of the website that has the Corel software on it.

And so this says Corel Paint Shop Photo Pro, and it turns out this is downloadable software, so to add this to cart -- my cart, I click on this button that says download.

So that tells me that not only is it going to add to the my cart, but also it's not going to come in the mail. I'm going to, in fact, download the software.

Q And so what happened when you clicked that

button?

A So I clicked that button, and then it gave me that other same message: It's been added to your cart.

A little bit later, I said, okay -- I'm skipping a few pages here now. I said, okay, now its it's time to, you know, buy it. I've selected the two products. I found them. They're in my shopping cart. And so I looked at my shopping cart and -- to see what was there, and this is the page that shows up.

So this is the page that corresponds to the shopping cart. And most importantly -- I mean, besides listing the two products that I've just selected, most importantly, at the bottom, it contains another button called checkout.

Q All right. Did you click the checkout button?

A I clicked the checkout button.

Q And?

A And it said you have to log in.

So it turns out I'm an existing customer, so I typed in my Newegg identification, which is my e-mail address, my password, and then clicked submit, and that allowed me to log in.

Q All right. And what happened when you clicked the submit button?

A Well, the system, of course, knew that I was

checking out, and I can't just check out without the system knowing who I am, so it asked me who I was.

Then it says, okay, if you want to check out, well, here's all the payment information that we have for you. This is the shipping address we have. This is the credit card information we have to -- to finish the payment.

And it asks me basically if this is all correct, and if it is, then I click the continue button.

Q All right. So you clicked the continue button?

A I clicked the continue button, and then it gives me essentially information about the order. This is going to be -- this is my last chance, basically, to change anything.

It says here's the shipping information we have. Here's the billing information we have. Here's the products that are going to get shipped to you. Is this okay?

And if it is okay, then at the bottom of this page is a button called submit order.

Q And I assume that you clicked the submit order button?

A Indeed, I did.

Q And what happened next?

A Okay. The next thing that happened was, I got this thank you page. And it says: Thank you for ordering from newegg.com.

And one of the options on this page is a button in the lower right-hand corner to log out, and so I logged out.

Q Okay.

A And then it gave me another page. There's a -- there's a real pattern here of clicking buttons and getting new pages and clicking buttons, getting new pages. These are the requests and the responses between my computer and the servers at the Newegg -- Newegg service system.

So I clicked -- I logged out, and then it gave me a message that says: Thank you. You are successfully logged out.

Q Okay.

A So that really concluded the purchase example that I wanted to -- to show to the jury.

Q Did you try to find out whether the Newegg website would give you order history information?

A Yes, I did.

The other thing that's important to the case is, in fact, the -- it's called statement -- hypertext statement documents, which are documents that describe

the purchase transactions that have taken place before.

And Newegg has a facility to do that. To access it, there's a -- now, this is at the bottom of one of the pages. There's a number of things that you can do, shopping help and things to do with your account, and one of those is order history.

So that's underlined, and therefore, it's a link. So I clinked on that link.

Q And what happened?

A Well, not surprisingly, I got my order history.

So this is a display of the last four invoices -- or the last four payments that were made -- payment transactions made on the Newegg website. And each one of those invoice numbers here is underlined.

And as we now know, that means that that's a link. And so one of the things that I could do is I could get more details about that.

For example, I mean, this is the number, but I might not -- maybe a month has gone by, let's say, and I don't quite remember what the number was, but I want to know what was in this invoice. So I click on this link, and it provides me with more details.

And it turns out, yep, this was the -- it wasn't the cable. This was the software that I

purchased. And so this gives me the order detail associated with -- with that invoice.

Q All right, Doctor. Does this combination of things that you've just shown us, does this complete your purchase example that you had mentioned earlier on the -- what you've now got up?

A Yes, it does.

Q All right. Let's get to the meat of it now that we've got the background and you've demonstrated to us that you've personally gone through the system and run it yourself to see what you could see. Let's turn to your main reason for being here today.

Have you reached any opinions regarding whether Newegg meets the claims of the Soverain patents, the three different patents-in-suit here?

A Yes, I have. I reached these opinions by going through a particular process and --

Q Would you tell us what the process was? You've got a slide up here, but would you tell us, please?

A Yes. And the conclusion, not surprisingly, is that yes, they meet the claims. But this is the process that I went through, because you can't just, you know, make assertions. You have to say, okay, what's the evidence that you have?

And the evidence that I looked at has to match the claims. So -- but that happens later.

The first process that I did was I started out by reading the patent, not surprisingly. And the associated prosecution history or file history, as the Judge told us this morning mean the same thing.

That's all -- it's all the dialogue between the patentee and the Patent Office during the generation of the patent, and it results in the patent.

So I spent time studying both the patent -- like I read the patent so many times -- I've lost track how many times -- but the patents and the prosecution histories are an important part of the background and kind of a starting point.

The next thing I did was reviewed -- I think of this as the Court's dictionary, okay? It's called a claim construction order, but I think of it as dictionary. It says there's lots of terms in dispute, and as a matter of law, these are the definitions I'm supposed to use.

So it doesn't matter what I think they mean; this is what the Court says they mean. So these are the definitions that I applied in my analysis.

Another large component of my time was spent reviewing Newegg documents. I mean, this, after all,

forms a large portion of the evidence that I need to rely on to show the matching with the claims. And so I spent a lot of time reviewing that.

Other things I can rely on turns out to be statements made under oath by corporate representatives of Newegg.

We met Mr. Wu this morning, and he was the main corporate representative whose testimony I also relied on in terms of understanding how the Newegg system operated.

And I actually physically attended his deposition and, of course, received a transcript -- transcript of it later, which I studied, and I reviewed other Newegg deposition testimony. But Mr. Wu's was really the most -- the most significant one.

And then as we talked about these two binders -- and in fact, I've got four more binders that describe two other purchase transactions, which we also will not go through.

I studied the operation of newegg.com and neweggmall.com. One pair of these binders is a purchase transaction I did at neweggmall.com.

And then with all of this information and a very messy office with paper piled all over, I was able to then form the analysis that I did, comparing the

claims under the Court's construction with the documentation and other evidence that I have from Newegg and form my opinions about whether or not they match.

Q All right. Let's cut to the chase. Tell the Ladies and Gentlemen of the Jury, if you would, please, what the opinions were that you reached, Doctor.

A There are two websites, newegg.com and a more recent one newegg.ca is Canadian. And those two websites -- based on the testimony of Mr. Wu, is that those two websites basically operate the same.

And they do operate the same for purposes of my analysis and that those, therefore, meet all of the elements of these two claims of the '314, these three claims of the '492, and two claims of the '639 patent.

Q Was it your understanding from what you reviewed, Dr. Grimes, that the Canadian website was, in fact, hosted on the same servers here in the United States that the newegg.com was hosted?

A Yes, it is. The -- this notion -- it's real strange -- interesting, actually, the dot-com, you think of, well, that's the United States. Well, no. It turns out I know several websites in England that are dot-com websites.

And here's an example of a dot-ca website that you would think of would be in Canada which is not in

Canada. It's, in fact, in the United States.

One of the -- one of the sort of humorous questions, trivia questions, is, what are the three most important things to know about the internet? And the answer is no location, no location, no location.

So you really have no idea physically where these websites are when you attach to them. And here is just an interesting example of that at Newegg.

You can address -- as long as the -- as long as you type in newegg.ca, it takes you to a particular server, and that server -- in this case, actually, I couldn't buy anything there, because I do not have a Canadian address.

So it really is -- looks like it's in Canada, but, in fact, it's not.

Q What time period does your analysis apply for with respect to the newegg.ca site?

A The newegg.ca website is relatively recent, I think in the last year or two. I don't remember specifically the dates of it, but it -- but the 2001 is when the newegg.com website was initially brought forward as we heard this morning.

Q In your summary of opinion slide that you have up on the projection system right now, you also talk about neweggmall.com. What's neweggmall.com, as you

understand it?

A Well, Newegg Mall is meant to refer to like a shopping mall where you might go, and there might be a huge store, which might be, you know, Macy's. But then in the mall, there are all kinds of other stores of other merchants selling other merchandise.

Well, Newegg Mall sets up to be the same thing, so it's kind of a company operative arrangement Newegg provides. Other merchants also sell merchandise in the Newegg Mall.

Q Well, what time periods do you understand it -- does your analysis of neweggmall.com cover?

A That's also relatively recent. I think within the last year or two.

Q Have you prepared a summary of your newegg.com system to each of Soverain's patents?

A Yes, I have.

Q Exhibit 21, would you take a look at that for us and see if you can identify it?

A (Witness reviews exhibit.)

Q Would you tell us what Exhibit 21 is, Doctor?

A Yes. Exhibit 21 is a portion of the expert report that I did, which provides detailed results of my analysis of the comparison between the way the Newegg system operates and the structures it has and the --

each one of the elements of the claims that are involved in this lawsuit.

Q From which patent?

A This is -- Appendix C is for the '314 patent. And there are two other appendices for the other two patents.

Q Is Exhibit 22 the Appendix C that relates to the '429 -- your analysis of the '492 patent?

A Yes, that's correct.

Q And is Exhibit 23 the Appendix C of your expert report that relates to your analysis of the '639 patent?

A Yes, that's correct.

Q Did you prepare a summary for neweggmall.com website?

A Yes, I did.

Q And you might look at Exhibit 31 in your book; is that the summary?

A Yes. This -- this appendix here essentially includes all three patents. I didn't do a separate appendix for each patent, so this one has all three of them.

Q Do you have Exhibit 29 handy in the binders that you have there, Doctor?

A Yes, I do.

Q Could you identify that for us and explain briefly what it is?

A It says separately bound, which means, to me, get out of my chair.

Q Okay.

A So these are two of the other four binders I mentioned. These binders correspond to the same thing, all the detail, web pages, HTML traffic, everything associated with my Newegg Mall purchase.

Q So you did an actual hands-on purchase experiment, so to speak, with regard to the Newegg Mall site?

A Yes, neweggmall.com, right.

Q Doctor, is it your opinion -- and I think you had this on your summary slide we just had up there -- that newegg.com and newegg.ca, the Canadian site, meet all the elements of the asserted claims? Is that, in fact, your opinion?

A Yes, I didn't do the -- all of the claims for the Newegg Mall. I did the ones that are listed here.

Q Claim 34 of the '314, Claim 15 of '492, and Claims 8 and 78 of the '639?

A Yes, that's correct.

Q Judge Davis, a little earlier today, told us about the claims and what their function was. Just to

make sure that you understand this the same way as the Court did, what do you understand the function of the claims in the patent to be?

A Well, here's an example of one of the claims from the '314 patent. This is Claim 34 highlighted in the background here. And I've taken the first portion of Claim 34 so that we can see the text a little easier.

The claims are made up of a sequence of limitations. The first one here about a buyer computer, the second one about a shopping cart computer, and the third one about a computer network. So I have to take the full text of each claim element one at a time -- just because it makes it easier to follow -- I took them one at a time. And I said, okay, does the Newegg system provide all of the requirements of this claim limitation? And if so, how can I show that, and what's the evidence that I have that makes me come to that conclusion?

So this was the -- the claims, essentially, it's like a -- I like the example of a trespassing that was used earlier.

The claims really define what the boundaries are. In other words, one of the things that's required of the patent is that it tell people: If you go within these boundaries, then you're going to practice the

claim, and that's not allowed without some kind of a license; or, you're outside the boundary, so everything is fine.

So the claims have this role of identifying what the boundaries are for the intellectual property that is in the patent claims.

Q Doctor, do you understand what it means for a claim to be infringed literally as compared to what it means for a claim to be infringed under the Doctrine of Equivalents?

A Yes, I do.

Q Tell us what you understand literal infringement to mean.

A Well, literal infringement means that it's very clear, and there really isn't much doubt, that the way that the particular system works, in this case the Newegg system, matches literally or precisely or exactly the way the claim is written. And there's -- it's really not open to much interpretation about what the claim means; and given that interpretation, this is what -- how the Newegg system matches that requirement.

Q Now, when you say matches, you told us a minute or two ago about claim elements when you were describing Claim 34 of the '314 patent. Is that what has to be matched by the system that you're trying to

decide whether or not it infringes?

A Yes, that's correct. That's correct.

Q To your understanding, now, what does it mean to infringe under the Doctrine of Equivalents?

A The patent system, if you will, basically had decided that, as I understand it, that if you make some -- some minor variation to the way the patent describes it, that that's still within the boundaries identified by the -- by the claim.

And so there's a separate analysis that one goes through called the Doctrine of Equivalents to find out if this variation, if you will, if it's a variation in interpretation of what the claim means, if it still falls within the boundaries of the claim. And that is called a Doctrine of Equivalents analysis.

So you look at the two alternatives, and you say: Okay, I understand there are differences, but would these -- are these differences significant to a person of ordinary skill in the art or is this just a minor change?

And so the analysis that I did was to determine whether or not there was any substantial differences between the two -- between the two alternatives that I evaluated.

Q When you did the analysis that we're going to

look at in a few minutes, with respect to the Doctrine of Equivalents, did you understand that you had to either literally or by equivalence still have to have every element that the claim called out?

A Yes. It was mentioned earlier that, you know, if you have ten claims, it's not enough to just practice nine of them, you have to do -- or claim limitations; you have to do all ten. And that is exactly the methodology I applied. And that's why I took them one at a time.

And then when I reached the end of the claim, if everything was met, then my conclusion was that, yes, this claim is matched, and, therefore, Newegg infringes this claim.

Q And in the instance that we discussed a few minutes ago where you did the alternative Doctrine of Equivalents' analysis, how did you do that? Did you -- well, you tell us.

A Well, there's a three-part test that's done. The claims have some kind of a function, some particular way that it's done, and some particular result that comes from the claim limitation. So you have to analyze all three of those: The function, the way, and the result.

And in the particular analysis that I did, the

function and the result were actually the same among these two alternatives. The difference was in the way.

So I looked at the way that it's -- I think it's done literally and the correct way to interpret the claim, and I looked at the way that Newegg says, well, no, you should look at it this way.

