1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3   SOVERAIN SOFTWARE          )
                               )    DOCKET NO. 6:07cv511
 4      -vs-                    )
                               )    Tyler, Texas
 5                             )    9:00 a.m.
     NEWEGG, INC.              )    April 27, 2010
 6
                       TRANSCRIPT OF TRIAL
 7                       MORNING SESSION
               BEFORE THE HONORABLE LEONARD DAVIS,
 8         UNITED STATES DISTRICT JUDGE, AND A JURY

 9                  A P P E A R A N C E S

10   FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
                              JONES DAY
11                            2727 N. Harwood St.
                              Dallas, Texas  75201-1515
12
                              MR. THOMAS L. GIANNETTI
13                            MR. BARRY R. SATINE
                              MS. CLARK CRADDOCK
14                            JONES DAY
                              222 East 41st St.
15                            New York, New York  10017-6702

16                            MR. CARL ROTH
                              ROTH LAW FIRM
17                            115 N. Wellington, Ste. 200
                              P.O. Box 876
18                            Marshall, Texas  75670

19                            MR. MICHAEL C. SMITH
                              SIEBMAN, REYNOLDS, BURG,
20                            PHILLIPS & SMITH
                              713 S. Washington Ave.
21                            Marshall, Texas  75670

22
     COURT REPORTER:          MS. JUDITH WERLINGER
23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
```

```
 1  FOR THE THE DEFENDANTS:   MR. RICHARD SAYLES
                              MR. MARK STRACHAN
 2                            SAYLES WERBNER
                              4400 Renaissance
 3                            1201 Elm St.
                              Dallas, Texas  75270
 4
                              MR. HERBERT A. YARBROUGH, III
 5                            YARBROUGH LAW FIRM
                              100 E. Ferguson, Ste. 1015
 6                            Tyler, Texas  75702

 7
                              MR. DAVID C. HANSON
 8                            MR. KENT BALDAUF, JR.
                              MR. DANIEL H. BREAN
 9                            THE WEBB LAW FIRM
                              200 Koppers Bldg.
10                            436 Seventh Ave.
                              Pittsburgh, PA  15219
11

12                            MS. CLAUDIA W. FROST
                              MR. JEREMY J. GASTON
13                            PILLSBURY WINTHROP
                              909 Fannin St., Ste 2000
14                            Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

```
1                   P R O C E E D I N G S

2                   (Jury out.)

3                   COURT SECURITY OFFICER:  All rise.

4                   THE COURT:  Please be seated.

5                   All right.  I understand the parties have

6    something to bring up before we bring the jury in?

7                   MR. ADAMO:  I'm afraid so, Your Honor.

8    Mr. Satine will address it for us.

9                   THE COURT:  Okay.  What is it?

10                  MR. SATINE:  Your Honor, one of our

11   witnesses this morning -- or this afternoon, will be

12   Mr. Nawrocki, the damages expert.  We provided these

13   demonstratives to the other side last night.

14                  We spent quite a bit of time talking, but

15   there are many objections that we have not been able to

16   work out.  We have a number of objections to our use of

17   any financial information of Newegg's, any indication

18   that Newegg used the patents prior to the damage period.

19                  We have not been able to work that out,

20   Your Honor.

21                  I'll hand up a copy of the slide.

22   Somebody can explain the objection they have, and I will

23   respond.

24                  THE COURT:  All right.  What are the

25   objections?
```

```
 1                 MR. SAYLES:  May it please the Court.
 2                 First, the objections would go to the
 3  underlying exhibits that would support certain of the
 4  slides.  Those exhibits are Exhibits 162 through 176 and
 5  245.  The nature of these exhibits -- and I do --
 6                 THE COURT:  Is that Plaintiff's
 7  exhibit -- Plaintiff's exhibit numbers?
 8                 MR. SAYLES:  Yes, they are Plaintiff's
 9  exhibit numbers.
10                 THE COURT:  Okay.
11                 MR. SAYLES:  And I do have, in writing,
12  the objections that we have made to those exhibits, but
13  I can summarize it a bit for the Court.
14                 THE COURT:  Okay.  Why don't you hand me
15  up the written objections where I can look at that.
16                 MR. SAYLES:  Mark, would you do that?
17                 And, Your Honor, it's hard to see the 1,
18  but that's 162.  It kind of looks like 62.
19                 THE COURT:  Okay.
20                 MR. SAYLES:  All right.  The documents at
21  issue evidence Newegg's total sales revenues or profits.
22  Mr. Nawrocki, the Plaintiff's damage expert, relies on
23  these documents to calculate his royalty, which is
24  approximately 25 percent of Newegg's total profits from
25  its revenues.
```

1              Without a predicate that Newegg's total

2    profit is the proper royalty base, the evidence is

3    irrelevant and prejudicial.

4              To base royalty on Newegg's total

5    profits, Soverain and Mr. Nawrocki must show that the

6    patents-in-suit drive the demand for the sale of

7    Newegg's website.  They have not done so and indeed

8    represent that they need not do so.

9              Absent such a showing or even attempted

10   showing, Newegg's total sales revenue have no proper

11   bearing on a reasonable royalty calculation, and the

12   documents should be excluded.

13             The documents at issue also show that

14   Newegg has very high revenues, on the order of 2 to $2.5

15   billion annually.  This proffer is essentially number

16   dropping.

17             Since Soverain has not properly

18   apportioned these revenues to demonstrate the amount

19   creditable to the invention, it's unfairly prejudicial

20   for the jury to hear about Newegg's substantial revenues

21   which Soverain offers to support their unapportioned

22   and, therefore, overstated royalty.

23             And in further support of those

24   objections, I would submit that the testimony, evidence,

25   and documents concerning an accused infringer's net

1  worth or total revenue or revenues from sales of

2  anything than the actual royalty base, should be

3  excluded.

4           And with respect to that objection, the

5  slides -- Mark, do you have my slides?

6           Judge, I'll point out the slides these

7  pertain to, but those are our objections to Exhibits 162

8  through 176 and Exhibit 245.

9           THE COURT:  And what are those exhibits,

10  financial reports?

11           MR. SAYLES:  Yes, Your Honor.

12           THE COURT:  All right.

13           MR. SAYLES:  They're financial reports

14  with these large numbers in them.

15           And to carry over to the slides that will

16  be used with Mr. Nawrocki, we object to Slide No. 5; and

17  if the Court can see there, one of the bases for that is

18  Plaintiff's Exhibit 174, which is objected to.

19           In addition, in this case, Your Honor --

20  and this applies to Slide 5 and a couple of others --

21  the damage period is stipulated to be from the date of

22  filing the suit in 2007 until the date of trial.  The

23  extent-of-use numbers shown on Slide 5 go back to 2001.

24           We submit that any numbers that are

25  submitted and shown to the jury prior to the damage

1  period that begins in 2007 could be prejudicial,

2  misleading, and irrelevant and might lead to an

3  erroneous conclusion that damages would be entitled for

4  that period.

5           With respect to Slide 6, the same

6  objection applies.  There the extent-of-use is bar

7  graphed, and it goes back to 2005.  It is color-coded

8  for the damages period, but, nevertheless, it does show

9  the number of transactions in prior years going back --

10          THE COURT:  The jury is going to be

11  clearly instructed on the damage period in the Court's

12  charge, so -- go ahead.

13          MR. SAYLES:  All right.  We object to

14  Slide No. 12, and that's primarily for the statement at

15  the bottom of the slide that Newegg's commercial

16  success, current popularity, and profitability is a

17  factor that the jury should consider, because in this

18  case, the -- there's been no showing that it is so

19  successful and popular because of the patented features

20  that are at issue here.

21          And Newegg's commercial success is not a

22  Georgia-Pacific Factor; rather, it is the commercial

23  success of the patented technology that's a proper

24  consideration.  And there are lots of reasons for

25  Newegg's success.

1            Then Slide 13 is founded on Exhibit --

2   Plaintiff's Exhibit 245, to which we object, and it

3   mentions net sales of $2.1 billion, and we object to

4   that as irrelevant and unfairly prejudicial.

5            Slide 15 is founded upon Plaintiff's

6   Exhibit 174, which is objected to, and here again, this

7   is a bar graph showing Newegg's extent-of-use, and it

8   goes back to 2001, and we object to anything prior to

9   2007 as irrelevant, misleading, and potentially

10  prejudicial.

11           Slides 16, 17, 18, and 19 are all of the

12  same nature.  They are all founded on the documents that

13  I objected to specifically.  They state the net sales

14  numbers and gross profits, as I've argued earlier, and

15  we submit that a calculation, based on that, and a

16  showing of that is irrelevant and prejudicial.

17           And so, Your Honor, those are the

18  Defendant's objections to the underlying exhibits, 162

19  through 176 and 245, and the slides that are based upon

20  them.

21           THE COURT:  Okay.  Thank you.

22           Let me ask you this, Mr. Sayles:

23  Obviously, you have known what their damage expert's

24  approach was since you had his report and deposed him, I

25  take it.

```
 1                    MR. SAYLES:  That is true, Your Honor.

 2                    THE COURT:  Have you -- have you made or

 3   have we addressed any type of challenge to his

 4   methodology by way of Daubert or otherwise?

 5                    MR. SAYLES:  Yes, we have.

 6                    THE COURT:  Okay.

 7                    MR. SAYLES:  We had a Daubert motion

 8   directed to this issue, and it was denied.

 9                    THE COURT:  Okay.  Well, all right.  And

10   let me hear a response, please.

11                    MR. SATINE:  Your Honor, that is the

12   first point, that there was a Daubert motion directed to

13   this.  We pointed out, Your Honor --

14                    THE COURT:  Lower the microphone a little

15   bit, if you would, please.  Thank you.

16                    MR. SATINE:  I'm sorry.

17                    Your Honor, we did have a Daubert motion

18   directed to this, and what we discussed during the

19   argument on that Daubert motion was that Mr. Nawrocki

20   does not use this information with respect to revenue

21   for his royalty base.  This was a factor that he used in

22   connection with his royalty rate.

23                    That was argued to Your Honor.  Your

24   Honor denied the Daubert motion.

25                    And with respect to consideration of
```

1 royalty rate, there are cases -- this Court, in i4i,

2 said an expert can consider sales revenues in connection

3 with royalty rates.  That does not violate the entire

4 market value rule.

5           Same sort of holding in OPTi, Inc.,

6 versus Apple in this district, December 3rd, 2009.

7 Throughout the Georgia-Pacific Factors 8, 11, 14, and

8 one thing Mr. Sayles did not --

9           THE COURT:  What are you using as the

10 royalty base, and how are you directing it to the -- to

11 the accused invention?

12           MR. SATINE:  Mr. Nawrocki -- what

13 Mr. Nawrocki does is he calculates what the rate of --

14 the rate of return is, the profitability of Newegg, and

15 he takes that into consideration in determining what is

16 a reasonable royalty to apply to the royalty base, which

17 is the number of transactions which infringe the patent.

18           His base is the number of transactions,

19 because our position is that the transaction

20 infringes --

21           THE COURT:  All right.  Objections are

22 overruled.

23           What else?

24           MR. SAYLES:  Your Honor, yesterday I

25 mentioned to you that in the interest of time, we would

1   work with the other side and narrow our objections to

2   bringing color-coded remaining objections, and I have

3   done that.

4                    THE COURT:  Okay.

5                    MR. SAYLES:  We have the objections in

6   writing, and we have Soverain's designations in red and

7   Newegg's in yellow.  And there are not very many of

8   them, but I brought three copies --

9                    THE COURT:  Okay.

10                   MR. SAYLES:  -- for the Court's

11  consideration.

12                   THE COURT:  All right.  Pass those up,

13  please.

14                   All right.  What else?  I'll take a look

15  at these.

16                   MR. ADAMO:  Your Honor -- and I won't

17  take the Court's time to do this now, but in view of

18  your ruling on those exhibits, I want to talk to

19  Mr. Sayles about whether he will now stipulate them into

20  evidence because --

21                   THE COURT:  Whether he'll what?

22                   MR. ADAMO:  Whether he will stipulate

23  that they can come into evidence, because you've just

24  resolved what the objection was, and I think --

25                   THE COURT:  Right.  Your objection is

1  preserved.

2               MR. SAYLES:  All right.  If my objections

3  are preserved and they're offered in evidence, that's

4  all I can do.

5               THE COURT:  That's right.  Okay.

6               MR. ADAMO:  Okay.

7               THE COURT:  Thank you.

8               MR. ADAMO:  Thank you.

9               THE COURT:  Bring the jury in, please.

10              COURT SECURITY OFFICER:  All rise for the

11  jury.

12              (Jury in.)

13              THE COURT:  Please be seated.

14              All right, Ladies and Gentlemen of the

15  Jury.  Welcome back.  I hope you had a good night's

16  sleep, and you're ready to put in a full day today,

17  so -- you did a very good job yesterday paying close

18  attention.  I saw you taking notes and listening to the

19  witness.

20              So we'll continue now with the

21  cross-examination of Mr. Grimes.

22     JACK GRIMES, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

23                      CROSS-EXAMINATION

24  BY MR. BALDAUF:

25      Q    Good morning, Dr. Grimes.

1        A     Good morning.

2        Q     Just wanted to touch a few points about your

3   background.

4              If I understood your testimony yesterday, when

5   you're not enjoying your semi-retirement, you work as an

6   expert witness, correct?

7        A     I work as an expert witness, and I also am on

8   the Board of Directors of a startup company.

9        Q     And you've been doing litigation expert

10  witness work since the 1990s?

11       A     Yes.  It started out part-time and have really

12  remained part-time all during that time.  There was

13  some -- a year or two where I did it pretty much

14  full-time, but it sort of started part-time and now is

15  part-time.

16       Q     And you work with an expert broker firm?

17       A     Yes, I do.

18       Q     So for the hourly fee that you're paid, some

19  of that goes to the broker firm; you keep the rest?

20       A     Yes.  That's the way it works, uh-huh.

21       Q     And you've worked with the -- with counsel for

22  Soverain in a number of cases before this, correct?

23       A     Yes.  I've worked with them on several cases.

24       Q     Is it true that you personally have never

25  designed an E-commerce system?

1      A     No, I have not been involved in the design of

2  an E-commerce system, only the security aspects of

3  E-commerce, which I talked about yesterday.

4      Q     Now, you took us through the claims yesterday,

5  and I certainly don't want to repeat all of that.  I

6  commend you.  That was a test of endurance.

7            But in all of those claims, in every one of

8  the claims, you talked about this limitation of a

9  customer computer or a buyer computer, correct?

10     A     Yes, that's correct.

11     Q     You were --

12     A     Not all -- not all of the claims, but many of

13  the claims dealt with that, yes.

14     Q     And those claims that had that limitation, do

15  you agree that the customer computers is supplied by the

16  customer?

17     A     Yes, it is, with the exception of the testing

18  that Newegg does.  But in almost all cases, it's

19  supplied by the customer.  It's the customer's computer.

20     Q     And would you agree with me that Newegg does

21  not somehow force its customers to connect to its

22  website?

23     A     No.  The customer decides they want to

24  purchase something, and they have to type in the Newegg

25  URL or otherwise connect to the website.

1       Q     And they do so of their own free will.

2       A     Certainly, just like you would, you know, pick

3   Home Depot of your own free will.  It's very much the

4   same, yes.

5       Q     And if no customer ever connected to the

6   Newegg website, would you agree that there would not be

7   a customer computer for the purposes of the claims?

8       A     Well, the -- I mean, this is the -- Newegg's

9   description of their system.

10      Q     Correct.  But I'm asking you this:  If no

11  customer connects, is there a customer computer present?

12      A     The Newegg system would still represent a

13  customer computer; but if a customer doesn't connect,

14  then there would be no usage of the customer computer,

15  if that's -- if that's your question.

16      Q     It is.  Thank you.

17      A     Okay.

18      Q     You also testified that Newegg instructs its

19  customers how to use its website on its help page,

20  correct?

21      A     Yes, among other things.  But the help page is

22  quite extensive.

23      Q     Can a customer choose not to follow these

24  instructions?

25      A     The customer, you know, may not even be aware

1  of the web page; but if they are, then it provides

2  instructions.

3      Q    But the customer can decide not to follow them

4  of their own free will?

5      A    Certainly.  I don't know why a customer would

6  go to a help page and then ignore the instructions, but

7  that's possible, certainly, yeah.

8      Q    And based upon your testimony yesterday, I

9  take it that you agree that a customer cannot shop on

10  the Newegg website unless he or she has turned on

11  cookies on their computer?

12     A    The browser -- the browser on their computer

13  must have cookies enabled in order to actually purchase

14  products.

15     Q    Do you agree with me that it's up to the

16  customer whether or not they enable cookies?

17     A    As I said yesterday, the default is that

18  they're enabled, but the customer could disable cookies

19  for some reason.

20     Q    If the customer disables cookies for some

21  reason, can Newegg somehow go into that customer

22  computer and turn them on?

23     A    No.  The customer computer -- the customer has

24  to set the -- has to enable cookies; otherwise, they

25  can't purchase products.

