```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         TYLER DIVISION

 3   SOVERAIN SOFTWARE            )
                                 )      DOCKET NO. 6:07cv511
 4       -vs-                    )
                                 )      Tyler, Texas
 5                               )      1:05 p.m.
     NEWEGG, INC.                )      April 27, 2010
 6
                         TRANSCRIPT OF TRIAL
 7                        AFTERNOON SESSION
               BEFORE THE HONORABLE LEONARD DAVIS,
 8         UNITED STATES DISTRICT JUDGE, AND A JURY

 9                    A P P E A R A N C E S

10   FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
                              JONES DAY
11                            2727 N. Harwood St.
                              Dallas, Texas  75201-1515
12
                              MR. THOMAS L. GIANNETTI
13                            MR. BARRY R. SATINE
                              MS. CLARK CRADDOCK
14                            JONES DAY
                              222 East 41st St.
15                            New York, New York  10017-6702

16                            MR. CARL ROTH
                              ROTH LAW FIRM
17                            115 N. Wellington, Ste. 200
                              P.O. Box 876
18                            Marshall, Texas  75670

19                            MR. MICHAEL C. SMITH
                              SIEBMAN, REYNOLDS, BURG,
20                            PHILLIPS & SMITH
                              713 S. Washington Ave.
21                            Marshall, Texas  75670

22
     COURT REPORTER:          MS. JUDITH WERLINGER
23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
```

```
 1  FOR THE THE DEFENDANTS:   MR. RICHARD SAYLES
                              MR. MARK STRACHAN
 2                            SAYLES WERBNER
                              4400 Renaissance
 3                            1201 Elm St.
                              Dallas, Texas  75270
 4
                              MR. HERBERT A. YARBROUGH, III
 5                            YARBROUGH LAW FIRM
                              100 E. Ferguson, Ste. 1015
 6                            Tyler, Texas  75702

 7
                              MR. DAVID C. HANSON
 8                            MR. KENT BALDAUF, JR.
                              MR. DANIEL H. BREAN
 9                            THE WEBB LAW FIRM
                              200 Koppers Bldg.
10                            436 Seventh Ave.
                              Pittsburgh, PA  15219
11

12                            MS. CLAUDIA W. FROST
                              MR. JEREMY J. GASTON
13                            PILLSBURY WINTHROP
                              909 Fannin St., Ste 2000
14                            Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    COURT SECURITY OFFICER: All rise.
 3                    (Jury in.)
 4                    THE COURT:  Please be seated.
 5                    All right.  You may proceed.
 6                    MR. HANSON:  Thank you, Your Honor.
 7            G. WINFIELD TREESE, PLAINTIFF'S WITNESS,
 8                        PREVIOUSLY SWORN
 9                    CROSS-EXAMINATION (CONTINUED)
10   BY MR. HANSON:
11        Q    Mr. Treese, why did you leave Open Market?
12        A    There was a difference of opinion in the
13   technology strategy.
14        Q    And what was that difference of opinion?
15        A    The CTO was not interested in pursuing some
16   projects that I had been involved in developing.
17        Q    What were those projects?
18        A    They were a new architecture for the software
19   that would allow some new flexibility in doing a larger
20   range of business transactions.
21        Q    So it would be accurate to say that Open
22   Market was no longer the exciting challenge you describe
23   as your reason for joining Open Market?
24        A    The company had changed.
25        Q    At the time you left, was Open Market
```

1   profitable, if you know?

2        A    Not to my knowledge.

3        Q    At the time, were Open Market's revenues

4   rising or falling?

5        A    I don't recall.

6        Q    Was the marketplace very competitive at that

7   time?

8        A    In 2000 the marketplace was competitive.

9        Q    And who were some of the Open Market

10  competitors at that point in time?

11       A    Companies included Broad Vision, Art

12  Technology Group, a number of others I don't recall

13  right now.

14       Q    Broad Vision and Art Technology?

15       A    Yes.

16       Q    What products did Broad Vision provide?

17       A    To the best of my recollection, Broad Vision

18  provided software that was focused on discovering what

19  individuals liked to buy most in order to market more

20  effectively to them.

21       Q    And what did Art Technology provide?

22       A    Art Technology provided web design and systems

23  that integrated both electronic commerce and content

24  presentation.

25       Q    And is it true then that somehow that competed

1    with the Transact product?

2        A     Those companies did not compete directly with

3    the functionality of the Transact product.

4        Q     So in what way did they compete with Open

5    Market?

6        A     At that time Open Market had a range of

7    products for catalog presentation, for content

8    management, as well as Transact.

9        Q     Now, I apologize for going back to this

10   enterprise and commercial service provider licenses.  I

11   guess I'm slow.

12             Can you explain, would a licensee selling its

13   own products be more likely to take the enterprise or

14   the commercial service provider license?

15       A     A company that was selling its own products

16   would be more likely to take the enterprise license,

17   because it was for what they were doing.

18       Q     Now, I believe you mentioned that both of the

19   licenses had basically two parts; is that correct?  Let

20   me finish -- expand the question.  An upfront payment

21   and subsequent payments for maintenance?

22       A     Both of those would be included in both

23   licenses, yes.

24       Q     So there was an upfront payment and then there

25   were ongoing payments for both licenses?

1      A    Yes.

2      Q    And did all of the licensees opt for the

3  continuing payments so that they would be provided the

4  maintenance services?

5      A    That was certainly most common.  I don't know

6  if there were any that chose not to.

7      Q    Did some of the customers do their own

8  implementation?

9      A    I'm not sure what you mean by their own

10 implementation.

11     Q    Did the Transact product have to be configured

12 somehow to a particular business?

13     A    Yes, it did.

14     Q    And so, did some of the customers do that on

15 their own or did they have Open Market do that for them?

16     A    Many customers had Open Market do that for

17 them.  I don't know if some chose to do it themselves.

18     Q    Now, you mentioned a dollar amount, and I

19 believe it was for the -- for the enterprise license.

20 You mentioned 125,000 to 250,000; is that correct?

21     A    That's correct.

22     Q    And was that an upfront payment?

23     A    I believe that that was the normal case, yes.

24     Q    And there could have been payments beyond

25 that.  Is that what you're suggesting?

```
 1      A    It's possible.  The details of the some of the

 2  deals varied.

 3      Q    And -- and you really, at this moment, don't

 4  have the details at your -- at your -- at the tip of

 5  your fingertips?

 6      A    I was not involved in negotiating the details

 7  of the pricing.

 8      Q    One last question:  What is your hourly rate

 9  for participating today?

10      A    $425 an hour.

11              MR. HANSON:  I'm finished, Your Honor.

12              THE COURT:  Thank you.

13              Redirect?

14              MR. ADAMO:  None is necessary, Your

15  Honor.  Thank you.

16              THE COURT:  All right.  Thank you.

17              You may step down.

18              Who will be your next witness?

19              MR. ADAMO:  Mr. Roth, Your Honor, with

20  the Court's permission, is going to call Ms. Wolanyk.

21              THE COURT:  All right.

22              MR. ROTH:  May it please the Court,

23              Ladies and Gentlemen of the Jury.

24      KATHARINE WOLANYK, PLAINTIFF'S WITNESS, SWORN

25                     DIRECT EXAMINATION
```

1    BY MR. ROTH:

2        Q     Would you identify yourself, please, for the

3    jury?

4        A     My name is Katharine Wolanyk.

5        Q     And I believe you've been identified as the

6    president of the Plaintiff in this case, Soverain

7    Software?

8        A     The president and the chief legal officer,

9    yes.

10       Q     Ms. Wolanyk, if we do our job here today, in

11   the next 30 minutes or so, I would like to get the jury

12   to -- or get you to inform the jury a little bit about

13   yourself, a little bit about Soverain, and perhaps

14   answer Mr. Sayles' question about what we're doing here.

15             Tell us about yourself.  Where are you from?

16   Where did you grow up?

17       A     I was born and raised in a small town,

18   Wheatfield, New York, near Buffalo, New York.

19       Q     And did you attend college?

20       A     I did.  Michigan State University.

21       Q     And what did you study at Michigan State?

22       A     Engineering.

23       Q     And what type of engineering did you do?

24       A     It was a general engineering program.

25       Q     After getting your degree in engineering, what

1    was your first employment?

2        A    I moved to the West Coast to work for Hughes

3    Aircraft Company in Los Angeles.

4        Q    And did you work -- how long did you work for

5    Hughes?

6        A    I was with Hughes for eight years.

7        Q    And doing engineering work?

8        A    Systems engineering work, yes.

9        Q    What particular project were you involved with

10   in the eight years you were at Hughes?

11       A    I worked on the design and implementation of

12   the B2 Stealth Bomber radar system.

13       Q    And out of my own curiosity, I would like to

14   ask you a lot more about exactly what you did on the

15   Stealth Bomber, but when I asked you that question you

16   told me it was still classified; is that right?

17       A    That's correct.

18       Q    After eight years at Hughes, what did you do?

19       A    I left to go to law school.

20       Q    And where did you attend law school?

21       A    The University of Chicago law school.

22       Q    And could you explain for the jury just what

23   it is, after a successful starting career as an

24   engineer, that would possess you to go to law school?

25       A    I wanted a new challenge, and I felt that

1   would be a good fit for me.

2       Q    So you attended the University of Chicago Law

3   School?

4       A    That's correct.

5       Q    And what year did you graduate?

6       A    1996.

7       Q    Did you pass the bar?

8       A    I did.

9       Q    And where did you go to work?

10      A    I went to work for a law firm, Latham &

11  Watkins in Chicago.

12      Q    And Latham & Watkins is, shall we say, a very

13  large law firm, one of the largest in the world?

14      A    That's correct.

15      Q    What we refer to around here in East Texas as

16  tall-building lawyers.

17      A    Correct.  We were in the Sears Tower, so we

18  would be very TBL.

19      Q    How long -- what type of work did you do?  Did

20  you do litigation?  Did you do -- what type of lawyering

21  did you do?

22      A    I did not do litigation.  I was a corporate

23  attorney, and because of my engineering background, I

24  did work predominantly with technology companies.

25      Q    So you -- you weren't a courtroom lawyer by

1  any means?

2      A      I was not.

3      Q      Have you ever testified in court before?

4      A      This is my first time in a courtroom.

5      Q      It's a little intimidating, isn't it?

6      A      It is.

7      Q      It's not what you expect.  We will try to make

8  it easy for you.

9      A      All right.  Thank you.

10      Q      Mr. Sayles can be kind of rough, but he can't

11  eat you, so you will be okay.

12              The -- how long did you stay at Latham &

13  Watkins?

14      A      A little over three years.

15      Q      And what did you do when you left Latham &

16  Watkins?

17      A      I left Latham to go to work for a company

18  called Divine in Chicago.

19      Q      All right.  So this is the Divine that we've

20  heard talked about a little bit before?

21      A      The very same, yes.

22      Q      Okay.  Tell us a little bit about Divine.

23              What kind of company was it?

24      A      Well, it was an internet-focused -- originally

25  an investment company.  And it was 1999.  You know, the

1    climate was very good for internet companies, and this

2    was a very exciting company to be part of in Chicago.

3         Q    Did -- was -- was Divine just getting started?

4    Had it just been formed?

5         A    It was -- yes, it was a startup.

6         Q    Who was the founder of Divine?

7         A    Andrew Filipowski.

8         Q    And tell us a little bit about Mr. Filipowski?

9         A    He went by Flip.  It was easier to say than

10   Filipowski, I guess.  And he was -- had been previously

11   the chairman and CEO of a company called Platinum

12   Technology in Chicago.  Very successful company.  I had

13   done a lot of legal work for Platinum previously, so I

14   came to know him.  And Platinum had grown very rapidly

15   through acquisitions of great technology companies and

16   had just been sold for $3-1/2 billion shortly before

17   Divine was formed.

18        Q    And how did -- what was the business plan at

19   Platinum?  What had he done to, in a couple of years,

20   build an enterprise that sold for $3-1/2 billion?

21        A    These were very smart judges of software

22   technology and were able to acquire companies and put

23   them together and then develop those products together

24   and sell them very successfully in the marketplace.

25        Q    So, I think he put -- integrated about 70

1   small companies into one company, basically?

2        A    That's correct.

3        Q    And then so apparently -- was Divine his

4   effort to, if he had done it once, he was going to do it

5   again?

6        A    Absolutely.  That was the plan.

7        Q    Where did he get his management team?

8        A    The bulk of the management team had come from

9   the executive team at Platinum.  And I was the first

10  non-Platinum employee to join.

11       Q    Any other females?

12       A    There were a few females, but I was the only

13  executive.

14       Q    Was Flip successful in raising money for his

15  new venture with the credibility that he had already

16  established with a 3-1/2 billion dollar venture?

17       A    Yes, it was a very, very exciting opportunity.

18  A large number of companies invested right away in the

19  first few months; Microsoft, Hewlett-Packard, Compaq,

20  Level 3.  A number of big, big companies invested about

21  $300 million.

22       Q    Did Divine set about to follow up the plan to

23  expand and build another Platinum, or hopefully build

24  another Platinum?

25       A    That was -- that's what we set out to do, yes.

1      Q    Well, tell us what happened over the next

2  couple of years.  Starting in 1999, what happened over

3  the next couple of years?

4      A    Well, the company was formed in 1999.  We

5  raised, as I said, a lot of capital.  We went public in

6  the mid-part of 2000 and raised another 400 million or

7  so.  So we had a big war chest.

8           And from there we started acquiring companies

9  and trying, as best we could, to -- to pick the right

10 companies and put them together and integrate them

11 successfully.

12     Q    How big did Divine get at its peak?

13     A    At its peak we were about 3000 employees.  I

14 think we had 50 or so software products, somewhere

15 between 6 and $700 million in revenues.

16     Q    How many locations worldwide?

17     A    I don't know.  Many.

18     Q    More than 20?

19     A    Yes.

20     Q    Did Divine also form alliances with other

21 companies?

22     A    We did.  That was one of the ways that you

23 would sell software is you would work with other

24 technology companies.  And we did work with Microsoft

25 and IBM, Hewlett-Packard, Compaq, Dell; all the big

1  companies.

2     Q    Now, during your four years there, what were

3  your job duties?

4     A    I started out as the acting general counsel.

5  And after the general counsel was able to join from

6  Platinum, then I went and moved into the business part

7  of the company.  And I was on the corporate senior vice

8  president of corporate development.  And later on chief

9  alliance officer, as well; managed the strategic

10  alliances for the company.

11    Q    So as Divine evolved, so did your job

12  responsibilities?

13    A    I'm sorry?

14    Q    As Divine evolved, so did your job

15  responsibilities?

16    A    Yes.

17    Q    Was one of the companies -- how many companies

18  did you buy in that two-year period?

19    A    Over 30.

20    Q    All right.  And was one of those companies a

21  company called Open Market that we have heard Mr. Treese

22  talking about?

23    A    Yes.

24    Q    Were you involved in any way with that

25  purchase?

```
 1      A    Yes.  As I said, I was on the -- in the
 2   corporate development organization, which was the
 3   organization that's tasked with identifying good
 4   companies and going out and investigating their -- their
 5   capabilities and then negotiating a deal to acquire
 6   them.
 7      Q    Okay.  Did you, as part of your investigation,
 8   learn about Open Market and the technology that it owned
 9   and the products that it had?
10      A    Yes.
11      Q    And the decision was made to purchase Open
12   Market?
13      A    Correct.
14      Q    Okay.  And do you recall when that was?
15      A    I think it was in mid-2001.
16      Q    Okay.  The -- do you recall what Divine paid
17   to purchase Open Market?
18      A    It was approximately $70 million.
19      Q    $70 million?
20      A    70.
21      Q    Now, we've heard some references to it, and I
22   want to put it back in the time frame, but everybody's
23   heard, I guess, of the dot-com bubble.  Give us your
24   description about what that era was in the late
25   '90s/early 2000 period.
```

1    A    Well, the dot-com bubble related to internet

2  companies, and there were lots of companies that were

3  forming and growing very rapidly and going public.  This

4  was in the late '90s.  And the bubble, so to speak,

5  burst in mid-2000.  And after that a lot of these

6  companies that had been very successful failed; a lot of

7  companies that had been worth a great deal of money,

8  suddenly were not and were laying off employees and

9  struggling to survive.

10    Q    Okay.  Did the dot-com bubble bursting, affect

11  Divine?

12    A    It did, because we initially were focused on

13  investing in companies.  But as the valuations came down

14  and companies became more available, we turned to

15  acquiring companies, because there just were so many

16  great technologies companies that we could afford

17  suddenly.

18    Q    Well, what happened to Divine eventually?

19    A    Eventually we grew too big too fast.  We

20  didn't manage to make it, and we broke up and sold.

21    Q    While you were successful in raising a whole

22  lot of capital, hundreds of millions of dollars

23  originally, after the dot-com bubble burst was there any

24  more -- anybody else willing to invest in this company;

25  put it that way?

1      A    Well, we were -- we were public as well, so we

2  had investors in that regard.  But it was a tough time.

3      Q    What was kind of the last straw for Divine?

4  Was there a particular purchase made that required an

5  awful lot of immediate cash that just wasn't available?

6      A    Yes.  There was one company WorldCom that we

7  acquired somewhat -- it was heavily debated within the

8  corporate development team, but we did acquire them.

9          And because of the nature of their business,

10 it required a lot of cash.  And it ended up being a big

11 problem for the company.

12     Q    Now, when the financial troubles came down on

13 Divine, how did it affect these 35 subsidiaries that

14 they had already acquired?  Did it have an impact on

15 them?

16     A    Well, we had gone through -- in the process of

17 trying to integrate them, we had reorganized.  We had

18 tried to kind of put products together and did a lot of

19 changes to try to survive.

20     Q    Let me interrupt you to turn your mic a little

21 bit to the side again.  You're having the same trouble

22 that Win did.

23          Were there cutbacks in employees, reduction in

24 staff?

25     A    Yes.

```
 1      Q    All of the usual type of things?

 2      A    Yes.

 3      Q    Let's talk about Open Market in particular.

 4           Did it go through a period of neglect due to

 5 the financial strain on Divine?

 6      A    It did.  It wasn't alone in that regard.

 7 Because we had acquired so many companies and had so

 8 many software products, as we were trying to integrate

 9 and also get the company the right size, there was a lot

10 of products that just didn't get the attention; and Open

11 Market's Transact product was among them.

12      Q    Okay.  Did Open Market lose a lot of its

13 customers?

14      A    It did.

15      Q    Lose its engineering staff?

16      A    A lot of the engineering staff did move on.

17      Q    What eventually happened to Open Market and

18 the other various subsidiaries of Divine?

19      A    The company was broken up and sold to

20 different investors.

21      Q    Okay.  That brings us to talking about

22 Soverain Software.  Was Soverain Software formed by some

23 investors specifically for the purpose of purchasing

24 what was left of Open Market?

25      A    Yes.
```

1    Q    Who were the investors?

2    A    The investors --

3    Q    Who leads the industrial group, if you would?

4    A    The investors were a group from New York that

5    were originally interested in buying a separate part of

6    Divine.  And in the course of working with them on that

7    transaction, I suggested to them that there was an

8    opportunity they should also consider.

9    Q    Okay.  The -- tell us what your role was in it

10   coming about that Soverain was formed to purchase Open

11   Market.

12   A    Well, I had always thought of Open Market as

13   one of the best parts of Divine.  When we acquired it, I

14   was very impressed with the product, the customers they

15   had, the history, the patent portfolio.

16        So when this kind of dismantling of Divine was

17   going on, I saw it as an opportunity, a business

18   opportunity that I thought with the right approach could

19   be very successful.  So I suggested it to these

20   investors thinking perhaps they would be interested.

21   Q    Okay.  And they decided to follow your advice

22   then and purchase that asset?

23   A    We did.

24   Q    Now, you might recall hearing Mr. Sayles in

25   his opening statement saying that Open Market and

1  Transact had never been successful.  Do you -- do you

2  share that view?

3       A    I do not.  I do not at all.

4       Q    Tell us what your knowledge of Open Market's

5  success was with the product Transact in particular,

6  during the late '90s?

7       A    Well, Open Market was not only, you know, very

8  well-known as a company, but its Transact product was --

9  was one of the very first E-commerce software products,

10 and it grew very rapidly.  By 19 -- 1999 it commanded

11 over 30 percent of the E-commerce software market

12 dwarfing all the other competitors, including companies

13 like Microsoft and IBM.  So from that perspective, the

14 Transact product was very, very successful.

15      Q    I am looking at exhibit -- well, it's actually

16 got two exhibit numbers on it.  It's already in

17 evidence, Plaintiff's Exhibit 149 and Defendant's

18 Exhibit 220.  And I'm not going to bother putting it up

19 on the board or anything.

20           But this document is an Open Market report,

21 and it's an Open Market document, but it indicated that

22 Open Market's share from 1998 of the entire E-commerce

23 software program was 30 percent -- 29.8 percent.

24      A    Correct.

25      Q    Okay.  Is that one of the facts that you were

1 aware of when the decision was made to purchase Open

2 Market for Divine?

3      A     It was one -- one of the facts, as well as

4 their customer list.

5      Q     Okay.  Who were some of the customers that

6 Open Market had during the point of time that you were

7 investigating it to be purchased by Divine?

8      A     Well, at the time we were looking at them to

9 purchase them for Divine, as you've heard Mr. Treese

10 testify, there were -- there were some of the biggest

11 companies in the world; AT&T, Disney, Sony, Time-Warner,

12 Business Week, the McGraw-Hill publishing companies.

13 There were very, very large companies.

14      Q     And those are companies that had selected

15 Transact as the software to run their websites?

16      A     Correct.

17      Q     Okay.  This same document indicates that big

18 competitors in '98 included Microsoft.  Do you know

19 what -- do you recall what Microsoft's market share was

20 compared to Open Market's 29.8 percent?

21      A     I believe at the time it was around two to

22 three percent of the market.

23      Q     And this document actually says it was 3.7

24 percent.  Does that fit?

25      A     That sounds right.

```
 1      Q    Oracle's was 2.5 percent?

 2      A    Right.

 3      Q    IBM was 2.4 percent?

 4      A    Right.

 5      Q    Okay.  Has that circumstance changed today?

 6      A    It's about reversed, yes.

 7      Q    When financial difficulties came and Open

 8  Market's business fell under a period of neglect under

 9  Divine's management, what happened with respect to

10  market share to these other -- the big boys, so to

11  speak?

12      A    Well, Transact is a product that's -- it's a

13  very complex product.  It's intended to run either large

14  companies' E-commerce websites or, in the case of

15  commerce service providers, to run a lot of companies'

16  websites.  And there's changes that are needed to be

17  made on a constant basis.

18           And so what happened in the waning days of

19  Divine is that the engineering development that needed

20  to go on was not happening.  Customers weren't getting

21  the support they needed, so they would logically make

22  the decision, especially when E-commerce needs to be

23  working to be successful, they would make the decision

24  to move to a different product or build their own

25  website.
```

1    Q    Tell us what happened after you persuaded this

2    group of investors to purchase the Open Market assets.

