```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                           TYLER DIVISION

 3
   SOVERAIN SOFTWARE              )
 4                               )   DOCKET NO. 6:07cv511
        -vs-                      )
 5                               )   Tyler, Texas
                                 )   8:42 a.m.
 6 NEWEGG, INC.                   )   April 29, 2010

 7                       TRANSCRIPT OF TRIAL
                          MORNING SESSION
 8             BEFORE THE HONORABLE LEONARD DAVIS,
           UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                    A P P E A R A N C E S
10
   FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
11                          JONES DAY
                            2727 N. Harwood St.
12                          Dallas, Texas  75201-1515

13                          MR. THOMAS L. GIANNETTI
                            MR. BARRY R. SATINE
14                          MS. CLARK CRADDOCK
                            JONES DAY
15                          222 East 41st St.
                            New York, New York  10017-6702
16
                            MR. CARL ROTH
17                          ROTH LAW FIRM
                            115 N. Wellington, Ste. 200
18                          P.O. Box 876
                            Marshall, Texas  75670
19
                            MR. MICHAEL C. SMITH
20                          SIEBMAN, REYNOLDS, BURG,
                            PHILLIPS & SMITH
21                          713 S. Washington Ave.
                            Marshall, Texas  75670
22

23 COURT REPORTER:         MS. JUDITH WERLINGER

24 Proceedings taken by Machine Stenotype; transcript was
   produced by a Computer.
25
```

```
 1  FOR THE THE DEFENDANTS:  MR. RICHARD SAYLES
                             MR. MARK STRACHAN
 2                           SAYLES WERBNER
                             4400 Renaissance
 3                           1201 Elm St.
                             Dallas, Texas  75270
 4
                             MR. HERBERT A. YARBROUGH, III
 5                           YARBROUGH LAW FIRM
                             100 E. Ferguson, Ste. 1015
 6                           Tyler, Texas  75702

 7

 8                           MR. DAVID C. HANSON
                             MR. KENT BALDAUF, JR.
                             MR. DANIEL H. BREAN
 9                           THE WEBB LAW FIRM
                             200 Koppers Bldg.
10                           436 Seventh Ave.
                             Pittsburgh, PA  15219
11

12                           MS. CLAUDIA W. FROST
                             MR. JEREMY J. GASTON
13                           PILLSBURY WINTHROP
                             909 Fannin St., Ste 2000
14                           Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2               (Jury in.)

 3               THE COURT:  Please be seated.

 4               All right.  Mr. Sayles, you ready to

 5  proceed?

 6               MR. SAYLES:  We are ready to proceed,

 7  Your Honor.

 8               THE COURT:  All right.

 9               MR. SAYLES:  And in keeping with the

10  Court's procedures, we have our list of exhibits to

11  offer and to provide to the Court Reporter for the

12  record.

13               THE COURT:  Very well.

14               MR. SAYLES:  On April 28th, Newegg

15  offered and these exhibits were admitted into evidence:

16  Defense Exhibit 1 and Defense Exhibit 50.

17               Today Newegg offers into evidence, with

18  no objection by Soverain, Defense Exhibits 2 through 6,

19  156, 488, 495, 501, 504, and 505.

20               THE COURT:  Be admitted.

21               MR. SAYLES:  May I approach,

22  Ms. Ferguson --

23               THE COURT:  Yes, you may.

24               MR. SAYLES:  -- to give her the list?

25               THE COURT:  Plaintiff have something
```

```
 1  similar?

 2                  MR. ADAMO:  Mr. Sayles, do you have

 3  another one?

 4                  MR. SAYLES:  Yes.  I gave you that.

 5                  MR. ADAMO:  No, no.  I just thought maybe

 6  you had two there.

 7                  MR. SAYLES:  Oh, that's cumulative, so...

 8                  MR. ADAMO:  Thank you.

 9                  I'm sorry, Your Honor.  Yes, I do.

10                  THE COURT:  All right.

11                  MR. ADAMO:  Good morning.

12                  THE COURT:  Good morning.

13                  MR. ADAMO:  This will be Plaintiff's

14  Exhibit List 3, Your Honor, and these are exhibits

15  that -- excuse me -- Newegg has agreed are admissible,

16  and there are no objections, Plaintiff's 16, Plaintiff's

17  17, and Plaintiff's 27A.

18                  And Ms. Ferguson has previously marked

19  these as Plaintiff's Exhibit List 3.

20                  THE COURT:  Okay.  Very well.

21                  MR. ADAMO:  These are extra copies for

22  the Court's...

23                  Thank you, Your Honor.

24                  THE COURT:  You may proceed.

25                  MR. BALDAUF:  At this time, Defendant
```

1    Newegg calls Mr. Edward Tittel, who has already been

2    sworn.

3                    THE COURT:  Okay.

4                    MR. BALDAUF:  Your Honor, is it okay

5    during this testimony if I walk back and forth between

6    the podium and the board?

7                    THE COURT:  Excuse me?

8                    MR. BALDAUF:  May I walk back and forth

9    between the podium and the board throughout this?

10                   THE COURT:  Yes, you may.

11                   MR. BALDAUF:  Okay.  May I proceed?

12   EDWARD R. TITTEL, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

13                       DIRECT EXAMINATION

14   BY MR. BALDAUF:

15       Q    Good morning, Mr. Tittel.  How are you today?

16       A    I'm fine.  Thank you.

17       Q    Could you please introduce yourself to the

18   members of the jury.

19       A    Yes.  My name is Edward R. Tittel, and I live

20   in Round Rock, Texas.

21       Q    And how are you employed at the present time,

22   sir?

23       A    I'm a full-time freelance writer and

24   consultant.

25       Q    And on what topic do you write?

1       A    I write on a number of different

2  computer-related topics, but my primary areas of

3  interest are Windows, computer security, and markup

4  languages.

5       Q    And how many books have you written on

6  computer-related subjects?

7       A    Well, to tell you the truth, I've lost count.

8  The last time I managed a complete count, it was around

9  140.

10      Q    And I'm just going to show a quick slide of

11 just some of the many titles that you've written.

12      A    I've always been afraid that when I show up at

13 the pearly gates, St. Peter is going to kick me out for

14 killing so many trees.

15      Q    I'd like to talk about a couple of these books

16 that you've written in a little bit greater detail.

17           First, I'd like to turn to what is Defendant's

18 Exhibit 54, Building Web Commerce Sites, which I have

19 right here, by Ed Tittel, Charlie Scott, and others.

20           Are you the Ed Tittel referenced on the cover

21 of this book?

22      A    Yes, I am.

23      Q    What is the subject of Building Web Commerce

24 Sites?

25      A    This book explains to smaller companies how

1    they could build a website that would include E-commerce

2    capabilities, such as a shopping cart and payment

3    handling, and manage financial records to keep track of

4    payments.

5         Q    I'd next like to bring to your attention

6    Defendant's Exhibit 65, which is Foundations of

7    Worldwide Web Programming With HTML and CGI.

8              This book is written by Ed Tittel, Mark

9    Gaither, and others.  Are you the Ed Tittel referenced

10   on the cover of this book?

11        A    Yes, I am.

12        Q    What is the subject matter of this book, sir?

13        A    When web servers were first built, they really

14   didn't have much ability beyond displaying pages of text

15   to users for them to look at information.

16             CGI stands for common gateway interface, and

17   it was a technology that was developed in the '92/'93

18   timeframe that allowed the web server to talk to other

19   programs so that it could communicate with the database,

20   perform calculations, access libraries of images; in

21   other words, extend the capability of a web server to

22   more than just put text and images up on the screen.

23        Q    I'd next like to turn your attention to

24   Defendant's Exhibit 63, which is the CGI Bible.

25             This book says it's written by Ed Tittel and a

1   few others.  Are you the Ed Tittel referenced on this

2   book?

3        A    Yes, I am.

4        Q    Now, first of all, what is CGI?

5        A    CGI, again, is the common gateway interface.

6   It is the programming interface that allows a web server

7   to call some other program so that it can do something

8   for it.

9             Basically, web servers can grab files and push

10   them to users in a lot of cases.  Especially when you

11   want to have a user interact with a web page, a back-end

12   program accessed through CGI was the original way to add

13   that kind of capability to a website.

14        Q    By the way, when was this one written?

15        A    The CGI Bible has a publication date of 1997.

16        Q    Okay.  I just asked because the copy that we

17   have has a price tag on it where it says:  Clearance $3.

18   So I guess this one is not doing so well.

19        A    Nothing is as cheap as old technology.

20        Q    Next, I'd like to bring your attention to

21   Defendant's Exhibit 662, which is my favorite, HTML for

22   Dummies by Ed Tittel and Stephen James.

23             Are you the Ed Tittel?

24        A    Yes, I am.

25        Q    What is html?

```
 1      A    Html stands for hypertext markup language, and
 2 it refers to a collection of elements that you can put
 3 into a text file to control what happens when that text
 4 file shows up at a web server.
 5           You can change the color of the font.  You can
 6 change the type of font.  You can change the position of
 7 elements on the page.  You can bring in graphics.  You
 8 can bring in other elements and objects.  And html
 9 basically handles all of that capability.
10      Q    How many editions of HTML for Dummies have you
11 written?
12      A    As of 2008, that book has gone into its 12th
13 edition.
14      Q    Have you contributed any other volumes to the
15 four Dummies series?
16      A    Yes.  I have written Dummies books on Novell
17 Netware, on Windows server, on xhtml, and we even had a
18 book out for a while called More HTML for Dummies.
19      Q    I bet that was great.
20      A    Right.
21      Q    Have you written any articles on
22 computer-related topics?
23      A    I started writing articles for publication in
24 1986 for a Macintosh magazine called The Macazine.
25           And then next -- that next year when I went to
```

1    work for a California-based technology company, they

2    very foolishly offered a thousand-dollar bonus for each

3    article that an employee could place in a computer trade

4    journal.

5            And after I earned 18 of those bonuses that

6    year, they changed the program.

7    Q    And how many articles have you written on

8    computer-related subjects?

9    A    I'm guessing that magazine articles probably

10   number somewhere around 800 to a thousand and that

11   articles for the web, probably double that amount.

12   Q    Could you please walk us very quickly through

13   your educational background?

14   A    Sure.  I'm an Army brat, so I went to school

15   all over the place.  And my dad wound up at Fort Belvior

16   in Northern Virginia just before he retired, so I

17   graduated from high school in Fairfax County, Virginia.

18           I went to Princeton in 1970, and I graduated

19   with a degree in anthropology in 1973.

20           I went to work for the Library of Congress for

21   three years after that.  And then in 1976, I came down

22   to the University of Texas at Austin, and I got a

23   master's degree in anthropology in 1979.  And that same

24   your, I switched over to computer science.

25           In 1981, I got a letter from the Dean of the

1   Computer Science Department saying that I had earned

2   enough credit in computer science to get a bachelor's

3   equivalency, which basically means everything except the

4   diploma.  And when I stopped taking graduate classes in

5   1982, I was about two-thirds of the way to a master's

6   degree in computer science.

7        Q    So what happened?  Did you finally have to

8   start working for a living?

9        A    That's one way of looking at it.  There was a

10  company called Information Research Associates that was

11  founded by three of the members of the CS faculty at UT.

12  And they recruited graduate students to work on projects

13  for them, and it basically turned out they kept me so

14  busy, I didn't have time to go to school anymore.

15       Q    Okay.  I do not want to run step by step

16  through your work history in the interest of time, but

17  did you work in the computer field prior to your writing

18  career took off?

19       A    Well, the first seven years after I got out of

20  grad school, I worked in a variety of different software

21  development jobs, all of them related in some form or

22  fashion to databases.

23            In 1987, I took a job with a California-based

24  company called Excelan that was acquired by Novell in

25  1989, and that's when I got more into the networking

1   side of things.

2        I stayed with Novell until 1994, and I -- my

3   last job at Novell was director of technical marketing,

4   and I was responsible for all corporate communications

5   with publications and for developer conferences and also

6   for technical content for trade shows, which means I got

7   to spend a lot of time in strange places.

8        And the reason why I left Novell was because

9   they announced they were going to close down their

10  Austin facility, and I had two stepkids in high school;

11  and the boss and I decided that it was probably better

12  to leave them where they were than to move to California

13  or Utah.

14  Q   Do you still live in the Austin area to this

15  day?

16  A   I'm -- well, I'm now in Round Rock.  I'm sort

17  of a tax refugee from Austin, but I still live in the

18  Austin area, yes.

19  Q   Could you please explain to the jury -- and I

20  want to try to do better of this.  We've been throwing

21  around these technical jargons, and I know some of them

22  I don't understand, and I'm sure there are a lot of

23  other people that don't.

24       Could you please explain what TCP/IP is to the

25  jury very simply?

1     A    Sure.

2          TCP/IP is an acronym, and it actually is

3     spelled T-C-P, slash, I-P, and that's because TCP is the

4     name of one internet protocol, and IP is the name of

5     another internet protocol.

6          When you put them together, you have two of

7     the most important protocols that are used on the

8     internet, but you also have a shorthand way of referring

9     to all of the protocols that are used on the internet.

10         So, normally, when you say TCP/IP, most people

11    think internet protocols.

12    Q    Now, did you work with TCP/IP during your

13    employment?

14    A    Yes.  I started working with TCP/IP when I was

15    at Schlumberger in 1984 through '86.

16         Then when I took my next job, the way I found

17    my next employment was, we had several different kinds

18    of computers, PCs, Macintoshes, and DEC VAX machines

19    that we had to figure out how to get them to talk to

20    each other.

21    Q    Okay.  Now, Mr. Tittel, I -- it is

22    interesting, but --

23    A    Okay.  I'll stop.

24    Q    -- we want to speed this up today.

25    A    Sorry.

1      Q    Okay.  Were you a software developer at any of

2  your jobs?

3      A    Yes.  I was a software developer until I went

4  to work at Excelan in 1987.

5      Q    But does your experience include working with

6  E-commerce sites?

7      A    I have never developed and built any commerce

8  site, but I have certainly integrated E-commerce

9  packages into websites.

10     Q    Is it fair to say that you have certainly

11  studied and written about them?

12     A    Yes, that's fair.

13     Q    How long have you been working exclusively in

14  the computer field?

15     A    I started working in 1981, and it turned out

16  to be full-time that year.  So that would make 29 years.

17     Q    Have you ever been retained as an expert prior

18  to this case?

19     A    No, I have not.

20     Q    Do you have any legal training?

21     A    No.

22     Q    Are you a lawyer?

23     A    No.

24     Q    Are you here to explain the law to the Court?

25     A    No, I'm not.

1      Q      What do you understand to be the purpose of

2  your testimony?

3      A      The purpose of my testimony is to examine the

4  patents and to try to understand and explain them in

5  terms of the other things that I know about, related

6  tools and technologies.

7      Q      Now, you said you've never been retained as a

8  witness before this case.  Prior to this case, had you

9  ever had your deposition taken?

10     A      No, I had never been deposed before.

11     Q      And prior to right now, have you ever

12  testified before in court?

13     A      First time ever.

14     Q      Okay.  I'm going to break up your testimony

15  into two distinct parts.

16            The first part, we're going to talk about

17  non-infringement, and then we're going to switch gears

18  and talk about invalidity, okay?

19     A      Okay.

20     Q      Now, I know you're prepared to discuss all of

21  these various claim limitations in exhaustive detail,

22  but in the interest of time, I would like you to skip

23  over a lot of the repetitive claim elements and simple

24  design choices and issues, and let's just focus on the

25  big pictures.  Okay?

1    A    Okay.

2    Q    Have you reviewed the claims of the three

3   patents asserted by Soverain against Newegg?

4    A    Yes, I have.

5    Q    Did you read the file histories?

6    A    Yes, I did.

7    Q    When?

8    A    When I was deposed in -- I believe it was

9   August of last year, the file history was brought to my

10   attention at that time.  Subsequently, it was furnished

11   to me, and I read it at that time.

12   Q    Have you studied Newegg's systems?

13   A    Yes.  To the extent that they're documented in

14   Mr. Wu's giant notebooks with source code and examples.

15   Q    And unlike Dr. Grimes, did you review Newegg's

16   actual computer code relating to the functionality at

17   issue here?

18   A    Yes, I did.

19   Q    Have you reviewed Soverain's infringement

20   contentions?

21   A    Yes, I have.

22   Q    And have you reviewed Newegg's invalidity

23   contentions?

