1

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE EASTERN DISTRICT OF TEXAS
                             TYLER DIVISION
 3
    SOVERAIN SOFTWARE              )
 4                                )   DOCKET NO. 6:07cv511
        -vs-                      )
 5                                )   Tyler, Texas
                                  )   9:00 a.m.
 6  NEWEGG, INC.                   )   April 30, 2010

 7                       TRANSCRIPT OF TRIAL
                    MORNING AND AFTERNOON SESSIONS
 8              BEFORE THE HONORABLE LEONARD DAVIS,
           UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                      A P P E A R A N C E S
10
    FOR THE PLAINTIFFS:       MR. KENNETH R. ADAMO
11                            JONES DAY
                              2727 N. Harwood St.
12                            Dallas, Texas  75201-1515

13                            MR. THOMAS L. GIANNETTI
                              MR. BARRY R. SATINE
14                            MS. CLARK CRADDOCK
                              JONES DAY
15                            222 East 41st St.
                              New York, New York  10017-6702
16
                              MR. CARL ROTH
17                            ROTH LAW FIRM
                              115 N. Wellington, Ste. 200
18                            P.O. Box 876
                              Marshall, Texas  75670
19
                              MR. MICHAEL C. SMITH
20                            SIEBMAN, REYNOLDS, BURG,
                              PHILLIPS & SMITH
21                            713 S. Washington Ave.
                              Marshall, Texas  75670
22

23  COURT REPORTER:          MS. JUDITH WERLINGER

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

2

```
 1  FOR THE THE DEFENDANTS:  MR. RICHARD SAYLES
                             MR. MARK STRACHAN
 2                           SAYLES WERBNER
                             4400 Renaissance
 3                           1201 Elm St.
                             Dallas, Texas  75270
 4
                             MR. HERBERT A. YARBROUGH, III
 5                           YARBROUGH LAW FIRM
                             100 E. Ferguson, Ste. 1015
 6                           Tyler, Texas  75702

 7
                             MR. DAVID C. HANSON
 8                           MR. KENT BALDAUF, JR.
                             MR. DANIEL H. BREAN
 9                           THE WEBB LAW FIRM
                             200 Koppers Bldg.
10                           436 Seventh Ave.
                             Pittsburgh, PA  15219
11

12                           MS. CLAUDIA W. FROST
                             MR. JEREMY J. GASTON
13                           PILLSBURY WINTHROP
                             909 Fannin St., Ste 2000
14                           Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2               (Jury out.)
 3               COURT SECURITY OFFICER:  All rise.
 4               THE COURT:  Please be seated.
 5               All right.  Before we bring the jury in,
 6   let me just tell you, I am granting Plaintiff's JMOL
 7   motion on obviousness.  I'm denying it as to
 8   anticipation.
 9               But I think -- I don't think it's a close
10   call on obviousness.  I don't think there's sufficient
11   testimony to present an obviousness case to the jury.  I
12   think it would be very confusing to them.
13               On anticipation, I'm going to submit that
14   to the jury.  I'm not going to grant the JMOL at this
15   time.  But I will say it's a very close call.  But if
16   the jury doesn't find it, then we don't have to worry
17   about it.  If they do find it, then I'll take a closer
18   look at it when we can look at the transcripts and
19   testimony in the case.
20               So with that said, the -- I have -- we've
21   taken out the obviousness part of the charge.
22               Anticipation is still in.  We did move
23   the anticipation date, effective -- I'm sorry --
24   effective date up into -- to include some instructions
25   on that.  I think it had been in the obviousness section
```

1   of -- a few sentences.

2                 I am not conditioning the damage issue on

3   a finding of invalidity because I want to get all three

4   findings, depending upon what I might do with invalidity

5   in post-verdict motions, if we get to that point, so...

6                 MR. ADAMO:  Understood, Your Honor.

7                 Now, I have not been before Your Honor

8   where you've ruled out something so close to final

9   argument, but -- I should have let you do this, but

10  because I'm a fair fool, I'm going to ask what it is --

11  what can I tell them that you would find acceptable

12  about what happened to obviousness?

13                THE COURT:  Well, I just don't think you

14  need to mention it.

15                MR. ADAMO:  Understood.

16                Now, the difficulty is, my slide said --

17  I'm going to have to jump over it.  I might be able to

18  work with Mr. Gooden to get him to pull the slide, but

19  when my slide set was put together, it was on the

20  assumption that Your Honor --

21                THE COURT:  Do y'all need 10 minutes to

22  try to juggle some of that?  I'll give it to you, if you

23  need it.

24                MR. ADAMO:  If I go through it with

25  Mr. Gooden sitting next to me and say pull --

```
 1                    THE COURT:  All right.  Why don't -- why
 2  don't -- why don't we take about -- let me know when
 3  you're ready.  We'll take about five minutes.
 4                    Mr. Sayles?
 5                    MR. SAYLES:  May it please the Court.  I
 6  have one housekeeping matter.
 7                    THE COURT:  All right.
 8                    MR. SAYLES:  In keeping with the Court's
 9  procedure, I have marked Defendant's Exhibit List No. 3,
10  which includes Defense Exhibit 516, the stipulations,
11  which was offered and admitted yesterday; and with the
12  Court's permission, I'll tender this list now to the
13  Court.
14                    THE COURT:  All right.  Any objection?
15                    MR. ADAMO:  No, Your Honor.
16                    THE COURT:  Be admitted.
17                    All right.  Any cleanup on the
18  Plaintiff's exhibits, or are we good?
19                    All right.  Anything else from Newegg?
20                    MR. SAYLES:  No, Your Honor.
21                    THE COURT:  All right.  We'll just take a
22  five-minute recess while both of you go over your
23  presentations.
24                    COURT SECURITY OFFICER:  All rise.
25                    (Recess.)
```

```
 1              (Jury out.)

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Please be seated.

 4              MR. ADAMO:  Your Honor, thank you for the

 5  time.  Mr. Gooden and I went through the slides, and I

 6  think I got them all out.  I erred on the side of, when

 7  in doubt, I took it out.

 8              THE COURT:  All right.  Very good.

 9              Let's see.  Now, I was going to -- oh, I

10  know what I wanted to mention to you.

11              Ms. Ferguson has advised me that there's

12  a few differences between her notes and y'all's final

13  exhibit list that you've turned in.

14              So what I'm going to do is, we're going

15  to mark Plaintiff's and Defendant's final exhibit lists

16  with the annotations, the one that goes to the jury

17  that -- as Plaintiff's Exhibit List Final and

18  Defendant's Exhibit List Final.

19              And I would like agreement that those do

20  constitute all of the exhibits that are in evidence in

21  this case.

22              Plaintiffs so agree?

23              MR. ADAMO:  Ms. Craddock is telling me to

24  say yes, Your Honor, so yes.

25              THE COURT:  All right.  Mr. Sayles?
```

1                    MR. SAYLES:  And Mr. Brean is telling me

2     the same thing.

3                    THE COURT:  You guys are good at

4     dodging -- dodging the responsibility.

5                    MR. ADAMO:  Your Honor -- Your Honor,

6     can't -- can't you tell from the resemblance between

7     Mr. Sayles and myself, we're working cooperatively?

8                    THE COURT:  There's no resemblance at the

9     top of your head.

10                   [Laughter]

11                   THE COURT:  All right.  Bring the jury

12    in.

13                   COURT SECURITY OFFICER:  All rise for the

14    jury.

15                   THE COURT:  Please be seated.

16                   (Jury in.)

17                   THE COURT:  Good morning.  Hope y'all had

18    a good evening and are back here ready to go.

19                   As you'll recall, Monday you heard

20    opening statements.  You've now heard those.  You've

21    heard all of the evidence in the case.  You've heard

22    the -- you're about to hear the Court's Charge.  Then

23    you're going to hear the final arguments this morning,

24    and then you'll be able to begin your deliberations.

25                   We do have sandwiches coming in for you

8

1  today for your lunch, so I'll just advise you of that.

2                   If you'll bear with me, I'm going to read

3  through some instructions.  I'm going to have the court

4  security officer pass out to you a copy of the Court's

5  Charge.

6                   So you'll have all of this.  You're

7  welcome to follow along, but please listen to what I say

8  as I go through the Court's Charge.  I do get to

9  ad-libbing from time to time, but I think if you'll just

10  listen, it will be helpful to you.

11                   Let's start with the verdict form that

12  you've been handed.  I'll just cut right to the chase.

13  If you'll look at that two- or three-page form, really

14  you've got three questions to answer in regard to this

15  case.

16                   The first question deals with

17  infringement, and it asks:  Did Soverain prove by a

18  preponderance of the evidence -- there's that burden of

19  proof standard again -- that Newegg directly infringed

20  or induced infringement of the asserted claims of the

21  '314 and '492 patent?

22                   Answer yes or no for each claim and each

23  type of infringement.

24                   Then you'll see, for the '314 patent,

25  Claims 35 and 51, and a place for you to answer yes or

9

1  no as to both direct infringement and inducement.

2  Same thing as to the '492 patent.

3              And I'll have many more instructions to

4  you in a moment about how you go about finding that and

5  what the law is, but just to let you see what questions

6  you're going to be answering.

7              Then Question No. 2:  Did Soverain prove

8  by a preponderance of the evidence that Newegg directly

9  infringed the asserted claims of the '639 patent?

10             And there you see the same thing for the

11  '639 patent.

12             The next question deals with invalidity.

13  Did Newegg prove by clear and convincing evidence --

14  there's that standard -- that the claims of the '314

15  patent, the '492 patent, and the '369 (sic) patent are

16  invalid.

17             Really, that should be or.

18             Did Newegg prove by clear and convincing

19  evidence that the claims in the '314, '492, or '639

20  patent -- you answer for each patent and each claim.

21  So the '314 patent claim numbers, '492, and '639 claim

22  numbers.

23             After the invalidity question is a damage

24  question.

25             If you have found that any claim

1  infringed, answer Question 4; otherwise, do not answer

2  Question 4.

3              What sum of money, if paid now in cash,

4  do you find from a preponderance of the evidence would

5  fairly and reasonably compensate Soverain for Newegg's

6  infringement of the following patents:  The '314 and/or

7  the '492 and then the '639 patent.

8              Signed this blank day and a place for

9  your jury foreperson to sign.

10             So those are the questions you'll be

11  asked.  Now let me go through the Court's Charge and the

12  instructions with you.

13             You've now heard all of the evidence in

14  the case.  I'm now going to instruct you on the law that

15  you must apply.  It is your duty to follow the law as I

16  give it to you.

17             On the other hand, you, the jury, are the

18  judges of the facts.  You're the sole judges of the

19  facts in this case.  You should not consider any

20  statement that I may have made during the trial or make

21  in these instructions as any indication whatsoever that

22  I have any opinion about the facts of the case.

23             Again, that is solely your province.  You

24  are the judges of those facts.

25             After I instruct you on the law, the

1  attorneys are going to have an opportunity to present

2  their closing arguments to you.

3              Again, the statements and arguments of

4  the attorneys are not evidence.  They are not

5  instructions on the law.  They are merely what they

6  believe that the evidence shows, and they will try to

7  put the evidence in context for you in light of the

8  instructions that you -- on the law that you will take

9  from me.  They're intended on only to assist you.

10             All right.  General instructions.

11  A verdict form has been prepared for you.  We've been

12  over that.  You will take this form to the jury room,

13  and when you've reached a unanimous agreement as to your

14  verdict, you will have your foreperson fill in, date,

15  and sign the form.

16             Answer each question on the verdict form

17  from the facts as you find them.  Do not decide who you

18  think should win and then answer the questions

19  accordingly.  Your answers and your verdict must be

20  unanimous.

21             In determining whether any fact has been

22  proved in this case, you may, unless otherwise

23  instructed, consider the testimony of all witnesses,

24  regardless of who may have called them, and all exhibits

25  received in evidence, regardless of who may have

1  produced them.

2                        When you go to the jury room, you will

3  receive all of the exhibits that have been introduced in

4  this case.  They'll be in a box, they'll be numbered,

5  and there will be an index with the numbering and a

6  description of the documents.

7                        Now let me visit with you about witness

8  testimony.

9                        By the Court allowing testimony or other

10  evidence to be introduced over an objection of an

11  attorney, the Court did not indicate any opinion as to

12  the weight or effect of such evidence.

13                        You, again, are the sole judges of the

14  credibility of all witnesses and the weight and effect

15  of all evidence.

16                        When the Court sustained an objection to

17  a question addressed to a witness, the jury must

18  disregard the question entirely and may draw no

19  inference from the wording of it or speculate as to what

20  the witness would have testified to if he or she had

21  been permitted to answer the question.

22                        Also, at times, I may have ordered that

23  a -- that you disregard or that a question or answer be

24  stricken.  You should not consider that testimony.

25                        At times during the trial, it was

1   necessary for the Court to visit here at the bench with

2   the lawyers out of your hearing or by calling a recess.

3                  We met because often during the trial,

4   something comes up that does not really involve you,

5   mainly questions of law.  You should not speculate on

6   what was discussed during such times.

7                  In determining the weight to give to the

8   testimony of the witness, you should ask yourself

9   whether there was evidence tending to prove that the

10  witness testified falsely concerning some important fact

11  or whether there was evidence that at some other time

12  the witness said or did something or failed to say or do

13  something that was different from the testimony the

14  witness gave before you during trial.

15                 In other words, you're judging the

16  credibility.  And in judging that, you can consider many

17  things.  You should keep in mind that a simple mistake

18  by a witness does not necessarily mean that the witness

19  was not telling the truth as he or she might remember

20  it, because people may forget things or remember other

21  things inaccurately.

22                 So if a witness has made a misstatement

23  or has testified differently at different times, you

24  need to consider whether the misstatement was an

25  intentional falsehood or simply an innocent lapse of

1  memory, and the significance of that may have to do

2  whether it has to do with an important fact in the case

3  or with only some unimportant detail.

4              Now, how to examine the witness, the

5  evidence.

6              Certain testimony in this case has been

7  presented to you through depositions.  Again, as I

8  instructed you earlier, a deposition is a sworn,

9  recorded question and answer of the witness taken in

10  advance of trial.

11              In some cases, if the witness cannot be

12  present, the deposition is either read in or played by

13  video.  It is still under oath.

14              Deposition testimony is entitled to the

15  same consideration and is to be judged by you as to

16  credibility and weight as if the witness had testified

17  from the witness stand in court.

18              While you should consider only the

19  evidence in this case, you are permitted to draw such

20  reasonable inferences from the testimony and exhibits as

21  you feel are justified in light of common experience.

22              In other words, you may make deductions

23  and reach conclusions that reason and common sense lead

24  you to draw from the facts that have been established by

25  the testimony and evidence in the case.

1                The testimony of a single witness may be

2     sufficient to prove any fact, even if a greater number

3     of witnesses may have testified to the contrary, if,

4     after considering all the other evidence, you believe

5     that single witness.

6                Again, it comes back to you are the sole

7     judges of the facts.

8                Now, there are two types of evidence that

9     you may consider in properly finding the truth as to the

10    facts in this case.

11               The first is what we call direct

12    evidence, such as the testimony of an eyewitness.

13               The other is indirect or circumstantial

14    evidence; that is, the proof of a chain of circumstances

15    that indicates the existence or nonexistence of certain

16    other facts.

17               As a general rule, the law makes no

18    distinction between direct and circumstantial evidence

19    but simply requires that you find the facts from a

20    preponderance of all the evidence, both direct and

21    circumstantial.

22               Now, with regard to expert testimony.

23    When the knowledge of a technical subject matter may be

24    helpful to the jury, a person who has special training

25    or experience in that technical field, which we call an

1  expert witness, is permitted to state his or her opinion

2  on those technical matters.

3            However, you are not required to accept

4  that opinion.  As with any other witness, it is up to

5  you to decide whether to rely upon it.

6            In deciding whether to accept or rely

7  upon the opinion of an expert witness, you may consider

8  any bias of the witness, including any bias you may

9  infer from evidence that the expert witness has been or

10  will be paid for reviewing the case and testifying, or

11  from evidence that he or she testifies regularly as an

12  expert witness, and that income from such testimony

13  represents a significant portion of the expert's income.

14            I'm now going to give you a summary of

15  each side's contentions in this case.  I will then tell

16  you what each side must prove to win on these issues.

17            In this case, the Plaintiff, Soverain,

18  contends that the Defendant, Newegg, uses technology for

19  its websites that infringes Claims 35 and 51 of the '314

20  patent; Claims 17, 41, and 61 of the '492 patent; and

21  Claims 60 and 79 of the '639 patent.  Soverain asks you

22  to award damages for this infringement.

23            Newegg contends that it does not infringe

24  Soverain's patent and that Soverain's patents are

25  invalid.  Newegg asks that you deny Soverain any

1  damages.

2              Now, with regard to the burdens of proof,

3  I instructed you about these at the beginning of the

4  case, and I'm going to instruct you about them again

5  because they're important.

6              Soverain has the burden of proving

7  infringement by a preponderance of the evidence.

8              Preponderance of the evidence means

9  evidence that persuades you that a claim is more likely

10 true than not true.

11             In determining whether any fact has been

12 proved by a preponderance of the evidence, you may,

13 unless otherwise instructed, consider the stipulations,

14 the testimony of the -- of all witnesses, regardless of

15 who may have called them, and all exhibits received in

16 evidence, regardless of who may have produced them.

17             It will be your job to determine whether

18 Soverain has met its burden of proving that infringement

19 of the asserted patent claims is more likely true than

20 not true.

21             Now, Newegg bears the burden of proving

22 invalidity by the clear and convincing evidence

23 standard.

24             Proof by the clear and convincing

25 evidence standard is a greater burden of proof than

1   proof by a preponderance of the evidence, but it is less

2   than the burden of proof that you may have heard about

3   in criminal cases:  Beyond a reasonable doubt.

4                   Clear and convincing evidence is evidence

5   that produces an abiding conviction that the truth of a

6   factual contention is highly probable.

7                   In determining whether any fact has been

8   shown by clear and convincing evidence, you may, unless

9   otherwise instructed, consider the stipulations, the

10  testimony of all witnesses, regardless of who may have

11  called them, and all exhibits received in evidence,

12  regardless of who may have produced them.

13                  It will be your job to determine whether

14  Newegg has met its burden of proving the invalidity of

15  the '314, '492, and '639 patent claims.

16                  Now let's talk about the claims of the

17  patents-in-suit.

18                  As I told you at the beginning of the

19  trial, the claims of a patent are the numbered sentences

20  at the end of the patent.  The claims describe the

21  invention made by the inventor and describe what the

22  patent owner owns and what the patent owner may prevent

23  others from doing.

24                  Claims may describe products, such as

25  machines or chemical compounds, or processes for making

1  or using a product.  Claims are usually divided into

2  parts or steps called elements or limitations.

