```
1               IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                         TYLER DIVISION

3   SOVERAIN SOFTWARE             )
                                  )    DOCKET NO. 6:07cv511
4        -vs-                     )
                                  )    Tyler, Texas
5                                 )    1:00 p.m.
    NEWEGG, INC.                  )    April 28, 2010
6
                         TRANSCRIPT OF TRIAL
7                         AFTERNOON SESSION
               BEFORE THE HONORABLE LEONARD DAVIS,
8          UNITED STATES DISTRICT JUDGE, AND A JURY

9                    A P P E A R A N C E S

10  FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
                             JONES DAY
11                           2727 N. Harwood St.
                             Dallas, Texas  75201-1515
12
                             MR. THOMAS L. GIANNETTI
13                           MR. BARRY R. SATINE
                             MS. CLARK CRADDOCK
14                           JONES DAY
                             222 East 41st St.
15                           New York, New York  10017-6702

16                           MR. CARL ROTH
                             ROTH LAW FIRM
17                           115 N. Wellington, Ste. 200
                             P.O. Box 876
18                           Marshall, Texas  75670

19                           MR. MICHAEL C. SMITH
                             SIEBMAN, REYNOLDS, BURG,
20                           PHILLIPS & SMITH
                             713 S. Washington Ave.
21                           Marshall, Texas  75670

22
    COURT REPORTER:          MS. JUDITH WERLINGER
23
    Proceedings taken by Machine Stenotype; transcript was
24  produced by a Computer.

25
```

```
 1  FOR THE THE DEFENDANTS:  MR. RICHARD SAYLES
                             MR. MARK STRACHAN
 2                           SAYLES WERBNER
                             4400 Renaissance
 3                           1201 Elm St.
                             Dallas, Texas  75270
 4
                             MR. HERBERT A. YARBROUGH, III
 5                           YARBROUGH LAW FIRM
                             100 E. Ferguson, Ste. 1015
 6                           Tyler, Texas  75702

 7

 8                           MR. DAVID C. HANSON
                             MR. KENT BALDAUF, JR.
                             MR. DANIEL H. BREAN
 9                           THE WEBB LAW FIRM
                             200 Koppers Bldg.
10                           436 Seventh Ave.
                             Pittsburgh, PA  15219
11

12                           MS. CLAUDIA W. FROST
                             MR. JEREMY J. GASTON
13                           PILLSBURY WINTHROP
                             909 Fannin St., Ste 2000
14                           Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2               (Jury out.)

 3               COURT SECURITY OFFICER:  All rise.

 4               THE COURT:  Please be seated.

 5               All right.  Do we have something to take

 6  up before the jury comes in?

 7               MR. HANSON:  Yes, Your Honor.

 8               MR. GIANNETTI:  I'm sorry.  May I use the

 9  podium, Your Honor?

10               THE COURT:  Yes, you may.

11               MR. GIANNETTI:  Your Honor, there are

12  going to be two witnesses coming up, and I wanted to

13  raise a couple of evidentiary matters.

14               First with respect to Mr. Treese.  From

15  the documents that we've been provided by counsel, it

16  appears that Mr. Treese is going to be asked about a

17  paper, the Trewitt, T-R-E-W-I-T-T paper, which is

18  Defendant's Exhibit 26.  This is a paper written by a

19  DEC employee, which was originally authored --

20               THE COURT:  A staff employee of who?

21               MR. GIANNETTI:  A DEC employee.

22               THE COURT:  Oh, a DEC employee.

23               MR. GIANNETTI:  DEC, D-E-C, DEC employee.

24               It was originally offered in support of

25  the Defendant's prior art defenses, invalidity defenses.
```

1    It was the subject of our Motion in Limine No. 22.  They

2    agreed to the motion, and so the paper is out of the

3    case as prior art.

4                I understand, however, that they are --

5    they have some other theory under which they want to

6    bring it in, and they want to ask Mr. Treese about it.

7    And so my -- my motion is that -- well, actually, the

8    motion's already been granted.  And so my request is

9    that this Trewitt paper be excluded and that they be

10   prevented from questioning Mr. Treese about the paper

11   since it doesn't have any -- since it's not prior art.

12   It doesn't have any relevance.  It's out of the case.

13                MR. HANSON:  Your Honor, we're offering

14   it as evidence of state of the art and level of skill in

15   the art.  We're not offering it as prior art.  It may

16   seem like a distinction, but -- and it is a distinction.

17                And I have a case here, Your Honor, which

18   I provided to the other side, in which the Court of

19   Appeals for the Federal Circuit allowed documents which

20   were not prior art to be used to show the level of skill

21   in the art.

22                The level of skill in the art, as this

23   Court well knows, is one of the factors in determining

24   whether or not a claimed invention is obvious or

25   non-obvious.  And that's why we're offering it.

1                    THE COURT:  And what is -- what -- excuse

2    me.  Go ahead.

3                    MR. GIANNETTI:  Two things, Your Honor.

4    The level of skill of the art not in dispute.  There was

5    an agreed-to jury instruction that sets a level of skill

6    in the art.  So I don't see that this is relevant to

7    anything in the case.  There's no dispute over what the

8    level of skill in the art is.

9                    And I will be happy to address their

10   case, Your Honor.  It was an unusual situation.  It was

11   nothing like this in their case.  In fact, I will hand

12   up a copy of it.

13                   While it's true in this case that the

14   Court did admit it -- I'm on Page 13, Your Honor, which

15   I've highlighted -- this case was an unusual situation

16   where the person who was the proponent of the prior art,

17   a fellow named Lund, his level of skill was below that

18   of the ordinary skill in the art.  And the question was

19   whether if something was -- first of all, it came in on

20   the issue of motivation to combined references, which is

21   not what they're offering it for; and, secondly, the

22   author of this particular piece of prior art was agreed

23   to be a person of less than ordinary skill in the art.

24   And that's certainly not the case with Mr. Trewitt.

25                   So this is really just a back-door way of

1    getting around this motion in limine, which they agreed

2    to, which says that this does not come in as prior art.

3    It's not relevant to any issues in the case, and their

4    case does not support this authority.

5                I think Your Honor should exclude this

6    evidence.

7                MR. HANSON:  If I may, Your Honor, I

8    would point out one more thing.

9                This document was supplied to the Patent

10   Office and is part of the file history of the '639

11   patent, the reexam of the '314, and the reexam of the

12   '492 patent.  So, it's part of the record before the

13   Patent Office.  And I believe, under those

14   circumstances, it's allowable as evidence of level of

15   skill in the art.

16               MR. GIANNETTI:  May I respond to that,

17   Your Honor?

18               THE COURT:  Yes, you may.

19               MR. GIANNETTI:  The Patent Office

20   concluded it wasn't a publication, and, therefore, not

21   prior art.  So it's consistent with our motion in

22   limine.

23               THE COURT:  All right.  The objection is

24   sustained.  All right.  What else?

25               MR. GIANNETTI:  The second issue is

1   Mr. Trevor -- no, excuse me.   Just a second.

2                  The second issue relates to Mr. Trevor's

3   testimony.   Mr. Trevor is going to be testifying about

4   certain book excerpts, and these are Defendant's

5   Exhibits 2, 3, and 4.   I think, Your Honor, I will hand

6   up copies of them.   And we objected to these as hearsay.

7   We would just like to renew our objection, you to

8   entertain our objection.

9                  These plainly are hearsay when offered as

10  corroboration for what the CompuServe Mall was, which I

11  believe that's what its purpose is.

12                 THE COURT:   These are the CompuServe

13  manuals?

14                 MR. ADAMO:   Yes.

15                 MR. GIANNETTI:   These are the manuals,

16  Your Honor.

17                 THE COURT:   Okay.

18                 MR. GIANNETTI:   And we would renew it.

19  They're not only hearsay, but they're double hearsay.

20  And they're not subject to any exception.   We believe

21  they should be excluded.

22                 THE COURT:   All right.   Response.

23                 MR. HANSON:   There is an exception.

24  There is the 807.   These are books that are published.

25  We'll be able to establish with evidence that witness

1  has seen them when they were published.  And there's no

2  evidence to show that the authors didn't actually have

3  personal knowledge of them; and there's evidence to show

4  that the authors did have personal knowledge of them.

5           MR. GIANNETTI:  Your Honor, they

6  shouldn't be offered for the truth.  And these are

7  Exhibits 2 through 5.

8           MR. HANSON:  I do --

9           THE COURT:  Excuse me.  Go ahead.

10           MR. HANSON:  I believe this was one of

11  the issues that was already argued on a motion in

12  limine, and decided.

13           MR. GIANNETTI:  I believe it wasn't

14  decided finally, Your Honor.

15           THE COURT:  Well, it is now.  It's

16  overruled.

17           What's next?

18           MR. GIANNETTI:  One further matter with

19  respect to Mr. Trevor.

20           You recall the Court ruled that

21  Mr. Trevor's testimony must be corroborated.  I believe

22  that was the ruling on the motions in limine.  So we

23  would -- we would request the Court to take Mr. Trevor's

24  testimony under Rule 104(b) of the Federal Rules of

25  Evidence, which is the rule that permits relevancy of

1  testimony to be conditioned on facts.  I will hand up a

2  copy of the rule here, Your Honor.  I have highlighted

3  the relevant portions.

4            Basically, the way this -- the way we

5  understand this rule, Mr. Trevor would be permitted to

6  testify.  The Defendants would be -- have the burden of

7  establishing that the testimony is corroborated.  And if

8  they fail in that endeavor, as we believe they will,

9  Your Honor would have to exclude the testimony.  So, in

10  other words, his testimony would be conditioned on their

11  being able to prove that it's corroborated.

12            We believe that's consistent with the

13  rule and also consistent with Your Honor's prior ruling

14  that Mr. Trevor has to be corroborated.

15            THE COURT:  Response.

16            MR. HANSON:  Mr. Trevor's testimony will

17  be closely tied to the documents that you have just

18  accepted into evidence.

19            MR. GIANNETTI:  That --

20            MR. HANSON:  There's a rule of reason

21  with regard to corroboration, and it doesn't have to be

22  word-for-word, but it will be very close to what has

23  actually been set forth in the books.

24            MR. GIANNETTI:  Your Honor, that's just

25  the problem.  Our view is the books don't corroborate.

1    The books are so general and so nondisclosive of the

2    technical details.

3              THE COURT:  You can make an objection or

4    motion at the appropriate time, but I will hear the

5    testimony, and we will see whether -- whether they tie

6    it together sufficiently.

7              MR. GIANNETTI:  Okay, Your Honor.

8              And one final thing.  I just want to

9    remind the Court that Mr. Trevor is appearing here as a

10   fact witness.  And when we discussed this situation

11   before, I think you said that he would not be permitted

12   to testify as an expert.

13             And during the course of his examination,

14   we're going to be watching that pretty closely, I'm

15   sure.  And I don't think this is a situation that's

16   appropriate for lay testimony.  This is the kind of

17   technical information where only experts who have

18   submitted reports and are properly qualified before the

19   Court should be permitted to give opinion testimony.

20             THE COURT:  Very well.  Thank you.

21             MR. HANSON:  And one more exhibit, Your

22   Honor.  We want to offer Exhibit 156, which is called

23   the CompuServe Mall video, because we understand that

24   Soverain has withdrawn their objection to it.

25             MR. GIANNETTI:  Your Honor, I understand

1   this is going to be part of Mr. Trevor's testimony.

2                    MR. HANSON:  That's correct.

3                    MR. GIANNETTI:  We will admit it on that

4   basis.  Certainly it's illustrative of what he's going

5   to be testifying about.

6                    THE COURT:  Very well.  Be admitted.

7                    Anything further?

8                    Bring the jury in.

9                    COURT SECURITY OFFICER:  All rise for the

10  jury.

11                   (Jury in.)

12                   THE COURT:  All right.  Please be seated.

13                   MR. HANSON:  Your Honor, at this time we

14  call Mr. Treese on cross-examination.

15                   THE COURT:  All right.  Mr. Treese.

16                   MR. ADAMO:  He's in the witness room,

17  Your Honor.  One of my colleagues is going to get him.

18                   THE COURT:  Okay.

19                   MR. ADAMO:  Oh, there he is.

20        G. WINFIELD TREESE, DEFENDANTS' WITNESS,

21                    PREVIOUSLY SWORN

22                    DIRECT EXAMINATION

23  BY MR. HANSON:

24        Q    Good afternoon, Mr. Treese.

25        A    Good afternoon.

1      Q      Good to see you again.  I have a number of

2   questions, and I think we can go through this pretty

3   quick.

4             When you were at DEC Cambridge research lab,

5   you did work with the internet; isn't that correct?

6      A      That's correct.

7      Q      And at that time you were familiar with the

8   tools of the internet, such as html?

9      A      Yes.

10     Q      Http?

11     A      Yes.

12     Q      And URLs?

13     A      Yes.

14     Q      What is html again?

15     A      Html is the language we use to describe what

16  is presented on a web page.

17     Q      And http is?

18     A      Http is the protocol or the method of

19  communication between a web browser and a web server.

20     Q      And a URL is what?

21     A      URL is the name or the address of a web page.

22     Q      And were you also familiar with the anchor

23  feature of html?

24     A      Yes.

25     Q      And what is the anchor feature of html?

1    A    The anchor feature lets a URL specify not only

2  the web page but a particular part of the web page, like

3  a paragraph somewhere on the page.

4    Q    And isn't it a fact that this is the basis of

5  hypertext when working with the worldwide web?

6    A    URLs are the links we use in the worldwide

7  web, yes.

8    Q    And not one of these items, html, http, URLs

9  or hypertext links, were invented by DEC or Open Market;

10  isn't that correct?

11    A    That is correct.

12    Q    Now, just before -- well, during the time you

13  were at DEC, you -- did you work with the mosaic

14  browser?

15    A    Yes, I did.

16    Q    And was the mosaic browser the first graphic

17  user interface type browser?

18    A    It was the first one that I used.

19    Q    And can you explain to the jury what is a

20  graphic user interface browser?

21    A    A graphic user interface browser is one that

22  can use pictures, drawings, and text as well as colors,

23  different fonts, and things like that, to provide a rich

24  presentation of information.

25    Q    And isn't it a fact that neither DEC nor Open

1    Market invented or developed the mosaic browser?

2        A    That's correct.

3        Q    And, in fact, it was developed by the NCSA, or

4    the National Super Computer Applications organization

5    that was at the University of Illinois?

6        A    That's correct.

7        Q    Now, when you worked at DEC, did you also work

8    with a server that was available from NCSA, a web

9    server?

10       A    I believe we did, yes.

11       Q    And when you went to Open Market, is that not

12   the web server that you worked with?

13       A    That's the web server software we used

14   initially.

15       Q    And isn't it a fact that no one at DEC or at

16   Open Market developed NCSA web server?

17       A    We did not develop at Open Market the original

18   server software from NCSA.

19       Q    And isn't it a fact that the web server, NCSA

20   web server, had a feature called common gateway

21   interface?

22       A    Yes, it did.

23       Q    And can you explain what the common gateway

24   interface is?

25       A    The common gateway interface was a way for a

1   web server to communicate with another program that was

2   going to provide information back to the user.

3        Q    And that was invented by NCSA, correct?

4        A    I don't recall if that was originally from

5   NCSA.

6        Q    But it was part of the NCSA web server that

7   you worked with at Open Market?

8        A    Yes.  The web server did implement the common

9   gateway interface.

10       Q    And isn't it a fact that, when the shopping

11  cart database was implemented at Open Market, it was

12  implemented using a commercial database management

13  system called Sybase?

14       A    We used the Sybase database product to store

15  the information for the shopping cart.

16       Q    The Sybase database was not developed by Open

17  Market, correct?

18       A    That's correct.

19       Q    And isn't it a fact that in the development of

20  the technology that's been incorporated in the

21  application for the '314 patent, the Sybase database was

22  connected to the NCSA server using the CGI function?

23       A    The -- our application code communicated with

24  the web server for the common gateway interface.  Then

25  the application software that we developed made calls to

1    the Sybase database software.

2        Q    And were those calls facilitated by use of a

3    language called Tcl?

4        A    The language that we used for writing the

5    software code for many of those applications was called

6    Tcl.

7        Q    And was there not a kit of Tcl available

8    publicly to connect web servers using CGI to the Sybase

9    database that was used by Open Market?

10       A    There was a tool kit for communicating with

11   the Sybase database from a Tcl application.

12       Q    And the Tcl kit was not invented or developed

13   by Open Market; is that correct?

14       A    Are you referring to the Tcl database?

15       Q    Well, let's take them one at a time.  The Tcl

16   language to begin with?

17       A    The Tcl language and the software used to

18   implement the language were not developed at Open

19   Market.

20       Q    And what about the tool kit?

21       A    The tool kit for communicating with the

22   database was not developed at Open Market.

23       Q    And earlier we covered the fact that, when the

24   '314 patent was filed, the patent itself did not teach

25   or enable one to transfer credit card numbers over the

1    internet encrypted?

2        A    We talked yesterday about the software did not

3    implement that function.

4        Q    Correct.

5             And isn't it a fact that cookies were not

6    invented by Open Market?

7        A    Cookies were not invented by Open Market.

8        Q    And isn't it a fact that the SSL protocol that

9    enables the transfer of encrypted information over the

10   internet was not invented by Open Market?

11       A    The SSL protocol was not invented by Open

12   Market.

13       Q    Now, Mr. Treese, have you written a book?

14       A    Yes, I have.

15       Q    And who was your coauthor?

16       A    Dr. Stewart.

17       Q    And did you and Dr. Stewart make every attempt

18   to make that book accurate and complete?

19       A    Yes, we did.

20       Q    And did it come out in two versions?

21       A    Yes, it did.

22       Q    And was the second version published in around

23   2003?

24       A    That's correct.

25       Q    Now, do you recall in that book that you

1  described three places where a shopping cart might be

2  placed:  Server side, client side, and then a

3  protocol-based shopping cart?

4       A    Yes, that's the way we described it.

5       Q    And is that an accurate -- was that an

6  accurate description of the situation when you were

7  working developing the subject matter that's set forth

8  in the '314 application?

9       A    We had some understanding about those

10 characteristics at that time.

11      Q    And isn't it a fact that the -- that there was

12 no way, at the time the '314 patent application was

13 filed, to implement a cookie-based shopping cart?

14      A    There was no means to implement a cookie-based

15 shopping cart available to us at that time.

16      Q    How would you characterize a cookie-based

17 shopping cart, as client side or protocol based?  I

18 forget how you put it the last time.

19      A    I believe we would classify it as a

20 protocol-based shopping cart.

21      Q    Is that because the cookie goes back and

22 forth?

23      A    That's correct.

24      Q    So isn't it a fact that the only way to

25 implement a shopping cart that's described in the

1    application for the '314 patent is a server-side

2    shopping cart?

3        A    I don't think that's the case.

4        Q    And why do you say that?

5        A    On the -- my recollection is that the

6    description in the '314 patent refers to the server

7    updating a database.  It does not specify where the

8    database is kept.

