```
 1                IN THE UNITED STATES DISTRICT COURT
 2               FOR THE EASTERN DISTRICT OF TEXAS
                          TYLER DIVISION
 3
   SOVERAIN SOFTWARE              )
 4                               )   DOCKET NO. 6:07cv511
        -vs-                     )
 5                               )   Tyler, Texas
                                 )   1:00 p.m.
 6 NEWEGG, INC.                  )   April 29, 2010
 7                    TRANSCRIPT OF TRIAL
                       AFTERNOON SESSION
 8           BEFORE THE HONORABLE LEONARD DAVIS,
         UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                   A P P E A R A N C E S
10
   FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
11                          JONES DAY
                            2727 N. Harwood St.
12                          Dallas, Texas  75201-1515

13                          MR. THOMAS L. GIANNETTI
                            MR. BARRY R. SATINE
14                          MS. CLARK CRADDOCK
                            JONES DAY
15                          222 East 41st St.
                            New York, New York  10017-6702
16
                            MR. CARL ROTH
17                          ROTH LAW FIRM
                            115 N. Wellington, Ste. 200
18                          P.O. Box 876
                            Marshall, Texas  75670
19
                            MR. MICHAEL C. SMITH
20                          SIEBMAN, REYNOLDS, BURG,
                            PHILLIPS & SMITH
21                          713 S. Washington Ave.
                            Marshall, Texas  75670
22

23 COURT REPORTER:         MS. JUDITH WERLINGER

24 Proceedings taken by Machine Stenotype; transcript was
   produced by a Computer.
25
```

```
 1   FOR THE THE DEFENDANTS:   MR. RICHARD SAYLES
                               MR. MARK STRACHAN
 2                             SAYLES WERBNER
                               4400 Renaissance
 3                             1201 Elm St.
                               Dallas, Texas  75270
 4
                               MR. HERBERT A. YARBROUGH, III
 5                             YARBROUGH LAW FIRM
                               100 E. Ferguson, Ste. 1015
 6                             Tyler, Texas  75702

 7

 8                             MR. DAVID C. HANSON
                               MR. KENT BALDAUF, JR.
                               MR. DANIEL H. BREAN
 9                             THE WEBB LAW FIRM
                               200 Koppers Bldg.
10                             436 Seventh Ave.
                               Pittsburgh, PA  15219
11

12                             MS. CLAUDIA W. FROST
                               MR. JEREMY J. GASTON
13                             PILLSBURY WINTHROP
                               909 Fannin St., Ste 2000
14                             Houston, Texas  77010

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    COURT SECURITY OFFICER:  All rise.
 3                    (Jury in.)
 4                    THE COURT:  Please be seated.
 5                    All right, Mr. Sayles.  What will be
 6  next?
 7                    MR. SAYLES:  May it please the Court.
 8                    THE COURT:  Uh-huh.
 9                    MR. SAYLES:  On August the 25th, 2009,
10  Shikhar Ghosh gave a deposition at which time lawyers
11  for both parties appeared.  He was duly sworn on oath
12  and testified as we're about to show.
13                    THE COURT:  Okay.  Thank you.
14                    (Video playing.)
15                    QUESTION:  Mr. Ghosh, could you please
16  provide a general overview of your educational
17  background?
18                    ANSWER:  I got -- I got my BCom, which is
19  a bachelor's in India, in '78.  I came here and did my
20  master's at Harvard Business School, MBA.  That's it.
21                    QUESTION:  And could you take us through
22  your employment history.
23                    ANSWER:  All the way back?
24                    QUESTION:  How about following your --
25  sorry.  What was the degree in India called?
```

```
 1                    ANSWER:  BCom.

 2                    QUESTION:  BCom.  Following that.

 3                    ANSWER:  All right.  So after my MBA, I

 4    joined the Boston Consulting Group.  I was there until

 5    1988 or so.  I was a partner in the Boston office.

 6                    I left to form -- or to join a company as

 7    the CEO called Apex Software.  We did cellular software.

 8                    Sold that company to EDS in 1991, I

 9    believe, and ran -- that company then became EDS's

10    Personal Communication Division.  I ran that for them

11    until '93.

12                    And in '93, with David Gifford, formed

13    Open Market.  I was the CEO until '95, late '95; then

14    became the chairman.  I was the chairman until '99 or

15    so.  I forget the exact date.  But it was when Divine

16    bought the company.

17                    And since then -- after that, founded

18    another company called iBelong.  That company then

19    merged with another company and became Verilytics.  I'm

20    CEO of both companies.

21                    Since then have founded or helped found

22    an additional three or four companies.  I'm the

23    non-executive chairman of three, four companies right

24    now -- three companies and on the board of one company.

25                    So I was doing basically board roles for
```

1   two or three years.  And I'm currently employed by

2   Harvard Business School, and I'm on the faculty.

3                QUESTION:  Do you have any opinion as to

4   the value of the shopping cart technology in the scheme

5   of the overall Transact product?

6                ANSWER:  No.  It's one of the pieces

7   that's necessary.

8                QUESTION:  Necessary how?

9                ANSWER:  It's hard to imagine someone

10  doing shopping without some functionality like that;

11  otherwise, every transaction would be unique and

12  different.

13               QUESTION:  What do you mean by unique and

14  different?

15               ANSWER:  You'd have to -- if I was buying

16  six things from the store, I'd have to buy each one as a

17  complete transaction.  So no different than if you

18  walked into a store and had to buy each element, go in

19  and buy the first thing in the grocery store and come to

20  the checkout counter, put that in the bag, and go back

21  again.

22               QUESTION:  Do you have any opinion as to

23  the value of the methods of storing state in the scheme

24  of the Transact product?

25               ANSWER:  It's critical.  So without

1  state, it's really hard to imagine how you could conduct

2  commerce, or for that matter, anything of any value.

3           QUESTION:  What, in your opinion, drove

4  the customer demand for Transact?

5           ANSWER:  It was a unique product.  It was

6  complete.  It did all of the functions, almost -- you

7  know, at different time periods, different -- there were

8  different elements of value.

9           In the early stages, it was the only one.

10 In the later stages, it had a particular philosophy and

11 was very useful if you wanted to operate multiple sites

12 or multiple products or you wanted scale or you wanted

13 something very secure.  It was the high end of the

14 market, the higher end of the market.

15          QUESTION:  What made it better than

16 competing products in terms of large scale or multiple

17 stores?

18          ANSWER:  That's what I did.  It could

19 handle large scales.  It could handle multiple stores.

20 It could handle multiple methods of connecting to it.

21 If you were a large company and you didn't want to

22 change your whole operation, it fit into your

23 environment because it had so many different options in

24 it.

25          It -- just as an example, it could handle

1    soft goods and hard goods.  If you were selling an

2    article and you were selling a CD, one was delivered

3    physically, and one was delivered online.

4                    And from a software perspective, these

5    are very different things, and it could do both of

6    those.  It could do subscriptions.  It could do single

7    sales.  It could do warranties.  It could do a whole

8    range of these things.

9                    QUESTION:  Are there any other features

10   of Transact that you believe drove the customer demand?

11                   ANSWER:  It was an end-to-end product, so

12   it allowed somebody to do everything from the beginning

13   to the end, offered -- offered a shopping experience,

14   and that was somewhat unique.

15                   QUESTION:  What caused Open Market to be

16   sold to Divine?

17                   ANSWER:  The business was in pretty bad

18   shape.  The company was losing money and did not have a

19   huge cash balance, and the public markets were not

20   available to raise additional capital.

21                   QUESTION:  We had discussed earlier that

22   certain features of the Transact product were patented

23   by Open Market.  Had Open Market ever threatened to sue,

24   under its patents, any of its Transact licensees?

25                   ANSWER:  Not that I recall.

1                    QUESTION:  Had it ever actually sued any

2      of its licensees under its --

3                    ANSWER:  Not that I recall.

4                    QUESTION:  -- patents?

5                    Do you know why Open Market did not?

6                    ANSWER:  Why would we sue our customers?

7                    QUESTION:  That's not what I'm asking.

8                    Would Open Market have and why not?

9                    ANSWER:  No, unless there was an

10     egregious violation of a patent.  So I can imagine that

11     if somebody bought a license from us to do one thing,

12     and the company -- IBM could have bought a license from

13     us, you know, for one of their businesses and then chose

14     to create a product that violated our patents, I

15     wouldn't see a problem with suing them on that.

16                   QUESTION:  Mr. Ghosh, if Newegg had

17     approached you in 2001 seeking to license Transact from

18     Open Market, what would your reaction have been?

19                   ANSWER:  We'd have licensed it.

20                   QUESTION:  You would have licensed it to

21     them?

22                   ANSWER:  Yes.

23                   QUESTION:  In your experience, would you

24     expect that license to have been more like a merchant

25     license or more like a CSP license?

1                    ANSWER:  More like a merchant license,
2  probably.
3                    QUESTION:  Why is that?
4                    ANSWER:  If they were just selling their
5  own stuff.
6                    QUESTION:  As opposed to them wanting to
7  host the stores of third parties?
8                    ANSWER:  Right.  Right.
9                    QUESTION:  What terms would you expect to
10  be able to license Newegg for Transact?
11                    ANSWER:  I have no idea, but standard
12  terms.  I can't see why it would be different.
13                    QUESTION:  And by standard, you mean
14  terms similar to those of other merchants or single-user
15  agreements?
16                    ANSWER:  Yes.
17                    QUESTION:  If Newegg were licensed under
18  Transact, would you expect the license fee to be a
19  lump-sum payment?
20                    ANSWER:  Probably.
21                    QUESTION:  Would you expect their
22  maintenance and service to be roughly 20 to 30 percent
23  of that lump-sum payment?
24                    ANSWER:  Yes.
25                    QUESTION:  Would you expect Newegg to pay

```
 1   any license fees on an ongoing basis?

 2               ANSWER:  No.

 3               QUESTION:  Would you expect Newegg to pay

 4   any fees based on revenues?

 5               ANSWER:  Probably not.

 6               QUESTION:  Would you expect Newegg to pay

 7   any fees based on the number of transactions that are

 8   performed via its website?

 9               ANSWER:  Probably not.

10               MR. BREAN:  I have no further questions.

11               (End of video clip.)

12               MR. SAYLES:  That concludes the

13   deposition of Shikhar Ghosh.

14               At this time, we would call Mr. Chris

15   Bakewell.

16               THE COURT:  Okay.  Mr. Bakewell.

17               COURTROOM DEPUTY:  I don't believe he's

18   been sworn.

19               THE COURT:  Have you been sworn,

20   Mr. Bakewell?

21               THE WITNESS:  I haven't been sworn.

22               THE COURT:  All right.  If you would,

23   please raise your right hand to be sworn, sir.

24               (Witness sworn.)

25               MR. SAYLES:  May it please the Court.
```

```
 1                THE COURT:  You may proceed.
 2          CHRIS BAKEWELL, DEFENDANT'S WITNESS, SWORN
 3                     DIRECT EXAMINATION
 4  BY MR. SAYLES:
 5      Q    Would you introduce yourself to the jury,
 6  please.
 7      A    Yes.  Good afternoon.  My name is Chris
 8  Bakewell.
 9      Q    And why are you here?
10      A    I am here as an expert witness on damages
11  issues.
12      Q    I'd like you to tell the Ladies and Gentlemen
13  of the Jury your conclusion regarding damages, and then
14  we're going to go through the basis for that.
15      A    Okay.  My conclusion regarding damages is that
16  the appropriate measure in this case is a lump-sum
17  damages award of $500,000.
18      Q    Now, Mr. Bakewell, let me start at the
19  beginning.
20      A    Okay.
21      Q    I'd like to go through your qualifications and
22  a little bit of your background.
23      A    Sure.
24      Q    Where do you live?
25      A    I live in Sugarland, Texas.
```

1      Q    And what do you do for a living?

2      A    I am a management consultant.

3      Q    And what is your area of expertise?

4      A    I focus my practice on the valuation of

5   intellectual property.

6      Q    How did you become involved in that field?

7      A    Well, I started my career programming

8   computers after I graduated from college, and I then

9   went to graduate school where I got an MBA in finance,

10   and I used that combined background and began working

11   for a consulting firm.

12      Q    And have you had any articles or books

13   published in the area of intellectual property

14   valuation?

15      A    Yes, sir.  I've had articles published, a

16   chapter in a book that's due to be published, articles

17   in peer-reviewed journals.

18      Q    Tell the Ladies and Gentlemen what a

19   peer-reviewed journal is.

20      A    Peer-reviewed journal is a journal that is --

21   the article that I submit is reviewed by my peers before

22   it's published to ensure that the article reflects the

23   state of the art.

24      Q    All right.  We're here about licensing.  Have

25   you had anything published in the area of licensing?

1     A     Yes, sir.  I've had articles published in the

2  area of licensing.

3     Q     You told us that you went to college.  Where

4  did you go?

5     A     I went to Bradley University in Peoria,

6  Illinois, for undergraduate.

7     Q     All right.  And I don't want you to be too

8  modest.  Did you graduate with honors?

9     A     I did.  I graduated with honors, yes, sir.

10    Q     And what are the degrees that you have

11 received?

12    A     I have a Bachelor's of Science degree in

13 finance and business from Bradley University.  I also

14 have an MBA in finance from the University of Maryland

15 at College Park.

16    Q     And then did you have any honors from there?

17    A     Yes, sir.  I was a graduate fellow at the

18 University of Maryland.

19    Q     And would you tell the Ladies and Gentlemen of

20 the Jury some of your professional certifications that

21 you hold.

22    A     Well, I am an accredited senior appraiser,

23 which is a designation that's awarded by the American

24 Society of Appraisers.  That takes 10,000 hours of

25 hands-on valuation of experience -- hands-on valuation

1   experience to earn, as well as passing five

2   examinations.

3           I am also a certified licensing professional.

4   That's licensing as in the licensing that we're talking

5   about here today.

6       Q    All right.  Now, you've been retained by

7   Newegg's lawyers in this case as an expert witness.

8       A    Yes, sir.

9       Q    And do you get paid for your time like the

10  other experts who have come before you?

11      A    Yes, sir.  My firm does.

12      Q    And at what rate are you being compensated for

13  your time?

14      A    $475 per hour.

15      Q    What is it that you've been asked to do?

16      A    Well, ultimately, to form opinions regarding

17  damages appropriate in this case.  That's involved

18  reviewing a bunch of materials, boxes and boxes of

19  materials, reviewing Mr. Nawrocki's report.

20  I've been asked to provide commentary and rebuttal

21  opinions regarding Mr. Nawrocki's work as well.

22      Q    Mr. Nawrocki described quite a volume of

23  materials that he reviewed.  Have you reviewed those

24  same materials?

25      A    I've reviewed everything that Mr. Nawrocki has

1   and I believe some additional information as well.

2        Q    And did you hear his testimony?

3        A    Yes, sir.  I was here in the court for his

4   testimony.

5        Q    Before we go into the greater details, have

6   you been asked to make any assumptions with regard to

7   your analysis?

8        A    I have.  I've been asked to make one key

9   assumption, and that is that the patents-in-suit are

10  valid, enforceable, and infringed.

11       Q    Now, you're a damages expert?

12       A    Yes, sir.

13       Q    Do you have any opinions regarding the

14  validity or the infringement of these patents?

15       A    No, sir.

16       Q    And if the patents are not infringed, what

17  would be the result regarding damages?

18       A    Oh, there would be no damages.  There would be

19  no need for my testimony.

20       Q    Or alternatively, if the patents are found to

21  be invalid, what would the answer be with regard to

22  damages?

23       A    No damages.  Zero dollars.

24       Q    All right.  So we'll go with the assumption

25  that you're legally required to make?

```
 1      A    I'm required to make that assumption.

 2      Q    All right.  Now, like Mr. Nawrocki, you've

 3 issued some reports in this case, and you've given a

 4 deposition.

 5      A    Yes, sir.

 6      Q    Can you give us an idea of the amount of

 7 information that you have reviewed in order to form your

 8 opinions, just so that we'll have an understanding of

 9 that?

10      A    Well, when you asked that question, I think

11 of, back in my office, I have about 20 banker's boxes

12 filled with documents.  I have additional information

13 that's stored electronically above and beyond that.  But

14 that's the image that comes to mind.

15      Q    And have you prepared some slides that will

16 help facilitate your testimony --

17      A    Yes.

18      Q    -- in this case?

19      A    Yes, I have.

20      Q    You heard Mr. Nawrocki testify, and do you

21 agree with Mr. Nawrocki, at least on some points?

22      A    Oh, I do, yes.  I think he and I agree on some

23 points.

24      Q    And do we have a slide that will show that?

25      A    Yes.  So this slide summarizes some of the
```

1    things that Mr. Nawrocki and I agree upon.

2         Q    Would you explain that, please.

3         A    Sure.

4              We both agree that the license at issue here,

5    it would be a non-exclusive license.

6              We both considered the Georgia-Pacific

7    Factors.  Those are the 15 factors that Mr. Nawrocki

8    explained.

9              We agree upon the hypothetical negotiation

10   date of January 2001.

11             We agree that damages begin in November of

12   2007.  That's a different date than the hypothetical

13   negotiation date.  We're actually required to make that

14   assumption by law.

15             And then we also agree that Open Market is

16   unprofitable or would have been unprofitable at the time

17   of the hypothetical negotiation.

18        Q    And is that what the hard facts and the

19   evidence shows in this case?

20        A    Absolutely, yes, sir.

21        Q    And what about the issue of the so-called

22   convoyed or collateral sales?  Do you remember

23   Mr. Nawrocki addressing that?

24        A    I do.  It may not have been apparent to

25   everyone in the courtroom, but there's a Georgia-Pacific

1   Factor that relates to convoy or collateral sales.

2           What that means, it means basically what

3   Mr. Ghosh testified to on video, and that is that the

4   appropriate measure of value is an upfront amount and

5   attachments of value related to maintenance and services

6   and ongoing amounts are inappropriate.

7           In fact, Mr. Nawrocki didn't discuss that in

8   detail, but he didn't include such amounts in his

9   analysis.

10      Q   All right.

11      A   So I'd say we agree upon that point.

12      Q   So the maintenance fees that have been

13  mentioned would not be a proper consideration for the

14  damages?

15      A   I think both he and I and Mr. Ghosh, as well,

16  all agree upon that point.

17      Q   All right.  Do you have any disagreements with

18  Mr. Nawrocki?

19      A   I do.  That's why I'm here.

20      Q   And generally speaking, what sort of

21  disagreements do you have?

22      A   Well, let's see --

23      Q   Have you prepared a slide that will outline

24  these?

25      A   I -- I think so.  I have multiple slides, but

1    I think I can describe it conceptually first.

2        Q    All right.

3        A    When I think about this case and the

4    difference between Mr. Nawrocki's damages opinion and

5    mine, I think about when I go to the grocery store.

6             When I go to the grocery store with my kids

7    and load up the grocery cart with groceries, the grocery

8    cart is there free, and I don't have to pay to use the

9    grocery cart.  I don't have to drop money in a bucket

10   when I leave.

11            If I buy a pack of gum or if I load the thing

12   up with -- cereal is what my kids like the most, I -- I

13   don't have to pay and nor does the grocery store.  They

14   paid for the carts one time upfront.

15       Q    All right.  So let's list your areas of

16   disagreement, if you would, on the slide that you

17   prepared and just outline those to the jury first, and

18   then we'll take them one by one.

19            But I want them to hear where your areas of

20   Mr. Nawrocki's mistakes, in your opinion, lie.

21       A    Yes, sir.

22            Well, the first point, his royalty base

23   includes unrelated sales.  I think that, in some ways,

24   relates to the example that I just gave about the

25   grocery cart.

1          The second is that he ignored real-world

2     licenses and other real-world evidence.  We'll talk

3     about licenses from Divine in more detail throughout my

4     testimony here today.

5          And then the third category, this 25-percent

6     rule of thumb that Mr. Nawrocki applied, I think, proves

7     that he's overreaching, because he's applying that rule

8     of thumb to all of Newegg's profits, not profits that

9     are attributable to the invention, which is required

10    under Georgia-Pacific.

11        Q    All right.  Now, let's take these one by one

12    and go into a little bit more detail.

13        A    Okay.

14        Q    The first one is, you said that Mr. Nawrocki's

15    royalty base includes unrelated sales.  Would you please

16    describe what you mean by that?

17        A    Okay.  I've described that I think

18    conceptually that his royalty base includes things that

19    don't relate to the patented technology.

20             And I have prepared a series of slides that

21    describe this, I think, in a little bit more detail and

22    graphically.  There's going to be, I believe, four bars

23    that eventually go across the screen.  So this builds up

24    to the calculation that I've performed.

25             The first bar -- should I go and describe it?

1      Q     Yes, please.  Describe it.

2      A     The first bar, you can see on the left-hand

3   side that it has the number $100 next to a bracket.

4           That hundred dollars, when I think about that,

5   Newegg sells monitors, for example, right?  And I think

6   they cost about a hundred dollars.

7           The profit margins that Newegg maintains on --

8   or earns on those monitors, I've measured, but the cost

9   of the monitor itself, that has nothing at all to do

10  with the shopping cart.  And so I subtracted that.

11          Newegg's gross profit margins are 10 percent.

12  That's -- as Mr. Nawrocki described it, he described the

13  cost of -- cost of goods sold being just how it sounds,

14  that it's the cost of the actual items.

15          So the cost of a hundred-dollar monitor to

16  Newegg is $90.  That's what that 90 percent is.

17  Then Newegg has, obviously, to manage their business.

18  They have to have salaries and employees.  Actually,

19  this calculation doesn't include that.  What I've

20  allocated, in terms of overhead, is credit card

21  processing fees, and I think shipping costs and only

22  things that are directly attributable to a transaction

23  explicitly.

24          That totals 3.7 percent, leaving a 6.3-percent

25  profit margin or $6.30, which is the number at the top.

```
 1              Just one last thing before we move on.  That
 2   $6.30 is -- it's roughly equivalent to the 6 percent
 3   that Mr. Nawrocki discussed.  It could be viewed as
 4   being much lower.  Looking at it at an operating profit
 5   level, those numbers are more like 1 or 2 percent.
 6              So from the starting point, these
 7   calculations, if you consider that $6.30 is on the table
 8   from the sale of this monitor, it could very well be $2
 9   or $1, but I'm taking a generous view in my calculations
10   here.
11        Q    All right.  And before we proceed on, are
12   these calculations based on underlying facts and data
13   that you relied on so that you're actually relying on
14   factual information?
15        A    Oh, yes.  They're based on financial
16   statements, all their financial statements, yes, sir.
17        Q    All right.  And what was the next step in your
18   analysis?
19        A    Well, then over that $6.30 that's available,
20   the next step is to try to figure out how much of that
21   $6.30 is attributable to the invention, not to Newegg's
22   business.
23              I think, as we heard Mr. Cheng describe -- and
24   he showed pictures when he testified -- Newegg is a
25   fairly complicated, sophisticated business, and there's
```

1  a lot that's involved in getting a computer monitor to

2  the marketplace above and beyond a shopping cart on the

3  screen.

4         And so I went and looked at analysts' reports

5  and conducted some research to try to determine what

6  those other factors are.  We call that -- in the field

7  of work that Mr. Nawrocki and I are on -- in, we call

8  that apportionment.

9    Q    All right.  And before we go into that in more

10  detail, you were here when Mr. Nawrocki said that from

11  an economic standpoint, he did not do analytical

12  calculations about whether the patented features drove

13  demand for the Newegg products.

14         Do you remember that subject?

15    A    Oh, I do, yes.  Yes, sir.

16    Q    Would you tell the Ladies and Gentlemen of the

17  Jury what it means when you refer to patented features

18  driving demand for sales?

19    A    Well, patented features driving demand for

20  sales, the way that I think about it is that when one's

21  measuring a royalty, the patent needs to be attached to

22  the royalty base economically somehow.

23         So if you're going to include all of the sales

24  and profits from a transaction, it's incumbent upon the

25  person doing the analysis -- and I think it would be

1    understood between any parties in a negotiation -- that

2    the only portion that is appropriate is the part that is

3    causing people to make a purchasing decision.

4            And Mr. Nawrocki said on cross-examination, he

5    did no analysis of that whatsoever.

6        Q    All right.  You've read his reports?

7        A    Yes, sir.

8        Q    You've read his deposition?

9        A    Yes.

10       Q    And he acknowledges in court that he can cite

11   no evidence that indicates the patented features drive

12   the sales of the Newegg products?

13       A    That's right.  He did in open court.

14       Q    And with respect to the analysis of your

15   calculations, are there any charts that would support

16   your view that the demand is driven by other factors?

17       A    Well, there are.  There's a survey that was

18   conducted by Newegg.  It's actually conducted on a

19   regular basis.  And we'll come to it, I think, in maybe

20   two or three slides.

21       Q    All right.

22       A    Newegg -- just to go to your question, Newegg,

23   in its ordinary course of business, prior to this

24   lawsuit even being filed, never listed shopping cart

25   technology as something that is important to its

1    customers.

2              It submits a -- it has a survey on its website

3    that it uses for feedback to get feedback from

4    customers, and it lists things like did you like our

5    products?  Was our delivery fast enough?  How -- how

6    about our prices?

7              And we'll see that when we get to it.

8         Q    All right.

9         A    A couple more slides.

10        Q    All right.  And would you take us to the next

11   step in your analysis, please.

12        A    So the next step in the analysis is, out of

13   this $6.30, to try to figure out how much of that is

14   related to the -- the computer, let's say the screen

15   itself, or in this case, the closest I could find from

16   the research that I performed were references to the

17   Intuitive website layout and design, one reference to

18   that.

19             This slide here that's up right now lists, in

20   fact, 21 different factors that I observed in my

21   research.

22             Some of them we'd expect to see, and they fit

23   into the answer I just gave you, brand name being one,

24   site contact, like the actual monitor itself, customer

25   relations, the fact that it offers a private-label

1   credit card.  One of them relates to the Intuitive

2   website and design.

3           So on a fraction basis, 1 out of 20 is 5

4   percent.  So it's a little bit less than 5 percent

5   credit, I think, goes to just the Intuitive website

6   layout and design.  That's something, obviously, much

7   broader than what the patents are.

8       Q    All right.  Are -- these factors that you have

9   put on this chart that are an assessment of Newegg's

10   success, are they based on documentation and evidence?

11      A    Oh, yes, sir.  I went and conducted research

12  and looked through documents produced in this lawsuit,

13  and every time a different attribution of Newegg's

14  success came up, I listed it out, and it is based upon

15  actual evidence in the case, yes, sir.

16      Q    All right.  Would you take us to the next

17  step, please?

18      A    Okay.  So from that, remember, I said 1 out of

19  20 is 5 percent.  Well, I know that Mr. Nawrocki

20  contends that the technology here is fundamental and

21  very important, and I've accepted that.

22          And so I took that 5 percent, and for purposes

23  of being conservative, I doubled it.  And so I gave 10

24  percent credit.

25          So out of that $6.30 that was available, I

1    credited 10 percent to the website layout and said,

2    look, 90 percent relates to other things, and I took

3    that off the table.

4             So that turns the $6.30 into 63 cents.

5        Q    And is this based on financial statements of

6    Newegg?

7        A    It is.  That's what the $6.30 is from.

8             And then the next bar is taken from the other

9    research that I conducted regarding -- from analysts

10   reports and independent observations on market -- from

11   the marketplace.

12       Q    Did you also have at your disposal, for review

13   and consideration, Newegg documents where they assessed

14   internally the factors that contributed to the online

15   shopping experience?

16       A    Yes, sir, I did.

17       Q    Is that important?

18       A    That's important.

19       Q    And can you walk us through that and tell us

20   what that significance is?

21       A    Sure.  Sure.

22            So this -- so I have two bars.  And remember,

23   I said there's going to be four.

24            So the next bar, the third bar, relates to how

25   much of that website layout generally could possibly

1   relate to the fact that there's a shopping cart on the

2   website.

3            And so what I found that I thought was the

4   most meaningful for measuring that was an internal --

5   actually, it's on their website -- a document that --

6   from Newegg's website that attributes all of the factors

7   on its website that it believes are important.  And I

8   think this predates the lawsuit, too.

9        Q    All right.

10       A    This is the document.

11       Q    And is this slide a summary of what those

12  factors are that Newegg believes contribute to the

13  online shopping experience?

14       A    It is.

15           So back in 2005, Newegg announced its new

16  website design, and it issued a press release.  And when

17  it did that, it described the Intuitive website layout

18  and design and also listed 12 other factors that are

19  relevant or it highlighted when it released the updated

20  website.

21           Those things included things that I would

22  expect to hear based upon what I've seen sitting here in

23  the courtroom so far:  Comparison of products, rollover

24  and guided navigation, reviews of products, photos,

25  how-to videos, and things of that nature.

1    Q    All right.  And in summary, is what all these

2    facts and data shows is that the online shopping

3    experience and the success of Newegg is attributable to

4    many factors other than these alleged patented --

5    A    Yes, sir, that's exactly what it says.

6    Q    And have you walked us through now the factors

7    that you considered on the online shopping experience,

8    or is there yet more?

9    A    I have -- well, I turned that into a

10   calculation again.  1 over 13 as a ratio is roughly 8

11   percent, a little bit less than that.

12         And so I took that ratio, and I applied it to

13   that -- this is just another listing of the same

14   factors, the same 13 factors.

15   Q    All right.  And wait.  Back up for just a

16   minute there --

17   A    Sure.

18   Q    -- because I want to point out, you cited on

19   some of these actual source documents at the bottom.  Is

20   this -- go to the next slide.

21         Is this actually exhibits where you've read

22   them, reviewed them, and taken them into account?

23   A    Yes, sir.  This is --

24   Q    Hard evidence?

25   A    Yes, sir.

1     Q     All right.  All right.  Go to the next one.

2     A     So 1 out of 13 is roughly 8 percent.  I

3  rounded up.  That means you have to take 92 percent of

4  the remaining amount off the table.  That turns that 63

5  cents from a hundred-dollar transaction into 5 cents.

6           So that's the amount that's available to

7  apportion between the parties, the possible benefit

8  attributable to the invention.

9           Now, notably, nowhere in this analysis did --

10  were there any reference to specifically shopping cart

11  or session IDs.  So, yeah, I think it's safe to assume

12  that this 8 percent measures something broader than the

13  patents we're discussing here today.

14           So, again, this number, I think, is

15  conservative as well.

16           And that leaves -- as I said, out of that

17  hundred-dollar transaction for the monitor, there's 5

18  cents that are left over to be split up that could

19  possibly be attributed to the patented invention.

20     Q     All right.  You indicated that there were four

21  bars.  Is there yet another step?

