```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                         TYLER DIVISION

3   SOVERAIN SOFTWARE            )
                                 )  DOCKET NO. 6:07cv511
4        -vs-                    )
                                 )  Tyler, Texas
5                                )  9:00 a.m.
    NEWEGG, INC.                 )  June 29, 2010
6

7          TRANSCRIPT OF POST-VERDICT MOTION HEARING
              BEFORE THE HONORABLE LEONARD DAVIS,
8               UNITED STATES DISTRICT JUDGE

9
                        A P P E A R A N C E S
10
    FOR THE PLAINTIFFS:      MR. KENNETH R. ADAMO
11                           JONES DAY
                             2727 N. Harwood St.
12                           Dallas, Texas  75201-1515

13                           MR. OGNJAN SHENTOV
                             MR. BARRY R. SATINE
14                           JONES DAY
                             222 East 41st St.
15                           New York, New York  10017-6702

16                           MR. MICHAEL C. SMITH
                             SIEBMAN, REYNOLDS, BURG,
17                            PHILLIPS & SMITH
                             713 S. Washington Ave.
18                           Marshall, Texas  75670

19
    COURT REPORTER:          MS. SHEA SLOAN
20                           shea_sloan@txed.uscourts.gov

21
    Proceedings taken by Machine Stenotype; transcript was
22  produced by a Computer.

23

24

25
```

```
 1    FOR THE DEFENDANTS:      MR. KENT BALDAUF, JR.
                               MR. DANIEL H. BREAN
 2                             MR. JAMES J. BOSCO, JR.
                               THE WEBB LAW FIRM
 3                             200 Koppers Bldg.
                               436 Seventh Ave.
 4                             Pittsburgh, PA  15219

 5
                               MS. CLAUDIA W. FROST
 6                             PILLSBURY WINTHROP
                               909 Fannin St., Ste 2000
 7                             Houston, Texas  77010

 8

 9
      ALSO PRESENT:   MS. KATHARINE WOLANYK, SOVERAIN
10                    MR. LEE CHENG, NEWEGG

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. Ferguson, if you will call the case,
 4     please.
 5              THE CLERK:  Court calls Case No. 6:07cv511, Soverain
 6     v. Newegg.
 7              THE COURT:  Announcements.
 8              MR. ADAMO:  Good morning, Your Honor.  Ken Adamo for
 9     Jones Day Dallas for Soverain.  I am joined by Michael Smith;
10     my partners, Mr. Shentov and Ms. Satine.  And Your Honor
11     remembers Ms. Wolanyk from Soverain Software.
12              THE COURT:  Good morning.
13              MS. FROST:  Good morning, Your Honor.  Claudia Frost
14     for Newegg.  With me is Mr. Cheng, Mr. Baldauf, Mr. Brean, and
15     Jim --
16              MR. BOSCO:  Bosco.
17              MS. FROST:  Bosco.
18              THE COURT:  Very well.
19              MS. FROST:  We also have some witnesses here.
20              THE COURT:  Also have what?
21              MS. FROST:  Witnesses here as well.
22              THE COURT:  You do?  What are they going to testify
23     about?
24              MS. FROST:  Principally about design-around and any
25     ongoing royalties, should the Court be inclined --
```

1           MR. ADAMO:  Well, Your Honor, I had absolutely no

2   notice that there was going to be an attempt on defendant's

3   part to turn this into an evidentiary hearing this morning.  I

4   would have had my experts here.  We would have been prepared

5   under the circumstances.  There was no indication at all that

6   there was going to be an attempt to put testimony on this

7   morning.

8           THE COURT:  Did y'all give them notice that you were

9   going to call witnesses?

10          MS. FROST:  No, Your Honor, we did not give them

11  notice we were going to call witnesses.  But we were informed

12  by the Court when Mr. Yarbrough's office called, that if we

13  intended to have any evidence at the injunction hearing that

14  we should be prepared to present it here.

15          THE COURT:  Well, that is always the case, but there

16  is usually some communication between counsel as to -- if they

17  intend to do that, but I doubt if we are going to get to them

18  anyway.  We will cross that bridge if we need to.

19          MR. ADAMO:  Thank you.  If Your Honor wants the

20  evidentiary hearing, of course, whatever the Court wants I can

21  be prepared for it.  But ambush on a Tuesday...

22          THE COURT:  Okay.

23          MR. ADAMO:  Thank you, sir.

24          THE COURT:  It seems like y'all are still playing

25  well together.  And I take it you were not able to -- why

1    weren't y'all able to settle the case?  I thought the jury had

2    settled it for you.

3              MR. ADAMO:  I think I better defer to Ms. Wolanyk

4    because she was present at the mediation session that we had

5    per your instructions after the verdict, Your Honor.

6              THE COURT:  All right.

7              MS. WOLANYK:  Your Honor, that is correct.  We did

8    have a mediation session in the month of May.  And we did make

9    an attempt, but it appears we are not yet ready to settle the

10   case.

11             THE COURT:  Not what?

12             MS. WOLANYK:  Well, we did make an attempt to

13   settle.  Newegg has made statements to the press that they are

14   determined to appeal, and it seemed they may not be in a

15   settling frame of mind.  We're not giving up though.

16             THE COURT:  What is Newegg's answer to my question?

17             MS. FROST:  Would you like to --

18             MR. LEE:  Your Honor, we made an attempt to settle,

19   and we just could not come to terms.  Despite the great,

20   valiant efforts to settle the case, which I greatly

21   appreciate, we couldn't come to terms with Ms. Wolanyk.

22             THE COURT:  Let's get into the motions.  I think

23   what I would like to take up first is Newegg's JMOL, Docket

24   No. 407 on non-infringement.  I don't really want to get into

25   the invalidity or motion for new trial part.  But I want to

1    hear argument on that, and I think that will bridge into

2    Soverain's renewed JMOL.  And so we will get into the direct

3    infringement as well.

4              All right.  I will hear from Newegg.

5              MS. FROST:  Is this good?  Can everybody hear me?

6              MR. ADAMO:  Yes.

7              MS. FROST:  Thank you.

8              THE COURT:  Where is Mr. Sayles today?

9              MS. FROST:  Somewhere, Your Honor.  I don't know

10   where he is.  I think he is in trial, perhaps.

11             THE COURT:  Okay.

12             MS. FROST:  He is not present.

13             MR. ADAMO:  It is not because he and I had a fight,

14   Your Honor.

15             THE COURT:  Okay.

16             All right.  Proceed.

17             MS. FROST:  Your Honor, as you are well aware, there

18   is plenty of paper in the case, so what I will try to do is

19   hit the highlights of our motion and the core of it so that --

20   and refer to -- for a lot of the details to the dockets and

21   motions themselves.

22             But, in summary, Soverain's theory of infringement

23   regarding the '314 and '492 patents is based on alleged use by

24   Newegg or its customers of the claimed system.

25             Soverain further asserts that the analysis of

1    infringement should be made by looking at the use of the

2    system as a whole rather than the approach used by the courts

3    in BMC and MuniAuction.

4         While Newegg certainly doesn't concede the propriety

5    of that approach at all, even assuming for the sake of

6    argument today that it is correct, Soverain still cannot prove

7    that anyone directly infringes the asserted claims of the '314

8    and '492 patents.

9         Soverain does not dispute that to prove direct

10   infringement all elements of the asserted claim must be met.

11   Nor does Soverain contest the proposition that without direct

12   infringement there can be no indirect infringement.

13        In light of that, I would like to address the

14   limitations of the claims that have not been met and why that

15   is fatal to Soverain's claim and why Newegg is entitled to

16   judgment as a matter of law.

17        In particular let me focus on the shopping cart

18   claims.  There are two elements or limitations of the asserted

19   claims of the '314 and '492 patents that are not met by

20   anyone; neither by Newegg nor by its customers.  We refer to

21   those in our papers as the plurality limitation and the

22   modification limitation.

23        This Court is well aware of those from the pleadings

24   and the evidence.  But just for refreshing, the plurality

25   limitation is the limitation that provides, "said buyer

1    computer being programmed to receive a plurality of requests

2    from a user to add a plurality of respective products to a

3    shopping cart in said shopping cart database."

4           And the modification limitation is, "modify said

5    shopping cart in said shopping cart database to reflect said

6    plurality of products to said shopping cart."

7           The reasons why these claim limitations are not met,

8    are discussed at length in Docket No. 407 at Pages 5 through 9

9    and Docket No. 413 at Pages 9 through 12.

10          Because these limitations are not met by anyone, no

11   direct infringement can be established.  Without it, no

12   liability for inducement can lie; and Soverain's infringement

13   claim should be dismissed and Newegg's -- should be granted

14   judgment as a matter of law on that claim.

15          Let me focus next on the hypertext statement.

16          THE COURT:  Well, before you go on to the next, let

17   me hear a response as to that point.

18          MR. ADAMO:  Dr. Shentov is going to handle that,

19   Your Honor.

20          THE COURT:  All right.

21          MR. SHENTOV:  Good morning, Your Honor.  I'm Ognjan

22   Shentov --

23          THE COURT:  Go to the podium, and feel free to make

24   any introduction you would like to.

25          MR. SHENTOV:  Well, the introduction is I am very

1   pleased to be here after being forced to miss the trial.

2   Unfortunately, I had another trial in New Hampshire that

3   extended much over time, like almost a whole week.  We had

4   volcanos in Iceland and others -- I don't know what to say,

5   but I am pleased to be here.

6          Your Honor, the one issue that I wanted to address,

7   and it will -- I think it permeates the entire brief that

8   Newegg has.  I apologize.  I want to digress a little bit for

9   a second.  But the whole premise of the Newegg brief is that

10  for somehow or another we have failed the all elements

11  claim limit -- the all elements rule, which is defined in

12  the -- by the Federal Circuit in PSN v. Ivoclar.

13         The allegation that we have missed -- for some

14  reason the evidence has not shown that Newegg meets all claim

15  elements of the asserted claims in the patent, is quite wrong

16  actually.

17         I would like very briefly to point out to what

18  appears to be very scholarly -- by the defendants in laying

19  out why the all elements rule has been missed.

20         The first part is what the all elements rule is.  It

21  is listed on Page 2 of their opening brief.  And it says:

22  "Under the all elements rule, an accused product or process is

23  not infringing unless it contains each limitation of the

24  claim, either literally or by equivalent."

25         Subsequently, defendants have a rather scholarly

1    analysis as to why this limitation was not met in the Newegg

2    system.  And that analysis goes on very briefly on Page 4 in

3    which they say:  "System and method claims do not claim

4    action."

5            And responding here to Ms. Frost's allegation that

6    the BMC and the MuniAuction standards apply and that somehow

7    or other Soverain did not apply the BMS and MuniAuction

8    standards.  That is not correct, Your Honor.  BMS and

9    MuniAuction apply specifically to method claims and indicate

10   that all claim limitations -- all claim steps have to be

11   performed by a single party or someone under its direction and

12   control.  This is how they segue --

13           THE COURT:  And who performed all of the elements in

14   this case?

15           MR. SHENTOV:  Absolutely, Your Honor.  This is part

16   of our motion for JMOL of infringement of Claim 79, which is

17   the only method claim that is in question here.

18           I guess what -- the issue at the moment was about

19   the system claims.  As to the method claims, I believe, as the

20   evidence will show, that a single actor Newegg is performing

21   all step limitations of Claim 79.

22           But as to the claims of the '314 and '492 patent to

23   which Ms. Frost has just mentioned briefly, these are system

24   claims.  And the allegation is that for system claims we have

25   not been able to meet the all elements rule because of the

1    proposed standard -- or standard, rather, proposed by Newegg,

2    which I will get to just briefly in a second.

3            On Page 4 this is what they are saying:  By

4    contrast, system and apparatus claims by contrast to method

5    claims, they do not claim action.  Instead they claim

6    structure --

7            THE COURT:  I'm sorry.  I couldn't understand.

8            MR. SHENTOV:  System claims claim structure.  That

9    is fine.  I will skip a few lines.  Because system claims

10   concern structure, the concept supporting divided infringement

11   break down because the predicate act is missing.  There is

12   only structure.  Also agreed.