So I did okay. I did an analysis of the way that they think it should be done. And I determined that the way that I think the claim properly is interpreted and the way the Newegg thinks it's interpreted were -- the differences were insubstantial.

So there's essentially -- we will get into more details later, but it's basically a design alternative. The designers could do it this way or they can do it that way.

And when you have a situation like that, that's further evidence that the differences are insubstantial. And if the differences are insubstantial, then it still meets the requirement of the claim under the Doctrine of Equivalents.

Q You're not a patent lawyer, are you?

A No. No, I'm not.

Q How did you word --

A It would interfere with my hunting in the hills of northern Nevada.

Q I'm sorry?

A It would interfere with my hunting in the hills of northern Nevada.

Q I'm sure that's not turning into a hunting lawyer's bad joke.

A I'm sorry. This is serious business; I shouldn't make light of that.

Q It is that, Doctor.

How did you learn about these patent law concepts then that you were just talking about that you apparently applied in doing your analysis to reach your opinions?

A In all cases, they come from discussions with the attorneys in the case. I've actually done the Doctrine of Equivalent analysis several times before, so I had some familiarity with it.

But again, on this case, I was again taught, if you will, by the attorneys: This is what you should do, this is the analysis you should perform, and then -- and then you tell us what the results are, which I did.

Q Over what chronologic time period, calendar time period, did you analyze the Newegg system, or the state of the Newegg system, I guess is what I'm trying to ask you?

A Oh, golly, it was the better part of a year.

The documents were produced -- started being produced quite some time ago. I don't even remember exactly when. And that's when I really started my analysis.

Before that, I spent time understanding the patent and the prosecution history and so forth.

Q Do you recall those various examples that -- the purchase examples that you told us about so far, some of the purchase examples that you studied were done by yourself, correct?

A Yes.

Q And were there any available for you to study that had been done by somebody else at an earlier time?

A Yes. There was -- the other two binders the remaining two of the six, which are also an exhibit here -- were -- represented a purchase transaction that was done by the attorneys perhaps, I think like a year earlier, in 2008.

Q And your recent transaction was June of 2009?

A Yes.

Q Okay.

A Then I did a later one with the Newegg Mall. It may have been around throughout the same time. But I did basically two full purchase transactions.

Q It's April 2010. What information, if any, do you have that the system, at least as of, let's say, as

of last month, March, was the same as what you analyzed in the documents you looked at and the study you did in 2009?

A It's my understanding that the system operates the same today as it -- as it did when I did my purchase example in 2009. Actually, I did -- I did another purchase later to buy some more cables. I mean, the prices are very good on the Newegg website, I have to tell you. So I went back and I bought some HDMI cables for my television. So I did an additional transaction in November -- I think it was November -- personally. And it's my understanding it still operates the same way today.

MR. ADAMO: Your Honor, at this point we're going to now start going through in detail, claim element by claim element, the various seven claims in the three patents. Would you like to consider taking a break at this point or should we just power on?

THE COURT: I think we're all right. Is the jury okay? Anybody need a break?

All right. We will go ahead and see if we can get through it.

MR. ADAMO: Just the anticipation is just electric in the room for this next stage, Your Honor.

THE COURT: Everyone is waiting.

MR. ADAMO: We're just sort of like, yes, let's go.

Sorry. It was the volcanic dust, Your Honor. It obviously got to me.

THE COURT: You had that before you went.

MR. ADAMO: That's one. One of these days I've got to learn, Your Honor, to not lead with my chin in this courtroom.

THE COURT: All right.

MR. ADAMO: Thank you.

Q (By Mr. Adamo) All right, Doctor. Maybe we should take -- I am in fear that we're going to knock some of these --

A No, let's leave this one up.

Q Can I take the binders?

A Yes.

Q I am in fear you will knock those down?

A And I would like -- while we're moving here, I'd like to have another chart -- chart put up.

THE WITNESS: Thank you, gentlemen.

Q (By Mr. Adamo) All right. I believe we've got this set up, so we're going to do it in patent number order from the last three digits. So let's start with '314.

Briefly, I mean briefly, refresh us as to what

the '314 patent is about, as you understand it?

A The '314 patent is a network-based sales system that essentially provides a complete shopping experience. It allows you to go to a website, find the products you want, purchase the products you want, pay for them with a credit card or whatever, and then they are delivered to your door.

Q Is this patent, as you understand it, just for the idea of using a shopping cart on line?

A No. Shopping carts, I mean, are not a new idea. We all use the metaphor of a shopping cart.

But the key thing about the '314 patent is the -- is the ability to complete the transaction online.

I mean, before, you would have to, you know, you could go to Macy's website and find products you wanted, then you would have to call Macy's and give them your credit card over the phone; you'd have to fax them information or something.

But this -- the '314 patent allowed you to complete the transaction online without making a phone call.

Q I used the phrase earlier "soup to nuts." Is that apropos with regard to the '314 patent in your view?

A It -- that's what I meant by complete -- complete shopping experience, yes. From beginning to end, you don't need to leave your computer basically.

Q The claims of the '314 patent that Newegg is accused of infringing, the ones you've studied, are those system claims, method claims, or both?

A The '314 -- the first two patents essentially have system claims. A system claim is basically structural, and it deals with the capability of the system. A method claim, which is in the last patent, the '639 patent, deals with the operation of the system.

So the way I think of it is, if you have a system claim, then the system has to have the capability to do the operations that are described; and for a method claim you have to actually show that it doesn't. So the method claims deal with the process or the operation -- actual operation of the system.

Q All right. Claim 35 is the first of the two claims in the '314 patent. That's the one that's in the original patents; and the later claim is the one that's in the reexam, which I think we managed to figure out earlier this morning.

Do you have a slide showing your analysis of Claim 35?

A Yes. It starts here. This is Claim 35, and

you notice it's very short. Well, the reason it's short is because of the first sentence. It says: In accordance with Claim 34. So this is what's known as a dependent claim.

In other words, to show that the Claim 34 matches between the requirements and the -- and the way the Newegg system is built, you also have to show that Claim 34 also matches, because Claim 35 really depends upon Claim 34.

So, on the right side over here I have put a -- I had this board constructed for us. And this is Claim 34, all of these elements. And then down at the bottom here we have Claim 35.

So Claim 35, in order to be -- to show that it infringes, I have to first really do the analysis of Claim 34. So the starting point here is Claim 34. When I finish it, then we will return basically to Claim 35.

Q All right. The letters 34(a) and (b), (c), (d), (e), et cetera, et cetera, were they in the original claim, or did you add those on yourself just to have a way to keep track of where you are?

A I added those. In fact, the convention here is that the brackets are things that I've added. The Number 34 starts out that's part of the claim, and the (a) is what I added. Then I called 34(b) the second

one, and 34(c), and so on.

This is just a way of -- it's a notation for me to keep track of which claim element that I'm working on. And I did that the same for all of the -- for all the claims.

Q All right. Let's start to step through it as expediently as we are able to and be correct, Doctor. Let's start with element 34(a). Is that the first element that you considered?

A Yes. I started with -- I started at the top basically and went in alphabetical order.

Q All right. Would you explain your analysis of 34(a), and we have -- I guess you have actually because you're controlling the slides -- you've got a slide up, '314 patent claim element 34. Is this the system that you used in doing the analysis of these claims?

A Yes. This -- you can see that this claim really just includes -- the evidence is just the upper portion of this larger diagram that we spent some time on this morning. So -- I mean earlier.

This particular diagram that I've shown here is a -- it's kind of a simplified version of this one that we have on the -- on the -- on the posters. Okay?

The two were on two different pages of the same document that were produced by -- by Newegg. So

that's the reason they look -- they look so similar.

So this is a network-based sales system. I mean, it has the network, the public internet. It has a customer computer and server computers. And so that's what we mean by network. And since it's oriented towards sales, it's a sales system.

And this word comprising means that we need to look at all the rest of the elements, (b), (c), (d), (e), all the way down to the last one. And the network sales system, comprising means that it includes those.

So there can be other things that the Newegg system does; but in order to practice this Claim 34, it has to do every one of these. It can't do just most of them; it has to do every one of them.

Q All right. All the way down at the bottom of the slide you have up on the presentation system at the moment, which is your No. 34, there is a parenthetical.

And it says: Sources, Newegg documents (P008P018), and then Wu 30(b)(6) TR11:7-20. What's all that mean?

A You probably can't read that. I mean, I can't even read it and I'm right next to it. But this across the bottom -- I have done this routinely on all of the slides that I've prepared here.

And this came from those other exhibits where

I have all the detailed information. This -- this is the reference to the Newegg evidence. Okay?

In all cases, this is either testimony or documents produced by Newegg about how their system works. So this is how I know that and what I relied on for the fact that the system works the way I'm describing to you this afternoon.

Q This whole mechanism that you came up with with the slides and breaking the claim elements down and all, are the slides intended to be summaries of this additional documentation, such as, the exhibits, transcript pages, things of that nature?

A Yes, that is exactly right.

Q And when you prepared these slides, to the best of your ability, I mean, did you accurately summarize what's in the source material that you've cited on them?

A Yes. That was the way that we decided what should go on the slides was I looked at the evidence, and people who were assisting me to make these -- looked at the evidence, and we made sure that this was an accurate summary.

Q I don't know if you have Exhibit 62(a) and (b) available to you?

A I do.

Q Would you tell us what you understand those exhibits to be?

A I had mentioned earlier that one of the most important depositions was the chief technical person, Mr. Wu, the corporate -- corporate spokesman for Newegg.

And Exhibit 62(a) is essentially all of his testimony, or excerpts of his testimony, that he gave at his deposition.

Q All right. Is that the testimony from Mr. Wu's deposition that you relied on in doing your analyses for the seven claims of the three patents?

A Yes, that is correct.

And Exhibit B that you asked me about, I took his testimony, and essentially I matched it up with the -- each claim term.

So for example, here is his testimony about how the network sales system operates at Newegg and what the structure is. And one of the diagrams he used in his description is, in fact, the one that we have up here. So this all essentially -- that's how I know how to describe to the jury how the system operates is because Mr. Wu told us in his deposition.

Q What did you conclude about whether Newegg meets Element 34(a)?

A Based on the analysis I did, the Newegg sales

system, in fact, meets Element 34(a).

Q All right. We've put up your Slide 35. This is headed Claim 35 elements shown in Newegg system.

What are you going to do with this document?

A This is -- this is just a way for me to sort of -- and people on the jury to figure out where we are.

So every time I finish an analysis, I sort of go back to this and put a check mark in so that you have some notion of where we are in going through all of these elements of 34 -- the elements of Claim 34. Then we will do Claim 35.

Q Is the check mark supposed to symbolize that we just did the analysis or is it supposed to symbolize that your opinion is the element is there?

A No. The check mark is a symbol that, in fact, the analysis shows that the Newegg system meets the requirements of this particular claim limitation 34(a).

Q All right. Did you next analyze Elements 34(b) through (d)?

A Yes.

Next -- I did the next three together, (b), (c), and (d) because they're very straightforward and they're easy to -- easy to understand once you know how the Newegg system works.

So 34(b) is a client computer, a buyer

computer it's called here, for operation by the user who wants to buy products; and that is the customer computer, which is part of the Newegg system.

Q So is that first piece, 34(b), in the Newegg system, in your opinion?

A Yes. And that's, again, based on this same diagram here. This is the customer computer located in the upper left-hand corner; and this is part of the Newegg system, the network sales system really represented by this entire picture.

Q What about the next item in 34(c), the shopping cart computer?

A 34(c) is the shopping cart computer as you mentioned, is represented by this sequence of servers. And so you might say, well, how do you know that? And the answer is at bottom of the slide here, it's from Mr. Wu's testimony.

So Mr. Wu described the operation of the SSL computer as the -- performing the functions of the shopping cart computer. And I used as the definition of the shopping cart computer the Court's construction for what the shopping cart computer was.

Q All right. 34(d) is a shopping cart database.

Did you find that in the Newegg system?

A Yes. We referred to this earlier, and, in

fact, it describes it as a shopping cart database. So there was very little question as to what the shopping cart database corresponded to in the Newegg system. But that was confirmed by Mr. Wu in his testimony.

Q Did the structure that was labeled shopping cart database on the big exhibit that you're using, which apparently is our Exhibit 8, did it match the Judge's definition, or the Court's definition, of what a database had to be?

A Yes, it did.

Q Is the shopping cart database connected to the shopping cart computer in the Newegg system as 34(d) requires it to be?

A It definitely is.

Here's the -- these two elements, the shopping cart computer and the shopping cart database, in this diagram, they're connected by this arrow. And that arrow is understood to be and described as a network connection. So, in fact, the shopping cart computer, as operation is described by Mr. Wu, and the shopping cart database, are, in fact, connected to each other.

Q In analyzing 34(b) through (d), how did you determine what meanings to give to the claim terms?

A As always, the case -- I mean, whether I explicitly remember to say it or not, I always used the

Court's construction. And here are a few of the terms that were important in the last couple of minutes of analysis that provide the definitions that I used for computer, shopping cart, shopping cart computer and, shopping cart database.

Q To the best of your understanding, did these come from the Markman construction that originated with Judge Davis?

A Not to the best of my understanding; in fact, they did come -- literally these were copied directly from the Court's dictionary of the claim construction order provided by Judge Davis.

Q Do you have a definition from the Court of the term computer? Did the Court say anything about whether or not the claim computer had to be just one physical device?

A Well, I mean, the definition is here. It had to be a functional unit to perform substantial computation. And that, in fact, could be represented by a single box, if you will, or a collection of boxes.

Each box may, in fact, contain multiple processing units.

So all of those fulfill the definition of a computer, based on the Court's construction.

Q Okay. There is reference to a database in the

shopping cart database definition. Do you see that?

A Yes.

Q Can you explain why, in your view, Newegg has a database, according to the Court's construction?

A First of all, based on the -- well, I mean, it says database on the diagram, but that's actually not sufficient.

But when Mr. Wu was asked about this, what does this functionality correspond to, he characterized it in a way that met the definition, which is a collection of logically related data stored together in one or more computer files. And a person of ordinary skill in the art would understand that that is right; that's what a database is. And it meets the Court's construction as described by Mr. Wu in his testimony.