1      Q    Now, once the customer checks out at the

2   Newegg website, who's responsible for paying for the

3   selection?

4      A    Well, the customer's credit card is charged,

5   so, ultimately, the customer, of course, pays his credit

6   card bill.  I mean, he's purchasing the product, so the

7   customer pays for them in the end.

8      Q    So do you agree with me that Newegg is not

9   responsible for paying for these products if the

10  customers do not do so?

11     A    Actually, I haven't thought about that.  I

12  don't know what happens.  I mean, customer -- Newegg

13  certainly pays for the inventory, so they have purchased

14  the inventory.  If the customer doesn't pay, I don't

15  know what happens, actually.

16     Q    I'd like to talk about the '314 patent.

17          From your testimony yesterday, you told us

18  that Soverain is asserting the infringement of only

19  Claims 35 and 51, correct?

20     A    Yes, that is correct.

21     Q    And these claims depend upon Claim 34.

22     A    Right.  Exactly right, uh-huh.

23     Q    So if Newegg does not infringe Claim 34, would

24  you agree with me that it cannot infringe 35 or 51?

25     A    Yes.  That's the way it works.  You have to

1  have all of the -- for 35, you have to have 35 and then

2  all of the elements of 34.

3      Q    And just to be clear, with respect to the

4  elements, the portion in brackets, I believe you

5  testified yesterday that those are not actually in the

6  claim, that you put those in for our ease of reference,

7  correct?

8      A    Yes, that's correct.  Anything in brackets

9  like that are text that I've added.

10     Q    I'd like to look at 34(b), at least one buyer

11 computer for operation by a user desiring to buy

12 products.

13              MR. BALDAUF:  If you could please pull up

14 Appendix B, Page 2, please, Ms. Johnston.

15              If you could please highlight -- or

16 enlarge the very first paragraph on the right side.

17     Q    (By Mr. Baldauf) And, Dr. Grimes, we're taking

18 a look at your expert report that you prepared in this

19 case, correct?

20     A    Yes, that's correct.  This is my -- this is

21 Appendix C from my expert report.

22     Q    And this is the portion of your report where

23 you compare the claim elements of Claim 34 of the '314

24 patent to that functionality of the Newegg website that

25 you believe satisfies those limitations, correct?

1      A      Yes, that's correct.

2      Q      Okay.  With respect to the limitation in

3  34(b), at least one buyer computer for operation by a

4  user desiring to buy products, you wrote that a Newegg

5  customer computer, when connected to the Newegg server

6  system, through Newegg's website via the internet

7  becomes a buy computer.

8           So is it your testimony that the customer's

9  computer is the buyer computer?

10     A      Yes.  It becomes the buyer computer after it

11 connects to the Newegg server system.

12     Q      And, again, this computer is supplied by the

13 customer.

14     A      Yes.  It's the customer's computer, and it

15 becomes a buyer computer, matching this claim

16 limitation, when it connects to the Newegg server

17 system.  Then it becomes part of the Newegg server

18 system.

19     Q      Now, Claim 34(b) also requires a user desiring

20 to buy products.  Is the user in this claim element the

21 customer?

22     A      Yes.  The claim requires the buyer computer

23 for operation by the user.  So the focus of the claim is

24 the buyer computer, and it is the -- the user is the --

25 is the customer, with the exception of the testing

1  situations that I mentioned.

2      Q    Does Newegg supply the customer or user?

3      A    No.  The customer is, you know, people like

4  you and I who want to buy products.

5      Q    And we talked about this before.  Newegg does

6  not somehow control the customer and force them to log

7  on to their website.

8      A    No.  No.  That's -- that's also not required

9  by the claim.

10     Q    But you agree that the customer decides to

11  access the Newegg website by their own free will.

12     A    Certainly.  Certainly.

13     Q    So do you agree with me that it's the customer

14  that satisfies the limitation of a user?

15     A    Well, the limitation is for a buyer computer

16  for operation by a user.  So the limitation of a buyer

17  computer, the buyer computer is the customer's computer;

18  and when it's connected to the Newegg server, it becomes

19  a buyer computer.

20     Q    Right.  But I'm asking you about the latter

21  portion of that claim, for operation by a user.  Who

22  satisfies that portion?  The user?

23     A    Well, the buyer can --

24     Q    Is that the customer, or is that Newegg?

25     A    With the exception of the testing activities,

1  it's the customer that actually does operate the

2  computer.

3      Q    Thank you.

4           If I could turn your attention to what you

5  have designated as 34(f).  Said buyer computer being

6  programmed to receive a plurality of requests from a

7  user to add a plurality of respective products to a

8  shopping cart in said shopping cart database.

9           Is the cookie stored in the user's computer

10  browser of the Newegg shopping cart?

11      A    The cookies stored in the browser contains the

12  contents of the shopping cart, yes.  You can think of it

13  as a shopping cart, but it contains the contents of the

14  user shopping cart.  It's the products he wants to

15  purchase.

16      Q    So is that the shopping cart?

17      A    You can think of it that way.  I think of it

18  as a cookie representing the contents of the shopping

19  cart.

20      Q    Now, I just want to be very clear on this

21  point, because we did talk about this in your

22  deposition.  And I'm not sure we're saying something

23  different, but I just want to make sure we're on the

24  same page.

25           If you could please turn to Page 131 of your

1  deposition transcript.

2          Do you have that in front of you, sir?

3     A    Yes, I do.

4     Q    If you look to Line 11:

5          QUESTION:  So you've interpreted a

6  shopping cart to include cookies?

7          ANSWER:  The contents of the shopping

8  cart for multiple clicks are stored in a cookie called

9  the Newegg cookie.

10         QUESTION:  A moment ago, you referred to

11 that as the shopping cart.

12         ANSWER:  Yes, that's the shopping cart.

13 The contents of the shopping cart are stored in the

14 cookie called the Newegg cookie.

15    Q    (By Mr. Baldauf) So is it fair to say that

16 you're referring to that cookie as the shopping cart?

17    A    Yes, you could say that.

18    Q    Okay.

19    A    That would be a good way to say it.

20    Q    Is there any portion of the '314 patent that

21 describes the shopping cart as being a cookie?

22    A    I don't -- I don't recall specifically.  I

23 think not.  Yeah.

24    Q    Would you agree with me that only a

25 server-side shopping cart is disclosed in the '314

1  patent?

2      A     Server-side shopping cart.  A server-side

3  shopping cart is disclosed.

4      Q     Would you agree with me that that's the only

5  type of shopping cart that's disclosed in the '314

6  patent?

7      A     I don't recall if it is the only thing, but it

8  could be the only thing.  It certainly is disclosed.  I

9  recall that, yes.

10             MR. BALDAUF:  If we could turn to Page 4

11  of the appendices of Dr. Grimes's report.

12      Q     (By Mr. Baldauf) And we're still talking about

13  limitation 34(f).

14             MR. BALDAUF:  If you could move it to the

15  other side of the page and the paragraph beginning by

16  selecting.  That one.  Thank you.

17      Q     (By Mr. Baldauf) Sir, you wrote:  By

18  selecting, clicking on an ad to cart or download button,

19  a user is requesting to add a selected product to the

20  shopping cart.

21             So this is the request to add the product to

22  the shopping cart?

23      A     That is correct.  That's what I testified to

24  yesterday.

25      Q     Okay.  And this is an action taken by the

1  user, correct, the customer?

2      A    Yeah.  The -- the claim requires that the

3  buyer computer be programmed to receive the request.

4  The request is a mouse click by the user, uh-huh.

5              MR. BALDAUF:  If we could please move to

6  the next page.

7              If you could blow up the sentence that

8  says:  A user may request to add.

9      Q    (By Mr. Baldauf) Okay.  Now, here you write:

10             A user may request to add multiple items to

11  the shopping cart by clicking multiple add-to-cart or

12  download buttons.

13             So is it your contention that when the

14  customer clicks the add-to-cart button multiple times,

15  that this is the plurality of requests from the user to

16  add the plurality of products to the shopping cart?

17     A    Almost.  The -- the requests are generated by

18  the multiple clicks, and those clicks, of course, are

19  performed by the user.  And the buyer's computer is

20  programmed to operate on those clicks, basically,

21  receive those requests.

22     Q    So the claim requires a plurality of requests

23  from a user to add a plurality of respective products to

24  a shopping cart, correct?

25     A    That's how the buyer computer must be

1 programmed to do that, yes.

2      Q    Do you agree that a plurality means more than

3 one?

4      A    It means two or more, that's correct, yes.

5      Q    So is this limitation satisfied if the

6 customer only puts a single item in the shopping cart

7 and then checks out?

8      A    No.  The claim language is very clear.  It has

9 to be programmed to receive a plurality of requests from

10 the user.

11      Q    So to --

12      A    So there has to be -- the structure has to

13 contain the ability for the user to make multiple

14 requests.

15      Q    So to satisfy the system in this claim, the

16 user has to put multiple items in the shopping cart?

17      A    That's what I -- that's the evidence I put

18 forward, yes.

19      Q    Okay.  So let's talk about that instance when

20 the customer puts multiple items in the shopping cart.

21           I believe it was your testimony yesterday that

22 these servers here on the Newegg system constitute the

23 shopping cart database, correct?

24      A    No.

25      Q    No?  I'm sorry.  The shopping cart computer.

1      A      Yes.  The shopping cart database --

2  fortunately, we have different colors, I guess.

3      Q      Yeah.  It looks like Star Wars.

4      A      The shopping cart database is represented by

5  this block here that has --

6      Q      Okay.

7      A      -- shopping cart DB written underneath it.

8      Q      Okay.  And both of those are server-side,

9  correct?

10     A      Yes, they are.  They're both part of the

11 Newegg server system.

12              MR. BALDAUF:  So if we could refer to

13 Slide 42 from Dr. Grimes' presentation yesterday.

14     Q      (By Mr. Baldauf) So just to -- it should be on

15 the screen in front of you, sir.  This is a slide that

16 you had prepared in connection with your direct

17 yesterday, correct?

18     A      Yes, that's correct.

19     Q      Okay.  So if you could walk us through this,

20 please.  Can you explain this to us once again?  What's

21 happening here?

22     A      Certainly.  And this relates to 34(f), which

23 we've been --

24     Q      Right.

25     A      -- which we've been talking about.

1      Q     That's what we're discussing.

2      A     Right.  So 34(f) requires the buyer computer

3   to be programmed to receive requests.

4            So this shows that the buyer computer is

5   programmed.  It's the -- the add-to-cart button is what

6   has the html code behind it, if you will, that it's

7   executed when the button is clicked, so the buyer's

8   computer is programmed.

9            When the add-to-cart button is clicked -- in

10  this case, let's assume it's for the first time -- in

11  response to the click, the program -- the buyer computer

12  program running on the browser takes the add-to-cart

13  button, creates a message -- in fact, this is an

14  add-to-cart message, and it contains the product

15  identifier associated with the product right next to the

16  add-to-cart button, the cable, okay?

17           Then it goes to -- that message then goes to

18  the Newegg server system, which is -- which is this

19  server block here (indicates), and then the server

20  system generates a new cookie representing the shopping

21  cart contents or, if you will, the shopping cart --

22     Q     Uh-huh.

23     A     You can call it that, if you like.

24     Q     Well, or like you have.

25     A     Yeah.  And then sends this cookie containing

1  this content, this product identifier, back to the

2  client computer where it is stored by the browser in the

3  cookie file.

4      Q    Okay.  So while that's going on, those

5  requests are going back and forth, at no time are they

6  yet going to the shopping cart database, correct?

7      A    Not yet, no.  That's not the way the Newegg

8  system works.

9      Q    Now, the claim itself reads:  A plurality of

10  requests from a user to add a plurality of respective

11  products to a shopping cart in a shopping cart database.

12          Would you agree with me that while the

13  customer is adding products --

14              MR. BALDAUF:  Can you keep that up,

15  please?

16      Q    (By Mr. Baldauf) -- while the product -- while

17  the customer is adding products to a shopping cart,

18  pressing add-to-cart, pressing add-to-cart, but prior to

19  the time they hit checkout, that shopping cart is not in

20  the shopping cart database while the products are being

21  added?

22      A    That is correct.  The add-to-cart button

23  causes the cookie to be updated with one item or two

24  items or however many times they press it.  That cookie

25  representing the shopping cart contents is stored by the

1   browser on the client's computer.

2       Q    So it's never in the shopping cart database

3   while the customer is adding the products?

4       A    Yes.  There are other shopping carts in the

5   shopping cart database but not -- not the one that's

6   currently being used by the customer to collect his

7   products, that's right.

8       Q    Okay.  And then I believe, based upon your

9   chart that you put together, that the Newegg cookie

10  shopping cart, that only -- the contents only go to the

11  shopping cart database once the customer hits checkout;

12  is that correct?

13      A    Yes.  That -- clicking checkout, as I

14  testified yesterday, sends -- the browser is programmed

15  to send another message when the button is clicked.

16          So that checkout message goes along with the

17  cookie, and it's received by the server.  At that point,

18  the server then takes the information from the cookie

19  and inserts it into -- into the shopping cart database.

20  So that's -- our picture is gone, but that's -- that's

21  the time at which the shopping cart database is, if you

22  will, loaded with the information from the customer's --

23  from the customer's cookie.

24      Q    I know --

25      A    The cookie that is stored on the customer's

1  website.

2      Q    I'm sorry.  Were you finished?  I'm sorry.

3           And would you agree with me that that happens

4  only once, that all of those contents are sent to the

5  shopping cart database only once when checkout is hit?

6      A    Well, it happens every time the checkout

7  button is selected.  But if the customer is through

8  shopping, does one checkout operation, then it's -- the

9  database is updated only once.

10     Q    Would you agree with me that a request to

11  check out is not a request to add a product to the

12  shopping cart?

13     A    That's correct.  It's a request to check out.

14  I mean...

15     Q    During your testimony yesterday, you talked at

16  length about these claims and the various limitations.

17  I don't recall a discussion, though, about one word in

18  Claim 34(f), and that's respective.  I don't believe you

19  talked about that yesterday.

20          That's a word we hear a lot, respective,

21  respectively.  Do you agree with me respective means

22  something relating to two or more things, but they're

23  regarded individually?

24     A    I have thought about what respective means in

25  this claim -- this claim element, and I believe it

1  represents the relationship between the request and the

2  products.

3       Q     My question is just what respectively means.

4       A     Respectively?

5       Q     Yes.

6       A     You know, I haven't really thought about it

7  other than in the context of the claim.

8       Q     Okay.  Is that not a word you're familiar

9  with?

10      A     It's not a word I use, no.

11      Q     Okay.

12      A     And the important thing is what it means

13  relative to the claim, and that's really all I focused

14  on.

15      Q     Okay.

16      A     I didn't actually think about what it may mean

17  independent of that, yes.

18      Q     Okay.  I'd like to now turn to what you have

19  marked as element 34(h).

20            The language to modify said shopping cart in

21  said shopping cart database to reflect said plurality of

22  requests to add said plurality of products to said

23  shopping cart, would you agree with me that plurality

24  means more than one?

25      A     Yes.  Two or more.  We've -- we've already

1    talked about that, uh-huh.

2         Q    And as you stated previously, the contents of

3    the shopping cart are only sent bundled together when

4    the checkout button is hit to the database.

5         A    Yes, that's correct.  The cookie is sent,

6    which contains multiple items.

7         Q    Prior to this transfer to the shopping cart

8    database, there is no shopping cart -- filled shopping

9    cart in the shopping cart database, correct?

10        A    Nothing that corresponds to the customer's

11   purchase.  I mean, the database contains -- I mean,

12   there are other customers, and so it contains their

13   shopping carts, but nothing -- there's no shopping cart

14   in the database that relates to the purchase items that

15   are in the customer's cookie.

16        Q    Right.  And that's what we're talking about.

17        A    Yeah.  That's correct, yes, uh-huh.

18        Q    So you'll agree that with respect to this

19   customer, prior to the time that they hit checkout, the

20   shopping cart database is empty.

21        A    No.  It contains the elements from the other

22   customers who are doing checkout.

23        Q    Right.

24        A    So the database is not empty.  There's just no

25   shopping cart in the shopping cart database that

1 corresponds to the cookie, which is what the customer is

2 attempting to do.

3     Q    And that was my question.

4     A    Okay.

5     Q    I'm talking about that specific customer.

6     A    Yes.  For that specific customer, that's

7 correct.  There's no shopping cart in the database until

8 after the checkout button is pressed or clicked.

9     Q    Now, with the Court's claim construction,

10 modify the shopping cart means to change, correct?

11     A    Yes.  Specifically to change an instance of a

12 shopping cart in the shopping cart database.

13     Q    To change, to change it.

14     A    Modify.  To change, I would say, is a fair

15 interpretation of modify.

16     Q    So is it your testimony that placing the

17 contents of the shopping cart cookie into the shopping

18 cart for the first time -- into the shopping cart

19 database -- I'm sorry -- for the first time constitutes

20 modifying the shopping cart in the shopping cart

21 database?

22     A    It constitutes modifying an instance of the

23 shopping cart in the shopping cart database.