3    And let me ask you what -- what assets did we purchase?

4    When we talk about purchasing Open Market, they didn't

5    just purchase patents, did they?  What did you buy?

6    A    It was the Transact software business, so it

7    was all of the source code and related documents that

8    went with the software product.  It was all of the

9    customer contracts that we could recover.  It was the

10   existing customer relationships with the customers that

11   was still there.  And as well as the -- the related

12   intellectual properties, the patents for the most part.

13   Q    Now, let me see how to phrase this.  Was one

14   of the conditions that these investors made when you

15   were trying to persuade them to buy this business is

16   that you would agree to become the CEO and run the

17   company?

18   A    That was the only condition they would invest

19   under, yes.

20   Q    Okay.  What did they tell you they wanted to

21   do after they hired you to run the company?

22   A    Well, they wanted me to move as quickly as we

23   could to re -- you know, reengage an engineering team,

24   to reach out to the customers and try to get that

25   situation stabilized, and ultimately to make money.

1    Q    Well, a little more basic than that.  Like
2  every investor that buys a company, they want the CEO to
3  go make money.

4    A    That's right.

5    Q    And how do you make money with a technology
6  company such as Soverain?  What -- what do you do?  What
7  is your sources of making money when you have the kind
8  of assets that Soverain owns?

9    A    If you're lucky enough to have a product, as
10  we do, you develop that product, you support that
11  product, you sell that product, and you make money from
12  that side of the business.

13    Q    And the product -- the principal product at
14  least is Transact?

15    A    That's correct.

16    Q    Were there some other programs as well?

17    A    There are some smaller programs, but Transact
18  is the main product.

19    Q    All right.  And what else can you do to make
20  money when you own a technology company?

21    A    Well, in our case, I thought that the
22  licensing of the patents also would be a good business.

23    Q    Okay.  So if we can, we can kind of look at
24  it, there's two aspects of the business enterprise.  One
25  is your software side, the software, the Transact

1   program that you can sell and service.

2        A    Right.

3        Q    Okay.

4             The other major asset is the patent portfolio

5   that you said you licensed; is that it?

6        A    That's correct.

7        Q    And how many patents does Soverain own?

8        A    Right now we have over 50 pending and issued

9   patents.

10       Q    Okay.  Is that worldwide or just in the United

11  States?

12       A    Worldwide.

13       Q    Including the patents that are the subject of

14  this lawsuit are three of those patents; is that right?

15       A    Correct.

16       Q    All right.  You mentioned licensing.  And,

17  essentially, when you own -- well, you've heard the

18  reference that has been made about a patent being like a

19  deed to real estate.

20       A    Uh-huh.

21       Q    But having a patent portfolio is like opening

22  an office building, and you can rent the right or

23  permission to use an office in the office building in

24  exchange for money?

25       A    Correct.

1      Q     And make money based on the asset that you
2  own; is that it?
3      A     That's right.
4      Q     And patent licensing is similar to that.  You
5  give permission to another company to use the technology
6  that you have the exclusive right to?
7      A     That's correct.
8      Q     And that's called a license?
9      A     Yes.
10     Q     Now, let's talk first about the software side
11  of the business.
12           When you took over what was left of Open
13  Market, what -- what did you find?  What kind of shape
14  was it in?
15     A     It was -- it was a big challenge.  I was it
16  initially.  And so we -- initially, I needed to figure
17  out what there was that I could reconstitute.  I needed
18  to hire an engineering team; and we had customers
19  calling us saying, you know, we're using your product,
20  when are you going to start supporting it, investing in
21  it.
22     Q     Did it have an established office somewhere?
23     A     There was no office, no.
24     Q     Did it have any employees left?
25     A     No.

1    Q    So how did you go about reviving the software

2  business?  What's first thing you did?

3    A    The first thing I did is I called another

4  former Divine executive that I knew, Casey Andrysiak,

5  and talked to her about whether she would be willing to

6  join Soverain to run our engineering team.

7    Q    And who was that?

8    A    Casey Andrysiak.

9    Q    Is Casey here in the courtroom today?

10   A    Yes, she is.

11   Q    Back there sitting in the back?

12   A    That's her.

13   Q    So did you talk Casey into coming into this

14 venture as well?

15   A    I did.  She was a little busy at the very

16 moment I asked her, but she came onboard shortly

17 thereafter.

18   Q    There is an interesting story about that, too,

19 as I understood from talking to Ms. Andrysiak.  Where

20 was she when she accepted the job?

21   A    She was in the hospital giving birth to her

22 first child.

23   Q    So where did she live at the time?

24   A    At the time Casey was in the Alexandria,

25 Virginia, area.

1     Q     And where does she live now?

2     A     She lives at Ft. Hood, Texas, now.

3     Q     And is her place of residence related to her

4   husband's occupation?

5     A     Yes.  Casey's husband is an officer in the

6   Army.

7     Q     So they live in Ft. Hood where he's currently

8   stationed?

9     A     That's where he's stationed, yes.

10     Q     What then did you and Ms. Andrysiak do to

11   continue to try and revive Open Market from the ashes,

12   so to speak?

13     A     Well, there were engineers that had worked on

14   the Transact product at Divine, and so the first thing

15   we did is went out and tried to recruit them to rejoin.

16   These are folks that had worked on the product for the

17   last year or so -- or more actually -- and knew it, had

18   worked with the customers, so they were at this point

19   our best chance of being able to restart the business.

20     Q     What about the customer files?  Were you able

21   to locate all of those?

22     A     We did.  It was a challenge.  They were

23   scattered all over the country, the world really,

24   because Open Market had sold Transact all over the

25   world.  So our -- we had customers and contracts,

1   therefore, spread out everywhere.

2       Q    Did you have people calling saying they were

3   customers looking for support, that you didn't even have

4   any record had been a customer?

5       A    Yes.  It was a little embarrassing to ask them

6   if they could send us a contract so we could kind of

7   figure out the circumstances, but that's how it worked.

8       Q    Did you manage to put together an engineering

9   team then to provide support for your customers?

10      A    We did.

11      Q    Okay.  Where are the headquarters of Soverain

12  now?

13      A    Chicago.

14      Q    And who is the actually located in Chicago?

15      A    I'm in Chicago, and we have a couple of

16  corporate people in Chicago.

17      Q    Okay.  You've already identified

18  Ms. Andrysiak.  What is her title?

19      A    Casey is the vice president of technology.

20      Q    Okay.  And what is her educational background?

21      A    Casey's got an engineering -- couple of

22  engineering degrees, and I think an MBA as well.

23      Q    Is Soverain what I would refer to as kind of a

24  virtual company in the sense that you've got a small

25  corporate headquarters, but your support staff and your

1    engineering staff is scattered out where they're needed?

2         A    That was -- that was the way we hired folks.

3    We, you know, wanted to get the people that we needed to

4    get and couldn't insist that they all move to Chicago

5    just because I was there, so we worked it out that way.

6         Q    A lot of your engineering support is from

7    overseas?

8         A    That's correct.  That's where they were

9    previously, and so we kept them.

10        Q    Mr. Treese indicated that he has a consulting

11   agreement.  Were you able to locate others of the

12   original inventors?

13        A    (Nods head.)

14        Q    Have you made arrangements with, not only with

15   Mr. Treese, but some of the other original inventors to

16   work with Soverain?

17        A    Yes.

18        Q    Okay.  What type of arrangement is this?

19        A    They are consulting agreements.

20        Q    They are not employees as such?

21        A    They're not employees.  Again, many of them

22   had moved on to other opportunities and so weren't

23   available necessarily to be full-time employees, or had

24   other projects they were working on.

25        Q    What -- in addition to Mr. Treese, who else

1    serves as a consultant?

2        A    Larry Stewart, Andy Payne, Thomas Levergood.

3        Q    Okay.  Now, how does that arrangement work?

4    When are they called upon to do their consulting

5    services?

6        A    Well, Larry and Win especially work with Casey

7    and the team on Transact from time to time.  They were

8    the original architects of the product, and in many

9    cases, are the only people that still can put together

10   why something was done many years ago.

11            We also have a good-sized patent portfolio,

12   and we continue to file patents and -- patent

13   applications, that is -- and so the consultants will

14   work with us in that regard, too.

15       Q    Has -- have you been able, with the assistance

16   of your engineering team, as well as the consultants, to

17   upgrade Transact and keep it current?

18       A    We believe so.  We've brought out four or five

19   versions of the product since we acquired the company,

20   and are in the works with a new version right now.

21       Q    I don't want to go into too much detail.  I

22   think we've heard enough from previous witnesses about

23   ultimate details.  But from an overview of this product

24   Transact, I gather this is not something you go down to

25   the local store and buy and bring home and put on your

1  computer like a CD; is that correct?

2      A    Not even close.

3      Q    This -- as Mr. Treese indicated, you -- it

4  requires continuous maintenance and updating; is that

5  right?

6      A    That's correct.

7      Q    So if I was going to find out what it would

8  cost me to own a copy of Transact, what are the types of

9  expenses or costs involved in using a products -- the

10  product Transact?

11     A    Depending on your type of business, you would

12  first need to figure out how large of a license you

13  needed.  Then there would be the integration and

14  installation charges that would go, because you have to

15  connect that software, install that software and connect

16  it to the other parts of your business so that you're

17  able to sell things online.  And then there is the

18  annual maintenance and support that allows you to get

19  updates to the product and custom engineering help and

20  things like that over time.

21     Q    So there were some questions about the

22  licensing fees.  And that is a fee for the right to use

23  the software, the license fee?

24     A    Right.

25     Q    And that's an initial upfront cost?

1    A    Correct.

2    Q    And how is that -- is it still a two-tiered or

3 two types of structures as Mr. Treese described Open

4 Market did?

5    A    Yes, we still sell the product that way.

6    Q    All right.  And -- and what is the cost of a

7 license, just the bare license, and how is it priced?

8    A    We price Transact for an enterprise customer,

9 kind of the basic license, it's based on the amount of

10 computing power they need, extent of use, how big the

11 site is going to be since it's per CPU.

12    Q    The $150,000 number that you heard from

13 Mr. Treese, is that still the same number or has it

14 changed?

15    A    Yes.

16    Q    But it's per CPU; is that right?

17    A    That's how we price it, yes.

18    Q    And CPU stands for?

19    A    Central processing unit.

20    Q    Central processing unit?

21    A    Or computer processing, I'm sorry.

22    Q    So is the first thing you have to determine is

23 how many -- how large the site's going to be, how many

24 CPUs or central processing units it's going to require?

25    A    Uh-huh.

1      Q    Is that right?

2      A    Yes.

3      Q    And then the license is based on how big the

4  site is in that sense?

5      A    Correct.

6      Q    How much computing power is involved?

7      A    How much computing power, how much traffic

8  they envision, how many transactions they'll need to be

9  doing, how many sites they'll be running; all of that is

10  taken into consideration.

11      Q    Now, after the initial license fee, you

12  indicated there is implementation fees?

13      A    Yes.

14      Q    And describe how that works.

15      A    The implementation is done with our

16  engineering team working with the customer's technical

17  people.  And it can take -- as Win said, it can take

18  months, if not longer, to beef that up.

19      Q    And what does that involve?  Does that require

20  Soverain's engineering staff to go on site and perform

21  the work?

22      A    It can, yes.  Often does.

23      Q    Okay.  And that's to connect all of the

24  equipment and all the various servers and forms that

25  they have got that they want to hook up together to make

1   it all integrate and work with Transact?

2        A    Correct.

3        Q    And every installation then is somewhat

4   different?

5        A    That's exactly right.

6        Q    Now, why can't the customer just go modify the

7   program to fit their own needs?  Why -- why do you have

8   to have implementation fees?

9        A    Well, there's some very limited customization

10  that the customer can do on their own.  But in the end,

11  they don't have the access to the source code that we

12  do.  So to do the actual implementation, we're the only

13  ones that can do it.

14       Q    Now, I don't want to go into this too deeply,

15  but what do you mean by source code?

16       A    Source code is the computer code that software

17  programs are written in.  And when you buy, say, a copy

18  of software in a store, you're getting what's called

19  object code, which is kind of a hidden version of how

20  the program runs.  You can't see the actual -- it's the

21  crown jewels really of the software company, the source

22  code.

23       Q    The source code is what these people like Mr.

24  Treese -- I guess I ought to be calling him Dr. Treese,

25  he's got a couple of them -- sits down and actually

1  writes.  It's a language that they write the

2  instructions in that actually tell the computer what to

3  do?

4        A     That's right.

5        Q     Is that right?

6        A     That's right.

7        Q     But the computer doesn't read source code,

8  does it?

9        A     Right.

10        Q     It reads what they call object code?

11        A     Correct.

12        Q     So source code gets converted to object code?

13        A     Correct.

14        Q     But to change the program, you have to have to

15  source code?

16        A     That's correct.

17        Q     And there are millions of lines of

18  instructions or source code in Transact; is that right?

19        A     That's correct.

20        Q     So that's what you have to have to do the

21  customization that the customer needs?

22        A     Oftentimes, yes.

23        Q     Okay.  And a license to a software program

24  doesn't give you access to the source code?

25        A     No.

1     Q     If you say that's the crown jewels, that's

2   kept locked away in a safe?

3     A     Right.  Because, otherwise, then anyone could

4   just copy it and that would be the end of your business.

5     Q     Now, how many customers -- have you been able

6   to maintain or retain some customers out of the ashes of

7   what was left of Open Market after Divine collapsed?

8     A     We did.

9     Q     How many customers do you have, or can you the

10  tell the jury the names of some of the current customers

11  that you've continued since 2003?

12    A     Well, we've brought back a number of

13  customers:  Reuters, Business Week, a number of the

14  McGraw-Hill publishing family, Bureau of National

15  Affairs.

16    Q     That's a publishing company as well?

17    A     That's a publishing company as well.

18    Q     Called BNA?

19    A     Right, BNA.

20          We have customers in Europe.  The names

21  wouldn't be familiar, but they were former Open Market

22  customers that we were able to bring back.

23    Q     Let me ask you about the basic cost, if you

24  would, for a customer.  And let's take -- at my request,

25  have you looked at a particular customer or gotten some

1    numbers together on a particular customer to be able to

2    give the jury a flavor of what's involved with the

3    actual costs of ownership?

4         A    Yes.  We took a look at one of our current

5    customer's contract history to be able to get a sense of

6    that, yes.

7         Q    And I think that, for confidentiality reasons,

8    I don't want to name it, but this is one of your current

9    customers?

10        A    It's one of our current customers, and it is a

11   major customer.

12        Q    And this particular customer started back in

13   May of 1999?

14        A    Correct.

15        Q    Okay.  It says the implementation time was 20

16   months.  What does that mean?

17        A    This was a very complex installation.  And it

18   required, you know, a year and a half of a lot of time

19   at customer sites, multiple customer sites, because this

20   customer has operations all over the globe.

21        Q    So they worked on it for 20 months before they

22   could switch the key and turn it on?

23        A    Yes.

24        Q    The implementation fees I see to be $715,000

25   for that particular customer?

```
 1      A    That's right.

 2      Q    Do you recall what the initial license fee was

 3  for the number of CPUs they were using?

 4      A    Well, again, this is a large customer.  We

 5  tried to look at somebody who would have a very complex

 6  setup with a lot of transactions and a lot of traffic.

 7  And the initial license fee was $650,000, I believe.

 8      Q    $653,000, to be exact?

 9      A    653, right.

10      Q    So, but that 653,000 for the license was just

11  kind of the very start?

12      A    That's correct.

13      Q    Implementation was another 700.

14           Then there is a charge that shows here for

15  maintenance and support fees on an annual basis starting

16  with a pilot phase and continuing on right up to this

17  year?

18      A    Yes.

19      Q    Okay.  And those fees range anywhere from

20  68,000 to 225,000 a year, according to this.

21      A    They keep our engineering team very busy, yes.

22      Q    Now, what are those fees related to?  What

23  kind of services are being performed that are necessary

24  to run this copy of Transact?

25      A    As you said, that's the annual maintenance and
```

1  support.  So every time we bring out a new version of

2  the product, if they're current on their maintenance and

3  support contract, they get access to the new version of

4  the products.

5          Any type of support calls -- our customers run

6  their E-commerce sites 7 days a week, 24 hours a day.

7  And our engineering team is often working through

8  weekends and in the middle of the night to keep their

9  websites up and running.  So they have access to the

10 engineering team.

11     Q    These kind of customers don't want their

12 website to be down for one minute, do they?

13     A    No.  It's a major crisis if their website even

14 just slows down.

15     Q    Because it costs them money every minute it's

16 down?  People can't buy things.

17     A    Exactly.

18     Q    And it looks like they've spent $2.9 million

19 in the last ten years for that, for maintenance and

20 support.

21          So the total cost of ownership for this major

22 customer of Transact came out to about $5.2 million; is

23 that right?

24     A    That's as of this year, and they are still a

25 current customer.

1      Q     And it's going to continue to cost them as

2   long as they continue to use the program?

3      A     That's correct.

4      Q     Now, have you been able to go out and recruit

5   new customers?

6      A     We've certainly tried.  And we've had a lot of

7   opportunity, sales opportunities that we feel we've done

8   very well in.  But in the end, we've not been able to

9   sell to any new customers.

10      Q     Okay.  What kind of problem do you run into,

11   with Transact at one point having a third of the market,

12   now you're having trouble selling new copies?  What's

13   changed in the world?

14      A     Well, what's changed is that the, you know,

15   the situation where Open Market had a huge market share

16   years ago, and then they didn't maintain that is that

17   the big players, the IBMs, the Microsofts, the Oracles

18   of the world have moved in, and they now are the only

19   game in town.

20           So even though technically Transact is a very

21   good product, we find ourselves in sales situations

22   where we're going head-to-head with some of the biggest

23   companies in the world.  It's hard to compete as a small

24   company on that basis.

25      Q     It's just the old thing of a company with

1   eight to ten employees has trouble competing against IBM

2   and Microsoft?

3        A    Well, that's the first part.  The second part

4   is -- is we're small, and we feel that we put a lot of

5   support into our current customers.  But in the end --

6   and we've had it happened to us many times, that, in

7   fact, a sales situation we were up against Oracle, and

8   we were doing very well, and we thought the customer

9   might choose us, and in the end they went with Oracle

10  because Oracle said we'll just throw it in for free.

11            Now Oracle is selling the customer lots of

12  other software, millions of dollars of software,

13  database and otherwise.  But we can't afford to give our

14  product away for free.

15       Q    So when it came down, though, to a decision,

16  basically, they had evaluated, and your engineers had

17  made presentations and Oracle's had made presentations?

18       A    Months and months.

19       Q    Transact versus Oracle?

20       A    Uh-huh.

21       Q    Is that it?

22       A    That's it.

23       Q    But Oracle, of course, doesn't sell just

24  E-commerce.  They have a lot of other programs that that

25  customer was going to be buying as well?

1    A    Yes.

2    Q    Millions of dollars worth?

3    A    Millions of dollars.

4    Q    And what wound up happening to you was, when

5   it got close, Oracle just said:  We'll give you the --

6   we'll give you our E-commerce program for free if you

7   buy the rest of it?

8    A    Right.

9    Q    So it was your price versus free.

10   A    Hard to compete with that, yes.

11   Q    So do you continue to try to sell Transact?

12   A    We do.

13   Q    And -- but let me just ask you the bottom

14  line.

15        Despite all of these obstacles in the way of

16  trying to get it raised up from the ashes and compete

17  against the big boys, so to speak, has the software side

18  of the business been profitable for your investors?

19   A    Transact has been profitable every year since

20  the very beginning we owned it.

21   Q    From the very first year, you were able to

22  turn a profit?

23   A    Yes.

24   Q    And you've turned a profit every year on the

25  software side; is that correct?

```
 1      A    That is correct, yes.

 2      Q    All right.  Well, let's turn now and talk a

 3 little bit about the other side of Soverain's business,

 4 and that is their property, their intellectual property,

 5 their patents, and your licensing program.

 6           How long did it take you and Ms. Andrysiak to

 7 get the software side stabilized enough where you could

 8 turn your attention over to the patent portfolio?

 9      A    Probably four to six months before we were

10 able to look toward the patents.

11      Q    All right.  Now, how do you go about doing the

12 licensing or patent licensing part of the business?  Do

13 you do that entirely in-house, or do you have outside

14 help?

15      A    It requires outside counsel.

16      Q    Okay.  So you employ outside counsel to assist

17 you with the licensing process?

18      A    That's correct.

19      Q    And what does that entail?  What kind of work

20 do those lawyers do and the consultants that they hire?

21      A    We have to figure out who might be a possible

22 licensee.  We have to analyze, to the extent we can, the

23 way their system operates on the web, and then we have

24 to file suit.

25      Q    Okay.  How do you go about -- when you've
```

1  identified somebody that you believe is using your

2  patented technology that you think should be paying for

3  the right to use your technology, how do you go about

4  convincing them to do it?

5      A    Well, it used to be that you would send

6  letters or you'd get in contact with them somehow, and

7  you would say, we would like to engage with you in a

8  licensing conversation regarding certain patents.

9      Q    Okay.  So you'd tell them you think they need

10 a license and ask them to sit down and have a business

11 conversation?

12     A    Right.

13     Q    But you don't do that anymore; is that right?

14     A    No.

15     Q    In today's legal culture?

16     A    Yeah.  The rules have changed in recent years

17 especially, that if you were to -- especially as a small

18 company -- to contact a company about licensing your

19 patents, that it would leave you open to being sued

20 immediately.

21     Q    So they can file a suit to claim your patents

22 invalid, and they get to pick where they file it.

23     A    Correct.

24     Q    And if you contact several companies, you may

25 wind up defending the validity of your patents from

1   Seattle to Florida --

2        A    That's right.

3        Q    -- to California --

4        A    Which --

5        Q    -- right?

6        A    -- we just can't afford.

7        Q    So the situation now is, I guess, you sue

8   first and talk later?

9        A    Unfortunately, yes.

10       Q    All right.  Now, with this system, have you

11  successfully licensed your patents?

12       A    We have.

13       Q    All right.  Give the jury an indication of

14  some of the major retailers in online shopping that have

15  taken a license, even though they got contacted first

16  with a lawsuit.

17       A    Well, Amazon, Gap, Zappos, TigerDirect,

18  Shutterfly, Redcats USA.

19       Q    All right.  Do you consider your licensing

20  program then to be successful?

21       A    I do.  We do.

22       Q    And the fact is that I guess out of the first

23  seven companies that you have tried to persuade to get a

24  license, six of them now have a license?

25       A    That is correct.

1    Q    Okay.  And the answer to the question about

2    what are we doing here, the company that you still

3    believe is using your technology without permission and

4    isn't willing to pay for it is Newegg?