24   A    Yes, I have.

25   Q    Who prepared Newegg's invalidity contentions?

```
 1        A     The attorneys prepared those invalidity
 2   contentions.
 3        Q     Did you independently evaluate these
 4   contentions?
 5        A     Yes.  I took each of those contentions and
 6   examined the references and made sure that the
 7   contentions matched my understanding of what the
 8   references told me about the claims.
 9        Q     And did you incorporate and adopt these
10   contentions into your analysis?
11        A     Yes, I did.
12        Q     Now, I think there may have been a little bit
13   of confusion on one point during your deposition
14   stemming from the fact that you're not a lawyer or a
15   professional witness.  But have you considered and
16   studied the Court's claim constructions?
17        A     Yes, I have.
18        Q     Can you explain to us why your first report
19   did not list the claim constructions as something that
20   you had considered?
21        A     Yes, I can, and with some apologies.
22              The file system that I used at first when I
23   was preparing my first expert report consisted of
24   keeping all the documents that the attorneys furnished
25   to me to use for my analysis in a pile.  And to that
```

1  pile, I added other documents that I found myself.

2          And then when I wrote the report, I made a

3  list of everything that was in that pile.

4          Unfortunately, one of the items that should

5  have been in that pile was not in that pile, and it was

6  the claim constructions.  And that's why that doesn't

7  appear until the inventory for my second expert report.

8     Q    Now, were the constructions that you used

9  substantively different from the Court's constructions?

10    A    Expect for one term, database, my

11  interpretation of the terms and the Court's

12  interpretations of the terms were completely synonymous.

13          So except for areas that are really no longer

14  in contention for this case, my understanding of the

15  terms at the time I wrote that report and my

16  understanding of the terms as I sit before you right now

17  are completely in accordance with the claim

18  construction.

19          In fact, in my notebook, which nobody else has

20  in their notebook, the first pages are the very same

21  claim constructions so that I can refer to them, should

22  we need to do so this morning.

23    Q    Using the Court's claim constructions, does

24  Newegg infringe any of the asserted claims of the

25  Soverain patents?

1           Specifically using those claim

2   constructions --

3       A    Yes.  The contested claims, correct?

4       Q    -- does -- yes.  Does Newegg infringe any of

5   those claims?

6       A    No, they do not.

7               MR. GIANNETTI:  I object, Your Honor.  He

8   said he's not going to express any opinions.  That

9   sounded like an opinion to me.  I move to strike.

10              THE COURT:  Restate your question,

11  Counsel.

12              MR. BALDAUF:  We can move on, Your Honor.

13              THE COURT:  All right.  So the objection

14  is sustained, and the jury is instructed to disregard

15  the last question and answer.

16      Q    (By Mr. Baldauf) I'd first like to talk about

17  the issue of non-infringement.  Let's focus first on the

18  '314 claim.

19              Now, Soverain has alleged the infringement of

20  Claims 35 and 51.  Since these claims are dependent upon

21  Claim 34 and can't be infringed unless Claim 34 is

22  infringed, I want to just focus on Claim 34 only.

23              What is your understanding about how many

24  limitations Newegg must not satisfy to avoid

25  infringement?

```
 1      A    My understanding is that if Newegg fails to
 2 satisfy a single limitation of the claim, it fails to
 3 infringe.
 4      Q    Now, I don't want to belabor this point, but
 5 listening to the testimony here this week and just based
 6 upon common sense, do you agree that Newegg does not
 7 supply at least the one buyer computer and the user?
 8      A    Absolutely.
 9      Q    I couldn't decide whether to use red or black.
10 Red will work.
11           I'd like to move down to -- well, strike.
12           Just one last thing.  Does Newegg somehow
13 control or direct the user to come to Newegg's website?
14      A    No, they don't.
15      Q    I'd like to now move on to 34(f).
16           Said buyer computer being programmed to
17 receive a plurality of requests from a user to add a
18 plurality of respective products to a shopping cart in
19 said shopping cart database.
20           First, who sends the request:  Newegg or the
21 customer?
22      A    The customer does.
23      Q    And, again, this claim is very -- this claim
24 language is very important.
25           I want to talk about right here, shopping cart
```

1    in said shopping cart database.  What is the

2    significance of that language?

3        A    The significance of that language is that the

4    shopping cart information is stored in a shopping cart

5    database.

6        Q    Meaning that the shopping cart has to be in

7    the shopping cart database at this time?

8        A    That's the way I read the language, yes.

9        Q    Likewise, what is the significance of the word

10   respective?

11       A    Well, if we think of a sentence that uses the

12   word respective or respectively, it might say something

13   like I gave my wife and my sister a ring and a pendant

14   respectively.  That means you gave your wife a ring and

15   your sister a pendant.

16           So when I see that word respective showing up

17   in the language, what it says to me is that as each item

18   is added to the shopping cart, a corresponding change or

19   addition is made to the shopping cart database.

20       Q    So does Newegg -- I'm sorry.

21           In the Newegg system, does the user add a

22   plurality -- either a plurality of requests from the

23   user to add a plurality of respective products to a

24   shopping cart in said shopping cart database?

25       A    Yes.  If the user decides to buy more than one

1   item, that satisfies the needs for the plurality.  And

2   what happens is, as each item gets added, the

3   add-to-cart button gets hit on the catalog page, and

4   through a back and forth with the server, the

5   client-side cookie gets updated to incorporate the

6   contents that's just been added.

7       Q     So when that's being added, are those requests

8   to add the plurality of respective products, are they

9   going to a shopping cart while it's in the shopping cart

10   database?

11       A     No.  They're going to a cookie that's on the

12   customer computer.

13       Q     Now, we've been talking all week about the

14   difference between the server-side shopping cart that is

15   disclosed and claimed in the patent and the client-side

16   or back-and-forth methodology that Dr. Stewart testified

17   to yesterday.

18           Is this language significant with respect to

19   that difference?

20       A     Yes, it is.

21       Q     I would like to talk about this limitation in

22   the context of a demonstrative that we've put together.

23       A     Okay.

24       Q     If you could first explain to the jury what

25   we're seeing here.

1      A      What you see on this display on the right-hand

2      side of the screen is a picture of the customer

3      computer.  And you'll notice that off to the right, in

4      the box at the bottom, we've cleverly put a chocolate

5      chip cookie behind a table of items.

6              And what we're about to do is to add some

7      stuff to a shopping cart and show you how it winds up

8      inside that cookie.

9      Q      Okay.  So let's -- let's do this.  So the

10     customer hits add-to-cart --

11     A      Right.

12     Q      -- which I'm going to do.  What else?

13     A      So when the customer hits the add-to-cart

14     button, a message goes through the worldwide web to the

15     server.

16             And the server uses something called the set

17     cookie command in its return page to the client, and

18     then the item and the quantity for the shopping cart

19     contents gets updated.

20             So we see one camera shows up in the cookie.

21     Q      Is the Newegg shopping cart in the shopping

22     cart database when it receives this request to add this

23     product?

24     A      No.  You'll notice that our little red ball

25     bounces back strictly between the client and the web

 1   server, and we don't go to the shopping cart database,

 2   at least not yet.

 3       Q    Which is the one that's above on --

 4       A    That's the one on top at the left, yes, that's

 5   correct.

 6       Q    Okay.  So let's go ahead.  The customer

 7   decides he wants to buy something else.  Here goes.

 8            Add-to-cart again.

 9       A    Okay.  So we hit add-to-cart, goes through the

10   web, hits the server, server creates a set cookie

11   request, and bingo, when it gets back to the client, we

12   add one battery to our cookie.

13       Q    Okay.  So now a plurality of products have

14   been added to the shopping cart, correct?

15       A    Yes, that's correct.

16       Q    But have they been added to the shopping cart

17   while it's in the shopping cart database?

18       A    No.  As you can see from our demonstrative, no

19   action has touched the shopping cart database just yet.

20       Q    Okay.  One more time.

21       A    Okay.

22       Q    You've got a camera.  You've got a battery.

23       A    That's right.  We need a memory card now.

24       Q    Okay.

25       A    So let's go ahead and push the button.

1     Q     Here we go.

2     A     Send a message to the web server.  It sends a

3  set cookie request that adds a memory card to our

4  collection of items for our digital camera, and now our

5  cookie is stuffed with three pieces of merchandise.

6     Q     Okay.  So now we've placed three separate

7  items in the shopping cart, correct?

8     A     Yes, that's correct.

9     Q     At any time has that shopping cart been in the

10  shopping cart database?

11     A     No, it has not yet hit the shopping cart

12  database.

13     Q     Okay.  So now, when does it go to the shopping

14  cart database?

15     A     When we hit the checkout button and stop

16  shopping, that's the point at which a message leaves the

17  client, goes to the web server, and then finally goes up

18  into the shopping cart database.

19     Q     Now, to be clear, is a request to check out a

20  request to add products to the shopping cart?

21     A     No, sir.

22     Q     Okay.  So let's show what happens.

23     A     Okay.  When we click add -- I'm sorry -- when

24  we click checkout --

25     Q     Checkout.

```
 1      A    -- the red ball goes through the web, hits the

 2 server.  The server sees it's a checkout request, so it

 3 grabs the contents of the cookie, and it pushes them

 4 into the shopping cart database.

 5      Q    One time.

 6      A    Exactly.  One time.

 7      Q    Now, this is the Newegg cookie-side

 8 methodology, correct?

 9      A    Yes, it is.

10      Q    I would now like, using another demonstrative,

11 to contrast this with the server-side system that is

12 claimed in the '314 patent.

13      A    Okay.

14           MR. GIANNETTI:  I object, Your Honor.

15 Characterizing the claims, and I don't think he should

16 be doing that.

17           THE COURT:  Restate your question.

18           MR. BALDAUF:  We can just move on to the

19 exhibit.

20           THE COURT:  All right.

21      Q    (By Mr. Baldauf) Mr. Tittel, what do we have

22 before us?

23      A    What we have here is a server-side database

24 system, which means that when a shopper adds an item to

25 a cart, a message goes from the web browser through the
```

1  web server to the database server so that each time

2  something goes in the cart, something also happens in

3  the shopping cart database.

4      Q    So let's do the same thing here.  Let's put a

5  -- let's try to buy a first product, okay?

6      A    Okay.  So we click add-to-cart, and the

7  message goes to the web server and straight up into the

8  shopping cart database where a shopping cart record is

9  created, and we put a camera inside it.

10     Q    Okay.  So let's do a second request.

11     A    Okay.  So then control returns to the client,

12 and the client selects a second product, goes back to

13 the web server and again to the shopping cart database

14 where the battery, quantity 1, gets put into the

15 shopping cart record in the shopping cart database for

16 that user session.

17     Q    And a third product?

18     A    Same thing all over again.  Hits the server,

19 then up to the database, and bingo, there's our memory

20 card that shows up for the camera in the shopping cart

21 record in the shopping cart database.

22     Q    Using an example -- excuse me -- using the

23 example of a regular physical shopping cart that someone

24 would use at Wal-Mart or the grocery store, can you

25 explain the difference between Newegg's database method

1   and the server-side model?

2        A    Yes.  The Newegg method uses a shopping cart

3   in a conventional sense in that you go to the grocery

4   store, your cart is in your hand, head to the produce

5   section, drop in a head of lettuce, head to the canned

6   goods, grab a can of beans, drop it in the cart, head to

7   the dairy section, grab a quart of milk, drop it in,

8   roll it up on the register, pay, and go out.

9             On the other hand, the server side is more

10  like there is no shopping cart, and you go grab the

11  lettuce, and you walk it to the conveyor belt at the

12  cash register, and then you walk from there back into

13  the canned goods section, grab the can of beans, bring

14  it to the conveyor belt, and then finally to the dairy

15  section, grab your milk, bring it to the conveyor belt.

16            Then you can check out with the clerk and pay

17  for your merchandise.

18       Q    Why does Newegg use this cookie methodology as

19  opposed to the server-side database system?

20       A    There are two very important reasons why

21  Newegg chose this implementation.  And we heard Mr. Wu

22  talk about this to some extent yesterday.

23            One of those reasons is that updating a cookie

24  involves only two machines, right?

25            When we saw the demonstrative, the information

1    goes from the client to the web server, and then the web

2    server uses a set cookie command to send the shopping

3    cart contents back to the client.

4              Only two machines involved.  A lot faster.

5    The data that's involved is simple text data that's very

6    quick to move and very quick to write.

7              On the other hand, the server-side model

8    actually involves three machines, and it also turns out

9    that doing things to databases requires a lot more

10   instructions and a lot more processing power and time

11   than writing entries into a text file.  That's the way

12   that computers work.

13             The other reason is that in testimony we've

14   heard here in the trial, only 6 to 8 percent of shopping

15   carts that get started on the Newegg website actually

16   end up going to checkout.

17             In earlier conversations with Mr. Wu, he had

18   told me it was 1 out of every 20.  So that either

19   translates into 1 out of 6, to 1 out of 12, or even as

20   many as 1 out of 20.  All of those other shopping carts

21   never go to the cash register.

22             So if you use a database model, you're looking

23   at a tremendous volume of machine time, network traffic,

24   and storage space to accommodate all of that

25   information.

1          And when -- you know, we saw from those

2    numbers that right now Newegg is handling a million

3    completed transactions a month.  Well, if those ratios

4    that I just explained are true, that means we're looking

5    at somewhere between 6, 12, or maybe even 20 million

6    shopping carts that never turn into anything.

7          Why would you want to put that kind of

8    information in the database somewhere?  It just doesn't

9    make sense.

10    Q    Are there likewise disadvantages to using the

11    Newegg cookie system as opposed to the server-side

12    model?

13    A    Well, first and foremost, if you want to shop

14    on the Newegg site, you have to turn the cookies on.  It

15    won't work otherwise.

16          And as we heard Mr. Stewart --

17    Q    Please go ahead.  I'm sorry.

18    A    As we heard Mr. Stewart say in his deposition

19    yesterday, for security reasons, people do turn shopping

20    carts off -- I'm sorry -- cookies off.  I beg your

21    pardon.

22          The other reason is that if I shop at home, my

23    shopping cart stays with my web browser.  In fact, if I

24    open Internet Explorer and Firefox on my machine, if I

25    start shopping on Firefox, I can't access that same

1  information in Internet Explorer because the cookie

2  stays with the browser.

3      Q    In the server-side model, could you shop from

4  multiple computers?

5      A    As long as you were able to reestablish the

6  same session that you started and grab the contents of

7  its associated shopping cart, yes, you could.

8      Q    With respect to this issue of cookies, if the

9  user disables cookies, is there anything that Newegg can

10  do about it to enable them?

11      A    No.  No.  Newegg can't reach into the

12  customer's -- customer's machine and change that

13  setting.

14      Q    Will the server-side database system work if

15  cookies are disabled?

16      A    The server-side database works just fine if

17  cookies are disabled.

18      Q    Is the Newegg cookie method equivalent to the

19  server-side method, meaning does it work in the same way

20  and get the same result?

21              MR. GIANNETTI:  I object, Your Honor.

22  This is outside the scope of his report.

23              THE COURT:  Restate your question.

24              MR. BALDAUF:  I think we made the point.

25  I'm not sure I heard the objection, but we can move on.

```
 1                    THE COURT:  All right.  The jury will
 2  disregard the last question.
 3      Q    (By Mr. Baldauf) So based upon all that, does
 4  Newegg satisfy the limitation of said buyer computer
 5  being programmed to receive a plurality of requests from
 6  the user to add a plurality of respective products to a
 7  shopping cart in said shopping cart database?
 8      A    No, it does not.
 9                    MR. ADAMO:  How many people does it
10  take --
11                    MR. BALDAUF:  That makes a bad joke,
12  doesn't it?
13                    MR. ADAMO:  How many people does it take
14  to screw in a lightbulb?
15                    Mr. Baldauf, how many lawyers does it
16  take?
17                    MR. BALDAUF:  Yeah.
18                    MR. SAYLES:  I can do it without help.
19                    MR. ADAMO:  Yeah.  I can see you trying
20  it without help, Mr. Sayles.
21      Q    (By Mr. Baldauf) I don't want to spend a lot
22  of time on this right now, because this limitation
23  appears over and over again in these claims, and we can
24  discuss it in connection with one of the other claims.
25                    But does Newegg program the buyer computer?
```

```
 1      A    No, they don't.
 2      Q    I'd like to talk about 34(h).  Specifically,
 3  this language:  Said shopping cart computer being
 4  programmed to receive said plurality of shopping cart
 5  messages to modify shopping cart in said shopping cart
 6  database?
 7           Why is that language significant to this
 8  claim?
 9      A    Because it says that when the contents of the
10  shopping cart change, the contents of the database
11  change.
12      Q    Using these two side-by-side slides, can you
13  explain to us what you mean by modifying said shopping
14  cart in said shopping cart database?
15      A    Well, if we look at the top of the slide,
16  which represents the Newegg system, what we see is that
17  as items get added to the cart, it's the cookie on the
18  customer computer that changes and that no interaction
19  with the shopping cart database is involved.
20           On the other hand, if we look at the
21  server-side implementation at the bottom of the slide,
22  each time an item is added to the shopping cart, a
23  corresponding change is made to the contents of the
24  shopping cart record in that shopping cart database.
25      Q    So does Newegg satisfy the limitation of said
```

1    shopping cart computer being programmed to receive said

2    plurality of shopping cart messages to modify shopping

3    cart in said shopping cart database?