3              For example, a claim that covers the

4  invention of a table may recite the tabletop, four legs,

5  and the glue that secures the legs on the top.  The

6  tabletop, legs, and glue are each a separate element of

7  the claim.

8              Construction of the patent claims.

9              In deciding whether or not the accused

10  technology infringes the patent, the first step is to

11  understand the meaning of the words used in the patent

12  claims.

13             It is my job as Judge to determine

14  whether the patent -- to determine -- it is my job as

15  Judge to determine what the patent claims mean and to

16  instruct you about that meaning.

17             You must accept the meanings I give you

18  and use those meanings when you decide whether or not

19  the patent claims are infringed and whether or not the

20  patents are invalid.

21             Before I instruct you about the meaning

22  of the words of the claims, I will explain to you the

23  different types of claims that are at issue in this

24  case.

25             Before I do that, though, let me suggest

1  that you turn to -- let's see.  Do they have the chart

2  as an exhibit?  Yes.

3                  MR. ADAMO:  They do, Your Honor.

4                  THE COURT:  Exhibit A to the charge will

5  be on Page -- starts over on Page 22 of the charge.  If

6  you'll flip over there.

7                  There you will see in the left-hand

8  column are various terms that are used in the patent

9  claims.  And you probably heard some of these testified

10  about during the trial.

11                 And as I told you earlier, at some point

12  prior going to trial, the parties reviewed the claims.

13                 When they had a disagreement over what a

14  particular term meant, they would come to me, and we had

15  a hearing, usually a three- or four-hour hearing.

16                 They filed briefs on the law, on the

17  patent, and I then construed what the meaning of those

18  terms were in light of the specification of the patent

19  and the meaning of the patent.  So you're bound by these

20  terms.

21                 For example, a statement URL, and then

22  you see the Court's construction, a URL concerning a

23  statement.

24                 Computer, what that is:  A functional

25  unit that can perform substantial computation, including

1  numerous arithmetic operations or logic operations

2  without human intervention.

3                 Connected to:  Having a link to, to send

4  or receive data.

5                 Database:  A collection of logically

6  related data stored together in one or more computerized

7  files.

8                 And it goes on for several pages.  I'm

9  not going to the read them all, but I would commend them

10  to your reading and your review as you do your

11  deliberations.

12                 The attorneys will also, in their closing

13  argument, point out to you any of these definitions that

14  they think are of particular importance to you in

15  reaching your verdict.

16                 Now, I'm going to explain to you the

17  types of claims that are at issue in this case.  It may

18  be helpful to refer to copies of the '314, '492, and

19  '639 patents that you have in year notebooks as I

20  discuss the claims at issue here.

21                 First are independent and dependent

22  claims.  We went over this earlier.  I'll mention it

23  again.

24                 Patent claims may exist in two forms

25  referred to as independent claims and dependent claims.

1                   An independent claim does not refer to
2     any other claim of the patent.  It is not necessary to
3     look at any other claim to determine what an independent
4     claim covers.  Claim 17 of the '492 patent is an
5     independent claim.
6                   A dependent claim refers to at least one
7     other claim in the patent.  A dependent claim includes
8     each of the claim elements of the other claim to which
9     it refers, as well as the additional elements recited in
10    the dependent claim.
11                  In this way, the dependent claim is said
12    to depend on the other claim.  To determine what a
13    dependent claim covers, it is necessary to look both at
14    the dependent claim and the independent claim to which
15    it refers.
16                  So if you've got an independent claim,
17    you just look at the elements of that claim.
18                  If you have a dependent claim, you look
19    at the elements of that claim, plus the elements of the
20    claim it refers to, okay?
21                  Everybody with me?
22                  Okay.  All right.  When analyzing the
23    validity and alleged infringement of any dependent
24    claim, you must consider all limitations of both the
25    dependent claim and independent claim for which it

1  depends.

2                    And I think I've been over that.

3                    Now let's skip down to the interpretation

4  of claims.

5                    In deciding whether or not the accused

6  technology does or does not infringe a patent claim --

7  well, this is Appendix A.  I've been over that as well.

8  I've already told you about the Court's claim

9  construction.

10                    Paragraph 3.4 is a glossary of patent

11 terms.  A glossary of patent terms is contained in

12 Appendix B to this charge.

13                    If you'll turn back to Appendix B, which

14 begins on Page 26, is the glossary of patent terms, and

15 that's another list of definitions for you there.

16                    I would direct your attention over to

17 Page 27.  One definition that you'll -- or word that

18 you'll hear me mention several times that I think is

19 worth me going over with you -- and I would commend all

20 of these glossary of terms to you for your reading and

21 consideration in reaching your verdict.

22                    But one of ordinary skill in the art,

23 you'll hear many references to one of ordinary skill in

24 the art or as one of ordinary skill in the art would

25 know it.

1                    Here I define what that is.

2                    From time to time, I'll refer to a

3     hypothetical person of ordinary skill in the art or a

4     person of ordinary skill in the field.  This

5     hypothetical person is presumed to be aware of all the

6     prior art and knowledge that existed in the field during

7     the relevant time period.

8                    The skill of the actual inventor and

9     experts is irrelevant because they may possess that

10    something that distinguishes them workers of ordinary

11    skill in the art.

12                   Factors to consider in determining the

13    level of ordinary skill in the art include the

14    educational level and experience of people working in

15    the art, the types of problems faced by workers in the

16    art, and the solutions found to those problems and the

17    sophistication of the technology in the field.

18                   All right.  Let's go back to Page 7, and

19    I'm now going to discuss infringement with you.

20                   Any person or business entity that,

21    without the patent owner's permission, makes, uses,

22    sells, or offers to sell a device or practices a method

23    that is covered by at least one claim of a patent before

24    the patent expires, infringes the patent.

25                   A patent owner has the right to stop

1  others from infringing the patent claims during the life

2  of the patent.

3                    In this case, Soverain asserts that

4  Newegg has infringed the patents-in-suit.  Soverain has

5  the burden of proving infringement by a preponderance of

6  the evidence.

7                    Only the claims of a patent can be

8  infringed.  You must consider each claim individually.

9  You must compare each of the asserted claims, as I have

10  defined them, to the accused methods and systems used by

11  Newegg's websites and determine whether or not there is

12  infringement.

13                    You must not compare the accused systems

14  or methods with any specific example set out in the

15  patent.

16                    You compare it to the claims set forth in

17  the patent, the claims that are at issue in this case.

18                    Soverain has alleged that Newegg

19  infringes these -- the asserted claims both directly and

20  indirectly.  I will now explain each of the types of

21  infringement in more detail.

22                    So we've got infringement and then two

23  types, direct and indirect, underneath it.

24                    A patent claim is directly infringed only

25  if the accused system or method includes each and every

1   element in that patent claim.

2                   If you find that the accused system or

3   method includes each element or step of the claim, then

4   the system or method infringes the claim even if such

5   system or method contains additional elements or steps

6   that are not recited in the claim.

7                   If the accused system or method does not

8   contain one or more of the limitations recited in a

9   claim, then that system or method does not directly

10  infringe that claim.

11                  An accused system infringes the claim if

12  it is reasonably capable of satisfying the claim

13  elements, even though it may also be capable of

14  non-infringing modes of operation.

15                  Direct infringement requires a party to

16  perform or use each and every step of a claim method

17  literally or under the Doctrine of Equivalents.

18                  Where no one party performs all the steps

19  of a claim method, but multiple parties combine to

20  perform every step of the claim method, that claim will

21  nevertheless be directly infringed if one party

22  exercises control or direction over the entire method so

23  that every step is attributable to the controlling

24  party.

25                  Mere arm's-length cooperation between the

1    parties is not enough to establish direct infringement.

2                    A person can directly infringe a patent

3    without knowing that what it is doing is an infringement

4    of the patent.

5                    It may also directly infringe even

6    though, in good faith, it believes that what it is doing

7    is not an infringement of any patent and even if it did

8    not know of the patent.  Infringement does not require

9    proof that the person copied a product or the patent.

10                    A claim limitation may be directly

11    infringed in one of two ways:  Either literally or under

12    the Doctrine of Equivalents.

13                    So we've got direct infringement and

14    indirect infringement.

15                    Under direct infringement, it can be

16    proven either by literal infringement or the Doctrine of

17    Equivalents.  And I'm going to describe each of those to

18    you.

19                    A claim limitation is literally infringed

20    and is literally met if it exists in the accused system

21    or method just as it is described in the claim language,

22    either as I have explained that language to you, or if I

23    did not explain it, as it would be understood by one of

24    skill in the art.

25                    Again, that's that ordinary person --

1   order skill in the art.

2                    So that's literal infringement.  In other

3   words, it literally exists in the accused system or

4   method as described in the -- in the claim language.

5                    Next is the Doctrine of Equivalents.

6   This is another way of proving direct infringement.

7                    A claim limitation is present in an

8   accused system or method under the Doctrine of

9   Equivalents if the differences between the claim

10  limitation and a comparable element of the accused

11  system or method are insubstantial.

12                   One way to determine whether a difference

13  is insubstantial is to look at whether the element of

14  the accused system or method performs substantially the

15  same function in substantially the same way to achieve

16  substantially the same result as the element recited in

17  the patent claim.

18                   You may also consider whether, at the

19  time of the alleged infringement, a person having

20  ordinary skill in the field of the technology of the

21  patent would have known of the interchangeability of the

22  alternative feature and the unmet requirement of the

23  claim.

24                   The interchangeability of the two

25  features must have been known to persons of ordinary

1  skill in the field of technology at the time the

2  infringement began.

3           Thus, the inventor need not have foreseen

4  and the patent need not describe all potential

5  equivalents to the invention covered by the claims.

6           Also, slight changes in technique or

7  improvement made possible by technology developed after

8  the patent application is filed may still be considered

9  equivalent for the purposes of the Doctrine of

10  Equivalents.

11           Now, next is active inducement of

12  infringement.  This would be your indirect infringement.

13           So you've got direct infringement, either

14  literally or by the Doctrine of Equivalents.

15           Now we're going to talk about indirect

16  infringement by inducement.

17           Soverain alleges that Newegg is also

18  liable for infringement by actively inducing others to

19  directly infringe Claims 35 and 51 of the '314 patent

20  and Claims 17, 41, and 61 of the '492 patent.

21           As with direct infringement, you must

22  determine whether there has been active inducement on a

23  claim-by-claim basis.

24           A person is liable for active inducement

25  of a claim only if:

1               (1) the person takes action during the

2  time the patent is enforced which encourages acts by

3  someone else;

4               (2) and the encouraged acts constitute

5  direct infringement of that claim;

6               (3) and the person is aware of the patent

7  and knows or should have known that the encouraged

8  act -- acts constitute infringement of that patent;

9               (4) and the person has an intent to cause

10  the encouraged acts;

11               (5) and the encouraged acts are actually

12  carried out by someone else.

13               In order to prove active inducement,

14  Soverain must prove that each of these requirements is

15  met by a preponderance of the evidence.

16               Intent to cause the acts that constitute

17  direct infringement may be demonstrated by evidence of

18  active steps taken to encourage direct infringement,

19  such as advertising an infringing use or instructing how

20  to engage in an infringing use.

21               In order to establish active inducement

22  of infringement, it is not sufficient that Newegg was

23  aware of the acts that allegedly constitute the direct

24  infringement; rather, you must find specifically that

25  Newegg intended to cause the acts that constitute the

1  direct infringement and must have known or should have

2  known that its action would cause the direct

3  infringement.

4            If you do not find that Newegg

5  specifically meets these intent requirements, then you

6  must find that Newegg has not actively induced the

7  alleged infringement.

8            So back to our charge, the first issue,

9  infringement, direct infringement, it can be proven

10 either literally or under the Doctrine of Equivalents;

11 and then induced infringement is the indirect

12 infringement that I've just described for you, active

13 inducement of infringement.

14           All right.  That's all of the

15 instructions with regard to the first question,

16 infringement.  We now turn to the defense of invalidity.

17           Newegg has changed -- Newegg has

18 challenged the validity of the '314, '492, and '639

19 patents.

20           Newegg must prove that a patent claim is

21 invalid by -- and here's that standard -- the clear and

22 convincing evidence standard of proof.

23           An issued patent that is issued by the

24 United States Patent & Trademark Office is accorded a

25 presumption of validity based on the fact that the

1  Patent Office correctly issued the patent.

2          The effective filing date of an

3  application is generally the date that the application

4  was actually filed at the U.S. Patent Office, but in

5  instances with continuation applications --

6          JUROR:  I have a question.  I'm sorry.

7          THE COURT:  Yes.

8          JUROR:  Can we make notes?

9          THE COURT:  Sure.  Yeah.  You can make

10  notes on it, uh-huh.

11          MR. ADAMO:  Can we approach?

12          THE COURT:  Yes.

13          (Bench conference off the record.)

14          THE COURT:  All right, Ladies and

15  Gentlemen.  One thing that the attorneys have pointed

16  out to me, with regard to the Doctrine of Equivalents --

17  that's the second way that you can -- all right.

18          Under direct infringement, you can prove

19  it either literally or by the Doctrine of Equivalents.

20  And then as to inducement, it can also be proven by the

21  Doctrine of Equivalents, okay?

22          So that's just an oral instruction I'm

23  giving you.  So that Doctrine of Equivalents applies to

24  both direct infringement and induced infringement.

25          All right.  Now, continuing on with

1  invalidity, I was telling you about the effective filing

2  date on Page 11.

3           The effective filing date of an

4  application is generally the date that the application

5  was actually filed at the U.S. Patent Office, but in

6  instances with continuation applications, the effective

7  filing date can be earlier.

8           A continuation application is an

9  application filed during the pendency of a parent

10  application that claims inventions that were disclosed

11  in the parent application and also claims the priority

12  date of the parent application.

13           A claim of priority means that the

14  continuation application is claiming entitlement to the

15  same filing date as the parent application such that the

16  continuation is treated as if it were filed on the same

17  date as the parent application.

18           The date that the parent application was

19  filed is the effective filing date, even though the

20  application may have been filed months or years later.

21           The effective filing date determines

22  whether certain items constitute prior art that can be

23  used to invalidate a patent.  Here, the patent

24  application filed as a continuation of the '780

25  patent -- no.  Excuse me.  That sentence should be --

1                    MR. ADAMO:  I think it's okay if you read

2      it the way you wrote it, Your Honor.

3                    THE COURT:  All right.  Here, the '639

4      patent application was filed as a continuation of the

5      '780 patent and claims priority to the '780 patent.

6                    I will now explain to you Newegg's

7      grounds for invalidity in detail.  In making your

8      determination as to invalidity, you should consider each

9      claim separately.

10                    All right.  The first is anticipation for

11      lack of novelty.

12                    A patent claim is invalid if the claimed

13      invention is not new.  For a claimed invention to be

14      invalid on the basis of anticipation because it is not

15      new, all of its elements must be in a single previous

16      device or method or described in a single previous

17      publication or patent.

18                    These items are called prior art

19      references.  You may not combine two or more items of

20      prior art to prove anticipation.

21                    Newegg must prove by clear and convincing

22      evidence that the various claims of the patents-in-suit

23      are anticipated by a single item of prior art.

24                    The disclosure in a prior art reference

25      does not have to be the same words as the claim, but all

1   of the elements of the claim must be there, either

2   stated expressly or necessarily implied or inherent in

3   the level of ordinary skill in the field of technology

4   of the patent at the time of the invention so that

5   someone of ordinary skill in the field of technology of

6   the patent, looking at that one prior art reference,

7   would be able to make and use the claimed invention.

8               Something is inherent in an item of prior

9   art if it is always present in the prior art or always

10  results from the practice of the prior art and if a

11  skilled person would understand that to be the case.

12              Inherency may not be established by

13  probabilities or possibilities.  The mere fact that a

14  certain thing may coincidentally result from a given set

15  of circumstances is not sufficient.

16              I will now explain the different ways in

17  which Newegg can show that the various claims of the

18  patents-in-suit are not new.

19              Anticipation by a printed publication or

20  prior patent.

21              A patent claim is invalid if the

22  invention defined by that claim was described in a

23  printed publication or patented in the United States or

24  a foreign country before it was invented by the patent

25  application or more than one year prior to the filing

1  date of the United States patent application -- the

2  effective filing date of the United States patent

3  application.  Printed publications may include issued

4  patents.

5                    A printed publication or patent will not

6  be an anticipating prior art reference unless it

7  contains a description of the invention covered by the

8  patent claims that is sufficiently detailed to enable

9  one of ordinary skill in the field of the technology to

10  practice the invention without undue experimentation.

11                    Factors to be considered in determining

12  whether a disclosure would require undue experimentation

13  include:

14                    (1) the quantity of experimentation

15  necessary;

16                    (2) the amount of direction or guidance

17  disclosed in the patent or publication;

18                    (3) the presence or absence of working

19  examples in the patent or publication;

20                    (4) the nature of the invention;

21                    (5) the state of the prior art;

22                    (6) the relative skill of those in the

23  field of the technology;

24                    (7) the predictability of the art;

25                    (8) And the breadth of the claims.

1                   A printed publication must be reasonably

2    accessible to those members of the public who would be

3    interested in its contents.

4                   It is not necessary that the printed

5    publication be available to every member of the public.

6    So long as the printed publication was available to the

7    public, the form in which the information was recorded

8    is unimportant.

9                   The information must, however, have been

10   maintained in some permanent form, such as printed or

11   typewritten pages, magnetic tape, microfilm,

12   photographs, or photocopies.

13                  A United States patent that was filed

14   before the inventors of the patents-in-suit invented one

15   of their claimed inventions is prior art with respect to

16   those claimed invention -- inventions as of the date the

17   United States patent was filed.

18                  In other words, a U.S. patent can be

19   prior art, as of its filing date, if it was filed before

20   the inventors of the patents-in-suit invented their

21   inventions, even if the patent did not actually publish

22   or issue until after the inventors invented their

23   inventions.

24                  Next is anticipation by public knowledge

25   or use by another.

1          A patent claim is invalid if the

2    invention recited in that claim was publicly known or

3    used in the United States by someone other than the

4    inventor before the patent applicant invented it or more

5    than one year before the effective filing date of the

6    United States patent application.

7          Private or secret knowledge, such as

8    knowledge confidentially disclosed within a small group,

9    is not enough to invalidate a patent claim.  A prior

10   public use by another may anticipate a patent claim even

11   if the use was accidental or was not appreciated by the

12   other person.

13         Thus, a prior public use may anticipate

14   an invention even if the user did not intend to use the

15   invention or even realize he or she had done so.

16         Next is anticipation by a prior

17   invention.

18         A patent claim is invalid if the

19   invention defined by that claim was invented by another

20   person in the United States before it was invented by

21   the patentee and that other person did not abandon,

22   suppress, or conceal the invention.

23         As a general rule, the first person to

24   reduce an invention to practice is said to be the first

25   inventor.  An invention is reduced to practice either

1   when a patent application is filed or when the invention

2   is made and shown to work for its intended purpose.