9        Q    Well, maybe you didn't understand my question.

10   What I'm saying is that the only description of -- of a

11   way to do a shopping cart set forth in the '314 patent

12   is one that's server side?

13       A    It's a description of the server managing the

14   contents of a shopping cart.

15       Q    And do you recall that you were deposed in

16   this application (sic)?

17       A    Yes, I was.

18                MR. HANSON:  Excuse me, Your Honor.

19                THE COURT:  Uh-huh.

20       Q    (By Mr. Hanson) Well, let's go on.

21                When Open Market came to work in what, about

22   May of 1994, was there a feature of html called basic

23   authorization?

24       A    Basic authentication, yes, there was.

25       Q    Authentication.  Thank you.

1          And can you explain to the jury how basic
2   authentication worked?
3      A    Basic authentication was a simple mechanism
4   that, when you would -- when a web browser would connect
5   to the web server, the web server would say, before I
6   can give you that page, I need to identify you.  And the
7   web browser would prompt the user for a name and a
8   password and send that along with a repeat of the rest
9   of the request, thus identifying the user to the
10  browser -- to the server.
11     Q    And every time a server requested
12  authorization again, isn't it a fact that the client
13  browser would automatically send back the authorization?
14     A    Yes, it would.  You wouldn't have to be
15  prompted for it again.
16     Q    And isn't this the way that -- well, I think
17  you testified regarding what a session was and what a
18  state was, and I believe you said shopping cart would be
19  an example of a state; is that correct?
20     A    Shopping cart items are an example of state
21  maintained in a web session.
22     Q    And if there are multiple users accessing a
23  server, there has to be some method to keep the states
24  separate -- the state of one user separate from the
25  state of another user; is that not correct?

1      A    That's correct.

2      Q    And is that -- is that the reason for

3  sessions?

4      A    That's part of the reason for sessions.

5      Q    But that is a way session is implemented?

6  Let me restate the question.

7           How was session implemented to maintain the

8  shopping cart described in the '314 patent application?

9      A    I don't recall the precise specification of

10  those mechanisms.

11      Q    Wasn't it a fact that basic authentication was

12  used to keep track of the user, and basic authentication

13  was used repeatedly to identify the correct shopping

14  cart?

15      A    To the best of my recollection, we used basic

16  authentication to identify the users but not to identify

17  individual sessions.

18      Q    And have you discussed this recently with

19  Dr. Stewart?

20      A    No, I have not.

21      Q    Is it not a fact that in your book, you and

22  Dr. Stewart have said that basic authorization can be

23  used as a means of keeping track of sessions?

24           MR. ADAMO:  Excuse me, Mr. Hanson.

25  Could you be clear which edition, first or second?

1          Thank you, Your Honor.  I'm sorry.

2     Q    (By Mr. Hanson) Second edition.

3     A    In the second edition we say that session

4 mechanisms can be built out of authentication

5 mechanisms.

6     Q    Thank you.

7          Behind you I believe there is a copy of

8 Plaintiff's Exhibit 1, which is the '314 patent.  And if

9 you will look at Figure 1.

10          MR. HANSON:  And if you can blow up the

11 figure at the bottom.  Thank you.

12     Q    (By Mr. Hanson)  Mr. Treese, is that an

13 accurate description of the system that's described in

14 the text of -- of the '314 patent?

15     A    It's a diagram that reflects some of the

16 aspects of what's described in the text.

17     Q    And there is listed there on the upper

18 left-hand side, buyer computer.

19          Is that the customer computer?

20     A    That would be correct.

21     Q    Then there's shown a network in between.

22 Would that be the connection between the buyer computer

23 and server?

24     A    Yes.  Usually the internet.

25     Q    Then there is then a payment computer.  Is --

1   is that a web server that is used to support a shopping

2   mall of some sort?

3       A    It's a system that supports the transaction

4   processing, the user information shopping carts.

5       Q    And is that also the server that distributes

6   the catalog pages to the buyer computer?

7       A    In this -- in this diagram, no, it is not.

8       Q    And where are the pages sent -- collected and

9   sent to the buyer computer?

10      A    The catalog pages come from the merchant

11  computer, labeled 14.

12      Q    Okay.  And there is an item 21 that's called

13  the shopping cart database?

14      A    That's correct.

15      Q    And is that hung off of the payment computer?

16      A    Yes, it is, in the diagram.

17      Q    And it's not hung off of the buyer computer?

18      A    That's correct.

19              MR. HANSON:  Pass the witness.

20              Pass the witness.

21              MR. ADAMO:  Oh, I'm sorry, I didn't hear

22  you.

23              THE COURT:  Cross -- I mean direct exam?

24              MR. ADAMO:  Redirect, Your Honor,

25  briefly.

```
 1                    CROSS-EXAMINATION
 2   BY MR. ADAMO:
 3       Q    Can you see what I'm holding up, Mr. Treese?
 4       A    Yes.
 5       Q    This is the first edition of your book?
 6       A    That's correct.
 7              MR. ADAMO:  This is Plaintiff's
 8   Exhibit 82, Your Honor.  It's in evidence.
 9       Q    (By Mr. Adamo) Copyright date on this, do you
10   remember what it is?
11       A    1998.
12       Q    All right.  And is it fair to say that what
13   you put in this book was what you and Dr. Stewart knew
14   about the subject matters discussed as of 1998?
15       A    Yes, that's correct.
16       Q    And the work that you did with respect to the
17   inventions of the three patents-in-suit was done when?
18       A    That was in 1994.
19       Q    So this book is written four years after, with
20   four years more knowledge than what you knew at the time
21   you made the invention?
22       A    That's correct.
23       Q    The other book that you were asked about is
24   the second edition?
25       A    That correct.
```

1                    MR. ADAMO:  This is P83, which is in

2    evidence, Your Honor.

3        Q    (By Mr. Adamo) Do you remember what the

4    copyright date on this was?

5        A    I believe that was 2003.

6        Q    Was this book, as the first edition was,

7    written with all the knowledge that you and Dr. Stewart

8    had in 2003?

9        A    Yes, it was.

10       Q    So by this time you were eight to nine years

11   away from when you made the inventions in the

12   patents-in-suit?

13       A    That's correct.

14       Q    And you have all your information that you

15   gained in that time in this book?

16       A    Yes.

17                   MR. ADAMO:  I have nothing further, Your

18   Honor.  Thank you.

19                   THE COURT:  Uh-huh.  All right.  Thank

20   you.  You may step down.

21                   Who will be your next witness?

22                   MR. HANSON:  Your Honor, we call

23   Mr. Trevor, and he has not been sworn.

24                   THE COURT:  All right.  Mr. Trevor.

25                   COURTROOM DEPUTY:  Would you raise your

```
 1  right hand, please.
 2              (Witness sworn.)
 3       ALEXANDER TREVOR, DEFENDANT'S WITNESS, SWORN
 4                   DIRECT EXAMINATION
 5  BY MR. HANSON:
 6       Q    Good morning, Mr. Trevor.  Would you introduce
 7  yourself to the jury by stating your full name and
 8  address.
 9       A    I'm Alexander Trevor, and I reside in Florida.
10       Q    Mr. Trevor, we have a challenge with the soft
11  voice in this courtroom; and if you can adjust that
12  microphone a little closer, it might work better.
13       A    Can you hear me all right now?
14       Q    Yes.  Yes.
15       A    Okay.
16       Q    In what year did you receive your first
17  university-level degree?
18       A    1967.
19       Q    And what -- and from what school was that?
20       A    It was a Bachelor of Science in physics at
21  Yale University.
22       Q    Have you had any other college degrees?
23       A    Yes, I have a Master of Science in electrical
24  engineering from the University of Arizona.
25       Q    And in what years were you at the University
```

1  of Arizona?

2      A    I entered the program in late 1967 and

3  graduated in 1971.

4      Q    Was your work at the University of Arizona

5  interrupted?

6      A    It was interrupted by military service.  It

7  was the time of the Vietnam war.

8      Q    And where did you serve and in what capacity?

9      A    I served as a lieutenant in the U.S. Army

10  Signal Corps.  I spent one year in the Pentagon

11  telecommunications office in Washington, D.C., and a

12  year in MACV Headquarters in Saigon, Vietnam, working in

13  intelligence data processing.

14      Q    And what was your first full-time job after

15  completing your work at the University of Arizona?

16      A    Systems analyst at CompuServe Network, which

17  was later renamed CompuServe Incorporated.

18      Q    What is a systems analyst?

19      A    A systems analyst is a kind of software

20  engineer who designs and develops computer programs or

21  software.

22      Q    What kinds of computer programs were you

23  writing as a systems analyst?

24      A    Primarily system software, things like print

25  spoolers, decompilers, data-communication software.

```
 1              Later I wrote some application software such
 2   as CompuServe chat program.
 3         Q    For how long did you work for CompuServe?
 4         A    About 25 years.
 5         Q    So in what year did you leave?
 6         A    It was in 1996.
 7         Q    And what was your position when you left
 8   CompuServe?
 9         A    I was executive vice president and chief
10   technical officer.  I was responsible for the support
11   services division, which included software development,
12   R&D, operations, engineering, and manufacturing.
13         Q    What were the circumstances of your leaving
14   CompuServe.
15         A    The new CEO and I disagreed in the level of
16   R&D that was necessary to keep CompuServe competitive.
17   So I decided it would be more interesting to go start my
18   own company.
19         Q    Did you maintain a relationship of any sort
20   with CompuServe?
21         A    Not initially; but later, in about 2000,
22   CompuServe retained my company, Nuvocom, to do some
23   consulting work.
24         Q    Well, tell us a little bit about Nuvocom.
25   What does it do?
```

1      A      Nuvocom does what I call software archeology,

2  which is researching old software.

3      Q      And is it with particular emphasis on software

4  that was developed at CompuServe?

5      A      Yes.  Myself and the people I work with now

6  are all pretty much CompuServe alumni, although we have

7  some people we work with who were with Prodigy.

8      Q      At the time you left, where was CompuServe

9  located?

10      A      Columbus, Ohio.

11      Q      Did it have any other locations?

12      A      Yes.  It had an R&D center in Tucson, Arizona;

13  branch offices in major cities across the United States

14  as well as in a few foreign countries, U.K., France,

15  Germany; and some affiliates, one in Japan and another

16  in Montreal.

17      Q      And please keep your voice up, sir.  I'm

18  having a little -- maybe the jury hears you, but I can't

19  hear you.

20      A      I will speak a little closer to the mic.

21  Maybe that will help.

22      Q      Then we will get that spit sound.  I

23  understand.

24            Let's go back in time a little bit.  What was

25  the nature of CompuServe's business when you first

1  joined?

2      A     It was computer time-sharing, remote computing

3  services for businesses and corporations.

4      Q     And can you tell us, really briefly, what

5  computer time-sharing was?

6      A     As I say, it was remote computing services for

7  companies.  Back then, the computer -- you didn't have

8  the internet, you didn't have personal computers.  So

9  the computers that were available were very expensive

10  and very big.  So companies, small companies, even big

11  companies, would essentially rent time from companies

12  like CompuServe.

13      Q     What physical equipment did CompuServe have to

14  support its time sharing service?

15      A     It had servers, which we called host computers

16  at that time; data storage devices; data communications

17  equipment.  All of the stuff was much more expensive and

18  much bigger and much less powerful than today's

19  equivalents.

20      Q     And was there also network equipment?

21      A     Yes.  The -- there were modems and network

22  processing computers.  Today you call them routers and

23  switches.

24      Q     And those were owned by CompuServe and

25  distributed around the world by them?

1      A     Well, by -- by say 1993, there were tens of

2   thousands of CompuServe mode computers around the

3   country and around the world as well as leased telephone

4   lines linking them together.

5      Q     At some point did the nature of CompuServe's

6   business expand or change?

7      A     Yes.  In 1978 CompuServe introduced one of the

8   first electronic mail systems for commercial use.

9   In 1979 they introduced a consumer information service

10  called CompuServe Information Service.  And then in 1981

11  they opened up their packet network to third-party

12  servers effectively making it a public packet network.

13     Q     Did you say that the business changed to

14  involve a consumer information service?

15     A     Yes.

16     Q     And just what did you mean by that?

17     A     It was a set of online services for consumers.

18  In many respects similar to what you can find on the

19  internet today, only without the fancy graphics and

20  multimedia.  It didn't support those things in the early

21  days.

22     Q     And what were the various services that were

23  provided?

24     A     There was a wide spectrum of services.  Some

25  of the more popular categories were communications,

1  which included electronic mail, user forums, chat;

2  educational services like an online encyclopedia;

3  financial, you know, including stock prices; news,

4  weather, sports; online games, Dungeons and Dragons and

5  all kinds of fun stuff; shopping, including electronic

6  mall, airline ticketing, and software for downloading.

7      Q    Can you give the jury an overview of the

8  electronic mall that you've just described?

9      A    Yes.  The electronic mall was E-commerce for

10 consumers.  Basically you could shop and buy things

11 online.  The way you did it was, you needed a personal

12 computer with communication software loaded, and

13 typically a telephone modem, since that's how most

14 people communicated in those days.  You would make a

15 dial-up connection to a CompuServe node computer.

16          Sorry about the popping.

17          Once connected to the CompuServe servers, you

18 would be presented with a top-level menu.  One of the

19 choices would be the electronic mall or shopping.  Make

20 that choice, navigate a few more menus.  You'd get to

21 the -- you'd enter the electronic mall.  There, you

22 could make a choice of one of a hundred different

23 stores.

24          Select the store you wanted to shop.  Enter

25 the store.  And there you could browse for the --

1  whatever products that vendor had to offer on line.

2  If --

3      Q    If you could break it up a little bit.  You

4  say you could -- when you got to the store you could

5  look for various products; is that correct?

6      A    Yes.

7      Q    And how were the various products presented to

8  you?

9      A    They were presented as menus.  So, it was a

10  way to search for products.  But when you found a

11  product that interested you, you could get a detailed

12  description of the product, and in some cases there was

13  a photograph so you could look at it.

14        If you wanted to purchase it, you would type

15  the order command, which was abbreviated by the letter

16  O, and that would update your electronic shopping cart

17  with the item.

18        And then you could continue to shop, or you

19  could get some more items and put them in your shopping

20  cart, or you could check out from the store, at which

21  point you'd be prompted for your billing information,

22  including a credit card.

23        And you'd also have the opportunity to review

24  your selections in your shopping cart.  And you could --

25  if you changed your mind, you could check the whole

1    thing or you could delete individual items.

2          But once you were satisfied that this is the

3    stuff you wanted to buy, then you would acknowledge

4    that, and the host computer would respond with a

5    confirmation code, an order confirmation code.

6    Q    Could you purchase more than one product at a

7    time from a vendor or merchant on the mall?

8    A    Absolutely.  You could purchase -- I think

9    there was a limit of about 40 items that you could put

10   in your shopping cart at one time.  Yes, more than one

11   definitely could you go in your shopping cart.

12   Q    So you could -- the customer could select up

13   to about 40 items if they wanted -- it sounds like a lot

14   to do on shopping -- but before they checked out; is

15   that what you're telling us?

16   A    Before they checked out, they would shop,

17   select items by pressing the order command.  They could

18   do that multiple times, each time would update or cause

19   the host computer to update the user's electronic

20   shopping cart with the selection.

21         As I said, there was a limit of about 40.  I

22   don't think many people put 40 things in their shopping

23   cart.

24   Q    Now, if a menu presented a choice of more than

25   one product, how would the customer select that product?

```
 1      A    In the initial version of the electronic mall,
 2  which was text oriented, you would look at a menu, and
 3  there would be a number beside each menu item.  So if
 4  you wanted the first book, for example, in the menu, it
 5  would be number 1, so you type the number 1 followed by
 6  a carriage return.  Today they call it enter key.
 7      Q    When was the CompuServe electronic mall first
 8  available?
 9      A    1984.
10      Q    And by May of 1984 -- now skipping ahead, I
11  guess.  By May of 1994, what equipment did CompuServe
12  have?
13      A    In May of 1994 CompuServe was supporting over
14  a million and a half customers over a hundred 36-bit
15  host computers or servers, two of which were dedicated
16  to the electronic mall, plus about a hundred 32-bit
17  servers in data storage devices and data communications
18  equipment.
19      Q    I think you explained this a little bit, but
20  by 1994 how did personal computer users connect to the
21  CompuServe information service?
22      A    Again, you needed a personal computer with
23  communication software installed.
24           At that point in time you could connect your
25  computer to CompuServe through the internet or through
```

1    several other third-party networks.  But typically users

2    would make a dial-up connection to a local CompuServe

3    node computer.

4            In either case, a logical circuit was

5    established between your PC and the CompuServe host

6    computer.  And that logical circuit was maintained for

7    the duration of your session on CompuServe.

8        Q    Was that circuit a secure circuit?

9        A    It was certainly a lot more secure than the

10   connection over the internet.  It didn't go through

11   university basements or anything.  But it was relatively

12   secure.

13       Q    And CompuServe solicited customers' credit

14   card numbers, did they not --

15       A    Yes.

16       Q    -- over that network?

17       A    CompuServe customers transmitted their credit

18   cards over that network, and we never had any trouble

19   with people having their credit cards ripped off, other

20   than social engineering, which existed even back then.

21           You know, on chat somebody would say, hey, I'm

22   CompuServe, give me your credit card.  That kind of

23   thing existed even back then.

24       Q    Did CompuServe make available to its members

25   and customers software for installation on personal

1  computers so that they could communicate with

2  CompuServe?

3      A    Yes.  Communication software wasn't as

4  prevalent in the early days as it is now, so CompuServe

5  developed a line of smart terminal software called

6  Vidtex for most of the popular -- most of the popular

7  personal computers at the time.  That included the

8  Commodore 64, Ataris, Apple 2s, TRCs, and the IBM PC.

9  The version for the IBM PC was called The Professional

10  Connection.

11          All of those small terminal programs included

12  auto log-on, which meant you didn't have to dial up the

13  number and type all your stuff every time you wanted to

14  log on, cursor addressing, some graphics capabilities,

15  and error-correcting file-transfer protocols.

16      Q    Now, you've explained to us about the

17  CompuServe network, but were other networks -- was it

18  possible that other networks could be used for a

19  customer to connect to CompuServe?

20      A    Yes.  From fairly early on, CompuServe

21  supported international networking standards and

22  interfaced with other public packet networks.

23  Domestically that included networks called Tymnet and

24  Telenet, and internationally Datapack in Canada,

25  TransPack in France, and a number of others.  And as I

1  mentioned, by -- certainly by '94 it included the

2  internet as well.

3      Q    You better explain that because that's going

4  to -- did you just say the internet by '94?

5      A    Yes.

6      Q    And how was that accomplished?

7      A    It was accomplished via a TELNET -- TELNET

8  protocol connection.

9      Q    And not the worldwide web?

10     A    No.

11     Q    Did you personally use the CompuServe

12  electronic mall to purchase products?