22     A     And so there is yet another step.

23           Just one, kind of, side comment.  We heard

24  Mr. Wu testify about the lines of code that relate to

25  the patented technology.  I have that in real small

1    print there at the bottom of the third bar.

2              It says 5.6 lines of code.  That's less than 1

3    percent of the lines of code.  That, again, shows that

4    this 8 percent calculation that I did is conservative

5    and that I'm leaving more money out there to be

6    allocated between the parties.

7              And that's the next step, is to split up these

8    profits between the parties.  And I split them up using

9    the same ratio that Mr. Nawrocki chose, although I think

10   that there's some issues with the underlying principles.

11        Q    All right.

12        A    But I just accepted that.

13        Q    We'll get to that in a little bit.  But you've

14   accepted it for now.

15        A    For now, for the purposes of this --

16        Q    All right.

17        A    -- calculation.

18        Q    And accepting that, would you take us through

19   the next step, please.

20        A    So he used something called the 25-percent

21   rule of thumb to split it up.  That leaves -- 75 percent

22   of the profit is taken off the table, and Newegg earns

23   it, because it's the one that's commercializing the

24   invention.

25              And that leaves 25 percent of the 5 percent

1    available for Soverain, or actually, in this case,

2    because of the hypothetical negotiation date is back in

3    2001, Open Market.

4            So that's what this --

5       Q    All right.

6       A    -- last bar shows at the very top there.  It

7    says 0.0125.  That's a, you know, fraction -- it's just

8    a little bit more than a penny that remains from this

9    hundred-dollar transaction that's attributable to the

10   shopping cart technology.

11      Q    All right.  Now, where does all this leave us?

12      A    Well, this leaves us with -- with a little bit

13   over a penny from that transaction.  And that provides

14   an indication of apportionment.

15      Q    All right.  Let's take a look at Slide 8.

16           Would you tell the Ladies and Gentlemen of the

17   jury what this slide is portraying.

18      A    This is the one that we discussed a few

19   moments ago, and I said there were -- I used the word

20   contemporaneous.

21           That's, I think, a fancy word that means real

22   life, produced outside of litigation, occurring before

23   litigation actually happened, studies of how Newegg

24   views and measures its business, and what the important

25   factors are for it running its business and, in fact,

1    drive its sales.

2              And as you can see here -- I'll read them in

3    for the record:  Customer service, product selection,

4    customer reviews, pricing -- and pricing actually gets

5    the most votes from Newegg's customers -- deals and

6    promotions, safety and security, and fast shipping,

7    which gets the second or third most votes, which is not

8    surprising based upon the testimony we've heard so far.

9        Q    All right.  Now, we're still talking about

10   your disagreements with Mr. Nawrocki, and we've talked

11   about the subject of whether the patented features drove

12   the demand for Newegg's product.

13       A    Right.

14       Q    What about Transact, the software product of

15   Open Market?  Was it successful?

16       A    Well, now, we've heard testimony about that

17   from Ms. Wolanyk, about how the product ultimately was

18   not successful in the marketplace.

19              And I preferred -- prepared some analyses that

20   show that, based upon financial statements that I've

21   reviewed in this case.

22       Q    So let me see if I understand.  Even though

23   the patented technology is included in Transact, it was

24   not -- the Open Market (sic) was not successful?

25       A    That's right.  And I think that -- it actually

 1   raises a key point.  And what that means, if I can kind

 2   of turn that into my observation from a financial point

 3   of view, is that just because a product has these

 4   patents in it does not mean that it's going to make

 5   money in the marketplace.

 6          There's other things that need to occur in

 7   order for a business or a software product to be

 8   successful.

 9      Q    Have you measured or quantified Open Market's

10   situation?

11      A    I have.  I think I have some slides that

12   summarize that.

13      Q    Would you explain this slide, please?

14      A    Yes.  This slide, which is taken from exhibits

15   in this -- that have been admitted into evidence in this

16   lawsuit, charts Open Market's cumulative losses since --

17   from 1995 through the point in time just prior to when

18   it was acquired by Open Market and right up to the

19   alleged date of first infringement.

20          It lost money, as you can see by the blue

21   bars -- not the line but the blue bars -- every year.

22   And the losses on a cumulative basis totaled $236.4

23   million.

24      Q    All right.  Let me see if I can clarify a

25   little bit of this.

```
 1              January 2001 that's shown here is the alleged
 2  date of the first infringement, and that would be when
 3  the jury is to consider the hypothetical negotiation.
 4      A    Just the hypothetical negotiation.  Not
 5  damages --
 6      Q    All right.
 7      A    -- but the hypothetical negotiation.
 8      Q    And at that time, Open Market owned the
 9  patents, as well as the Transact product.
10      A    That's right.
11      Q    And you mentioned the sale.  That was to
12  Divine in August of 2001 after the hypothetical
13  negotiation.
14      A    Just after.  I mean, we -- in our practice,
15  we'll incorporate that type of information into our
16  analysis.
17      Q    Well, let's just look at the date of the
18  hypothetical negotiation.
19              What's the bottom line on Open Market's
20  financial status then?
21      A    Well, as I said, by that point in time, Open
22  Market had lost $236.4 million.  It had gone seven years
23  without earning a profit.
24      Q    Why is that important?
25      A    Well, it shows that the patented invention
```

1  itself does not mean that a company is going to be

2  successful.  And, in fact, it's another indicator that

3  the patented invention does not drive demand in the

4  marketplace.

5      Q    Now, one of the things that you said that

6  you've considered in this case is deposition testimony.

7      A    Yes, sir.

8      Q    And with regard to Mr. Nawrocki's opinion, do

9  you disagree with Mr. Nawrocki as it relates to specific

10  testimony?

11      A    Well, I do.  I think that there's testimony

12  that's out there that runs directly against the grain of

13  what Mr. Nawrocki -- his damages conclusions are.

14      Q    Give us an example.

15      A    I have a slide with that information.  I'll

16  turn back to it.  This summarizes the testimony we heard

17  from Mr. Ghosh just prior to when I testified.

18          He was asked a bunch of questions about

19  Transact.  Two of them stood out to me, because he was

20  asked twice what drove the customer demand for Transact.

21          In the context of the deposition in this

22  lawsuit, the CEO of the company said that it was a

23  unique product.

24          He didn't say anything about the shopping cart

25  technology or the session ID or the patents even.  He

1   talked about the breadth of the product and the fact

2   that it was software geared towards customer needs, not

3   towards the fact that it had patents.

4        Q    All right.

5        A    Twice he was asked that.

6        Q    All right.  Now, before we move on to the next

7   area of disagreement, let's -- let's finish this out.

8             Was the Transact revenue history important to

9   your consideration?

10       A    It was, and I have a slide that summarizes

11  that.

12       Q    Could you describe the Transact revenue

13  history and why that's important to your analysis?

14       A    Okay.  This slide that's being displayed right

15  now for the jury summarizes the revenues from Transact

16  for that same period that the losses for Open Market

17  were shown.

18            And as this -- the slide shows, that in 1999,

19  two years prior to the hypothetical negotiation, that's

20  when revenues from Transact peaked.

21            However, in the two years leading up to the

22  hypothetical negotiation date, January 2001, that its

23  revenues from the product had fallen precipitously.

24       Q    So when we get to the discussion of the

25  hypothetical negotiation, is the circumstances of both

1   parties important to what they would have likely agreed

2   to?

3       A    It's very important, very important.  The

4   hypothetical negotiation requires an analysis of the

5   facts and circumstances present at that point in time.

6       Q    All right.  Let me take you now to the next

7   area of disagreement, if I could --

8       A    Okay.

9       Q    -- all right?

10           You said at the beginning that Mr. Nawrocki

11  ignored real-world licenses and other real-world

12  evidence.  Let's deal with that for a moment.

13      A    Okay.

14      Q    Could you tell us what you mean by this,

15  please?

16      A    Well, the deposition testimony that was played

17  just before I testified, I think, summarized the notion

18  of this quite well.

19           Mr. Ghosh -- Mr. Ghosh, in fact, explicitly

20  went against the grain of the damages model that

21  Mr. Nawrocki set forth.  He said any transaction that

22  would occur between the parties would not be a running

23  royalty type of transaction.  That's a real-world

24  consideration.

25           The other thing that comes to mind when I look

 1   at this -- at this bullet point and think about

 2   real-world evidence are licenses, and particularly,

 3   licenses produced by Open Market, Divine's licenses for

 4   the patents.

 5        Q    And you were here when Ms. Wolanyk testified

 6   as well?

 7        A    Yes, I was.

 8        Q    And you heard her testimony that the licenses

 9   executed by Soverain since its inception, with one

10   exception, have been lump sums.

11        A    That's correct.

12        Q    Is that important?

13        A    Yes, sir.

14             MR. SATINE:  Your Honor, may we approach?

15             (Bench conference.)

16             MR. SATINE:  When you're saying they're a

17   lump sum, are we now talking about the --

18             MR. SAYLES:  I'm talking about the

19   earlier license now, the Transact license.

20             MR. SATINE:  He said the Soverain

21   license.  He said Soverain.

22             THE COURT:  I'll instruct the jury to

23   disregard the last question.

24             MR. SAYLES:  Sure.  Yes, sir.

25             (Bench conference concluded.)

1                THE COURT:  All right.  The jury -- I've

2    sustained an objection.  I instruct you to disregard the

3    last question and answer, and Mr. Sayles will restate

4    his question.

5        Q    (By Mr. Sayles) Let me rephrase this a little

6    more precisely.

7                Did you consider the patent license --

8    licenses entered into, certain ones, by Open Market and

9    Divine?

10       A    Yes, sir, I did.

11       Q    And how was it that you determined which

12   patent licenses to look at with regard to Open Market

13   and Divine?

14       A    Well, I focused on patent licenses that -- and

15   licenses generally that related to the patented

16   technology.

17               I also disregarded any licenses that related

18   to -- or that involved specifically a lawsuit.

19       Q    All right.  And would you tell the Ladies and

20   Gentlemen of the jury the basis for that sort of

21   selection, please?

22       A    Well, part of it is the Court's determination,

23   and the other part comes from my experience in the field

24   of licensing, and that is that licenses that settle

25   lawsuits, that once they've been filed, are often

1  influenced by other factors other than the technology

2  itself.

3      Q    All right.  Did you consider certain specific

4  Open Market and Divine licenses that are now in evidence

5  in this case?

6      A    Yes, sir.

7      Q    And have you summarized that on Slide 13?

8      A    I have.

9      Q    And would you explain to the Ladies and

10  Gentlemen of the Jury what it is that's summarized on

11  Slide 13, please.

12      A    Okay.  Well, this provides account of the

13  different forms of royalties that appear in these patent

14  licenses.

15          And by form of royalties, I mean whether the

16  license is structured to be a one-time lump-sum payment,

17  or if there's royalties that accumulate indefinitely

18  over time.

19          And all of them actually, in my opinion --

20  I've separated one out, and I'll discuss it briefly, why

21  I don't think that's a running royalty either; but all

22  of them have predetermined or determinable amounts that

23  stop after a certain period of time.  We refer to

24  that -- we refer to that in the licensing field as being

25  a lump sum.

 1          The one that I listed as being as a lump sum,

 2   plus a variable component, was a license entered into in

 3   October of 2002 between Divine and Bikecology. I had

 4   included a 4,000-dollar payment.

 5          There was a very small running royalty of 0.2

 6   percent of gross sales that was applied, at least small

 7   relative to what Mr. Nawrocki's damages opinion is.

 8          And what's important to observe is that I did

 9   some research, and it's in the footnote, that the entity

10   that that amount related to was sold right around the

11   time of the -- of that license.

12          So in my mind, from an economic perspective,

13   that's a lump-sum license as well.

14      Q    All right.  Now, are these licenses that

15   you've summarized on Slide 13, the ones that are in

16   evidence in this case, are they exhibits that are

17   indicated on the bottom of the slide here?

18      A    Yes, sir.

19      Q    And are these licenses that were entered into

20   around the 2000 to 2002 or '3 timeframe?

21      A    Yes, sir.

22      Q    Closer to the time of the hypothetical

23   negotiation?

24      A    That's correct, yes, sir.

25      Q    And with respect to the running royalty that

1  Mr. Nawrocki has calculated, are these licenses that are

2  in evidence contradictory of that?

3       A    They're very different.  Mr. Nawrocki

4  calculates a running royalty that continues on over a

5  long period of time, whereas these had predetermined

6  amounts that were determined -- that are lump sum in

7  nature.

8       Q    All right.  And for the patent license in

9  evidence that indicate that Divine generally entered

10  into running royalties, have you summarized those on

11  Slide 13A?

12       A    Okay.  But I have to correct your question.

13       Q    Yes.

14       A    I think that they didn't generally enter into

15  running royalties.  They generally entered into lump-sum

16  licenses.

17       Q    You are correct.

18       A    And that's summarized in this slide that's up

19  now.

20            Now, from my perspective, when I was sitting

21  back in the courtroom, when these licenses were shown,

22  it seemed that -- particularly during Mr. Nawrocki's

23  testimony, the focus was on the percentages.  But in

24  each of these, if they're read more closely, these

25  percentages are really lump-sum amounts.

```
 1              Say, for example, the third one down --
 2                  THE WITNESS:  If you can point to that.
 3       A    -- Webster Orchard, that, I think, was one
 4  that came up a couple of days ago.  It says 2 percent of
 5  gross sales, but it's 2 percent of gross sales in 2001,
 6  only in one year.  And that's a calculable lump-sum
 7  amount.  And, in fact, that amount turns out to be
 8  $2,000.
 9       Q    (By Mr. Sayles) And you were in the courtroom
10  when I cross-examined Mr. Nawrocki, and he acknowledged
11  that that license was through the life of the patent?
12       A    Yes, sir.
13       Q    And that even though this recital is in the
14  license, you heard him acknowledge that was a one-time
15  payment?
16       A    That's right.
17       Q    Now, have you also summarized further these
18  licenses that are in evidence in this case to compare
19  them to Mr. Nawrocki's damage model?
20       A    I have.  I've prepared -- prepared a
21  demonstrative that shows this.  And this is a bit of
22  a -- it was a bit of a challenge to make, because as
23  you'll see -- I don't know if you can point to the
24  axis -- we call it the X axis, the axis that goes up and
25  down where there's $30 million, I had to break it
```

1    because these amounts are so small relative to

2    Mr. Nawrocki's damages conclusion of $34 million.

3            And, in fact, when you add it all up -- add

4    all of the lump sums up, they total just about $200,000.

5    Mr. Nawrocki's damages conclusion is about 150 times

6    larger than that.

7        Q    All right.  Let me be sure we have this

8    correctly.

9            Does this slide accurately summarize the

10   revenues from the Open Market and Divine patent

11   licenses --

12       A    Yes, sir.

13       Q    -- that were non-settlements of litigation

14   lawsuits?

15       A    Yes, sir.

16       Q    And you're telling us that the total of every

17   one of them, including the Johnson & Johnson one for a

18   hundred thousand, is a total of 200,000?

19       A    About $200,000, yes, that's correct.

20       Q    And Mr. Nawrocki's calculation of $34 million

21   in damages is how much compared to that?

22       A    About a hundred and, I think, 65 times higher.

23   It's more than 150 times higher.  And it's a -- it's a

24   running royalty, so, presumably, it just continues to

25   grow even larger than -- than that.

1      Q    Did you also consider the Transact single-user

2  software licenses?

3      A    I did.  I considered those as data points.

4      Q    And -- as data points?

5      A    I did.

6      Q    Would you tell the Ladies and Gentlemen of the

7  Jury what you mean by that in your analysis, please?

8      A    This is something I considered, particularly

9  given Mr. Ghosh's testimony; and I think we've heard

10  others beyond Mr. Ghosh, Ms. Wolanyk and technical

11  experts as well, discuss how the patents are embodied in

12  the software.  So that's a fancy word -- the patents are

13  included in the software, the patented technology at

14  least.

15         And because those transactions were entered

16  into between willing parties, and the patented

17  technology was part of the up-front payment, and the

18  up-front payment is granted access to the patented

19  technology, I reviewed those up-front portions and

20  measured them against my damages conclusions.

21      Q    All right.  Now, I want you to show us the

22  summary of that in a moment, but let's get this

23  straight.

24         A patent license is different from a software

25  license.

1     A     Oh, yes, sir, they're different.

2     Q     And with respect to what would have happened

3 in a hypothetical negotiation in 2001, why do you

4 consider the Transact software licenses as somehow being

5 informative?

6     A     Well, because they included access to the

7 patented technology.  The patented technology was some

8 subset of the software licenses.

9           They're also meaningful because they're

10 arm's-length agreements that reflect a bargain between

11 two parties in the marketplace at arm's length.

12           And so they are informative in my view of at

13 least the reasonableness or the reasonable royalty

14 conclusion in this matter.

15     Q     Did you prepare some slides that demonstrate

16 the data point of the Transact software licenses?

17     A     Yes, sir, I did.

18     Q     Would -- and are these figures based on source

19 documents that are in evidence as exhibits that are

20 marked at the bottom of the slide?

21     A     Yes, sir, that's correct.

22     Q     Hard facts and data?

23     A     Yes, sir.

24     Q     All right.  Would you explain what's shown

25 here?

1      A     So I've reviewed ten of the -- ten of the

2  software licenses that are of the form that Newegg would

3  have entered into.  Not the commerce service provider

4  licenses, I set those aside because those involved

5  companies like AT&T and MCI at the time, which are very

6  much unlike Newegg.

7            And I focused more on the vendor-type of

8  licenses that are -- the licensees in those transactions

9  are more like Newegg.  In fact, that's what Mr. Ghosh

10 said is that that's the type of license that Newegg

11 would enter into.

12     Q     All right.  In fact, the Ladies and Gentlemen,

13 of course, along with you and everyone else, heard Mr.

14 Ghosh's the testimony just prior to yours.

15     A     Yes, sir.

16     Q     Let's move through that very quickly.

17     A     Okay.

18     Q     That's quick enough.

19     A     That's another graphical illustration of the

20 difference between Mr. Nawrocki's damages conclusion and

21 the largest of the up-front portions of those software

22 licenses for Transact.

23            His conclusion is $34 million in damages.  If

24 you look at those data points, the largest is about

25 $344,000.

1      Q     All right.  The third area of disagreement

2  that you indicated at the beginning that you had was

3  that Mr. Nawrocki is overreaching with the 25-percent

4  rule of thumb.

5      A    Yes, sir.

6      Q    And where -- tell the Ladies and Gentlemen of

7  the Jury what the 25 percent rule of thumb is?

8      A     Well, Mr. Nawrocki conceded this in his

9  deposition -- or in his cross-examination, that the 25

10  percent rule of thumb is quite controversial in the

11  field of licensing.  And one of the reasons why is

12  because it was developed some 30 years ago by one person

13  who made this observation of a split-up.  It was in a

14  totally different economy, and his observation related

15  to manufactured and industrial goods.

16        There's been a lot of academic literature

17  that's been written that describes that split-up as

18  being arbitrary in nature.  And in today's economy where

19  products are very sophisticated and patented technology

20  only comprises a small portion of overall products that

21  are sold in the marketplace, apportionment is required.

22        Mr. Nawrocki, when he applied the 25 percent

23  rule of thumb, applied to it all of the profits from

24  Newegg's business.

25      Q    Is that your main area of disagreement with

1  him?

2      A    Yes, sir.

3      Q    And with regard to this 25-percent rule of

4  thumb, is it a written rule that persons such as

5  yourself must abide by?

6      A    Oh, no, sir.  As I said, it's very

7  controversial.  And in my practice I do not use it.  I

8  tend to do other calculations as we've shown here.

9  If I'm ever going to use it, I will apply it just to the

10 portion of profits that are attributable to the

11 invention, and certainly not to everything.  And

12 that's -- that's a very significant criticism of the

13 rule in literature is that it's often misapplied, as

14 it's been misapplied here by Mr. Nawrocki.

15     Q    All right.  Have you prepared a summary slide

16 that brings all of this together based on the documents

17 that are in evidence and that you've reviewed?

18     A    I have.

19     Q    And this is Slide 23.  And I'd like you to

20 tell the Ladies and Gentlemen of the Jury what it

21 depicts.

22     A    Okay.  These are each of the data points that

23 we described throughout my testimony.  The first one

24 being what I call the benchmark rate or an apportionment

25 calculation.

1            And we will walk through exactly what the math

2   is one more time.  It's a fraction of 1 percent, in

3   fact, a penny when applied to a hundred-dollar monitor.

4            When it's applied to the royalty base in this

5   case, the total of that calculation yields about

6   $600,000.  That's the bar that says benchmark with the

7   $599,000 above it.

8            The second category is the total of lump sum

9   licenses that have been admitted into evidence, the

10  non-settlement agreements and they total $200,000.

11           The third is the largest of the up-front

12  payments for Transact, and that is $344,000.

13           And then Mr. Nawrocki's damages conclusion is

14  listed next to that.  Again, with a broken axis because

15  there wasn't room to fit it on a graph.

16      Q    All right.  Now, have we covered your areas of

17  disagreement with Mr. Nawrocki?

18      A    Yes, sir.

19      Q    Let's move to your affirmative opinions.

20           Have you formed affirmative opinions in this

21  case?

22      A    Yes, I have.

23      Q    You've heard Mr. Nawrocki testify about a

24  hypothetical negotiation, right?

25      A    That's right.  And we agree upon the date.

1     Q     And what else?  Anything else that you

2  disagree with?

3     A     Well, we disagree a little bit upon the

4  context.  And I would like to spend a little bit more

5  time discussing that.  That's what this slide is

6  intended to show.

7            These are two parties, Open Market and Newegg,

8  sitting down at a negotiating table.  It's called a

9  hypothetical negotiation, but it's -- actually the

10 premise of this hypothetical negotiation, it's grounded

11 in economics and financial analysis.

12           And the intent is to measure what the parties

13 would have reasonably agreed upon in order for, in this

14 case, Newegg to have access to the patented technology.

15           So at this time, in January 2001, we discussed

16 how Open Market was in dire financial straits and had

17 not been successful in generating from its software that

18 embodied the patented invention.  That's Open Market's

19 side of the table.

20           Then we heard testimony over the last day or

21 so about Newegg at that point in time being a licensee,

22 being a start-up.  January 2001 is right when the

23 business started.  At that point in time being of

24 limited financial resources, and hoping to grow its

25 business over time.

1      Q    All right.  Now, just to be clear, of course,

2   a hypothetical negotiation, by definition, is one that

3   never took place?

4      A    That's right.

5      Q    But that's the legal framework within which

6   persons like yourself must analyze this?

7      A    That's correct.

8      Q    And the legal framework within which the jury

9   must consider it.

10      A    That's right.  It's a legal framework, but it

11   also, as part of the legal framework, it says that it's

12   between willing parties that are prudent, that have

13   access to all information.

14          So in that way, even though it's called a

15   hypothetical negotiation, it's meant to be a real

16   financial analysis and a real assessment of what would

17   have reasonably happened back in 2001.

18      Q    And at the hypothetical negotiation would

19   Newegg be required to take a license?

20      A    Yes, if it wanted to use the patented

21   technology, yes.

22      Q    But would they be handcuffed in the

23   hypothetical negotiation situation?

24      A    No.  This negotiation, by law, is explicitly

25   between willing parties.

1      Q    And as a valuation expert, why is this

2   important?

3      A    Well, it's important because the framework

4   actually, it's closely correlated with the valuation

5   theory.  For example, valuation -- in my profession, as

6   an appraiser, we follow the same rules that one would

7   use to appraise or value a house.  And the terminology

8   regarding the hypothetical negotiation is very close to

9   the valuation of a home or of a business.

10          It's -- one is required to go back at the time

11   of the negotiation, or at the time of the valuation, and

12   to assess the outcome of a transaction between willing

13   parties with access to factual and objective

14   information, under no compulsion -- under no compulsion

15   to buy or sell.

16      Q    All right.  And in 2001 would Newegg have had

17   options, in plain words?

18      A    It would have had options.  It could have

19   taken a license or not taken a license.

20      Q    All right.  And what about Transact?

21      A    And it could have used -- it could have taken

22   a license to Transact as well.

23      Q    All right.  I want to pick up the pace a

24   little bit.

25          Did you -- in your analysis, did you use the

1   analytical framework of the Georgia-Pacific factors?

2      A    I did.  In fact, Mr. Nawrocki and I, I think

3   kind of view a lot of these factors in somewhat of a

4   common way.  I think there's one factor that I have

5   listed as a technical factor that Mr. Nawrocki has as a

6   commercial factor.

7           I just want to point out one.  It's GP Factor

8   13.  And that relates to the portion of the profit that

9   should be credited to the patented invention.

10     Q    And you feel that he didn't give proper

11  consideration?

12     A    That's what I discussed, the portion word.

13  That's where the apportionment is deriven (sic) from.

14     Q    All right.  Let's get to the bottom line.  Do

15  you have an opinion, based on your background, training,

16  and experience, at what a reasonable royalty would be in

17  this case?

18     A    Yes, sir, I do.

19     Q    And what is that opinion?

20     A    It's a lump sum payment of $500,000.

21     Q    And could you explain briefly how you got

22  there?  And you don't have to repeat anything that

23  you've said.

24     A    Well, I assessed the outcome of the

25  negotiation -- essentially what I did is I reviewed all

1    of the evidence and information that's available to me,

2    those 20 boxes of data, with an emphasis on reading

3    financial statements and performing calculations in

4    order to assess the outcome of what the negotiation

5    would be.

6        Q    All right.  Did you summarize your

7    considerations under the Georgia-Pacific factors by

8    listing them at the top?

9        A    I did.  I have a slide for each of these three

10   buckets:  The licensing, technical, and commercial

11   factors.

12       Q    All right.  Would you walk us through that,

13   please?

14       A    So the licensing considerations -- we

15   discussed a lot of this, and so I'll just cover them at

16   a high level and walk through the slides fairly quickly.

17            I considered actual patent licenses that are

18   admitted into evidence.  I considered Transact and its

19   value as specifically described by Mr. Ghosh and the

20   fact that it embodies the patented technology.

21            We also heard Mr. Ghosh describe how Open

22   Market sought to widely license its patent portfolio.

23            And there's other testimony, actually, that

24   relates to that as well.

25       Q    All right.

1        A    And the license that we're valuating is the

2   U.S. license to the patents-in-suit.

3        Q    Back in the time frame we've discussed that

4   are in evidence in this case?

5        A    That's right.  And the outcome of the

6   hypothetical negotiation would yield U.S.-only license

7   to the patents-in-suit.

8        Q    All right.  Would you tell us what is in Slide

9   26A very quickly, because I think we may have touched on

10  this?

11       A    Okay.  I mentioned in the prior slide how Open

12  Market's strategy was to broadly license its patents.

13  That actually comes from Defendant's Exhibit No. 269.

14            In fact, the quote is:  Open Market strategy

15  from its business plans at the time was to broadly

16  license its patents so as not to slow the growth of

17  internet commerce and to use them as a defensive tool

18  against competitors.

19       Q    All right.  And in support of your own

20  affirmative opinion, did you consider the Open Market

21  and Divine patent licenses --

22       A    I considered those things.

23       Q    -- that are in evidence that we have already

24  discussed?

25       A    Yes, sir.  This is another slide that

1   summarizes those 19 licenses that total $200,000.

2           If you look at them in a little bit more

3   detail, they average a little under $11,000 (sic).  The

4   smallest is $400,000 and the largest is a hundred

5   thousand dollars.

6       Q    In support of your affirmative opinion, did

7   you consider Transact as a data point as you've

8   described earlier in your disagreements with

9   Mr. Nawrocki?

10      A    I did.  And this next slide, Slide 28,

11  summarizes that.  I saw ten of those licenses.  They

12  averaged about $200,000 in the up-front portion, a

13  minimum of a hundred and maximum $344,000.

14      Q    Did you consider the Houghton-Mifflin company

15  Transact software license that is in evidence in this

16  case?

17      A    This is actually one that came up during my

18  deposition.  It's something that I observed along the

19  way.  I have a slide that summarizes that.  That license

20  is Defendant's Exhibit No. 217.

21          I'm not sure -- if I point on the monitor,

22  does it show up?

23      Q    I can barely see it with my glasses on.

24      A    Yeah, because this is very small.  So I will

25  circle it here.

```
 1      Q    Circle it and then read what it says.
 2      A    So there's a couple of things that pop out in
 3  this license.
 4           The list price for the license was $200,000.
 5  The actual price where it says price per unit was zero.
 6  That reflects a hundred percent discount for the
 7  up-front portion of the license.  The access to the
 8  technology was given for free.  This I think is an
 9  interesting frame of reference, the extended price is
10  zero dollars.
11           It's particularly interesting in light of
12  Ms. Wolanyk's testimony, who -- remember when she
13  said -- I guess it was on Tuesday, that when she was in
14  competition in the marketplace against Oracle, Oracle
15  did the same thing.  They gave their software away for
16  free.
17      Q    And this is an example of that as well?
18      A    This type of software; that's right.
19      Q    All right.  Let's go to Slide 30.  And is this
20  a slide that explains -- uh-oh.
21      A    How do we get rid of these?
22      Q    Looks like we're using carbon paper there.
23      A    I did it somehow.
24      Q    All right.  And is this the technical
25  considerations that are described in the Georgia-Pacific
```

1   factors that are briefly referenced 9, 10, and 11?

2       A    Yes, sir.  And just to cover them very

3   quickly.  The patents don't cover entire software

4   products.

5            Open Market strategy was to broadly license

6   this technology.  I view it sort of as being

7   commodity-like in nature in that they wanted the

8   technology to be widely disseminated.

9            And Mr. Wu said this from a technical point of

10  view, that the patented claims represent less than

11  1 percent of the code in Newegg's website.

12      Q    All right.  And let's go to Slide 31.

13           Did you go through all the commercial

14  considerations in Georgia-Pacific which are factors 5,

15  6, 8, 12, and 13?

16      A    I did.  And these were -- this summarizes my

17  observations from those -- those factors.

18           Just briefly I will walk through them, if I

19  may.

20      Q    Yes, please.

21      A    The fact that Open Market and Newegg weren't

22  competitors I think is key.

23           Open Market, again, sought to widely

24  disseminate its technology, and it would have provided

25  an opportunity for Open Market to do that.

1          There's no evidence at all that the patented

2    invention drove demand.

3          Transact was unsuccessful.  Open Market was

4    unsuccessful.

5          There's no evidence that Newegg's business

6    success can be tied to the use of these patents or is

7    driven by use of these patents.

8          The patented claims are not mentioned in

9    marketing materials or, in particular, that survey that

10   we covered very early on in our presentation.

11         It's one of many features on the website, not

12   to mention the fact that Newegg actually sells stuff,

13   products that people are interested in at reasonable

14   prices at timely delivery.

15         Neither Mr. Nawrocki nor I observed any

16   standard rates in the industry.