13           Put another way, absent legally relevant action

14   there is no basis to hold one entity vicariously liable for

15   another.  Again, agreed.

16           As such, applying agency principles to apparatus

17   system claims is simply nonsensical.  Also agreed.

18           Consequently, they say, unless an entity owns or

19   possesses all structural elements of an accused system, that

20   entity should not be liable for patent infringement even if

21   the accused system is infringing.

22           Your Honor, this is the basic premise of their JMOL

23   motion, and is fundamentally wrong.  It sounded scholarly.

24   There is an analysis of what method claims require in the BMS

25   standard and MuniAuction standard which specifically apply to

1    method claims.  Here we are talking about systems.

2              Here is the standard that they propose; own or

3    possess.  Your Honor, I submit that there is absolutely no

4    statutory basis for an "own or possess" standard for

5    infringement of a system claim.

6              And this actually permeated the entire brief.  It is

7    one of the grounds for which they assert Newegg does not

8    infringe.  It is one of the grounds on which they say there

9    was an error in Your Honor's charge to the jury.  They say it

10   is basically a reason for a new trial.  It is not, Your

11   Honor.  The "own or possess" standard is make up -- is made up

12   by Newegg as a way to avoid infringement.

13             I like to think of it as Newegg defining or

14   discovering, if you like, a new patent infringement vaccine.

15   It is like any time that a patent infringement is asserted

16   against them they claim, oh, divided actor infringement, you

17   don't own or possess that element or that element; we are

18   free; and there is no infringement.

19             That cannot be right, Your Honor.  There is no

20   statutory basis for ownership.  The only case that directly

21   addresses the question of own or possess is Level 3 which

22   specifically says ownership or possession is not required.

23             Now, turning to --

24             THE COURT:  Now, Ms. Frost, response?

25             MS. FROST:  Your Honor, my argument assumed for

1    today for the purposes of argument only that we are going to

2    look at the claim in the same -- through the same prism that

3    Soverain says we should.  I mean, we do agree that the

4    standard should be different than the one Soverain is arguing

5    for.  But just to simplify and to show the Court how

6    fundamentally flawed their position is, we have assumed the

7    correctness of that position; that the system as a whole

8    should be looked at.

9            Even assuming that we are wrong and they are right

10   that they should look at the system as a whole instead of a

11   MuniAuction approach, we still win because they failed to meet

12   the limitations of '314 and '492 that I just discussed.

13           THE COURT:  Okay.

14           MR. SHENTOV:  Not true, Your Honor.  What -- the

15   standard is basic for JMOL.  They have to show there was no

16   substantial evidence that would justify the jury's verdict of

17   infringement.  We have the jury look at the evidence, which

18   was presented at trial by Dr. Grimes, who looked at element by

19   element and it is spelled out in our brief.  I don't need to

20   repeat it.

21           But he had a detailed element-by-element

22   infringement analysis which concluded that each and every

23   limitation of the claim, including the modification limitation

24   and the plurality limitations, were specifically present in

25   the operation of the Newegg system.

1              This evidence was supported also by admissions and

2      by additional exhibits which we spelled out here.  Basically,

3      the standard for JMOL for them to prevail is that there was no

4      substantial evidence on which the jury could have decided in

5      favor of Soverain.  That is not true, Your Honor.

6              Basically, the argument now is they are saying,

7      well, Mr. Tittel said that the plurality limitation was not

8      present.  Mr. Tittel had a detailed discussion that -- the

9      doctrine of equivalents was not met.  He had a discussion that

10     the modification limitation was not met.  But guess what, we

11     had a countervailing substantial evidence by Dr. Grimes who

12     actually presented that each and every limitation, including

13     the plurality limitation and the modification limitations have

14     been met.

15             Briefly, on the modification limitation.  There was

16     a big deal in a trial -- there was a discussion as to whether

17     the modification, as Newegg claims the claim should read,

18     meaning that for each request to the -- to Newegg's system,

19     there has to be a modification in the database, well they are

20     doing it somewhat differently.  They are putting it in a

21     cookie.  The cookie contains all information about

22     modifications of the shopping cart by the customer.  And at

23     the end when the customer checks out, all of these limitations

24     are collectively put into the database.

25             There was ample evidence on this.  There were

1    discussions that -- there were actually rather interesting

2    animations that showed how even if their reading of the claim

3    is correct, then under the doctrine of equivalents the

4    modification limitation would have been met by the operation

5    of the Newegg system.

6           There is ample evidence on both sides, and basically

7    they are saying, well, we believe our expert and not their

8    expert.  That is not the standard for JMOL on which they can

9    prevail on JMOL.

10          THE COURT:  What is your response to their argument

11   that Newegg's customers do not directly infringe?

12          MR. SHENTOV:  Your Honor, first of all, the jury

13   found induced infringement.  And the jury was instructed by

14   Your Honor in the charge that to find induced infringement,

15   they have to have direct infringement.  And direct

16   infringement, the only other actor that is present in this

17   commercial interaction, is a Newegg customer.

18          The response to it, Your Honor, is that we have

19   extensive evidence which supported the fact that Newegg uses

20   the system, in fact, each and every element of the system, and

21   we also have substantial evidence that the Newegg customers

22   used the system.  And --

23          THE COURT:  But if there is -- if the evidence shows

24   that Newegg uses every element of the system, why did the jury

25   not find direct infringement?

```
 1              MR. SHENTOV:  They may have been confused, Your

 2    Honor.  The fact of the matter is that no reasonable jury

 3    could have --

 4              THE COURT:  Do you think we need a new trial where

 5    we can get an unconfused jury?

 6              MR. SHENTOV:  I think we are quite happy with the

 7    ruling of infringement under inducement theory.  The reason

 8    why in our motion we moved for a new trial under direct

 9    theories is in case they have a motion and in case they

10    prevail on their induced theory, we would like to move for new

11    trial on infringement.  Because the evidence generally says

12    that each element of the system is being used directly by the

13    Newegg customer.

14              And Dr. Grimes actually had specific evidence to

15    this effect.  It starts at Page 127.  Actually I think more

16    specifically, the use of the system was discussed between Mr.

17    Adamo and Dr. Grimes starting in the afternoon of the 26th,

18    roughly around Page 165 and so on.

19              There is ample evidence that the users of the Newegg

20    system put in place, to use Your Honor's expression in

21    Renhcol, they put the system in use by making a request.  Add

22    this thing to my shopping cart.  That is something in which --

23    that is an instance in which a message goes to the Newegg

24    system, the Newegg system responds to that message and creates

25    a cookie or a cookie string, which is returned back to the
```

1    user.  This is the user of the system.

2           Then subsequently when the user checks out, the user

3    also checks the payment part of the Newegg system.  Ample

4    evidence supports the fact that the Newegg customers directly

5    use the entire system.  Now --

6           THE COURT:  Response to that?

7           MS. FROST:  Your Honor, there is no sufficient

8    evidence that our customers use the system.  Fundamentally,

9    let me get back to my original point, which I think is, again,

10   fundamental to the understanding here.  Two elements of the

11   system, if you look at it as a whole, two elements of the

12   system are not -- two limitations are not met by anybody.

13          THE COURT:  All right.  Are you talking about the

14   plurality --

15          MS. FROST:  The plurality and the modifying.

16          THE COURT:  Well, we are talking about the customer

17   right now.  I want to hear your response on that.

18          MS. FROST:  It would be the same problem in any

19   infringement analysis because even if the customer did the

20   other elements -- certainly the customer doesn't modify --

21          THE COURT:  Well, you are arguing modification and

22   plurality, but I want to hear your response to his argument

23   that the customer does directly infringe all of the elements.

24          MS. FROST:  The customer -- well, the plurality --

25   with all respect, the plurality and modification limitations

 1    are not met by the customer either.  They really reside, if

 2    you will, on the Newegg side of this.

 3              THE COURT:  Okay.  We will get to those in a moment.

 4    I want to hear assuming that they are met.

 5              MS. FROST:  Okay.  All right.  Assuming they are

 6    met, there is still no evidence that -- no substantial

 7    evidence that the customers -- they may communicate with

 8    Newegg's computers, but they don't operate them.  The

 9    customers don't carry out the steps -- the elements of the

10    system.

11              THE COURT:  Well, are you going back to your "own or

12    possess" argument?

13              MS. FROST:  They use the system, but they don't --

14    and we think for --

15              MR. SHENTOV:  Exactly, Your Honor.  They use the

16    system.  I apologize.

17              MS. FROST:  Well, that is their argument, the

18    customers use the system --

19              THE COURT:  Does the customer use the system?

20              MS. FROST:  They claim we do.

21              THE COURT:  No.  I'm asking you, do they?

22              MS. FROST:  They don't use all elements of the

23    system claim.

24              THE COURT:  What elements do they not use?

25              MS. FROST:  Well, certainly, they don't use anything

1      that is on the Newegg side of the system, which would be part

2      of the Newegg servers, the Newegg system.  We have got the

3      customer initiating -- making the contact using the system

4      that is -- I am trying to indulge their analysis here.  Their

5      analysis, it is a whole system.  We don't think it should be

6      looked at that way.

7              But if you look at it that way, the customer

8      initiates the system to use it.  Newegg somewhat offers it for

9      use.  That is the way their "system as a whole" argument

10     works, as I understand it.  And we believe that the customer

11     does not -- with respect to the shopping cart claims -- the

12     hypertext statement is totally different.  But with respect to

13     the shopping cart claims, it is our position there is not

14     substantial evidence that the customer uses the system because

15     it -- the customer computer doesn't satisfy all of the

16     elements of the claim, the system claim.  So there can't be

17     direct infringement unless all of the elements of the claim

18     are satisfied.

19             THE COURT:  Response?

20             MR. SHENTOV:  I'm not sure that makes sense outside

21     the paradigm they defined of "own or possess."  That has been

22     their argument that because the user does not own or possess

23     the Newegg servers, they have nothing to do with it and

24     infringement is impossible as a matter of law.  That is a

25     fundamentally wrong position.  Ownership has never been

 1   required.

 2          Use of the system as a whole has been required, and

 3   I find it very strange that an operation which generates 2

 4   billion dollars in sales and now sort of says, oh, customers?

 5   What customers?  We don't care about what they do.  Of course,

 6   they do.  The customers are those that are driving the sales,

 7   and the fact that they own the computer, well, that is --

 8   their computer becomes part of the Newegg system at the moment

 9   they connect and they make a sale.

10          That is all of the requirements from the Federal

11   Circuit law, including NTP and Your Honor's decision in

12   Renhcol.

13          MS. FROST:  Your Honor, it is our position that when

14   two separately owned and operated computer systems communicate

15   via the Internet using an industry standard protocol such as

16   HTTP, that does not create a new system for purposes of

17   imposing infringement liability based on use.  There is no

18   case we are aware of that says it does.

19          MR. SHENTOV:  There is absolutely no Federal Circuit

20   law that supports their idea.  I have read the transcript of

21   the case in which Ms. Frost made that argument to Your Honor

22   saying that you should include a charge to the jury that the

23   system has to be owned and operated.  There is nothing like

24   that.  When pressed by Mr. Adamo, show me the Federal Circuit

25   case, there was an omission.  There is no such case.  Why?

1    Because it cannot be the right standard.

2           If "own or possess" is the right standard for

3    infringement under use, 271(a) use infringement, a system --

4    there will be swaths of patents that will become instantly

5    non-infringable in the patent -- that cannot be the intent of

6    the Federal Circuit.

7           NTP is actually quite clear in this regard because

8    while they did distinguish between method claims in which you

9    basically have an actor -- for each element of the step you

10   can point to a specific person and say this is the guy who did

11   the receiving step, this is the guy who did the processing

12   step.  You can assign whether the intent -- I'm sorry.  I

13   didn't mean intent.  You can assign whether these acts do or

14   do not meet the limitation of a system.