Q As you understand the function of Newegg's system that we're discussing here, if more than one customer clicks checkout, is more than one customer's selections then stored together in the shopping cart database in the Newegg system?

A Yes. The way the operation of the database was described is that all of the shopping carts -- when checkout occurs, all the shopping carts that are currently involved in checkout -- I mean, Newegg is very successful. They have, you know, millions of customers.

So there's certainly tens or hundreds or thousands checking out at any one time, more than likely. And all of those shopping cart computers are, in fact -- shopping carts are, in fact, stored in the same shopping cart database, which is this collection of -- collection of servers shown right here.

Q Are the shopping carts for the various customers, in your view, logically related?

A Yes, they are. They're all shopping carts, and they're all contained in the shopping cart database.

So they are logically related by virtue of being in the same database.

Q Did the Court say anything about how long the information has to be stored?

A No. For the '314 and the '492 patent, those are system claims, and they don't -- they don't say anything -- they just mean that the functionality to store the data has to be present.

Q Did the Court say anything --

A There's no additional requirement for anything else, including how long they are in the database.

Q All right. Did the Court say anything about whether a database has to be backed up to satisfy the definition of database?

A Well, I mean, most databases are backed up;

some of them aren't. But that's not a requirement of the claim language.

As I stated earlier, this comprising word here means that the Newegg system, or the accused system, has to perform all of these actions and contain all of these structures in this case. It can also do other things.

In the case of database, it could provide backup; could not provide backup. But that's not required by the claim.

Q All right. Have you completed your explanation of your analysis of elements 34(b) through (d), Dr. Grimes?

A Yes, I have.

So I went back to my favorite chart here, and I added the check marks for these three, because the Newegg system practices the requirements for these three claims based on that -- claim elements based on the evidence that we just looked at.

Q All right. Let's go to claim element 34(e).

What does that claim element require, as you understand it?

A Well, this element requires that the buyer computer and shopping cart computer, which we've already looked at, be interconnected by a computer network.

Q In the Newegg system, are they?

A Yes, they are. This is represented by this black line.

I've added the red line here, by the way. That's not part of the Newegg document that was produced. But I added the red line to show the connection between the buyer computer and the shopping cart computer. For example, when you're adding items to the shopping cart, this is the path that the request takes from the client computer to the shopping cart computer; and also the response going back to the client computer travels over the same network.

Q And the public internet that appears on this slide that you have up on the display system at the moment, is that an indication of the buyer computer and the shopping cart computer being interconnected by a computer network?

A Yes, it is. Precisely, that's what this black line in the Newegg diagram represents; it represents that connection, interconnection.

Q So what did you conclude about whether Newegg meets element 34(a)?

A This one is pretty straightforward. Based on the evidence that we just looked at, in fact, I gave 34(e) a check mark as being met by the Newegg system.

Q I want to turn now to elements 34(f), (g), and

(h), but focusing on (f) first.

And here I want to focus on the way that the Newegg system, when used, adds items to the shopping cart. So I want to focus you back on your actual purchase examples, sir. Are you with me, Dr. Grimes?

A Yes.

Q Can you explain in a little more detail how Newegg does that in the system?

A I described it in words before, but sometimes it's nicer to have some diagrams and animations to show this, because this is going to turn out to be an important aspect of the -- of the case.

The buyer computer, or the client computer, is executing the browser. The browser has your product element that you're looking at, like your cable. And then we have this button called add-to-cart.

So when you click the add-to-cart button, let's suppose that this is the first product that you have found on the website -- you're going to buy several things, but this is the first one. So this is the first time in this interaction that you clicked the add-to-cart button.

What happens is, for all button clicks, actually almost all button clicks, the browser sends a message to the Newegg server system over this network

that we just looked at, and it sends the message to the server.

Now, the server gets this request for service, and the service is add-to-cart. So what the Newegg server does is it adds this product to a cookie -- actually, the first time it happens it generates the cookie because there wasn't a cookie before. So it adds this product a cookie.

And then when it sends the page back saying you just purchased this item, it also sends the cookie back to the client's computer. The client's computer automatically, whenever it sees the cookie, stores it in the cookie file. So it stores this cookie.

Q Is the information about the product stored after the buyer clicks add-to-cart?

A Yes.

Q Where?

A The information as to what the product is is sent in the message to the server computer. The server computer takes that information -- the product ID, actually, the product number, and puts that in the cookie, and then sends this cookie back to the server computer -- back to the client computer to be stored.

Q Can the buyer add a second product?

A Yes. In my example, I wanted to buy some

software. So I clicked -- it was actually called the download button, but the function was the same as if I had purchased a different cable. It was -- I clicked the add-to-cart button for the second time.

Q And what happened?

A Okay. A message was sent. Every time messages are sent, all of the cookies from this server that is being addressed are sent with the message.

Now, before there were cookies sent as well, but they weren't important to us because this was -- there wasn't any shopping cart cookie, if you will.

So the second time, it takes all the cookies, now which includes the shopping cart cookie, and sends that to the server. The server gets this message -- the action is to add an item to the shopping cart -- and it has the cookie from before.

So it adds the second product information in this cookie. It actually modifies the cookie to add the second item. Then it sends the cookie, with the page saying you just purchased this item, back to the client computer.

And the client computer does the same thing. It takes this cookie that it got, which now has two products in it, and stores that in this cookie file.

Q Okay. What happens when the buyer is

satisfied with what they've selected and wants to check out?

A Well, they are perhaps looking at their shopping cart to see what it is they purchased. But the important thing is that there is a checkout button. And they click the checkout button when they are through shopping and through putting items in their cart.

So they click the checkout button. When you click this button, not surprisingly, another message is sent along with all of the cookies, which includes the shopping cart cookie, to the Newegg server. And the Newegg server now, instead of having an add-to-cart action, it wants to do a checkout action.

So the check-out action involves some different things. In particular, it looks at this cookie, gets the data out of it for what the products are that correspond to items in the shopping cart, and it stores those in this shopping cart database. And then basically that concludes the checkout action that the server takes.

Then it sends a message back with more cookies and says, you know, proceeds with the next stage in the checkout process.

But this is that same shopping cart database that we looked at earlier on this diagram. This is the

shopping cart computer which is performing these actions, these requests, add-to-cart as well as checkout. And this is the shopping cart database, which is where the product information is stored after the checkout button has been clicked.

Q I think earlier, a few minutes ago, we promised the jury a little more real-time demonstration of how all this works.

Did you prepare or ask us to prepare an animation along those lines?

A Yes. I asked that we make a short movie that -- that describes how this system actually works.

Q All right. I think Mr. Gooden has now put up on the monitor the beginning of the short movie. Would you, working with Mr. Gooden, try and step us through this, please, Dr. Grimes?

A Yes. It begins by looking at the web page that has the cable on it. And so you're looking at this web page, and then you decide that that's correct. And so you find the cable that you want, and you go down and, sure enough, there's an add-to-cart button under it. We've seen this before.

You click on the button. The browser creates a message. The message is add-to-cart item. It sends the product information for the cable to the shopping

cart computer. The shopping cart computer then says, okay, this is the first one, so I need to generate a cookie with this shopping cart information in it for the cable.

Then I'm going to send that back to the customer computer, or the buyer computer, and that's going to store it in this -- the cookie file. The idea was to have a cookie jar there, which I thought was kind of humorous.

So then we go and make the second purchase, which is the software. I click on the download button, which generates an add-to-cart message. And it sends -- now it sends this additional cookie that it has with the first item in it to the shopping cart computer. The shopping cart computer now takes the first cookie and modifies it and makes the -- change it to have both items in it, and sends it back to the customer's -- the buyer computer, also the client -- same as the client computer, and it stores it in the cookie file.

Okay. Now, when the shopping is concluded, and you have this shopping cart page you're looking at that has this button on it called checkout, you click the checkout button. It, just like before, generates another message to checkout, sends along all the cookies that go to this server, which includes the cookie with

the shopping cart information in it.

That information goes to the server computer. This time, though, the message is checkout, the action to take place. So in this case, it takes the information from the cookie and puts it in the shopping cart in the shopping cart database.

So now we're ready to proceed with the next stage of the checkout, which depends upon having the information in the shopping cart database.

Q Did you confirm with any sort of Newegg documentation or Mr. Wu's testimony that the Newegg system actually works as you've testified and just shown us with the animation as well as your Slide 42?

A Yes, I did. These animations, of course, were done -- I had them done in preparation for the trial. These are not Newegg movies. These are movies that I had created.

Q Do you have a --

A But they are completely consistent with Mr. Wu's testimony. That's the important thing is that they are illustrative and demonstrative of how the Newegg system works.

Q Do you have a copy of Exhibit 14 in your binder, Dr. Grimes?

A Yes, I do.

Q Would you tell us what that is and what, if anything, that's got to do with what we just spent the last 15 or 20 minutes focusing on, this cookie, add-to-cart, checkout, database, storage issue?

A This is a two-page diagram. It's entitled Newegg Shopping Flow.

This is -- this is a page that we got from Newegg that describes how the shopping flow works. And this, in fact, is also -- I believe Mr. Wu was actually asked about this diagram, and that's how we were able to understand in great detail what all of the different actions are taken by the Newegg system. So it works -- this is additional supporting evidence for it working the way that I just described.

MR. ADAMO: Turn to Element 34(f) of Claim 34 of the '314 patent, please.

Q (By Mr. Adamo) What does that claim element require?

A This is a different kind of claim. This claim is about how the buyer computer is programmed. So the language starts out the buyer computer being programmed to do several things.

First, it has to receive a plurality of requests from a user. These requests from the user are to add products to a shopping cart. And then the

request from the user and the products need to end up in the shopping cart database.

So since this is a system claim, that means that the Newegg system must contain the structures that allow this to occur.

Q Does the Newegg system meet element 34(a) in your opinion?

A Yes, it does. It, in fact, contains the structures shown on this diagram and is consistent with this diagram on the screen now, as well as Mr. Wu's testimony of how the system works.

Q Can you show us --

MR. ADAMO: Just back up a second here.

Q (By Mr. Adamo) Can you show us again an example of the add-to-cart button in the Newegg system?

I guess you've got one right here.

A Yes. This is the -- each time there is a product on the web page that the user desires to purchase, or download if it's -- if it's downloadable software, there's a button that has this little icon picture of a shopping cart on it. And when you click that, that sends a message to the Newegg server system to add this item to your shopping cart.

Q The add-to-cart button is on the Newegg web page, apparently, but how is Newegg programming the

buyer computer?

A The Newegg programs the buyer computer because when it sends -- the server computer sends the information back to the buyer computer in a message, that message contains programming. It's programmed in a language called html. It stands for hypertext markup language. And it's a language that the browser uses to display the page and to program the actions of the buttons, for example, the add-to-cart button.

So the programming of the buyer computer is done by Newegg by virtue of sending this html code in a message to the browser, and the browser executes that code, generates the display, and provides the actions available to the customer, for example, the add-to-cart action.

Q Do you have on one of your slides, say Slide 44, some of this html code, Doctor?

A Yes, I do.

Q Would you show it to us, please?

A This is the code -- actually, the code for this page displayed is probably 30 or 40 pages long. In other words, that's one of the reasons these binders are so thick is because I captured all of that code and looked at it for this entire page.

But the important thing was now going to be:

What is the action that takes place that it's programmed to do to generate the request?

Well, the requests are generated by virtue of the user, the buyer clicking on the button. And the computer has been programmed by Newegg, because this example, the code that we see here, causes the action when you click on the button.

In addition to providing the action, it also does more code here that tells you what the display is supposed to look like; in other words, what this little button is supposed to look like. It's supposed to say add-to-cart and have this icon and so on.

But the important thing is, is that not only does the code describe how to display the button, but it describes the action to be taken if the button is clicked by the user. And that's how the user sends a request.

It says: Program to receive a plurality of requests from the user. These requests are generated by clicking on add-to-cart button.

Q Are these -- in view of the explanation you have just given us about the request to add products to a shopping cart, are those requests, in your opinion, Doctor, requests to add products to a shopping cart in the shopping cart database?

A They are.
Q Why?
A Because the requests, as I just showed in the animation and the description of how the system works, the items that are added end up in the shopping cart database. Therefore, the request from the user to add the product ends up in the shopping cart database. And that meets the requirement of this claim.
Q Does Element 34 specify in any way when or how products are added to the database?
A It specifies the how because they are a result of a request from the user to add products. But it doesn't say anything about when. I mean, this is characteristic of system claims. The system has to be capable of making -- at some point, the request from the user to add product must be represented in the shopping cart database, which is the case --
Q And --
A -- as I described how that worked.
Q And in view of that description, because the information of what was in the shopping cart eventually ends up, or ultimately ends up in the shopping cart database, in your opinion, is that enough to satisfy, literally, element 34(f)?
A Well, that's what's required by a proper

reading of Claim 34(f). And the answer is yes, that's the way the Newegg system operates.

Q In your opinion, then, does the Newegg system literally meet element 34(f)?

A Yes, it does.

And back to my chart here, I gave 34(f) a check mark.

Q All right.

With regard to element 34(g), what does that element require?

A 34(g) is an additional thing that the buyer computer must be programmed to do to meet this claim element. And this one says, in response to these requests to add the shopping cart messages to the shopping cart computer, it's important that -- another requirement is that each of these requests contains or comprises, includes, a product identifier identifying the plurality of products.

Now, I mentioned that when you click the add-to-cart button, the message contains a product identifier. This is the actual html code, and it's a get request from the client to the web server.

And a get request gives the URL, and then there's an item number here that's in bold -- I don't know if you can read it or not. It says N82E1 and then

a bunch more digits. That is the product identifier for the cable that I purchased.

Q Does the message then include a product identifier for the product being added to the Newegg shopping cart as element 34(g) requires?

A Yes, it does. This message goes -- when you click the add-to-cart button, the message goes from the client computer to the web server. And I have a little -- cute little animation here that shows the message going from the client to the shopping cart computer labeled here as a web server.

Q For the reasons you've just described to us, did the Newegg -- I'm sorry -- does Newegg program the buyer computer to do this?