24     Q    What do you mean by an instance?

25     A    Well, this is based on Mr. Wu's testimony.  He

 1  described it as a two-step process.

 2          First, there's an instance created, which

 3  means there has to be some identification of some space

 4  in the shopping cart computer database, and that's step

 5  one.

 6          Step two involves moving the contents of the

 7  cookie into that space, which is the shopping cart in

 8  the database.

 9          So it's a two-step process.

10    Q    I believe that first step, from your report,

11  you refer to that as the assigning of the shopping cart

12  ID.

13    A    That's the way -- that's the way Mr. Wu

14  described it as step one, yes.

15    Q    What is the shopping cart ID?

16    A    Well, the shopping cart ID, as best as I

17  understand it, is an identification of some space in the

18  shopping cart database.

19    Q    Is the shopping --

20    A    It's assigned and allocated to the shopping

21  cart ID.

22    Q    In fact, it's a number, is it not?  It's a

23  counter.  It's a simple number.

24    A    Well, it's a -- in computer science terms, we

25  call it an identifier.  It's a -- it's a pointer.  It's

1    a -- it's a reference to space in the shopping cart

2    database.

3            And you can think of it as a number, but that

4    doesn't give you any idea of the -- of the meaning of

5    the number.  The number is an address or a reference

6    into the database.

7        Q    Are there any empty fields in this shopping

8    cart identifier that can be populated with information?

9        A    No.  The identifier is a reference to the

10   space in the database.

11       Q    So the shopping cart identifier itself

12   contains no fields that can be changed or modified?

13       A    Well, the identifier is a number, which is a

14   reference to the space.

15       Q    Is the shopping cart ID a stored

16   representation of a collection of products?

17       A    No.  That's the construction for a shopping

18   cart --

19       Q    Right.  So how --

20       A    -- not a shopping cart instance.

21       Q    So you're saying, to be an instance of a

22   shopping cart, that does not have to conform to the

23   definition the Court gave us for a shopping cart?

24       A    The Court gave us a definition of a shopping

25   cart, which I used, which is a...

1      Q      Which you used for shopping cart.

2      A      Yes.

3      Q      And now you're saying that an instance of a

4  shopping cart doesn't have to satisfy the definition of

5  a shopping cart?

6      A      Well, an instance is -- refers to the space in

7  the database where the shopping cart contents will go.

8      Q      But an instance of a shopping cart.  That's

9  what you said.

10      A      Yes.

11      Q      An instance of a shopping cart.

12      A      Yes.

13      Q      So --

14      A      That's an instance of a shopping cart.

15      Q      So the definition of a shopping cart, though,

16  is a stored representation of a collection of products,

17  agreed?

18      A      Yes.

19      Q      And the shopping cart ID is not a stored

20  representation of a collection of products.

21      A      Well, there's a difference between an instance

22  of a shopping cart and a shopping cart.  The Court

23  didn't construe an instance of a shopping cart.  It used

24  that as a part of the construction for the word modify.

25  So --

1      Q     So is it your testimony --

2                  MR. ADAMO:  Let him finish.

3                  MR. BALDAUF:  Sorry.

4                  MR. ADAMO:   Thank you.

5      A     So I used the Court's construction of a

6   shopping cart, and then I said, okay, what does modify

7   mean?

8                  And the Court said, well, modify means to

9   change an instance of a shopping cart in the shopping

10   cart database.

11      Q     (By Mr. Baldauf) So just so I'm clear, in

12   connection with your definition of instance of a

13   shopping cart, you did not use the Court's definition of

14   shopping cart?

15      A     I did, because the shopping cart is the

16   destination for where the information goes -- the

17   product information goes, and it's actually not a

18   shopping cart until the information is there, because

19   the shopping cart is a stored representation of

20   products.

21                  So it doesn't make any sense to have a

22   shopping cart if it doesn't contain these items, because

23   it doesn't contain a stored representation of products.

24      Q     I'll agree with you that I don't think this

25   makes sense, but the definition is very clear.  An

1  instance of a shopping cart.

2           MR. ADAMO:  Your Honor, objection at this

3  point.  They've been through this four times.  This is

4  starting to get argumentative.

5           MR. BALDAUF:  That's fine.  All right.

6  We can move on.

7           THE COURT:  All right.  Restate your

8  question.

9           MR. BALDAUF:  I think I made my point.

10          MR. ADAMO:  Thank you.

11          MR. BALDAUF:  Thank you.  I apologize.  I

12  carrying that too far.

13          THE COURT:  All right.  Question and

14  answer, Counsel.

15     Q    (By Mr. Baldauf) Sir, with respect to this

16  functionality in the Newegg website, you know, this idea

17  of modifying the shopping cart in the shopping cart

18  database, have you reviewed the Newegg computer code

19  relating to this functionality?

20     A    No, I have not.  I relied on Mr. Wu's

21  testimony.

22     Q    Have you examined any of the Newegg -- Newegg

23  source code?

24     A    Not directly, no.

25     Q    Just to step back one second, do you agree

1  with me that the -- while the customer is shopping,

2  it -- the cookie for the shopping cart is being updated

3  in the customer's browser as he's hitting the

4  add-to-cart button, as opposed to in the shopping cart

5  database?

6      A    Yes.  When a customer clicks the add-to -- I

7  testified about this yesterday.  When a customer clicks

8  the add-to-cart button, the html in the buyer computer

9  is programmed to send a message to the server computer.

10  The server computer then returns the -- a cookie --

11  either it's the first edition or second edition, but in

12  either event, it returns a cookie that contains the

13  results of that.

14          And the server computer, you know, knows that

15  cookies are enabled; otherwise, this operation won't

16  succeed.  And so it's automatic that the browser stores

17  this -- stores this representation of the shopping cart.

18              MR. BALDAUF:  If we could please pull up

19  Page 14 of Exhibit C?

20              And if we could pull up the first two

21  sentences of the first paragraph.  Keep going down.  The

22  first -- keep going down.  Right.  Up a little bit.

23              Yeah.  That's good right there.

24      Q    (By Mr. Baldauf) This comes from your report

25  where you wrote in your report that Newegg's system of

1   modifying the shopping cart in the cookie has the

2   advantage of simplifying database management.

3           What do you mean by that?

4       A   Well, there's a -- an operation -- the process

5   of purchasing items and putting them in a shopping cart,

6   the shopping cart information has to be stored

7   somewhere.

8           So the design -- this is under the Doctrine of

9   Equivalents now --

10      Q   Right.

11      A   -- since we're looking at it here, yeah.

12          So the design alternative that the implementer

13  of an E-commerce system considers is, well, where am I

14  going to store that information?  Am I going to store it

15  on the server side --

16      Q   Which is what's disclosed in the '314 patent,

17  correct?

18      A   That's correct.

19      Q   Okay.

20      A   And then -- or I'm going to -- am I going to

21  store in it a cookie, which is --

22      Q   Which -- which is what Newegg does.

23      A   -- which is what the Newegg system does,

24  right.

25          And so -- so this is a design choice.

1       Q    Okay.

2       A    And if you're going to store it in a cookie,

3  then that's a -- doesn't require any additional

4  resources to hold the contents of the shopping cart on

5  the server side.

6       Q    So you're --

7       A    So that simplifies -- so if you -- if you

8  reduce the amount of things that the database management

9  system has to do, then that simplifies it.

10      Q    Does that save space on Newegg servers?

11      A    It would save space on Newegg servers, yes.

12           And it would take -- I mean, the space has to

13  be taken somewhere, so the space is taken up by sending

14  the information to the customer's computer to be stored

15  there.

16      Q    Right.  So in the Newegg system, space isn't

17  taken up by storing shopping carts during the selection

18  process, correct?

19      A    Yeah.  Those are the -- those are the

20  tradeoffs of the two design alternatives, yes.

21      Q    Is there something that Newegg is sacrificing

22  by choosing this method instead of the server-side

23  method?

24      A    Yes, as a matter of fact.

25      Q    What is that, sir?

1    A    Well, if you -- if you purchase -- you go

2  shopping at the office, and you want to buy two or three

3  things, then they're saved as a cookie on your office

4  computer, because that's the computer you're using at

5  the time, and that's the way -- it's programmed to do

6  that.

7         Then if you go home at night and say, well,

8  gee, you know, I want to add some more things to this,

9  and maybe then buy the items in my shopping cart, the

10  shopping cart isn't there.  It's on your computer at the

11  office.

12         So this is -- this is one of the things that's

13  considered, and that's what makes it a design

14  alternative.  There are characteristics of each way of

15  implementing the E-commerce system, and this affects the

16  decision on how to implement it.

17    Q    So if a designer would select the server-side

18  option disclosed in the '314 patent, would a customer be

19  able to continue shopping from multiple computers?

20    A    Yes, they would.  That's one of the

21  consequences of -- of having the information on the

22  server.

23    Q    I'd like to now turn our attention to the '492

24  patent.

25         I believe you testified yesterday, with

1 respect to Claim 17 of the '492 patent, that it's

2 virtually identical to Claim 34 of the '314 patent that

3 we've just discussed; is that correct?

4      A    Yes, that's right.  I talked about -- rather

5 than go through all of the elements of the claim, I

6 talked about the differences, yes, that's right.

7      Q    And since we just talked about a lot of the

8 things that are in both claims, I'm not going to belabor

9 that point here either.

10           However, with respect to Claim 15, a hypertext

11 statement system, so, again, Claims 41 and 61, these are

12 the asserted claim, they depend upon Claim 15.

13      A    Yes, that's correct.

14      Q    And if Claim 15 is not infringed, Claims 41

15 and 51 cannot be infringed; is that right?

16      A    That's right.  Claim 41, of course, includes

17 the text here; but because of this phrase, in accordance

18 with Claim 15, that means it has to also satisfy all of

19 these limitations for Claim 15.

20           That's -- I believe that's what you said, yes.

21      Q    Yes.  Right.

22           This claim talks about -- it's a hypertext

23 statement system.  What is a hypertext link?

24      A    Pardon me?

25      Q    What is a hypertext link?

1      A      A hypertext link is a region on the web page

2   displayed by the browser from the code that comes from

3   the server.  And the link refers to an area of the

4   screen that you can click on -- the user can click on.

5           And the computer is programmed to respond to

6   that link and take some action.

7           Typically, it brings up another web page,

8   but -- but that's -- that's a -- an example.  Really,

9   it's programmed to take some action.

10     Q      Is the use of hypertext a basic function of

11  the worldwide web?

12     A      Yes.  I have a hard time imagining the

13  worldwide web without hyperlinks.

14     Q      Did Open Market invent the use of hypertext

15  links on the web?

16     A      No.  Those were -- well, actually, the -- the

17  notion of a hyperlink is very early.  Comes from a

18  fellow named Ted Nelson, who wrote -- wrote a book about

19  hyperlinks called Computer Literacy or -- I forget

20  exactly the name of it, but -- but it was, you know,

21  decades, decades before Open Market's system.  So 10 or

22  20 -- 10 or 20 years.

23     Q      This claim also talks about a transaction

24  detail, transaction statement.  What is that?  What is

25  the transaction detail within 15(f)?  Display

1  transaction details, what are those, sir?

2      A    Well, they're -- I think, as you -- as you

3  might just take from reading this, they're details about

4  the transaction.  The statement document consists of a

5  transaction history, and transaction details would be

6  further information about a transaction.

7      Q    What type of information would you expect to

8  be in a transaction detail?

9      A    Well, the claim tells us actually what

10  needs -- what, to satisfy the claim, needs to be there.

11  That's the context I used in analyzing this in the

12  claim.

13         But I would expect, you know, additional

14  information, I mean, you know, details or somehow

15  further information.  It's not presented by the

16  statement without the detail.

17      Q    And these relate to the past transactions what

18  you have previously purchased, how much it costs, that

19  sort of thing?

20      A    Yes.  Purchase transactions, right.

21      Q    Can you tell me how often this hypertext

22  function is used by customers on Newegg's website?

23              MR. ADAMO:  Objection.  It's outside the

24  of the scope of the direct.

25              THE COURT:  Restate the question.

1          MR. BALDAUF:  Excuse me, Your Honor.  I
2  didn't hear.

3          THE COURT:  Restate the question.

4     Q    (By Mr. Baldauf)  The question was simply:  Do
5  you know if, in fact, Newegg customers select or choose
6  the transaction details and, if so, how frequently?

7          THE COURT:  Overruled.

8     A    I -- actually I don't have any idea.  It's the
9  capability of the website -- it's actually a very
10  powerful website; it has lots of capabilities.  And all
11  I have direct experience with are the ones I used which
12  were -- I described in my purchase example.

13          So, I mean, I used it, but I really don't have
14  any idea of what frequency it's used.

15     Q    (By Mr. Baldauf)  Again, this claim, like what
16  we discussed -- discussed previously, requires a client
17  computer for operation by a client user.  Again, would
18  you agree with me that it is the customer that supplies
19  the client computer?

20     A    Yes.  A customer supplies the client computer.
21  As I described yesterday, it is used by the Newegg
22  order -- order history system.

23     Q    And with respect to for operation by a client
24  user, again, that's the customer?

25     A    Yes, that customer is the one that uses it.

1  The requirement under the claim is for a client

2  computer.

3       Q    My focus though --

4       A    And it's for operation by the user, but the

5  requirement to satisfy the claim is that there be a

6  client computer, which is part of the Newegg system.

7  It's called the customer in the Newegg diagram.

8       Q    Right.  I was just reading the entirety of the

9  passage.

10      A    Yes.

11      Q    For operation by a client user.

12      A    That's correct.

13           Let me add one thing.

14      Q    Sure.

15      A    It's actually used by -- it could be a Newegg

16  computer if they're providing testing of the system.

17      Q    Okay.  Thank you.

18      A    That's really true for all of the claims.  I

19  keep forgetting to mention that.

20      Q    With respect to testing, do you know how

21  frequently Newegg tests its systems?

22      A    Well, not specifically, but in the normal

23  course of doing business and adding features to

24  websites, which I am familiar with, you would really

25  test features before they were launched for customer

1  use.  And I have seen some documents produced by Newegg

2  about some of their testing that they have done.

3       Q    Uh-huh.

4       A    And that's the normal case.  You test to make

5  sure that you're not going to end up with lots of, you

6  know, upset customers because something doesn't work

7  quite right the way it was designed.

8            So the purpose of the testing is to ensure

9  that you're going to have smooth, trouble-free operation

10  when people come to use these facilities that you're

11  adding to the website.

12       Q    So you believe this is internal Newegg testing

13  that they're operating, if you will, as the customer?

14       A    Yes.  That's a good way to characterize it.

15  It's Newegg employees with Newegg computers, obviously,

16  acting as customers for purposes of testing.

17       Q    So these are not revenue-generating sales;

18  this is all internal to Newegg?

19       A    No, they would not generate -- the purpose

20  isn't to generate revenue.  The purpose is to make sure

21  the facilities work that are being launched on the

22  website.

23       Q    15(f) there, the client computer being

24  programmed to display the statement document to receive

25  a request from the client user to display transaction

 1   details, and so on.

 2          Who requests the display of transaction

 3   details?

 4      A    Well, this claim requires that -- a client

 5   computer to be programmed.  And it has to be programmed

 6   to do these things.  And once it's been programmed to do

 7   that, then it meets this claim requirement.  The actual

 8   requests, of course, are done by the user clicking --

 9   clicking buttons.

10      Q    That was my question.

11          I believe you testified yesterday that the

12   client computer runs a browser that is programmed by

13   Newegg.  Is that a fair summary of your testimony?

14      A    Yes.  Generally, claims require two things:

15   Client computer programmed by Newegg and server

16   computers programmed by Newegg.  So the client computers

17   are programmed by Newegg, as I testified yesterday.

18      Q    And you believe that is satisfied by Newegg

19   sending html pages to the browser of the customer's

20   computer, correct?

21      A    Yes.  That's the mechanism that the Newegg

22   system uses to control the operation of the -- of the

23   customer computer.

24      Q    Okay.  In fact, the way this works, is it not

25   the customer computer that pulls or extracts the web

1   page from the Newegg server?

2       A    No.  The messages go back and forth between

3   the client and the -- and the server computer.

4   The only thing that the customer does, which is not

5   covered by the claims, is to actually connect to the

6   Newegg website.  Once they connect to the Newegg

7   website, they get the initial homepage that has the

8   specials and things on it; and, at that point, all of

9   the operation of the browser is controlled by the

10  programming that comes from Newegg.

11      Q    And this is subsequent to the customer

12  initially logging -- taking the action of logging onto

13  the Newegg website?

14      A    Yes.  It's like the customer, you know,

15  deciding to walk into Home Depot.  I mean, that's kind

16  of the initial decision that the customer makes.  They

17  connect to this website, and they type newegg.com, and

18  then they are connected to the website.

19      Q    So after this happens, then you believe that

20  Newegg programs the customer's browser?

21      A    Yes.  All subsequent actions that take place

22  relative to the website are controlled by the code, html

23  code, that is sent to the browser in response to a

24  request from the client computer.