5    A    That's correct.

6    Q    And that's why we're here today, and that's

7    why we've got this lawsuit?

8    A    That's correct.

9            MR. ROTH:  We'll pass the witness, Your

10   Honor.

11           THE COURT:  All right.  Cross-exam?

12           MR. SAYLES:  May it please the Court.

13               CROSS-EXAMINATION

14   BY MR. SAYLES:

15   Q    Ms. Wolanyk, with Mr. Roth's introduction, I

16   do want to assure you I mean you no disrespect in asking

17   you questions here today, but you understand that you

18   are here as a corporate representative of Soverain, the

19   party that brought this lawsuit.

20   A    I do.

21   Q    And like so many people in this room, you too

22   are a lawyer --

23   A    I am.

24   Q    -- by training and education.

25   A    That's correct.

1    Q    And even though you're not a litigation

2  lawyer, you have worked with litigation lawyers very

3  closely in your business; isn't that so?

4    A    That is very so.

5    Q    And you told us that this was the first time

6  that you had the testified in a courtroom a little

7  earlier, right?

8    A    That's correct.

9    Q    But you have given what are called

10  depositions, haven't you?

11    A    I have, yes.

12    Q    And you do understand the importance of a

13  deposition, don't you?

14    A    I do.

15    Q    It's under oath, just like in court?

16    A    That's correct.

17    Q    And your lawyer is there, and the other lawyer

18  who you're adverse to is there; is that right?

19    A    All kinds of lawyers, yes.

20    Q    And I suppose, in preparation for your

21  testimony today, you probably reviewed your depositions,

22  didn't you?

23    A    I did.

24    Q    And as I ask you some questions this

25  afternoon, can I rely on your depositions?

1        A    You may.

2        Q    You answered some questions to Mr. Roth about

3    the installation of Transact, the hookup and

4    installation.

5             Do you recall that subject?

6        A    I do.

7        Q    Isn't it true that Soverain has not licensed

8    the Transact product to any licensee that was not first

9    licensed by Open Market?

10       A    I said as much, yes.

11       Q    So with respect to these hookups and

12   installations, since around 2001 there haven't been any

13   new customers of Transact; isn't that right?

14       A    That is correct.

15       Q    So we have a nine-year period where there have

16   been no new customers who have gotten a hookup or an

17   installation of this Transact product?

18       A    That's not correct.

19       Q    No new customers that weren't first licensed

20   by Open Market?

21       A    That part is correct.

22       Q    All right.  And Open Market, to be clear,

23   began selling Transact in 1996.  You know that history,

24   don't you?

25       A    I do.

```
 1      Q    And the Transact product actually incorporates

 2 and reflects each of the claims that are asserted in

 3 these patents in this case; isn't that right?

 4      A    The Transact product was developed at that

 5 time, yes.

 6      Q    And Open Market's assets were purchased by

 7 Divine in 2001; isn't that right?

 8      A    Yes.

 9      Q    And since then, Divine has gone out of

10 business; is that right?

11      A    Yes.

12      Q    And you indicated to the jury that Open Market

13 was successful with Transact.  But the fact is, Open

14 Market never made a profit with Transact; isn't that

15 right?

16      A    Open Market was operating at a time where

17 companies took their money and put it into building the

18 business faster and faster.  So Open Market may not have

19 been profitable, but the Transact product was

20 successful, which, I think, is what I testified.

21      Q    All right.  Let me restate the question that I

22 just asked you.

23           Even though Open Market sold the Transact

24 product, Open Market never made an operating profit;

25 isn't that so, ma'am?
```

1    A    I don't know for certain, but I would guess
2  that to be the case.
3    Q    Divine acquired the rights to Transact and the
4  patents from Open Market, correct?
5    A    Divine acquired all of Open Market.
6    Q    All of Open Market, which included Transact
7  and included the patents; isn't that right?
8    A    That's true.
9    Q    And even though Divine had those rights and
10  others, Divine lasted about 15 months; isn't that true?
11    A    Divine was in existence for four years.
12    Q    After it acquired Open Market, it lasted about
13  15 months; isn't that so?
14    A    That's correct.
15    Q    Would you agree that Newegg is not a
16  competitor of Soverain?
17    A    For the most part, yes.  With the launch of
18  Newegg Mall, arguably they're providing software to sell
19  online, so I guess you would consider that a bit of a
20  competitor.
21    Q    But mostly Newegg would fall in the category
22  of what you would call a potential customer --
23    A    Yes.
24    Q    -- isn't that right?
25    A    Yes.

1    Q    And Mr. Roth brought this out, but even though

2    you would consider them a potential customer, they were

3    not approached about a license to Transact before the

4    suit was filed.

5    A    That's correct.

6    Q    These patents-in-suit have been licensed from

7    time to time; isn't that right?

8    A    Yes.

9    Q    So we're talking about two different types of

10   licenses:  Patent licenses and then Transact licenses.

11        Two different things, right?

12   A    Very different things, yes.

13   Q    And with regard to the patent licenses --

14   licenses that have been entered into, isn't it correct

15   that they have all been lump sum except for one?

16   A    There are over 40 licenses, and I can't say

17   I've got them all memorized, to be honest, but I would

18   say you're correct.  The bulk of them are lump sum.

19   Q    Okay.  And by lump sum, what we mean is that a

20   party that's getting a license pays a negotiated fee

21   upfront for a license that extends the life of the

22   patent.  That's the concept, isn't it?

23   A    That's correct.

24   Q    And that's contrasted from what's called a

25   running royalty where a party might pay on a transaction

1   basis or year to year, isn't it?

2       A    Yes.

3       Q    And from Soverain's standpoint, it would like

4   to have a running royalty in certain situations; isn't

5   that right?

6       A    We are willing to entertain it, sure.

7       Q    But the licensees, for the most part, have

8   insisted on these lump-sum licenses; isn't that so?

9       A    True.

10      Q    With respect to Transact, you've talked, in

11  response to Mr. Roth's questions, about ongoing fees.

12           Those ongoing fees are for maintenance and

13  services; isn't that right?

14      A    The maintenance support ongoing fees are.  We

15  also have customers who do custom engineering work, and

16  that's separate, and that can be ongoing.

17      Q    And as a matter of fact, there are licensing

18  fees for those customers who do use Transact; isn't that

19  right?

20      A    That's true.

21      Q    And those, too, are, without exception,

22  lump-sum upfront amounts; isn't that so?

23      A    I believe that's correct.

24      Q    Ms. Wolanyk, you understand that the damages

25  are measured by a reasonable royalty, and that's what

1   you've told the jury that you're seeking here; is that

2   right?

3        A    Yes.

4        Q    And you understand from this case, that the

5   hypothetical negotiation to establish that royalty would

6   have occurred in 2001, the time of the alleged first

7   infringement.

8        A    Yes.

9

10       Q    And at that time, it was Open Market that

11  owned these patents, wasn't it?

12       A    Yes, I believe so.

13       Q    So if we go to the hypothetical negotiation,

14  at the table, we would have Open Market on one end and

15  Newegg on the other end; is that right?

16       A    At that timeframe, yes.

17       Q    Right.  And in January of 2001, Open Market

18  was about nine or ten months from being completely

19  acquired; isn't that right?

20       A    Yes.

21       Q    And you understand from what you've heard in

22  the courtroom and your knowledge of history, that Newegg

23  was a new "up-start" company itself in 2001; isn't that

24  right?

25       A    I thought --

1      Q    You don't know that?

2      A    I thought that they had had a computer

3  business or something at that point.

4      Q    They did.

5           You know that they were not an online retailer

6  of electronics until 2001.

7      A    That I do know, yes.

8      Q    And you -- you've seen their -- the numbers on

9  them.  It's been talked about in the courtroom.  And

10  they've been growing, right?

11     A    Correct.

12     Q    And it's fair to say that compared to today,

13  it's a much different picture than it was in 2001 for

14  Newegg; isn't that right?

15     A    They are much more established now, yes.

16     Q    Right.  In terms of the number of sales, they

17  have many more today than they did in 2001, right?

18     A    Yes.

19     Q    Their -- their status and future is much more

20  secure today than it would be in 2001; wouldn't that be

21  a fair statement?

22     A    Seems so, yes.

23          You know that Open Market itself actually

24  licensed these patents-in-suit at least a few times.

25          You know that from the history --

1        A    I do.

2        Q    -- and the acquisition, don't you?

3        A    I do.

4        Q    And prior to around 2002, the largest license

5    was to Johnson & Johnson, isn't that right, for these

6    patents?

7        A    I'm sorry.  The timeframe prior to --

8        Q    Well, let me -- let me just ask you, if you

9    would, to look at Exhibit 223, because I realize there's

10   a lot of paper here.

11            I'll ask you if you recognize this as a patent

12   license agreement that's in evidence dated June the 5th,

13   2000 -- between Open Market on the one hand and Johnson

14   & Johnson Vision Care on the other hand.

15       A    Yes.

16       Q    And from your knowledge of Soverain and its

17   representative, you're aware of this piece of history --

18       A    Oh, yeah.

19       Q    -- aren't you?

20            And Johnson & Johnson Vision Care is the

21   company that makes contact lenses that is almost a

22   common household name; is that true?

23       A    I think so.

24       Q    And if you turn to Page 2 of the license,

25   under license grant to licensee, is it correct that Open

1    Market hereby grants the licensee a non-exclusive,

2    worldwide, paid-up license under the licensed patents to

3    make, have made, and use licensed products in and for

4    the field of use.

5              That was the breadth of the license, wasn't

6    it?

7        A    Yes.

8        Q    And the license fee is in Paragraph No. 3

9    right below that.

10             Do you see that?

11       A    I do.

12       Q    And that was for Open Market to pay a

13   one-time, non-refundable license fee of $100,000; is

14   that right?

15       A    Yes.

16       Q    And isn't it true that up until the time of

17   the hypothetical negotiation, this license would have

18   been the largest license fee ever achieved by Open

19   Market for these patents?

20       A    I think that's right.

21       Q    I -- I think this is clear, and I'm going to

22   move through it very quickly.  If I -- if I lose you,

23   you tell me, and I'll slow down, all right?

24       A    All right.

25       Q    Soverain is not the one that originally

1  developed this technology.  That's obvious, correct?  It

2  was the inventors at Open Market.

3      A    That originally developed it, yes.

4      Q    And let me see if I have this correct.  You

5  have acknowledged that Open Market went out of business

6  by virtue of the acquisition by Divine.

7      A    They -- they stayed in existence as a legal

8  entity, but as a separate, standalone business, yes.

9      Q    But not doing business, just as an entity; is

10 that right?

11     A    That's right.

12     Q    So if we say that by virtue of the

13 acquisition, Open Market went out of business, that

14 would be true, wouldn't it?

15         It still existed as an entity, but it wasn't

16 doing business, right?

17     A    It wasn't doing business as a standalone, but

18 its products and such were still being sold.  That's the

19 thing I'm struggling with.

20     Q    Well, its products were being sold by Divine

21 Technologies once the company was acquired; isn't that

22 true?

23     A    That is true.

24     Q    You mentioned that Transact has been a

25 profitable -- profitable product for Soverain.  Do you

1  remember Mr. Roth asking you about that?

2      A    I do.

3      Q    I'm going to ask you to turn to Exhibit 250 in

4  your book there that I have before you, and tell me when

5  you're there.

6      A    I am.

7      Q    Isn't it correct that this document reflects

8  income and expense relating to Transact only?

9      A    Yes.

10     Q    And this document does not include expenses,

11 such as salaries, does it?

12     A    It does for the entire engineering team,

13 anyone who works on Transact.

14     Q    Do you recall at your deposition -- and I can

15 show it to you, if you need me to -- at Page 136, where

16 you said that this document does not include salaries

17 and rent?

18     A    It doesn't include my salary, and it doesn't

19 include rent, you are correct.

20     Q    And Soverain's salaries for personnel are

21 around $300,000 a year; is that right?

22     A    Yes.

23     Q    And rent is around $60,000 a year; is that

24 right?

25     A    That is correct.

1    Q    And there are other costs, such as telephone,

2  accounting costs, and the like; isn't that true?

3    A    That's true.

4    Q    That are not shown here; isn't that correct?

5    A    That's right.

6    Q    And so at a minimum, you've indicated there

7  are at least $360,000 each year in expenses that are not

8  shown on this sheet in salaries, rent.  That's 360,

9  right?

10    A    That might be right.  Those other --

11    Q    Okay.

12    A    Those other expenses are more corporate, but

13  yes.

14    Q    All right.  You're not quibbling with me.  I

15  could show you on Page 136 and 138 of your deposition

16  where you verified that.

17         You're not contesting that, are you?

18    A    No, I'm not contesting it.

19    Q    Okay.

20    A    I'm just explaining it.

21    Q    All right.  So the numbers that are shown on

22  the net income line for the Transact product that show

23  positive numbers, those don't really represent take-home

24  profit or put-it-in-the-bank money, do they?

25    A    As we look at the Transact business, it does.

1      Q      Before expenses that I've covered with you; is

2  that right?

3      A      There would be -- I guess there could be an

4  allocation of a portion of the corporate expenses that

5  could be added to this.

6      Q      All right.  So it depends on how you allocate

7  expenses, but if you allocate them one way, one could

8  say that Transact has lost money every year; isn't that

9  right?

10     A      It could.  That's not how we account for it,

11 but it could, yes.

12                  MR. SAYLES:  May I approach the Bench,

13 Your Honor?

14                  THE COURT:  Yes, you may.

15                  (Bench conference.)

16                  MR. SAYLES:  You asked that I approach

17 the Bench before attempting to get into the purchase

18 price for these patents-in-suit.  And remember, the

19 argument was it was purchased in bankruptcy.

20                  At this time, I would request that the

21 Court allow me to prove from the contract the purchase

22 price of the patents was $590,000.  And with respect to

23 the bankruptcy aspect, I have two exhibits that shows

24 the multiple bidders available.

25                  THE COURT:  Shows what?

1              MR. SAYLES:  Multiple bidders available

2    for that bankruptcy auction.  So I would submit that,

3    therefore, I should be allowed to establish the purchase

4    price.

5              MR. SATINE:  Your Honor, we would renew

6    the argument we did with respect to the MIL.

7              THE COURT:  The what?

8              MR. SATINE:  The motion in limine.

9    Motion in Limine No. 1 that you granted.

10             One, the bankruptcy auction is two years

11   past the date of the hypothetical, has no relevance to

12   the hypothetical negotiation.  Different party.

13   Different party and it's after the hypothetical

14   negotiation.

15             And, two, it's prejudicial under 403.

16             Three, it's highly prejudicial now after

17   Ms. Wolanyk has testified about how the assets moved.

18   It makes it appear as if she's been hiding something

19   from the jury and trying to hide the fact it was a

20   bankruptcy.

21             So it's not relevant.  It's prejudicial,

22   regardless.  It was prejudicial before.  It's more

23   prejudicial now.

24             THE COURT:  Counsel?

25             MR. SAYLES:  Yes, sir.

1                    THE COURT:  What's the jury going to

2     think if this is two years after the hypothetical

3     negotiation?

4                    MR. SAYLES:  My response to that is -- my

5     response to that is that it still goes to the value of

6     the patents at the time of the hypothetical negotiation,

7     because licenses and other indications of value provided

8     at the hypothetical negotiation are sometimes permitted.

9                    THE COURT:  Well, if I let that in, do

10    you want me to let in what Amazon paid them?

11                   MR. SAYLES:  No, I don't.

12                   THE COURT:  Then I wouldn't offer that,

13    if I were you, because if I let that in, I'm going to

14    let the Amazon stuff in, if they want to put it in.

15                   What's good for the goose is good for the

16    gander.

17                   If you're going to get into this stuff

18    after it and they want to, y'all have at it; but just

19    realize you're not going to get half of it.  You're

20    going to get the whole thing.

21                   MR. SAYLES:  Okay.  Would you give me

22    just a moment to confer with my client on that issue?

23                   THE COURT:  We'll go ahead and take our

24    break at this time.

25                   MR. SAYLES:  Okay.

```
 1                    (Bench conference concluded.)

 2                    THE COURT:  Ladies and Gentlemen of the

 3   Jury, we're going to go ahead and take our afternoon

 4   break at this time.  We'll be in recess until 2:40.

 5                    Please remember my instructions.

 6                    COURT SECURITY OFFICER:  All rise.

 7                    (Jury out.)

 8                    (Recess.)

 9

10                    (Jury out.)

11                    THE COURT:  Mr. Sayles, did you come to a

12   conclusion whether you want to pursue that line of

13   questioning?

14                    MR. SAYLES:  No, Your Honor, I do not

15   want to pursue that.  I might have another question or

16   two.

17                    THE COURT:  Bring the jury in, please.

18                    COURT SECURITY OFFICER:  All rise for the

19   jury.

20                    MR. ADAMO:  I guess I don't get Christmas

21   early this year, Judge.

22                    (Jury in.)

23                    THE COURT:  Please be seated.

24                    MR. SAYLES:  May it please the Court.

25                    THE COURT:  All right.  Mr. Sayles, you
```

1    may proceed.

2        Q    (By Mr. Sayles) Ms. Wolanyk, just another

3    minute or so.

4        A    Okay.

5        Q    Have you done your best to give me your best

6    and most honest answers?

7        A    I have.

8        Q    And when you told me that predominantly the

9    license agreements prior to the hypothetical negotiation

10   were of the lump sum variety, that's the way it was,

11   isn't it?

12       A    Of the ones I'm recalling, yes.

13       Q    Yes.  And in this case I need to ask you this:

14   In addition to being the chief executive officer of

15   Soverain, you also have an ownership interest in the

16   company, don't you?

17       A    I do.

18       Q    And to some extent, your bonus or compensation

19   could be related to the outcome in this case; isn't that

20   right?

21       A    That's -- that's correct.

22       Q    Okay.

23            MR. SAYLES:  Pass the witness.

24            THE COURT:  All right.  Redirect.

25                    REDIRECT EXAMINATION

```
 1   BY MR. ROTH:
 2       Q    Ms. Wolanyk, how much -- what percentage of
 3   the stock in Soverain do you own?
 4       A    Five percent.
 5       Q    And how did you earn your equity interest of
 6   five percent?
 7       A    I worked for a year without a salary.
 8       Q    So your first year you agreed with the
 9   investors that you wouldn't get paid a salary, and in
10   exchange at the end of the year they would give you five
11   percent of the company?
12       A    That's right.  We were a startup.
13       Q    Yeah.  All right.
14            Now, if anyone got the impression from the
15   questions or the way Mr. Sayles phrased his question
16   about Divine bought Open Market and 15 months later it
17   went broke, Open Market had nothing to do with the
18   demise of Divine, did it?
19       A    I think actually Open Market was one of
20   Divine's success stories.  It was just a bigger, much
21   bigger problem.
22       Q    So Open Market was one of the good purchases
23   they made?
24       A    It was the best, I thought.
25       Q    And, if anything, Divine took down Open
```

1  Market, not vice versa?

2      A    It could be argued, yes.

3      Q    All right.  Now, you were asked a question

4  about the Johnson & Johnson agreement.

5              MR. ROTH:  Is that 223, I think?  Would

6  you bring that up, please?

7      Q    (By Mr. Roth) We put that up there, and

8  Mr. Sayles asked you about the license fee being -- I

9  believe it was a hundred thousand dollars, wasn't it?

10  It's on the second page where he --

11              MR. ROTH:  Pull up the second page.

12     A    Yes.

13     Q    (By Mr. Roth) He read this part to you, I

14  think, where they -- they Johnson & Johnson paid a

15  hundred dollars for this license to the patent?

16     A    Yes.

17     Q    And actually it was to one patent, wasn't it?

18     A    That's correct.

19     Q    Only one patent?

20     A    Only one patent.

21     Q    Second thing is -- is that he read to you

22  about, it was the granted clause -- which if you will go

23  up, I believe it's up underneath here -- by granting a

24  worldwide license.  A worldwide paid-up license to make

25  and have made and use licensed products in and for the

1  field of use.

2           Do you see that language?

3     A    I do.

4     Q    Field of use.  All right.

5           MR. ROTH:  Let's go back, if you would,

6  to the first page.  Let's see what this really involves.

7           If you would, you blow up the background,

8  then this part right here starting with licensee.

9     Q    (By Mr. Roth) The licensee is a worldwide

10  company that operates various intranet and internet

11  sites for its internal business purposes.

12          See that?

13    A    I do.

14    Q    What's that mean?  What's an intranet?

15    A    An intranet typically is a website that's

16  accessible only to employees of a company inside the

17  company.

18    Q    It's a private network within the company?

19    A    Right.

20    Q    Is that right?

21    A    That's correct.

22    Q    Not accessible to people outside the employees

23  of the company?

24    A    Correct.

25    Q    So -- and accordingly -- the next sentence:

1            Accordingly, the licensee desires a license

2   for the licensed products as defined below in and for

3   the field of use, the field of use, defined below.

4            Then it defines field of use to be what?  See

5   that next clause?

6       A    I do.  Would you like me to read it?

7       Q    Yes.  Just read the first sentence there.

8       A    The development and operation of intranet and

9   internet websites by licensee, solely for licensee's

10  internal business purposes.

11      Q    All right.  So this isn't a license to the

12  patents for anything but a very limited purpose; is that

13  correct?

14      A    That's correct, and just for one patent.

15      Q    For one patent only for internal use, not for

16  the internet, not for selling goods on the internet; is

17  that right?

18      A    That's correct.

19      Q    Okay.  That's not anything like the type of

20  license that would be required to license all of the

21  patents-in-suit to run a website like Newegg runs?

22      A    That's correct.

23      Q    Farthest thing from being similar, isn't it?

24      A    Very, very different things.

25      Q    Now, you were asked -- and I think it was 250

1  was the other exhibit.

2           MR. ROTH:  If you could, would you bring

3  that up.  Blow that up where we can see it.  We never

4  did get to see it.

5       Q    (By Mr. Roth) This was an exhibit you were

6  shown on cross-examination.  And can you tell the jury

7  what that is?

8       A    This is the -- the income statement for just

9  the Transact software business.

10      Q    All right.  And that's the actually part of a

11  larger document that was produced and that they talked

12  to you about at your deposition; wasn't it?

13      A    That's correct.

14      Q    And it was all the financial statements for

15  these periods?

16      A    That's correct.

17      Q    All right.  This is a page, according to

18  your -- the way you do your corporate accounting, where

19  you list your total revenue that's related strictly to

20  Transact software; is that right?

21      A    Yes.

22      Q    And the total expenses that are listed are

23  what expenses?