4         A    No, it does not.

5              MR. BALDAUF:  I'm afraid to touch this

6    thing now.

7              MR. SATINE:  Mr. Sayles will fix it.

8         Q    (By Mr. Baldauf) Were you here for Mr. Grimes'

9    testimony?

10        A    Yes.

11        Q    Did you hear when he testified that the

12   assignment of a shopping cart ID creates an instance of

13   a shopping cart in the Newegg shopping cart database

14   that is then modified?

15        A    Yes, I did.

16        Q    Have you also heard the assertions from

17   Soverain that going from no record to a record in a

18   database constitutes modification of the shopping cart

19   in the shopping cart database?

20        A    Yes, I have.

21        Q    Do you agree with either of these assertions?

22        A    No, I don't, and I'll tell you why.

23        Q    Please look at the demonstrative and explain

24   why.

25        A    Okay.  Let's take a look at the demonstrative

1    that's up on the screen.  When we get to that point in

2    the checkout process -- if you'll remember, when we go

3    from the web server up to the database server at the

4    very end, what happens in the code is that an integer

5    counter or just a number gets read from a variable, and

6    that number is the shopping cart ID.

7         Q    Okay.  Stop there.

8         A    I'm sorry?

9         Q    Stop right there.

10             Is there any empty field, anything associated

11   with that number that can be changed, modified, or

12   otherwise?

13        A    No.  It's just a counter, and it has nothing

14   to do with the database either.

15             On the other side of the diagram, going to the

16   right, we see the contents of the cookie moving into a

17   variable so that all the data can be combined.

18             So what happens is, we get a number on the

19   left, which is our shopping cart ID, and we get data on

20   the right, which is our shopping contents, and all of

21   that information, in a single SQL command, gets dropped

22   into the database in one fail swoop.

23             In database terminology, modify means to

24   change an existing record.  And, in fact, if you look at

25   the claim construction, the definition of modify, as

1   applied to the shopping cart in the shopping cart

2   database, reads:  To change an instance of a shopping

3   cart in a shopping cart database.

4           Creation in database terms is not change.

5   It's what's called instantiation, because you go from

6   something -- I'm sorry -- from nothing to something.

7           So it's not a modification.  Modification

8   means changing something that's already there.

9   Q    Does Newegg satisfy each and every element of

10  the asserted claims of this patent?

11  A    No, it does not.

12  Q    Okay.  I'd now like to turn to the '492,

13  specifically Claim 17, briefly.

14          MR. BALDAUF:  Be careful with that, Dan.

15  No.  I'm sorry, Dan.  Claim 17 first.  Yes.

16          Oh, well, that's all right, because we

17  weren't going to say much about it anyway.

18  Q    (By Mr. Baldauf) As Dr. Grimes testified, do

19  you agree that Claim 17 is virtually identical to

20  Claim 34 that we just discussed?

21  A    With a few minor differences, yes.

22  Q    I'd like to just talk about this very, very

23  quickly.

24          With respect to a couple of the limitations

25  that we just discussed in Claim 34, at least one buyer

1    computer for operation by a user desiring to buy

2    products, the buyer computer being programmed to receive

3    a plurality of requests from a user to add a plurality

4    of products to a shopping cart in said shopping cart

5    database, and then the shopping cart computer being

6    programmed to receive a plurality of shopping cart

7    messages to modify the shopping cart in the shopping

8    cart database, for the reasons that you just explained,

9    with respect to Claim 4 -- 34, does Newegg satisfy those

10   limitations for Claim 17 of the '492 patent?

11        A    No, they don't.

12        Q    Now let's talk about this one.

13        A    Okay.

14        Q    Soverain also asserts Claims 41 and 61 of the

15   '492 patent.  Again, these depend upon Claim 15, so I

16   would just like to talk about Claim 15.

17             Again, we have the same limitation.  Once

18   again, a client computer for operation by a client user.

19             And does Newegg supply the client computer and

20   client user?

21        A    No, it doesn't.

22        Q    Does Newegg somehow direct or control the

23   client to come to its website and shop?

24        A    No.  Shopping remains a free-will experience.

25        Q    I would now like to talk about programming.  I

1    told you before I didn't want to talk about programming.

2    This is what I want to talk about.

3        A    Okay.

4        Q    15(f):  The client computer being programmed

5    to display the statement document to receive a request

6    from the client user to display transaction details and

7    so forth.

8            Does Newegg program the client computer to

9    display the state in the document?

10       A    No, it doesn't.

11       Q    How is the client computer programmed?

12       A    The client computer receives an html document

13   that it includes information about what the display is

14   on the screen and how to display it.

15           As you notice -- whoops, I knocked out

16   the screen.  Sorry.

17       Q    Let's start -- let's back up just one second

18   before --

19       A    Okay.

20       Q    I want to talk about programming in two

21   sentences -- I'm sorry -- in two sentences.

22           First, I want to talk about the browser on the

23   client computer.  Who programs or puts the browser on

24   the client computer?

25       A    Browsers come from software development

1   companies, like Microsoft with Internet Explorer, the

2   Mozella Foundation for Firefox, Opera Software for

3   Opera, and so on and so forth.

4        Q    Does Newegg do that?  Do they program and put

5   those browsers on the customers' computers?

6        A    No, they don't.

7        Q    Now, sitting here throughout the week, have

8   you heard testimony that Soverain suggests that when

9   Newegg server sends html pages to the customer's browser

10  that this constitutes programming?

11       A    Yes, I have.

12       Q    Will the customer's browser display Newegg's

13  page without the instructions sent on these html pages?

14       A    No, it can't.

15       Q    But does that have any issue -- or any bearing

16  on the issue of programming?

17       A    No, not really.

18       Q    Is it fair to say that you know a little bit

19  about html?

20       A    Yes, that's a fair statement.

21       Q    And this is one of those instances where we

22  could say you wrote the book.

23       A    That's right.

24       Q    Let me give you the book.

25       A    Okay.  Thanks.

1          You'll notice that the cover -- cover of this

2   book says HTML.  Html stands for hypertext markup

3   language.

4          A markup language is a language that's

5   designed to handle text and to do things with text and

6   to interact with other kinds of computing facilities.

7          A programming language is a general-purpose

8   software development tool that can be used to create any

9   kind of program.

10          In other words, what you can do with a markup

11   language is pretty limited.  You can't use it to do

12   mathematical calculation.  You can't use it to influence

13   logic or decisions.  You can't use it to create

14   general-purpose programs.

15          What html does, it does very well, but by

16   consensus with the computer science field, a markup

17   language is not a programming language.

18          And that's the basis for my belief that this

19   is not programming.  This is document handling and

20   document processing.

21          And html files are called html documents.

22   They're not called html programs.  That's the common

23   practice in the industry, and it's been that way ever

24   since html came on the scene in 1991.

25     Q     So does Newegg client -- does Newegg program

```
 1   the client computer and display the statement document

 2   to receive a request from the client user to display

 3   transaction details corresponding to a portion of the

 4   statement document displayed by the client computer and

 5   to cause a transaction detail hypertext link

 6   corresponding to the portion of the statement document

 7   to be activated?

 8        A    No.

 9        Q    So does Newegg satisfy all the limitations of

10   the asserted claims of this patent?

11        A    No, it does not.

12        Q    I'd now like to turn to the '639 patent.

13        A    Okay.

14        Q    Do you understand that this is referred to as

15   the session ID patent?

16        A    Yes, I do.

17        Q    In general, how does the basic inherent

18   function of the internet relate to session IDs?

19        A    If by the internet, you mean the worldwide

20   web --

21        Q    Sorry.  I did.

22        A    -- session mechanisms are necessary to

23   establish ongoing communications between a pair of

24   communicators, usually, a client and a server.

25        Q    Let's take a look at this.  You see the ball
```

1  going back and forth.

2       A    Yes.

3       Q    Is this necessary for this type of system to

4  work?

5       A    The only way that you can use the worldwide

6  web is for a client to communicate with a server.  It's

7  inherent in the way that the worldwide web works.

8       Q    Does it necessarily require the participation

9  of two separate parties?

10      A    Yes, it does.

11      Q    Let's first take a look -- this one is on your

12 screen -- the limitation of forwarding a service request

13 from the client to the server system.

14           What does this mean?

15      A    Well, if you look at the picture on the

16 screen, you see the red rubber ball goes through a cloud

17 labeled worldwide web.

18           If you actually look at what happens to a

19 packet or a piece of information when it goes from a

20 client -- a web client to a web server, you'll see that

21 in between where it starts out at the client and where

22 it ends up at the server, there's a lot of places where

23 it stops in between.

24           Each one of those stops usually occurs at a

25 router or a firewall somewhere, and when it arrives

1    there, the device checks the address and looks at it and

2    says, hey, I can't do this here locally; I got to pass

3    it on to somebody else who can -- who might be able to

4    handle it himself.

5           And so there's a whole bunch of intermediate

6    steps called forwards involved between getting from the

7    client to the server.

8    Q    Does Newegg forward the service request from

9    the client to the server system?

10   A    No.  Newegg does not forward that information.

11          And that's, again, inherent to the way that

12   the internet works.

13   Q    The claim then requires the client storing the

14   session identifier for use in subsequent distinct

15   requests to the server system.

16          Now, this limitation is also in Claim 78.

17   What does it mean for the client to store the session

18   identifier?

19   A    When you set up a session or you log on to a

20   server what usually happens is, you're going to give it

21   an account and a password or some other kind of

22   credentials to prove who you are, and then if the server

23   likes what it sees, it's going to say, okay, you can do

24   something with me.

25          And part of the message that it sends back

1  that tells you it's okay for you to do something with it

2  is a special identifier that's built so that it's hard

3  to fake out and hard to forge, and it becomes a part of

4  what the client uses afterwards to communicate back with

5  the server.

6         The reason why this happens is because it

7  takes some time to look up a password and to check an

8  account name and to figure out what that account is

9  allowed to do and so on and so forth.

10        And if you had to do it every time you sent a

11  message between a client and a server, it would put lots

12  of unnecessary overhead on that communication.

13        So the shortcut that gets used in a lot of

14  different systems is that once you establish your

15  credentials, which is called authentication, then you

16  get some kind of token or identifier back from the

17  server that you can use to communicate so that you don't

18  have to go through all that hoopla every time you go

19  back and forth.

20     Q    Who performs this step of storing the session

21  identifier?

22     A    The customer computer stores the session

23  identifier and then uses it in subsequent

24  communications.

25     Q    Does Newegg control or direct the customer and

1   his or her computer to store the session identifier?

2       A    No.  That's a basic behavior of how the web

3   works.

4       Q    Moving on.  Appending the stored session

5   identifier to each of the subsequent distinct requests

6   from the client server system.

7            What does this mean?

8       A    This is what I referred to earlier as the

9   shortcut that the client uses to say, hey, you know me;

10  I'm okay, and to be able to gain access not just to the

11  server but also to whatever kind of ongoing interaction

12  it has with the server.

13      Q    Who performs this step?

14      A    The client does.

15      Q    And does Newegg control or direct the client

16  to do so?

17      A    No.  Again, it's inherent to the way that the

18  web works.

19      Q    Does Newegg satisfy every limitation of the

20  asserted claims in the '639 patent?

21      A    No, it does not.

22      Q    Now, next we're going to move on to start

23  talking about invalidity, but I want to ask you one last

24  thing.

25           Now, we've been talking about cookies all

1    morning.

2        A    Okay.

3        Q    Mr. Grimes was asked why a cookie is called a

4    cookie and did not know.  Could you please explain that

5    to the jury?  I think it's kind of interesting.

6        A    Yeah, it is sort of an interesting story.

7    The original name for cookies was magic cookie, and the

8    reason why it's magic is because it's a piece of

9    information that passes in the background between a

10   client and a server, and it's not usually visible to the

11   client, but it's a way of moving information back and

12   forth.

13            And the reason why it's called a magic cookie

14   is because it's based on a fortune cookie where you

15   don't know what's inside until you break it and read

16   the, you know, help, I'm a prisoner in a Chinese fortune

17   cookie factory.  So that's why they call it a magic

18   cookie.

19            Turns out that magic cookies were used in a

20   number of systems in the late 1980s, including as

21   authentication for the X Windows system that Mr. Treese

22   told us about during his testimony.

23       Q    I'd like to now switch gears and talk about

24   invalidity.

25            First, how were you employed during the

1   1994/1995 time period when these patents were filed?

2       A    That's when I was working on my CGI books, and

3   an edition of HTML for Dummies and when we were starting

4   to plan out our E-commerce book.

5       Q    Do you have a firm understanding of the

6   subject matter of these patents?

7       A    Yes, I do.

8       Q    Now, we've talked about some of your writings

9   earlier.  Could you please explain how your writings are

10  relevant to the subject matter of these claims just in

11  general?

12      A    Sure.

13           In addition to the various web development

14  topics that we've already discussed, I've written a

15  college textbook on computer networking and another

16  college textbook on TCP/IP.

17           So I have a pretty good understanding of the

18  protocols and mechanisms that are used to make things

19  work on the internet in general and on the web in

20  particular.

21      Q    Now, based upon what we heard yesterday from

22  Mr. Trevor, we're going to be talking here quite a bit

23  about CompuServe --

24      A    Yes.

25      Q    -- as well -- as well as some other prior art.

1          You have a pretty good familiarity of

2    CompuServe yourself; is that correct?

3    A    Yes.  I got my first CompuServe account in

4    1987 when I started writing those magazine articles I

5    told you about.

6          Turns out that back then, CompuServe was

7    probably the major way that most magazines required

8    their writers to file stories to get assignments to

9    communicate about work and so on and so forth, and so I

10   started becoming a CompuServe user pretty much right

11   away.

12   Q    I'd like to also show you Defendant's Exhibit

13   511, which is a book called The Trail Guide to

14   CompuServe by Robert Wiggins and Ed Tittel.

15         Are you the Ed Tittel that wrote this book?

16   A    Yes, I am.

17   Q    What kind of review of CompuServe did you do

18   to write this book?

19   A    Well, publishers don't like to just give money

20   away to write books, so they usually have to jump

21   through some hurdles to get them to give you their

22   money.

23         For the vast majority of books that I've

24   written I have had to submit a formal book proposal.

25   And a book proposal has a survey of the market, it has

1    an outline that says what you're going to write about,

2    and then it has something called a competitive analysis.

3            And a competitive analysis means you go out

4    and look up all the other books on that subject, and you

5    look at them, and read as much of them as you can, and

6    you provide a summary of what those books cover.  And

7    then you explain why your book is going to be better

8    than their book and it's going to say something that

9    their book doesn't say, and ya-da, ya-da, ya-da.

10    Q    I would first like to discuss the '314 patent,

11    but in doing so, we're going to talk about a few

12    CompuServe books first.

13            Before we get started, do you know when the

14    application for the '314 patent was filed?

15    A    In October of 1994.

16    Q    First, I'd like to talk about a book that

17    Mr. Trevor talked about yesterday, Defendants' Exhibit

18    2, How to Get the Most Out of CompuServe.

19            Do you know when this book was published, sir?

20    A    Yes, it was published in 1989.

21    Q    Prior to the filing date of the '314 patent?

22    A    Yes, that's correct.

23    Q    Are you familiar with this book?

24    A    Yes, I am.  I used it -- when I went to work

25    at Novell, because they didn't have that many people

1   that knew TCP/IP, I became what was called a sysop on

2   CompuServe.  That stands for system operator.  Sounds

3   fancy, but it means you're a babysitter.  You have to

4   keep all the unruly forum participants in line, and then

5   you have to answer all the questions that nobody else

6   wants to answer.  So it kept me up nights.