3              Thus, if another person reduces to

4   practice an invention before the inventor on the patent,

5   then the reduction to practice by the other person will

6   be prior art to the patent claims.

7              A patentee who is not the first to reduce

8   to practice can still be the first to invent if he can

9   show two things:

10              (1) that he conceived of the invention

11   before the other party conceived of his invention;

12              And (2) that he exercised reasonable

13   diligence in reducing his invention to practice from the

14   time just before the other party conceived to the time

15   he reduced it to practice.

16              Conception is the middle part of an

17   inventive act, i.e., the formation in the mind of the

18   inventor of a definite and permanent idea of the

19   complete and operative invention as it is to be applied

20   in practice.

21              Reasonable diligence means that the

22   inventor worked continuously in the United States on

23   reducing the invention to practice.  Interruptions

24   necessitated by the everyday problems and obligations of

25   the inventor or those working with him or her do not

1    prevent a finding of diligence.

2                    Next is corroboration of oral testimony.

3                    Oral testimony alone is insufficient to

4    prove prior invention or that something is prior art.

5                    A party seeking to prove prior invention

6    or prior art also must provide evidence that

7    corroborates any oral testimony, especially where the

8    oral testimony comes from an interested witness or a

9    witness testifying on behalf of an interested party.

10                    This includes an individual or company

11   testifying that his invention or its invention predates

12   the patents-in-suit.

13                    Documentary or physical evidence that is

14   made contemporaneously with the inventive process by

15   someone other than the alleged inventor, provides the

16   most reliable proof that the alleged prior art

17   inventor's testimony has been corroborated.

18                    For any oral testimony that a party has

19   put forth alleging that a particular event or reference

20   occurred before the filing date of the patents-in-suit,

21   that party must also have provided some sort of

22   corroborating evidence that agrees with the oral

23   testimony.

24                    If you find the party has not

25   corroborated the oral testimony with other evidence, you

1  are not permitted to find that the subject of that oral

2  testimony qualifies as prior art or supports a prior

3  date of invention.

4              If evidence is presented for purposes of

5  attempting to corroborate oral testimony, then you must

6  determine whether this evidence does, in fact, properly

7  corroborate that oral testimony.

8              In making this determination, you should

9  consider -- consider the following factors:

10              (1) the relationship between the

11  corroborating witness and the alleged prior user;

12              (2) the time period between the event and

13  this trial;

14              (3) the interest of the corroborating

15  witness and the subject matter of this suit;

16              (4) contradiction or impeachment of the

17  witness's testimony;

18              (5) extent and detail of the

19  corroborating witness's testimony;

20              (6) the witness's familiarity with the

21  subject matter of patented invention and the alleged

22  prior use;

23              (7) probability that a prior use could

24  occur considering the state of the art at the time;

25              And (8) impact of the invention on the

1  industry and the commercial value of its practice.

2              All right.  That completes all of the

3  instructions relating to Question No. 3 in your verdict

4  form, which is the invalidity defense.

5              The next question that you will answer is

6  the damage issue.  If you have found in Questions 1 and

7  2 that any claims of the patent are infringed, then

8  you'll answer this Question No. 4.  And here are your

9  instructions with regard to answering the damage issue.

10             I have now instructed you as to the law

11 governing Soverain's claims of patent infringement and

12 Newegg's claims of invalidity.

13             If you find that Newegg has infringed a

14 claim of the '314, '492, or '639 patents, then you must

15 determine what damages Newegg must pay Soverain for that

16 infringement.

17             If, on the other hand, you find that

18 Newegg has not infringed a claim of the '314, '492, or

19 '639, then Soverain is not entitled to any damages, and

20 you should not make any findings about damages for that

21 claim.

22             The fact that I am instructing you about

23 damages does not mean that Soverain is or is not

24 entitled to recover damages.

25             You should not interpret the fact that I

1  have given instructions about damages as an indication

2  in any way that I believe Soverain should or should not

3  win this case.

4                    I am instructing you on damages only so

5  that you will have guidance in the event you decide that

6  Newegg is liable and that Soverain is entitled to

7  recover money from Newegg.

8                    Now, the date the damages begin.

9                    In considering damages, the time period

10  is November 2, 2007, to present.  It is undisputed that

11  Soverain cannot recover damages for any infringement of

12  the patents-in-suit before November 2, 2007.

13                    Reasonable royalty.

14                    The patent laws specifically provide the

15  amount of damages that Newegg must pay Soverain for

16  infringing Soverain's patents may not be less than a

17  reasonable royalty for the use that Newegg made of

18  Soverain's inventions.

19                    A royalty is a payment made to the owner

20  of a patent by a non-owner in exchange for rights to use

21  the claimed invention.  The royalty payment generally

22  reflects the value of the use of the claimed invention.

23                    A reasonable royalty is the royalty that

24  would have resulted from a hypothetical arm's-length

25  negotiation between Soverain's predecessor, Open Market,

1   and a company in the position of Newegg on the eve of

2   the infringement with both sides at this negotiation

3   willing to enter into a license and both sides at this

4   negotiation operating under the assumptions that the

5   patents are valid, the patents are infringed, and the

6   licensee should respect the patents.

7            You are to decide what a reasonable

8   royalty would be, based on circumstances as of the time

9   just before Newegg began selling or using the patented

10  inventions.

11           You may consider any actual profits made

12  by Newegg and any commercial success of the patented

13  inventions, but the amount of those profits is not

14  determinative on the issue of what a reasonable royalty

15  is.

16           Although the relevant date for the

17  hypothetical reasonable royalty negotiation is the date

18  that infringement began, you may consider in your

19  determination of reasonable royalty damages any evidence

20  with respect to the expectations for the future that the

21  negotiators had as of the eve of infringement and any

22  actual profits by Newegg after that time and any

23  commercial success of the patented invention in the form

24  of sales of the patents or infringing product after that

25  time.

1          You may only consider this information,
2     however, if it was foreseeable at the time the
3     infringement began.
4          Soverain has the burden to prove by a
5     preponderance of the evidence that it suffered the
6     damages it seeks.  While Soverain is not required to
7     prove damages with mathematical precision, it must prove
8     its damages within reasonable certainty.
9          Soverain is not entitled to damages that
10    are speculative, and Soverain's proof of damages must
11    have a sound economic basis.
12          Now, reasonable royalty.
13          In deciding what a reasonable royalty is,
14    you may consider the factors that Soverain would
15    consider in setting the amount Newegg should pay.
16          I will list for you a number of factors
17    you may consider.  This is not every possible factor,
18    but it will give you an idea of the kinds of things to
19    consider in setting a reasonable royalty.
20          And here, you're -- on the next -- this
21    page and all the next pages, you see 15 factors, which
22    are -- have been -- you've heard referred to in the
23    testimony as Georgia-Pacific Factors.
24          These are the factors you would consider
25    in setting a reasonable royalty.  I commend them to you

1 for your reading.  I'm not going to read them all to

2 you.  The attorneys will point out the ones that they

3 think are most important for you to consider or not

4 consider, in their closing arguments.

5                     Now, over to the top of Page 20:  In

6 addition, it is proper for you to consider any economic

7 or business factors that normally prudent business

8 people would, under similar circumstances, reasonably

9 take into consideration in negotiating the hypothetical

10 license.

11                     Next is non-infringing alternatives.

12                     In determining a reasonable royalty, you

13 may consider whether or not Newegg had commercially

14 acceptable, non-infringing alternatives to making a

15 license -- to taking a license from Open Market that

16 were available at the time of the hypothetical

17 negotiation and whether that would have affected the

18 reasonably royalty the parties would have agreed upon.

19                     All right.  That concludes my

20 instructions relating to the damage question that you

21 will answer.

22                     Now let me just give you some general

23 instructions regarding your deliberations and how to

24 conduct them.

25                     You must perform your duties as jurors

1 without bias or prejudice as to any party.  The law does

2 not permit you to be controlled by sympathy, prejudice,

3 or public opinion.

4           All parties expect that you will

5 carefully and impartially consider all of the evidence,

6 follow the law, as it is being given to you, and reach a

7 just verdict regardless of the consequences.

8           It is your sworn duty as jurors to

9 discuss the case with one another in an effort to reach

10 agreement, if you can do so.  Each of you must decide

11 the case for yourself, but only after full consideration

12 of the evidence with the other members of the jury.

13           While you are discussing the case, do not

14 hesitate to re-examine your own opinion and change your

15 mind if you become convinced that you are wrong.

16           However, do not give up your honest

17 beliefs solely because the others think differently or

18 merely to finish the case.

19           Remember that in a very real way, you are

20 the judges, judges of the facts.  Your only interest is

21 to seek the truth from the evidence in the case.

22           You should consider and decide this case

23 as a dispute between persons of equal standing in the

24 community, of equal worth and holding the same or

25 similar stations in life.

1              When you retire to the jury room to

2    deliberate on your verdict, you may take this charge

3    with you, as well as exhibits which the Court has

4    admitted into evidence.

5              You should then select your foreperson

6    and begin conducting your deliberations.  If you should

7    recess during your deliberations, follow all of the

8    instructions that the Court has given you regarding your

9    conduct during the trial.

10             After you have reached your verdict, your

11   foreperson is to fill in on the form -- on the verdict

12   form your answers to the questions.

13             Do not reveal your answers until such

14   time as you are discharged, unless otherwise directed by

15   me.  You must never disclose to anyone, not even to me,

16   your numerical division on any question.

17             Any notes that you have taken during this

18   trial are only aids to your memory.  If your memory

19   should differ from your notes, then you should rely on

20   your memory and not on your notes.

21             The notes are not evidence.  A juror who

22   has taken notes should rely on his or her independent

23   recollection of the evidence and should not be unduly

24   influenced by the notes of other jurors.  Notes are not

25   entitled to any greater weight than the recollection or

1    impression of each juror about the testimony.

2              Now, if you need to or want to

3    communicate with me at anytime, please give a written

4    message or question to the bailiff, who will bring it to

5    me.  There will be forms provided for you to do so.

6              I will then respond as promptly as

7    possible either in writing or by having you brought into

8    the courtroom so that I can address you orally.  I will

9    always first disclose to the attorneys your question and

10   my response before I answer your question.

11             After you have reached a verdict, you are

12   not required to talk with anyone about the case unless

13   the Court orders otherwise.

14             Now, that concludes my general

15   instructions.

16             I will say to you, we're going to take a

17   short break, about 15 minutes, and allow you to use the

18   facilities.

19             Then when we come back, you'll hear the

20   closing arguments, which will take about two hours, so

21   we're going to be, again, going till probably 12:30,

22   12:35.  So I want you to have a good break and be rested

23   up before you hear the closing arguments.

24             Also, during your deliberations, as I

25   told you yesterday, beginning today, when you retire to

1  deliberate, you're going to be in charge.

2              So if you want to take a break, if

3  somebody wants to go outside and smoke or get some fresh

4  air or if you want to adjourn for the night and come

5  back tomorrow or you want to adjourn for dinner or you

6  need snacks or you need dinner, you just send a note out

7  and let me know.

8              But before you do any of those things, be

9  sure you communicate with me first, and I'll send you a

10  note saying it's fine to take a 20-minute break outside,

11  or it's fine to retire and come back tomorrow, whatever

12  you may decide that you want to do.

13              But you'll be in charge of your

14  deliberations.  You can work as long or as hard as is

15  necessary to reach a verdict, and you will be in charge

16  at that time.

17              But right now we're going to take our --

18  let's go ahead and take a 20-minute break, till 20

19  minutes until 11:00, at which time we'll come back and

20  hear the closing arguments.

21              Please remember my instructions.  Again,

22  still don't discuss this case.  Even though you've heard

23  the charge, you've got to wait until you've heard all of

24  the closing arguments, and then -- about 12:35, 12:40,

25  then you'll be able to begin your deliberations.

```
 1                    So we'll be in recess until 10:40.

 2                    COURT SECURITY OFFICER:  All rise.

 3                    (Jury out.)

 4                    (Recess.)

 5                    (Jury in.)

 6                    THE COURT:  Please be seated.

 7                    All right.  The Court will recognize

 8   Mr. Adamo for purposes of closing arguments.

 9                    Would you like any time warnings,

10   Mr. Adamo?

11                    MR. ADAMO:  Absolutely, Your Honor.  If I

12   could have a 30-minute warning and a 35-minute warning.

13   I'm going to try to be sat down before 40 minutes of my

14   hour.

15                    THE COURT:  All right.  Very well.

16                    MR. ADAMO:  At least my first ups.

17                    THE COURT:  Okay.

18                    MR. ADAMO:  Ms. Ferguson, could we have

19   the -- thank you very much.

20                    Well, good morning.  We're at the end, or

21   close.  Thank you for your attention so far.  I just

22   need you to try to give me one more hour of your time.

23                    As I said to you on Monday, if someone

24   uses somebody else's property without permission, they

25   should pay for it.
```

1                 And as I also said to you on Monday when

2    this case started, Soverain needs your help to

3    accomplish this, to get Newegg to honor its

4    responsibilities, to do what the law requires.

5                 We tried to do what we promised.  We

6    tried, over the last four days, to bring to you the

7    evidence to show you that Soverain deserves the help

8    we're asking from you now through your verdict, that

9    help to require Newegg to pay a reasonable royalty

10   damages provided by the law for over 56 million

11   transactions during the damages period, 56 million

12   transactions worth of infringement without which Newegg

13   would not be grossing well over $2 billion per year from

14   its customers.

15                Remember -- and this is sort of a key

16   thing -- Newegg is nothing but its online shopping

17   website.  It has no stores.  It isn't planning to build

18   any stores.  If the system doesn't exist and doesn't

19   operate, Newegg makes zero money.  And that's always the

20   way it's been since the company was founded in 2001.

21                This system that this case is about is

22   essential, critical and essential to their business.  No

23   computer system, no website, no Newegg.  Keep that in

24   mind, please.

25                Now, traditionally, closing argument, as

1    you heard from Your Honor, you're supposed to review the

2    evidence, try to tie it all together, match it up

3    against the issues and the burdens of proof so that we

4    can demonstrate to you that the seven claims in the

5    three patents are infringed and that we should be

6    awarded damages.

7                   For my first ups, that's what I'm going

8    to try to do.  For once, Mr. Sayles gets book-ended by

9    me, not like the opening where he had the last word.

10                  Today, I have the last word, because I

11   have to demonstrate entitlement to your verdict on

12   infringement and on damages.

13                  The last 20 minutes, I may not be so

14   traditional.  I'm going to try to do some things that

15   may be a little bit different, so let's go.

16                  One of the things that His Honor charged

17   you just a few minutes ago was that you can make

18   deductions and reach conclusions that reason and common

19   sense lead you to draw from the facts.

20                  At the end of the day, this is all about

21   your common sense, your everyday experience, what you

22   feel is correct and proper under the law after you've

23   seen the witnesses, you've seen the cross-examination,

24   and you've heard the evidence.

25                  Now, I'm going to take just a few minutes

1   to review the invention story again, because that is

2   where we start.  And that, I believe, is important to

3   keep in mind, because it's been portrayed as if these

4   people invented nothing and certainly nothing that was

5   worth anything.

6                    You saw Win Treese testify.  He testified

7   here live.  In fact, he was also called as a witness by

8   Mr. Sayles.

9                    You saw Dr. Stewart, co-inventor also,

10  testify by videotape.

11                   So you saw both of the inventors testify,

12  and they talked about the circumstances of their making

13  the inventions of the seven claims of the three

14  patents-in-suit back in 1994/'95.

15                   Remember the historic setting.  Internet

16  available for commerce in 1991.  Worldwide web developed

17  1991/'92.  Great potential if you could put the two

18  together.  The web gives you pictures, which the

19  internet couldn't do, mostly text.  Tremendous potential

20  for business.

21                   The problem was, the potential that was

22  there was difficult.  There were technical problems,

23  serious technical problems.

24                   The potential was, you could possibly

25  develop a website that was just like going to your local

1   store, browse, take things off the shelf, put them in

2   the shopping cart, take them out of the shopping cart,

3   put them back if you decided you had changed your mind.

4               The potential was there, but how to do

5   it?  That's what they were intending to do.  They wanted

6   to come up with a system that would allow you to browse

7   or mimic the real world.

8               Two problems, as you recall.  And you've

9   heard this throughout the course of the testimony.  The

10  problems were state and session.

11              The web was stateless deliberately.  You

12  heard the testimony about how you need to maintain

13  session.  You've got to be able to track what's in your

14  carts and be able to determine whether you're still in a

15  session or not.  You have to be able to track whether

16  there have been multiple requests.

17              And in the book that you heard about that

18  Dr. Stewart and Mr. Treese wrote in 1998 -- this is

19  Plaintiff's Exhibit 82 -- they summarized the issues of

20  state and session that they had to solve.  These were

21  the problems.

22              They also needed to handle the situation

23  about completing a transaction.  You wanted to pay

24  online.  You didn't want to have to go and e-mail

25  something in or fax something in.  Just like we do

1  today, you wanted to be able to do it all in one fell

2  swoop.

3              You wanted to sit down, maybe with a soft

4  drink in your hand, bring the computer up, start

5  shopping, go from here to there, maybe go to another

6  website, give them your credit card number; and by the

7  time you sat up and went on to whatever else you were

8  going to do at home, the transaction was completed, and

9  you had bought stuff.

10             You recall the timeline to the various

11  events.  A bunch of guys came out of DEC, joined the

12  company in May of 1994, April of 1994.  Had the two

13  critical ideas in May of '94 and June of '94.  And by

14  October of '94, they had the business up and running,

15  essentially, as you recall Mr. Treese's testimony, by

16  ridiculous workhours.

17             Everybody in this industry seems to work

18  very hard, 24/7, all-nighters, don't go home, sleeping

19  in the same clothes, too many McDonald's hamburgers,

20  et cetera.  But because they were committed to getting

21  this developed, they got it done in the amount of time

22  that they spent, exceedingly short period of time.

23             Three patents-in-suit.  Two of them, the

24  '314 and the '492, these were the patents that covered

25  essentially the soup to nuts, as I referred to it; the

1   entire shopping experience, using the worldwide web and

2   the internet; product descriptions go to the buyers all

3   the way through to the completion of the transaction.

4                  And the '492 patent, if you recall, this

5   is the patent that allows -- by using the clicks, the

6   hypertext, allows the customer to get back a record of

7   your prior transactions.

8                  And the '639 patent, the third

9   patent-in-suit, this was the patent that disclosed how

10  to solve the session identification problem.  This is

11  the session ID patent.

12                 So they got all three of these patents

13  filed.  The '639 is a continuation, as you heard His

14  Honor say, of an earlier patent, all filed late 1994 or

15  early '95.  The Patent Office examined these patents and

16  issued them for the first time starting in 1998.