13     A    Yes.  As part of my responsibility as chief

14  technical officer, I had to be familiar with and test

15  out all of CompuServe's new products.  So I tested many

16  aspects of the electronic mall, including selecting a

17  store, checking the proper updating of the electronic

18  shopping cart when an item was added or deleted from the

19  shopping cart, the checkout process.  And I personally

20  bought items from the electronic mall using my personal

21  credit card.

22     Q    Well, can you tell us what specific

23  responsibilities you had with regard to CompuServe

24  electronic mall prior to May of 1994?

25     A    The systems analysts and programmers who

1  developed and maintained the electronic mall reported to

2  me.

3      Q    And I believe you already said this, but isn't

4  it the case that the CompuServe computers accumulated

5  and held the customers' product selections prior to

6  checkout?

7      A    Prior to checkout, a customer's selections

8  were held in a personal order file or electronic

9  shopping cart that was an in-memory database in the

10  file.  It was specific to each customer.

11      Q    Now, as a CompuServe -- as CompuServe evolved,

12  it developed different modes of interacting with its

13  members; is that correct?

14      A    CompuServe developed a -- as I mentioned

15  earlier, CompuServe was text oriented.

16      Q    And that's where I wanted to start.  What did

17  you mean by text oriented?

18      A    Basically -- I mean, you didn't have any

19  graphics to speak of.  What you saw on your screen was

20  text.  You interacted by typing on your keyboard and

21  seeing text displayed on your screen.

22      Q    I believe that before you is a copy of

23  Defendants' Exhibit 2, which is a book by Messrs. Bowen

24  and Peyton, and it's the fourth edition.  Do you have it

25  in front of you?

1      A    I do, yes.

2      Q    And that book is called How to Get the Most

3  Out of CompuServe.

4      A    Correct.

5      Q    Do you see the fourth edition at about the

6  time it was published in 1989?

7      A    Yes, I did.  And I got a personal copy at that

8  time.  In fact, it was a copy signed by one of the

9  authors.

10      Q    And is that the only edition of the Bowen and

11  Peyton book that you have?

12      A    No.  I still have copies of the second, third,

13  fourth, and fifth editions.  I don't know if I have a

14  first edition.

15      Q    Is there any question that the authors had

16  access to CompuServe and CompuServe Mall when they wrote

17  their book?

18      A    There's no question.  The authors were members

19  of CompuServe.  They -- they provided their e-mail

20  addresses, the CompuServe e-mail addresses in the book,

21  and asked readers to communicate with them.  And they

22  couldn't received or send e-mail if they didn't maintain

23  a CompuServe account.  Plus I know they had access to

24  CompuServe's marketing and technical people.

25                    MR. HANSON:  I wonder if we could bring

1   up Page 331 of Exhibit 2 and look at the screen shot at

2   the top of the page.  Maybe you can blow that one up.

3        Q    (By Mr. Hanson)  And can you explain to us

4   what the purpose of this screen shot is, or this screen

5   is.

6        A    This is a screen that you would see once you

7   the entered the Walden Books online store and worked

8   your way down through book categories until you got down

9   to a choice of two books.  At this point you could

10  select either of these two books.

11       Q    And how was that selection made?

12       A    You would enter the number corresponding to

13  the book you were interested in followed by a carriage

14  return.

15       Q    And then what would happen?

16       A    And then you'd be -- then a detailed

17  description of the book would be displayed, followed by

18  a prompt for the O command.

19       Q    Okay.  I think we have another screen that we

20  could show on this page that shows where the -- where

21  the O command is.

22       A    Right.

23       Q    Is that a representation of a page that would

24  come to the user after making the selection 1 or 2, and

25  would also describe the book that had been selected?

1    A    That would be at the bottom of the description

2  page.

3    Q    What we're seeing is what would be at the

4  bottom of the description page?

5    A    That's correct.  Yes.

6    Q    The description is not shown, that's what I --

7    A    That's correct.  The description is not shown.

8    Q    Then what would happen when the O -- O command

9  was entered?

10    A    Then the electronic shopping cart would be

11  updated with this selection and retained there while the

12  user shopped.

13    Q    And how would the CompuServe servers know what

14  product to put in the shopping cart or the personal

15  holding file?

16    A    Well, the user had just selected one item

17  before typing the O command, and the host computer

18  remembered that selection.

19    Q    Are these screens typical of those that were

20  available in 1989 on the CompuServe Mall?

21    A    They were typical of the text or ASCII version

22  of the electronic mall.

23    Q    Could the customer change their mind after

24  they had entered the O command?

25    A    There were two ways.  They could type an exit

1    command, which would have abandoned the entire shopping

2    cart; or, after typing the checkout command, they would

3    be presented with a review screen where they could

4    modify or delete items individually.

5        Q    Well, how -- how did you get to where you had

6    to pay?  What did you have to do next in order to pay

7    for the goods once you decided to purchase them?

8        A    You would type the checkout command.  You

9    would be taken to a checkout area, which is where you

10   get a chance to review all the items in your shopping

11   cart.  So you'd see the quantity, the description, the

12   price of each item.

13            You could -- at that point you could modify it

14   or accept it.  And you would be prompted for billing

15   information, including credit card typically.  And then

16   the next thing, after you accepted that you'd get a

17   confirmation number.

18               MR. HANSON:  You can take that screen

19   down, please.

20       Q    (By Mr. Hanson)  Was it necessary for the

21   users to have become members of CompuServe before they

22   could use the CompuServe Mall?

23       A    Yes, it was.

24       Q    And how did they become members?

25       A    Through an online sign-up process.

1     Q    And was there a charge of some sort to

2  maintain your membership?

3     A    Yes.  There was a monthly charge.

4     Q    And how did -- how did they CompuServe collect

5  that monthly charge?

6     A    In most cases it was done by credit card.

7     Q    Was it possible for someone entering into a

8  mall -- mall store or merchant's store to purchase goods

9  and somehow charge it to CompuServe?

10    A    Not in the electronic mall, but there were

11 other places in CompuServe where you could do that.

12    Q    Now, we've talked about the ASCII version or

13 the text version service that was developed early on.

14         As the serviced developed, did they come out

15 with different modes of interacting with the CompuServe

16 Mall?

17    A    CompuServe developed a high-level application

18 protocol in 1989 called HMI, host micro interface.

19 However, the electronic mall was not implemented in HMI

20 until March of 1994.

21    Q    Did -- and let's keep -- this is a little bit

22 tricky here, this area we're going into.

23 Did CompuServe provide something called DOSCIM and

24 WINCIM?

25    A    Again, back to 1989 when CompuServe developed

1  the HMI protocol, they came out with actually two client

2  programs, communications programs, that implemented that

3  protocol.  One was for a Macintosh called Maxim; the

4  other one was called just CompuServe Information Manager

5  for DOS computers.  In other words, the DOS operating

6  system.

7       Q    Was there also a Windows version of that

8  program?

9       A    The Windows version came out in 1993 -- yeah,

10  1993.

11       Q    And was the Windows version implemented with

12  the HMI protocol?

13       A    Yes.  All versions of the CompuServe

14  Information Manager implemented the HMI protocol.  They

15  also all supported ASCII.

16       Q    So is it -- is it not the case -- well, let me

17  put it this way:  How is the -- how -- when did the

18  mall, CompuServe electronic mall, implement HMI -- an

19  HMI version?

20       A    It was March and April of 1994 that the mall

21  was in production for customers in HMI -- in HMI

22  version.

23       Q    But prior to that time, for example, WINCIM

24  could be used to access CompuServe, but what happened

25  when you went to the mall?

1      A    Like I say, in mid-'93 or January of 1994, if

2  you used WINCIM to access CompuServe, and then went to

3  the electronic mall, an ASCII window would open up when

4  you went to the store, and you would interact with that

5  mall store using the ASCII commands that we just talked

6  about.

7      Q    Now, before you should be Defendant's Exhibit

8  4, which is the Ellsworth and Ellsworth book.  And it's

9  entitled Using CompuServe.

10          Are you familiar with that book?

11     A    Yes.

12     Q    And when did you first know of that book?

13     A    I've had a copy for years and years.  I don't

14  know how many.

15     Q    Now let's turn to Page 374 of that book.

16  And let's see if we can blow up this screen in the

17  center.

18          Now, can you describe to us what we're seeing

19  here?

20     A    That's a screen generated by WINCIM, Windows

21  version of CompuServe Information Manager, and the

22  window -- the smaller window entitled Electronic Mall

23  Shopping is one of the entry windows or entry screens

24  into the -- into the electronic mall.  It's actually an

25  entry window into the ASCII version of the electronic

1  mall.

2      Q      But this particular screen is an HMI screen;

3  is that correct?

4      A      It is an HMI screen, yes.

5      Q      Okay.  So how would somebody select one of the

6  choices that are presented by that screen?

7      A      They would move their cursor over the menu

8  choice they wanted to select and highlight it by a mouse

9  click.  And then to make their selection, they could

10  either double-click on that or they could go to the

11  select button and push that.  And that would cause a

12  message to be sent, an HMI protocol message that would

13  contain the selection to be sent to the host computer.

14      Q      And so there's a little bit -- a little

15  description there called CIS shopping; is that right?

16      A      Yes.  That's the address you could enter into

17  a go command.  One of the ways to move around in

18  CompuServe quickly in the ASCII version was to type a

19  page address, much like you -- if you know a URL of a

20  website, you can type in the URL.  On CompuServe you

21  could type in the page name and go directly.

22      Q      There's a little icon at the top of the screen

23  next to the words The Electronic Mall/Shopping.  What is

24  that icon?

25      A      Well, there's a shopping cart icon.

1      Q    Did something happen when you clicked that?

2      A    No.

3      Q    Now, I think we ought to describe some of the

4  other columns on this -- the rows on this page so we

5  understand.

6           But the top row has the words CompuServe

7  Information Manager.  What do you call that row?  The

8  title bar?

9      A    That's the Windows title bar.

10     Q    And how is that title bar generated?

11     A    Well, it's partly a function of the version of

12 Windows that you're using, some of the details, like

13 what the buttons look like, depending upon whether

14 you're running Windows 3.0 or Windows 2000 or XP, the

15 text comes from the WINCIM.

16     Q    Okay.  And the next ribbon or row, what's that

17 all about?

18     A    Well, it's a textual menu bar.

19     Q    And that's just standard on it?

20     A    Yes.  That's standard.

21          Then following that are a bunch of icons; it

22 was called a ribbon.  And those buttons invoked

23 particular functions in WINCIM, such as the go command

24 or access to your e-mail filing cabinet, for example.

25     Q    Were those buttons always the same?

1    A    No.  WINCIM gave the user the ability to

2  customize that the ribbon.

3    Q    Well, let's step forward a page.

4              MR. HANSON:  Can we blow up the top?

5    Q    (By Mr. Hanson) Is this a different screen

6  than we just saw?  If you look at the monitor, you may

7  be able to --

8    A    Yes, it's a different screen.

9    Q    And is this the screen you would have come to

10  if you made the right selection and clicked select on

11  the previous page?

12    A    My book is missing Page 375.

13  Yes.  That is the -- Page 375, Figure 15.9 is the next

14  screen you see after selecting electronic mall.

15    Q    And you could step through screens in some

16  manner as you've just described?

17    A    You -- you could select through HMI screen

18  using the procedure that I described, yes.

19    Q    Now, is it apparent to you the status of the

20  CompuServe Mall at the time this book was written

21  relative to whether or not the mall had implemented HMI

22  protocol?

23    A    My understanding is this book was published in

24  March of 1994.  HMI version of the electronic mall was

25  in beta at that time but not in production.

1     Q    So the rest of the description, with regard to

2  the electronic mall in this book, is the mall is

3  implemented using the ASCII version in a window; is that

4  correct?

5     A    That's correct.  Once you proceeded actually

6  into the mall store, an ASCII window would be opened,

7  and you would interact with the ASCII command.

8     Q    So the shopping experience, then, would be

9  substantially the same as you described with regard to

10  the Bowen and Peyton book?

11     A    Yes, it would.

12     Q    Now, at some point, did the electronic mall

13  implement the ASCII protocol and the customers -- and

14  the merchants also implement themselves under the HMI

15  protocol?

16     A    Could you repeat that question, please?

17     Q    Yes.  At some point, was one able to purchase

18  products on the CompuServe Mall clicking select buttons

19  and no longer entering ASCII commands?

20     A    Yes.

21          After April 9th, 1994, there were a number of

22  mall stores that were implemented into the HMI

23  electronic mall.  And in those stores, you would

24  navigate using the selection process of highlighting and

25  clicking with a mouse that we described.

1      Q    And that's kind of similar to what you see on

2  the internet today?

3      A    It's similar to using an internet browser.

4      Q    So it was necessary for merchants that had

5  stores on the CompuServe electronic mall to modify their

6  stores once the mall was implemented in HMI, with the

7  HMI protocol; is that the right understanding?

8      A    Well, the merchants didn't have to do that.

9           They could continue to offer their stores in a

10  text mode.

11          But to be available in the HMI mode, the

12  conversion has to be made.  And typically that was done

13  by a CompuServe staff rather than by the merchants

14  themself.

15      Q    Did CompuServe make what might be called a

16  computer screen video to illustrate purchase on the --

17              MR. HANSON:  And don't bring it up yet,

18  please.

19      Q    (By Mr. Hanson)  -- on the electronic mall

20  totally implemented with the HMI protocol?

21      A    Yes, they did.

22      Q    And can you describe that video that we're

23  going to show in a minute?  It's not a movie of an

24  actual purchase, is it?

25      A    No.  What it is, it's a set of screen shots of

1   several different sessions.  They were put together to

2   illustrate what the HMI mall looked like.

3        Q    Okay.  We're going to play this, and we can

4   stop it at each screen and talk about each screen.  And

5   there's a sound to this video, but we're going to make

6   every attempt to turn the sound off when it comes up so

7   that the witness can describe the screens.

8             Now, this is the first screen.  Can you tell

9   us when this video was prepared, this demonstration

10  video was prepared?

11       A    I mean, I have a copy of it on a CD.  I'm kind

12  of a pack rat and I kept my CompuServe CD, pilot edition

13  CD from when I worked at CompuServe.  And this movie is

14  on there, and it has a date of May 5th, 1994.

15       Q    Okay.  Can you look at the monitor in front of

16  you and tell us what we're seeing?

17       A    That's a Windows -- WINCIM screen with no --

18  no sub-windows on it.

19       Q    Say again, sir?

20       A    There's no sub-windows.  It's just the main

21  window.

22       Q    So how would somebody use this screen?

23       A    They would have to either select one of the

24  commands on the text file that you file through help

25  line or push one of the buttons on the ribbon to execute

1   a function.

2       Q    And can you explain the meaning of the various

3   buttons on the ribbon?

4       A    Okay.  The first button is help.  The next one

5   with the little heart is the favorite places.  The one

6   with the magnifying -- the one with the magnifying glass

7   is search.

8   The next one invokes a web browser.

9            The next one is the go command, a little

10  traffic light.  Then the stock prices get you stock

11  quotes.

12           Next is the weather, your local weather.

13           Next is your e-mail inbox, and you can see

14  this guy's got something in the e-mail inbox because

15  it's highlighted.

16           The next one is the outbox.  There's nothing

17  there because it's kind of grayed out.

18           Next is the filing cabinet, your e-mail filing

19  cabinet.

20           Then I think the next one is a glossary.  I'm

21  not absolutely positive.

22           And then the exit command to exit from WINCIM.

23      Q    I neglected to say that this video that we're

24  looking at step by step is Defendants' Exhibit 157.

25  Now, let's go on to the next screen, if we can.

1     A     Okay.  Here the user has moved the mouse over

2   the browser select button.  And anybody that you hover

3   over would be highlighted.  I don't know why.

4     Q     Doesn't make sense?

5     A     No.

6     Q     Could it be that they were moving on their way

7   to the go button?

8     A     It could be.

9     Q     Okay.  If the go button was pressed, what

10  happened?  What happened?

11    A     Then a go window would pop up.

12    Q     So let's bring the next screen up and see what

13  happens.

14    A     All right.  This is the go window, and the

15  user has entered already the letters m-g-o, which was

16  the go word for the HMI version of the electronic mall

17  at this point in time.

18  Remember, this is very new, and not everything is in the

19  HMI version yet.  So people have to be able to get to

20  the ASCII version as well as the HMI version.

21    Q     So what would they do?  They have some choices

22  there:  Okay, cancel, and help.

23    A     Well, if they wanted to actually go to that

24  page, what they would press is the okay button.

25  Otherwise, they could cancel out.  If they were totally

1    baffled, they could press help.

2        Q    All right.  Let's assume they click the okay

3    button, and let's go on to the next screen.  What are we

4    seeing here?

5        A    So this is the -- the first sub-menu you were

6    looking at was the entry point to the HMI version of the

7    electronic mall.  Obviously, at an early point, there

8    are only eight stores in there.

9            At the point that that screen was taken, the

10   user has already made a selection by highlighting the --

11   they had highlighted the Metropolitan Museum of Art

12   store.  They had not actually pressed the select button.

13   The screen we're looking at now, they pressed the select

14   button on the first screen and brought up the

15   Metropolitan Museum Taipei.

16       Q    So I guess what you're telling us, in order to

17   get to this window that's in the lower right, they had

18   to interact with the window -- previously interact with

19   the window in the upper left?

20       A    That's right.

21       Q    All right.  Now, what would somebody do here?

22       A    Well, they have several choices, but if you

23   wanted to start searching for products, they would

24   select this quick-search function, then press the select

25   button.

1    Q    Now, I see there's a little icon up in the

2    corner that looks like some sort of a disconnect between

3    the plug and a receptacle.  What's that all about?

4    A    When you are online -- perhaps you remember

5    from the first screen, that symbol was not there.  That

6    comes up when you're connected.  And if you press it, it

7    causes you to get disconnected.

8    Q    It's not an indication that they're

9    disconnected; it's just that that's a way you could

10   disconnect?

11   A    That's correct.

12        And if you look over toward the left of the

13   ribbon, between the yellow question mark and the -- I

14   don't know what color that is, the heart, it says

15   connected and 258.  So that's an indication that you

16   were online and the amount of time that you were

17   connected in this session.

18   Q    So let's move on to the shopping experience.

19   It looks like this demonstration suggests the clicking

20   product quick-search; is that correct?

21   A    Yes.  They have highlighted quick-search, and

22   they are pressing select at this point.

23   Q    All right.  Let's go on to the next screen --

24   or we stay right here, don't we?  We get a third window

25   right in front of us.

1    A    This illustrates one of the big advantages of

2  the HMI mall.

3         In the ASCII version, the text version, you

4  had to remember commands.  Here, you can actually see

5  several windows at once, and the commands are right in

6  front of you.  You just push a button.

7         In this case, we're going to do a search for

8  something we want to buy.  So looking for a pendant, and

9  you type the word pendant into the box, and then press

10  the okay button.