17         And then the last factor is the fact that it's

18   important, in fact critical in my view, to apportion the

19   benefits from the invention in any sort of damages

20   calculation.

21    Q    All right.  Now, I think that the Ladies and

22   Gentlemen of the Jury will probably recall that

23   Mr. Nawrocki and other witnesses agreed that Newegg and

24   Soverain or Open Market are not competitors?

25    A    That's right.

```
 1      Q     And is that important in a hypothetical
 2 negotiation?
 3      A     Oh, it's very important.
 4      Q     Why?
 5      A     It's called an inventor/promoter relationship.
 6 And the royalty rates that are observed in
 7 inventor/promoter relationships, as one might imagine,
 8 are much lower than royalty rates than yield from
 9 licenses between competitors where competitors are using
10 patents to block one another out of the market or
11 protect key parts of their products.
12            Royalties in inventor/promoter relationships
13 are much lower.
14      Q     All right.  And in consideration of your
15 affirmative opinion, not your criticism of Mr. Nawrocki,
16 did you consider Open Market's cumulative losses?
17      A     I did.  We saw this slide previously.  Leading
18 up to the date of the hypothetical negotiation, Open
19 Market was losing money at a rapid pace.  They lost
20 $236.4 million on a cumulative basis.
21      Q     And we've already talked about Transact's
22 revenue history.  Did that factor into your affirmative
23 opinion?
24      A     That was a consideration I made as well.  Its
25 revenues were falling prior to the hypothetical
```

1   negotiation.

2        Q    Same discussion we had earlier.

3        A    Yes, sir.

4        Q    All right.  Then finally, could you describe

5   for us your benchmark apportionment analysis?

6        A    I can.

7             So this is another way of showing the four

8   bars that I walked everybody through earlier.  And just

9   to walk through these very quickly again.

10            The starting point.  This time I used a

11  hundred percent instead of a hundred dollars.  I take

12  off 90 percent for the cost of the monitor or whatever

13  the item is that Newegg is selling.  That leaves 10

14  percent.

15            I allocated 3.7 percent for shipping and

16  credit card fees.  I could have allocated more.  This

17  number could have been -- instead of 6.3 percent, it

18  could have been 1 or 2 percent.

19            I then took a look at analyst reports and

20  third-party observations regarding Newegg and its

21  commercial success and allocated 10 percent of that 6.3

22  percent to the intuitive layout and the design -- excuse

23  me, the intuitive layout and design of Newegg's website.

24            Then I drilled down a little bit further.  And

25  although it says here shopping cart/session ID relative

1  contribution, we actually never got down that far.  We

2  talked about some features of the website above and

3  beyond that, but I said, okay, that's going to have to

4  suffice for now.

5          So I took the .63 percent we're at now and

6  multiplied it by 8 percent.  That leaves half of

7  1 percent.

8          Then to apportion that leftover benefit I used

9  just as a split-up I took 25 percent and gave it to Open

10  Market and 75 percent to Newegg.

11     Q    All right.  Now, this says accused sales times

12  benchmark, and it has almost 600,000.  But what is your

13  opinion as to a reasonable royalty?

14     A    It's $500,000.

15     Q    And explain the difference here.

16     A    Well, there's other data points that are less

17  than $500,000.  And then I think as I walked through,

18  the assumptions that I made for each of these

19  calculations are conservative.  And had I, in fact, used

20  1 or 2 percent, this calculation would have yielded,

21  gee, one-sixth, or $100,000 instead of $600,000.

22     Q    Are your -- is your analysis based on hard

23  evidence?

24     A    Oh, yes, sir.

25     Q    Have you verified your facts and figures?

```
 1     A    Yes, sir.

 2     Q    Do you feel strongly about this opinion?

 3     A    I do.

 4     Q    And do you think that the amount that you

 5 stated, less than 500,000, would be a reasonable royalty

 6 in this case in total?

 7     A    Yes, sir.

 8              MR. SAYLES:  I'll pass the witness.

 9              THE COURT:  All right.  Very well.

10              Let's see, we've been going for -- how

11 long do you think your cross will take, Counsel?

12              MR. SATINE:  I would say about an hour,

13 Your Honor.

14              THE COURT:  I think we'll take our break

15 before then and give y'all a chance to clear your heads

16 a little bit.

17              We will be in recess until 2:40.

18              COURT SECURITY OFFICER:  All rise.

19              (Recess.)

20              (Jury out.)

21              COURT SECURITY OFFICER:  All rise.

22              THE COURT:  Please be seated.

23              All right.  Before we bring the jury in,

24 I do have the Court's Charge for you to take a look at.

25              Ms. Ferguson, do you have copies there?
```

```
 1                    We have two copies for each side, if
 2  y'all would like to come get those.  And as I said,
 3  we'll hear objections after we complete all of the
 4  evidence.
 5                    MR. ADAMO:  Thank you, Your Honor.
 6                    THE COURT:  You bet.
 7                    All right.  Anything else before we bring
 8  the jury in?
 9                    MR. SAYLES:  Not from the Defense.  We're
10  ready to go.
11                    THE COURT:  All right.  Bring in the
12  jury.
13                    COURT SECURITY OFFICER:  All rise for the
14  jury.
15                    (Jury in.)
16                    THE COURT:  Please be seated.
17                    All right, Counsel.  You may proceed.
18                    MR. SATINE:  Thank you, Your Honor.
19                       CROSS-EXAMINATION
20  BY MR. SATINE:
21       Q    Good afternoon, Mr. Bakewell.
22       A    Good afternoon.
23       Q    Mr. Bakewell, we've had a number of experts
24  who have already appeared in this trial, and it's
25  getting into the afternoon on Thursday, and we're trying
```

1    to move ahead quickly.  So we're going to try to move

2    through some of this expeditiously, okay?

3        A    Okay.

4        Q    Now, you told us that you are compensated by

5    the hour for the work you have performed; is that

6    correct?

7        A    Yes, sir, my firm is.

8        Q    How much have you and your firm billed so far

9    in connection with this lawsuit?

10        A    I think approximately $200,000.

11        Q    And you described yourself at one point during

12    your testimony as an appraiser.  Did I hear you

13    correctly?

14        A    Yes, sir.

15        Q    Would it also be fair to describe you as a

16    damages expert?

17        A    Yes, sir.  In this context, that's correct.

18        Q    All right.  Have you testified in court over

19    the last few years as a damages expert on a number of

20    occasions?

21        A    I have, yes.

22        Q    Would you say that that now occupies the

23    majority of your professional life?

24        A    No, sir.  It's about half.

25        Q    About 50 percent of your professional life?

1        A     Yes.

2        Q     Okay.  And just so we're clear, you are not an

3   economist; is that correct?

4        A     No, sir, I'm not an economist.

5        Q     Okay.  Let's get a few other things out of the

6   way before we get to your opinions.

7              Now, you told us that you have assumed that

8   each of the three Soverain patents in this lawsuit --

9        A     Yes, sir.

10       Q     -- are valid, right?

11       A     That's right.

12       Q     You've told us you assume they are

13  enforceable, right?

14       A     Yes, sir.

15       Q     You told us you assumed they are infringed by

16  Newegg, right?

17       A     Yes, sir.

18       Q     Okay.  Is it fair for us to assume that you

19  are going to make those same assumptions during your

20  cross-examination, that the three patents in this

21  lawsuit are valid, are enforceable, and are infringed?

22       A     Yes, sir.

23       Q     Okay.  Now, we heard that you had your

24  deposition taken in this case, right?

25       A     Yes.

1     Q     In fact, I took your deposition in this case,

2  right?

3     A     You did.

4     Q     Okay.  And you've had a chance to review that

5  deposition prior to your testimony today?

6     A     Yes, sir.

7     Q     Okay.  And you are going to stand by what you

8  testified to at that deposition, correct?

9     A     I believe so.

10     Q     Okay.  And we've heard that you've submitted

11  expert reports in this case, right?

12     A     Yes, sir.

13     Q     And you have had an opportunity to review

14  those expert reports before you've taken the stand to

15  testify today, right?

16     A     That's correct.

17     Q     And you are going to stand by what you said in

18  those reports, correct?

19     A     I believe so, within context, that's correct.

20     Q     Okay.  Now, during your testimony, you kept

21  referring -- well, you referred several times to the

22  deposition testimony of Mr. Ghosh.

23              MR. SATINE:  If we could put Slide No. 10

24  back on the screen.

25     Q     (By Mr. Satine) At the very bottom of that

1   slide, it says:  No mention of patented claims, right?

2       A    That's right.

3       Q    Okay.  Well, did you hear the questions and

4   answers that were posed to Mr. Ghosh in the video that

5   was played in this courtroom?

6       A   I did, yes, sir.

7       Q    Did you hear Mr. Ghosh asked:  Do you have any

8   opinion as to the value of the shopping cart technology

9   in the scheme of the overall Transact product?

10          You heard that?

11      A   I did.

12      Q    And did you hear Mr. Ghosh say:  It's one of

13  the pieces that's necessary?

14      A    Yes, sir.

15      Q    But there was no mention of the patented

16  claims, right?

17      A    Not in the quote that's on Slide 10.

18      Q    You talked about when you go to the grocery

19  store to buy a lot of cereal, the grocery cart is free.

20          Do you remember that?

21      A    That's right.  You're not required to drop

22  money in when you enter or leave the store.  There's no

23  counter that -- that a grocery store has in order to pay

24  for every time somebody puts groceries into a grocery

25  cart, that's right.

1      Q     How much cereal do you buy in supermarkets

2  which have no shopping cart?

3      A     I have three kids, and so we buy a lot of

4  cereal and -- that's for sure.

5            I think all the supermarkets or grocery stores

6  I've been in have shopping carts.

7      Q     It's sort of necessary to shop in a

8  supermarket, isn't it?

9      A     Well, when I'm shopping for my kids, it is.

10           When I go in by myself, it's certainly not.

11     Q     Okay.  Well, were you here in the courtroom

12  when we played Mr. Ghosh's -- part of Mr. Ghosh's

13  testimony where he said:  It's hard to imagine someone

14  doing shopping without functionality like that;

15  otherwise, every transaction would be unique and

16  different?

17           And then there was a question, which said:

18  What do you mean by unique and different?

19           And he said:  You'd have to -- if I was buying

20  six things from a store, I'd have to buy each one as a

21  complete transaction.

22           So it would be no different than if you walked

23  into a store and had to buy each element, go in and buy

24  the first thing in the grocery store and come to the

25  checkout counter, put that in the bag, and go back

1   again.

2          Is a grocery cart necessary to the shopping

3   experience on Newegg?  Yes or no.

4      A   Well, your question doesn't --

5      Q   You can't answer yes or no?

6      A   A yes or no answer doesn't fit.

7      Q   Okay.

8      A   I'd like to answer it in detail, if I may.

9      Q   Is a grocery cart necessary to shopping for

10  all that cereal for your kids?  Yes or no.

11     A   Oh, that's -- yes, sir, that's true.

12     Q   You don't go in and buy one box of cereal, pay

13  for it, go out to your car; go in and buy another box of

14  cereal, pay for it, and go out to your car; go in, buy a

15  third box, pay for it, go out to your car.  Right?

16     A   That's an interesting point, because we've

17  heard testimony throughout this trial by technical

18  experts.  I think Mr. Grimes said those situations

19  wouldn't infringe.

20          And, in fact, that represents about two-thirds

21  of the transactions that occur on Newegg's website,

22  situations like that.

23     Q   Sir, did Dr. Grimes testify that you go into

24  the supermarket to buy cereal for your children -- that

25  was the question I asked, okay?

```
 1      A    Oh, no.  He was testifying about single --
 2      Q    Excuse me.  Excuse me.  I won't interrupt you,
 3 if you won't interrupt me.  Try to answer my questions,
 4 okay?  Because we really want to get through with this
 5 so the jury can get out of here today --
 6      A    Okay.  Yes, sir.
 7      Q    -- okay?
 8           Mr. Ghosh said, having a shopping cart on a
 9 website is just like having a shopping cart in a
10 supermarket.  You have to have it if you're going to be
11 buying a couple of boxes of cereal --
12      A    Oh, sure.
13      Q    -- right?
14      A    Yes, sir.
15           Well, you have to have it as a grocery store,
16 but not necessarily for a couple of boxes of cereal.
17 But I understand the question that you're asking.
18      Q    You also told us that Mr. Ghosh said that
19 Newegg would enter into a single-user license agreement.
20           Did I hear you correctly?
21      A    Yes, sir.
22      Q    Okay.  And then I went to the transcript,
23 because that wasn't what I thought you said.  And let's
24 see if this refreshes your recollection.
25           He was asked:  If Newegg had come to buy a
```

1    software license -- we're not talking about hypothetical

2    negotiation, patent infringement -- if they had come to

3    buy a software license in 2001, would Open Market have

4    sold it to them?

5                And he said:  Yes.

6                And he was asked:  What kind?

7                And the questions and answers that I see

8    here -- and let's see if this refreshes your

9    recollection -- would you expect that license to have

10   been more like a merchant license or more like a CSP

11   license?

12               And he said:  More like a merchant license,

13   probably.

14               Question:  Why is that?

15               Answer:  If they were just selling their own

16   stuff.

17               Question:  As opposed to them wanting to host

18   the stores of third parties?

19               Answer:  Right.

20               You are aware that one of the websites that is

21   an accused website in this lawsuit is Newegg Mall,

22   right?

23        A    Oh, yes, sir.  The volumes at Newegg Mall are

24   virtually immaterial versus what we're talking about

25   here; but, yes, sir, I'm aware of that.

```
1        Q    Mr. Bakewell --

2        A    Yes, sir.

3        Q    -- again, if you answer my questions, we'll

4   finish up --

5        A    Yes, sir.

6        Q    -- okay?

7        A    Yes, sir.

8        Q    You are aware that Newegg Mall is an accused

9   website in this lawsuit, right?

10       A    Yes, sir.  Uh-huh.

11       Q    You are aware that Newegg Mall hosts stores

12  for third parties, right?

13       A    I am, yes, sir.

14       Q    And did you hear Mr. Ghosh say:  Well, we give

15  them the single merchant license if they were not

16  hosting stores for third parties, right?

17       A    Yes, sir.

18       Q    Okay.  Let's talk about the hypothetical

19  negotiation.

20            At the hypothetical negotiation, Newegg is

21  required to take a patent license, correct?

22       A    Oh, yes, sir.

23       Q    Transact is not a patent license, correct?

24       A    That's correct.  It's a software license.

25       Q    At the hypothetical negotiation, the law
```

1   requires that we assume that Newegg would be a willing

2   licensee for a patent license, correct?

3        A    Yes, sir.

4        Q    The law does not require that we assume that

5   Newegg will be a willing licensee for a software

6   license.

7        A    Oh, no.  We're evaluating a patent license,

8   that's correct.

9        Q    Okay.  So at the hypothetical, what the

10  parties are negotiating is a patent license, a license

11  to the patents, right?

12       A    Yes, sir.

13       Q    They are not at the negotiating table at this

14  hypothetical negotiation negotiating a software license

15  to Transact, right?

16       A    That's correct.

17       Q    Now, let's talk about the parties at the time

18  of this hypothetical negotiation.

19            You've reviewed the license agreements that

20  Open Market entered into for that time period, right?

21       A    Yes, sir, I have.

22       Q    Did Open Market enter into any license

23  agreements in 2001 for any of its patents?

24       A    Yes, sir.

25       Q    And was that patent license that Open Market

1    entered into a patent license for a running royalty in

2    part?  Yes or no.

3         A    I'd have to see it.  I -- as I sit here, I

4    don't recall.

5         Q    Don't recall.

6              Do you have a copy of the license agreement up

7    there between Open Market and Internet Number

8    Corporation?  Is that in your books?

9         A    No, sir.  Where would I find --

10        Q    I'm not sure.  I didn't prepare those books.

11   I didn't know we were going into this.  I don't even

12   know if it's an exhibit.

13             MR. ADAMO:  Mr. Sayles, will you provide

14   him one?

15             MR. SAYLES:  I'll be happy to.

16             MR. ADAMO:  Thank you, sir.  I appreciate

17   it.

18             MR. SATINE:  P184, Mr. Sayles.  It may

19   not be in your book.

20             THE WITNESS:  Oh, thank you.

21        A    Did you say 184?

22        Q    (By Mr. Satine) P184.

23             MR. SATINE:  Do we have a copy?

24             MR. ADAMO:  Yes, we do.

25             THE WITNESS:  I don't think I have that.

```
 1                    MR. ADAMO:  P184?

 2                    THE WITNESS:  I don't have that.

 3                    MR. SATINE:  Okay.  I'll do it from here

 4   then.

 5        Q    (By Mr. Satine) So you don't recall if the

 6   agreement --

 7                    MR. SATINE:  We can take that one --

 8   well, we do have it up on the screen, P184.

 9        Q    (By Mr. Satine) You don't recall if P184 had

10   any running royalty elements?

11        A    Oh, I do recall this agreement.  It was for

12   different -- different patents.

13        Q    That's what I said when I asked the question.

14   I'm not trying to mislead you.  I just asked if they

15   entered into any patent agreements in 2001 and whether

16   any of those patent agreements had any running royalty

17   elements to them.

18        A    Oh, that's -- now I remember.  That's correct.

19        Q    And it did.  It did have a running royalty to

20   it, right?

21        A    Yes, sir.

22        Q    Okay.  Thank you.

23             Now, you told us that at the time of the

24   hypothetical, Open Market -- I think your words were --

25   is in dire financial straits, correct?  Those were your
```

1  words?

2      A    It could be.  I think that the evidence speaks

3  for itself.

4      Q    Okay.  Well, the evidence does speak for

5  itself, and I think the evidence that we've heard was, a

6  number of months after the date of the hypothetical,

7  Divine paid about $70 million to acquire Open Market,

8  right?

9      A    Oh, that's not correct.  You're

10  misunderstanding that transaction.

11      Q    Did you hear Ms. Wolanyk's testimony in this

12  court?

13      A    That transaction was stock-for-stock

14  transaction.  That was not a cash transaction --

15      Q    And how much --

16      A    -- the way you described it.

17      Q    Okay.  And how much was the stock worth at the

18  time it was provided by Divine in exchange for the Open

19  Market stock?  $70 million, right?

20      A    The stock was, that's right.

21      Q    Okay.

22      A    For the entire company, that's right.

23      Q    So at this hypothetical negotiation in 2001,

24  we have Open Market, the owner of the patents, on one

25  side of the table, right?

```
 1        A    Yes, sir.

 2        Q    And we have Newegg on the other side of the

 3   table, right?

 4        A    Yes.

 5        Q    And this is on the eve of infringement, right

 6   before Open Market -- before Newegg can go into business

 7   and start its websites, correct?

 8        A    That's right.

 9        Q    Okay.  So Newegg is eager to start its

10   websites, right?

11        A    Presumably, yes.

12        Q    Okay.  And we have Open Market, which wants to

13   get fair value for its patents; is that fair?

14        A    I think that's a fair term.  I'd say fair

15   market value.

16        Q    Okay.  They want to get fair rent for the use

17   of their property, right?

18        A    I can agree with that, yes.

19        Q    Okay.  And Newegg, we've heard, is a startup

20   with very little cash, right?

21        A    That's true.

22        Q    Okay.  Newegg -- Newegg, though, has hopes of

23   some day selling billions of products each year, right?

24        A    Oh, sure, absolutely.

25        Q    But right now they don't have a whole lot of
```

1    cash at the time of the hypothetical negotiation, right?

2         A    Yeah, not a whole lot.

3         Q    Okay.  So with this situation, isn't it

4    logical for the two parties sitting at this hypothetical

5    negotiation to agree that Newegg is going to pay as it

6    uses the patents so that they don't have to pay

7    everything upfront when they don't have the money; and

8    this way, if Newegg's website don't work out, they're

9    not out the money?

10             Isn't that logical?

11        A    No, sir.  I think you're -- that's an

12   incomplete analysis of the situation.

13        Q    So you don't agree that's logical, right?

14        A    I think it's incomplete.

15        Q    It's incomplete.

16             If the parties, at the time of the

17   hypothetical, agreed to a running royalty, and Newegg's

18   three websites that are at issue in this lawsuit were

19   not successful, Newegg wouldn't have had to pay a lot of

20   money for those patent licenses, right?

21        A    It depends on what the royalty rate is.

22        Q    If the parties were having -- at this

23   hypothetical negotiation, Open Market would have wanted

24   to have recognition by the industry for its patents,

25   wouldn't it?

1     A     Well, sure.

2     Q     Okay.

3     A     Absolutely.

4     Q     It would want to have a stream of revenue

5  continuing, because Open Market wasn't closing its doors

6  yet.  It didn't get purchased by Divine for some time,

7  right?

8     A     Oh, no.  That's contrary to my experience in

9  licensing.  A company in the situation that Open Market

10 was in that needed cash would be more inclined to accept

11 or negotiate for an upfront payment in order to continue

12 to fund its business.

13    Q     So, in your opinion, Open Market would have

14 said to themselves:  Well, we're going to get acquired

15 in a few months by Divine, so instead of having Divine

16 pay $70 million, we'll have them pay $70,500,000?  That

17 would have been what's going through Open Market's mind?

18    A     No, sir.  That's misleading.  There was no

19 cash in that transaction, so that's not the way that the

20 parties would have evaluated it.

21    Q     They received stock worth $70 million, the

22 Open Market stock?

23    A     Stock exchange.  There was no cash.

24    Q     But the stock was marketable, right?  People

25 could sell it.  It was traded on the New York Stock

```
 1   Exchange?

 2        A    Yeah.  I'm not sure if I would use that term,

 3   but that's possible.

 4        Q    Were you here in the courtroom when Mr. Cheng

 5   testified?

 6        A    Yes, I was.

 7        Q    Did you hear him testify how many patent

 8   licenses Newegg has?

 9        A    Yes, I did.

10        Q    How many?

11        A    There's a handful.

12        Q    Well, I heard him say that they have one

13   patent license.  You heard him say a handful?

14        A    That's the one that I remember.

15        Q    Well, now, we're sort of passing each other in

16   the night.

17             I thought I said I heard him say they have one

18   patent license.  You said they have a handful.  Handful

19   in my hand is five.  So one or five?

20        A    No, sir.  What Mr. Cheng testified is that

21   that license was to a pool of patents.

22        Q    But how many --

23        A    A pool --

24        Q    -- license agreement?

25        A    It's one license agreement --
```

```
 1      Q    Thank you.
 2      A    -- covering effective license agreements
 3 between an array of parties, an array of patents.
 4           That's what I meant by a handful, sir.
 5      Q    Okay.  And the one license agreement that
 6 Newegg has is a running royalty.  That was Mr. Cheng's
 7 testimony, correct?
 8      A    The one that totaled $4,000 per year, is what
 9 he testified.
10      Q    As a running royalty, correct?
11      A    That's correct.
12      Q    Okay.  You could have answered that with a yes
13 or no, right?
14      A    Well, it wouldn't have been a complete answer,
15 sir.
16      Q    Correct is not complete.  Got it.  Okay.
17           I tell you what, let's talk about Transact,
18 okay?
19           Now, you've told us you're going to stand by
20 what you said in your reports, right?
21      A    Yes, sir.
22      Q    And in your reports --
23      A    Within context, I will.
24      Q    Okay.  Well, we'll give you a copy of your
25 report, if you think I'm misquoting you.
```

1          In your reports, you said, according to an

2  Open Market document, Open Market held approximately 30

3  percent of the E-commerce software market by the end of

4  1998.

5          Do you stand by that statement?

6     A    Oh, yes, sir.  I think that's a fact.

7     Q    Okay.  Open Market's share of that market at

8  that time was substantially larger than Microsoft's

9  share of the market, right?

10    A    I believe we heard testimony to that effect.

11    Q    Would you agree with that?

12    A    I don't have any reason to disagree.

13    Q    Well, where did you get the information about

14 Open Market's share?  Did you read that whole document?

15    A    I did.

16    Q    Did you see anything in there about anybody

17 else's share of the market?

18    A    I don't recall, but I can agree with your

19 question.

20    Q    Do you recall if you saw anything about IBM's

21 share of the market?

22    A    I think that IBM's market share was smaller.

23    Q    In fact, if we added up IBM's share of the

24 market and Microsoft's share of the market, they still

25 didn't come close to Open Market's share of the market,

1  right?

2      A    Oh, that's possible.

3      Q    I know it's possible, but do you remember?

4      A    I don't remember exactly, but I think that

5  that's consistent with my general recollection of the

6  document, yes, sir.

7      Q    You are going to stand by what you said in

8  your reports; that you reviewed information in this case

9  concerning the price of single merchant license fees for

10  Transact, right?

11      A    Yes, sir.

12      Q    And you saw information in this case -- let me

13  go to your report, so I don't take it out of context.

14          Bear with me.

15          You said in your report that Mr. Ghosh

16  testified that a single merchant license fee for

17  Transact software ranged between $0.1 million and $1

18  million.

19          You said that in your report, right?

20      A    Oh, yes, sir.

21      Q    You stand by that statement?

22      A    That's what he said, yes, sir.

23      Q    You saw other documents which also said that

24  Transact single merchant software licenses sold for $1

25  million or more, didn't you?

```
 1      A    I've seen descriptions to that effect.

 2      Q    Is that a yes?

 3      A    Descriptions.  I'm not sure exactly what your

 4 question was, but I think I agree with it.  I had

 5 never -- I haven't seen actual licenses.  That's what

 6 I'm trying to clarify.

 7      Q    That's right.

 8           In your report, you said that Open Market sold

 9 approximately 12,000 licenses of Transact software,

10 correct?

11      A    That's right.

12      Q    Okay.  And then you put up on your slides and

13 you told us you reviewed 10 of those 12,000 licenses for

14 purposes of that slide, right?

15      A    That's right.

16      Q    Were you here in the courtroom when Mr. Treese

17 testified on Tuesday morning?

18      A    Yes.

19      Q    Did you hear Mr. Treese testify that Disney

20 was a Transact licensee?

21      A    Yes, I recall that.

22      Q    Have you been able to review the Disney

23 Transact license?

24      A    No, I haven't seen that.

25      Q    Got lost somewhere at Divine, right?
```

1       A    I'm not sure why the reason is that I don't

2  have -- haven't had access to it.

3       Q    Mr. Treese testified that 3Com had a Transact

4  license, right?

5       A    I recall that.

6       Q    Do you know if anybody's been able to find a

7  copy of that license?

8       A    I haven't seen it.

9       Q    Mr. Treese testified that the Tribune Company

10 had a Transact license, right?

11      A    I believe so.

12      Q    Do you know if anybody's been able to locate a

13 copy of that license?

14      A    I haven't seen it.

15      Q    Mr. Treese testified that the Chicago Tribune

16 had a Transact license, right?

17      A    Is that what you just said?

18      Q    No.  I said Tribune Company, and then

19 Mr. Treese also -- okay.  He said the Tribune Company,

20 which owns the Chicago Tribune, so I'll stay with that.

21           Okay.  Were you here in the courtroom when

22 Mr. Treese testified that the typical price for a basic

23 corporate customer license to Transact was in the range

24 of $125,000 to $250,000?

25      A    Oh, yes, sir.

1     Q    Were you here in the courtroom when Mr. Treese

2  testified that there were additional costs to that

3  license?

4     A    I was.

5     Q    You were here when he talked about

6  installation services, right?

7     A    Yes.

8     Q    You were here when he talked about annual

9  software maintenance for updates and bug fixes?

10    A    Yes, sir.

11    Q    You were here when he talked about

12 customization, right?

13    A    Yes.

14    Q    You were here when he talked about

15 integration, right?

16    A    I was.

17    Q    You were here when he said that customization

18 costs could run anywhere from $50,000 to several hundred

19 thousand dollars, right?

20    A    Oh, yes.

21    Q    You were here when he said annual service

22 charges would run around 15 to 20 percent of the

23 original license price, right?

24    A    No.  I think he said that they could.  I don't

25 think that he said that they would absolutely.

Q Well, I suggest to you that --

MR. SATINE: And we can put -- I'm not sure if we can put up the transcript on the screen. It was Page 113 of the transcript from Tuesday in the morning.

And if we can blow that page up. There we go. Lines 12 through 17.

Q (By Mr. Satine) Does that help refresh your recollection as to whether or not that's what Mr. Treese said?

A Oh, that's consistent with -- yes, sir, that's consistent with my recollection and the documents. I don't think the documents indicate that there's any automatic attachment of maintenance on an annual basis to the upfront license fees.

In fact, I covered that during my presentation. And that's one of the things that Mr. Nawrocki and I agree upon.

Q You were here in the courtroom when Ms. Wolanyk testified on Tuesday, right?

A Yes, sir, I was.

Q Ms. Wolanyk testified that a Transact license could cost millions of dollars when you added up all the costs to the software licensee, right?

A It could.

```
 1        Q      That's right, could.

 2        A      That's right.

 3        Q      Open Market offered two types of Transact

 4   licenses, right?

 5        A      Yes, sir.

 6        Q      Open Market offered single-user licenses,

 7   right?

 8        A      That's right.

 9        Q      Open Market offered commerce -- commerce

10   service provider licenses, right?

11        A      Yes, sir.

12        Q      And one of the differences between these two

13   licenses is that a commerce -- commerce serve provider

14   license or CSP license allowed a company like Newegg to

15   host stores of third parties on a website like Newegg

16   Mall, right?

17        A      That's correct.

18        Q      For purposes of your report and testimony here

19   in this courtroom, you assumed that Newegg could host

20   stores of third parties on neweggmall.com without a CSP

21   license, right?

22               All it needed was a single-merchant Transact

23   license.  That was your testimony, right?

24        A      I'm not sure I would agree with that.

25        Q      So would -- if Newegg had been bargaining to
```

1  purchase Transact licenses for all of its websites,

2  would it have needed a CSP license for the Newegg Mall

3  website?

4      A    No, sir.  According to Mr. Ghosh, it would

5  have needed a single-user license.

6      Q    I thought we covered that part of Mr. Ghosh's

7  testimony.  Let's go back to it.

8      A    I thought we did, and I thought we were clear.

9      Q    I guess we're not.  Let's go through it again.

10         Mr. Ghosh was asked:  In your experience,

11  would you expect that license to have been more like a

12  merchant license or more like a CSP license?

13         Answer:  More like a merchant license,

14  probably.

15         Question:  Why is that?

16         Answer:  If they were just selling their own

17  stuff.

18         Question:  As opposed to them wanting to host

19  the stores of third parties?

20         Answer:  Right.

21         Mr. Ghosh said that if Newegg had wanted a

22  Transact license to operate the Newegg Mall website, one

23  of the accused websites in this lawsuit, it would need a

24  CSP license.  Isn't that what he said?

25      A    No, sir.  He said the license overall would be

1 more like a single-user license.