15          The MuniAuction case is pretty clear.  However, for

16   the purposes of system claim analysis, that breaks down.  NTP

17   told us that the analysis of system claims under use is

18   fundamentally different.  Why?  Because it is not done on an

19   element-by-element, on component-by-component limitation.  It

20   is done in the use of the system as a whole.  There is no

21   question in this case that the Newegg systems do use the

22   system as a whole.

23          THE COURT:  I think we are about to beat this to

24   death.  Any final word on that?

25          MS. FROST:  Your Honor, I just need to say with

 1    regard to Federal Circuit authority, it has been argued to you

 2    many times and I will not repeat it --

 3              THE COURT:  Thank you.

 4              MS. FROST:  -- NTP does not control this.

 5              THE COURT:  Would you -- all right.  What other

 6    points do you have on your JMOL on inducement?

 7              MS. FROST:  I have one more point on the hypertext

 8    statement.  But would the Court like to hear any argument on

 9    the modification and plurality points or rely on our brief?

10              THE COURT:  All right.  Go ahead.

11              MS. FROST:  I'm going to ask Mr. Baldauf to do that

12    since he knows that more intimately than I.

13              MR. BALDAUF:  Your Honor, I think the our position

14    is well set out in the briefing with respect to the

15    plurality.  I would like to just take one moment to speak

16    about modification.

17              I think this is very fundamental and very clear that

18    there was absolutely no evidence presented at trial that

19    either Newegg or its customers satisfied the claim limitation

20    of "to modify said shopping cart in said shopping cart

21    database."  This can't be an issue of equivalents.  The claim

22    is very clear that the shopping cart has to be modified in the

23    shopping cart database.

24              Now, Dr. Grimes did put together his nice little

25    chart.  This is Plaintiff's Exhibit P62B.  And it starts on

1   Page 14 and goes through Page 18.

2           That is it.  That is the entirety of their evidence

3   that they put on concerning the satisfaction of the

4   modification.  If one reads that evidence, it is nothing but

5   some language taken from Mr. Wu's deposition that does not say

6   anything about satisfaction of that limitation whatsoever.

7           So what happened, if you recall?  We crossed Mr.

8   Grimes.  I asked him how, how was this modified?  So for the

9   first time on cross-examination he said, well, what happens is

10  Newegg creates an instance of a shopping cart because they

11  take a shopping cart ID, put that into the shopping cart

12  database first, and then later put in the contents of the

13  shopping cart.  That shopping cart ID is in there first and

14  then it is modified when you put the contents of the shopping

15  cart in there.

16          What is an instance of a shopping cart ID?  I'm

17  sorry, the instance that you are talking about, the instance

18  of the shopping cart that he claims is the shopping cart ID?

19  To be an instance of a shopping cart you have to be a shopping

20  cart.  I asked him to take a look at the Court's construction

21  of "shopping cart," which is "the collection of representation

22  of products."  I point blank asked him, does the shopping cart

23  ID include these representations of products?  Of course, it

24  does not.  It is nothing but a counter.  It is nothing but a

25  number.  It has no fields.  There is nothing in it.  It is a

1    number.  It cannot be a shopping cart; therefore, it can't be

2    an instance of a shopping cart.  Case closed right there.

3              Beyond that, though, in our case in chief, Mr. Wu

4    and Mr. Tittel both clearly explained that regardless of what

5    is in that shopping cart ID, which again is just a counter,

6    it's just a number.  That is all that is in there.  They both

7    testified that is married to the contents of the shopping

8    cart, and together they are inserted only one time into the

9    shopping cart database.  That is it.

10             It is instatiated one time.  It goes from zero to

11   nothing.  There is nothing that is ever modified or changed

12   in that shopping cart database.  There is absolutely no

13   evidence to the contrary.  Well, everything -- the very little

14   that was in this Plaintiff's Exhibit 62B is nothing but a

15   farce, and doesn't say what Dr. Grimes says it says.

16             Thank you.

17             THE COURT:  Okay.  Response.

18             MR. SHENTOV:  I would disagree with Mr. Baldauf.  I

19   will try to locate a slide which Newegg used at trial.  But

20   basically what the evidence shows is that there is the

21   creation -- or rather the instantiation and the modification

22   of the shopping cart database happens in two steps.

23             In the first step when the customer clicks the

24   checkout button, a number is generated, created.  That number

25   is handed, and that number creates a sort of a holding space,

1    if you like, for a shopping cart in the database.  That is on

2    the left of the number, and I have the presentation somewhere

3    here.  So in case we need it, we will present it.  This was

4    their own illustration actually.

5             But it is a two-step approach.  In the first

6    approach you give a number to the shopping cart associated

7    with this particular customer who just clicked the checkout

8    button.  In the second instance, the content of the shopping

9    cart -- of the customer's shopping cart is put into the

10   shopping cart database with and -- in association with that

11   number.

12            So Your Honor's definition of what a shopping cart

13   in a shopping cart database is -- what to modify an instance

14   of a shopping cart in a shopping cart database --

15            THE COURT:  How was it modified?

16            MR. SHENTOV:  To modify, I think Your Honor's

17   definition is it is to change an instance of a shopping cart

18   in a shopping cart database.  And Your Honor specifically in

19   the -- in the -- it was I believe in the Amazon claim

20   construction order, you specifically indicated that the

21   shopping cart can have zero items, one item, or more items.

22   So the argument here that there is nothing, in other words,

23   the shopping cart of the user is empty at the time, well,

24   okay, it is interesting; but that still meets the Court's

25   definition of what it is to modify the shopping cart in a

1    shopping cart database.

2            THE COURT:  So you are saying it is empty and when

3    the customer transfers its cookie information over, then it is

4    modified?

5            MR. SHENTOV:  Correct.  It is -- all of the changes

6    happen at the same time.  And the jury heard the evidence from

7    their expert, they heard the evidence from Dr. Grimes.  There

8    is substantial evidence to justify -- to find that the

9    modification limitation in the claim has been met.

10           THE COURT:  Do you contend that the modification in

11   the customer's cookie constitutes satisfaction of that

12   element?

13           MR. SHENTOV:  I think that our theory, Your Honor,

14   again, the modification happens at the end when the customer

15   checks out.

16           THE COURT:  All right.  Response?

17           MR. BALDAUF:  Your Honor, this ignores the claim

18   language.  This ignores the claim's construction.  The claim

19   says you have to modify said shopping cart, and it has to be

20   modified in the shopping cart database.  So that means this

21   shopping cart has to be in the shopping cart database and

22   modified at that time.

23           Your claim construction, "modify" "to change an

24   instance of a shopping cart in the shopping cart database."

25   So that means that shopping cart has to be modified while it

 1    is in the shopping cart database.

 2              Let's talk about --

 3              THE COURT:  Well, let me ask you this --

 4              MR. BALDAUF:  Please.

 5              THE COURT:  -- I mean their argument is at the time

 6    you assign this identifier, you in essence have an empty

 7    shopping cart sitting there.  Do you agree with that?

 8              MR. BALDAUF:  No, it is absolutely wrong, and there

 9    is absolutely no evidence that satisfies that.  The evidence

10    was uncontradicted that you have a shopping cart ID.  It has

11    no fields -- first of all, the shopping cart ID cannot be a

12    shopping cart because the shopping cart has to be a stored

13    representation of the products.

14              This has nothing to do with the zero.  It has

15    nothing to do with anything.  It can never be a shopping cart

16    because it has no fields.  It has nothing to store information

17    of any kind.  It is nothing but a number.  That number is then

18    combined with the shopping cart, which is in the cookie,

19    together goes into the database at one time.  Never modified

20    in the shopping cart database.  They are just completely

21    ignoring the claim constructions --

22              THE COURT:  You may not have a particular section of

23    storage identified to that, but you have created at least a

24    pointer that something is going -- potentially going to be

25    stored there and right now nothing is there, don't you?

```
 1              MR. BALDAUF:  No, you have an empty shopping cart

 2    database with respect to this customer.  There is nothing in

 3    it; and at one time, at that time this -- the shopping cart

 4    contents and that shopping cart ID enter that shopping cart

 5    database at the same time.  There is no pointer.  There is

 6    nothing in that shopping cart database before that action

 7    takes place.

 8              THE COURT:  Response?

 9              MR. SHENTOV:  The response, Your Honor, is that the

10    evidence is uncontroverted that there is a two-step process.

11    Number one, you create an identifier.  That identifier

12    corresponds to the shopping cart in the cookie.  Then in the

13    second step you populate the database with the data from the

14    user's cookie.  And that data is associated with the shopping

15    cart ID.

16              We have never said the shopping cart ID is the

17    shopping cart because it is an ID, it is an identifier of the

18    shopping cart.  What is at the moment when the user -- at the

19    end after the user clicks the checkout button, what ends up

20    happening is that the customer's shopping cart ID in

21    association with the items that have been put into the

22    shopping cart, are made part of the shopping cart database.

23              And actually to respond to Mr. Baldauf's --

24              THE COURT:  Yeah, but what about the modification?

25              MR. SHENTOV:  Well, the modification is the claim
```

1    itself does not say at what point it has to happen.  And it

2    certainly doesn't say it has to happen on an item-by-item

3    basis.  This is the principal argument that in order to

4    satisfy the modification limitation you have to have -- for

5    each message, each item that is added to the shopping cart, it

6    has to be reflected in the database.  That is simply not true.

7    If you read the claim limitation it requires that the shopping

8    cart in the database be modified.

9            The modification, in our view, and in Dr. Grimes'

10   view, which was presented to the jury, was that the

11   modification happens at once at the moment with the entire

12   shopping cart is translated into the database.

13           THE COURT:  What is your response to their argument

14   that when the identifier is assigned, there is no empty

15   database there, so to speak, to be modified?  There is just an

16   identifier -- I think they are saying that there is not

17   modification, there is creation.

18           MR. SHENTOV:  It is an instantiation, I think.  That

19   is exactly Your Honor's definition of what "to modify" means.

20   It is to change an instance of a shopping cart in the

21   database.  And in that case when you associate a number with

22   the shopping cart content, item number, quantity, et cetera,

23   et cetera, that corresponds to modification of the database.

24   It just happens at one point.

25           MR. BALDAUF:  That makes absolutely no sense.  If I

1    just understood what you said, you said modification happens

2    at once --

3                MR. SHENTOV:  No.  The modification happens over

4    time.  The modification --

5                MR. BALDAUF:  Please.

6                MR. SHENTOV:  In each instance when you add an item

7    to the shopping cart, it is modified, your cookie is

8    modified.  What I am saying is the database is changed at once

9    at the end.  I'm sorry.

10               MR. BALDAUF:  The database is changed at once at the

11   end.  The claim specifically requires modify said shopping

12   cart in said shopping cart database.  So the shopping cart has

13   to be modified in the shopping cart database.  They admit that

14   only one time the contents of the cookie go into the

15   database.

16               To go back to the definition of "modify," "to change

17   an instance of a shopping cart in a shopping cart database."

18   Again, there is absolutely nothing, there is no shopping cart

19   in that database that can be changed.  They are pointing to

20   this shopping cart ID.  So to change an instance of a shopping

21   cart, something must -- they have to be calling something a

22   shopping cart that is already in that shopping cart database

23   that can be changed.

24               But the "shopping cart" definition is a stored

25   representation of a collection of products.  There is no way

1    that the shopping cart ID can constitute an instance of a

2    stored representation of a collection of products because,

3    number one, that shopping cart ID is not yet in that database;

4    and, number two, there is no technical way that it could ever

5    store a representation of products because it is nothing but a

6    number.

7           Their argument fails based upon the claim language

8    itself because it requires the modification in the database

9    and based upon the constructions.

10          MR. SHENTOV:  Your Honor, the jury heard the

11   evidence.  This is, by the way, the illustration that was

12   presented at trial by Newegg in which you can see an

13   illustration of the database in which to the right there is

14   this cart ID number; and then in association with the cart ID

15   number, you have the items.  Item number quantity, item

16   quantity, insert shopping cart.  Clearly, there is a shopping

17   cart in the shopping cart database.  And the population, if

18   you like -- the populating the instance of the shopping cart

19   happens at the checkout time, which is perfectly permissible

20   per the claim language and according to the evidence that Dr.