A Yes. By virtue of sending the html code to the buyer computer, Newegg -- what it's doing is controlling the buyer computer and what actions can be taking place -- can take place on the buyer computer.

And so one of those actions is add-to-cart. And so when the -- when that action is -- the request is made by clicking the button, in fact, the shopping cart computer, because of its programming, sends the message, which includes the product identifier.

Q What do you conclude about element 34(g) as to whether Newegg meets that, Doctor?

A Well, for all these reasons and the evidence shown here and that I summarized, it meets 34(g).

Q All right. 34(h), what are the requirements of element 34(h)?

A Okay. 34(h), we just talked about the programming of the shopping -- of the client computer.

Now we are going to switch and talk about the programming of the shopping cart computer. We just talked about the client being programmed, and now we have to show that the shopping cart computer is programmed.

Q Is it?

A Yes, it is.

Q How?

A That's what the web server does; it receives messages and takes actions. And computers just don't do anything unless they are programmed to do them. Otherwise, they just sit there and consume power.

In this case, the server computer, here called the web server. In fact, its sole purpose in life is to receive requests and to take action based on those. So, in fact, it does receive this plurality or the several shopping cart messages as required and takes action.

Q All right. Does 34(h), the element of the claim that we're looking at, have any other

requirements?

A Yes, it does. There's basically two parts. It has to be programmed to do two things.

Receiving the plurality of messages is -- is really not in much dispute because that's what web servers do.

The second part, though, is -- is more problematic and is one of the issues in the suit, as we heard this morning.

And here this shopping cart computer has to be programmed to modify the shopping cart in the shopping cart database, and the modification in the database has to reflect these plurality of requests to add products to the shopping cart.

Q All right. Is the Newegg shopping cart computer programmed in that fashion?

A Yes, it does. It is programmed to do that. It's shown in this diagram here, along with the supporting testimony from Mr. Wu. And the Court's construction about modify I wrote here because it's very important to this, showing that the Newegg system meets this claim element. Modify means to change an instance of a shopping cart in a shopping cart database.

Q Let me -- let me ask you -- I think this is essentially the same question, but let me phrase it in

slightly a different way.

Does the claim require the shopping cart computer being programmed to modify the shopping cart in the shopping cart database after each shopping cart message?

A No. The claim, as we can see by reading the text here, it says you have to modify the shopping cart to reflect the plurality of requests. It doesn't say follow one -- it doesn't say one at a time. It just says that -- that the result has to be that the shopping cart database reflects these results. And it has to modify the shopping cart in the database to do that.

As you understand this claim and how -- at the moment, focus on your understanding of the claim -- is it correct that the modification could happen after each individual message?

A Yes. That would be -- if it happened after each individual message, that would also meet this requirement, because the claim doesn't say whether it has to be done one at a time or all at once. It simply says that the shopping cart database has to be modified to reflect this -- these three requests. You make three requests for products, the shopping cart database has to reflect that. It doesn't say one at a time or all at once or some other way.

Q As you understand the claim element, it could work either way; is that fair?

A Yes. In fact, in my experience in online shopping, systems do work both ways. So the answer is yes.

Q And which way does Newegg do it?

A Newegg does it all at once, as I described earlier. They -- they wait until you do the checkout operation. In other words, you can add-to-cart, add-to-cart, add-to-cart, the information shows up in the cookie. It's only when you do checkout that it's stored in the shopping cart database.

Q All right. In earlier submissions in the case which haven't been in front of the Court so far, but I'm just going to say this, Newegg has said that, going from an empty cart to a full cart is not a modification but an insertion.

What's your reaction to that and your response, Dr. Grimes?

A Well, I mean, you can -- you can characterize it as an insertion, I suppose. But I'm not sure what they mean by that.

The thing that I did was I went back to the Court's construction, which is to change an instance of a shopping cart in the shopping cart database. I mean,

the Court said this is what it means to modify it. So that's -- that's the definition I used.

I don't know -- you could call it an insertion, I suppose, if it, in fact, changes an instance of a shopping cart in the shopping cart database. Then it would match. But, otherwise, I am not sure what they meant -- Newegg meant when they said, no, no, it does an insertion in the file.

Q In your understanding, is going from zero items to multiple items a change as the Court used that phrase in the definition we're looking at on your Slide 49?

A The answer is yes. And the reason is because that's what Mr. Wu testified was the way that the shopping cart database -- insertion, if you want to use that word -- occurred.

In other words, there was an instance of a shopping cart, and that instance was modified. And that's the way the system works. And, therefore, based on his description in his deposition, it meets the modify requirement for the -- based on the Court's construction.

THE COURT: Mr. Adamo, we've been going for about two hours. Whenever you get to a good stopping place, unless you're about to finish up with

this witness. How much longer do you anticipate?

MR. ADAMO: On this point, we're exactly at the place we were going to talk about the Doctrine of Equivalents. Maybe five more minutes --

THE COURT: Go ahead and finish that.

MR. ADAMO: -- and then this would be a good place to break, if I can ask everybody to hang in for five more.

THE COURT: As soon as you get to a stopping place, we'll take a break.

MR. ADAMO: Absolutely, Your Honor. Appreciate the courtesy.

Q (By Mr. Adamo) Dr. Grimes, I just promise we're going to do this accurately but quickly.

A All right.

Q The slide says literal analysis -- this is your Slide 49. Why are we specifying literal analysis on this slide?

A Well, this is a -- it's to remind all of us, and me in particular, that, in fact, I did another analysis, which is the Doctrine of Equivalents.

So I just described to you my literal analysis. This is the way I believe the claim should operate, should mean, and this is the way the Newegg system works, and it meets the literal description in

the claim.

Q Okay. Now, you did this alternative analysis because you're not sure of your analysis, or you did it just to see what would happen if you had bought into Newegg's argument?

A No. I didn't do it because of any question of my own analysis because of the reasons I said, the testimony of Mr. Wu and so forth; but just sort of to make sure, I did an analysis of this claim limitation based on what Newegg interpreted it to mean. And I did that analysis under the Doctrine of Equivalents.

Q And your understanding of what Newegg interpreted this to mean was an addition every time there's a message?

A Yes. They interpreted this language, which to me it doesn't say that, but they said: When you reflect the plurality -- let me see if I can restate the language as they mean it.

They said, to reflect a plurality of requests to add products to the shopping cart each time a request is sent by the client. I have made this up. But they think that this other language, each time a request is made by the client is actually there.

And so I said, well, let's -- let's make the assumption, under the Doctrine of Equivalents, that it

is there, and then do they still match this claim requirement under the Doctrine of Equivalents. So that's the analysis I did.

Q All right. Under what you understand to be Newegg's belief position, whatever, do you believe that Newegg meets the modify element under the Doctrine of Equivalents?

A It does. I did the three-part analysis I described before. I won't go back through all of that. But the function performed, which is to modify, is the same under the way Newegg thinks it should be interpreted versus what I think is the correct literal interpretation, the result is the same, I mean, you end up with items stored in Newegg's shopping cart database. The discrepancy is the way Newegg does it and the way Newegg thinks it needs to be done, which is one at a time.

So I looked at the way Newegg does it, which I already described it adds items to the cookie, and then at checkout it dumps all of the items into the shopping cart, versus doing it every time you do an add-to-cart. I actually prepared a little animation to show this difference.

Q Okay. Another animation. A quick one, I hope?

A A quick one.

Q All right.

A So the claim, according to Newegg, is that, every time you click an add-to-cart button, they maintain that that has to cause it to show up in the shopping cart database. That's the essence of the way they think that the claim should operate. And I said all the systems do it that way, so that is a perfectly reasonable -- if they did it that way, that would, in fact, practice the claim element.

But the way they actually do it is different. I did this before so you will recognize it. Every time you add an item to the shopping cart, it actually gets added to the cookie, which you can think of as like a shopping basket or something. Then once you do the checkout operation, not the add-to-cart but the checkout operation, that causes all of the product identifiers in the cookie to be put into the shopping cart database.

So the question is, okay, these two ways of interpreting the claim are different, but are -- are the differences between these two ways substantial? And, in fact, I looked at them and they are not substantial. The differences are insubstantial.

One of the reasons I came to that conclusion is, these, in fact, are design alternatives. A designer

implementing a shopping cart and putting items from a shopping cart into a database could do it either way. In fact, systems do do it either way.

So these two, the differences between the way Newegg does it, on the bottom, and the way they believe that it is required to be done, on the top, are, in fact, equivalent under the Doctrine of Equivalents.

Q And that's with respect specifically to elements 34(h), correct?

A Yes. I can -- we're going to back up. Here it is. This is 34(h). So this is the claim element that I analyzed under the Doctrine of Equivalents.

Q All right. So what's the conclusion that you reached, Dr. Grimes, as to whether Newegg meets element 34(h) under the Doctrine of Equivalents?

A It meets this under the Doctrine of Equivalents, so I gave it a check mark.

Q Okay.

MR. ADAMO: This would be a good point, Your Honor, with the Court's permission.

THE COURT: All right. Very well.

Ladies and Gentlemen of the Jury, we will be in recess until 3:10. So enjoy your break. Remember my instructions. Don't discuss the case among yourselves.

Be in recess.

(Jury out.)

(Recess.)

(Jury in.)

THE COURT: Please be seated.

You may proceed, Mr. Adamo.

MR. ADAMO: Thank you, Your Honor.

Thank you, Ms. Ferguson.

Q (By Mr. Adamo) All right. Dr. Grimes, let's see if we can finish out. I think we were on -- I should just check 34(h), I think that's where we stopped before the break. Let's move on to element 34(i), and let's see if we can pick up the pace a bit if you don't mind, Doctor.

What does element 34(i) require?

A This is a third aspect of how the shopping cart computer needs to be programmed. And this caused the shopping cart message -- payment message to be created.

Q What's a payment message?

A Well, the Court's construction is here.

Payment message is a message relating to the payment for one or more products.

Q Does Newegg meet this element?

A Yes. This page shown here has the billing information and the total, which is -- in fact, meets

the Court's construction.

Q And what is Newegg's payment message? Is it this confirm order page?

A Yes, it's this confirm order page that's shown here.

Q And why is that a payment message?

A Because it's a message because of the information that's received from the server, that relates to the payment for one or more products. And we know that because we can see the information on the page.

Q Is the shopping cart computer programmed to cause this to be created?

A Yes. We know it is because we received this web page from the shopping cart computer.

Q And does that then go back to your point earlier about html code generating the page and that being programming?

A Yes. That code is, in fact, generated by the shopping cart computer sending a message to the client and displayed.

Q What did you conclude about element 34(h) -- excuse me, 34(i) then?

A It's met by the evidence that we've summarized here, and I gave it a check mark.

Q 34(j), what does element 34(j) require?

A 34(j) is a programming about the -- effected on the buyer computer, and it has to be programmed to do these two things, receive a request and to cause a payment message to be activated to initiate the transaction.

Q Is Newegg's buyer computer programmed to perform the first task of element 34(j)?

A It is programmed to receive a request because when you click on buttons, the submit-order button in particular, that generates the request which is received from the user.

Q All right. What about the second task? Is the buyer computer programmed to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart?

A Yes. The Court's construction is listed here, and when the submit-order button is clicked, that, in fact, causes a payment message to be activated to initiate the transaction.

Q And how is that done?

A The action is caused by the message that's sent in response to clicking the submit-order button. That's what causes the activation of the initiation of

the payment transaction.

Q And is the message that's sent to the Newegg shopping cart computer, does that tell the computer that the buyer made the requested purchase?

A Yes, it does. That's the action that's to be taken place by the buyer -- by the server computer when it receives this message. It initiates the transaction.

Q And is the sending of the message an action associated with the payment message so the Court's construction is satisfied?

A Yes, that is correct.

Q Is the payment transaction initiated?

A Precisely. The -- the clicking of this button and the sending of the message to the server computer is what initiates the transaction.

Q So the buyer computer does the recited actions then?

A Yes. The buyer computer is programmed to cause the message to be activated, and then that message is received by the server computer.

Q And programmed how, again?

A Programmed using html that's been sent from the server computer.

Q Do you have any further evidence that a payment transaction was initiated, more than what we've

look at so far?

A Well, we can tell it's been initiated because, in fact, we get a thank-you message from the website in response to the server computer initiating payment thanking -- thanking me for ordering it.

And further, sometime later, I get an e-mail. This came to my e-mail for my purchases telling me that my order was successfully charged. So I know that, in fact, the payment transaction had to have been initiated; otherwise, I wouldn't get this message.

Q Dr. Grimes, does Newegg meet claim element 34(j) then?

A Yes, it does for the reasons I summarized here, so I gave it a check mark.

Q Let's move on to claim elements 34(k, (l), and (m). Do these elements add new structures to the claim?

A No. These are really definitions. In fact, they're definitions consistent with the Court's construction. So these were the definitions I've already used in the analysis that I performed thus far.

Q All right. Let's just step through them briefly for completeness.

34(k), does the Newegg system have that claim shopping cart?

A Yes, it does. It has this stored

representation of a collection of products.

Q 34(l), does the Newegg system have the claim shopping cart database?

A Yes, it does. The Newegg database does meet this claim element.

Q And 34(m), does the Newegg system have the claim shopping cart computer?

A Yes. The shopping cart computer, as we've talked about earlier, is the computer that modifies the stored representations in the database.

Q And in the way you've discussed before the break with respect to element 34(h), is the shopping cart computer modified -- programmed to modify the shopping cart and the database, et cetera, et cetera?

A Yes, it is. It uses this network connection in this diagram -- this large diagram that I showed earlier.

Q Does Newegg meet elements 34(k) through (m), then, in your opinion?

A Yes, it does. And these are the three remaining elements of 34, so I gave each of those a check mark.

Q All right. We've been through elements (a) through (m) of Claim 34. That's all of them?

A That is all of them.

Q All right. In your opinion, then, does the newegg.com website meet all the elements of Claim 34?

A It does. It does.

Q Before we go to Claim 35, let me ask you about the neweggmall.com. Does that meet all the elements of Claim 34?