25      Q    Is a browser a computer?

1       A    Well, it certainly depends what you think a

2  computer is.  I don't recall specifically if the Court

3  construed that.  Yes, they did, actually.

4       Q    Yes, he did.

5       A    Let me review this here.

6            Functional unit that can perform substantial

7  computation, including numerous arithmetic operations or

8  logic operations without human intervention.

9            So the computer -- I'm sorry, what was your

10 question again?

11      Q    If a browser is a computer under that

12 definition.

13      A    I would say the browser is an application that

14 runs on the computer.

15      Q    The browser itself is not a computer, correct?

16      A    Well, when someone says go to your computer

17 and buy me a cable, then the distinction between a

18 browser and a computer might get lost.  But from a

19 technical standpoint, I think of the browser as an

20 application that runs on a computer.

21      Q    Right.  And I was just focusing on the Court's

22 construction.

23      A    Yes.  But the computer is definitely a

24 functional unit that can perform substantial

25 computation, including running -- running a browser.

```
 1      Q    Does the '492 patent disclose the sending of
 2  instructions to a browser as constituting programming
 3  the buyer computer?
 4      A    Well, the -- the browser receives instructions
 5  in two ways.  I mean, for example, if you're going to
 6  enable cookies or disable cookies, then that's kind of
 7  browser-based commands that are independent of what
 8  Newegg is doing.
 9           But once browsers are enabled, which means you
10  can buy products, at that point the control of the -- of
11  the browser is done, relative to the claims, is done
12  completely by a code that's sent from the Newegg server
13  system.
14      Q    My question, though, is specifically, does the
15  '492 patent disclose the sending of instructions to a
16  browser as constituting programming the buyer's
17  computer?
18      A    Oh, I'm sorry, I misunderstood your question.
19  The -- the claim language just says that the client
20  computer is programmed, right here for example.
21           So my analysis was, okay, how does the Newegg
22  system work?  Does it contain a client computer, which
23  is the second element?  And then is, in fact, it
24  programmed to do the things that the claim requires?
25           And the answer is -- was yes.  And it does
```

1  that by sending the html code from the server computer.

2      Q    I understand all that.  If you would please

3  answer my question.

4      A    Oh, I'm sorry.

5      Q    My question is very specific.

6           In the '492 patent itself, the specification

7  that the Judge described to us at the onset of this

8  trial where it discusses the operation of the invention,

9  anywhere in there does it disclose the sending of

10  instructions to a browser as constituting programming

11  the buyer computer?

12      A    Oh, I'm sorry.  I thought you were referring

13  to the claims.  You're actually referring to the patent

14  itself.

15      Q    Yes, I am.

16      A    I apologize.

17      Q    That's quite all right.

18      A    I misunderstood the context of your question.

19           I don't remember specifically, but a person of

20  ordinary skill in the art reading the specification

21  would understand what a browser would be or could be

22  used and how they work.

23      Q    To answer my question, you don't remember?

24      A    I don't remember specifically, no.  But I do

25  know that it would be within the knowledge of a person

1  of ordinary skill in the art that that's the way

2  browsers work, yeah.

3       Q    Does Newegg install browsers on customer

4  computers?

5       A    No.  I think I testified yesterday that you

6  could have any one of a number of browsers that --

7  sometimes they come as part of your system.  When you

8  install Windows, they're just there.  And sometimes

9  people say, oh, I want to use this new Firebox browser.

10  You say, oh, okay.  So you download that.  So those are

11  done by the customer.

12       Q    I think we can finally turn our attention to

13  the '639 patent.

14            I don't want to belabor this point, but,

15  again, we can just concentrate on these independent

16  claims, correct?

17       A    Certainly.  All the claim elements, whether

18  they are in the independent claims or the dependent

19  claims, must be satisfied.

20            MR. BALDAUF:  If we can please pull up

21  Exhibit B, Page 1 of the report.

22       Q    (By Mr. Baldauf) okay.  Looking at this, it's

23  a -- part 1(a) that you've designated -- a method of

24  processing service request from a client to a server.

25            MR. BALDAUF:  If we could blow up the

1  first paragraph on the right-hand side, please.

2     Q   (By Mr. Baldauf)  The second sentence you

3  wrote in the client server model:  Client sends service

4  request over communications link to a server.

5          So would you agree with me that it's the

6  client or customer who is sending the requests?

7     A   Yes.  The html code behind a button, the

8  programming behind a button like we've been talking

9  about -- add-to-cart is a perfectly good example to

10  use -- that code, when it's executed by the browser, is

11  what sends the service request to the server for some

12  action.  In this case, you have the cart action.  But

13  that's -- that's a description of the client server

14  model.  Clients request service; servers provides

15  service.

16     Q   And it's the client that requests service?

17     A   Yes.  Yes.

18     Q   If we could move on to what you have marked as

19  1(b), forwarding a service request from the client to

20  the server system.

21          Who forwards the service request from the

22  client to the server system?

23     A   Well, there's a -- which claim element is

24  this?

25     Q   What you have marked as 1(b).

1      A    1(b), yes.

2           Okay.  This forwarding occurs in multiple

3  steps.  I mean, it starts with the client; then it's

4  received by elements along the way.  For example, it's

5  received by the firewall at the Newegg web system, the

6  server system, and then it's forwarded to this netscaler

7  block that I testified about yesterday, and then it's

8  forwarded from there to some other servers to actually

9  perform the action requested inside the Newegg server

10  system.

11           MR. BALDAUF:  If you could please pull up

12  Page 3 to Exhibit B of Dr. Grimes' report.

13      Q    (By Mr. Baldauf)  Sir, Page 3 of Exhibit B to

14  your report is your explanation of how this claim

15  limitation is satisfied, correct?

16      A    Yes, that's correct.  This is the -- this

17  is -- what we're looking at here is my detailed

18  analysis.  I summarized it yesterday, but these are the

19  details, yes.

20           MR. BALDAUF:  Would you be kind enough to

21  blow up the first paragraph on the right side.

22

23      Q    (By Mr. Baldauf)  You wrote that to satisfy

24  this limitation:  Client computer forward send service

25  requests to the Newegg server system when, for example,

1   users click hyperlinks while browsing web pages.

2           Is that accurate?  Is that how that limitation

3   is satisfied?

4       A    Yes.  This is -- client computers forward --

5   that's right.  When you click on a hyperlink, the code,

6   the html code behind that link, causes a service request

7   to be sent by the browser.

8       Q    So it's the client computer that's forwarding

9   that service request?

10      A    Well, the client computer generates the

11  service request.  Forwarding sort of means that it's

12  been received somewhere, you know, like forwarding mail,

13  for example.  I get mail and I forward it.  So someone

14  else sent me the mail, but the person that receives it

15  then does the forwarding operation.

16          So client computers send a service request,

17  and then it's forwarded by other elements in the chain.

18  This is perhaps not very clearly written.  But

19  forwarding means receive something and then send it on.

20      Q    And you had mentioned the firewall and the

21  netscaler, correct?

22      A    Those are two elements.  In fact, Mr. Tittel

23  has said that the -- that this claim element is met by

24  virtue of the fact that the netscaler forwards it to the

25  server system.  And that's certainly one place that it

1    is forwarded, yes.

2        Q    We can let Mr. Tittel testify himself.

3             Could you show me where in your report in this

4    discussion of element 1(b) that you explain that this

5    limitation is satisfied by either forwarding from the

6    firewall or netscaler?  I don't -- you can look, but I

7    don't believe it's in your report.

8        A    The use of that particular example, which I

9    agree with completely, was first -- the first time I had

10   thought about that was when I read it in Mr. Tittel's

11   report.

12       Q    Okay.  So would you agree with me that it's

13   not in your report?

14       A    I don't believe I went into that level of

15   detail on the issue, particular issue of what exactly it

16   means to forward.  I have what is written here.

17       Q    And that's it?

18       A    Yes.

19       Q    And that's that the client computers forward

20   or send service requests to the Newegg server system?

21       A    Yes.  Well, what I have written here speaks

22   for itself, of course.

23       Q    If we could take a look at what you have

24   marked as 1(c) now:  Returning a session identifier from

25   the server system to the client, the client storing the

1   session identifier for use in subsequent distinct

2   requests.

3           This includes the language client is storing

4   the session identifier for use in subsequent distinct

5   requests.

6           Is this satisfied by the customer's computer

7   storing the session identifier?

8       A    The claim requires that the session identifier

9   be returned from the server system to the client.  And

10  then it requires that the client store the session

11  identifier for use in subsequent requests.

12          So it's -- the storing is done by the client,

13  yes.

14      Q    And then moving on from that to 1(d):

15          Appending the storage session identifier to

16  each of the subsequent distinct requests.

17          Again, is that done by the customer computer?

18      A    Yes.  It's controlled by the Newegg system

19  because it sends the html, which causes the browser to

20  actually do that.  That's an automatic operation of the

21  browser when cookies are enabled is that the -- in this

22  case the stored session ID is stored in a cookie, and it

23  is automatically appended to requests of the browser.

24      Q    But that's done on the customer computer?

25      A    Yes.  The request is sent from the customer

1  computer, yes.

2           MR. BALDAUF:  If you could please pull up

3  Page 6 of Exhibit D to Dr. Grimes' report.  If you could

4  pull up the last paragraph, please.

5       Q    (By Mr. Baldauf)  Dr. Grimes, you wrote in

6  your report that the conventional operation of cookies

7  is that a server system sends a cookie value to a client

8  computer, and the client computer stores the cookie

9  value for use in subsequent requests to that server

10  system.

11          What do you mean by the conventional operation

12  of a cookie?

13      A    Well, that's the way all browsers that I know

14  of operate.  That's what I meant by conventional is that

15  it's something that is -- is done by -- it's done by all

16  browsers that I know of.  Certainly you could use for

17  doing purchases on the Newegg system.

18           MR. BALDAUF:  If you could pull up

19  Slide 6 from Dr. Grimes' presentation yesterday.

20      Q    (By Mr. Baldauf) Dr. Grimes, this is another

21  slide from your presentation yesterday.  Is this what

22  you're referring to as the conventional operation of

23  cookies?

24      A    This is a description of the conventional

25  operation of a browser that has cookies enabled, yes.

1      Q     Was this invented by Open Market?

2      A     No.  I think it was invented by Netscape,

3  probably around 1992, as I recall.

4      Q     If we could switch gears briefly.  Claim 78.

5  Again, this claim, as you testified yesterday, is very

6  similar to Claim 1 that we just discussed, correct?

7      A     Yes, that's correct, uh-huh.

8      Q     Part A:  A method of processing, in a server

9  system, service requests from a client to the server

10  system.

11            Again, are these service requests that are

12  sent by the client or customer to the server system?

13      A     Yes.  The service requests are from a client,

14  meaning -- meaning a client computer or the buyer

15  computer or the customer computer.  Yes, those service

16  requests come from the client.

17      Q     And in 78(b):  Receiving, from the client, a

18  service request to which a session identifier stored at

19  the client has been appended by the client.

20            Do you agree that it is the client that -- or

21  the client's computer that has appended the stored

22  session identifier?

23      A     Yes.  The claim requires that they be received

24  from the client.  So this is an operation that's done on

25  the server, they receive the messages from the client.

1              And, in fact, yes, that is correct.  The

2    identifier stored at the client has been appended by the

3    client.  That's the way the browser works.

4         Q    We talked a bit -- not we, but one of my

5    associates and you talked a bit at your deposition about

6    sessions, correct?

7         A    Undoubtedly, I don't remember.  It was most of

8    a year ago.  But I'm sure you will remind me of what I

9    said.

10        Q    That's why I'm here, right?

11        A    That's right.

12             MR. ADAMO:  You can bet on it.

13        Q    (By Mr. Baldauf)  The Court has defined

14   session as a series of requests and responses to perform

15   a complete task or set of tasks between a client and a

16   server system, correct?

17        A    In the context of the '639 patent, that is

18   correct, yes.

19        Q    And I believe you testified that a task

20   depends upon the request that the server receives and

21   the responses that it provides to the client.  Does that

22   sound accurate to you?

23        A    Yes.  A task is represented by the series of

24   requests and responses.

25        Q    Could a session be the sending back of an ID

1   from the server to the customer's computer after

2   authentication?

3       A    Well, when you do a logged-in session, which

4   involves authentication by the server, that's

5   actually -- the sending of that cookie and storing it is

6   the beginning of the session.

7       Q    Okay.

8       A    So that's -- that's -- my analysis shows that

9   that's when the session begins, the logged-in session

10  particularly begins.

11      Q    As a task?

12      A    Pardon me?

13      Q    As a task?

14      A    I wouldn't consider that a task, no.  That's

15  the beginning point.  In other words, you have to begin

16  the session, then the task consists of requests and

17  responses that occur once the session is begun.

18      Q    How many?

19      A    How many?

20      Q    Yes.

21      A    Well, at least one set of requests and

22  responses.

23      Q    You talked a bit yesterday about this concept

24  of inducement of infringement.  Just a couple final

25  questions.

1           Are Newegg's customers responsible for the

2   operation of Newegg servers?

3       A   I can't imagine they would be.

4       Q   Do Newegg's customers ever supply or operate

5   Newegg's shopping cart computers or shopping cart

6   databases?

7       A   The -- the shopping cart system -- the Newegg

8   system, you know, at the data center is operated by --

9   by Newegg employees for sure.  And the -- and I talked

10  about the fact that the service send htmls, so in that

11  sense they're controlling the user's computer, but they

12  don't -- the user operates the user's computer.

13      Q   Thank you.

14              MR. BALDAUF:  Thank you.  I pass the

15  witness.

16              THE COURT:  All right.  Redirect.

17              MR. ADAMO:  Redirect, Your Honor?

18              MR. BALDAUF:  Yes, redirect.

19              MR. ADAMO:  It will be brief.

20              THE COURT:  Okay.

21              MR. ADAMO:  Your Honor, it will work best

22  if I can stand here by the charts.

23              THE COURT:  That will be fine.

24              MR. ADAMO:  With my volume voice on.

25                   REDIRECT EXAMINATION

1  BY MR. ADAMO:

2      Q    You spent a lot of time with Mr. Baldauf on

3  the '314 patent talking about things that the customers

4  did or didn't do, or when they did them or if they did

5  them.

6           What kind of claim is the '314 patent claim,

7  Doctor?

8      A    This is called a system claim.

9      Q    Okay.

10     A    I thought for a moment you were going to

11  delete part of the claim.

12     Q    Don't worry about it.

13          Claim 35, is that a system claim?

14     A    Yes, it is.  In fact, all of the claims that

15  are asserted in this case in the '314 patent are all

16  what are known as system claims.  They are claims about

17  the structure of the Newegg system.

18     Q    All right.  And I think you were making, in

19  your back-and-forth with Mr. Baldauf, you were trying to

20  point out in various of your answers that the claims

21  require computers that are programmed in a certain way;

22  is that correct?

23     A    Yes.  That's the -- that's the language of the

24  claim, right.

25     Q    Okay.

1        A    For like the client computer and the server

2    computer.

3        Q    Programmed, programmed.  I think I've got them

4    all.

5             Claim 34, does any element of Claim 34 require

6    any action on behalf of a customer?

7        A    The claim language itself does not.  I mean,

8    customers, of course, are involved; but the claim

9    doesn't require the customer action.  The claim requires

10   that the computer be programmed.

11       Q    All right.  Let me be clear about this.  So

12   let me ask you again:  Do any of the elements of

13   Claims 34, 35, or 51 require any customer action?

14       A    No, they do not.

15       Q    All right.  So besides all the time you spent

16   with Mr. Baldauf talking about what customers did or

17   didn't do with respect to the system claims in the '314

18   patent, you then turned to the '492 and you spent all

19   sorts of time talking with him about what customers did

20   or didn't do with respect to this patent.

21            What kind of claim is this?

22       A    All of the asserted claims are also system

23   claims for this patent.

24       Q    Those claims, those system claims, the

25   elements in those system claims call out computers that

1   are programmed to do a certain thing?

2       A    That's correct, yes.

3       Q    And I didn't circle the for operation before.

4            Is for operation a function of a computer?

5       A    Yes.

6       Q    Not structural?

7       A    That's correct.

8       Q    All right.

9       A    It's what is the purpose, basically.

10      Q    Do any of the elements of any of the claims in

11  the '492 patent, Claims 15, 21, 60, 61, do any of them

12  require any action of any type on the part of a

13  customer?

14      A    No, they do not.

15           MR. ADAMO:  I have nothing further, Your

16  Honor.  Thank you.

17           THE COURT:  Thank you.  Any further

18  recross?

19           MR. BALDAUF:  Nothing further, Your

20  Honor.

21           THE COURT:  All right.  Thank you.  You

22  may step down.

23           All right, Ladies and Gentlemen of the

24  Jury, I think we will go ahead and take our morning

25  break at this time.  So we will be in recess until

1  10:30.  Please remember my instructions.  You are

2  excused.

3                COURT SECURITY OFFICER:  All rise.

4                (Jury out.)

5                (Recess.)

6                COURT SECURITY OFFICER:  All rise.

7                (Jury in.)