24      A    They're all the expenses that are directly

25  attributable to the Transact business.

```
 1      Q    So that's the software engineers?

 2      A    Yes.

 3      Q    That's the people that work on the project;

 4 that would be the consulting fees that you might have

 5 paid in any given year?

 6      A    Correct.  Any marketing fees that are specific

 7 to Transact, anything of that nature.

 8      Q    Okay.  Now, the consolidated statement that

 9 this was a part of would show the information for that

10 same period of time that considers all of your expenses?

11      A    Correct.

12      Q    And all of your income?

13      A    Correct.

14      Q    Your licensing, royalty income; is that right?

15      A    Right.

16      Q    It would also include your attorney's fees,

17 your expenses?

18      A    Correct.

19      Q    Your office overhead?

20      A    The corporate overhead.

21      Q    Everything?

22      A    Yes.

23      Q    The consolidated statement, if we were looking

24 at that, does that reflect that, on behalf of your

25 investors and five percent for yourself, you have made
```

1    money in your operations of the Soverain software

2    business?

3        A    Well, there are expenses involved with

4    litigation, and so there are years where we don't.  But

5    on average, for our entire existence, we have overall

6    been several million dollars in profitability.

7        Q    You've averaged several million dollars a year

8    on the average --

9        A    Right, a year.

10       Q    -- since you took it over?

11       A    Correct.  On average.

12            MR. ROTH:  We'll pass the witness, Your

13   Honor.

14            THE COURT:  All right.  Recross.

15                 RECROSS-EXAMINATION

16   BY MR. SAYLES:

17       Q    Ms. Wolanyk, you were in the courtroom when

18   you heard the '780 patent is sort of the parent of the

19   patents-in-suit, weren't you?

20       A    It's the -- of one of the patents, the '639,

21   yes.

22       Q    That's right.  And, in fact, it's even up here

23   in the box; isn't that right?

24       A    It is, for that reason.

25       Q    And if we go to Exhibit 223, Paragraph 1(c)

1    down at the bottom, 1(c).

2        A    Yes.

3        Q    It says there that the licensed patents means

4    U.S. patent '780, including divisionals, continuations,

5    and reissues, and all foreign counterparts; is that

6    right?

7        A    That's correct.

8        Q    So the way license agreements are known and

9    understood, this license agreement actually did cover

10   more than the '780 patent, didn't it?

11       A    I was referring of the patents-in-suit, it

12   covers one of the patents-in-suit, the '639 patent.

13                   MR. SAYLES:  Pass the witness.

14                   THE COURT:  Anything further?

15                   MR. ROTH:  No further questions, Your

16   Honor.

17                   THE COURT:  All right.  You may step

18   down.  Thank you.

19                   Who will be your next witness, Mr. Adamo?

20                   MR. ADAMO:  Your Honor, our next and last

21   witness will be Mr. Jim Nawrocki, our damages expert.

22                   And with the Court's permission,

23   Mr. Satine will handle that examination.

24                   THE COURT:  Very well.  Mr. Nawrocki.

25                   How long do you anticipate this witness

 1  will take, Mr. Nawrocki?

 2              MR. SATINE:  Approximately one hour, Your

 3  Honor.

 4              THE COURT:  One hour, very well.

 5              MR. ADAMO:  Our expectation, Your Honor,

 6  is that we are hoping we may rest before the end of the

 7  day.

 8              THE COURT:  I hope so, too.

 9              MR. ADAMO:  That's up to my other

10  sparring counsel here, sir.

11              THE COURT:  Thank you.

12              Mr. Sayles, there is a chance they may

13  rest this afternoon.  If they do, will you be prepared

14  to go forward?

15              MR. SAYLES:  Yes, we will.

16              THE COURT:  Very well.

17              MR. SATINE:  With the Court's permission.

18              THE COURT:  You may proceed.

19        JAMES NAWROCKI, PLAINTIFF'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MR. SATINE:

22      Q    Mr. Nawrocki, would you please introduce

23  yourself to the Ladies and Gentlemen of the Jury by

24  telling them who you work for and what you do?

25      A    My name is James Nawrocki, and I'm president

1   of IPFC Corp.  IPFC Corp is located in Houston.  We also

2   have an office in Austin.  And I provide financial

3   consulting services.

4        Q    What kind of financial consulting services

5   does IPFC Corp provide?

6        A    We provide financial consulting service mostly

7   in the areas of intellectual property.  Intellectual

8   property such as patents, trademarks, and copyrights.

9             And that would involve valuations, assistance

10  with companies on licensing, as well as damage analysis.

11       Q    How many years of experience do you have in

12  this area?

13       A    I've worked in the area of financial

14  consulting and intellectual property matters since '82.

15  So more than 25 years.

16       Q    And can you please tell the jury how you got

17  into this area of work?

18       A    Yes.  I actually started -- I'm a CPA, and I

19  started doing work in accounting and auditing with a

20  large CPA firm.  And as part of that work, occasionally

21  we'd have requests for assisting companies that were

22  involved in intellectual property matters.

23             And so the first case I was involved in was

24  back in the early '80s, and one case led to another.  So

25  now I spend the majority of my time in the area of

1    intellectual property valuations.

2        Q    Now, you've prepared some demonstratives to

3    help us move efficiently through your testimony because

4    we have a lot of material to work through.  So let's put

5    the first one up on the screen, and you should be seeing

6    a copy on your screen once we get it there.

7            Mr. Nawrocki, what are we seeing on the left

8    side of the screen and what are we seeing on the right

9    side of the screen?

10       A    Okay.  So this is a -- what's called a

11   curriculum vitae or a CV.  It's my background.  The left

12   side is the front page of my background.  You will see

13   my logo, the IPFC logo up in the upper left-hand corner.

14           And on the right side I've just highlighted

15   several parts of my experience.

16       Q    Okay.  And have you ever served as an expert

17   witness on damages analysis in a patent case?

18       A    Yes, I have.  I've been asked to serve on --

19   as a damage expert in several cases.  I'd say there's

20   probably been more than a hundred cases I've been asked

21   to render an opinion.  Some of those cases have gone to

22   trial, some have not.

23       Q    Can you tell us about some of those patent

24   cases in which you have served as an expert witness?

25       A    The cases are involved in a lot of high-tech

1    areas.  I've done some work for Texas Instruments here

2    in Texas.  Also worked for Yahoo!, the internet company.

3    They had a dispute with Google involving search

4    technology.  They also had a case involving FindWhat, a

5    smaller search company.  So I worked on behalf of them

6    in terms of their search technology in a patent

7    infringement matter.

8           I've also worked on a case involving

9    Microsoft's Internet Explorer product, the browser that

10   we've heard some discussion of.  I worked in evaluating

11   the patents related to that.

12          I've also work for several universities; the

13   University of California, as well as the University of

14   Texas.  Several universities have intellectual property

15   departments.  As part of their research they'll develop

16   patents.  And so I've worked with the University of

17   Texas as well.  The case with them involved hybrid

18   batteries that are used in some of the hybrid cars and

19   computers and things such as that.

20   Q    And can you tell us about some of the courts

21   in which you have testified in the past?

22   A    I have testified in Texas in several of the

23   courts.  Over in Marshall, Lufkin, Houston, Austin,

24   Dallas, so in several courts in Texas.  As well as

25   nationally, Delaware and various other jurisdictions

1    across the country.

2        Q    Now, in this case you have been called as an

3    expert witness by the Plaintiff, Soverain Software?

4        A    That's correct.

5        Q    When you testify as an expert, do you always

6    testify as an expert for the plaintiff?

7        A    No.  I work for plaintiffs and as well --

8    defendants as well.

9        Q    How are you paid for your work as an expert?

10       A    My firm is paid for our time based upon an

11   hourly basis for my time, as well as the time of the

12   people working with me.

13       Q    Is the payment of work contingent on the

14   outcome of the trial?

15       A    No, it's not.

16       Q    What have you been asked to do in this case?

17       A    What I've been asked to do in this case is

18   review the financial information that's been produced by

19   the parties, do my own research of any publicly

20   available information, review deposition testimony.

21           I've been here in court to hear the testimony

22   as well.  As well as render an opinion in terms of what

23   the damages are as a result of the alleged infringement

24   by Newegg.

25       Q    Do you have an opinion as to the reasonable

1    royalty damages to which Soverain is entitled due to

2    Newegg's infringement of the patents-in-suit?

3         A    Yes, I do.

4              MR. SATINE:  Let's go to the next

5    demonstrative, please.

6         Q    (By Mr. Satine) What are we looking at here?

7         A    So this is taken from the U.S. Code.  It's a

8    statute -- part of the statute for remedies for patent

9    infringement.  So when there's patent infringement, the

10   Code provides some overall guidance.

11             It states that:  Upon finding for the

12   claimant, the Court shall award the claimant damages

13   adequate to compensate for the infringement, but in no

14   event less than a reasonable royalty -- so reasonable

15   royalty represents a floor level of damages -- for the

16   use made of the invention by the infringer.

17             So this provides the overall guidance from a

18   damages determination that I used as part of my

19   analysis.

20        Q    Okay.  The jury has heard a bit about

21   royalties and comparisons to things.  Do you have a

22   slide on royalties?  It's the next one.

23             MR. SATINE:  Can you put that up?

24        Q    (By Mr. Satine) If you could you walk us

25   through this?

1      A    Yes.  I think this has been used in a couple

2    of different examples in terms of talking about what a

3    royalty is.  And we're all used to paying rent on a

4    house or rent on, you know, a car or something like

5    that.  So when you have a house, there's a landlord and

6    a tenant.  They enter into a relationship, and it's

7    usually a lease agreement, and that will be a payment

8    that would be in terms of rent is what it would

9    typically be.

10            Intellectual property is like a patent or a

11   trademark, something like that.  Here we've got a

12   patent.  The relationship there is a licensor, who owns

13   the patent, and then a licensee, he's who is going to

14   seek to use the patent.  They enter into a license

15   agreement, and a royalty is paid for that.

16            So the royalty represents, basically, a rent

17   for that patent.  You don't own the patent, but you're

18   paying a rent for your use of the patent.

19      Q    As an expert, how do you go about deciding

20   what is a reasonable royalty to be paid by someone who

21   infringes a patent owner's rights?

22      A    Well, there's several things.  There is the

23   component of what's the royalty base; that's one

24   component.  The other thing is determining what the

25   royalty rate is that you applied to that.  And we will

1   be talking about that in a second.

2          The royalty rate is determined based upon a

3   review of some factors called Georgia-Pacific Factors.

4   There's 15 factors that came out of a decision about,

5   oh, back in the '70s that cited 15 factors.  And that's

6   one of the considerations that I've made in determining

7   the royalty rate in this case, or royalty amount in this

8   case.

9      Q    You did a Georgia-Pacific analysis in this

10  case?

11     A    That is correct.

12          MR. SATINE:  If we can please have the

13  next slide.  Let's go back.  I'm sorry.  I'm getting

14  ahead of myself.

15     Q    (By Mr. Satine) What information did you

16  review and consider as part of your Georgia-Pacific

17  analysis?

18     A    Well, as I mentioned, there was various

19  information produced by Newegg, as well as by Soverain.

20  Open Market/Divine produced various information as well.

21  I looked at public information, went to the Newegg

22  website, and looked at -- did industry research as well

23  in terms of internet companies, their sales on the

24  internet.

25          Looked at public filings for Newegg.  Read

1   various depositions, technical reports, other expert

2   reports.  Had discussions with Mr. Grimes -- or Dr.

3   Grimes, I should say -- and Ms. Wolanyk.  So I've done a

4   very complete analysis of information as well as

5   discussions.

6        Q    One more thing before we get to your opinion

7   in this case.  Did you make any assumptions for purposes

8   of reaching that opinion?

9        A    Yes.  The overall assumptions I made were that

10  the patents at issue are valid, they're enforceable, and

11  they are infringed by Newegg.  As part of a damage

12  context, that's what the law provides, that we need to

13  make the assumption of validity, infringement, and

14  enforceability in order to provide the context of the

15  damages.

16       Q    So the law requires you to make those

17  assumptions?

18       A    That's right, within the context of a damage

19  analysis.

20       Q    Now, I believe you have a demonstrative which

21  summarizes your opinion as to the royalty damages to

22  which Soverain is entitled, and that's up on the screen.

23  And we can also put one on the easel, because I think

24  we're going to keep coming back to this while we put

25  other things on the screen today.

1           MR. SATINE:   Thank you.

2      Q     (By Mr. Satine) Mr. Nawrocki, can you walk us

3  through this slide?

4      A     Yes.  This is the summary of royalty damages

5  that I've calculated based upon my analysis.  This chart

6  summarizes that calculation.

7           On the left column you'll see the patents at

8  issue, the '314 patent and the '492 patents.  And then

9  below that you will see the '639 patent.  The '314 and

10  the '492 relate to the online sales system.  And then

11  the '639 the session management patent.  They've been

12  talked about quite extensively here.

13           The next column shows the royalty base.  The

14  royalty base is over 28 million transactions.  That is

15  shown in transactions -- it doesn't represent -- it's

16  not shown that way in this chart, but I think on the

17  overhead, at least on my document, shows transactions.

18           And that's what it represents.

19      Q     You are correct.  The one up on the screen

20  says transactions and the base and per transaction on

21  the royalty rate.  And it's on the board.  I apologize

22  for that.

23      A     It represents transactions.  So it's

24  28,316,504 transactions that are within the damages

25  base.  And those are Newegg's completed transactions.

1    To that I applied the royalty rate of 80 cents for the

2    '314 and '492 patents -- and that's if either or both

3    patents are found infringed and valid, as well as

4    enforceable -- to arrive at the total of 22,653,203.

5              Then the same approach I used for the '639,

6    using a different royalty rate.  So for the '639, the

7    same amount of completed transactions times the 40 cents

8    per transaction to arrive at 11,362,602.

9              The grand total of damages, based upon the

10   extent of that infringement, the extent of those

11   transactions, is 33,979,805.

12   Q    I would like to start by talking about the

13   royalty base.  The number 28,316,504 appears two times.

14            Why do we see it two times?

15   A    Because the patents -- there is two different

16   sets of patents, as I mentioned.  One is for the online

17   sales system; the other is for the session management.

18            And the same amount of transaction applied the

19   both.  The same amount of transaction is accused of

20   infringing both patents.

21   Q    Why is the royalty base the number of

22   transactions?

23   A    That -- as we talked about earlier, we wanted

24   to look at the extent of use, or the use made of the

25   invention.  I'm not sure if we had a few -- if you could

1   just go back, maybe go back a couple of charts, if you

2   would.  One more.  Yes.

3           So if you look at the bottom line for use made

4   in the invention by the infringer, that use made was a

5   lot of transactions, over 28 million transactions.

6   That's what that represents.

7           Okay.  You can go back.

8   Q    And you have some slides about use.

9           MR. SATINE:  Let's go to the next slide

10  after this one.

11  Q    (By Mr. Satine) This is entitled During

12  Infringement Period.  Can you explain that to us?

13  A    Yes.  So what I've shown on this chart is

14  Newegg's extent of use during the infringement period.

15  There was some discussion a little bit earlier about the

16  hypothetical negotiation, which we will talk about in a

17  second here, starting in early 2001.

18          So this shows their completed online sales

19  transactions -- that's Newegg's completed online sales

20  transactions -- from '01 all the way through 2010.  I've

21  estimated it through April of 2010.  I think they

22  provided us information through March.  I estimated it

23  through April 30th, basically at the end of this trial.

24  Q    Where did you get this information that we're

25  seeing on this chart?

1      A    This came from information that was provided

2  by Newegg.  Newegg produced various spreadsheets that

3  contained their completed transactions.  That's where

4  this information came from.

5      Q    Why does the infringement period begin in

6  2001?

7      A    Well, because that's when they were first

8  accused of infringing -- that coincides with their first

9  accused infringement, I should say.  That coincides with

10 their first accused infringement.

11          The damages period is a little bit less than

12 that.  We'll be talking about that in a second.

13     Q    Why is the number of completed online sales

14 transactions during the infringement period larger than

15 the royalty base on the summary of royalty damages

16 chart?

17     A    All right.  So the 54.7 million on the chart

18 above is higher than the 28.3 million.  And, again,

19 that's because the chart on your overhead, the 54

20 million, shows all the completed transactions.  However,

21 Soverain is only seeking damages from the filing of the

22 suit in November of '07.

23          MR. SATINE:  Let's go to the next chart.

24     Q    (By Mr. Satine) And what do you mean by

25 Newegg's extent of use at the top of this chart?

 1     A     Well, this is the similar information that I
 2  just showed; it's just that it shows it in a bar chart.
 3  It's the same information.  The blue bars that you see
 4  there, that represents the 28.3 million that I show on
 5  the large chart here in court.
 6           So if you add up all those blue bars from 2007
 7  to 2010, that's 28.3 million.  In fact, I put that on
 8  the top portion of the chart there.
 9           The gray areas, those are areas that they're
10  still accused of infringing, but I have not been asked
11  to calculate damages for that period.
12           As I understand, Soverain is only seeking
13  damages from the filing of suit in November of '07.  So
14  that's why that '07 bar is just the very tip of it.
15     Q     Okay.  I want to be clear on this.  The gray
16  parts that we're seeing up there, the gray bars, are
17  they included in the royalty base?
18     A     No, they're not.
19     Q     What is the relevance, if any, of the
20  pre-November 2007 transactions?
21     A     The pre-November 2007?
22     Q     The gray bars?
23     A     The gray bars?  It shows the extent of
24  infringing use.  So these were still accused of
25  infringement; but, again, for damages purposes, we're

 1   just calculating it for the blue bars.

 2        Q    Okay.

 3             MR. SATINE:  Let's look at your next

 4   slide.

 5        Q    (By Mr. Satine) This one says During the

 6   Damages Period.  Can you explain this one to us?

 7        A    Right.  So this one is -- this is the support

 8   for the calculation of the 28.3 million.  It shows it on

 9   an annual basis from November '07 through April 30th of

10   2010.

11        Q    Just so we're clear, why is the number for

12   2007 and the number for 2010 so much smaller than the

13   numbers for 2008, 2009?

14        A    Because '07 -- 2007 and 2010, those are just

15   partial years.  November through December for '07, and

16   then just January through April of 2010.  It might be

17   worth putting the numbers on the record, I guess, if you

18   would like.  1.7 million completed transactions in '07.

19   I will say 1,757,278.  Then for 2008, 10,571,583.  2009

20   would be 12,046,351.  And then for 2010 it's 3,941,292.

21   For a total of 28,316,504, which is the same on the

22   damages chart that we have.

23        Q    Mr. Nawrocki, I'm going to ask you to keep

24   your voice up just a little bit.

25        A    Okay.

1              MR. ROTH:  Ask him to move the microphone

2     closer.  When he looks away, we can't hear you at all.

3              THE WITNESS:  What about if I turn it

4     this way?

5              MR. ROTH:  We're having a lot of trouble

6     getting the right distance from it.

7     Q     (By Mr. Satine) Okay.  We've now talked about

8     the royalty base, so let's turn to the royalty rates.

9     You have two royalty rates, 80 cents and 40 cents.  What

10    kind of analysis did you do to determine those rates?

11    A     As I mentioned, I looked at the

12    Georgia-Pacific Factors, which have been identified in a

13    prior case.  What we have on the overhead here is a list

14    of those factors.  It comes from a case called

15    Georgia-Pacific versus U.S. Plywood.

16             And that was a case -- the case went on in the

17    '60s, but the decision -- one of the decisions that

18    listed out these factors was in 1970.  So, it's been

19    around for 40 years now.  And it lists out 15 factors,

20    and those are shown on the right side there.

21    Q     Okay.  And we have -- you prepared this slide,

22    which is easier to look at than trying to work through

23    those 15 factors as written by the Court.

24             MR. SATINE:  Which we'd have to go up.

25    There we go.

1    Q    (By Mr. Satine) And what's the purpose of this

2    slide, if you could just tell us that?

3    A    So this slide is a summary of those factors.

4    And I have put them into several groups for discussion

5    here today.  So this relates to the 15 factors.  It's

6    adapted from the Georgia-Pacific case.  I have put them

7    in several different groups.

8         The numbers that are shown on here coincide

9    with the numbers that were in the Georgia-Pacific case.

10   So I put them in groups of licensing factors, financial

11   and business factors, technical factors, and then other

12   considerations as well.

13   Q    Okay.  Now, we've heard a bit about

14   hypothetical negotiations.  That's factor No. 15 over

15   there on the right.  Why don't we start with that.

16   First of all, what is a hypothetical negotiation?

17   A    There's been some discussion about a

18   hypothetical negotiation.  And in a damages context,

19   what that refers to is that, because the parties haven't

20   agreed for a license in the real world, we have to go

21   back and do a hypothetical negotiation as one of the

22   factors.  Go back in time, the time of the first

23   infringement, and determine what the parties would have

24   agreed to between a licensor and a licensee as a

25   business proposition.  So that's what that refers to.

1      Q    Is a hypothetical negotiation the same thing

2  as a settlement negotiation?

3      A    No, it's not.  Because the parties haven't

4  settled the case and worked out a license, you've

5  basically got to do this hypothetical construct.  It's

6  quite a bit different.

7      Q    What if the parties of this hypothetical

8  negotiation cannot come to an agreement?

9      A    That's the difference.  In a real world

10  negotiation, one of the parties sometimes says, I'm not

11  going to take a license, you know, I'm not going to do

12  it.

13          In a hypothetical negotiation, you have to

14  work out an agreement in terms of what makes sense based

15  upon the use that's at issue, based upon the parties'

16  position at that time.

17      Q    Tell us about the hypothetical negotiation in

18  this case.  Who's there, what are they thinking, what's

19  going on?

20      A    So we've heard some discussion about it, but

21  let me try the put in it context here.

22          So what we have is we have Open Market, who's

23  at one side of the table, and Newegg is on the other

24  side.  This is basically in late 2000, early 2001.  I

25  understand that Newegg introduced this website with the

1    accused technology in early 2001.

2              So what's the situation for Open Market?  Open

3    Market had had thousands of licensees in the past.

4    We've heard that during the years they had tremendous

5    success, and then they started decreasing.

6              So at this point in time Open Market, had

7    already licensed, I think, over 10,000 licensees.  They

8    had licensed several large companies that you heard

9    discussion about.  They had a market share that

10   approached 30 percent compared to Microsoft and IBM.  So

11   their technology was being used.  There was some

12   discussion about their Transact software and how

13   successful that was at that time.

14             So that presents one side of the fence.

15   Newegg had used -- I'm sorry, Open Market had used

16   several different licensing scenarios for themselves,

17   including licensing software sometimes.  They also had

18   some per-transaction-type licenses they did as well.

19             On the other side is Newegg.  As was

20   mentioned, they were starting on this new venture into

21   selling products on the internet.  As I understand it,

22   they were making computers and trying to make computers,

23   but now they were going to jump into the internet and

24   would need technology to facilitate this.

25             So they would be anxious to obtain technology

1   that they were allowed the use on their business plan

2   and their business venture to be able to have an

3   efficient process for their customers.  So they would be

4   anxious for the technology.