7           But, anyway, at that time I obtained a copy of

8   the Bowen and Peyton book and used it as a reference

9   while I was trying to become as proficient with

10  CompuServe as possible.

11      Q    I would next like to show you Defendants'

12  Exhibit 4, which was likewise discussed by Mr. Trevor

13  yesterday, Using CompuServe by Ellsworth and Ellsworth.

14          Do you know when this book was published?

15      A    Yes, this book was published in March of 1994.

16      Q    I think it was actually April.

17      A    Maybe April.  That's true, yeah.  It was

18  somewhere in that neighborhood.

19      Q    Is this prior to the filing date of the '314

20  patent?

21      A    Yes, it is.

22      Q    Are you familiar with this book?

23      A    This book was, by and large, considered the

24  Bible for CompuServe at the time.  The Ellsworths had

25  the reputation of having the best reference on

1   CompuServe around.  So this was the one that we paid the

2   most attention to in our competitive analysis.

3       Q    Next I would like to show you what is being

4   marked as Defendants' Exhibit 3, CompuServe CIM Running

5   Start by Bob Campbell.

6            Do you know whether this book was published,

7   sir?

8       A    According to the copyright page, this book was

9   published in 1993.

10      Q    Again, prior to the filing of the '314 patent?

11      A    Yes.

12      Q    Now you heard Mr. Trevor testify yesterday

13  that these books were not written for programmers.  Do

14  you agree with that?

15      A    Yes, I do agree with that.  These books were

16  aimed at end users to show them how to use CompuServe,

17  to teach them what CompuServe could do, to explain and

18  illustrate lots of different services and capabilities

19  that CompuServe could provide, and in general to help

20  them become better CompuServe users.

21      Q    However, would someone skilled in the art of

22  computer programming understand how to create the

23  described functionality in these books based upon

24  disclosure?

25            MR. GIANNETTI:  I object, Your Honor.  No

1   basis for this opinion.

2              THE COURT:  Restate the question and lay

3   a predicate.

4       Q    (By Mr. Baldauf) Mr. Tittel, based upon your

5   long experience in the industries, the hundreds of books

6   that you have written, do you believe that you have the

7   ability to explain to us whether one of ordinary skill

8   in the art would understand how to program something

9   based upon a disclosure in a book as to what the end

10  functionality is?

11      A    I do.

12      Q    Based upon that understanding, would someone

13  reading the disclosure in these books understand how to

14  implement that functionality?

15             MR. GIANNETTI:  I object.  There's no

16  foundation for this opinion, Your Honor.

17             THE COURT:  Overruled.

18      A    In general, if you know how to write software

19  and you read about or see how a software system works,

20  you can figure out what's going on underneath the hood.

21             If you see menus being used -- menus are

22  things that programmers know how to create and how to

23  manipulate.  If you see data being manipulated, if you

24  understand the kind of manipulation that's involved, you

25  can write code to perform that manipulation.

```
 1              This generally is a technique known as reverse
 2    engineering, and software developers do it everyday to
 3    figure out how to build programs or how to take
 4    functionality that they like that they see in somebody
 5    else's program and add it to their program.
 6              I don't know if y'all are old enough to
 7    remember back when --
 8                   MR. GIANNETTI:  Your Honor, this is a
 9    narrative.
10                   THE COURT:  Sustained.
11         Q    (By Mr. Baldauf) Okay.  We can move on.
12         A    Excuse me.
13         Q    (By Mr. Baldauf) I would like to show you Page
14    321 of the Using of CompuServe book.  I'm sorry, 221 of
15    How to Get the Most Out of CompuServe.
16              Could you please --
17         A    Which exhibit is that one?
18         Q    How to Get the Most Out of CompuServe is
19    Defendants' Exhibit 2, but it's on the screen right in
20    front of you.
21         A    Okay.
22         Q    Could you please read the bottom portion of
23    this page that's displayed, and then explain to us what
24    it means.
25         A    Yes.  Let's start with:  Here is the rundown
```

1    on ordering, which refers to how to order something on

2    CompuServe.

3           You browse through a single store's database,

4    ordering as many things as you like with the O command.

5    That means when you find something you like, you select

6    it, and then you hit the O key to tell the server that

7    you want to put it in your personal holding file.

8           As you exit the store, you are taken to an

9    order area, which is the electronic version of a

10   checkout clerk with a cash register, where you are asked

11   for information such as name, address, phone number, and

12   your method of payment, which often is a credit card

13   number but can vary depending on the merchant with which

14   you are dealing.

15          There are stopping places all along the way to

16   make corrections to the ordering information and even to

17   cancel the entire order.  In other words, the O command

18   isn't a final commitment, so a slip of the fingers won't

19   get you into trouble.

20   Q    Could a customer purchase multiple items from

21   a merchant in the CompuServe Mall based upon this

22   disclosure?

23   A    Yes, they could.

24   Q    In the interest of time -- we were going to

25   talk about the same language that appears in the

1   Campbell book, but I would like the move this along a

2   little bit.

3           Turning to the Ellsworth and Ellsworth book,

4   Using CompuServe, there are a number of pages here that

5   Mr. Trevor talked about yesterday, but --

6           MR. BALDAUF:  Mr. Brean, if we can just

7   go to Page 376.

8       Q    (By Mr. Baldauf) I am going to move through

9   these quickly so we could speed this up a little bit.

10      A    Okay.

11      Q    Could you please read these portions from 376

12  of the Ellsworth and Ellsworth book to us?

13      A    Certainly.

14          The order command functions the same way for

15  each store, but merchants may vary in payment and

16  delivery options.  Some merchants also offer extended

17  warranty options.  Again, pay attention to these

18  options.  When you find a product that you want to buy,

19  press O for order.  Your order will be stored in a

20  personal holding file until you leave that merchant's

21  store.

22          Next paragraph:  Press R to continue browsing

23  the store in which you just placed the order.  You can

24  place as many orders in the store as you want.  When you

25  are finished shopping in that store, type checkout.  An

1  electronic order form appears.

2     Q    I'd like to focus your attention specifically

3  on the underlying language:  Your order will be stored

4  in a personal holding file until you leave the

5  merchant's store.

6          Using the Court's construction, is the

7  personal holding file a shopping cart in a shopping cart

8  database?

9     A    Yes, it is a shopping cart in a shopping cart

10  database.

11          The personal holding file itself is a shopping

12  cart.  And because CompuServe supported multiple

13  individuals shopping in the same store at the same time,

14  a collection of such files would be maintained, and that

15  would meet the Court's requirements for a shopping cart

16  database.

17     Q    I would now like to discuss how the teachings

18  of the CompuServe Mall in these references match up with

19  the claims.

20          First of all, a network-based sales system.

21  The Using CompuServe book describes the use of WINCIM to

22  connect the computers.  What does this explain to us

23  about CompuServe being a network-based sales system?

24     A    Well, the existence of sophisticated

25  communication software designed to work with the

1    CompuServe information service indicates there was a

2    communications client that the PC or a buyer computer

3    could use to communicate with the CompuServe servers

4    back in Columbus, Ohio.

5            And we know from Mr. Trevor's testimony

6    yesterday, that there was actually a pretty complicated

7    network in between the local points of presence, where

8    your modem line might go, and the 40-plus Digital

9    Equipment minicomputers back in Columbus, Ohio.

10   Q    But does this text of Using CompuServe

11   disclose the limitation of a network-based sales system?

12   A    Yes.

13   Q    Next:  At least one buyer computer for

14   operation by a user desiring to buy products.

15           Again, looking at the same language, what does

16   this tell us about the existence of the buyer computer?

17   A    Well, we see the name of a specific client.

18   It's a piece of software called WINCIM, although, again,

19   as we heard from Mr. Trevor yesterday, CompuServe had

20   lots of different clients for various platforms that you

21   could use to log into CompuServe and go shopping in the

22   CompuServe Mall.

23   Q    And the Bowen and Peyton, I think this one

24   maybe is a little bit even more clear:  Turn on your

25   computer and run your communications program.

1          Again, do these references teach the existence

2  of a buyer computer for operation by a user desiring to

3  buy products?

4      A    Absolutely.

5      Q    At least one shopping cart computer.

6          What does this language in using CompuServe

7  tell us about the existence of a shopping cart computer?

8      A    Well, the architecture of CompuServe was such

9  that no information was stored on the client except

10  perhaps as related to how screens looked and what kind

11  of buttons there were and that sort of thing.

12          Any information about products, product

13  selection, purchase, whatever, would be sent in a

14  message from the client to the server.  And, in fact,

15  the personal holding file is on the server, and that's

16  where we find our shopping cart computer.

17      Q    And specifically then, moving down to How to

18  Get the Most Out of CompuServe, it talks about the

19  existence of 40 Digital Equipment Corporation

20  microcomputers.

21          Did you ever visit that site?

22      A    Yes, I did.

23      Q    What do these references on -- do these

24  references teach the existence of a shopping cart

25  computer?

1      A    Yes, they do.

2      Q    In a shopping cart database connected to said

3  shopping cart computer.

4           Going back to the Using CompuServe book, what

5  does this explain to us about a shopping cart database

6  connected to said shopping cart computer?

7      A    Well, because we know there was a personal

8  holding file for each individual user who was active in

9  a merchant's store, and that multiple users could be

10  active in any individual store at anytime, there would

11  be multiple personal holding files where those personal

12  holding files represent -- each represents a shopping

13  cart, and the collection of personal holding files

14  represents a shopping cart database.

15      Q    Is this confirmed in How to Get the Most Out

16  of CompuServe book?

17      A    Yes, it is.

18      Q    Do these books disclose a shopping cart

19  database connected to said shopping cart computer?

20      A    Yes, they do.

21      Q    Said buyer computer and said shopping cart

22  computer being interconnected by a computer network.

23  I doubt this is very, very controversial, but does the

24  Using CompuServe book disclose the interconnection by a

25  computer network?

1      A     Absolutely.  Not only did CompuServe operate

2   its own networks, but it also interoperated with other

3   networks as well.

4      Q     These networks there such as TimeNet, Telenet,

5   DATAPAC, et cetera?

6      A     Sprintnet, yes, numbers of others.

7      Q     Do these books disclose the limitation of said

8   buyer computer and said shopping cart computer being

9   interconnected by a computer network?

10     A     Yes, they do.

11     Q     Okay.  I was dreading these, they are so long.

12  Said buyer computer being programmed to receive a

13  plurality of requests from a user to add a plurality of

14  respective products to a shopping cart in said shopping

15  cart database, and, in response to said requests to add

16  said products, to send a plurality of respective

17  shopping cart messages to said shopping cart computer,

18  each of which comprises a product identifier identifying

19  one of said plurality of products.

20         Could you please first explain to us what that

21  means in simpler terms?

22     A     Yes.  That means that you can pick a product

23  and put it in your shopping cart, and, in fact, that you

24  can pick more than one product and put it in the same

25  shopping cart.

1      Q      Is this disclosed in the Using CompuServe

2 book?

3      A      The CompuServe Mall supported numerous stores.

4 And inside each store, users could order one or more

5 products, in fact, as many as they -- like Mr. Trevor

6 said yesterday, they might have been limited to 40, but

7 that's enough for me on most grocery store trips even.

8      Q      Is this also confirmed in How to Get the Most

9 Out of CompuServe?

10      A      Yes.

11      Q      Now, you explained to us that Newegg does not

12 add a plurality of respective products in a shopping

13 cart in said shopping cart database, that this takes

14 place on the customer's computer.  How do we know where

15 this happens in the CompuServe Mall?

16      A      Well, again, the CompuServe environment was

17 one where the client could make selections and choose

18 things, but each such selection results in a message

19 going from the client to the server where that

20 information is stored.

21           So the only way that the personal holding file

22 could be updated each time an item was selected and the

23 O key was hit to order that item would be by adding to

24 the personal holding file for each such selection.

25      Q      Are the limitations of this claim taught or

1  obvious to one reading these books?

2      A    Yes, they are.

3              MR. GIANNETTI:  I object, Your Honor.

4  This sounds like an opinion about the evidence --

5              THE COURT:  I'm sorry.  What?

6              MR. GIANNETTI:  Sounded like an opinion

7  of obviousness.  He's expressing opinions of

8  obviousness, and that's not what he's here to do, and

9  it's not in his report.

10              MR. BALDAUF:  I beg to differ

11  Mr. Giannetti.  We certainly offered these references

12  under both 102 and 103.

13              MR. GIANNETTI:  The issue is whether this

14  witness has expressed any opinions in his report.  He

15  said specifically when he came to speak to us today he

16  was not going to express he legal opinions.  He's

17  expressing an opinion of obviousness, and it's not

18  covered by his report.

19              MR. BALDAUF:  I disagree.  His report

20  included the contentions.  But I can change the

21  terminology if it makes it easier for everybody.

22              THE COURT:  All right.  Repeat your

23  question.

24              The jury will disregard the last question

25  and answer.

1      Q    (By Mr. Baldauf) Mr. Tittel, based upon the

2  teachings of the Using CompuServe book and How to Get

3  the Most Out of CompuServe book, are these limitations

4  taught or apparent based upon these teachings?

5      A    Yes.

6      Q    Got ahead of myself.

7           Said shopping cart computer being programmed

8  to receive said plurality of shopping cart messages, to

9  modify said shopping cart in said shopping cart

10  database, to reflect said plurality of requests, to add

11  said plurality of products to said shopping cart, and to

12  cause a payment message associated with said shopping

13  cart to be created.

14           What do these references tell us -- sorry.

15           Before I do that, what does this limitation

16  mean?

17      A    It means that as you shop, you can pick items,

18  in fact, multiple items, and then when you're ready to

19  stop shopping and start checking out, you can so

20  indicate and be informed as to what is in your shopping

21  cart and what you're going to have to pay for it.

22      Q    Do these books explain that the shopping cart

23  was modified in the shopping cart database?

24                MR. GIANNETTI:  I --

25      A    Yes, they do.

1      Q      (By Mr. Baldauf) Does this passage likewise

2   describe a payment message?

3      A      The top passage on the page mentions an

4   electronic order form.  This is the first step in a

5   payment message.  It basically is the point at which

6   you're told what it is that you bought and how much

7   you're going to have to pay.

8           When we saw the movie -- or rather the

9   demonstration yesterday from Mr. Trevor, this was the

10  point at which the selection of items that had been

11  picked showed up, and then we had the option to add,

12  delete, or quit.

13     Q      Are the limitations of this clause set forth

14  in the CompuServe books?

15     A      Yes, they are.

16     Q      Next limitation:  Said buyer computer being

17  programmed to receive a request from said user to

18  purchase said plurality of products added to said

19  shopping cart and to cause said payment message to be

20  activated to initiate a payment transaction for said

21  plurality of products added to said shopping cart.

22     A      This is the point --

23     Q      Sorry.  I got ahead of myself.  There we go.

24        Okay.

25     A      This is the point at which you type checkout

1   and you indicate that you're done with the shopping part

2   and you're ready to start with am I going to actually to

3   buy this and pay for it part.  And that's the point at

4   which you get a message that tells you what it is that

5   you have put into your shopping cart and are told how

6   much it's going to cost you to take that stuff and make

7   it yours.

8        Q    Again, reading on in Using CompuServe, what

9   does this explain to us?

10       A    Well, it tells us that in order to pay for

11  merchandise, we have to identify ourselves so that not

12  only can the merchant come back later and say you are

13  the person who bought this stuff, but also so that they

14  know where to send it.

15       Q    Now, is the activation of the payment message

16  simply whatever message is sent to CompuServe computers

17  from the buyer computer until the customer exits the

18  store?

19       A    The payment message occurs at the end of the

20  transaction when the buyer confirms the purchase and

21  essentially authorizes a transfer of funds.

22       Q    Does Ellsworth disclose that checkout

23  initiates an order completion process during which the

24  shopper can indicate the order is correct?