17                 Now, we're going to come back to this.

18  You've heard about the reexaminations.  Two of the

19  patents-in-suit, '314 and '492, were reexamined.

20                 In other words, the Patent Office, having

21  once decided they were patentable, were asked to do the

22  work again by amazon.com, not by us.

23                 Actually, you now know that there's been

24  litigation between Soverain and amazon.com, and that was

25  part of amazon.com's litigation tactics, put it back in

1   the Patent Office.

2                And as you'll see, CompuServe Mall was

3   all over both of those procedures.   The Patent Office

4   was fully informed of CompuServe Mall, and they

5   reexamined and allowed, continued, maintained the '314

6   and '492 despite the fact of the CompuServe Mall prior

7   art.   That's the reexaminations that you've heard about.

8                All right.   Burdens of proof.   This is

9   important because it drives your considerations from

10  this point on.   And His Honor made this fairly clear

11  this morning.   I've only got preponderance of the

12  evidence burdens.   I only have to prove more likely than

13  not, right?

14               Think of the scales of justice.   All I've

15  got to do is get the scale to you-all to tip a little

16  bit, and that's preponderance of the evidence.   That's

17  my level of proof to you for infringement and for

18  damages.   That's all I have to prove.

19               The patent is presumed valid.

20  Mr. Sayles' burden and Newegg's burden is to show you

21  that there's evidence at the second level:   Clear and

22  convincing evidence, the abiding belief that something

23  is true.   That's the difference between the two.

24               So my burden of proof, preponderance of

25  the evidence.

1             Let's talk about Newegg for a moment.

2             Hang on just a second.

3             All right.  As always, Ladies and

4  Gentlemen, the technology will kill you, given half a

5  chance.

6             All right.  I'll just do this without

7  this.

8             Let's talk about Newegg for a moment.

9             If you recall, Newegg was founded in

10  2001.  There was testimony regarding their S1, their

11  submission to the Securities and Exchange Commission.

12  You saw this blown up several times.

13             And the portion of the S1 form -- Page

14  12, Mr. Gooden.  Take him just a moment -- this is where

15  Newegg told the SEC about how important the online

16  shopping system was to their business.

17             And I'll quote:  A critical component of

18  our strategy is providing a high-quality customer

19  shopping experience.  Accordingly, the effective

20  performance, reliability, and availability of our

21  website and network infrastructure are critical to our

22  reputation and our ability to attract and retain

23  customers.

24             Nothing in there about everything being

25  customer satisfaction.  You recall there were some

1  surveys that you saw yesterday where the survey

2  choices -- Mr. Bakewell admitted the survey choices

3  didn't even allow a customer to talk about their

4  reaction to the website.

5         But to the Securities and Exchange

6  Commission, Newegg says:  Our website and network

7  infrastructure are critical to our reputation and our

8  ability to attract and retain customers.

9         No website, no business.

10         You recall Mr. Wu testified that he had

11  looked at other people's websites at the time that he

12  was developing the Newegg website.

13         Interestingly, while he was looking at

14  those other people's websites -- and maybe he looked at

15  amazon.com's, maybe not; he doesn't really remember --

16  he never checked to see whether any of these people had

17  patents or not.  At least that's what he says.

18         He never checked to see if he was

19  trespassing on anybody else's rights with the knowledge

20  that he gained; he just went ahead and benchmarked the

21  other websites and used them as an information source to

22  develop the Newegg system.

23         Now, Mr. Wu -- and you may not remember

24  this, because there's been an awful lot we've heard over

25  the last four days -- Mr. Wu was asked by Mr. Sayles on

1  redirect this question, quote:  And why are you still

2  using that design even though you programmed it in 2000

3  with so little resources?

4              Mr. Wu answered:  Well, Newegg is number

5  one performer in term of the responding time, because

6  our whole -- Newegg's architecture, the shopping cart,

7  Newegg is number one performers in the world.  We are

8  happy with our performance, so we stick with our

9  solution.

10             Well, there's Mr. Wu pointing exactly to

11  one of the structures that we say the patents-in-suit

12  cover:  The shopping cart.  And he's attributing to that

13  presence in their system, importance such that they're

14  going to stick with the system, which is exactly what

15  they did.

16             All right.  Now, infringement.  First

17  thing I have to prove to you.  Let me just review the

18  evidence for you.

19             You recall Dr. Grimes.  Right after

20  opening statements, Dr. Grimes and I engaged in a

21  riveting -- which I'm sure y'all remember -- exciting

22  four-hour walk through approximately 120 slides with

23  pictures and citations and all the rest of that to try

24  to demonstrate to you folks the basis for his opinions

25  that there had been infringement.

1                    And we went through essentially set by

2  set -- I'll get back to this.

3                    We went through set by set -- and I'll

4  remind you what they look like in a moment -- of charts

5  where he had broken the claims down, and then we went

6  slide by slide to demonstrate the basis for his

7  allegations that there was infringement.

8                    And we did that with the two claims of

9  the '314 patent; we did that for the three claims of the

10 '492 patent; and we did that for the two claims of the

11 '639 patent.

12                   Now, in response, Newegg had Mr. Tittel

13 testify, and we'll talk about what Mr. Tittel had to say

14 in a moment.

15                   The instructions in the charge that His

16 Honor just read that are relevant to you determining our

17 infringement case are the general infringement charge,

18 the direct infringement charge.  That's where we're

19 saying Newegg itself directly infringes.  Not its

20 customers, Newegg itself.  And that's the remaining

21 portion of the charge.

22                   And we have two ways that Dr. Grimes

23 demonstrated to you infringement:  Literal infringement,

24 and then on one of the claim limitations, he talked

25 about the Doctrine of Equivalents.

1                   Key point.  Key point.  Second one.  Key

2      point.  The claims of the '314 and the '492 patents are

3      system claims.  And I think you'll remember there was a

4      lot of back and forth about that.  System claims, okay?

5                   We're only talking about completed

6      transactions here.  That's all we're raising with

7      you-all as far as the damages.

8                   So those transactions are only completed

9      transactions.  That means nobody got up and walked away

10     from the computer before they finished the transaction

11     and bought something.

12                  So all this talk you've heard about

13     somebody could have gone; they might not have stayed;

14     they might not have come in the first place, it's not

15     relevant.

16                  All that counts here, because all we're

17     asking you to look at for damages, are completed

18     transactions.  Somebody came to the computer, got on the

19     Newegg's system, stayed there until they bought

20     something, and then they left, okay?

21                  '314 and '492 are system claims.  And Dr.

22     Grimes tried to be very clear about that.  All that

23     means is, you look for the system.  Nobody has to use

24     it.  Customer reaction is irrelevant.

25                  You look at the system.  The piece of

1 equipment programmed or having the capability -- that's

2 how His Honor charged you -- is what you're looking for

3 in each system.

4              Newegg uses the system at issue here to

5 sell.  The customer uses the system to buy.  The claims

6 relate to the Newegg side of that equation.  They don't

7 require anything to be done by the customer.  They were

8 very deliberately written that way, okay?

9              So I'm going to make it again, because

10 this is the second key point.  Newegg uses the system to

11 sell; the customers use the system to buy; but the

12 claims are directed to what is on Newegg's side, not

13 anything the customer has to do.

14             If the computer was programmed to have a

15 certain functionality, which Dr. Grimes went through in

16 great detail, that's all that is necessary to

17 demonstrate infringement.

18             Who buys or sells the customer computer,

19 right -- right here -- and you-all have seen this until

20 you're probably sick of looking at it, but this is

21 Newegg's system chart.

22             There's the customer computer, which is

23 part of the system.  Once that computer gets captured

24 when the customer comes on to the system, okay, it's now

25 part of the system.  And it's designed that way.

1                  Remember, Mr. Wu testified he knew

2      exactly what he was doing.  The system was designed to

3      use the customer's computer as part of the system.  Why?

4      He wanted to save money.

5                  He knew there would be cookies.  He knew

6      they'd be -- more likely than not, they would be turned

7      on, because that's their fallback position.  If you

8      don't affirmatively turn them off, they're on.  He knew

9      all of that.

10                  So the system was designed to effectively

11     capture the customer computer.  And that's why you see

12     the customer computer on the Newegg diagram of the

13     system.  That's exactly what they were intended --

14     intending -- excuse me -- to do with the system.

15                  So what do we know that's relevant to

16     this point, relevant to infringement?

17                  A customer can't shop without being part

18     of the Newegg system.  Remember, we heard testimony

19     about that.  If the cookies aren't there or they're not

20     turned on, you get an error message.  You can't complete

21     your sale.  You can't complete your transaction.  You

22     can't buy, okay?

23                  So the customer has no choice.  You've

24     got to become part of the system if you are, in fact,

25     going to buy something.

1          So in every one of the transactions we've

2  asked for damages on, the customer, necessarily, by

3  Newegg's design and control, became part of the system,

4  right?

5          Here -- that's the second point.  The

6  customer can't shop without having the cookies enabled.

7  And the cookies are enabled by default.  In normal

8  English, that means they're on automatically.  You have

9  to do something deliberately to turn them off.

10          And you remember, when I cross-examined

11  Mr. Wu, he said:  Oh, yeah, that's -- of course.  That's

12  straightforward.  Of course I knew that.  I intended

13  that.  That's how I designed the system.

14          So in a complete transaction, the

15  customer computer is part of the system.  This is all

16  what Dr. Grimes testified to.  The cookies are enabled,

17  and the system worked from start to finish exactly as it

18  was designed.

19          The customer acted as Newegg wanted them

20  to act.  Newegg used the system itself, structured the

21  system directly, but the customers also did exactly what

22  the system was designed to do, because they have no

23  other choice.

24          That's what Dr. Grimes testified to.

25  There isn't any option.  If they try to do it some other

1    way, it won't work.  The system won't work.

2                    And for all the transactions we've asked

3    you to award reasonable royalty damages on, the customer

4    stayed with the system, paid cash money, and that's

5    where Newegg's $2 billion is coming from.

6                    All right.  Very briefly.  I'm not going

7    to go through all of this again, believe me.  This is

8    how Dr. Grimes presented the evidence to you.  If you

9    all recall, he took the patent claim; he broke it down

10   with his own little numbering or lettering; he then went

11   through element by element with these types of slides.

12                   And I think you may remember that.  There

13   were about 90 of them.  He went through element by

14   element with these slides.  The slides show the relevant

15   drawings or documents.  They've all got citations at the

16   bottom.

17                   You remember I asked him about the source

18   information, so this is all evidence in the record, and

19   he gave you all the line-by-line information, and he was

20   meticulous about that.

21                   He was driving me crazy it was taking so

22   long, because we had time budgets here, and he was over

23   the budget, but he was meticulous.

24                   And you recall he kept score, more or

25   less, with these element-by-element charts with the

1   check sheets, and he went through element by element to

2   demonstrate infringement to you.

3              Now, this is just summarizing what I've

4   said to you a moment ago about Newegg using the entire

5   system itself.  It has its own servers, databases, and

6   network links.

7              Once the customer comes on and the server

8   recognizes the customer, that computer is effectively

9   captured for the purposes of the transaction, as long as

10  they stay online.

11             And in every one of these transactions,

12  they stayed till the end.  And from there on out, the

13  buyer computer becomes part of the system, runs on the

14  programming that Mr. Wu designed.  That's how

15  Dr. Dris -- excuse me -- that's how we were able to

16  demonstrate to you that there was infringement.

17             Now, active inducement of infringement.

18  And there are -- and I'll show you this just in a

19  moment.  He went through, remember, claim after claim

20  after claim after claim following exactly this system.

21             Now, active inducement.  Here's the jury

22  charge on active inducement.  This is actually an easy

23  act-of-inducement case in contrast to most.  Here's the

24  reason why.

25             We're not asking for damages any earlier

1    than when we filed suit, okay?  We sued for the reasons

2    Ms. Wolanyk described to you, and that's what starts the

3    damages period, okay?

4                    So the various elements that you have to

5    show here, after you've been sued, are relatively

6    straightforward.

7                    The person is aware of the patent.  Well,

8    yeah, they got sued.

9                    The person has an intent to cause the

10   encouraged acts.  Well, yeah, they want people to come

11   to the website and buy stuff.  They know that in the

12   lawsuit, we've said that infringes, okay?

13                   So if you step through the

14   act-of-inducement requirements in the charge, you will

15   see that they're very readily demonstrated because we

16   had already sued them.  They knew exactly -- and the

17   lawsuit was going on, so they were getting more and more

18   information every day about what we said they were doing

19   wrong and what infringed.

20                   So there's no question about the fact

21   that they had the necessary intent here.  This is

22   clearer than the usual -- the usual case because of the

23   lawsuit.

24                   Now, Newegg's raised all sorts of excuses

25   and explanations as to why what they've done really

1  doesn't infringe.  The principal excuse which you've

2  heard about till you're blue in the face is the cookie

3  story.

4           Is everything on the server side or the

5  cookie is on the client's side, and does that mean no

6  infringement?  The answer very clearly is no.

7           And Dr. Grimes went and explained that to

8  you in great detail as to why it does not.  He showed

9  you that the Newegg system both literally infringes; and

10 even under Newegg's argument about whether everything

11 had to be put into the shopping cart database every time

12 or could be put in all at once -- remember, there was a

13 whole bunch of discussion about that -- Dr. Grimes

14 demonstrated to you, accepting their position -- didn't

15 agree with them, but he accepted it -- that under the

16 Doctrine of Equivalents, you end up being able to

17 demonstrate infringement.

18           His Honor explained the Doctrine of

19 Equivalents to you in this charge.

20           Dr. Grimes and the web browsers, this is

21 where the cookies come from.  Remember, Mr. Wu said:

22 Oh, yeah, I knew everybody was going to have a web

23 browser.  I expected it.  And I knew exactly how web

24 browsers were going to work.  I counted on the cookies

25 being there.

1            You recall -- here's the explanation of

2   how the cookies work, how the information is stored and

3   passed back and forth until the end of the experience

4   whereon the information is transferred into the shopping

5   cart database.

6            You remember you were taken through this

7   diagram in some detail, again, pretty much line by line,

8   to demonstrate how the system worked.

9            Dr. Grimes took you through this.  I

10  won't take the time to do this, because you've seen

11  animations, again, I'm sure, until you're blue in the

12  face.  This is the animation that demonstrates how the

13  cookie goes back and forth.

14           How long does this run?

15           It's 35 seconds.  Will you tolerate this

16  for 35 seconds?

17           All right.  Run it one more time, and I

18  promise this is the last time I'll ever show it to you.

19           Here's how the ordering works.  You

20  click.  This is Newegg's website.  Add-to-cart.  Here's

21  the item across the internet, going to the shopping cart

22  computer.  There's the cookie.  And it doesn't go to the

23  shopping cart database, but it's on the cookie and comes

24  back and goes into the storage area, the little cookie

25  jar.

1           And then this is repeated for additional

2   product.  Same procedure.  To the cookie jar.  The

3   second item.  And this time, third time through, we're

4   going to check out.  And here the cookie is picked up

5   with the information about the two items, and this time,

6   because it's going to checkout, it gets put into the

7   shopping cart database.

8           That, Dr. Grimes described to you in

9   great detail, is an equivalent.  It passes the

10  function-way-result test.  Way and function are

11  identical -- way and result are identical -- I'm

12  sorry -- function and result are identical, and the way

13  is not insubstantially different.  That's the evidence

14  that you were provided.

15          And remember, you didn't hear any

16  response from Mr. Tittel on equivalency, not a word.

17          So Dr. Grimes was not challenged by

18  Mr. Tittel on this point.  He did not testify, there's

19  nothing in the record in the way of an opinion from

20  Mr. Tittel challenging Dr. Grimes on the Doctrine of

21  Equivalents.

22          So you've got evidence here for literal

23  infringement and the Doctrine of Equivalents on the

24  particular element involved.

25          The various elements involved were 34(f),

1  and this is the evidence you were shown on that, 34(g),

2  and particularly 34(h).  This was the element that the

3  equivalents proof was shown on.

4              Here is the literal analysis that he

5  showed you where he demonstrated that there was literal

6  infringement, and here is the Doctrine of Equivalents

7  analysis that you also were shown.

8              Function and result identical.  The way,

9  the using of the cookies, insubstantially different from

10  leaving everything on the server side throughout.

11             And I won't rerun this one.  You recall

12  we showed you this animation.  This demonstrated how the

13  equivalent system worked, and I just won't take the time

14  to rerun this, although it looks like it's rerunning

15  itself.

16             Okay.  Mr. Gooden saved us.

17             And similar system, all right?  As he

18  went through and demonstrated to you, element by

19  element, he came back and he checked; and eventually, we

20  got all the way through to all of the elements on Claim

21  35, and that was his evidence of infringement on that

22  claim.

23             And then we just kept on slide after

24  slide, all the detailed evidence, full description,

25  Claims 35 and 51 of the '314; 17, 41, and 61, but only

1   on the new system on '492.  Same type of presentation,

2   element by element, claim by claim.

3                   So on the '639 patent for the two

4   different sessions, both Claim 60 and Claim 79.

5                   And then he presented a summary to y'all

6   of his opinions, and this was the summary -- remember,

7   there are three websites involved.  He testified that

8   newegg.com and Newegg dot Canada, CA, met all of the

9   elements of the asserted claims and that the

10  neweggmall.com -- that's the new website -- met the

11  elements of the specific claims identified there.

12                  This is the verdict form.  This is my way

13  of saying to you that we suggest that as you consider

14  the evidence, we believe that the evidence would support

15  your coming to your own decision.

16                  I'm not trying to tell you how to fill

17  this thing out.  We suggest that the evidence would

18  support, under the preponderance of the evidence

19  standard, your reaching this view that both direct

20  infringement and inducement is shown with respect the

21  all of the claims in suit.

22                  All right.  Ms. Wolanyk, she's sitting

23  right there.  Why did we have Ms. Wolanyk testify?

24  Here's the point.

25                  I'm sure Mr. Sayles is going to get up

1  and show you the same slide he showed you in the

2  opening:  Why are we here, the implication being that

3  the patent is not being infringed and not being valid

4  and us asking for a serious amount of money, there must

5  be something wrong with us being in this court; us,

6  being Soverain Software.

7               So we had Ms. Wolanyk testify, so you

8  could understand how the business reasons and the

9  business purposes explain why we're here.

10               We demonstrated through her testimony the

11  commitment of the company to the Transact product, the

12  nature of Soverain Software's businesses, the

13  appropriateness under the competitive situation, how the

14  industry is set up, and the well-accepted use of

15  licensing, for Soverain to be raising cash money by

16  licensing, needed revenue, and that then means, in

17  licensing programs, where you get people who are using

18  your technology and they don't license, you've got to

19  enforce the patents.

20               It's that simple.  If you don't enforce

21  the patents, you don't have a licensing program when

22  people who should be paying refuse.  It's just that

23  simple.