11   Q    Okay.  They're searching for a pendant.  Let's

12  see what happens next.  I guess we advance one screen.

13   A    Okay.  So, apparently, in this store, there's

14  more than one pendant.  In the top line, it says, search

15  results, six records.  And so the six different kinds of

16  pendants are displayed in that window.

17  The user has highlighted Russian cross pendant.  And you

18  can see the blue line there highlighting it.

19   Q    So if they selected that, what would happen?

20   A    When they press the select button, a

21  description of the item should come up.

22  Okay.  So there's a description.  And you will notice

23  that there are several buttons along the right side.

24  One of them is -- well, the first one's order.  There's

25  also one that says view item.

1   You could also, from this screen, navigate through the

2   different pendant choices by pressing previous item or

3   next item, or you can cancel out.

4        Q    Okay.  So now --

5        A    So the user -- there is also a prompt for

6   quantity.  If you're interested in this, you would enter

7   the number you want to buy.

8        Q    The quantity?

9        A    Yes.

10        Q    Oh, okay.  So I've got a wife and a daughter

11   and two granddaughters; I should buy four.

12       A    Exactly.

13        Q    All right.  But this person just bought one.

14             So what happens -- what happens when the order

15   button is pressed?

16       A    Then the -- the selection, including the

17   quantity, would be placed in the user's electronic

18   shopping cart.

19             But this next screen that we're looking at is

20   not what you would see after pushing the order button;

21   this is what you would see after pressing the view item

22   button.

23        Q    Okay.

24        A    And in this video or slide show, if you want

25   to call it that, they're going to show images of several

1    different items, some of which -- these two are from the

2    Metropolitan Museum of Art store.  At least one of them

3    comes from an entirely different store.  You don't get

4    oranges from the museum.

5                    THE COURT:  Counsel, when you get to a

6    stopping point, let's take our afternoon break.

7                    MR. HANSON:  Okay.  Ten minutes or we can

8    take a break now.

9                    THE COURT:  That's fine.

10                    MR. HANSON:  Okay.  I think I can do it

11   in ten minutes.

12        Q    (By Mr. Hanson)  So I guess I can step back a

13   screen.

14        A    So, hopefully, here they're going to actually

15   press the order button.

16        Q    Press the order button.  All right.

17        A    So that brings up the order form where you

18   can -- you could add more items, change it, cancel it,

19   or proceed.

20        Q    There's just one item here --

21        A    Yes.

22        Q    -- on this screen.  But the customer, they

23   could have ordered some more items after they saw the

24   first one; isn't that correct?

25        A    By pressing the add button, they could add

1  more items to their shopping cart.

2      Q    They could do it right here; they could add

3  another item.

4      A    They could here, yes.

5      Q    They still have a chance.  And there's a

6  change button there.  What does the change do?

7      A    Well, if you want to go back and you forgot

8  your mother and cousins --

9      Q    All right.

10      A    -- and want to add some more Russian cross

11  pendants, you can go back there and change the quantity.

12      Q    Okay.  And you could delete it, and you can

13  cancel the order?

14      A    Right.

15      Q    I suppose delete is if you wanted to shop some

16  more; cancel the order; you just wanted to go home?

17      A    Supposing you had several items in here.  The

18  delete would delete a single item.

19      Q    Uh-huh.

20      A    And the cancel order would dump the whole

21  thing.

22      Q    I don't know whether there are any more

23  screens.  Let's step forward and see if there's any more

24  screens.

25      A    There are some more screens.

1    Q    There aren't anymore?

2    A    There are more.

3    Q    Okay.  The delay here is that we have to let

4  the video play.  There we go.

5  So what's this screen all about?

6    A    One more chance to make changes.  And the

7  previous screen had a checkout button.

8    Q    Yes.

9    A    So if you're ready to check out, you press

10  that, and now you would be prompted for billing

11  information.

12        First thing is what country, because billing

13  information changes depending upon what country.  U.S.,

14  Japan, and the U.K. have different addresses, and so on.

15    Q    Okay.

16    A    These are collecting billing information.  You

17  can see, again, this is a slide show because -- none of

18  the data is filled in.  It's just a blank screen, and

19  then you move to the next screen.

20    Q    Right.

21    A     In reality, you would have to put in your

22  name, address, and all that stuff before you could move

23  to the next screen.

24    Q    Now, we explained at the start that this is

25  not a movie of somebody actually purchasing the stuff.

```
 1      A      Right.  Right.

 2      Q      All right.

 3      A      Then here they ask for your shipping address.

 4             And, you know, just like online stores today,

 5   you have the option of shipping to your billing address

 6   or optionally entering a different address.

 7      Q      Moving on?

 8      A      Okay.  That's as far as the movie goes.

 9      Q      That's as far as it goes.

10      A      If you actually completed this, you would get

11   a confirmation number.

12      Q      So did this slide show accurately depict your

13   understanding of how would one purchase a product on the

14   CompuServe electronic mall when it was implemented in

15   HMI and the merchant store was implemented in HMI?

16      A      Yes.  It's accurate but incomplete.  As we've

17   discussed going through the movie, it doesn't show

18   actually filling out the -- some of the screens.

19      Q      Did you ever visit Open Market in Cambridge,

20   Massachusetts?

21      A      Yes, I did.

22      Q      And when was that?

23      A      That was in September 1994.

24      Q      And how did that come about?

25      A      At the suggestion of a good friend of mine,
```

1  who was one of the venture capital investors in Open

2  Market.

3      Q    And what was the purpose of the visit?

4      A    I wanted to see if there was any technology

5  that might be of help to CompuServe.  And, obviously,

6  they wanted to sell me on their product.

7      Q    And who did you meet while you were there?

8      A    I met Shikhar Ghosh, David Gifford, and Larry

9  Stewart.  Maybe some others.  I don't recall.

10     Q    And did they demonstrate anything to you while

11 they were there?

12     A    Yes, I got the demo.

13     Q    And can you describe that demo relative to

14 what we've just seen with regard to the HMI mall?

15     A    I don't really remember any details of the

16 demo.

17     Q    If you have the Ellsworth and Ellsworth book

18 in front of you, do you?  Can you -- can you look in

19 there and tell us what the publication date is?  This is

20 Exhibit 156.

21     A    It says copyright 1994.  It says copyright

22 1994.

23     Q    Thank you.  And I misspoke before when I said

24 the video was 150 -- was 157.  It's actually 156.

25                MR. HANSON:  I pass the witness.

```
 1                     THE COURT:  All right.  We will take our
 2  afternoon break at this time.
 3                     Ladies and Gentlemen of the Jury, we will
 4  be in recess until 10 minutes after 3:00.  Please
 5  remember my instructions.
 6                     COURT SECURITY OFFICER:  All rise.
 7                     (Jury out.)
 8                     (Recess.)
 9                              (Jury in.)
10                     COURT SECURITY OFFICER: All rise.
11                     THE COURT:  Please be seated.
12                     All right, Mr. Giannetti, you may
13  proceed.
14                     MR. GIANNETTI:  Thank you, Your Honor.
15                        CROSS-EXAMINATION
16  BY MR. GIANNETTI:
17       Q    Good afternoon, Mr. Trevor.
18       A    Good afternoon, Mr. Giannetti.
19       Q    We meet again.
20            Mr. Trevor, on direct examination, you
21  described your occupation as a software archeologist?
22       A    Yes, sir.
23       Q    And I believe you said that you research prior
24  work in the software field; is that correct?
25       A    Yes.
```

```
 1      Q    You didn't mention what use is made of your
 2 research.
 3           Is litigation a main use of the research that
 4 you -- that you do in the software field?
 5      A    I've worked for clients that are sometimes
 6 trying to defend themselves from litigation or
 7 prevent -- prevent litigation.
 8      Q    This isn't the first time that you've been
 9 involved in patent cases, is it?
10      A    No, it's not.
11      Q    In fact, you have been involved in a number of
12 cases over the last few years; isn't that true?
13      A    I've been involved in a few.
14      Q    Well, let's -- let's mention a few of them
15 just to put them in the record.
16           You testified at a deposition in a case called
17 Amazon versus Barnes & Noble; is that correct?
18      A    Yes.
19      Q    And, in that case, Barnes & Noble was opposing
20 a patent that was owned by Amazon; is that correct?
21      A    Yes.
22      Q    And then CompuServe was the subject of your
23 testimony in that case?
24      A    It was.
25      Q    And you were -- you were appearing on behalf
```

1    of the party opposing the patent in that case; is that

2    right?

3        A    I was appearing on behalf of

4    barnesandnoble.com.

5        Q    In another case Civix versus Travelscape, you

6    appeared in that case, also?

7        A    Yes.

8        Q    And you were again on the side of the party

9    that was opposing the patent in that case?

10       A    Yes.

11       Q    You testified about CompuServe art again in

12   that case?

13       A    That's right.

14       Q    You also testified at deposition in a case

15   called St. Clair versus Sony; is that correct?

16       A    Correct.

17       Q    You were working for Sony in that case?

18       A    I was.

19       Q    And, in fact, you filed an expert report in

20   that case; isn't that true?

21       A    Yes.

22       Q    And again, the art that you testified about in

23   that case was CompuServe?

24       A    Yes.

25            And then there's the case of Soverain versus

1    Amazon.com involving my client in this case, Soverain.

2          You testified at a deposition in that case,

3    didn't you?

4    A    As I recall, I did, yes.

5    Q    In fact, you testified as an expert in that

6    case on behalf of Amazon; is that right?

7    A    That's right.  And I believe I gave a

8    demonstration of CompuServe technology as part of

9    that.

10   Q    That's right.  And in that case you were

11   opposing two of the three patents that are involved in

12   this case; isn't that so?

13   A    I don't recall the patent numbers, no.

14   Q    And again, the subject matter of your

15   testimony was CompuServe; is that right?

16   A    I think to a large extent it was.

17   Q    So on at least four occasions prior to this

18   case, you've testified about CompuServe on behalf of

19   parties opposing the validity of patents; isn't that

20   true?

21   A    Yes.  And it's not too surprising, since

22   CompuServe was a pioneer in many of the online and

23   E-commerce fields.

24   Q    In none of those cases did a judgment issue

25   validating the patents due to CompuServe; isn't that

1    true?

2         A     Say that again.

3         Q     In none of those cases -- none of those cases

4    resulted in a judgment holding a patent invalid based on

5    CompuServe?

6         A     Well, you know, I don't -- I didn't follow the

7    cases after, you know, my expert reports or testimony,

8    so I don't know how they all turned out.

9         Q     So nobody -- nobody filled you in as to

10   whether your side won or not?

11        A     As I recall, on the Amazon case, that that was

12   ultimately -- it was appealed and the appeal came out in

13   favor of Barnes & Noble.  I could be wrong, but that's

14   my recollection.

15        Q     Let's talk about CompuServe, okay?

16              CompuServe, I think you said it was a system

17   where you had to dial up; isn't that correct, at least

18   prior to 1994?

19        A     In the early '70s, I mean basically there was

20   no other choice but dial-up.

21              In later years, some CompuServe users were

22   directly connected to CompuServe modes, so a dial-up

23   connection wasn't necessary.

24        Q     But in the -- in the time period of 1994, it

25   was necessary to dial up CompuServe for most users.

1    That was the most common way of doing it, wasn't it?

2         A    It was the most common way.

3         Q    So you needed a telephone line and a modem?

4         A    Yes.

5         Q    And a modem was a piece of equipment that

6    allowed your computer to communicate with a computer at

7    the other end through the analog telephone lines; is

8    that right?

9         A    That's correct.

10        Q    It changed the digital technology -- it

11   allowed the digital technology of the computers at

12   either end of the line to communicate through ordinary

13   telephone lines.  Is that a good description?

14        A    That's right.  And that link was between the

15   personal computer and a nearby network entry point, such

16   as a CompuServe network node.

17        Q    All right.  And for some people, it required

18   making a long distance phone call, didn't it?

19        A    Well, for very few, because, by that point in

20   time, CompuServe network covered probably over 85

21   percent of the population in the United States, and a

22   good part of the rest was covered by supplemental

23   networks like Tymnet and Telenet.

24        Q    But the few who didn't have a number -- a

25   local number that you could call, you would incur long

1    distance charges; isn't that right?

2         A    CompuServe also had an 800 number you could

3    call.  There was a surcharge related to that.

4         Q    Okay.  But in any event, you did also have to

5    pay a monthly fee.  Wasn't that the usual deal for

6    people, that in order to have access to the CompuServe

7    service, you paid a monthly fee?

8         A    In -- in 1994, yes, a monthly fee.  But part

9    of that, it was an hourly fee, in the earlier days of

10   CompuServe, an hourly fee.

11        Q    And it was also a closed system in the sense

12   that you had to have a user ID, a password in order to

13   access the system?

14        A    You had to have a user ID and password to

15   access the system, that's true, just like you need

16   access credentials to get on ISP on the internet.

17        Q    But to get on the internet today, if I wanted

18   to browse websites on the internet, I would not need a

19   user ID or password, would I?

20        A    You would need to have a relationship with

21   some ISP, either a free one or paid one.  If you're in

22   your home you would probably have to pay for it.

23        Q    CompuServe called its users members; isn't

24   that right?

25        A    Yes.

1     Q    And by that, it meant that they paid a monthly

2  fee, they got a user ID and a password, and they had

3  access to CompuServe services such as the electronic

4  mall that you were testifying about?

5     A    Yes.

6     Q    Now, you mentioned that at some point

7  CompuServe was on the internet around 1994?

8     A    Yes.

9     Q    And I think you were careful to distinguish

10  between the internet and the worldwide web because there

11  is a difference; isn't there?

12     A    Well, the worldwide web application layer

13  protocol up here called http, TELNET is a different

14  protocol.  But in early '94, there weren't very many

15  websites.  Maybe a few hundred.  And TELNET was an

16  important protocol.

17     Q    TELNET was a different protocol or application

18  on the internet from the worldwide web; isn't that

19  true?

20     A    Yes, it was, and still is.

21     Q    And it was a text-based system.  Didn't look

22  like the fancy graphics that you see on the worldwide

23  web today; do -- did it?

24     A    You could transmit different kinds of data on

25  TELNET, but the most common use for it was text-oriented

1   terminal mode data, as you described it.

2      Q    So when you said that CompuServe was on the

3   internet in -- in '94, it was not on the worldwide web,

4   it was accessible through this text-based TELNET system

5   that you're talking about; isn't that true?

6      A    That's correct.  But you could use WINCIM in

7   HMI mode through the internet.  As far as the users were

8   concerned, they didn't see TELNET.  It was just another

9   way to connect to CompuServe.

10     Q    But it wasn't on the web.  I just want to make

11  sure that it's absolutely clear that it was not on the

12  web?

13     A    No.

14     Q    Now, you talked about various versions of

15  CompuServe; is that right?  You had a -- an early

16  version that was the ASCII version, A-S-C-I-I version?

17     A    Yes.

18     Q    Okay.  And that was the one that you showed on

19  the screen from the Bowen and Peyton book with the

20  menus.  Do you recall that?

21     A    Yes.

22     Q    Didn't have hypertext links or couldn't click

23  on things to get information from CompuServe; is that

24  right?  In other words, the way it's communicating with

25  CompuServe was through menus?

1    A    That's correct.  And even later, it was

2    through menus, too, only a different user interface.  It

3    was a graphical interface, much like a browser.

4    Q    So there was a second version you talked about

5    using something called a WINCIM.  That was the HMI

6    version; is that right?

7    A    HMI protocol was a more advanced user

8    interface to CompuServe, and it required that you have a

9    client that -- well, communication software that was

10   compatible with that protocol, and CompuServe had such

11   clients such as Macintosh, Windows and DOS, and some

12   third-party-made communication software using HMI.  So

13   there were a number -- number of communications programs

14   that enabled you to view CompuServe and HM -- HMI

15   mode.

16   Q    HMI mode is different than http; isn't that

17   true?

18   A    It's a different protocol, but it has some of

19   the same look and feel to it.

20   Q    But it's different?

21   A    It's different, yes.

22   Q    Okay.  And -- and the HMI protocol, or a

23   computer that was able to handle the HMI protocol, would

24   not necessarily be able to render an http display or

25   page; isn't that true?

1          In other words, if you had a program that was
2    designed for HMI, you could not display http; is that
3    right?
4        A    Well, I mean, a good example is WINCIM that we
5    were just looking at.  And when we went through the
6    buttons on the ribbon, one of the buttons would invoke a
7    browser.  So the browser could interpret http and would
8    integrate it in with WINCIM.  Okay.
9          And I'm not saying that WINCIM itself could
10   interpret it.  But there were two different protocols:
11   http, HMI.  And WINCIM 1.2, which we are looking at,
12   they were integrated together.
13       Q    What you're describing is a situation where a
14   button on the WINCIM screen would send you to a
15   different piece of software, to a browser that was
16   designed to render or to display http pages.  Isn't that
17   what you're describing?
18       A    Yes.  But the browser was integrated with
19   WINCIM.  So it wasn't like, you know, something else
20   came up over here in an entirely different program.  It
21   came up within the window.
22          As far as the user is concerned, it was just
23   like another WINCIM window.  The way it works is a
24   multiple window.
25       Q    But to programmers, it was a different

1  protocol; isn't that right?

2      A    To programmers it was a different protocol,

3  sure.

4      Q    I'd like you to take a look -- you testified

5  about three books that -- I think you have them in the

6  binder that's before you.  One is the Bowen and Peyton

7  book.  That's Exhibit 2.  The second is the Campbell

8  book, which Exhibit 3.  I don't think you mentioned the

9  Campbell book, so let's just -- let's just concentrate

10  on Exhibit 2 and Exhibit 4.

11      A    Okay.

12      Q    And let me ask you some general questions

13  about those books, and then maybe we'll get into the

14  specifics.

15          First of all, you're not the author of those

16  books; is that right?

17      A    No, I'm not.

18      Q    No one at CompuServe is the author of those

19  books; isn't that right?

20      A    I don't -- I'm not really familiar with the

21  Campbell book; but, you know, I've never heard of him

22  before, the book, so I don't think he was a CompuServe

23  employee.

24      Q    All right.  To your knowledge, none of the

25  authors of those three books that you testified -- or

1  the two that you testified about, or the Campbell book,

2  either the Bowen and Peyton, the Campbell or the

3  Ellsworth book, they're not CompuServe people, are

4  they?

5      A    You are correct, they are not CompuServe

6  people, to the best of of my knowledge.

7      Q    And these are books that are really intended

8  and directed at CompuServe users; isn't that true?

9      A    They're intended, as best I can tell, for

10  CompuServe users or potential CompuServe users.

11      Q    Okay.  I will accept that.

12          In 19 -- in the 1990s or '89, when the Bowen

13  and Peyton book was written, a computer -- personal

14  computers were still a pretty new thing, and services

15  like CompuServe were a fairly new development, weren't

16  they?