2    Q    Well, we've gone through the testimony now

3 three times in court.  The jury heard it, as we all did,

4 on the video.  I've read it a few times.  The jury will

5 work it out.  And we're going to move on.

6         For purposes of your testimony, you assumed

7 that Newegg could host all three of its websites on --

8 it could operate all three of its websites with one

9 single-user license, correct?

10   A    I think it's fair to assume that my thought

11 process is that it would all be covered under one

12 license entered into around the time of the hypothetical

13 negotiation.

14   Q    That was your --

15   A    That's consistent with the licenses I

16 reviewed, yes.

17   Q    Okay.  That was your thought process.

18        And which witness came into this courtroom and

19 testified that that was Open Market's thought process?

20        Was it Mr. Ghosh?

21   A    Well, that's what we had discussed before when

22 he said it was more like or would have been more like a

23 single-user license.

24        I think that each license is an individual

25 license, and the parameters would have been negotiated

1    on a unique basis.

2        Q    And that's what you think Mr. Ghosh testified

3    to, right?

4        A    That's what his testimony meant to me, yes,

5    sir.

6        Q    Now, you told us that the price of one

7    single-user Transact software license was no more than

8    344,014, correct?

9        A    That's correct.  Of those that I listed,

10   that's right.

11       Q    And $344,014 is the amount that Corel agreed

12   to pay for a single-user Transact license, right?

13       A    Yes.  I'm familiar with that license, yes,

14   sir.

15       Q    Okay.  But $344,014 was just one of the fees

16   that Corel agreed to pay in connection with that

17   license, right?

18       A    Oh, no, sir.  I disagree.  That 300 and -- may

19   I explain?

20       Q    No.

21       A    Okay.

22       Q    If you disagree, we'll see if we can work it

23   out.

24       A    I'll find the time to explain.

25       Q    The Corel software license agreement required

1    Corel to pay for maintenance and support, didn't it?

2        A    I believe that it did, yes, sir.

3        Q    The payment for maintenance and support is not

4    included in the $344,014, right?

5        A    That's right.  It's not.

6        Q    The Corel software license agreement for

7    Transact required Corel to pay transaction fees, right?

8        A    Yes, sir.

9        Q    Corel was required to pay a fee based on the

10   number of transactions on its website, right?

11       A    Yes, sir.

12       Q    The transaction fee to be paid by Corel ranged

13   up to 25 cents per transaction, correct?

14       A    I think that's consistent with my memory, yes,

15   sir.

16       Q    The transaction fee to be paid by Corel of up

17   to 25 cents per transaction was not included in the

18   $344,014, right?

19       A    That's correct.

20       Q    The Corel software license agreement for

21   Transact required Corel to also pay a subscription fee,

22   correct?

23       A    I believe so.

24       Q    The subscription --

25       A    Now, this is where -- I don't recall how that

1   $344,000 was split up, but there's more than just the

2   software license fee in that $344,000.  There's other

3   amounts as well.

4           So I was actually being conservative by taking

5   that full amount.

6       Q   I'm sorry.  I took my glasses off.  Do you

7   remember at your deposition apologizing for how small

8   the font was in your report on these charts?

9       A   Oh, yeah.  And if you show it now, I'll

10  apologize again.  That is some small font.  I think I

11  set a record.

12      Q   Okay.  Do you have a copy of your first

13  witness report -- your first expert report up there, or

14  we'll get you one.

15      A   Not unless you gave it to me.

16              MR. SATINE:  Your Honor, may I approach

17  the witness?

18              THE COURT:  Yes, you may.

19      Q   (By Mr. Satine) Now, Mr. Bakewell, since I've

20  already found it, if you could go to Exhibit 7 in your

21  report, Page 3 of 8, and it's the first one on that

22  page.

23      A   Oh, yes.

24      Q   Okay.  And you have several columns there in

25  that chart, right?

```
 1        A    Yes, sir.
 2        Q    For the licensee Corel, you have a column for
 3   Total License Fees, right?
 4        A    That's right.
 5        Q    And then next to that you have another column
 6   for Training and Implementation/Maintenance and Support
 7   Fees, right?
 8        A    Yes, sir.
 9        Q    And next to that you have another column which
10   is entitled Merchant Fees Licenses.  You have not
11   applicable for Corel, right?
12        A    Yes.
13        Q    Next to that you have another column that says
14   Transaction Fees, and you filled that in for Corel,
15   right?
16        A    Yes, sir.
17        Q    Next to that you have another column that says
18   Additional Fees, and you filled that in for Corel,
19   right?
20        A    Yes.
21        Q    And in that column it talks about subscription
22   fees, right?
23        A    That's right.
24        Q    And the subscription fee to be paid by Corel
25   was 1 percent of Corel's gross revenues from its sales
```

1   of subscriptions, right?

2      A   Yes.

3      Q   And Corel was required to pay a subscription

4   fee for each year that it used Transact, right?

5      A   I believe so, yes.

6      Q   And the payment by Corel for subscription fees

7   was not included in the $344,014, right?

8      A   No, sir.

9      Q   The Corel software license agreement to

10   Transact did not allow Corel to have access to

11   Transact's source code, correct?

12      A   Oh, no, it didn't.  I agree with that.

13      Q   Okay.  The Corel software license agreement to

14   Transact did not allow Corel to change or modify the

15   Transact source code, correct?

16      A   That's correct.

17      Q   Do you know of your own knowledge whether

18   Newegg, in 2001 --

19              MR. SATINE:  Strike that.

20      Q   (By Mr. Satine) Let me ask it this way:

21        At your deposition, do you remember if I asked

22   you if you knew whether Newegg would have needed access

23   to the Transact source code if it wanted to use Transact

24   to operate newegg.com?  Do you remember that question?

25      A   Yes.

1    Q    Do you remember that your answer -- what your

2  answer was?

3    A    Not exactly.

4    Q    Remember you said you would have to go back

5  and ask Mr. Tittel?

6    A    I may have said that, yes.

7    Q    Did you hear Mr. Tittel testify about that in

8  this courtroom, when they would have had to modify --

9  needed access to the Transact source code if Newegg

10 wanted to use Transact to operate newegg.com?

11 Mr. Tittel testified about that as an expert?

12   A    Frankly, I don't recall.

13   Q    Do you remember at your deposition I asked you

14 whether Newegg would have needed to make changes to any

15 source code, its own source code or any source code, in

16 order to integrate Transact into what it had, all those

17 lines of computer code?  Remember that?

18   A    Somewhat, yes.

19   Q    Do you remember what your answer was?

20   A    Not exactly.  I may have deferred to

21 Mr. Tittel.

22   Q    You did refer to Mr. Tittel?

23   A    He's the technical expert.

24   Q    Did Mr. Tittel come into this courtroom and

25 testify about that?

```
1        A    I don't recall that.

2        Q    Do you remember at your deposition I asked you

3   if the look and feel of the three Newegg websites

4   involved in this lawsuit would be any different if

5   Newegg was using a 2001 version of Transact?  Remember

6   that?

7        A    Yes.

8        Q    Do you remember what your answer was?

9        A    I probably deferred to a technical expert.

10       Q    You deferred to Mr. Tittel, right?

11       A    Yes, sir.

12       Q    Did Mr. Tittel come in and provide this court

13  with any testimony about that?

14       A    I don't recall hearing that.

15       Q    Do you remember at your deposition whether I

16  asked you if Newegg would have to delay its entry into

17  the marketplace if at the time of the hypothetical

18  negotiation it decided to implement the use of Transact

19  software?

20       A    I vaguely remember that.

21       Q    You remember what your answer was?

22       A    Actually, I don't.

23            MR. SATINE:  If we could call up

24  Mr. Bakewell's deposition, Page 101.

25            And there's a question starting at Line
```

1   15 through Line 20, and then we're going to go over to

2   Page 102 next.

3       Q    (By Mr. Satine) Remember I asked you:  Do you

4   have the technical expertise to opine as to how long it

5   would have taken Newegg to integrate the Transact

6   product into its software -- software code in January of

7   2001?

8           And your answer was:  No, not from a technical

9   point of view.

10      A    That's right.

11          MR. SATINE:  Now if we can go to Page

12   102, Lines 11 through 13.

13      Q    (By Mr. Satine) Do you remember if I asked

14   you:  Do you identify the amount of time it would take

15   somewhere in your report?

16          And you said:  No, sir.

17          Right?

18      A    That's right.  That's what I said.

19      Q    And as of today you still cannot provide that

20   information, right?

21      A    Yes, sir, that's correct.

22      Q    Do you know how many sales Newegg would have

23   lost if it had delayed its entry into the marketplace in

24   2001 in order to implement the Transact software?

25      A    No, sir.

```
 1      Q    Haven't done that calculation?

 2      A    No.

 3      Q    Haven't done any economic analysis about that?

 4      A    Not of that in particular, no.

 5      Q    The Corel software license agreement does not

 6 contain a grant of a license to use the patents in this

 7 lawsuit separate and apart from the Transact software,

 8 right?

 9      A    That's right.  It's not a patent license.  I

10 agree with that.

11      Q    Yes or no:  You assume that at the

12 hypothetical negotiation Newegg had the option of buying

13 a Transact software license instead of paying a royalty

14 for a patent license, yes or no?

15      A    The hypothetical negotiation involves rights

16 to a patent and its valuation of a patent license.

17      Q    So that means at the hypothetical negotiation

18 Newegg did not have the option?

19      A    Oh, no, sir.

20      Q    Oh, they had the option at the hypothetical

21 negotiation?

22      A    No, you got my answer backwards.  No, they

23 didn't have the option.

24      Q    Okay.  So let's be sure that we're not

25 crossing paths here.
```

1          At the hypothetical negotiation Newegg's only

2   option is to take a patent license, right?

3       A    That's right.

4       Q    At the hypothetical negotiation Newegg has no

5   option of saying, no, we're not taking a patent license;

6   we're going to purchase a software license to Transact

7   instead, right?

8       A    The hypothetical negotiation valuates a patent

9   license.  Other options in terms of software licenses

10  are certainly relevant considerations and would inform

11  the negotiation.  But it involves a patent license.

12      Q    Does that mean the answer to my question is

13  yes?

14      A    Well, we got backwards with yes and no.

15  My answer to your question is that the hypothetical

16  negotiation involves the taking of the patent license.

17      Q    Okay.  So let's try to make sure we're all

18  talking about the same thing.

19          Since the hypothetical negotiation deals with

20  the taking of a patent license, one of the parties at

21  the hypothetical negotiation can't say:  Nope, no patent

22  license for me, I'm going to buy the Transact software

23  license?

24      A    Oh, I agree with that.  That's correct.

25      Q    Do you agree that TigerDirect.com is a website

1  which competes with Newegg?

2      A    I believe so.

3      Q    Do you believe that TigerDirect does not have

4  a software license to use Soverain's Transact software?

5      A    Yes, I agree.

6      Q    You agree that TigerDirect has a patent

7  license from Soverain?

8      A    Yes, sir.

9      Q    Do you agree that TigerDirect has a patent

10  license from Soverain to use the patents in this

11  lawsuit?

12      A    Yes, sir.

13      Q    Do you agree that Amazon.com is a website that

14  competes with newegg.com?

15      A    In a limited sense, yes, sir.

16      Q    In a limited sense.

17          Have you reviewed Newegg's S-1 filings with

18  the Securities and Exchange Commission of the United

19  States?

20      A    I have.  I believe Amazon is listed as a

21  competitor.

22      Q    Okay.  Amazon does not have a software license

23  to use Soverain's Transact software, correct?

24      A    That's correct.

25      Q    Amazon has a patent license from Soverain,

1  correct?

2      A    Oh, yes, sir.

3      Q    Amazon has a patent license from Soverain to

4  use the three patents in this lawsuit, correct?

5      A    Yes.

6      Q    Now, let's talk a little bit about patent

7  licenses.

8            You went through patent licenses that you

9  reviewed the patents-in-suit, right?

10      A    Yes, sir.

11      Q    And you told us that you excluded from your

12  valuation any patent licenses that resulted from the

13  settlement of the lawsuit, right?

14      A    Yes.  I made an effort to differentiate

15  between licenses that settled a lawsuit where a

16  complaint was filed.

17      Q    Okay.  So you used one of the two Open Market

18  agreements, right?

19      A    Yes, sir.

20      Q    You used 18 of the 32 Divine license

21  agreements, right?

22      A    Yes, sir.

23      Q    You used none of the Soverain granted license

24  agreements, right?

25      A    That's correct.

```
 1      Q    So you didn't consider in the analysis on that

 2 bar chart Amazon.com, right?

 3      A    That's right.

 4      Q    You didn't put Gap up there, right?

 5      A    I did not.

 6      Q    You didn't put Redcats up there, right?

 7      A    That's right.

 8      Q    Didn't put Zappos up there, right?

 9      A    Yes.

10      Q    Didn't put TigerDirect up there?

11      A    Yes, sir.  I agree with that.

12      Q    Now, you and Mr. Sayles did talk about the

13 Divine licenses and the one Open Market license to

14 Johnson & Johnson?

15      A    We did.

16      Q    Okay.  And you compared Mr. Nawrocki's royalty

17 calculation to what you said were these real-world

18 patent licenses, right?

19      A    Yes, sir.

20      Q    Okay.  Well, let's see if we can do a

21 comparison, also.

22               MR. SATINE:  Your Honor, may I approach

23 and put something on the easel, if somebody can do that?

24               THE COURT:  Yes, you may.

25      Q    (By Mr. Sayles) Okay.  You were here in the
```

1 courtroom when Mr.  Nawrocki went through that summary

2 of royalty damages, right?

3      A    Oh, yes, sir, I was.

4      Q    Let's talk about some of your real-world

5 patent licenses.  Let's start with the license to

6 Cadence 120.  That was a patent license from Divine,

7 right?

8      A    Yes, sir.

9      Q    That was one of the licenses on your bar

10 chart, right?

11     A    Yes.

12     Q    That was a license in which Cadence agreed to

13 pay a royalty of $1,000 or 1 percent of its gross sales

14 from the previous year, whichever was greater, right?

15     A    That's what it said, 1 percent of the sales

16 for the previous year.

17     Q    So if Corel paid a thousand dollars, that

18 means that its gross sales were less than $100,000,

19 right?

20     A    I think you can deduce that, yes, sir.

21     Q    But if it paid more than a thousand dollars,

22 that means it had sales of more than $100,000, right?

23     A    I think so.  That's right.  During that one

24 year.

25     Q    Okay.  The first full year of the damages

1    period in this case is 2008, right?

2         A    Yes, sir.

3         Q    Newegg's gross sales in 2008 were

4    approximately $2 billion, right?

5         A    That sounds about right.

6         Q    Okay.  If Newegg agreed to pay a royalty of

7    $1,000 or 1 percent of its 2008 gross sales, whichever

8    is greater, Newegg would be paying a royalty of?

9              MR. SAYLES:  Your Honor, before we go

10   into this any further, I'm going to object to that.  The

11   hypothetical negotiation is 2001, not 2008.  So I object

12   to this as irrelevant, and it's also misleading.

13             THE COURT:  Okay.  Restate your question,

14   Counsel.

15        Q    (By Mr. Satine) Is Plaintiff in this case

16   seeking damages for 2001?

17        A    No, sir.

18        Q    Is Plaintiff in this case seeking damages for

19   a period that starts at the end of 2007?

20        A    Yes, sir.

21        Q    The parties to the hypothetical negotiation

22   would have been negotiating for a license agreement

23   which would cover the period in this lawsuit, right?

24        A    I think that's actually incorrect.

25        Q    That's incorrect.  So, in other words, what

1  you're saying is, when we get to court and we do a

2  hypothetical negotiation, and we're looking at a time

3  period from late 2007 until April 2010, what we really

4  need to do is roll back to 2001 and say, how much would

5  the parties have paid then based on the usage as of the

6  date of a hypothetical when Newegg has not yet gone into

7  business?

8      A    That's right.  The facts and circumstances as

9  of that date would have been evaluated.

10          On the other hand, the damages period is from

11 November 2007 until the date of the lawsuit.

12     Q    Have you ever heard of the book of wisdom?

13     A    Yes, sir.

14     Q    That enables the parties at the hypothetical

15 negotiation to sort of open this hypothetical book and

16 look at what's going to be happening, right?

17     A    That's correct.

18     Q    Okay.  So at this hypothetical negotiation in

19 2001, Newegg and Open Market are trying to gather all

20 the information they can.  They would be able to look in

21 this book of wisdom and take a look at what Newegg's

22 growth is going to be in future years, right?

23     A    That's right.  Just like the other licenses,

24 the parties would have anticipated growth and considered

25 that in the outcome of the license they negotiated.

1     Q    Okay.  And if the parties are going to have a

2  fair and reasonable negotiation, and Newegg is going to

3  say, well, wait a minute Cadence is paying 1 percent of

4  their gross sales, wouldn't it be fair and reasonable

5  for Open Market to say, we need to look at your gross

6  sales and what are they going to be, and let's apply

7  1 percent to that just to get another data point on a

8  real-world patent license data point.

9     A    For that one year of start-up business, that

10 data point is a relevant consideration.  That's right.

11 The parties would have known that those percentages were

12 applied to one year of business, typically early years

13 of business, and that's it.

14    Q    Okay.  So we're in a court of law now.

15 There's a lawsuit, it's gone on for years.  Soverain is

16 seeking damages for a period from late 2007 to 2010.

17 But when we calculate reasonable royalty damages, what

18 we look at is Newegg's use of the soft -- of the

19 patented technology back in 2001, not in 2008 and 2009

20 and 2010, right?

21    A    Oh, no, sir, that's not what I said, if that's

22 what you're implying.

23    Q    Okay.  So at this hypothetical negotiation,

24 somebody on Open Market's side of the table would have

25 said, yes, Cadence paid 1 percent of its gross sales for

1 year, but look at what your gross sales are.  Look at

2 what your gross sales are going to be.  Let's talk about

3 what 1 percent of that would be as we try to determine

4 what is a fair and reasonable patent license royalty to

5 cover from 2001 through November 2007, which Soverain is

6 not seeking damages for in this lawsuit, and then from

7 November 2007 until April 2010.

8          Isn't that something that reasonable people

9 would do at a hypothetical negotiation?

10     A    Two considerations, I think, are relevant.

11 The first is that most, if not every, business that

12 starts up has anticipations to grow over time.  And I'm

13 sure that those other licensees had reasonable

14 expectations to grow over time.  Yet they entered into

15 licenses that were capped, that had lump sums of only

16 one year during the start-up year.  That's a very

17 important consideration, and I think that Newegg would

18 have reasonably expected to get a similar deal.

19          The fact that Newegg has been successful I

20 think is not something that should be held over their

21 head or against them, because all those parties

22 anticipated being successful.  That's Point No. 1,

23 Mr. Satine.

24     Q    Uh-huh.

25     A    Point No. 2 is that the calculation that I did

1   for apportionment considers the sales during the damages

2   period, not during 2001.  So just to be clear, when I

3   calculated damages in the apportionment calculation, I

4   used sales during the damages period, yet the result of

5   that calculation was $600,000.

6        Q    So when you did your apportionment analysis,

7   you thought it was reasonable to look at sales during

8   the damages period.  But at the hypothetical

9   negotiation, it would have been unreasonable for Open

10  Market and Newegg to look at the sales during the

11  damages period?  That's your testimony, right?

12       A    Well, I don't -- I don't see how you can ask

13  that question given my prior answer.  So maybe I should

14  try again.

15       Q    Well, I guess that means you can't answer my

16  question, correct?

17       A    No, I think I've answered your question.

18       Q    Okay.

19       A    I think it's very clear.

20       Q    Let's look at another of your real-world

21  patent licenses.

22            Divine entered into a patent license with

23  Odimo, correct?

24       A    Oh, yes, sir.

25       Q    And the agreement with Odimo was that Odimo,

1   for each one of its 35,000 shopping cart transactions,

2   would pay a royalty which represented approximately 85

3   cents per transaction, right?

4       A    During one year, a start-up year.

5       Q    During one year?

6       A    It's very important.  In your questions, you

7   keep leaving that out.  That's an important

8   consideration, critical, in fact, in those licenses.

9       Q    So would it have been fair at the hypothetical

10  negotiation for the parties to say, let's look at the

11  number of transactions in 2008 and let's multiply that

12  by 85 cents per transaction to get another data point to

13  discuss?  Would that have been fair?

14      A    No, sir.

15      Q    That wouldn't be fair.

16           Would it have been fair at this hypothetical

17  negotiation for the parties to say, let's look at the

18  number of transactions in 2009 and multiply that by 85

19  cents to get another data point?  That's not fair?

20      A    Sir, that's not how -- sir, that's not how

21  those licenses are structured.  They're not -- they're

22  not a function of anticipated sales some eight or nine

23  years into the future.  They're a function of one year

24  historical sales.

25           And the gross amount of those licenses I think

1   is also a relevant consideration.  None of them come

2   anywhere near to the damages conclusion here.  I mean,

3   the damages conclusion here, as I mentioned, is 165

4   times higher than all of those licenses if I add them up

5   in total.

6       Q    And it's 165 times higher because we have such

7   a larger royalty base, right?

8       A    A larger royalty base and a larger royalty

9   rate, that's for sure, absolutely.

10      Q    Is 80 cents per transaction higher than 85

11  cents per transaction that Odimo paid?

12      A    1.20 is.  That's 50 percent higher.

13      Q    They were paying 85 cents per shopping cart

14  transaction.  For the first two patents on that chart,

15  the rate is 80 cents.  That is five cents less than

16  Odimo was paying, right?

17      A    That math is correct.  But which, again,

18  you're leaving out is that was for one year, a start-up

19  year.  They didn't -- that license did not say, let's

20  look at what your sales maybe will be in 2010, and if

21  you're really successful as a business, we're going to

22  sock it to you.  They don't say that.

23      Q    Some of the Divine licenses were not for one

24  year, right?

25      A    That's right.  I think that's correct.

1    Q    Some of them covered a period of several

2  years, right?

3    A    Start-up years, that's right.

4    Q    You and Mr. Sayles talked about a license

5  agreement that was for $400, right?

6    A    Yes, sir.

7    Q    That was the license agreement that Divine

8  entered with a company by the name of LH Internet,

9  correct?

10    A    I vaguely recall that.

11    Q    And LH Internet agreed to pay Divine 2 percent

12  of its gross sales over the internet for one year,

13  right?

14    A    That's what the license says.

15    Q    Okay.  But, again, your position is at the

16  hypothetical negotiation it would have been unreasonable

17  for Open Market to say, what's fair is fair.  If you

18  want to point to these licenses and say they only paid

19  $400 based on 2 percent of their gross sales, let's look

20  at 2 percent of your gross sales in the damages period.

21    A    Yeah, that's unreasonable, sir.  That's

22  unreasonable and it's misleading and it's inconsistent

23  with the licenses.

24    Q    Let's put your Slide 13A back up on the

25  screen.

```
 1                    THE COURT:  Counsel, let me ask about how
 2    much longer you think you have on cross?  We've been
 3    going for about an hour now.
 4                    MR. SATINE:  I'm sorry, Your Honor.  I'm
 5    going to try to wrap it up and I will move quickly.
 6                    THE COURT:  Very well.  Thank you.
 7         Q    (By Mr. Satine) Mr. Bakewell, if we look in
 8    the column that says One-time Payment.
 9         A    Yes, sir.
10         Q    Each and every one of the listings there
11    references a payment that represents a percentage of
12    gross sales or net sales or gross profit for a fee per
13    transaction, right?
14         A    Again, because you keep leaving this off, it's
15    during a single year, and a start-up year.  And it's
16    explicitly called out.  That's very important.
17         Q    Is the answer to my question yes?
18         A    My answer is the answer that I gave to your
19    question, sir.
20                    MR. SATINE:  Your Honor, could I get a
21    yes or no from the witness?
22                    THE COURT:  You may answer yes or no,
23    then explain your answer.
24                    THE WITNESS:  Okay.
25         A    Shall I answer your question again?
```

1      Q     (By Mr. Satine) Yes, with a yes or no, and

2  then Your Honor said explain it.

3      A     Yes.  May I explain?

4      Q     Your Honor said you can.

5      A     The explanation is that each of these one-time

6  payments are capped.  They're capped.  They're capped by

7  the fact that they're only one year.  And not only are

8  they only one year, they're one start-up year.  These

9  are start-up-type businesses.

10           And, in addition to that, it's relevant to

11  consider what the gross dollar amount of those licenses

12  are as indicated in the last column.

13      Q     Mr. Bakewell, each and every one of those

14  entries in the column that says One-time Payment

15  represents the extent of use of the patents, right?

16  They are tied to the extent of use, right?

17      A     I think that conceptually I can agree with

18  you.  I don't think that any of these licenses called

19  that out specifically.  But presumably the payment is in

20  exchange for value for extent of use.

21      Q     Would you agree that the royalty that should

22  be paid in this lawsuit, with the assumptions the

23  patents are valid, enforceable, and infringed, is a

24  royalty that should be commensurate with Newegg's level

25  of use of the inventions?

1      A    Oh, that's a consideration, yes, sir.

2      Q    Let's move on to your benchmark analysis,

3  which was your third theory, right?

4                 MR. SATINE:  Let's put up Slide 34.

5      Q    (By Mr. Satine) Now, you have a starting point

6  of 100 percent there, right?

7      A    That's right.

8      Q    And if we wanted to plug in a number there,

9  because at the bottom you say you're multiplying

10  something by the benchmark; you're multiplying whatever

11  that hundred percent is by the benchmark, right?

12     A    Yes, sir.

13     Q    If we wanted to plug in the number there, what

14  we'd be looking at is Newegg's total accused sales

15  during the damages period, right?

16     A    Yes.

17     Q    So if we replaced accused sales with a number,

18  and we kept your benchmark of 0.0125 percent, what we'd

19  have up there would look like this I think --

20  $4,794,540,093 times .0125 percent, right?

21     A    Yes, sir.

22     Q    That's if we put the numbers in.

23     A    Yes, sir.

24     Q    Now, you told us that you verified your facts

25  and figures, right?

```
 1      A    Yes, sir.

 2      Q    One of the figures and facts that you verified

 3  was the 6.3 percent that we see on that slide, right?

 4      A    That's right.

 5      Q    Still have your report up there?

 6      A    I do.

 7      Q    Okay.  Why don't you go to Exhibit 5A of your

 8  report.  We're going to have to put it up on the screen.

 9               Well, I guess we're not going to have to

10  put it up on the screen.

11      A    I'll turn to it.

12      Q    Well, we'll turn to it and we'll talk about

13  it.

14               See where you have incremental profit at the

15  bottom of that screen?

16      A    That's right.  In this exhibit it's 6.7

17  percent.  Yes, sir.

18      Q    But you checked and verified your facts and

19  figures, right?

20      A    I did.

21      Q    6.7 percent, 6.3 percent, you were in the

22  courtroom when Mr. Nawrocki said, on the high side he

23  would use 6 percent, right?

24      A    And on the low side he would use 1 percent.

25  That's right.
```

1                MR. SATINE:  Let's look at Slide 8.

2      Q     (By Mr. Satine) Do you recall that I asked you

3  at your deposition whether the Newegg customers who

4  answered this survey had any other choices they could

5  pick when answering what they liked about Newegg, or

6  were those the only choices they were given?  Remember

7  that?

8      A     Oh, yes, I remember.  And that's correct.

9      Q     Those were the only choices they were given,

10  right?

11      A     Yes, sir.

12      Q     They didn't have a box they could check which

13  said they liked the shopping method system.  That wasn't

14  one of the choice, right?

15      A     Oh, no, it wasn't.

16      Q     Let's take a look at Slide 6, your 21 factors.

17  There's no source at the bottom of that one, right?  So

18  if we talked about what you put under each one, you said

19  you had source, hard evidence; no source, no hard

20  evidence, right?

21      A     Oh, no, sir.  That's -- I don't think that

22  that's an accurate thing to say.  My sources for these

23  were analyst reports and writeups by third parties

24  regarding Newegg.

25                MR. SATINE:  If you could just highlight

1   the private label credit card.

2       Q    (By Mr. Satine) Of the 28 million transactions

3   at issue in this lawsuit, how many of them involved a

4   transaction where a customer used the private label

5   credit card?

6       A    I don't know.

7       Q    Another one you have up there is electronic

8   newsletter.

9            Of the 28 million transactions at issue in

10  this lawsuit, how many of them involved a transaction

11  where a customer took advantage of Newegg's electronic

12  newsletter?

13      A    I haven't quantified that.

14      Q    What about offline advertising through

15  publications, billboard, and trade?  Were you here when

16  Mr. Cheng testified about how much offline advertising

17  Newegg does?

18      A    Yes, sir.

19      Q    Another one you have up there is rewards

20  programs, right?

21           Of the 28 million transactions at issue in

22  this lawsuit how many of them involved a transaction

23  where a customer used a reward program?

24      A    I haven't quantified that, sir.

25      Q    Do you know if the newegg.ca website has a

1    rewards program?

2        A    I don't know.

3        Q    Another fact that you have up there is RSS web

4    feeds.  What are RSS web feeds?

5        A    RSS web feeds, my understanding is that those

6    are feeds that are made either to e-mail accounts or to

7    the consumer on the screen, based upon real-time

8    information.

9        Q    When you did your research -- you were the one

10   who selected these 21 items, right?

11       A    Yes, sir.

12       Q    You did that based upon reviewing Newegg press

13   releases and articles you found on the internet, right?

14       A    That's right.

15       Q    When you read something about Newegg's RSS web

16   feeds, did it say anything about whether or not they

17   drive sales to the Newegg website?

18       A    Oh, no, there was not that explicit statement.

19       Q    It's just an assumption you made, right?

20       A    It was an observation that I made that that

21   was said.