21   Grimes presented to the jury.

22          THE COURT:  Okay.  What was your point about this?

23          MR. SHENTOV:  Well, the point was that if you

24   look -- it is a two-step process, Your Honor.  On the left

25   they have labeled it "take a number."  And they take a

1    number.  But look at what happens in the database, that number

2    is there corresponding to a number of other items.  Maybe it

3    is a pointer, maybe it -- but the reality is that there is --

4    once the number is taken there is an association in the

5    database with the shopping cart.  And that shopping cart

6    instance is modified the moment when you populate those

7    entries with the item --

8              THE COURT:  I think we beat that one to death.  Do

9    you have anything further?

10             MR. BALDAUF:  I do not.  Are we done on that topic,

11   Ms. Frost?

12             MS. FROST:  On shopping cart, yes.

13             MR. BALDAUF:  Yes, I guess we will move to the

14   hypertext.

15             THE COURT:  All right.  Hypertext.

16             MS. FROST:  In our motion and supporting papers we

17   have several bases of non-infringement with respect to the

18   hypertext aspect of the claim -- of claim '492.  But I am

19   going to focus here on just one.  That is, that there is no

20   evidence whatsoever that anyone other than the plaintiff's

21   expert Dr. Grimes ever used this functionality on the system.

22             Under the ACCO Brands case there must be evidence of

23   actual infringing use or evidence that the accused

24   instrumentality necessarily infringes the patent for

25   inducement liability to obtain.

 1              There is no evidence here of actual infringement;

 2    therefore, there is no liability for inducement under the

 3    plain language of ACCO Brands.

 4              THE COURT:  Okay.  Response.

 5              MR. SHENTOV:  Very simply.  ACCO related to an

 6    instance in which there was an expert who was the only person

 7    who did, in fact, use the system; and they had to deal with

 8    locks.  These locks were described in the user manual in a

 9    non-infringing way.  So at the end of the day in the ACCO

10    case, the Court found that other than the expert, the

11    plaintiff's expert, no one had used it in an infringing way

12    because the manual, if you like, described a non-infringing

13    use of the product.

14              By contrast, the cases to which we cited in our

15    brief, Your Honor, particularly the Mass Engineered -- Your

16    Honor's case of 2009 -- and even more specifically a Federal

17    Circuit case in Lucent Technologies with Gateway.  First of

18    all, it permits evidence of circumstantial evidence of

19    infringement.

20              What is the circumstantial evidence of infringement

21    in this case is the fact that they have instructions to the

22    user as to how to use the hypertext statement system.  What

23    are these instructions?  They basically say, well, if you

24    would like to find out more about your transactions, go to the

25    transactions page.

1    At that moment, Your Honor, when the user goes to

2    the transaction page, he has already used the system in an

3    infringing way because that is all -- this is another system

4    claim.  As you recall, the '492 and '314 claims these are

5    system claims.  They relate to the capability of using

6    something.

7    And, I mean, I don't think the defendants here can

8    seriously contend that their users are not using their

9    transaction history statements.  Why else would they be trying

10   to design around things, as they are telling us?  In fact, it

11   is being used, and the circumstantial evidence which was

12   presented at trial that the manuals and the instructions which

13   Newegg provides to its customers actually specifically tell

14   them to do it in an infringing way.

15   That is the distinction between the ACCO line of

16   cases in which the manual basically described a non-infringing

17   way of the system; whereas, in Lucent, which is very similar

18   to our situation, in Lucent basically the court was in a very

19   similar situation that we have now.  There is circumstantial

20   evidence of infringing use.  Why?  Because the instruction

21   manual there suggests the use of the system in an infringing

22   way.

23   THE COURT:  All right.  Very good.

24   MS. FROST:  Your Honor, may I briefly respond to

25   that?

1          THE COURT:  Uh-huh.

2          MS. FROST:  There is no evidence whatsoever that

3    anyone used it in an infringing way here either.  The only

4    evidence was that Dr. Grimes used it.  So Soverain's point

5    about circumstantial evidence or otherwise is misguided.

6          Further, the cases they discussed, Lucent, Mass

7    Engineering produce distinctions without differences.  In

8    Lucent the instruction was only on infringing use.  In Mass

9    Engineering there was, as this Court is well aware, there is

10   no evidence of the advertising or other documents showing

11   non-infringing use, so the implication was that the

12   instruction was for infringing use.

13         Here there is no evidence whatsoever that Newegg

14   provided instructions for use one way or the other, frankly.

15   The only evidence Soverain can point to is the wholly

16   inadequate evidence that is from Newegg's website's help page

17   that tells visitors they can go to the order status page to

18   view their order status.  We have that instruction on the web

19   page if Your Honor would like to see it.  We can highlight it

20   maybe.

21         You are going to have to help me because my old eyes

22   can't read that far, and I don't have a monitor on up here.

23   Maybe Mr. Brean can read it into the record for you.

24         MR. BREAN:  Your Honor, the evidence cited by

25   Soverain is from Plaintiff's Exhibit P15, which is up here on

1    the screen.  And they point to the fact that on the Newegg

2    help page of its website, it simply says, "How can I check my

3    newegg.com order status online?"  It says, "Go to the order

4    status page."  That is the one and only instruction that

5    Newegg provides that would direct a customer in any way toward

6    order status or order history.

7              MS. FROST:  Thank you.

8              Your Honor, we submit that is absolutely

9    insufficient evidence to establish that we instruct the

10   customers one way or the other so that the ACCO case in any

11   way loses any of its significance for us.  We believe that the

12   ACCO case controls the outcome here and mandates a judgment as

13   a matter of law on non-infringement because there is no

14   evidence of inducement established under the precepts of that

15   case.

16             Newegg does not instruct its customers how to

17   navigate or activate any particular hypertext link to view

18   their transaction details as is required by the claims, and

19   there is no evidence of actual use by anyone other than Dr.

20   Grimes.

21             THE COURT:  All right.  Response?  Final word?

22             MR. SHENTOV:  Very quickly.  Actually, the Newegg

23   statement document itself has a -- the moment when the user

24   goes to the Newegg statement document, he has already made use

25   of the system.  And how you get to it is, you know, is -- how

1    they instruct the user to see their statement documents is

2    through the help page.  The help pages say go to click to a

3    particular button to see your order history.

4             The moment that the user clicks that particular

5    button and gets to the statement documents which has a listing

6    of its transaction history, the user has already made use of

7    the system.  This is exactly the way as it is in Lucent.

8             THE COURT:  All right.  Very good.

9             Anything further on Newegg's JMOL on induced

10   infringement?

11            MS. FROST:  No, Your Honor.  We will rely on what is

12   in the pleadings that we have for any further argument or

13   points that the Court would like to --

14            THE COURT:  Let's go to Soverain's JMOL on direct

15   infringement.

16            MR. SHENTOV:  I will be taking that one, too, Your

17   Honor.

18            THE COURT:  I'm dealing with the '314 and '492

19   still.  Then you can do the '639 after that or do them

20   together.

21            MR. SHENTOV:  There is a significant overlap, Your

22   Honor, between the argument that we had for direct

23   infringement of the '314 and '492.  It is basically

24   cross-motions --

25            THE COURT:  Okay.

 1            MR. SHENTOV:  As far as the system method claims are
 2   concerned, I think we already discussed that.
 3            So I would like to focus -- in this part of the
 4   discussion I would like to focus on Newegg's motion for
 5   judgment as a matter of law that Claim 79 of the '639 patent
 6   is infringed.
 7            MR. ADAMO:  He meant Soverain.  You said "Newegg."
 8            MR. SHENTOV:  I apologize.
 9            We are not taking the JMOL and trying to argue to
10   the jury lightly, Your Honor.  But I think in this particular
11   case in the analysis of -- in the infringement analysis of
12   Method Claim 79 of the '639 patent, in essence, the Court
13   should grant a judgment as a matter of law because no
14   reasonable jury could have found that the claim was not
15   infringed.
16            And I know this is sort of the phrase, but it is
17   very meaningful in this case.  I can put up the standard for
18   review.  And the Court should grant judgment as a matter of
19   law in a patent case when no reasonable jury could have found
20   that the claim was not infringed.  And also I put down,
21   because for evidentiary purposes the rules of the regional
22   circuit apply.  Under the Fifth Circuit law, entry of JMOL is
23   important if the evidence supporting the movement is
24   uncontradicted and unimpeached.  It is quite important, so I
25   would like to repeat it.  It is uncontradicted and

1      unimpeached.

2              The case -- actually the one that we cited, Medical

3      Care has an additional more relaxed standard as to when JMOL

4      would be important.  But I think the evidence in this

5      particular case is clearly uncontradicted and unimpeached.

6              Next slide.

7              We briefly touched upon the all elements rule in the

8      argument on the previous motion.  But, again, this is a

9      statement of the all elements rule, which is provided by the

10     defendant, by Newegg, in several of their briefs.  I actually

11     counted them.  They started in their 50(a) motion.  It is in

12     the 50(b) motion and a number of others.  This, Your Honor,

13     what is on the screen, is the correct statement of the all

14     elements rule.

15             Under the all elements rule an accused product or

16     process is not infringing unless it contains each limitation

17     of the claim either literally or by equivalent.  This is it.

18     There is no ownerships, there is no possession.  There is none

19     of that.  So let's see how this applies in the particular

20     instance of the evidence which was presented at trial for the

21     infringement of Claim 79.

22             Next one.

23             At trial, Your Honor, we had completely one-sided

24     evidence actually presented in some ways.  I will explain that

25     in more detail.  But we had Dr. Grimes testify in detail that

1    all limitations of Claim 79 are met by the operation of the

2    Newegg system.  So, as far as the all elements rule is

3    concerned the way that defendants have spelled it out for us,

4    all of the evidence shows that every single limitation of the

5    claim has been met.

6             And he further testified how all of the steps which

7    are recited in the claim are specifically performed by Newegg.

8    I have pointed here in the slide the transcript that starts

9    from roughly on the 26th in the afternoon from Page 157 to

10   about 165.

11            So the evidence -- substantial evidence was

12   presented by Soverain at trial that all of the elements of

13   this method claim have been met.  And in addition evidence

14   also showed that all of the steps recited in the claim are

15   performed by Newegg.

16            THE COURT:  I know Newegg didn't put anything on,

17   but what if the jury didn't buy what Dr. Grimes said and

18   discounted it, you still have the burden of proof.  What other

19   proof do you have?

20            MR. SHENTOV:  Your Honor, the proof is actually

21   that -- I believe the jury got confused actually.  And the

22   reason is not only that, you know, on their end they have no

23   evidence; but, in fact, what they did have, not evidence, but

24   attorney argument which I think was rather misleading in that

25   case, Counsel there repeatedly stated that Claim 1 of the '639

1    patent is the same as Claim 78, which is at issue here.

2            Now Claim 1 actually specifically has a limitation

3    in which the client is required to do something, and actually

4    let me...

5        (Pause in proceedings.)

6            Could you flip to Slide 7.

7            Your Honor, there were two instances in which I

8    believed the jury was seriously mislead, probably not

9    intentionally.  I'm not saying anything.  But I think the jury

10   got it wrong because by attorney's argument, the argument was

11   made that the limitation of Claim 1, which requires -- if you

12   look at the bottom left-hand corner it says the client storing

13   the session identifier.

14           This is an action which is performed not by Newegg.

15   We have admitted that.  It is performed by the client.

16   However, look at what the Counsel suggested in his examination

17   of Mr. Tittel.  They said it requires the client storing

18   session identifier for use in subsequent distinct requests.

19   Now, this limitation is also in Claim 78.  No, it is not.  One

20   of them specifically requires the client to do something, to

21   take an action.

22           We can point to somebody doing something.  What is

23   that act?  It is of storing the session identifier.  If you

24   look at the right-hand side, there is no action which is

25   required on the part of the client.  What is required is the

1   step of receiving.  What is to be received, then, is a session

2   identifier previously stored by the client.  That does not

3   require an action, contrary to virtually what the entire

4   argument in their brief says.  That is not an act which is

5   required on the part of the client.