A It does. The transaction that I did verified that the Newegg Mall also meets element -- all the elements of Claim 34.

Q So if we went through all of the detail we just went through with this Newegg website, we'd end up with boxes checked for all of 34(a) through 34(m)?

A Yes, we would. The transactions operate really substantially the same way on newegg.mall as they do on newegg.com, based on Mr. Wu's description of Newegg Mall.

Q So, literally, would all of elements 34(a) through (m), in your opinion, be satisfied by neweggmall.com?

A Yes, they would.

Q All right. Now, let's turn to Claim 35.

Please tell us what you understand Claim 35 requires.

A We saw this at the beginning of the '314. This is the one that depends upon 34. So 35 then

includes everything included in 34, and then adds some additional limitations.

In this particular case, the shopping cart computer I have to show is programmed to cause the payment message to be created before the buyer computer causes the payment message to be activated.

Q And why do you say that the payment message was created before? What is it that you see that evidences that?

A Well, the payment message is really the message that creates this web page that's displayed to the user that comes from the -- from the web server, the shopping cart computer. And it contains this button. And it's the button that activates the initiation of the message.

So the payment message is created because we can see it, and then the button is clicked. And so the message is created before the payment message is activated.

Q If it wasn't done in that sequence, would there be a button to click?

A No, there would not be a button to click. Just by nature of the way that the system operates, the message occurs, then the button is there, and you click on the button, and that activates the payment.

Q With regard to Claim 35, then, Dr. Grimes, is it your view that Newegg meets that claim?

A Yes, it does. It is my opinion, so I gave 35 a check mark.

Q All right. Now, looking at Claim 35 as a whole, what's your opinion?

A Well, Claim 35, which includes Claim 34, has all the elements that we've just analyzed. And I presented summaries of my detailed analysis so I gave 35 a check -- 35 is one of the claims in the suit.

Q And is it your view that Claim 35 is literally infringed?

A Yes, it is literally infringed.

Q All right. Let's turn to Claim 51. What does Claim 51 require, Doctor?

A 51 is a similar structure to 34 because it also depends on 34. So all of the analysis that we just completed for 34 applies also to 51.

So 51 adds an additional requirement where the network that's in Claim 34 is an internet.

Q Can you explain -- oh, I see. So what you called earlier is the cloud, the public internet, that is the element that you say responds to Claim 51?

A Yes, that's correct.

Based on the system diagram that we have here,

you can see that the internet is the network that connects the customer computer with the server computers.

Q All right. And a number of the slides that we've looked at have had the source information in the lower right-hand corner that we discussed earlier. This slide does. Same reason, the source information is there for the same purpose, Doctor?

A Yes. That's the case for all of the slides that I've summarized. I made sure that each one of them has the source from my detailed analysis.

Q So what's your ultimate conclusion about Claim 51?

A Well, for -- because of the rationale for -- and the evidence for Claim 34, Claim -- and the way Claim 51 is evidenced, then I gave 51 a check mark as well.

Q Is Claim 51 literally infringed, in your opinion, Dr. Grimes?

A Yes, it is.

Q All right. Why don't we now turn our attention to the '492 patent.

And I think in your overall topics we are right in the middle of the three patents. We have done '314 patent; we are now at '492.

What relation, again, does the '492 patent have to the '314 patent?

A The '492 patent, turns out, it also has a claim that's very much like the '314 patent; but the main feature of the '492 patent is that it adds a different functionality, namely checking past transactions.

Q All right. Let's -- excuse me just for one moment.

Okay. Claim 15 of the '492 patent, that claim is directed to what?

A Yes. Claim 17, which is -- which is -- let's see, Claim 41, let me say --

Q Okay.

A -- is the one that's asserted in this matter, the first one to be dealt with. And 41 depends upon -- depends upon Claim 15.

But I think there's another patent -- another claim that we were going to deal with first.

Q Yeah.

A Claim 17, which is actually not listed here.

Q We don't have that one on the chart?

A That's a little bit confusing. I don't think I have a chart with Claim 17 on it.

Q All right. Let's -- so we have to work

without the chart on Claim 17. But let's do Claim 17 first anyway.

Can you tell us what the differences are between Claim 17 and Claim 34 of the '314 patent?

A Yes. This is relatively straightforward to deal with because we just spent all this time on Claim 34 of the '314. And it turns out that Claim 17 of the '492 is almost identical. I mean, if you compare the text side by side, which I have done, there's actually very little difference. What the differences are I've got on this slide and the next one.

Q All right. So this is your Slide 67. You've got a first difference here that you identified between Claim 17 of the '492 patent and Claim 34 of the '314 patent?

A That is correct.

Q All right. Could you briefly explain the first difference?

A Well, the first difference is that the computer network in the Claim 34 has an additional requirement in that it has to be a public packet switched computer network. So, it's more specific than Claim 34.

Q Does Newegg's system use a public packet switched computer network?

A It does indeed. The Court construed the term packet switching in analyzing the -- because of the fact that it uses the internet, it's really well-known that the internet is, in fact, an example of a packet switched system that meets the Court's definition. It's a packet switched computer network.

Q How do you know the internet is a packet switched network, Dr. Grimes?

A Well, not only did Mr. Wu confirm that, but the other documents that I have listed here provide additional confirmation. The RFC listed here and Tanenbaum, which is a very well-known book on computer networks.

Q And a packet switched network -- I think you might have seen during my opening, I put a slide up there quickly -- is a packet switched situation where messages are split up into pieces, the packets are sent, and then the packets can go in a variety of different paths, but they eventually arrive at their destination, and then they are reassembled?

A That's correct. The message is far too long to be contained in a single packet, so it's broken up into multiple packets. That's just the way the internet works.

Q You made reference to something called RFC

'791. Would you look at your binders and hopefully you're going to find Exhibit 24, which should be that internet protocol?

A Yes. This is a document from the Internet Engineering Task Force, which is a group of -- loosely coupled group of people who, in fact, worry about what kind of standards should be used by the internet. And this RFC is an example of one of the documents that describes the IP or the internet protocol.

Q In your experience and in your view, Dr. Grimes, is an RFC such as this a reliable reference and, in fact, a reference that people in your line of work and your experience rely upon with regard to the internet protocol?

A It is. The Internet Engineering Task Force is a group of people who are all cooperating. And so when a document like this shows up, the other people say, okay, well, this is the way we should do it. It doesn't have force of standards body or something. But, in fact, it works very well over many, many years as a way to get uniformity in the operation of the internet.

Q And you also talked about Tanenbaum 3D edition on Slide 67. What is that?

A Tanenbaum is probably one of the most well-recognized computer science books that deals with

computer networks. And he has many editions going back many years, and the 3d edition is an example.

Q Is Tanenbaum, to your understanding, a reliable reference, essentially a standard reference in the computer network field that people such as yourself rely upon?

A Yes. Tanenbaum is what I would call an authoritative source of information about all aspects of computer networks.

Q All right. We've got on the system the front page of Tanenbaum's book, part of which is in -- should be in your binder as Exhibit 25. Would you find that for us and confirm that Exhibit 25 is, in fact, part of the Tanenbaum book?

A Yes, it is. I have provided specific citations for that which are listed across the bottom of the slide here to specific pages in this reference to confirm that the internet uses this packet switched protocol, the packet switched computer network.

Q All right. What about the other differences you identified between Claim 34 of the '314 patent and Claim 17 of the '492 patent?

A This difference relates to the messages that are sent back and forth between the client and the server and the server and the client. In this case, the

shopping cart message, which goes from the client to the server, has additional requirements. In particular, it has to contain a universal resource locator or a URL. And the payment message is another example of a message that must contain a URL.

And here is the http traffic that I recorded during my purchase example. And, in fact, it shows that the http shopping cart message contains a URL and shows that the payment message also contains a URL.

Q What conclusion did you reach then, Doctor, with respect to Claim 17 of the '492 patent and whether the Newegg system satisfies it?

A Because of these differences and additional requirements are met, I concluded that Claim 17 is practiced by the Newegg system.

Q Literally?

A Literally.

Q All right. Let's move on to other claims in the '492 patent.

Does the '492 patent have other claims that, in your opinion, are met by Newegg?

A Yes. This is the second, in some sense the major feature of the '492, which is the hypertext statement system.

Here we have Claim 15 and Claim 41 on the

board. And as we can see from the board and from the slide, we first need to analyze Claim 15.

Q All right. Is that because Claim 41 is dependent; it cites back to Claim 15?

A Yes, exactly. It's a dependent claim, and it's dependent upon Claim 15. So we have to revisit Claim 41 after we have looked at the evidence for Claim 15.

Q All right. We've got your -- now we've got your poster that matches the questions I should be asking you. Got Claim 15, Claim 41, and hopefully it's also going to work for Claim 61, which it looks like it does.

Let's start with Claim 15, please. You used the same system of breaking it down into subparts with brackets to show what you did yourself?

A Yes, that's correct.

Q Let's turn to 15(a) first. What does that element recite?

A This is a -- recites a hypertext statement system comprising, which means it includes the items listed below.

Q Does Newegg have a hypertext statement system?

A Yes, they do. They call it the order history system, order history pages, but it is a hypertext

statement system.

Q Look now at elements 15(b) through 15(d). What did your analysis of those elements show?

A These three elements, looking at (b) first, requires a client computer, which is the same computer we were used to pointing out in the upper left-hand corner of the diagram. And it's for operation by a user of the claim.

Q And what about element 15(c)?

A Element 15(c) is -- requires one or more server computers for operation by server users. And we've seen this before, as I circled it in red here with the oval. Previously we called it the shopping cart computer, and it also performs the hypertext statement functions.

Q And now element 15(d), what did your analysis show there?

A The client computer and the server computers are interconnected. And we already dealt with this question before. It's interconnected with a public packet switched computer network, which is the internet.

Q What is your opinion, then, Dr. Grimes, as to whether Newegg meets Claim elements 15(a) through (d)?

A Based on the evidence we've summarized here, in fact, the Newegg system meets these four claim

elements listed here.

Q All right. Let's continue with your analysis of Claim 15. Looks like we're up to element 15(e). What did your analysis with respect to that element show?

A This is a requirement for the programming of the server computer, and it has to do a couple of things. One of them is to record information pertaining to the transactions in a database. And the database is shown on the right here with the little yellow square, and that's where the order information -- the order history information for the transactions is stored.

Q Does the Newegg server computer record the information, then, about the purchase transactions in the database?

A Yes, it does. We can see this because the web server column, if you will, is the transaction server for hypertext statement documents. And the thing at the bottom says send message. So the web server sends the message, and it goes through the MSNQ server into the data center and stored in the order database. So it meets this claim element.

Q Is the little gold square in there in the original document or is it there --

A No, I added that. That is to represent the

order history and the result of the recording that information in the order history database. That is the database that is required.

Q All right. You've just explained how the data is recorded. How is it programmed to do that, or at what point is it programmed to do that?

A Yes. We know that it's programmed to do that because of this diagram, number one; and, number two, because when Mr. Wu was asked about where the information is recorded, he said it's recorded in the order database.

Q What's the second function that the server computer must be programmed to do?

A Okay. The second thing is that the same server computer must also be programmed to transmit a statement document that contains the transaction records to the client computer over the network.

Q Are new -- excuse me -- Newegg server computers programmed in that way, Dr. Grimes?

A Yes, they are.

This is an example of the html code on the client. And when you click the link that requests the order history, shown here in the red, from the newegg.com secure server, which is the server we've been focusing on, the server says, okay. That means that it

received the request and is going to supply the requested information.

Q And how does that -- how do you know that the computer's -- excuse me, the server computer was programmed in the required way then?

A Well, I mean, that's what server computers do. They are all programmed -- the only thing the server computer really does is it receives requests and takes action based on those. And the way we know that it is programmed to do this particular operation is because we receive an order history page as a result of the request.

Q What did you conclude about whether the Newegg system meets element 15(e)?

A For the reasons I've stated here, and the other reasons, including Mr. Wu's testimony, it meets this element.

Q All right. Let's turn our attention to 15(f).

Would you please explain your analysis for that claim element?

A This is a requirement on how the client computer is programmed. And we know from earlier it's programmed by sending an html code from the server to the client. That program -- the client controls what the client computer does.

And it does these three things. It displays the statement document, it's called an order history. It receives a request from the client to display details. That's done with a mouse click. And it causes the transaction detail link corresponding to that portion of the document to be activated when you click on the request.

Q Does the statement document have invoice number hypertext links in it?

A Yes. Here's the portion of the web page that comes back when you -- when you do this. So we know that the -- the request was successful.

This particular -- this represents multiple purchases that I've made. One of them is this dash 5 -- ends in 560. It's underlined, so I know it's a link.

Q Okay. And the element also requires that the client computer is programmed to cause a transaction detail hypertext link corresponding to part of the statement document to be activated, right?

A Yes.

Q I did --

A And clicking on this link not only sends the request but causes the detailed document to be activated.

Q And you know that how?

A Well, I know that because when I click on it, I end up seeing the detail document.

Q What did you conclude about whether the Newegg system meets element 15(f)?

A The Newegg system does, in fact, practice element 15(f).

Q Let's turn to element 15(g), please.

What does your analysis of the newegg.com system show with respect to this element of the '492 patent?

A Okay. Well, this is the other side of the request. In other words, we just talked about the buyer computer clicking the link, sends the request. This says that the server computer needs to be programmed to respond to the activation of the link. And it responds by transmitting the details to the client computer over the network as a detail document.

Q Does the Newegg system meet this element?

A It does. And here is the document that actually shows up on the client computer. So the only place it can come from is from the -- from the server computer based on the request for this document. And here it is. And it, in fact, shows the detail for this particular invoice. In fact, this is the software. So this is not the cable, but this is the software that

I ordered. So this is the details behind that link that I clicked on.

Q And this is your Slide 77 that you're describing?

A Yes, that's correct.

Q Does that conclude your explanation of how element 15(g) is met?

A Yes. 15(g) is the last element of 15 that we needed to analyze before dealing with 41. And so all the elements of 15 have been met, so I gave them all the check marks all at once.

Q In your view, Doctor, were they all met literally by the Newegg system?