8                THE COURT:  Please be seated.

9                All right.  Who will be your next

10 witness, Mr. Adamo?

11               MR. ADAMO:  Your Honor, Soverain Software

12 would call G. Winfield Treese, who goes by Win.

13               THE COURT:  He has been sworn, has he

14 not?

15               MR. ADAMO:  He has, Your Honor.

16               THE COURT:  All right.

17               MR. ADAMO:  And he has been out in the

18 hallway until just a minute or two ago --

19               THE COURT:  Okay.

20               MR. ADAMO:  -- pursuant to the Rule.

21               THE COURT:  Thank you.

22               MR. ADAMO:  May we begin?

23               THE COURT:  Yes, you may.

24               MR. ADAMO:  Thank you, Your Honor.

25          G. WINFIELD TREESE, PLAINTIFF'S WITNESS,

```
 1                         PREVIOUSLY SWORN

 2                         DIRECT EXAMINATION

 3  BY MR. ADAMO:

 4       Q    Good morning.

 5       A    Good morning.

 6       Q    And would you introduce yourself to the Ladies

 7  and Gentlemen of the Jury, please?

 8       A    My name is George Winfield Treese, but most

 9  people call me Win.

10       Q    Where did you grow up?

11       A    In Shreveport, Louisiana.

12       Q    Does your family still live in Shreveport?

13       A    My mother lives there part-time.

14       Q    Did you go to college?

15       A    Yes, I did.

16       Q    And where?

17       A    At the Massachusetts Institute of Technology.

18       Q    That's the Boston area?

19       A    In Cambridge, Massachusetts, yes.

20       Q    Did you earn a degree from MIT, Mr. Treese?

21       A    Yes, I did.

22       Q    And what degree did you earn?

23       A    A Bachelor of Science in mathematics.

24       Q    What year?

25       A    That was in 1986.
```

1      Q     Did you work while you were going to MIT?

2      A     Yes, I did.

3      Q     What type of job did you have?

4      A     I was a student employee of MIT's Project

5  Athena.

6      Q     All right.  What was Project Athena at the

7  time you were a student programmer there?

8      A     Athena was a multi-year experiment in the use

9  of workstations, early PCs, in undergraduate education.

10     Q     And what specifically did you do as part of

11 your job?

12     A     As a student, I did some software development,

13 and I also provided technical support for the user

14 consultants who would help students who had questions

15 about the systems.

16     Q     In 1986, after you received your BS in

17 mathematics from MIT, what -- what did you do next?

18     A     I went to work on the full-time staff at MIT's

19 Project Athena.

20     Q     What was your job title?

21     A     I was chief systems engineer.

22     Q     All right.  Now that you are chief systems

23 engineer and not a student any longer, what were the

24 things that you were responsible for?

25     A     I was in -- generally responsible for putting

1   together all of the software components for a -- the

2   complete software environment at Project Athena and

3   making sure that we got those installed on the thousand

4   or so computers that we had.

5       Q    Were there any particular projects that you

6   worked on that you remember that you thought were

7   important at the time?

8       A    I was also involved with the development of

9   some key components, including the X Windows system,

10  which is like the Windows system that we use on PCs

11  today; the Cerberus Authentication System, which is a

12  security system that's now been incorporated in many

13  systems, including Microsoft Windows; and the Zephron

14  Notification System, which was an early kind of instant

15  messaging system.

16      Q    All right.  After your employment -- full-time

17  employment at Project Athena, what did you do next for

18  work?

19      A    In 1998, I went to work for Digital Equipment

20  Corporation at its research lab in Cambridge.

21      Q    What was Digital at that time?

22      A    At that time, Digital was the world's second

23  largest computer company.

24      Q    All right.  The word or the shorthand phrase

25  DEC, D-E-C, gets bounced around quite a bit.  Did that

1  have any relationship to Digital that you were working

2  for?

3      A    Yes.  That was a nickname for Digital.

4      Q    Was Digital particularly known for anything

5  important, remarkable in the technology world that you

6  were in at that point?

7      A    At that time, Digital was especially

8  well-known for its VAX minicomputers and for computer

9  networking.

10     Q    Hard to get a job at Digital at that time,

11 Mr. Treese?

12     A    Yes, it was.  Digital was quite selective in

13 hiring in engineering, and especially in their research

14 lab, it was very, very choosy.

15     Q    What work did you do while you were at

16 Digital?

17     A    I worked on several projects, including

18 operating system software, internet firewalls, and

19 security, a lot of the early internet technology at

20 Digital, and sending audio across a network.

21     Q    What was Digital's internet firewall that you

22 worked on?  What was that project about?

23     A    That project was really intended to protect

24 Digital's internal company network from bad things going

25 on on the internet.  These days we have firewalls in our

1  houses to protect from bad things on the internet.  This

2  was early work to do that.

3      Q    You also said something about working on

4  transmitting audio.  What was that about?

5      A    That was a project to move audio, radio,

6  music, speech, what-have-you, across a computer network.

7           Again, just as today, we can listen to radio

8  stations and music over the internet.

9      Q    Ever heard of something called the Alpha

10  processor?

11      A    Yes, I have.

12      Q    Did you ever work on it?

13      A    I worked on software for the Alpha processor.

14      Q    And what was the Alpha processor?

15      A    Alpha was, at the time, the world's fastest

16  microprocessor, developed by Digital in the early 1990s.

17      Q    While you still had this Digital day job, did

18  you feel you had enough time to be doing something else,

19  Mr. Treese?

20      A    Yes, I did.

21      Q    And what was that something else?

22      A    I also attended Harvard University for a

23  graduate degree in computer science.

24      Q    While you still had your full-time job?

25      A    That's correct.

1       Q    Did you get a degree from Harvard?

2       A    Yes, I did, a master's degree in computer

3  science.

4       Q    You remember the year?

5       A    1992.

6       Q    After you got your master's degree from

7  Harvard, did you remain a DEC employee?

8       A    Yes, I did.

9       Q    Did you think you had more free time?  Did you

10 go start doing some other educational program?

11      A    I also enrolled in the Ph.D. program in MIT's

12 Department of Computer Science.

13      Q    How long were you employed at Digital?

14      A    For six years; until 1994.

15      Q    Okay.  You left Digital.  Then where did you

16 go for a job?

17      A    I went to a startup company called Open

18 Market.

19      Q    Were you employed at Open Market when you

20 invented the technology that was claimed in the three

21 patents that are at issue in this case?

22      A    Yes, I was.

23      Q    Do you still work?

24      A    Yes, I do.

25      Q    All right.  Where do you work now?

1       A     I work now for a consulting company called

2    Serissa Research.

3       Q     What is Serissa Research?

4       A     Serissa Research is a small consulting

5    company.  We do work in internet technology, electronic

6    commerce, high-performance computing, and image

7    processing.

8       Q     And what type of people do you work for?  I

9    guess what are the company's customers or clients?

10      A     We've worked for a variety of companies, both

11   large and small.  We've also done some work for Soverain

12   Software and for the U.S. Department of Defense.

13      Q     What is it that you do for Soverain?

14      A     We have consulted on a range of topics about

15   Open Market's technology, the Transact product, and the

16   intellectual property from Open Market.

17      Q     Does Serissa in any way help Soverain service

18   customers for Transact products?

19      A     We provide technical support when that's

20   necessary.

21      Q     Why do you think you're here today?

22      A     I'm here as an inventor on the

23   patents-in-suit.

24      Q     Now, the patents-in-suit, you're aware there

25   are three of them, Mr. Treese?

```
 1       A    Yes.

 2       Q    And you're a named inventor on -- currently on

 3  all three of the patents?

 4       A    That's correct.

 5       Q    And I'm going to use the shorthand numbers for

 6  the three patents, the '314, the '492, and the '639.

 7            Do you -- are you going to be able to work

 8  with those numbers and keep which patents are which

 9  straight?

10       A    Yes.

11       Q    Let's talk a little more about Open Market.

12            What was Open Market?

13       A    Open Market was a startup company in 1994.  We

14  were setting out to build systems to do business on the

15  internet.

16       Q    Do you remember when Open Market first opened

17  its doors?

18       A    I believe the company was founded at the end

19  of 1993.

20       Q    And when did you join?

21       A    In May of 1994.

22       Q    Why did you go from what sounded like a pretty

23  good job at DEC to a startup at Open Market?

24       A    I was excited about the work that Open Market

25  was doing, about the technology the company would be
```

1  developing, and it seemed like a terrific opportunity.

2      Q    What about the technology that you understood

3  the company was going to be developing, inclined you to

4  leave DEC?

5      A    It was an exciting time for the internet and

6  in really broadening the use of the internet for many

7  purposes, and business was new on the internet at that

8  time.

9      Q    Well, DEC, at that point, I think you said,

10  being the second largest computer company in the world,

11  weren't they going to work on the worldwide web and the

12  internet?  Why didn't you just stay with them and do the

13  work there?

14      A    At that time, Digital had many of its -- much

15  of its own networking technology, which had been very

16  good.  It was not embracing the internet very rapidly at

17  that time, and this looked like the future to me.

18      Q    When you went over to Open Market, did you

19  already know any of the folks who worked there?

20      A    Yes, I did.

21      Q    Name a couple for us, if you don't mind.

22      A    I had worked at Digital with Larry Stewart and

23  Andy Payne.

24      Q    Let's focus on Larry Stewart first.  What was

25  his position at the time you joined Open Market?

1    A    He was the chief technology officer at Open

2 Market.

3    Q    And how and when did you first meet him?

4    A    I had met Larry some years before when we were

5 both working at Digital.

6    Q    And what did you think of the guy?

7    A    When I first met him, I thought he was

8 intimidatingly smart.

9    Q    Okay.  I guess I shouldn't lead with my chin,

10 but I'm going to ask anyway.  What is an intimidatingly

11 smart person, Mr. Treese?

12    A    You can talk to Larry, describe what you're

13 working on; and before you finish the description, he

14 asks you a question you hadn't thought of, and then he

15 follows it up with a solution to that problem.

16    Q    Is he for rent?

17         All right.  Now, I've got to ask you a

18 question about personal bias.  Is there another reason

19 that you seemed to like Mr. Stewart?

20    A    Yes.  We're married to sisters.

21    Q    So the guy's your brother-in-law.

22    A    Yes, he is.

23    Q    Okay.  And you actually live next door to each

24 other, right?

25    A    That is correct.

1      Q    Okay.  Do you remember about when Mr. Stewart

2   opened -- joined Open Market, Mr. Treese?

3      A    I believe that was in April of 1994.

4      Q    I think you mentioned Andy Payne?

5      A    Yes, I did.

6      Q    Was he already at Open Market when you joined?

7      A    Yes.  He also started in April of '94.

8      Q    Did he work at DEC?

9      A    Yes, he did.

10     Q    Are Payne and Stewart co-inventors with you on

11  the '314 patent and the '492 patent?

12     A    Yes, they are.

13     Q    And you're co-inventors along with two other

14  individuals, who we'll get to in a little bit, on the

15  '639 patent?

16     A    Yes.

17     Q    All right.

18          MR. ADAMO:  Could we bring up a group

19  photo?

20     Q    (By Mr. Adamo) On your monitor and on the

21  screen is a photograph that's entitled Open Market:  The

22  Inventors.

23          Do you recognize this?

24     A    Yes, I do.

25     Q    I very foolishly promised the jury that I

1   would let you tell them what the story behind the

2   dandelions was, so why don't you explain why a whole

3   group of adults is standing in a field holding

4   dandelions.

5        A    We went out to take that picture as the

6   company was just really getting started.  There was a

7   little grass field right across the street, and I was in

8   the middle of the street from where our first offices

9   were; and the CEO, Shikhar Ghosh, thought it would be

10  interesting to pick the dandelions that were growing all

11  over the place in that grassy patch.

12       Q    And seeing he was the boss, everybody just

13  sort of said, I guess we better?

14       A    That's exactly right.

15       Q    Okay.  You didn't think this photograph was

16  going to survive, did you?

17       A    No, I did not.

18       Q    Okay.  Are you in the picture somewhere, Mr.

19  Treese?

20       A    Yes, I am.  I'm on the far right.

21       Q    With the -- I always have to be careful about

22  commenting about hair.  How would you describe your

23  hairstyle at that time, Mr. Treese?

24       A    That was a little bit longer and curly.

25       Q    All right.  Now, is your brother-in-law --

1    excuse me -- is Mr. Stewart, the guy who lives next door

2    to you, in the picture somewhere?

3        A    Yes, he is.  He's just to the -- a little bit

4    close to the middle in the striped black and blue shirt.

5        Q    Okay.  So he's the smiling guy with, like, the

6    rugby shirt?

7        A    Yes.

8        Q    And the gentleman who's in the foreground

9    standing between the two of you, who's that?

10       A    That's Shikhar Ghosh, the founder and CEO of

11   Open Market.

12       Q    Okay.  The two ladies who are in the front

13   row, who's the lady in the center, and who's the lady to

14   the left?

15       A    Kathy Matthews, our office manager, and on the

16   left, Kim Alley, who worked on marketing for Open

17   Market.

18       Q    Okay.  The three men that are left in the

19   picture, this guy with glasses who looks like he's sort

20   of hiding in the background, do you know who he is?

21       A    That's Andy Payne.

22       Q    Okay.  All right.  When you started at Open

23   Market in May of '94, was Shikhar Ghosh already there?

24       A    Yes, he was.

25       Q    Now, was he one of the co-founders?

 1      A    That's correct.

 2      Q    Who was the other one?

 3      A    David Gifford.

 4      Q    Did you know -- I think it's Dr. Gifford --

 5  before you started at Open Market?

 6      A    Yes, I did.

 7      Q    How?

 8      A    He was a professor at MIT, and I knew him from

 9  my time at MIT.

10      Q    Do you happen to know where Dr. Gifford is

11  employed today, if he still is?

12      A    He's still a professor at MIT.

13      Q    When you joined Open Market, did you have a

14  title originally?

15      A    No, I did not.

16      Q    Did you get one at some point?

17      A    Yes, I did.

18      Q    And what title did you get?

19      A    Vice president of technology.

20      Q    Okay.  All right.  Let's take down the

21  dandelion picture, and I want to talk to you a little

22  more about what was happening in the 1990s, as far as

23  technology was concerned.

24           Let's focus first on the internet.  What was

25  happening with respect to the internet in the early --

1  early 1990s?  Things that were important, not just

2  everyday stuff.

3      A    There were two key things, I think, that

4  really influenced Open Market.

5          The first was that the internet was open for

6  commercial use.  Before that, the use of the internet

7  had been restricted to research and education uses.

8          The second was the invention of the worldwide

9  web.

10          MR. ADAMO:  Your Honor, what we're going

11  to do, with the Court's permission, is, I have asked

12  Mr. Gooden -- we've set this demonstrative up.  It's a

13  timeline, and we're going to just sort of build the

14  entries --

15          THE COURT:  All right.

16          MR. ADAMO:  -- as we go along, and then

17  for the record, there will be a complete copy when we're

18  finished.

19          THE COURT:  All right.

20          MR. ADAMO:  Thank you, Your Honor.

21      Q    (By Mr. Adamo) All right.  So we've put up on

22  the timeline the two events you just mentioned,

23  Mr. Treese?

24      A    Yes.

25      Q    What relationship, if any, to online shopping

1  or E-commerce did these two events have?

2      A    Well, the first one was that being able to do

3  business on the internet was a key part of then doing

4  the business on the internet.  Before, you simply

5  couldn't do it.

6      Q    And --

7      A    The worldwide --

8      Q    Go ahead.  I'm sorry.

9      A    The worldwide web was important because it

10  made the internet a richer, more interactive tool to use

11  than it had been, and that made it possible to think

12  about a rich shopping experience.

13      Q    Okay.  Why do you say the worldwide web

14  enabled richer content, if I can phrase it that way?

15      A    Before the worldwide web on the internet,

16  almost everything was done with text, off and on small

17  terminals, no pictures, no graphics, very limited

18  capabilities.

19           The web browser and the web servers let us

20  connect things together and display pictures of things

21  that you might want to buy and link those together in

22  interesting ways.

23      Q    Okay.  Were there any other ways that at the

24  time you thought the capabilities of the worldwide web

25  might facilitate online shopping and E-commerce?

1      A    Besides being able to give us the graphical

2  display and make it more interactive, the use of

3  hypertext links in the worldwide web, where you can

4  click on a link and go to the next page in a catalog,

5  find out more information about an item for sale or even

6  select something to buy, were a key part of what the web

7  made it possible for us to do.

8      Q    All right.  Let's add a few more of the dates

9  that you just mentioned on to the -- on to the timeline.

10          When did Stewart and Payne start working at

11  Open Market again?

12     A    That was in April of 1994.

13     Q    All right.  So the dates of April and May of

14  '94 that are now on the timeline, are they accurate?

15     A    Yes, they are.

16     Q    And you started in May, so you're now on there

17  as well, correct?

18     A    Correct.

19     Q    All right.  Let's go back to the 1994 events

20  then.

21          At the time you joined Open Market, were there

22  other E-commerce companies at that time that you were

23  aware of?