5          Open Market would realize they had valued

6   patents.  The patents had already issued.  So that would

7   be the construct of the negotiation at that time.

8       Q   At this hypothetical negotiation, what

9   information do each of the parties have about the other

10  party?

11      A   It's been called a card dealt face-up.  So

12  it's like you're playing Texas Hold'em, and all the

13  cards -- everybody's cards are dealt face-up.  So

14  everybody knows the other party's information.  In the

15  real world that doesn't happen.  Some parties might keep

16  certain information to themselves.

17         But in this construct, you basically say

18  there's no hiding any information; everything is dealt

19  face-up.

20      Q   Okay.  So we have this hypothetical

21  negotiation, Open Market, Newegg, cards are face-up.

22         Okay.  Then we have other factors to look at.

23  So let's start with the licensing factors.

24             MR. SATINE:  Let's go to the next slide

25  that you have.

1     Q    (By Mr. Satine) Okay.  Now, explain the first

2   bullet point on this slide.

3     A    So this provides a summary of the different

4   licensing factors and the points related to those.

5          So, for the first one in 1998, this is a

6   couple of years before the hypothetical, Open Market

7   began encouraging companies to voluntarily take licenses

8   to its newly-issued patents.

9          I think earlier there was a Wall Street

10  Journal article talking about the fact that they had

11  just received the patents.  And they sought to receive

12  licensees for their patent.  They invited people to seek

13  a license.

14    Q    Okay.  Now, we've been hearing about the

15  Johnson & Johnson agreement.  So if you could turn to

16  Exhibit P-185 in your binder which is up there in front

17  of you.

18          MR. SATINE:  And if we could put that

19  cover of that agreement on the screen.

20    Q    (By Mr. Satine) This is the one that

21  Ms. Wolanyk was discussing with counsel just a little

22  while ago.  If we look at the bottom of the first page

23  of the license agreement, I think it's Paragraph 1(c),

24  does it tell us which patents Open Market licensed to

25  Johnson & Johnson?

 1      A     Yes.  At the bottom section there, (c), you

 2   will see that the licensed patent that's part of this

 3   agreement referred to that, what's called the '780

 4   patent, including divisionals, continuations, and

 5   reissues and foreign counterparts.

 6              As I understand it, the '780 was the

 7   predecessor to the '639.

 8      Q     Does the license that was given to Johnson &

 9   Johnson by Open Market include a license to practice the

10   '314 patent?

11      A     No, not to my knowledge.

12      Q     So does the license that was given by Open

13   Market to Johnson & Johnson include a license to the

14   '492 patent?

15      A     Not to my knowledge.

16      Q     And, by the way, was this the Johnson &

17   Johnson or some subsidiary of Johnson & Johnson?

18      A     It was a subsidiary of Johnson & Johnson.  If

19   you look at the very top portion --

20              THE WITNESS:  Maybe you can blow that top

21   portion up.

22      A     -- it mentions Johnson & Johnson Vision

23   Care.

24              THE WITNESS:  If you can highlight that.

25      A     They are located in Florida.  Whereas, Johnson

1   & Johnson corporate is located up in the northeast.  But

2   this would be their vision care subsidiary presumably.

3        Q    Now, Mr. Roth and Ms. Wolanyk talked about the

4   fact that this was a hundred thousand dollar payment.

5             Mr. Nawrocki, if Johnson & Johnson paid a

6   hundred thousand dollars for a license to use the '780

7   patent, why don't we simply stop the testimony right

8   there and say, Newegg shouldn't have to pay any more

9   than that?

10       A    Well, this is for a whole different type of

11  use, as was talked about.  This is for internal use for

12  Johnson & Johnson.  As we know, Newegg has been selling

13  computers, electronics on the internet to consumers.

14  This is for internal use for Johnson & Johnson, and it

15  specifically refers to that within the context.

16            So it doesn't show what the volume of the

17  transactions were, or if there were any transactions.  I

18  assume there weren't.  These are internal transfers

19  using the session management patent.  But, to my

20  knowledge, there's no third-party transaction that would

21  be anywhere close to the 28 million they are talking

22  about here.  In fact, I think they are specifically

23  prohibited.

24       Q    Taking into consideration the hundred thousand

25  dollars that Johnson & Johnson Vision Care paid to Open

1  Market, do you still think that you've shown the jury

2  what is a reasonable royalty in this case?

3      A    Yes.  The 33 million that I have calculated,

4  33.9 million, is still an appropriate calculation.  The

5  hundred thousand is something I considered.  But once I

6  read the agreement, I realized that it was for internal

7  use, and it was not for third-party use such as the

8  transactions that Newegg has had.

9      Q    Let's go back to the slide with your bullet

10  points on licensing factors.  Let's go to the second

11  bullet point.

12           Tell us about that.

13      A    Yes.  The second bullet point is that in early

14  2001 -- so this is after the hypothetical -- Open Market

15  began to enforce its patent rights against Intershop.

16  Intershop was a competitive company.  It sold software

17  as well.  It wasn't like Newegg that's selling products.

18  They were selling software as well.

19           So Open Market realized that and began

20  enforcing their rights against Intershop.

21      Q    When you say began enforcing their rights

22  against Intershop, what does that mean?

23      A    I think what Ms. Wolanyk mentioned is they

24  filed suit against Intershop in early 2001.

25      Q    They filed a patent infringement suit?

1    A    That's correct.

2    Q    And did Open Market and Intershop settle that

3    lawsuit?

4    A    Yes, that's my understanding.

5    Q    As a result of the settlement of that lawsuit,

6    did Open Market and Intershop enter into a patent

7    license agreement?

8    A    That's my understanding.

9    Q    Okay.  Well, the attorneys have agreed not to

10   discuss the terms of any license agreement that resulted

11   from the settlement of a lawsuit.  So we're going to

12   move to your third bullet point.

13               MR. SAYLES:  Excuse me, Your Honor.  I'm

14   going to object to the sidebar remark of counsel there

15   and ask the Court to instruct the jury to disregard

16   that.  That was improper.

17               THE COURT:  All right.  Restate your

18   question, Counsel.

19   Q    (By Mr. Satine) Mr. Nawrocki, if you could

20   just move to the third bullet point on that chart and

21   please explain that to us.

22   A    Yes.  The third bullet point talks about the

23   fact that Open Market, who we've been talking about,

24   Divine, who acquired the patents from Open Market, and

25   then Soverain had licensed one or more of the patents at

1   issue in this case more than 40 times.  These patents

2   have been licensed more than 40 times, including several

3   large internet retailers.

4          There's a bunch of licenses to some small

5   companies; there was also some licenses to some large

6   companies.  The large internet retailers included

7   amazon.com as well as The Gap.

8   Q    Well, we've talked about patent licenses that

9   were granted by Open Market.  So let's talk about some

10  of the Divine licenses, and the jury has heard about

11  some of those.

12         In doing your Georgia-Pacific analysis, did

13  you review the patent licenses that were granted by

14  Divine with respect to the patents-in-suit?

15  A    Yes, I did.

16  Q    Okay.  If we could turn -- if you could turn

17  to Exhibit P-194 in your binder.

18         MR. SATINE:  And we are going to put the

19  cover page of that up on the screen.

20  Q    (By Mr. Satine) And P-194 is the license

21  agreement between Divine and Katco Industries, Inc.  Do

22  you have that in front of you?

23  A    Yes, I do.

24  Q    And if we could all turn to Page 2 and look at

25  Paragraph 7.

1          MR. SATINE:  If we can expand that on the

2   screen.

3       Q    (By Mr. Satine) Do we see how much money Katco

4   Industries paid to Divine for this patent license?

5       A    Yes.  It says here under Section 7 that Katco

6   paid a one-time payment of $1,000.  It's a fairly small

7   payment, which represents -- the licensee represents, so

8   Katco represents at least 10 percent of gross profit of

9   sales of product over the internet.  So as shown here,

10  Katco was a fairly small company and user of the

11  technology.

12      Q    So -- just so -- make sure I did my math

13  right.  If Katco paid $1,000, which was at least 10

14  percent of gross profit of sales of the product over the

15  internet, that means Katco's gross profit of sales of

16  product over the internet was no more than $10,000?

17      A    That's correct.

18      Q    Mr. Nawrocki, if Katco paid $1,000 for this

19  patent license, how can close to $34 million be a

20  reasonable royalty in this lawsuit?

21      A    Because of the difference in use made.  We

22  talked about the use made there being fairly

23  insignificant.  Here we're talking about a lot higher

24  volume of sales, as well as transactions.

25      Q    If you could turn to another of the Divine

1   licenses which is in your book.  It's Exhibit P-199.

2   And, again, we're going to put the cover page up on the

3   screen, so we can all look with you.

4                MR. SATINE:  And if you would blow that

5   first paragraph up.

6       Q    (By Mr. Satine) This is an agreement between

7   Divine and Odimo, Incorporated?

8       A    That's correct.

9       Q    Now, we're going to turn, if we can, to Page 2

10  and look at Paragraph 7.  I'd like to take a look at how

11  much Odimo paid Divine for this patent license.  Can you

12  supply that for us?

13      A    Sure.  So within Paragraph 7 of this license,

14  it shows that licensee, that's Odimo, shall pay to

15  Divine the sum of $30,000.  And then it also says that

16  it represents a royalty of approximately 85 cents per

17  shopping cart transaction made last year on their

18  websites.

19      Q    And in the next sentence there, something in

20  parenthesis.  What does that refer to?

21      A    Actually, within that context of that sentence

22  it says that it's represented by the licensee, so Odimo

23  said that they had approximately 35,000 transactions.

24      Q    If Odimo paid Divine $30,000, how can an

25  amount close to $34 million be a reasonable royalty in

1    this case?

2        A    All right.  I know this has been discussed,

3    and some of these things were shown in court earlier

4    about these different bars on these different amounts.

5    But if you take a look at it, it's $30,000 for the

6    35,000 transactions.  As you can see, that's 85 cents a

7    transaction.

8            So what I've calculated here is 80 cents and

9    40 cents a transaction.  Due to the significant

10   difference in volume, that represents the difference for

11   the magnitude of the damages that are at issue in this

12   case.

13           Another way of looking at it, if you look at

14   the number of transactions there, it's 35,000.  Here you

15   have 28 million.  It's several hundred times more

16   transactions at issue from Newegg, several hundred

17   times -- I think it's 800 -- little bit more than 800

18   times the amount.

19       Q    Let's look at just one more of the Divine

20   licenses.

21           If you could turn to Exhibit P-202 in your

22   binder.

23           MR. SATINE:  Once again, please put the

24   first page up for the rest of us to look at it.

25       A    The exhibit number again, Mr. Satine?

1        Q     (By Mr. Satine) 202.

2        A     Okay.

3        Q     You have your copy?

4        A     I have it.

5        Q     And this is an agreement with a company called

6    Webster Orchard, Inc.  And, again, if you could turn to

7    Page 2, Section 7, and if you can tell us how much money

8    Webster Orchard paid to Divine?

9        A     It says they shall pay to Divine -- licensees

10   shall pay to Divine, if you look at the center portion

11   there, a one-time payment equal to 2 percent of $100,000

12   of gross sales of product over the internet.  So $2,000.

13       Q     Does that mean that Webster Orchard had a

14   hundred thousand dollars of gross sales?

15       A     A hundred thousand dollars of gross sales of

16   product over the internet.

17       Q     And they paid 2 percent on those sales?

18       A     That's correct.

19       Q     Well, if Webster Orchard was supposed to pay 2

20   percent of this hundred thousand dollars of sales, gross

21   sales, how can you say that close to 34 million dollars

22   is a reasonable royalty in this case?

23       A     Again, just because the differences in the

24   use.  The hundred thousand dollars is a lot smaller

25   amount than Newegg has sold over the internet.  We will

1   see in some other charts that there has been billions of

2   dollars of sales over the internet.

3       Q    And if there are billions of dollars of sales,

4   do we have any idea if the number of transactions are

5   the same between Newegg and Webster Orchard?

6       A    We don't have the amount of transaction for

7   Webster, so -- but presumably, for a hundred thousand

8   dollars in sales, it wouldn't be anywhere close to the

9   28 million that we have at issue here.

10              MR. SATINE:  Let's go back to that

11  licensing factors slide.

12      Q    (By Mr. Satine) And if you could explain the

13  last of the bullet points there.

14      A    I think that's what we've talked about

15  already, the fact that Open Market, Divine, and Soverain

16  have licensed is significant.

17      Q    Right.  We've talked about Open Market and

18  Divine.  You also mentioned Soverain up there.  Can you

19  tell us about some of the Soverain licensees, who they

20  are?

21      A    Yes.  Soverain, as I think has been mentioned

22  by Ms. Wolanyk, has licensed several companies,

23  including Amazon, Zappos, several other companies as

24  well as Shutterfly.

25      Q    Let's go to the next slide that's entitled

1    Technical Factors.  Now, since you are not a technical

2    expert, do you rely upon Dr. Grimes for your conclusions

3    here?

4        A    I do.  I was here for Dr. Grimes' testimony,

5    and I heard his testimony about the patents.  And so

6    this is, in part, related to his comments on the

7    importance of the technology.

8        Q    I would like you to turn in your exhibit book

9    to Exhibit P-245, which is a document filed by Newegg

10   with the United States Securities and Exchange

11   Commission.  And if you could turn to Page 78 of that

12   exhibit.

13            I would like you to read for the jury the

14   first paragraph under that heading Technology and

15   Intellectual Property.

16       A    Okay.  So this document is from, as you

17   mentioned, S1.  And within the context of this, the

18   technology and intellectual property, this is Newegg's

19   document, it says that:  Our technology systems are a

20   critical component of our success and are designed to

21   enhance efficiency and scalability.  Our strategy is to

22   develop proprietary software and license technologies

23   from third parties as appropriate, in order to simplify

24   and improve the customer shopping experience, as well as

25   facilitate our fulfillment, financial, and customer

1  service operations.

2     Q    Is that statement that Newegg made to the

3  Securities and Exchange Commission consistent with the

4  bullet points we saw on your slide relating to technical

5  facts?

6     A    This talks about the importance of the

7  technology to Newegg.  Newegg recognizes technology is

8  important, especially in their customer experience.

9     Q    Let's go to the next demonstrative, which is

10 entitled Financial/Business Factors.

11         Can you please explain the first bullet point

12 on this?

13    A    Okay.  So the first bullet point is that:

14 Every Newegg completed transaction is assumed to be

15 infringing all three patents at issue.

16         We talked about that earlier.  That relates to

17 the extent of use.  This is for some of their completed

18 transactions.  As I understand, all the 28.3 million

19 transactions are accused of infringing all three

20 patents.

21    Q    What does the second bullet point refer to?

22    A    The second bullet point is that Newegg has

23 become the second largest web-only retailer.

24         Some people may not have heard about Newegg

25 before this case.  It was relatively new for me as well.

1   I had heard of Amazon.  But as I became involved in this

2   case, I realized that Newegg was the second largest

3   web-only retailer.  So they are a very large company,

4   has been quite successful with their internet sales

5   program.

6       Q    Let's take a look at the next slide and we'll

7   come back to this one in a moment.

8            What's on this slide?

9       A    This is an excerpt from Newegg's S1 or

10  prospectus.  And it says, and this is speaking for

11  Newegg:  We are a leading E-commerce company focused on

12  selling information technology, or IT products,

13  predominantly through our U.S. website, www.newegg.com.

14           As an example of our E-commerce leadership, we

15  are the second largest online retailer in the United

16  States as measured by our 2008 net sales of 2.1 billion

17  according to the 2009 Internet Retailers Top 500 Guide.

18           So they recognized in their public filings,

19  and mentioned in their filings with the SEC, that they

20  were the second largest retailer as well, so people

21  would be familiar with them.

22      Q    Let's look at your next slide.  I believe this

23  comes from the 2009 Internet Retailers Top 500 Guide.

24  What are you showing us on this slide?

25      A    Well, this shows -- this is taken from that

1    guide.  This is the document they were referencing in

2    their prospectus, and it mentions that 2008 web sales

3    volumes.  Number 1 is Amazon; we're all familiar with

4    them.  And then number 2 is Newegg.  Then you'll see

5    several other companies that you might be familiar with;

6    Netflix, Zappos, Amway, several other companies.

7              If you look on the right side, there's FTD,

8    Disney.  At number 17, Ms. Wolanyk mentioned Shutterfly

9    as an example.

10    Q    Well, some of these names we have heard of so

11   far in this lawsuit.  Can you tell us which of these 20,

12   top 20 web-only sites are licensed to practice the

13   patents in this lawsuit?

14    A    Well, at this time the companies that have a

15   license, to my understanding, is number 1 is Amazon; you

16   can highlight that one.  Number 4, Zappos has a license.

17   Number 12, FTD has a license.  And then Number 17,

18   Shutterfly has a license.

19    Q    I think we were looking at your demonstrative

20   called Financial/Business Factors.  I think we're up to

21   the third bullet point there.

22              MR. SATINE:  So let's go back to that

23   slide.

24    A    Okay.

25    Q    (By Mr. Satine) And will you please explain

1  the third bullet point.

2      A    So the third bullet point here is another part

3  of the financial and business factors.  That's an

4  important factor.  It's recognizing the contributions

5  that were made by Newegg.

6           Newegg has a whole lot of money they spend on

7  inventory for the products they buy.  They have

8  logistics in terms of getting it from warehouses to the

9  people.  They have customer service they provide.  And

10  so that's another consideration under the financial and

11  business factors that I certainly recognize.

12     Q    Can you turn to Exhibit P-166 in your book?

13     A    What's the exhibit number?  I'm sorry.

14     Q    166.

15     A    Okay.  I have that.

16     Q    Is it your understanding this is Newegg's

17  business review from the third quarter 2005 board

18  meeting?

19     A    Yes, that's my understanding.

20     Q    Let's look at Page 3 of P166 where you see the

21  picture of this cake.  And can you tell us what your

22  understanding is of what this cake is intended to

23  represent?

24     A    Yes.  This document -- we'll only talk about

25  this page, but this document talks their assessment of

1   the marketplace.

2            This is before a board meeting, and this page

3   that we're looking at talks about the Newegg business

4   model.  In other words, what's their recipe for making

5   this model work that they have, this internet site?

6            And what they've done is, in the form of a

7   cake, they've shown the important part, the important

8   layer is the customer experience.  And several layers

9   are important.

10           You'll see they talk about three other layers,

11  but they highlight the customer experience layer, and

12  it's got several different pillars to it:  The product

13  management, logistics, and IT and MIS.  IT and MIS

14  stands for information technology and management

15  information type systems.

16               THE WITNESS:  And if you maybe just pull

17  back a little bit on what you've blown up.  Maybe blow

18  up the whole top portion of the cake would be a good

19  idea.  There you go.

20  A    So the customer experience is highlighted

21  there, and if you think about it, their front doors are

22  basically their website.  They bring people into their

23  web, and that represents their front doors.  They're not

24  Best Buy.  They don't have a bricks-and-mortar

25  operation.  Their front door is their website.

1          So they talk about -- their web experience is

2    part of that, and they talk about several other things.

3    Customer service.  I think they provide customer service

4    as well and all the other functions.

5          But the point is, is that interface with the

6    customer and having a good customer experience is an

7    important part of it, and I recognize there's various

8    things that make up that customer experience that we've

9    talked about.

10          MR. SATINE:  Let's put up the next

11    demonstrative entitled Newegg's Extent of Use.

12    Q    (By Mr. Satine) What are we looking at here?

13    A    So we looked at a chart similar to this

14    before, which had their total transactions, so this

15    shows their total transactions over this period of time,

16    the completed online transactions.

17          Of note is, if you look at 2001, it's well

18    less than a million transactions there.  I believe it's

19    less than a half a million transactions in that year.

20    And it grew steadily, steadily, steadily all the way to

21    the point where, in 2009, the last year we have a full

22    year information for, it's nearly 12 million

23    transactions just in that year.

24    Q    And does this relate to the last bullet point?

25    We're going to go back to it now, your slide Financial

1   Business Factors.  Does this relate to the last bullet

2   point of that slide?

3        A    Yes.  One of the ways of looking at the

4   commercial success is taking a look at what's been done

5   with the technology and what's the extent of use.

6        Q    In that last bullet point, it also talks about

7   profitability.  Did you consider profitability?

8        A    Right.  So now we're getting into the

9   financial information.  And so we've looked at their

10  transactions, but I also looked at their profitability

11  as well.

12            And there will be several charts we have on

13  this, but I looked at their profitability from the

14  transactions that they -- that they went ahead and had

15  on the internet.

16       Q    When you look at profitability, what

17  profitability do you look at, from what time period?

18       A    Well, in the hypothetical negotiation,

19  ideally, you look at the projected profitability, and

20  what's a reasonable expectation of what that

21  profitability would be as they were entering this

22  venture they were going into.

23            I also looked at actual profitability as well.

24  So I looked at forecasted or projected and also looked

25  at their actual results as well.

1      Q     Did you look at any projections from the time

2    of the hypothetical negotiation in 2001?

3      A     I would have liked to look at projections at

4    that time.  Unfortunately, they didn't -- they said they

5    didn't have any at that point in time.  So I looked at

6    projections that they submitted and looking as close to

7    the hypothetical as I could.

8      Q     Okay.

9            MR. SATINE:  Let's put Exhibit P171 up on

10   the screen.

11     Q     (By Mr. Satine) Mr. Nawrocki, if you look on

12   the screen or in your book, what are we seeing on

13   Exhibit P171?

14     A     Okay.  So if you look at this, this is a

15   Newegg projected income statement, and it mentions that

16   it's with $30 million capital raised being considered.

17   So they were seeking to get some capital financing.

18   And the top portion of the page talks about the dollar

19   amounts they were projecting.

20           THE WITNESS:  Maybe you could blow up

21   that whole portion of the top page, top portion of the

22   page.  There you go.

23     A     And so that shows their projected operations

24   from '05 through' 08.

25           Now, keep in mind, the hypothetical is in '01,

1   but this is as far back a projection as we obtained

2   through the discovery process.

3           And what it shows is their estimated sales in

4   '05 through '08.  And those amounts are show in

5   thousands of dollars.  So that first month of 2005,

6   that's $1.6 billion, and then the next year, 2.3

7   billion, all the way up to $4 billion in 2008.

8           So a fairly aggressive projection, but they

9   were candidly doing very well on their website.  And so

10  their results, you'll see, are in the billions of

11  dollars.

12          The next line talks about their cost of sales.

13  That's when you take a look at the cost of the product.

14  If you have a monitor you're going to buy from them on

15  the website, it would be the cost of the monitor that

16  you would subtract to get the gross margin.

17          And then there's also -- SG&A is their selling

18  and general administrative costs.  And then income from

19  operations are shown there, $28 million all the way up

20  to 282 million in 2008.

21      Q   (By Mr. Satine) Does Newegg project a percent

22  of profitability?