25       A    Yes, that's true.

```
 1      Q     Did the CompuServe Mall display a screen after

 2 checkout summarizing the customer's payment selections?

 3      A     Yes, it did.

 4      Q     Was this screen shot sent from the CompuServe

 5 servers?

 6      A     Yes, it was.

 7      Q     Was this screen created by the server before

 8 it was displayed?

 9      A     Of course it was.

10      Q     After it was displayed, could it be accepted

11 or activated?

12      A     Yes.

13      Q     Are the limitations of this clause set forth

14 in the Using CompuServe book?

15      A     They are met, yes.

16      Q     The final limitation:  Said shopping cart

17 being a stored representation of a collection of

18 products, said shopping cart database being a database

19 of stored representations of collections of products,

20 and said shopping cart computer being a computer that

21 modifies said stored representations of collections of

22 products in said database.

23            Do you agree with Dr. Grimes that this clause

24 just contains definitions?

25      A     Yes.  And I believe we've already explained
```

1  how, by adding items to the personal holding file from

2  the client to the server, we've been involved in using

3  all of these definitions.

4       Q    Do these CompuServe books set forth these

5  limitations of this final claim clause?

6       A    Yes, they do.

7       Q    I would ask you one final question.

8            Mr. Trevor talked yesterday about the

9  internet.  Did CompuServe work over the internet?

10      A    Well, yes, in a manner of speaking they did by

11  their support for Telenet.

12           But the language of the word internet is

13  pretty interesting in that if you refer to the internet,

14  you're talking about the TCP/IP interconnected global

15  collection of computers that we all know and love.  But

16  if you talk about an internet, you're just talking about

17  a network of networks.

18           And I think in the other things that we've

19  looked at in the CompuServe writings, the CompuServe

20  Network definitely interfaced with other networks and,

21  therefore, also meets the definition of an internet.

22      Q    Are the asserted claims of the '314 patent

23  shown or apparent based upon the teachings in these

24  books about the CompuServe Mall?

25           A    Yes, they are.

1                    MR. GIANNETTI:  Your Honor, I'm going to

2     object to that belatedly.  I don't think the word

3     apparent is appropriate here.  It doesn't have any --

4     doesn't have any relationship to any appropriate legal

5     standard.

6             But I think he can ask the question as shown,

7     but I believe the section of his question that referred

8     to apparent should be stricken.

9                    MR. BALDAUF:  Again, I disagree.  Our

10    contentions very clearly set forth that we were offering

11    these references both under 102 and 103.

12                   MR. GIANNETTI:  If by apparent he means

13    it's shown in there, then I will accept that.  But if

14    he's suggesting that this witness is -- is expressing

15    opinions of obviousness, he's expressly testified in his

16    deposition he's not going to do that, and he hasn't

17    formed any opinions.

18                   THE COURT:  Is he expressing opinions of

19    obviousness?

20                   MR. BALDAUF:  I was not trying to elicit

21    that, but...

22                   THE COURT:  Well, let's couch it in terms

23    of whether it anticipates, then, rather than

24    obviousness.

25                   MR. BALDAUF:  Well, considering he's not

1   a lawyer, how about if I just use something more

2   generic, like matches up, just is it in there.

3              THE COURT:  All right.  Any problem with

4   matches up?

5              MR. GIANNETTI:  That's fine, Your Honor.

6   As long as the word obviousness and opinions of

7   obviousness are kept out.

8              THE COURT:  All right.

9              MR. BALDAUF:  Okay.  I don't want to make

10  this harder than it has to be.

11     Q    (By Mr. Baldauf) Okay.  Let's talk about the

12  '492 patent.  And we can do this much, much more quickly

13  because the whole host of the limitations we just talked

14  about are in these same claims.

15             Quickly, Claim 17, as we have talked about

16  before, is virtually identical to the claim we just

17  talked about.  It has a couple of new limitations that

18  aren't in there.

19             The first one:  The buyer computer and the

20  shopping cart computer being interconnected by a public

21  packet switched network.

22             Do the CompuServe books disclose that

23  CompuServe and the user computer was interconnected by a

24  public packet switched network?

25     A    Yes.  All of the networks referred to in that

1    reference are packet switched, and all were available to

2    the public.

3        Q    There are two other new limitations in here:

4    A product identifier identifying one of the plurality of

5    products and at least one of which comprises a universal

6    resource locator.

7             And to cause a payment message to be created,

8    the payment message comprising a universal resource

9    locator.

10            So the new thing here is a universal resource

11    locator.  What is a universal resource locator?

12        A    Actually, it's a uniformed resource locator,

13    and we know it as a URL.  It's the address that appears

14    in the address line in a web browser.  If I go to

15    www.microsoft.com, that www dot so forth and so on is a

16    URL.

17        Q    Was this use of URLs new with the filing of

18    this patent?

19        A    No.  In fact, the hyper in hypertext comes

20    from the use of URLs and links.

21        Q    Was -- were URLs invented by Open Market?

22        A    No.  They were invented by Daniel

23    Berners-Lee -- I'm sorry, Tim Berners-Lee and his

24    colleagues at CERN in '89 and '90 as the first

25    implementation of html and http was created.

1      Q    Are the limitations of Claim 17 of the '492

2   matched up by the CompuServe Mall teachings and basic

3   internet URL functionality?

4      A    Anyone who wanted to move shopping to the web

5   would know they had to use URLs to tie things together

6   to deliver information.

7      Q    Okay.  Moving on to Claim 15.  And I'm going

8   to move through this pretty quickly because a lot of

9   these limitations are the same.

10          Hypertext statement system.  What is a

11   hypertext statement system?

12     A    A hypertext statement system is a linked

13   collection of html documents that represent a statement.

14          Let's talk about a bank statement.  You might

15   have a page that has your savings account, your checking

16   account, and your money-market account on it; and then

17   you could click on a link for your checking account and

18   see your transactions for the last month.  That's how my

19   bank account works online anyway.

20     Q    Okay.  So -- you were here yesterday for

21   Mr. Treese's testimony?

22     A    Yes, I was.

23     Q    Do you agree with him that hypertext, like a

24   URL, is just a basic functionality of the internet?

25     A    Of the worldwide web.

1      Q    I'm sorry, of the worldwide web?

2      A    Yes, it is.

3      Q    I keep doing that.

4           And I just pulled out a reference here to the

5    prior art Gifford patent.  It just discusses the use of

6    hypertext.

7      A    Yes.

8      Q    With respect to a lot of these limitations

9    now:  A client computer for operation by a client user.

10          And we talked about that in the '314 patent.

11   Is this the same here?

12     A    Yes, it is.

13     Q    One or more server computers for operation by

14   a server user.

15          Again, same as in the earlier claim.  Is it

16   the same here?

17     A    Yes, it is.

18     Q    The client computer and the server computers

19   being interconnected by a public packet-switched

20   computer network.

21          Actually, this is the limitation we just

22   talked about in Claim 17.  Is this likewise taught in

23   the CompuServe Mall book?

24     A    Yes, it is.

25     Q    Okay.

 1          At least one of the server computers being

 2  programmed to record information pertaining to purchase

 3  transaction records in a database, and to transmit a

 4  statement document comprising the purchase transaction

 5  records to the client computer over the network.

 6          Now this one certainly is different.

 7  Could you please refer to this portion of Using

 8  CompuServe and explain to us what this teaches?

 9      A    Absolutely.

10          You will notice in the first paragraph that,

11  when you finish an order and you indicate it's correct

12  and complete, you get something called a confirmation

13  number.  That confirmation number is a unique identifier

14  that corresponds to your transactions so that you can

15  look it up anytime you want to in the future and get all

16  the information about that transaction that you might

17  ever need.

18          To any competent programmer, the ability to

19  access a record by a unique identifier means that they

20  know how to find it, and once they've got it in their

21  hands, they can take it and slice it and dice it any way

22  they want to.

23      Q    What do the -- what does this passage teach

24  about recording transaction records in the database and

25  transmitting a statement document to a client?

1        A     It describes the mechanisms of causing a

2    statement to appear in a hypertext system.

3        Q     There's no hypertext system here, is there?

4        A     Well, okay.  It describes how to access

5    information about a transaction.

6        Q     Now, what is a statement document?

7        A     Well, we all get bills, right?  A statement

8    document is like a bill.  It has your name and address

9    on it.  It has the company that's sending you the bill.

10   It has an itemized list of charges and taxes and fees

11   and ya-da, ya-da, ya-da, and then there is a number that

12   you've got to pay the note for.

13       Q     Is this portion of the claim set forth in the

14   using CompuServe reference?

15       A     Yes, it is.

16       Q     Next limitation:  The client computer being

17   programmed to display the statement document, to receive

18   a request from the client user, to display transaction

19   details corresponding to a portion of the statement

20   document displayed by the client computer, and to cause

21   a transaction detail hypertext link corresponding to the

22   portion of the statement document to be activated.

23             What does Using CompuServe -- I don't want to

24   talk about hypertext right now -- but what does Using

25   CompuServe tell us about the other portion of this claim

1   limitation?

2       A    Well, it tells us that we have a way to get at

3   that information.  It doesn't tell us anything about how

4   that information gets displayed.

5            And, of course, since CompuServe didn't have

6   hypertext, it couldn't use hypertext for display either.

7       Q    And, again, what is hypertext?

8       A    Hypertext is, in the case of html, it's a

9   markup language that you use to create web pages.

10      Q    Does this limitation match up with the

11  teachings in the Using CompuServe book as well as the

12  basic operation of the worldwide web?

13      A    Anyone who could get access to the text in a

14  transaction record would understand how to use html to

15  present that information at a variety of levels of

16  details.  That's how they do it for my bank account.

17           That's how you do it for just about any kind

18  of statement.

19      Q    And again, is the use of html -- I don't want

20  to say it was invented there, but at least described in

21  the prior art Gifford patent?

22      A    Yes.

23      Q    A final limitation:  At least one of the

24  server computers being programmed to respond to

25  activation of the transaction detail hypertext link by

1   transmitting the transaction details to the client

2   computer over the network as a transaction detail

3   document.

4           What is this explaining to us?

5       A   Well, this is basically how you drill down

6   from a higher level of detail in a document to a lower

7   level of detail in a document.

8           To go back to my bank account example.  When

9   you click on the line that corresponds to your checking

10  account, you see your checking account deposits and

11  withdrawals for the last 30 days.  That's exactly what

12  this refers to here.

13      Q   Is this set forth in the basic use of

14  hypertext?

15      A   Yes.  It's inherent in the basic use of

16  hypertext.

17      Q   Do the asserted claims in the '492 patent

18  match up with the teachings of the CompuServe books and

19  basic internet functionality and just plain common

20  sense?

21      A   Yes, they do.

22      Q   Okay.  I'd like to move on to the session ID

23  patent.  And I have in front of you right now on the

24  screen U.S. Patent No. 5560008 to Johnson, who was an

25  IBM employee.  This is actually an IBM patent filed

1    May 15th, 1989.

2         Could you read this language and explain to us

3    what it means?

4    A    Certainly.

5         Here's how it goes:  A message, called a

6    request for service, is sent from the user client

7    machine to the server remote machine anytime the service

8    is needed on the remote machine.  The request for

9    service contains enough information to insure that the

10   remote user is authorized to use the server and the set

11   of credentials and capabilities the user is to have when

12   using resources on the server machine.

13        The server builds a set of credentials that

14   represent all of the interesting security facts about

15   that remote user.  This information includes the user

16   ID, the group ID that the user is in, the group set of

17   other group IDs that the user has access to, an account

18   ID, the set of privileges of the user that allow the

19   user to bypass the normal security restrictions on the

20   system, and so forth.

21        The server establishes all of the credentials

22   for the user, and stores this information in a data

23   structure called the credential structure, and returns a

24   small value, for example, 64 bits, to the client machine

25   where the user is running.  This returned small value is

1    referred to as the credentials identifier.

2       Q    So please explain to us what that means.

3       A    Well, I believe this patent is in connection

4    with the IBM OS/2 Warp server, which was one of the

5    network operating systems that was available along with

6    Novell Netware and 3Com's 3 Server at the time.  And it

7    basically describes:  How do I log on to a network

8    server over a network?

9           I present my credentials, I get checked out,

10   my rights and permission gets established.  All my

11   information gets set up so that I can make subsequent

12   access.  And then I get an identifier back that allows

13   me to skip going through the authentication and

14   authorization part the next time I talk to that server.

15      Q    And how was this similar to the session ID

16   that we've been discussing?

17      A    The same mechanisms that are used to set up a

18   network log-in, apply to establishing a session.

19      Q    Let's now turn to the specific limitations of

20   Claim 1 of the '639 patent and show how they match up

21   with Johnson, or the Johnson IBM patent.

22           A method of processing service requests from a

23   client to a server system through a network.

24           What does Johnson explain to us about this?

25   And if you could read the text.

1     A     It basically tells us that there is a way of

2 sending messages from the client to server to make a

3 request for service, which is the same thing as a

4 service request.

5     Q     So you're saying that a service request is the

6 same thing as a request for service?

7     A     Yes, I am.

8     Q     Said method comprising the steps of forwarding

9 a service request from the client to server system.

10 Johnson provides that a message, called a request for

11 service, is sent from the user client machine to the

12 server remote machine anytime that service is needed on

13 the remote machine.

14          What does this tell us?

15     A     It tells us that when the client wants

16 something, it has a way to ask the server for it.

17     Q     Does this disclose this limitation of Claim 1?

18     A     Yes, it does.

19     Q     Next limitation:  Where communications between

20 the client and server system are according to hypertext

21 transfer protocol.

22          Now, will you acknowledge that Johnson does

23 not disclose -- disclose hypertext transfer protocol?

24     A     Johnson doesn't disclose any protocol in his

25 patent.

1      Q     Again, is hypertext transfer protocol the

2    basic protocol of the web?

3            See, I got it right that time.  I didn't say

4    internet.

5      A     Thank you.

6            Http is how you get things done between

7    clients and servers on the web.

8      Q     Does basic internet functionality, as well as

9    the disclosure in the Gifford patent, disclose the use

10   of hypertext transfer for communications between

11   computers on the web?

12     A     Yes.

13     Q     Returning a session identifier from the server

14   system to the client, the client storing the session

15   identifier for use in subsequent distinct requests to

16   the server system.

17     A     That's the small value that gets returned to

18   the client machine.  That's the ticket that says, hey,

19   you know me; I don't have to jump through all those

20   hoops so we can talk.

21     Q     So is this limitation disclosed in Johnson?

22     A     Yes, it is.

23     Q     And finally:  And appending the stored session

24   identifier to each of the subsequent distinct requests

25   from the client to the server system.

1              Is this limitation likewise shown in the

2  Johnson IBM patent?

3      A    Yes.  It says you must present the credential

4  identifier to the server in every request.

5      Q    Now.  We've heard a lot of testimony

6  throughout this trial directed to the fact that Claims

7  78 and 79 are virtually identical to Claim 1 with the

8  addition of a couple limitations.

9              I don't want to spend any more of the jury's

10  time than I have to on this hypertechnical stuff.

11              However, does the text of Johnson itself

12  likewise match up with all the limitations of Claim 78

13  and 79?

14              MR. GIANNETTI:  Your Honor, I object.  78

15  and 79 were the subject of the motion in limine.  I

16  don't believe this is really consistent with the ruling

17  on that motion.

18              MR. BALDAUF:  Your Honor, we had this

19  argument last Monday.

20              THE COURT:  All right.  Counsel,

21  approach.

22              I tell you what.  We have been going for

23  almost an hour and a half.  Why don't we go ahead and

24  take a 15-minute break.  We will be in recess until --

25  actually we've been going almost two hours.  So y'all

1   have been very patient.

2                   Are you about through with this witness,

3   Counsel?

4                   MR. BALDAUF:  This was actually my last

5   question.

6                   THE COURT:  I'm afraid to recess because

7   I'm afraid you'll think of three or four more.

8                   So, Counsel, approach the Bench and let's

9   see if we can deal with this very quickly.

10                  (Bench conference.)

11                  MR. GIANNETTI:  Your Honor, here is the

12  issue.  Your Honor, at the motion in limine hearing,

13  there was an issue as to these two claims, 78 and 79.

14  They were not covered in their expert report.  And I

15  believe Mr. Baldauf will agree to that.

16                  So the Court ruled that Mr. Baldauf --

17  Mr. Baldauf made the representation that they are very

18  similar to Claim 71 --

19                  MR. BALDAUF:  Claim 1.

20                  MR. GIANNETTI:  -- Claim 1, excuse me.

21                  And, in fact, they are, except they do

22  contain some additional limitations.

23                  So Your Honor's ruling was that --

24                  THE COURT:  He didn't cover it in his

25  report?