24               There is no fault or viable criticism

25  that I can see in a company seeking to put a case for

1  enforcement of its patent rights before a jury like you

2  folks in a United States District Court, such as we're

3  privileged to be in, in Tyler, Texas.  Not one thing

4  wrong with doing that.

5           A company is entitled to exercise its

6  constitutional rights just like any of us are.  That's

7  why we had Ms. Wolanyk testify.

8           Damages.  Money.  Is that why we're here?

9  Of course.  I mean, I'm always glad to try a case; I'm

10 glad to particularly try a case in Tyler; but we're not

11 here just to have me practice trying cases.

12          Of course this is about money, and we're

13 asking for money under the law, and we believe we've

14 demonstrated to you that the client is entitled to

15 money.

16          THE COURT:  Mr. Adamo, I failed to give

17 you your time notice.  You've used 35 minutes.

18          MR. ADAMO:  Thank you, Your Honor.

19          Newegg demonstrates second on the table

20 of all its competition as to where it stands on web

21 volume.

22          This is the reasonable royalty charge.

23 His Honor just read it to you, as to what we needed to

24 show, what we needed to demonstrate on reasonable

25 royalty.  Mr. Nawrocki testified on that subject, which

1  I think you'll all remember.

2              These are the Georgia-Pacific Factors

3  that Mr. Nawrocki applied.  His Honor has them in the

4  charge.  You recall he mentioned that to you, but he

5  just skipped over them so you wouldn't have to sit

6  through them all.

7              Here's, in a nutshell, our damages

8  presentation.  The damages period, November 2nd, 2007,

9  through today.  A royalty payment that reflects the

10  value of the use of the claimed invention.

11              Now, you heard Mr. Wu, in the transcript

12  I just read you, specifically point to the shopping cart

13  as to why their system was so good and they got such

14  great response on it.

15              So that's the value that you've already

16  heard him testify that's appropriately considered here.

17  The value of the use of the claimed invention.

18              I hate to keep coming back over to this,

19  but this is so essential because of the way the

20  Defendants have brung the case.  They don't use the

21  system; they don't have a business.  There isn't

22  anything more valuable than that.  Your business closes

23  down, of course it's valuable.

24              Here's the damages period in a bar graph.

25  There are the 28 million transactions.

1                   A hypothetical negotiation, Open Market,

2    on critical and fundamental E-commerce patents, was

3    trying to monetize the patents.

4                   You heard all this back and forth with

5    Mr. Bakewell yesterday and also with Mr. Nawrocki about

6    the buyout and whether $70 million of stock that you

7    could sell on the stock market was cash or not.

8                   I, quite frankly, didn't understand what

9    that was all about.  Every time I've sold stock and I've

10   gotten cash for it, that is cash to me.

11                  But Newegg, startup, limited financial

12   resources, but great expectations.

13                  Technical factors for consideration under

14   Georgia-Pacific, Soverain.

15                  Significance of the patents, they're

16   critical and necessary.

17                  Newegg's view, they say relatively

18   unimportant.

19                  Newegg technical alternative, that's

20   critical.  None, zero, nada.  No alternative, not at

21   that time.  This was the system that they needed if they

22   were going to compete.

23                  The licensing factors, all of which were

24   testified to by Mr. Nawrocki, the business factors, the

25   ranges of percentage of profitability, and et cetera,

1    how he apportioned the profit.

2              Do you remember these slides?  Sorry.

3    They reproduced so badly that he got up here with a tear

4    sheet, and he showed you how he had made adjustments;

5    that he hadn't just followed the 25-percent rule

6    blindly.  He demonstrated to you how he had made the

7    adjustments and went through quite a presentation on

8    that.

9              The bottom line, 28 million transactions,

10   80 cents per transaction.

11             Now, you remember, Mr. Bakewell yesterday

12   testified about the Odimo license where it was 85 cents

13   a transaction.  So Mr. Nawrocki is not way off at 80

14   cents.  But 80 cents for the two patents, 40 cents for

15   the '639 patent, $34 million.

16             Yeah.  That's real money.  That's a lot

17   of money.  And why is it so much?  Because this is the

18   engine that their business runs on, and they're making a

19   lot of money and doing a lot of business; 28 million

20   transactions, totaled 12 million, I believe, last year

21   and a couple of billion dollars.

22             So the number value here is high, not

23   because we're trying to steal from people.  It's because

24   of the use they've made of the licensed technology.

25             Same thing with this verdict form.  All I

1   mean by this, as I filled it out, is here's what the

2   evidence that we've presented to you shows in the way of

3   the numbers.  This is only my suggestion that under the

4   preponderance of the evidence, if this is your

5   conclusion, the evidence would support this conclusion.

6               Invalidity, I'm going to go through this

7   very briefly, very briefly.

8               This was Dr. -- mainly because you just

9   heard this yesterday afternoon, okay?

10              This is Dr. Shamos right there, the

11  billiard player, right?  I -- frankly, I couldn't figure

12  out where Mr. Sayles was going.  I was figuring in a

13  minute here we were going to have a money game going,

14  and we were going to either get Mr. Shamos to play for

15  our side or we were going to go down to some billiards

16  hall.

17              I am informed, because of my misspent

18  youth, I think billiards, I think, you know, pocket

19  billiards, like nine-ball and stuff like that.  Well,

20  that's one of the things he does.  But the real

21  billiards is the English thing with the red ball and the

22  white balls.  That's -- that's really what he does.

23              But in any event, you heard Dr. Shamos.

24  He went through all of this evidence yesterday in

25  detail, where anticipation is their only ground for

1   alleging invalidity.  Anticipation.  That's it.  That's

2   what you're going to have to decide when they present

3   this information to you.

4               One reference --

5               THE COURT:  Mr. Adamo, you've used 40

6   minutes.

7               MR. ADAMO:  Yes, Your Honor.  I'll be

8   done in a shake.

9               One reference.  Has to all be in one

10  reference.  Can't combine references.  Each element has

11  to be shown to be in one reference.

12              Clear and convincing evidence, okay?

13  Here's where the burden shifts over:  Clear and

14  convincing evidence.  And if you remember, with respect

15  to the '314 and '492, CompuServe Mall, that's what the

16  Patent Office was aware of during the reexaminations.

17              Clear and convincing evidence, evidence

18  that produces an abiding conviction that the truth of a

19  fact is highly probable.

20              And Dr. Shamos' conclusion was that

21  Mr. Tittel has not shown any asserted claim to be

22  anticipated.  No single prior art reference discloses

23  all the limitations of any of the asserted claims.

24              There's a nice photograph of Dr. Shamos.

25              Mr. Tittel tried to advance this position

1  for Newegg, and if you recall, Dr. Shamos presented in a

2  great deal of detail why CompuServe Mall does not

3  anticipate.

4                    It's an entirely different technical

5  structure:  Through modem, dial-up, no worldwide web, no

6  internet.

7                    All the messages in CompuServe come in on

8  one line.  That's how the server knows who you are.  Not

9  the way it works on the stateless worldwide web

10  internet.

11                    And he took you through and showed you

12  how things went back and forth because the mainframe --

13  first, he showed Moby Dick; and then when you pushed O,

14  that was the only thing you could have ordered.  And

15  there were no need for product identifiers.  It was set

16  up that way.

17                    The -- remember the different books?

18  These books.  There was all this mixing and matching of

19  these books.  That's what they supposedly showed.  But

20  you can't mix and match.  One reference.  One book.

21                    And Dr. Grimes -- I'm sorry -- Dr. Shamos

22  demonstrated to you why that book didn't satisfy the

23  evidentiary burden.

24                    The differences between the internet and

25  CompuServe's server, he went through in great detail.  I

1  won't go through all these.  This is essentially the

2  presentation you saw yesterday.  He went through claim

3  by claim, patent by patent, demonstrating that there

4  was, in fact, no evidence of anticipation.  None

5  whatsoever.

6            Last point.  His Honor mentioned

7  corroboration, that all of this testimony about -- all

8  of this information about prior art had to be

9  corroborated.  There's no corroboration.  Not under the

10  standard as His Honor charged him.

11            Mr. Trevor wasn't able to use the books

12  to do it, because as you recall, during Mr. Giannetti's

13  cross-examination, the books didn't have a disclosure.

14            They were written, basically, for someone

15  at a very, very, very high level, almost a high school

16  kid.  HTML for Dummies, that's the type of people that

17  those books at the lowest level were written for.

18            So what do I suggest in the verdict form

19  with regard to invalidity?  My suggestion is that under

20  clear and convincing evidence, the information in the

21  record from Dr. Shamos demonstrates that you would be

22  within, if you so conclude, the law and the burden of

23  proof if you reached this conclusion.

24            I thank you for your attention.  I will

25  be back with you briefly after Mr. Sayles' comments.

```
 1                    THE COURT:  Thank you.
 2                    MR. ADAMO:  Your Honor, that completes my
 3  first part of my closing.
 4                    THE COURT:  Thank you.
 5                    MR. ADAMO:  Thank you, sir.
 6                    THE COURT:  You have 15 minutes left.
 7                    MR. ADAMO:  Yes, sir.
 8                    MR. SAYLES:  May it please the Court.
 9                    May I take just a moment to set up?
10                    THE COURT:  Yes, you may.
11                    Okay.  Y'all feel free to stand up and
12  stretch, if you want to.
13                    JUROR:  They were all telling me to sit
14  down.  They were all afraid I would get in trouble.
15                    THE COURT:  It's not a bad idea.
16                    (Pause in proceedings.)
17                    MR. SAYLES:  Your Honor, if you would,
18  I'd like a warning at 30 minutes, 15 minutes, and 2
19  minutes left.
20                    THE COURT:  30, 15, and what?
21                    MR. SAYLES:  Two.
22                    THE COURT:  All right.
23                    MR. SAYLES:  May it please the Court.
24                    Counsel, Ladies and Gentlemen.
25                    I have to first start off by thanking
```

1    you.  You've sat here for a week.  It seems like much

2    longer time than that, I'm sure.  It seemed longer than

3    that to me as well.

4                    But I want to tell you that even though

5    you sat there, and you got sandwiches, and you get low

6    pay, and you see these highly-educated, high-priced

7    expert witnesses, it can be frustrating.

8                    But I want to tell you how I feel about

9    your participation.  The Constitution of the United

10   States, in the Seventh Amendment, gives us the right to

11   a jury trial, even in complicated matters like this.

12                   I have, for 36 years, had the opportunity

13   to bring cases to juries just like you.  And today I

14   stand up for Newegg.  I stand up for a company that is

15   willing to stand up for itself and to challenge claims

16   that are made against it in a courtroom before regular

17   citizens like you.

18                   And the reason I'm honored to do that, I

19   know from my experience that you and every jury I've

20   ever seen, takes that obligation very seriously.  And it

21   takes a lot of courage by Newegg to stand up for itself

22   and take this case the distance to a jury verdict.  And

23   they're willing to do it, and I'm proud to stand up for

24   them in doing it, and I thank you for your service.

25                   I want to mention a few items that

1  Mr. Adamo touched on, and then I want to talk to you

2  about the issues in the case.

3              But, first of all, he asked you for your

4  help.  And I know that he probably didn't mean anything

5  improper by that, but what I ask you for is a just

6  verdict based on the evidence and grounded in the law

7  that the Court has given you.  That's what I'm asking

8  for.

9              And Mr. Adamo mentioned the reexamination

10 of two of these patents in the Patent Office.  Let me

11 say very clearly now, and he'll correct me if I am

12 wrong, the reexamination before the Patent Office has

13 nothing to do with the issue of infringement.  Nothing.

14 That is for you to decide.  Newegg was not involved in

15 that.  The issue of their infringement was not involved.

16             The next thing I want to talk to you

17 about is the burden of proof.  And it is true, it is

18 true that the burden of proof on Soverain in this case

19 is a preponderance of the evidence, but let's not

20 trivialize that.  It is their burden of proof, and the

21 law requires it.

22             And the burden of proof requires that

23 they actually persuade you, persuade you that a claim is

24 more likely true than not true.

25             Let me see if I can get this to work.  If

1  not, I'm just going to tell you what it says and go from

2  there.

3              Here's the burden of proof.  Soverain has

4  the burden of proving infringement by a preponderance of

5  the evidence.  Preponderance of the evidence means

6  evidence that persuades you that a claim is more likely

7  true than not true.

8              Now, let me tell you what this means in

9  the context of this case.  Soverain has to meet that

10  burden of proof to get infringement.  If they don't get

11  infringement, the case is over.  If you answer no to

12  those first questions that you're asked about

13  infringement, then that's it.

14             And that's what you should do based on

15  the evidence in this case.  More likely true than not

16  true.

17             What if, in your mind, you heard the

18  evidence back and forth and you heard the experts debate

19  and it's a tie or less than a tie?  If that's the case,

20  they have not met their burden of proof, and the answer

21  to the questions on infringement is no.

22             So let's not allow them to trivialize the

23  burden of proof on the issue of infringement.  It's

24  important.

25             You know, Mr. Adamo argued that the

1  website to Newegg is important to its business, and he

2  quoted the S1.  Sure it is.  Sure it is.  But let me

3  reason with you for just a moment.

4              The front door to the grocery store is

5  important to the grocery store's business.  The shopping

6  cart that you roll up and down the aisles is important

7  to the grocery store's business.  And clearly, the

8  website in this case is important to Newegg's business.

9              But you heard Mr. Wu say that the accused

10  functionalities of these patents, if you assume that

11  there's some similarity here, represent .6 cents, 6/10

12  of 1 percent, of the entire code for that computer

13  program.  That's the evidence.  Less than 1 percent.

14              Now, it's not all measured by the amount

15  of code.  The code is what it takes to make that whole

16  computer program run, and there's a lot more to it than

17  these inventions that are claimed here, a lot more to

18  it, 99 percent more to it in the case of Newegg, plus

19  all the other factors that you heard about Newegg's

20  success.

21              They have achieved success, and I ought

22  not to stand here and have to apologize for that.

23              Newegg came out in 2001 at the very time

24  that internet companies were having a hard time.  They

25  came out at a time when many companies, including Open

1   Market and Soverain, were failing.

2                   And now we know today they succeeded.

3   They ought not to be punished for that.  They ought to

4   be proud of that.

5                   We know Mr. Wu, when he did his work day

6   and night with very few resources, as you heard, that he

7   didn't go look and see if there were patents that

8   covered the work that he did.

9                   Well, think about this for just a moment.

10  If you or I write a song or a poem, and in our heart, we

11  know that we did it, we don't have to go listen to every

12  song in the world or read every poem in the world to see

13  if our work is original.

14                  So the fact that James Wu didn't go check

15  for patents is meaningless in this case.

16                  With regard to Mr. Adamo's argument on

17  the source code, he argued that Mr. Grimes confirmed

18  that these functionalities were in the source code.

19                  Actually, Mr. Grimes, if you listened

20  carefully, admitted he himself did not look at the

21  source code; that one of his colleagues did.  That means

22  somebody that worked for him.

23                  And I want to cover a few items in the

24  charge with you for just a moment, and then I'm going to

25  turn to the very issues in the case.

1          Remember, the law says -- and I know

2   you've heard this at least four times -- to cover what

3   the dependent claim covers, you have to look at the

4   claim it depends upon.

5          And in the verdict form, you will see

6   there are some dependent claims.  And the verdict form

7   does not mention the independent claim, but you have to

8   look at that to determine if there's infringement in

9   those cases.  And I'm going to show you in a moment why

10  the elements of the claims are not met.

11         And remember this, also:  I mentioned to

12  you, and you heard it in the Court's Charge, in order to

13  infringe the claims of a patent, the accused

14  functionality must meet each and every element.  Not 9

15  out of 10, not 9-1/2 out of 10, but 10 out of 10.

16         And I'm going to show you the elements

17  that are missing and why there's no infringement.  And

18  Soverain has the burden of proving this.

19         I'm going to show you on Page 8 where

20  this -- I'm just going to quote from it.

21         On Page 8 of the charge, it says that if

22  the accused system or method does not contain one or

23  more of the limitations in reciting -- recited in the

24  claim, then the system or method does not directly

25  infringe that claim.

1                    So, you know, what I just told you is

2    what the Court is saying in this charge.  If one element

3    is missing, there's no infringement.

4                    And there's another method of direct

5    infringement that was mentioned, and that is this issue

6    of the Doctrine of Equivalents.

7                    The charge on Page 9 says:  When no one

8    party performs all the steps of the claimed method but

9    multiple parties combine to perform every step of the

10   method, that claim will nevertheless be directly

11   infringed if one party exercises control or direction

12   over the entire method so that every step is

13   attributable to the controlling party.

14                   Now, what that means is that in order to

15   infringe under the Doctrine of Equivalents here, Newegg

16   has to control and direct every step.  We know that a

17   customer is involved here, and Newegg doesn't control

18   and direct every step that the customer takes.

19                   And in fact, Mr. Grimes -- Mr. Tittel,

20   our expert, specifically explained that there were not

21   equivalents here.

22                   He explained that abandoned -- that there

23   are abandoned shopping carts, and you can't shop from

24   multiple computers, for example.  You know, if you go

25   from one to the other on the Newegg system, you can't

1  pick up where you left off, so to speak.

2              On the Soverain patent claims where they

3  have a server-side database, you can.  It's an important

4  difference.

5              And also a point was made about cookies

6  not being enabled.  Mr. Adamo said that the default is

7  that cookies are enabled.

8              Yes, for us individuals who may have a

9  computer at home, that's certainly true, but some people

10  turn them off.  Some people work in companies and in

11  places where cookies are disabled.

12              So a person wanting to use the system has

13  to be sure that cookies are enabled.  That person does

14  that, not Newegg.

15              Now, are the differences substantial or

16  insubstantial?  They are very substantial, and I'll show

17  you in just a moment -- in fact, why don't we just do it

18  right now while we're here.  You've heard this already.

19              Because the patents are invalid, Newegg

20  doesn't infringe, and Soverain's claim for damages is

21  grossly inflated.  That -- that is what we're here

22  talking about.  But here's the infringement issue that

23  I'm talking to you about now, why the answer is no to

24  these infringement questions.

25              Where is the shopping cart?  In the

1  Soverain system, it's in a database on the Soverain

2  side.  That's the way it's described in the '314 patent.

3              And Dr. Grimes said that he thought that

4  that was right, but he wasn't sure.  But don't you know,

5  as smart as Dr. Grimes is and as much work as he did, he

6  does know that, too.

7              In the Newegg system, the shopping cart

8  is stored in a cookie.

9              When are the products added to a

10 database?  On the Soverain patent, as soon as you hit

11 add-to-cart, they're added to a database.

12             The difference is that in the Newegg

13 system, it's only when you hit checkout and you have

14 collected all the products in the cookie, one time, on

15 checkout, they get dropped into the database to complete

16 the order.