17      A    That's true.

18      Q    Would you say that these books are written on

19  a pretty basic level?

20      A    Yes.  They're not -- they're not designed for

21  implementers or computer software applications.

22      Q    And they're not designed for the people that

23  would be called upon to develop a system like

24  CompuServe, are they?

25      A    No.

1       Q    Now, let's turn to the Bowen and Peyton book,

2   if you will.  That's Exhibit 4.  And I believe you went

3   through some of the -- some of the screens on that.

4       A    It's Exhibit 2?

5       Q    It's on the screen there.

6            Now, in your -- in your testimony you used a

7   term shopping cart a couple of times.

8       A    Yes.

9       Q    In fact, more than a couple of times.

10           Now, do you see that term used in the Bowen

11  and Peyton book?

12      A    No.  But it was used internally at CompuServe

13  and in numerous publications.

14      Q    Okay.  Have -- have you seen it in any

15  document that you've looked at in connection with your

16  testimony today, the term shopping cart?

17      A    Not in any of these three books.

18      Q    Okay.  And have you seen anything in these

19  books, either the Campbell book or the Peyton book --

20  Bowen and Peyton book or the Ellsworth book that would

21  teach somebody how to implement the shopping cart?  And

22  by implement, you know I'm talking about, you know,

23  writing software and doing things that programmers need

24  to do to implement this.

25      A    These books address the -- primarily the user

1    interface.  But Bowen and Peyton, for example on 321,

2    they talked about the function of the order command.

3    And they say this is a common prompt in the electronic

4    mall.  If you want to order products you have to simply

5    enter O and the system knows it.

6              Okay.  So what does knows it mean?  It means

7    the host computer has to make a record of it.  You know,

8    any programmer knows that that means you got to write it

9    someplace.  It doesn't give the name of the file, but a

10   programmer wouldn't need that in order to understand

11   what's involved in that function.

12   Q    Is there any description in that book of the

13   software that would be needed to implement that, any

14   description in there?

15   A    As I said, this is a description from the

16   user's point of view.

17             But software engineers have reversed engineered

18   applications on less than this.

19   Q    The answer is, it's not there; is that

20   correct?

21   A    This is -- there's no specific implementation

22   information in these books.

23   Q    That was my question.  Thank you.

24             Now, when that order button is pushed, in the

25   example that you went through, I take it a message is

1  sent from the client to the host to the server; is that

2  right?

3      A    Yes.

4      Q    Is that what would happen?

5           Is there any description in those books of the

6  format or how that message would be put together, for

7  better -- lack of a better word?  I'm looking for some

8  technical description of what that message would be in

9  those three books.

10     A    All the pages describe the O command.  Anybody

11 with a little technical knowledge knows that.

12     Q    That's not my question.  My question is, is it

13 in the book?

14     A    It says enter the O command.

15     Q    It doesn't say what happens, what messages go

16 from the client to the server when you push that button

17 and when you enter that command, does it?

18     A    It doesn't say that, no.

19     Q    Now, you also in your testimony, I think you

20 dropped the word database maybe a couple of times; is

21 that right?

22     A    I think I did.

23     Q    Okay.  Where in those books is there a

24 description of how that database would be implemented?

25     A    As I said, these books don't -- are not

1    implementation guides.  I have, you know, personal

2    knowledge of how the system worked.

3        Q    So, in other words, it's not in there?

4        A    But anybody is going to know if you type a

5    command --

6        Q    It's not in there, is it?

7        A    But if you type a command on the terminal

8    program, it's connected to a server, it's going to go to

9    the server.

10       Q    It doesn't tell you what that message is, does

11   it?

12       A    It tells you it's the letter O.

13       Q    And is that all the message is, is the letter

14   O?

15       A    The code for the letter O followed by a

16   carriage return.

17              MR. GIANNETTI:  Would you pull up the

18   slide?

19       Q    (By Mr. Giannetti) I am going to put a slide

20   up and I'm going to...

21              Okay.  So now this is a slide from your

22   presentation and this is a point -- can you see this on

23   your upon for

24       A    Yes.

25       Q    This is a point you went through that

1    transaction, this is the moment of truth with regard to

2    the product; isn't that true?

3        A    Now we're looking at the HMI version.

4        Q    Right.

5        A    Okay.  And at this point, when you press the

6    order button, that's when it sends an HMI message to the

7    host computer, which causes it to update the personal

8    order file or the shopping cart.

9        Q    So in the ASCII version, it just sends the

10   character O?

11       A    Right.

12       Q    Without anything else?

13       A    Well, with a carriage return.

14       Q    With a carriage return.

15            Now, the HMI version, you're saying the

16   message is a little bit different?  Is it just the

17   letter O?

18       A    No.  It's an HMI packet.

19       Q    Where is that packet described in any of those

20   manuals that you testified about?

21       A    It's not -- none of these are

22   implementation -- implementation guides.

23       Q    Now, at this point in the ordering process,

24   there's just one product that's being displayed on the

25   screen in the CompuServe electronic mall system; isn't

1  that right?

2      A    Well, at this point we've already selected a

3  product from a list, and what we're looking at is a

4  detailed description of a single product and we're being

5  given the opportunity to order it and enter a

6  quantity.

7      Q    Okay.  And this is the HMI version of

8  the system; is that right?

9      A    Yes.

10     Q    Was it the same in the ASCII version, where

11  there was one product that was selected when you hit the

12  the order button, or I guess typed the command O or

13  entered the -- I guess in the -- in the -- just to make

14  it clear.

15          In the ASCII version, you entered the

16  character O; is that right, from the keyboard?

17     A    That's right.

18     Q    Or you could select order from a menu?

19     A    I don't think so.

20     Q    Okay.  You had to enter from the keyboard.  It

21  was not a point-and-click system like the HMI version;

22  is that right?

23     A    That's correct.  There were a lot of computers

24  that were running, in the early days, didn't have mice,

25  for example.

```
 1      Q    But in both systems at the time that you made
 2 the decision to order and indicated it either by typing
 3 in an O or clicking on the order button, it's only one
 4 product; is that right?  One product's been selected?
 5      A    That's right, yes.
 6      Q    So at that point, there would be no need to
 7 include, in the message that went between the client and
 8 the server, information about what product was being
 9 selected; isn't that true?
10      A    In a previous message, though, in a previous
11 message the user has selected the product.
12      Q    But for that message, there's no need, is
13 there?
14      A    For the order command, there's no need to
15 select or provide information, because the product has
16 already been selected.  We're only talking about one
17 product at this I point in time.
18      Q    So the message that goes from the client to
19 the host or the server, in each case, when an order is
20 placed by either clicking on the button or entering the
21 O, did not contain an identification of the product in
22 either system; isn't that right?
23      A    That's correct.
24      Q    Now, you mentioned a personal holding file
25 that's mentioned in one of these documents.  I think
```

1   it's the Ellsworth document, is it?  I thought I marked

2   it in my copy.  It's 376.

3        A    Page 376.  At the bottom of the second

4   paragraph?

5        Q    Yes.

6        A    Your order will be stored in a personal

7   holding file until you leave the merchant's store.  Is

8   that what you're referring to?

9        Q    That's what I'm referring to, right.

10                MR. GIANNETTI:  Put that up on the

11   screen.

12        Q    (By Mr. Giannetti) Do you know which paragraph

13   it's in?  I'm looking for it.

14        A    Yeah.  It's the second paragraph on Page

15   376.

16        Q    Yeah.

17                MR. GIANNETTI:  Would you highlight the

18   second paragraph?

19        Q    (By Mr. Giannetti) So this tells you what

20   happens when the order command is entered, that an order

21   is stored in something called a personal holding file

22   here?

23        A    Personal holding file, personal order file.

24        Q    Okay.  And you equate that with a shopping

25   cart; is that right?

1      A     Not just me, but CompuServe, simple ease, and

2  people have read articles, yes.

3      Q     So where in this document does it explain how

4  that would be implemented?

5      A     This document doesn't address

6  implementation.

7      Q     Now, there was a time when the CompuServe

8  system did move to the internet, isn't that true, to the

9  worldwide web?

10      A     CompuServe integrated some web pages into its

11  service.  Most of that happened after I left.

12      Q     Do you recall the announcement -- the date of

13  the announcement that CompuServe was going to make a

14  move to the worldwide web?

15      A     I don't.

16              MR. GIANNETTI:  Could you put up

17  Exhibit 51?

18      Q     (By Mr. Giannetti) Okay.  Does this document

19  refresh your recollection in any way about when that

20  announcement occurred, that it was in May of 1996?

21      A     Well, I don't remember the exact date that I

22  left CompuServe, but it was in May of '96 that I left.

23      Q     You left in May of '96?

24      A     Yes, I did.

25      Q     And at that time, was there a movement of

1   CompuServe to the web that was being announced publicly?

2       A    There were projects going on related to that

3   that I -- you know, I was aware of, but, you know, I

4   don't -- I don't remember any public announcement.

5       Q    Wasn't it true that CompuServe didn't actually

6   go live on the -- on the web until at least late '97,

7   over a year-and-a-half later?

8       A    I don't know.

9       Q    You weren't there at the time?

10      A    I wasn't there at the time, no.

11      Q    Is the electronic mall operating today?  I

12  mean, the CompuServe electronic mall.

13      A    No.

14      Q    In fact, CompuServe shut down last summer,

15  didn't they?

16      A    The classic version of CompuServe shut down in

17  June of last year.

18      Q    And the classic version was the version that

19  was the -- really the continuation of the version that

20  you testified about earlier today, isn't it?  Isn't that

21  true?

22      A    Yes.  Sometimes after I left CompuServe, it

23  was acquired by America Online, and they basically

24  converted CompuServe to AOL technology.  And they kept

25  vestiges of CompuServe as the classic service for a

1  while.  CompuServe still exists today, but it's

2  basically a rebranded subset of AOL.

3      Q    So CompuServe classic is gone.  CompuServe

4  electronic mall is gone.  Not in operation today; isn't

5  that right?

6      A    That's true.

7      Q    All right.  I want to just touch briefly on

8  the Soverain/Amazon case that you did testify about as

9  an expert.  This was a few years ago.  And I just want

10  to refresh your recollection that two of the three

11  patents in this case were involved.

12          Do you recall that?  You wrote a report in

13  that case.

14      A    That was a long time ago, but, I mean, I'll

15  take your word for it that those are the same patents.

16      Q    Yeah.  I could show you your report, but

17  you'll find out that the '314 and the '492 were involved

18  in that case.

19      A    I'm not going to question that.

20      Q    Okay.  Now, in that case, you relied on

21  CompuServe, but two different CompuServe systems than

22  the one you talked about today; isn't that so?

23      A    As I recall, it was mainly the Travel Shopper,

24  airline reservation and ticketing system.

25      Q    Okay.  So you relied on something called

1  Travel Shopper, which dealt with making travel

2  reservations through CompuServe; is that right?

3      A    You could make reservations, and you could

4  purchase tickets online.

5      Q    I think the other system that you relied on in

6  that case was something called EZ Saver, another travel

7  system?

8      A    EZ Saver was the American Airlines version.

9  Travel Shopper was the TWA version.  But it was

10  basically the same software.

11      Q    So in the Soverain versus Amazon case where

12  you testified as an expert and prepared a report on the

13  validity of the patents in that case, you relied on two

14  different CompuServe systems than the one that you

15  testified about today; isn't that true?

16      A    Yes.

17      Q    You did not even consider the CompuServe

18  electronic mall as prior art in connection with that

19  case, did you?

20      A    Well, I didn't design Amazon's defense.  You

21  know, I did some research, presented them with the

22  results of my software archeology, and I'm sure they had

23  good reasons for picking the CompuServe systems that

24  they did.

25      Q    Well, you were their expert in that case,

1  weren't you?

2      A    I wasn't their lawyer.

3      Q    Didn't they ask for your technical expertise

4  in that case as to what they should or should not be

5  using as prior art?

6      A    They asked me a lot of questions, I made some

7  recommendations, but I didn't design their defense.

8      Q    But you ended up relying on things other than

9  CompuServe mall in that case, didn't you?

10     A    Yes.

11              MR. GIANNETTI:  Nothing further.  Thank

12  you.

13              THE COURT:  Redirect?

14              MR. GIANNETTI:  Pass the witness.

15                  REDIRECT EXAMINATION

16  BY MR. HANSON:

17     Q    There were some questions asked about the O

18  command --

19     A    Yes.

20     Q    -- and whether or not the O command included a

21  product description.

22              Was there any need for a product description

23  in the O -- that went along with the O command?

24     A    There was no need because the item had already

25  been selected, and the server was already holding that

1    information.  So when the order command came along,

2    there was no doubt about what was being ordered.

3        Q    There were some questions posed to you about

4    the Amazon case.

5            Now, I know it's been a while, and you're not

6    a legal expert, and we're not asking you for any legal

7    or expert opinions in this case.

8            Do you recall or not whether the claims that

9    were asserted in the Amazon case at the time you were

10   asked to give testimony regarding Travel Shopper and EZ

11   Saver are all the same -- all the same in both this case

12   and that case?

13           In other words --

14       A    Yeah.  It --

15       Q    And if you know, you know.  If you don't know,

16   you don't know.  That's all I'm asking.

17       A    To the best of my recollection, at least some

18   of the claims in the Amazon case had to do with the

19   actual purchasing process and maybe even using credit

20   cards, but certainly part of the purchasing process.

21   That's my recollection.

22               MR. HANSON:  No further questions.

23               THE COURT:  All right.  Anything further?

24               MR. GIANNETTI:  Nothing further, Your

25   Honor.

```
 1                    THE COURT:  All right.  You may step
 2  down.
 3                    All right.  Who will be your next
 4  witness?
 5                    MR. BALDAUF:  Your Honor, at this time,
 6  we would like to offer the video deposition of Lawrence
 7  Stewart, who was one of the inventors of the
 8  patents-in-suit.
 9                    The video is 52 minutes long, 35 minutes
10  of which is to be charged to Newegg and 17 minutes of
11  which is to be charged to Soverain.
12                    THE COURT:  All right.  Very well.  You
13  may begin.
14                    Ladies and Gentlemen of the Jury, I guess
15  this is probably the first video deposition we've had,
16  and let me just explain to you what that is.
17                    Sometime prior to trial, the attorneys,
18  pursuant to Court rules, will take the deposition of a
19  witness where it's taken down under oath by a
20  stenographer, and it's also sometimes videoed.
21                    And then when we come to trial, that
22  deposition can be introduced into evidence, and it has
23  the same force of testimony as if the witness were here
24  testifying live.
25                    So the attorneys have gone through it,
```

1  and you heard some times referred to.  And I mean, if

2  they played the whole thing, it might be four or five

3  hours long, so they've edited it down to 52 minutes of

4  what each side believes would be helpful to you.

5              So that's what you're going to be

6  hearing.  So we'll be bringing the popcorn in in a

7  little bit, and y'all just sit back and enjoy

8  yourselves.

9              (Video playing with no sound.)

10             THE COURT:  We normally have sound, too.

11 We're technologically advanced enough to hear it, so I'm

12 sure there's a little glitch in the computer there.

13 They'll get it fixed.

14             (Video playing.)

15             QUESTION:  Are you being compensated for

16 your appearance here today?

17             ANSWER:  I am being compensated for my

18 time but not for testimony.

19             (Video stopped.)

20             THE COURT:  You want to start that over

21 where we can hear who the witness is, please?

22             (Video playing.)

23             QUESTION:  Dr. Stewart, will you state

24 your full name, please?

25             ANSWER:  Lawrence Colm Stewart.

```
1              QUESTION:  And what is your residence?

2              ANSWER:  In Wayland, Massachusetts.

3              QUESTION:  And in what year were you

4  born?

5              ANSWER:  1955.

6              QUESTION:  And by whom are you employed?

7              ANSWER:  Serissa Research.

8              QUESTION:  And how long have you worked

9  for Serissa Research?

10             ANSWER:  Since 2001.

11             QUESTION:  And who did you work for

12 before that?

13             ANSWER:  Open Market.

14             QUESTION:  Are you being compensated for

15 your appearance here today?

16             ANSWER:  I am being compensated for my

17 time but not for testimony.

18             QUESTION:  And at what hourly rate are

19 you being compensated?

20             ANSWER:  Let me see if I remember.  I

21 think it is about $400 an hour.

22             QUESTION:  And did you meet with counsel

23 in the near past to discuss preparation for this

24 deposition?

25             ANSWER:  I did.
```

1                     QUESTION:  And for how many hours did you
2    meet with him?
3                     ANSWER:  Maybe six.
4                     QUESTION:  Do you have any financial
5    interest in the outcome of this lawsuit?
6                     ANSWER:  I do not.
7                     QUESTION:  Do you own any -- do you own
8    any stock in Soverain?
9                     ANSWER:  I do not.
10                    QUESTION:  Do you still own any stock in
11   Open Market?
12                    ANSWER:  I have some wallpaper from Open
13   Market, I think; but, no, it is, as far as I know, of no
14   value.
15                    QUESTION:  And how did you acquire stock
16   for Open Market?
17                    ANSWER:  I acquired founders' stock when
18   the company was started.
19                    QUESTION:  Did you ever sell any of your
20   founders' stock?
21                    ANSWER:  I did.
22                    QUESTION:  And -- and then retained some
23   after you left?
24                    ANSWER:  That's correct.
25                    QUESTION:  And is that the stock that

1   you're talking about as being wallpaper?

2                ANSWER:  That's correct.

3                QUESTION:  Well, let me ask you this:

4   When did you first join Open Market?

5                ANSWER:  In -- in late April of 1994.

6                QUESTION:  And what were your

7   responsibilities in late April 1994?

8                ANSWER:  In the initial period, my

9   responsibilities were to build an engineering team and

10  work on the first product offerings of the company.

11               QUESTION:  And did you build an

12  engineering team?

13               ANSWER:  I did.

14               QUESTION:  And -- and who comprised that

15  team?

16               ANSWER:  The number of engineering staff

17  grew over time, so I can remember some of the early

18  ones.  I'm not sure what you're asking.

19               QUESTION:  I'm asking -- let me limit it

20  to the period 1994.

21               ANSWER:  Let me see if I get everyone.

22  Andrew Payne, David Mackie, Win Treese, Henry Tumblin, I

23  think were the first maybe four.  Later on, additional

24  folks.

25               QUESTION:  In what year did you graduate

1  from high school?

2                    ANSWER:  1972.

3                    QUESTION:  And what was your next step in

4  your education?

5                    ANSWER:  I attended the Massachusetts

6  Institute of Technology.

7                    QUESTION:  And did you graduate from MIT?

8                    ANSWER:  I did.

9                    QUESTION:  And what was your degree in?

10                   ANSWER:  A bachelor's degree in

11 electrical engineering.

12                   QUESTION:  In acquiring your degree in

13 electrical engineering, did you take computer science

14 courses?

15                   ANSWER:  I did not.

16                   QUESTION:  What did you do after you

17 graduated from MIT?