22                MR. SATINE:  Put up a slide we saw with

23   Mr. Nawrocki, Slide No. 2.  Can you get that?

24       Q    (By Mr. Satine) You were here in the courtroom

25   when Mr. Nawrocki went through this slide, right?

```
 1      A    Yes, sir.

 2      Q    It says:  Upon finding for the claimant, the

 3 Court shall award the claimant damages adequate to

 4 compensate for the infringement, but in no event less

 5 than a reasonable royalty for the use made of the

 6 invention by the infringer.

 7           To the best of your knowledge, that slide

 8 accurately quotes from Title 5, Section 284 of the

 9 United States Code, right?

10      A    That excerpt is verbatim, yes, sir.

11           MR. SATINE:  Pass the witness, Your

12 Honor.

13           THE COURT:  All right.  Thank you.

14           MR. SAYLES:  If it please the Court.

15           THE COURT:  Redirect?

16           MR. SAYLES:  Yes, sir.

17              REDIRECT EXAMINATION

18 BY MR. SAYLES:

19      Q    Mr. Bakewell, let's start kind of at the end

20 and work backward.

21           You were asked some questions about the $400

22 license and the fact that it has 2 percent for one year

23 in that license.  Do you recall that?

24      A    Yes, sir, I do.

25      Q    How long was the license for once the $400 was
```

```
 1   paid?

 2        A    Forever.

 3        Q    And with respect --

 4        A    Or for the life of the patents.

 5        Q    With respect to each of these patent licenses,

 6   where they were up on the board and there was a

 7   percentage of sales in a given year, did that have to be

 8   paid year after year?

 9        A    No, sir, that was a one-time payment.

10        Q    For the life of the patents?

11        A    Yes, sir, I believe so.

12        Q    You were asked about the Odimo license and the

13   85 cents per transaction issue a few minutes ago.  Do

14   you remember that?

15        A    I do.

16        Q    And was that paid for -- how many years was

17   that paid for?

18        A    I believe it was paid only once --

19        Q    For how long?

20        A    -- for that one year.

21        Q    For how long?

22        A    For the life of the patents.

23        Q    You were asked a few questions about

24   Plaintiff's Exhibit 184, which is Defense Exhibit 224.

25                  MR. SAYLES:  I wonder if we can get that
```

1  up.

2      Q    (By Mr. Sayles) That's the license with INN.

3           Do you recall that license?

4      A    I do.

5                MR. SAYLES:  All right.  Let's see if we

6  can get it.

7      Q    (By Mr. Sayles) And I think the point that

8  Mr. Satine was making is that this is an Open Market

9  license that has a running royalty in it as opposed to a

10  lump sum.  Do you recall that?

11     A    That was the implication of his questions,

12  yes.

13     Q    All right.

14          If we look at the patents that are covered in

15  Paragraph G at the bottom of the page -- and I'll blow

16  that up -- did it involve any of the patents-in-suit in

17  this case?

18     A    No, sir.

19     Q    And with respect to -- also what it covered,

20  are the assigned patents described in Paragraph B.

21     A    Yes, sir.  That's what was covered under the

22  license.

23     Q    And you've read and studied this?

24     A    I have.

25     Q    And this was based on a Japanese patent

1  application?

2      A    That's correct.

3      Q    Was the technology that was involved in this

4  one license that had a running royalty, in any way

5  related to the technology that's involved in these

6  patents?

7      A    I've seen no way to make a connection from a

8  commercial point of view.  They seem very different to

9  me.

10     Q    You were asked a number of questions about

11 TigerDirect and others who have licensed these patents.

12          Do you recall that subject line?

13     A    Yes, sir.

14     Q    Now, the terms of those licenses have not been

15 analyzed by you; is that right?

16     A    That's right.

17     Q    Tell the -- without going into the terms, tell

18 the Ladies and Gentlemen of the Jury why those terms are

19 not a part of your analysis.

20     A    Well, there's two reasons.

21          MR. SATINE:  Your Honor, may we approach?

22          THE COURT:  Yes, you may.

23          (Bench conference.)

24          MR. SATINE:  During my questioning of

25 Mr. Nawrocki, I had suggested that he avoid -- that he

1    would not discuss this in this case.  Mr. Sayles raised

2    an objection on the comment.  He now is asking the

3    witness to expound.  I thought we had an understanding

4    of how we were dealing with it.

5                    MR. SAYLES:  Let me respond to that.  I

6    don't plan to go into the terms, but he brought the fact

7    up about the licenses.  From his standpoint, in terms he

8    can't consider it because it was settlement of --

9                    THE COURT:  You don't need to get into

10   that area.  Show what the settlement was, if you want to

11   go into that.

12                   MR. SAYLES:  I know, but they mentioned

13   the existence of them, and they put the big old elephant

14   in the room.

15                   THE COURT:  Y'all mentioned the existence

16   of them from the outset.  I thought that was the

17   agreement, that they could mention that they had

18   licensed it to them.

19                   MR. SAYLES:  Well, that was the ruling

20   that you made, and I think that it's probably right with

21   respect to the fact that others have licensed the

22   patents, but the reason the terms aren't considered is a

23   different question.

24                   THE COURT:  No.  Don't go into any

25   settlement.

1                    MR. SAYLES:  All right.  All right.

2                    MR. SATINE:  Thank you.

3               (Bench conference concluded.)

4      Q    (By Mr. Sayles) Mr. Bakewell, I want to ask

5  you about the book of wisdom concept that Mr. Satine

6  asked you in one of his questions.

7      A    Yes, sir.

8      Q    Would you tell the Ladies and Gentlemen of the

9  Jury what that is from the standpoint of someone who

10  does the type of work that you do?

11      A    Yes.  Well, the book of wisdom refers to case

12  law which permits an analyst, such as myself, somebody

13  who's evaluating the hypothetical negotiation, to

14  consider data that is subsequent to the hypothetical

15  negotiation as part of their royalty information.

16      Q    And why is it that you don't consider in 2001

17  the exact information that occurs eight or nine years

18  later?

19      A    Well, the data might be considered, but it

20  always needs to be considered in context against other

21  data that is available at the time of the hypothetical

22  negotiation.

23               And typically, data that is what we call

24  contemporaneous or close to the time of the hypothetical

25  negotiation is of more value to the analysis, because it

1   reflects the current state of affairs and information

2   the parties would have reasonably had access to at the

3   hypothetical negotiation.

4        Q    All right.  And Mr. Satine asked you a few

5   questions about the Newegg Mall.  Do you recall that

6   line of questions?

7        A    Yes, sir, I do.

8        Q    And are you aware that the Newegg Mall

9   launched in 2008?

10       A    I am.

11       Q    Did you consider the Newegg Mall in your

12  analysis?

13       A    I was aware of it, yes, and I considered it;

14  however, I was also aware that as of 2001, the

15  hypothetical negotiation date, there were no plans that

16  I had seen regarding the Newegg Mall.

17       Q    All right.  And you heard Mr. Nawrocki's

18  testimony.  Did he offer any testimony on damages

19  based on Newegg -- the Newegg Mall?

20       A    No, sir, I don't believe he did.

21       Q    You were asked some questions about service

22  charges and maintenance fees with regard to Transact.

23            Do you remember that?

24       A    Yes, sir.

25       Q    And would you tell the jury why you did not

1    take those into account?

2        A    Well, because there's no financial or economic

3    basis to do that.  There is no certainty that those

4    revenue streams would be attached.  And, in fact, my

5    understanding of Open Market's business is that quite

6    often those revenue streams were a challenge to be

7    attained.

8            On top of that, those revenue streams are --

9    there -- there's something that's different than being

10   granted assess to a patent.

11       Q    And do the service fees and the maintenance

12   fees, do they represent profit to whomever owns the

13   Transact product anyway?

14       A    That's right.

15       Q    Are there costs associated with providing

16   those services?

17       A    Oh, absolutely.

18       Q    Now --

19       A    And when you said profit, they represent

20   revenues, but not necessarily profit.

21       Q    All right.

22       A    You need to consider the costs that get offset

23   against those revenue streams.

24       Q    And you may have covered this earlier, but did

25   Mr. Nawrocki use those figures and fees in connection

1   with his calculations?

2        A    No, sir.  I covered that in the beginning of

3   my -- my questions that you asked me.  And that was one

4   of the things that Mr. Nawrocki and I agree upon, that

5   those fees are not relevant to be considered.

6        Q    You were asked a number of questions about

7   some Transact agreements that had higher figures than

8   the $344,000.

9             Do you recall that?

10       A    Yes, sir.

11       Q    And why is it that you cited to the $344,000

12  as opposed to the higher figures that Mr. Satine threw

13  out in his questions to you?

14       A    Well, those -- the $344,000 is the software

15  license fee, the part that granted access to the

16  technology.

17            And Mr. Satine actually curtailed me from

18  answering the question in its entirety, because that

19  particular example, if I can find it -- just bear with

20  me a moment, and I'll get to it.

21            That particular example, the $344,000 is

22  comprised of a 73,600 base commerce system subscription.

23  In addition to that, there were other things that were

24  not subscription fees, such as physical goods module

25  license, digital goods module license, sales tax module,

1  a Battle Star 4.0 for Transact development license,

2  Netscape Enterprise Server license, and a whole host of

3  other things that are unrelated to the patents that

4  we're discussing here.

5      Q    And of course, you're familiar with the fact

6  that in cases such as this, the parties must exchange

7  information.

8      A    Yes, sir.

9      Q    And with respect to the Transact licenses that

10  you considered, where did they come from?

11      A    They came from documents that were produced by

12  Soverain.

13      Q    And did you in any way disregard any of the

14  licenses that they actually produced?

15      A    No, sir, I didn't.

16      Q    And with respect to the one license, the one

17  patent license that you described that Newegg has for a

18  group of licenses, is that what's called the MPEG

19  license?

20      A    That's right.  Mr. Cheng talked about that.

21  That's a patent -- it's a license to a standard.

22      Q    And did you fully consider that and whether it

23  had any significance here?

24      A    I did.  It's the license to a standard, which

25  is very different.  It's for MPEG technology, which

1    relates to audio playback.

2            To the extent that it is considered, I think

3    it would be relevant -- very relevant to know that the

4    total payments per year under that license were

5    approximately $4,000.

6    Q    All right.  And you were asked some questions

7    about the sale of Open Market to -- to Divine.

8            Do you recall that?

9    A    Yes, sir.

10   Q    And I'll mention the figure again, $70

11   million.  What was that figure?

12   A    The Plaintiffs seemed to like that amount.

13   That amount was the -- represented the entirety of the

14   business, all of its assets, employees, software,

15   customer lists.  We heard Ms. Wolanyk talk about how

16   those were very valuable references, et cetera.

17   Q    All right.  And you said that there was no

18   cash involved in that transaction.  Would you explain

19   what you meant by that?

20   A    It was a stock-for-stock transaction.  So when

21   Mr. Satine, in his question, implied somehow there would

22   be cash that would be flowing into the doors of Open

23   Market, I felt that it was misleading.

24           A stock-for-stock transaction is different

25   than somebody offering stock on the open marketplace to

1  receive a capital injection for the firm.

2     Q     Was the business of Open Market in pretty bad

3  shape at the time that transaction took place?

4     A     Well, I think the evidence is very clear by --

5  as shown by those charts.

6              MR. SAYLES:  And is it possible to pull

7  up Mr. Ghosh's testimony at Page 66, Line 23 from the

8  transcript?  If it's not readily available, tell me.

9              MS. JOHNSTON:  What page?

10             MR. SAYLES:  It's Page 66, Line 23.

11    Q     (By Mr. Sayles) All right.  This was played

12 for the jury, but I'm going to ask that the words on the

13 question at Line 23 be pulled up, and then we'll look at

14 the answer on Page 67, Line 1.

15             Is this what you were relying on when you said

16 that at the time of the sale, the business was in bad

17 shape, Mr. Ghosh's testimony?

18    A     This is one of the pieces of information that

19 showed or demonstrated that to be a fact.

20    Q     And because we're actually creating a record

21 here, the question was:  What caused Open Market to be

22 sold to Divine?

23             And Mr. Ghosh's answer was:  The business was

24 in pretty bad shape.  The company was losing money and

25 did not have a huge cash balance, and the public markets

1  were not available to raise additional capital.

2          Is that some of the testimony you're relying

3  on?

4      A    Yes, sir.

5      Q    You were asked some questions about whether

6  Newegg could get up from the bargaining table under a

7  hypothetical negotiation, and I think you indicated that

8  they could not.

9      A    That's right.

10     Q    On the other hand, could Open Market say, I

11  don't like this, and could they get up and walk in a

12  hypothetical situation?

13     A    No, sir.  This -- this negotiation is between

14  prudent and willing business people.

15     Q    All right.  And then, finally, you mentioned

16  that there were some single-item transactions.  Do you

17  recall that in the very early part of your

18  cross-examination?

19     A    Yes, sir, I do.

20     Q    And what do you mean by single-item

21  transactions?

22     A    Well, my understanding is that that's when a

23  user may just put a single item into a shopping cart and

24  check out.

25     Q    And did you see facts and data on how often

1    that occurs?

2         A    It occurs about two-thirds of the time.

3              MR. SAYLES:  I'll pass the witness.

4              Thank you.

5              THE COURT:  All right.  Anything further?

6              MR. SATINE:  Very briefly, Your Honor.

7              THE COURT:  All right.

8                   RECROSS-EXAMINATION

9    BY MR. SATINE:

10        Q    Mr. Bakewell, the MPEG license that Newegg

11   entered into is for a pool of patent licenses, correct?

12        A    Yes, sir.

13        Q    So a number of companies that have patent

14   licenses in that technology have pooled them together,

15   and Newegg has taken a patent license from that whole

16   group of companies for that one technology, right?

17        A    That's correct, for that standard, that

18   technical standard.

19        Q    You said you agree with Mr. Nawrocki that

20   Transact maintenance figures should not be considered.

21        A    Yes, sir.

22        Q    Mr. Nawrocki doesn't consider the cost of a

23   Transact software license as an alternative to a patent

24   license, does he?

25        A    That's true.

```
 1                    MR. SATINE:  Nothing further, Your Honor.

 2                    MR. SAYLES:  Nothing further, Your Honor.

 3                    THE COURT:  Thank you.  You may step

 4   down.

 5                    All right.  Who will be your next

 6   witness, Mr. Sayles?

 7                    MR. SAYLES:  If it please the Court, at

 8   this time, the Defense would offer Defendant's Exhibit

 9   516, which is the parties' stipulations in this case,

10   and I would request that the Court tell the jury what

11   the stipulations are or permit me to do so.

12                    THE COURT:  All right.  Ladies and

13   Gentlemen of the Jury, a stipulation is a fact that has

14   been agreed to between the Plaintiff and the Defendant

15   prior to trial.  And they will reduce those to a written

16   stipulation and both of them sign it and then it's going

17   to be filed with the Court.

18                    And the stipulations that they've agreed

19   to are facts that are not controverted and not facts for

20   you to find, and they are facts for which you will be

21   bound by their stipulation.

22                    So that's what it is.

23                    MR. SAYLES:  All right.  So Defense

24   Exhibit 516 will be admitted?

25                    THE COURT:  All right.  Mr. Adamo?
```

 1                    MR. ADAMO:  Do you want us to sign them,
 2  Your Honor?
 3                    THE COURT:  I'm sorry?
 4                    MR. ADAMO:  Do you want us to sign them,
 5  Your Honor?
 6                    MR. SAYLES:  No.  I -- no, you don't need
 7  to sign them.  I mean, they've been signed.  I'm --
 8                    THE COURT:  Well, I said signed.  I
 9  thought y'all had signed them.
10                    MR. SAYLES:  We did.  Oh, we did in the
11  pretrial order, yes, Your Honor.
12                    THE COURT:  Okay.
13                    MR. SAYLES:  We did do that.
14                    THE COURT:  Okay.
15                    MR. SAYLES:  And we've reduced them to an
16  exhibit.
17                    THE COURT:  And both sides agree to
18  those, right?
19                    MR. ADAMO:  Yes.  I just wondered if you
20  wanted another signature.
21                    THE COURT:  No.  That's all right.
22                    All right.  Any objection to it?
23                    MR. ADAMO:  No, sir.
24                    THE COURT:  All right.  Be admitted.
25                    MR. SAYLES:  All right.

1                    THE COURT:  All right.  Who will be your

2  next witness?

3                    MR. SAYLES:  Your Honor, at this time,

4  the Defense rests its case.

5                    THE COURT:  All right.  Very well.

6                    Plaintiff have rebuttal testimony?

7                    MR. ADAMO:  We do, and Plaintiff also has

8  a Rule 50 motion.  How would you like to handle that,

9  Your Honor?

10                    THE COURT:  When would you like to make

11  it?

12                    MR. ADAMO:  Right here, sir.

13                    THE COURT:  Okay.

14                    MR. ADAMO:  I don't -- I don't want to

15  take the Court's time and certainly not the jury's time

16  to suggest arguing it at this point, but...

17                    THE COURT:  All right.  Just hand it up,

18  and it will be noted as being filed.

19                    MR. ADAMO:  And may I file it

20  electronically as well, Your Honor?

21                    THE COURT:  Yes, you may.

22                    MR. ADAMO:  Thank you, sir.

23                    THE COURT:  In fact, file it

24  electronically, and we won't file it in the papers.

25                    MR. ADAMO:  Yes, sir.

1                    THE COURT:  All right.  Who will be your

2  first witness?

3                    MR. GIANNETTI:  Your Honor, may it please

4  the Court, we call Professor Michael Shamos.

5                    THE COURT:  Professor Shamos.

6                    MR. GIANNETTI:  I believe, Your Honor,

7  he's already been sworn.

8                    THE COURT:  All right.  Very well.

9                    Now, I note that the parties -- it's

10  4:10.  The parties indicated yesterday -- Plaintiff

11  estimated an hour, and Defendant estimated 30 minutes

12  for cross-examination.

13                    So if that proves true, we will be going

14  until approximately 5:40 this evening.  Do any of the

15  jury members need to make any phone calls or anything?

16                    Okay.  All right.  You may proceed.

17    MICHAEL SHAMOS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

18                    DIRECT EXAMINATION

19  BY MR. GIANNETTI:

20    Q    Professor Shamos, we're coming down the

21  homestretch.

22                    Would you please introduce yourself to the

23  jury and tell them who you are, where you're from, and

24  what your occupation is?

25    A    Yes.  My name is Michael Shamos, S-H-A-M-O-S.

1    I live in Pittsburgh, Pennsylvania, and I'm a faculty

2    member at Carnegie Mellon University in Pittsburgh.

3        Q     Can you tell the jury something about yourself

4    in connection with -- tell them about your experience in

5    connection with computers?

6        A     Oh.

7        Q     Just summarize it for us.

8        A     Yeah.

9             I was born in New York in 1947 to an

10   educational family.  My father was the chairman of the

11   Physics Department at New York University.  He

12   eventually became president of the New York Academy of

13   Sciences and the National Science Teachers Association.

14   So I was always around science and scientists.

15            When I was in high school, I took a city-wide

16   examination in New York City for high school students to

17   be allowed to attend Columbia University on Saturdays,

18   and I entered that Columbia science honors program, and

19   that was my first exposure to computers, was in 1962.

20   So 48 years ago.

21            And that got me fascinated with them for the

22   rest of my life.

23            And when I went to college, I wanted to major

24   in computers, but the field didn't exist at that time in

25   universities.

1           So I went to Princeton, like Mr. Tittel, and I
2   couldn't major in computers, so I majored in physics;
3   but I spent most of my time in the computer center.
4           And upon graduation, I got the dream job at
5   IBM.  That's what all the computer guys wanted to do.
6   And I became a programmer for IBM Corporation from 1968
7   till 1970.
8           During that time, I attended Vassar College,
9   which was physically right near where IBM was.  I met my
10   wife there, and we've been together 42 years.
11           I got a master's degree in physics from Vassar
12   College, but I was still a programmer at IBM.
13           That was during Vietnam wartime.  I had a very
14   low draft lottery number, so I had to go.  And I served
15   in the United States Public Health Service from 1970 to
16   1972 as a commissioned officer.
17           I was stationed at the National Institutes of
18   Health in Bethesda, Maryland, and I worked for the
19   National Cancer Institute.  I was response -- my title
20   was supervisory programmer.  I was responsible for
21   running a very large data processing center that
22   processed cancer chemotherapy data.
23           When my service ended in 1972, finally, there
24   was such a thing as a field of computer science.  Yale
25   University had just started a graduate program, and I

1  applied and was admitted to Yale, and I spent three

2  years at Yale in pursuit of a Ph.D.

3          Upon graduation, then in 19 -- well, when I

4  left Yale in 1975, I was hired as an assistant professor

5  at Carnegie Mellon University in Pittsburgh, which at

6  the time was the number-one ranked graduate school in

7  computer science in the country, and today is the

8  number-one ranked graduate school of computer science.

9          One of my responsibilities at CMU was to

10 organize and staff the introductory program courses.  I

11 was always referred to as the introductory programming

12 czar.  And I did that, and I taught introductory

13 programming, as well as -- as well as graduate courses.

14         And I was with -- I've been continuously

15 associated with Carnegie Mellon University since 1975.

16         I took -- I changed my status from full-time

17 to adjunct for quite a period of time, so I could pursue

18 some other things, one of which was I ran -- started and

19 ran a couple of software companies in Pittsburgh,

20 Pennsylvania, based on technology that had been

21 developed at the university.

22         I also attended law school after I got my

23 Ph.D. from Yale.  I practiced as a lawyer also in

24 Pittsburgh, and I became a patent attorney, actually.

25         One of my specialties is electronic voting.

1    I've been an examiner -- an official examiner of

2    electronic voting systems for Pennsylvania since the

3    year 1980, and I performed that function for the

4    Attorney General of Texas for 13 years, from 1987 until

5    the year -- until the year 2000.

6              I returned to Carnegie Mellon full-time in

7    1998 to start what they called at the time the Institute

8    for Electronic Commerce.

9              This was a time when the internet boom was in

10   full swing, and the university realized that it wasn't

11   really producing any graduates who were qualified to

12   work in E-commerce businesses.  The business students

13   didn't know enough technology, and the computer science

14   students didn't know enough business.

15             So they set up a program that I was

16   co-director of.  I was the -- it was a joint venture

17   between our business school and the school of computer

18   science.  I was the co-director from the computer

19   science side, and my responsibility was to design and

20   staff the technology side of that program.

21             Our deal with the business school ended in

22   2004, and the school of computer science took over the

23   entire thing, and now I am the sole director of graduate

24   programs in electronic business at Carnegie Mellon

25   University.

```
 1      Q    Is there a connection between your work at

 2 Carnegie Mellon and the subject matter of these patents?

 3      A    Yes.   These patents are all about electronic

 4 commerce.

 5      Q    What's your experience with the internet?

 6      A    Well, I was first exposed to the internet in

 7 1975 when I came to Carnegie Mellon University.   I

 8 actually probably was exposed at Yale, but certainly in

 9 1975.

10           At that time, the internet was called the

11 ARPANET.   It was financed by the Department of Defense

12 Advanced Research Projects Agency.   That's what the ARPA

13 is.

14           And at the time, it was a consortium of

15 military laboratories, the Pentagon, and a number of

16 universities that had strong computer science

17 departments.   Carnegie Mellon University was one of the

18 original nodes on that network.

19           And so I used the internet starting in 19 --

20 in 1975.   At that time, it was largely for electronic

21 mail and bulletin boards.   And as we know, the internet

22 has evolved into a great deal more than that.

23           The -- with respect to my -- my personal

24 involvement, when I was a patent attorney in Pittsburgh,

25 I represented the inventor of the first internet search
```

1    engine.  His name was Michael Mauldin, and he invented

2    something called Lycos, which was a predecessor of

3    Google and Alta Vista and the other search engines.

4            And at the time, I was actually considering --

5    or being considered for a job with Lycos, Inc.  And so I

6    was forced to study internet protocols for that job

7    interview.

8            Then, of course, when I came back to CMU and

9    started teaching electronic commerce, I actually taught

10   about internet protocols.

11      Q    CMU is Carnegie Mellon University?

12      A    I'm sorry.  Carnegie Mellon University.

13           THE COURT:  All right.  Counsel, I think

14   we're going to take a short break here.

15           Ladies and Gentlemen of the Jury, we're

16   going to -- obviously, this witness is going to take

17   probably an hour, hour-and-a-half.  We've been going

18   almost two hours.

19           So we're probably going to be pushing

20   6:00 o'clock -- I just want to tell you -- before we get

21   through.  But rather than sit here, I think it would be

22   good for us just to take a short break and then come

23   back, and we'll wrap it up.  Okay?

24           So we'll take a break until 4:35; 15

25   minutes.

```
 1                    COURT SECURITY OFFICER:  All rise.
 2                    (Jury out.)
 3                    THE COURT:  Please be seated.
 4                    All right, counsel.  I just want to
 5   caution you.  I think the jury is very, very tired.  I
 6   think the quicker you can get in on both sides on direct
 7   and cross and make your points and get out, I just sense
 8   they're very, very tired.
 9                    So I want to just encourage you to -- I
10   don't want you to short circuit what you need to put on,
11   but we just went through, you know, 10 minutes of
12   qualifications.
13                    That's not, Professor, to demean your
14   qualifications; but the jury has been sitting here all
15   day, eight hours a day since Monday.  And I guess you
16   have, too, haven't you?
17                    THE WITNESS:  I have, Your Honor.
18                    THE COURT:  Well, you ought to be tired.
19   What's wrong with you?
20                    [Laughter]
21                    THE WITNESS:  I am tired.
22                    THE COURT:  All right.  We'll be in
23   recess until 35 after.
24                    COURT SECURITY OFFICER:  All rise.
25                    (Recess.)
```

1                    (Jury in.)

2                    THE COURT:  All right.  Please be seated.

3                    Another reason we have to take these

4    breaks is our poor Court Reporter here.  You think it's

5    hard sitting here listening all day.  If you do this all

6    day long, you need to stretch your hands every now and

7    then.

8                    So then we appreciate you, Ms. Judy.

9                    MR. GIANNETTI:  May I continue?

10                   THE COURT:  Yes.

11        Q    (By Mr. Giannetti) Professor Shamos, we have

12   retained you as an expert in this case.  Can you explain

13   what your assignment has been?

14        A    Yes.  It was really quite limited.  I was

15   asked to look at a report that was issued by Mr. Tittel

16   on the issue of invalidity and to review and comment on

17   that report and the testimony on invalidity in this

18   case.

19        Q    And were you present during Mr. Tittel's

20   testimony?

21        A    Yes.

22        Q    Have you put together a presentation, a set of

23   slides summarizing what you've done and what opinions

24   you formed?

25        A    Yes, I have.

```
 1              MR. GIANNETTI:  Can we start that?

 2      Q    (By Mr. Giannetti) I'm going to let you

 3 control the slides, okay?

 4      A    Okay.

 5      Q    This slide -- does the first slide that you

 6 put up summarize the things that you've done in

 7 connection with forming your opinions in this case?

 8      A    Yes.

 9      Q    Can you just run through quickly what you've

10 done?

11      A    Very quickly.

12           Well, I read the patents, of course, and the

13 proceedings in the Patent Office, which were previously

14 referred to as the file histories.

15           I applied the Court's claim constructions, and

16 also there were some agreed-upon constructions between

17 the parties that I was bound by.

18           I reviewed not only Mr. Tittel's report but

19 also the materials that he reviewed in preparing his

20 report.

21           I've listened to all of the courtroom

22 testimony.  I think I may have missed ten minutes of

23 testimony on nontechnical issues, including the

24 testimony of Mr. Trevor.

25           I analyzed Mr. Tittel's arguments, and I
```

1   considered whether his arguments were correct.  And my

2   opinion is that he hasn't shown any of the asserted

3   claims to be invalid or even argued convincingly in that

4   direction.

5       Q    Does Soverain have to prove that its patents

6   are valid, to your understanding?

7       A    My understanding is it doesn't, no.

8       Q    Is it up to Newegg to prove that the patents

9   are invalid?

10      A    By clear and convincing evidence, yes.

11      Q    Okay.  Let's go to the next slide, if you

12  will.

13      A    Yes.  This deals with anticipation.  And I

14  believe that Mr. Tittel hasn't shown any of the asserted

15  claims to be anticipated, which means he didn't show

16  that any single prior art reference disclosed all the

17  limitations of any particular asserted claim.

18      Q    Now, what about obviousness?  We've heard that

19  word a number of times in this case.  Has -- has

20  Mr. Tittel shown the claims are obvious?

21      A    Well, he didn't use the word obvious, but the

22  demonstrations that he made seemed to be veering in that

23  direction.  And to the extent that he put various

24  references together to try to show that the claims were

25  obvious, I don't think he did that properly, for several

1   reasons.

2           I don't think these are in any particular

3   order, but he used what's referred to as hindsight.  And

4   the idea of hindsight is that now here we are in 2010,

5   we're looking at a patent claim, and someone would like

6   to show that that was obvious back in 1994.

7           So they look at the elements of the claim, and

8   they go around and they hunt around for prior art that

9   seems to disclose this element or that element of the

10  claim.

11          That's hindsight because it uses something

12  which wasn't invented at the time, back in 1994,

13  something that is now invented, as the guidepost for

14  exactly how you go and find references.  And he did

15  that.  And that's not -- that's not a proper analysis

16  for showing obviousness.

17      Q   In his analysis that Mr. Tittel testified

18  about, CompuServe and the CompuServe Electronic Mall, do

19  you recall that?

20      A   Yes.

21      Q   Do you have slides on the -- on the electronic

22  mall --

23      A   Yes.

24      Q   -- of CompuServe?

25          Would you go to those, please?

1      A    Yes.

2      Q    This slide shows the basic operation of the

3   CompuServe Mall?

4      A    Correct.  This is consistent with Mr. Trevor's

5   testimony.

6      Q    And it shows the CompuServe mainframe computer

7   known as the server and the client communicating through

8   a telephone line?

9      A    That's right.  I haven't shown the telephone

10  or the dial-up, but I've shown a client terminal, which

11  is typically what the person at home would use, and the

12  mainframe.  And that -- this horizontal line here -- I

13  will try to put this in here -- that is a telephone

14  line.

15     Q    Okay.  And is the same telephone line used

16  during the entire transaction with CompuServe?

17     A    Yes, the user dials up, gets access to

18  something on CompuServe, does some things, and then

19  eventually hangs up.  And during that entire time, the

20  telephone connection has been maintained.

21     Q    It's like calling up a friend on the

22  telephone?

23     A    Yes.  It's a conversation, and it starts and

24  it ends at some point.

25     Q    Now, was CompuServe a system that was -- was

1   closed and was opened only to people who were members?

2        A    I think Mr. Trevor testified that the people

3   who paid money to access CompuServe were referred to as

4   members, and you couldn't access CompuServe unless you

5   were a member.

6        Q    Do you have a slide on that?

7        A    Yes.

8        Q    Okay.  That's your -- that slide illustrates

9   that concept?

10       A    I think it shows that members are able to

11  connect to CompuServe; and the nonmember suffering with

12  a big red X there, he's unable to get access to

13  CompuServe.

14       Q    Now, was there -- as a result of the

15  communications going over a telephone line, was there --

16  does CompuServe know what activities each user was

17  doing?

18       A    Yes.  During this telephone conversation,

19  there is a one-to-one connection between the user's

20  terminal and the CompuServe computer.  So, anything that

21  CompuServe sent you, it knew what it had sent you.  And

22  anything that you sent back, by way of characters over

23  the telephone line, it knew from whom they were coming.