6           I mentioned earlier that Newegg appears to think

7   that they discovered a patent infringement vaccine, which is

8   like the divided infringement actor.  In the context of method

9   claims, I think it goes something like this:  Any time you

10  mention a third party we cannot infringe because there is

11  third party involved here.  That is not what the laws says.

12          The law tells you to look at the claim elements, the

13  specific acts which are required.  And what is required in

14  this case is simply and only the act of receiving.  What is

15  being received then is in a compound modifier.  It is a

16  service request, and you have to look at the service request

17  and whether it has a session identifier.

18          When you look at the -- at what is being received

19  and the limitations of what -- of how this session -- I'm

20  sorry, that service request is described, if those limitations

21  are met, you are done.  The action has been done.  And what I

22  am saying, Your Honor, is that in this case all of the

23  evidence was that each individual claim element was there.

24  There is no rebuttal evidence.  Nobody said, no, we are not

25  meeting that limitation.

1          All of the controversy is whether the steps are

2     being met or not met.  And the fact is that in that regard,

3     the differences between Claim 1 and Claim 78 are very

4     distinct.  And I would like to point out to another --

5          THE COURT:  Before you go on, let me hear a response

6     to what you have said so far.

7          Ms. Frost.

8          MS. FROST:  Certainly, Your Honor.  I think Your

9     Honor hit the nail right on the head here.  The jury just

10    simply rejected Soverain's evidence about the way it thought

11    infringement was established.  This is a classic divided

12    infringement problem presented in the '639 patent with regard

13    to this claim.

14         This is a method claim.  This is not a system

15    claim.  We don't have to worry about whether divided

16    infringement problems are right or wrong.  The law is clear

17    under BMC divided infringement does apply to method claims

18    without question.  The jury verdict of no infringement should

19    not be disturbed.

20         The Court has heard the argument that it really

21    boils down to just this:  Besides, one, that I think that Your

22    Honor is precisely right on that the jury just didn't accept

23    their theory and they failed to meet their burden of proof,

24    and that is the jury verdict should not be disturbed, it also

25    boils down to an argument over whether Soverain is trying to

1    read language out of the claim or not.  They want to say that

2    Counsel's argument misled the jury somehow.  That is complete

3    speculation, first of all.

4              Second of all, it wasn't misleading.

5              Third, there wasn't any objection that we can find.

6              Fourth, it could have been cleared up if it was

7    somehow misleading, and wasn't, obviously, to the jury's

8    satisfaction.

9              Moreover and significantly as discussed in our

10   brief, there are two elements that are on the client's side

11   that have to be performed by the client, and they were not.

12             THE COURT:  Put the slide back up that was up --

13   your slide from a moment ago, if you would, that compares

14   Claim 1 and Claim 78.

15             MR. SHENTOV:  This one.

16             THE COURT:  Ms. Frost, let me ask you this:  Is it

17   your contention that claim -- and I believe it is 78 requires

18   action from the client rather than just receiving as they have

19   highlighted here in blue.

20             MS. FROST:  Yes, Your Honor.  It includes the

21   limitation of a service request to which a session identifier

22   stored at the client has been appended by the client.  This

23   also requires action by the client through the client

24   computer.

25             Indeed, Dr. Grimes testified as such.  He said, "The

1   identifier stored at the client has been appended by the

2   client.  That is the way the customer's browser works."

3          THE COURT:  Is that a claim element or is that

4   merely describing what you are receiving?

5          MS. FROST:  It is part of the claim, Your Honor.  It

6   has to be performed by the client in order for it to be

7   received.  So, yes, it is part of the claim.

8          MR. SHENTOV:  Yes, it is part of the claim.  It is

9   part of what you will receive.  And if you look at the service

10  request which has a session identifier appended by the client,

11  well, then the limitation is met.

12         THE COURT:  But let me ask you this, Ms. Frost:  If

13  Claim 78 does just require receiving, then is Soverain's

14  motion for JMOL good?

15         MS. FROST:  No, no, it is not --

16         THE COURT:  Why not?

17         MS. FROST:  -- it is not good.

18         The claim language itself expressly includes the

19  processing of service request from the client to the

20  server system --

21         THE COURT:  Now, you just --

22         MS. FROST:  -- which --

23         THE COURT:  Wait just a moment.  You tend to do

24  this, Ms. Frost.  I ask you a question and then you are

25  restating your earlier argument.  I said if the Court agrees

1    that receiving is the only element and that the client

2    preparing the service request is not, then is their JMOL good?

3    Could you answer that question for me?

4              MS. FROST:  Yes, Your Honor.  I am sorry.  I

5    certainly was intending to answer it.  What I was going to say

6    that unquestionably -- the service request from the client

7    unquestionably requires that the client customer sending the

8    service request.  Dr. Grimes and the jury agree, and this was

9    confirmed by Mr. Tittel.  So, yes, client customer -- client

10   computer action is required for Claim 78 to be satisfied.  So,

11   no, their JMOL is not correct.

12             THE COURT:  Response.

13             MR. SHENTOV:  Your Honor, this is like the patent

14   vaccine case.  Any time a third party is mentioned, then,

15   well, we have nothing to do with it.

16             I think there is a very similar situation, I believe

17   it is in the Level 3 case, in which the court basically

18   responds to an argument very similar to what Ms. Frost is

19   making now.  Said look this is -- we didn't invent customers.

20   The customers are there, and the description in the claim of

21   what is being done provides the context.

22             I think as part of our brief exchange, the

23   suggestion was made that we should have framed the claim

24   somewhat differently so that it only has reference to the

25   receiving entity.  And it would read something like, receiving

1    from thin air a service request.  Well, they will say the same

2    thing again.  The thin air is doing something to the request

3    and to meet the other limitation.

4         The fact is that we have complied -- we, Soverain --

5    in drafting the claims have complied with the requirements

6    spelled out in BMC.  BMC expressly says if you don't like to

7    have a divided actor problem, structure your claims in such a

8    way that only one party is on the receiving end or on the

9    giving end.  That is exactly what we did here, and I think

10   this illustration shows it rather clearly.

11        When we juxtaposed the two claims, I mean one of

12   them unquestionably requires the client to do something.  The

13   other one doesn't.

14        THE COURT:  Response.

15        MS. FROST:  Yes, Your Honor, two.  First of all, I

16   think that their argument is hyperbolic, and certainly it is

17   not the way the law would have it come out here.  Method

18   claims can be infringed by a third party in two ways.

19        One, if the claims are drafted directed to use to

20   one party's action or used by one party or based on vicarious

21   liability.  Neither of those things are present here.  They

22   didn't establish vicarious liability under BMC.  The jury was

23   instructed on it; and as the Court aptly noted it, the jury

24   did not agree with them and rejected their evidence.  They

25   didn't satisfy their burden under vicarious liability.  The

1    claims are not drafted -- could have been drafted differently,

2    and they were not.  With respect --

3            THE COURT:  Do y'all really -- are you really

4    arguing a claim construction issue at this point as to whether

5    receiving includes some action by the client or whether

6    receiving is just receiving?  Did you raise that in claim

7    construction?

8            MR. SHENTOV:  No.

9            MS. FROST:  No, I don't believe it was raised in

10   claim construction, but I will be corrected by Mr. Baldauf if

11   that is wrong.

12           MR. SHENTOV:  You may recall that defendants waived

13   their claim construction hearing.  We were supposed to be here

14   on May 28th, and that issue has never been raised.

15           THE COURT:  Was that issue ever joined under the

16   Patent Rules.

17           MR. SHENTOV:  No.

18           MS. FROST:  Your Honor, we don't believe --

19           MR. SHENTOV:  If you don't mind --

20           MS. FROST:  Excuse me.

21           MR. SHENTOV:  -- I can also show you the next

22   instance in which the jury could have potentially been misled

23   because sometime later in the context of invalidity, Newegg's

24   Counsel said Claim 78 and 79 are virtually identical to Claim

25   1, and there was a side bar in which Mr. Giannetti to the

1  qualification of Claims 78 and 79 as being virtually identical

2  to Claim 1, and that objection was sustained by Your Honor.

3          MS. FROST:  Your Honor --

4          MR. SHENTOV:  I appreciate that we should not

5  disturb jury verdict if there was any evidence, but there was

6  no evidence that any of the claim elements were met.  It is

7  pretty clear that potentially the jury got confused between

8  Claim 1 and Claim 78.

9          THE COURT:  Are you asking for JMOL on this issue or

10  new trial?

11          MR. SHENTOV:  Yes, Your Honor, we are asking for

12  JMOL and the new trial.  Conditionally if Your Honor rules for

13  us on this issue and it is reversed or remanded for some

14  reason, we ask conditionally under Rule 50 for a new trial.

15          In terms of the new trial on the question of

16  liability for the '639 patent, as you know, Your Honor, we

17  have also requested a new trial on damages -- since the jury

18  didn't find any liability on the '639 patent, it didn't even

19  get to the question of damages.  There is -- under 28 U.S.

20  Code 1292(c)(2) I believe, Your Honor, this issue -- or all of

21  the issues which are on appeal can go up on appeal except for

22  accounting.

23          So, in other words, what we are saying that, yeah,

24  an issue of new trial on the '639 patent is probably

25  appropriate; but we believe that it may be considered

1   following the return on appeal of all of the other issues.

2            THE COURT:  Okay.  Anything further on the '639?

3            MS. FROST:  Just one brief response, Your Honor.  We

4   don't believe that this is a claim construction issue at all.

5   Moreover, the concern that they have raised, if anything,

6   would go to the weight, not with respect to anything else.  So

7   we don't believe a JMOL is appropriate.  All limitations in

8   the claim are meaningful.

9            They want to read that limitation out.  Claim 78

10  doesn't focus on one entity, and it requires the combined

11  actions of both.  Absent vicarious liability there is no way

12  they can recover legally under this claim.  So the jury

13  verdict should be sustained.

14           THE COURT:  Okay.  Thank you.

15           All right.  Let's see.  All right.  We have pretty

16  well dealt with everything.  I guess -- we have dealt with all

17  the infringement and non-infringement issues now?

18           Would you like to touch briefly on your invalidity

19  JMOL?

20           MS. FROST:  Happy to, Your Honor.  And very

21  briefly.

22           Specifically, Newegg contends that the asserted

23  claims of the patent are -- or the patents, the '314 and '492

24  are invalid as a matter of law.  Claims 35 and 51 of the '314

25  patent were anticipated by the CompuServe Mall.  Claims 35 and

1    51 of the '315 patent and Claim 17 of the '492 patent were

2    obvious, based on the CompuServe Mall alone or in combination

3    with Gifford and the knowledge of one of ordinary skill.

4              Claims 41 and 61 of the '492 patent were obvious

5    based on Gifford and the knowledge of one of ordinary skill.

6    Claims 60 and 79 of the '639 patent were obvious based on

7    Gifford and Johnson either alone or in combination along with

8    the knowledge of one of ordinary skill.

9              And to the extent we raise some additional

10   invalidity grounds in our Rule 50(a) motion, those are

11   incorporated into our 50(b).  I don't want to take up a lot of

12   time today on this motion.  It is fully briefed, we believe,

13   but those are the basic points.

14             THE COURT:  Any response?

15             MR. SHENTOV:  I don't have much to add other than I

16   believe Your Honor ruled perfectly correctly that the

17   obviousness case they presented to the jury was so weak that

18   it didn't even have to go to the jury.