A Yes, they were. They are all met literally by the Newegg system.

Q Okay. Let us then look at Claim 41. We already looked at 15, which 41 is dependent from, and you have concluded that 15 is literally infringed?

A Yes.

Q All right. Now, let's turn to 41. What did your analysis of Claim 41 show?

A Well, this is an additional requirement in addition to all the requirements of Claim 15. And this requirement is -- is that at least one of the server computers in the client -- one of the server computers

to the client computer in response to a statement URL sent by the client computer to one of the server computers.

So we need to look at the -- at the information, the message that came from the client computer and determine whether or not it contained this statement URL.

Q Does Newegg meet this claim element -- I'm sorry, this claim, excuse me?

A It does. This claim is -- by clicking the order history, sends this following request. And the request, in fact, includes the URL as required by this claim. And it meets the Court's construction, as I showed at the bottom here.

Q All right. What was the definition you applied in that analysis for a statement URL?

A The statement URL, which is the claim term, the Court said is a URL that concerns a statement. And this concerns the order history, which is, in fact, a statement.

Q Does that satisfy the Court's definition, sir?

A It does.

Q All right. Does the newegg.com system meet the additional element of Claim 41 as to Claim 15?

A It does. So I gave Claim 41 a check mark.

Q Is it your belief and conclusion and opinion, Doctor, that Claim 41 is literally infringed by the newegg.com system?

A Not only Claim 17, but Claim 41, are literally infringed.

Q Before we turn to Claim 61, did you do an analysis of Claim 15 and Claim 41 for the Newegg Mall that we were discussing earlier?

A Yes, I did. Claim 15, Claim -- and Claim 41 were met by the Newegg Mall as I detailed in one of the appendices that we looked at earlier.

Q Was that also literal, in your view?

A Yes, it was literally infringed.

Q Let's turn to Claim 61 now, the last claim of the '492 patent that we're going to look at. That's at the bottom of your chart. Is that a dependent or independent claim?

A It's dependent. But instead of being dependent on 15, it's dependent on 60, which is dependent on 15. So there's another link in the chain here.

Q Okay. So 61 depends on 60; 60 depends back to 15?

A Correct.

Q What does Claim 65 require then?

A Before we look at 61, we have to look at 60. And 60 requires a statement system according to Claim 15, but the statement system needs to include information on the transactions by the user that took place during a given month. So this is an additional restriction on Claim 15.

Q What's your conclusion after analysis regarding Claim 60?

A Well, we can see from the exhibit here, which was the order history document that I received and looked at on my computer, that, in fact, it allows you to set one month and it will provide you with the details about the transaction for that month.

Notice I have at the top new version only.

Q Yes.

A In looking at the -- I did three different transactions -- or looked at three different transactions; two of them I did.

The earlier one, which was done in 2008, did not have this capability. So this capability represents something that Newegg added to their system sometime between the middle of 2008 and the middle of 2009 when these two transactions were done. So this is relatively recent.

The rest of everything I've talked about goes

all the way back to 2001. This is the first example we have of a claim that doesn't go all the way back to 2001.

This claim has really only been infringed since, for sure that we know, since sometime in 2009. So, it's relatively recent.

Q Up to this particular point, the limitation that appears, the dependent limitation that added to Claim 15, everything you've been testifying about earlier must apply equally to what you're calling both versions?

A Yes, that's correct.

Q Okay. Does that complete your analysis of Claim 60?

A Yes, it does. And now we can move to 61, which is dependent on 60, which was dependent on 15.

Q All right. To meet claim -- first, what does Claim 61 require?

A 61 requires further information on the transactions by the user in a hypertext statement system. In fact, it requires four items, but really only needs to include one of them, so date of transaction, product ID, payment amount, merchant identifier.

So we look at the order history information

and we say: Does this include at least one of these four elements? And the answer is yes, because it includes two of the four elements. It includes the date and the payment amount.

Q All right. I just want to clarify; you might have misspoke yourself.

Does Claim 61 require all four of -- the date of transaction and identification of the product, payment method, and a merchant identifier, or just any one or more of the four?

A All you have to do, if you match this claim requirement, is just one of these four.

Q All right. Now --

A There's two of them, which is, of course, at least one.

Q Agreed.

We're looking at your Slide 84. You've got new version only on this slide as well. Why?

A Well, 61 is dependent upon 60, and 60 is only the new version. So, therefore, Claim 61 also is restricted to just the new version because of Claim 60.

Q Does that finish your analysis with regard to Claim 61?

A It does. And this time I gave it a qualified check mark. I said 61 is met only by the new system.

And by new system I mean since sometime in 2009.

Q And in your view, is the infringement by the new system only of Claim 61, literal?

A Yes, it is.

Q All right. Doctor, that's all that we needed to address on the '492 patent. But before we turn to the remaining patent, the '639 patent, I want to ask you a few more questions about the system claims, the ones we've been discussing in the '314 patent and '492 patents.

Now, I hopefully was careful to ask you in each instance about your ultimate opinion and conclusion.

Am I correct that you testified that, and explained how the Newegg system met all of the elements of the claims that we've reviewed so far out of the '314 and the '492 patents?

A Yes, that's correct. The Newegg system is this large diagram beside me here.

Q Okay. Who uses the Newegg system?

A Well, in the first instance, Newegg, the company, uses the entire system. In other words, everything on this diagram here is used. And used means essentially the operation of it is controlled by Newegg. That includes the servers, databases, the network links,

the buyer computers as well.

Q And this is your Slide 86 where you have summarized your views on this subject, sir?

A That is correct.

Q Now, you say that Newegg also uses the buyer or client computer as part of the system, I see.

A Yes, that is correct.

Q All right. How do you reach that conclusion? I mean, whoever is sitting in their home is the one who's punching the buttons on their client computer; isn't it?

A That's also true. In other words, the client computer is used both by Newegg and by, you know, you or I if we're buying products.

Q All right. Let's stick to the use by Newegg before we talk about the customer use.

Why do you say that Newegg is using the buyer or client computers?

A Well, Newegg -- Newegg uses the client computer because it controls the client computer. In other words, if a person is buying products and paying for them on the Newegg website, all of the operations or all of the options that are available to the user on the client computer are controlled by Newegg.

And it's controlled because Newegg sends the

programming that the browser uses to display the pages, and the pages contain buttons that Newegg puts on the page, and those are the only options that the user has for what kind of operations to do on the Newegg website.

Q Now, you note here on your Slide 86 under buyer -- Newegg uses buyer computers client computers, you note providing cookies and storing shopping cart and other information and cookies on those computers. Then you've got a sub-note: Newegg requires customers to have cookies enabled.

Can you explain all that to us a little more, please, Dr. Grimes --

A Yes.

Q -- why that supports your view that Newegg uses the claim systems that you've been discussing?

A Certainly.

If -- if you go to buy something on the Newegg website, and you put items in the shopping cart, and you click checkout, if for some reason cookies are not enabled in your browser, the system will give you an error message basically. It says, I'm sorry, but you have to enable cookies on your browser if you're actually going to purchase these products.

The same thing happens if you try and log in and you don't have cookies enabled. The system -- the

Newegg system does not allow you to actually purchase anything, or log in for that matter to check your statement document, unless you have cookies enabled.

So there's no option for the user here. The user has to have cookies enabled or they simply can't purchase things on the website. So in that sense, the client computer operates automatically once the user enables cookies.

So there isn't any election or option available to the user. The user gets a web page to be displayed; and if cookies are enabled, then when these web pages come from the server computer, the browser automatically stores the cookies and Newegg realizes that because you can't buy things without having cookies enabled.

So this is the automatic operation of the user. There is no option for the user. They have to enable cookies or they simply can't buy products.

Q As best as you can tell from your review of all of this Newegg system information, was this some accident or was the system designed to operate exactly the way you just described it?

A No, it must operate the way I was describing. In fact, that's conventional in many websites on the internet. And when you first install a browser, in

fact, that's the default, that cookies are enabled. So, many times the users install a browser, they go to newegg.com, and they don't even realize this is an issue because, in fact, cookies are enabled.

Newegg's website was designed specifically to operate only with cookies enabled if you wanted to purchase products. You can shop, you know, but you can't buy anything.

Q All right. You don't get $2 billion from transactions if people shop and don't buy, right?

A Yes, that's correct. That's correct.

Q Let me just make sure that -- because you've used some terms here several times now and we didn't cover them in your tutorial. And I want to make sure that you explain the terms to the jury, because computer people don't speak English.

And cookies enabled, in plain English does that mean they're turned on?

A Yes. That means they're turned on. If you go into the preferences capability of the browser and search around, probably listed under cookies, you have the ability to turn them off. And if you do that, you can't buy products on the Newegg website.

Q You said something about cookies enabled being a default condition, am I remembering what you said

correctly?

A Yes. When you first install browsers, that's the default. In other words, the user doesn't actually have to do anything. That's sort of the way they operate, sort of out-of-the-box, if you will.

Q So when you say default, let me see if I can get that back in English. Enable means turned on, right?

A Turned on.

Q And default means it comes on and stays on unless you do something to shut it off?

A That is correct, yes.

Q Okay.

All right. Would you look at Exhibit 15 in your binder, please?

A Yes.

Q What is that?

A This is the help page from the Newegg website, and it is very well done actually. It's four pages long. It basically provides help for people that are having difficulty or have some questions about some things, or maybe they're having trouble logging in or whatever. So this is a help page that is organized in several categories. It talks about ordering products and so on.

Q Is there a discussion about cookies in that help page somewhere?

A Yes, there is.

Q Where is it approximately, so Mr. Gooden can blow it up so the ladies and gentlemen of the jury can see it.

A I'm looking for the -- yeah, here it is. It's on -- it says: I am experiencing trouble with my shopping cart. What can I do?

So this person has tried to check out, and it didn't allow them to check out. So they're having trouble with their shopping cart.

And it says here: Usually occur for one or more of the following reasons:

Number one, cookies are not enabled, and then it gives another reason, too, or your browser is configured to block cookies from newegg.com.

So for whatever reason, cookies are not automatically stored when they come back from the server. Either they're not enabled, or for some reason, the website is blocked.

Q So either they're not turned on or the client computer, the people who are sitting in their homes, are keeping other computers from shoving cookies into their computer by blocking it, correct?

A Yes. Some browsers have the capability, according to this, to block specific websites. I don't know why you would block a website you're trying to buy products at, but that's the second reason.

Typically, the reason is the first one, the cookies are not enabled. So some -- you know, maybe your son or daughter has come in and, you know, changed the preferences or something to block cookies.

Q Is there an analogy of any sort that you feel is appropriate, Dr. Grimes, that would describe Newegg's use of its customer computers?

A Yes. The key is, is that Newegg controls the operation of the client computer when it's connected to the Newegg website.

Example of that might be maybe the mother is preparing dinner or the father is preparing dinner, and the daughter comes up and says, can I go out and play, 11-year-old daughter, and the parent says, You can clean your room, or you can do your homework.

In other words, there's only two options available for the daughter. Playing is not one of them.

So this is -- this is the same kind of analogy for the way Newegg controls the operation of the client computer. The client may want to do something, but the only thing that they can do are the options that are

available based on the html that programs the browser.

Q Would it be appropriate, in your view, to say that Newegg is acting like a puppeteer?

A Puppeteer. I haven't -- I haven't thought about that. They are in the sense that they're controlling the available options on the client computer. So in that sense, it's like a puppeteer, yes.

Q All right. And Newegg uses the entire system for what purpose, Dr. Grimes?

A Well, the purpose is to -- you know, to make money. I mean, that's why really any company is probably in business. And they use the computer system to that end. I mean, they may have other purposes, but that's the one that comes to mind.

Q All right. You mentioned a few minutes ago that Newegg's customers also use the system. Does Newegg instruct the customers how to use the website and the system?

A It does through the help menu that I just described.

And in addition, the technical officer, Mr. Wu, said that yes, cookies are required in order to shop. That's the help page I mentioned.

If you try and log in and cookies aren't enabled, the log-in page itself tells you, you know, you

have to enable cookies in order to log in.

So if you -- if you use the website at all and cookies aren't enabled, there's all kinds of messages that tell you that that's likely the problem.

Q Would you look at Exhibit 18 in your binder, please?

A Yes. This is a corporate summary from the website.

Q All right. In the second -- please look at the portion where there's a discussion of -- about newegg.com.

Do you see that?

A Yes. Near the bottom?

Q Yes.

And the first line, let me read it out loud.

Quote, Newegg.com, Inc., is the second largest online-only retailer in the United States, period, close quote.

Do you see that?

A Yes.

Q You understand what that means?

A Yes. That means that there is no physical Newegg store. It means that the only way to buy products from Newegg is to type in, you know, or otherwise go to newegg.com or one of their other

websites and navigate the site and so forth, like I did in my purchase example. You can't go to a physical store and buy products.

Q Dr. Grimes, in your opinion, in view of everything that you've seen with regard to the Newegg systems, does Newegg encourage, coax, lead its customers to use Newegg's sales and hypertext statement systems?

A It certainly does. When you go to the home page, for example, it tells you what the specials are. I mean, it advertises on the website to say, you know, this is -- these are the specials that we're running. I mean, they have good prices everywhere, but the specials are things that -- products that they're featuring.

Q Would you agree, sir, that Newegg needs customers to use its website because that's the only kind of business it's able to do?

A Well, not having any physical stores, I mean, if you're a merchant, then you have to have a mechanism to sell products, and the newegg.com website is the main mechanism that they use to sell products.

Q Let's turn to the '639 -- thank you, Doctor.

Let's turn to the '639 patent now and see if we can keep up the focus here.

The '639 patent, again, just so we've got it,

because we've been talking about a bunch of other things. Very briefly, what does the '639 patent relate to, as you understand it?

A This is this -- has been described earlier as the session ID patent. And we'll be looking at -- at some claims, so if I could have the board changed to the next -- the next one.

The -- basically, the '639 patent provides the underlying technology to manage sessions using this technique called -- the invention called a session ID or session identifier.

Q All right. The session identifier that you just mentioned, did you give a particular meaning to session in the context of the '639 patent?