24     A    There were others starting up at about the

25  same time.

1     Q     Were you familiar with some of them?

2     A     Some of them that I remember from that time

3   included Netscape, a company called First Virtual, and

4   one called CyberCash.

5     Q     What did they do?

6     A     Netscape set out building the core pieces for

7   the web in general, the web browser and the server

8   software that would be needed for people to use the web

9   for all kinds of applications.

10          First Virtual was working on a system for

11   doing -- for buying things by e-mail that you would get

12   delivered by e-mail.  Their favorite example is actually

13   a joke of the day that you could buy for a nickel.

14          And CyberCash was working on developing ways

15   of doing secure payment for credit cards over the

16   internet.

17     Q     Okay.  How is what you were thinking about or

18   trying to do at Open Market different or planning to be

19   different than what these other companies were already

20   trying to do?

21     A     What we set out to do at Open Market was to

22   build the full set of systems that you would need to do

23   business on the internet.

24          That would, of course, include payment; but it

25   would include the presentation of products, like a

1  catalog, for sale, the ability for someone to choose

2  what they wanted to buy or choose what they didn't want

3  to buy, if they changed their mind later, complete the

4  transaction, and then keep track of what they had

5  purchased after the sale.  It was really a complete set

6  of things.

7       Q    All right.  I referred to what Open Market was

8  attempting to do, as far as online shopping was

9  concerned, as a soup-to-nuts system.  Is that accurate?

10      A    I think that's a good way to describe it.

11      Q    Who were the intended buyers and sellers for

12 the system, as Open Market folks viewed it, in mid-1994?

13      A    We were building the tools that would

14 primarily be used -- our customers would be businesses.

15           But we thought a lot about all of the users of

16 the system, which would include anyone who was buying

17 something from those sellers, as well as the tools, of

18 course, that the sellers would need to do it.

19           And we wanted that capability to be available

20 to small businesses, as well as the large businesses,

21 and the network to be open to anyone with a network

22 connection to be able to buy things from these sellers.

23      Q    Was there any thought in your minds or

24 intention at the time to put the system together so that

25 the small mom-and-pop store in Connecticut on the web

1   would look like Nieman Marcus in Dallas?

2       A    That was absolutely something that we had in

3   mind, to enable small businesses to have the same kind

4   of presence on the net.

5            Around that time, there was a cartoon in the

6   New Yorker, two dogs sitting at a computer.  One dog

7   says to the other:  On the internet, no one knows you're

8   a dog.

9            And that really had a couple of meanings for

10  us.  One was that as a seller, you could be a small

11  business there with as big a presence on the network as

12  a large seller did.

13           But also it was true for the buyers, that any

14  buyer was the same to a seller no matter where they came

15  from, no matter what they looked like, how old or young

16  they were, how they were dressed.  All buyers looked the

17  same on the internet.

18      Q    This -- what's up on the screen right now that

19  we're showing, is this, in fact, the cartoon you were

20  referring to?

21      A    Yes, it is.

22      Q    All right.  Let me ask you now to look in your

23  binder -- and we'll put this up on the system -- at a

24  document that's in evidence as Exhibit P78.

25           Are you familiar with this document,

1  Mr. Treese?

2      A    One moment.

3      Q    Probably all the way at the end of your

4  binder.

5      A    Yes, I am familiar with it.

6      Q    This document is entitled on the first page

7  Open Market Store Building Kit Plan.  Were you familiar

8  with what Open Market referred to as the Store Building

9  Kit?

10     A    Yes, I was.

11     Q    And just broadly, can you tell us what it was

12  intended to be?

13     A    The Store Building Kit was the set of tools

14  that we were envisioning building for businesses to

15  create their presence on the worldwide web that would

16  enable them to sell products and services on the web.

17     Q    All right.

18              MR. ADAMO:  Mr. Gooden, would you go down

19  to the bottom of the first page and blow that whole

20  paragraph up?  Thank you.

21     Q    (By Mr. Adamo) I've highlighted some of the

22  long language that's in the last paragraph, the first

23  page of P78.

24              Mr. Treese, would you just read the

25  highlighted portion out loud for us --

1     A     The Store --

2     Q     -- please?

3     A     -- Building Kit pages will provide a simple,

4  easy-to-use interface to creating a store on the

5  internet.  The user input will be simple text with

6  options to upload image files or data files in the case

7  of information providers.

8     Q     Is that, in sum or substance, what you-all

9  were trying to do at that time?

10    A     Yes, it is.

11          MR. ADAMO:  Mr. Gooden, the top of the

12  second page now, please.

13          Same exhibit, Your Honor, P78.

14    Q     (By Mr. Adamo) There's another portion of that

15  document that I've asked to be highlighted there.  I'll

16  read that one.

17          Store Building Kit is specifically aimed at

18  the small merchant with little computer or internet

19  experience.

20          Does that accurately reflect what your plans

21  were at Open Market in mid-1994?

22    A     Yes, it does.

23    Q     If you -- excuse me just for a moment.

24          If you look at the top of the first page of

25  the exhibit, Mr. Treese, there's a handwritten date.

1  You've seen that before?

2      A    Yes, I have.

3      Q    Can you confirm that that date should be read

4  as June 8th, 1994?

5      A    That's correct.

6      Q    And did you, in fact, see this document on or

7  around that date for the first time?

8      A    Yes, I did.

9              MR. ADAMO:  First page of the exhibit

10  now, the second paragraph, please, Mr. Gooden, if you

11  would blow that up.  Thank you.

12      Q    (By Mr. Adamo) Would you read that highlighted

13  portion for us, please, Mr. Treese?

14      A    The stores created by the kit will be a series

15  of web hypertext pages supported by a set of Open Market

16  programs for payment, accounting, et cetera.

17      Q    Can you explain to the jury with a little more

18  detail what that was about, that particular statement?

19      A    What we had in mind was creating on -- on a

20  worldwide web server, a set of pages that would have

21  products for sale, like the pages of a catalog, and then

22  the programs that they would use would let you buy and

23  pay for items, as well as for handling the accounting,

24  the transactions, and keeping track, after you bought

25  things, of what you had bought.

1      Q    Was the availability of hypertext links and

2  hypertext pages considered by Open Market at that time

3  as a possible way in which the customer could mimic

4  browsing, that you could -- by the hypertext links, you

5  could sort of go through the site and other sites and

6  look at stuff?

7      A    Yes.  We planned to use hypertext links

8  extensively for many of the functions for browsing the

9  products for sale, as well as executing the actions that

10 you would need to do.

11     Q    Was the focus that you had at the time, the

12 business owner or the person setting up the store?  I

13 mean, what about the customer?

14     A    When we thought about our customer, that would

15 be the business of setting up the store.  In designing

16 the system, we spent a lot of time thinking about both

17 what the business would need, but also what experience

18 the buyers would have, because the software that we were

19 developing would be interacting and working with the

20 buyers as much as the sellers.

21     Q    Was it -- would it be fair to say that you

22 were -- as far as the ultimate customer was concerned,

23 you were trying to develop an online system that would

24 make the experience, sitting in front of your computer,

25 like being in a real store?

1     A     We wanted to make it as familiar, like being

2  in a store or using a catalog, as we could.

3               MR. ADAMO:  Mr. Gooden, if you would go

4  to Page 7, please.

5               Still on Exhibit P78, Your Honor.

6               Would you blow up the bottom portion of

7  that page?  Thank you.

8     Q     (By Mr. Adamo) All right.  I've highlighted

9  part of this page as well, and I'll read it just so it

10  will go a little quicker, Mr. Treese.

11               Quote, a key feature is that this page will

12  serve a, inner quote, shopping cart, close the inner

13  quote, for the customer as they browse/search the store.

14               The customer can refer to what items have been

15  provisionally selected for purchase and can

16  add/change/delete items.  Upon submitting the order, the

17  customer will be prompted for payment and shipping

18  information.

19               Can you explain how that statement tied into

20  what you were trying to build in June of 1994, if it

21  does?

22     A     What we saw as an important part of the

23  experience for the buyer is, I'd be looking at a catalog

24  page.  I'd say, I'd like to buy that shirt.  I need to

25  save that information somewhere so I can put it in a

1  shopping cart.  Maybe I want to buy two of them, so I

2  can change the quantity.

3         Later I might browse and say, oh, I like that

4  shirt better, so I can delete one item from the shopping

5  cart, add the other one.  When I'm done, I go and check

6  out.

7     Q    Was this document that we've just been looking

8  at dated in June of 1994 essentially the first statement

9  of the overall system that you were trying to design at

10 Open Market?

11    A    I believe that's correct.

12    Q    The various ideas that we've just pointed out

13 to the jury and to His Honor, who had those ideas?  I

14 mean, how did you come up with them?

15    A    The ideas about what we wanted to build came

16 from a lot of discussion back and forth among the

17 members of the original Open Market team to figure out,

18 we need a shopping cart; it has to have these kind of

19 functions; we need to build the tools for the seller,

20 because without those, the seller can't do his work.

21        We were working very closely together with a

22 lot of discussions to generate the ideas that are

23 reflected here.

24    Q    I'm going to change the focus a little bit

25 now, Mr. Treese.  Now I want to try to have you focus in

1  on the technical problems, to the extent there were

2  technical problems that Open Market had to solve, and

3  forward in 1994, so you could get this system designed

4  and up and functional.

5       Basically, what were the challenges that y'all

6  had to -- had to face to get the system up and running

7  in 1994?

8       A    There were quite a few.  A couple of the hard

9  ones were how to keep track of the state, the

10  information about what was going on in the transaction,

11  and how to maintain information about the browsing

12  session and the shopping session that the customer had.

13      Q    All right.  As succinctly as you can, without

14  turning this into a technical discussion, what's state?

15      What was the -- what was -- what was the

16  nature of that problem, just very generally?

17      A    State is our shorthand for the set of

18  information that represents what's been going on in a

19  transaction, what items you might want to be buying;

20  that is, a list of items in your shopping cart would be

21  part of the state of a transaction.

22      Q    All right.  And I think you also used the word

23  session?

24      A    Yes.

25      Q    What was a session?

1       A       A session would be a series of requests in a

2   related session of what you're doing.  Browsing through

3   a catalog, choosing items, discarding items would all be

4   part of the same session.  A few days later, you might

5   have another session.

6       Q       And why was that a technical issue in

7   developing the type of system that you folks were

8   focusing on at Open Market in the mid-1994?

9       A       Those were a problem, because the worldwide

10  web, as originally designed, was intentionally designed

11  without state, which has a lot of benefits for some

12  applications, but for the business applications we had

13  in mind, state was absolutely essential.

14      Q       Did you and the other people at Open Market

15  solve these state and session problems?

16      A       Yes, we did.

17      Q       How?

18      A       We did it in a -- in a couple of pieces for

19  the state and for sessions.

20      Q       All right.  Start with the first piece.

21      A       For the state, we stored that information on a

22  web server so that there was a database keeping track of

23  the items in your shopping cart, is a good example of

24  the kind of state we needed to have.

25              And then that was actually connected to what

1  you were doing by the session so that you would have a

2  shopping cart for a session.

3       And that was done by attaching some

4  information that would go back and forth between the

5  browser and the server as you browse through -- as you

6  interacted with the shopping cart, and that's what we

7  called a session identifier.

8    Q    Now, when you say -- said browser in your last

9  answer, as far as hardware is concerned, are you

10 referring to the client computer or the customer

11 computer?

12   A    The browser is software that would be running

13 on the client computer -- that's the technical term --

14 or the customer's PC.

15   Q    Do you tend to use the terms interchangeably,

16 Mr. Treese?

17   A    Yes.

18   Q    All right.  You mentioned that you came up

19 with the idea of sending something that you just told us

20 was a session identifier back and forth between the

21 client and the server.

22       Just if you don't mind, tell us a little bit

23 more about the session identifier, please.

24   A    At that time, what we did was, every web page

25 has a name called a URL.  You can see it in the top bar

1  of a web browser, usually.

2          And to that, we attached an identifier that

3  would be consistent through the session even as you

4  changed pages.  And that's how we built the first

5  system.

6      Q    Best recollection of when someone at Open

7  Market came up with this solution to this state/session

8  problem?

9      A    I believe that was in May of 1994.

10     Q    Would you, in your binder, please, look at

11 Exhibit P75 that's already in evidence?

12          MR. ADAMO:  And, Mr. Gooden, I guess if

13 you would blow up about the top half of the page.  Come

14 down a little more.  Keep going.  Good.  Thank you.

15     Q    (By Mr. Adamo) Have you seen this document

16 before, Mr. Treese?

17     A    Yes, I have.

18     Q    And do you know what the date was that this

19 document was -- on which this document was created?

20     A    There's information at the top indicating it

21 was dated May 2nd, 1994.

22     Q    And who is the author?  Is there information

23 that shows you who the author of the document is?

24     A    Yes.  It was written by Andy Payne.

25     Q    Okay.  Does this document in any way show what

1  we were just talking about, about the session ID?

2      A    Yes, it does.

3      Q    In fact, is that actually -- I've had

4  Mr. Gooden pull up the top portion of the document, but

5  does actually the entire document talk about this point?

6      A    Yes, it does.

7      Q    Let me just quote it here.  It says, quote:

8  We need a way to have some notion of session to carry

9  state on the server for things like browsing catalogs

10  and composing orders.

11          And then it goes on to say:  Suppose URLs

12  could have a session ID, et cetera, et cetera.

13          Is that essentially a description of the

14  solution that you guys came up with for the

15  State/session problem?

16      A    Yes, it is.

17      Q    Now, there were other companies selling things

18  online in the spring and summer of 1994, correct?

19      A    I believe there were some, yes.

20      Q    Did you have any idea how those companies were

21  dealing with the state/session problem that you folks

22  were wrestling with at the time?

23      A    Some of them would actually have you keep

24  track on a piece of paper about what you wanted to buy

25  and fax them an order or call it in after you had looked

1  on the website.

2          We sometimes call this "sneaker net" because

3  it involved someone running around in sneakers to

4  actually handle the order.

5      Q    Well, were people actually dealing with the

6  problem or avoiding it?

7      A    That was pretty much working around it, just

8  avoiding the problem.

9      Q    To your knowledge, at Open Market, were there

10  other ways of maintaining state and session in May of

11  1994, other than the one you had just come up with?

12      A    Not that I'm aware of.

13      Q    All right.  I've asked that the timeline be

14  modified so that we've now added the date of the

15  document we were just looking at, May 2nd of 1994.

16          Is that accurate, Mr. Treese?

17      A    Yes, it is.

18          MR. ADAMO:  And I believe, Mr. Gooden, we

19  can add another item in, that's the date of the earlier

20  memo, P78, that we just looked at, and I've asked Mr.

21  Gooden to do that.

22      Q    (By Mr. Adamo) Is that accurate, Mr. Treese?

23      A    Yes, it is.

24      Q    All right.  How long did it take Open Market

25  to get these ideas into a real live working product?

 1     A    We built our first system that implemented
 2  these through the summer.  It took us about five months.
 3     Q    Do you remember when -- what the name of the
 4  first product was?
 5     A    That was a service we operated called the Open
 6  Marketplace.
 7     Q    Do you remember when that was first made
 8  available, when it was launched?
 9     A    It was launched in October of 1994.
10          MR. ADAMO:  Mr. Gooden, can we add that
11  to the timeline?
12     Q    (By Mr. Adamo) You started in May; Stewart and
13  Payne were already there in April; and you had a
14  commercial version of at least the Open Marketplace --
15  and we'll get into that in a moment -- in October; is
16  that right?
17     A    That's correct.
18     Q    Did you guys sleep?
19     A    Not very much.
20     Q    No.  Seriously.  Explain to us -- I'm sure
21  everybody here is looking at this and going -- were
22  these problems difficult to solve?
23     A    The problems were difficult to solve, and we
24  spent a lot of time early on struggling with them.  We
25  talked about them all the time, over lunch, over dinner,

1 in the evenings, on weekends, and came up with a design

2 for what we needed to do, and then we spent a lot of

3 time, 18-hour days, writing the code to implement them

4 to get us to that October launch.

5     Q    Would it be fair to say -- and this was not a

6 term that was used back in the day, but, I mean, were

7 you-all essentially working 24/7?

8     A    Just about.  In fact, the night before we

9 launched the Open Marketplace, Larry and I were there

10 all night putting the finishing touches on it to make it

11 work the next day.

12    Q    And because he was your brother-in-law, you

13 had your excuses ready when you went home as to where

14 you had been.

15         Okay.  Seriously.  I mean, you were pulling

16 all-nighters and things like that?

17    A    We did that, yes.

18    Q    All right.  Tell us what Open Marketplace was.

19    A    The Open Marketplace was like an online

20 shopping mall operated by Open Market so that the

21 sellers would create their stores and that they would be

22 served up on computers that Open Market operated for

23 them, and they would pay the Open Market for doing that.

24    Q    Okay.  Who used the Open Marketplace system?

25    A    Some customers right around that time included

1  Intuit Software, a company called Kutters Cheese, and

2  soon around that time, Mead Data Central.