23      A   Yeah.  If you look at the bottom portion --

24          THE WITNESS:  Maybe if you close that and

25  look at the bottom portion.

1     A    So what they do on the bottom portion is, they

2    do this on a percentage basis.  So this is something I

3    considered as well, is what were their percentage profit

4    expectations.

5           And what you'll see is that the gross margin

6    level --

7                THE WITNESS:  Maybe you can just

8    highlight that gross margin row all the way across, and

9    then the same thing with income from operation two lines

10   down.

11    A    So that represents what their profit

12   expectations were.

13          So gross margin, it goes from 9.4 percent all

14   the way up to 14 percent.  And what that is, is giving

15   an example.  So if you're selling a computer for $200,

16   you're making 10 percent profit as an example on it, so

17   you're making $20 of gross profit.  That means you spent

18   $180 on the monitor, and you're selling it for 200.  So

19   that's generally how that works.

20          The income from operations is after they track

21   all of their accounting, financial, and corporate

22   expenses.  And they show profits there from 1.8,

23   approximately, percent to more than 6 percent, 6.6

24   rounded, in 2008.

25    Q    (By Mr. Satine) Okay.  So you've told us that

1    you considered Newegg's projections of profitability.

2    Did you also consider Newegg's actual profitability in

3    doing your Georgia-Pacific analysis?

4         A    Yes.  I could have stopped here with the

5    projected, but I also said, well, let's take a look at

6    their actual profitability as well just to see what

7    things were like from their actual results.

8              So we've got another chart that explains that

9    as well.

10        Q    Okay.  What are we looking at on this chart?

11        A    So this is a summary of Newegg's financial

12   results.  This is overall through the company.

13             And on the left, you'll see the years from

14   2001 to 2009, and you'll see that in 2001, the first

15   year they started, they hit the ground running with $115

16   million in sales and continued on all way through 2009

17   where they had 2 point -- more than $2.2 billion in

18   sales in 2009.

19             The next column shows their gross profit for

20   each one of those years, and it goes from 11 million up

21   to $240 million in gross profit in 2009.

22             And then the last column to the right is their

23   operating profit.  An interesting thing is, right in the

24   first year, 2001, they were profitable right off the --

25   right off the bat.  They made 1.6 percent in that year.

1    2002, they made 2.9 percent.  So they started increasing

2    their profitability.

3         They had some low years.  And then overall

4    you'll see that their overall percentage --

5              THE WITNESS:  If you'll highlight the

6    bottom right-hand corner.

7    A    -- that overall bottom is 1.6 percent on an

8    overall basis.  And that's what they actually have done.

9    Q    (By Mr. Satine) Now, a lot of numbers on this

10   slide.  After you've identified all of this, what did

11   you do with it?  How did you use it?

12   A    A couple of things.  We took a look at the

13   projected profits you heard about, and we were looking

14   at operating profits there.  We also saw gross profit

15   information here.

16        I looked at that '01 and '02 period and saw

17   that they were doing 1.6 and 2.9 percent.  So those

18   entered into my considerations, in terms of now -- in

19   terms of what type of royalty rate would I look at here.

20   There's profits they're making, and so one of the things

21   I had to consider was how to use this information in

22   terms of determining a royalty rate.

23   Q    And how did you use this information in

24   determining a royalty rate?

25   A    Well, the next thing I did is, I took a

1   portion of profits.  There's a -- there's a rule in

2   terms of calculating or assessing a royalty, taking a

3   little portion of the profit, that's sometimes called a

4   25- to 33-percent rule.  And that says I'm going to pay

5   25 to 33 percent or one-quarter to one-third of my

6   profits in a royalty.

7          So if you have a patent and I want to license

8   that patent from you, what we'd start our negotiations

9   at is, if I'm making 10 percent, I'd say, well, let's

10  start it at 2-1/2 to 3.3 percent, and you tune it up or

11  down from there.

12         But it's at least a starting point in the

13  negotiations.  And it's been used in various different

14  damage contexts, as well as valuations and licensing as

15  well.

16     Q    Is this a Jim Nawrocki rule, or do other

17  people use it?

18     A    No.  It's been a rule.  It's been around since

19  I was a little -- since I was a little kid back in the

20  '60s.  But it's called the 25-percent rule.  Different

21  people have used it.  It's been in textbooks.

22         There's mixed reactions about whether or not

23  you should use it exclusively or you should tune it up

24  or down.  And what you'll see, based on my analysis, is

25  you need to apply it to the specific facts of the case.

1      Q     Okay.  Let's look at your next slide.  What

2   does this slide entitled Profit Apportionment show?

3      A     So this is how it works here, is what I've

4   done is I've taken Newegg's average order value.  It

5   ranged -- it was sometimes over $300.  Sometimes it was

6   a little bit less than $200.  But their overall average

7   was $200 per order.

8           I applied here an operating profit of 6

9   percent.  You saw the forecast was 6.5, 6.6 percent.  So

10  I've used 6 percent here to come up with an average

11  profit per order of $12.  So if they were expecting to

12  make 6 percent profit, the expectation would be about

13  12 -- $12 per order.

14          And then the next section that I did was, I

15  apportioned it 25 to 33 percent.

16              THE WITNESS:  So maybe you could

17  highlight that portion for me, if you would.  Yeah, that

18  section right there.

19      A     So that's the quarter -- one-quarter to

20  one-third apportionment I talked about.

21          So what you do is, you apply that to the $12,

22  and you get $3 to $4, would be what the royalty rate

23  would be.  That's in the blue block -- blue boxes.

24          So that would be the starting point.  The rate

25  I came up with were 80 cents and 40 cents, and we'll

1  tell you how I got there, but this is at least a

2  starting point.

3       Q    (By Mr. Satine) Okay.  Let's go to the top of

4  the slide.

5       A    Sure.

6       Q    It says:  Newegg's average order.  Can you

7  tell us what that means?  Most people spend $200?  Is

8  that how to you determine the average?  How does that

9  work?

10       A    Well, it's -- it's an overall average taken

11  from Newegg's documents.  They produced very detailed

12  spreadsheets in terms of what their internet order sales

13  were, dollars and units, and the overall average is,

14  again, a little bit more than $200.

15            At points in time -- I think near the

16  hypothetical, it was over $300.  But $200, I thought,

17  was a conservative estimate of the average order size.

18  Now, some people might spend less than that.  If you buy

19  a cable, it might be $30 or $40.  If you buy a monitor,

20  it might run you $200 or $300.  So this is the average

21  order size.

22            Let me give you an example.  My son went to

23  Newegg two weeks ago.  He was building a computer at

24  school, and he wanted to buy all these products.  So he

25  made a transaction and spent over $1200 on all the

1  different equipment, including the box and the fans and

2  the CPU.

3           So some orders would be larger; some would be

4  smaller.

5       Q    Did your son spend the $1200 or did you spend

6  the $1200?

7       A    He spent my $1200, unfortunately, but it was

8  his graduation present.

9       Q    Okay.  And then we have your -- your operating

10  profit on this slide is 6 percent, but you told us that

11  related to projected, right?

12      A    Well, we talked a couple of slides ago about

13  their projection.  It was really 6.5 percent.  So I

14  said, well, what -- we don't have what their expectation

15  was at the time.  So -- and this is when I used -- I

16  used 6 percent on this slide.  I've done it a couple of

17  other ways as well.

18          So this was trying to use what would be their

19  reasonable expectation on a go-forward basis of what

20  their profitability was.

21      Q    Okay.  Let's go to your next demonstrative.

22      A    Sure.

23      Q    I think that's the last of your

24  demonstratives.

25      A    Yes, I think it is.

1    Q    Okay.  What does this demonstrative show us?

2    A    Well, this is the same type of analysis, only

3  instead of just using the 6 percent, which I used on the

4  prior chart -- that's on the right side -- I'm now using

5  a profitability of 1-1/2 percent on the left side there.

6              THE WITNESS:  If you'll highlight that.

7    A    And then the next one would be 3 percent and

8  then 6.

9         You know, there's different profitability

10  there.  You say, well, why all the different numbers?

11  Well, that relates to the fact that on those actuals, as

12  well as their forecast, they were trying to anticipate

13  what's their reasonable expectation, in terms of how

14  profitable they'll be, and this shows different

15  scenarios, basically.

16    Q    (By Mr. Satine) So the first scenario is what?

17  Walk us through that a little more slowly.

18    A    Sure.  So at the first column, it's 1-1/2

19  percent.  You apply that to the $200 of average order

20  size, and you get $3 average profitability.

21         And under that, if you split it between

22  one-quarter and one-third, you would wind up with rates

23  of 75 cents to a dollar.  So that would be a scenario in

24  that fashion.

25         The middle column does it at 3 percent.  If 3

1    percent was their expectation, then the resulting

2    royalty rates would be 1-1/2 to $2.

3          And if 6 percent was their expectation, you

4    would say, well, they're expecting probably closer to

5    their forecast, then it would be 3 to $4.

6          So that's -- that's how this chart marks, and

7    it's an apportionment.  Oftentimes, if I have a forecast

8    or some actual information that we knew was their

9    expectation, we would use that; but here we had several

10   different data points, so I -- I've included all of

11   them.

12   Q    Okay.  Now, I said that was your last

13   demonstrative, but I want to go back to one just to be

14   sure we've covered everything.

15   A    Sure.

16   Q    The slide where we had your summary of the 15

17   Georgia-Pacific Factors --

18              MR. SATINE:  If we can get that back up

19   for a moment.

20   Q    (By Mr. Satine) Okay.  We've talked about the

21   licensing factors.  We've talked about financial

22   business factors.  We've talked about technical factors.

23   We've talked about the hypothetical negotiation.

24          The only one we haven't talked about yet is

25   Factor 14, the opinion testimony of qualified experts.

1                How did Factor 14 affect your analysis?

2      A    Well, that's where I basically bring all of

3   the analysis together and kind of determine what the

4   final royalty rate is.  It's my opinion that I think

5   this is a reasonable royalty rate.  It's based upon my

6   judgment of my consideration of the various

7   Georgia-Pacific Factors that we've already been

8   discussing.

9      Q    Okay.  Tell us how you did that.

10     A    There's a whole set of data points that we've

11  been talking about, and it's probably easier if I my use

12  the easel to explain the scenarios here.

13               MR. SATINE:  Your Honor, may the witness

14  get up and go to the easel?

15               THE COURT:  He may.

16               MR. SATINE:  Thank you.

17               THE WITNESS:  Can I get some water?

18               MR. SATINE:  We have water coming from

19  all directions.

20               THE WITNESS:  I usually speak pretty

21  loud, but let's see if I can do it.

22               MR. SATINE:  Water and a microphone.

23               THE WITNESS:  Water and a microphone.

24               Can I try it without the microphone, if

25  that works?  I'll try to talk loud.  Is it okay if I try

1  to talk loud?  I'll talk loud and slow, if I can.

2                   THE REPORTER:  You need to speak into the

3  microphone, please.

4                   THE WITNESS:  Do I?  Okay.  I should be

5  able to.

6                   Okay.  You know what I'll need on the top

7  chart to go through some of the data points is that

8  profit apportionment one.  I think it was the one -- the

9  last chart that Mr. Satine said was our last overhead

10  one.

11                  Yeah, that one would be helpful.

12       Q    (By Mr. Satine) Okay.

13       A    So when I'm doing this analysis, we now have

14  to determine what rate are we going to apply here to

15  these different transactions?  And there's all sorts of

16  numbers to choose from, and so I'll try to go through

17  different considerations.

18            So, first of all, we've got a 33-percent

19  apportionment, and I'll put on the top here the 1.5

20  percent profitability, the 3 percent profitability, and

21  then the 6 percent profitability.  Those --

22       Q    Mr. Nawrocki, if I could just stop you for a

23  moment.

24                  MR. SATINE:  Your Honor, could we just

25  move the easel down between counsel table so the jury

1  might be able to see it a little easier?

2              THE COURT:  Can the jury see from there?

3  Can y'all see it all right from there?  Like it up a

4  little closer?

5              JUROR:  No.  It's fine.

6              THE COURT:  I think it's okay.

7              THE WITNESS:  Okay.

8              MR. SATINE:  Okay.

9              THE COURT:  I see you're trying to do

10  the -- okay.  Yeah.  You can get that a little closer,

11  if you like.

12              THE WITNESS:  This one here?

13              THE COURT:  Yeah.

14              THE WITNESS:  Okay.  Can you move that

15  up, if you would?  My hands are full.

16              THE COURT:  See if you can't find him a

17  darker marker, too, if you have one.

18              THE WITNESS:  Yeah.  I'll turn it on its

19  angle there.

20      A    Okay.  So the first consideration was this

21  33-percent factor that we see up there, and then the

22  25-percent factor we talked about.

23              So at 33 percent, the amounts per transaction

24  were a dollar, $2, and then $4.  Those are different

25  rates to consider under that analysis.

1          And then under 75 percent -- I'm sorry -- 25

2   percent, we consider that 75 cents, a dollar fifty, and

3   then $3.

4          So this provided some initial guidance, in

5   terms of what -- what sort of rates I would consider.  I

6   then had to evaluate the different Georgia-Pacific

7   Factors that we were talking about.

8          We looked at various things in terms of

9   licensing, in terms of technical factors, the business

10  factors.

11         And one of the important things, I thought,

12  was, if you take a look at the fact that Newegg

13  contributed a lot to this website, this inventory

14  management, logistics, all the things they've done,

15  their own development of a lot of this using -- accused

16  to be using the technology, but I recognized that, so I

17  said, well, let's tune it down to some other

18  apportionments, such as 20 percent and 15 percent.

19         Let's tune a portion of the amount down.

20  So at this level, if you apply the 20 percent to the $3,

21  you get 60 cents, a dollar twenty, and then two forty.

22         And at 15 percent times the $3, you would get

23  45 cents, 90 cents, and then a dollar eighty.

24         So I give you a whole set of numbers starting

25  with the 25-percent to 33-percent apportionment, looking

1    at other apportionments as well, that would bring it

2    into recognition of the different Georgia-Pacific

3    Factors that I considered.

4           So then I had to determine, based upon

5    judgment, what rate did I feel was appropriate.  And so

6    what we have is for the '314 and the '492, I felt that

7    80 cents would be very reasonable.  In light of this, it

8    would be conservative, but yet reasonable in light of

9    some of these data points.

10          And for the '639, 40 cents, which is the

11   session management one.

12          '314 and '492 relates to the whole system; the

13   '639, at least for Newegg's application, relates to

14   session management, and so I've used the smaller royalty

15   rate there.  So this represents the royalty rates.

16   It's judgment based upon these different data points

17   that I considered.  It's not a calculation from these.

18   They're a judgment that I felt, based upon these

19   different data points, it fell well within that range.

20      Q    Okay.  So your -- so the range was -- you have

21   80 cents, and that's for what patents?

22      A    It's for the '314 and the '492 patents.

23      Q    And then you have 40 cents, and that's for

24   what?

25      A    That's for the '639 patent.

1      Q     Did you do anything further to check the

2  reasonableness of those two royalty rates?

3      A     Yes.  After I considered this information, as

4  I further cross-checked, I looked at a few other things.

5  There were several other things we talked about.

6            For example, there was an analysis on a

7  percentage of profits -- percentage of gross profits we

8  saw and talked about in some of the Divine licenses.

9  There was also a percentage of sales talked about in

10  some of those licenses.  And then there were also some

11  cents per transactions that were talked about as well.

12            If you'll remember, one of the transactions --

13  one of the licenses we talked about had 85 cents per

14  transaction.  And that compared, you know, favorably to

15  the 80 cents and 40 cents I had per transaction.

16            The percentage of sales, there were several on

17  that.  There was some at 1 percent; some at 2 percent.

18  I think they went as high as 10 percent in terms of some

19  of those other licenses that we saw as a cross-check.

20            What that would be, that would represent -- 1

21  percent would represent a 2-dollar royalty, a 4-dollar

22  royalty, or a 20-dollar royalty.  So, again, the 80

23  cents and 40 cents are well within that.

24            On the gross profit side, we saw some

25  10-percent gross profits.  We saw various other ones.

1  Their gross profits, a couple of different data points

2  would be 40 -- 10 percent and 14 percent.

3         They were actually doing around 10 percent.

4  They had forecasted as much as 14 percent gross profit.

5  So if you turn that into a rate, that would, again, be

6  approximately $10 -- $1 -- I'm sorry -- $2 and then $2

7  and then 40 cents, $2.80.

8         So the point is, I get various data points

9  that, again, were well above the numbers I came up with,

10  but I still felt that the 40 cents and the 80 cents that

11  I calculated were reasonable, even based upon those

12  cross-checks.

13     Q    Okay.  Mr. Nawrocki, if you could retake your

14  seat, I still have about three or four questions.  I'll

15  move the stand.

16         Let's go back to the summary of royalty

17  damages.  Is it your opinion that using a royalty base

18  of 28,316,504 transactions with the '314 and '492

19  patent -- patents, that royalty damages to which

20  Soverain is entitled in this case are $22,653,203?

21     A    Yes.  I feel that is reasonable.

22     Q    Is it your opinion that using a royalty base

23  of 28,316,504 transactions, that a royalty damage award,

24  with respect to the '639 patent in this case, would be

25  $11,326,602?

```
 1      A    Yes.  I feel that's reasonable as well.

 2      Q    Do you think both of those rates are

 3  reasonable royalty rates?

 4      A    Yes, I do.

 5      Q    One last question.  Mr. Sayles showed the jury

 6  a chart during the opening where he had the royalties

 7  that had been paid to Divine.  Is that a fair

 8  comparison?

 9      A    Not by dollar amount.  As we've talked about,

10  the extent of use in those royalties was -- paled in

11  comparison to the use that's at issue here.

12           An important consideration is, what is the

13  extent of use?  As we've talked about at length, the

14  extent of use by Newegg was significant and

15  significantly different than those.

16                MR. SATINE:  No further questions, Your

17  Honor.  We pass the witness.

18                THE COURT:  All right.

19                Cross-examination.

20                MR. SAYLES:  May it please the Court.

21                Your Honor, may I approach the witness

22  and this chart for just a moment and then take the

23  podium?

24                THE COURT:  Yes.  Uh-huh.

25                MR. SAYLES:  All right.
```

```
 1                      CROSS-EXAMINATION

 2  BY MR. SAYLES:

 3      Q    Mr. Nawrocki, did you allocate the royalty

 4  rate among the claims of the '314 and the '492?

 5      A    No, I did not.

 6      Q    Did you allocate the royalty rate under the

 7  '639 according to the claims?

 8      A    No.  I assumed they were valid and infringed.

 9      Q    You need to speak up.

10      A    I'm sorry.  I assumed they were all valid and

11  infringed.

12      Q    But you -- but you didn't allocate it among

13  one or the other claims in case one is found valid and

14  one is invalid.  You didn't do that, did you?

15      A    That's correct.  I did not.

16      Q    And if the parties had not agreed to a running

17  royalty back in 2001, we wouldn't be considering the

18  royalty base of transactions that occurred in 2007 to

19  2010; isn't that so?

20      A    I think you would be looking -- well, I can't

21  answer that.

22      Q    All right.  You do know that prior to the

23  hypothetical negotiation, all of the license agreements

24  that were entered into were what are called lump sums;

25  isn't that right?
```

 1     A    That's correct.  Some of -- not all of them,

 2  but most of them.

 3     Q    All right.  Now, let me ask it this way:  If

 4  Newegg, at the table in 2001, and Open Market, at the

 5  table, had agreed to a lump sum, we wouldn't be talking

 6  about the transactions that occurred in '07 to 2010;

 7  isn't that so?

 8     A    If they had already agreed to that back then?

 9     Q    That's right.  To a lump sum.

10     A    That's correct.  If they had agreed to it, we

11  wouldn't be talking about the transactions.

12     Q    All right.  May I take this down?

13     A    Sure.

14     Q    I'd like to go back and ask you just a few

15  questions about your background and experience,

16  Mr. Nawrocki.

17     A    Okay.

18     Q    Of course, this case is not your first time to

19  testify in court, is it?

20     A    That's correct.

21     Q    In fact, it is fair to say that a large part

22  of your professional activity is with regard to

23  litigation; isn't that right?

24     A    I'd say a large part of my analysis or career

25  is relating to damage analysis.  It might not be in

1  court.  It might be valuations of licenses or other

2  formats.

3      Q    But most of your professional endeavors relate

4  to claims in lawsuits; isn't that right?

5      A    A majority, yes, uh-huh.

6      Q    And you have been an expert witness not only

7  in technology that involves the internet but in other

8  areas as well; is that right?

9      A    Yes, I have.

10     Q    You've expressed opinions about damages

11  regarding aircraft?

12     A    Yes.

13     Q    Agriculture?

14     A    Yes.

15     Q    Automotive?

16     A    Yes.

17     Q    Chemicals?

18     A    Yes.

19     Q    Construction business?

20     A    Not in a patent context.  That would be a

21  non-patent context.

22     Q    But you served as an expert witness on issues

23  of damages in that type of case, construction.

24     A    Yes.  I think it was a roof that collapsed on

25  a hangar, but okay.

```
 1      Q    Electronics?

 2      A    Yes, definitely.

 3      Q    Medical products?

 4      A    Yes.

 5      Q    Oil and gas?

 6      A    Yes.

 7      Q    Semiconductors?

 8      A    Yes.

 9      Q    Telecommunications?

10      A    Yes.

11      Q    Utilities?

12      A    Not in a damage -- not in a patent context but

13 in a valuation context.

14      Q    All right.  I'm going to stop right there, but

15 you've given testimony or consulted in litigation

16 matters in other areas that I didn't name as well,

17 haven't you?

18      A    That's a pretty long list.  I'd say that those

19 are -- over my 30-year career, that's probably the

20 industries I've worked in.  There might be some other

21 ones, but those are -- those are a lot of the industries

22 I've worked on.

23      Q    You may have said this, but you provided

24 litigation consulting assistance in more than 100 cases;

25 isn't that right?
```

1      A      That's correct.  Over the last 30 years, yes.

2      Q      And naturally, you do charge for your time,

3   don't you?

4      A      Yes, I do.

5      Q      Looks like you've done a lot of work here.  Do

6   you know how much time you spent?

7      A      More than 200 hours, I'd say.

8      Q      And how much do you charge per hour, sir?

9      A      525 an hour is the rate my firm charges.

10     Q      Your firm is your firm, isn't it?

11     A      No.  I have five other partners.

12     Q      You're the majority owner, aren't you?

13     A      No, I'm not.  I have well less than 50 percent

14  of the ownership.

15     Q      You've appeared in cases, either in deposition

16  or trial, in Delaware, right?