1            MR. BALDAUF:  He did not.  If I may, Your

2    Honor.  We discussed this in the motion, and this is the

3    claim that was set forth in our supplemental invalidity

4    contentions that they have had since August.  And as I

5    explained to the Court, we're doing a reference in Claim

6    1 --

7            THE COURT:  You can do that, but you

8    can't do it with this witness if he didn't cover it in

9    his report.  Did he cover it in his report?

10           MR. GIANNETTI:  No, he did not.

11           MR. BALDAUF:  Not this specific claim,

12   no, because this is one that was added later and was not

13   part of --

14           THE COURT:  Claim 3?

15           MR. BALDAUF:  It was briefly before his

16   report --

17           MR. GIANNETTI:  Briefly before.  We gave

18   additional notice and gave additional time to prepare

19   the report, we added the claims.  We said we will give

20   you more time for the report, and they still didn't --

21           THE COURT:  All right.  Sustain the

22   objection.

23           (Bench conference concluded.)

24           THE COURT:  All right.  Any more

25   questions for this witness, Counsel?

```
1                    MR. BALDAUF:  No, Your Honor.

2                    THE COURT:  All right.  Now we will take

3  our break, and then we will come back and have

4  cross-examination.

5                    So enjoy your break until 10:40.

6                    We will be in recess.

7                    COURT SECURITY OFFICER:  All rise.

8                    (Recess.)

9                    COURT SECURITY OFFICER:  All rise.

10                   (Jury in.)

11                   THE COURT:  Please be seated.

12                   All right, Mr. Giannetti.  You may

13  proceed.

14                   MR. GIANNETTI:  Thank you, Your Honor.

15                      CROSS-EXAMINATION

16  BY MR. GIANNETTI:

17      Q    Good morning, Mr. Tittel.

18      A    Good morning, Mr. Giannetti.

19      Q    And hello again.

20      A    Nice to see you again, too, sir.

21      Q    Mr. Tittel, I believe you testified that this

22  is a first.  I believe you testified that this is the

23  first court appearance that you've made as an expert

24  witness?

25      A    Yes, it is.
```

1    Q    And in fact, this is the first case that

2    you've worked on as an expert?

3    A    Yes, it is.

4    Q    Would you agree that you might do some things

5    differently if you had to do them again?

6    A    Yes.

7    Q    Okay.  Well, let's talk about a few of those

8    things.

9         You prepared an expert report in this case.

10   Do you recall that?  In fact, you prepared several.

11   A    Yes, sir, I did.

12   Q    Let's talk about the first one which dealt

13   with the issue of prior art in the patents; is that

14   correct?

15   A    Yes.

16   Q    So in preparing your report, isn't it true

17   that you did not use the Court's claim constructions?

18   A    I was aware of the Court's claim

19   constructions, and I used the Court's claim

20   constructions -- by and large, I did -- not knowing I

21   was not allowed to take issue with the definition of a

22   database.

23   Q    Well, I believe you testified that you

24   interpreted the claims in light of your own knowledge of

25   computer science.  Isn't that what you did when you

1    prepared your first report?

2        A    That's what I said in my deposition, yes, sir.

3        Q    And didn't you also fail to follow an

4    element-by-element approach in analyzing the claims in

5    that report?

6        A    I paid attention to the elements in the claim.

7    When I worked through the initial set of materials for

8    my expert report, I looked at all the claims, but I only

9    ended up focusing on those claims where I felt there was

10   some chance of making an argument against them.

11       Q    My question is, did you prepare an

12   element-by-element comparison --

13       A    No.

14       Q    -- of the claims to the prior art?

15       A    No, sir, I did not.

16       Q    You didn't do that, right?

17       A    No, sir.

18       Q    That's something you might do if you had to do

19   this again?

20       A    Perhaps, yes.

21       Q    And, in fact, you couldn't even recall if you

22   saw the Court's claim constructions before you wrote

23   your first report; isn't that right?

24       A    Yes, sir, that is correct.

25       Q    And I believe you talked about that the

1  database issue -- you used a definition of database that

2  was not consistent with the Court's claim construction;

3  is that right?

4      A    Yes, I did.

5      Q    That was what you called a fully-fledged

6  database in your prior testimony at deposition?

7      A    Yes.  It's the kind of database we heard

8  Mr. Stewart talk about in his deposition as one that

9  meets the acid criteria.

10     Q    And that's something you wouldn't do again, is

11 it?

12     A    No, sir.

13     Q    And you also -- in your second report,

14 however, you used a more relaxed definition of database;

15 isn't that right?

16     A    I followed the Court's claim construction,

17 sir.

18     Q    I thought you referred to that as a more

19 relaxed definition.

20     A    That's what I -- that's what I called it.

21     Q    So you used the more relaxed definition in

22 your second report, which dealt with infringement, and a

23 more rigorous definition in your first report, which

24 dealt with prior art; is that right?

25     A    I don't believe those arguments have survived

1    to this point of the trial, sir.

2        Q    I'm just asking you what you did in

3    preparation --

4        A    Okay.  That's what I did.  I'm sorry.

5        Q    Okay.  And another thing that you did was that

6    you accepted an analysis of the claims in the prior art

7    prepared by Newegg's attorneys.  I think you referred to

8    that in your direct examination; isn't that right?

9        A    Yes.  I incorporated the invalidity

10   contentions that I obtained from the Newegg lawyers.

11           And my reason for doing so was that there were

12   a great many references that we had to go through and

13   find supporting information for, and this helped me make

14   that search a great deal easier.

15       Q    Is that something you think you would do

16   again, or would you do your own analysis?

17       A    Well, I did do my own analysis.  I was very

18   careful to review not only the material that was

19   presented in the invalidity contentions but also the

20   material that surrounded it.  And if I hadn't agreed

21   with what was presented, I wouldn't have included it.

22       Q    Well, let's take that a step further, if we --

23   if we may.

24           When you accepted that analysis that had been

25   prepared by Newegg's attorneys, you didn't know whether

1    they had used the Court's claim constructions or some --

2    someone else's; isn't that right?

3         A    Unlike myself --

4         Q    Isn't that correct, sir?

5         A    No, it's not correct.

6         Q    Isn't that what you testified at your

7    deposition?

8         A    I don't remember saying words to that effect.

9         Q    Take a look at Page 97 of your deposition.

10        A    Okay.

11        Q    Do you have that in front of you?

12        A    Yes, I do.

13        Q    Okay.

14        A    Would that be the validity deposition?

15        Q    It would be the first one.

16        A    Okay.  Page 97.

17             Okay.  Would you please point out to me --

18        Q    Yeah.  I'm looking for it, sir.

19        A    Oh, I'm sorry.

20        Q    Okay.  I'm sorry.  Page 99.

21        A    Oh, okay.  Well, that's why I --

22        Q    I put you on the wrong page.

23        A    -- was confused about the page.  Okay.

24        Q    And you talk in there about the -- at Line 14,

25    you're talking there about the materials that were

1    prepared by Newegg's counsel.

2              And here's the question I asked you:  Do you

3    know for a fact whether the Court's claim constructions

4    were used in preparing these documents?

5              And you said:  I do not, sir.

6         A    At the time that I answered that question, I

7    was not aware of it.

8         Q    Okay.  So you prepared a report in this case

9    and you testified at the deposition based upon a set of

10   analyses, and you weren't sure whether the Court's claim

11   constructions had been used at that time; is that right?

12        A    That's what I said, yes, sir.

13        Q    Okay.  Now, another thing that you didn't

14   do -- and I think you mentioned this in your direct

15   examination -- is that when you prepared your report in

16   this case and formed -- and appeared for your first

17   deposition, you didn't review the Patent Office file,

18   the prosecution history for the patents involved in this

19   case, did you?

20        A    No, sir, I did not.

21        Q    And that's something you would certainly do if

22   you did this job again, wouldn't you?

23        A    Yes, sir, it certainly is.

24        Q    All right.  And another thing that you didn't

25   do is that you didn't review all the prior art that was

1    considered by the Patent Office.

2        A    I was already familiar with a fairly major

3    portion of the prior art, and I certainly felt like I

4    knew enough about the prior art to create a background

5    against which to evaluate the claims.

6        Q    Yeah.  But you didn't systematically review

7    all the prior art that was before the Patent Office, did

8    you?

9        A    Given the very large number of items listed in

10   the prior art list, I'm not sure that I would have had

11   time to do it.

12       Q    Was it a matter of time?

13       A    Not necessarily.

14       Q    Is that something you think you would have

15   done if you had more time?

16       A    Yes, I do.

17       Q    And if you had to do this again, you would do

18   that, wouldn't you?

19       A    Without fail.

20       Q    Now, I think at the beginning of your

21   testimony, you said that you understood your role here.

22            Your job for today was to explain the patent,

23   that you were to review the patents and explain them.

24       A    Yes, sir.

25       Q    You didn't say anything about rendering any

1   opinions about obviousness, did you?

2        A    No, I did not.

3        Q    And, in fact, you did not understand your role

4   here, and you did not come prepared here today to render

5   any such opinions, did you?

6        A    I am definitely prepared to talk about matters

7   related to how the technology, methods, and systems

8   described in the patents play against the general

9   background of internet technology in the timeframe of

10  '94, '95, and the filing dates of patents.

11       Q    But you're not here really to give your

12  opinions on obviousness, are you?

13       A    I believe, if I'm asked questions that relate

14  to what a person of ordinary state (sic) in the art

15  could do under the circumstances, that I could provide a

16  meaningful answer.

17       Q    At the time of your deposition, you didn't

18  understand that to be your role, did you?

19       A    No, sir.

20       Q    In fact, just to expand that a bit, the whole

21  subject of validity, that's not something that you've

22  come here prepared with an opinion to express; is that

23  true?

24       A    No, that's not true, sir.

25       Q    So you're an expert -- you believe you're an

1    expert on patent law and validity?

2         A    No.  I believe that my expert opinions can

3    shed light on matters of validity.  I don't think I can

4    decide matters of validity.

5         Q    Okay.  Let's take a look at the claim charts

6    that you testified about in the first part of your

7    testimony when you were discussing the comparison

8    between the patent claims and the Newegg system.

9              The first thing that you talked about was

10   Claim 34 of the '314 patent.  I've put it up there on

11   the easel.

12        A    Yes, sir.

13        Q    Now, you recognize that this claim is what

14   they call a system claim?

15        A    Yes, sir, I do.

16        Q    Okay.  And it says that.  Right -- right at

17   the beginning, it says:  A network-based sales system

18   comprising, correct?

19        A    Yes, it does.

20        Q    And is there any doubt in your mind that

21   Newegg uses their sales system to sell products?

22        A    No, there isn't.

23        Q    Okay.  So when you talked about these various

24   elements of the claim -- for example, you said the buyer

25   computer, that's something that's not part of Newegg --

1    you weren't saying that they don't use a -- a

2    network-based sales system.

3         You weren't saying that Newegg does not use a

4    network for sales, were you?

5         A    No, I was not.

6         Q    Okay.  And while you mentioned that the buyer

7    computer was something that they didn't use, isn't it a

8    fact that once someone accesses the Newegg website,

9    Newegg sends messages to that computer concerning --

10        A    Yes, sir.

11        Q    -- concerning selling products?

12        A    Yes, that's true.

13        Q    And you don't consider that to be using that

14   computer by Newegg to sell its products?

15        A    No, sir.  I don't necessarily consider that

16   use.

17        Q    Well, you mentioned something about free will

18   or maybe your counselor did.

19        Yes, it's true that once someone -- that the

20   decision whether to access the website may be up to the

21   customer, but once the customer gets on the website,

22   wouldn't you agree that the choices are limited by that

23   information which is presented by Newegg?

24        A    The choices that appear on the web page are a

25   direct reflection of the contents of the html documents

1    that are delivered to that page.

2        Q    And those --

3        A    But in addition to the choices that appear on

4    that page, the user always has the option to bail out.

5    They don't have to do anything.  They can close the

6    browser and go do something else.  That's the free-will

7    element, I think.

8        Q    Just -- just to use a brick-and-mortar

9    comparison, if I may.  You always have the choice

10   whether to shop at Macy's or some other store; but once

11   you're in the store, you have to choose from among the

12   products that Macy's provides.

13            And that's -- isn't that the same with Newegg?

14       A    Well, you -- you always have the option of

15   heading for the door anytime you don't want to shop.

16       Q    And that's true, also, with the website, isn't

17   it?

18       A    Of course it is.

19       Q    So it's really no different than a

20   brick-and-mortar store in that respect, is it?

21       A    Except for the fact that I can get into that

22   store from my living room or in my pajamas or maybe even

23   in some other condition, absolutely.

24       Q    Well, I'll accept that difference.  I think

25   from the point of view of my comparison, I don't think

1    that makes a difference, but I will accept that.

2         Okay.  So let's talk about the other elements

3    of this claim that you mentioned.

4         In 34(f), I think you -- you focused on the

5    word respective; is that right?

6    A    Yes, I did.

7    Q    And you said that that is what suggested to

8    you that there had to be a one-to-one updating of the

9    database, as you put it, each time a product was -- was

10   selected; isn't that right?

11   A    Well, if -- if you wanted --

12   Q    Isn't that right, sir?

13   A    Well, may I make a qualification or --

14   Q    Well, first, answer my question.

15   A    Yes, but that fails to take the possibility of

16   deletion or change into account.

17   Q    Of what?  I'm sorry?

18   A    Change, as in change of quantity, or deletion,

19   as in removal of an item, into account.

20   Q    Okay.

21   A    You could do all of those things.

22   Q    But you -- but the word respective is critical

23   to your analysis on this particular point, isn't it?

24   A    Absolutely.

25   Q    In fact, your whole analysis of this turns on

1   the word respective.

2       A    I wouldn't say the entire analysis hinges on

3   it, but a part -- a portion of it certainly does, yes.

4       Q    The piece of it that relates to the updating

5   of the database turns on the word respective, correct?

6       A    Yes.

7       Q    Okay.  Now, the Court hasn't construed this

8   term; isn't that right?

9       A    I'm sorry.  Would you repeat the question?

10  I'm having a little trouble hearing you.

11      Q    The Court has not construed this term.  It's

12  not in the Court's claim construction that you have

13  before you, is it?

14      A    No.  Respective is not in there.  I checked.

15      Q    So you picked the definition for that; isn't

16  that true?  You interpreted that in a certain way, the

17  Ed Tittel interpretation of that.

18      A    Well, actually, what I did was I thought about

19  the way in which I heard it used in ordinary discourse,

20  and I figured that since it wasn't part of the claim

21  construction, that the rules of ordinary discourse would

22  apply.

23      Q    Do you believe that opinions can differ as to

24  that meaning?

25      A    I beg your pardon, sir?

1     Q     That opinions can differ as to that meaning?

2     A     Again, I'm having trouble hearing what you're

3  saying.

4     Q     That opinions can differ as to the meaning of

5  that term.  Would you -- would you concede that they

6  can?

7     A     Opinions can always differ, but common

8  understandings are also common understandings.

9     Q     Okay.  You're not pointing to any dictionary

10 definitions or any authoritative sources that you're

11 aware of, are you?

12    A     No, I'm not.  I didn't think it was necessary.

13 I think I know what the word means.

14    Q     Okay.  Well, what -- what about the

15 possibility that there is a one-to-one correspondence

16 between requests and products?  Isn't that another

17 possibility for the word respective?

18    A     No, that is not another possibility.  That is

19 exactly what I was trying to say.

20    Q     At least not in your view of that term?

21    A     I'm confused.  I don't understand -- I think

22 I've agreed that, to me, respective means not

23 necessarily one to one in the sense of item for item,

24 but it does mean one to one in the sense of action for

25 action, so that for each addition to the shopping cart,

1  there is a change to the database; for each deletion

2  from the shopping cart, there is a change in the

3  database; for each change in quantity, there's a change

4  to the database.

5          That's the sense that I meant respective.

6      Q    Well, how about this interpretation:  For each

7  request, there is a product?  Isn't that an equally

8  viable definition or an equally applicable one?

9      A    I don't think so.

10     Q    Okay.  Well, so you differ in opinion with --

11  with Dr. Grimes; is that right?

12     A    Yes, I do.

13     Q    But you can't point to anything specific that

14  support your opinions, can you?

15     A    Other than a common understanding of the

16  English language, no, sir.

17     Q    But you will admit that if your interpretation

18  of that term is incorrect, then your analysis that

19  follows from it is wrong; isn't that true?