17             And modification is one of the claims of

18 both the -- elements of the '314 and '492.  It's a

19 common element.  So if you find that this is

20 substantial, then there's no infringement for this

21 reason in both patents:  What is modified in the

22 shopping cart database?

23             In the Soverain system, every time a

24 product is added, the database is changed on the server

25 side.

1                    In the Newegg system, nothing happens as

2    products are added to the shopping cart cookie on the

3    Newegg side.  Nothing.  That is a substantial

4    difference, not an insubstantial difference.

5                    And the differences, do they matter?

6    They absolutely matter.  They're very important.  It's a

7    waste of space on the Soverain system, as described in

8    the patents, to have abandoned shopping carts, computer

9    space taken up by that; whereas on the Newegg system,

10   with the cookies, there's efficiency involved.

11                   Sure, you lose some advantages, but

12   there's efficiency involved.  This is not a meaningless

13   distinction.  It's a very meaningful distinction.

14                   Now, we talked about the cookie system,

15   and you've seen this and heard about this.  Here's the

16   Newegg system where the order goes back and forth

17   between the client computer and the server.  Never makes

18   it up to the database till checkout.

19                   On the bottom here is the contrast to

20   what is described in the patents, which is a shopping

21   cart database on the server side.  Client sends the

22   messages, and they go right into the server.

23                   Here's a graphic depiction of the

24   substantial difference between the two systems.  The

25   Newegg cookie-based shopping cart is just like a

1  shopping cart that can keep moving around and going up a

2  and down the aisle.

3              On the Soverain's patents, as they are

4  described in these -- in the '314 and the '492,

5  Soverain's server-side shopping cart results in every

6  single item being added on that side.

7              So Newegg does not add a plurality of

8  respective products to the shopping cart in the shopping

9  cart database.  That's an element of the claims right

10  there.  Respective products, plurality.  That's got to

11  mean more than one.

12              Newegg does not modify the shopping cart

13  in the shopping cart database.  You remember the

14  discussion about that?  The shopping cart database on

15  the Newegg side is created one, and only one, time.

16  Everything goes into it.  It's not added respectively

17  one by one.

18              Mr. Grimes' testimony here.  Mr. Grimes

19  was asked -- and I wanted to tell you, this is not me

20  saying this; this is their expert witness, Dr. Grimes,

21  who's much more highly educated than I am and knows a

22  whole lot more about this than I do, so I'll take his

23  word for it.

24              To satisfy the system in this claim, the

25  user has to use -- put multiple items in the shopping

1  cart?  That's the question.

2               And he said:  That's -- that's the

3  evidence I put forward, yes.

4               Now, we'll get to the meaning of this in

5  damages in a few minutes, because there were a lot of

6  single-item transactions, but right now I'm talking

7  about infringement.

8               Here is the slide that was described for

9  a long time that describes that there's actually no

10 modification in the Newegg system.  There's no

11 modification.

12              This is the last step.  After the request

13 is made from the customer, it comes around, it gets a

14 number, the shopping cart cookie, with all the items

15 selected, goes over, and it all gets dropped into the

16 database on the Newegg side at one time, and then off to

17 the data center to ship the goods.  A very substantial

18 difference.

19              Now, let me talk about the session ID

20 patent for just a moment here.  That's the '639.

21 It's not infringed because Newegg doesn't forward a

22 request from the customer.  There's no storing of a

23 session identifier.  And you heard all about that in the

24 testimony.  I know this is complicated stuff.  And there

25 is no appending to a session identifier.

1              Each of these three things are elements

2    that you'll find in the claims of the '639 patent that

3    Newegg does not perform.  And if it doesn't perform just

4    one of them, there's no infringement.

5              Now, the hypertext claims of the '492.

6    This -- the hypertext claims are like where you can

7    review your shopping order history.  You know, you click

8    on a hypertext link, and it puts up your prior order.

9              And that's the idea behind the '492

10   patent.

11              And it has an element in there that

12   requires that Newegg do the programming of the buyer

13   computer, the customer's computer.  That doesn't happen

14   here.

15              Html language, as was explained to you by

16   Dr. Tittel, is not a programming language, and that's

17   where hypertext links come from.

18              And actually, on the damages side,

19   there's really no evidence about how much customers use

20   this feature anyway.  It's like a receipt or a review --

21   a review of your order that you can look back on

22   whenever you want to.

23              So there's no infringement of the

24   hypertext claims of the '492 for that reason.

25              Now, let me cover just a couple of more

1   instructions before I move to the issue of validity.

2                  On active inducement of infringement, the

3   instruction on Page 10 of the charge says:  A person is

4   liable for active inducement of a claim only if -- those

5   are the Court's words:  Only if.

6                  Let's take a look at this for a moment.

7   You see how good I am with technology.  Anyway, let's

8   take a look at the active inducement instruction here.

9   I'm going to read it to you.  It's on Page 10.  And you

10  can see it, and I trust that you will.

11                 A person is liable for active inducement

12  of a claim only if -- only if.  Those are the Court's

13  words -- in Item 3, the person is aware of the patent

14  and knows or should have known that the encouraged acts

15  constitute infringement of that patent.

16                 That's what it takes for inducement.

17  There are other elements, too, but that's the one that

18  shows you there is no inducement for this reason:  Just

19  because Soverain files a lawsuit and claims that there

20  is infringement, doesn't mean that Newegg knows there is

21  infringement.

22                 Doesn't a party have a right to contest

23  that?  Doesn't -- doesn't the possibility of a

24  disagreement about whether there is or is not

25  infringement exist?

1              I mean, you've seen four days full of

2    evidence where you can see there's a disagreement, a

3    real one.  No matter what you conclude, you have to see

4    that there's a disagreement here.

5              So how can a person know that their

6    actions that they encourage another to do would

7    constitute infringement of the patent in that situation?

8    This is an item of intent.

9              And if you -- when you turn to Page 11,

10   you'll see that on this inducement idea, the Court says:

11   You must find specifically that Newegg intended to cause

12   the acts that constitute direct infringement and must

13   have known or should have known that its actions would

14   cause the direct infringement.

15             If you do not find Newegg specifically

16   meets these intent requirements, then you must find that

17   Newegg has not actively induced the alleged

18   infringement.

19             Right there it is in black and white by

20   the Court.  You have to know and intend to induce

21   infringement.  It's mental intent.

22             Ladies and Gentlemen, that is probably

23   the second clearest thing in this case.

24             Now, let me touch on invalidity for a few

25   minutes.

1          And on invalidity, you'll see on Page 12

2  of the charge under anticipation, that the disclosure in

3  the prior art reference does not have to be in the same

4  words as the claim, but all of the elements of the claim

5  must be there, either stated expressly or necessarily

6  implied or inherent in the level of ordinary skill in

7  the field of technology of the patent at the time of the

8  invention so that someone of ordinary skill in the field

9  of technology of a patent, looking at the prior art

10  reference, would be able to make and use the claimed

11  invention.

12          So what do we have?  We have two separate

13  items.  And Mr. Baldauf went through this very carefully

14  with Mr. Tittel, Exhibit 2, CompuServe, Fourth Edition,

15  and he brought out the testimony that either -- not in

16  the same words -- and either expressly or necessarily

17  implied or inherent, all of the elements of these claims

18  are disclosed in this book separately.

19          And Exhibit 2 is not one of the many

20  references before the Patent & Trademark Office.  Is

21  not.  And you saw the pages from this book.

22          Separately, Exhibit 4, Using CompuServe.

23  Mr. Baldauf, in great painstaking detail, went through

24  the pages in this book showing that -- though not in the

25  same words, that the elements of the claims were

1  expressly stated or necessarily implied and understood

2  by one of skill in -- of ordinary skill in the art.

3  Separately.

4                Now, let me tell you one other important

5  thing about these books.  Mr. Adamo has mentioned and in

6  his presentation mentioned that in the patents there is

7  a reference to a CompuServe book, and there is.  Not

8  these two books but another book.

9                Now, don't you know, with a

10  highly-skilled and high-powered legal team that is

11  headed by Mr. Adamo, if that book was what they claim it

12  is, they would have brought it here, marked it as an

13  exhibit, and showed you what the pages are.  They didn't

14  do that.

15                So you don't have any evidence of what's

16  specifically in that book about CompuServe, but you do

17  have what is in the two CompuServe manuals that we

18  developed through our expert witness that were not

19  before the Patent Office.

20                And don't you know, if their references

21  to CompuServe were so good, you would have seen them.

22  And you didn't.

23                I want to go now to a couple of slides

24  here.

25                All right.  This is the Ellsworth book

1    that we developed in painstaking detail that I just

2    talked to you about.  This is where that book says that

3    CompuServe Electronic Mall is the oldest shopping center

4    in cyberspace, and it goes on to describe more about its

5    features.

6                    There was a mention in the examination of

7    one of our witnesses, and I'm sure it was Mr. Tittel,

8    that the word shopping cart is not in the book.  Well,

9    there's actually something better than that.  There's a

10   picture of a shopping cart right there, a picture of

11   one.

12                   And there was an argument among the

13   experts about whether -- there it is in a little closer

14   form.

15                   There was an argument about whether an

16   order stored in a personal holding file until you leave

17   the merchant's store is a shopping cart piece of

18   information.

19                   Well, it obviously is.  One skilled in

20   the art knows that.  The words aren't there, but the

21   pictures are, and there's words there.  So it's there.

22                   Damages.  I said the second most clear

23   thing in this case was that there was no active

24   inducement of infringement.  The most obvious thing is

25   that the damages claimed here are not supported by the

1  evidence.

2              Now, on damages, the law says -- and this

3  is something that the Judge repeated that I worried

4  about from jury selection on.

5              THE COURT:  You've used 30 minutes of

6  your time.

7

8              MR. SAYLES:  Thank you, Your Honor.

9              The instruction on Page 17 says:  The

10  fact I am instructing you about damages does not mean

11  Soverain is or is not entitled to recover damages.

12              Right at the top of the page.

13              Now, as a lawyer, I'm obligated to talk

14  about damages just as the Court is required to instruct

15  you about damages.  But as the Court says, that doesn't

16  mean there are any damages.

17              I submit to you that the evidence in this

18  case is, there is no infringement, and therefore, the

19  damages are zero.  But to do my job, permit me to do

20  that without prejudice to Newegg, according to the law,

21  just the way Judge Davis did, and let me to talk about

22  that.

23              The instructions say that this would all

24  take place at a hypothetical negotiation in January of

25  2001.  And believe you me, I realize that it's not gut

1  instinct as to why you would have a hypothetical

2  negotiation in January of 2001, but in the court case,

3  where the damage period is actually limited to 2007

4  until the time of trial.

5              Sounds kind of odd to me, but that's the

6  way the law works.  You have to look back at the time of

7  the alleged first infringement and figure out, as best

8  you can, what the parties would likely have agreed to at

9  that time.  That's what you have to do.

10             And back at the time of the negotiations,

11 sitting at the table for Open Market would have been

12 Shikhar Ghosh.  And at the other end of the table would

13 have been James Wu or his boss, but certainly on the

14 Open Market side would have been Shikhar Ghosh.

15             Mr. Ghosh no longer has any interest in

16 this case.  He -- there were a couple of witnesses here

17 who didn't have some sort of financial stake in the

18 outcome.

19             Ms. Wolanyk does.  And I'm not being

20 critical of her.  She owns a part of the company,

21 Soverain.  Lee Cheng works for Newegg.  James Wu works

22 for Newegg.  But Shikhar Ghosh has moved on and has no

23 stake in this case.

24             And what he said was that at the time of

25 the hypothetical negotiation, that Open Market would

1  have been willing to license Transact to Newegg.

2              Now, the evidence in this case that's

3  actually in evidence that you have back in the jury room

4  is that the highest fee ever paid for a license for

5  Transact was $344,000.

6              Now, don't you know, if a company is

7  sitting at the bargaining table negotiating for a patent

8  license, and one of the alternatives they have is to do

9  business with the guy sitting at the other end of the

10  table and to take a software license for that amount of

11  money, they're not going to give up one-third of their

12  profits for the life of these patents, which runs to

13  2014.  There's no way reasonable business people would

14  have done that in January of 2001.

15              The damages instructions here say that --

16  on Page 17, down towards the bottom, that a reasonable

17  royalty is a result -- royalty that would have resulted

18  from a hypothetical arm's-length negotiation --

19  horsetrading, two-way street.  Open Market didn't get to

20  dictate and hold out for as much as they wanted to.  You

21  have to consider everything.

22         And you would have to consider a negotiation

23  between Open Market and a company in the position of

24  Newegg on the eve of infringement.  I'm quoting the

25  Court.  On the eve of infringement.  Not Newegg in 2010,

106

1    but Newegg in 2001, when it was a startup company.

2                   And on the eve of infringement, folks, that's

3    before -- right before the first transaction, the eve

4    of.  You've got high hopes in 2001, but many others in

5    the internet commerce business failed time after time

6    after time.

7                   So it would not be reasonable that the parties

8    would have foreseen or anticipated in the future that

9    this company would be as successful as it has been.

10                  And so the charge says you decide what a

11   reasonable royalty would be based on the circumstances

12   at the time.  It's on Page 17, just before Newegg began

13   selling and using the patented inventions.

14                  And it surely does say that you consider the

15   profits made and any commercial success based on the

16   patented inventions.  But the profits are not

17   determinative of what a reasonable royalty is.  It says

18   it right there.

19                  So they've been profitable today, but that

20   doesn't answer the question.  It says in the charge, you

21   may only consider information if it was foreseeable at

22   the time the infringement began.  That's a quote from

23   Judge Davis on Page 18.

24                  The royalty factors.  I am going to go through

25   a few of these.  The first thing I want to do is give

1  you a couple of stipulations.

2              Could you go to 516, please, and Stipulation

3  25 through 30?

4              This is in evidence as Exhibit 516.  A couple

5  of these are very pertinent to the damage issue that I'm

6  about to discuss.

7              And you don't -- let's see.  Did we give y'all

8  the stipulations yet or -- I don't think so.

9                  MS. JOHNSTON:  I don't have it.

10                 MR. SAYLES:  You don't have it?

11             All right.  I'm going to read these

12  stipulations to you.

13                 No. 25.  The patents-in-suit were

14  originally assigned from the inventors to Open Market.

15                 We know that, but that's a stipulated

16  fact.

17                 Open Market began selling a software

18  product named Transact in 1996.

19                 27.  The Transact product incorporates or

20  reflects each of the asserted claims of the

21  patents-in-suit, as well as additional functionality.

22                 Transact had -- it was a product.  It had

23  more in it than the patented technology, stipulated

24  fact.

25                 Open Market's assets were purchased by

1  Divine in 2001.

2                    And remember this number that was dropped

3  on you about that that was a 70-million-dollar

4  transaction?  And Mr. Bakewell, who had studied it,

5  tried to explain, well, that was a stock-for-stock

6  transaction.  It wasn't money.  There was not money that

7  changed hands.

8                    Stipulated Fact No. 29 is Divine declared

9  bankruptcy in 2003.  Stipulated fact.

10                    So stock of Divine became wallpaper just

11  like some of the owners of Open Market said that they

12  had stock and that it was just wallpaper now.

13                    And Stipulated Fact No. 30 is Soverain

14  has not licensed the Transact product to any licensees

15  that were not first licensed by Open Market.

16                    Now, Transact has the patented

17  inventions.  If they're so great, wouldn't you expect

18  that they would develop new customers and new clients?

19                    But a stipulated fact is, they haven't

20  licensed that product to any licensees that weren't

21  first licensed by Open Market, and that takes us all the

22  way back to 2001.

23                    Now, that bears on damages.  How valuable

24  are these things?

25                    These Georgia-Pacific Factors, I need to

1    talk about them.  You'll see them when you look at the

2    charge.

3                    Any royalties received by Soverain or its

4    predecessors from licensing the patents-in-suit.

5                    Let me go through this first, since it's

6    in order.

7                    Mr. Ghosh, who I said really doesn't have

8    a dog in the fight here:  What caused Open Market to be

9    sold to Divine?

10                   ANSWER:  The business was in pretty bad

11   shape.

12                   I think on cross-examination, there was

13   some quibbling with Mr. Bakewell, who said that.  But

14   Mr. Bakewell, our damages expert, is merely quoting what

15   the chairman of the board said.  And right there it is:

16   The company was in bad shape.  Losing money hand over

17   fist.

18                   Mr. Ghosh also said:  If Newegg had

19   approached Open Market in 2001 wanting a license for

20   Transact, what would your reaction have been?

21                   He said:  We would have licensed it.

22                   What better non-infringing alternative do

23   you have than a software product that has the patents in

24   it?

25                   Mr. Ghosh also was asked:  What terms

1  would you expect to be able to license Newegg for

2  Transact?

3               ANSWER:  I have no idea, but standard

4  terms.  I can't see why it would be different.

5               And he was asked:  By standard, do you

6  mean terms similar to those of other merchants or

7  single-user agreements?

8               And he said:  Yes.

9               QUESTION:  Would you expect Newegg to pay

10 any fees based on revenues?

11              Mr. Ghosh, who would have probably been

12 the guy at the table doing the negotiating said:

13 Probably not.

14              QUESTION:  Would you expect Newegg to pay

15 any fees based on the number of transactions that were

16 performed on their website?

17              How much better can you ask the question

18 to the most important person, the person sitting at the

19 other end of the bargaining table?

20              His answer:  Probably not.

21              Mr. Paul Esdale, who testified very

22 briefly in this case by deposition, he said that Open

23 Market was a software company.  That's what their

24 business was.  That they even had discussions internally

25 about the appropriate use of the patents to encourage

1  sales.

2              And he said:  We didn't do that.

3              So at the other end of the bargaining

4  table on the Open Market side, what do you have?  You

5  have a company then that's really interested in

6  developing customers for Transact, not suing folks.  Not

7  enforcing their patents at that time, but selling

8  Transact.  That's what he said.

9              So as we went through, Mr. Nawrocki did

10  several things.  His royalty base included unrelated

11  sales, he ignored the real-world licenses that are in

12  evidence, and he used the 25-percent rule.

13              And you know what?  That's the rule of

14  thumb.  That's the name of it.  You know what the rule

15  of thumb is?  I think that looks level.  That's the rule

16  of thumb.

17              I asked him time after time:  Did you do

18  an economic analysis of these various factors?

19              And he admitted it.  He didn't.  There's

20  no sound economic analysis here for that.

21              And the Court's Charge says that while

22  the Plaintiff doesn't have to prove their damages with

23  mathematical certainty, it says on Page 18, that they

24  are required the prove their damages with reasonable

25  certainty, with reasonable certainty.

1                  The damages can't be speculative.

2     Soverain's proof of damages must have a sound economic

3     basis.  That's the Court's Charge.

4                  Now, the royalty factors.  Go through a

5     couple of those.