18                   ANSWER:  I attended graduate school.

19                   QUESTION:  Where?

20                   ANSWER:  At Stanford University.

21                   QUESTION:  And what was the -- what was

22 your study at Stanford?

23                   ANSWER:  A master's degree in electrical

24 engineering followed by a Ph.D.

25                   QUESTION:  Upon receipt -- were you

1   employed during the time you were at Stanford, other

2   than at the university working for your degrees?

3               ANSWER:  I was a research intern at the

4   Xerox Palo Alto Research Center.

5               QUESTION:  What year did you start at

6   Xerox?

7               ANSWER:  I believe in the summer of 1977.

8               QUESTION:  And for how many years did you

9   work at Xerox?

10              ANSWER:  Until early 1984.

11              QUESTION:  And what was the nature of

12  your work at Xerox?

13              ANSWER:  I worked on a number of projects

14  broadly involving computer science and computer systems

15  research.

16              QUESTION:  Can you be more specific?

17              ANSWER:  Sure.  The first project

18  involved data communications over power line carrier,

19  sending signals over the power wiring.

20              The second project involved building an

21  interface between the ARPANET and the Xerox Alto

22  computer that was used for the DARPA packet radio

23  program.

24              The third project involved writing

25  floating point microcode for the Alto.

1              My major project there following my

2    graduation was the Etherphone, a system for -- sort of a

3    private branch telephone system running over the

4    computer network.

5              QUESTION:  Now, you mentioned the

6    ARPANET.  Was that the precursor to what people today

7    refer to as the internet?

8              ANSWER:  One of the precursors, I

9    suppose, yes.

10             QUESTION:  Let's go on.  It's been a long

11   time.

12             Subsequent to being awarded your Ph.D.,

13   what employment did you undertake?

14             ANSWER:  I worked at the Xerox Palo Alto

15   Research Center.

16             QUESTION:  And for how long did you stay

17   with Xerox?

18             ANSWER:  From -- until the spring of --

19   or winter of 1984.

20             QUESTION:  And did you take employment

21   after that?

22             ANSWER:  I did.

23             QUESTION:  And where was that?

24             ANSWER:  At the Digital Systems Research

25   Center.

1                QUESTION:  And what was the nature of

2    your work at the Palo Alto Research Center?

3                ANSWER:  A number of projects involving

4    computer systems research, several.  Do you want some --

5    do you want more -- more detail?

6                QUESTION:  Please.

7                ANSWER:  The major project was the

8    development of multiprocessor workstations, including

9    the so-called Firefly machine in various versions, work

10   on the Autonet local area network system, work on

11   hardware and software for voice on personal computers.

12               QUESTION:  Okay.  Subsequent to '89,

13   then, where did you go?

14               ANSWER:  I transferred to the Digital

15   Cambridge Research Lab.

16               QUESTION:  And what was still with

17   Digital Equipment Corporation?

18               ANSWER:  That's correct.

19               QUESTION:  And to whom did you report at

20   Cambridge?

21               ANSWER:  At first, to Dr. Victor

22   Vyssotsky.

23               QUESTION:  How do you spell that, if you

24   know?

25               ANSWER:  Oh, man.  V-Y-S-S-O-T-S-K-Y.

1  That's an approximation.

2              QUESTION:  And what was nature of your

3  work when you joined the Cambridge Laboratory?

4              ANSWER:  Again, there were a number of

5  computer systems research projects.  The primary one was

6  early development of the Digital alpha-based machines.

7  And I was seconded, I suppose you would say, to the

8  Semiconductor Engineering Group, so I had offices in

9  both Cambridge and in Hudson, Massachusetts.

10             Other projects at the Cambridge Lab

11  included AudioFile, which was a system for managing

12  speech and audio on personal computers, and some work

13  with speech recognition as well.

14             QUESTION:  The -- did you have

15  any employees report to you while you were at Cambridge?

16             ANSWER:  I did.

17             QUESTION:  And who were they?

18             ANSWER:  I believe Andrew Payne and

19  perhaps Tom Levergood.  I think the reporting

20  relationships at CRL were fairly vague.

21             QUESTION:  Prior to joining Open Market,

22  did you have any experience with databases?

23             ANSWER:  Yes.

24             QUESTION:  Did you have any experience

25  with commercial databases?

1                    ANSWER:  I did not.

2                    QUESTION:  What databases did you have --

3    okay.

4                    Can you describe your experience with

5    databases prior to joining Open Market?

6                    ANSWER:  At the Xerox Palo Alto Research

7    Center, there was a research project called Juniper,

8    which was a file system based on database technology.  I

9    used that file system for the storage of data files for

10   my thesis research.

11                   QUESTION:  You used the term database

12   technology.  Can you give us a sense of what you think

13   database technology comprises?

14                   ANSWER:  Well, the way I think about

15   databases is that they do a few things for you if you're

16   trying to build an application that -- you can store

17   things in them and get them back later, you can do

18   searching, and you can do transactions with a number of

19   properties, usually called ACID -- let's see if I can

20   remember this -- atomicity, consistency, isolation, and

21   durability.  Applications may need some or all of these

22   aspects of databases.

23                   QUESTION:  Was the database that you

24   worked with one that made use of the SQL language?

25                   ANSWER:  Juniper did not provide SQL.

1          QUESTION:  You used the term atomicity.

2  How does that relate to databases?

3          ANSWER:  The usual example is that you

4  can -- the usual example is banking.  So if I want to

5  debit one account and credit another, those two events

6  must happen either together or not at all.

7          So you can't debit and fail to credit,

8  and you can't credit but fail to debit.  They must both

9  happen or nothing happens.  And that -- and that is sort

10  of the essence of an atomic transaction.

11          QUESTION:  And you mentioned isolation.

12  How does that relate to databases?

13          ANSWER:  As I understand it, the

14  activities of multiple users of the database should not

15  interfere with one another.

16          So it shouldn't make a difference.  If

17  you have independent activities using the same database,

18  it shouldn't -- one should not be able to affect the

19  correctness of the other.

20          QUESTION:  And is durability simply what

21  it sounds like?

22          ANSWER:  No, actually.  I -- I believe

23  durability refers to not losing the data once it's in

24  there.  The data is recorded in some stable fashion.

25          QUESTION:  How does consistency relate to

1  the database?

2            ANSWER:  This is probably the one I'm

3  weakest about.  I think it refers to everybody has the

4  same notion of what happened.

5            If you have, you know, two parties to a

6  transaction, they both agree that this account was

7  debited, and that one was credited or that nothing

8  happened.  But you can't have one conclusion from one

9  perspective and a different conclusion from some other

10 user of the database.

11           QUESTION:  Now, you've mentioned these

12 features of a database, of database technology.  Was

13 that your understanding at the time you joined Open

14 Market?

15           ANSWER:  No.

16           QUESTION:  And when did you come to

17 understand these features of database technology?

18           ANSWER:  I think, starting from my work

19 with Juniper, I began learning about databases, and I

20 think that education continues today.  I think the --

21 sort of the -- I had a good -- a good understanding of

22 it probably by 1995.

23           QUESTION:  When you arrived at Open

24 Market, what other employees were there?

25           ANSWER:  I think I arrived at Open Market

1  before the company was funded so that I'm not sure that

2  the question makes sense.

3              QUESTION:  When were you joined with

4  other employees at Open Market?

5              ANSWER:  I think I was the first person

6  after Shikhar Ghosh and David Gifford to become

7  associated with Open Market, so the people who were

8  there when I got there, I suppose, were David and

9  Shikhar.

10             QUESTION:  And which employees next

11 arrived?

12             ANSWER:  David Mackie and Andrew Payne.

13 I'm not sure in which order.  Oh, wait.  Kim Alley was

14 perhaps quite early.

15             QUESTION:  And when Mackie, Payne, and

16 Alley arrived, where were you located?

17             ANSWER:  I think we did not have offices

18 then.  I know that Andy and I were working out of our

19 basements.

20             QUESTION:  Now, while you were working in

21 your basement, what were you working on?

22             ANSWER:  I think my primary activity was

23 worrying about -- about sort of setting up technical

24 infrastructure, internet access, computers.  There

25 were -- we had a series of meetings at which we

1    discussed what the company would do.

2               QUESTION:  Who were the early -- early

3    investors in Open Market?

4               ANSWER:  Greylock, the venture capital

5    firm, and an investment syndicate, the -- I don't know

6    if it was a formal business.  The representative was

7    Guli Arshad.

8               QUESTION:  Now, I understand

9    Mr. Gifford -- Dr. Gifford was an MIT professor; is that

10   correct?

11              ANSWER:  Still is, I believe.

12              QUESTION:  I see.

13         And how did you come to meet Dr. Gifford?

14              ANSWER:  I think I first met him in -- in

15   Stanford.  We lived in the same graduate student house.

16   He was in the same class as I was at MIT, but I don't

17   recall meeting him there.

18              QUESTION:  Do you recall how it came

19   about that he recruited you for Open Market?

20              ANSWER:  Yes.  He -- he telephoned and

21   said:  I have an idea for a company.

22         And he described it, and I said:  David, that

23   is the first idea you've called me about that isn't

24   loony.

25              QUESTION:  Had he called you about ideas

1    before?

2                    ANSWER:  Yes, he had, but I don't

3    remember what they were about.

4                    QUESTION:  Do you recall how he expressed

5    his idea that wasn't loony?

6                    ANSWER:  Not in detail.  I think the

7    essence was:  The internet is going to be open for

8    commercial activity, and we should do something about

9    commerce.

10           I'm sure there was more to it than that, but

11   that's what I remember.

12                   QUESTION:  Did he explain that he had any

13   experience with the internet and commercial activity?

14                   ANSWER:  I don't know if it was during

15   that phone call, but over the next month or so, he did,

16   yes.

17                   QUESTION:  To what extent did he provide

18   ideas during the year 1994 that played into the

19   developments at Open Market?

20                   ANSWER:  Well, he wrote the first

21   business plan for the company, and it was chock full of

22   ideas.

23                   QUESTION:  Did you have access to that

24   business plan?

25                   ANSWER:  I don't know.  I must have -- I

1  suspect I did, but I don't recall specifically.

2                 QUESTION:  Did that business plan guide

3  your activities during 1993?

4                 ANSWER:  No.

5                 QUESTION:  Did it during 1994?

6                 ANSWER:  In part.

7                 QUESTION:  In what part?

8                 ANSWER:  Many of the ideas in it were

9  loony, and I ignored those.  The -- I think the general

10  notion of providing a transaction service to enable

11  merchants to conduct commerce with customers was the

12  central idea of the company, and that survived very

13  well.

14                 QUESTION:  In what form did that survive?

15                 ANSWER:  I think that there -- that --

16  that the representative of that notion going forward

17  became the Transact product line.

18                 QUESTION:  Do you recall in what year the

19  Transact product line became available commercially?

20                 ANSWER:  Its name changed over the course

21  of the history, but in 1994.

22                 QUESTION:  And in what form was the

23  Transact product line made available in 1994?

24                 ANSWER:  The first public offering of the

25  thing that became known as Transact was in October of

1    1994.  We called it the Open Marketplace, I think, and

2    we called the transaction engine the Payment Switch in

3    those days.

4              QUESTION:  Was the Open Marketplace a

5    service provided by Open Market to enable merchants to

6    put a commercial web page on the internet?

7              ANSWER:  I think that's one of the things

8    it enabled, among others.

9              QUESTION:  Are you aware of any merchants

10   that put -- made use of the Open Marketplace?

11             ANSWER:  I am.

12             QUESTION:  And who are they?

13             ANSWER:  The initial launch customers, I

14   believe, were Mead Data Central, a software company,

15   Ipswitch, and I'm not sure of the name, Kutter's Cheese

16   or something like that.  That one may have been later.

17             QUESTION:  And for how long did Open

18   Market offer the service, the Open Marketplace service?

19             ANSWER:  I don't know.  At some point,

20   the company decided its business was in selling the

21   software to others to operate rather than to operate by

22   itself, but I don't recall when that was.

23             QUESTION:  I'm going to ask the reporter

24   to mark as Exhibit 3 a document that was produced

25   bearing production numbers SVN2-00039958 through -60,

1   and it bears a date of May 5th, 1994, and a title, Store

2   Building Kit.

3           Did you prepare this document?

4               ANSWER:  It's -- I think so, yes.

5               QUESTION:  Was this prepared during that

6   period of time when you were working at home, or was

7   this prepared later?

8               ANSWER:  You know, I don't know the

9   answer.  I don't know whether we moved into our first

10  offices.  The...

11              QUESTION:  Did Open Market eventually

12  design something referred to as the Store Building Kit

13  or the like?

14              ANSWER:  Not in -- we did it a different

15  way in 1994.  Later on, we had something much like this.

16  I think in 1995.

17              QUESTION:  How does this differ from what

18  was done in 1994?

19              ANSWER:  This is a description of a

20  shrink-wrapped software product that you would load onto

21  your own PC and build content.

22          What we developed in 1994 was called Online

23  Storebuilder that was an interactive process with a web

24  browser for the user and a web-server-based

25  implementation of the store building system.

```
1                    QUESTION:  Now, there's mention in the

2      second line of this first paragraph of the Open Mall.

3      Was that a project that was taken up during 1993 by Open

4      Market?

5                    ANSWER:  No.

6                    QUESTION:  I'm sorry.  1994?

7                    ANSWER:  Yes.

8                    QUESTION:  And can you describe how that

9      was taken up?

10                   ANSWER:  I think this is an early name

11     for the -- for the idea of Open Market itself operating

12     a -- a mall, namely, a collection of online merchants

13     that came -- came to commercial fruition as the Open

14     Marketplace in October.

15                   QUESTION:  On Page 3, the second to the

16     last paragraph begins:  There might be, paren, at least,

17     close paren, two classes of merchants who would use the

18     kit.

19                   The first class are folks who are already

20     plugged into the internet and have seen things like

21     mosaic or at least have seen AOL or CompuServe, close

22     paren.

23                   What was your knowledge of AOL at the time of

24     preparing this document?

25                        ANSWER:  I believe I had seen other
```

1  people using it.  I did not myself have an account or

2  myself have used it.

3              QUESTION:  Do you know what other people

4  you had seen using it?

5              ANSWER:  No.

6              QUESTION:  Had you seen them using it for

7  purchase of -- for -- for making purchases of products?

8              ANSWER:  I'm pretty sure not.

9              QUESTION:  At the time of this memo, what

10  was your knowledge of CompuServe?

11              ANSWER:  I knew it to be a -- an online

12  service, but -- but one disconnected from the internet.

13              QUESTION:  And what kind of services did

14  CompuServe provide that you knew of at the time?

15              ANSWER:  My general understanding, it was

16  sort of a commercial time-sharing service.  You could

17  get an account, and you could log into it, and I

18  actually don't know what you could do once you got

19  there.

20              QUESTION:  Did you have any familiarity

21  with a thing known as the CompuServe mall at the time of

22  preparing this document?

23              ANSWER:  I did not.

24              QUESTION:  Who was assigned to build the

25  Open Marketplace software?

```
 1              ANSWER:  There -- that pretty much

 2  encompasses all of the software that Open Market was

 3  working on, so I suppose everybody in engineering was

 4  working on it in one way or another.

 5              QUESTION:  Did any individual have the

 6  heavy oar, so to speak?

 7              ANSWER:  It's difficult to say which is

 8  the heavy oar.  I think fundamentally, I was working on

 9  the transaction system.

10         Dave Mackie was working on the Online

11  Storebuilder aspects of it.

12         Andy Payne worked on servers and

13  infrastructure and the mall machinery.

14         Henry Tumblin worked on payment processing and

15  interactive voice response.

16         Win Treese worked on security and

17  authentication issues.

18         That's -- that's a rough breakdown, but we all

19  worked on everything.

20              QUESTION:  I'm going to ask the reporter

21  to mark as Exhibit 4 a document that was produced with

22  production numbers SVN2-003967 through -86.  It appears

23  to be an e-mail dated 8 May 1994.

24         Did you prepare this e-mail?

25              ANSWER:  I have no reason to think I
```

1  didn't.  I think I did.

2                  QUESTION:  Does it relate to one of the

3  early meetings that you mentioned earlier?

4                  ANSWER:  I think it does.

5                  QUESTION:  Is the Shikhar referred there

6  Mr. Ghosh?

7                  ANSWER:  Shikhar, yes, it is.

8                  QUESTION:  Shikhar?

9                  ANSWER:  That's correct.

10                 QUESTION:  And Andy refers to Andy Payne?

11                 ANSWER:  That's correct.

12                 QUESTION:  And Cathy (sic) -- no.  Who is

13  Cathy (sic)?

14                 ANSWER:  I think I'm in trouble here.

15  That's misspelled.  It's Kathy with a K.  I think that's

16  Kathy Matthews, who is Shikhar's administrative

17  assistant.

18                 QUESTION:  So Kim Alley wasn't present,

19  according to this?

20                 ANSWER:  According to this, nobody else

21  was present, right.

22                 QUESTION:  And I believe if you go to the

23  last page -- the second to the last page of this

24  document, I think it appears at No. 85, there's an

25  indication that Mr. Treese was under consideration for

1    becoming an employee.

2                   ANSWER:  It looks that way, yes.

3                   QUESTION:  As was -- as was Mr. Mackie?

4                   ANSWER:  I don't see the reference to

5    Mackie.

6                   QUESTION:  Well, in the sentence

7    following Win Treese, it says --

8                   ANSWER:  Ah, I have it, yes.

9                   QUESTION:  So at that time, they were

10   probably not employees of Open Market?  At that time

11   being the date of this document.

12                  ANSWER:  I believe that's correct.

13                  QUESTION:  Now, going back to the first

14   page, in a paragraph that begins:  Stage 2, colon,

15   there's reference to the Future Fantasy Bookstore.  And

16   my question to you is, what was your knowledge of the

17   Future Fantasy Bookstore at time of this e-mail?

18                  ANSWER:  I had been to the physical store

19   when I was in Palo Alto, so I had that much knowledge of

20   it.  I don't know whether I had been to visit the

21   website, for example, or knew anything about the store

22   before this meeting.

23                  QUESTION:  And at this meeting, who

24   related the information which raised:  Another example

25   is the Future Fantasy Bookstore, which is resident on a

1   DEC worldwide web server in Palo Alto?

2                ANSWER:  I don't know for sure.  Probably

3   Andy.

4                QUESTION:  Did you come to have any more

5   specific understanding of the Future Fantasy Bookstore

6   website subsequent to the date of this e-mail?

7                ANSWER:  I did.

8                QUESTION:  And what was that knowledge?

9                ANSWER:  At some point, I think I went to

10  visit the website, looked at the -- looked at the --

11  looked at some number of the screens.

12               QUESTION:  Was that during 1994?

13               ANSWER:  Very likely, yes, during the

14  summer of '94, sometime between here and mid-summer

15  probably.

16               QUESTION:  During that period of time,

17  did you visit any other commercial websites, meaning

18  websites that offered products for sale?