24       Q    Go to the next slide, I think that's shown.

25       A    Yes.  So, for example, here I think there was

1  testimony about this -- this particular screen in which

2  you were supposed to press O on your keyboard if you

3  would like the purchase the item that's currently being

4  displayed.

5          So what's being displayed here is the book

6  Moby Dick, and if you press O to purchase, then what

7  happens is that message, and every message that you send

8  to CompuServe, comes in over that telephone line.

9          And so here, if you actually want to purchase

10 the book and you hit the O key, then the letter O is

11 sent to the CompuServe mainframe.  I think Mr. Trevor

12 testified it was actually the letter O followed by the

13 carriage return character.  Those two characters would

14 be sent to the CompuServe mainframe, and it knew that

15 you wanted to order Moby Dick, not because you said that

16 in the message, but because it had previously sent you a

17 screen that said Moby Dick.

18     Q    Some of the claims in this case involve

19 product identifiers; is that correct?

20     A    That's right.

21     Q    And does that relate to this discussion that

22 we're having about CompuServe, the need or the lack of

23 need for product identifiers?

24     A    Yes.  I think the claims refer to shopping

25 cart messages which are compelled to include product

1    identifiers.

2        Q    Were there such product identifiers in

3    CompuServe?

4        A    No.  Mr. Trevor testified that it didn't need

5    them.  And that's consistent with my understanding.  It

6    didn't need them.  If it needed them, then this would

7    never work because O does not identify Moby Dick.

8        Q    Did Mr. Tittel refer to the product

9    identifiers in his testimony?

10       A    No.  He kind of skipped over those claim

11   limitations that had product identifiers in them.

12       Q    But Mr. Trevor said they weren't there.

13       A    That's right.

14       Q    Let's go to the next slide.

15            Okay.  This is a slide on product identifiers?

16       A    Yes.  This is another slide on product

17   identifiers for the later system that had this WINCIM

18   software that would turn a PC into the equivalent of a

19   client terminal.

20            And the interface there was slightly

21   different.  You didn't hit O.  You had to hit -- hit

22   this order key, which is where the little arrow on the

23   left-hand picture is shown.

24            And when you hit the order key, some message

25   went across, I think the exact format of it was not

1  testified to.  But it didn't have a product identifier;

2  it was just an indication that the order key had been --

3  had been hit at that time.

4       Q    Was this point overlooked also in Mr. Tittel's

5  the testimony?

6       A    He never talked about product identifiers.

7       Q    So this is something that was missing from the

8  CompuServe Mall, the CompuServe Electronic Mall, the

9  product identifiers that are included in some of the

10  claims?

11       A    That's correct.  There was no need for product

12  identifiers, and it didn't have them.

13       Q    So let's skip ahead to -- I think you have a

14  slide on the -- on one of the CompuServe references that

15  Mr. Tittel was testifying about.

16            Does this relate to the Bowen and Peyton

17  reference that Mr. Tittel and Mr. Trevor testified

18  about?

19       A    Well, that's what this -- this screen is

20  about -- I mean, the title -- the title of the slide, is

21  that he improperly combines four different CompuServe

22  references.  So he was trying to show that CompuServe

23  anticipated some of these claims.

24            And CompuServe, as a system, existed in

25  various different versions at various different times.

1  Mr. Trevor testified to that.  And these books that

2  Mr. Tittel relied on were also published at different

3  times, and they describe different versions of the

4  system.

5          Yet when he was trying to show that CompuServe

6  matched up, I think in his words, matched up with the

7  claims, he would pick and choose various quotations from

8  these different books that were written in different

9  years, and obviously, as I'll show, don't even describe

10  the same version of CompuServe.

11      Q    The Bowen and Peyton 1989 book represented a

12  very early version of the electronic mall where menus

13  were used; is that right?

14      A    Yes.  This is the pre-WINCIM version, what I

15  think what was referred to as the ASCII version.  ASCII,

16  all that means is you only have the ability to send

17  characters.  You can't send graphics, for example.

18      Q    And what version of CompuServe Mall did the

19  later books, the Campbell book and Ellsworth book,

20  describe?

21      A    Campbell and Ellsworth clearly describe the

22  versions of CompuServe with WINCIM because you can see

23  the illustrations in the books have -- they show the

24  WINCIM interface.

25      Q    And in his analysis, did Mr. Tittel combine

1   those two versions?

2       A    Well, I think the implication is he combined

3   them, but what he really did was to pick and choose from

4   the various ones.  When he wanted to show a particular

5   claim element was in CompuServe, he seemed to pick the

6   book that was convenient for that purpose.

7       Q    And why, in your opinion, is that wrong?

8       A    It's not actually my opinion.  It's -- the

9   nature of anticipation is you have to be able to find

10  all of the claim elements in the same single reference.

11  And those four books are four different references.

12      Q    Can go to the next slide, please.

13      A    Yes.

14      Q    And what does this slide relate to?

15      A    Well, there was a video that was presented by

16  Mr. Trevor that showed this -- this version that had the

17  order button.  And, again, that video is like a fourth

18  reference.  The video is not any one of the three books.

19  And there's no -- there was no testimony as to the --

20  the version of CompuServe that that represented, the

21  date on which that version of CompuServe existed, nor

22  any of that.

23      Q    Now, in Mr. Tittel's presentation, I think it

24  was clear that the -- that CompuServe was not on the

25  worldwide web in the 1994 time period; is that true?

1      A    He definitely testified that it was not on the

2  worldwide web.

3      Q    Okay.  And -- and do you -- do you have an

4  opinion as to what it would have taken to take

5  CompuServe and move it to the internet in that time

6  period, to the worldwide web?

7      A    Yes.  The natural thing might have been to

8  say, well, there's this internet that is coming along;

9  it seems to be very important.  Let's put our

10  system on -- on the internet.

11         The problem is that the architecture of the

12  CompuServe system didn't permit that to be done readily

13  because for these little O characters that are coming

14  that say order, order, order.

15         On the internet, because all of the -- the

16  communications from all the different users and these

17  client terminals over here around the edge, all of

18  these, those are different users, and they may be all

19  over the world.  And all of them are sending Os along

20  this line.  And the CompuServe server is not able to

21  keep straight whose O is which.  It doesn't know --

22  because of the stateless nature of the internet, it

23  didn't know what the last thing it was that it sent to a

24  particular client terminal.  So when the O comes back,

25  it wouldn't know what that particular person wanted to

1  order.

2           Now, of course, ultimately this problem was

3  solved.  But it wasn't a simple matter of let's just

4  take all of our existing networking and let's replace it

5  with the internet.  If they did that, it just wouldn't

6  work.

7       Q    Now, there was some discussion about TELNET in

8  both Trevor's testimony and Tittel's.

9       A    Yes.

10      Q    And they said that in 1994 CompuServe was

11 available through TELNET.

12      A    Yes.

13      Q    Is that the same thing as the worldwide web?

14      A    No.  In fact, I can probably use this drawing

15 to explain exactly what TELNET is.

16           TELNET was an extremely early ARPANET

17 protocol.  It existed in 1975.  If you were a node on

18 the network, and you wanted to establish a kind of

19 telephone connection between yourself and another node

20 on the network, you could do that by saying, TELNET, and

21 then you would give the name of the place you wanted to

22 connect to.

23           So if I happened to be at Yale, I could just

24 go to my terminal and type TELNET CMU, and that would

25 connect me to Carnegie Mellon University.  And it was as

1  if my terminal happened to be sitting in the computer

2  room at Carnegie Mellon University.  It was effectively

3  my transporting myself there.

4          So even that went over the internet, what

5  happened is -- let's suppose that this -- this node over

6  here is Yale, and this node down here is Carnegie

7  Mellon.  When you ask for a TELNET connection, what

8  happened is these various of these lines -- I'm not sure

9  I'm getting all these arrows -- would be dedicated to a

10  connection between the two universities.  And it would

11  be effectively like a telephone line even though it

12  wasn't over the telephone network.

13      Q    And that's not what happens in the worldwide

14  web, is it?

15      A    No.  The worldwide web doesn't have

16  dedicated -- it's referred to as connectionless.  It

17  doesn't have dedicated connections of that kind.

18      Q    Can we go to the next slide, please?

19      A    Well, this is just an explanation of why it

20  wouldn't have been obvious how to move CompuServe to the

21  web.  If I just took all the CompuServe software and I

22  replaced the interface, the network interface to an

23  internet interface, the system would completely

24  collapse, and you wouldn't be able to order a single

25  thing on it.

```
 1      Q    Is the internet sometimes referred to as an
 2 open system?
 3      A    Yes.
 4      Q    In what sense?
 5      A    Well, it's open -- a good example is I just
 6 passed a restaurant a block or two away from here and
 7 they advertised free internet.  And so what that would
 8 mean is I could just walk into that cafe, sit down, open
 9 up my laptop, and I'm connected to the internet.  No
10 credentials required, no nothing.
11      Q    And that's in contrast to CompuServe where you
12 have to be a member?
13      A    Yes.
14      Q    Would you go to the next slide, please?
15      A    Yes.
16      Q    This -- this slide refers to some specific
17 claims?
18      A    Yes.  This is dealing with what have come to
19 be called the sales system claims, as opposed to the
20 session -- the session identifier claims or the
21 hypertext claims.
22           This is Claims 35 and 51 of the '314 and Claim
23 17 of the '492.
24      Q    Okay.  Do these claims all require that
25 product identifier that you talked about earlier that's
```

1    not present in CompuServe?

2        A    Yes.

3        Q    Do you have a slide on that?

4        A    Yes.

5        Q    Okay.

6        A    So this just repeats that CompuServe didn't

7    need product identifiers as Mr. Trevor testified to.

8             And all the sales system claims require the

9    buyer computer -- and here's a quote -- to send,

10   dot-dot-dot, shopping cart messages, dot-dot-dot, each

11   of which comprises a product identifier.  And down here

12   is an example of what such a message might look like in

13   a system that conformed to that claim.

14            So instead of saying O, which doesn't indicate

15   any kind of product at all, if you say, add item product

16   ID: 38918491, that's very specific.  We know exactly

17   what product you want to add regardless of where this

18   message came from.

19       Q    So Mr. Trevor said there's really no need for

20   a product identifier?

21       A    There's no need for that, and it didn't have

22   them.

23       Q    Let's go to the next slide, please.

24       A    Yes.

25       Q    What does this show?

1      A     Well --

2      Q     Is this further on that point?

3      A     This is further explanation of why that

4   particular claim limitation isn't met.  There's no

5   shopping cart message with a product identifier.  The

6   only thing the client terminal sent was an order

7   command.  There was no product identifier, and there was

8   no need to have a product identifier.

9      Q     Now, in the CompuServe slides that we saw that

10  Mr. Trevor put up there, there was a menu, and a

11  selection was made from a menu.  Is that a product

12  identifier?

13     A     No.

14     Q     Why not?

15     A     Well, for several reasons.  First of all,

16  Mr. Trevor testified that when you move your -- your

17  cursor down on the screen, and as you move it down that

18  green highlight bar shows up next to a particular

19  product.

20          If you then say select, Mr. Trevor testified

21  that that's not an indication that you want to order the

22  thing; that's an indication that you want a product

23  description.  And that's when the Russian cross pendant

24  text came up and pictures of the Russian cross pendant.

25          And it's after that that you hit the order

1  button.  And, again, the only thing that goes is an O,

2  or the equivalent of an O.

3      Q    So at the point that you hit that order

4  button, the product's already been identified?

5      A    Yes.  Again, CompuServe didn't need to know

6  because, when you asked for select, it knew what product

7  you were interested in.  And if you then later hit

8  order, it knew that was the one that you were -- that

9  you wanted to buy.

10     Q    Could you skip ahead a couple of slides to the

11  first slide on database issue?

12     A    Yes.

13     Q    Okay.  Now, one of the things that we've been

14  discussing, the issues we've been discussing in these

15  patent claims, is the shopping cart database.

16     A    Yes.

17     Q    You see that?

18          And in Mr. Tittel's testimony he identified

19  the shopping cart database in the CompuServe Electronic

20  Mall as the shopping cart -- excuse me, the personal

21  holding file that was referred to in one of the books as

22  the shopping cart, and the file that's related to that

23  as shopping cart database.

24     A    Yes.

25     Q    Have you put the Court's construction of the

1  term shopping cart database on this slide?

2      A    That's right.

3      Q    Okay.  And how is that relevant to this

4  discussion?

5      A    Well, it's relevant to this notion of exactly

6  what the personal holding file was.  And I knew that

7  there was a personal -- something called a personal

8  holding file because it's described in the CompuServe

9  books.  But I didn't actually know until I heard

10 Mr. Trevor's testimony as to exactly what was meant by

11 the personal holding file.  And it's different from what

12 I thought it was.

13     Q    And what was your recollection of his

14 testimony?

15     A    Oh, he testified that it was information held

16 in main memory of the computer.  It was never even

17 written to a disk file.

18     Q    So do you disagree with Mr. Tittel's testimony

19 that there was a database in -- in the CompuServe

20 Electronic Mall that handled the products that are

21 ordered?

22     A    I don't know whether there was a database, and

23 I don't think Mr. Tittel knows whether there was a

24 database or not.  It's his obligation to show that there

25 was one, and he didn't.

1      Q     How does Mr. Trevor's testimony bear on this?

2      A     Well, because if all these -- these pieces of

3  information are being held in main memory of the

4  computer, that's not a database.

5      Q     Let's take a look at your next slide.

6  Mr. Tittel was suggesting, I believe, that a person

7  looking at these books, the three books that we've been

8  testifying, or you've been testifying about, that that

9  person looking at those books would say that there's a

10  database, and they would actually know how to build one.

11          Do you agree with that?

12      A     Okay.  Well, I don't think it's necessarily

13  true that there had to be a database there.  I think

14  it's possible there might have been.  It might have been

15  a reasonable design choice, but it certainly wasn't

16  required.

17          If somebody looked at those books and said,

18  well, I'd like to build this system and I'd like it to

19  have a database, I don't think they could sit down and

20  do that in a straightforward fashion.  They might

21  eventually come up with it after -- after a lot of work.

22  They wouldn't be directed by that to put a database in.

23      Q     Do you think that these three books inherently

24  disclose a database?

25      A     Well, inherently has a special meaning with

1    respect -- with respect to patents.

2        Q    Would you say that they necessarily --

3        A    No.

4        Q    -- disclose a database?

5        A    They definitely don't necessarily disclose a

6    database because there are ways of implementing the

7    system that doesn't require a database.

8        Q    What would be an example?

9        A    Well, an example would be that, after you've

10   made your selection of products, instead of actually

11   storing it in a database, it sends it off to a

12   fulfillment house, which would then fill your order and

13   send it to you without ever recording it in a database.

14   That's one way.

15       Q    Okay.  And that would be an alternative to a

16   database?

17       A    Yeah.

18       Q    Let's go to the next slide, if you will.

19       A    Yes.  This is just a list of the elements that

20   Mr. Tittel did not show were present in Claims 35, 51,

21   and 17.

22       Q    The X that you put on this slide indicates

23   that you did not believe that there was sufficient

24   evidence, or that Mr. Tittel had provided evidence --

25       A    Okay.

1      Q     -- of those being present?

2      A     With respect to the shopping cart database, I

3  don't agree with him.

4            With respect to the product identifier, he

5  didn't even mention it at all.

6      Q     And those are elements of all of the claims

7  that you've mentioned on this slide of '314, Claim 35

8  and 51; and '492, Claim 17?

9      A     That's right.  And they're not present even if

10 you combine somehow CompuServe with the internet.  It's

11 not just CompuServe alone; it's CompuServe plus the

12 internet does not disclose these things.

13     Q     Okay.  Let's go to the next slide, if you

14 will.

15           Okay.  Now, we're now talking about '492

16 patent Claim 17.  This is another claim involving the

17 shopping cart; is that right?

18     A     Yes.  This just has some additional claim

19 limitations.

20     Q     Okay.  And what would those be?

21     A     Well, they are listed down there.  At least

22 one of the shopping cart messages comprises, includes, a

23 universal resource locator.  He never showed that.  And

24 also the payment message comprising a universal resource

25 locator.  He never showed that either.

1              I think what he said was that basically URLs

2      are common on the internet.  But that doesn't say that

3      you have to have a shopping cart message with one or

4      that you have to have a payment message with one.

5          Q    You've indicated the absence of those things

6      in CompuServe with the Xs?

7          A    Well, they are certainly not in CompuServe.

8      And the question is:  Would they be in CompuServe plus

9      the internet?  The problem is there was no shopping cart

10     message anyway in CompuServe plus the internet.  So it

11     wouldn't have a URL if it didn't exist.

12         Q    Okay.  Let's go to the -- that completes your

13     analysis on the sales system claims, the shopping cart

14     claims?

15         A    Yes.

16         Q    So let's now turn to the claims that are

17     involved in the hypertext statements.  And those are 41

18     and 61 of the '492.

19              What's your conclusion on that?

20         A    Well --

21         Q    And whether those were present in the

22     CompuServe Mall.

23         A    I think the content of most of those claims is

24     not disclosed by the references that -- that Mr. Tittel

25     discussed.  I think the way he handled it was he put a

1  claim limitation up on the screen, and then flashed some

2  kind of quotation from some reference next to it, and

3  then quickly put a checkmark next to the element showing

4  that it -- he believed it was present.  But if you

5  actually read the quotations that he put up there, they

6  don't show that.

7          So, for example, in -- in CompuServe, the way

8  in which you checked the status of an order was you

9  would have to call up the merchant on the telephone and

10  ask the merchant, Where's my order?

11         Another alternative was you could send an

12  e-mail message to the merchant through CompuServe, and

13  then the merchant would go through some process to look

14  up your status and then send you an e-mail back

15  indicating what your status was.  That is not close to

16  what is claimed in the hypertext -- in those hypertext

17  claims.

18     Q    In the hypertext claims, there's a need for a

19  hypertext for a transaction statement; is that true?

20     A    There has to be --

21     Q    Transaction --

22     A    Yes.  There has to be a transaction statement,

23  and then there are transaction detail hyperlinks.

24     Q    Right.  And none of those were present in

25  CompuServe?

1      A    Not close.

2      Q    Would you go to the next slide, please?

3      A    Yes.

4           Yes.  This shows what the intention of the

5  claim in '492 is, that you ought to be able, sitting at

6  your computer, to -- by clicking and typing things, you

7  ought to be able to do a status inquiry and the server

8  computer ought to be responding to your status inquiry.

9  There's no human intervention; there's no calling up

10 anybody on the telephone.

11     Q    All right.  Let's go to the next slide.

12          Does this relate to that same thing?

13     A    Yes.  It's the same things.  This is the '492

14 hypertext claims that we're talking about.

15          CompuServe didn't have a statement document,

16 and it didn't have a transaction detail document.  And

17 so even adding the internet to it doesn't give you a

18 statement document or a transaction detail document.

19     Q    So what did Mr. Tittel point to in discussing

20 these claims?

21     A    I think he talked about his bank statement or

22 something like that.  But bank statements aren't

23 disclosed in the internet or in the CompuServe

24 references.

25     Q    So --

1      A    So here there are basically three steps that

2  appear in those claims.

3           One is you have to transmit a statement

4  document comprising the purchase transaction records.

5  Now purchase transactions are things that you've already

6  purchased.  So if I've made five purchases from Amazon,

7  I'd like to be able to go back and review my five

8  purchases, maybe learn their status, when are they

9  coming, et cetera, cancel an order if it hasn't been

10  filled yet.  So a statement document is one that shows

11  all of my -- all of my pending orders.  That's nowhere

12  in CompuServe.

13           Then on that statement there has to be a

14  transaction detail hypertext link.  This is something

15  which, if you click on it, you will get details of that

16  particular of the five transactions.

17           Well, okay, not only was there no statement

18  document, but let's even forget about the internet.

19  There wasn't any kind of way on CompuServe of obtaining

20  that kind of information.

21           So if you took CompuServe and added the

22  internet to it, you wouldn't get the transaction detail

23  hypertext link.

24           Then you had to be able to activate -- the

25  user had to be able to activate that link, and that

1    would send a request to the server computer for status

2    information.  That's not in CompuServe.

3              And then in response, the server would have to

4    send the actual details of that particular historical

5    transaction.  And that's not in CompuServe either.

6         Q    Let's go to the next slide.

7         A    Yes.

8              So here's how CompuServe worked.  You would

9    select items for purchase, then you would click

10   checkout, and a screen appears that lists the items that

11   you want to purchase in this particular transaction.

12   And then you click okay, and then you can continue on to

13   complete the purchase transaction.

14             Well, Mr. Tittel, at least in his report -- I

15   don't think he did it live in court -- but in his report

16   he called this screen the statement document.  But it

17   isn't, because you haven't engaged in a transaction yet.

18   You could always hit cancel order and it would go away,

19   and there's no -- there's no transaction.  And so, it's

20   not a statement document.

21        Q    Purchase transaction record has to be a record

22   of a completed transaction; is that correct?

23        A    Yes.

24        Q    That's shown in your next slide?

25        A    Yes.  So this is a slide of a big grocery

1   store.  And the arrow is pointing to what we refer to as

2   an abandoned shopping cart.  Apparently somebody put

3   some items in it and they left the store without buying

4   anything.

5           And so selecting products that you might

6   purchase, or you might never purchase, that's not a

7   purchase transaction.  It becomes a purchase transaction

8   when you go to the cash register and buy the stuff.

9       Q    Okay.  Have you summarized your analysis of

10  these claims -- '492, Claims 41 and 61, in your next

11  slide?

12      A    Yes.  And there's more missing from those.

13          So let's even assume we could take CompuServe

14  and somehow combine it with the internet.  Then these

15  elements of the hypertext claims are all missing.  We

16  don't have the required database.  There's no statement

17  document; there's no hypertext link to be activated; and

18  no transaction detail document comes.

19      Q    Does that complete your analysis of the

20  hypertext statement claims?

21      A    Yes -- no.

22      Q    Well, no.

23      A    It doesn't.

24      Q    It doesn't.

25      A    Wow.

```
 1      Q    There's one more, 41 and 61.

 2      A    Yes, there are even more.

 3           Yes.  The server computer doesn't send the

 4  statement in response to a statement URL because there's

 5  no statement and there's no statement URL.

 6           And there was another claim that required you

 7  to be able to ask for transactions that took place in a

 8  given month.  CompuServe couldn't do that.  And since

 9  there was no statement document, it couldn't include any

10  of the things that are listed down on the bottom line

11  there, the date of the transaction, et cetera.

12      Q    So you put big Xs in all of those.

13      A    Right.

14      Q    So now let's go to the last of our three

15  patents, the '639.

16           This is the session ID technology; is that

17  right?

18      A    That's right.

19      Q    All right.  Can you just briefly review the

20  issues of state and session?

21      A    Yeah, I will be very brief.

22      Q    Very brief.  We've heard a lot about it, but I

23  think it would be --

24      A    Right.  So I think a good example the jury can

25  probably relate to is, consider a trial.  Various events
```

1    occur during trial that change the state of things.

2    So when the Defense rested, it then came to the

3    Plaintiff to put on a rebuttal case.  And we are in the

4    middle of that.

5              And when I'm done, and after I have been

6    excused, then this trial is going to move into a

7    different state.  And then a state is going to come,

8    hopefully tomorrow, when you're asked to retire to the

9    jury room to consider the verdict.  And then a state

10   will occur after you come back with your verdict.  And

11   then eventually the whole thing will end.

12             And if we couldn't keep track of those states,

13   we could never possibly ever finish a trial.

14             And the analogy on the internet is that while

15   a shopper is engaging in an interaction with an online

16   store, if the store can't keep track of the state of

17   things -- which products has he viewed, which products

18   has he already ordered, what quantity of a particular

19   product has he ordered -- if the store couldn't keep

20   track of those things, then the store would never be

21   able to complete a transaction.

22             And so, I think you heard a lot of testimony

23   about, there were debates over whether http should be

24   stateless or not stateless or whatever.  The decision

25   was made to make it stateless, and that caused a

1    tremendous problem, and lots of people tried to solve

2    the problem of how to add state to an essentially

3    stateless system.  And there were various solutions, one

4    of which is in the '639 patent.

5          Q    And is state the same thing as session?

6          A    No.

7          Q    What's the difference?

8          A    If you have a state maintenance mechanism, you

9    can, with further invention, figure out a way to use it

10   to maintain sessions.  If you can't maintain state, you

11   can't maintain sessions.  But just because you can

12   maintain state doesn't automatically mean that it's

13   obvious how to maintain sessions.

14         Q    Do you have some slides on what is not a

15   session identifier?

16         A    Yes.  Let's get past this.  Talked a lot about

17   state.

18              Okay.  So I just want to harken back to the

19   Court's construction of session.

20              It's the series of requests and responses to

21   perform a complete task or set of tasks between a client

22   and a server system.

23              So if you're only going to do one task, here

24   is a request and a response, and another series of more

25   requests and responses, and finally you're done, and

1    that's a complete task.  And so that whole thing is an

2    example of one session.

3             It's also possible to have multiple tasks.  So

4    you might finish task one, then you want to continue on

5    in the same session and accomplish another task.  And

6    then many, many, many tasks.

7             And all of that together can be one session

8    under the Court's construction, either of those

9    possibilities, the single-task session or the

10   multiple-task session.

11            And the question is how to maintain session

12   state.  How do you know when the sessions begin and the

13   sessions end?

14            And I think there were various proposals by

15   Mr. Tittel that this was known somehow in the prior art.

16   But, as I said, maintaining state doesn't automatically

17   maintain a session.

18            So there are some websites that are kind to

19   people who speak foreign languages.  They remember that,

20   whenever you visit the site, you would like to interact

21   with the site in French.  Well, that extends over many,

22   many, many sessions.  That fact is not -- that state is

23   not a session identifier.

24            And, in fact, Mr. Tittel didn't identify any

25   single prior art reference that disclosed session

1  maintenance at all.

2      Q    Mr. Tittel pointed to a Johnson reference.  Do

3  you recall that?

4      A    Yes.

5      Q    Now, was that a state -- did that reference

6  have a session identifier?

7      A    No.  I'm spacing forward.

8      Q    What did Johnson have?

9      A    First we have to understand what a session

10  identifier is.

11      Q    Yes.

12      A    The Court's construction -- or the agreed

13  construction, I forget -- is a text string that

14  identifies a session.

15      Q    Would that apply to Johnson?

16      A    So it has to be a text string and it has to

17  identify a section.  It doesn't apply to Johnson because

18  Johnson's credential identifier could either extend over

19  many, many different sessions, or it could stop being

20  effective in the middle of a session.  It didn't

21  identify a session.

22          Likewise, user identifiers, like user names,

23  don't identify a session; they identify a user.  A

24  credential identifier doesn't identify a session; it

25  just says this person is allowed to access these certain

1    pieces of information.

2         So something that changes during a session

3    clearly doesn't identify the session.  And something

4    that can expire or go out of business during the session

5    doesn't identify it.  And something that extends over

6    many sessions doesn't identify a session.

7    Q    Mr. Tittel also referred to a Gifford patent

8    in connection with his discussion of session IDs.  Does

9    that patent disclose a session ID?

10   A    I think that the use of the Gifford reference

11   was to add the internet and hypertext to the Johnson

12   reference, which I think he acknowledged does not

13   disclose the internet or hyperlinks.  So the idea is --

14   I think he combined Gifford with Johnson to get this

15   over to the internet.

16        But what you're getting over to the internet

17   didn't have session identifiers in the first place.  So

18   you don't get session identifiers just by adding the

19   internet into things.  In fact, it makes it worse.

20   Because the Johnson reference was in closed systems

21   where the server knew who you were.

22        When you all of a sudden go to the open system

23   of the internet, you can't just take Johnson and put it

24   on the internet.  In fact, to my knowledge, Johnson has

25   never been put on the internet.

1    Q   One of the claims, Claim 60, requires a user

2  identifier.

3    A   Yes.

4    Q   Was there any discussion of that in

5  Mr. Tittel's testimony?

6    A   Yes.  So Claim 60 requires the purchase

7  request including an associated user identifier.  But if

8  you look back to the quotation that Mr. Tittel put up at

9  that time he was discussing this claim, there was

10  absolutely nothing whatsoever about a user identifier in

11  a purchase request.

12        And you don't even have to have a identifier

13  in a purchase request.  Because if you know -- if you

14  have a session maintenance mechanism, and you know that

15  the purchase request is part of this session, then for

16  the user to identify himself at any point in the session

17  would be sufficient.  So it doesn't have to be in the

18  purchase request.

19    Q   Now, do you have a slide that summarizes your

20  analysis of the session management claims in the '639

21  patent?

22    A   Yes.  I just a wanted to make sure there

23  weren't two slides.  So when you ask me if I'm done, I

24  will give you the correct answer.

25    Q   I think there's just one this time.

1      A    There's one slide, yes.

2           So Claim 60 has all four of these limitations.

3    Even taking Johnson, which is this credential identifier

4    patent, and somehow adding the internet into it, you

5    still don't get a session identifier.  You don't get

6    appending the identifier, which doesn't exist, to each

7    of the subsequent requests.

8           The purchase request is no disclosure of any

9    purchase request having any user identifier.  And since

10   there's no user identifier, you can't access -- on

11   receipt of the purchase request, you can't go and access

12   the user information.

13          So none of those -- none of those elements are

14   even in the combination of the Johnson and Gifford.

15     Q    Okay.  Now, there has been some discussion in

16   the testimony in the case of basic authentication.  I

17   believe it came up with Mr. Treese and maybe others.

18     A    Yes.  I think I had a slide earlier on that.

19     Q    Does that have any relationship to this

20   discussion of identifying sessions?  In other words, can

21   basic authentication identify sessions?

22     A    No.  It was recognized that authentication was

23   needed, because a lot of worldwide websites wanted to

24   sell content to people.

25          The New York Times, for example, didn't give

1    away its historical articles for free.  And so if you

2    made a request to the New York Times server, the New

3    York Times would have to have some way of knowing that

4    you were a paid subscriber.

5            So a mechanism was added to the http protocol

6    that would enable you to add a user name and password in

7    a header field in the http request.  So there's http,

8    it's got some headers, and then there's some html in the

9    middle of it.

10            That's a credential identifier.  That

11   basically says, here's a token which will tell you that

12   I'm authorized to access these -- this content.  And

13   that may -- that token may be good for years.  It has

14   nothing to do with session boundaries.

15   Q    All right.  Now skipping ahead to the next

16   slide.

17            You tested the additional considerations of

18   non-obviousness?

19   A    Yes.  So even if a combination of different

20   prior art references seem to have the elements of the

21   claim, even that doesn't mean that the claim is obvious,

22   because it's required to look at actual evidence of

23   whether or not the claim is obvious.