19             As far as the anticipation case, the evidence is

20   quite clear that in no instance did the defendant present not

21   a single piece of prior art which recited all elements of the

22   claim.  The evidence is very clear on this that anticipation

23   was even a close case to even present to the jury.  We believe

24   that Your Honor was right then and would be right now to deny

25   this motion.

```
 1          THE COURT:  Okay.  All right.  Newegg's JMOL on

 2   damages, motion for a new trial or remittitur.  Do you wish to

 3   be heard on that, Docket No. 406?

 4          MS. FROST:  Yes, Your Honor, I would, very briefly.

 5   Again, there is quite a bit in our motion, but I am going to

 6   focus on one point this morning, if I may, that I think is

 7   very significant.  That is, that Soverain had no evidentiary

 8   support for a use-based running royalty.  In fact, this issue

 9   is of paramount importance not only to the JMOL itself but

10   also to any post-verdict or post-judgment motions that the

11   Court is going to entertain today.

12          The only evidence that -- of damages that was

13   properly before the Court was that coming from our expert Mr.

14   Bakewell.  I'm not going to go in, again, to the detail of our

15   Daubert motions or any of the other bases for why Mr.

16   Nawrocki's opinions are not reliable and not competent to

17   support a damage award simply because we have been over those,

18   we have heard them, but also in respect of the Court's time

19   today.

20          But it is apparent that the only evidence that is

21   competent at all to support damages is that presented by Mr.

22   Bakewell and, therefore, we moved for JMOL that the damages

23   awarded, if any, should not be more than what Mr. Bakewell

24   testified to would be an appropriate paid-up lump sum royalty

25   for all three patents, and that is $500,000.
```

```
 1              THE COURT:  What about if the jury thought a lump

 2    sum was appropriate but thought it was two-and-a-half million?

 3              MS. FROST:  Your Honor, that is our second

 4    alternative argument.  We do not believe that damage verdict

 5    would be appropriate.  It is excessive.  But for the purposes

 6    of considering only the post-verdict post-judgment relief that

 7    is being sought here today, we believe the only way, for the

 8    same reason that a lump sum royalty is the only royalty that

 9    could be awarded, that the jury's award itself should be

10    considered as a lump sum royalty, too.

11              THE COURT:  All right.  Anything further on that

12    one?

13              MS. FROST:  Your Honor, we can -- since that is the

14    only evidence that was presented was the lump sum, that is the

15    only kind of royalty -- damage award that can be, we will rest

16    on our papers --

17              THE COURT:  Let me ask you this --

18              MS. FROST:  -- for the rest of the argument.

19              THE COURT:  What about the fact that the jury

20    greatly discounted, if they did believe it was a running

21    royalty, if the two-and-a-half million does represent a

22    running royalty, that they just greatly discounted Soverain's

23    expert's 80 cents per transaction to a little more than 8

24    cents per transaction?

25              MS. FROST:  We believe, Your Honor, that suggests
```

1    that they actually credited it as a lump sum, not as a running

2    royalty.  But I am not sure I understand the question if I am

3    assuming it is a running royalty.  Are you asking me what

4    significance do we show to that?

5              THE COURT:  Right.

6              MS. FROST:  Well, it shows certainly with regard to

7    any post-judgment remedy, it certainly is relevant.  The jury

8    thought that the damages were very, very small.  And also the

9    fact that it is a round number, again, we believe shows it is

10   more like a lump sum as opposed to just a simple reduction in

11   a running royalty.

12             THE COURT:  Juries tend to think in round numbers.

13             MS. FROST:  This one is kind of interesting, Your

14   Honor.  This one happens to be five claims at $500,000, which

15   happens to be our expert's proof of a lump sum, which seems to

16   be potentially more than just coincidental.

17             THE COURT:  Response?

18             MR. SATINE:  Your Honor, to begin -- I will be

19   brief.  There was evidence concerning running royalties.  With

20   respect to the Divine licenses, there was evidence concerning

21   the Odimo license which was based on 85 cents per transaction.

22   It was a lump sum paid on this running royalty component.

23   There was the System Optic's license, which was a license

24   which ran from 2000 through 2002.  10 percent of gross sales

25   for that period was calculated.

```
 1              The defendant argued that the Transact Software
 2    license was a non-infringing alternative.  The jury heard
 3    evidence of the Transact license with respect to Corel, which
 4    had transaction fees of up to 25 cents per transaction.  There
 5    was evidence upon which a jury could find a running royalty.
 6              What the jury did, we can all speculate.  Could they
 7    have discounted Mr. Nawrocki's estimation, it is very
 8    possible?  It is one thing I have speculated with.  They
 9    simply discounted it and granted us 10 percent and then
10    rounded up, which would give us the 2.5 million.  We do not
11    know what the jury did.  But certainly for the purposes of the
12    JMOL, there is a reasonable basis for the jury to have said
13    this was a running royalty and for us to conclude that what
14    the jury did is provide a running royalty.
15              THE COURT:  Thank you.  Anything further on that
16    one?
17              MS. FROST:  We just need to make clear that we
18    strongly and fervently dispute the fact that there was
19    evidence of anything use-based that was done by Soverain or by
20    Newegg.  There is no evidence of a use-based royalty here.
21    All of the licenses including --
22              THE COURT:  No evidence of what?
23              MS. FROST:  Of a use -- of a running royalty or
24    use-based royalty that was present in either Newegg's
25    licensing practices or any of the licenses that were in
```

1    evidence presented by Soverain.  All of the licenses included

2    lump sum license fees for use of the technology and are to be

3    properly considered as lump sum licenses and not running

4    royalty.

5              I will refer the Court to the Bakewell declaration

6    with respect to our response to Soverain's motion for

7    permanent injunction or ongoing royalties.  If the Court would

8    like to see a summary of that evidence reprised in that

9    testimony, it is in the declaration.  It makes that point very

10   plain.

11             THE COURT:  We will take up Soverain's motion for

12   permanent injunction or ongoing royalties, Docket No. 403 will

13   be next.

14             Mr. Adamo?

15             MR. ADAMO:  Yes, sir.

16             Your Honor, the briefing has been very complete, I

17   think, on our post-verdict request for relief.  I don't want

18   to go back over things that the Court and its staff have

19   read.  But we have satisfied all four of the necessary

20   criteria in a post-eBay world for this Court acting within its

21   discretion to award permanent injunctive relief here with

22   respect to Soverain Software.

23             Your CSIRO case, Your Honor, is very informative in

24   this area --

25             THE COURT:  Are you a research institute?

1          MR. ADAMO:  You don't have to be under CSIRO, Your

2    Honor.  You didn't say that in CSIRO and the United States

3    Supreme Court didn't say it in eBay.  That is not a condition.

4          THE COURT:  And you say Soverain's business is its

5    licensing program?

6          MR. ADAMO:  A predominant part of the business is

7    its licensing program.  As you heard Ms. Wolanyk testify and

8    her declarations that have been provided either in response to

9    Newegg's opposition or in support of our position, have

10   demonstrated they have a bifurcated business at the time the

11   technology was acquired in the manner that Your Honor was

12   aware of.

13         The concept that you heard Mr. Roth have Ms. Wolanyk

14   testify to the jury was they wanted to buy the Transact

15   business.  They wanted to buy the Transact product.  They have

16   supported it.  They have continued to try to advance that

17   product, but they also have in parallel engaged in a licensing

18   program.

19         As a result of the competitive conditions which Ms.

20   Wolanyk has testified about, the predominance of the cash flow

21   into the company over time has been from the licensing

22   program; but as Ms. Wolanyk also repeated, the hope is that

23   the licensing program is going to fund and help support the

24   continued growth of the Transact product.

25         I would note, only because I lived with this for a

1    number of years, that while Texas Instruments had a huge

2    licensing program for a number of years, and in fact, it is a

3    matter of public record the company probably survived for

4    years as a result of the licensing program, they continued to

5    market product or attempt to market product that competed with

6    the people that they were trying to license.  It is not a very

7    dissimilar situation here.  Of course, Soverain Software is no

8    TI, but it is a similar circumstance.

9            THE COURT:  Okay.

10           MR. ADAMO:  So CSIRO, Your Honor -- the point of

11   reminding the Court of CSIRO, is you recognized irreparable

12   harm to a licensing program as sufficient evidence to support

13   a permanent injunction.

14           So we have not only got irreparable harm to the

15   licensing program in the John Hopkins case, which we have

16   cited in our briefing, Trans Ocean Offshore explains how

17   compulsory licensing when you have got a licensing -- ongoing

18   licensing program evidences irreparable harm to the licensing

19   program.  The case precedent is replete with support for

20   irreparable harm to a licensing program coming from a

21   compulsory license.

22           But we also have the traditional circumstance here

23   proved up by the Newegg Mall product that there is, in fact,

24   competition between the Transact side of Soverain Software's

25   business and what Newegg does with respect to the Newegg

1    Mall.  So that is the more traditional, classical source of

2    direct competition evidence which tends to be relied upon for

3    evidence of irreparable harm.  It is damage that is not

4    quantifiable.

5             And the fact that in your i4i case against Microsoft

6    there was a point made in Newegg's I think it was the

7    surreply, Your Honor, that Transact is just a small

8    competitor.  Well, the point that you made in i4i was, so

9    what?  Small competitors just because they are small aren't

10   barred from requesting permanent injunctive relief if they can

11   prove up what they need to prove up.  i4i was minuscule in

12   concept and in size to Microsoft, but that in and of itself

13   didn't lessen the right to injunctive relief.

14            THE COURT:  Okay.  Thank you.

15            Response on the injunction.

16            MS. FROST:  Yes, Your Honor.  First of all, with all

17   respect to Mr. Adamo, Soverain hasn't even come close to

18   satisfying the four elements required under eBay to achieve an

19   injunction.  They hang their hat on CSIRO, but it won't hold

20   it.  In fact, the case undermines Soverain's entire position.

21            One of the points that I was going to make, of

22   course, is the one that Your Honor made.  They have no basis

23   to liken themselves to a research institute.  The facts with

24   regard to a research institute and research institutions enjoy

25   a unique status is that the Supreme Court pointed out in eBay.

1    Certainly what the eBay court was trying to do is say there is

2    no categorical limitation on who can and cannot get injunctive

3    relief, but certainly it did not say that if being a research

4    institution is a condition but certainly being a research

5    institution elevates and puts a company in a different class

6    or status than Soverain sits currently.

7         Perhaps even more significantly than that, Your

8    Honor, is one of the things that you pointed out in the CSIRO

9    opinion itself distinguishing that case from the case we have

10   here.  In words, in fact, that could have been written of this

11   case, the court said -- it pointed out in Justice Kennedy's

12   concurrence in eBay, he instructed courts to be cognizant of

13   the nature of the patent being enforced and the economic

14   function of the patent holder when applying the equitable

15   factors.

16        Justice Kennedy was particularly concerned with

17   situations like this when the patented invention is but a

18   small component of the product that the companies seek to

19   produce, and the threat of an injunction is employed simply

20   for undue leverage and negotiations.  Legal damages in such a

21   case may well be sufficient to compensate for the

22   infringement, and an injunction may not serve the public

23   interest.

24        Your Honor, likewise, in the z4 Techs case made a

25   similar observation which is equally apt here.  That is, the

1    technology there was a small component of Microsoft software,

2    and the infringement did not hinder or exclude z4's sales or

3    licensing of its product.  The right to exclude becomes more

4    urgent when the product is the invention.

5            In the CSIRO case, as Your Honor observed, the '069

6    patent there was the core technology involved in IEEE standard

7    802.11.  Buffalo Techs' infringement related to the essence of

8    the technology and was not a small component.  Here the only

9    evidence is that the technology at issue is a small

10   component.  In fact, only one percent of the lines of code

11   that Newegg developed could be possibly even linked to it in

12   any way.

13           So this case is so different from CSIRO, and

14   Soverain has tried to map its arguments today on CSIRO, but

15   they are polar opposites.  CSIRO compels a conclusion

16   different from the one Soverain seeks and, in fact, the one

17   Newegg seeks, which is an injunction is not appropriate.

18           Certainly, I could go through the bases and I will

19   just hit very superficially on them.  They are in our brief.

20   But Soverain's claim of irreparable harm is contradicted by

21   numerous established facts in the case.  Soverain and its

22   predecessors have repeatedly acted inconsistently with the

23   right to exclude by extensively licensing the patents both to

24   online retailers like Newegg and others.

25           Soverain has offered to license Newegg.  Soverain's

1   patents' licensing practices have focused on obtaining

2   monetary objectives rather than non-monetary objectives like

3   cross- licensing.  This is a factor that courts consider

4   significant.

5           Soverain made no effort during the two-and-a-half

6   years the suit was pending to seek a preliminary injunction

7   against Newegg or the other defendants.  eBay, of course,

8   found that significant.