A Well, the cart construed it, and it's at the bottom of the slide here. It identified -- it construed both session and session identifier.

A session is a series of requests and responses to perform a complete task or a set of tasks between a client and a server system. We've seen client computers and server computers. Those make up a client and server system.

And then a session identifier is a string of characters, a text string, that identifies a particular session.

Q Does Newegg have a session identifier using the definitions that His Honor gave?

A It does. It actually has two different sessions: A checkout session and a log-in session.

Q Can you explain the first session, please?

A Well, sessions -- sessions have to have a beginning and an end, and there has to be one or more tasks associated with that. And then there has to be a session ID that corresponds to that session.

In the case of the Newegg system, the checkout session is initiated by clicking on the checkout button, and it ends when you click the submit order button.

The task, as you would expect, is paying for the products in the shopping cart. And the SID is a particular cookie. It's the value associated with the shopping cart ID cookie that's stored on the client browser and is updated by the server.

Q Okay. So what is the session -- excuse me. What is the Newegg session identifier for the checkout session then?

A It's the cookie called shopping cart ID, and the identifier is the value contained in that cookie, and it's showing here in red.

This box, by the way, is a fragment of the message sent back by the server to the client and

instructs the client to set this cookie, and it gives it the name and the value for the cookie.

Q Now, on this slide that's here, No. 90, you've got some dates and use information. What are those dates, and why did you put that information on this slide?

A I could not confirm that the shopping cart ID -- how far back it went. So I was able to confirm that it was used between August 10, 2007, and at least as late as October 29, 2008.

And I confirmed that because I had a colleague of mine look at the code and also -- because it says at the bottom here -- it's in response to an interrogatory, which is a correspondence that came from Newegg, and according to Mr. Wu's testimony.

Q What's the second session that you mentioned a minute or two ago? What is that session? When does it begin, and when does it end?

A This I call the log-in session, because it corresponds to logging in to use facilities in the computer. It has a beginning and an end, logging in and logging out.

The task is -- could be several things. The Court didn't say what the task needed to be, just there needed to be one or a set of tasks, one task or a set of

tasks.

And so it depends what the user does. For example, if he logs on for the purpose of checking the order history, then checking the order history turns out to be a task.

There's a different cookie, the customer log-in cookie, which stores the information -- stores the session ID for the log-in session.

Q And is some of the http traffic shown on your Slide 91, the one that's on the system now?

A Yes. It's been used at least as early -- as far back as August of 2007, and it's currently being used today.

Q And does the slide show some of the http traffic?

A Yes. This is the http message that comes back to the client to set this cookie up. And in this particular -- it's like the previous one, but this time it sets a different cookie, and it sets this value, this -- it's written in red here. And that is the text string that corresponds to the value of the session ID.

Q All right. Let's turn to the claims, if we can, starting with Claim 60.

It looks as if we've got a dependent situation here again, Dr. Grimes; is that correct?

A Yes. This -- we need to go through Claim 1 first and then return to Claim 60.

Q Okay. Let's start with Claim 1.

Is Claim 1 a system claim or a method claim?

A This is a method claim. So it means that we have to show that the -- the Newegg system actually does what the method says.

Q And how did you begin your analysis of Claim 1?

A Well, I looked at the structure and looked at the definition for the terms, and it needs to show that Newegg has a method for processing these requests over a network, and then the method actually has several steps. But the -- based on the documents that I've seen and the purchase example exhibits, Newegg does, in fact, process these service requests through a server system. So they meet this claim element.

Q So what is it that does the processing?

A The processing is done by the Newegg system, and the service requests come from the client to the server through the network.

Q The preamble that we're looking at, 1(a), uses the term service request. Did the Court define that term, and is that the definition that you used?

A Both of those are true. Service request is

listed at the bottom. And as is always the case, I used the Court's construction for the term.

Q When we were looking earlier at the '314 and the '492 patents, the term request was involved with those patents.

Does the term service request, with regard to the '639 patent, have the same meaning as the word request did when we looked at them earlier -- looked at it earlier in the '314 and the '492 patents?

A They use similar words, but, in fact, they have quite different meanings.

The -- in the -- in the '314 and the '492 patent, the request was a result of clicking a button, for example. Add-to-cart is an example of a request. So the button click generated the request.

Here a service request is an http message -- http message that occurs under the covers, so to speak. It goes between the client and the server.

So a service request is this collection of messages from the client through a server to a accomplish some task. And a service request is the request part of that.

Q What did you conclude about element 1(a) in your analysis?

A Element 1(a) is practiced by the Newegg

system.

Q All right. Element 1(b), what does element 1(b) require?

A Element 1(b) requires forwarding -- forwarding a service request from the client to the server, and the communications between the two need to correspond to the hypertext transfer protocol, which is http.

Q In Newegg's system, is a server request, in fact, forwarded from the client to the Newegg server system?

A Yes, it is. The service request is forwarded. For example, on the way, it's forwarded from the netscaler block that we looked at earlier to the SSL server block. And, in fact, the Newegg technical expert said that the step, in fact, was performed by the server system.

Q Who actually does the forwarding step?

A The forwarding step is done by each of the elements along the way. In other words, it goes from the customer to the firewall. It's forwarded by the firewall to the netscaler. It's forwarded by the netscaler to the SSL system. So it's forwarded really many times.

Q Are the communications between the client and the server system, as you analyzed it, according to the

hypertext transfer protocol?

A Yes, it is. In fact, it says in this line right here, between the customer computer and the public internet, it identifies http as the protocol. There's actually a slight variation of it called https, which is also an http protocol.

Q What did you conclude about element 1(b)?

A Element 1(b) is met by the Newegg system.

Q And who meets it?

A The server system -- well, the Newegg system as a whole meets this claim element.

Q Go to 1(c). What does step 1(c) require?

A 1(c) requires a returning of the session ID from the server to the client, and then the client stores the session ID for use in subsequent requests to the server system.

Q Does the Newegg server system return a session identifier to the client?

A It does. In fact, that's shown here by -- we've seen this before, too -- by the set cookie commands.

In this particular case, the set cookie command involves customer log-in, which is the session ID for the logged-in session.

Q Is there a standard cookie protocol now,

Doctor, somewhere?

A Yes. That's probably the result of another RFC -- in fact, I have it listed at the bottom here. It's one of the exhibits -- RFC 2109 that describes how client computers store cookies.

Q Would you look at Exhibit 26 in your binder for me, please?

A Yes.

Q Is that, in fact, the RFC 2109?

A It is. It's entitled: Http State Management Mechanism. We've come across this term state before. And the use of the cookies is a mechanism to allow state to be managed, according to this description.

Q And the RFCs that you've looking -- the RFCs that you're looking at here, 2109, is that relied upon and treated by you and your peers in the way that the earlier ones were that we discussed today?

A Yes. This amounts to a de facto standard that's used by the industry, yes.

Q All right.

MR. ADAMO: Go back to Slide 95.

Q (By Mr. Adamo) In the messages on your slide, the cookie names have a percent sign, 5F, in them. What does that mean? At the beginning.

A The -- there's actually -- it looks like

there's a carriage return there, but there's not. The sequence is NV%5FCUS and so on.

The percent sign means that the following two characters are to be interpreted as -- all three of those are to be interpreted as a character. And, in fact, it means underlining.

Q Okay. Who performs the step of returning?

A The returning of the session identifier comes from the client -- or from the server computer to the client. So it's generated by the client -- I'm sorry. It must be getting late in the day.

Q It is. Keep going.

A The session identifier comes from the server system. So it's created by the server system and sent to the client.

Q All right. What about the second aspect of second element 1(c). Does the client in Newegg's system store the session ID for use in subsequent distinct requests to the server?

A Yes. As we described earlier through the other patents, this is a cookie, and the cookie that comes from the server to the client is automatically stored, and it's always sent with all following requests to that -- to that same web server.

So, yes, it's stored and is sent with

subsequent requests, as required by this claim.

Q Who performs the step of storing?

A The storing is done by the client, the server -- the client computer. It's also called a buyer computer.

Q Does Newegg direct, instruct, or control the client computer to store the session identifier?

A This fragment -- yes. The fragment we're looking at here is part of the html code that is sent from the server to the client. The client browser executes this code and then performs the storing operation for all of the cookies that are contained in the message.

Q Is this essentially the situation with cookies that you described to us earlier?

A Yes. It's precisely the situation I described earlier.

Q What did you conclude about whether the Newegg system meets element 1(c)?

A For the reasons that I've described here in detail in my report and summarized it, it meets this claim element.

Q Element 1(d), let's move on to the final step, actually. What does that require?

A Well, this requires that the system operate

the way I just described it does.

In other words, this requires that it actually be appended -- the stored session identifier be appended to each of the subsequent requests from the client to the server. And that's the way the browsers work.

Q Did this, in fact, occur in the Newegg's system?

A Yes, it does. This cookie is the cookie that is stored on the client, and all the cookies that come from that server go back to that server with every subsequent request.

Q Did the Court provide a definition for appending, Dr. Grimes?

A It provided it -- as I recall, this -- this term for appending was actually in a different term, but at least indirectly, it defined what appending means, yes. And it was tagging, affixing, or supplementing.

Q Is what you just described, this cookie line that we're looking at in your Slide 96, does that come within the Court's definition of appending?

A It does. It does. The cookie is added to -- all the cookies for that server are added to the http message when it is sent back to the server.

Q Who performs the step of appending?

A Appending is done by the client, by the

browser, basically, on the client computer.

Q All right. Again, does Newegg direct, instruct, or in some manner, control the client to perform the step of appending?

A It does. The way that the browsers work, they receive the html code from the server, and when they send the next request, they automatically perform this appending based on the -- the operation of the -- the only operation of the browser.

Q What did you conclude about whether the Newegg system meets element 1(d)?

A It meets element 1(d).

Q All right. I think we've gone through all four elements of Claim 1 of the '639 patent. Would you tell the ladies and gentlemen of the jury what your opinion is about whether the newegg.com system meets that claim?

A For the reasons that I've recited and summarized today, it meets all the elements of Claim 1.

Q Did you also consider whether neweggmall.com meets all the elements of Claim 1?

A I did. And based on my analysis, Newegg Mall also meets all of the elements of Claim 1 for all the same reasons that newegg.com meets it.

Q Let's turn to Claim 60 now in the '639 patent.

Sixty depends on Claim 1, Doctor; is that correct?

A That is correct. And Claim 60 has four parts to it.

Q All right. What's the first -- let's look at 60(a). What's the first requirement of Claim 60 then?

A This is everything from Claim 1, plus at least one service request includes a purchase request. And the purchase request in turn has to include an associated user identifier.

And so the html that's shown here, which occurs when you click the submit order button, in fact, generates a service request, and it does, in fact, include an associated user identifier, which turns out to be my g-mail or e-mail address.

Q Did you conclude that at least one service request in the Newegg's system comprises a purchase request?

A Yes, I did.

Q Did the Court provide a definition for a purchase request?

A It did.

It's one or more messages requesting a purchase. And in fact, that's part of the shopping analysis that I did.

Q Why then did you conclude that Newegg's system

has a purchase request, briefly?

A Because of the -- this is part of the http traffic that results from clicking the submit order button.

Q Did you conclude that the purchase request also includes a user identifier?

A It does, because the -- my name here and e-mail address is what I used as the user identifier on the Newegg website.

Q What did you conclude about whether the Newegg system then meets element 60(a)?

A I concluded that it does meet all the requirements for element 60(a).

Q All right. 60(b). What does element 60(b) require?

A 60(b) says that upon receipt of the purchase request at the server, the server needs to access user information associated with this identifier that it got in the message, and the information has to be sufficient to charge an account associated with the user and the purchase price of the product identified by the purchase request.

Q Does Newegg meet this step?

A It does. This page that we've seen before, which occurs as part of the checkout process, includes,

you know, my name, my credit card number, expiration date, as well as the total purchase price for the product identified in the request.

Q Having had identity fraud problems for years, Doctor, I congratulate you that you took care on these slides to knock out your credit card information.

A Yes, I did.

Q All right. Is the information accessed when a user makes a purchase request?

A Yes, it is. When the request is made, the server accesses the user information.

Q Does the purchase request identify the purchase price?

A It does. That's actually shown in the next slide where I have another part of the http traffic from the same action, submitting the submit order button. And this fragment of it shows the -- both the product identifier -- actually both product identifiers, as well as the total amount, the $57 for the two -- for the two products.

Q Does it also identify the product or the products to be purchased?

A Yes. In blue here is the identifiers, these -- the 160 number and the 12-8 number are the two product identifiers for the two products, the cable and

the software.

Q Who does the accessing?

A The accessing is done by the server system.

Q And what did you conclude about whether the Newegg system meets element 60(b)?

A My conclusion, in looking at the http traffic, is that it's met by the Newegg system.

Q All right. Element 60(c), what does that require?

A Well, this is sort of the next step that requires also that the user be charged for the product identified by the purchase request based on the user information.

Q All right. And does Newegg charge the user for the product identified by the purchase request?

A It does. We've seen this confirmation e-mail before, but in addition, this is a fragment of my American Express card showing the -- showing the transactions -- transaction for the $57.

Q Okay. Now, was the charge, quote, according to the user information, close quote, as the claim element recites?

A The user information -- well, the system, based on Mr. Wu's testimony of how it works, uses the user information that it has stored on the server system

to actually complete the charge to my credit card account, because it showed me what the account number was going to be, and then it got the information from the server to cause the charge to occur.

Q Who does the charging?

A The charging is done -- well, it's initiated by the Newegg server system. I mean, in the end, the charging is actually done by American Express.

Q But the starting of the charging operation is by the system?

A The initiation of it is done by the Newegg system.

Q What did you conclude about whether the Newegg system meets element 60(c)?

A It -- for the reasons we've just discussed, it does, in fact, meet and practices claim element 60(c).

Q All right. 60(d). What does the last step of Claim 60, element 60(d) require?

A Well, 60(d) is satisfied, you know, when your door bell rings, and the guy from DHL says: Here's a package for you. And you look at it, and you see that it's from Newegg and open it up, and it contains the cable that you ordered.