3      Q    Is that the outfit that's now LexisNexis?

4      A    That's correct.

5      Q    On the box on the timeline, there's a word

6  Transact after launch of Open Marketplace.  Could you

7  tell us what Transact was or is, Mr. Treese?

8      A    Transact was the product version that we

9  eventually developed out of what we had built for the

10  Open Marketplace.  It was a product that a company could

11  buy and operate themselves with the same kind of

12  functions.

13     Q    During October of 1994 when you launched Open

14  Marketplace, was anything else going on at Open Market

15  that sticks in your memory?

16     A    Yes, there was.

17     Q    What?

18     A    We filed the first patent application for the

19  '314 patent.

20             MR. ADAMO:  Mr. Gooden, would you put

21  that on?

22     Q    (By Mr. Adamo) That was filed October 24th of

23  1994?

24     A    Yes.

25     Q    If you would just confirm that.  Look at Tab 1

1  in your -- in your binder.  You have to flip to the back

2  of the first page, and you see that's a copy of the '314

3  patent?

4       A    Yes.

5       Q    It does, in fact, show it was filed October

6  24th of 1994?

7       A    Yes.

8       Q    The '492 patent, are you familiar with that?

9       A    Yes, I am.

10      Q    Do you understand that the '492 patent is

11  related to the '314 patent?

12      A    Yes.

13      Q    What do you understand the nature of the

14  relationship to be?

15      A    '492 is a continuation of '314.

16      Q    And what do you understand that means?

17      A    That means that it's an additional set of

18  claims about the invention based on the same

19  specification as the '314 patent.

20      Q    Does the '492 patent specifically claim or

21  discuss the use of hypertext links, as you recall it?

22      A    Yes, it does.

23      Q    And is that what we talked about earlier this

24  after -- this morning still when we looked at the Store

25  Builder Kit document, P78?

1      A    That's correct.

2      Q    Did the Open Marketplace and eventually the

3 Transact systems use hypertext links?

4      A    Yes, they did.

5      Q    How?

6      A    They used -- hypertext link is used in lots of

7 ways.  Part of it was browsing through the catalogs, the

8 items for sale.

9           One of the things was, if you were ready to

10 put something in your shopping cart, you would click on

11 a hypertext link, and that would actually instruct the

12 server to put the item into the shopping cart.

13          Editing the shopping cart was done in that

14 way.

15          And also, after you had purchased several

16 items, you could go to a web page about your account and

17 see a list of the items you had made.  You would get to

18 that page with a link.  On that page would be links to

19 details about those transactions and usually links back

20 to the actual product pages, if you wanted to go back to

21 those for reference.

22      Q    All right.  I want to direct your attention a

23 little more now to the third patent, the '639 patent.

24          Are all of the inventors on that patent also

25 Open Market employees?

1      A    Yes.

2      Q    Tom Levergood and Steve Morris are also named

3 on that patent besides -- currently named on that patent

4 besides yourself, Payne, and Stewart, correct?

5      A    That's correct.

6      Q    Where did Mr. Lever -- excuse me --

7 Mr. Levergood work before he worked at Open Market?

8      A    He had also been at Digital.

9      Q    And what about Steve Morris?

10      A    Steve had also worked at Digital.

11      Q    Generally, in your own words, can you tell us

12 what the invention of the '639 patent was?

13      A    The '639 patent is really about session

14 identifiers.

15      Q    Is that the same session identifier you just

16 described to us a few minutes ago?

17      A    Yes.

18      Q    Would you look at Tab 3 in your binder,

19 please?

20           Do you see the filing date for the '639

21 patent?

22      A    Yes.

23      Q    And when was the actual application that

24 turned into the '639 patent filed?

25      A    January 12th, 1998.

1      Q    All right.  Now, just below that date, at Line

2  63, there's another date and patent identified.  Do you

3  see that?

4      A    Yes.

5      Q    And it says continuation of Application Number

6  dot-dot-dot, filed on June 7th, 1995, now Patent No.

7  5708780.  Do you see that as well?

8      A    Yes.

9      Q    Is the '780 patent in some way related to the

10  '639?

11      A    The '639 patent is a continuation of the '780

12  patent.

13      Q    The '780 patent was, according to the face of

14  the patent, was filed January 7th, 1995?

15      A    June 7th, 1995.

16      Q    I'm sorry.  That's correct.  Thank you.

17           All right.  When these patents started to

18  issue -- when did the '314 patent issue?

19      A    The '314 issued in early 1998, I believe.

20      Q    Do you remember when '780 issued?  If you do,

21  fine; if you don't.

22      A    It was around the same time.

23      Q    Actually, if you look at Tab 6 in your binder

24  you will see the '780 patent.

25           Can you tell us when it issued?

1        A    Issued January 13th, 1998.

2        Q    When these patents started to issue, was that

3   a big deal for Open Market?

4        A    Yes, it was.

5        Q    Did you-all do anything to tell the world

6   about this or mark the event in some way?

7        A    Yes, we did.  We issued a press release.  We

8   briefed the press; and we also briefed press and

9   analysts who were coming to Open Market headquarters for

10  a meeting.

11       Q    To the best of your knowledge, did your press

12  release get picked up by anybody?

13       A    Yes, it did.

14       Q    Would you look at Exhibit 45, please, in your

15  binder?

16            Is that an issue of the Wall Street Journal

17  from March of 1998 that has an item in it talking about

18  Open Market saying it will receive soft -- internet

19  commerce software patents?

20       A    Yes, it is.

21       Q    After the patents issued, what did Open Market

22  do business-wise?

23       A    Well, the first thing is we continued to focus

24  on the software products business that we had been

25  building.  We added to that some expiration of licensing

1  opportunities for the patents.

2      Q    How did that go?

3      A    Not very well.

4      Q    All right.  What happened when your initial

5  attempts to license the patents didn't go so well?  What

6  did you do next?

7      A    The next thing was we brought in an outside

8  firm to help us work out the licensing strategy and

9  focus a bit better on how to do that.

10     Q    Did you do anything else?

11     A    Eventually we decided that without litigation

12  the licensing program would not be successful, and we

13  filed a lawsuit against a company called Intershop.

14     Q    Did you do anything else in regard to

15  enforcing the patents in aid of the licensing program?

16  Did you -- see if you remember, Mr. Treese.  If you

17  don't, you don't.  Did the company buy some sort of

18  policy from someone to assist in the enforcement?

19     A    As -- as part of the program we had, we

20  arranged for a complicated insurance policy that would

21  help fund litigation and licensing program and would be

22  paid back based on the proceeds from that.

23     Q    Go back and focus a little on the products

24  again.  You said that Open Market launched Open

25  Marketplace in October of 1994?

```
 1     A    Yes.

 2     Q    And you said that Open Market later launched

 3 Transact.  And Transact again was what?

 4     A    Transact was the software products that came

 5 out of our work on the Open Marketplace.

 6     Q    And Transact was first sold when?

 7     A    That was in -- around May of 1996.

 8     Q    What else was happening in Open Market in

 9 1996?

10     A    Around May of 1996 was also when Open Market

11 went public.

12     Q    Let's talk about licenses for a moment.

13          Did Open Market offer only one type of license

14 with respect to Transact?

15     A    There was more than one license type.

16     Q    Can you -- best recollection, can you describe

17 the types of licenses?

18     A    There were at least two.  One was for large

19 companies -- we called it the enterprise license -- who

20 would buy the software and operate it themselves.  The

21 other was a commerce service provider license for

22 companies who wanted to provide services to small and

23 medium-sized businesses, who would be operating much as

24 what we talked about the Open Marketplace.  Only those

25 companies would operate it instead of Open Market.
```

1    Q    Mr. Treese, I think I've just finally figured

2  out what all the popping has been.  You've got an

3  extremely powerful voice.  If you could tilt the

4  microphone a little bit off center and maybe drop your

5  voice just a tad.  Are you a little nervous?

6    A    A little bit.

7    Q    Okay.  You're among friends -- at least I'm

8  your friend.  Try not to boom it out so much, because

9  the popping is sort of making us all -- everybody's been

10  looking around the room trying the figure out where it's

11  been coming from.

12         All right.  Let's go back to talking about the

13  licenses.

14         In the customer service provider licenses, do

15  you remember any of Open Market's customers that had

16  those licenses?

17    A    Those companies included AT&T, MCI, Sprint,

18  First Union National Bank.  At the time, it was about 11

19  of the world's largest 15 phone companies.

20    Q    Did Open Market promote the fact that it had

21  customers like AT&T?

22    A    Yes, we did.

23    Q    How?

24    A    We would issue press releases and

25  announcements about them.

1      Q    Let's go back to the other style of license,

2  the corporate customer license.  Do you recall who any

3  of Open Market's corporate customers were?

4      A    Corporate customers included companies like

5  Disney; 3Com; the Tribune Company, which owns The

6  Chicago Tribune; and other media properties; Business

7  Week; Time Warner for its magazines; Mcgraw-Hill;

8  business Week; companies like that.

9      Q    Best of your recollection, do you remember

10  what a typical -- typical price for a basic corporate

11  customer license to Transact was, best recollection?

12      A    I believe that was in the range of $125,000 to

13  $250,000.

14      Q    Were there any additional costs to that

15  license that you are aware of?

16      A    Yes, there typically would be.

17      Q    And can you the tell us what they -- what the

18  nature of those costs were?

19      A    Those costs would include installation,

20  services, annual software maintenance for updates and

21  bug fixes, and things like that.  And often some

22  customization and integration that would make it work

23  with other software that the company had.

24      Q    Bug -- bug fixes.  That basically in English

25  means that there's something wrong with the program that

1  needs to be fixed?

2      A    That's correct.

3      Q    About how much did the customization cost for

4  the customer corporate licenses run?  Again, best

5  recollection and personal knowledge.

6      A    Those could range from, depending on the

7  complexity of what had to be done, from $50,000 to

8  several hundred thousand dollars.

9      Q    Did corporate customer licenses frequently

10 involve customization, to the best of your knowledge?

11     A    Yes, they did.

12     Q    You also mentioned some annual service

13 charges.  What do you recall being the range of annual

14 service charges for corporate customer licenses?

15     A    I -- best of my recollection, the service

16 charges -- the annual maintenance cost was around 15 to

17 20 percent of the original license price.

18     Q    Go back now to the other style of license, the

19 CSP style.  Did that type of license have annual service

20 charges?

21     A    Yes, it did.

22     Q    Did that type of license have customization

23 costs?

24     A    It could, yes.

25     Q    Again, best recollection, something you knew

1  from the job directly, what was the general price range

2  for a commerce service provider license for Transact?

3      A    For Transact, the commerce service provider

4  licenses could range from $250,000 to over a million

5  dollars.

6      Q    Why that -- sounding like rather extreme

7  spread in price?

8      A    Part of the licensing structure for the

9  commerce service providers depended upon the number of

10  merchants or sellers they expected to have.  There were

11  some fees associated with those numbers.

12      Q    Did Open Market ever use or have a trademark?

13      A    Yes, we did.

14      Q    What was one of the trademarks, or as many of

15  them as you can remember?

16      A    One of them was We Are Internet Commerce.

17      Q    How did you pick that one?

18      A    That we chose to show the full range of

19  software that we were providing, not just a piece of the

20  internet commerce software puzzle, but the full range of

21  software that we had.

22      Q    Is internet market still around -- I'm sorry,

23  is Open Market still around today?

24      A    No, it's not.

25      Q    Where did it go?  What happened?

1      A      It was acquired by a company called Divine in

2  2001.

3      Q      And it no longer exists?

4      A      And Divine ran into trouble during the dot-com

5  bust.

6      Q      Transact.  What about the Transact product?

7  Is it still around today?

8      A      The Transact product is still around today.

9      Q      People still using it, to the best of your

10  knowledge?

11      A      Yes, they do.

12      Q      Last few questions.

13             How do you feel about the patented inventions

14  that are represented by all those grants from the United

15  States Government?

16      A      I'm proud of it.

17      Q      Why?

18      A      First of all, as an engineer, we have a

19  technical challenge to solve those problems.  And that

20  was part of the reward for that.

21             Secondly, it was the core technology that we

22  needed to build a growing software business at that time

23  in an explosion of doing business on the network.

24             And the third, that work and the work at Open

25  Market beyond that, influenced the evolution of doing

1  business and the software that's used for it on the

2  internet.

3           MR. ADAMO:  Thank you, Your Honor.  I

4  have nothing further.  I pass the witness.

5           THE COURT:  Thank you.  Cross.

6               CROSS-EXAMINATION

7  BY MR. HANSON:

8     Q    Good morning, Mr. Treese.  It's good to see

9  you again.  I'm sure you remember that I met you on a

10 rainy day in Boston and asked you a number of questions

11 at your deposition.

12    A    Good morning, Mr. Hanson.

13    Q    Nice to see you again.

14         And at your deposition you answered those

15 questions under oath; isn't that right?

16    A    Yes.

17    Q    And that deposition was transcribed and you

18 read it and signed it?

19    A    Yes.

20    Q    Thank you.

21         And we can rely upon that then, can't we?

22    A    Yes.

23    Q    Yes.  Mr. Treese --

24           MR. HANSON:  I wonder if we could bring

25 up that screen that showed the pictures of the various

1  people at Open Market.  Is that possible?

2               MR. ADAMO:  Casey.  Oh, you don't have

3  control of it.

4      Q    (By Mr. Hanson)  Mr. Treese, you perhaps --

5  there it is.

6           There are two other individuals in that

7  picture that you didn't mention.  Just -- to skip over

8  them and not tell us who they are, it just has me too

9  curious.  I have to ask that question.

10     A    Yes.  The gentleman with the mustache --

11     Q    Yes.

12     A    -- is David Gifford.

13     Q    That's David Gifford.  Okay.

14     A    And the gentleman right next to him on the

15  other side from Andy is David Mackie.

16     Q    Mackie.  David Mackie.  Thank you.

17          Now, I know you brought out in your direct

18  testimony that both you, Dr. Stewart, and Mr. Payne all

19  worked at the Cambridge research center of the Digital

20  Equipment Corporation, which we've been referring to as

21  DEC; is that right?

22     A    That's correct.

23     Q    And you worked together at the same location;

24  is that right?

25     A    That's correct.

1   Q   And I think you told us that one of the things

2   that you did while you were at DEC was to investigate

3   and work with internet projects; isn't that correct?

4   A   That's correct.

5   Q   And in that regard you had become familiar

6   with the tools of the internet, had you not?

7   A   Yes, I had.

8   Q   And could we characterize the tools of the

9   internet as things like html and http?

10   A   Those were some of the tools.

11   Q   And TCP/IP?

12   A   Yes.

13   Q   And html is the language that's used for

14   coding web pages; is that correct?

15   A   Yes, it is.

16   Q   And http is the protocol or the rules for

17   sending messages back and forth between a browser and a

18   server?

19   A   Yes, it is.

20   Q   And you were familiar with those at the time

21   you joined Open Market?

22   A   That's correct.

23   Q   And so were probably the other individuals:

24   David Mackie and Dr. Stewart?

25   A   Yes.

1    Q    Now, I would like to fill in a little gap in

2  your timeline.

3              MR. HANSON:  I wonder if we could bring

4  that full timeline back up on the screen.

5    Q    (By Mr. Hanson)  Now, I see there is a little

6  gap there between the introduction of the worldwide web

7  and -- and April and May when Dr. Stewart and you and

8  Andy Payne began working on your project.  And I'd like

9  to see if there isn't something that ought to be filled

10 in that gap, in particular:  Isn't it a fact that the

11 mosaic browser --

12             MR. ADAMO:  Objection, Your Honor.  This

13 is outside the scope of the direct.  And it sounds to me

14 as if we're going to go into their case-in-chief.

15             They've asked him to be held over.  We

16 have an agreement between counsel that we're not jumping

17 out of each other's cases.  I'm not trying to keep the

18 information out of the record, but this is not the right

19 time.  This sounds like it's going into invalidity.

20             THE COURT:  Counsel, are you going into

21 invalidity at this point?

22             MR. HANSON:  I'm trying the fill in the

23 timeline.  We have in mind to ask the witness to be held

24 over for our case so that we can ask questions --

25             THE COURT:  He's indicated that they

1  will -- he has indicated that they will be available --

2  he will be available during your case.

3                 MR. HANSON:  He has just done that, sir?

4                 THE COURT:  Yes.

5                 MR. ADAMO:  I have done that before, Your

6  Honor, but now I'm doing it in open court, yes.

7                 Absolutely, he will be here.

8                 MR. HANSON:  Thank you.

9                 Well, then we can cover some other

10  things.  It's hard to see how this is -- we will go on.

11                 THE COURT:  Thank you, Your Honor.

12      Q    (By Mr. Hanson)  So, now, when you joined Open

13  Market in May, there was a group that was working

14  together that involved both -- both Stewart and Payne

15  and yourself, and didn't David Mackie also work with

16  you?

17      A    Yes, he did.

18      Q    And what was his role while you were working

19  over that summer to develop the Open Marketplace?