17     A      Yes.

18     Q      Indiana?

19     A      Yes.

20     Q      Illinois?

21     A      Yes.

22     Q      New York?

23     A      Yes.

24     Q      Massachusetts?

25     A      Yes, Boston.

1      Q    Norway?

2      A    Norway as well, yes.

3      Q    And then you mentioned a half a dozen cities

4  or so in Texas where you've appeared in courtrooms to

5  give testimony.

6      A    That's correct.

7      Q    Now, let me ask you some questions and see if

8  we can agree on certain things before we get to any

9  areas of disagreement, all right?

10     A    Okay.

11     Q    Before taking the witness stand, I'm sure that

12 you studied your reports.

13     A    Yes.  I believe I have them right here.  Yes.

14     Q    All right.  And you suspected that I might ask

15 you some questions about your reports, and you prepared

16 yourself for that, didn't you?

17     A    Well, I wasn't sure what questions you would

18 ask, but if you did, at least I'd have my reports with

19 me.

20     Q    All right.  And your deposition was taken?

21     A    Yes, it was.

22     Q    And you studied that, too, I'm sure.

23     A    I reread it in the last few days, yes.

24     Q    All right.  Transact.  You're aware that

25 Transact represented the off-the-shelf publicized (sic)

1  version of core internet commerce that was owned by Open

2  Market.

3       A    I'm familiar with the Transact product.  That

4  description, if you would read it again.

5       Q    Off-the-shelf productized version of its core

6  internet commerce application, that's Transact.

7       A    Yes.  It's an E-commerce.

8       Q    All right.  In your report, you described it

9  as off the shelf, didn't you?

10      A    Well, it wasn't off the shelf like in a

11 context of going into a store and buying it.  It's

12 something that the company had developed, so...

13      Q    All right.  I don't want to quibble with you,

14 but if you look on Page 9 of your report, you described

15 Transact as off the shelf, didn't you?

16      A    This is my first report?

17      Q    Yes, sir.

18      A    Which paragraph?

19      Q    Paragraph No. 22.

20      A    Yes, I see that.

21      Q    And you refer to OM-Transact, and you put it

22 in quotes, Transact, in your report, didn't you?

23      A    Yes, uh-huh.

24      Q    And we've been talking about Transact in this

25 case.  Is that the Transact you intended to be referring

1  to in your report?

2     A    Yes.  The Transact product, I think, that was

3  being discussed in this case.

4     Q    And when you wrote up your report, you thought

5  it was off the shelf, but now you know it's customized;

6  is that right?

7     A    No.  I always knew there was some

8  customization.  And in fact, right in that sentence, it

9  says that.  It had been developing and offering on a

10  customized basis.  That's on Page 9.

11     Q    All right.  Let me ask you about Open Market.

12  You had to study the history of these patents going all

13  the way back to Open Market as part of your work, didn't

14  you?

15     A    I reviewed the patents, but the study or

16  analysis of the patents was more related to the

17  technical experts.

18     Q    Well, you described Open Market's early

19  success with their product called Transact in your

20  report, didn't you?

21     A    Yeah.  I'm sure I had.  Which paragraph are

22  you referring to?

23     Q    Well, do you remember whether you discussed

24  their early success or not?  And then I'll tell you.

25     A    Yes.  I -- I do recall them being very

1  successful.  I think I mentioned that earlier.

2       Q    All right.  And on Page -- Paragraph No. 30,

3  you wrote in your report that Open Market's early

4  success with Transact turned out to be short lived; is

5  that right?

6       A    That's correct.

7       Q    That's an accurate statement, isn't it?

8       A    Yes.

9       Q    In the year 2000, Open Market was experiencing

10  a decline in its average revenues generated by Transact

11  licenses, wasn't it?

12       A    For Transact, that's my understanding, yes.

13       Q    So it was on the downward slide before the

14  hypothetical negotiation; isn't that fair?

15       A    For Transact software, that's my

16  understanding.

17       Q    That embodied the patents in issue in this

18  case.  You understand that, too, don't you?

19       A    They included the patents at issue, that's

20  correct.

21       Q    And Open Market's revenue actually peaked in

22  the year 2000; isn't that right?

23       A    What peaked in 2000?

24       Q    Open Market's revenue peaked in 2000.

25       A    Yes, absolutely.

```
 1      Q    So at the time of the hypothetical
 2 negotiation, it had peaked and was on the downside;
 3 isn't that right?
 4      A    Well, no.  No, that's not correct.
 5      Q    All right.  Well, if it peaked in 2000, 2001
 6 is after that.  That's after the peak, isn't it?
 7      A    2000 was the peak.
 8      Q    Isn't it true that recognition of Open
 9 Market's intellectual property, which we're talking
10 about here, in 2002 and 2001, was limited?
11      A    I'd say that's fair.
12      Q    You actually wrote that in your report, didn't
13 you?
14      A    Some --
15      Q    Paragraph 34?
16      A    Something similar, yes.
17      Q    Paragraph 34.  Do you see that?
18           Well, let's move on.  I don't think you're
19 quibbling with me.
20      A    No.  I agree.  That's why I wrote it.
21      Q    All right.  Now, when Divine acquired this
22 intellectual property, that is these patents and
23 Transact, it ended up, because of its aggressive
24 strategy, ending up in financial trouble, right?
25      A    Yes.  I think Ms. Wolanyk talked about that as
```

1  well.

2      Q    All right.  And it struggled financially; is

3  that right?

4      A    Divine?

5      Q    Yes.

6      A    Yes.

7      Q    Even though it owned Transact and even though

8  it owned these patents, right?

9      A    That's correct.

10     Q    You know something about Newegg by virtue of

11 your work in this case, right?

12          You studied documents?

13     A    Yes, I did.

14     Q    Depositions?

15     A    Yes.

16     Q    And Newegg was founded in 2001; is that right?

17     A    Their financials were for a different company.

18 I think they were called Magnella (sic), I believe, but

19 Newegg had some existence.  There was different

20 relationships.  I can't remember exactly when Newegg

21 started, but --

22     Q    All right.  But Newegg, as we are discussing

23 it here, was founded in 2001, wasn't it?

24     A    Could we talk about just the internet site for

25 Newegg?  That would be 2001, as I understand it.

```
 1      Q    Right.  Well, not to quibble with you --
 2      A    Okay.
 3      Q    -- but in Paragraph 41 of your report --
 4      A    Yep.
 5      Q    -- you actually say Newegg was founded in
 6 2001.
 7           So can we go with that?
 8      A    Yes.  And it's referencing their website,
 9 which is what they said.  But in looking at their
10 financials, they talked about different subsidiaries
11 formed at different points in time.  That's why I was --
12 just trying to be clear.
13      Q    All right.  And to be clear, Newegg began as a
14 subsidiary of a company called ABS Computer
15 Technologies, right?
16      A    That's right.
17      Q    And that was the company that was a custom PC,
18 personal computer, vendor trying to make it; is that
19 right?
20      A    That's my understanding.
21      Q    And at that time, the competition was very,
22 very strong in the personal computer area, wasn't it?
23      A    I think especially in the assembly area, yes.
24      Q    I may have asked you this, but I think you
25 said it in another place in your report.  I'll just ask
```

1   you if this is correct.

2           Despite Open Market's widely-publicized

3   strategy of developing a broad patent licensing program,

4   its intellectual property portfolio was not fully

5   recognized by the E-commerce industry in the form of

6   increased Transact sales or patent licenses.

7           That's true, isn't it?

8       A   Over a period of time, that's correct.

9   They -- well, over a period of time, that would be

10  correct.

11      Q   In fact, if we get right down to the bottom

12  line, you haven't seen any evidence to indicate that

13  Open Market ever established profitability associated

14  with the sale of the software products that embody the

15  patented technology.

16      A   That's incorrect.

17      Q   That's incorrect?

18      A   Right.  They obtained gross profitability.

19  They didn't obtain operating profitability.

20      Q   Turn to Page -- to Paragraph 77 in your report

21  and tell me if I read this sentence correctly.

22          You there?

23      A   Yes, uh-huh.

24      Q   Quote, I have seen no evidence to indicate

25  Open Market's established profitability associated with

 1    its sale of software products embodying the patented

 2    technology, period, end quote.

 3            Did you write that?

 4       A    Yes, I did.

 5       Q    Then if you go on down in the same paragraph,

 6    did you write:  Open Market did not earn a profit at the

 7    operating level in any given year?

 8       A    Yes.  That's what I referred to in my prior

 9    answer.  At the operating profit level, they didn't.

10       Q    You mentioned to the Ladies and Gentlemen of

11    the Jury the 25-percent to 33-percent rule.

12            Do you remember that discussion?

13       A    Yes, I do.

14       Q    That's sometimes shorthanded as the rule of

15    thumb; is that right?

16       A    Sometimes called the rule of thumb or starting

17    point, yes.

18       Q    And it's -- some people criticize that rule in

19    the economic world; isn't that so?

20       A    There's some criticism of using it arbitrarily

21    and some -- some support for using it in different

22    analyses.  Some courts have used it, and some articles

23    have commented on it.

24       Q    I want to go back for a moment to Defense

25    Exhibit 223, which is the Johnson & Johnson license.

1    And I think it's a different exhibit number in your

2    book, actually, but I'm going to put it up here.

3        A    Okay.  That's fine.  You'll put it up on the

4    screen?

5        Q    Yes, I will.

6        A    That's fine.

7                 MS. JOHNSTON:  What number?

8                 MR. SAYLES:  It's Defense Exhibit 223.

9        Q    (By Mr. Sayles) Now --

10                MR. SATINE:  Mr. Sayles, I believe it's

11   Plaintiff's 185, if Mr. Nawrocki wants to look at it.

12       Q    (By Mr. Sayles) Okay.  If you want to look at

13   it in your book --

14       A    Okay.

15       Q    -- feel free to turn to it.  And I think I've

16   got it on the screen for you.

17       A    All right.

18       Q    You told us your background, and you're not a

19   lawyer, are you?

20       A    I'm not a lawyer.

21       Q    And it's not your job to interpret contracts

22   or give legal interpretation to them, is it?

23       A    That's correct.

24       Q    From an economic standpoint, you just read

25   what you see and do the best you can, don't you?

1    A    Yes.  I'm familiar with the terms of licenses

2  certainly, and so I read them, and I'm generally

3  familiar with different contexts.

4    Q    All right.  If we look at this document in

5  Paragraph 1(b), which is the field of use that -- you

6  were asked a few questions about it, and I want to take

7  you through a little bit more of that.

8         It says means the -- field of use means the

9  development and operation of intranet and internet

10  websites by licensee, solely for licensee's internal

11  business purposes, which may include dissemination of

12  information related to licensee's products and services

13  and the sale, use, manufacture, or distribution of

14  licensee's products and services and for no other

15  purpose.

16         Do you see that?

17    A    Yes, uh-huh.

18    Q    Now, you've given us your interpretation of

19  that agreement, but you're basing that on just your

20  reading of the document; isn't that so?

21    A    It's my understanding of the context of that

22  clause, but certainly attorneys might have different

23  perspectives on it.  I just know that referred to

24  internal business purposes.

25    Q    All right.  I want to refer you to Plaintiff's

1    Exhibit 194, which is the Katco license agreement.

2         A    Okay.

3         Q    Do you remember being asked a few questions

4    about that?

5         A    Yes, I do.

6         Q    And there it says:  The licensee operates

7    cosmeticmall.com website.  That's in the second whereas

8    clause at the top.

9         A    Yes, I see that.

10        Q    And the license -- the patents that are

11   licensed here include what's listed in 1(a), which

12   includes the '780, the '314, and the '492; is that

13   right?

14        A    That's correct.

15        Q    The two patents-in-suit, plus the parent of

16   the third patent; is that right?

17        A    That's correct.

18        Q    And in Paragraph No. 2 here, it says that the

19   license during the term of this agreement and subject to

20   the payment specified in Paragraph 7 below, Divine

21   grants to licensee a paid-up, non-transferable,

22   non-exclusive license.

23             Do you see that?

24        A    Yes, I do.

25        Q    All right.  And as someone familiar with

1    reading license agreements, you know what paid up means,

2    don't you?

3         A    Yes.

4         Q    That means a one-time fee, and you're done,

5    doesn't it?

6         A    Yes.

7         Q    And you were asked some questions about this

8    Paragraph 7 being for $1,000 and a representation that

9    that represented 10 percent of the gross profit of sales

10   of product over the internet in Paragraph 7.

11             Do you remember being asked about that?

12        A    Yes, I do.

13        Q    Now, you know that the term of this license

14   was granted until these patents expired.  Did you know

15   that?

16        A    That's usually the case, but let me take a

17   look.

18        Q    Paragraph 22.

19        A    Yes, I see that.

20        Q    All right.  And so if we look at this

21   document, $1,000 was paid by this company, one-time,

22   paid up for the full life of the patents, even if their

23   business skyrocketed in the future; isn't that so?

24        A    That would seem to cover that as well.

25        Q    One of the benefits of a lump-sum payment at

1    the bargaining table is, the party receiving the money

2    doesn't have to -- they have a guarantee; they get the

3    amount they agree upon, regardless of the success of the

4    other party; isn't that right?

5         A    It could have been a benefit to the licensor,

6    but it might not always be a benefit to the licensor.

7         Q    All right.  Let's look at Plaintiff's Exhibit

8    199.  And this is the license agreement that you were

9    asked about with -- I'm going to call it Odino,

10   O-D-I-N-O.

11        A    I think it's Odimo, I think.

12        Q    Okay.  Do you recall being asked about this

13   license?

14        A    If you don't mind, Mr. Sayles -- I'm sorry.

15   The exhibit number?

16        Q    It's Plaintiff's Exhibit No. 199.

17        A    Okay.  I have that.

18        Q    And I do want to be sure you're with me, so --

19        A    Yeah, I'm with you.

20        Q    -- if you will, look in -- the licensed

21   patents, it does include the '314, the '780, the '424,

22   and the '492 by number in Paragraph 1(a), doesn't it?

23        A    That's correct.

24        Q    That would to be the patents-in-suit in this

25   case; is that right?

1     A     That's correct.

2     Q     And if you go down to Paragraph No. 2, it says

3  that Divine grants to licensee a paid-up,

4  non-transferrable, non-exclusive license.  Do you see

5  where it says that?

6     A     Yes.

7     Q     And paid up here means the same thing it meant

8  just a minute ago, paid up one time for good; isn't that

9  right?

10    A     Generally paid up in one time.  Sometime it

11 could be multiple payments, but paid up.

12    Q     All right.  And if we look at Paragraph No. 7,

13 that's where the $30,000 is; is that right?

14    A     That's correct.

15    Q     So if the business of this company skyrocketed

16 after they paid for their paid-up royalty, they wouldn't

17 owe any more money, would they?

18    A     I'm not aware of them needing -- owing any

19 more money, if their business took off from here.

20    Q     They would have paid their 30,000, and that's

21 it; is that right?

22    A     That's my understanding.

23    Q     And if we look at Paragraph 22 of this same

24 document, just to be sure, the term of this agreement is

25 until the licensed Divine patents expire.

1          Do you see that?

2     A    Yes, I do.

3     Q    I'd like you to take a look at Plaintiff's

4  Exhibit 202 that you were asked about.  This is the

5  license agreement with Webster Orchard.  Tell me when

6  you're there.

7     A    All right.  I'm there.

8     Q    All right.  And this is a license agreement

9  between Divine on the one hand and Webster Orchard on

10  the other hand in September of 2002; is that right?

11     A    Yes.

12     Q    Paragraph 2.  Once again, this is a paid-up,

13  non-transferable license, isn't it, according to its

14  terms?

15     A    That's correct.

16     Q    And if we turn the page to Paragraph No. 7,

17  even though there's a recitation that this is equal to 2

18  percent of the licensee's gross sales, the payment is 2

19  percent of $100,000 one time, paid up for the life of

20  the patents; isn't that right?

21     A    That's my understanding.

22     Q    In these transactions of Newegg that you had

23  up on the chart as your royalty base -- you remember the

24  number of transactions?

25     A    Yes, uh-huh.

1     Q     Did you do a subtraction for the transactions
2  where a single item only was purchased?
3     A     No.  This includes all completed transactions.
4     Q     All right.  And if we look in your report or
5  your deposition and in your testimony now, you are not
6  taking into account the possibility that single-item
7  transactions are non-infringing, are you?
8     A     I don't have an opinion on the infringement.
9     Q     But you haven't -- but you haven't backed out
10  the single-item transactions in all these numbers you've
11  given us.
12     A     I've included all completed transactions.
13     Q     Now, I think that we can agree on this.  To be
14  clear with the jury, it is not your job and is not your
15  background and expertise to give opinions on the
16  validity of these patents; is that right?
17     A     That's correct.
18     Q     Your job is to assume that they're valid; is
19  that right?
20     A     That's correct, as we talked --
21     Q     And it's the jury's job to decide that; is
22  that right?
23     A     The validity?
24     Q     Yes, sir.
25     A     Yes.  The validity will be decided by the jury

1   and the Court.

2       Q    And it's not your expertise or your place in

3   this courtroom to testify about infringement either, is

4   it?

5       A    That's correct.  That's not my role.

6       Q    You assume it.

7       A    I assumed it, right.

8       Q    And that's up to the jury to decide in this

9   case; is that right?

10      A    Final determination is up to the jury.

11      Q    All right.  And it would be wrong for anyone

12  to infer that you are expressing an opinion from a

13  professional standpoint on either validity or

14  infringement, wouldn't it?

15      A    I have no opinion on validity or infringement

16  here.

17      Q    All right.  Let's talk about the royalty rate

18  you came up with of a dollar twenty per transaction.

19           That's what it is, isn't it?

20      A    The 80 cents and the 40 cents is a dollar

21  twenty, that's right.

22      Q    All right.  And you said you made some

23  deductions from other numbers that you calculated.

24           Do you remember that testimony?

25      A    I don't recall saying deductions.  I said

```
 1   other apportionments.

 2        Q    All right.

 3        A    Is that what you're referring to?

 4        Q    Yes, it is.

 5        A    What I had it on the easel over here.

 6        Q    Yes.

 7        A    Yes.

 8        Q    Now, these apportionments --

 9              MR. SAYLES:  May I approach this easel,

10   Your Honor?

11              THE COURT:  Yes, you may.

12        Q    (By Mr. Sayles) These apportionments --

13        A    Excuse me.  I'm sorry.  Could you just turn

14   the easel slightly?

15        Q    I'm sorry.

16        A    That's good.  That's fine.

17        Q    These apportionments are your opinion of what

18   is a proper adjustment or apportionment of this; is that

19   right?

20        A    Those are my calculations of an apportionment

21   based upon recognition.  So that's a judgment, as is the

22   80 cents and the 40 cents.

23        Q    A recognition of one thing is Newegg's

24   contribution to its success by, among other things, good

25   customer service, right?
```

1      A      Uh-huh.

2      Q      But you haven't done an economic analysis

3  where you attribute specific numbers to the contribution

4  of customer service, have you?

5      A      A dollar amount to the customer service?

6      Q      Dollar amount.

7      A      No.  I have not put a dollar amount to the

8  customer service.

9      Q      Or a specific percentage.

10      A      Not specifically to customer service, but the

11  remaining amount would be for Newegg.

12      Q      Right.  And similarly, you haven't put a

13  number, based on economic analysis, on an adjustment for

14  persons who are attracted to Newegg because of the good

15  prices, have you?

16      A      Not a specific number, but that's also

17  included in the 80 to 85 percent that I'm giving to

18  Newegg.

19      Q      All right.  But that's -- that's just your

20  judgment and opinion there --

21      A      That's correct.

22      Q      -- isn't that right?

23      A      That's correct.

24      Q      We don't have a specific economic analysis

25  analyzing each of the factors that Newegg contributes

1  here, do we?

2      A    Not other than looking at their overall

3  financials and their overall profitability.

4      Q    Otherwise, it's your opinion; is that right?

5      A    Based upon the information that they provided.

6      Q    Are you aware of specific survey information

7  about why customers are attracted to Newegg?

8      A    I don't recall if there was survey information

9  that was available.  I know there's various criteria,

10  including customer service, logistics, and things like

11  that, but I don't recall if there was customer service

12  information.

13      Q    All right.  As a damage expert witness, on

14  occasion, you've done surveys yourself, haven't you?

15      A    In a few instances, I've done surveys.

16  Oftentimes, I've worked with other survey experts.

17      Q    Here, did you do any sort of survey to

18  determine what low pricing has to do with Newegg's

19  success?

20      A    No.  I assumed that was a consideration.

21      Q    Did you do any survey or analysis to determine

22  what its award-winning customer service contributed?

23      A    No.  I assumed that was a consideration as

24  well.

25      Q    Or fast shipping?

1        A    I considered that as well.

2        Q    But you can't quantify it with a survey, can

3   you, what that contribution is?

4        A    That's correct.  There's no survey that I've

5   done to assess what amount was relating to fast

6   shipping, how many people went there for fast shipping.

7        Q    And actually, there's no specific economic

8   analysis, other than your judgment about it, in your

9   report or your deposition; isn't that right?

10       A    That's correct.  I did not do a survey or an

11  economic analysis of the specific attributions to

12  customer service or fast shipping.

13       Q    Or any other aspect of Newegg's contribution

14  to its own success; isn't that right?

15       A    Other than the documents that I saw that

16  Newegg produced.

17       Q    You did some calculations of what Newegg's

18  operating net profit was, didn't you?

19       A    That's correct.

20       Q    In actual fact, it comes out to about $2.94

21  per transaction; is that right?

22       A    I -- it depends on how you're calculating it.

23  You talking about the entire period?

24       Q    Well --

25       A    Which period are you referring to?

1    Q    You calculated it at $2.94 for some period of
2    time, didn't you?

3    A    I would have to take a look.

4    Q    Per transaction I'm talking about.

5    A    Per transaction, I have calculations we went
6    through at $3, which is close to the 2.94, $6 and $12.

7    Q    Right.  And the $6 and $12 you based on
8    projections; isn't that right?

9    A    By expectations or projections.

10   Q    That's right.

11   A    The $6 was a projection; the $3 was my looking
12   at what their profitability was in the earlier years,
13   but expectations of what their anticipated profitability
14   would have been.

15   Q    And if their expected profitability is about
16   $3 per transaction, $1.20 royalty per transaction is
17   taking 40 percent of their profit; isn't that right?

18   A    $1.20 would be 40 percent of the $3, if you
19   use the $3.

20   Q    Well, in some of your numbers you did use $3,
21   didn't you?

22   A    Yes.  And in some there was $12, which would
23   be then 10 percent of their profits.

24   Q    And so it is your opinion, as I understand it
25   then, that, back in 2001 at the bargaining table, when

1  Open Market was on the decline and Newegg was just

2  getting started, that it would have reached an agreement

3  that could actually pay to Open Market upwards to 40

4  percent of its profit?  That's your opinion?

5        A    I don't think that's what the time period

6  would suggest.  At that time period, the profitability

7  and the average prices were different than that.