20     A    Certainly.

21     Q    Now, the next element is 34(h), and that has

22  to do with modifying the shopping cart in the shopping

23  cart database; that's correct?

24     A    Yes, sir.

25     Q    So you're not quibbling with the idea that

1   Newegg modifies a shopping cart; is that correct?

2       A    No.  It has to modify the shopping cart in

3   order to reflect the shopping activity.

4       Q    Okay.  But your -- your issue with this is

5   that the modification does not take place in the

6   shopping cart database.

7       A    Yes, that's precisely correct.

8       Q    Okay.  And -- and your -- and you're saying --

9   you -- you're -- you do recognize that -- that in

10  checkout, once the checkout has taken place, once the

11  customer has chosen to check out, you do recognize that

12  shopping cart database has changed in some way.

13      A    Well, I have an issue with the word

14  modification, sir, and it has to do with the meaning of

15  the word modification in standard database terminology

16  and also as it appears in the claim constructions for

17  this suit.

18      Q    Okay.  We're going to take a look at the slide

19  that I think you focused on when we got -- when you got

20  into this discussion --

21      A    Okay.

22      Q    -- with Mr. Baldauf on direct.

23           Okay.  And you say that in this instance, the

24  database is not -- it is not modified.  The situation --

25  this shows checkout once the checkout button has been

1   activated; is that correct?

2       A   Yes, sir.

3       Q   Okay.  And at that point, what happens is that

4   the contents of the cookie relating to the product are

5   moved into a database, correct?

6       A   Yes, that is correct.

7       Q   Okay.  And so the issue is whether that is a

8   modification of the database or whether it is, in your

9   terms -- you called it an instant --

10      A   Instantiation, yes, sir.

11      Q   And you think that's an important difference;

12  is that right?

13      A   Yes, I think it's an important difference

14  because the way in which databases are described and the

15  way in which the language for the definition of modify

16  is described, modify specifically says to change an

17  instance, and instantiation means to create an instance.

18          Now, to change an instance means that

19  something already exists and you're doing something to

20  make it different.

21          Instantiation means nothing exists and you're

22  creating it.  I think those two things are very

23  different, and I believe that most database experts

24  would agree with me on that.

25      Q   Well, let's -- let's just talk about your

1   opinions, if you will, and we'll see how they play out.

2       A   Yes, sir.

3       Q   Take a look at that diagram again.  And that

4   big cylindrical thing at the bottom, that's the

5   database, right?

6       A   Yes, it is.

7       Q   And that diagram shows something called a cart

8   ID; isn't that right?

9       A   Yes, it does.

10      Q   So the cart ID exists at the point that the

11  information from the cookie is put in it database,

12  right?

13      A   The cart ID exists as a value of a counter

14  variable stored as a single integer.

15      Q   All right.  So there's something in that

16  database?

17      A   It's not in the database, sir.  It's the value

18  of a variable that belongs to that program.  That --

19  excuse me.

20      Q   Your slide shows it in the database, sir.

21      A   I beg your pardon?

22      Q   Your slide shows it in the database?

23      A   It enters the database at exactly the same

24  time all the other data does.  That's why it's an

25  instantiation.

1     Q     But your slide shows the card ID in the

2 database?

3     A     No, sir.  That can symbol in which the number

4 appears is not a database.  That's a file.

5     Q     I thought that was the shopping cart database?

6     A     No, sir, that is not the shopping cart

7 database.  The shopping cart database is below -- I'm

8 sorry.  It's below in the center of the screen where we

9 see all the different fields with the pointers going

10 into it.

11          The number with the pound sign item beneath it

12 is a simple program variable.  And basically the way it

13 works is, it's like I have a little counter and I'm

14 counting people coming through the door.  Every time

15 somebody comes through the door, the count goes up by

16 one, so that if they want a shopping cart they get the

17 number associated with the number on the counter.

18     Q     Well, don't you agree that the -- the cart ID

19 is the instance of the shopping cart?

20     A     I absolutely do not.  A shopping cart is

21 defined as a data structure that includes various kinds

22 of product information and description.  And at the

23 point where the counter is incremented, none of that

24 information is present.

25     Q     I am going to ask you a question, and I'm

1  going to ask you to try to answer my question.

2      A    I beg your pardon?

3      Q    The question is simply:  Once the cart ID

4  comes into existence, isn't that, in effect, the

5  shopping cart?

6      A    No, it is not.

7      Q    Isn't that a pointer to where the shopping

8  cart is going to be in the database?

9      A    No, sir, it is not.  Until that pointer gets

10 inside the database, it has no meaning or value as a

11 database element.  At that point -- at the point when

12 the counter is incremented it is a potential pointer to

13 a database.  But until the record gets instantiated in

14 the database, it doesn't point to anything.

15     Q    Wouldn't you agree that if you add something

16 to something, it's a modification?

17     A    A modification of what?

18     Q    Of whatever was there originally.

19     A    That's such a general question I can't begin

20 to answer it.  Can you be more specific, please?

21     Q    I'm just saying if there is a shopping cart ID

22 that is used to identify the shopping cart, and to that

23 ID you add information, aren't you modifying?

24     A    According to the claim construction, sir --

25     Q    I'm just asking the answer.

1    A    No.

2    Q    So your chart is wrong there where it shows

3    the existence of the cart ID?

4    A    No, it's not.  Because at that point it's been

5    instantiated into the database.  That's what that table

6    of fields that are named cart ID, item, quantity, item,

7    quantity, that represents a record in the database.

8         That's --

9    Q    So the cart ID is there, and then the

10   information is added to it.  Isn't that what you show in

11   your diagram here?

12   A    No, sir.  What I slow in that diagram, if you

13   look at it carefully, is we have information entering

14   from the left, we have information entering from the

15   right.  That information is deposited all at once as the

16   single arrow from the insert shopping cart data and cart

17   ID label clearly shows, and it all hits the record at

18   the same time.

19        We're not first creating an empty record with

20   a shopping cart ID inside it and then dropping shopping

21   cart data into it; we're doing it in all one swell foop

22   (sic).

23   Q    In your instantiation theory here that that is

24   not the same as modification, have you pointed to any

25   references here that support that?  I haven't seen

1   anything in your testimony to support this testimony.

2        A    It's based on a common understanding of the

3   way that databases work.

4        Q    You don't have any documents, do you?

5        A    I beg your pardon?

6        Q    You don't have any documents on that that you

7   brought to court today that you've testified about.

8        A    Again, I absolutely cannot hear what you're

9   saying.  I am very sorry.

10        Q    I'm just saying you don't have any documents

11   on that point, do you?

12        A    No, I don't have any documents on that point.

13        Q    So let's go on to another element in this

14   case.

15             You -- you mentioned that the buyer computer

16   was programmed, and you gave a more detailed

17   presentation on that later in your testimony.  I'm going

18   to come back to that for now in 34(j).

19             But just to discuss the subject generally,

20   isn't it true that html is sent from the server to the

21   buyer computer, html pages?

22        A    Absolutely.  Yes, sir.

23        Q    And your issue is that that's not programming;

24   is that right?

25        A    Yes, sir, that's correct.  Html is not

1    considered a programming language.

2        Q    Okay.  We'll come back to that.  Hold that

3    thought, but we'll come back to it.

4        A    Okay.

5             MR. GIANNETTI:  Let's take a look at the

6    '492 patent, if we can.  Put that up.

7        Q    (By Mr. Giannetti) And '492 raises some of the

8    same issues; is that correct?  The buyer computer issue

9    that we just discussed?

10       A    Yes, sir.

11       Q    And the shopping cart database?

12       A    Yes, the shopping cart database.

13       Q    And the -- any other points of distinction for

14   that, or is that it?

15       A    There's the hypertext statements, which is not

16   included in the previous.

17       Q    And that's in another '492 claim, right?

18       A    Yes, sir.

19       Q    But this claim -- if your theory is about

20   buyer computer and respective and shopping cart

21   database -- if your theories are incorrect or if the

22   jury doesn't accept them, then the same analysis applies

23   to this claim, correct?

24       A    That is true, yes.

25       Q    Okay.  You don't have any further distinctions

1    on this claim; is that right?

2         A    No, I have nothing further at this time.

3         Q    Now, let's take a look at the next one.

4              MR. GIANNETTI:  Very interesting.

5    Claim 17.  Do you have a chart for Claim 17?

6         Q    (By Mr. Giannetti) I think in your analysis of

7    Claim 15 there was an issue about what was stored --

8    storing and the issue of storing information, storing

9    session identifier.

10             You testified -- when we get the claim up.

11   You testified about the question about who does what in

12   connection with Claim -- I believe it was Claim 15.  And

13   there was a question about returning a session

14   identifier for the server system to the client, the

15   client storing the session identifier for use in

16   subsequent requests.

17        A    Yes.

18        Q    Do you recall that?

19        A    Yes, I do.

20        Q    And I think your position on that was that the

21   storing function is really done by the -- by the

22   customer's computer; is that right?

23        A    Yes, sir.

24        Q    And that's something that's out of Newegg's

25   control; is that right?

```
 1      A    And that's something that's out of what?

 2      Q    Newegg's control.

 3      A    Newegg does not do the storing, sir.  The

 4 browser on the customer computer does the storing.

 5      Q    And I think your position was the same for

 6 that portion of the claim which talks about appending

 7 the storage session identifier.  Do you recall that?

 8      A    Yes, I do.  Yes, that's correct.

 9      Q    Well, isn't it true that this is a mechanism

10 that Newegg takes advantage of?

11      A    It's inherent to the behavior of the worldwide

12 web.

13      Q    And it's something that Newegg takes advantage

14 of when they designed their system; isn't that?

15      A    Yes, it is.

16      Q    And so to say that it's -- it's done by the

17 client, isn't it true that it is really done by the

18 client because of the information that's sent by Newegg?

19      A    Yes, but it still happens as a result of

20 computer executions that are carried out on the client

21 computer.

22      Q    Okay.  I think we have the claim up.

23           Returning the session identifier from the

24 server system to the client and appending the storage

25 system identifier.
```

1               Do you recall that analysis?

2       A    Yes, sir.

3       Q    This is the portion of the claim I'm talking

4   about.

5               All right.  This information is sent -- there

6   is information sent from the server to the client that

7   basically directs the client to set the cookies; isn't

8   that true?

9       A    Yes, that's true.

10      Q    The client would not create the cookie or set

11  the cookie and change it if it were not for instructions

12  that were received from Newegg; isn't that true?

13      A    Yes, that is true.

14      Q    So when you say that this is -- these steps

15  are being performed by the client, they're being

16  performed by the client in response to instructions sent

17  by Newegg?

18      A    Those instructions are sent by Newegg, but the

19  client computer is still the one that carries them out.

20      Q    Without those instructions, the client

21  computer with not carry those steps out, would it?

22      A    No, it couldn't.

23      Q    Computers don't have free will, do they?

24      A    Not in any likable way.

25                 (Laughter)

1      Q     I agree with that.

2            Another step that you talked about -- this is

3   in '639 Claim 1 -- was the step of forwarding a service

4   request from the client to the server, that's step 1(a)?

5      A     Yes, sir.

6      Q     Forwarding service request, do you see that?

7            It's up on the screen.

8      A     Yes, I do.

9      Q     And I think your testimony was that that is,

10  again, something that is -- is performed by -- it's not

11  performed by Newegg; is that right?

12     A     A party other than Newegg, yes.

13     Q     Have you changed your mind about that since

14  your expert report in this case?

15     A     Well, here we are again in some murky waters

16  related to the basic behavior of the internet.

17     Q     So let me show you your expert report, and you

18  tell me whether you changed your mind about that.

19           Bear with us for a minute.

20           So here's the -- here's the step that we're

21  talking about:  Forwarding the service request from the

22  client to the server.

23           And when you prepared your expert report, you

24  said the step is performed by the server.

25     A     That was an error on my part, sir.  So, yes, I

1   have changed my mind.  And I will be happy to explain

2   why.

3        Q     Well, I'm just happy that you will admit that

4   you made another mistake, but I don't need to have an

5   explanation.

6        A     Very good.  Thank you, sir.

7        Q     But I do want to ask you a question.  You

8   heard Dr. Grimes' testimony; is that right?

9        A     Yes, sir.

10       Q     You were here when he testified?

11       A     Yes, sir.

12       Q     There's something called a netscaler in the

13   Newegg system.  Are you familiar with that?

14       A     Yes, I am.

15       Q     And doesn't that forward the service request?

16       A     There's no way on any well-built network on

17   the internet for a packet to make it off the internet

18   and into a private network without going through a

19   firewall or some other device to make sure it's not

20   going to blow up when it gets inside your network.

21            That's why I said it's an inherent behavior of

22   the internet.

23       Q     So your testimony would be that the netscaler

24   does forward?

25       A     Yes, the netscaler does forward, but it's not

1   the only thing that forwards.  And if it were not for

2   all the other forwards starting at the client and going

3   through the cloud, the information could not get there.

4       Q    So you agree with Dr. Grimes' analysis on this

5   point that the netscaler, which is under Newegg's

6   control, forwards?

7       A    Once the packet hits the Newegg network

8   boundary, then, yes, Newegg is forwarding the packet.

9       Q    Let's move on to the issues of validity that

10  you talked about.

11          I think one thing -- you were here yesterday

12  when Dr. -- Mr. Trevor testified, weren't you?

13      A    Yes, I was.

14      Q    And you heard him repeatedly say that

15  various -- various pieces -- well, let's put it this

16  way.  You heard him say repeatedly that there were

17  things that he could not find in the three books, the

18  books on CompuServe that you testified about, right?

19      A    I'm not sure what you're saying, sir.  Could

20  you repeat it?

21      Q    Well, I asked him a series of questions about

22  things that were available in CompuServe, and he

23  answered that they were not -- that they were described

24  in CompuServe, and he said they were not there.  For

25  example, the term shopping cart didn't appear in any of

1  those three manuals that you talked about; is that

2  right?

3       A    Yes, that is correct, yes.

4       Q    And, in fact, do you agree with Dr. Trevor, or

5  Mr. Trevor, that the manuals that you testified about

6  don't show how to implement the shopping cart?

7       A    No, they do not.

8       Q    And you also testified that the messages that

9  go from the client to the server that you testified

10  about are not shown there; isn't that right?

11       A    No, the messages are not shown, that's

12  correct.

13       Q    And, in fact, the books themselves don't show

14  how to implement the database that you talked about?

15       A    No, they don't.

16       Q    He said that, and you agree with him?

17       A    I do agree with him.

18       Q    And that the personal holding file that you

19  equated to the database -- to the shopping cart --

20       A    Yes, sir.

21       Q    -- that is -- the implementation of that isn't

22  shown either?

23       A    No, no implementation is shown.

24       Q    What you said was that -- you used the term

25  reverse engineering.  You said these manuals or these

1  books could be reverse engineered and people could

2  figure out how to do these things; isn't that what you

3  said?

4      A    Yes, sir, that is what I said.

5      Q    Isn't it true that when people talk about

6  reverse engineering they're usually talking about a

7  physical device, like a piece of software or a computer?

8  Isn't that what people are usually talking about?

9      A    My understanding of reverse engineering refers

10  to an ability to recreate a system or to create a system

11  with similar functionality as to what we might call the

12  inspiring system or the original system.

13          I don't think it has to come from a piece of

14  hardware or a piece of software.  I think it could come

15  from a specification or even from an understanding of

16  how a system behaves.

17          Simply knowing that you can do something like

18  store information about purchases means that a competent

19  programmer can figure out how to do it.

20      Q    If there's something not described there, for

21  example, the database, what is there to reverse

22  engineer?

23      A    A -- a qualified programmer would understand

24  that because the CompuServe Mall supported --

25      Q    Sir, would you answer my question?

1          What is there to reverse engineer if there is

2 nothing there?

3          MR. BALDAUF:  Your Honor, he was

4 answering the question.

5          THE WITNESS:  I was answering the

6 question.

7          MR. GIANNETTI:  I don't think he was,

8 Your Honor.

9          THE COURT:  All right.  Restate your

10 question.

11    Q    (By Mr. Giannetti) My point is:  If there is

12 no description of the database, how could the reverse

13 engineer or the programmer use the information in there

14 to build a system?

15    A    They could infer from the visible behavior of

16 the system that numerous other components were present

17 in the background, even though they might not have been

18 directly obvious or explicitly described.