6                  Open Market, at the time of the

7     hypothetical negotiation -- you heard this very

8     distinctly in the evidence.  I think we went over it

9     probably twice.  It was on the way downward side.  They

10    were below the zero line, in terms of their losses, at

11    the time of the hypothetical negotiation.

12                 A party in that situation, don't you

13    know, would like to have a lump-sum payment at that

14    time.  Only makes sense.

15                 Their Transact product, their revenues

16    had peaked in 1999, and they were going downhill at a

17    rapid rate.  And at 2001, their Transact revenues were

18    right there.

19                 Don't you know, if they sat at a

20    negotiating table when Transact was going downhill, that

21    they would like to have a lump-sum payment for these

22    licenses?  It only makes sense.

23                 Open Market and Divine's patent licenses.

24    Now, these are the ones that are in evidence.  And the

25    Court says you are to consider what is in evidence and

1  the reasonable inferences that you can draw from what's

2  in the evidence.

3            And there were 19 Open Market or Divine

4  patent licenses, and the range of these was 400 to

5  $100,000.

6            Now, we got in a big debate about this

7  100,000-dollar license to Johnson & Johnson, which was

8  the largest one, but follow me on this for a moment.

9            These are the real-world licenses of the

10 patent up until the time of around 2002 or 2003 back

11 closer to the time of the hypothetical negotiation.

12 These are the ones that are in evidence.

13           And you're not supposed to speculate

14 about anything that is not in evidence.  These are the

15 ones that are in evidence.

16           And if we take Johnson & Johnson, which

17 is the highest one at $100,000, do you remember, on

18 cross-examination, Mr. Satine kind of argued that, well,

19 that the Johnson & Johnson license was different because

20 it only allowed internal use.  He argued that.

21           Think about this.  Well, all right.  If

22 it's irrelevant and we took that off, what does that do

23 for them?  It makes their picture worse, doesn't it?

24           If we took off the

25 hundred-thousand-dollar license, then you would have the

1  licenses in evidence that are a few thousand dollars;

2  the next highest one is $30,000; over to Mr. Nawrocki's

3  calculation of nearly $40 million.

4           And if you total all the licenses

5  together, including the Johnson & Johnson license, the

6  total of all of them was a lump-sum payment of $200,000,

7  .6 percent of Mr. Nawrocki's damages.

8           All right.  Let me agree with Mr. Satine

9  and let's take off the Johnson & Johnson hundred

10 thousand dollars, and that makes Mr. Nawrocki's number

11 .3, .3 percent of the total of all of the real-world

12 licenses entered into.

13          Doesn't help them.  It goes the other way.

14          Transact.  Yes, it's a software license, but

15 don't you know if -- and there's 10 in evidence.  There

16 was testimony about didn't so-and-so testify that there

17 was one maybe for a million, but we can't come up with

18 it.  There was testimony like that.

19          But the ones in evidence, the hard evidence,

20 the hard evidence that Mr. Bakewell relied on is the

21 ones that are in evidence, and the license fees there

22 range from a hundred thousand to 344,000.

23          THE COURT:  Counsel, you have 12 minutes

24 left.

25          MR. SAYLES:  Thank you, sir.

1              So Mr. Nawrocki's damage opinions are

2  totally inconsistent with the real-world evidence.

3              The Newegg source code -- now, this is --

4  I told you this related to damages as well.  The Newegg

5  website has over 600,000 lines of source code, over

6  600,000 lines.  That's where you write out how you make

7  the computer program work.

8              The shopping cart function, the hyper

9  state -- statement text statement (sic) and the session

10  ID functions are represented by these dots inside the

11  overall website.

12              That's how much these patented inventions

13  have to do with the overall website, about .66 percent

14  of the lines of code.  Yet they want one-third of

15  Newegg's profits.  It's not reasonable.  It's not fair.

16  Newegg was successful for a lot of reasons.  Sure, they

17  have a good website.  Just like the grocery store has a

18  front door and shopping carts to push around, they have

19  a good website.

20              But there are all these other factors,

21  pricing, customer service, fast and accurate shipping,

22  product selection.  And you see, I did include the

23  website on this graphic, but I did put in the dots that

24  represent graphically the source code for that.

25              That's why Newegg has been successful.

1  Wouldn't give up 25 percent to one-third of its profits

2  back when it was just getting off the ground.  It's not

3  reasonable.

4           So there are a couple of Georgia-Pacific

5  Factors that I will mention, because I know that's a

6  funny word, too.  But in every single patent case, we

7  talk about that, because that's the framework within

8  which to consider a reasonable royalty.

9           And these begin on Page 18 of the charge.

10  The first one is royalties received by Soverain or its

11  predecessors.  Well, we know, we've been through the

12  fact that they were small.

13          The second factor, any rates paid by

14  Newegg for the use of other patents comparable to the

15  patents-in-suit.

16          Well, Newegg doesn't need to license

17  patents.  It licenses software, as Mr. Cheng explained.

18  They have one patent license.  It's not comparable to

19  these patents.  It's the MPEG collection of patents that

20  it licenses and pays a payment of about $4,000 twice a

21  year.

22          So the rates that Newegg has paid is

23  nothing really compared to what they're claiming here.

24          The third factor is whether the license

25  would be exclusive or nonexclusive.

1                    Well, you pay more for an exclusive

2    license.  It is clear that all the licenses in evidence

3    are non-exclusive to these patents, every single one of

4    them.

5                    The fourth factor is whether the party

6    holding them wanted to preserve exclusivity, and they

7    didn't.  There's no evidence that they did.

8                    The fifth factor is, are the two parties

9    at the table competitors, or are they a customer and

10   potential client?

11                   It says:  Are they competitors?  And you

12   know why?  Because if you're competing in the same

13   field, you're going to charge more.

14                   These two were not in the same field.

15   Open Market was a software company.  Newegg was an

16   online retailer of electronics.  And I think nearly

17   everybody admitted they weren't competitors.

18                   The established profitability of the

19   commercial inventions and their commercial success,

20   well, we do know that Open Market was successful in

21   getting their press releases out to the public.

22   That's -- that's what we saw.

23                   We saw those press releases they put out.

24   So what?  They weren't profitable with these inventions

25   either by licensing or by putting them in the Transact

1   product.

2                    13.  I think 13 is unlucky 13 for

3   Soverain.  This, I believe, is probably the most telling

4   factor.  The portion of the profits that's due to the

5   patented inventions as compared to the portion of the

6   profits due to other factors, such as unpatented

7   elements or unpatented manufacturing processes or

8   features or improvements developed by Newegg.

9                    First and foremost, Mr. Nawrocki did not

10  make an apportionment of the profits due to the

11  inventions.  He didn't do it.  And it's their burden of

12  proof on these damages.  He didn't do it.

13                    And you, finally, can consider economic

14  factors that business people, ordinary prudent business

15  people, would reasonably consider at that time.

16                    There was a question brought up about the

17  Odimo license and the fact that it recites in it that

18  it's based on 85 -- 85 cents a transaction.  It does,

19  but it's one year.

20                    And I think I went through that in great

21  detail, that it's a paid-up license for the life of the

22  patents and based on a calculation done in year one.

23  Paid up forever.

24                    That's the way most of these licenses

25  were that recite a percentage.  In fact, I'll go out on

1  a limb and say all of them that recite a percentage.

2  Ms. Wolanyk herself acknowledged -- and let me say this

3  about Ms. Wolanyk.  I have great admiration and respect

4  for her and what she has accomplished and her position,

5  but this case is not about that.

6              Let's take what she said.  She -- she was

7  basically truthful in what she said.  And I would ask

8  you not to decide this case on the basis of who you like

9  the best.

10             And, you know, the Plaintiff, by

11  tradition, gets to sit at the table where they are.

12  They get to sit there like they're in a receiving line

13  at a wedding and greet you each day.  And that should

14  have nothing to do with anything really.

15             Ms. Wolanyk is a fine person, but she

16  said that most of the licenses were upfront, lump-sum,

17  paid-up.  She never even mentioned, although she had

18  every opportunity, licenses for running royalties.

19             So I want to ask you, when you fill in

20  the verdict form, to answer no on infringement.

21  Question 1 and Question 2, both of those, answer no.

22  On validity, I ask that you answer yes to each one of

23  those blanks.

24             And then on the damages, the fourth

25  question, you're asked there to allocate your damages

1  between the '314 and the '492 and '639.

2                    How in the world can you do that?

3  Mr. Nawrocki didn't really give you a basis for doing

4  that.  You don't know from an economic standpoint.

5  There was no analysis of what each patent contributes to

6  the financial results here.  There's no analysis of

7  that.

8                    But however you do it, let's take

9  two-thirds and one-third.  Let's take his 40 cents and

10  80 cents, totaling a buck twenty as our percentage.  But

11  the damages, according to a sound economic analysis by

12  Mr. Bakewell, based on real-world evidence, not ignoring

13  it, is less than $500,000.

14                    So if you answer that question at all,

15  justice and fairness dictates that your answer be less

16  than $500,000.  That's the evidence.

17                    I'm watching the clock, and I know I'm

18  about out of time, and there's so many things that I can

19  think of that I wish I could say.  Time won't permit it.

20                    But I'm comforted by this fact:  There

21  are eight of you over there.  I've added up your ages.

22  We have over 350 years of life's experience sitting

23  right over there in the jury box.

24                    And I believe -- based on my experience

25  with trusting juries, I believe that among you, you

1 heard it all, and you can do a better job than I could

2 of standing up here and telling you all the additional

3 reasons that exist in this record for no infringement

4 and no damages or very low damages, below $500,000.

5           So I have to trust that, and I do.

6 And I say once again, I'm proud of Newegg for taking a

7 stand and being willing to face a jury and accept the

8 result, because I believe that justice will be done.

9           And we don't ask you for help, and we

10 don't ask you for any favor.  We ask that you ground

11 your decision in the law given to you by the Court and

12 as included in the evidence and as blessed by your

13 conscience, and that's all we can ask, and we await your

14 verdict.

15           THE COURT:  Thank you, Mr. Sayles.

16 Mr. Adamo --

17           MR. ADAMO:  Thank you, Your Honor.

18           THE COURT:  -- rebuttal argument; 15

19 minutes.

20           MR. ADAMO:  I have 15 minutes left, Your

21 Honor?

22           THE COURT:  Yes.

23           MR. ADAMO:  Would you give me -- would

24 Your Honor mind giving me a two-minute warning?  We'll

25 make this like this is a football game.

```
 1                THE COURT:  Two minutes?

 2                MR. ADAMO:  Two minutes, please.

 3                THE COURT:  Okay.

 4                MR. ADAMO:  Thank you.

 5                I'm not asking this jury to do me any

 6  favors.  This just goes to show you that -- I believe

 7  it's Cardinal Richelieu who was once quoted -- at least

 8  it was in a Three Musketeers movie that I remember

 9  seeing, so that's where I learned it from -- give me six

10  lines, and I'll come up with a reason to hang the most

11  honorable of men.

12                By help, I meant to get Newegg to do what

13  it should have known to do without us having to file a

14  lawsuit.  And in this court, you're the only ones who

15  can do that.

16                I have come before you showing you

17  evidence.  I didn't even do what Mr. Sayles did and tell

18  you how to answer the verdict form, did I?  I guess if I

19  wanted your help, I would have told you what to do.  I

20  didn't do that.  So let's get focused to what counts

21  here.

22                I told you I was going to be a little out

23  of the ordinary.  I'm going to try to do this almost

24  like a two-minute drill.

25                Now, as I'm sure you all know, I am from
```

1  Dallas, but plainly, I'm not from here, okay?  I've been
2  in Dallas since 1988.  I do talk quickly.  I'm going to
3  watch you to try to make sure that you're with me, but
4  I'm going to try to cover a lot of ground in a very
5  short period of time.
6              Let's start with the comments about
7  active inducement of infringement.
8              All right.  Mr. Sayles seems to have read
9  over the part of the jury charge that says known or
10  should have known.  You heard an awful lot about known,
11  but you didn't hear anything about or should have known.
12             And if you look at No. 3, you'll find
13  it's in there.
14             These folks have been in this lawsuit
15  since November of 2007.  And as this lawsuit went on,
16  they were given more and more information from us about
17  why we felt that they infringed and why their conduct
18  was improper.
19             So the more they stayed in the lawsuit,
20  the more they learned.  And the should have known came
21  into effect more and more every day.
22             Advertising, you recall I spent some time
23  with Mr. Cheng about inducement in the advertising.
24  Remember the websites and how they had bought the
25  advertising, and it led to such huge advantages for them

124

 1   sales-wise.  That's evidence, as you look at the Judge's

 2   charge, to indicate that there's inducement.

 3                     We're tired.  You're tired.  But,

 4   plainly, Mr. Sayles and I are tired, because Mr. Sayles

 5   normally would not have missed such an obvious thing as

 6   that.  But he's missed some other things in some of the

 7   discussions he's had with you.

 8                     I didn't say anything about source code.

 9   He says that I did.  I can guarantee you, I'm not that

10   sleepy that I don't remember what I'm talking about

11   here.

12                     He says there's no evidence about what

13   our CompuServe articles to the Patent Office disclosed.

14   You remember that?

15                     You remember me running around like a

16   chicken with my head cut off yesterday afternoon at the

17   end of the day, while Mr. Giannetti was taking redirect

18   examination from Dr. Shamos?

19                     I put up on the screen, and Dr. Shamos

20   testified about one of the CompuServe articles that was

21   in the Patent Office.  So there's the evidence.

22                     And Dr. Shamos testified, it's even

23   better than these third-hand books.  It was a CompuServe

24   internal document that described the system.  Yesterday

25   afternoon.  So I'm not quite sure how that got lost in

1  memory here.

2              That little -- I think VENN diagram is

3  what it was called, if I'm remembering this correctly.

4  I've never been much of a mathematics; but the big

5  thing, and Mr. Sayles was very proud of putting the

6  little dots in there, we keep hearing about 66 percent

7  of the code and the functionality.

8              I forgot where Wal-Mart was, a 24-hour

9  one, this morning; or I would be holding up a spark plug

10 right now.

11             How much of an engine is a spark plug,

12 all right?  A spark plug is an exceedingly small part,

13 but that's what makes your car run.  Take the spark

14 plugs out of the car, and you won't go two blocks.

15             Take the shopping cart and the session

16 identifier out of Newegg's system, and they won't sell a

17 nickel of anything.

18             So a small amount of code doesn't tell

19 you anything about the functionality.  But you heard

20 Mr. Wu say -- and I quoted it, and I won't quote it

21 again, but you heard Mr. Wu say:  We stick with the

22 system.  We've got tremendous performance because of the

23 shopping cart.

24             You take the shopping cart and the 60.66

25 (sic) percent of code out of this thing, and the system

1   will look at you dumb.  How much more important can you

2   possibly think of something being?

3               Doctrine of Equivalents.  Counsel got up

4   here and told you about what was or wasn't a substantial

5   difference.  Well, I guess if I was in his shoes, I'd

6   try to do the same thing.  There's just one problem.

7   What he says isn't evidence.  He's not an expert.

8   And he would be the first one, I would hope, with candor

9   to admit it.  The Judge instructed you, what he or I say

10  is not evidence.

11              And Mr. Tittel, who's the person it

12  should have come from as to whether this was, in fact,

13  substantial or insubstantial -- Dr. Grimes testified it

14  was insubstantial.  Mr. Tittel was silent.  He didn't

15  offer an opinion.

16              So there's no countervailing evidence.

17  And Mr. Sayles' argument isn't evidence, according to

18  the Judge's instructions.  And I know you-all are going

19  to follow the instruction.

20              I was waiting to see if that little round

21  and round chart that they're so proud of was going to

22  come back up.  I'll show you why in a second.

23              Skip the first one.  Start at 135.

24  Let me just show you what has been in front of the

25  patent -- no, not that one.  We'll come back.  That's

1  the end.  I changed the order.  Go to the next one.  Go

2  to the one -- well, I'm going to tell you the story

3  about the goats and the cabbages at the end, not at the

4  beginning.

5               All right.  Here is what Dr. Shamos

6  testified about yesterday.  This is CompuServe Mall in

7  front of the PTO during the prosecution of the '314

8  patent, okay?

9               All right.  Here's two more pieces --

10  three more pieces of CompuServe Mall art in front of the

11  PTO during the '314 reexamination.

12               Here's one, two, three pieces of

13  CompuServe Mall art in front of the PTO during the

14  original -- I'm sorry -- during the '492 reexamination.

15  Here's the fourth piece.

16               And there's the three pieces of

17  CompuServe Mall information before the PTO during the

18  '639 patent.

19               They tried to run -- not these folks, but

20  amazon.com tried to run the argument that the PTO -- to

21  the PTO that the two patents -- all three patents -- two

22  patents, '314, '492, should have been invalidated over

23  this art.  The PTO didn't buy it.

24               So now they're trying to run the same

25  argument before you folks.  It's not clear and

1  convincing evidence on this point.

2                   Customer action.  We got back to the

3  customer action again.  I would just remind you what

4  Dr. Grimes testified to repeatedly.  The system claims

5  don't require a customer to do anything.  They are on

6  the Newegg site.

7                   You've got Mr. Sayles' argument to you.

8  That's not what the claims cover.

9                   Is the customer computer part of the

10 system?  Absolutely.

11                  Was the system designed to include the

12 customer computer?  Absolutely.

13                  Does the customer have much choice to do

14 anything other than follow the system once you're in the

15 system?  Absolutely not.

16                  Mr. Tittel.  Now, I mean no disrespect to

17 Mr. Tittel, but you have to go back there and

18 essentially decide whether you're going to do what

19 Mr. Sayles wants you to do, told you you should do on

20 the verdict on infringement and validity based on

21 Mr. Tittel.

22                  I would suggest to you, be cautious.

23 Here's why.  The big round and round circle chart that

24 they're so proud of about the way that supposedly

25 operates, well, this is the testimony that Dr. Grimes

129

1  relied on from Mr. Wu about whether it took place in two

2  steps -- remember, their big argument, both things move

3  around and drop in at the same time.

4              Well, that's not what Mr. Wu testified

5  to.  Mr. Wu testified that there are two steps.  It's

6  right there.  Then we go through the second step with

7  this ID.  That's the testimony that Dr. Grimes -- I'm

8  sorry.  I keep doing this.  I have a very good friend

9  whose name is Dr. Grimes.

10             That's the testimony that was cited

11 during our presentation.  That's not the testimony that

12 Mr. Tittel is relying upon.  So you have got to be

13 cautious.  Mr. Tittel is not relying on what Mr. Wu

14 testified to as to how the system runs.

15             Now, there are some other issues with

16 Mr. Tittel that, again, I would caution you about.

17 Mr. Tittel and his own client aren't in agreement.

18 Remember this back and forth about his html programming?

19             Question:  Mr. Tittel, html is not

20 considered a programming language.  The claim says

21 programming, not programming language.