19               ANSWER:  Likely.  The one I remember

20  was -- I don't remember the name of it, Internet

21  something, and I was stopped at the main entrance

22  because you had to have an account even to get inside,

23  and I didn't have one.  Internet -- I don't remember.

24               QUESTION: Okay.

25               ANSWER:  I remember being irritated.

1               QUESTION:  Now, in the next paragraph of

2   this document, evidently, Mr. -- you're -- you're

3   recording what you believe Mr. Payne said at the

4   meeting, and -- and your sentence reads:  The existing

5   online ordering is done by typing in credit card numbers

6   in the clear, or as done out-of-band, paren, by

7   confirming the order by telephone, for example, close

8   paren, or is done on the basis of a preexisting

9   relationship, like customer account with a specific

10  merchant.

11              Can you explain what was meant by in the

12  clear?

13              ANSWER:  In the context of this

14  paragraph, I would say it means unencrypted and

15  potential of being intercepted.

16              QUESTION:  At the time this document was

17  prepared, was there any way to use the available

18  browsers to transmit credit card numbers from an html

19  form to a web server that was encrypted?

20              ANSWER:  I don't think I was aware of any

21  at that time.  There is something on Page 4 about

22  something called secure mosaic, but I don't know whether

23  that was actual or what its capabilities were at the

24  time.

25              QUESTION:  Did you ever become aware of

1   what the capabilities of secure mosaic were?

2                    ANSWER:  I'm not sure it's the same

3   thing.  If this -- this is written here in the context

4   of EIT, so this might be referring to what later became

5   shttp, the secure web protocol devised by EIT and

6   Teresa.

7                    QUESTION:  Did Open Market ever use that

8   protocol?

9                    ANSWER:  I believe that the Open Market

10  web server in '95 was planned to or did implement shttp,

11  but nobody ever used it to my knowledge.

12                   QUESTION:  Continuing with Exhibit 4,

13  there's reference near the middle of second page to the

14  CompuServe mall.  It reads:  CompuServe-mall, and then

15  it's in parens, $10 million, close paren, charges

16  $50,000 to put up a large merchant.

17                   Were you aware that at the time of this

18  e-mail, that CompuServe enabled merchants to put

19  products on their site?

20                   ANSWER:  I think it was something I

21  learned at the meeting.

22                   QUESTION:  Did you ever come to have more

23  understanding of the CompuServe mall than is related in

24  this sentence?

25                   ANSWER:  No.

1                    QUESTION:  Did the CompuServe mall serve

2      as the suggestion for producing the Open Marketplace at

3      Open Market?

4                    ANSWER:  I don't know any information

5      about that.  I don't know.

6                    QUESTION:  Now, turning to the page that

7      bears the production number ending in 83, there's a

8      paragraph that begins Stage 2.  And it reads:  This

9      situation is involving -- evolving towards internet

10     access to existing dial-up services and to improved --

11     and to improved, paren, but still idiosyncratic, close

12     paren, interfaces.

13                   On the internet, multiple sessions could

14     potentially offer multi-screen access to multiple

15     services.  It goes on to say in parens:  You can do this

16     on a CompuServe today, close paren.

17                   Did you understand that CompuServe could

18     enable multi-screen access to multiple services at the

19     time of preparing this document?

20                   ANSWER:  I -- I -- I think I reported

21     that sentence, but I did not know what it was referring

22     to.

23                   QUESTION:  And at the meeting, who

24     related the gist of that sentence for you to record?

25                   ANSWER:  I don't know.

```
 1                    QUESTION:  Could it have been Shikhar --
 2                    ANSWER:  It could have been.
 3                    QUESTION:  -- or Kathy?
 4                    ANSWER:  Kathy seems unlikely.  She was
 5     mostly silent at these meetings.
 6                    QUESTION:  Now, the next -- next
 7     paragraph reads:  A side note on changing models dash --
 8                    ANSWER:  Hold on a second.  I lost my
 9     page.
10                    Okay.  I'm with you.
11                    QUESTION:  Side notes on changing models,
12     dash, existing time sharing systems, paren, including
13     CompuServe, close paren, can charge a flat rate per time
14     or per access or can simply delegate the charging system
15     to a vendor application.
16                    Did you understand at the time of this
17     document that CompuServe provided vendor applications?
18                    ANSWER:  I don't think that's something I
19     knew or reported.  I recorded it.
20                    QUESTION:  By 1998, had CompuServe
21     migrated to the internet?
22                    ANSWER:  I have no idea.
23                    QUESTION:  Beginning on the page that
24     ends in 69, there's a heading:  Online statements.
25     And the second paragraph under that heading reads:
```

1   Within the Smart Statement, each line contains the usual

2   information about a transaction, but in addition, the

3   item is active.

4                    What did you mean by the item is active?

5                    ANSWER:  As we built the system on the

6   Smart Statement, the line item was a hypertext link that

7   you could click on to see a detailed statement.  So

8   active means it was a link you could activate.

9                    QUESTION:  And hypertext links were part

10  of the html markup language; is that correct?

11                   ANSWER:  The concept is older than that,

12  but html includes the ability to create hypertext links.

13                   QUESTION:  Did you later use other

14  databases?

15                   ANSWER:  We did.

16                   QUESTION:  What other databases were

17  used?

18                   ANSWER:  Later on, Transact supported

19  both Sybase and Oracle databases, and other Open Market

20  products, such as the -- some of the catalog products, I

21  think, used some other kind of database.  I don't

22  remember the name of it.  Not SQL.

23                   QUESTION:  Dr. Stewart, near the end of

24  October of 1994, did Open Market make some sort of a

25  rollout or announcement about products that were

1  available from Open Market?

2              ANSWER:  That's correct.

3              QUESTION:  And what products did they

4  announce?

5              ANSWER:  I think we announced the service

6  Open Marketplace, which was not a software product per

7  se but a service, including Online Storebuilder, and the

8  transaction service implemented by the Payment Switch

9  and an initial set of stores and relationships.

10              QUESTION:  Okay.  For the addition of

11  every item to a shopping cart, was it necessary to

12  authenticate the user using basic authentication?

13              ANSWER:  I believe in -- in October '94,

14  that's the way our code worked, yes.

15              QUESTION:  Are you an author of this

16  book?

17              ANSWER:  I am.

18              QUESTION:  Did you co-author it with

19  Mr. Treese?

20              ANSWER:  I did.

21              QUESTION:  How did you and Mr. Treese go

22  about preparing this book or writing this book?

23              ANSWER:  If recollection serves, this is

24  the second edition.

25              QUESTION:  It says so.

1                   ANSWER:  We took the -- the text from the

2      first edition, and I think we divided it up into

3      chapters, and each worked on revisions of those chapters

4      and then traded them and went over each other's work

5      before arriving at the final text.

6                   QUESTION:  Do you recall if that's the

7      way you and Mr. Treese cooperated in writing the first

8      edition?

9                   ANSWER:  I think that's -- that's pretty

10     much the same method we used, yes.

11                  QUESTION:  And did you attempt to make

12     the discussions in the book as accurate as possible?

13                  ANSWER:  I think eventually with books,

14     you reach diminishing returns, and you just have to ship

15     it, but we made an effort to make it accurate.

16                  QUESTION:  If you'll turn to the -- Page

17     314 of the exhibit, there starts a chapter entitled

18     Shopping Carts and Order Management.

19                  ANSWER:  My copy does not have such a

20     page.

21                  QUESTION:  319?

22                  ANSWER:  Ah, 319.  Got it.

23                  QUESTION:  Now, in this chapter, there's

24     discussion of server-side shopping carts, client-side

25     shopping carts, and protocol-based shopping carts.

1                    Are protocol-based shopping carts

2    described in Exhibit 1, which is '314 patent?

3                    ANSWER:  Could you repeat the question

4    now?  I'm sorry.  I took so long, I've forgotten the

5    wording.

6                    QUESTION:  Is there any discussion of

7    protocol-based shopping carts in Exhibit 1, the '314

8    patent?

9                    ANSWER:  They're certainly not called

10   protocol-based shopping carts.  It just merely refers to

11   a shopping cart, as far as I can tell.

12                   QUESTION:  Is there any discussion in the

13   '314 patent of a client-side shopping cart?

14                   ANSWER:  I don't think so, no.

15                   QUESTION:  What would be your

16   understanding of the difference between a client-side

17   shopping cart and a protocol-based shopping cart?

18                   ANSWER:  As described in the book, a

19   client-side shopping cart is something perhaps

20   implemented in Java or ActiveX controls that you could

21   add items to without making any network communications

22   at all, so solely implemented on the client.

23                   Perhaps if you had a CD-ROM-based

24   catalog, you could build up a shopping cart full of

25   items locally and then purchase it all at once.

1                   A protocol-based shopping cart, as

2     described in the book, is a notion where the -- the

3     collection of items is -- is passed back and forth

4     between the server and the client as part of a -- as

5     part of the session.

6                   QUESTION:  So if a shopping cart was

7     maintained in a cookie, would that be a protocol-based

8     shopping cart?

9                   ANSWER:  In the intended usage of the

10    book, I would say that's true.  It spends part of its

11    life in the client, most of its life on the road, and

12    part of its life in the server.

13                  QUESTION:  Now, at the time the '314

14    patent was filed in October 24th, 1994, were there

15    browsers available that implemented Java applets or

16    ActiveX controls or JavaScript?

17                  ANSWER:  Not to my knowledge.

18                  QUESTION:  So in -- at that date, the

19    only two ways of implementing a shopping cart was either

20    a protocol-based shopping cart or a server-side shopping

21    cart?

22                  ANSWER:  Well, in this taxonomy, I

23    suppose that's true, but we have to be careful not to --

24    not to confuse protocol-based shopping carts with

25    cookies, because that's not the only way to do it.

1              QUESTION:  Now, I'm going to direct your

2    attention to Page 285 of the book.  And there's a last

3    sentence of a paragraph near the bottom of the page that

4    reads:  There are two ways to create a web session

5    today, colon, custom URLs and cookies, comma, as shown

6    in Figure 14-6.

7              ANSWER:  I see that.

8              QUESTION:  Is that an accurate statement

9    as of the time the book was written?

10             ANSWER:  It's accurate -- as of 2003, I

11   think that's true.  There's -- it might be possible to

12   do the same thing with TLS temporary keys.  There's --

13   there's some other technologies, but I'm not sure they

14   were extant in 2003.

15             QUESTION:  Were they extant in 1995?

16             ANSWER:  I -- I don't know for sure.

17   There -- if -- if the TLS temporary keys or something

18   like that were available, that would be of not universal

19   applicability, I suppose.  Well, cookies aren't either,

20   so I don't think we're talking about universal

21   applicability here.

22             QUESTION:  Why are cookies not

23   universally applicable?

24             ANSWER:  Oh, the key problem is people

25   turn them off.  The -- there was a lot of trouble about

1  privacy and the implications of cookies in -- in the

2  time period from '95 to -- well, to current day.

3            QUESTION:  Now, to your knowledge, in

4  1994, would it be accurate to say that there are two

5  ways to create a web session today:  Custom URLs and

6  cookies?

7            ANSWER:  I was not aware of the

8  availability of cookies in 1994, so this would not have

9  been an accurate statement then.

10            QUESTION:  So then, as far as you know,

11  in 1994, the only way to implement a web session was to

12  use a custom URL?

13            ANSWER:  There are some fine points about

14  what is a session, I guess, that -- some uses of things

15  that are session-like can be accomplished with

16  authentication protocols, but for -- for this

17  discussion, I think that it's accurate.

18            QUESTION:  Would there be some relative

19  disadvantage in using the authentication protocol versus

20  the custom URLs?

21            ANSWER:  Yes.

22            QUESTION:  And what was that?

23            ANSWER:  Two come immediately to mind.

24  The first one is that if you use an authentication

25  protocol as a session mechanism, that you get confused

1   if there are two of them running simultaneously.

2               So if I have my desktop machine and my

3   laptop -- not that we had laptops then -- it would be --

4   it would be difficult to -- if you used -- if I -- if I

5   used the same name and password, as it were, to log in

6   on both, there's no way for the servers to keep those

7   activities distinct.  It looks like it's the same thing.

8   Now, sometimes that's exactly what you want but not

9   always.

10              The other key disadvantage of the use of

11  authentication methods as a session mechanism is that it

12  puts the system design at sort of a security

13  disadvantage.

14              If you have a lot of servers that you'd

15  like to do session-like things, it appears that you

16  might need many copies of the authentication information

17  floating around, and the more copies of it there are,

18  the less secure it is.

19              QUESTION:  Did the abandoned shopping

20  carts occupy memory on the server?

21              ANSWER:  That -- that depends on the

22  implementation of them.  If -- if -- so what

23  implementation are we talking about?

24              QUESTION:  Well, a server-side shopping

25  cart that has -- a server-side shopping cart computer

1    that has abandoned shopping carts, would that not have

2    occupied a larger amount of memory on the server than

3    was necessary?

4              ANSWER:  Than necessary.  Although

5    storage, I suppose, is so cheap that it may not be a

6    real issue.

7              In addition, you get one shopping cart

8    per registered customer in the implementation that --

9    that my code did, which is not an undue load.  It's not

10   like you get thousands of them per customer.  So it's a

11   bounded problem.

12             (End of video clip.)

13             THE COURT:  Does that complete the

14   order -- offer?

15             MR. BALDAUF:  That completes the

16   deposition transcript of Lawrence Stewart.

17             Your Honor, during that deposition, the

18   witness mentioned Deposition Exhibits 4, 21, 3, and 10,

19   and those correspond respectively to Defendant's

20   Exhibits 1, 9, 50, and 52, which we would like to move

21   into evidence at this time.

22             THE COURT:  All right.  Any objection?

23             MR. ADAMO:  No, Your Honor.

24             THE COURT:  Be admitted.

25             MR. BALDAUF:  Your Honor, it's

1  approximately ten minutes to 5:00.  We have one more

2  clip that's nine minutes long, if we could show that.

3             THE COURT:  All right.  Go ahead.

4             MR. BALDAUF:  This would be the video

5  clip of Paul Esdale.

6             Mr. Esdale was the head of business

7  development at Open Market.  The video, as I said, is

8  nine minutes long, seven minutes of which are to be

9  charged to Newegg and two minutes of which are to be

10  charged to Soverain.

11             THE COURT:  Okay.

12             (Video playing.)

13             QUESTION:  What were your job

14  responsibilities while you were at Open Market?

15             ANSWER:  During what time period?

16             QUESTION:  We can start at the beginning,

17  and then we'll move through it.  So during your first

18  part of your tenure.

19             ANSWER:  The first part of my tenure was

20  licensing Open Market's software products to outside

21  companies that were typically not end user customers.

22             QUESTION:  Let me point to you on the

23  page marked as Esdale Exhibit 2, right after the little

24  drawing, there's a sentence that appears to me to read,

25  and correct me if I'm wrong:  Open Market remains an

1   application software company, not a litigation.

2                 ANSWER:  Right.

3                 QUESTION:  What -- do you recall what

4   that meant?

5                 ANSWER:  What that meant was that -- and

6   this is a conversation with Gary -- that Gary's opinion,

7   shared by some and different than others, but pretty

8   much common, was that Open Market is a software company.

9   That's what our business was.

10                We had reached revenues of 80 or $90

11  million a year, and we reached those revenues by selling

12  software and services to companies.  That's what our

13  primary business was.

14                So the point here is that Open Market was

15  not a patent licensing company.  That wasn't our primary

16  business.  That's what that meant.  And this is -- and

17  by the way, I will say that this is an unfinished

18  sentence, which means that we were probably moving

19  pretty quickly, which is not uncommon, and moved on to

20  the next thought and grabbed a note you can see below

21  it.

22                So what that probably would have -- it

23  said we are mainly a software company, not a litigation

24  company or a patent licensing company, as our primary

25  business.  That's how I would refer -- that's what I

1    would interpret that comment as going back seven years.

2              QUESTION:  During your tenure as leading

3    the patent group at Open Market, would you say that Open

4    Market remained a software company, as opposed to a

5    litigation company?

6              ANSWER:  Yes.

7              QUESTION:  The question pending was:

8    Were you aware whether there were high-level discussions

9    within the company about trying to leverage Open

10   Market's patents into sales to potential customers on

11   the software side?

12             ANSWER:  A couple of things.  What are

13   high-level discussions?

14             QUESTION:  Do you recall having any

15   discussions within Open Market about trying to leverage

16   Open Market's patents into sales to potential customers

17   on the software side?

18             ANSWER:  The question -- it's a question

19   that -- I want to answer your question --

20             QUESTION:  Yes.

21             ANSWER:  -- but I'm still having trouble

22   with the way you're phrasing it.

23             QUESTION:  Okay.

24             ANSWER:  I recall discussions of whether

25   it is appropriate to use patents to encourage sales of

1   products.  We did not do that.  That's the -- the

2   discussions we had were around we had a policy not to

3   use the patents in any way to leverage a sale of our

4   products.

5              QUESTION:  In other words, as you

6   testified before, the sales pitch would not mention the

7   patents, except to the extent that it would say that

8   perhaps there's a patent out there or something like

9   that?

10             ANSWER:  The -- what I said was that on a

11   company overview-type slide material --

12             QUESTION:  Right.

13             ANSWER:  -- it may say, Open Market is

14   five years old.  Industry leader in E-commerce.  Has

15   valuable patented technology, along the scope of like an

16   industry leader.  Marketing materials would mention

17   patents.

18             Salespeople could give somebody a

19   corporate overview of Open Market, and in our corporate

20   overview, it might say something about the fact that the

21   company has patented technology.  The salespeople would

22   typically not go beyond that.

23             And you asked about -- so those -- the

24   discussions that I recall were -- there were discussions

25   I recall about not using patents to leverage product

1    sales.  You phrased it in a way of using.  The

2    discussions I recall were not doing that.

3              QUESTION:  During the course of the rest

4    of 1998, did Open Market begin to think more about the

5    different options available to it for its patent

6    portfolio?

7              ANSWER:  I know that the patent team,

8    meaning especially Win, Eric, myself, with specifically

9    Rob Pressman of Bramson & Pressman, began -- we talked a

10   lot about the different options.

11             And I think it was from that middle of

12   '98 through '98, we were really exploring, discussing

13   the different options.

14             QUESTION:  What were the different

15   options that you were considering?

16             ANSWER:  The same options that we've

17   talked about earlier, licensing, not licensing, suing,

18   not suing, spinning out a patent company to do it, doing

19   nothing, using the patents defensively, using the

20   patents to consider licensing for folks that might be

21   interested in making strategic investments.  All of

22   those options were discussed by that group.