24            And those -- that evidence is called

25   additional considerations of non-obviousness.  And my

```
 1  understanding is that the law requires such additional
 2  considerations to be considered if they exist.  And they
 3  do exist in this case.
 4      Q    And did Mr. Tittel factor this into his
 5  analysis?
 6      A    No, not at all.
 7      Q    Give some examples of these additional
 8  considerations that should be looked at.
 9      A    Yes.  So one example is praise by others or
10  professional acclaim.
11           If somebody does something that's very trivial
12  and obvious, it's unlikely that people are going to
13  praise them for it.  So if you praise somebody, it means
14  they did something significant.
15           Failure of others.  So if you're going to
16  argue that an invention is obvious, and 20 different
17  people tried to make it and they couldn't, that's very
18  strong evidence that it wasn't obvious, even if it
19  happens to occur in some arbitrary combination of
20  references that you might put together.
21           Likewise, commercial success.  If I can make a
22  lot of money by making this invention; and it's obvious
23  to make that invention, then lots of other people are
24  going to do it, too, because we can rely on human beings
25  to want to make money.  And that's the theory behind the
```

1   commercial success factor.

2          And then commercial acquiescence, the

3   licensing of things to others.  If something is obvious

4   and easy to make, I'm not going to pay you for it.  I'm

5   going to have my own guys do it themselves.

6          And so these are -- this is the reasoning

7   behind these -- these additional considerations of

8   non-obviousness.

9   Q    And did you take -- did you find any or are

10  you aware of any praise by others --

11  A    Yes.

12  Q    -- in connection with the Soverain patents and

13  their inventions?

14  A    Yes.  The technology of Open Market at the

15  time and the importance of the patents was recognized in

16  articles in the New York Times and the Wall Street

17  Journal.

18          And the Transact product itself, which

19  embodies, it says, Soverain's inventions -- which means

20  they're now owned by Soverain, but it was Open Market's

21  inventions -- received industry praise, and they

22  received an internet excellence award presented by

23  NetWorld, NetWorld Interop.

24  Q    Is there anything in Mr. Tittel's book about

25  Transact?

1       A    Yes.  Mr. Tittel himself praised Open Market.

2   And I don't think he specifically mentioned Transact.

3       Q    You're right.

4       A    And these are quotations from one of

5   Mr. Tittel's books.  Open Market is a leader in

6   electronic commerce products since early 1995 -- 1994.

7            But we know what that product is.  It's

8   Transact.

9            Open Market's software solution is regarded as

10  one of the most viable for businesses wanting to

11  establish an online commerce presence, and Open Market

12  software, quote, functions with all types of browsers,

13  all varieties of payment types, and all security

14  protocol formats.

15      Q    That's right out of Mr. Tittel's writings?

16      A    Yes.  The quotation marks are his.

17      Q    What about commercial success?  Are you aware

18  of any commercial success?

19      A    I've heard testimony and seen documents that

20  there were a huge number of licensees, more than a

21  thousand licensees of Transact.

22           I think we heard testimony that it occupied

23  something like 30 percent of the market for such

24  software.  And some of these large corporations that are

25  listed there were licensees.

```
 1      Q     What about license -- what about patent
 2  licenses?
 3      A     Well, my understanding was, there was -- there
 4  was patent a license.  I don't think I've listed that.
 5      Q     I think we have the next --
 6            MR. GIANNETTI:  If you'll go to the next
 7  slide.
 8      A     Ah, yes.  These are companies that have
 9  licensed Soverain's patented technology.
10      Q     (By Mr. Giannetti) Now, I think another factor
11  that you mentioned was failure of others?
12      A     Yes, and I think that's extremely significant
13  here.
14      Q     Can you elaborate on that?
15      A     Yeah.
16            It was known early on -- when the http was
17  being developed, there was really great debate -- and a
18  lot of this debate is available publicly, because that's
19  one great thing about the internet, is this worldwide
20  communication medium.
21            And when people are doing things on the
22  internet, they make a record of it on the internet.  And
23  so we have lots of bulletin boards and e-mail forums and
24  exchanges where technical people were debating back and
25  forth, should http have state or shouldn't it have
```

1    state?

2              And there were advantages and disadvantages.

3    And eventually, the decision was made in http 1.0 to not

4    have state.  Everybody knew that that was going to

5    create problems, and lots of people went off attempting

6    to solve the problem of how can we add state to http.

7              And the first viable solution that I know of

8    was in the '639 patent.  It's the session identifier.

9    So many people tried, but the inventors here were the

10   first ones to actually find a solution.

11       Q    I think we've reached your final slide,

12   Professor.

13       A    All right.

14       Q    The bottom line.

15       A    Bottom line, that Mr. Tittel and Newegg and

16   all its witnesses haven't shown that any asserted claim

17   is anticipated, and likewise, they haven't shown that

18   any asserted claim is obvious.

19       Q    And those are your opinions in this case?

20       A    They are.

21              MR. GIANNETTI:  Nothing further.  Pass

22   the witness.

23              THE COURT:  All right.

24              MR. SAYLES:  May it please the Court.

25              THE COURT:  Yes.

```
 1                    CROSS-EXAMINATION

 2  BY MR. SAYLES:

 3       Q    Mr. Shamos, good late afternoon.

 4       A    Good afternoon.

 5       Q    I first want to tell you that I respect your

 6  education, and I intend to be fair with you, and I ask

 7  you to be fair with me.

 8            Will you do that?

 9       A    We'll give it a try.

10       Q    All right.  You have pursued a number of

11  vocations, haven't you?

12       A    Yes.

13       Q    You've been a practicing lawyer.

14       A    That's correct.

15       Q    You have stood in the place that I stand --

16  not this courtroom but other courtrooms -- doing what

17  the lawyers are doing in this case, haven't you?

18       A    I have.

19       Q    And you've been a full-time professor in

20  college, haven't you?

21       A    Yes.

22       Q    You've been a part-time professor in college,

23  haven't you?

24       A    Yes.  You were the founder and president of a

25  company called Unilogic, weren't you?
```

```
1        A     That's right.

2        Q     And you were the founder and president of a

3   company called -- is it Lexium?  Did I say that right?

4        A     That -- unfortunately, that's the way a lot of

5   my employees pronounce it, but it's actually Lexium

6   (different pronunciation).

7        Q     All right.  And you were a founder and

8   president of that for a while?

9        A     Yes.

10       Q     And you're actually an official referee,

11  aren't you?

12       A     Yes.

13       Q     In the area of billiards; is that right?

14       A     That's right.  It's -- I'm certified to

15  referee world tournaments.

16       Q     All right.  And you have been an author,

17  correct?

18       A     Yes.

19       Q     You've written articles?

20       A     Yes.

21       Q     You've written books?

22       A     Not as many as Mr. Tittel, but I have written

23  books.

24       Q     All right.  And you've done that, hopefully,

25  for a return on your efforts; is that right?  For pay.
```

1      A    Many of those things were successful at

2  producing a return.  They weren't all successful.

3      Q    All right.  I'll grant you that.

4           You've actually written nine books on the

5  subject of shooting pool; is that right?

6      A    Well, if you include all the foreign

7  translations of them, yes, I think that's right.

8      Q    All right.  And you are actually the president

9  of another business, aren't you, Mr. Shamos?

10     A    I'm not sure which one you're referring to.

11     Q    Expert Engagements, LLC.

12     A    Yeah.  I'm actually not sure whether I have

13  the title of president, but yes.  My wife and I own

14  Expert Engagements, LLC.

15     Q    All right.  Did you know that your website

16  says that you are the president of Expert Engagements,

17  LLC?

18     A    I didn't know that.  I'll go check, but...

19     Q    All right.

20          MR. SAYLES:  May I approach the witness

21  briefly, Your Honor?

22          THE COURT:  Yes, you may.

23     Q    (By Mr. Sayles) That's your website that says

24  you're the president.

25     A    Oh, I'm sorry.  I'm not doubting the

1   correctness of what you were saying.

2       Q    Oh.

3       A    I just -- yes.  The website does say that.  I

4   didn't remember it said that, but it does say that, yes.

5       Q    All right.  Would you agree with me that in a

6   case on trial where justice is being sought, the case

7   ought to be determined on the basis of the facts?

8       A    Well, yes, to the extent that if the facts

9   were the only consideration, then it needs to be decided

10  on the basis of the facts, yes.

11      Q    All right.  And this Expert Engagements

12  business that I asked you about just a moment ago is

13  actually an expert witness locating service that you

14  provide; is that right?

15      A    Well, it started out that way, but it's come

16  down to where I'm basically the only expert witness that

17  it locates.

18      Q    All right.  Well, you're -- so is that -- is

19  that actually advertising for you, sir?  You recommend

20  yourself when people call your service; is that right?

21      A    Well, okay.  So let me -- since you've asked,

22  I should explain this.

23           I've been doing expert witness work for some

24  time, and I would frequently get requests from people

25  for expert witness services that were just way outside

1    of any area of expertise that I had.

2            And for a while, I would refer them to various

3    professors at Carnegie Mellon University.  And after a

4    while, I was doing it so much, I figured I may as well

5    get paid for that.

6            And so what I would do is make arrangements

7    with professors that if I found the work, that I would

8    be able to charge a relatively small fee for that.

9        Q    All right.

10       A    And so we then started -- my wife and I -- and

11   the reason I didn't know I was president is she runs the

12   whole thing.  I do the work of the expert witnessing,

13   but she runs everything else.

14           And so what would happen is, we would get

15   calls for the weirdest things, because we're very small,

16   and people only came to us when they were desperate and

17   all the other expert witness agencies couldn't locate

18   anybody for them.

19           And so we went off on a series of very odd

20   projects.  It took an incredible amount of time, and it

21   resulted in very little compensation.

22           And so eventually, we really stopped taking on

23   new engagements of that kind.  And so when people called

24   Expert Engagements, if it's not in my area of expertise,

25   we basically say:  No, I can't help you.

1          But if it has to do with computers or internet

2   commerce, then it's me.

3      Q    All right.  Well, there's your explanation.

4   Now let me ask you a few questions about it.

5      A    Sure.

6      Q    Did you know that your website was still up in

7   the year 2010 advertising your services for locating

8   experts for others?

9      A    Oh, we will do it.  It's just not a main focus

10  of the business.

11         For example, in the computer field, there are

12  many areas of computers that I would not consider myself

13  an expert in, but I know people who are 50 feet down the

14  hall from me at the university.

15         And so if it's easy for me to find somebody,

16  we'll do it.  But the last time -- the straw that broke

17  the camel's back here was somebody wanted an expert on

18  the construction of crossbows because somebody had been

19  injured while they were trying to cock a crossbow, and

20  they were trying to allege that the manufacturer was

21  negligent.

22         I don't know anything about crossbows, and I

23  didn't know anybody who knew anything about crossbows,

24  and I don't have the -- we don't have the time to go

25  find people who do that.

1       Q    All right.  Well, there's another explanation.
2    But the fact is, you have a company that advertises to
3    anyone who accesses your website that you are an expert
4    witness locator; isn't that true, sir?
5       A    Yes.  It's not only true that we advertise;
6    it's true that we'll do it.
7       Q    All right.  And you have appeared in
8    courtrooms yourself many times, haven't you?
9       A    Yes, I have.
10      Q    As a witness; isn't that right?
11      A    Yes.
12      Q    And you -- obviously, like other expert
13   witnesses in this case, you charge for your time, don't
14   you?
15      A    Yes.
16      Q    And your standard charge, at least at the time
17   of your report for your time, was $525 an hour; is that
18   right?
19      A    Yes.
20      Q    Isn't it true that Open Market did not invent
21   the internet?
22      A    Correct.
23      Q    Didn't -- didn't invent shopping carts?
24      A    Hmm.  According to the Court's construction,
25   it didn't invent shopping carts.

1     Q     All right.  Didn't invent hypertext?

2     A     Correct.

3     Q     Did not invent session IDs?

4     A     I -- it did -- I think it invented session

5     IDs, yes.

6     Q     It didn't invent cookies, did it?

7     A     No.

8     Q     It didn't invent browsers, did it?

9     A     No.

10    Q     It didn't invent databases either, did it?

11    A     No.

12    Q     Now, you mentioned that you are a lawyer, and

13    I brought it up again.  You're not here to give opinions

14    about the law.  That's understood and agreed, right?

15    A     Unless you ask me.

16    Q     Well, I don't intend to, and you don't intend

17    to offer any opinion on the law, do you?

18    A     My direct testimony is over, so...

19    Q     Okay.  And I just want to establish one fact:

20    Isn't it correct that no party to a patent lawsuit is

21    allowed to call the Patent Examiner?

22    A     Well, that's a rule of the Patent Office.

23    Q     All right.  So neither Soverain can call the

24    Patent Examiner on the phone and ask them questions or

25    take their depositions nor can Newegg; isn't that right?

```
 1      A     That's my understanding of the Patent Office

 2 practice.

 3      Q     And with regard to the issue of validity, it

 4 is ultimately up to the jury in cases like this to

 5 decide that; is that right?

 6      A     I think that's why we're here.

 7      Q     And with respect to some of the CompuServe

 8 books, you know that Exhibit 2, CompuServe Fourth

 9 Edition, was not cited in the references at the Patent

10 Office.  You know that, don't you?

11      A     I didn't recall which edition of which book it

12 was.  CompuServe itself was before the Patent Office.

13 That book may not have been.

14      Q     CompuServe was mentioned before the Patent

15 Office, but this book wasn't; isn't that so?

16      A     As I say, I'll take your word for it.

17      Q     All right.  CompuServe CIM, which is

18 Exhibit 3, is not listed in the cited references before

19 the Patent Office; isn't that right?

20      A     Yes.  I think there were huge numbers of

21 CompuServe books, which we would refer to as cumulative.

22      Q     The answer is, it was not cited in the

23 references; isn't that right?

24      A     I believe the first word of my answer was yes.

25      Q     All right.  And as a matter of fact,
```

1    Exhibit 4, Using CompuServe, is not cited in the

2    references that were listed in the patents before the

3    Patent Office; isn't that right?

4         A    I'll take your word for it.

5         Q    All right.

6                   MR. SAYLES:  Pass the witness.

7                   THE COURT:  All right.  Redirect?

8                   MR. ADAMO:  Excuse me, Your Honor.

9    Mr. Giannetti wants me to get him something.

10                  Good enough?

11                  He's got the slides to my opening.

12   Excuse me, Your Honor.  Thank you.

13                  REDIRECT EXAMINATION

14   BY MR. GIANNETTI:

15        Q    We just put a slide up.  This is a page from

16   the '314 patent, from the examination of the '314

17   patent.  And isn't it correct that CompuServe was before

18   the Patent Office in the examination of the '314 patent?

19        A    Yes.  I testified to that.  And in fact, this

20   reference was actually posed by CompuServe itself, which

21   would indicate to me that it would be more authoritative

22   than a textbook written by an outsider.

23        Q    And on the subject of your compensation --

24        A    Yes.

25        Q    -- does your compensation depend in any way on

1   the outcome of this case?

2       A   I hope not.  I mean, that's not the deal, no.

3               MR. GIANNETTI:  Nothing further.  Pass

4   the witness.

5               MR. SAYLES:  Nothing further.

6               THE COURT:  All right.  Thank you.  You

7   may step down.

8               All right.  Very well.  Mr. Adamo, who

9   will be your next witness?

10              MR. ADAMO:  I'm going to say the magic

11  words.  We're done, Your Honor.

12              THE COURT:  You rest.  All right.  Very

13  well.

14              Defendant finally close?

15              MR. SAYLES:  Yes.

16              THE COURT:  All right.  Plaintiff finally

17  close?

18              MR. ADAMO:  Yes.  And I reiterate my Rule

19  50 motion that I just filed.

20              THE COURT:  Okay.  Very well.  I'll take

21  those up.

22              All right, Ladies and Gentlemen of the

23  Jury, that concludes all of the evidence in the case.

24  We've reached that -- that place that I know you've all

25  have been anxious to get to.

```
 1                    It's almost 5:00  -- or it's a little
 2      after 5:30.  We're -- I'm going to recess you until in
 3      the morning in just a moment.
 4                    First, I'd like to get a little guidance
 5      from y'all.  For this whole week, the lawyers and the
 6      Court have been in the driver's seat.  Tomorrow y'all
 7      get in the driver's seat.
 8                    So I'm going to start giving you a little
 9      training on that, and I'd like to ask you this.  Let me
10      tell you what we've got to do tomorrow.
11                    When we come in, I will deliver a Court's
12      Charge to you, which is rather lengthy.  I'm going to
13      read it.  You'll have copies of it.  I'll skim over some
14      parts, but I'll read most of it for you.
15                    It's probably going to take 45 minutes to
16      an hour.  After that, we'll probably take about a
17      15-minute break, and then you will hear closing
18      arguments from both sides.
19                    How long did I give y'all for closing
20      arguments?
21                    MR. ADAMO:  Sixty minutes each, Your
22      Honor.
23                    THE COURT:  Sixty?
24                    MR. ADAMO:  Yes.  Now, don't -- I knew he
25      was going to do this.  He told me earlier.
```

```
 1                    MR. SAYLES:  Your Honor, 45 minutes
 2   should be sufficient.
 3                    MR. ADAMO:  I planned on 60, and he
 4   asked --
 5                    THE COURT:  Well, we'll talk about it in
 6   the morning.  You sharpen your pencil tonight.
 7                    Anyway, we'll have either 45 or 60
 8   minutes of closing argument on each side.  So that's
 9   going to put us until about noon, and at that point in
10   time, you'll get the case.  You'll be in the driver's
11   seat from then on.  You'll begin your deliberations.
12                    What I'd like to know from you now is, we
13   had sandwiches brought in for you today, and I want to
14   thank both parties.  They not only treated y'all but the
15   Court's staff.
16                    They brought sandwiches for everybody so
17   that we could eat them on a short lunch hour, and then I
18   ended up giving you a long lunch hour, because I thought
19   we were going to be through by 4:00 o'clock.  But it
20   didn't work out that way.
21                    So, anyway, thank y'all very much for the
22   sandwiches.  They were enjoyed by everyone.  I'm sure
23   the jury did as well.
24                    My question to you is, tomorrow you're
25   probably going to be through hearing argument around
```

1    noon.  Do you think you would like to take an hour's

2    break, go out and have lunch, and then come back and

3    start deliberating, or would you rather have sandwiches

4    brought in and go ahead and start deliberating as you

5    eat?

6               JUROR:  We'll do while we eat.

7               THE COURT:  What's that?

8               JUROR:  We'll do it while we eat.

9               THE COURT:  Okay.  That's wonderful.

10              JUROR:  We're tired of y'all.  No

11   offense.

12              [Laughter]

13              MR. ADAMO:  None taken.  We understand.

14              THE COURT:  We understand.  We

15   understand.  It's not cruel and unusual punishment, but

16   it is punishment.  You might disagree at this point.  I

17   shouldn't mention that right --

18              JUROR:  I wonder what I did.

19              THE COURT:  I promise you, when it's

20   over, you'll look back on it as a great experience in

21   your life, but hard to see right now.  I didn't get much

22   response to that suggestion.

23              All right.  Well, we will do that then.

24   So we can plan -- if the parties don't mind providing

25   lunch again tomorrow.

1                    MR. ADAMO:  Absolutely, Your Honor.

2                    THE COURT:  And we'll have lunches, and

3    everyone can work through.

4                    MR. ADAMO:  In fact, if anybody wants a

5    specific something, we'll even take orders, Your Honor.

6                    THE COURT:  Would y'all like anything

7    different rather than Jason's Deli?

8                    JUROR:  T-bone steak, medium rare.

9                    [Laughter]

10                   THE COURT:  Would you like --

11                   MR. ADAMO:  Are you an onions man?  Do

12   you eat onions?

13                   JUROR:  Your Honor, what would you like?

14                   THE COURT:  That only comes if you're

15   still deliberating at 6:30 at night.

16                   JUROR:  We'll be done by then.

17                   THE COURT:  So for lunch, we can do

18   sandwiches.  We can get you Bruno's Pizza, which is real

19   good, if you would rather have pizza.  Stick with --

20   some people don't like pizza.  I saw a couple of --

21   okay.  We'll just stick with sandwiches then.  How about

22   that?

23                   Or I'll leave it up to the parties.

24   Y'all get together.  If you want to treat them to

25   anything different, you can.

1                  MR. ADAMO:  We can, you know, mix and
2   match a little, Your Honor.  Maybe we could run some
3   pizza in, if somebody wanted, and bring sandwiches, and
4   everybody can just pick.
5                  THE COURT:  Okay.  Well, y'all get
6   together and work it out.  I know whatever you get, they
7   will be very appreciative of.
8                  Okay.  So that's the plan for tomorrow.
9   Still you need to remember my instructions.  Do not
10  discuss this case among yourselves.  Do not discuss it
11  with anyone else, and don't do any independent
12  investigation.  Stick to the rules.
13                 Tomorrow at noon, that's when you can
14  finally start discussing the case.
15                 So at this time, with the Court's thanks
16  and the parties' thanks, you are excused for the
17  evening.  We'll see you back here at 9:00 o'clock in the
18  morning.
19  Be in recess.
20                 COURT SECURITY OFFICER:  All rise.
21                 (Jury out.)
22                 THE COURT:  All right.  Have y'all picked
23  the foreperson yet?
24                 MR. ADAMO:  I was about to say.  I don't
25  even think we have to take an educated guess.

```
 1                    THE COURT:  Very well.  Motions for JMOL.
 2                    MR. ADAMO:  You have mine.
 3                    THE COURT:  You serious about any of it?
 4                    MR. ADAMO:  Yeah.  I'll tell you one --
 5     yeah.  I'm serious about all of it, but I'll tell you
 6     one part.  Your Honor, I'll tell you one part -- really,
 7     the two parts that I think are serious, because they
 8     also would match up to our objections to the jury
 9     charge.
10                    I believe that there just isn't evidence
11     to go to the jury on some --
12                    THE COURT:  Priority date?
13                    MR. ADAMO:  -- some of the materials that
14     are in the charge, and I've got those in the motion as
15     well.
16                    THE COURT:  Well, which ones are they?
17                    MR. ADAMO:  In Your Honor's charge, it
18     would be Pages 11, 12 -- it would be Pages 11 through
19     15.  It's the effective filing date of the '639 patent.
20                    THE COURT:  Okay.  Do we have any
21     that's -- could you go to the podium, please, Mr. Adamo?
22                    MR. ADAMO:  Yes.
23                    THE COURT:  And if counsel could go to
24     the podium as well.
25                    All right.  Do we have a dispute about
```

1  the effective filing date of the '639?

2              MS. FROST:  No, Your Honor.  That was

3  going to be my good news for you.

4              THE COURT:  Thank you.

5              MS. FROST:  That we take you seriously,

6  and we cut it down, and those are not in the case, so...

7              THE COURT:  Okay.  JMOL as to the

8  effective date of the '639 is granted.  5.1 is out of

9  the charge.

10             What about written description?

11             MR. ADAMO:  Well, yeah, that would go.

12  5.1.1 would go.

13             MS. FROST:  Yes.

14             THE COURT:  Written description is out.

15  All right.

16             MR. ADAMO:  5.1.2 would go.

17             MS. FROST:  Correct.

18             THE COURT:  All right.

19             MR. ADAMO:  5.1.3 would go.

20             MS. FROST:  Yes.

21             THE COURT:  Wonderful.  I hate reading

22  those.

23             All right.

24             MS. FROST:  There are a couple of other

25  places in the charge, Your Honor, where --

1                    THE COURT:  Excuse me?

2                    MS. FROST:  There are -- I'm sorry.
3    There are a couple of other the places in the charge
4    we'll get to where there are some references to it that
5    I'll point out to you that we can omit, or I can tell
6    you now, whichever you prefer.

7                    THE COURT:  Well, let's -- let me get
8    these down first.

9                    MS. FROST:  Because they were just
10   omissions related to these particular changes.

11                   THE COURT:  Okay.  Well, are you in
12   agreement with the ones that Mr. Adamo just mentioned?
13   And to be sure we're all clear on it, it's 5.1, 5.1.1,
14   5.1.2, 5.1.3 --

15                   MS. FROST:  Yes.

16                   THE COURT:  -- of the charge.

17                   MS. FROST:  Correct.

18                   THE COURT:  All right.  JMOL is granted
19   on those.  It's not included in the charge.

20                   What other sections can we do away with?

21                   MR. ADAMO:  I also, Your Honor -- 5.3 on
22   obviousness, which would also pick up 5.3.1, -.2, -.3
23   and -.4, so, basically, Pages 19 all the way through 24.

24                   There hasn't been any attempt at making a
25   proper obviousness case here.  I mean, Mr. Tittel

1    started to try to opine, and you remember there was a

2    sustained objection on -- on obviousness.

3                    THE COURT:  Well, before we argue it, is

4    there any objection to that?

5                    MS. FROST:  Yes, Your Honor.

6                    THE COURT:  Okay.

7                    MS. FROST:  We believe there's an

8    obviousness issue that should go to the jury or should

9    be granted in our favor as a matter of law, which brings

10   me to my JMOLs, which are being electronically filed

11   right now, and I'm going to be handing them up to Your

12   Honor in just a moment.

13                   THE COURT:  Okay.  So you object to the

14   obviousness?

15                   MS. FROST:  Yes, I do.

16                   THE COURT:  Okay.  What -- what evidence

17   are you relying on for obviousness?

18                   MS. FROST:  The evidence of Mr. Tittel.

19   And if I may go to my desk --

20                   THE COURT:  Didn't they ask him on

21   deposition that he was not going to the express any

22   opinions on that, and did he not -- they objected, and

23   so, therefore, they didn't waive it, and he did not

24   express any opinions, as I recall, on obviousness?

25                   MR. GIANNETTI:  That's right, Your Honor.

1    He didn't at his deposition.

2            THE COURT:  Okay.  I'm asking them.  I

3    know you don't think he did.

4            MS. FROST:  Your Honor, I may defer to my

5    co-counsel here for the details, since I wasn't present

6    at the deposition, but it's our view that you don't need

7    an expert witness necessarily to opine on obviousness in

8    a case like this and that the references themselves from

9    which the jury can make that conclusion are in evidence

10   and are before them, and that's sufficient.

11           MR. ADAMO:  Your Honor, the law is just

12   dead set against that.  The Federal Circuit has several

13   times specifically said that -- and this is a

14   complicated case.  This is not trying to decide whether

15   we've got a can opener patent that's obvious here.  This

16   is a complicated case.

17           The Circuit has been exceedingly clear

18   that you don't just get to take a couple of exhibits,

19   dump them into the jury box, stand up on final argument,

20   wing it, and get a verdict on it.

21           I've actually got a bench memo on exactly

22   this point that I could file later in the day, because

23   we were expecting something like this might happen.  But

24   the Circuit is absolutely clear that in a case like

25   this, you need expert opinion testimony to get to the

1   jury, and they don't have it.

2                And when they tried today, there was --
3   it looked like, you know, an attempt on Mr. Tittel's
4   part to go to obviousness.  Mr. Giannetti got up and
5   objected, and Your Honor sustained the objection, and
6   that was the end of it.

7                So there isn't enough evidence here to
8   get to the jury on obviousness.  And there's no
9   testimony about a Graham analysis.  Nothing even close.
10  So you want to call it Graham/KSR, I don't care what you
11  call it.  There wasn't sufficient evidence here.  There
12  wasn't even an attempt made to do it.

13                And I played that out in my -- it's in my
14  JMOL motion, but it also was my second reason and my
15  only other reason for objecting to the charge.  There
16  isn't an obviousness case here for the jury to decide.

17                I mean, rigorously, it's a legal issue
18  under -- there are underlying -- excuse me --
19  incorporated underlying factual matters, and they
20  haven't put any evidence in on any of the underlying
21  factual matters.

22                And that's really the only fact issue in
23  an obviousness case, as Your Honor knows.  KSR confirmed
24  obviousness is a legal issue.  Anticipation is a fact
25  issue, but obviousness is a legal issue.

1                    So the only thing that can go to the jury

2      are the underlying fact issues, and there's zero

3      evidence on any of the underlying fact materials and

4      ground.  Zero.  There's nothing for the jury to decide.

5                    THE COURT:  Any response?

6                    MS. FROST:  We respectfully disagree,

7      Your Honor, with that.  We believe there's plenty of

8      factual evidence in the record from which the jury could

9      make that conclusion.

10                   THE COURT:  Okay.  Do you have any legal

11     authority as to whether expert testimony is or is not

12     necessary for -- in order for it to meet your burden as

13     to obviousness?

14                   MS. FROST:  There are certain cases --

15     let me see if I can get that.  It's easier for me to

16     read off of this than my e-mail.

17                   There's a ++Blackboard versus

18     Desire2Learn at 574 Fed 3d 1371, Your Honor, that

19     indicates that expert testimony is not required on the

20     ultimate issue of validity where witness testimony and

21     documents are in evidence on which a conclusion would be

22     based.

23                   THE COURT:  And what -- was that issue

24     obviousness in that validity case?

25                   MS. FROST:  I believe so.

1                THE COURT:  Okay.  Anything further?

2                MS. FROST:  And there's a case in our

3    JMOL Mr. Gaston just pointed out to me that we cite for

4    both obviousness and anticipation that expert testimony

5    is unnecessary, and that's Proveris Science Corps versus

6    Innova Systems, Inc., which is 536 Fed 3d 1256, and

7    that's Federal Circuit 2008.

8                MR. ADAMO:  Well, Your Honor, I've got

9    the senior case here, Centricut, Llc, versus Esab Group,

10   Inc., 390 Fed 3d 1361 and 1370, Fifth Circuit 2004, and

11   the later panel decisions -- I don't know what these

12   other two cases hold, but Your Honor is well aware the

13   Circuit doesn't let the later panel trump the earlier

14   panel.

15               And this case is plain -- in a case

16   involving complex technology, the patentee cannot

17   satisfy its burden of proof by relying only on the

18   testimony from those who are admittedly not an expert in

19   the field.  There hasn't been any expert testimony here.

20   Tittel -- Mr. Tittel was the only one that could have

21   given it, and he forswore it during his deposition.  I

22   can get you more -- as I said, I can get you more

23   pointed authority on this.  I know there is more.  We

24   can have it over here in an hour.

25               THE COURT:  Do you have it briefed in

1    your JMOL motion?

2                    MR. ADAMO:  Not -- yes, but not to the --

3    the answer is yes.  I have more depth in the bench memo.

4                    THE COURT:  All right.  Both of you have

5    until 7:00 o'clock to file any additional briefing on

6    that one you wish.  I'll take that one under advisement.

7    I am -- and I'll tell Defendants, I think you're on a

8    little bit of thin ice on that one, but...

9                    Okay.  What's next?  Was that all you

10   had?