9           The shopping cart functionality, as I mentioned, is

10  but one of numerous features of the accused system and

11  represents a minuscule portion of the code.

12          With respect to the issue of whether they are

13  competitors or not, Soverain's claim is completely

14  unsupported.  Transact does not compete with the Newegg Mall.

15  Indeed, there is no evidence that Transact is presently a

16  viable commercial product at all.  Soverain hasn't been able

17  to sell it to a single new customer since it acquired it in

18  2003.

19          There is no admissible proof that Transact's failure

20  is the result of any infringement by others, nor has Soverain

21  made any effort to exclude any more likely causes for it.

22          I'd like to ask the Court at this point to consider

23  a motion to strike that we have pending because that will

24  guide me in any further response that I need to make with

25  respect to this issue.

 1              In particular, part of the proof that Soverain has
 2    attempted to put in the record here in support of their motion
 3    for injunction is the declaration from Ms. Wolanyk.  We have
 4    moved to strike various portions of that declaration because
 5    they contain inadmissible conclusions that either Ms. Wolanyk
 6    is not competent to testify about because she is not an expert
 7    or because she has no basis for giving the opinion and they
 8    are, therefore, unsupported conclusions.
 9              THE COURT:  Thank you.  Anything --
10              MR. ADAMO:  May I respond?
11              THE COURT:  Yes.
12              MR. ADAMO:  If the Court will indulge me quite a bit
13    further.
14              THE COURT:  Okay.
15              MR. ADAMO:  Ms. Wolanyk's testimony is admissible
16    under Federal Rule of Evidence 702 -- I'm sorry.  701, excuse
17    me, Your Honor.  It is not 702 through 705 evidence.  We
18    explained that in great detail in our opposition brief and
19    gave particular examples.  There is also a Fifth Circuit case
20    that is right on point that a business person in a senior
21    position, such as Ms. Wolanyk, has even more 701 leeway than
22    might a low-level employee.
23              In response to the eBay-based CSIRO-based attack,
24    huh?  Mr. Justice Kennedy did not cabin who gets and who
25    doesn't get injunctions.  They were doing concurrences.  He

1    stated a point of view.  And I guess if he had persuaded the

2    rest of the court that eBay should be read the way my

3    colleague said it should be read, Bilski, which was just

4    handed down yesterday written by Justice Kennedy, would have

5    taken these type of patents and blown them into the wind.

6            There is no restriction in eBay at all that a person

7    who is licensing, unless they are a research institution,

8    can't ask for injunctive relief.  That is just wishful

9    thinking.  It is not the law.  It is not what Mr. Justice

10   Kennedy wrote, and the rest of the Court obviously didn't take

11   it that way or Bilski would have come out differently

12   yesterday than it did.

13           The shopping cart is de minimus.  That is not what

14   Mr. Wu testified about, that is not what the jury heard about,

15   and it is one percent of the code?  My heart is, what, maybe 2

16   percent of my body weight.  Tear my heart out, and I will drop

17   dead on the spot.

18           THE COURT:  Promise?

19      (Laughter.)

20           THE COURT:  Go ahead, Mr. Adamo.

21           MR. ADAMO:  Try to take the shopping code out of

22   that system right now, and they have got no business.  28

23   million transactions are gone.  As Counsel for Newegg

24   testified, they would have to start building stores.  Even

25   they can't build stores that fast.  Just because it is one

1    percent of the code doesn't count for anything.  It is, what

2    does the infringement here, what portion, what part of their

3    system does it make up?  It is the heart of the system.  I

4    think during the closing arguments I said it is like running

5    your engine without spark plugs.  It is a similar situation

6    here.

7         The fact that there has been previous licensing by

8    Soverain -- eBay, 547 U.S. at 393.  Baden Sports which,

9    granted, is a Western District of Washington case; but that is

10   Microsoft's home base says that doesn't per se bar permanent

11   injunctive relief.  And we have gone through this in great

12   detail in the opposing papers.

13        I will note, Your Honor, that there are a number of

14   statements in the surreply brief about cases supposedly

15   holding this and Soverain supposedly making certain

16   admissions.  These statements are inaccurate.  Several of

17   their cases I checked, they don't support what they are cited

18   for.

19        But more to the point, Dr. Grimes hasn't made or Mr.

20   Shamos haven't made any admissions regarding things that are

21   alleged design-arounds which aren't ripe for adjudication at

22   this point, are or are not within the scope of the claims.

23        They address different situations.  The

24   design-around memo that was mentioned in the surreply, the

25   question there was, was it an acceptable non-infringing

1    substitute?  All Dr. Grimes knew about at the time was enough

2    to say, no, it is not acceptable; but he didn't know enough

3    about how it worked.  That is as far as any admission went.

4              THE COURT:  Thank you.

5              Let me hear your alternative argument on ongoing

6    royalty.

7              MR. ADAMO:  Well, it is a compulsory license.  So,

8    plainly, it is not the remedy that we seek, for all of the

9    reasons we have noted because we don't get to set the

10   conditions, et cetera.  So it is not an alternative in the

11   sense of either/or; it is an alternative in the sense of,

12   well, if we are not going to get the one at least we don't go

13   home empty-handed, and they don't get a free ride for the next

14   five years.

15             This argument, by the way, that the jury's

16   two-and-a-half million dollars runs to the end of the life of

17   the patents which have got five more years to run, is just

18   wrong.  The record doesn't support that.  You charged the jury

19   that damages stopped at the time of verdict.  It was only a

20   two-and-a-half-year period.  So something has to happen for

21   the next five years.

22             Paice III, now Chief Judge Folsom, the situation in

23   Paice/Toyota, similar circumstance.  What was done, it was the

24   analysis done very similarly to what Mr. Nawrocki did, took

25   the lump sum as Judge Folsom -- Chief Judge Folsom said there

1   was no way to tell exactly how they got to the lump sum.  But

2   acting as if it was based on a running royalty, was

3   appropriate.  Our calculation was done.

4          He, however, emphasized that failing to consider the

5   party's changed legal status would create incentive for every

6   defendant to fight every patent infringement case to the

7   bitter end.  It goes without consideration of changed legal

8   status.  There is essentially no downside to losing.

9          Since April they have been willful infringers.  And

10  they have apparently planned to continue to be willful

11  infringers for some indeterminate period in the future.

12         The status has changed markedly.  2001 versus 2010,

13  this isn't Newegg Open Market anymore back in the days when

14  Newegg was just starting and Open Market was staggering.  This

15  is now Newegg Soverain software with a very successful

16  licensing program.  Newegg is the second largest online

17  retailer.  They are still projecting six percent

18  profitability.

19         Their S-1, Exhibit P245, acknowledges the importance

20  of the technology; and that any effects on changing the

21  technology would be terribly risky, et cetera, et cetera.  We

22  have been very conservative in the suggestion of what the

23  minimum running royalty should be.

24         We demonstrated -- Mr. Nawrocki explained how the

25  calculation was done.  Chief Judge Folsom was much more

1    expansive.  He started with the 25 percent rule and gave Paice

2    a far more substantial amount of money.

3            In the surreply, there was a statement that, well,

4    you never get more than the design-around as a royalty.  Mars,

5    Inc. v. Coin Acceptors, 522 F.3d 1359-1373, Fed Circuit 2008.

6    As a matter of law, reasonable royalty damages are not capped

7    at the cost of implementing any cheap, available, acceptable

8    non-infringing alternative.

9            So what we have done here is we have taken the Paice

10   III case's guidance.  Mr. Nawrocki has arrived at a fair --

11   frankly, in my view, Your Honor, a beyond-belief fair 20 cents

12   per transaction going forward.  And we believe that is

13   supportable both under the law and under just business common

14   sense.

15           This, as Mr. Wu said -- and I used this during

16   closing argument -- the shopping cart in their system is very

17   important to the customer satisfaction, to the enjoyment of

18   the shopping experience.  It is the heart of their system.

19   You don't get the heart cheap.

20           THE COURT:  Okay.

21           MR. ADAMO:  And you don't get it for free.

22           THE COURT:  Okay.  Thank you.

23           Response?

24           MS. FROST:  Yes, Your Honor.  I am going to start,

25   if I may, quickly to respond on my motion to strike.  We do --

1    even looking at the evidence with respect to Ms. Wolanyk's

2    testimony or declaration under 701, she is still not qualified

3    on technical matters nor has Soverain ever argued that she is.

4    Because each of the statements in her declaration serves to

5    defend or attempts to defend technical or scientific subjects,

6    she is not qualified to offer expert testimony on them.  So we

7    think that the particular paragraphs of her declaration that

8    we have identified, should be stricken.

9          Specifically, the software necessary or critical to

10   the functioning of any e-commerce system which she testifies

11   to in her declaration is a technical issue.  She is not a

12   programmer or network specialist, and she is no more qualified

13   to testify that the patents-in-suit are necessary for

14   e-commerce than she is about anything else technical.

15         Nowhere in her declaration does she explain why or

16   how Newegg's alleged infringement has interfered with

17   Soverain's licensing efforts as they alleged.  The mere

18   statement of that conclusion without supporting facts, isn't

19   evidence.  And, further, her statements that other parties are

20   infringers and the non-accused websites infringe, are simply

21   attempts to offer an infringement opinion which she is not

22   qualified to make.

23         The case that Mr. Adamo refers to, the Versai

24   Management case is totally distinguishable there.  The

25   business owner was testifying about his company's business

 1    interruption losses.  It didn't involve any scientific or

 2    technical issues but only the owner's personal familiarity

 3    with the operation of his own company, so that case is

 4    completely inapposite, and we would request that the Wolanyk

 5    declaration be stricken, particularly with regard to

 6    Paragraphs 5, 7, 8, 10, 12, and 14.

 7                  MR. ADAMO:  May I respond?

 8                  THE COURT:  Yes.

 9                  MR. ADAMO:  Just very briefly.  When Ms. Wolanyk

10    said in her declaration and spoke of the criticality of

11    software, the spin from Newegg is, well, it has to be a

12    technical discussion.  The entire tenor of her declaration why

13    it is proper under 701 and why the Fifth Circuit case is not

14    only not inapposite, it is supportive is because she was

15    speaking of critical software from a business competitive

16    e-commerce space background.  That is her experience.  That is

17    her skill.

18                  And if we were trying to use her to work in

19    technical opinions here, you would have thought our briefing

20    would have quoted her declaration and tried to make hay out of

21    it in that forum, and it absolutely doesn't.  What she said in

22    the context of how the declaration was used is proper 701

23    testimony, Your Honor.

24                  THE COURT:  Okay.  All right.  Thank you.

25                  Let's go to Soverain's motion for pre-judgment

 1   interest costs.

 2          MS. FROST:  Your Honor, I'm sorry.  That was just my

 3   response to the motion to strike.  I will be very brief.  I

 4   have a response to his ongoing royalty argument.

 5          THE COURT:  Okay.  All right.

 6          MS. FROST:  As well as --

 7          THE COURT:  Okay.

 8          MS. FROST:  With respect -- to go back, actually I

 9   want to just point out that Mr. Adamo's straw-man argument

10   about Justice Kennedy's opinion, that's not our argument --

11          THE COURT:  Let's go on to your ongoing royalty.

12          MS. FROST:  Will do, Your Honor.  Happy to move on.

13          For the reasons we stated earlier today in our

14   motion for JMOL and in our response to the motion for

15   injunction or ongoing royalties, we submit that the jury's

16   verdict should be construed as a lump sum so that no ongoing

17   royalty or post-verdict or post-injunction damages are

18   appropriate in any case.

19          If you look at an ongoing royalty, though, there is

20   a -- and we have attached the declaration of Chris Bakewell to

21   our response which we would ask the Court to consult for this

22   purpose as to what we believe an appropriate ongoing royalty,

23   if one were to be awarded, should be, it is certainly quite

24   different from and much more reasonable than the one posed by

25   Mr. Nawrocki.

1           There has been a change in legal status; and as

2    Paice commands the courts to consider, the circumstances must

3    be viewed in light of the present day as opposed to those that

4    existed at the time of the original hypothetical negotiation

5    in 2001.