So this is evidence that, in fact, the purchase request for the cable has been fulfilled. And

since it came to me with the correct address, it was fulfilled based on the user information.

Q Is what we're looking at in your Slide 102 here, is this a photograph of what actually showed up at your house?

A Yes. I took this photograph and provided it so that we could make a slide out of it.

Q With respect to the last element of this claim, element 60(d), does the Newegg system meet this element?

A Yes, it does. It meets element (d) as is shown here.

Q And who does the fulfilling: Newegg or the customer?

A Well, the fulfilling is done by Newegg. I mean, this comes out of their warehouse -- one of these three warehouses as you described earlier. I'm not sure where it came from, but, obviously, it came from Newegg. It showed up on my door with a Newegg return address.

Q All right. With respect to Claim 60, then, overall, Dr. Grimes, what is your opinion with regard to whether it, in fact, infringes?

A Claim 60 is met, so I gave all four elements that we just analyzed a checkmark.

Q All right. I misspoke myself. I meant to say

whether the Newegg system infringes. Does the Newegg system infringe Claim 60?

A Yes. For all the reasons I gave you, the Newegg system really meets all of the elements of Claim 60.

Q Literally?

A Literally.

Q And is that true for both the log-in session and the checkout session?

A Yes, it is.

I looked at -- both for the time periods that I indicated when I described it earlier, Claim 60 is met by both the checkout session and by the log-in session.

Q All right. Let us look at the last claim of the '639 patent --

MR. ADAMO: -- which, Your Honor, I am happy to report is the last claim we are going to do today.

THE COURT: Very well.

MR. ADAMO: Let's get the poster up. Claim 79. Excuse me.

Q (By Mr. Adamo) All right. Is Claim 79 dependent or independent, Doctor?

A Claim 79 is dependent on Claim 78, which we -- which we haven't looked at yet.

Q All right. And we've got your poster up, so we've got both 78 and 79 available to you. Let's start with 78(a).

What does claim element 78(a) require?

A We can look at 78(a) and (b) together, actually. They're very much like Claim 1. In fact, the wording is slightly different but almost identical.

And Claim 78(a) adds an additional requirement for the processing in a server system. I already described, when I did Claim 1, that it occurred in a server system, but that wasn't a requirement for Claim 1. But it is a requirement for Claim 78.

Q So your conclusion about this element, then, is what?

A My conclusion is that 78 is met and really for the same reasons that I described for Claim 1(a).

Q Who does the processing: Newegg or the customer?

A Newegg. It's done by the Newegg -- actually, by the Newegg server system.

Q And let's look at element 78(b) on this board.

What is your conclusion with respect to that element?

A 78(b) is slightly different. It says: Receiving from the client a service request to which an

identifier stored at the client has been appended by the client.

So this really refers to an operation at the Newegg server system side, which is what's doing the receiving, and then receiving comes from the client.

Q And is it your conclusion that Newegg meets element 78(b)?

A Yes. Communication is also done by the http, the hypertext transfer protocol, which is also required for 78(b).

Q And so who does the receiving: The customer or Newegg?

A Newegg. Newegg does the receiving.

Q But doesn't the client have to send a request in order for Newegg to receive it?

A Yes, that's true. But that's not required by the claim. What's required by the claim is that it be received from the client, the service request. And that operation is done by the server.

Q Is it your understanding that the way the claim is structured, it's not necessary to get into the sending because the claim doesn't talk about the sending?

A That's correct. That's correct. The only thing that's necessary here is that the server system

receives from a client the service request.

Q Does Claim 78(b) have a step of appending or storing a session identifier when it says, quote, a service request to which a session identifier is stored at the client has been appended by the client, close quote?

A No. Only that the request that's received contain a session identifier that has been appended by the client.

Q Let's look at element 78(c). What do you understand that to require, Dr. Grimes?

A This is a further step actually not contained in Claim 1, so it's -- I don't have anything to compare it with in Claim 1. It's by itself. This is a validation step. And then once it's been validated, servicing the service request.

Q Does Newegg meet this?

A Yes, it does. We have deposition testimony from Mr. Wu that described the validation, and we know that the service request is -- it's serviced because we actually see the results of that.

So, in fact, the validation has been identified by Mr. Wu, and the servicing of the service request, if it's valid, can be seen by the http traffic I looked at, plus Mr. Wu's testimony.

Q Is the log-in session ID what you were looking at both in your personal work, as well as looking at Mr. Wu's testimony?

A Yes. Yes. The topic under discussion was the log-in session ID.

Q Who performs the steps of validating and servicing?

A Those are done by the server, the server system, the Newegg server system.

Q What is your opinion about element 78(c), Doctor?

A 78(c) is also met by the Newegg system.

Q All right. And let's look now at Claim 78 in its entirety.

Do you have an opinion as to whether Claim 78 is met in its entirety?

A Yes. All three elements are met for the reasons that I just described, and so I gave all three of them a checkmark.

Q Are the elements, in your view, all met literally?

A Yes, they're all met literally.

Q And who is the actor who's meeting all these elements, as you understand it?

A All three of these elements are performed by

the Newegg service system.

Q All right. Does your analysis that we've just discussed apply not only to the log-in session ID but also to the checkout session ID situation?

A I don't recall. I'd have to look at my -- at my notes. I believe so. I believe it also applies to the checkout -- checkout session.

Q All right. Did you form an opinion about Claim 78 for the Newegg Mall?

A Yes. Claim 78 is met by the Newegg Mall.

Q Does the Newegg Mall have the equivalent of the checkout session ID?

A I believe so, yes.

Q Does that help you refresh your recollection as to whether you -- the analysis would be the same for both the log-in session ID and the checkout session ID?

A Yes, it does.

The one that doesn't have the checkout session was one of the earlier claims that we looked at, earlier examples that we looked at.

In this case, both the log-in session and the checkout session are performed by both the Newegg Mall and by the newegg.com website.

Q All right. Let's turn to Claim 79. First element is 79(a), what does that require?

A 79(a) requires everything from 78, plus requires that the server system receive an initial request from the client or a first request from the client.
Q Did the Court construe that claim term, Doctor?
A It did. It said that first -- initial service request means the first one in a session.
Q And does Newegg meet that element, according to your analysis?
A Yes, it does. I looked at the http traffic, and there's a cookie that's generated by the server when it receives the request to log in.
Q Who does the step of receiving?
A Receiving is done by the server system.
Q So that's Newegg?
A That's Newegg service system, yes.
Q All right. Element 79(b). What does claim element 79 (b) require?
A That requires that in response to this request, the server system -- actually is what does it -- creates a session identifier, and that's done by the Newegg server system.
Q So Newegg does meet this element; is that correct?

A Yes, it does.

We also have a response to an interrogatory -- a response to a question here that says that the customer log-in, which is the log-in session identifier, is created by the Newegg system.

Q All right. Would you look quickly in your binder at Exhibit 27 and tell me if that is the interrogatory response that you quote on your Slide 110?

A Yes, it is.

Q And who does the step of creating?

A The creation is done by the Newegg service system.

Q 79(c), what does that claim element require?

A 79(c) is almost identical to 1(c) and requires this returning of the session identifier to the client -- it turns out it's returned in this customer log-in cookie -- for storage by the client for use in subsequent requests.

So I already described earlier how that happens. It happens the same way as it did for element 1(c).

Q All right. Does Newegg meet this element?

A Yes, it does. It meets element 79(c).

Q Who does the step of returning?

A The step of returning is done by the Newegg

service system.

Q I think we've now been through all of the elements of Claim 79. Did you form an opinion regarding the infringement or lack thereof of this claim, Doctor?

A I did. I concluded that element -- all the elements in Claim 79 were met, so I gave them all a checkmark.

Q And now the same question I asked you a few seconds ago, a few minutes ago. The logged-in session seemed to be the focus of what we were just discussing.

Does the analysis also apply to the checkout session?

A Yes, it does. It applies to both the checkout session and the log-in session for both of these claims.

Q All right. Is it your view, Doctor, then, with respect to both of the asserted '639 patent claims, that they are infringed by Newegg?

A Yes.

So just to summarize, both newegg.com and newegg.ca, the Canadian website, meet all elements of the asserted claims that are listed here, which is the ones we went through this afternoon.

Q All right. We got a tad ahead of ourselves. We'll get to your last slide.

Can you give me a best estimate of how many

hundreds of hours of your work it has taken for you to generate everything that we've spent the last almost four hours going through? Can you give us an estimate?

A Wow. Several hundred, 200, 300, something in that -- 400, something in that range. It was -- it was a lot of work.

Q And as we have been asking you questions and you've been providing the information to the ladies and gentlemen of the jury this afternoon, were you going at a pace that you felt was appropriate due to the seriousness of this nature and the complexity of the subject matter?

A Yes, indeed. I maybe should apologize for giving some long answers, but I really want to make sure that my answers are understood. So I may have been able to make it shorter, but I guess I erred on the side of trying to make sure that the answers were clear.

Q All right. So let's look at your summary, and then I'm going to sit down.

A Okay.

Q Would you as succinctly, as briefly as you can, tell us what the overall summary of your opinions are with respect -- or is with respect to the seven claims of the three patents that are at issue here regarding Newegg?

A Yes. As I stated very briefly before, newegg.com, newegg.ca websites meet all of the elements of this list of asserted claims.

Q Literally?

A Literally.

Q All right. With respect to the neweggmall.com.

A I did a subset analysis of a subset of the claims, and these are the claims you asked me about as we went through this afternoon.

So in summary, there are these four claims that I analyzed, and the neweggmall.com website meets all the elements of these four claims.

Q Thank you, Dr. Grimes.

MR. ADAMO: Your Honor, I pass the witness.

THE COURT: All right. Very well. Thank you.

All right, Ladies and Gentlemen of the Jury, I think this would be a good stopping place for today. We'll come back in the morning and begin with the cross-examination of Dr. Grimes.

You've paid very good attention today. Thank you very much for that. Please go home and get a good night's sleep tonight.

Please remember the Court's instructions. Don't discuss the case among yourselves or with anyone else. Don't make any independent investigation. Come back here, and we'll start back at 9:00 o'clock in the morning.

So try to be here a few minutes before, so we can, hopefully, start promptly at 9:00. Thank you for your attention. The jury is excused.

COURT SECURITY OFFICER: All rise for the jury.

(Jury out.)

THE COURT: Please be seated.

All right. Just for the parties' information, Plaintiff has used 3 hours, 35 minutes, and Defendants have not used any time yet.

Do you have any idea how long your cross will probably go for tomorrow?

MR. BALDAUF: I expect about an hour, Your Honor.

THE COURT: Okay. All right. Very well.

How long did I give y'all for direct and cross? Was it 12 hours?

MR. SAYLES: Twelve hours a side, yes, sir.

THE COURT: All right. We're going to --

it would be my goal to try to finish all the testimony by Thursday evening, so we can come back Friday morning and charge the jury and argue the case, but we're going to be running probably two or three hours short, unless y'all can give some time back or we persuade the jury to work some extra hours one of the next three days.

So what do y'all think?

MR. ADAMO: Just by the grace of God, we just saw the longest presentation from us by far, and I'm not a believer in wasting time unnecessarily. I think it will depend upon how Mr. Sayles progresses. I don't need to dwell. I'm not going to use it just for the heck of it, Your Honor. So I just can't tell at this point. I'll tell you candidly, I'm a half hour off my time budget.

THE COURT: Over?

MR. ADAMO: I budgeted three hours, so I've got to make the half hour up. My team is all looking at me, and I can't repeat in public what they're thinking about me right now, but we'll get it tightened back up.

We've got the crosses already allocated, and we've already got a pretty good --

THE COURT: Do you think you'll take the full 12 hours?

MR. ADAMO: I'm going to try for 11, but I can't promise.

THE COURT: What about Defendants?

MR. SAYLES: I think we'll finish by Thursday evening.

THE COURT: Okay.

MR. SAYLES: That would be my guess.

THE COURT: Think you can hold yours to 11?

MR. SAYLES: Yes, I do.

THE COURT: All right. Very well. Well, if y'all can do that, I won't ask the jury to work any extra time yet; but if you start seeing that you're going to be deviating from that, let me know.

MR. SAYLES: Your Honor, I have two housekeeping matters --

THE COURT: All right.

MR. SAYLES: -- that I want to mention.

Each of us have designated a little bit of deposition testimony. We've worked hard together. We've resolved most of the objections but not all of them.

And I suspect that there may be some deposition offers probably around Wednesday morning. And I wanted to be sure that we meet the Court's

expectations.

Should we bring you the transcripts and the items in dispute tomorrow to leave, so we'll be ready to go with those?

THE COURT: How many are there?

MR. SAYLES: I think there are three, aren't there?

MR. BALDAUF: Yes.

THE COURT: Yeah. That will be fine. Just let me have those in the morning.

MR. SAYLES: All right. And then, Judge, the other housekeeping matter is that I wanted to inquire about stipulations. We have made certain stipulations, and they are included in the joint proposed Charge. And both sides are requesting that certain stipulations be included.

In some courts, in order to have the stipulations in the record, one must read them into evidence. And here it is certainly all right with us if those stipulations are simply included in the Charge as opposed to taking time to read those stipulations to the jury.

THE COURT: What do they deal with mainly, the stipulations?

MR. SAYLES: They deal with the history

of the patents and the -- who the inventors were; that they were first owned by Open Market. There are certain stipulations about Open Market selling.

THE COURT: All right. Why don't you just cut those out and put them in a document entitled Stipulations, and if both sides agree to it, we'll just admit that as an item of evidence.

MR. ADAMO: That's perfectly acceptable.

MR. SAYLES: We'll do that.

THE COURT: All right. What else?

MR. SAYLES: That's all the matters we have, Your Honor.

THE COURT: All right. Y'all have a good evening. We'll see you in the morning.

COURT SECURITY OFFICER: All rise.

(Court adjourned.)

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/
SHEA SLOAN, CSR
OFFICIAL COURT REPORTER
STATE OF TEXAS NO. 3081

/s/
JUDITH WERLINGER, CSR
DEPUTY OFFICIAL COURT REPORTER
STATE OF TEXAS NO. 267