20      A    David Mackie worked on the development of the

21  store builder tools that a merchant would use to create

22  storefronts.

23      Q    And, in fact, isn't a good portion of the code

24  that Mr. Mackie wrote attached as an appendix to the

25  application for the '314 patent?

```
 1      A     I believe that all of the code that Open
 2 Market had at that time was attached.
 3      Q     And originally isn't it true that Mr. Mackie
 4 was named as an inventor of the '314 patent?
 5      A     That's correct.
 6      Q     And then at sometime later, you were replaced
 7 as the inventor in place of Mr. Mackie?
 8      A     That's correct.
 9      Q     And what was the circumstances for that?
10      A     During the preparation for the litigation
11 against Intershop, in a review of the inventorship, the
12 attorneys determined that the inventorship should be
13 changed.
14      Q     Now, were you aware of any existing
15 competition for the Open Marketplace in October of 1994?
16      A     I -- it's hard to say competition because
17 the -- we were not competing in sales situations with
18 anyone else.
19      Q     Were you competing with the CompuServe Mall?
20      A     Not to my knowledge.
21      Q     Why do you say you were not competing with the
22 CompuServe Mall?
23      A     The focus of our business on the internet and
24 discussions, at least that I knew about, with customers
25 were for selling on the internet not on selling on the
```

1  CompuServe Mall.

2      Q    But you were familiar with the operation of

3  the CompuServe Mall, were you not, during that summer

4  period while you were working to develop the Open

5  Marketplace?

6      A    I knew that it existed.

7      Q    Had you logged on and investigated it at all?

8      A    I had not.

9      Q    Had anybody else at Open Market?

10      A    I don't know that anyone had logged onto

11  investigate the mall.

12      Q    Now, I think you told us at the time of your

13  deposition that there was a rather loose organization

14  there at Open Market over that summer period.  I think

15  you indicated that Dr. Stewart was more or less in

16  charge, but that various of you had different jobs and

17  different roles; is that correct?

18      A    As engineers, we were working on different

19  parts of the development work, yes.

20      Q    Right.  And you just explained what David

21  Mackie was working on.  What was Andrew Payne working

22  on?

23      A    To the best of my recollection, Andy was

24  working on the change we needed for the web server

25  software and the implementation of some of the functions

1  we needed to do for Transact -- for the Open

2  Marketplace.

3      Q    What was Dr. Payne working on -- Dr. Stewart

4  working on?

5      A    Dr. Stewart was working on the -- on other

6  aspects of the Open Marketplace software, including the

7  database management.

8      Q    And what were you working on?

9      A    I was working on some of the functionality

10  required for the Open Marketplace, and also spent a lot

11  of time investigating the security software that was

12  going to be important for making it possible to do

13  secure transactions on the internet.

14      Q    Well, I believe you explained to us at your

15  deposition that secure transactions would be a

16  transaction to which information was encrypted before it

17  was passed back and forth on the internet; is that

18  correct?

19      A    That would be one way of providing secure

20  transactions.

21      Q    What other way would there be?

22      A    We also arranged for providing credit card

23  information that did not go across the internet at all.

24      Q    Oh, you would have to pick up a telephone and

25  call in; is that --

1    A    Yes.

2    Q    That's the way.

3         So, there was no -- there was no way at the

4    time the Open Marketplace was put into place and

5    operated to transmit credit cards over the internet from

6    the customer to the merchant that was supported by Open

7    Marketplace?

8    A    There was not a method without using a web

9    browser.

10   Q    And so your -- there was not a way to use the

11   web browser, and that's the way most people today

12   purchase things over the internet; is that not correct?

13   A    Those transmissions were not encrypted at that

14   time.

15   Q    Right.  And you say there was not -- you could

16   do it over the internet, but was that by having some

17   sort of a secure e-mail?

18   A    That's correct.

19   Q    And was that called PGP or something like

20   that?

21   A    Yes.  PGP stood for pretty good privacy.

22   Q    Okay.  But one would have to log off, would

23   they not, log off of the Open Marketplace Mall and then

24   get on the internet and send an e-mail to transmit the

25   credit card?

1       A    You would have to switch to use an e-mail to

2  send the credit card number in that way.

3       Q    And then you would have to install a pretty

4  good -- I'm sorry, I forgot it already.

5       A    Pretty good privacy.

6       Q    Pretty good privacy.

7       A    Yes, you would.

8       Q    So really, as a practical matter, at the time

9  the Open Marketplace was put into action, it wasn't

10  practical to use it as a customer, because you'd have to

11  either pick up a telephone or you'd have to use an

12  e-mail to transmit your credit card?

13       A    The credit card number could be transmitted

14  across the internet; it would not be encrypted.

15       Q    And isn't it a fact that it would be pretty

16  unwise to credit -- to transmit a credit card across the

17  internet not encrypted?

18       A    Certainly that's true today.

19       Q    Eventually there was a technology for

20  transmitting encrypted credit card information across

21  the internet, wasn't there?

22       A    Yes, there was.

23       Q    And I believe you told us at your deposition

24  that that was called SSL or what, TLS?

25       A    That's correct.

1    Q    And that was technology that was developed by

2  Netscape?

3    A    The original SSL technology was developed at

4  Netscape.

5    Q    Now, I have a few questions.

6         Did you -- did you participate in the

7  preparation of the patent application for the 39 -- '314

8  patent?

9    A    No, I did not.

10   Q    Did you read it before it was filed?

11   A    Not to my recollection.

12   Q    So you never had any objection to how it was

13  prepared or any input into how it was prepared?

14   A    That's correct.

15        MR. HANSON:  Maybe we could bring

16  Plaintiff's Exhibit 1 up on the screen, and particularly

17  Column 10.  And we could highlight the second paragraph

18  in the right-hand column.  And just blow that up a

19  little bit, please.

20   Q    (By Mr. Hanson)  Now, there are a number of

21  appendices that were attached to the patent application

22  when it was filed.

23        Did you have any part in deciding which

24  appendices should be attached to the patent application?

25   A    No, I did not.

1      Q    Did you know that appendices were attached to

2    the patent application?

3      A    I was not familiar with the contents of the

4    application at that time.

5      Q    Did you ever come to understand that there

6    were appendices attached to the patent application?

7      A    Yes, I did.

8      Q    And did you come to know the subject matter

9    that was contained in those appendices?

10      A    At least in some of it.

11           MR. HANSON:  Your Honor, if I can step

12    over here and get my book.

13           THE COURT:  Yes.

14      Q    (By Mr. Hanson)  Do you have a book in front

15    of you?  Do you just have the book that your...

16           Now I ask you to turn to -- the tab which is

17    marked 31(a), which is part of Defendant's Exhibit 31.

18    And I ask you if you have seen that document which is

19    labeled Appendix A?

20      A    I don't remember if I've seen this particular

21    document.

22      Q    Well, please look at the next tab, which is

23    Appendix B.  Have you seen that document?

24      A    I don't remember if I've seen that particular

25    document before.

1    Q    Are you familiar with the mosaic browser?

2    A    Yes, I am.

3    Q    Look at Appendix C.  Have you seen that

4  document before?

5    A    I don't recall seeing this document.

6    Q    Finally, I will ask you to look at Appendix D?

7    A    B or D?

8    Q    D as in David.

9         Have you seen that document before?

10   A    I have not.

11   Q    So it appears that you have not seen four --

12  three of the four appendices that were attached to the

13  application for the '314 patent application?

14   A    That's correct.

15   Q    Now, you had some comments about DEC's

16  interest in the internet.  And isn't it a fact that the

17  Cambridge research center was not the only research

18  center maintained by DEC?

19   A    That is correct.

20   Q    And, in fact, they had one called the Network

21  Systems Laboratory out in Palo Alto, California.

22         MR. ADAMO:  Objection.  He's going into

23  invalidity now.  No two ways about it.  I just opened

24  the binder -- and I'm not going to identify what this is

25  because, as Your Honor I'm sure well remembers, there's

```
1   a tremendous issue still pending before the Court about
2   this particular document.  That's the center where this
3   document came from that he's just asking him about.
4                   THE COURT:  Response?
5                   MR. HANSON:  Yes, Your Honor.  I haven't
6   asked any questions about this document.  I've asked
7   about another research center maintained by DEC.  And I
8   was going to ask him questions about what that research
9   center did.
10                  Now, we can take the document up during
11  the time when we call him back.
12                  THE COURT:  Okay.
13                  MR. ADAMO:  Thank you, Your Honor.
14       Q   (By Mr. Hanson)  All right.  You told us when
15  Messrs. Mackie, Stewart, Payne, Treese, Morris, and
16  Levergood arrived at Open Market.  Can you tell us how
17  long they stayed and when they left?  How long did David
18  Mackie stay with Open Market?
19       A   I don't recall.
20       Q   How long did Dr. Stewart stay with Open
21  Market?
22       A   Dr. Stewart left around the end of 2000.
23       Q   And when did you leave?
24       A   Also at the end of 2000.
25       Q   And when did Mr. Payne leave?
```

1      A    I don't recall precisely.

2      Q    When did Mr. Morris leave?

3      A    I don't recall.

4      Q    And when did -- how about Mr. Levergood?

5      A    I don't recall.

6      Q    And because you left, you never worked for

7   Divine Ventures; is that correct?

8      A    I was never employed by Divine.

9      Q    And did you ever have any kind of consulting

10  contract with Divine?

11     A    I had a consulting arrangement with Open

12  Market that I believe survived the acquisition.  I don't

13  recall any work done after the acquisition, to the best

14  of my recollection.

15     Q    Did you do work for Open Market after 2000

16  prior to the Divine acquisition?

17     A    I believe so, yes.

18     Q    And what kind of work was that?

19     A    That was fixing some problems with a software

20  that I had worked on that a customer urgently needed

21  fixed.

22     Q    Do you know whether Dr. Stewart ever did any

23  work for Divine Ventures?

24     A    Not to my knowledge.

25     Q    Now, I believe you said you had some sort of

1  consulting arrangement with Soverain; is that correct?

2      A    That's correct.

3      Q    Can you tell us how frequently you performed

4  any services with regard to the Transact software under

5  that settlement -- under that contract?

6      A    From time to time.

7      Q    And from time to time means what?  Once?

8  Twice?

9      A    A few times.

10      Q    A few times.  That mean three times or --

11      A    I -- more than three, less than ten.

12      Q    And what was the nature of that work?

13      A    That would be entering questions about the

14  Transact software, how it works, some of the background

15  for understanding that Soverain wanted to make some

16  change.

17      Q    And did you go visit the location where

18  Soverain was to make these changes or help make these

19  changes?

20      A    I did not.

21      Q    Was this all done over the telephone?

22      A    And electronically, yes.

23      Q    And through electronically.

24           Now, in addition to that work, what other work

25  have you done for Soverain Software?

1      A    I have been involved in answering questions

2 about the Open Market patents, the history of Open

3 Market; things of that nature.

4      Q    And have you spent time assisting Soverain in

5 the preparation of this lawsuit?

6      A    I have been involved in preparing for my

7 testimony and providing background information.

8      Q    And how many hours have you spent providing

9 background information and preparing for your testimony?

10      A    On -- on this case?

11      Q    On this case.

12      A    Probably around 150 hours total since the

13 lawsuit was filed.

14      Q    And in addition to this case, have you

15 assisted Soverain Software in preparing other lawsuits?

16      A    Yes.

17      Q    And what lawsuits were those.

18      A    That would include Soverain v. Amazon and

19 Soverain v. J.C. Penney and other Defendants?

20      Q    And how many hours did you spend working on

21 the Soverain v. Amazon case?

22      A    I don't recall the exact number.

23      Q    During your direct testimony you were asked a

24 number of questions about licensing.

25           Was part of your job to negotiate patent

1   licenses while you were at Open Market?

2       A    I was not responsible for negotiating the

3   licenses.

4       Q    Did you ever participate in the negotiation of

5   licenses?

6       A    I participated in meetings that were part of

7   the long-term discussions, yes.

8       Q    But you didn't participate in any individual

9   negotiation for a license?

10      A    Not in the actual negotiations.

11      Q    So what is the basis of your knowledge that

12  you offered up this morning regarding all these numbers

13  that you threw out that were for various licensees?

14      A    Those numbers were general information about

15  the -- from the pricing as discussed at Open Market and

16  through for some of the discussion internally after a

17  deal was closed.

18      Q    Did you have any -- you mentioned a lawsuit

19  was filed against Intershop; is that correct?

20      A    Yes.

21      Q    And that was the outcome of that lawsuit?

22      A    I believe that lawsuit was settled.

23      Q    And did you -- are you aware of any other

24  lawsuits, while you were at Open Market, that were

25  brought to enforce patent licenses?

1    A    No, I'm not.

2    Q    Now, I just have to get a little better

3  understanding of the difference between these two, I

4  think you called them licenses for Transact; is that

5  correct?

6    A    There were two different license structures

7  for Transact.

8    Q    And were these patent licenses or were these

9  licenses for -- of the software, the Transact software?

10   A    Those were licenses for the software.

11   Q    And you said there were two types of licenses,

12  I believe, the corporate customer?

13   A    Yes.

14   Q    And the other was the commerce service

15  providers, correct?

16   A    Yes.

17   Q    What's the difference there, please?

18   A    The difference was that a corporate customer

19  would operate Transact on their own behalf.  A commerce

20  service provider would operate Transact on behalf of

21  many businesses, typically small to medium-sized

22  businesses.

23   Q    So a commerce service provider then was

24  similar to what was originally envisioned for the Open

25  Marketplace?

1       A    That's correct.

2       Q    And -- and which of these licenses were for

3  the commerce service providers?

4       A    I don't understand the question.

5       Q    Oh, I'm sorry.  You mentioned a number of

6  licensees for the commerce -- that were commerce service

7  providers, did you not?

8       A    Earlier I named some companies?

9       Q    Yes.

10      A    Yes.  Companies like AT&T and MCI were

11  commerce service provider customers.

12      Q    And did you ever visit sites that they

13  maintained using the Transact software?

14      A    Do you mean visit the websites?

15      Q    Well, yes.

16      A    Yes.

17      Q    And did they have other merchants on there

18  besides -- for example, did AT&T have other merchants

19  besides themselves on the site?

20      A    That's my understanding.

21      Q    That's your understanding, but do you actually

22  know?

23      A    I don't recall visiting sites that I knew to

24  be hosted at AT&T.

25      Q    Can you tell us what your particular

1   contribution was to the -- what have been called the

2   shopping cart claims in the '319 (sic) and the '492

3   patents?

4        A    I can't isolate a specific contribution.

5        Q    Can you isolate anybody's specific

6   contribution?

7        A    Those inventions came out of a collaborative

8   work and discussion.  So I find it hard to make those

9   isolations.

10       Q    Did you have anything to do with writing the

11  software for implementing the shopping carts?

12       A    I don't recall specifically working on the

13  shopping cart software.

14       Q    What about the hypertext statement?  Did you

15  work on that?

16       A    I don't recall personally working on the

17  hypertext statement software.

18       Q    Now, one of the exhibits that you referred to

19  is in front of you in the book that your counsel

20  provided, which is the Exhibit 75.

21            At the bottom -- near the bottom, there's a

22  paragraph -- a paragraph that reads:  The web has an

23  existing mechanism to authenticate users.

24  Can you tell us what that existing mechanism was?

25       A    I believe that's referring to a mechanism

1  called basic authentication.

2     Q    And then there's -- it appears to be a

3  question here:  Could this mechanism be used to carry

4  along state information?

5          Did you -- do you recall seeing that question

6  at the time you first saw this document?

7     A    I don't recall precisely.  It seems likely.

8     Q    And -- and isn't it a fact that there was a

9  way to carry state information along with the existing

10 tools of the internet at the time of this document?

11            MR. ADAMO:  Your Honor, I'm sorry to

12 interrupt, but we're way outside the scope of the

13 direct, and I'm not sure where we're going, but it

14 sounds like we're going back into invalidity again.

15            THE COURT:  Response?

16            MR. HANSON:  Well, Your Honor, they put

17 the document in during their direct testimony.  I can

18 take it up after -- maybe we should take our lunch break

19 now and we will finish up right after the lunch.

20            THE COURT:  How much more do you have?

21            MR. HANSON:  I think I could well have

22 another half hour.

23            THE COURT:  Okay.  I think that would be

24 a good idea.

25            All right, Ladies and Gentlemen of the

1  Jury, we're going to take our noon recess today at this

2  time.  And we're going to be in recess until 1:00

3  o'clock.  So enjoy your lunch, and we will see you back

4  here at 1:00 o'clock.

5                    Be in recess.

6                    COURT SECURITY OFFICER:  All rise.

7                 (Jury out.)

8                 (Lunch recess.)

9

10                 C E R T I F I C A T I O N

11  I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled

13  matter.

14

15  /s/

16  SHEA SLOAN, CSR, RPR

17  OFFICIAL COURT REPORTER

18  STATE OF TEXAS NO. 3081

19

20  /s/

21  JUDITH WERLINGER, CSR

22  DEPUTY OFFICIAL COURT REPORTER

23  STATE OF TEXAS NO. 267

24

25