8        Q    But if they agreed to a running royalty, as

9  you express your opinion that they would, and achieve

10  the success they did, that's the very result; isn't it?

11       A    Not that it's 40 percent of their anticipated

12  profits, no.  It would be -- at that point in time, it

13  would be much less than 25 percent of their anticipated

14  profits.

15       Q    But in 2007 to 2010, would you at least

16  acknowledge that your suggested royalty rate would be a

17  high percentage of Newegg's total operating profit?

18       A    For 2007 to 2009, their --

19       Q    2010, I'm sorry.  The damage period.

20       A    Yes.  2007 to 2010, that period?

21       Q    Yes.

22       A    Their profitability ranged from 1.6 to 2.4

23  percent.

24            So if you used -- you could use 2 percent as

25  an approximate average for that period is their actual

1  profitability.

2      Q    And the average transaction was about $200?

3      A    Approximately $200.

4      Q    And if you charge $1.20 royalty, what

5  percentage of the profit is that?  Can you do the math

6  on that?

7      A    2 percent times $200 would be $4

8  profitability, and that would represent 30 percent;

9  $1.20 would represent for that period under that

10  scenario.

11      Q    I may have asked you this, if I did, forgive

12  me.

13          Other than using the 25-percent rule, which

14  you applied to Newegg's profit margin, did you make any

15  mathematical adjustments to your royalty rate or royalty

16  base?

17      A    Yes.  The royalty -- well, the royalty base

18  includes the transactions that are accused of

19  infringement.  That doesn't represent all their sales.

20  There are some additional sales they have in addition to

21  those.  So that's been adjusted to just include the

22  accused transactions.

23      Q    Did you make any mathematical adjustment to

24  your royalty rate based upon economic analysis

25  specifically?

1    A    I would say it was based upon my analysis of

2    the business information.  I wouldn't say to some extent

3    one could regard that as an economic analysis.  I would

4    regard it as more of a business analysis and business

5    judgment based upon the business plans and other

6    information that Newegg produced in terms of the

7    importance of this type of technology to them.

8    Q    One of the things that I think that you have

9    clearly assumed here is that the technology that is

10   embodied in the patents is integral, critical, or

11   fundamental to Newegg's business; is that right?

12   A    I think that's fair.

13   Q    And if that turns out to be incorrect, then

14   your opinion on damages would similarly be incorrect?

15   A    The judgment in terms of how critical the

16   nature would be, I relied upon the technical experts.

17   If it's not as critical, and that's a judgment for the

18   jury, then adjustments may or may not be necessary.

19   It's the damages calculation.

20   Q    All right.  You know that Soverain and Newegg

21   are not competitors in the marketplace, don't you?

22   A    That's correct.  I think there was some

23   discussion about Newegg Mall; but in general, I think

24   that's the case.

25   Q    And so what Soverain is claiming here, and

1    what you're supporting, is not any lost profits or lost

2    sales by Soverain, but rather a royalty; is that right?

3         A    That's correct.  The calculation is a

4    reasonable royalty or compensatory damages for

5    reasonable royalty.

6         Q    Because Soverain hasn't lost any sales or

7    profits on account of Newegg, have they?

8         A    Has Soverain lost any sales?

9         Q    Sales or profits on account of Newegg.

10        A    I have not been asked to analyze that.  But

11   Soverain is in the marketplace of selling software, but

12   I'm not aware of any specific lost sales.  I'm not

13   saying they haven't.

14        Q    And you do recognize that the products that

15   are sold by Newegg -- the televisions, the computers,

16   the cables, et cetera -- are not patented products;

17   rather it's the process or method that we're talking

18   about here?

19        A    Products may or may not be patented, but

20   not here.

21        Q    Not by these?

22        A    Not by these patents.

23        Q    All right.  You've testified, as you've

24   acknowledged to me, quite a few times.

25        A    Yes.

1    Q    And isn't it true that you've never concluded

2  that it would be appropriate to award a lump-sum royalty

3  in a software or internet-related case?

4    A    Did you say a lump sum in those cases?

5    Q    Yes.  You have never concluded it would be

6  appropriate to award a lump-sum royalty in a software or

7  internet-related case.  Never.

8    A    I think that's probably fair.  They have been

9  based upon the extent of use.  I couldn't say with

10  absolute certainty, just because I'm under oath, but I

11  don't recall of one as I sit here today.

12    Q    All right.  I will acknowledge it is not your

13  opinion, but reasonable people can disagree when it

14  comes to opinions; isn't that right?

15    A    Certainly.

16    Q    And here a lump-sum license might have been

17  agreed to in 2001.  That's a possibility; isn't it?

18  It's not your opinion, but it's possible.

19    A    Possibility, but it would consider extent of

20  use as well.

21    Q    Did you testify in this case that, under some

22  circumstances, a lump-sum payment could be appropriate?

23    A    I don't recall if I did.

24    Q    All right.  Just to refresh your memory, look

25  at Page 106, Line 15 and 16 of your deposition and see

1   if you said something like that.

2       A    I don't have my deposition here.

3       Q    Oh, all right.

4            Does that sound familiar to you?

5       A    I'd have to take a look and see, if you don't

6   mind.

7       Q    All right.  Let's go the Page 106, Line 15 and

8   16.

9            Do you recall this question and giving this

10  answer?

11      A    Give me just a second so I can read it, if you

12  don't mind.

13      Q    Sure, of course.

14           Look at 106, Line 10, and the answer

15  following.

16      A    Okay.

17      Q    Do you see where you said that the damages

18  amount would be a running or lump sum, it would need to

19  be commensurate with the use?

20      A    Yes, commensurate with the use, that's

21  correct.

22      Q    All right.  And in 2001 there really wasn't

23  very much use by Newegg because they were just starting

24  up, right?

25      A    That misinterprets the lump sum.  Lump sum

1   would be based upon projected use.  That's how you would

2   calculate a lump sum, based upon the projected

3   anticipated use.

4        Q    All right.  But if you did that and you put

5   yourself back in 2001, a lump sum might have been agreed

6   upon at that bargaining table.

7        A    It's possible, as I said here.

8             MR. SAYLES:  May I confer with my

9   co-counsel just for a moment, Your Honor?

10            THE COURT:  You may.

11            MR. SAYLES:  I pass witness.

12            THE COURT:  Redirect.

13            MR. SATINE:  Your Honor, redirect?

14            THE COURT:  Uh-huh.

15                  REDIRECT EXAMINATION

16  BY MR. SATINE:

17       Q    Mr. Nawrocki, at the time of the hypothetical

18  negotiation on the eve of infringement, how many

19  transactions was Newegg at?

20       A    At the eve of infringement?

21       Q    Yes.

22       A    None at that point in time.

23       Q    Today, in this courtroom, how many millions of

24  transactions has Newegg had?

25       A    We talked about that earlier.  Over 50

1    million; 28 million for the last few years, but over 50

2    million since '01.

3        Q    Now, Mr. Sayles took you to your deposition

4    testimony, and in that deposition testimony, I believe

5    you were talking about commensurate with use.  Can you

6    explain that to us?

7        A    Yes.  It might be helpful if you would call up

8    the deposition.

9             MR. SATINE:  Could you put that back up,

10   Page 106 of Mr. Nawrocki's deposition?

11       A    Yes.  So you see at Page 106, Line 16 -- 15

12   through 17, the damages amount would be a running or

13   lump sum and would need to be commensurate with that

14   use.

15            So if a license was done on a lump-sum basis

16   or a running basis, it would be commensurate with that

17   use.  So I've calculated damages on a running basis.

18       Q    (By Mr. Satine) So you've taken the 28,316,504

19   transactions into consideration in calculating a

20   royalty?

21       A    Yes, I have.  And that's fairest for both

22   sides.  If they don't use the technology a lot, then

23   they don't pay a lot.  If they use the technology a lot,

24   then they pay more.  It's commensurate with use.

25            A lump sum would be different than that, if

1    it's not based upon use.

2              MR. SATINE:  If you could go to Exhibit

3    P185 back on the screen.

4         Q    (By Mr. Satine) I think Mr. Sayles asked you

5    some questions about Paragraph 1(b).

6              MR. SATINE:  If you could blow up

7    Paragraph 1(b).

8         A    Okay.

9         Q    (By Mr. Satine) Now, Mr. Sayles focused on the

10   sentence which says -- first sentence which says:  Field

11   of use means development and operation of intranet and

12   internet websites by licensee solely for licensee's

13   internal business purposes.

14             And then there's a parentheses, right?

15        A    Yes.

16        Q    Okay.  Let's jump over everything in the

17   parentheses and jump to the end of the parenthesis and

18   continue.

19             And for no other purpose.  Can you tell us

20   your understanding of that?

21        A    Yes.  My understanding is that the licensee,

22   Johnson & Johnson, could use this for internal purposes,

23   not for external purposes, in terms of sales to third

24   parties.  It specifically talks about that in the next

25   area.

1           In no event will an internal business purpose

2    include the distribution of software to third parties.

3      Q    And if we look within the parentheses, it

4    says:  Which may include dissemination of information

5    related to licensee's products and services and the

6    sale, use, manufacturing, or distribution of licensee's

7    products and services.

8           What was your understanding of that language

9    in the parentheses?

10     A    The dissemination of information could be

11   things like product brochures, product details, that

12   type of information related to the sales or

13   distribution, an internal distribution system.

14          You might want to have some type of security

15   over that so other people wouldn't obtain it, and so

16   this would provide that type of security within the

17   session management patents -- or patent.

18     Q    Mr. Sayles also asked you about all the courts

19   you've appeared in around the United States and in

20   Norway, and he went through a lengthy list.

21          Have you been recognized as an expert witness

22   with respect to damages in each of those courts around

23   the United States and in Norway?

24     A    Yes, I have.

25     Q    One more time.  Using the royalty base, that

1  was based upon usage; is that correct?

2     A    That's correct.  This royalty base was based

3  upon the extent of use here.

4     Q    And based upon usage, what was the royalty

5  that you calculated was a reasonable royalty in this

6  case?

7     A    Total amount of 33,979,805.

8              MR. SATINE:  No further questions, Your

9  Honor.

10             THE COURT:  All right.  Thank you.

11             Recross?

12             MR. SAYLES:  May it please the Court.

13                  RECROSS-EXAMINATION

14 BY MR. SAYLES:

15    Q    While you have been recognized, as you say, as

16 an expert witness in the courtrooms you've appeared in

17 around the country and other places in the world, your

18 opinion is sometimes accepted and sometimes not; isn't

19 that right?

20    A    The ultimate decision is a matter for the jury

21 and the Court, that's correct.

22             MR. SAYLES:  Pass the witness.

23             THE COURT:  Thank you.

24             Anything further?

25             MR. SATINE:  Nothing further.

1                    THE COURT:  All right.  You may step

2  down.

3                    All right, Ladies and Gentlemen of the

4  Jury, I think we'll call it a day with that.  You've

5  been very attentive today.

6                    Let me just -- before we do that, does

7  Plaintiff rest?

8                    MR. ADAMO:  As you can see, I just got an

9  emergency message from -- there are -- there's some

10  evidentiary issues that are still open, as far as

11  admission of exhibits.

12                    Other than us, hopefully, resolving them

13  outside of the presence of the jury -- this is not

14  something that's a jury issue -- I think I informed the

15  Court earlier there were issues about exhibits that I

16  had used with Dr. Grimes that Mr. Sayles had agreed were

17  okay.  He agreed that they could be marked and treated

18  as demonstratives.

19                    I informed Your Honor that I felt that

20  they were entitled to come in -- all the way into

21  evidence.  In brief, he hasn't responded yet.  Open

22  issues like that.

23                    Other than that, you've heard all of our

24  testimony.  We just have some housekeeping issues to get

25  things in.

1               THE COURT:  Okay.  Well, I want to get

2     the Plaintiff rested.  So what do you need to do to

3     rest?

4               MR. ADAMO:  Get these evidentiary issues

5     resolved or get you to agree that you will resolve them.

6               I'll abide by the decision.

7               THE COURT:  Do you rest other than the

8     Court resolving these evidentiary issues?

9               MR. ADAMO:  Yes, these various

10    evidentiary issues.  Yes, I rest otherwise.

11              THE COURT:  All right.  Very well.

12              All right, Ladies and Gentlemen of the

13    Jury, that gets us through the evidence for the

14    Plaintiff's case.  We'll come back in the morning and

15    begin the evidence in the Defendant's case.

16              There may be some other documents that

17    may be admitted that are not admitted that -- based upon

18    some evidentiary rulings I have to make, but I'll take

19    care of that this evening, and y'all can go on home.

20              I hope you have a good evening.  Drive

21    careful.  Get some rest.  You've been very attentive

22    today.  We thank you for your service.

23              Please remember my instructions.  Do not

24    discuss the case with anyone else or among yourselves.

25              Don't make any independent investigation.

1   And we'll see you back here in the morning.

2                  I think we're making good progress toward

3   being through this week.  So with those encouraging

4   words, y'all have a good evening.  You are excused.

5                  COURT SECURITY OFFICER:  All rise for the

6   jury.

7                  (Jury out.)

8

9                  THE COURT:  All right.  Please be seated.

10                  MR. SAYLES:  Your Honor, I have a motion

11   that I'd like to make before we adjourn today.

12                  THE COURT:  Oh, I'm going to let you.

13                  MR. SAYLES:  All right.

14                  THE COURT:  I just want to get these --

15   the evidence all in here.

16                  What are we arguing over here?

17                  MR. ADAMO:  The bench memo, do you have a

18   copy of that, Your Honor?

19                  I'm sorry, Your Honor.  Pardon my back.

20                  Your Honor, here are three copies of the

21   bench memo that I gave to Mr. Sayles several days ago.

22                  MR. SAYLES:  Can you remind me?

23                  MR. ADAMO:  Yes.  This is the -- on

24   Sunday morning, I handed you two bench memos.

25                  One has been resolved as a result of His

1    Honor's rulings this morning.  That was the second part

2    of the --

3                   THE COURT:  Okay.  What exhibit numbers

4    do you wish to offer?

5                   MR. ADAMO:  P54, P244, and 62B, Your

6    Honor.

7                   THE COURT:  All right.  And which ones

8    are those?  Do you have them up here?  Are they blown

9    up?

10                  MR. ADAMO:  They were used during

11   Dr. Grimes' testimony.  54 and 244 are the collection of

12   the hundred and something slides that he used.

13                  Remember, Your Honor, there was source

14   information on all of the slides, and this memo

15   demonstrates that under the law, the slides can come in

16   as 1006 summaries.

17                  THE COURT:  Okay.  And what's P62B?

18                  MR. ADAMO:  That is where he had taken

19   Mr. Wu's testimony in the right-hand column.

20                  MS. CRADDOCK:  They agreed to 62B.

21                  MR. ADAMO:  I'm sorry?

22                  MS. CRADDOCK:  They agreed to 62B.

23                  MR. ADAMO:  Okay.  Thank you.

24                  THE COURT:  So 62B is already in?

25                  MR. ADAMO:  62B is already in, Your

1  Honor.

2                THE COURT:  So we're talking about 54 and

3  244.

4                MR. ADAMO:  We are, Your Honor.

5                THE COURT:  All right.  What's your

6  objection, Mr. Sayles?

7                MR. SAYLES:  Judge, I'm going to be very

8  straightforward with you.  I'm so tired I've forgotten

9  what they are, to tell you the truth.

10               THE COURT:  Okay.  All right.

11               MR. SAYLES:  I really have.

12               THE COURT:  Okay.  All right.  Well,

13  they're admitted.

14               MR. ADAMO:  Thank you, Your Honor.

15               THE COURT:  You bet.

16               MR. ADAMO:  And what were the ones --

17               THE COURT:  Motion for JMOL.

18               MR. SAYLES:  Well, we are not going to

19  make the JMOL at this time.  This is a different motion

20  that I want to make.

21               THE COURT:  Okay.  All right.  I am going

22  to hear JMOLs this evening, though, so...

23               MR. SAYLES:  You are?

24               THE COURT:  Yes.

25               MR. SAYLES:  Okay.  I'm looking for my

1  lawyer there, Judge.

2              THE COURT:  Looking for some help.  I

3  understand.

4              MR. SAYLES:  Yes.

5              May it please the Court.

6              Now that Mr. Nawrocki has testified,

7  Mr. Nawrocki admitted that he did not subtract one-item

8  orders in his testimony.

9              THE COURT:  Did not subtract what?

10             MR. SAYLES:  One-item orders, where a

11 single item was ordered on the Newegg website.  And in

12 this case, Mr. Grimes testified that such orders do not

13 infringe these patents.

14             We would move to strike Mr. Nawrocki's

15 testimony concerning the number of orders that he

16 testified to as his base and the total royalties for

17 shopping cart patents under Federal Rule 402 and 403.

18             In particular, Mr. Nawrocki claims that a

19 royalty of 80 cents per order is a reasonable royalty

20 for infringing uses of the shopping cart patents;

21 however, Mr. Nawrocki counts orders that include orders

22 in which only one item was placed in the shopping cart.

23             As Mr. Grimes testified, these orders do

24 not constitute an infringing use.  For this reason, any

25 testimony from Mr. Nawrocki that the proper royalty base

1   for the shopping cart patents is the entirety of Newegg

2   orders is incorrect as a matter of law and should be

3   stricken, and the jury should be asked to disregard it

4   as irrelevant under Federal Rule 402.

5            And in that regard, I want to cite to the

6   Court a case that I know the Court is familiar with,

7   Lucent Technologies, in which it says the damages award

8   can't be supported by evidence that the infringers also

9   used additional non-infringing features.

10           Only when the date picker is used to fill

11  out a form does infringement occur.  All other means of

12  filling out a form, such as typing in the entire date,

13  do not infringe.  The damages award ought to be

14  correlated in some respect to the extent of the

15  infringing method as used by consumers.

16           And so for that reason, Your Honor, we

17  submit -- and I won't repeat myself -- that Mr. Nawrocki

18  did not take the single-item orders into account, and

19  his testimony should be stricken.

20           THE COURT:  Okay.  Response?

21           MR. ADAMO:  Yes, Your Honor.

22           Dr. Grimes -- I'm sorry.  I didn't mean

23  to show the Court my back.

24           Dr. Grimes gave no such testimony.  This

25  was -- if you recall, this was the back and forth about

1   something being programmed in a certain -- in a

2   certain -- certain way that we went through when -- I

3   think you remember that was my -- my -- my redirect.

4               The fact that the -- being programmed to

5   receive a plurality, that's all the claim limitation

6   requires.

7               If you happen to -- and that's what he

8   testified to, that it was, in fact, programmed to

9   receive a plurality.

10              If in certain instances, a customer only

11  hit one, that doesn't change the fact that he's

12  testified, and it's now a jury issue, that programming

13  is -- is -- is required by the claim is, in fact,

14  present.  That's the -- that's the --

15              THE COURT:  You're saying the claim is

16  infringed even when someone just purchases one item?

17              MR. ADAMO:  The claim -- the system

18  claims are infringed as long as the computer is

19  programmed to receive a plurality.  It doesn't have to

20  receive a plurality.  The programming just has to be

21  capable of receiving a plurality.  That's what I took

22  Dr. Grimes through on redirect.

23              System claims are structure.  And the

24  issue is, were they so programmed?  And he testified

25  they were programmed to receive a plurality.  As long as

1  they're programmed to receive a plurality, what they did

2  or didn't receive is irrelevant.

3            THE COURT:  Response?

4            MR. SAYLES:  Judge, I think that I would

5  be actually repeating myself, but I will respond

6  briefly.

7            In the Lucent case, what was involved

8  there was a method --

9            THE COURT:  Well, I'm not so -- well, I

10  mean, you can get that -- to that in a moment, but what

11  I would really like to know about is, did you elicit

12  from Dr. Grimes' testimony where he indicated that a

13  single item purchase would not infringe?

14            MR. SAYLES:  I believe that we did.

15            THE COURT:  Do you have that testimony

16  for me?

17            MR. SAYLES:  Can you look it up?

18            THE COURT:  Well, go ahead with your

19  argument, and I may...

20            MR. SAYLES:  Judge, I -- again, I'm going

21  to shoot straight with you.  I've given you my best

22  argument, and I've stated my position as best I can, and

23  I don't want to take your time up by repeating.

24            MR. ADAMO:  If I just heard him right, he

25  just said Lucent's a method claim.  That is an entirely

1  different situation.  We don't know what that method

2  claim said.  Those claims are not method claims.  That's

3  the entire point of this.

4                THE COURT:  All right.

5                MR. ADAMO:  They're system claims.

6                THE COURT:  All right.  Motion's denied.

7                What's next?

8                MR. SAYLES:  All right.  Ms. Frost is

9  going to make a JMOL, if we have to make it today.

10                THE COURT:  I want to get it done today

11  where we can start off with the jury at 9:00 in the

12  morning.

13                MR. SAYLES:  Oh, Your Honor.  We could

14  make it at the end of our case, if the Court would

15  permit us to.  The rules allow that.  So we don't have

16  to make it in the morning.  We're ready to start with

17  the evidence in the morning.

18                THE COURT:  I'd like to go ahead and hear

19  it now.

20                MR. SAYLES:  All right.

21                MR. ADAMO:  I'm sorry, Your Honor.

22                MS. FROST:  Your Honor, we have the right

23  under Rule 50(a), as the Court is aware, under (2), to

24  make our judgment -- motions for judgment as a matter of

25  law at anytime before the case is to be submitted to the

1   jury, and that's our intention to do so.  We are not

2   prepared to make our motions at this time.

3                  THE COURT:  All right.  We're adjourned.

4                  COURT SECURITY OFFICER:  All rise.

5                  MR. ADAMO:  Your Honor?  Your Honor, I'm

6   sorry.  Could we get the time read --

7                  THE COURT:  Yes.

8                  MR. ADAMO:  -- for today?  I'm sorry,

9   Your Honor.

10                  THE COURT:  Plaintiff has used 6 hours

11   and 50 -- I've got to give you a few minutes back there.

12                  MR. ADAMO:  Keep on with that thought,

13   Judge.  Great.

14                  THE COURT:  6 hours and 47 minutes, and

15   Defendant has used 3 hours and 13 minutes.

16                  MR. ADAMO:  Thank you very much, Your

17   Honor.  Appreciate it.

18                  THE COURT:  Y'all have a good evening.

19                  MR. ADAMO:  Good night, sir.

20                  (Court adjourned.)

21

22

23

24

25

```
 1                 C E R T I F I C A T I O N

 2

 3   I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled

 5   matter.

 6

 7   /s/

 8   SHEA SLOAN, CSR, RPR

 9   OFFICIAL COURT REPORTER

10   STATE OF TEXAS NO. 3081

11

12

13   /s/

14   JUDITH WERLINGER, CSR

15   DEPUTY OFFICIAL COURT REPORTER

16   STATE OF TEXAS NO. 267

17

18

19

20

21

22

23

24

25
```