19          Given a system where you have multiple

20 concurrent users and you want to manage data for them,

21 the accepted best practice in the industry since the

22 1970s has been to use a database for that kind of use.

23    Q    Well, we've talked in this case about various

24 ways of implementing shopping carts; is that right?

25    A    Yes, we have.

```
 1      Q    So what is there about the description in
 2 those books that would necessarily tell someone how to
 3 implement a shopping cart in a particular way?
 4      A    I believe I answered that question with my
 5 previous answer.
 6      Q    You're saying that the descriptions in there
 7 are so clear that they would point to one particular
 8 implementation for a shopping cart?
 9      A    No.  What I am saying is I think they would
10 suggest a number of reasonable possible implementations,
11 and that, for reasons of efficiency and security and
12 reliability, that it would make sense to consider a
13 database among those alternatives.
14      Q    But no one particular way; is that right?
15      A    No, sir, no, definitely not.
16      Q    Now, were you here when Mr. Wu testified?
17      A    Yes.
18      Q    Do you think he knows a little bit about
19 programming E-commerce systems?
20      A    Yes, I do.
21      Q    My memory isn't a hundred percent, but I
22 thought Mr. Wu said, in answer to some questions on
23 cross-examination, that if you looked at a website you
24 couldn't -- you couldn't reverse engineer it.  You
25 couldn't tell exactly how it was implemented.  Isn't
```

1    that what you recall?

2       A    Well, actually that is true; but that's

3    because Mr. Wu was just looking.

4             If we look at the expert report from

5    Dr. Grimes, Dr. Grimes used a tool called Protocol

6    Analyzer, which captures all of the traffic that goes

7    across the wire from the server to the client.  And if

8    you look at that traffic, you will find a wealth of

9    information about exactly what's going on.

10      Q    So you think -- you think Mr. Wu doesn't know

11   about these code analyzers?

12      A    He said that he was performing a use case.

13   It's not his purpose in performing a use case to

14   determine all the details of the underlying

15   architecture.  That's not what a use case is for.

16      Q    You think you know more about CompuServe than

17   Mr. Trevor?

18      A    I beg your pardon?

19      Q    Do you think you have know more about

20   how CompuServe is implemented than Mr. Trevor?

21      A    Absolutely not, sir.

22      Q    And he was unable to find these disclosures in

23   the pages that you're relying on; isn't that true?

24      A    Can you be more specific about which

25   disclosures?

1      Q    I gave you a list.  I gave you the database.
2  I gave you the shopping cart, or the personal hold
3  folder.  He was not able to find any description of them
4  in there.  And you find it.
5           Do you think he knows more about CompuServe
6  than you do?
7      A    No, but I think I can use logical reasoning to
8  explain how I arrived at that conclusion.
9      Q    I think that was your direct examination.  I'm
10 just asking you whether you think you can find things
11 that Mr. Trevor can't.
12     A    Yes.
13     Q    Now, let's get back to this programming issue,
14 if we will.
15          I think this is with respect to a number of
16 claims, but you gave it the most attention with respect
17 to Claim 17 of the '492 patent.
18     A    Yes, sir.
19     Q    Is that up there?
20     A    That's it's 15, 41 --
21     Q    I think it doesn't matter because I think it's
22 the same issue.
23     A    Sure.
24     Q    Server computers being programmed or wherever
25 that word programming appears.

1            I believe you took the position that sending

2  an html document is not programming; is that right?

3        A    I don't take issue with the fact that the

4  server is programmed, sir.  I only take issue with the

5  fact that the client is programmed.

6        Q    Okay.  And I think your basis is that you --

7  you call html -- you don't think html is programming

8  language?

9        A    No, sir, I do not.

10       Q    Okay.  Have you ever written any books about

11 programming in html?

12       A    I beg your pardon?

13       Q    Have you written books about programming in

14 html?

15       A    If you're asking me if any of my books have

16 titles that included the words programming in html in

17 the title, I can't remember.

18       Q    Let's see if we can refresh your memory on

19 that.

20            MR. GIANNETTI:  Put that up.

21       Q    (By Mr. Giannetti) Is this one of your books?

22       A    Yes.  I think it was shown earlier.

23       Q    Worldwide Web Programming with HTML.

24            You still say that html is not programming?

25       A    Yes, I do.  And the reason why I do is because

1  you have to combine CGI and html together before you

2  could do any kind of programmatic activity using html.

3           That's, in fact, the point of combining those

4  two terms on the title of that book.

5      Q    So html itself is not programming language; is

6  that what you're saying?

7      A    No, sir, it is not.

8      Q    Even though it's referred to in your book as

9  programming with html and CGI?

10     A    If you don't have the CGI, there is no

11 programming.

12     Q    And you don't consider the http command

13 setting a cookie as programming?

14     A    No, sir, I don't.

15     Q    Even though it causes an action on the part of

16 the server?

17     A    No, sir, I don't.  I think -- my reasons for

18 believing that html is not a programming language have

19 to do with the fact that it's not computationally

20 complete.  You can't do any math in it; you can't do

21 logic flow in it; you can't write general purpose

22 programs in it.

23          Html is a very special-purpose markup language

24 that's designed to move text, information, and objects

25 around and to show them on a page and to let users

1    interact with them.  That doesn't mean that you can't do

2    things with it.  That means that I don't see it as a

3    programming language.

4         Q    You will admit it's a computer language,

5    though, right?

6         A    It is a language that works within the context

7    of a web browser.  A web browser runs on a computer.  By

8    that, you know, logical extension, yes, it is a computer

9    language, but it's not a computer language in the sense

10   of something that you can run on a computer by itself to

11   get work done.  You can't use html without a web

12   browser.  In fact, the reason why CGI is so --

13        Q    Sir, I think you answered my question.

14        A    Okay.  Sorry.

15        Q    I think we agreed earlier that computers don't

16   have free will?

17        A    Oh, yes.

18        Q    And they only do what they're told?

19        A    That's true.

20        Q    And html -- html input tells them what to do?

21        A    To some extent, yes.

22        Q    And you say that's not programming?

23        A    Yes, sir, I do.

24        Q    One further question.

25             I notice that you have a book called HTML for

1   Dummies?

2       A    Yes, I do.

3       Q    And then a follow-on book, More HTML for

4   Dummies?

5       A    That's right.

6       Q    Would they still be dummies after they read

7   your first book?

8               (Laughter)

9               MR. ADAMO:  Think carefully about this

10  one.

11              THE WITNESS:  I think the publisher would

12  like to think so.

13      Q    (By Mr. Giannetti) Let me just consult with my

14  colleagues.  That may be my last question.

15              That's my last question, Mr. Tittel.

16              MR. GIANNETTI:  Nothing further on the

17  direct.  Pass the witness.

18              THE COURT:  Thank you.

19              MR. GIANNETTI:  Nothing further on cross.

20              THE COURT:  Any redirect?

21              MR. BALDAUF:  No redirect, Your Honor.

22              THE COURT:  Thank you.

23              All right.  You may step down,

24  Mr. Tittel.

25              THE WITNESS:  Thank you.

1                   THE COURT:  Let me inquire of counsel as

2   to where we are.

3                   I appreciate the Plaintiff gave back a

4   little time from what they had estimated yesterday.

5                   MR. SAYLES:  Well, I am about to do the

6   same, Your Honor.

7                   THE COURT:  Good.  Well, I knew you

8   wouldn't want the Plaintiff to get ahead.

9                   MR. SAYLES:  That's right.

10                  Consistent --

11                  MR. ADAMO:  Further ahead, Your Honor?

12                  I'm sorry.  It was --

13                  THE COURT:  All right.

14                  MR. SAYLES:  May it please the Court.

15                  Consistent with the needs of the case and

16  the interest of justice, we have, however, in balancing

17  everyone's time, cut back on the depositions.

18                  Shikhar Ghosh will be our next witness by

19  deposition.  It is nine minutes.  It's been cut to nine

20  minutes.

21                  THE COURT:  Okay.

22                  MR. SAYLES:  That's the only deposition

23  that we are going to offer.

24                  THE COURT:  Okay.

25                  MR. SAYLES:  And then after that we will

1  call Chris Bakewell.

2                 THE COURT:  Uh-huh.

3                 MR. SAYLES:  And as the Court may recall,

4  and the jury may recall, Mr. Ghosh has already been

5  identified as a founder and the chief executive officer

6  of Open Market.

7                 THE COURT:  Uh-huh.  Okay.  And let me

8  ask you about Mr. Bakewell.  You are estimating an hour

9  and 20 minutes yesterday.  What's your estimate today?

10                MR. SAYLES:  I think that's about right.

11                THE COURT:  And the nine minutes on

12  Mr. Ghosh includes both parties?

13                MR. SAYLES:  It's all our time.

14                THE COURT:  All right.  And does

15  Plaintiff have any time that they want on Mr. Ghosh?

16                MR. ADAMO:  No, Your Honor.

17                THE COURT:  Okay.  And then Mr. Bakewell,

18  how long is Plaintiff anticipating on cross of

19  Mr. Bakewell?

20                MR. SATINE:  Your Honor, yesterday I was

21  anticipating an hour.  I spoke to Mr. Sayles, I thought

22  he was cutting down, so I was cutting down.  I guess I'm

23  back to my hour.

24                THE COURT:  Okay.  Well, all righty.

25  And then that will conclude Defendant's case, right?

```
 1                    MR. SAYLES:  Yes, Your Honor, it would.
 2                    THE COURT:  Then on rebuttal you have
 3   who, Dr. Shamos?
 4                    MR. GIANNETTI:  Yes, Your Honor,
 5   Dr. Shamos.
 6                    THE COURT:  Shamos.  How long on direct
 7   on Dr. Shamos?
 8                    MR. GIANNETTI:  I would think about an
 9   hour.
10                    THE COURT:  Good.  That's 15 minutes less
11   than yesterday.
12                    MR. GIANNETTI:  Maybe an hour and a
13   quarter, but somewhere in that range.
14                    THE COURT:  We're back to the hour 15.
15                    MR. GIANNETTI:  I will shoot for an hour.
16                    THE COURT:  What about cross?
17                    MR. SAYLES:  My team tells me that it
18   will be 30 minutes or less.
19                    THE COURT:  Well, good.  Let's see, that
20   puts us at about two and a half.  All right.  Very good.
21                    We should be able to get through with the
22   evidence this -- is that your only witness on rebuttal?
23                    MR. ADAMO:  I was just about to rise to
24   say that, Your Honor.  I know I had left some
25   uncertainty about that yesterday.  But, yes, Dr. Shamos
```

1  will be our only rebuttal witness.

2              THE COURT:  All right.  Well, according

3  to my calculations then, Ladies and Gentlemen of the

4  Jury, it looks like we have about -- let's see, about

5  three, three hours of testimony left.  So we should

6  finish ahead of schedule this afternoon.  So we're not

7  going to be quite as rushed as I thought.

8              So I think what I'm going to do -- the

9  parties have been good enough to bring you in

10 sandwiches.  They've been providing you with your snacks

11 all week.  I know you appreciate that.  Both parties

12 have split the cost on that.  But just to try to make

13 this a little more bearable and comfortable for you, we

14 do have sandwiches brought in for you today, if you wish

15 to stay in and eat those sandwiches.

16             I was going to do a 30-minute lunch, but

17 I have another hearing to take up.  And so that my staff

18 and I will have a chance to eat, I think we'll go ahead

19 and I will recess until 1 o'clock.  And we should still

20 have plenty of time to finish the testimony this

21 afternoon.

22             So enjoy your lunch.  Remember my

23 instructions.  Don't discuss this case among yourselves

24 or with anyone else.  And we'll see you back here at

25 1 o'clock.  Be in recess.

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    (Jury out.)

 3                    THE COURT:  Please be seated.

 4                    MR. ADAMO:  It's just housekeeping, Your

 5   Honor.

 6                    THE COURT:  Okay.

 7                    MR. ADAMO:  What's the Court's -- what's

 8   the Court's sense for where we start, stand, vis-a-vis

 9   the jury charge and the verdict form?

10                    THE COURT:  We're working on it.  I've

11   been trying to get some time to finish looking at it

12   here.  Should have it for you sometime this afternoon,

13   certainly before afternoon break.

14                    As soon as we get it, I will pass it out

15   to you, give you a chance to review it.  I will hear

16   objections to the charge this afternoon after we've

17   concluded all of the evidence.  That will be your only

18   chance to object.

19                    When we come back in the morning at 9:00,

20   we will go straight into charging the jury and closing

21   argument.

22                    MR. ADAMO:  All right.  Now, as --

23   obviously as we're approaching the close of their case,

24   it's our Rule 50 time.  I have got one in writing, but

25   there are going to have to be some slight modifications.
```

```
 1                     THE COURT:  We'll give you an opportunity
 2   to do that when they rest.
 3                     MR. ADAMO:  All right.  I mean, the rule
 4   is, as Ms. Frost of course reported to the Court, as
 5   long as we get it to you before --
 6                     THE COURT:  I don't know why they changed
 7   that rule.  That's troubling to me.
 8                     MR. ADAMO:  It costs me a lot of
 9   postcards and phone calls, et cetera, down to
10   administrative -- I don't know either, Your Honor.  That
11   one seemed to just slip in and got changed.
12                     But I'll have it in writing.
13                     THE COURT:  Okay.  That's fine.  Y'all
14   can file it whenever you want to under the rule anyway.
15                     So, okay.
16                     MR. GIANNETTI:  Your Honor, also we
17   handed up a motion related to Mr. Trevor, and I would
18   like to know if we could file it electronically.
19                     THE COURT:  That's denied.
20                     MR. GIANNETTI:  Denied.  I guess I don't
21   have to file it electronically.
22                     THE COURT:  No, you don't.
23                     MR. GIANNETTI:  Can I file it for the
24   record?
25                     THE COURT:  You should file
```

```
 1  it electronically so we'll know -- the Court of Appeals
 2  will know what motion I denied.
 3            MR. ADAMO:  As we did.  I think you
 4  probably saw where we came in this morning and filed
 5  electronically the bench memos, the last motion that you
 6  had also denied last evening, after having had your
 7  permission.
 8            THE COURT:  Okay.  That's fine.  Just
 9  don't put any new arguments in them after I've denied
10  them.
11            MR. ADAMO:  Oh, no.  Hard to believe as
12  it may seem, Your Honor, I like still being able to make
13  a living now that I'm about to turn 60.  I'm a little
14  old to get this far and going back to being an engineer.
15            Of course, at the close of all the
16  evidence, I will reoffer, as I'm sure Mr. Sayles will
17  reopen Rule 50, but I don't intend on filing anything
18  further that the original paper.
19            THE COURT:  All right.  Very well.
20            MR. SAYLES:  May it please the Court.
21            There's one other housekeeping item that
22  I'm going to mention because I don't want to forget it.
23  And that is, with regard to the stipulations.  Rather
24  than take the time to read them into evidence, the Court
25  had suggested, and we have certainly accepted that
```

```
 1    suggestion, we put them in in writing as an exhibit.

 2                    THE COURT:  Uh-huh.

 3                    MR. SAYLES:  And I believe that your

 4    Clerk volunteered to pull those out of the Court's

 5    charge for us to mark as an exhibit.  I'm not trying to

 6    give her work but --

 7                    THE COURT:  I think we had had it as an

 8    appendix, but I think it would be better just to have it

 9    as an exhibit.

10                    MR. ADAMO:  Six of one, half a dozen of

11    the other.

12                    THE COURT:  Do you have that for him?

13                    COURTROOM DEPUTY:  Uh-huh.

14                    THE COURT:  She has it for you.  Y'all

15    ought to offer that before you rest.

16                    MR. SAYLES:  We would like to do that.

17                    Either way will work.

18                    THE COURT:  Anything further?

19                    MR. ADAMO:  No, sir.

20                    THE COURT:  We are going to take about a

21    five-minute recess, and then we will take up the

22    Sta-Rite versus ITT case.

23                    (Lunch recess.)

24

25
```

```
 1              C E R T I F I C A T I O N

 2

 3   I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled

 5   matter.

 6

 7   /s/

 8   SHEA SLOAN, CSR

 9   OFFICIAL COURT REPORTER

10   STATE OF TEXAS NO. 3081

11

12

13   /s/

14   JUDITH WERLINGER, CSR

15   DEPUTY OFFICIAL COURT REPORTER

16   STATE OF TEXAS NO. 267

17

18

19

20

21

22

23

24

25
```