22             But look at what Mr. Wu says.  In your

23 experience, is there any relationship to the job you had

24 in developing an E-commerce?

25             Answer:  All of the programming, already

1  I have experience.  Web server, html.

2                      You see it?  Mr. Wu considers html to be

3  programming.  Mr. Tittel doesn't.

4                      There's more.  Mr. Tittel says:  Well,

5  you can just look at a book, read it, and you can figure

6  out what's going on under the hood with respect to the

7  software.

8                      I asked Mr. Wu the same thing on cross,

9  and I said:  You look at the website -- I'm sorry.  It

10  wasn't me.  It was Mr. Sayles.

11                      Question:  Does that tell you anything

12  about the source code?

13                      Answer:  No.  Just major -- several steps

14  adding-to-cart, checkout, browsing.  That's just the use

15  case.

16                      But the first answer is the one that

17  counts, no.

18                      Tittel going left; Wu going right.

19                      The database.  Did the books on

20  CompuServe disclose a shopping cart database connected

21  to a shopping cart computer?

22                      Mr. Tittel says:  Yes, they do.

23                      Mr. Trevor, boy, he's not in agreement

24  with that.  As I said, those books don't -- they're not

25  implementation guides.

1                    Messaging.  Same thing.  Are the

2   limitations of this clause set forth in the CompuServe

3   books?  Yes, they are.

4                    Back comes Mr. Trevor.  He's the

5   CompuServe expert.  What did Mr. Trevor say?  I

6   didn't -- it doesn't say that, no.

7                    Shopping cart.  The personal holding file

8   is on the server, and that's where we find our shopping

9   cart.

10                   Back comes Mr. Trevor, well, document

11  doesn't address implementation.

12                   And Dr. Shamos testified that, yeah,

13  there's a shopping cart file, but it's not in the

14  database.  It's in the mainframe.

15                   Remember that?  That was just yesterday

16  afternoon.  It's got to be in the database.  If it's not

17  in the database, it's in the mainframe.

18                   And then I can't take credit for the

19  title, and it's not meant to be disrespectful, but the

20  Tale of Two Tittels, he's not even agreeing with

21  himself.

22                   Do you think you know more about what

23  CompuServe has implemented than Mr. Trevor?

24                   First answer:  Absolutely not, sir.

25                   Second answer:  I'm just asking whether

1  you think you can find things that Mr. Trevor can't?

2  Yes.

3                   I want to just leave you with some

4  thoughts.

5                   Mr. Treese:  I'm proud of my work.

6                   Question:  Why?

7                   Answer:  That work and the work at Open

8  Market influenced the evolution of doing business in the

9  software that we used for it on the internet.

10                   Question:  Mr. Ghosh, do you have an

11  opinion as to the value?

12                   Answer:  No.

13                   Question:  The shopping cart?

14                   Answer:  No.  It's one of the pieces

15  that's necessary.  It's hard to imagine someone doing

16  shopping without some functionality like that.

17                   This is the spark plug in the engine of

18  Newegg's entire business.

19                   Question:  Do you have any opinion as to

20  the value of the methods?

21                   Answer:  It's critical.  So without

22  state, it's really hard to imagine how you could conduct

23  conduct -- excuse me -- conduct commerce, or for that

24  matter, anything of any value.

25                   Ms. Wolanyk.  We were listing out all of

1    the various people who are licensed.

2                    Question:  Is the company that you still

3    believe is using your technology without permission and

4    isn't willing to pay for Newegg?

5                    Answer:  Correct.

6                    And, Ladies and Gentlemen, this is a

7    professional person running a major company.  We're not

8    asking you to give her company a verdict under the law

9    and the facts just because you like her.

10                   Question:  Mr. Bakewell, at the

11   hypothetical negotiation, Newegg's only option is to

12   take a patent license, right?

13                   Answer:  That's right.

14                   You got Mr. Sayles again coming back up

15   and saying:  Oh, heck, they could have taken a software

16   license.

17                   THE COURT:  You have about two minutes

18   left.

19                   MR. ADAMO:  Understood, Your Honor.

20                   Well, that's not what Mr. Bakewell says.

21   That's not what you can do in the hypothetical

22   negotiation.  You have to take a patent license, not a

23   software license.

24                   So you keep hearing about this confession

25   and avoidance about software licenses.  And let me back

1  up just one second.  I want to say a few more words

2  about Mr. Bakewell.

3              Remember Mr. Satine, with Mr. Bakewell,

4  trying to get Mr. Bakewell to talk about the book of

5  wisdom and knowing what you would know in 2001, like the

6  point -- the 85-cent-per-transaction license, the Odimo

7  license and projecting forward?

8              Nobody starts a major business without

9  doing forward projections.  By the time this lawsuit

10  came up, there simply weren't the documents available,

11  as Mr. Nawrocki testified, okay?

12              Mr. Sayles comes back on redirect, and

13  all of a sudden, out of the blue, we've got Mr. Bakewell

14  agreeing that, oh, yeah, the book of wisdom, seven to

15  nine later, later data might be considered, but along

16  with, within the context of other contemporaneous data.

17              That's exactly our point.  You do look

18  forward, you do look at their projections, and you do

19  look at what they have done now.  And you would have

20  done it then.  It took his own lawyer to get

21  Mr. Bakewell to admit what he should have admitted

22  straight out to Mr. Satine.

23              Last point on the numbers.  Here's

24  Newegg's position.  Soverain damages of half a million,

25  .2 percent of Newegg's projected/incremental profit of 6

135

1    percent, .0125 percent of Newegg's accused sales of --

2    that number is so big, I'm not even going to read it.

3    It's 4 billion and 700 whatever.

4              Newegg keeps 98.8 (sic) percent of its

5    profits.  Here's what our position is:  33,979,805.  Is

6    it a lot of money?  Yes, because of their use.  That's

7    10 percent of their projected/incremental profit of 6

8    percent, .7 percent of the 4,000,794,000, and it's 90

9    percent of the profit.

10             Without this invention driving that

11   engine, there wouldn't be any profit.

12             Right to the beginning.

13             Last point.  Now I'm going to tell you

14   the story.  The old story of the cabbages and the goat.

15   Because as I've looked back at the defense here, this is

16   what the book is like.

17             Here's the story.  The owner of a cabbage

18   patch sued a neighbor for common-law trespass and

19   conversion.  Her single and simple assertion was that

20   the neighbor's goat ate her cabbages.

21             The neighbor responded with several

22   defenses.  You don't have any cabbages.  If you did have

23   cabbages, they weren't eaten.  If they were eaten, it

24   wasn't by a goat.  If they were eaten by a goat, it

25   wasn't my goat.  And if it was my goat, the goat was

1  insane.

2              We don't infringe, but if we do infringe,

3  the patent is not valid; but if the patent -- if we

4  infringe and the patent is valid, we don't owe you any

5  money.

6              We thank you very much for spending four

7  days of your week with us.  My client, my colleagues, my

8  partners, all of the people that you don't -- you

9  haven't seen, we really, really, really appreciate your

10  sitting as our jury here.  We know you will follow His

11  Honor's instructions.

12             We know, from seeing you, that you've

13  taken this all very seriously.  You've taken your oath

14  as a juror very seriously.

15             I don't want help.  I want you to take

16  the evidence we've presented with His Honor's reading of

17  the law, and I want you to go back, and I want you to

18  deliberate; and I'm hopeful that when you do, my

19  suggestions as to how to fill the verdict form out will,

20  when you make your minds up, not from me telling you,

21  will be how you judge the case.

22             I thank you very, very much.

23             Your Honor, that completes my closing.

24             THE COURT:  Thank you, Mr. Adamo.

25             All right, Ladies and Gentlemen of the

1  Jury.  You've heard the opening statements, all the

2  evidence, the charge, the closing arguments, and so now

3  it's time for you to retire to the jury room to begin

4  your deliberations.

5                    Your first action should be to elect your

6  foreperson, and then you should decide how you wish to

7  proceed.

8                    Sandwiches have been brought in for you.

9  You may want to take 30 minutes and just eat and not

10  talk about the case or you may want to get right into

11  it.  That, again, will be up to you.

12                    If you want to take a break, go outside,

13  or for whatever reason, just send me a note, let me know

14  what you'd like to do.  I'll respond, telling you that

15  that will be fine.

16                    Deliberate.  Take a break.  We're on your

17  schedule at this point, so you let us know what we can

18  do for you.

19                    If you need anything, any other drinks or

20  snacks or anything of that nature, please let us know.

21                    Thank you again for your very attentive

22  attitude throughout the course of the trial and during

23  closing argument.  At this time, you are excused to the

24  jury room to begin your deliberations.

25                    COURT SECURITY OFFICER:  All rise for the

1  jury.

2                  (Jury out.)

3                  THE COURT:  Please be seated.

4                  All right.  Anything further from the

5  Plaintiff?

6                  Anything further from the Defendant?

7                  MR. ADAMO:  No, Your Honor.

8                  MR. SAYLES:  No, Your Honor.

9                  THE COURT:  All right.  Very well-tried

10  case on both sides.  We'll be in recess awaiting the

11  jury's verdict.

12                  COURT SECURITY OFFICER:  All rise.

13                  (Jury deliberations.)

14

15                  (Jury out.)

16                  COURT SECURITY OFFICER:  All rise.

17                  THE COURT:  Please be seated.

18                  All right.  The Court has a note from the

19  jury, Juror Note No. 2, and it says:  Is inducement the

20  same as indirect infringement?

21                  And the Court would propose to answer --

22  the Court would propose to answer:  Inducement is a type

23  of indirect infringement.

24                  Is there any objection?

25                  MR. SAYLES:  There is no objection, but

1    we would request that you -- that you simply add that

2    that they should review the Court's instructions and

3    continue their deliberations.

4                    THE COURT:  Okay.

5                    MR. ADAMO:  I'm fine with that, Your

6    Honor.

7                    THE COURT:  With what he's suggesting?

8                    MR. ADAMO:  Yes, sir.  Otherwise, no

9    objection.

10                    THE COURT:  Okay.

11                    MR. ADAMO:  And I guess that would be

12    4.2, Your Honor.

13                    THE COURT:  4.2?

14                    MR. ADAMO:  4.2, yes.

15                    THE COURT:  Defendants agree?

16                    MR. SAYLES:  Yes.

17                    THE COURT:  Okay.  I'm not going to tell

18    them to continue their deliberations.  I think they know

19    that, but -- all right.

20                    We'll be in recess.

21                    MR. SAYLES:  Judge, would you tell us who

22    signed it?

23                    THE COURT:  Yes.

24                    Who signed that, Ms. Ferguson?

25                    COURTROOM DEPUTY:  Kristi Develin.

1                    THE COURT:  Who?

2                    COURTROOM DEPUTY:  Kristi Develin.

3                    THE COURT:  Kristi Develin.  Which one is

4   she, right front?

5                    MR. BALDAUF:  She's the one that was

6   asking questions during the --

7                    THE COURT:  Okay.  Thank you.

8                    All right, Ms. Ferguson.

9                    Counsel approach the bench, if you would.

10                   THE REPORTER:  Is this on the record?

11                   THE COURT:  No.  It's off the record.

12                   (Bench conference off the record.)

13                   (Court in recess.)

14                   (Jury deliberations continue.)

15                   (Jury out.)

16                   COURT SECURITY OFFICER:  All rise.

17                   THE COURT:  Please be seated.

18                   All right.  I've been informed we have a

19   verdict.  Is there anything before I bring the jury in?

20                   MR. SAYLES:  No, Your Honor.

21                   MR. ADAMO:  No, Your Honor.

22                   THE COURT:  All right.  You may bring the

23   jury in.

24                   COURT SECURITY OFFICER:  All rise for the

25   jury.

141

```
 1                    (Jury in.)

 2                    THE COURT:  Please be seated.

 3                    All right.  I understand that you've

 4   reached a verdict; is that correct?

 5                    THE FOREPERSON:  (Nods head.)

 6                    THE COURT:  All right.  If you'll hand

 7   the verdict to the court security officer, please.

 8                    THE FOREPERSON:  (Complies.)

 9                    THE COURT:  All right.  Ms. Ferguson, if

10   you will, please read the verdict.

11                    COURTROOM DEPUTY:  In Case

12   No. 6:07-CV-511, Soverain versus Newegg, verdict.

13                    Under infringement, as to direct

14   infringement on the '314 patent and the '492 patent, the

15   answer is no.

16                    Under inducement, as to the '314 patent

17   and the '492 patent, all the answers are yes.

18                    On Question No. 2, as to the '639 patent,

19   as to Claim 60 and 79, the answer is no.

20                    Under invalidity, as to the '314, the

21   '492, and the '639 patent, the answer is all no as to

22   all claims.

23                    Under damages, the answer to Question No.

24   4 is 2 million 500 dollars (sic) as to patent '134 or

25   the '492 patent.
```

1            As to the '639 patent, the answer is

2 zero, signed and dated by the jury foreperson.

3            THE COURT:  All right.  Thank you,

4 Ms. Ferguson.

5            Is there any request to poll the jury?

6            MR. ADAMO:  Yes, Your Honor, please.

7            THE COURT:  All right.  All members of

8 the jury who that represents your verdict, as

9 Ms. Ferguson just read it, if you will please stand.

10            (All jurors stand.)

11            THE COURT:  All right.  Thank you.  You

12 may be seated.

13            All right.  Members of the Jury, first,

14 the Court wants to thank you for your service here this

15 week.  You have all worked extremely hard.  It's been a

16 long, tedious case.  You've listened intently, and you

17 provided a valuable public service, which is critical to

18 the administration of justice guaranteed under our

19 Constitution.

20            Without your patient and humble service,

21 these guarantees could not be met, and the Court thanks

22 you for your service.

23            You have now completed your service.  You

24 have previously been instructed by me not to discuss

25 this case with others, including your family and

1   co-workers.  You are now relieved from that constraint.

2                    You are now allowed to discuss this case

3   and your experiences as a juror with whomever you wish.

4   However, you should never feel as if you are required to

5   discuss your experience.  Your privacy is valuable and

6   should never be jeopardized by your service, so don't

7   ever feel as if you are required to discuss your

8   experience if you don't wish to.

9                    To that end, I have instructed the

10   attorneys in this case and now instruct them not to

11   contact you in any manner.

12                    I have also instructed the attorneys that

13   any of your personal information that was given to them

14   at the beginning of the case is to be returned to the

15   Court.  This information will promptly be shredded, as

16   will your juror notepads.

17                    If you are contacted in any way by the

18   attorneys or their staff, please contact me immediately.

19                    In addition, you should never feel

20   required to answer to anyone about your service.  If you

21   ever feel harassed or pressured to speak about any

22   portion of your service during this case, please feel

23   free to contact me.

24                    You are to be commended for your

25   honorable service throughout this trial.  I thank you

1  again, and you are dismissed to the jury room.  If you

2  will wait there, someone will be there to finally

3  dismiss you in just a moment.

4                    The jury is excused at this time.

5                    COURT SECURITY OFFICER:  All rise for the

6  jury.

7                    (Jury out.)

8                    THE COURT:  Please be seated.

9                    All right.  The Court prefers to resolve

10  all post-trial issues before entering a final judgment.

11  Accordingly, the Court orders all post-verdict motions

12  to be filed by May 24th; responses are due by June the

13  7th; replies by June 14th; and surreplies by June 21.

14                    The Court sets all post-verdict motions

15  for hearing on Tuesday, June 29th at 9:00 a.m.

16                    Additionally, the Court orders that if a

17  party files more than one motion -- well, this will be

18  in my written order.  I'll enter a written order.  I

19  just have some page limitations on all those motions.

20                    Now, you know, it's pretty obvious to me

21  that this jury just settled y'all's case for you, which

22  you could have done last week very easily and less

23  expensively than you have -- all of you being here in

24  trial this week and everybody worrying about what was

25  going to happen.

```
 1              So I, again, encourage you, you know,
 2    settlement is a hallmark of our system.  If every case
 3    went to trial, you know, it's just -- it's a bad thing
 4    when cases have to go all the way to trial when there's
 5    a reasonable basis to settle it.  And if there's not a
 6    reasonable basis, you shouldn't.
 7                    Who is y'all's mediator in this case?
 8                    MS. WOLANYK:  Mike Patterson.
 9                    THE COURT:  All right.  Would y'all like
10    to go back -- I'm going to send you back to mediation.
11                    Would you like to go back to
12    Mr. Patterson, or do you have someone else that either
13    side would prefer?
14                    MR. CHENG:  Mr. Patterson.
15                    MS. WOLANYK:  Mike Patterson is fine.
16                    THE COURT:  Mr. Patterson?
17                    All right.  I'm going to ask you, within
18    the next -- well, I will say by May 24th, which is when
19    post-verdict motions are due.  But that's going to cost
20    everybody another hundred thousand dollars, you know, in
21    attorneys' fees.
22                    So get your heads together, get with
23    Mr. Patterson, see if you can work out a practical
24    business solution to this problem, and see if we can
25    make it go away.
```

1                  If not, I'll have a hearing on the 29th.

2    We'll enter judgment.  It can go to the Fed Circuit,

3    whoever wants to spend the money to appeal it; and we'll

4    come back and try it again, okay?

5                  Yes?

6                  MR. CHENG:  Your Honor, I hope this is

7    not inappropriate; but even taking what you just said

8    into account about settlement, I just want to say that,

9    you know, we're very thankful for your time and

10   attention to this case; and that I've been practicing

11   law for about 13 years, and this is the first time I

12   have felt like a real lawyer --

13                 THE COURT:  Thank you.  I appreciate that

14   very much.  Very kind of you, Mr. Cheng.

15                 All right.  Very well.  Good job on both

16   sides.

17                 Mr. Adamo?

18                 MR. ADAMO:  I just -- it's 2,500,000?

19                 THE COURT:  Uh-huh.  I believe that's

20   right, isn't it?

21                 And I think you said 2 million 500.

22                 COURTROOM DEPUTY:  Yes, 2,500,000.

23                 THE COURT:  We don't talk in less than

24   thousands around here.

25                 [Laughter]

1                 MR. ADAMO:  That's what I wrote down, but

2  I just wanted to make sure.

3                 THE COURT:  All right.  You're correct.

4                 All right.  Very well.

5                 Anything further?

6                 All right.  Everyone have a good weekend.

7                 We're adjourned.

8                 COURT SECURITY OFFICER:  All rise.

9                 (Court adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

148

```
 1              C E R T I F I C A T I O N

 2

 3   I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled

 5   matter.

 6

 7   /s/

 8   SHEA SLOAN, CSR, RPR

 9   OFFICIAL COURT REPORTER

10   STATE OF TEXAS NO. 3081

11

12

13   /s/

14   JUDITH WERLINGER, CSR

15   DEPUTY OFFICIAL COURT REPORTER

16   STATE OF TEXAS NO. 267

17

18

19

20

21

22

23

24

25
```