23             QUESTION:  During your tenure at Open

24   Market, did Open Market ever attempt to license its

25   patents to a company that used the Transact software?

```
1                ANSWER:  I don't know.
2                QUESTION:  To the best of your
3   recollection, can you recall a situation where Open
4   Market attempted to license its patents to a company
5   that used the Transact software?
6                ANSWER:  I don't recall Open Market
7   attempting to license the patents to any Transact users,
8   to the best of my knowledge.
9                QUESTION:  Did you discuss how pursuing a
10  potential license against a third party could affect any
11  potential software deal with that same third party?
12               ANSWER:  Can you say that again?
13               QUESTION:  Sure.
14               Did you discuss within Open Market
15  whether pursuing a patent licensing strategy against a
16  particular company could adversely affect any software
17  sales to that same third-party company?
18               ANSWER:  So did I discuss that?
19               QUESTION:  Yes.
20               ANSWER:  Yes.
21               QUESTION:  What do you recall about those
22  discussions?
23               ANSWER:  I just recall my -- the
24  attorneys -- my discussions were with the attorneys, so
25  maybe they're privileged -- I don't know -- where I was
```

1  just advised that -- myself, it's not a good idea to go

2  to a company in any way and make any kind of assertion

3  that they need to buy our products because we have

4  patents.

5                    And that was the extent of what I recall.

6  That was a conversation really more advisorial between

7  me and -- I'm not sure if it was Eric Pyenson or whether

8  it was the Bramson & Pressman guys or Fish & Richardson,

9  but I can remember that general theme working with my

10 attorneys.  Most likely, it was probably Bramson &

11 Pressman.

12                    QUESTION:  Do you recall ever having a

13 conversation regarding not pursuing a license against a

14 company because of the risk of losing a software sale to

15 that same third-party company?

16                    ANSWER:  Me?

17                    QUESTION:  Yes.

18                    ANSWER:  I don't remember being involved

19 in a conversation like that.  I don't recall any

20 conversation like that.

21                    QUESTION:  Do you recall whether Open

22 Market had any conversations regarding not pursuing

23 patent licensing targets for fear or risk of losing

24 software business?

25                    ANSWER:  I don't.  I don't recall that.

```
 1                QUESTION:  Sure.  As based on your
 2   knowledge of -- of the patents and Open Market's
 3   Transact products and if a customer bought a Transact
 4   product, did that mean to you that the customer had a
 5   license under the Open Market patents?
 6                ANSWER:  No.
 7                (End of video clip.)
 8                THE COURT:  All right.  Does that
 9   complete the offer?
10                MR. BALDAUF:  That's it, Your Honor.
11                THE COURT:  All right.  It's almost 5:00
12   o'clock, so I think we're going to adjourn here in a
13   moment.
14                Let me inquire first from Newegg as to
15   what witnesses you'll have tomorrow and how long you
16   anticipate your direct examination of each will take.
17                MR. SAYLES:  May it please the Court.
18   Tomorrow there will be two more depositions that will
19   last a total of about 34 minutes.
20                THE COURT:  Which two are those?
21                MR. SAYLES:  That's Shikhar Ghosh, which
22   is 32 minutes for Newegg and -- make that 33.  Soverain
23   only had 20 seconds.  We'll take it off.
24                And Pyenson, and that's 4 minutes, all
25   for Newegg.
```

```
 1                    THE COURT:  Okay.
 2                    MR. SAYLES:  And then after that, we'll
 3  call Mr. Ed Tittel, our expert witness, and then after
 4  that, we'll call Mr. Bakewell, who is our damages
 5  expert.
 6                    THE COURT:  Okay.  And how long do you
 7  anticipate your direct on Mr. Tittel will take?
 8                    MR. SAYLES:  Mr. Tittel?
 9                    MR. BALDAUF:  Approximately two hours,
10  Your Honor.
11                    THE COURT:  Two?
12                    All right.  And how long does Plaintiff
13  anticipate for cross for Mr. Tittel?
14                    MR. GIANNETTI:  I would say about an
15  hour, Your Honor.
16                    THE COURT:  All right.  And what about
17  Mr. Bakewell?
18                    MR. SAYLES:  I would say about an hour
19  and 20 minutes on direct.
20                    THE COURT:  Okay.  Cross?
21                    MR. SATINE:  About an hour, Your Honor.
22                    THE COURT:  All right.  And who after
23  that, or is that it?
24                    MR. SAYLES:  That's it.
25                    THE COURT:  Very good.  Defendant will
```

```
1   rest then?

2                 MR. SAYLES:  Yes, we will, Your Honor.

3                 THE COURT:  And then will Plaintiff have

4   any rebuttal?

5                 MR. ADAMO:  We will, Your Honor.

6                 THE COURT:  All right.  And who all will

7   you have tomorrow?

8                 MR. ADAMO:  At the moment, Dr. Shamos,

9   who's the only person that we are planning on.  But I

10  haven't, quite frankly, reached an ultimate decision on

11  that.

12                THE COURT:  Right.  Just best guess right

13  now.

14                Dr. Shamos, how long will you take on

15  direct on him?

16                MR. ADAMO:  Mr. Giannetti is going to do

17  it.

18                MR. GIANNETTI:  I would say an hour, hour

19  and 15, in that range.

20                THE COURT:  Okay.  And cross?

21                MR. HANSON:  It really depends upon what

22  he says, Your Honor, but perhaps an hour.

23                THE COURT:  All right.  Let's see.

24                Well, if y'all stick with those

25  estimates, we've got eight hours of testimony to get in
```

1   tomorrow.

2                   So we're getting in about -- Ladies and

3   Gentlemen of the Jury, about six a day by the time we

4   start at 9:00 and go till 5:00, have an hour for lunch,

5   and maybe six-and-a-half and take our morning and

6   afternoon breaks.

7                   So we need to either -- we need to try to

8   finish tomorrow where we can come back on Friday morning

9   and give you the charge and hear arguments.

10                  We can either start a little early and

11  really put in a long day tomorrow or if counsel feel

12  like they can give any time back or we can come back on

13  Friday morning.

14                  What would be the jury's desire:  To try

15  to get through with the testimony tomorrow or to plan to

16  come back Friday morning and finish it up?

17                  Would you rather put in -- all of those

18  that would like to put in a long day tomorrow and get

19  through with it, raise your hand.  Okay.

20                  Those that would like to come back on

21  Friday and not put in such a long day tomorrow?

22  Okay.

23                  JUROR:  Those of us that don't care?

24                  THE COURT:  What did you say?

25                  JUROR:  Those of us that don't care.

1                    THE COURT:  Okay.  All right.  Well, I

2   tell you what I think we'll do then, I'm going to ask

3   the attorneys to really look at their testimony tomorrow

4   and see how you can pare it down and just try to hit the

5   really important stuff and see if we -- we'll be pushing

6   it even -- with the estimates you've given me.

7                    But I'm going to ask the jury, if y'all

8   don't mind being here at 8:30 in the morning, we'll plan

9   to start at 8:30, and we'll plan to go until we finish.

10  So that may be 5:30 or 6:00 tomorrow afternoon.

11                   So just -- anybody have any trouble

12  staying that late due to childcare or anything?

13  If we have to.  I hope we don't have to.  I hope we can

14  finish up by 5:00 o'clock, but just in case we can't,

15  so...

16                   Okay.  Well, that will be our plan.  I'll

17  ask the attorneys to really look at their witnesses and

18  testimony and everything and see if you can pare it down

19  some tonight.

20                   Mr. Adamo?

21

22                   MR. ADAMO:  Time, Your Honor?  What have

23  you got us on the clock at?

24                   THE COURT:  Yes.  Plaintiff has used 8

25  hours and 27 minutes, and Defendant has used 7 hours and

1    12 minutes.

2                    And just for the jury's information, what
3    I've done with the parties to try to keep things moving,
4    I've given them each 12 hours of testimony and time.

5                    Now, they've indicated to me -- let's
6    see -- that's 7, 15 -- well, they're talking about using
7    pretty close to the whole thing.  So I was hoping they
8    could maybe be able to give us a few hours back.

9                    But we've used about, let's see, 15,
10   almost 16 hours, so that's about right.  We've got about
11   8 more hours of testimony, if they use everything.

12                   So, hopefully, we can -- if each side can
13   give back some time, it would sure be good, so...

14                   Anyway, thank y'all for your attention
15   today.  You did great.  I know it's long and tedious,
16   and you're tired of sitting and everything, but we're
17   getting close to the end.

18                   So we'll finish the testimony tomorrow,
19   and then we'll get this wrapped up on Friday.

20                   So remember my instructions.  Please
21   don't discuss the case among yourselves or with anyone
22   else.  Don't do any independent research.  Have a safe
23   drive home and a restful evening, and we'll see you back
24   here in the morning at 8:30, 8:30 in the morning.

25                   COURT SECURITY OFFICER:  All rise.

1                    THE COURT:  Do the attorneys need to

2    visit with me about anything?

3                    MR. SAYLES:  Yes.

4                    THE COURT:  All right.

5                    (Jury out.)

6                    THE COURT:  Before we do anything else,

7    I'm going to ask the parties, whoever's turn it is, if

8    you would plan to provide a sandwich tray for the jury

9    tomorrow, and we'll probably do about a 30-minute lunch

10   tomorrow to try to get on through.

11                   So who's got the ball tomorrow on food;

12   do y'all know?

13                   MS. GOODMAN:  We've been splitting it

14   each day.

15                   THE COURT:  Excuse me?

16                   MS. GOODMAN:  We've been splitting it

17   each day.

18                   THE COURT:  Okay.  Well, that's fine.

19                   Just however -- y'all have been doing a

20   great job with it, and court staff has even snacked on a

21   little bit of it, and so we appreciate that.

22                   But if you'll -- if you would -- you can

23   get a sandwich tray from Subway or Jason's Deli or

24   whatever you'd like to do.

25                   MR. ADAMO:  Your Honor, if there's a

1    chance we're going to have to work until 6:00, maybe we

2    should try to get some afternoon snack stuff, too, maybe

3    cookies or something.

4                    THE COURT:  Yeah.  Some -- some

5    cookies -- cookies would be great.  But I don't -- I

6    think, if we start at 8:30 and we do 30 minutes for

7    lunch, we ought to certainly be finished by 4:00, and

8    especially if both of you stick to the 11 hours you've

9    told me you were going to try to do.

10                   MR. ADAMO:  Why did I know I was going to

11   get reminded of that?  Gee, let me think.

12                   Yes, we understand, Your Honor.  We've

13   been trying to -- we'll work tonight with a sharp pencil

14   and see what we can do.

15                   THE COURT:  Good.  Okay.

16                   What else?

17                   Oh, y'all sit down everyone.

18                   MR. SAYLES:  May it please the Court.

19                   Your Honor this morning said that I would

20   have an opportunity to make my objections to the two

21   exhibits that were mentioned yesterday afternoon, and

22   I'm prepared to do that now.

23                   THE COURT:  All right.  That's P54 and

24   P244?

25                   MR. SAYLES:  That's correct, Your Honor.

```
1                    THE COURT:  All right.

2                    MR. SAYLES:  P244 is Dr. Grimes' slides

3   that were used during his testimony, and there were over

4   a hundred of them.

5                    I certainly agree that those are proper

6   demonstrative aids as testimony is developed, but I

7   would object to those as improper exhibits to go to the

8   jury room as being hearsay, as being cumulative, and as

9   not being a proper summary under Rule 1006.

10                   They ought not to go to the jury room for

11  the very same reason that we don't send deposition

12  transcripts or interrogatory answers and the like.

13  So that is the objection to 244, which is Dr. Grimes'

14  slides.

15                   THE COURT:  All right.  Response?

16                   MR. ADAMO:  Your Honor, I believe -- I

17  can't quite remember -- I know I gave Mr. Sayles a bench

18  memo, although I don't quite remember what --

19                   THE COURT:  Now, are you tired this

20  evening?

21                   MR. ADAMO:  No, I'm not going to use that

22  excuse.  I'm not tired.  I'm just trying to -- in sum or

23  substance, Your Honor, I can certainly make the bench

24  memo available to the Court.

25                   THE COURT:  I've got it right here in
```

1  front of me.

2            MR. ADAMO:  Oh, you do.  All right.

3            THE COURT:  I haven't read it recently

4  since yesterday, but...

5            MR. ADAMO:  In sum or -- in sum or

6  substance, from the cases that are cited here,

7  particularly, the C.R. Bard case out of northern

8  Illinois and the other cases that we cited, the Fifth

9  Circuit actually is very favorable to this idea.  These

10 documents are, in fact, proper 1006 summaries.

11           THE COURT:  Why?

12           MR. ADAMO:  Because they are favored as

13 deposition excerpts, smaller summaries and excerpts of

14 depositions.  The United States versus Bishop, United

15 States versus Segines, all the cases we cited here --

16           THE COURT:  Well, I mean, we usually --

17 we usually don't put demonstratives in, so I'm just --

18 you know, is there some factual reason why these are

19 different?

20           MR. ADAMO:  Yes, because they're not just

21 demonstratives.  If you recall, Dr. Grimes said on

22 several occasions, at the bottom of each of the slides,

23 he's got all of the source information.

24           So, essentially, what he did is, he

25 summarized on each slide the information that was the

1    basis for what was shown on the slide, and that included

2    detailed citations from the 30(b)(6) deposition of

3    Mr. Wu, the various exhibits that were relied upon and

4    such.

5              And that is a consistent use of 1006 with

6    C.R. Bard, the Carter/Massey-Ferguson case and various

7    Fifth Circuit cases that we have -- that we have cited.

8              THE COURT:  Okay.  Do you have any

9    objection to their expert's demonstratives being

10   introduced?

11             MR. ADAMO:  No.  He didn't put them

12   together the same way as mine are, but no.  I mean, 1006

13   summaries are 1006 summaries.  So no.

14             THE COURT:  Okay.  Response?

15             MR. SAYLES:  Well, I would prefer not to

16   do that, but, naturally, if their slides are admitted,

17   then it would be only prudent for us to mark ours and

18   offer them.

19             But I would urge the Court to use them in

20   the usual fashion, as demonstrative aids, and that they

21   not be in the jury room.  The exhibit numbers that were

22   cited on the summaries indeed are in evidence, and those

23   are the evidence in the case.

24             THE COURT:  All right.  The Court's going

25   to sustain the objection.

1                   What's next?

2                   MR. SAYLES:  The next one is 54.  And

3    that is Dr. Grimes' checkmarks on the claim charts

4    where, as he went through and said each element was

5    satisfied, he put a red checkmark.

6                   I think that that has occurred in every

7    patent case that I've ever been involved in, but those,

8    too, are demonstrative aids.  They're proper

9    demonstrative aids, and I didn't object to them on that

10   basis.

11                  But I would object to those as them being

12   exhibits, because they're hearsay, and they're

13   cumulative, and the testimony of Dr. Grimes and the

14   documents are the proper testimony for those charts to

15   go to the jury room.

16                  MR. ADAMO:  Well, Your Honor, it comes

17   down -- and at the risk of getting you annoyed at me on

18   what you just said, the essence of summaries is -- yes,

19   the Wu -- the Wu deposition testimony and the

20   compendiums of those have been agreed and admitted into

21   evidence.  The exhibits are admitted into evidence.

22                  But that's exactly why these documents --

23   I've tried to move them in as a summary, because when

24   they go back to the jury room, instead of boxes of stuff

25   that the jurors are going to have to try to dig out and

1    assemble, the charts are exactly the type of summary

2    that makes this easier for the jury to look at the

3    evidence.

4              The checkmarks essentially come out to be

5    the same thing.  Now, I will agree, my argument is not

6    as good on the checkmarks as it is on the 1006

7    summaries, which you just changed your ruling on from

8    yesterday, but that's why the 1006 summaries are on the

9    charts.

10             So I'm complying with putting his in for

11   the same reasons -- are actually advantageous to juror

12   consideration, because you've got this much material

13   rather than eight boxes of stuff back in the room.

14             THE COURT:  All right.  I'm going to

15   sustain the objection as to 54.

16   Let me see the charts as to 244.  Do you have those?

17             MR. ADAMO:  I have mine, if Your Honor

18   will give me one moment.

19             THE COURT:  I think you've got a little

20   more basis on that, but I'm still not...

21             MR. ADAMO:  Should I just hand the binder

22   up to Your Honor?

23             THE COURT:  That's fine.

24             MR. ADAMO:  They're all in this tab.

25             THE COURT:  Okay.

1                    MR. ADAMO:  You'll have to flip through
2    them, but you can see where the source is down at the
3    bottom.
4                    THE COURT:  Okay.
5                    MR. ADAMO:  Here you go, Ms. Ferguson.
6    Got it?
7                    COURTROOM DEPUTY:  Yes.
8                    MR. ADAMO:  There's usually a line at the
9    bottom of each one of them, Your Honor.  It starts off
10   with source.
11                   Short -- Mr. -- Mr. Roth, as I'm sure you
12   noticed, has whispered in my ear, shorthand summary, I
13   guess he thought that would be better.
14                   THE COURT:  All right.  The Court is
15   going to stick with its ruling.  The objection is
16   sustained.
17                   What else?
18                   Mr. Sayles, anything else?
19                   MR. SAYLES:  From -- from me, no, Your
20   Honor, but I think Mr. Baldauf does have a couple of
21   items.
22                   THE COURT:  All right.
23                   MR. BALDAUF:  Well, Your Honor, just
24   briefly with respect to exhibits that were introduced
25   today --

```
 1                    THE REPORTER:  Can you go to the
 2   microphone?  I'm sorry.
 3                    MR. BALDAUF:  Your Honor, I would just
 4   like to offer into evidence some of the exhibits that
 5   were discussed today, specifically Defendants' Exhibits
 6   2 and --
 7                    THE COURT:  Why don't you do that
 8   tomorrow morning in front of the jury.  Just have a
 9   list, and we'll --
10                    MR. BALDAUF:  Fair enough.
11                    THE COURT:  -- we'll introduce that, and
12   get counsel's agreement on it, okay?
13   Anything further?
14                    MR. SAYLES:  Nothing further from Newegg.
15                    MR. ADAMO:  Your Honor, will the bench
16   memo end up in the record now?  I would ask --
17                    THE COURT:  If you filed it.
18                    MR. ADAMO:  I have not, but I will.
19                    THE COURT:  All right.  Well, I've made
20   marks all over it.
21                    MR. ADAMO:  No.  I'll get a clean --
22                    THE COURT:  Yeah, you can file it.
23                    MR. ADAMO:  All right.  Thank you, Your
24   Honor.
25                    THE COURT:  We'll be adjourned.
```

```
 1                  COURT SECURITY OFFICER:  All rise.

 2                  (Court adjourned.)

 3

 4

 5                  C E R T I F I C A T I O N

 6

 7   I certify that the foregoing is a correct transcript

 8   from the record of proceedings in the above-entitled

 9   matter.

10

11   /s/

12   SHEA SLOAN, CSR

13   OFFICIAL COURT REPORTER

14   STATE OF TEXAS NO. 3081

15

16

17   /s/

18   JUDITH WERLINGER, CSR

19   DEPUTY OFFICIAL COURT REPORTER

20   STATE OF TEXAS NO. 267

21

22

23

24

25
```