11                   MR. ADAMO:  No.  I was focusing on our

12   objections to the charge, and that's all the objections

13   we had to the charge.  The verdict form looks good for

14   us.

15                   THE COURT:  Okay.  You're kind of -- we

16   jumped from JMOL -- you started off on JMOL, and you

17   said there are a few things that relate to the charge on

18   the JMOL.

19                   Is there anything else orally that you

20   wish to present or point out to the Court with regard to

21   your JMOL motions?

22                   MR. ADAMO:  Sorry, Your Honor.  I've been

23   trying to sit here and listen to the testimony and read

24   briefs, get my closing together.  If I might have one

25   second.

1                    Well, frankly, yes, they don't have an

2      anticipation case either.  One reference.  They have no

3      evidence that shows any one reference anticipates any of

4      the seven claims of the three patents-in-suit, and

5      that's on Pages 1 and 2 of my -- my JMOL brief.

6                    The CompuServe books are scattered all

7      over the place on different versions, so that doesn't

8      cut it, and they don't go far enough.  The books

9      themselves as art don't go far enough.  And Mr. Trevor

10     didn't try to apply them.  He admitted there's no

11     implementation.

12                   So the books themselves don't act as

13     anticipatory references, particularly not the way they

14     were presented, all globbed together.  So they violate

15     the one-reference rule.

16                   CompuServe wasn't shown the extent --

17                   THE COURT:  Okay.  Counsel, what's your

18     reference?

19                   MS. FROST:  Yes, Your Honor.  We think we

20     have a number of references.  Indeed, we believe that

21     there's sufficient evidence, in some instances, to

22     entitle us to judgment.

23                   The testimony and accompanying exhibits

24     of Mr. Treese, Trevor, and Tittel, including Defendant's

25     Exhibits 2, 4, 12, which is the Gifford patent, and 27,

1   which is the Johnson patent, singularly each anticipate.

2   And I have in our motion, which has been electronically

3   filed, and I'll hand up in a moment, the specific claims

4   of each patent, which we believe reference anticipates.

5                MR. ADAMO:  There's been no showing.

6   There's been no evidence to demonstrate that any one of

7   those references singularly anticipates.

8                And this is the same thing.  You can't

9   just -- the Circuit has been adamant about this, Your

10  Honor.  You can't just mark exhibits, a piece of art,

11  walk over here, pitch it into the jury, walk over there

12  and do closing argument.

13               The evidence isn't here.  Element by

14  element, that's what the Court requires.  The Circuit is

15  adamant about that, and anticipation in particular.

16  One reference, claim by claim, element by element.  We

17  haven't seen it.

18               You can argue all you want about what

19  Johnson may or may not say.  With all due respect, I

20  mean, Ms. Frost is a fabulous appellate lawyer, but

21  she's no expert witness, and her testimony isn't

22  probative about anything, no more so than mine, some

23  lawyers signing a brief.

24               The testimony isn't probative on the

25  point either.  It's what's in the record.  It isn't in

1  the record as it stands right now.

2              MS. FROST:  Your Honor, the evidence of

3  the witnesses, Mr. Treese, Trevor, and Tittel, all of

4  which is in the record, did sufficiently, with the

5  references, we submit establish --

6              THE COURT:  Did they go through those

7  references, though, in a checklist fashion?  I don't

8  recall.

9              MR. ADAMO:  No.  I'm sorry.

10             THE COURT:  Not necessarily a checklist,

11 but did they deal with the references element by

12 element?

13             MS. FROST:  I believe they did, Your

14 Honor.  I'll defer to my counsel, who actually put them

15 on, if you would like to hear more specifics.

16             THE COURT:  Sure.  Uh-huh.

17             MR. BALDAUF:  If I may, Your Honor, with

18 respect to the claims of the '314 patent, specifically,

19 using CompuServe was cited with respect to every one of

20 the claim limitations, and we went through and checked

21 them off.

22             With respect to the additional

23 claim limitation --

24             THE COURT:  But CompuServe was not one

25 reference, was it?

1              MR. BALDAUF:  Using CompuServe was one

2    single book, and that was recited with respect to all of

3    the limitations separately.  Also, How to Get the Most

4    Out of CompuServe was used.

5              They were both used for every limitation,

6    and they both went up and corresponded to the

7    checkmarks.  So there were two separate references.

8              MR. ADAMO:  Okay.  May I respond just

9    briefly on this?

10             THE COURT:  Yes.

11             MR. ADAMO:  First of all, Treese, it's my

12   inventor.  I put him on.  I can guarantee you, Treese

13   did not put on any testimony in here demonstrating that

14   anything's anticipated.

15             So I'm not sure what Ms. Frost is talking

16   about, but nobody put Treese on for that.

17             And these other checklist things, okay,

18   arguments about inherency, which is what Tittel did, to

19   the extent they tried to use the checklist.

20             First of all, the checklist quotations

21   don't say what the checklists say, but more to the point

22   is, they tried to argue inherency.  Inherency requires

23   proof that something is always inevitably going to

24   happen.

25             To the extent there's any proof on that

1    issue, when Mr. Giannetti cross-examined him, he

2    admitted that things weren't inherent.  It's a

3    possibility.  That doesn't cut it.  That's not enough.

4    So, Your Honor, I mean, I realize that the tendency,

5    when we're this close to the end, with a jury in the box

6    and closing arguments ready, is the tendency is to err

7    on the side of letting it go to the jury, but this is --

8    this is really -- I mean, they've taken the references,

9    they're going over here, and they're pitching them in

10   the box, and then they're going to try to tie it

11   together in closing tomorrow.

12              Now, no offense to Mr. Sayles, but he

13   doesn't know a darn thing about this stuff at the end of

14   the day, and neither do I.  And more to the point, what

15   we say isn't probative.

16              That's all.  I'll be quiet now.

17              MR. BALDAUF:  Your Honor, I couldn't

18   disagree more.  I put the witness on myself.

19              First of all, Mr. Trevor was here and

20   explained the various components of the system.  The

21   jury heard that.

22              The Using the CompuServe book is a

23   separate reference, went through and matched up with the

24   claims, as to How to Get the Most Out of CompuServe.

25   Mr. Tittel testified as to what was taught in those

1 elements, and based upon his understanding of how these

2 systems work, what is taught in there.

3                    We did it for every single one of those

4 claims.

5                    Going forward, with respect to the '639

6 patent, we did the same thing with the Johnson/IBM

7 reference and went through those limitations, with the

8 combination, which is simply the use of the hypertext.

9                    Likewise, when we were talking about the

10 '492 patent session identifier claims, we likewise

11 applied the CompuServe references individually to all of

12 those claim limitations themselves with the use of the

13 underlying basic protocols of the internet that were

14 well-known to everybody.

15                    MR. ADAMO:  That's combination

16 references.  That's two.  I don't care how he tries to

17 put lipstick on this pig, Your Honor, it's more than one

18 reference.  That's the biggest difference between

19 anticipation and obviousness.

20                    If you've got to go to more than one

21 reference, you have to put in an obviousness case.  It's

22 that simple.  It really is that simple.  That's what the

23 law is, and the Circuit is just adamant about this.

24                    And, you know, you already heard Counsel

25 say Johnson --

```
1                  THE COURT:  Well, be careful what you ask
2    for, Mr. Adamo, because if you're not right and if I
3    give it, then they've got a free ride.
4                  MR. ADAMO:  I understand.
5                  THE COURT:  Sometimes, I think, lawyers
6    ask for too much.
7                  MR. ADAMO:  I understand.
8                  Well, you heard Counsel say that at least
9    in one of these instances, it was a combination of
10   things, Johnson plus something else.  Well, that's not
11   anticipation.
12                 THE COURT:  Okay.  Thank y'all for your
13   arguments.  I'll consider that one as well.
14                 Anything further regarding the Plaintiffs
15   on JMOL?
16                 MR. ADAMO:  I -- as far as what I have
17   here, I mean, I'm serious about all of them, Your Honor,
18   but I don't think -- I don't think any others, in view
19   of what I've already put on your plate, that I would ask
20   you to think about tonight.
21                 THE COURT:  All right.  Soverain's motion
22   for JMOL is denied, except the Court has taken under
23   advisement the anticipation and obviousness part.
24                 MR. ADAMO:  Understood.
25                 THE COURT:  All right.  Defendant have
```

1  any -- I don't have a copy of your JMOL in front of me.

2  Do you have a copy?

3           MS. FROST:  Yes, I do.  I'm on my way.

4  If I may approach?

5           THE COURT:  Okay.  I hope that's multiple

6  copies.

7           MS. FROST:  It is.  It's very short.

8  Your Honor, what I've just handed up and given to other

9  counsel and we, I believe, had filed electronically at

10  the close of the evidence are three JMOLs, one on the

11  issue of damages, another on the issue of

12  non-infringement, and a third on the issue of

13  invalidity.

14          Although we're very proud of our motions,

15  too, and I certainly would be happy to go over any of

16  them, I'm happy to rest on our papers, which I

17  appreciate the Court's indulgence giving me the time to

18  the end of the case to be able to provide this to you.

19          THE COURT:  All right.  Thank you.

20          All right.  Newegg's motions for JMOL as

21  to non-infringement, invalidity, and damages are denied.

22          What else?

23          Any other objections to the charge, other

24  than I take it you object to definitions regarding --

25  well, the whole invalidity.  You object to all of -- the

1    5.1 through whatever?

2              MR. ADAMO:  It's essentially 5 -- I

3    didn't have -- I didn't have a problem, Your Honor, with

4    how 5.2 was -- was stated.  I don't have any problem

5    with the -- with the statement of anticipation, but it's

6    essentially the same issue.  I don't think they have the

7    evidence.

8              THE COURT:  That it shouldn't be --

9    right.

10             MR. ADAMO:  And 5.3 is the same thing.  I

11   have no problem with the language of any of this, but

12   5.2 and 5.3, it's a question of whether Your Honor

13   thinks there's enough evidence for this to go to the

14   jury.  And you've already ruled in my favor on 5.1,

15   so...

16             THE COURT:  All right.  No other

17   objections to the Court's charge?

18             MR. ADAMO:  No other objections, and the

19   verdict form is fine with us, Your Honor.

20             THE COURT:  All right.  Does the

21   Defendant -- the Defendants have any other objections to

22   the -- are there any objections to the Court's charge?

23             MS. FROST:  Yes, Your Honor, there are a

24   few.  I have some general ones and then some very

25   specific ones, I'll go over.

```
 1                    Generally, we object to the charge to the
 2   extent that it does not include Newegg's previously
 3   submitted instructions which were in Docket No. 350 with
 4   two exceptions dealing with the entire market value rule
 5   and divided infringement, which I will cover separately
 6   when I get to those places in the charge.
 7                    We do object to the Court's --
 8                    THE COURT:  Well, I know you submitted a
 9   charge, and so did the other side, but now I've got my
10   charge, and I'd like to hear what your objections to it
11   are.  I'm not going to allow you to just incorporate in,
12   you know, everything that you've submitted before, so...
13                    MS. FROST:  I appreciate that, and I'm
14   going to the specific ones right now.
15                    THE COURT:  Okay.  All right.
16                    MS. FROST:  The first one of those, the
17   second paragraph of 4.1, it says:  An accused system
18   infringes a claim if it is reasonably capable of
19   satisfying the claim elements.
20                    We submit that -- and I will -- if I may,
21   reserve and make all of these objections without waiver
22   of our JMOLs, which have been denied, but where we
23   continue to believe that the --
24                    THE COURT:  Oh, certainly.
25                    MS. FROST:  -- these claims should not be
```

1  submitted to the jury.

2                THE COURT:  I understand that.

3                MS. FROST:  Fair enough.

4                We believe that the -- this language with

5  reasonably is appropriate -- is inappropriate and should

6  be --

7                THE COURT:  What do you think it should

8  say?

9                MS. FROST:  -- changed.

10                THE COURT:  What do you think it should

11  say?

12                MS. FROST:  We think reasonably should

13  just simply be deleted.

14                THE COURT:  So you should think it should

15  say an accused system infringes if -- infringes a claim,

16  if it is capable of --

17                MS. FROST:  Correct.

18                THE COURT:  -- of satisfying?

19                MS. FROST:  Correct.  We believe that

20  actual capability is required.

21                MR. ADAMO:  My -- I don't have all of our

22  papers in front of me, Your Honor, from their earlier

23  submission, but my recollection of the Federal Circuit

24  law on this point, the reasonably is properly in there.

25                THE COURT:  That's my recollection as

1   well, so that objection is overruled.

2                   What's next?

3                   MS. FROST:  We have an objection on

4   Page 9 to the divided infringement section.  It starts

5   at top of Page 9.  It says:  Direct infringement

6   requires a party to perform and use each and every step

7   of the claimed method.

8                   MR. ADAMO:  Ms. Frost, do you mean the

9   second full sentence in the first paragraph on Page 9?

10                  MS. FROST:  Yeah.  It's that whole

11  paragraph that I have some problems with.

12                  We would object to this and request

13  instead the specific instruction, Your Honor, that we

14  submitted, which was in our charge, Docket No. 360.

15                  THE COURT:  Okay.  Are you talking

16  about para -- the last paragraph of Paragraph 4.1

17  dealing with direct -- or excuse me -- it would be the

18  third paragraph of 4.1, direct infringement, that

19  begins:  Direct infringement requires a party to perform

20  or use each and every step of the claimed method, and

21  goes down through mere arm's-length cooperation, et

22  cetera?

23                  MS. FROST:  Yes.  Yes.  And we would --

24                  THE COURT:  And what is your objection to

25  the Court's instruction?

```
 1                    MS. FROST:  Our objection is severalfold.

 2                    THE COURT:  It's what?

 3                    MS. FROST:  Severalfold.

 4                    First of all, we believe that the

 5     objection -- that -- that the charge should include also

 6     a statement about system claims.

 7                    And this is a --

 8                    THE COURT:  What --

 9                    MS. FROST:  It only deals with method

10     claims at the moment.  It says:  Direct infringement

11     requires a party to perform or use each and every step

12     of a claimed method.  And it talks about direction and

13     control with respect to method claims.

14                    THE COURT:  Okay.  So what do you say it

15     should say?  Instead of method, should it say system?

16                    MS. FROST:  It should say method -- it's

17     difficult to come up with the appropriate statement,

18     other than what we have previously submitted to Your

19     Honor, which we would rather submit, but let me -- let

20     me work with it and try.

21                    What I'd like to add is a statement in

22     here that if Newegg itself does not own or possess the

23     elements recited in the system claim, Newegg does not

24     infringe that system claim.

25                    THE COURT:  All right.  That's your
```

 1   request.

 2                    MS. FROST:  Yes.

 3                    THE COURT:  Response?

 4                    MR. ADAMO:  It's not the law.  To the

 5   extent that case law from which this instruction would

 6   have come from the Federal Circuit case law, it is

 7   specific to method claims.  The law is not the same for

 8   system claims.  It's that simple.

 9                    And if Ms. Frost is trying to jump out of

10   the Federal Circuit here and say, well, we think it

11   should be the same for both system and method, but

12   that's not what the Federal Circuit says.

13                    THE COURT:  Okay.  Well --

14                    MS. FROST:  But that -- excuse me.  I'm

15   sorry, Your Honor.  I didn't mean to interrupt you.

16                    THE COURT:  Go ahead.

17                    MS. FROST:  The Federal Circuit hasn't

18   said, and that's kind of the problem.

19                    THE COURT:  All right.

20                    MS. FROST:  What the Federal Circuit has

21   said is that with regards to method claims, this is

22   correct.

23                    Several district court cases have held

24   that -- and Judge Ward has held and others have held

25   that method claims and system claims should be

1   considered under the same general type of analysis.

2                   We don't necessarily agree with that, and

3   in fact, in our JMOL, believe that many of the

4   Plaintiff's infringement claims should not go to the

5   jury at all, because they are divided infringement

6   system claims to which we believe that exception doesn't

7   apply.

8                   And so a divided infringement system

9   claim fails unless -- it should fail, period, unless one

10  person owns or possesses all of the system, which is not

11  what we have here.

12                  Our back -- our sort of backup

13  argument -- since the JMOLs have been denied, our backup

14  argument is that there should be some instruction with

15  regard to system claims that mirrors the method claim

16  direction and control type standard, and that's what

17  we've just proposed that the Court include.

18                  MR. ADAMO:  Your Honor, it's in our JMOL

19  briefing, and the Federal Circuit has spoken on the

20  point.  NTP Research versus Research -- NTP versus

21  Research in Motion, 418 F.3d 1282 at 1317, Federal

22  Circuit 2005.

23                  And Your Honor has already, in the

24  Renhcol -- your Renhcol case, which we've cited in our

25  JMOL motion, 548 F.Supp 356 at 360, you've already

1    looked at this issue; but, you know, plainly, the

2    Federal Circuit has spoken, and systems are different

3    than methods.  And that's what NTP says.

4                    THE COURT:  All right.  I overrule the

5    objection.

6                    Let me ask this question, though,

7    Mr. Adamo.  4.1 refers to, in Paragraph 2, a patent

8    claim is directly infringed only if the accused system

9    or method includes each -- you're not alleging method

10   claims, are you?

11                   MR. ADAMO:  In the '639, we are, Your

12   Honor.

13                   MS. FROST:  '639.

14                   THE COURT:  You are?

15                   MR. ADAMO:  But that's -- yeah, but

16   that's -- that's accurate.  You find it -- it's -- the

17   accused system or method has to include each step or

18   element of the claim.

19                   THE COURT:  Right.  But I'm saying it

20   should be system or method, is that correct, or just

21   system.

22                   MR. ADAMO:  No.  System or method is

23   correct.

24                   THE COURT:  Okay.  All right.

25                   MR. ADAMO:  Because the '639 claims are

1    processor or method claims, Your Honor.

2                THE COURT:  Then what about the next

3    paragraph beginning at the top of the next page where it

4    says:  Direct infringement requires a party to perform

5    or use each and every step of a claimed method?

6                MR. ADAMO:  That's also true.

7                THE COURT:  Okay.

8                MR. ADAMO:  It's true both as to system

9    and method.  You have to satisfy every element of the

10   claim with respect --

11               THE COURT:  What should that say?  Should

12   that be consistent with the preceding paragraph and say

13   system or method?

14               MR. ADAMO:  Well, not in the first

15   paragraph of -- no.  The first paragraph of Page 9, Your

16   Honor, is exactly --

17               THE COURT:  Okay.  I'm not -- I'm not --

18               MR. ADAMO:  -- correct the way it stands.

19               THE COURT:  -- raise more problems,

20   but --

21               MR. ADAMO:  No.

22               THE COURT:  Let's move on.

23               What's your next objection?

24               MS. FROST:  Your Honor, we would request

25   that the Court give, in connection with the Doctrine of

1  Equivalents, our -- at the end of the last sentence on

2  Page 9, it says:  In the patent claim is where the

3  sentence ends.

4              We would request that the Court add the

5  following statement, which is a correct statement of the

6  law, and we think would be -- would minimize the risk of

7  jury confusion in this case because of the number of

8  claim elements, the following:  Such equivalents must be

9  determined for individual elements of the claimed

10 invention, not the invention as a whole.

11             THE COURT:  Response?

12             MR. ADAMO:  I'm just looking to see how

13 the claim reads -- the charge reads at the moment.

14             Well, if you look at the first sentence,

15 a claim limitation -- that's not the whole claim; that's

16 a limitation -- is present in an accused system or

17 method under the Doctrine of Equivalents if the

18 difference between the claim limitation and a comparable

19 element in the accused system -- it's already in there.

20             THE COURT:  I think that -- I think that

21 would just be restating it.  Your objection and tender

22 is overruled.

23             What's next?

24             MS. FROST:  Page 16, Your Honor, under --

25 forgot one.  I'm sorry.

1                    THE COURT:  I think Page 15 is already

2    gone by agreement.

3                    MS. FROST:  Right.

4                    THE COURT:  That's best mode.

5                    MS. FROST:  And it's just been called to

6    my attention that on active inducement, again, we are --

7    have made a JMOL on that basis, that there's no evidence

8    of active inducement.

9                    THE COURT:  I've ruled on that.

10                   MS. FROST:  On Page 16, for participation

11   for lack of novelty, this is a suggestion to the second

12   full paragraph on that page, the disclosure in a prior

13   art reference.

14                   It seems to me that it would be clearer

15   for the jury if we use the same language from

16   Paragraph 1 and Paragraph 2.

17                   In the first paragraph, we talk about all

18   elements must be in a single previous device or method

19   or described in a single previous publication.  I don't

20   know that the jury knows what disclosures are, but it

21   seems to me that the description in a prior art

22   reference would be clear.  It's just a suggestion.

23                   THE COURT:  All right.  The Court

24   appreciates the suggestion, but I think we'll just leave

25   it like it is.

```
 1                What's next?

 2                MS. FROST:  On Page -- same page, as I

 3 mentioned earlier, I would give you a couple of cleanup

 4 places where our omission or dropping of those claims

 5 should be made note of.

 6                THE COURT:  Okay.

 7                MS. FROST:  Specifically, at the bottom

 8 of Page 16, the fourth line down, where it says:

 9 Application, paren, as described previously in Section

10 5.1, we can omit those parentheses and the words in

11 there, I think.

12                THE COURT:  All right.

13                MR. ADAMO:  Agreed, Your Honor.

14                MS. FROST:  Same thing on Page 18, under

15 5.2.2, at the conclusion of the first full paragraph,

16 under that section, we can omit as described previously

17 in Section 5.1.

18                THE COURT:  All right.

19                MR. ADAMO:  Agreed again.

20                MS. FROST:  On Page 23, right before we

21 get to 5.3.3, level of ordinary skill in the art, we had

22 submitted some language from KSR that we thought was

23 appropriate and would be helpful to the jury in this

24 case and would request that it be -- that the

25 instruction, based on the language from KSR, be given.
```

1    When there -- when there is a design need or market

2    pressure to solve a problem and there are a finite

3    number of identified, predictable solutions, a person of

4    ordinary skill has good reason to pursue the known

5    options within his or her technical grasp.

6              If this leads to anticipated success, it

7    is likely the product, not of -- it's likely the

8    product, not of innovation but of ordinary skill and

9    common sense, in that instance, the fact that a

10   combination was obvious to try might show that it was

11   obvious.

12             And we request that that instruction be

13   given.

14             MR. ADAMO:  You've got obvious to try

15   already handled, Your Honor, in the -- at the top of 23.

16   I guess it's a one-sentence paragraph, but it's there.

17   And that KSR language that Ms. Frost just read, I think

18   if you look at what other courts and Bar Associations,

19   et cetera, have recommended, there's no consistent view

20   on whether that language should be just be copied into a

21   charge.  It tends -- my experience is it tends to

22   confuse more than it does to clarify.

23             THE COURT:  All right.  That objection

24   and suggestion is denied.

25             What's next?

1                    MS. FROST:  With respect to the issue of

2     secondary consideration, it starts on Page 23, my focus

3     is on Page 24, specifically Items No. 7 and 9, we

4     request that at the end of Item 7 and 9, the following

5     language be added:  Based on the merits of the claimed

6     invention.

7                    These are correct statements of the law

8     and believe -- we believe provide the jury with

9     appropriate guidance with respect to what considerations

10    they should make.

11                   THE COURT:  All right.  That objection's

12    overruled.

13                   What's next?

14                   MS. FROST:  No. 20 -- Page No. 24, Item

15    5-4 -- or 5.4, corroboration of oral testimony, it's our

16    position that under Thomson, corroboration is not

17    required in this case.

18                   Certainly, if the jury is going to be

19    instructed with respect to corroboration, we believe

20    that the charge, as given, should be changed to say:

21    Oral testimony of an interested party alone is

22    insufficient, because the corroboration requirement, we

23    believe, as a matter of law, only extends to interested

24    parties, and so it should state that in the

25    instructions.

1                    THE COURT:  Response?

2                    MR. ADAMO:  That's wrong as a matter of

3    law.  That's not an accurate statement of what the law

4    is and the requirements of corroboration, and we've

5    weighed those cases out.

6                    THE COURT:  All right.  Objection is

7    overruled.

8                    What's next?

9                    MS. FROST:  With respect to damages, Your

10   Honor, we have a specific request that we would like to

11   hand up to the Court.  We'll electronically file it,

12   too.  Thank you.

13                   We would ask that this instruction deal

14   with the entire market value rule.

15                   There's two for y'all.  Thank you.

16                   MR. ADAMO:  Your Honor, they -- there was

17   already a submission of an entire market value rule

18   charge by Defendants, which I would assume you've

19   denied, because it isn't included in your -- the charge

20   that we're working through right now.

21                   So I'm not sure where this came from, but

22   this -- they've done this once already, and apparently,

23   you told them no --

24                   MS. FROST:  No.

25                   MR. ADAMO:  -- correctly.

1                    MS. FROST:  I beg your pardon, Mr. Adamo.

2    I didn't mean to interrupt you.

3                    We have not proposed this particular

4    language to the Court or to the parties, as -- we've

5    said from the outset --

6                    MR. ADAMO:  Well, Your Honor --

7                    MS. FROST:  -- we wanted to reserve our

8    right to make particular changes and suggestions and

9    objections to the charge as the case was presented and

10   the rulings were made and the evidence came in, and we

11   all, I believe, agreed that that would be the way we

12   would proceed.

13                   This, we submit, is the best articulation

14   of the situation -- or of the entire market value rule

15   as related to method and system claims that we have been

16   able to come up with.

17                   And it's an improvement, we submit, over

18   what we previously gave the Court and shared with

19   opposing counsel and would request that this, which we

20   believe more accurately states the law in this area --

21                   THE COURT:  Okay.  Thank you.  It's

22   denied.

23                   What's next?

24                   MS. FROST:  I believe, Your Honor, that

25   takes me to the end of our objections to the charge.

1                    THE COURT:  All right.  Very well.

2                    All right.  I said an hour.  How long do

3    y'all want tomorrow for closing arguments?

4                    MR. ADAMO:  I really need the hour.

5                    THE COURT:  All right.  An hour it is.

6    You still want 45 minutes or --

7                    MR. SAYLES:  No, sir.  I'll take the same

8    amount Mr. Adamo does.  It's hard enough going second as

9    it is and having the pressure put on you.

10                   THE COURT:  All right.  Both sides will

11   have an hour.  I think, by us having gotten all this

12   have out of the way, we can get an early start on it at

13   9:00 in the morning.  I think we'll have time for an

14   hour for each side.

15                   Let me ask you this:  I did this in my

16   last trial.  I used to not pass the charge out to the

17   jury until they went to the jury room.  And I'm going to

18   pass it out to them tomorrow when I begin.

19                   And the parties in the last case agreed

20   that by handing it out to them and commending it to them

21   to read, that I would charge them orally, but they were

22   agreeable to letting me just incorporate by reference

23   certain parts of the charge that are lengthy.

24                   Does anyone have any problem with that?

25                   MR. SAYLES:  Plaintiff goes first, but I

1  think I was here for that trial --

2                THE COURT:  I believe you were.

3                MR. SAYLES:  -- and I thought that worked

4  very well on the parts where you skipped lists that were

5  in there.

6                THE COURT:  Right.

7                MR. SAYLES:  And I had no problem with

8  the way you did it in the last case.

9                THE COURT:  Okay.  So you have no problem

10  with me doing it in this case?

11                MR. SAYLES:  No, sir.

12                THE COURT:  Okay.

13                MR. SAYLES:  I mean, if it's essentially

14  the same way --

15                THE COURT:  Well --

16                MR. SAYLES:  -- I think it was entirely

17  appropriate.

18                THE COURT:  Okay.  All right.

19                MR. ADAMO:  I would assume, Your Honor,

20  that where you're going with this is to the extent you

21  have reference to Appendix A and Appendix B in the

22  charge, you're just going to just tell everybody that

23  that's where it is.  If you need to consult it, do it

24  while you're back there.

25                THE COURT:  Right.  And I skip the

1   Georgia-Pacific factors, and I tell them that the

2   attorneys will point out to you which ones they think

3   are important, and anything that's more just, you know,

4   boring lists that they're not going to understand

5   anyway, so...

6               But I'll hit all the major infringement,

7   invalidity, and damage issues.

8               MR. ADAMO:  I think, at least my

9   experience, and I would assume it's Mr. Sayles' as well,

10  juries have enough of a hard time with this stuff while

11  they're standing as it is, but when they don't have it

12  in front of them or are reading along with you, they've

13  really got no clue, and they're going to stay with you.

14  So I'm totally in favor of them reading along with you.

15              THE COURT:  Yeah.  Okay.  Very well.

16              Anything further from the parties?

17              Oh, Ms. Ferguson reminds me that y'all

18  need to get your exhibits together.  You've received my

19  order regarding getting them marked.

20              And in my trial last week, when I visited

21  with the jury, one of the suggestions they made -- man,

22  that jury was out for two days digging through those

23  documents in there.  They never sent out a single note,

24  and their main problem was -- and it's such a valid

25  one --

1                    MR. ADAMO:  Couldn't see anything.

2                    THE COURT:  -- we didn't send an index in

3    with them to help them.

4                    So, I mean, think what that would be like

5    for you, as a lawyer, if your paralegal brought you a

6    box of documents with an exhibit list and a bunch of

7    numbers, but no description of what number is where.

8                    So on your exhibits, please have a

9    descriptive list that you've exchanged and both agree.

10   Don't get to arguing your case in your -- don't say

11   double star, this is the one, or anything on it.

12                   MR. ADAMO:  I was going to use colors,

13   Judge, just colors of reasoning.

14                   THE COURT:  But do have an index and have

15   them well organized.  And you know the drill with regard

16   to both demonstratives and exhibits.  After the trial,

17   all be reduced to a CD and filed with the Court.  Y'all

18   are in charge of exhibits after the trial, okay?

19                   Anything further?

20                   I want to compliment both sides for a

21   well-tried case.  You've moved it along very, very

22   promptly, and Plaintiff only used 11 hours and 15

23   minutes, and Defendant 10 hours and 30 minutes, so I'm

24   going to start going with 11 hours from now on.  I think

25   that's plenty.

```
 1                    MR. ADAMO:  Your Honor -- Your Honor --

 2  Your Honor, Sayles and I are getting older, Judge.  You

 3  can't work us like this all the time.

 4                    THE COURT:  I understand.

 5                    All right.  Well, thank you.  Y'all have

 6  a good evening.

 7                    (Court adjourned.)

 8

 9

10                    C E R T I F I C A T I O N

11

12  I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled

14  matter.

15

16  /s/

17  SHEA SLOAN, CSR

18  OFFICIAL COURT REPORTER

19  STATE OF TEXAS NO. 3081

20

21  /s/

22  JUDITH WERLINGER, CSR

23  DEPUTY OFFICIAL COURT REPORTER

24  STATE OF TEXAS NO. 267

25
```