6           In the present day we do not have -- I must take

7    issue with Mr. Adamo's statement that we have evidence of a

8    successful licensing program by Soverain.  Unless one

9    considers their litigation strategy and their litigation

10   licenses, they have had no successful licensing strategy

11   whatsoever with respect to non-litigation licenses.

12          Further and more significantly, I would like to

13   point out -- and this is what we did bring the witnesses to

14   talk to Your Honor about, if Your Honor would permit us to

15   present any evidence at this point -- and I do apologize to

16   Mr. Adamo to the extent an apology is necessary.  I did not

17   realize that any notice needed to be given.  I thought it was

18   sort of standard operating procedure.  I did.  And I didn't

19   expect any notice from him either, in light of that.

20          But be that as it may, I want to make plain that the

21   fact that Newegg has a design-around here that we are prepared

22   to present evidence to Your Honor on, and that is in evidence

23   discussed in our declarations so the Court can look at the

24   papers.

25          THE COURT:  Okay.  I will look at your declaration.

1          MS. FROST:  The design-around represents a specific

2    changed circumstance that the Court should consider with

3    respect to ongoing royalties because it does reflect that the

4    mindset, at least, of Newegg should not be properly considered

5    as that of a willful infringer under any circumstances.

6          I must say I am not aware of a case specifically

7    like this one where the design-around is actually being

8    implemented at this point in the proceedings, but it is.  One

9    of the design-arounds is actually already in effect, the one

10   on the hypertext statement; and the other one is to be

11   implemented at the end of July.

12         So whether the Court -- irrespective of what the

13   Court does with respect to entering an ongoing royalty, the

14   fact that we are trying to design around, which is our

15   absolute right, should be probative of the state of mind of

16   the infringer.

17         Let me talk a little bit about the ongoing royalty

18   itself though and why we think that the 20 cents that Nawrocki

19   posits and that Soverain argues for is excessive.

20         THE COURT:  I take it you think you are going to be

21   successful in the design-around, so if you are, then the

22   injunction issue and the ongoing royalty becomes moot, doesn't

23   it?

24         MS. FROST:  Certainly, Soverain admits that if we do

25   successfully design around that we do not have to be bound by

1   any injunction or that any ongoing royalty is owed.  But I

2   would say that I would be surprised if they were going to not

3   contend, as is their burden, that our design-around was not

4   more than colorably different.

5           THE COURT:  Have you shown them your design-around

6   or planned design-around?

7           MS. FROST:  We certainly made it -- we provided them

8   the description of it with some detail in the declarations,

9   yes.

10          THE COURT:  Okay.

11          MS. FROST:  That is why we thought, frankly, that

12  the parties would be prepared today to discuss this issue.

13  This isn't an ambush.  It is laid out very clearly here.  We

14  just thought oral testimony would be useful.

15          THE COURT:  All right.  Anything further?

16          MS. FROST:  The design-around -- if an ongoing

17  royalty is entered -- or ordered, we believe that the maximum

18  it should be would be -- we have three alternative maximums.

19  One is the cost of the design-around, which if Mr. Wu were

20  permitted to testify he would testify that it was

21  approximately $35,000.

22          And the Mars case that Mr. Adamo cites is

23  distinguishable in the sense that it says reasonable royalty

24  damages at the Georgia-Pacific 1 determination shouldn't be

25  more than the cost of the design-around.  That case dealt also

1    with a situation where the Court was trying to say that an

2    infringer shouldn't be able to go do a design-around that was

3    somehow ineffective in some way and cap their damages in the

4    case by doing that.  That is not at all what we have here.

5    So we believe that the cost of the design-around of 35,000

6    could be a maximum.

7            In the alternative, if we use the point .088

8    starting point -- or 88 cents a transaction starting point,

9    that Mr. Nawrocki used, then any use-based royalty for the

10   alleged future infringement should be no greater than that

11   amount because the various changed circumstances here

12   effectively cancel each other out and give no basis for the

13   Court to enhance or otherwise -- I'm sorry 8.8 cents, not 88

14   cents.  If I said that, I misspoke.

15           Anyway, the very changed circumstances effectively

16   cancel each other out, so there is no basis for an enhanced or

17   higher post-verdict or post-judgment award than in ordinary

18   cases.

19           And, finally, even if Soverain could obtain a

20   use-based royalty for alleged future infringement, our final

21   position -- and this is all laid out in Mr. Bakewell's

22   declaration -- that the royalty should be one-and-a-quarter

23   cents per hundred dollar transactions involving purchase

24   transactions of two or more products for the shopping cart

25   claims and for actual use of the hypertext statement feature

1    for the hypertext claims.  These bases are for what, we

2    submit, would be an appropriate ongoing royalty if one were

3    entered are all in Bakewell's declaration, which the Court can

4    read.

5              Finally, I would like to add that Judge Folsom, as I

6    understand it, applied in the Paice case the 25 percent rule

7    to the profits from the invention there, not from the total

8    profits, which is what Soverain is asking for here.

9              MR. ADAMO:  Your Honor?

10             THE COURT:  Yes.

11             MR. ADAMO:  Briefly?

12             THE COURT:  Okay.

13             MR. ADAMO:  The 20 cents was based, as all of Mr.

14   Nawrocki's analysis have been based, on the 28 million

15   transactions despite Newegg's never-ending attempts to try to

16   get me or someone on my side to admit we are using the entire

17   market value.  We haven't been.  We aren't and he didn't.

18             Mars, Inc., holds exactly what I just told the Court

19   it held.  And I just read into the record language directly

20   quoted from Page 1373 of the decision.  You don't get to cap a

21   running royalty situation by saying that you have got some

22   sort of a design-around.

23             Now, on the subject of the design-around, I will

24   accept this misunderstanding about the allowability of ambush

25   in Your Honor's Court and in the Eastern District of Texas.

1    But I can guarantee you, despite my occasional over-emotional

2    statements, I understand the Rules.  And I don't ambush

3    people.  If I come in here today looking to put somebody on

4    the stand, they would have known about it a week ago.

5            This is totally an ambush now because now I can see

6    where we are going here.  You are not supposed to consider Mr.

7    Nawrocki's approach or the case law that says a running

8    royalty after verdict when a person is a willful infringer can

9    appropriately be more because, oh, they have got a

10   design-around in place.  Says who?  I have not seen it.

11           What I saw were two declarations totally

12   uninformative to our experts.  We gave you the responsive

13   declarations.  And a footnote in a brief written and signed by

14   a lawyer that says there is a hypertext design-around in

15   place, I haven't a clue as to what they have done.  Not a

16   clue.

17           THE COURT:  Okay.

18           MR. ADAMO:  I have no idea what they are or aren't

19   going to do with respect to the shopping cart, but they have

20   just told you we can't do it until July.  What are we supposed

21   to do during July while the rest of the industry is watching

22   this case?  Are we just supposed to say, yeah, sure, go ahead.

23   Don't tell us what you are going to do.  Tell the Judge that

24   he can't do anything in the interim.  He can't put an

25   injunction on because we have designed around, and he can't

1    take into consideration that we are a willful infringer.  To

2    get any fair price in the interim we are supposed to wait the

3    next two months, then what?  I'm still not going to know what

4    they allegedly did.

5             Yes, there is a case out of this district by

6    Magistrate Judge Love that says that once it attaches

7    properly, we are the ones as the patent owners who have to

8    deal with the attempts to design-around, and we have the

9    burden of proof in demonstrating that the design-around

10   doesn't avoid the injunction.

11            But the way that usually works in my understanding,

12   Your Honor, is you put the injunction on now.  If they are so

13   sure they have got a design-around, then there plainly can't

14   be any injury to them if you put the injunction on now.

15            Their opposition based on harm to them or harm to

16   the public, should go away.  Then we will bring a contempt.

17   We will get the necessary discovery.  We will certainly make

18   an application to you to get the necessary discovery so I can

19   find out what is really going on and have my experts look.

20   I'm no expert in this area, and I'm a lawyer.  My testimony

21   isn't worth a darn.

22            THE COURT:  Counsel, what about that?  What if we

23   just agreed to an injunction going into effect August 1?  Then

24   if they are not satisfied, then y'all can fight it out.  If

25   they are, then go at it like that.

1          MS. FROST:  The injunction they are seeking, Your

2    Honor, is far, far broader than anything they would ever be

3    entitled to, number one, on the record and the evidence and

4    the findings of the jury here.  But they are attempting to

5    enjoin the entire Newegg system.

6          There are three different Newegg sites they are

7    trying to enjoin, and they have even added a fourth one that

8    there wasn't even any evidence of before the jury.  So any of

9    the injunctive relief that they are seeking here, is

10   completely overbroad and unjustified --

11         THE COURT:  I don't guess y'all have gotten together

12   and tried to discuss some type of an agreed injunction, have

13   you?

14         MS. FROST:  No, we have not.  To the extent only

15   here -- I would like to point out and direct the Court to

16   Docket 412, Pages 14 through 15.  I just don't want the record

17   to be left with the impression that this is something we have

18   really snuck up on Soverain with.  We made plain on 14 and 15

19   about the impact of the design-around that we are proposing,

20   on the royalty.

21         THE COURT:  Okay.  Thank you.

22         All right.  Anything further?

23         MR. ADAMO:  Just one last point.  In i4i v.

24   Microsoft, August 11th, 2009, it must have been the hearing

25   and the order which Your Honor considered and awarded

1     permanent injunctive relief in that case.  You granted an

2     injunction prohibiting Microsoft from selling Microsoft Word,

3     the entire program where the infringing feature was a small

4     portion of the program.

5             The relief that we have asked for here is no

6     different.  The system was proved to infringe.  The system is

7     what ought to be enjoined.  As we have said in our papers,

8     Your Honor, of course, how the Court might think that the

9     injunctive order ought to be framed in the exercise of your

10    discretion, we certainly would be as cooperative with you-all

11    or opposing Counsel as you might instruct us to do.  We are

12    not trying to overreach here.

13            THE COURT:  Okay.  Thank you.

14            MR. ADAMO:  Thank you, sir.

15            THE COURT:  Now, with regard to Soverain's motion

16    for pre-judgment interest and costs and post-verdict damages

17    and post-judgment interest, anything to argue on that?

18            MR. SATINE:  Your Honor, we are prepared to stand on

19    our papers.

20            THE COURT:  Ms. Frost, do you stand on your papers?

21            MS. FROST:  Yes, Your Honor.  I would just point out

22    that the pre-judgment interest we think should be --

23            THE COURT:  What about post-verdict damages?

24            MS. FROST:  Again, I think with the exception of

25    what is the correct amount of the judgment, there is no

```
 1   dispute; and we would agree that, as I read the papers, there

 2   is no dispute between the parties as to how to do that.

 3              THE COURT:  Very good.  Anything further?  I think

 4   we have pretty well covered everything, haven't we?

 5              MR. SATINE:  Yes, Your Honor.

 6              THE COURT:  All right.  Ms. Frost, anything further?

 7              MS. FROST:  Only just to point out we have a

 8   difference about the post-verdict damages and what they should

 9   be.  It is 966.67 per day as set forth in our papers.

10              THE COURT:  All right.  Very well.

11              Mr. Adamo?

12              MR. ADAMO:  Nothing further for us, Your Honor.

13   Thank you very much.

14              THE COURT:  Thank y'all very much.  I'll get you a

15   ruling as soon as I can.

16              I guess nobody is interested in going back to

17   mediation; is that correct?

18              MR. ADAMO:  Somehow, Your Honor, I think your

19   rulings will probably provide another jumping-off place for

20   another session.

21              THE COURT:  All right.  Very well.  Be adjourned.

22         (Hearing concluded.)

23

24

25
```

1                  C E R T I F I C A T I O N

2

3       I certify that the foregoing is a correct transcript from the

4       record of proceedings in the above-entitled matter.

5

6

7       /s/ Shea Sloan

8       SHEA SLOAN, CSR, RPR
        OFFICIAL COURT REPORTER
9       STATE OF TEXAS NO. 3081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25